# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------------------x

In re        :    Chapter 11

XERIUM TECHNOLOGIES, INC., <u>et al.</u>,[1]    :    Case No. 10-_____ (   )

          Debtors.    :    Joint Administration Requested

---------------------------------------------------------------------------------x

## DECLARATION OF STEPHEN LIGHT IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Stephen Light, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the President, Chief Executive Officer and Chairman of the Board of Directors of Xerium Technologies, Inc. ("<u>Xerium</u>"), which is incorporated in Delaware and headquartered in North Carolina. On the date hereof (the "<u>Commencement Date</u>"), Xerium, together with certain of its direct and indirect subsidiaries (collectively, the "<u>Debtors</u>") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

2. As President, Chief Executive Officer and Chairman of the Board of Directors of Xerium (the "<u>Board</u>"), I am familiar with the day-to-day operations, business and

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number or its foreign equivalent) are: Xerium Technologies, Inc. (8674), Huyck Licensco Inc. (0434), Stowe Woodward Licensco LLC (4459), Stowe Woodward LLC (4102), Wangner Itelpa I LLC (3561), Wangner Itelpa II LLC (3562), Weavexx, LLC (7969), Xerium Asia, LLC (3367), Xerium III (US) Limited (4460), Xerium IV (US) Limited (4461), Xerium V (US) Limited (4462), XTI LLC (6754), Xerium Canada Inc. (0003), Huyck.Wangner Austria GmbH (0323), Xerium Germany Holding GmbH (3219), and Xerium Italia S.p.A. (0150). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 8537 Six Forks Road, Suite 300, Raleigh, North Carolina 27615.

financial affairs, and books and records of the Company. Prior to joining Xerium in February, 2008, I served as President and Chief Executive Officer of Flow International Corporation.

3.     I submit this declaration (the "<u>Declaration</u>") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Debtors' chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court on the Commencement Date (the "<u>First Day Pleadings</u>").

4.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration and I am authorized to submit this Declaration on behalf of the Debtors.

5.     Part I of this Declaration provides a description of the Company's business, corporate history, organizational structure, significant indebtedness, and capital structure. Part II describes the circumstances giving rise to the commencement of the Debtors' chapter 11 cases. Part III summarizes the First Day Pleadings and the relief sought therein, which the Debtors believe is crucial to their successful reorganization.

## I.     DESCRIPTION OF THE DEBTORS

### A.     The Debtors' Businesses

6.     The Debtors, together with their non-Debtor subsidiaries and affiliates (collectively, the "<u>Company</u>"), are a leading global manufacturer and supplier of two categories of consumable products used in the production of paper products (the "<u>Clothing Segment</u>") and

roll technology products (the "<u>Roll Covers Segment</u>") installed in paper-making machines. The Clothing Segment consists of engineered synthetic textile belts, which range in size from 15 feet in width to more than 460 feet in length, that allow for the extraction of water while transporting paper through a paper-making machine. The Roll Covers Segment encompasses the covering and servicing of large metal rolls (up to 50 feet in length, six feet in diameter, and 140,000 pounds) upon which paper machine clothing products are often mounted and between which paper travels as it is processed from a "wet slurry" to a finished paper product. Both paper machine clothing and certain rolls are in constant contact with paper as it is produced and have a significant effect on the paper's quality and the paper producer's ability to differentiate its products. Because paper-making machines vary widely in size and design, the Company customizes clothing and roll covers to each individual paper-making machine. Paper machine clothing and roll covers must be replaced regularly to sustain high quality paper output and to ensure efficient paper production. Rolls and roll covers also require regular refurbishment, a service that the Company provides to its customers.

7. The Company's customers include paper and container manufacturers, such as International Paper Company, MeadWestvaco Corporation, and Smurfit-Stone Corporation. The Company's key competitors include Albany International Corporation (a publicly-held U.S. corporation), Voith AG (a privately-held German company), and Metso Corporation (a publicly-owned Finnish company).

<u>The Clothing Segment</u>

8. The Company manufactures three general types of clothing products that are utilized at various stages of the paper making process: forming fabrics, press felts, and dryer fabrics, which accounted for approximately 43%, 40%, and 6%, respectively, of the Clothing Segment's net sales in 2009. Forming fabrics receive wet paper slurry and allow water to drain

from paper stock in order to create an initial wet sheet. Press felts carry paper through the paper pressing process and facilitate water removal. Dryer fabrics are used to transport a paper sheet through the drying section of paper-making machines. The Company's Clothing Segment also produces certain consumable products for industrial filtration markets used in other (non-paper) industrial applications, such as steel, plastics, leather, fiber, cement, and textiles manufacturing, sales of which accounted for approximately 11% of the Company's net clothing sales in 2009. Finally, sales of certain auto-joining equipment accounted for approximately less than 1% of the Clothing Segment's net sales in 2009.

9.      The Company operates its Clothing Segment primarily through two brands: Weavexx, in North America, and Huyck.Wangner, outside North America. In North America, clothing products are manufactured by Xerium's domestic operating subsidiary Weavexx, LLC and by Xerium Canada Inc. Outside North America, clothing products are manufactured by various worldwide operating subsidiaries operating in Germany, Austria, Italy, Spain, Argentina, Japan, and Brazil under the Huyck.Wangner name. The Company purchases and resells clothing manufactured by selected third party producers to specific third tier paper producers in Asia.

The Roll Covers Segment

10.     Paper-making machines contain large steel cylinders known as rolls over which paper machine clothing is mounted and between which paper travels as it is processed. Paper-machine rolls are covered with roll covers comprised of rubber, polyurethane, composite, or ceramic compounds, depending upon the specific function of the roll. The Company manufactures, refurbishes, and replaces roll covers through the Roll Covers Segment. Sale of roll covers accounted for approximately 55% of total sales in the Roll Covers Segment in 2009. Roll cover refurbishment and mechanical services accounted for approximately 18% of total

sales in the Roll Covers Segment in 2009. The Company also produces and repairs "spreader rolls," which are small-diameter curved rolls used throughout a paper-making machine to stretch, smooth, and remove wrinkles from the paper and clothing. Sales of spreader rolls accounted for approximately 27% of sales in the Roll Covers Segment in 2009.

11. The Company operates its Roll Covers Segment worldwide under the brand name Stowe Woodward, and within China, under the additional brand name Xibe. Roll covers are manufactured by certain of Xerium's Debtor and non-Debtor subsidiaries operating in the United States, Canada, Germany, Finland, France, Italy, Brazil, China, and Mexico. The Company produces and distributes spreader rolls worldwide under the brand name Mount Hope, and in Europe, under the brand name Robec.

**B. Corporate History and Organizational Structure**

12. The Company grew out of the holdings of United Kingdom industrial conglomerate BTR, plc ("BTR") and traces its U.S. origins to the late 1800s. In 1976, BTR acquired two Massachusetts-based producers of roll covers and spreader rolls, Stowe Woodward, Inc., the predecessor to Stowe Woodward LLC ("Stowe Woodward") (the U.S. Stowe Woodward operating entity), and Mount Hope Machinery. Stowe Woodward was founded in the late 1800's as a manufacturer of rubber-covered balls and ebonite bowling balls, as well as rubber covers used to protect the steel rolls used in the textile and tannery industries. In 1980, BTR acquired two paper machine clothing producers: Huyck Corporation in upstate New York, one of the oldest machine clothing companies in the United States, and the Becker Company of West Germany. BTR quickly began to act as an industry consolidator, acquiring paper machine clothing manufacturers in Finland, Brazil, Italy, and Canada, among other locations. Over the course of the 1990s, BTR continued to increase its paper machine clothing and roll covers

capabilities by implementing targeted global acquisitions and investing in cutting edge research and development.

13.     In 1999, BTR was acquired by Siebe, plc, and the resulting company, which took the name Invensys, plc ("Invensys"), became the world's largest controls-automation company. Invensys sold a 90% stake in BTR's paper technology segment to certain funds managed by Apax Partners in 1999, which incorporated the business as Xerium. Xerium continued to drive the trend of industry consolidation by acquiring additional clothing and rolls businesses in the early 2000s, including holdings in Germany and Italy. Currently, Xerium is the direct or indirect parent of 45 worldwide subsidiaries. The Debtors' corporate organization chart is attached hereto as Exhibit A.

14.     On May 19, 2005, Xerium completed an initial public offering (the "IPO") and a reorganization. In connection with the IPO, Xerium entered into a credit facility and repaid approximately $752.5 million of principal and interest on its previously existing senior bank debt, mezzanine bank debt, and certain non-interest bearing shareholder notes. Today, approximately 51% of the common stock of Xerium is owned by Apax WW Nominees Ltd. and Apax-Xerium APIA LP.

**C.      Significant Indebtedness and Capital Structure**

Credit Facility

15.     Xerium is party to an Amended and Restated Credit and Guaranty Agreement, dated as of May 30, 2008 (as amended from time to time, the "Credit Facility"), by and among Xerium; XTI LLC ("XTI"), a Delaware limited liability company; Xerium Italia S.p.A. ("Xerium Italy"), an Italian società per azioni; Xerium Canada Inc. ("Xerium Canada"), a New Brunswick (Canada) corporation resulting from the amalgamation of Stowe-Woodward/Mount Hope Inc. and Weavexx Corporation; Huyck.Wangner Austria GmbH

("Xerium Austria"), an Austrian limited liability company (formerly known as Huyck Austria GmbH); and Xerium Germany Holding GmbH ("Xerium Germany"), a German limited liability company, as borrowers, certain subsidiaries of the borrowers as guarantors, various financial institutions and other persons from time to time, as lenders, and Citicorp North America, Inc., as administrative agent and collateral agent (the "Administrative Agent").

16.     The Credit Facility consists of (i) a $50 million revolving credit facility (the "Prepetition Revolver") and (ii) seven term loans with an aggregate original principal balance of $650 million (the "Prepetition Term Loans").  The Prepetition Revolver matures on November 19, 2011, and the Prepetition Term Loans mature on May 19, 2012.   As of January 1, 2010, $28.1 million was outstanding on the Prepetition Revolver, and $583.6 million was outstanding on the Prepetition Term Loans.   Each of the Debtors is a borrower or a guarantor under the Credit Facility.  The U.S. Debtors guarantee all obligations under the Credit Facility.[2]   The non-U.S. Debtors guarantee only the non-U.S. obligations under the Credit Facility.[3]

17.     To secure the obligations under the Credit Facility, pursuant to that certain Pledge and Security Agreement, dated as of May 19, 2005, and pursuant to other collateral documents, certain Debtors granted the lenders a security interest in, and continuing liens on, substantially all of such Debtors' assets.

