## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x

In re                                               :        Chapter 11
                                                    :
XERIUM TECHNOLOGIES, INC., et al.,[1]              :        Case No. 10-_____  (    )
                                                    :
                    Debtors.                        :        Joint Administration Requested
                                                    :
-------------------------------------------------------------------x

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING
## DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED
## FINANCING, (B) UTILIZE CASH COLLATERAL, (C) GRANT PRIMING LIENS,
## PRIORITY LIENS, AND SUPERPRIORITY CLAIMS TO DIP LENDERS, AND
## (D) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,
## (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF

Xerium Technologies, Inc. ("Xerium") and certain of its direct and indirect

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), respectfully represent:

### Fed. R. Bankr. P. 4001 Concise Statement[2]

1.       By this motion and for the reasons set forth below, pursuant to sections

105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"),

Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2, the Debtors respectfully

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number or its foreign equivalent) are: Xerium Technologies, Inc. (8674), Huyck Licensco Inc. (0434), Stowe Woodward Licensco LLC (4459), Stowe Woodward LLC (4102), Wangner Itelpa I LLC (3561), Wangner Itelpa II LLC (3562), Weavexx, LLC (7969), Xerium Asia, LLC (3367), Xerium III (US) Limited (4460), Xerium IV (US) Limited (4461), Xerium V (US) Limited (4462), XTI LLC (6754), Xerium Canada Inc. (0003), Huyck.Wangner Austria GmbH (0323), Xerium Germany Holding GmbH (3219), and Xerium Italia S.p.A. (0150).  The location of the Debtors' corporate headquarters and the service address for all Debtors is: 8537 Six Forks Road, Suite 300, Raleigh, North Carolina 27615.

[2] Unless otherwise indicated, capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the DIP Agreement (as defined below).

request entry of (a) an interim order substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Interim Order</u>") (i) authorizing the Debtors to (A) obtain postpetition senior secured financing, (B) utilize cash collateral, (C) grant priming liens, priority liens, and superpriority claims to the DIP Lenders (as defined below), and (D) grant adequate protection to the Prepetition Secured Parties (as defined below), (ii) scheduling a hearing to consider the relief requested herein on a final basis (the "<u>Final Hearing</u>"), and (iii) granting related relief; and (b) an order granting the relief requested herein on a final basis (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>").[3]

2.      Pending the Final Hearing and entry of the Final Order, the Debtors respectfully request that the DIP Facility (as defined below) be approved on an interim basis pursuant to the terms of the Superpriority Priming Senior Secured Debtor-In-Possession Credit and Guaranty Agreement, in substantially the form attached to the Interim Order as <u>Exhibit 1</u> (the "<u>DIP Agreement</u>").  Pursuant to Fed. R. Bankr. P. 4001 and Del. Bankr. L.R. 4001-2, the following are the material provisions of the DIP Agreement and/or the Interim Order:[4]

| **Borrower**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | Xerium Technologies, Inc. (the "<u>DIP Borrower</u>") |
| --- | --- |
| **Guarantors**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | All U.S. Debtors other than the DIP Borrower (the "<u>DIP Guarantors</u>," together with the DIP Borrower, the "<u>DIP Obligors</u>") |

---

[3] The Debtors will provide a proposed Final Order to the Court, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), and all parties in interest upon appropriate notice in advance of the Final Hearing.

[4] The summaries and descriptions of the terms and conditions of the DIP Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Agreement and the Interim Order.  In the event that there is a conflict between this motion and the DIP Agreement or the Interim Order, the DIP Agreement or the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Administrative Agent and Collateral Agent** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | Citicorp North America, Inc. (the "<u>DIP Agent</u>") |
| **Sole Lead Arranger and Sole Bookrunner** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | Citigroup Global Markets Inc. (the "<u>Arranger</u>") |
| **DIP Lenders** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | A syndicate expected to be comprised of banks, financial institutions and other entities (the "<u>DIP Lenders</u>") |
| **Commitment** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* <br> *Del. Bankr. P. 4001-2(a)(ii)* | Comprised of (a) a senior secured revolving loan facility of $20,000,000 and (b) a senior secured term loan credit facility of $60,000,000, which includes a letter of credit subfacility of $20,000,000 (collectively, the "<u>DIP Loans</u>" or the "<u>DIP Facility</u>").  (Interim Order ¶ 2; DIP Agreement §2.1) |
| **Term** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* <br> *Del. Bankr. L.R. 4001-2(a)(ii)* | Unless accelerated as a result of an Event of Default, the earlier of (a) one hundred twenty (120) days after the Closing Date, (b) the date the Revolver Commitment is permanently reduced to zero, (c) the date of the termination of the Revolver Commitment, (d) thirty five (35) days after entry of the Interim Order if the Final Order has not been entered by the Court on or before such date, (e) the closing date of any sale of all or substantially all of the assets of the Debtors pursuant section 363 of the Bankruptcy Code that has been approved by an order of the Court, and (f) the effective date of a Plan of Reorganization that has been confirmed by order of the Court. (Interim Order ¶ 30; DIP Agreement §1.1) |
| **Use of DIP Facility** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Facility shall be used to fund working capital and general corporate purposes, the administration and prosecution of the chapter 11 cases, adequate protection payments, and related transaction costs, fees and expenses associated with the DIP Facility.  Outstanding letters of credit issued under the prepetition Credit Facility (as defined below) shall be deemed to be Letters of Credit issued and outstanding under the DIP Agreement.  (Interim Order ¶ 9; DIP Agreement §2.4) |
| **Entities with Interests in Cash Collateral** <br> *Fed. R. Bankr. P. 4001(b)(1)(B)(i)* | Prepetition Collateral Agent on behalf of the Prepetition Secured Lenders, and the Secured Swap Counterparty (each as defined below, and collectively, the "<u>Prepetition Secured Parties</u>").  (Interim Order ¶ G(4)) |
| **Use of Cash Collateral; Material Terms** <br> *Fed. R. Bankr. P. 4001(b)(1)(B)(ii) and (iii)* <br> *Del. Bankr. L.R. 4001-2(a)(ii)* | The Debtors are authorized to use cash collateral of the Prepetition Secured Parties in accordance with the Budget (as defined below).  (Interim Order ¶¶ 5, 6) |

| | |
|---|---|
| **Interim Financing**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | The total $60,000,000 Term Loan Commitment and the total $20,000,000 Revolver Commitment under the DIP Facility shall be fully funded and made available (respectively) upon entry of the Interim Order and satisfaction or waiver of certain other conditions to closing set forth in the DIP Agreement; provided, that the Debtors shall be permitted to use on an interim basis only those amounts that are consistent with the Budget (as defined below) and the DIP Agreement, in the aggregate amount of approximately $21,000,000 (exclusive of amounts deposited into the Term Loan LC Collateral Account, and availability with respect to the Revolver Commitment). See ¶¶ 29-34 below. (Interim Order ¶¶ 2, 7; DIP Agreement §§ 2.1, 6.8) |
| **Amortization** | None. |
| **Interest Rates**[5]<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | At the DIP Borrower's election, the DIP Loans shall be LIBOR Loans or ABR Loans.  (DIP Agreement §2.6)<br><br>LIBOR Loans:  LIBOR Rate + 4.50% per annum.  (DIP Agreement §2.6)<br><br>ABR Loans:  Alternate Base Rate + 3.50% per annum.  (DIP Agreement §2.6)<br><br>Default Rate:  Applicable rate + 2.00% per annum.  If an Event of Default occurs and is continuing under the DIP Facility, each LIBOR Loan will convert to an ABR Loan at the end of the Interest Period then in effect for such LIBOR Loan.  (DIP Agreement §2.8) |
| **Fees**[6]<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | Upfront Fee:  0.50% of the Term Loan Commitments and 1.00% of the Revolving Commitments.  (DIP Agreement §2.9)<br><br>Commitment Fee:  1.00% per annum on the average daily amount of the unused Revolving Commitments.  (DIP Agreement §2.9)<br><br>Letter of Credit Fee:  0.25% per annum on the average aggregate daily amount available to be drawn under the Letters of Credit.  (DIP Agreement §2.9) |

---

[5] Under the prepetition Credit Facility, the Debtors currently pay interest at a rate of approximately 6.92% (inclusive of a 1.00% per annum premium in consideration for the Prepetition Secured Lenders' entry into the Waiver Agreements (as defined below)).