Derivative Financial Instruments

---

[2] The U.S. Debtors include Xerium, Huyck Licensco Inc., Stowe Woodward Licensco LLC, Stowe Woodward LLC, Wangner Itelpa I LLC, Wangner Itelpa II LLC, Weavexx, LLC, Xerium Asia, LLC, Xerium III (US) Limited, Xerium IV (US) Limited, Xerium V, and XTI LLC.

[3] The non-U.S. Debtors include Xerium Canada, Xerium Austria, Xerium Germany, and Xerium Italy.

18.     Xerium enters into derivative financial instruments to manage exposures that arise from business activities that result in the receipt or payment of future known cash amounts, the value of which are determined by interest rates or foreign exchange rates.  Such instruments include certain interest rate swaps to hedge variable interest related to the Credit Facility and foreign exchange contracts to protect the value of certain assets and obligations.

19.     With respect to the interest rate swaps, (a) Xerium was counterparty to that certain Confirmation, dated as of November 16, 2007, by and among Xerium and Deutsche Bank AG ("DB"), with an original notional amount of $132,808,000; (b) Xerium Canada was counterparty to that certain Confirmation, dated as of November 17, 2007, by and among Xerium Canada (as successor-in-interest to Weavexx Corporation) and DB, with an original notional amount of C$27,233,000; (c) Xerium Canada was counterparty to that certain Confirmation, dated as of November 17, 2007, by and among Xerium Canada (as successor-in-interest to Stowe-Woodward/Mount Hope Inc.) and DB, with an original notional amount of C$35,908,000; (d) XTI was counterparty to that certain Confirmation, dated as of November 17, 2007, by and among XTI and DB, with an original notional amount of €77,723,000 (collectively with the interest rate swaps referenced in clauses (a) thorough (c) above, the "DB Swaps"); (e) Xerium was counterparty to that certain 1992 ISDA Master Agreement (Multicurrency – Cross Border) and Schedule, dated as of November 16, 2007, and that certain Confirmation, dated as of November 19, 2007, in each case, by and among Xerium and Merrill Lynch Capital Services, Inc. ("MLCS" and together with DB, the "Swap Counterparties"), with an original notional amount of $132,808,000; and (f) XTI was counterparty to that certain 1992 ISDA Master Agreement (Multicurrency - Cross Border) and Schedule, dated as of November 16, 2007, and that certain Confirmation, dated as of November 19, 2007, in each case, by and among XTI and

MLCS, with an original notional amount of €77,723,000 (together with the interest rate swap referenced in clause (e) above, the "MLCS Swaps").  The Debtors' obligations under the DB Swaps were unsecured, and the Debtors' obligations under the MLCS Swaps were secured by certain prepetition collateral, ratably with the Debtors' obligations under the Credit Facility.  As more fully described in Section II(C) below, the DB Swaps and the MLCS Swaps have been terminated.

Unsecured Lines of Credit

(a)     R&D Facility

20.     As of December 31, 2009, Xerium Austria has outstanding borrowings in an amount equal to €1.2 million pursuant to four unsecured term loans from Österreichische Forschungsförderungsgesellschaft mbH (Austrian Research Promotion Agency (FFG)) ("R&D Facility Lender"), the national funding institution for applied industrial research in Austria (each term loan, a "R&D Facility").  Each R&D Facility loan agreement requires Xerium Austria to use loan proceeds for specified research and development projects and in instances of default, Xerium Austria must assign to the R&D Facility Lender all receivables derived from the specified research and development projects.

21.     Each R&D Facility bears interest at rate of 2% per annum, which is subsidized by the Austrian government, and the facilities have maturity dates of June 30, 2011, September 30, 2011, September 30, 2011, and March 31, 2014.

(b)     Umbrella Facility

22.     Pursuant to that certain Umbrella Facility Agreement, dated as of July 15, 2008 (the "Umbrella Facility Agreement"), by and among Xerium Technologies Limited ("Xerium UK"), as borrower, and DB, as lender, Xerium Austria, Xerium Italy, and Xerium Germany draw funds under a Guarantee Facility (defined below) and/or a Margin Facility

(defined below). The "Umbrella Facility" consists of a (i) €3,000,000 revolving credit facility that may be used for general corporate and working capital purposes, (ii) €1,000,000 guarantee facility that may be used through indemnities or bank guarantees (the "Guarantee Facility"), and (iii) €1,000,000 margin facility that may be used in connection with foreign exchange transactions (the "Margin Facility"). In connection with the Umbrella Facility Agreement, non-Debtor Xerium UK provided a guarantee in the amount of €5,000,000 that permits companies, for which Xerium UK is indirectly or directly the majority shareholder, to execute bank guarantees under the Guarantee Facility and to execute foreign exchange contracts under the Margin Facility. As of January 1, 2010, Xerium Austria, Xerium Italy, and Xerium Germany have been allocated for use portions of the Margin Facility and the Guarantee Facility in the amounts of €100,000, €0, and €0, respectively.

### D. Selected Financial Information

23. For the fiscal year ended December 31, 2009, the Company generated, on a consolidated basis, $500.1 million in net sales. As of December 31, 2009, the Company reported, on a consolidated basis, total assets of $693.5 million and total liabilities of $813.2 million, including approximately $640.1 million of debt.

## II. KEY EVENTS LEADING TO THE DECISION TO COMMENCE THE VOLUNTARY CHAPTER 11 REORGANIZATION CASES

### A. Industry-Specific Events

24. Xerium's operations are highly dependent upon general trends in the paper production industry as well as the degree to which the paper production industry is affected by global economic conditions. In recent years, paper producers have seen decreased demand for their products from the newsprint and printing and writing sectors due to the increasing prevalence of electronic media. This trend has been exacerbated by the current global economic

crisis, which has prompted a dramatic slow-down in print advertising as well as in packaging materials. The drop in global demand for paper products has resulted in a surplus of paper inventory at paper-making companies and corresponding curtailments and idling of paper-making machines. In addition, as Xerium's customers have experienced difficulty raising funds in the capital markets, customers' demand for Xerium's products and services has necessarily contracted.

25.     Xerium's revenues have been adversely affected by the reduced capacity of, and demand by, its customers. In response, Xerium has taken a variety of cost-cutting initiatives designed to improve its competitive position, including the closure of twelve manufacturing facilities between 2002 and 2008. Xerium's operational restructuring initiatives, however, have not kept pace with the transformation of its customer-base.

### B.     Liquidity Constraints and Prepetition Negotiations

26.     Xerium anticipated that it would not be in compliance with certain financial covenants under the Credit Facility for the period ended September 30, 2009. Accordingly, the Debtors and the lenders under the Credit Facility entered into that certain Waiver and Amendment No. 1, dated as of September 29, 2009 (the "First Credit Facility Waiver"), by and among the borrowers, the guarantors and the Administrative Agent. Pursuant to the First Credit Facility Waiver, the lenders agreed to waive any violation of the interest coverage, leverage, and fixed charge covenants under the Credit Facility until the earliest of (a) the occurrence of any other default under the Credit Facility, (b) the Debtors' failure to comply with any term of the First Credit Facility Waiver, or (c) December 15, 2009 (the "First Waiver Period"). In addition, the issuing banks agreed to issue new letters of credit in accordance with the terms of the Credit Facility in an outstanding amount of up to $3,500,000, for equipment purchases. In return, Xerium agreed, among other things, that during the First

Waiver Period, no new revolving loans could be made to Xerium and the lenders would not be required to extend credit to Xerium. In addition, in connection with the First Credit Facility Waiver, Xerium was required to pay an increased interest rate on the Credit Facility from September 29, 2009 through December 15, 2009. Absent the First Credit Facility Waiver, failure to meet these financial covenants would have constituted an event of default under the Credit Facility and potentially could have led to acceleration of Xerium's loan obligations.

### C. Restructuring Negotiations

27. During the First Waiver Period, Xerium engaged in extensive negotiations with the Administrative Agent and the Secured Lender Ad Hoc Working Group[4] regarding possible restructuring scenarios. The negotiations progressed smoothly and the parties worked toward various consensual restructuring scenarios. As a result, the Debtors and the lenders under the Credit Facility entered into that certain Waiver and Amendment No. 2, dated as of December 14, 2009 (the "Second Credit Facility Waiver"), pursuant to which, the lenders agreed to waive (a) any violation of the interest coverage, leverage, and fixed charge covenants under the Credit Facility that may have occurred but for the First Credit Facility Waiver and (b) any further violation of the interest coverage, leverage, and fixed charge covenants under the Credit Facility that may occur or have occurred until the earliest of (i) the occurrence of any other default under the Credit Facility, (ii) the Debtors' failure to comply with any term of the Second Credit Facility Waiver, (iii) the failure of Xerium and the Administrative Agent to negotiate in good faith and execute a term sheet for the restructuring of Xerium's debt and equity by no later than December 31, 2009, or (iv) February 1, 2010. The lenders also agreed to waive any hedging obligation

---

[4] The Secured Lender Ad Hoc Working Group consists of American Securities LLC, on behalf of its affiliated funds, ING Investment Management Co., on behalf of its affiliated funds, Carl Marks Strategic Investments, L.P., Citicorp North America, Inc., Cerberus Capital Management, L.P., on behalf of its affiliated funds and accounts, and Harbourmaster Capital Management Ltd.

defaults by Xerium, XTI, or Xerium Canada that may have occurred under the Credit Facility. In return, Xerium agreed, among other things, to pay each of the consenting lenders a consent fee equal to 0.05% of the outstanding principal amount of all loans under the Credit Facility (other than the Tranche 1 Revolving Loans) and the Tranche 1 Revolving Commitments of such lender.

28. On December 22, 2009, Xerium, the Administrative Agent, and the Secured Lender Ad Hoc Working Group reached an agreement in principal to pursue a financial restructuring on the terms set forth in the proposed joint prepackaged plan of reorganization (as amended, the "Plan") filed concurrently herewith, the terms of which are summarized below in Section II(D).

29. Also in connection with the restructuring, the Debtors commenced discussions with the Swap Counterparties to address a mutual termination of the swap agreements, establish the amount of the Swap Counterparties' respective termination claims, and reach an agreement on the treatment of those claims under the Plan. As a result of the parties' discussions, on December 31, 2009, Xerium, XTI, Xerium Canada, and DB entered into that certain Unsecured Swap Termination Agreement (the "Unsecured Swap Termination Agreement"), pursuant to which, the parties thereto terminated the DB Swaps effective as of December 31, 2009, fixed the amounts due to DB with respect to termination of the DB Swaps at (a) CAD 2,922,609.90 with respect to Xerium Canada, (b) $5,950,176.58 with respect to Xerium, and (c) €3,130,475.78 with respect to XTI (collectively, (a), (b) and (c), the "Unsecured Swap Termination Claims"), and DB agreed to forbear until February 1, 2010 from exercising any of its rights and remedies under the DB Swaps or in respect of DB's Unsecured Swap Termination Claims. In accordance with the terms of the Unsecured Swap Termination Agreement, Xerium, XTI, and Xerium Canada made a partial payment to DB (a) on December

31, 2009 of (i) $48,364.28 and (ii) CAD 23,755.59 and (b) on January 4, 2010 of €25,445.16, in reduction of DB's Unsecured Swap Termination Claims.