| | |
|---|---|
| **Budget**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(ii)* | A thirteen week cash flow forecast (updated on a monthly basis), which shall include actual cash receipts and disbursements (reported on a weekly basis). (DIP Agreement §5.1(p)) |
| **Other Covenants** | Compliance with affirmative and negative covenants as are customary for debtor in possession financing, including: (a) delivery of monthly and quarterly financial statements and (b) limitation on liens, indebtedness, investments, loans, acquisitions, sales, and affiliate transactions. (DIP Agreement §§ 5.1–5.13; 6.1–6.18) |
| **Liens and Priorities**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(i)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(i)(D) and (G),*<br>*4001-2(a)(ii)* | The DIP Loans shall be afforded certain liens and claims, including priming liens, priority liens, and superpriority claims, on property of the estate, as described in more detail in ¶ 36 below. (Interim Order ¶¶ 16, 19; DIP Agreement § 2.23) |
| **Carve-Out** | All fees required to be paid pursuant to 28 U.S.C. §§ 156(c) and 1930(a)(6); and all unpaid allowed fees, expenses, and disbursements (regardless of when allowed) of the Debtors' professionals and any statutory committee incurred post-Event of Default up to $3,000,000 (plus all unpaid professional fees, expenses, and disbursements of the Debtors' professionals and any statutory committee incurred prior to an Event of Default to the extent allowed at any time). (Interim Order ¶ 26; DIP Agreement §2.22(c)) |
| **Waiver of Rights**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(viii) and (x)*<br>*Del. Bankr. L.R.*<br>*4001-2(a)(i)(B) and (C)* | Upon entry of the Final Order, the Debtors waive certain rights and causes of actions against the Prepetition Agents (as defined below) and the Prepetition Secured Lenders, and the time within which any non-Debtor party in interest or statutory committee (a "Committee") may challenge the obligations to, or liens of, the Prepetition Agents and the Prepetition Secured Lenders (any such challenge, a "Challenge") will be limited to the earlier of (i) sixty (60) days from the date of appointment of a Committee, if brought by the Committee, and (ii) seventy-five (75) days from the date of entry of the Interim Order, if brought by any non-Debtor party other than the Committee; provided that a Challenge may not be commenced, asserted or continued by a Committee or any other non-Debtor party if a |

---

[6] Due to the confidentiality provisions in the Commitment Letter prohibiting public disclosure by the Debtors of the Fee Letter (each as defined below), the Debtors have not attached a copy of the Fee Letter to the motion or disclosed in the motion the terms set forth in the Fee Letter. However, the Debtors have provided a copy of the Fee Letter to the U.S. Trustee and have filed with the Court a motion to file the Fee Letter under seal.

| | |
|---|---|
| | Plan of Reorganization that provides for the allowance of the Prepetition Indebtedness (as defined in the Interim Order) or otherwise resolves such Challenge has been confirmed and consummated. The Final Order also will prohibit the assertion of all other claims under section 506(c) of the Bankruptcy Code against the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders. (Interim Order ¶¶ 38(b), 38(c)) |
| **Determination of Validity, Enforceability, Priority, or Amount of a Prepetition Claim or Any Lien Securing the Claim** *Fed. R. Bankr. P. 4001(c)(1)(B)(iii) Del. Bankr. L.R. 4001-2(a)(i)(B)* | Except to the extent that a Challenge is timely commenced and results in a final and non-appealable order of the Court disallowing the Prepetition Indebtedness or invalidating the Prepetition Liens (as defined in the Interim Order) in whole or in part, the Prepetition Indebtedness shall constitute allowed, secured claims for all purposes in the cases and any subsequent proceedings under the Bankruptcy Code, and the Prepetition Liens shall be deemed legal, valid, and binding. (Interim Order ¶ 38(c)) |
| **Adequate Protection for Prepetition Secured Parties** *Fed. R. Bankr. P. 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii)* | Adequate protection for the Prepetition Secured Parties includes, replacement liens and superpriority claims, to the extent of diminution in value of their collateral, cash payments in an amount equal to all accrued but unpaid interest (whether prepetition or postpetition) owed to the Prepetition Secured Parties, and payment of accrued and unpaid interest and reasonable fees and expenses of the Prepetition Secured Parties (including fees and expenses of legal and financial professionals). See discussion in ¶ 44 herein. (Interim Order ¶ 37) |
| **Events of Default** *Fed. R. Bankr. P. 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Agreement contains certain Events of Default, as described in ¶ 39 below. (DIP Agreement § 8.1) |
| **Waiver or Modification of the Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Subject to five business days' written notice to the Debtors, upon an Event of Default, the automatic stay shall be terminated (solely with respect to the DIP Facility) to permit the exercise of remedies by the DIP Agent and the DIP Lenders, with a full waiver by the DIP Obligors of all rights to contest such termination except with respect to the existence of an Event of Default. (Interim Order ¶¶ 32, 33; DIP Agreement §8.1) |

| | |
|---|---|
| **Waiver or Modification of Applicability of Nonbankruptcy Law Relating to the Perfection or Enforceability of a Lien** *Fed. R. Bankr. P. 4001(c)(1)(B)(vii)* | All liens granted for the benefit of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, other than liens on Avoidance Actions (as defined below), shall be valid, enforceable, non-avoidable, and perfected, effective as of the date of entry of the Interim Order, and no further action shall be required to effect such perfection. (Interim Order ¶ 18) |
| **Indemnification** *Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Obligors agree to certain indemnities as described in ¶ 41 below. (Interim Order ¶ 2; DIP Agreement §10.4) |
| **Conditions to Borrowing** *Fed. R. Bankr. P. 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(ii)* | Customary borrowing conditions, including: (a) entry of the Interim Order or Final Order, as the case may be, (b) absence of any administrative claim that is senior to, or <u>pari</u> <u>passu</u> with, the superiority claim of the DIP Agent and the DIP Lenders (other than claims secured by Permitted Liens, Additional Permitted Liens, or the Carve-Out), (c) absence of any Default or Event of Default, (d) representations and warranties contained in the DIP Agreement are true and correct, and (e) extension of credit is consistent with the Budget (as defined below). (DIP Agreement §§ 3.1, 3.2, 3.3) |
| **Liens on Causes of Action Under Chapter 5 and Proceeds Thereof** *Fed. R. Bankr. P. 4001(c)(1)(B)(xi) Del. Bankr. L.R. 4001-2(a)(i)(D)* | Subject to entry of the Final Order, the DIP Agent, for the benefit of the DIP Lenders, shall be granted liens on all Avoidance Actions (as defined below) and any proceeds thereof. (Interim Order ¶ 16(b); DIP Agreement §2.23(n)) |

### Background

3.     On the date hereof (the "<u>Commencement Date</u>"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Fed. R. Bankr. P. 1015(b).

## Jurisdiction

5.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Debtors' Businesses

6.     The Debtors, together with their non-Debtor subsidiaries and affiliates (collectively, the "Company"), are a leading global manufacturer and supplier of two categories of consumable products used in the production of paper products (the "Clothing Segment") and roll technology products (the "Roll Covers Segment") installed in paper-making machines.  The Clothing Segment consists of engineered synthetic textile belts, which range in size from 15 feet in width to more than 460 feet in length, that allow for the extraction of water while transporting paper through a paper-making machine.  The Roll Covers Segment encompasses the covering and servicing of large metal rolls (up to 50 feet in length, six feet in diameter, and 140,000 pounds) upon which paper machine clothing products are often mounted and between which paper travels as it is processed from a "wet slurry" to a finished paper product.

7.     The Company operates 38 facilities in 13 countries, 32 of which are manufacturing facilities.  The Company's facilities are strategically located in the major paper-producing regions of North America, Europe, South America, and Asia-Pacific.  Eleven of these facilities manufacture clothing, twenty facilities manufacture and service roll covers, and one facility manufactures both clothing and roll covers.  The Company owns substantially all of its manufacturing facilities.

8.     As of January 1, 2010, the Company employs approximately 3,290 people worldwide, of which approximately 2,500 are manufacturing employees, 400 are sales and

marketing employees, 100 employees are in research and development, and 300 are administrative and other employees.

9.　　For the fiscal year ended December 31, 2009, the Company generated, on a consolidated basis, $500.1 million in net sales. As of December 31, 2009, the Company reported, on a consolidated basis, total assets of $693.5 million and total liabilities of $813.2 million, including approximately $640.1 million of debt.

### The Debtors' Prepackaged Plan

10.　　Prior to the Commencement Date, the Debtors solicited votes on their proposed joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code pursuant to a disclosure statement, dated March 2, 2010 and supplement thereto, dated March 8, 2010 (together, the "Disclosure Statement"). On the Commencement Date, the Debtors filed the proposed plan, as amended (the "Plan") and the Disclosure Statement with the Court. As set forth in the Certification of The Garden City Group, Inc. with Respect to Solicitation and Tabulation of Votes on Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed on the Commencement Date, the Plan has been overwhelmingly accepted by all classes entitled to vote.

11.　　As described in the Disclosure Statement and the Declaration of Stephen Light in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "Light Declaration"), filed with the Court on the Commencement Date, the Plan contemplates a comprehensive financial restructuring of the Debtors' capital structure that will reduce the Debtors' leverage and enhance their long-term growth and competitive position. The Plan also provides for an improvement in the Debtors' liquidity by extending the maturity dates of their prepetition indebtedness. Under the Plan, general unsecured claims will be rendered unimpaired and holders of equity interests in Xerium will receive shares of new common stock to be issued

on the effective date of the Plan and warrants to purchase additional shares of new common stock.

**Prepetition Secured Indebtedness**

**A.    Credit Facility**

12.    As of the Commencement Date, Xerium and certain of its subsidiaries were parties to that certain Amended and Restated Credit and Guaranty Agreement, dated as of May 30, 2008 (as amended from time to time, the "Credit Facility"), by and among Xerium, XTI LLC, Xerium Italia S.p.A., Xerium Canada Inc., Huyck Wangner Austria GmbH, and Xerium Germany Holding GmbH, as borrowers, certain subsidiaries of the borrowers, as guarantors, various financial institutions and other persons from time to time, as lenders (the "Prepetition Secured Lenders"), Citicorp North America, Inc., as collateral agent (the "Prepetition Collateral Agent," and together with the Prepetition Secured Lenders and the Secured Swap Counterparty (as defined below), the "Prepetition Secured Parties"), and Citicorp North America, Inc., as administrative agent (the "Prepetition Administrative Agent," and together with the Prepetition Collateral Agent, the "Prepetition Agents").