30.     In addition, on January 4, 2010, Xerium, XTI, and MLCS entered into that certain Secured Swap Termination Agreement (the "Secured Swap Termination Agreement"), pursuant to which, the parties thereto terminated the USD MLCS Swaps effective as of December 31, 2009, and the EUR MLCS Swaps effective as of January 4, 2010, and fixed the amounts due to MLCS with respect to the termination of the MLCS Swaps at (a) $5,989,522.00 with respect to Xerium and (b) €619,097.58 with respect to XTI (collectively, (a) and (b), the "Secured Swap Termination Claims"), and MLCS agreed to forbear until February 1, 2010 from exercising any of its rights and remedies under the MLCS Swaps or in respect of MLCS' Secured Swap Termination Claims.   In accordance with the terms of the Secured Swap Termination Agreement, on January 4, 2010, Xerium and XTI made a partial payment to MLCS of $48,684.09 and €5,032.15, in reduction of MLCS' Secured Swap Termination Claims.

31.     To enable the parties to successfully negotiate the definitive documentation memorializing the parties' agreement in principal and enable the Debtors to solicit votes and pursue the contemplated restructuring set forth in the Plan, the Debtors and the lenders under the Credit Facility entered into certain waiver and amendment agreements, Xerium, XTI, Xerium Canada, and DB entered into certain forbearance amendment agreements, and Xerium, XTI, and MLCS entered into certain forbearance amendment agreements, all extending the waiver and forbearances discussed above through April 1, 2010, in exchange for certain consent fees.

**D.    The Plan**[5]

32.    As discussed more fully in the Disclosure Statement, dated March 2, 2010 (as amended, the "Disclosure Statement") filed with the Court contemporaneously herewith, the Plan provides for the allowance of Credit Facility Claims, Secured Swap Termination Claims, and Unsecured Swap Termination Claims, and in satisfaction of such claims the holders thereof will receive their ratable shares of (a) $10 million in Cash, (b) $410 million in principal amount of new second-lien term notes to be issued pursuant to an Amended and Restated Credit Facility, and (c) 82.6% of the shares of the new common stock to be issued by Reorganized Xerium on the Effective Date (prior to dilution by (i) equity incentive awards granted post-Effective Date under the New Management Incentive Plan and (ii) the exercise of New Warrants that will be issued under the Plan).  All other allowed claims will be unimpaired.  Moreover, pursuant to the Plan, on the Effective Date, the existing common stock of Xerium will be canceled and holders of allowed equity interests in Xerium will receive their ratable shares of (a) a number of shares of new common stock of Reorganized Xerium that is equal to 17.4% of the shares of new common stock to be issued and distributed on the Effective Date (or reserved for future distribution in respect of equity awards granted prepetition) and (b) New Warrants to purchase up to 10% of the issued and outstanding shares of new common stock of Reorganized Xerium as of the Effective Date (on a fully diluted basis).  The Plan further provides that on the Effective Date the Debtors' postpetition financing facility will convert into an $80 million first–lien revolving credit and term loan exit facility.

---

[5] The summary of the Plan provided herein is qualified by reference to the provisions of the Plan.  To the extent that there is any inconsistency between the following summary and the Plan, the terms of the Plan shall control.  Capitalized terms used but not defined in Part II(D) shall have the meaning ascribed to such terms in the Plan.

33.     On March 2, 2010, the Debtors commenced the solicitation of votes on the Plan and delivered copies of the Plan, the Disclosure Statement and the appropriate ballots to all holders of claims as of the February 23, 2010 record date established in the Disclosure Statement in the classes entitled to vote on the Plan. The Disclosure Statement also established March 22, 2010 as the deadline for the receipt of ballots to accept or reject the Plan, subject to the Debtors' right to extend the solicitation period. Ultimately, to avoid disenfranchising holders that had expressed an interest in voting but whose ballots had not been received by the initial deadline, including foreign voters, the Debtors instructed the voting agent to accept all ballots received as of 6:00 p.m. on March 26, 2010. More than 92% of the creditors entitled to vote in Class 2 and 100% of the creditors entitled to vote in Class 5 submitted ballots with respect to the Plan. As set forth in the Certification of The Garden City Group, Inc. with Respect to Solicitation and Tabulation of Votes on Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed concurrently herewith, the Plan has been overwhelmingly accepted by the two classes entitled to vote. Specifically, 96.68% in amount and 97.73% in number of claims voted in Class 2, and 100% in amount and 100% in number of claims voted in Class 5, were voted to accept the Plan. The Debtors have made certain nonmaterial corrections to the form of plan attached to the Disclosure Statement and contemporaneously herewith filed with the Court the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated March 30, 2010.

### E.    Purpose of the Financial Restructuring

34.     The purpose of the financial restructuring is to reduce the Debtors' leverage and to enhance their long-term growth and competitive position. Specifically, the financial restructuring is designed to reduce the notional value of the Debtors' total outstanding debt obligations from approximately $640 million as of December 31, 2009, including swap

termination liabilities, to a notional value currently estimated to be approximately $480 million on a pro forma basis as of the consummation of the financial restructuring. The Debtors will also be able to improve their liquidity by extending the maturity dates on the Prepetition Revolver and the Prepetition Term Loans from 2011 and 2012, respectively, to 2015.

35.     The Debtors believe that the financial restructuring will reassure customers and suppliers that the Debtors are financially sound, reduce any reluctance to conduct business with the Debtors and allow the Debtors to improve the terms of transactions with their customers and suppliers. Furthermore, resolution of liquidity concerns and completion of the financial restructuring will allow the Debtors' management to focus its attention on operations and long-term planning rather than on short-term financial management. Therefore, the Debtors believe that the proposed financial restructuring pursuant to the Plan is in the best interests of the Debtors and their creditors.

**F.     Part IV Proceeding**

36.     On or about the Commencement Date, the Debtors intend to file an application for recognition of their chapter 11 cases in Canada under Part IV of the Companies' Creditors Arrangement Act with the Ontario Superior Court of Justice (Commercial List). In furtherance thereof, the Debtors have filed a First Day Pleading requesting that the Court appoint Xerium as the Debtors' foreign representative in any foreign country, including Canada. The Debtors anticipate that the recognition by the Canadian court of their chapter 11 cases and the orders entered by the Court therein will advance the orderly cross-border restructuring of the Debtors' indebtedness.

**III.     SUMMARY OF THE FIRST DAY PLEADINGS**

37.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Pleadings, which the Debtors believe are necessary to enable them to

operate in chapter 11 with a minimum of disruption and loss of productivity. The Debtors respectfully request that the Court grant the relief requested in the First Day Pleadings as critical in stabilizing and facilitating the Debtors' operations during the pendency of the chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below. Any capitalized term not expressly defined in this Part III shall have the meaning ascribed to that term in the relevant First Day Pleading.

A.     **Motion of Debtors for Entry of an Order Pursuant to Fed. R. Bankr. P. 1015(b) and Del. Bankr. L.R. 1015(b) Directing Joint Administration of Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

38.     By the Joint Administration Motion, the Debtors seek joint administration of their chapter 11 cases for procedural purposes only. While there are a number of affiliated Debtors in these chapter 11 cases, most, if not all, of the motions, applications and other pleadings that will be filed in these cases will relate to relief sought jointly by all of the Debtors. Joint administration will allow the Debtors' cases to be administered as a single case, rather than multiple independent cases. Joint administration will also obviate the need for duplicative notices, motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and their estates, as well as creditors and other parties in interest. The Court will also be relieved of the administrative burden of entering duplicative orders and maintaining duplicative files and dockets. Moreover, supervision of the administrative aspects of these chapter 11 cases by the U.S. Trustee will be simplified.

39.     Joint administration will not adversely affect the rights of the Debtors' respective creditors because the Joint Administration Motion requests only the administrative consolidation of the Debtors' estates and as such, each creditor may still assert a claim against a particular estate. In fact, creditors' rights will be enhanced by the reduction in costs resulting from joint administration.

40.     Accordingly, I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**B.     Application of Debtors For Entry of an Order Pursuant to 28 U.S.C. § 156(c) and Del. Bankr. L.R. 2002-1(f), and Del. Bankr. L.R. 2002-1(f) Authorizing (I) Retention and Employment of the Garden City Group, Inc. as Noticing, Claims, and Balloting Agent for the Debtors and (II) Appointment of the Garden City Group, Inc. as Agent of the Bankruptcy Court (the "<u>Claims and Noticing Agent Retention Application</u>")**

41.     By the Claims and Noticing Agent Retention Application, the Debtors seek authorization to (i) retain and employ the Garden City Group ("<u>GCG</u>") as noticing, claims, and balloting agent of the Debtors and (ii) appoint GCG as agent of the Bankruptcy Court.  The Debtors selected GCG based on, among other things, its expertise in providing similar services in large chapter 11 cases.  The Debtors' understand that GCG is a nationally recognized specialist in chapter 11 administration and has vast experience providing noticing, claims, and balloting services in connection with chapter 11 cases of this size and complexity.  The size the Debtors' creditor body makes its impracticable for the Debtors to undertake the task of sending notices to creditors and other parties in interest in these cases without assistance.  As described more fully in the affidavit of Karen B. Shaer in support of the Claims and Noticing Agent Retention Application, GCG has developed efficient and economical methods to properly handle, among other things, the voluminous mailings associated with noticing of creditors and parties in interest and any claims administration that may be required in these cases.

42.     Accordingly, the Debtors request authorization to compensate and reimburse GCG for all services rendered and expenses incurred in connection with the these chapter 11 cases in accordance with their engagement letter.  The Debtors believe that such compensation is reasonable and appropriate for services of this nature and comparable to those charged by other providers of similar services.