13.    The Credit Facility consists of (a) a $50 million revolving credit facility (the "Prepetition Revolver") and (b) seven term loans with an aggregate original principal balance of $650 million (the "Prepetition Term Loans"). The Prepetition Revolver matures on November 19, 2011, and the Prepetition Term Loans mature on May 19, 2012. As of January 1, 2010, $28.1 million was outstanding on the Prepetition Revolver, and $585.4 million was outstanding on the Prepetition Term Loans. Each of the Debtors is a borrower or a guarantor under the Credit Facility (collectively, the "Prepetition Credit Parties"). The U.S. Debtors guarantee all obligations under the Credit Facility. In addition to being borrowers, the non-U.S. Debtors guarantee the non-U.S. obligations under the Credit Facility.

14.     To secure the obligations under the Credit Facility, pursuant to that certain Pledge and Security Agreement, dated as of May 19, 2005 (as amended from time to time, the "Pledge and Security Agreement"), by and between the Prepetition Credit Parties and the Prepetition Collateral Agent, and pursuant to other collateral documents, certain Prepetition Credit Parties granted the Prepetition Collateral Agent and the Prepetition Secured Lenders a security interest in, and continuing liens on, substantially all of the Prepetition Credit Parties' assets.

15.     Pursuant to the Pledge and Security Agreement, the Prepetition Collateral Agent was granted, for the benefit of the Prepetition Secured Lenders, a security interest in, and continuing liens on, all of the Prepetition Credit Parties'

> right, title and interest in, to and under all personal property of such Grantor[7] including, but not limited to the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located
>
> a.     Accounts;
> b.     Chattel Paper;
> c.     Deposit Accounts;
> d.     Documents;
> e.     General Intangibles;
> f.     Goods;
> g.     Instruments;
> h.     Insurance;
> i.     Intellectual Property;
> j.     Investment Related Property;
> k.     Letter of Credit Rights;
> l.     Money;
> m.     Commercial Tort Claims;
> n.     all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and
> o.     all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

---

[7] Capitalized terms used in this paragraph but not defined herein shall have the meaning ascribed to such terms in the Pledge and Security Agreement.

(Pledge and Security Agreement, § 2.1).  Certain of the Prepetition Credit Parties also pledged equity interests in certain of their subsidiaries and granted mortgages and deeds of trust on their real property (collectively with the property and assets listed in clauses (a) – (o) above but specifically excluding the property and assets identified in Section 2.2 of the Pledge and Security Agreement, the "Collateral").

### B. Secured Swap Termination Claims

16.　　Xerium enters into derivative financial instruments to manage exposures that arise from business activities that result in the receipt or payment of future known cash amounts, the value of which are determined by interest rates or foreign exchange rates.  Such instruments include certain interest rate swaps to hedge variable interest related to the Credit Facility and foreign exchange contracts to protect the value of certain assets and obligations.

17.　　With respect to interest rate swaps, prior to the Commencement Date, (a) Xerium was counterparty to that certain 1992 ISDA Master Agreement (Multicurrency – Cross Border) and Schedule, dated as of November 16, 2007, and that certain Confirmation, dated as of November 19, 2007, in each case, by and among Xerium and Merrill Lynch Capital Services, Inc. (the "Secured Swap Counterparty"), with an original notional amount of $132,808,000 and (b) XTI LLC was counterparty to that certain 1992 ISDA Master Agreement (Multicurrency – Cross Border) and Schedule, dated as of November 16, 2007, and that certain Confirmation, dated as of November 19, 2007, in each case, by and among XTI LLC and the Secured Swap Counterparty, with an original notional amount of €77,723,000 (together with the interest rate swap referenced in clause (a) above, the "Secured Swaps").  The Debtors' obligations under the Secured Swaps were secured by the Collateral, ratably with the Prepetition Credit Parties' obligations under the Credit Facility.   As described below, the Secured Swaps have been

terminated and the claims of the Secured Swap Counterparty have been fixed; however, such claims remain ratably secured by the Collateral.

**Events Leading To The Chapter 11 Filings**

18.     As more fully described in the Light Declaration, a sustained decrease in global demand for paper products and the resulting reduction in capacity of the Company's customers have adversely impacted the Company's revenues.

19.     In August of 2009, the Company anticipated that it would not be in compliance with certain financial covenants under the Credit Facility.  Accordingly, in an effort to provide the Debtors time to explore viable options for a financial restructuring, the Debtors sought waivers of such covenants from the Prepetition Agents and the Prepetition Secured Lenders.  Following discussions between the parties, the Debtors, the Prepetition Agents, and the Prepetition Secured Lenders entered into a series of four waiver agreements (collectively, the "Waiver Agreements"), pursuant to which the Prepetition Secured Lenders agreed, among other things, to waive violations of certain financial covenants under the Credit Facility through April 1, 2010.

20.     Subsequent to the parties' execution of the first Waiver Agreement, the Debtors, the Prepetition Administrative Agent, and certain of the Prepetition Secured Lenders negotiated the contours of a financial restructuring for the Debtors, and in late December 2009, the parties reached an agreement in principle to pursue a restructuring on the terms set forth in the Plan.

21.     In connection with the restructuring, the Debtors also engaged in discussions with the Secured Swap Counterparty to address a mutual termination of the Secured Swaps.  As a result of these discussions, the Debtors and the Secured Swap Counterparty entered into a termination and forbearance agreement (as amended from time to time, the "Secured Swap

Termination Agreement"), pursuant to which, among other things, the Secured Swaps were terminated, the claims of the Secured Swap Counterparty were fixed (such claims, the "Secured Swap Termination Claims"), and the Secured Swap Counterparty agreed to forbear from exercising any rights and remedies under the Secured Swap or in respect of the Secured Swap Termination Claims through April 1, 2010.

22.     During the period in which the Waiver Agreements and the forbearance provided under the Secured Swap Termination Agreement were in effect, the parties negotiated definitive documentation to memorialize their agreement in principal, and the Debtors solicited votes on the Plan in anticipation of these chapter 11 cases.  As the Debtors were unable to achieve a consensual out-of-court restructuring with the Prepetition Secured Lenders, the Debtors determined to effectuate the contemplated restructuring pursuant to chapter 11 of the Bankruptcy Code.  The Debtors concluded, with the assistance of their investment banker and financial advisor, Rothschild Inc. ("Rothschild"), that postpetition financing and the use of cash collateral is necessary to enable the Debtors to continue their business operations in the ordinary course and preserve the going concern value of their assets.

## Relief Requested

23.     By this motion and for the reasons set forth below, pursuant to sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Fed. R. Bankr. P. 2002, 4001, and 9014, and Del. Bankr. L.R. 4001-2, the Debtors respectfully request that the Court (a) authorize the Debtors, on an interim basis pending the Final Hearing and entry of the Final Order, to (i) obtain postpetition senior secured financing up to an aggregate principal amount of $80,000,000; provided that, although on the Closing Date the full amount of the Commitments shall be funded (with respect to the Term Loan Commitment) or made available (with respect to the Revolver Commitment), during such interim period the Debtors shall be permitted to use

approximately $21,000,000 of such amount, consistent with the Budget (as defined below) and the DIP Agreement,[8] (ii) utilize cash collateral, (iii) grant priming liens, priority liens, and superpriority claims to the DIP Agent and the DIP Lenders, and (iv) grant adequate protection to the Prepetition Secured Parties, (b) authorize the Debtors, on a final basis, to (i) obtain postpetition senior secured financing up to an aggregate principal amount of $80,000,000, (ii) utilize cash collateral, (iii) grant priming liens, priority liens, and superpriority claims to the DIP Agent and the DIP Lenders, and (iv) provide adequate protection to the Prepetition Secured Parties, (c) schedule the Final Hearing,[9] and (d) grant related relief, in each case, on the terms and subject to the conditions described herein and set forth in the DIP Orders and the DIP Agreement.

**Debtors' Proposed DIP Facility**

### A.       Efforts to Obtain DIP Financing

24.       Beginning in the fall of 2009, the Debtors, together with Rothschild, initiated a dialogue with the Prepetition Administrative Agent regarding the possibility of the Prepetition Administrative Agent arranging and providing a postpetition financing facility to the

---

[8] Such amount is exclusive of funds deposited into the Term Loan LC Collateral Account, as well as the Revolver Commitment, on the Closing Date.

[9] As the Debtors are required to provide notice of the Final Hearing to the same parties entitled to receive notice of the combined hearing to consider (among other things) the approval of the Disclosure Statement and confirmation of the Plan, for the sake of efficiency and to minimize costs, the Debtors propose to include notice of the Final Hearing in the notice of such combined hearing (the "Combined Notice"). The proposed form of the Combined Notice is attached as Exhibit B to the Motion of Debtors' Pursuant to 11 U.S.C. §§ 105(a), 1125, 1126, and 1128, and Fed. R. Bankr. P. 2002, 3017, 3018, and 3020 for Entry of an Order (I) Scheduling a Combined Hearing to Consider Approval of Disclosure Statement, Solicitation Procedures and Form of Ballots, and Confirmation of Debtors' Prepackaged Plan of Reorganization and Establishing Objection Deadlines with Respect Thereto and (II) Approving the Form and Manner of Notice of Commencement of Chapter 11 Cases, Final Hearing To Consider Approval of Debtors' Postpetition Senior Secured Financing and Use of Cash Collateral, Combined Hearings, Related Deadlines, and Assumption and Rejection of Executory Contracts and Unexpired Leases Pursuant to Debtors' Joint Prepackaged Plan of Reorganization.