43.     In light of the Debtors' need for the proposed services and GCG's qualifications, I believe the employment and retention of GCG promotes the efficient administration of theses chapter 11 cases and relieves the Court of administrative burdens and therefore, is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**C.     Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c), and 364(a), and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, (B) Continue Intercompany Transactions, (C) Honor Certain Prepetition Obligations Related to Use of Cash Management System, and (D) Maintain Existing Bank Accounts and Business Forms, (II) Extending Time to Comply With 11 U.S.C. § 345(b), and (III) Scheduling a Final Hearing (the "<u>Cash Management Motion</u>")**

44.     By the Cash Management Motion, the Debtors seek (a) authorization to (1) continue to operate the cash management system (the "<u>Cash Management System</u>") including continuing to invest excess funds in a manner consistent with their existing investment guidelines ("<u>Investment Guidelines</u>"), (2) continue transfers of funds and intercompany transactions ("<u>Intercompany Transactions</u>") in the ordinary course of the Debtors' businesses, consistent with their prepetition practices, (3) honor certain prepetition obligations related to the use of the Cash Management System, and (4) maintain their existing bank accounts ("<u>Bank Accounts</u>") and business forms and (b) an extension of the time to comply with section 345(b) of the Bankruptcy Code.

45.     To maximize the efficiencies and value of their businesses, the Debtors employ the Cash Management System to collect, transfer, and disburse the funds generated by their collective operations. Through the use of the Cash Management System, the Debtors are able to collect and transfer cash efficiently to satisfy their financial obligations. The Cash Management System facilitates the Debtors' cash forecasting and reporting and enables the

Debtors to monitor the collection and disbursement of funds and maintain control over the administration of their accounts at various banks. As a practical matter, it would be extremely burdensome and expensive to establish and maintain a different cash management system because the Debtors have extensive and geographically dispersed operations in numerous countries around the world. Accordingly, the Debtors request to continue the Cash Management System and to satisfy all periodic service charges and other fees for the maintenance of the Cash Management System, up to an aggregate amount of $20,000 during the first twenty-days following the Commencement Date.

46.     To the extent there are excess funds in certain accounts maintained by the Company, the Company invests those funds in a manner consistent with its Investment Guidelines, which are customary and appropriate. The Debtors believe that these funds are secure and that obtaining bonds to secure those funds, as required by sections 345(b) of the Bankruptcy Code, would be unnecessary and detrimental to the Debtors' estates and creditors. The Debtors therefore respectfully request a sixty-day extension of their time to comply with the requirements of section 345(b) of the Bankruptcy Code. During that time, the Debtors will discuss their investment practices with the U.S. Trustee to determine what modifications, if any, would be appropriate under the circumstances. Given the anticipated short duration of these cases, an extension of time to comply with section 345(b) of the Bankruptcy Code is particularly warranted.

47.     The Debtors also engage in Intercompany Transactions. The Intercompany Transactions reduce the administrative costs incurred by the Debtors and allow for the purchase and supply of essential goods for the operation of its businesses. Further, the use of the Cash Management System to effectuate intercompany loans reduces interest expense by

enabling the Debtors to utilize all funds within the system rather than relying upon short-term borrowing to fund operations of the Debtors' and their non-Debtor affiliates' cash requirements. The Debtors also benefit from the use of a coordinated cash management system with their other non-Debtor affiliates due to the integration of their businesses on an operational level. The Debtors propose a cap of $8.5 million on Intercompany Transactions effectuated during the first twenty-one days following the Commencement Date. The Debtors will continue to maintain records of their Intercompany Transactions to assure that no creditors are prejudiced.

48. The Debtors also believe that their transition to chapter 11 will be more orderly, less costly, and with a minimum of harm to operations, if all Bank Accounts are continued following the Commencement Date with the same account numbers. Further, to avoid disruption to their business and to minimize expenses, the Debtors respectfully request they be authorized to continue to use their existing check stock and business forms. To the extent that the Debtors do resort to new check stock, any new check stock ordered[6] will reflect their status as debtors in possession and list the case number under which these cases are being jointly administered. Moreover, the U.S. Debtors will work with their systems personnel and outside systems consultants to determine what computer system changes are required to reflect their debtor in possession status on electronically generated checks. They will keep the U.S. Trustee apprised of their progress on this project, and will implement changes to their electronically generated checks as soon as reasonably practicable.

---

[6] As the Debtors operate globally, to alleviate confusion or misunderstanding by parties in foreign jurisdictions regarding the nature of chapter 11 and the ability of the Debtors to continue to operate in the ordinary course, the Debtors request that the requirement to reflect their status as debtors in possession and list the case number under which these cases are being jointly administered on new check stock be limited to the U.S. Debtors, and that the Debtors in foreign jurisdictions be exempt therefrom.

49.    Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations.    Such result would cause significant harm to the Debtors' businesses and their estates.    Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**D.    Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing, (B) Utilize Cash Collateral, (C) Grant Priming Liens, Priority Liens, and Superpriority Claims to DIP Lenders, and (D) Provide Adequate Protection to Prepetition Secured Parties, (II) Scheduling a Final Hearing, and (III) Granting Related Relief (the "<u>DIP Financing Motion</u>")**

50.    By the DIP Financing Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to, among other things, (i) obtain postpetition senior secured financing in the aggregate amount of $80 million, (ii) utilize cash collateral, (iii) grant priming liens, priority liens, and superpriority claims to the Debtors' proposed postpetition lenders, (iv) provide adequate protection to the Debtors' prepetition secured lenders and (b) scheduling a final hearing on the DIP Financing Motion.

51.    Beginning in the fall of 2009, the Debtors, together with their financial advisor, Rothschild, Inc., initiated a dialogue with the Prepetition Administrative Agent regarding the possibility of the Prepetition Administrative Agent arranging and providing a postpetition financing facility to the Debtors, in the event the Debtors were to commence chapter 11 cases.    By early February 2010, the Debtors had yet to secure a postpetition financing commitment.    At that same time, the Debtors and Rothschild recognized that the Debtors likely would be unable to pay in full the principal and interest due to the Prepetition Secured Lenders on March 31, 2010 without the benefit of third-party financing.    Accordingly, Rothschild, at the

Debtors' request, commenced a process to survey the market for other potential sources for postpetition financing.

52.     During this process, in late February 2010, the Debtors obtained a commitment for postpetition financing from the Prepetition Administrative Agent (which is submitted to the Court for approval pursuant to the DIP Financing Motion).  Although none of the parties contacted by Rothschild had yet submitted a financing proposal to the Debtors, the Debtors were advised that certain of these parties had conveyed to Rothschild their respective expectations regarding the all-in costs of the postpetition financing required by the Debtors.  In each case, the expected all-in costs exceeded the costs associated with the postpetition financing proposed by the Prepetition Administrative Agent.  In addition, the Debtors were further advised by Rothschild, based upon its knowledge and understanding of the current debtor in possession financing market, that there could be no realistic expectation of a lender or lender group providing postpetition financing to the Debtors secured by liens junior to the liens securing the Credit Facility, or on an unsecured basis.

53.     Accordingly, the Debtors and Rothschild determined in late February 2010 not to incur further costs or devote additional resources to the financing process.  Rather, the Debtors and Rothschild focused their efforts on the negotiation, documentation, and finalization of the proposal submitted by the Prepetition Administrative Agent.  The Debtors ultimately concluded that the DIP Facility proposed by the DIP Lenders, which is premised upon a consensual priming of the Prepetition Secured Parties' liens and thus avoids the need for a lengthy and uncertain priming dispute, is the best postpetition financing option available to the Debtors.

54.     The Debtors have been informed that the Prepetition Secured Parties (the lenders under the Credit Facility and the secured swap termination counterparty) have consented to the Debtors' use of Cash Collateral in the ordinary course of business and in accordance with the Budget, subject to the grant of adequate protection, and the other terms and conditions set forth in the proposed interim order. As adequate protection for any diminution in value of their collateral from and after the Commencement Date, the Prepetition Secured Parties will be granted (a) liens on the Collateral, subject only to (i) liens granted in favor of the DIP Agent and the DIP Lenders and (ii) the Carve-Out and any Permitted Liens and Additional Permitted Liens, (b) a superpriority claim, subject only to (i) the superpriority claims granted in favor of the DIP Agent and the DIP Lenders and (ii) the Carve-Out and any claim secured by Permitted Liens or Additional Permitted Liens, (c) payment of cash in an amount equal to all accrued and unpaid interest (whether prepetition or postpetition) under the Credit Facility and the Secured Swap Termination Agreement, as applicable, and (d) payment of reasonable fees and expenses incurred by the Prepetition Administrative Agent and the Prepetition Secured Lenders under the Credit Facility and by the Secured Swap Counterparty under the Secured Swap Termination Agreement (in each case, including reasonable fees and expenses of legal and financial professionals).

55.     In order to effectuate the transactions contemplated by the Plan, and to provide the Debtors with the liquidity necessary to fulfill their administrative and operational obligations during the pendency of these chapter 11 cases, the Debtors also require postpetition financing. Approval of the DIP Facility and the use of Cash Collateral will enable the Debtors to fund their current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs. Absent the requisite financing, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses, their going concern

value, and ultimately, their ability to successfully reorganize. Because the Debtors' available and projected Cash Collateral is insufficient to fund these critical expenditures, the credit provided under the DIP Facility is essential to maximizing the value of the Debtors' estates for the benefit of all stakeholders. Further, the availability of credit under the DIP Facility will instill much needed confidence in the Debtors' employees, vendors, and customers, thereby greatly enhancing the likelihood that the Debtors' will continue to receive the support of their key constituents throughout the pendency of these chapter 11 cases. In addition to the DIP Facility, the Debtors require the use of Cash Collateral in order to ensure they have the liquidity necessary to fund their day-to-day business operations.

56. Although on the closing date, the full $80 million amount of the DIP Facility will be made available in accordance with the DIP Agreement, during the interim period prior to entry of the Final Order, the Debtors may use only approximately $21 million of the DIP Facility proceeds, consistent with the Budget and the DIP Agreement (the "Interim Amount"). The Debtors' access to this Interim Amount will ensure that the Debtors can meet all of their administrative and other obligations during the early stages of these chapter 11 cases. The Debtors lack the funds necessary to continue their business operations, and thus, have an urgent and immediate need for liquidity. Absent authorization to use Cash Collateral and obtain credit under the DIP Facility, on an interim basis pending the Final Hearing, the Debtors will suffer immediate and irreparable harm, as the Debtors will be unable to satisfy their postpetition obligations as they come due, to the detriment of their estates and creditors, and all parties in interest. Accordingly, the interim relief requested is vital to preserving the Debtors' going concern value and ensuring the Debtors a meaningful opportunity for a successful reorganization.

57. For these reasons, I believe that the DIP Facility is the best financing options available to the Debtors under the present circumstances. Furthermore, because the proposed financing will preserve the Debtors' enterprise value for the benefit of all stakeholders, I believe that entering into the DIP Agreement is a sound exercise of the Debtors business judgment.