Debtors, in the event the Debtors were to commence chapter 11 cases. By early February 2010, notwithstanding the diligent efforts of the Debtors, the Prepetition Administrative Agent, and their respective advisors with respect to the negotiation and documentation of the Plan and other preparatory efforts related to the potential commencement of these cases, the Debtors had yet to secure a postpetition financing commitment. At that same time, the Debtors and Rothschild recognized that, according to the Debtors' current liquidity forecast, the Debtors likely would be unable to both pay in full the principal and interest due to the Prepetition Secured Lenders on March 31, 2010 and have sufficient funds to satisfy the Debtors' ordinary course obligations without the benefit of third-party financing. Accordingly, Rothschild, at the Debtors' request, commenced a process to survey the market for other potential sources for postpetition financing, including certain Prepetition Secured Parties (other than the Prepetition Administrative Agent) and other unrelated third parties that could have an interest in providing such financing to the Debtors.

25. In that regard, Rothschild approached approximately twelve potential lenders, comprised of a cross-section of traditional and non-traditional lenders capable of providing the requisite financing to the Debtors, in order to provide such parties with general background regarding the Debtors' businesses, and to determine whether such parties had an interest in providing the prospective financing. In response to these inquiries, six parties executed non-disclosure agreements ("NDAs"), and each such party received information from Rothschild including, among other things, a brief overview of the Debtors' proposed restructuring, a copy of the agreement in principle with the Prepetition Secured Lenders, draft financial projections demonstrating the feasibility of the proposed restructuring, and a draft debtor in possession financing budget.

26.     During this process, in late February 2010, the Debtors, with the assistance of Rothschild, obtained a commitment for postpetition financing from the Prepetition Administrative Agent (which is embodied in the DIP Agreement submitted to the Court for approval pursuant to this motion).  Although none of the NDA parties had yet submitted a financing proposal to the Debtors, the Debtors were advised that certain NDA counterparties had conveyed to Rothschild their respective expectations regarding the all-in costs of the postpetition financing required by the Debtors.  In each case, the expected all-in costs exceeded the costs associated with the postpetition financing proposed by the Prepetition Administrative Agent.  In addition, the Debtors were further advised by Rothschild, based upon its knowledge and understanding of the current debtor in possession financing market, that there could be no realistic expectation of a lender or lender group providing postpetition financing to the Debtors secured by liens junior to the liens securing the Credit Facility, or on an unsecured basis.

27.     It bears noting that, because the Debtors' obligations to the Prepetition Secured Parties are secured by substantially all of the Debtors' assets, the Debtors had only two potential options with respect to the prospect of obtaining postpetition financing from a lender or lender group other than the Prepetition Administrative Agent:  (a) find a lender willing to extend postpetition financing with priority junior to that of the Prepetition Secured Parties or (b) obtain postpetition financing that primed the liens of the Prepetition Secured Parties without such parties' consent.  Given the status of the capital markets at the time and the Debtors' imminent liquidity needs, the Debtors and Rothschild concluded that any proposal for postpetition financing (other than the proposal of the Prepetition Administrative Agent) in all likelihood would have contemplated a non-consensual priming lien on substantially all of the Debtors' assets, and thus would not have contemplated (x) unsecured credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code, (y) credit secured by liens junior to the Prepetition Secured Parties' liens, or (z) credit secured by liens equal to the Prepetition Secured Parties' liens.

28.     Accordingly, the Debtors and Rothschild determined in late February 2010 not to incur further costs or devote additional resources to the financing process.  Rather, the Debtors and Rothschild focused their efforts on the negotiation, documentation, and finalization of the proposal submitted by the Prepetition Administrative Agent.  The Debtors, in the sound exercise of their business judgment, ultimately concluded that the DIP Facility proposed by the DIP Lenders, which is premised upon a consensual priming of the Prepetition Secured Parties' liens and thus avoids the need for a lengthy and uncertain priming dispute, is the best postpetition financing option available to the Debtors.

**B.     Implementation of the DIP Agreement**

29.     The Debtors, the DIP Lenders, and the DIP Agent engaged in extensive, good faith, arm's length negotiations with respect to the terms and conditions of the postpetition financing.  The result of these negotiations is the proposed DIP Facility, including the form of the DIP Agreement.

30.     As a condition to their agreement to provide postpetition financing to the Debtors, the DIP Agent and the DIP Lenders required that the total $80 million commitment under the DIP Facility, comprised of the $60 million Term Loan Commitment and the $20 million Revolver Commitment, be fully funded (with respect to the Term Loan Commitment) and made available (with respect to the Revolver Commitment) upon entry of the Interim Order and satisfaction or waiver of the closing conditions set forth in the DIP Agreement (such date, the "Closing Date").  Pursuant to the DIP Agreement, on the Closing Date, the Term Loan proceeds shall be deposited into two separate accounts to be maintained by the DIP Agent – the

Term Loan LC Collateral Account and the Term Loan Deposit Account. Approximately $19 million of the $60 million Term Loan proceeds shall be deposited into the Term Loan LC Collateral Account, for the sole purpose of cash collateralizing letters of credit outstanding under the Credit Facility and any letters of credit issued under the DIP Facility.[10] The balance of the Term Loan proceeds, less an amount equal to the fees and expenses payable to the DIP Agent, the Arranger, and the DIP Lenders upon the Closing Date in connection with consummation of the DIP Facility, shall be deposited into the Term Loan Deposit Account. Funds deposited into this account may be used by the Debtors only in a manner that is consistent with the Budget (as defined below) and in accordance with certain financial covenants set forth in the DIP Agreement.[11]

31. On the Closing Date, the DIP Borrower also shall be able to draw upon the $20 million Revolver Commitment. As with respect to the Term Loan Deposit Account, the Debtors' ability to draw upon the Revolver Commitment also is limited by the Budget (as defined below) and the applicable financial covenants set forth in the DIP Agreement.

32. The Debtors have provided a budget to the DIP Agent, which forecasts projected cash flow for the thirteen-week period following the Commencement Date, and which budget has been approved in form and substance by the DIP Agent (as subsequently amended,

---

[10] As reflected in the Budget, the total amount of Term Loan proceeds to be deposited into the Term Loan LC Collateral Account on the Closing Date is $18,985,000.

[11] Pursuant to Section 6.8(a) of the DIP Agreement, the DIP Obligors are required to maintain at all times during the period from the Closing Date through May 31, 2010, Cash and Cash Equivalents on hand in an amount equal to or greater than $40 million (including amounts held on deposit in the Term Loan Deposit Account and the unused portion of the Revolver Commitment, but excluding cash in the Term Loan LC Collateral Account).

modified, and updated from time to time in accordance with the DIP Agreement, the "Budget").[12]

33.     As reflected in the Budget, the total amount of DIP Facility proceeds potentially required by the DIP Borrower prior to the anticipated entry of the Final Order on or about April 25, 2010 is approximately $21 million (the "Interim Amount").[13]  Absent the ability to use the Interim Amount pending entry of the Final Order, the Debtors will not have sufficient cash on hand to enable them to satisfy their postpetition obligations as they come due. Accordingly, access to these funds on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors' estates by ensuring that the Debtors have sufficient liquidity to continue their business operations uninterrupted during the period prior to entry of the Final Order, to fund the administration and prosecution of these cases, and to satisfy the proposed adequate protection payments to the Prepetition Secured Parties.

34.     Furthermore, as evidenced by the Budget, the DIP Facility is appropriately sized given the Debtors' projected liquidity needs during these cases.  The Debtors believe that the Budget is feasible and will provide the Debtors with sufficient liquidity to operate during the pendency of these chapter 11 cases without the accrual of unpaid administrative expenses.

35.     As required by the DIP Agent, the Commitment Letter, dated February 26, 2010, between Xerium and Citigroup Global Markets Inc. (the "Commitment Letter"), provides that the Fee Letter, dated February 26, 2010, between Xerium and Citigroup Global Markets Inc., executed in connection with the Commitment Letter (the "Fee Letter"), and the contents

---

[12] The Budget is annexed as Exhibit H to the DIP Agreement.  The DIP Agreement is annexed as Exhibit 1 to the Interim Order.

[13] Pursuant to Section 6.8(b) of the DIP Agreement, average monthly receipts and disbursements are consistent with the Budget if not less than 80%, and not more than 120%, respectively, of projected amounts set forth in the Budget.  See DIP Agreement § 6.8(b).

thereof, shall be treated as confidential information pursuant to Fed. R. Bankr. P. 9018. The Debtors have provided a copy of the Fee Letter to the U.S. Trustee, and have filed with the Court a motion to file the Fee Letter under seal (in each case, consistent with the terms of the Commitment Letter).

### C.     Liens and Claims

36.     Pursuant to the DIP Orders, all loans and obligations under the DIP Facility shall:

a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, constitute superpriority claims against each of the Debtors, with priority over any and all administrative expenses, diminution claims, all claims of any kind asserted by the Prepetition Secured Parties arising under the Interim Order or the Final Order, and all other claims against the Debtors, subject only to the Carve-Out and any claim secured by Permitted Liens or Additional Permitted Liens;[14]

b)     Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all existing and after-acquired real and personal, tangible and intangible, property of the Debtors' respective estates not subject to valid, perfected, and non-avoidable liens as of the Commencement Date, including, upon entry of the Final Order, all causes of action arising under chapter 5 of the Bankruptcy Code and all proceeds thereof (the "Avoidance Actions"), subject only to the Carve-Out and any Permitted Liens and Additional Permitted Liens; and

c)     Pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the Collateral that is subject to existing liens that secure the obligations of the DIP Obligors under or in connection with the Credit Facility and the Secured Swaps, which senior priming liens shall also prime any liens granted after the Commencement Date to provide adequate protection to the Prepetition Secured Parties, but shall be subject to the Carve-Out and any Permitted Liens and Additional Permitted Liens.