**E.** **Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing the Debtors to Satisfy Prepetition Claims of Certain Creditors in the Ordinary Course of Business and (II) Scheduling a Final Hearing (the "Prepetition Claims Motion")**

58. By the Prepetition Claims Motion, the Debtors seek authorization to satisfy, in the ordinary course of business, the allowed, fixed, liquidated, noncontingent, and undisputed prepetition claims (the "Payable Claims") of holders of Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims (as those terms are defined in the Plan) (collectively, the "Prepetition Creditors").

59. In the ordinary course of their businesses, the Debtors incur numerous obligations to Prepetition Creditors, including suppliers, vendors, mechanics, shippers, warehousemen, and employment agencies that provide, among other things, vital raw materials, supplies, and services necessary to operate the Debtors' businesses, including machining and specialized production services, telecommunications services, utility services, personnel services, shipping and storage services, employment services, and equipment. Allowing the satisfaction of Payable Claims of the Prepetition Creditors on the terms set forth in the Prepetition Claims Motion will allow for a seamless reorganization in these prepackaged cases.

60. The Debtors propose that they be authorized to satisfy the Payable Claims, subject to the $12,270,000 interim and $19,442,000 aggregate caps set forth in the Prepetition Claims Motion, on the condition that by accepting payment, each Prepetition Creditor agrees to

(i) maintain or reinstate trade terms during the pendency of the Debtors' chapter 11 cases that are at least as favorable as those existing on the Commencement Date or are otherwise satisfactory to the Debtors in their business judgment, (ii) release any liens asserted against the Debtors' property related to the Payable Claims, and (iii) withdraw any and all proofs of claim filed by such Prepetition Creditor in the Debtors' chapter 11 cases. The Debtors further propose that, if a Prepetition Creditor, after receiving a payment on account of its prepetition claim, does not maintain or reinstate trade terms during the pendency of these chapter 11 cases that are at least as favorable as those existing on the Commencement Date or are otherwise satisfactory to the Debtors in their business judgment, then any payments of prepetition claims made to such Prepetition Creditor after the Commencement Date may, solely in the Debtors' discretion, be (i) deemed applied to postpetition amounts payable to such Prepetition Creditor, or (ii) treated by the Debtors as an unauthorized postpetition transfer recoverable by the Debtors upon a motion to enforce the terms requested in the Prepetition Claims Motion.

61. The Debtors believe that such relief is reasonable and appropriate under the circumstances and necessary to the Debtors' successful reorganization. The Debtors' major creditor constituents have reached agreement on the terms of the Plan and the paramount goal of the parties in interest during these compressed chapter 11 cases is protecting the value of the Debtors' businesses by preventing operational disruptions. The relief sought preserves the value of the Debtors' estates by ensuring that the Debtors have access to the goods and services that they need to remain stable and enabling the Debtors to maintain good relationships with their trade creditors for the benefit of the reorganized debtors when they emerge from chapter 11. The Debtors do not seek authority to satisfy all Payable Claims immediately, but only to satisfy in the ordinary course of business undisputed amounts that come due on terms consistent with

prepetition practice up to the applicable cap. Thus, the Debtors submit that the relief requested is narrowly tailored to facilitate their fast-tracked chapter 11 reorganization.

62. The Debtors submit that good relations with their trade creditors is essential to the continued operation of their businesses during the pendency of their chapter 11 cases. The Debtors' inability to maintain existing terms with vendors could cause production disruptions if suppliers cease providing goods and services even for a short period of time, imperiling the Debtors' restructuring efforts and damaging the goodwill of their customers. Further, any interruption in the supply of such goods and services will drastically affect the Debtors' ability to deliver its products to their customers. Given the immensely competitive market in which the Debtors' operate, such an interruption would lead to an immediate erosion in customer confidence which would be difficult, if not impossible, to restore. In these uncertain economic times, such a scenario would drastically affect the Debtors' revenues, cash flows, and profitability, and could lead to large customer damage claims against the Debtors.

63. Furthermore, if Prepetition Creditors agree to continue supplying the Debtors postpetition under current trade terms, the Debtors will avoid unnecessary expenses during these cases. Current trade terms will help the Debtors' maintain their liquidity, and will facilitate their ability to sustain operations while reorganizing. Such terms also allow the Debtors to avoid the inherent operational inefficiencies of paying cash on demand and managing billing processes for numerous vendors that require cash in advance or shorten their trade terms.

64. I am informed by counsel that certain of the Payable Claims may be entitled to administrative expense priority status pursuant to section 503(b)(9) of the Bankruptcy Code because they relate to goods delivered to the Debtors in the ordinary course of business within twenty-one days of the Commencement Date. Furthermore, certain of the Payable Claims

may be secured because such claims arise from specialty repair and machine work completed by vendors that may be able to assert mechanics liens on the Debtors' property or such claims arise from shippers who may be able to assert possessory liens on the Debtor's property. The relief requested herein allows the Debtors to avoid the expense required to analyze each Payable Claim to determine which amounts are payable as postpetition administrative expenses, which amounts are payable as secured claims, which amounts are subject to administrative priority under section 503(b)(9), and which amounts should be held back until effectuation of the Plan. Likewise, satisfying such claims in the ordinary course of business minimizes disruption to the Debtors' operations by preventing the initiation of reclamation claims, adversary proceedings, and other motions filed by the Prepetition Creditors seeking payment of their prepetition claims.

65.     The relief requested is further supported by the prepackaged nature of these cases. As stated above, prior to the Commencement Date, the Debtors solicited votes on their Plan from the holders of claims entitled to vote. The votes tabulated and received from these classes demonstrate overwhelming acceptance of the Plan, which provides for the full satisfaction of, among other things, all Payable Claims. The relief requested merely expedites the treatment and distribution that is afforded to the Payable Claims held by Prepetition Creditors under the widely-supported Plan in order to protect the Debtors' businesses and preserve the value of the Debtors' estates. The Debtors submit that no parties in interest will be prejudiced.

66.     Accordingly, I believe that the relief requested is essential, appropriate and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**F.** **Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a), and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs, (II) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations and (III) Scheduling a Final Hearing (the "<u>Employee Wages and Benefits Motion</u>")**

67.     By the Employee Wages and Benefits Motion, the Debtors seek, among other things, (a) authorization, in their sole discretion and in the exercise of their business judgment, as deemed necessary to continue to operate and preserve value, to (1) pay all wages, salaries, commissions, sales incentives, other compensation, and related administration and other costs incident to the foregoing (collectively, the "<u>Compensation Obligations</u>") and employee benefits, which include, among other things, vacation, sick leave, personal time off, leaves of absence, severance, healthcare, pension, insurance, retirement, and other welfare benefits, reimbursable business expenses, and related administration and other costs incident to the foregoing (collectively, the "<u>Employee Benefit Obligations</u>"), earned or incurred prior to the Commencement Date, (2) withhold all federal, state, local, and foreign taxes relating to the Compensation Obligations and Employee Benefit Obligations as required by applicable law, (3) pay all employment, unemployment, social security, and similar federal, state, local and foreign taxes including, without limitation, taxes relating to the Federal Insurance Contributions Act ("<u>FICA</u>") and the Federal Unemployment Tax Act ("<u>FUTA</u>") relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "<u>Payroll Taxes</u>"), and make other payroll deductions, including but not limited to, retirement and other employee benefit plan contributions, union dues, garnishments, and voluntary deductions (collectively with the Payroll Taxes, the "<u>Payroll Deduction Obligations</u>," and collectively with the Compensation Obligations and Employee Benefit Obligations, the "<u>Prepetition Employee Obligations</u>") and (4) continue

and honor their prepetition programs, policies, and practices with respect to the Prepetition Employee Obligations in the ordinary course of business, and (b) direction to all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors' accounts in satisfaction of the Prepetition Employee Obligations.

68.     As of the Commencement Date, the Debtors employ approximately 1,559 individuals.   The continued operation of the Debtors' businesses and their successful reorganization depends on the retention and cooperation of the Debtors' employees and other personnel.  Any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtors' relationship with their employees at a time when the employees' support is critical to the success of the Debtors' chapter 11 cases.  At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend any decline in the employees' morale.  Consequently, it is critical that the Debtors be authorized to satisfy their Prepetition Employee Obligations and continue their ordinary course Employee Benefits Obligations in effect as of the Commencement Date.  The Debtors propose a cap of $4.3 million on the payment of Prepetition Employee Obligations during the first twenty-one days following the Commencement Date.

69.     Moreover, if the checks issued and fund transfers requested in payment of the Prepetition Employee Obligations are dishonored, or if such Prepetition Employee Obligations are not timely paid during the postpetition period, the Debtors' employees could suffer extreme personal hardship, including, in some instances, being unable to pay their daily living expenses.   It would also be inequitable to require the Debtors' employees to bear

personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed.

70.     Accordingly, I believe that payment of all Prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**G.     Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8) and 541, and Fed. R. Bankr. P. 6003 and 6004 Authorizing Debtors to Pay Prepetition Taxes and Assessments (the "Taxes Motion")**

71.     In the ordinary course of business, the Debtors incur certain taxes and governmental charges, including, but not limited to, sales, use, property, franchise, value-added, and other taxes and governmental charges (the "Taxes and Assessments"), which are payable directly to the federal government, various foreign governments, and various state and local taxing authorities ("Taxing Authorities").

72.     By the Taxes Motion, the Debtors seek authority to pay all Taxes and Assessments as they come due, including any penalties and interest with respect thereto, determined to be owed for periods prior to the Commencement Date and any Taxes and Assessments subsequently determined upon audit, or otherwise, to be owed for periods prior to the Commencement Date, in an aggregate amount not to exceed $2.3 million.

73.     Payment of the Taxes and Assessments is critical to the Debtors' continued, uninterrupted operations.  Nonpayment of Taxes and Assessments may cause the respective Taxing Authorities to take precipitous action, including, but not limited to, preventing the Debtors from conducting business in applicable jurisdictions where Franchise Taxes or certain Other Governmental Assessments are unpaid, seeking increased audits, seeking to lift the

automatic stay and perhaps imposing liens, all of which would be disruptive to the Debtors' operations and detrimental to all parties in interest. Moreover, to the extent that the Taxes and Assessments are secured by liens on the Debtors' property, interest as well as penalties may continue to accrue even after the Commencement Date. The Debtors submit that payment of such amounts may actually reduce the amounts ultimately paid to the Taxing Authorities because prompt payment will avoid the imposition of liens and accrual of interest and penalties with respect to the Taxes and Assessments.