---

[14] "Permitted Liens" are liens that the DIP Obligors are permitted to incur under the DIP Facility, including liens in favor of the DIP Agent under the DIP Facility and various statutory liens. "Additional Permitted Liens" are liens in existence as of the Commencement Date that the Debtors were permitted to incur under the Credit Facility, certain capitalized leases and purchase money security interests, and various statutory liens whether arising before or after the Commencement Date.

37. Except with respect to liens on Avoidance Actions, the liens securing the DIP Facility shall be valid, perfected, enforceable, and effective as of the date of entry of the Interim Order without any further action by the DIP Obligors, the DIP Agent, or the DIP Lenders and without necessity of the execution by the DIP Obligors of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

**D. Provisions to be Highlighted Pursuant to Del. Bankr. L.R. 4001-2**

38. The Debtors believe that the following provisions of the DIP Agreement and/or the Interim Order must be highlighted pursuant to Del. Bankr. L.R. 4001-2:[15]

a) **Binding the Estate to Validity, Perfection, or Amount of Secured Debt.** Although certain stipulations by the DIP Obligors set forth in the Interim Order relate to the validity, amount and perfection of the Prepetition Indebtedness and the Prepetition Liens, the Interim Order reserves the rights of non-Debtor parties in interest, including any statutory committee, to initiate a Challenge with respect thereto by the earlier of (i) sixty (60) days from the date of appointment of a Committee, if brought by a Committee, and (ii) seventy-five (75) days from the date of entry of the Interim Order, if brought by any non-Debtor party other than a Committee; <u>provided</u> that a Challenge may not be commenced, asserted or continued by a Committee or any other non-Debtor party if a chapter 11 plan of reorganization that provides for the allowance of the Prepetition Indebtedness or otherwise resolves such Challenge has been confirmed and consummated. (Interim Order ¶ 38(c)).

b) **Granting Liens on DIP Obligors' Claims and Causes of Action Under Chapter 5 of the Bankruptcy Code.** Effective as of entry of the Final Order, the DIP Obligors shall grant liens on Avoidance Actions and proceeds thereof. (Interim Order ¶ 16(b); DIP Agreement at §2.23(n))

c) **Waiver of Section 506(c) Surcharge.** Effective as of entry of the Final Order, the Debtors waive the ability to surcharge against the DIP Collateral and the Prepetition Collateral (each as defined in the Interim Order) without the prior written consent of the Prepetition Collateral Agent, the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders (as applicable). (Interim Order ¶ 12).

---

[15] Additional extraordinary provisions not specifically covered by Del. Bankr. L.R. 4001-2 are highlighted in the Concise Statement provided at the outset of the motion.

### E. Events of Default

39. The DIP Agreement contains customary events of default for loan agreements of this type. Such events of default include, but are not limited to, the following:

a) Failure to pay principal (no cure) or interest or fees (three-day cure) when due;

b) Cross-default to payment defaults by the DIP Obligors, or any of their subsidiaries, on principal aggregating at least $5,000,000 (other than any failure, default or breach resulting solely from or caused by the filing of these cases);

c) Breach of any negative covenant, any financial covenant, or the use of proceeds covenant;

d) Breach of any other covenant or other related loan or collateral document (twenty-day cure);

e) Material inaccuracy of any representation or warranty when made;

f) A Change of Control, other than as a result of the transactions contemplated by the Plan;

g) Entry of an order granting relief from the automatic stay to permit foreclosure on any assets of the DIP Obligors which have a value in excess of $1,000,000;

h) Entry of an order appointing a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers under section 1106 of the Bankruptcy Code;

i) Entry of an order confirming, or submission by the Debtors of, a plan of reorganization that does not provide for (i) payment in full of the DIP Facility before the effective date of such plan, or (ii) conversion of the DIP Facility to an exit financing facility;

j) Entry of an order granting any superpriority claim (other than the Carve-Out and any claims secured by Permitted Liens or Additional Permitted Liens) that is equal or senior to the DIP Agent's superpriority claim;

k) Entry of an order granting, or permitting the grant, of liens on the Collateral other than as permitted by the DIP Agreement and the related documents, including the DIP Orders;

l) Any DIP Obligor files any action, suit, or other proceeding challenging (i) the validity, perfection, or priority of any liens securing the Credit Facility,

(ii) the validity or enforceability of any of the Credit Documents (as defined in the Credit Facility), or (iii) asserting any avoidance claim against, or seeking to recover money damages from, any agent or lender under the Credit Facility or DIP Facility;

m) Conversion of any of the cases to a case under chapter 7 of the Bankruptcy Code;

n) Failure by the Court to enter the Final Order within thirty-five days after entry of the Interim Order; and

o) Any DIP Obligor fails to comply with any material term, provision, or condition of the Interim Order or the Final Order.

**F.  Remedies**

40.     Following the provision by the DIP Agent to the Debtors of five business days' written notice of an Event of Default under the DIP Facility (with a copy of such notice to be provided to counsel to the Debtors, counsel to any statutory committee appointed in the chapter 11 cases, and the U.S. Trustee, and filed with the Court), without further order of, or application to, the Court, all amounts owed to the DIP Agent and the DIP Lenders under the DIP Agreement, the Interim Order, or the Final Order (as applicable), shall be immediately due and payable, and the DIP Agent and the DIP Lenders shall have the rights and remedies provided in the DIP Agreement, the Interim Order, or the Final Order (as applicable).  Pursuant to the DIP Agreement, the DIP Obligors waive their right to contest the exercise of remedies by the DIP Agent and the DIP Lenders; however, the DIP Obligors may contest the assertion of the existence of an Event of Default.

**G.  Indemnification**

41.     The DIP Obligors agree to indemnify the DIP Agent, the Issuing Bank (as defined in the Interim Order), the DIP Lenders, and their respective affiliates, officers, partners, directors, trustees, investment advisors, employees, and agents from liabilities relating to or arising out of, among other things, the DIP Agreement or any environmental claims or hazardous

materials activity arising from any action by the DIP Borrower or its subsidiaries. The indemnity does not extend to liabilities caused by or resulting from the willful misconduct or gross negligence of the indemnified parties.

## Use of Cash Collateral and Adequate Protection

42.     Most of the cash, cash equivalents, and other amounts on deposit or maintained in the Debtors' bank accounts constitute proceeds which, to the extent subject to valid and perfected liens, are the cash collateral of the Prepetition Secured Parties, subject to the security interests of such parties in accordance with section 552(b) of the Bankruptcy Code (collectively, the "Cash Collateral").

43.     The Debtors have been informed that the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to the grant of adequate protection, including the proposed Adequate Protection Liens (as defined below) and payments discussed below, and the other terms and conditions set forth in the Interim Order.

44.     To the extent that their interests in the Collateral constitute valid and perfected security interests and liens as of the Commencement Date, the Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Collateral to the extent of any diminution in the value of such Collateral from and after the Commencement Date. As adequate protection for any such diminution in value, the Prepetition Secured Parties shall be granted (a) liens on the Collateral (the "Adequate Protection Liens"), subject only to (i) liens granted in favor of the DIP Agent and the DIP Lenders and (ii) the Carve-Out and any Permitted Liens and Additional Permitted Liens, (b) a superpriority claim, subject only to (i) the superpriority claims granted in favor of the DIP Agent and the DIP Lenders and (ii) the Carve-Out and any claim

secured by Permitted Liens or Additional Permitted Liens, (c) payment of cash in an amount equal to all accrued and unpaid interest (whether prepetition or postpetition) under the Credit Facility and the Secured Swap Termination Agreement, as applicable, and (d) payment of reasonable fees and expenses incurred by the Prepetition Administrative Agent and the Prepetition Secured Lenders under the Credit Facility and by the Secured Swap Counterparty under the Secured Swap Termination Agreement (in each case, including reasonable fees and expenses of legal and financial professionals).

45.     The Adequate Protection Liens shall be valid, perfected, enforceable, and effective as of the date of entry of the Interim Order without any further action by the DIP Obligors, the Prepetition Administrative Agent, or the Prepetition Secured Parties and without the need for execution by the DIP Obligors of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

## The DIP Facility Should Be Authorized

46.     Approval of the DIP Facility and the use of Cash Collateral will enable the Debtors to fund their current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs. Absent the requisite financing, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their businesses, their going concern value, and ultimately, their ability to successfully reorganize. Because the Debtors' available and projected Cash Collateral is insufficient to fund these critical expenditures, the credit provided under the DIP Facility is essential to maximizing the value of the Debtors' estates for the benefit of all stakeholders. Further, the availability of credit under the DIP Facility will instill much needed confidence in the Debtors' employees, vendors, and customers, thereby greatly enhancing the likelihood that the Debtors will continue to receive the support of

their key constituents throughout the pendency of these chapter 11 cases. Accordingly, the timely approval of the relief requested herein is imperative.