74. Importantly, certain of the Taxes and Assessments are collected by the Debtors on behalf of the applicable Taxing Authority and are held in trust by the Debtors for the benefit of such Taxing Authority. As such, I am informed by counsel that these funds do not constitute property of the Debtors' estates pursuant to section 541 of the Bankruptcy Code, and therefore, such funds are not available for the satisfaction of creditors' claims.

75. Furthermore, many federal, state, local, and foreign statutes impose personal liability on officers and directors of companies for nonpayment of such "trust fund" taxes or other tax obligations owed by such entities. To the extent that the relevant Taxes and Assessments, such as the Debtors' Sales and Use Taxes, Value-Added Taxes, and certain Other Governmental Assessments, remain unpaid by the Debtors, the Debtors' directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these chapter 11 cases. Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their officers, directors, and executives from devoting their full attention to the Debtors' business and the orderly administration of these chapter 11 cases. The Debtors believe that this would materially and adversely affect their ability to operate in the

ordinary course of business and to administer these chapter 11 cases, with resulting detriment to all parties in interest.

76.     The Debtors submit that the payment of Taxes and Assessments as they come due will preserve the value and inure to the benefit of the Debtors and their estates and will not prejudice any parties in interest.  Indeed, pursuant to the Plan, the Taxes and Assessments will be satisfied in full as either general unsecured claims or priority claims under section 507(a)(8) of the Bankruptcy Code.  Thus, the relief requested merely expedites the treatment and distribution that is afforded to such claims under the Plan.

77.     Accordingly, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption.

H.     **Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to Pay Prepetition Obligations to Foreign Creditors and (II) Scheduling a Final Hearing (the "<u>Foreign Creditors Motion</u>")**

78.     By the Foreign Creditors Motion, the Debtors seek authorization to pay, in their sole discretion and in the ordinary course of business, as and when due, undisputed prepetition claims (the "<u>Foreign Claims</u>") of vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions (collectively, the "<u>Foreign Creditors</u>"), including, without limitation, claims for payment for materials and services provided to the Debtors, as well as import and tax obligations owed to Foreign Creditors, subject to interim and aggregate caps in the amount of $5,358,993 and $7,582,000, respectively.

79.     In connection with the global scope of their business operations, the Debtors have numerous foreign suppliers, vendors, service providers, and other non-domestic

relationships which are essential to the Debtors' ability to timely manufacture highly-specialized products in response to customer demands. The Debtors obtain a substantial amount of their raw materials, equipment, parts, and other items necessary for the Debtors' manufacturing operations through supply contracts with these Foreign Creditors, many of which are sole-source suppliers. Because most of the Debtors' products are custom-ordered and designed, the Debtors manufacture such products as and when ordered by their customers. Consequently, the Debtors do not keep in stock a significant inventory of the critical raw materials supplied by many of the Foreign Creditors, and accordingly, the Debtors rely upon as-needed and timely shipments of such raw materials to ensure their ability to promptly manufacture these specialized products.

80. As the Debtors' revenue generating capacity depends heavily upon the Debtors' continued relationships with their Foreign Creditors, the Debtors' ability to make payments to Foreign Creditors on a regular basis is crucial to maintaining the Debtors' domestic and foreign operations. Although the scope of the automatic stay provided by the Bankruptcy Code is universal, enforcing the stay in foreign jurisdictions is difficult, if not impossible, if the creditor as to which enforcement is sought has no presence in the United States. As a result, notwithstanding the commencement of these cases, the Debtors are at risk of Foreign Creditors disregarding the automatic stay to exercise self-help or otherwise engage in conduct that disrupts the Debtors' business operations. Absent payment, Foreign Creditors may withhold vital goods and services from the Debtors, terminate key relationships, sue one or all of the Debtors in a foreign court, or otherwise cease to continue to do business with the Debtors.

81. In short, payment of the undisputed prepetition claims of Foreign Creditors is critical to the Debtors' ability to sustain essential relationships with Foreign Creditors throughout the pendency of these chapter 11 cases. Accordingly, I believe that the

relief requested in the Foreign Creditors Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**I.** **Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), and 503(b)(1), and Fed. R. Bankr. P. 6003 and 6004 Authorizing Debtors to Honor Prepetition Obligations to Customers and Continue Customer Programs in the Ordinary Course of Business (the "<u>Customer Programs Motion</u>")**

82.     Prior to the Commencement Date, in the ordinary course of business and as is customary in their industry, the Debtors engaged in certain activities to foster and maintain a positive reputation and relationship with their customers. In that regard, the Debtors implemented customer programs and policies (the "<u>Customer Programs</u>"), such as warranty programs and billing error-related refunds and credits, designed to ensure customer satisfaction, promote customer loyalty, create goodwill for the Debtors and their products and services, and respond to competitive pressures. These Customer Programs are vital to the Debtors' efforts to reorganize and revitalize their businesses, and ultimately, to maximize value for the Debtors' stakeholders. The Debtors' revenue-generating capacity, and by extension, the future success of their businesses is inextricably linked with the Debtors' continued ability to retain existing, and attract new, customers.

83.     Accordingly, the Debtors seek authority to continue the Customer Programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder, subject to an aggregate cap in the amount of $900,000. Programs similar to the Customer Programs are standard practice in the Debtors' industry, and customers have come to expect such programs from industry participants, including the Debtors. Thus, the Debtors' inability to honor their Customer Programs would place them at a considerable competitive disadvantage. Continuing the Customer Programs is vital to the Debtors' ability to sustain their reputation for consistently providing high-quality products and delivering seamless

service that addresses customer needs. Moreover, the benefits to the Debtors' estates – continued credibility in the industry and the preservation of customer satisfaction and loyalty – far outweigh the costs of continuing the Customer Programs and honoring the prepetition obligations thereunder.

84. In light of the significant risk to the Debtors' customer relationships, competitiveness, and credibility in the industry, I believe that continuing the Customer Programs in the ordinary course of the Debtors' business and performing and honoring prepetition obligations arising under such Customer Programs is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**J.      Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366, and Fed. R. Bankr. P. 6003 and 6004 (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (II) Approving Debtors' Proposed Form of Adequate Assurance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Scheduling a Final Hearing (the "Utilities Motion")**

85. By the Utilities Motion, the Debtors seek entry of an interim order (a) prohibiting, pending entry of a Final Order, Utility Companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding for Utility Services or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance of payment to Utility Companies, (b) approving the Debtors' Proposed Adequate Assurance, (c) approving procedures for resolving any requests for alternative adequate assurance of payment, (d) scheduling a hearing to consider the relief requested herein on a final basis; and (ii) entry of a final order granting the relief requested therein on a final basis.

86. In connection with the operation of their businesses, the Debtors obtain various Utility Services, including electricity, natural gas, oil, water, sewer, telephone, trash

collection, cable and data, and other similar services from the Utility Companies or their brokers. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, irreparably damaging the Debtors' production supply, vendor relationships, and revenue stream to the detriment of all parties in interest, and potentially delaying the Debtors' successful reorganization.

87. Within 20 days of the Commencement Date, the Debtors propose to place a cash deposit equal to two weeks of Utility Services, calculated based on the two-week historical average over the past 12 months (the "Adequate Assurance Deposit"), into a newly-created, segregated account (the "Utility Deposit Account") for the benefit of any Utility Company, unless such Utility Company (i) agrees to a lesser amount, (ii) already holds a deposit or letter of credit equal to or greater than two weeks of Utility Services, or (iii) is currently paid in advance for its Utility Services. The Debtors estimate that the Adequate Assurance Deposit will be approximately $200,000. The creditors of the Debtors shall have no interest in, or lien on, the Adequate Assurance Deposit or the Utility Deposit Account.

88. I believe that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future Utility Services in the ordinary course of business with funds available from their postpetition financing, should provide the Utility Companies with the assurance they need and enable the Debtors to continue to operate their businesses in chapter 11 without disruption to their Utility Services. This is especially true in light of the nature and short duration of these prepackaged chapter 11 cases where the Debtors anticipate payment of the prepetition claims of certain creditors, such as the Utility Companies, in the ordinary course of business. I further believe that the procedures for requesting additional assurance of payment as set forth in the Utilities Motion provide the Utility Companies with a fair and orderly process for

seeking modification of the Proposed Adequate Assurance while protecting the Debtors from being forced to address numerous additional adequate assurance requests in a disorganized manner and at a time when the Debtors' efforts could be more productively focused on the seamless continuation of their operations in chapter 11.

89.     Accordingly, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**K.     Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b), and Fed. R. Bankr. P. 4001(d), 6003, and 6004 (I) Authorizing Debtors to Renew Their Workers' Compensation Program and to Continue or Renew General Liability, Property Liability, and Other Insurance Programs and Pay All Obligations in Respect Thereof, (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, and (III) Modifying the Automatic Stay to Permit Employees to Proceed With Workers' Compensation Claims (the "<u>Insurance Motion</u>")**

90.     By the Insurance Motion, the Debtors seek (i) authorization to (a) continue or renew their Insurance Programs on an uninterrupted basis in accordance with the procedures and policies in place prior to the Commencement Date, (b) pay any undisputed prepetition obligations under the Insurance Programs, including premiums, deductibles, fees payable to Insurance Service Providers, any true-up amounts, and other fees and costs relating thereto (collectively, the "<u>Insurance Obligations</u>") and (ii) modification of the automatic stay in order to permit employees with valid Workers' Compensation Claims to proceed, at the Debtors' direction, in the appropriate nonbankruptcy judicial or administrative forum for the limited purpose of determining the allowed amount of such claim or permitting such claim to be satisfied from the proceeds of the Debtors' Compensation Policy.

91.     In connection with the operation of their businesses, the Debtors maintain various Insurance Programs, including a workers' compensation program (the "<u>Workers' Compensation Program</u>"), as well as general liability, property, excess liability, fiduciary,

automobile, directors' and officers' liability, marine cargo liability, and other insurance programs (the "Liability and Property Insurance Programs") through several different Insurance Carriers. The Debtors believe that as of the Commencement Date, there are no prepetition amounts due under the Workers' Compensation Program or any of the Liability and Property Insurance Programs.

92. The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing policies, declining to renew their insurance policies, or refusing to enter into new insurance agreements with the Debtors in the future.

93. Moreover, applicable state law mandates that the Debtors maintain workers' compensation coverage for their employees. Failure by the Debtors to pay the premiums associated with their Workers' Compensation Program would jeopardize their coverage and expose the Debtors to substantial liability in fines by various state workers' compensation boards.