47.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (x) the debtor is unable to obtain such credit otherwise and (y) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

48.     The Debtors have been unable to obtain sufficient financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code. Despite their concerted efforts, the Debtors did not find a lender or group of lenders, within the timeframe necessitated by the Debtors' liquidity needs, willing to extend (a) unsecured credit pursuant to section 364(a) or (b) of the Bankruptcy Code, allowable under section 503(b)(1) as an administrative expense or (b) credit in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code. Similarly, the Debtors' efforts to procure postpetition financing or other financial accommodations from any other prospective lender or group of lenders on terms and conditions more favorable than the proposed DIP Facility, and within the necessary timeframe, proved unsuccessful. Accordingly, the

Debtors propose to obtain the financing set forth in the DIP Agreement by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), and (d) of the Bankruptcy Code.

49.     Having determined that postpetition financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility with the DIP Agent and the DIP Lenders extensively and at arm's length.  So long as a debtor's business judgment does not run afoul of the letter and spirit of the Bankruptcy Code, courts grant a debtor considerable discretion with respect to postpetition financing.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In Farmland Industries, Inc., 294 B.R. 855, 881-84 (Bankr. W.D. Mo. 2003); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

50.     A debtor is not required to seek alternative financing from every possible lender in order to satisfy the requirements of section 364(d) of the Bankruptcy Code.  In re 495 Central Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  Rather, a debtor need only demonstrate sufficient efforts to obtain financing from other sources without the granting of senior liens.  Snowshoe, 789 F.2d at 1088 (the debtor demonstrated that credit could not be obtained without the granting of a senior lien, in part by providing evidence that efforts to obtain financing from other financial institutions in the geographic area had proven unsuccessful).

51.    The diligent efforts of the Debtors and Rothschild notwithstanding, the Debtors were unable to procure the requisite postpetition financing within the Debtors' expedited timeframe absent the granting of superpriority claims and priming liens.  Substantially all of the Debtors' assets are encumbered, and given these limitations, the Debtors have successfully negotiated postpetition financing on the best terms available.  The circumstances of these chapter 11 cases necessitate postpetition financing under sections 364(c) and (d) of the Bankruptcy Code. Further, although the DIP Agent and the DIP Lenders required that the total $80 million commitment under the DIP Facility be fully funded (with respect to the Term Loan Commitment) and made available (with respect to the Revolver Commitment) prior to entry of the Final Order, the Debtors will be able to use the Interim Amount pending entry of the Final Order.  In light of the foregoing reasons, the DIP Facility reflects the exercise of the Debtors' sound business judgment.

52.    The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length.  Accordingly, the DIP Lenders and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.[16]

### The Use of Cash Collateral Should Be Approved and the Proposed Adequate Protection Should Be Authorized

53.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this

---

[16] The provisions highlighted pursuant to Del. Bankr. L.R. 4001-2 were negotiated thoroughly and were required both by the DIP Lenders for the availability of the DIP Facility and the Prepetition Secured Parties for their consent to use Cash Collateral.  Therefore, the inclusion of such provisions is justified by the facts and circumstances of these cases.

section." 11 U.S.C. § 363(c)(2). In addition to the DIP Facility, the Debtors require the use of Cash Collateral in order to ensure they have the liquidity necessary to fund their day-to-day business operations. Absent authority to use Cash Collateral, the Debtors' liquidity needs will not be satisfied, jeopardizing the Debtors' ability to continue business operations and the success of these chapter 11 cases. Thus, the use of Cash Collateral is imperative to the preservation of the Debtors' going concern value and to ensure the ultimate success of the Debtors' efforts to reorganize.

54.     The Prepetition Secured Parties have consented to the use of Cash Collateral on the terms set forth herein and in the Interim Order, and their interests in the Cash Collateral are adequately protected as described herein. Accordingly, the Debtors' request to use Cash Collateral in the operation of their businesses and the administration of these chapter 11 cases should be approved.

55.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by the trustee, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of the relief. 11 U.S.C. § 361. Adequate protection is an elastic concept, and accordingly, what constitutes adequate protection must be decided on a case-by-case basis. See MBank Dallas v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987); Martin v. U.S. (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985). The focus of the inquiry is whether a secured creditor is protected from diminution in the value of its interest in the collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The

whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy") (internal citations omitted).

56.     In consideration for the adequate protection proposed herein, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral and entry into the DIP Facility.  The Adequate Protection Liens, superpriority claim, cash payments, and other protections afforded the Prepetition Secured Parties provide ample protection against any diminution in the value of their interests in the Collateral.  Accordingly, the adequate protection proposed herein is fair, reasonable, and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

57.     The relief requested herein contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to (a) permit the DIP Obligors to grant the security interests, liens, and superpriority claims described above with respect to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as the case may be, and to perform such acts as may be reasonably requested to assure the perfection and priority of such security interests and liens, (b) permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and continuance of an Event of Default and after five business days' written notice thereof, the rights and remedies provided in the DIP Agreement, the Interim Order, and the Final Order, as applicable, and (c) implement the terms of the proposed DIP Orders.  In the Debtors' business judgment, the stay modification requested herein is fair and reasonable under the circumstances.

### Interim Approval Should Be Granted

58.     Fed. R. Bankr. P. 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen

days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a hearing to consider the relief requested on a final basis.

59.     Pursuant to Fed. R. Bankr. P. 4001(b) and (c), the Debtors respectfully request that the Court conduct an expedited preliminary hearing on this motion and (a) approve the DIP Facility on an interim basis, (b) authorize the Debtors to use Cash Collateral and, consistent with the Budget and the DIP Agreement, use up to $21 million of the DIP Facility on an interim basis, pending the Final Hearing and entry of the Final Order, in order to finance the Debtors' ongoing business operations and avoid immediate and irreparable harm to the Debtors, their estates and creditors, and all parties in interest, and (c) schedule the Final Hearing.

60.     The Debtors lack the funds necessary to continue their business operations, and thus, have an urgent and immediate need for liquidity. Absent authorization to use Cash Collateral and obtain credit under the DIP Facility, on an interim basis pending the Final Hearing, the Debtors will suffer immediate and irreparable harm, as the Debtors will be unable to satisfy their postpetition obligations as they come due, to the detriment of their estates and creditors, and all parties in interest. Accordingly, the interim relief requested herein is vital to preserving the Debtors' going concern value and ensuring the Debtors a meaningful opportunity for a successful reorganization.

### Waiver of Fed. R. Bankr. P. 6004(a) and (h)

61.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Fed. R. Bankr. P. 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Fed. R. Bankr. P. 6004(h).

## Notice

62.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases.  Pursuant to Del. Bankr. L.R. 9013-1(m), notice of the "first-day" hearing to consider this motion is being provided to (i) the U.S. Trustee, (ii) the holders of the fifty largest unsecured claims against the Debtors on a consolidated basis, (iii) counsel to Citicorp North America, Inc., as administrative agent for the Debtors' prepetition secured lenders and prospective postpetition lenders, (iv) Merrill Lynch Capital Services, Inc., and (v) the Internal Revenue Service.  Following the hearing, a copy of this motion and any order entered with respect hereto will be served on (a) the foregoing parties, and (b) all parties having filed requests for notices in these chapter 11 cases.  Due to the urgency of the circumstances and the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

**No Prior Motion**

63.    No prior motion for the relief requested herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:    March 30, 2010
            Wilmington, Delaware

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

John J. Rapisardi
Sharon J. Richardson
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Proposed Co-Attorneys for Debtors
and Debtors in Possession

## EXHIBIT A

## Proposed Interim Order

---------------------------------------------------------------------------x

In re                                          :     Chapter 11

                                               :
XERIUM TECHNOLOGIES, INC., et al.,[1]          :     Case No. 10-_____ (   )

                                               :
                      Debtors.                 :     Jointly Administered

                                               :

---------------------------------------------------------------------------x

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO
OBTAIN POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 105, 362, 363 AND 364, (II) GRANTING LIENS AND
SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO
11 U.S.C. §§ 364 AND 507, (III) AUTHORIZING USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (IV) PROVIDING ADEQUATE PROTECTION TO
PREPETITION SECURED LENDERS AND SECURED SWAP COUNTERPARTY
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364, AND 507, AND (V) SCHEDULING
<u>FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)</u>**

Upon the motion (the "<u>Motion</u>") dated March 30, 2010 of Xerium Technologies, Inc.