94. The risk that eligible workers' compensation claimants will not receive timely payments for prepetition employment-related injuries could have a devastating effect on the financial well-being and morale of Xerium's current employees. Departures by Xerium's employees at this critical time may result in a severe disruption of the Debtors' businesses with a substantially adverse impact on the Debtors, the value of their assets and businesses, and their ability to reorganize. The retention of Xerium's qualified and dedicated senior management is also linked to the continued effectiveness of the directors' and officers' liability insurance

policies.  Pursuant to the guidelines established by the U.S. Trustee, the Debtors are obligated to remain current with respect to certain of their primary Insurance Programs.  Therefore, the continuation or renewal of the Insurance Programs, on an uninterrupted basis, and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Programs, are essential to preserve the Debtors' businesses and preserve the value of the Debtors' estate for all creditors.

95.     Accordingly, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**L.      Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Payment of Certain Prepetition Shipping and Warehouse Charges and Mechanics Lien Charges and (II) Scheduling a Final Hearing (the "<u>Liens Motion</u>")**

96.     By the Liens Motion, the Debtors seek authorization to (i) pay the prepetition shipping, warehouse, and related charges to Shippers and Warehousemen that the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain the release of raw materials, parts, certain finished goods, indirect materials, machinery, and equipment (collectively, the "<u>Goods</u>") held by such Shippers and Warehousemen, subject to interim and aggregate caps in the amount of $313,000 and $413,000, respectively, and (ii) satisfy prepetition obligations to Mechanics and discharge the liens, if any, that the Mechanics may have on the Debtors' property or certain property of the Debtors' customers, subject to interim and aggregate caps in the amount of $1,175,000 and $2,156,000, respectively.

97.     As an integral part of their businesses, the Debtors use domestic and foreign commercial common carriers, movers, shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping auditing services, deconsolidators, logistics management companies, and other third party service providers to ship, transport, import,

facilitate the movement of Goods through customs, and deliver Goods, as well as a network of third party warehouses to store Goods. The Debtors rely heavily on their Shippers and Warehousemen to obtain these essential Goods. In connection with the importation of Goods, the Debtors engage certain Shippers to take all actions necessary to obtain possession of imported Goods, including making payments on the Debtors' behalf of customs duties, import-related taxes, and other incidental import expenses to the U.S. Customs and Border Protection Agency and to non-U.S. customs authorities.

98.     Due to the commencement of these chapter 11 cases, certain Shippers and Warehousemen may refuse to release any Goods in their possession pending receipt of payment for their prepetition services. Under some state laws, a Shipper or Warehouseman may have a lien on the respective Goods in its possession (some of which may be property of the Debtors' customers), which secures the charges or expenses incurred in connection with the transportation or storage of such Goods. The continuity of the Debtors' business operations depends on timely availability of Goods. Consequently, the continued cooperation of the Shippers and Warehousemen is imperative. Moreover, a Shipper's refusal to release property owned by the Debtors' customers could cause significant delay in the manufacturing operations of the Debtors' customers, and consequently, harm the Debtors' customer relationships and reputation.

99.     The Debtors rely on timely availability of Goods to prevent interruptions in their business operations. Consequently, the continued cooperation of the Shippers and Warehousemen is imperative.

100.     The Debtors also transact business with other third parties that provide repair, maintenance, and related services for certain machinery and equipment used in the Debtors' manufacturing operations. Applicable state law may grant these Mechanics a lien

against the real or personal property of the Debtors that was the subject of such services to secure payment of the amounts owed by the Debtors to such Mechanics. Thus, at any given time, there are Mechanics that may assert liens against the Debtors' property or otherwise refuse to release such property that is vital to the Debtors' business operations.

101.    Additionally, in connection with their service and repair of customers' roll covers, the Debtors frequently subcontract with Mechanics who perform certain specialty repair work. A Mechanic's refusal to release the rolls of the Debtors' customers could cause significant disruption to the customers' manufacture of paper products, and as a result, have devastating consequences for the Debtors' customer relationships and reputation. Similarly, a Mechanic's assertion of a lien on the rolls of the Debtors' customers would be equally detrimental to the Debtors' customer relationships. Further, the Debtors' customers may assert claims against the Debtors arising from a Mechanic's refusal to release their property.

102.    Accordingly, I believe that the Debtors should be granted the authority to pay all undisputed prepetition Shipping and Warehouse Charges and Mechanics Lien Charges, as doing so is in the best interest of the Debtors, their estates and creditors, and all parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**M.      Motion of Debtors For Entry Orders Pursuant to 11 U.S.C. §§ 105(a), 341(e), and 521(a), Fed. R. Bankr. P. 1007, 2015.3 and 9006(b), and Del. Bankr. L.R. 1007-1(b) and 1007-2(a) (I) Authorizing the Debtors to File a Modified Creditor Matrix and Modified Equity Security Holders List, (II) Approving the Manner of Notices to the Debtors' European Employees, (III) Extending Time Within Which to File (A) Schedules and Statements and (B) Financial Reports Pursuant to Fed. R. Bankr. P. 2015.3(a), (IV) Waiving the Requirement to File Schedules, Statements, and Financial Reports Upon the Effective Date of the Debtors' Prepackaged Plan, and (V) Directing the United States Trustee Not to Convene a Meeting of Creditors or Equity Security Holders or Appoint a Statutory Committee (the "Extension Motion")**

103. By the Extension Motion, the Debtors seek (i) entry of an order, (a) authorizing the Debtors to file a modified creditor matrix and a modified list of equity security holders of Xerium, (b) approving the manner of giving notices to the Debtors' European employees, and (c) scheduling a hearing to consider certain other relief requested in the Extension Motion and (ii) entry of an order, (a) extending through the date that is the ninetieth (90th) day after the Commencement Date the date by which the Debtors must file (1) schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs pursuant to section 521 of the Bankruptcy Code and Fed. R. Bankr. P. 1007 (collectively, the "Schedules") and (2) the first periodic reports of financial information with respect to entities in which the Debtors' estates hold a controlling or substantial interest pursuant to Fed. R. Bankr. P. 2015.3(a) (collectively, the "2015.3 Reports"), (b) permanently waiving the requirements to file the Schedules and 2015.3 Reports if the effective date of the Plan (the "Effective Date") occurs on or before the ninetieth (90th) day after the Commencement Date, and (c) directing the U.S. Trustee not to convene a meeting of creditors or equity security holders pursuant to section 341 of the Bankruptcy Code (the "341 Meeting") or appoint a statutory committee of creditors or equity security holders provided that the Effective Date occurs on or before the ninetieth (90th) day after the Commencement Date.

104. By the Extension Motion, in order to avoid implicating European data protection laws, which generally prohibit the transmission of personally identifiable information outside of the European Union (including to the Debtors' noticing agent), the Debtors propose that notices to European individuals be given in Europe, rather than by the Debtors' noticing agent in the U.S., and that the Debtors be authorized to omit the names, addresses, and all other

personally identifiable information related to their European employees (and former employees) from their Creditor Matrix and the Equity Security Holders List of Xerium. To demonstrate that all required notices have been given to those individuals in Europe, the Debtors propose to submit a declaration attesting to their compliance with all applicable notice requirements, but will not identify the names, addresses, or other personal information of the individuals that are noticed.

105. Additionally, in order to protect the personal information of the Debtors' U.S. and Canadian employees, the Debtors seek authorization to redact their names, addresses, and other personally identifiable information from the Debtors' Creditor Matrix, the Equity Security Holders List of Xerium, and any certificate of service filed by the Debtors or their noticing agent.

106. The Debtors also seek extension and waiver of certain statutory filing requirements. As described above, the Debtors have negotiated and solicited votes on their prepackaged Plan, which has been overwhelmingly accepted by each of the classes entitled to vote. Thus, the most critical and complex task required to effectuate a successful reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has been accomplished. The Plan provides that "other secured" claims, all priority claims, and general unsecured claims are unimpaired and contemplates an expeditious emergence from chapter 11, all as discussed in detail in the Disclosure Statement. As a result, the Debtors anticipate that the Effective Date will occur within ninety days after the Commencement Date.

107. Under these circumstances, the purpose of filing the Schedules and 2015.3 Reports has generally been fulfilled by other means. Indeed, much of the information that would be contained in the Schedules and the 2015.3 Reports is already reflected in the Disclosure

Statement or is otherwise publicly available through the Debtors' filings with the Securities and Exchange Commission. Thus, compilation of the Schedules and 2015.3 Reports would be unnecessarily burdensome and largely duplicative of information already available in public documents. Additionally, under these circumstances, a 341 Meeting and the appointment of a statutory committee is unnecessary, especially in light of the nature and short duration of the Debtors' prepackaged chapter 11 cases. The Debtors request that the Court extend and waive these requirements pursuant to a Final Order on notice.

108. I believe that the relief requested in the Extension Motion is in the best interests of the Debtors, their estates and creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**N.** **Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Enforcing Protections of 11 U.S.C. §§ 362, 365(e)(1), and 525 (the "Enforcement Motion")**

109. By the Enforcement Motion, the Debtors seek entry of an order articulating and confirming (i) the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) the antitermination and antimodification provisions of section 365(e)(1) of the Bankruptcy Code, and (iii) the protections against discriminatory treatment contained in section 525 of the Bankruptcy Code.

110. The Debtors operate a complex, global business and maintain extensive dealings with certain vendors, suppliers, customers and other parties who operate outside of the United States. The Debtors have a global footprint that includes manufacturing facilities strategically located in the major paper-producing regions of North America, Europe, South America, and Asia-Pacific. The Debtors sell their products in approximately 65 countries other than the United States, which represented approximately 73% of their net sales in 2009.

111.    Consequently, numerous customers, suppliers, creditors, and other stakeholders reside outside of the United States and may not be familiar with U.S. bankruptcy law.  I believe that the relief requested in the Enforcement Motion will help alleviate confusion regarding the effect of these chapter 11 cases on the Debtors and their foreign and domestic non-Debtor affiliates and will maximize the protections afforded by sections 362, 365, and 525 of the Bankruptcy Code, particularly because the automatic and self-executing nature of the these protections may not be recognized by foreign creditors or tribunals unless embodied by an order of this Court.  Accordingly, I believe that the relief requested in the Enforcement Motion is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

O.    **Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. § 1505 Authorizing Xerium Technologies, Inc. to Act as the Foreign Representative on Behalf of the Debtors' Estates (the "Motion to Appoint Foreign Representative")**

112.    By the Motion to Appoint Foreign Representative, the Debtors seek entry of an order authorizing Xerium to act as the foreign representative (the "Foreign Representative") on behalf of the Debtors' estates in proceedings in any foreign country.