(the "<u>DIP Borrower</u>") and its affiliated debtors, each as debtor and debtor-in-possession

(collectively, the "<u>Debtors</u>"), in the above captioned cases (collectively, the "<u>Cases</u>") pursuant to

sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e), and 507 of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Del. Bankr. L.R. 4001-2, requesting,

among other things:

---

[1] The Debtors in these chapter 11 cases (along with the last four digits of each Debtor's federal tax identification number or its foreign equivalent) are: Xerium Technologies, Inc. (8674), Huyck Licensco Inc. (0434), Stowe Woodward Licensco LLC (4459), Stowe Woodward LLC (4102), Wangner Itelpa I LLC (3561), Wangner Itelpa II LLC (3562), Weavexx, LLC (7969), Xerium Asia, LLC (3367), Xerium III (US) Limited (4460), Xerium IV (US) Limited (4461), Xerium V (US) Limited (4462), XTI LLC (6754), Xerium Canada Inc. (0003), Huyck.Wangner Austria GmbH (0323), Xerium Germany Holding GmbH (3219), and Xerium Italia S.p.A. (0150). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 8537 Six Forks Road, Suite 300, Raleigh, North Carolina 27615.

a. authorization for the DIP Borrower to obtain postpetition financing and for all of the DIP Borrower's U.S. subsidiaries that are Debtors (collectively, the "DIP Guarantors" and, together with the DIP Borrower, the "DIP Obligors") to guaranty the DIP Borrower's obligations in connection with such financing, up to an aggregate principal amount of $80 million (the "Commitment Amount"), pursuant to a senior secured superpriority priming debtor-in-possession facility (the "DIP Facility") comprised of (i) a $20 million senior secured superpriority priming debtor-in-possession revolving loan facility (the "Revolving Facility") and (ii) a $60 million senior secured superpriority priming debtor-in-possession term loan facility (the "Term Loan Facility"), with Citicorp North America, Inc. acting as Administrative and Collateral Agent (in such capacity, the "DIP Agent") for itself and a syndicate of financial institutions (collectively, the "DIP Lenders"), with Citicorp North America, Inc. as the issuing bank (the "Issuing Bank") and Citigroup Global Markets Inc., acting as Sole Lead Arranger and Sole Bookrunner (the "Arranger");

b. that this Court approve the borrowings under the DIP Facility pursuant to the terms and conditions of that certain Superpriority Priming Senior Secured Debtor-In-Possession Credit and Guarantee Agreement (the "DIP Agreement"), a copy of which is attached as Exhibit "1" hereto, among the DIP Borrower, the DIP Guarantors, the DIP Agent and the DIP Lenders, and any documents executed in connection therewith, and authorize the Debtors to execute and deliver, from time to time, any and all such documents,

instruments and agreements, and perform such other acts as may be required, necessary or desirable in connection with the DIP Agreement, including, without limitation, the payment of all fees, interest and charges required under the DIP Agreement;

c.   the granting of adequate protection to the collateral agent (the "Prepetition Collateral Agent") and the lenders (the "Prepetition Secured Lenders") under that certain Amended and Restated Credit and Guaranty Agreement, dated as of May 30, 2008 (as amended from time to time, the "Prepetition Credit Facility"), and Merrill Lynch Capital Services, Inc. as a secured swap counterparty (the "Secured Swap Counterparty," and, together with the Prepetition Collateral Agent and the Prepetition Secured Lenders, the "Prepetition Secured Parties") to the various interest rate swap and related agreements entered into with the Debtors (the "Secured Swaps," collectively, with the Prepetition Credit Agreement and all related Credit Documents as defined in the Prepetition Credit Agreement, and as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Secured Financing Documents");

d.   authorization for the Debtors to use Cash Collateral (as such term is defined in the Bankruptcy Code) in which the Prepetition Secured Parties have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral, and any and all diminution in the value of the Priming Lien Collateral (as defined below);

e.     the granting to the DIP Lenders of the DIP Liens (as defined below) in all existing and after acquired real and personal, tangible and intangible, property of the DIP Obligors, including, upon entry of the Final Order (as defined below), all causes of action of the DIP Obligors arising under Chapter 5 of the Bankruptcy Code, and any and all proceeds thereof (the "<u>DIP Collateral</u>");

f.     the granting to the DIP Lenders, in accordance with section 364(c)(1) of the Bankruptcy Code, superpriority administrative claim status in respect of all amounts owing by the Debtors under the DIP Facility, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code ("<u>Superpriority</u>"), subject to indebtedness secured by Permitted Liens,[2] Additional Permitted Liens and the Carve-Out (as defined below);

g.     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "<u>Interim Hearing</u>") on the Motion be held before the Court to consider entry of this proposed interim order (the "<u>Interim Order</u>"), authorizing the DIP Borrower to borrow, on an interim basis, up to the Commitment Amount, and authorizing the DIP Obligors to utilize such portion of the total proceeds made available to the DIP Obligors under the DIP Facility as is consistent with the DIP Budget and the DIP Agreement, through and including the date of the Final Hearing (as defined below);

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Agreement.

h.  that the Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") approving the DIP Agreement, and in connection therewith, that the Court approve the form and manner of notice of the Final Hearing; and

i.  granting to the Debtors such further relief as is just and proper.

The Court having considered the Motion and the exhibits attached thereto, including, without limitation, the DIP Agreement; and the Interim Hearing having been held before the Court on _____, 2010; and upon all of the pleadings filed with the Court, all evidence presented in support the Interim Order, the arguments of counsel stated on the record of the Interim Hearing, and all of the proceedings held before the Court; and after due deliberation and consideration and good and sufficient cause appearing therefore,

THE COURT HEREBY FINDS:

A.  On March 30, 2010, (the "Commencement Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing in the management and possession of its businesses and properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Cases are being jointly administered under Case No. 10-_____ (___).

B.  No request has been made for the appointment of a trustee or examiner and no statutory committee (a "Committee") has yet been appointed in the Cases.

C.  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.   On March 2, 2010, prior to the Commencement Date, the Debtors mailed out for solicitation that certain Disclosure Statement of Xerium Technologies Inc. and Certain of Its Direct and Indirect Subsidiaries dated as of March 2, 2010 (the "Disclosure Statement"), including, as exhibit "A," a copy of that certain Debtors' Joint Prepackaged Plan of Reorganization dated as of March 2, 2010 (the " Plan "), to all parties entitled to vote on the Plan.

E.   The Plan provides for, among other things, on the date that the Plan becomes effective in accordance with the terms and provisions thereof (the "Plan Effective Date"), the conversion of the DIP Facility into an exit facility comprised of an exit revolving loan facility and an exit term loan facility (together, the "Exit Facility").

F.   Notice of the relief sought by the Motion and the Interim Hearing was delivered via facsimile, electronic mail, and/or overnight delivery to the following:  (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) those parties listed on the Consolidated List of Creditors Holding Largest Fifty Unsecured Claims Against the Debtors, as identified in connection with the Debtors' chapter 11 petitions; and (iii) Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, NY 10112, Attention: Andrew Rosenblatt, Esq. and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391, Attention: Joel A. Waite, Esq., co-counsel to the DIP Agent and the Prepetition Collateral Agent.  Given the nature of the relief sought in the Motion, the Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rule 4001 in all respects for purposes of entering this Interim Order.

G.   Subject to Paragraph 38 below, the Debtors acknowledge, admit and confirm the following as of the Commencement Date:

1. Pursuant to certain Prepetition Secured Financing Documents, the Prepetition Collateral Agent and the Prepetition Secured Lenders made certain loans, advances and other financial accommodations, and provided for the issuance of letters of credit, for the account of the DIP Borrower or certain of its subsidiaries (together, the "Prepetition Borrowers").

2. Pursuant to certain Prepetition Secured Financing Documents, the Prepetition Borrowers were, as of the Commencement Date, indebted to the Prepetition Collateral Agent and the Prepetition Secured Lenders in the aggregate principal amount of approximately $597,800,000 and was indebted to the Secured Swap Counterparty for the aggregate principle amount of approximately $5,940,837.91 and €614,065.43.

3. For purposes of this Interim Order, the term "Prepetition Indebtedness" shall mean and include, without duplication, any and all amounts owing or outstanding under the Prepetition Credit Agreement (including, without limitation, all Obligations as defined in the Prepetition Credit Agreement) or any other Prepetition Secured Financing Documents, including, without limitation, the Secured Swaps, interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable pursuant to the Prepetition Credit Agreement or any other Prepetition Secured Financing Documents), and any and all obligations and liabilities, contingent or otherwise, owed in respect of the letters of credit or other Obligations outstanding thereunder.

4.      To secure the Prepetition Indebtedness under the Prepetition Credit Facility and the Secured Swaps, and pursuant to that certain Pledge and Security Agreement, dated as of May 19, 2005 (as amended from time to time, the "<u>Prepetition Security Agreement</u>"), and related documents, the Debtors granted a security interest in, and continuing Liens on, substantially all of the assets of the Debtors and certain non-debtor subsidiaries and affiliates of the Debtors granted a security interest in, and continuing Liens on certain assets of such subsidiaries and affiliates (the "<u>Prepetition Collateral</u>") to and/or for the benefit of the  Prepetition Secured Parties (collectively, the "<u>Prepetition Liens</u>").  For the avoidance of doubt, the term "Prepetition Collateral" shall refer to (i) collateral in or upon which a Lien or other security interest has been granted in favor or for the benefit of the  Prepetition Secured Parties in connection with, pursuant to or under the Prepetition Secured Financing Documents, and (ii) any Prepetition Collateral provided under any Prepetition Secured Financing Documents, including that described in this subparagraph, that existed as of the Commencement Date and at any time prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents and profits.

5.      The Prepetition Secured Financing Documents are valid and binding agreements and obligations of the Debtors, and the Prepetition Liens (i) constitute  valid,  binding,  enforceable  (other  than  in  respect  of  the  stay  of enforcement arising under section 362 of the Bankruptcy Code) and perfected first priority security interests and Liens, subject only to the Permitted Liens (as defined in the Prepetition Credit Agreement), but only to the extent such Permitted Liens are valid, enforceable, non-avoidable Liens and security interests that are perfected prior

to the Commencement Date (or perfected after the Commencement Date to the extent permitted by Section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the Prepetition Liens under applicable law and after giving effect to any applicable subordination or intercreditor agreements, and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

6.    (i) The Prepetition Indebtedness constitutes a legal, valid and binding obligation of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); (ii) no objection, offset, defense or counterclaim of any kind or nature to the Prepetition Indebtedness exists, and none of the Debtors, either collectively or individually, shall assert any claim, counterclaim, setoff or defense of any kind, nature or description that would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition Indebtedness; and (iii) the Prepetition Indebtedness and any amounts previously paid to the Prepetition Collateral Agent or any other Prepetition Secured Party on account thereof or with respect thereto, are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

7.    The Prepetition Collateral Agent (on its behalf and on behalf of the Prepetition Secured Lenders) holds properly perfected security interests and Liens in and on the Prepetition Collateral by taking possession of, or obtaining control over,

certain assets and by the filing of UCC-1 financing statements, mortgages and other required documents against the Debtors and such Prepetition Collateral with the proper state and county offices for the perfection of such security interests and Liens.