113.    The Debtors operate in several countries throughout the world, including Canada.  Currently, as part of their ongoing business operations, the Debtors have material assets in Canada and elsewhere, which are critical to the successful restructuring of the Debtors and their affiliates.  Therefore, it is necessary to ensure that these chapter 11 cases and any orders of the Court issued herein are recognized and respected in Canada and other jurisdictions abroad. As stated above, shortly following the Commencement Date, the Debtors intend to seek recognition of their cases in Canada.

114.    As a Debtor in these chapter 11 cases and the ultimate parent to each of the Debtors, Xerium is well-positioned to represent the Debtors' in foreign proceedings and to

serve as a conscientious Foreign Representative to ensure that these proceedings are coordinated and recognized in those jurisdictions in which the Debtors have assets. In addition, having Xerium serve as Foreign Representative is the most efficient option for the Debtors, as they will not need to retain a third party to act as such, with the added expense that would accompany such a retention, thereby preserving the Debtors' assets for the benefit of their estates and creditors.

115. Accordingly, I believe that the relief requested in the Motion to Appoint Foreign Representative is necessary, appropriate and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**P.** **Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 363(c) and 503(b) (I) Granting Administrative Expense Status to Undisputed Obligations to Vendors Arising from the Postpetition Delivery of Goods and Services Ordered Prepetition and (II) Authorizing Debtors to Satisfy Such Obligations in the Ordinary Course of Business (the "Administrative Expense Motion")**

116. By the Administrative Expense Motion, the Debtors respectfully request entry of an order (i) granting administrative priority status to all undisputed obligations of the Debtors owed to vendors and suppliers (collectively, the "Vendors") arising from the postpetition delivery of goods and services ordered prior to the Commencement Date and (ii) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

117. In connection with the normal operation of their businesses, the Debtors rely on various Vendors, to provide the Debtors with the goods and services necessary for the Debtors' production and distribution of their products to customers. As of the Commencement Date, the Debtors have certain prepetition purchase orders (the "Prepetition Orders") outstanding with various Vendors for goods and services ordered by the Debtors. As a consequence of the commencement of these chapter 11 cases, Vendors may be concerned that the obligations arising

from goods shipped or services ordered prepetition and delivered postpetition pursuant to the Prepetition Orders, will be treated as general unsecured claims against the Debtors' estates.

118. Without the benefit of an order authorizing the Debtors to pay for postpetition deliveries of goods and services ordered prepetition, Vendors may refuse to ship such goods (or may recall shipments) or perform services unless the Debtors issue substitute purchase orders postpetition. This is particularly true for Vendors located in foreign jurisdictions, which are even less familiar with the intricacies of chapter 11 and a debtor's authority to satisfy certain obligations in the ordinary course.

119. Accordingly, I believe that the relief requested in the Administrative Expense Motion is essential, appropriate, and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**Q.    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 1125, 1126, and 1128, and Fed. R. Bankr. P. 2002, 3017, 3018, and 3020 for Entry of an Order (I) Scheduling A Combined Hearing to Consider Approval of Disclosure Statement, Solicitation Procedures and Form of Ballots, and Confirmation of Debtors' Prepackaged Plan of Reorganization and Establishing Objection Deadlines With Respect Thereto and (II) Approving the Form and Manner of Notice of Commencement of Chapter 11 Cases, Final Hearing to Consider Approval of Debtors' Postpetition Senior Secured Financing and Use of Cash Collateral, Combined Hearings, Related Deadlines and Assumption and Rejection of Executory Contracts and Unexpired Leases Pursuant to Debtors' Joint Prepackaged Plan of Reorganization (the "Scheduling Motion")**

120. By the Scheduling Motion, the Debtors seek entry of an order (the "Scheduling Order"), (i) scheduling a combined hearing (the "Combined Hearing") to consider (a) the approval of the Disclosure Statement, the prepetition solicitation of votes to accept or reject the Plan (the "Solicitation Procedures") and the forms of ballots (the "Ballots") and (b) confirmation of the Plan, including any proposed amendments or modifications to the Plan, (ii) establishing the deadline to object to the adequacy of the Disclosure Statement, the

Solicitation Procedures, the Ballots, and confirmation of the Plan, and (iii) authorizing and approving the form and manner of notice of the commencement of the Debtors' chapter 11 cases, the final hearing to consider approval of the Debtors' postpetition financing, the Combined Hearing, and the assumption and rejection of executory contracts and unexpired leases pursuant to the Plan.

121.    Below is a timetable setting forth the Debtors' proposed dates for (i) the mailing of the Combined Notice, (ii) the objection and reply deadlines with respect to the Disclosure Statement, the Solicitation Procedures, the Ballots, and confirmation of the Plan, and (iii) the Combined Hearing:

| Timetable | |
|---|---|
| Commencement of Solicitation | March 2, 2010 |
| Voting Deadline | March 26, 2010 |
| Commencement Date | March 30, 2010 |
| Mailing of Combined Notice | April 6, 2010 |
| DIP Objection Deadline | April 15, 2010 |
| DIP Reply Deadline | April 20, 2010 |
| Final DIP Hearing | April 22, 2010 |
| Plan/Disclosure Statement Objection Deadline | May 4, 2010 |
| Plan/Disclosure Statement Reply Deadline | May 10, 2010 |
| Combined Hearing | May 12, 2010 |

122.    In these prepackaged chapter 11 cases, the most sensitive and complex task required to effectuate a successful reorganization – the negotiation of consensual agreements with critical creditor constituencies and formulation of a plan of reorganization – has been accomplished in advance of the Commencement Date.    Furthermore, prior to the Commencement Date, the Debtors solicited votes on the Plan from all parties entitled to vote to accept or reject the Plan.    The votes tabulated and received from these parties demonstrate an

overwhelming acceptance of the Plan. Thus, there is no reason to delay consideration of the confirmation of the Plan. Indeed, it is in the best interests of the Debtors' estates and creditors to proceed with the confirmation process as expeditiously as possible, as protraction of these cases may jeopardize the Debtors' relationships with customers, suppliers, and employees, and potentially may weaken the Debtors' ability to compete.

123. The Debtors submit that consideration of the approval of the Disclosure Statement, the Solicitation Procedures and the Ballots together with the confirmation of the Plan will promote judicial economy and conserve the Debtors' resources. The proposed schedule, and the relief sought in the Scheduling Motion, will assist in the Debtors' expeditious emergence from chapter 11 while providing adequate notice to parties in interest.

124. The proposed Combined Notice sets forth: (i) notice of commencement of the Debtors' chapter 11 cases, (ii) the date, time, and place of the final hearing to consider approval of the DIP Motion and the deadline and procedures for interposing objections thereto, (iii) a summary of the Plan, including the classification and treatment of claims against, and equity interests in, the Debtors and the assumption and rejection of executory contracts and unexpired leases pursuant thereto, (iv) the date, time, and place of the Combined Hearing and the deadline and procedures for interposing objections to the Disclosure Statement, the Solicitation Procedures, the Ballots, and confirmation of the Plan, and (v) instructions for obtaining copies of the Disclosure Statement and the Plan.

125. The Debtors propose to serve the Combined Notice by mail upon: (i) entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Fed. R. Bankr. P. 1007(d), (ii) the parties listed on the Debtors' creditor matrix, (iii) all equity security holders of record, (iv) counterparties to the Debtors' executory contracts

and unexpired leases, (v) the U.S. Trustee, (vi) the Internal Revenue Service, (vii) the Securities and Exchange Commission, (viii) the United States Department of Justice, and (ix) all parties having filed requests for notices in these chapter 11 cases.  In addition, the Combined Notice will be available on the Debtors' website at http://www.xeriuminfo.com.

126.    The Debtors submit that the proposed service of the Combined Notice, as described in the Scheduling Motion (which affords not less than the twenty-eight days' notice prescribed by the Federal Rules of Bankruptcy Procedure), complies with the requirements of Fed. R. Bankr. P. 2002 and 3017 and affords ample notice to parties in interest.

127.    Accordingly, I believe that the relief requested in the Scheduling Motion is essential, appropriate, and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

## CONCLUSION

For the reasons stated herein and in each of the First Day Pleadings, the Debtors

respectfully request that the Court enter orders approving the First Day Pleadings.

Stephen R. Light

<u>**Exhibit A**</u>

**Corporate Organization Chart**



# Xerium Technologies, Inc.

| | |
|---|---|
| Xerium Asia LLC [US] | |
| Xerium Asia Holding Ltd [HK] | |
| Huyck Wangner (Shanghai) Trading Co Ltd | |
| Huyck Wangner Vietnam Co Ltd | |
| Weavexx LLC [US] | |
| Wangner Limited [Ireland] | |
| Xerium III (US) Limited | |
| Xerium V (US) Limited | |
| Stowe Woodward LLC [US] | |
| Stowe Woodward Licensco LLC [US] | |
| XTI LLC [US] | |

Beloit Asia Pacific (M) Ltd [Mauritius]

Xi'an Paper Machinery Works

Stowe Woodward (Chengzhou) Roll Technologies Co Ltd [China]

Beloit XBe Roll Covering Co Ltd [China]

90%

10%

Xian Paper Machinery Works

Xerium IV (US) Limited

Robec Brazil LLC [US]

Stowe Woodward Mexico SA de CF

865,667 Shares

1 Share

153,351 Quotas

228,795 Quotas

205,890,194 Shares

Xerium do Brasil Ltda

116,461 Shares

38,550 Shares

Wangner Itelpa I LLC [US]

Wangner Itelpa II LLC [US]

8,328 Quotas

2,757 Quotas

Wangner Itelpa Participações Ltda [Brazil]

Xerium Technologies Brasil Industria e Comércio SA

1 share each: Otham, Carreli, Godoi

1 Quota

Huyck Licensco Inc [US]

17.42115%

82.57891%

Huyck Wangner France [Branch of Weavexx]

Huyck Wangner Japan Limited

Xerium Canada Inc

Xerium Germany Holding Gmbh

Xerium France SAS

Stowe Woodward France SAS

Huyck Wanger (UK) Ltd

Stowe Woodward (UK) Ltd

Xerium Technologies Ltd [UK Holdco]

Huyck Argentina SA

Huyck Wangner Spain SA

Huyck Wangner Germany GmbH

TIAG Transworld Interweaving GmbH [Switz]

Dissolution Pending

Huyck Wangner Scandinavia AB [Sweden]

Huyck Wangner Austria GmbH

Xerium Italia SpA

Huyck Wangner Italia SpA

Huyck Wangner Australia Pty Ltd

Stowe Woodward Sweden AB

Minority Shareholders

Robec Walzen GmbH [Germany]

99.45%

.45%

Stowe Woodward AG [Germany]

Stowe Woodward Finland Oy