None of the foregoing acknowledgments or agreements by the Debtors contained in this Paragraph shall be binding on the Debtors' estates, any Committee or any other party (other than the Debtors) and shall not affect or limit the rights of any Committee or any other party (other than the Debtors) with respect to their rights to assert, pursue or otherwise allege any claims or defenses against the Prepetition Secured Parties in accordance with, and subject to, the terms of this Interim Order.

H. An immediate and critical need exists for the DIP Borrower to obtain postpetition financing and use cash collateral to continue the operation of its businesses. However, the use of "cash collateral," as defined by section 363(a) of the Bankruptcy Code and including any and all prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds of the Prepetition Collateral ("Cash Collateral"), alone would be insufficient to meet the DIP Borrower's immediate postpetition liquidity needs. The DIP Borrower is unable to obtain the required funds (i) in the forms of (1) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (2) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (3) unsecured debt having the priority afforded by section 364(c)(l) of the Bankruptcy Code, or (4) debt secured only as described in section 364(c)(2) or (3) of the Bankruptcy Code or (ii) on terms more favorable than those offered by the DIP Lenders under the DIP Agreement, this Interim Order, the Final Order and all other agreements, documents, notes or instruments delivered pursuant hereto or thereto or in connection herewith or therewith, including, without limitation, the DIP Budget and the collateral documents described in the DIP

Agreement (collectively with this Interim Order and the Final Order, the "<u>DIP Financing Documents</u>").

I.       The Debtors have requested that, pursuant to the terms of the DIP Financing Documents, the DIP Lenders make loans and advances and provide other financial accommodations to the DIP Borrower, and that the Prepetition Secured Parties consent to the use of their Cash Collateral, to be used by the DIP Borrower solely in accordance with the terms of the DIP Financing Documents.  The ability of the DIP Borrower to continue its businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the DIP Borrower obtaining such financing and using such Cash Collateral.  The DIP Borrower will suffer immediate and irreparable harm if the requested postpetition financing is not available on an interim and final basis.  The DIP Lenders are willing to extend the postpetition financing under the DIP Facility on a superpriority and first priority secured basis, as more particularly described herein, pursuant to the terms and conditions of the DIP Financing Documents.  The DIP Borrower's and DIP Guarantors' entry into the DIP Financing Documents is fair and reasonable and is a sound, prudent exercise of their business judgment consistent with their fiduciary duties.  The DIP Financing Documents were negotiated at arm's length and in good faith between and among the DIP Borrower, the DIP Guarantors, the DIP Agent and the DIP Lenders, and the loans and advances provided for in the DIP Financing Documents constitute reasonably equivalent value and fair consideration.  Accordingly, the relief requested in the Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, and the avoidance of irreparable harm to the Debtors' estates and is in the best interests of the Debtors, their estates and creditors.

J.     Based on the record before the Court, (i) the terms of the use of the Prepetition Secured Parties' Cash Collateral as provided in this Interim Order and (ii) the terms of the DIP Financing Documents have been negotiated at arms' length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors and their respective estates and creditors. The DIP Lenders are extending the postpetition financing contemplated under the DIP Financing Documents to the DIP Borrower, and the Prepetition Collateral Agent and Prepetition Secured Parties are permitting the use of their Cash Collateral, in good faith, and the DIP Lenders are entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

K.     It is in the best interests of the DIP Obligors' estates that they be allowed to finance their operations and use Cash Collateral under the terms and conditions set forth herein and in the DIP Financing Documents. The relief requested by the Motion is necessary to avoid immediate and irreparable harm to the DIP Obligors' estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry and effectiveness of this Interim Order.

L.     The Prepetition Secured Parties are prepared to consent to the Debtors' use of the Prepetition Secured Parties' Cash Collateral only if the Debtors agree, and the Court orders in this Interim Order, that the Debtors shall make the Adequate Protection Payments (as defined below) and the Debtors shall grant the Adequate Protection Liens (as defined below). The Adequate Protection Payments (as defined below) and the Adequate Protection Liens (as defined below) provided to the Prepetition Secured Parties, and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary to obtain the consent or non-objection of such parties.

M.     The  Prepetition Secured Parties are prepared to consent to the granting of the DIP Liens (as defined below) in the Prepetition Collateral solely on the terms and conditions set forth in this Interim Order, including the approval of, and payment to the Prepetition Secured Parties of, the Adequate Protection Payments (as defined below), and the granting to the Prepetition Secured Parties of the Adequate Protection Liens (as defined below).

N.     The consent of the Prepetition Secured Parties to the priming of their Prepetition Liens by the DIP Liens (as defined below) is limited to such priming occurring pursuant to the DIP Financing Documents, and shall not extend to any other postpetition financing or to any modified version of the DIP Financing Documents (except to the extent modified in this Interim Order or a Final Order and only to the extent the Prepetition Collateral Agent and the Required Lenders (as defined in the Prepetition Credit Agreement) consent to such modification).

O.     The DIP Liens (as defined below) granted pursuant to this Interim Order to the DIP Lenders, are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (i) such security interests and Liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or Lien in the property of the DIP Borrower's estate, and/or (ii) the holders of such valid, perfected, prepetition security interests and Liens have consented to the security interests and priming Liens granted pursuant to this Interim Order to the DIP Lenders.

P.     Good cause has been shown for the immediate entry and effectiveness of this Interim Order pursuant to Bankruptcy Rules 4001(b) and (c), and Del. Bankr. L.R. 4001-2(b).  In particular, the permission granted herein for the DIP Borrower and DIP Guarantors to execute the DIP Financing Documents, to use Cash Collateral, and to obtain postpetition financing in accordance with the terms of the DIP Financing Documents pending the Final Hearing, including

on a priming Lien basis, is necessary to avoid immediate and irreparable harm to the DIP Borrower, the other Debtors and their respective estates. Entry of this Interim Order is in the best interests of the DIP Borrower, the other Debtors and their respective estates and creditors.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. **Motion Granted**. The Motion is granted on the terms and conditions set forth herein. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits or, to the extent applicable, deferred until the hearing on the Final Order.

2. **DIP Financing Documents**. The DIP Borrower is hereby (i) authorized to enter into the DIP Agreement and the other DIP Financing Documents, and (ii) authorized to borrow funds up to $80,000,000.00 following the entry of this Interim Order, incur debt, reimbursement obligations and other obligations, grant Liens, make deposits, provide indemnities and otherwise perform its obligations in accordance with the terms and conditions of the DIP Financing Documents.

3. **DIP Guarantors**. Each DIP Guarantor is hereby (i) authorized to enter into the DIP Agreement and other applicable DIP Financing Documents, and (ii) authorized to irrevocably guarantee the payment and performance of the DIP Borrower's and the other DIP Guarantor's obligations under or in connection with the DIP Financing Documents (the "DIP Obligations").

4. **Conditions Precedent**. The DIP Lenders shall have no obligation to lend under the DIP Facility unless and until all of the conditions precedent to the occurrence of the Closing Date with respect to the DIP Facility have been satisfied or waived in accordance with the terms and provisions of the DIP Financing Documents.

5. **Use of Cash Collateral**. Subject to the terms and conditions set forth in this Interim Order and effective immediately upon entry of the Interim Order, the DIP Borrower is authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use the Prepetition Secured Parties' Cash Collateral effective upon entry of this Interim Order, until the occurrence of a "Termination Event," which shall mean the expiration of three (3) business days following the provision of written notice to the Debtors (with a copy of such notice (a) provided to co-counsel to the Debtors, counsel to any Committee and the U.S. Trustee, and (b) filed with the Court) upon the earliest to occur of (i) the occurrence of the Maturity Date (as defined below), (ii) termination of the DIP Facility by the DIP Agent following the occurrence of an Event of Default and the expiration of the Remedies Notice Period (as defined below), (iii) the date on which neither this Interim Order nor the Final Order is in full force and effect, (iv) the date on which any of the Cases are converted to a case under chapter 7 of the Bankruptcy Code, (v) the date on which a trustee or examiner with expanded powers is appointed in the Cases, or (vi) the date on which any of the DIP Obligors fails to make any Adequate Protection Payment (as defined below) in accordance with the terms of this order.

6. **Limitation on use of Cash Collateral**. For so long as the DIP Borrower is authorized to use the Prepetition Secured Parties' Cash Collateral, no Cash Collateral of the Prepetition Secured Parties may be used directly or indirectly by the DIP Borrower, any Committee or any other Debtor or other person or entity to object to or contest in any manner the Prepetition Indebtedness or Prepetition Liens, or to assert or prosecute any actions, claims or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) against any of the Prepetition Collateral Agent or Prepetition Secured Parties without the consent of the Prepetition Collateral Agent and the applicable Prepetition