Secured Parties; provided, that, for so long as the DIP Borrower is authorized to use the Prepetition Secured Parties' Cash Collateral, the DIP Borrower is permitted to use Cash Collateral to dispute (a) the reasonableness of any fee or expense reimbursement request of any of the professionals retained by the Collateral Agent, the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, and (b) any assertion by the DIP Agent, any DIP Lender, the Prepetition Collateral Agent or any Prepetition Secured Lender of the existence and/or continuation of an Event of Default under the DIP Agreement, or a Termination Event under this Interim Order.

7. **Interim Borrowing**. The DIP Borrower is authorized to borrow up to the full amount of the Commitment Amount under the DIP Facility, provided that the total amount of DIP Facility proceeds to be used by the DIP Borrower on an interim basis through and including the date of the Final Order shall be consistent with the DIP Budget and the DIP Agreement.

8. **Binding Effect**. Upon the entry of this Interim Order and upon execution and delivery of the DIP Agreement and other DIP Financing Documents, the DIP Financing Documents shall constitute valid and binding obligations of the DIP Obligors enforceable against the DIP Obligors in accordance with their terms. No obligation, payment, transfer or grant of security under this Interim Order or the other DIP Financing Documents shall be stayed, restrained, voided or recovered under the Bankruptcy Code or any applicable non-bankruptcy law, or subjected to any defense, reduction, setoff, recoupment or counterclaim.

9. **Use of Lender Funds**. The DIP Borrower shall use Cash Collateral and the loans or advances made under, or in connection with, the DIP Financing Documents, solely as provided in this Interim Order or in the other DIP Financing Documents. From and after the Commencement Date, amounts loaned and advanced under, or in connection with, the DIP

Agreement and this Interim Order or the other DIP Financing Documents, including the extension or deemed extension of letters of credit (the "DIP Loans") and all proceeds of the DIP Collateral and Prepetition Collateral, including, without limitation, all of the DIP Borrower's existing or future cash and Cash Collateral (collectively, the "Lender Funds"), shall be used exclusively to (i) pay related transaction costs, fees and expenses associated with the DIP Facility, (ii) fund working capital and general corporate purposes of the Debtors and their subsidiaries during the pendency of the Cases, (iii) make Adequate Protection Payments (as defined below), and (iv) fund such costs, fees and expenses incurred in connection with the administration and prosecution of the Cases as are consistent with the terms of the DIP Budget and the DIP Agreement, including costs related to the Carve-Out (as defined below). Nothing in this Paragraph shall be construed to affect the right of any party in interest to object to the allowance and payment of any such amounts.

10. **Limitation on Use of Lender Funds**. No Lender Funds may be used directly or indirectly by the DIP Borrower or any of the other Debtors, any Committee or any other person or entity to (i) object to or contest in any manner the DIP Obligations, the DIP Liens (as defined below), the Prepetition Indebtedness, the Prepetition Liens, or Liens granted to the Prepetition Collateral Agent hereunder, (ii) assert or prosecute any actions, claims or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) against any of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or the Prepetition Collateral Agent, (iii) seek authorization for any party to use any of the Cash Collateral of the DIP Lenders without the consent of the DIP Agent, or (iv) obtain Liens that are senior to, on a parity with, or junior to the Liens of the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent or the Prepetition Secured Parties in the DIP Collateral or the

Prepetition Collateral, as applicable, or any portion thereof; provided, that, for so long as the DIP Borrower is authorized to use the Prepetition Secured Parties' Cash Collateral, the DIP Borrower is permitted to use Cash Collateral to dispute (a) the reasonableness of any fee or expense reimbursement request of any of the professionals retained by the Prepetition Collateral Agent, the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, and (b) any assertion by the DIP Agent, any DIP Lender, the Prepetition Collateral Agent, or any Prepetition Secured Lender of the existence and/or continuation of an Event of Default under the DIP Agreement, or a Termination Event under this Interim Order.

11. **Additional Agreements**.  In addition to complying with all provisions of the DIP Financing Documents and this Interim Order, the DIP Borrower is hereby authorized and directed to enter into any additional agreements providing for the establishment of lockboxes, blocked accounts or similar arrangements requested by the DIP Agent for purposes of facilitating cash collections from the DIP Borrower in accordance with the terms of the DIP Financing Documents and this Interim Order.

12. **Sections 506(c) and 552(b)**.  Upon entry of a Final Order, (i) the DIP Agent and the DIP Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lenders, and, as appropriate, the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the DIP Collateral or the Prepetition Collateral, and (ii) no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Collateral or the Prepetition Collateral, the Prepetition Collateral Agent, the Prepetition Secured Parties, the DIP Lenders, the DIP Agent or any of their respective claims pursuant to Sections 105 or 506(c) of the Bankruptcy

Code, or otherwise, without the prior written consent, as applicable, of the Prepetition Collateral Agent, the Prepetition Secured Parties, the DIP Agent and the DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

13. **Interest**.  Interest on the DIP Obligations shall be secured in the manner specified in Paragraph 16 herein, accrue at the rates (including any default rates), and be paid in accordance with the terms and provisions of the DIP Financing Documents.

14. **Fees**.  Any and all (i) fees agreed and required to be paid to the DIP Agent, the Issuing Bank, the Arranger or the DIP Lenders in connection with the consummation of the DIP Facility as referenced in the DIP Agreement (and in the separate letter agreement between the DIP Borrower and the Arranger in connection with the DIP Agreement), and (ii) such reasonable costs and expenses as may be incurred from time to time, including without limitation, fees and expenses of the professionals retained as provided for in the DIP Agreement and other DIP Financing Documents, are hereby authorized and shall be paid in accordance with the terms and provisions of the DIP Agreement or other DIP Financing Documents as applicable.  No such fees and expenses payable pursuant hereto shall be subject to further or separate approval by the Court (but the Court shall resolve any dispute as to the reasonableness of any fees and expenses referenced in (ii) above), and no recipient of any such payment shall be required to file any interim or final fee applications with respect thereto.

15. **Priority of DIP Obligations**.  All DIP Obligations hereby constitute, under section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against the Borrower having priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 365, 503(b), 507(a), 507(b),

546(c), 726 and 1114 of the Bankruptcy Code, or otherwise. Such superpriority claims shall, subject to the Permitted Liens, Additional Permitted Liens and Carve-Out (as defined below), be payable from and have recourse to all prepetition and postpetition property of the DIP Borrower and DIP Guarantors and all proceeds thereof.

16. **DIP Liens**. As security for the DIP Obligations, and subject only to the Carve-Out (as defined below), Permitted Liens and Additional Permitted Liens (as defined below), the DIP Agent, for and on behalf of the DIP Lenders, is hereby granted valid, binding, enforceable, first priority and perfected Liens (the "DIP Liens") in the DIP Collateral and the Prepetition Collateral as follows:

    a.    Priming Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Agent is hereby granted fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected, priming security interests in and Liens upon (the "Priming Liens"): all existing and after acquired real and personal, tangible and intangible, property of the DIP Borrower and the DIP Guarantors that constitutes collateral of the DIP Borrower and the DIP Guarantors under the Prepetition Credit Agreement and the Secured Swaps (the "Priming Lien Collateral"), which shall be senior in all respects to the interests in and Liens upon such property of, without limitation, the Prepetition Secured Parties but which shall be subject to (i) non-avoidable, valid, enforceable and perfected Permitted Liens (as defined in the Prepetition Credit Agreement) in existence on the Commencement Date, (ii) non-avoidable, valid, enforceable and perfected Liens that are capitalized leases listed on a schedule to the DIP Agreement, purchase money security interests listed on a schedule to the DIP Agreement or mechanics' or other statutory Liens in existence on the Commencement Date, and (iii) non-avoidable, valid, enforceable Liens that are capitalized leases listed on a schedule to the DIP Agreement, purchase money security interests listed on a schedule to the DIP Agreement or mechanics' or other statutory Liens in existence on the Commencement Date that are perfected subsequent to the Commencement Date as permitted by section 546(b) of the Bankruptcy Code and (iv) mechanics, warehousemen's or other statutory Liens arising after the Commencement Date (clauses (ii) - (iv), collectively, "Additional Permitted Liens").

    b.    First Liens. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Agent is hereby granted fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected, security interests

in and Liens upon (the "First Liens"), all existing and after acquired real and personal, tangible and intangible, property of the DIP Borrower and the DIP Guarantors that is not collateral of the DIP Borrower and the DIP Guarantors under the Prepetition Credit Agreement, existing, or acquired prior or subsequent to the commencement of the Cases, including, but not limited to, upon entry of the Final Order, all causes of action arising under Chapter 5 of the Bankruptcy Code, and any and all proceeds thereof, (the "First Lien Collateral" and together with the Priming Lien Collateral, the "DIP Collateral"), which Liens are subject only to the Carve-Out (as defined below), Permitted Liens and Additional Permitted Liens.

c.      No other person or entity shall receive or be granted any Liens of any type or nature, whether senior to, on parity with, or junior to the DIP Liens, on any of the DIP Collateral or Prepetition Collateral, excepting only the Carve-Out (as defined below), Permitted Liens and Additional Permitted Liens.

17.      **Additional Documents**.  The DIP Borrower and DIP Guarantors shall execute and deliver to the DIP Agent all such agreements, financing statements, instruments and other documents as the Postpetition Lender may reasonably request to evidence, confirm, validate or perfect the Liens granted pursuant hereto.

18.      **Liens Valid**.  All Liens granted herein and in the other DIP Financing Documents to or for the benefit of the DIP Agent or DIP Lenders shall pursuant to this Interim Order be, and they hereby are, valid, enforceable and perfected, effective as of the Commencement Date, and (notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code or any other relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be required to effect such perfection, and all Liens on deposit accounts or securities accounts shall, pursuant to this Interim Order be, and they hereby are, deemed to confer "control" for purposes of sections 8-106, 9-104 and 9-106 of the applicable Uniform Commercial Code as in effect as of the date hereof in favor of the DIP Agent; provided, however, that if the DIP Agent shall, in its sole discretion, choose to require the execution of and/or filing (as applicable) of any such control agreements, mortgages, financing

statements, notices of Liens and other similar instruments and documents, all such mortgages, financing statements, notices of Liens or other similar instruments and documents shall be deemed to have been executed, filed and/or recorded at the time and on the date of the Commencement Date. Each and every federal, state and local government agency or department may accept the entry by this Court of this Interim Order as evidence of the validity, enforceability and perfection on the Commencement Date of the Liens granted herein and in the other DIP Financing Documents to the DIP Agent or DIP Lenders; provided, further that, with the exception of priming the Prepetition Liens, nothing herein is intended to affect the validity, enforceability or perfection of the Prepetition Liens, which validity, enforceability or perfection (if any) shall be preserved.

19. **Priority of Liens**. Subject to the Carve-Out (as defined below), Permitted Liens and Additional Permitted Liens, and except as provided in Paragraph 16 hereof, the DIP Liens shall not be (i) subject to any Lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other Lien under section 364(d) of the Bankruptcy Code or otherwise. As provided in the DIP Financing Documents, an Event of Default shall occur if any claim or Lien (other than the Carve-Out (as defined below)) having a priority superior to, on parity with, or junior to those granted by this Interim Order with respect to the DIP Obligations shall be granted or allowed prior to the indefeasible payment in full in cash and satisfaction in the manner provided in the DIP Financing Documents of the DIP Obligations and until the Adequate Protection Payments have been indefeasibly made.

20. **Priority over Adequate Protection Liens**. Notwithstanding anything to the contrary herein, in any other DIP Financing Document, or in any Prepetition Secured Financing

Documents, subject to the Carve-Out (as defined below), Permitted Liens and Additional Permitted Liens, the DIP Liens and the superpriority claims granted to the DIP Agent and DIP Lenders hereunder and under the other DIP Financing Documents are and shall be at all times senior and prior in all respects to the Adequate Protection Liens (as defined below), all other Liens securing any Prepetition Indebtedness, in all cases, whether granted under this Interim Order, the Prepetition Secured Financing Documents, or otherwise, and any other obligations in respect of adequate protection and all other claims held by the Prepetition Collateral Agent and the Prepetition Secured Parties (including, without limitation any superpriority claims), in each case, whether arising under or related to the Prepetition Secured Financing Documents, this Interim Order or otherwise.

21. **Survival of DIP Obligations and DIP Liens**. The DIP Obligations and the DIP Liens shall not be discharged by, and shall survive, the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code. Except as otherwise provided herein, the DIP Obligations and the DIP Liens shall not be discharged by, and shall survive, the entry of an order confirming a chapter 11 plan in any of the Cases of the DIP Obligors, and shall continue in full force and effect until the DIP Obligations have been paid in full in cash. Notwithstanding the immediately preceding sentence, upon the Plan Effective Date and pursuant to the Plan and any order of the Court confirming the Plan, (i) the DIP Obligations and the DIP Liens shall not survive the Plan Effective Date, and (ii) upon such date shall be discharged by the conversion of the DIP Obligations and DIP Liens to obligations of, and liens granted by, certain of the Reorganized Debtors under the Exit Facility, as and to the extent described in the DIP Agreement, the Exit Credit Agreement and other Exit Credit Documents, the Plan, and any order of the Court confirming the Plan.

22.  **Survival After Dismissal**.  An Event of Default shall occur upon entry of an order dismissing any of the Cases that does not provide for the termination of the DIP Facility and payment in full in cash of all DIP Obligations.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349(b) of the Bankruptcy Code) that (i) the claims and Liens granted pursuant to this Interim Order to the DIP Agent and DIP Lenders shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations in respect thereof shall have been indefeasibly paid in full in cash and satisfied in the manner provided in the DIP Financing Documents (and that such claims and Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) the claims and Liens granted pursuant to this Interim Order to or for the benefit of the Prepetition Collateral Agent and Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such claims and Liens shall, notwithstanding such dismissal, remain binding on all parties in interest).

23.  **Survival After Conversion**.  An Event of Default shall occur in the event that an order is for any reason entered converting any of the Cases into cases under chapter 7 of the Bankruptcy Code.  The provisions of this Interim Order, including the grant of claims and Liens to or for the benefit of the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent and the Prepetition Secured Parties, and any actions taken pursuant hereto shall survive the entry of any order converting the Borrower's Case to a case under chapter 7 of the Bankruptcy Code.

24.  **Survival of Lien Priority**.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code in the event that any or all of the provisions of this Interim Order or any other DIP Financing Documents are hereafter modified,

amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity, enforceability or priority of any Lien or claim authorized or created hereby or thereby or any DIP Obligations incurred hereunder or thereunder. Notwithstanding any such modification, amendment or vacation, any DIP Obligations incurred and any claim granted to the DIP Agent or DIP Lenders hereunder or under the other DIP Financing Documents arising prior to the effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Interim Order and the other DIP Financing Documents, and the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the Liens and priorities granted herein and therein, with respect to any such DIP Obligations and claim.

25. **Survival of Interim Order**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in these Cases, (ii) converting any or all of these Cases to a case or cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any or all of the Cases, and the terms and provisions of this Interim Order, including, but not limited to, the financing protections granted hereunder, shall continue in full force and effect notwithstanding the entry of such order, and such protections shall retain their effect as provided by this Interim Order until all obligations of the DIP Borrower pursuant to this Interim Order are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in this Interim Order which survive such discharge by its terms).

26. **Carve-Out**. The claims granted hereunder to the DIP Agent or DIP Lenders, the DIP Liens and any claims or Liens ranking *pari passu* with or junior in priority to such claims of the DIP Agent, DIP Lenders and the DIP Liens shall be subject to payment of the Carve-Out. As

used in this Interim Order, "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), and all fees, expenses, and disbursements payable to any professionals retained by the Debtors pursuant to 28 U.S.C. § 156(c); and (ii) in the event of an occurrence and during the continuance of an Event of Default, the "<u>Case Professionals Carve-Out</u>", comprising the sum of (A) all allowed unpaid fees, expenses and disbursements (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) for any professionals retained by the Debtors or any Committee appointed in the Cases pursuant to sections 327, 328, 363 or 1103, as applicable, of the Bankruptcy Code (the "<u>Case Professionals</u>") incurred subsequent to receipt of notice delivered by the DIP Agent to counsel for the Debtors following the occurrence of an Event of Default expressly stating that the Carve-Out has been invoked (a "<u>Carve-Out Trigger Notice</u>") in an aggregate amount not in excess of $3,000,000 (the "<u>Carve-Out Cap</u>"), plus (B) all unpaid professional fees, expenses and disbursements of such Case Professionals incurred prior to receipt of the Carve-Out Trigger Notice to the extent previously or subsequently allowed pursuant to an order of the Bankruptcy Court (collectively, "<u>Allowed Professional Fees</u>") under sections 328, 330 and/or 331 of the Bankruptcy Code. So long as a Carve-Out Trigger Notice has not been delivered, the Carve-Out Cap shall not be reduced by the payment of fees or expenses allowed by the Bankruptcy Court (whether allowed before or after delivery of any Carve-Out Trigger Notice) and payable under sections 328, 330, or 331 of the Bankruptcy Code, or 28 U.S.C. § 156(c).

27. **Limitation on Use of Postpetition Funds**. None of the DIP Loans, Carve-Out or Cash Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Financing Documents

and the Prepetition Secured Financing Documents or the claims, security interests and Liens of the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent or the Prepetition Secured Parties with respect thereto or otherwise to litigate (including, without limitation, commencing adversary proceedings, motions, contested matters, arbitrations, mediations, or other similar proceedings) against any of the DIP Lenders or the Prepetition Secured Parties. Notwithstanding the foregoing, any Committee appointed in the Cases may spend up to an aggregate amount not to exceed $50,000 of the Carve-Out to investigate any potential claims against the Prepetition Collateral Agent or Prepetition Secured Parties, and any potential defenses to their claims, security interests, and Liens; provided that, for the avoidance of doubt, so long as a Carve-Out Trigger Notice has not been delivered in accordance with Paragraph 26, the expenditure of any portion of such amount by any Committee shall not reduce the Carve-Out Cap.

28. **Prepetition Lender and Postpetition Lender Rights**. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair (a) any of the rights of any of the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent, or the Prepetition Secured Parties under the Bankruptcy Code or under any non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent, or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to a case or cases under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner (including with expanded powers) or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans or (b) any other rights, claims

or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent or the Prepetition Secured Parties.

29. **<u>No Waiver</u>**. Notwithstanding anything herein to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Collateral Agent to seek additional adequate protection at any time.

30. **<u>Maturity Date</u>**. All amounts owed with respect to the DIP Obligations under the DIP Agreement shall become due and shall be paid in full or, in the case of (vi) below, converted to amounts owing under the Exit Facility, no later than the earliest to occur of (i) one-hundred twenty (120) days after the Closing Date with respect to the DIP Facility, (ii) the date the commitments under the Revolving Facility are permanently reduced to zero pursuant to the terms of the DIP Agreement, (iii) the date of the termination of the commitments under the Revolving Facility pursuant to the terms of the DIP Agreement, (iv) 35 days following the entry of this Interim Order, if the Final Order has not been entered on or before such date, provided that the Final Order need not have become final and non-appealable on or before such date, (v) the closing date of any sale of the Debtors or all or substantially all of the assets of the Credit Parties pursuant to section 363 of the Bankruptcy Code in the Cases that has been approved by an order of the Bankruptcy Court, and (vi) the date of the substantial consummation of the Plan that is confirmed pursuant to an order of this Court (the "<u>Maturity Date</u>"). As of the Maturity Date and, with respect to subparagraph (iv) of this paragraph, subject to expiration of the Remedies Notice Period (as defined below) and absent the determination by the Court that no Event of Default has occurred and/or is continuing under the DIP Facility, (a) the DIP Borrower shall no longer be authorized to (i) borrow funds or incur indebtedness under the DIP Facility, (ii) use any of the Postpetition Loans already received or (iii) use Cash Collateral, and (b) any

obligations of the DIP Agent or DIP Lenders to make loans or advances hereunder or under the other DIP Financing Documents shall terminate.

31. **Survival After Maturity**. Notwithstanding anything herein or the occurrence of the Maturity Date, all of the rights, remedies, benefits and protections provided (i) to the DIP Agent and the DIP Lenders under this Interim Order and the other DIP Financing Documents and (ii) to the Prepetition Collateral Agent and Prepetition Secured Parties under this Interim Order, shall survive such Maturity Date. Upon such Maturity Date, the principal of and all accrued interest and fees and all other DIP Obligations, as well as the Prepetition Indebtedness, shall, in each instance, be immediately due and payable and the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent and the Prepetition Secured Parties shall have all other rights and remedies provided in this Interim Order, the other DIP Financing Documents, the Prepetition Secured Financing Documents and applicable law; provided, that in the event such Maturity Date occurs due to the failure to satisfy the condition set forth in subsection (iv) of Paragraph 30 above (which failure also constitutes an Event of Default under Section 8.1(q) of the DIP Agreement), any exercise of remedies by the DIP Agent and the DIP Lenders under the DIP Facility or hereunder shall be subject to Paragraph 33 hereof.

32. **Modification of Automatic Stay**. For purposes of this Interim Order and the DIP Agent's or DIP Lenders' exercise of any and all of their remedial rights and remedies upon occurrence and during the continuance of an Event of Default, the automatic stay imposed by section 362(a) of the Bankruptcy Code shall be automatically vacated and modified after the provision by the DIP Agent to the Debtors of five (5) business days' prior written notice of such Event of Default (such five (5) business day period, the "Remedies Notice Period"), which written notice shall be served by the DIP Agent by facsimile upon the Debtors, counsel to the

Debtors, counsel to any Committee appointed in the Cases, and the U.S. Trustee, and which written notice shall be filed by counsel to the DIP Agent with the Bankruptcy Court, provided that the automatic stay under section 362(a) of the Bankruptcy Code shall not be automatically vacated and modified as provided above if, during the Remedies Notice Period, the Bankruptcy Court has determined that an Event of Default has not occurred and/or is not continuing. Upon the expiration of the Remedies Notice Period, unless the Bankruptcy Court has determined that an Event of Default has not occurred and/or is not continuing, (i) the Commitments, if any, of each DIP Lender shall immediately and automatically terminate; (ii) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind: (A) the unpaid principal amount of and accrued interest on the DIP Facility, and (B) all other DIP Obligations; and (iii) the DIP Agent may enforce any and all DIP Liens and may seek any and all other remedies provided for in this Interim Order or the Final Order. For the avoidance of doubt, neither the DIP Agent nor any of the DIP Lenders shall exercise any such rights and remedies on account of an Event of Default until after expiration of the Remedies Notice Period. The DIP Obligors' sole recourse with respect to opposing such modification shall be to contest the occurrence and/or continuation of an Event of Default.

33. **Exercise of Remedies**. Upon the expiration of the Remedies Notice Period, unless ordered otherwise by the Bankruptcy Court, the DIP Agent or the DIP Lenders shall at any time be entitled to exercise any of their rights and remedies hereunder, under the other DIP Financing Documents or under applicable law in order to effect payment or satisfaction of the DIP Obligations or to receive any amounts or remittances due hereunder or under the other DIP Financing Documents, including without limitation, foreclosing upon and selling all or a portion of the DIP Collateral or the Prepetition Collateral, the DIP Agent shall have the right without any

further action or approval of this Court to exercise such rights and remedies as to all or such part of the DIP Collateral or the Prepetition Collateral as the DIP Agent shall elect in its sole discretion,. No holder of a Lien primed by this Interim Order or granted by the DIP Borrower or any of the other Debtors as adequate protection shall be entitled to object on the basis of the existence of any such Lien to the exercise by the DIP Agent of its respective rights and remedies under the DIP Financing Documents or under applicable law to effect satisfaction of the DIP Obligations or to receive any amounts or remittances due hereunder or under the other DIP Financing Documents. The DIP Agent shall be entitled to apply the payments or proceeds of the DIP Collateral or the Prepetition Collateral in accordance with the provisions of this Interim Order and the other DIP Financing Documents, and in no event shall the DIP Agent be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral or otherwise.

34. **No Waiver of Remedies**. The failure or delay by (i) the DIP Agent or any Postpetition Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order or any other DIP Financing Documents or (ii) the Prepetition Collateral Agent or any Prepetition Secured Party to seek relief or otherwise exercise its rights and remedies under this Interim Order shall not constitute a waiver of any of the rights of such party, and any exercise of such rights and remedies against the DIP Borrower or the DIP Guarantors or any DIP Collateral or Prepetition Collateral shall not be construed to limit any further exercise of such rights and remedies.

35. **Successor and Assigns**. The provisions of this Interim Order shall be binding upon and inure to the benefit of each of the DIP Agent, the DIP Lenders, the Prepetition Collateral Agent, the Prepetition Secured Parties, the DIP Borrower, the DIP Guarantors and any

other Debtors and their respective successors and assigns (including any trustee or fiduciary hereafter appointed or elected as a legal representative of any of the Debtors, their estates, or with respect to the property of any of their estates) whether in these Cases, in any successor cases, or upon dismissal of any such chapter 11 or chapter 7 case.

36. **Further Assurances**. The Debtors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements) that the DIP Agent may reasonably request, in order to effectuate the transactions contemplated by the DIP Agreement, this Interim Order, or any other DIP Financing Document, or to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the DIP Agreement, this Interim Order, or any other DIP Financing Document.

37. **Adequate Protection**. The Prepetition Collateral Agent (for the benefit of the Prepetition Secured Lenders) and the Secured Swap Counterparty are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests, and are hereby granted the following forms of adequate protection (collectively, the "Adequate Protection Claims"):

    a.     Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value of the pre-petition security interest, the Prepetition Collateral Agent (for the benefit of the Prepetition Secured Lenders) and the Secured Swap Counterparty shall, effective upon entry of this order, be granted replacement security interests in and Liens upon all the DIP Collateral, subject and subordinate only to (i) the security interests and Liens granted to the DIP Agent for the benefit of the DIP Lenders in the Interim Order and pursuant to the DIP Financing Documents, (ii) Permitted Liens, (iii) Additional Permitted Liens and (iv) the Carve-Out (the "Adequate Protection Liens").

    b.     Superpriority. The Adequate Protection Claim of the Prepetition Secured Parties shall have Superpriority status, subject only to the Superpriority status of the DIP Obligations, claims secured by Permitted Liens, Additional Permitted Liens and the Carve-Out.

c.      Cash Payments.  The Debtors shall remit to the Prepetition Secured Parties cash payments in an amount equal to all accrued but unpaid interest (whether prepetition or postpetition) owed under the terms of the LIBOR Loans (as defined in the Prepetition Credit Agreement) and Secured Swaps, as appropriate, at the rate of 1.00% per annum in excess of the non-default interest rate payable on the LIBOR Loans under the Prepetition Credit Agreement on the dates when due under the Prepetition Credit Agreement or Secured Swaps, as applicable; provided, however, that (i) to the extent such payments became due and owing under the Prepetition Credit Agreement prior to entry of this Interim Order (whether before or after the Commencement Date), the Debtors shall remit such payments within five (5) business days following the later of (A) entry of this Interim Order and (B) the Closing Date, and (ii) all Adequate Protection Payments owed on account of accrued but unpaid interest shall be immediately due and payable three (3) business days following the earlier to occur of (A) a Termination Event or (B) the effective date of the Plan.

d.      Fees and Expenses.  The Debtors shall pay all reasonable fees, out-of-pocket costs and expenses of the Prepetition Collateral Agent, the Prepetition Secured Lenders, and the Secured Swap Counterparty (including fees and expenses of legal advisors, financial advisors and investment banks) promptly upon receipt of invoices therefor (with copies of such invoices provided to the U.S. Trustee and any Committee), whether such fees, costs and/or expenses are incurred prepetition or postpetition (subparagraphs c and d together comprising the "Adequate Protection Payments").  No such fees, costs and/or expenses payable pursuant hereto shall be subject to separate approval by the Court (but the Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee applications with respect thereto.

e.      Other Adequate Protection.  The Prepetition Secured Parties shall be entitled to such other adequate protection as (i) reasonably agreed upon by the Prepetition Secured Parties and the Debtors, and approved by this Court, or (ii) as otherwise granted by this Court.

38.  **Release of Claims and Defenses; Related Provisions**.

a.      Release.  Subject to entry of the Final Order and the rights of any Committee appointed in these cases or other party in interest as provided in the following subparagraph, the Debtors forever release, waive and discharge the Prepetition Collateral Agent and the Prepetition Secured Parties, together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors (collectively, the "Released Parties"), from any and all claims and causes of action arising out of, based upon or related to, in whole or in

part, any of the Prepetition Secured Financing Documents, any aspect of the prepetition relationship between the Debtors relating to any of the Prepetition Secured Financing Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses as to the extent, validity, priority or perfection of the Prepetition Liens or Prepetition Indebtedness, "lender liability" claims and causes of action, any actions, claims or defenses under chapter 5 of the Bankruptcy Code or any other claims and causes of action (all such claims, defenses and other actions described in this Paragraph are collectively defined as the "Claims and Defenses").  Nothing contained in this subparagraph shall affect the rights of any Committee or any other party in interest to undertake any action, on its own behalf, or on behalf of the Debtors' estates, with respect to, including, without limitation, any investigation or prosecution of, Claims and Defenses that is permitted in subparagraphs (b) and (c) of this Paragraph.

b.      Challenges.  Notwithstanding anything contained herein to the contrary and subject to Paragraph 27, the extent, validity, priority, perfection and enforceability of the Prepetition Indebtedness, and Prepetition Liens, and all acknowledgments, admissions, confirmations, and releases of the Debtors above, are for all purposes subject to the rights of any party in interest, other than a Debtor, to seek to invalidate, or otherwise challenge (including a determination of the validity, priority, and extent of any Lien of) the Prepetition Indebtedness or Prepetition Liens, including by properly filing a complaint pursuant to Bankruptcy Rule 7001 or by otherwise properly asserting a contested matter (any of these actions, a "Challenge"); *provided, however*, that any such Challenge must be commenced or asserted in this Court within (i) sixty (60) days after appointment of a Committee under section 1102 of the Bankruptcy Code, if brought by such Committee, and (ii) seventy-five (75) days after entry of the Interim Order, if brought by any non-Debtor party in interest other than a Committee; *provided further*, that a Challenge may not be commenced, asserted or continued by a Committee or any other non-Debtor party if a chapter 11 plan of reorganization that provides for the allowance of the Prepetition Indebtedness or otherwise resolves such Challenge has been confirmed and consummated.  Except to the extent that a Challenge is timely commenced within such time period (or such timely asserted Challenge does not result in a final and non-appealable order of this Court that is inconsistent with clauses (i) through (iv) of subparagraph (c) of this Paragraph), then any and all Claims and Defenses against any of the Released Parties shall be, without further notice to or order of the Court, deemed to have been forever relinquished, released and waived as to such Committee and other person or entity, and if such Challenge is timely asserted on or before such date, any and all Claims and Defenses that are not expressly asserted in such Challenge shall be deemed, immediately and without further action, to have been forever relinquished, released and waived as to such Committee and other person or entity.

c. <u>Allowance of Prepetition Indebtedness</u>. Except to the extent that a Challenge is timely commenced in accordance with subparagraph (b) of this Paragraph and such timely asserted Challenge results in a final and non-appealable order of this Court that is inconsistent with clauses (i) through (iv) of this subparagraph, then, without the requirement or need to file any proof of claim with respect thereto, (i) the Prepetition Indebtedness shall constitute allowed, secured claims for all purposes in the Cases and any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceedings if any of the Cases are converted to a case under chapter 7 of the Bankruptcy Code (a "<u>Successor Case</u>"), (ii) the Prepetition Liens (as applicable) shall be deemed legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), perfected, not subject to subordination (except as to the DIP Liens and as otherwise specified in this Interim Order, the other DIP Financing Documents and the Prepetition Secured Financing Documents) or avoidance for all purposes in the Debtors' Cases and any Successor Case, (iii) the release of the Claims and Defenses against the Released Parties shall be binding on all parties in interest in the Debtors' Cases and any Successor Case, and (iv) the Prepetition Indebtedness, the Prepetition Liens (as applicable), releases of the Claims and Defenses against the Released Parties (as applicable), and prior payments on account of or with respect to the Prepetition Indebtedness shall not be subject to any other or further claims, cause of action, objection, contest, setoff, defense or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor. Nothing in this Interim Order shall confer, or be deemed to have conferred, standing upon the Committee or any other person or entity to bring, assert, commence, continue, prosecute or litigate the Claims and Defenses against any Released Party.

39. **No Third Party Rights**. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any other direct, indirect or incidental beneficiary.

40. **Prepetition Credit Agreement Master Proof of Claim**. The Prepetition Collateral Agent shall (to the extent necessary) be authorized (but not required) to file a master proof of claim against the Debtors on behalf of itself and the applicable Prepetition Secured Lenders on account of their respective prepetition claims arising under the Prepetition Secured Financing Documents (a "<u>Master Proof of Claim</u>"). If the Prepetition Collateral Agent should

file a Master Proof of Claim, the Prepetition Collateral Agent and each Prepetition Lender (as applicable) and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in respect of its claims arising under the respective Prepetition Secured Financing Documents, and such shall be allowed or disallowed as if such entity had filed a separate proof of claim in the Cases in the amount set forth in the Master Proof of Claim. The Prepetition Collateral Agent is authorized to amend any such Master Proof of Claim from time to time.

41. **Notice of Final Hearing**. The Debtors shall promptly serve by United States mail, first class postage prepaid, copies of this Interim Order and a notice of the Final Hearing (the "Final Hearing Notice")[3] to be held on **April 22, 2010 at __:__ _.m.** to consider entry of the Final Order on the following: (i) the U.S. Trustee; (ii) those parties listed on the Consolidated List of Creditors Holding Largest Fifty Unsecured Claims Against the Debtors, as identified in connection with the Debtors' chapter 11 petitions; (iii) all parties listed on the Debtors' creditor matrix; (iv) Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, NY 10112, Attention: Andrew Rosenblatt, Esq. and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391, Attention: Joel A. Waite, Esq., co-counsel to the DIP Agent and the Prepetition Collateral Agent; and (v) counsel to any Committee, to the extent appointed. Copies of the Motion, this Interim Order and the Final Hearing Notice also shall be served upon all persons requesting service of papers pursuant to Bankruptcy Rule 2002 by United States mail, first class postage prepaid promptly following the receipt of such request. The Final Hearing Notice shall state that any party in interest objecting to the entry of the Final Order shall file written objections with the Court no later than **4:00 p.m. on April 15, 2010**, which objections shall be served so that the same are received on or before such date and time by: (a) Cadwalader, Wickersham & Taft LLP, One

---

[3] The Final Hearing Notice shall be incorporated into the Combined Notice (as defined in the Motion).

World Financial Center, New York, NY 10281, Attention: Sharon J. Richardson, Esq. and Zachary H. Smith, Esq., and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attention: Mark D. Collins, Esq., co-counsel to the Debtors; (b) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 2nd Floor, 844 King Street, Wilmington, Delaware 19801; and (c) Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, NY 10112, Attention: Andrew Rosenblatt, Esq., and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391, Attention: Joel A. Waite, Esq., co-counsel to the DIP Agent and the Prepetition Collateral Agent.

42. **Findings of Fact and Conclusion of Laws**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules and shall take effect and be fully enforceable immediately upon execution hereof.

43. **Interim Order Governs**.  In the event of any inconsistency or conflict between any of the terms and provisions of this Interim Order and the DIP Financing Documents, the terms and provisions of this Interim Order shall govern.

44. **Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.


Dated: _____, 2010
        Wilmington, Delaware


_____
      United States Bankruptcy Judge

**Exhibit 1**

**DIP Agreement**

**SUPERPRIORITY PRIMING SENIOR SECURED DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT**

**dated as of March [  ], 2010**

**among**

**XERIUM TECHNOLOGIES, INC., as Debtor and Debtor-in-Possession,
as Borrower,**

**CERTAIN SUBSIDIARIES OF THE BORROWER, as Debtors and Debtors-in-Possession,
as Guarantors,**

**VARIOUS BANKS,**

**CITIGROUP GLOBAL MARKETS INC.,
as Sole Lead Arranger and Sole Bookrunner,**

**CITICORP NORTH AMERICA, INC.,
as Collateral Agent,**

**and**

**CITICORP NORTH AMERICA, INC.,
as Administrative Agent**

# TABLE OF CONTENTS

Section 1.  DEFINITIONS AND INTERPRETATION ............................................................1

   1.1  Definitions.........................................................................................................1

   1.2  Accounting Terms............................................................................................27

   1.3  Interpretation, etc ...........................................................................................27

Section 2.  LOANS AND LETTERS OF CREDIT ..........................................................28

   2.1  Loans................................................................................................................28

   2.2  Issuance of Letters of Credit. .........................................................................30

   2.3  Pro Rata Shares; Availability of Funds. .........................................................35

   2.4  Use of Proceeds...............................................................................................36

   2.5  Evidence of Debt; Register; Banks' Books and Records; Promissory Notes..................................36

   2.6  Interest on Loans.............................................................................................37

   2.7  Conversion and Continuation..........................................................................38

   2.8  Default Interest................................................................................................39

   2.9  Fees .................................................................................................................39

   2.10  Voluntary Prepayments/Commitment Reductions. ........................................40

   2.11  Mandatory Prepayments/Commitment Reductions........................................41

   2.12  Application of Prepayments/Reductions. ........................................................42

   2.13  General Provisions Regarding Payments. .......................................................42

   2.14  Ratable Sharing. ..............................................................................................43

   2.15  Making or Maintaining LIBOR Loans............................................................44

   2.16  Increased Costs; Capital Adequacy.................................................................46

   2.17  Taxes; Withholding, etc. .................................................................................47

   2.18  Obligation to Mitigate ....................................................................................51

   2.19  Tax Credit .......................................................................................................51

   2.20  Defaulting Banks. ............................................................................................52

   2.21  Removal or Replacement of a Bank................................................................53

   2.22  Priority of Liens. .............................................................................................53

   2.23  Grant of Security Interest................................................................................55

   2.24  No Filings Required.........................................................................................56

   2.25  Conversion to Exit Facility .............................................................................56

Section 3.  CONDITIONS PRECEDENT ........................................................................56

   3.1  Conditions to Closing Date .............................................................................56

   3.2  Conditions to Each Credit Extension. .............................................................60

   3.3  Conditions Precedent to Withdrawals from the Term Loan Deposit Account ...............................62

| Section 4. | REPRESENTATIONS AND WARRANTIES | 63 |
|---|---|---|
| 4.1 | Organization; Requisite Power and Authority; Qualification | 63 |
| 4.2 | Capital Stock and Ownership | 63 |
| 4.3 | Due Authorization | 63 |
| 4.4 | No Conflict | 63 |
| 4.5 | Governmental Consents | 64 |
| 4.6 | Binding Obligation | 64 |
| 4.7 | Historical Financial Statements | 64 |
| 4.8 | Business Plan, DIP Budget and Cash Flow Forecast | 64 |
| 4.9 | No Material Adverse Change | 64 |
| 4.10 | No Restricted Junior Payments | 64 |
| 4.11 | Adverse Proceedings, etc | 65 |
| 4.12 | Payment of Taxes | 65 |
| 4.13 | Properties. | 65 |
| 4.14 | Environmental Matters | 66 |
| 4.15 | No Defaults | 66 |
| 4.16 | Material Contracts | 66 |
| 4.17 | Governmental Regulation | 66 |
| 4.18 | Margin Stock | 67 |
| 4.19 | Employee Matters | 67 |
| 4.20 | Employee Benefit Plans | 67 |
| 4.21 | Certain Fees | 68 |
| 4.22 | Compliance with Statutes, etc | 68 |
| 4.23 | Disclosure | 68 |
| 4.24 | Insurance | 68 |
| 4.25 | Use of Proceeds | 68 |
| 4.26 | Status as Superpriority Claim; Effectiveness of Order | 68 |
| 4.27 | Perfection of Security Interests | 69 |
| Section 5. | AFFIRMATIVE COVENANTS | 69 |
| 5.1 | Financial Statements and Other Reports | 69 |
| 5.2 | Existence | 75 |
| 5.3 | Payment of Taxes and Claims | 75 |
| 5.4 | Maintenance of Properties | 75 |
| 5.5 | Insurance | 75 |
| 5.6 | Books and Records; Inspections | 76 |
| 5.7 | [Reserved] | 76 |
| 5.8 | Compliance with Laws | 76 |

| 5.9 | Environmental. | 76 |
|------|----------------|-----|
| 5.10 | Further Assurances | 78 |
| 5.11 | Intellectual Property | 78 |
| 5.12 | Know-Your-Customer Rules. | 78 |
| 5.13 | Final Order | 79 |
| Section 6. | NEGATIVE COVENANTS | 80 |
| 6.1 | Indebtedness | 80 |
| 6.2 | Liens | 81 |
| 6.3 | [Reserved.] | 82 |
| 6.4 | No Further Negative Pledges | 82 |
| 6.5 | Restricted Junior Payments | 83 |
| 6.6 | Restrictions on Subsidiary Distributions | 83 |
| 6.7 | Investments | 83 |
| 6.8 | Financial Covenants. | 84 |
| 6.9 | Fundamental Changes; Disposition of Assets; Acquisitions | 85 |
| 6.10 | Disposal of Subsidiary Interests | 85 |
| 6.11 | Sales and Lease Backs | 85 |
| 6.12 | Transactions with Shareholders and Affiliates | 86 |
| 6.13 | Conduct of Business | 86 |
| 6.14 | Limitation on Issuance of Capital Stock | 86 |
| 6.15 | Amendments or Waivers of Organizational Documents | 86 |
| 6.16 | Prepayments of Other Indebtedness; Modification of Other Documents, etc. | 86 |
| 6.17 | Fiscal Year; Accounting Changes | 87 |
| 6.18 | Chapter 11 Claims | 87 |
| Section 7. | GUARANTY | 87 |
| 7.1 | Guaranty of the Obligations | 87 |
| 7.2 | Contribution by Guarantors | 87 |
| 7.3 | Payment by Guarantors | 88 |
| 7.4 | Liability of Guarantors Absolute | 88 |
| 7.5 | Waivers by Guarantors | 90 |
| 7.6 | Subordination of Other Obligations | 91 |
| 7.7 | Continuing Guaranty | 92 |
| 7.8 | Authority of Guarantors or Borrower | 92 |
| 7.9 | Financial Condition of the Borrower | 92 |
| 7.10 | Payments Set Aside | 92 |
| 7.11 | Validity and Effectiveness | 92 |
| Section 8. | EVENTS OF DEFAULT | 93 |

| 8.1 | Events of Default | 93 |
|---|---|---|
| Section 9. | AGENTS | 98 |
| 9.1 | Appointment of Agents | 98 |
| 9.2 | Powers and Duties | 98 |
| 9.3 | General Immunity | 98 |
| 9.4 | Agents Entitled to Act as Bank | 99 |
| 9.5 | Banks' Representations, Warranties and Acknowledgment | 99 |
| 9.6 | Right to Indemnity | 100 |
| 9.7 | Successor Administrative Agent and Collateral Agent | 100 |
| 9.8 | Collateral Documents and Guaranty; Intercreditor Agreement | 101 |
| 9.9 | Reliance and Engagement Letters | 102 |
| Section 10. | MISCELLANEOUS | 102 |
| 10.1 | Notices | 102 |
| 10.2 | Expenses | 102 |
| 10.3 | [Reserved] | 103 |
| 10.4 | Indemnity | 103 |
| 10.5 | Set Off | 104 |
| 10.6 | Amendments and Waivers. | 104 |
| 10.7 | Successors and Assigns; Participations. | 106 |
| 10.8 | Independence of Covenants | 109 |
| 10.9 | Survival of Representations, Warranties and Agreements | 109 |
| 10.10 | No Waiver; Remedies Cumulative | 109 |
| 10.11 | Marshalling; Payments Set Aside | 110 |
| 10.12 | Severability | 110 |
| 10.13 | Obligations Several | 110 |
| 10.14 | Headings | 110 |
| 10.15 | APPLICABLE LAW | 110 |
| 10.16 | CONSENT TO JURISDICTION AND SERVICE OF PROCESS | 110 |
| 10.17 | WAIVER OF JURY TRIAL | 111 |
| 10.18 | Confidentiality | 112 |
| 10.19 | Usury Savings Clause | 112 |
| 10.20 | Counterparts | 113 |
| 10.21 | USA Patriot Act Notice | 113 |
| 10.22 | No Setoffs and Defenses | 113 |
| 10.23 | Conflicts | 113 |

NY3 - 500429.13

**APPENDICES:**

A        Principal Office
B        Revolving Commitments
C        Term Loan Commitments
D        Notice Addresses

**SCHEDULES:**

1.1(a)     Guarantors
2.2(b)     Existing Letters of Credit
2.25       Intercompany Arrangements
4.1        Jurisdictions of Organization
4.2        Capital Stock and Ownership
4.13(b)    Real Estate Assets
4.14       Environmental Matters
4.16       Material Contracts
6.1(i)     Certain Existing Indebtedness
6.2(l)     Certain Existing Liens
6.6        Restrictions on Subsidiary Distributions
6.7(g)     Certain Existing Investments
6.12       Certain Affiliate Transactions
2.23(c)    Instruments and Tangible Chattel Paper
2.23(e)    Intercompany Notes; Pledged Securities
2.23(g)    Copyrights, Patents and Trademarks
2.23(h)    Commercial Tort Claims

**EXHIBITS:**

A        Assignment Agreement
B        Certificate Re Non-Bank Status
C        Compliance Certificate
D        Conversion/Continuation Notice
E        Exit Credit Agreement
F        Funding Notice
G        Prepackaged Plan of Reorganization
H        DIP Budget
I        Issuance Notice
J        Withdrawal Request
K        Intercreditor Agreement
L        Closing Date Certificate
M        Form of Weekly Cash Flow Forecast

NY3 - 500429.13

## SUPERPRIORITY PRIMING SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This **SUPERPRIORITY PRIMING SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of March [ ], 2010, is entered into by and among **XERIUM TECHNOLOGIES, INC.**, a Delaware corporation (the "**Borrower**"), **CERTAIN SUBSIDIARIES OF THE BORROWER**, as Guarantors, the Banks party hereto from time to time, **CITIGROUP GLOBAL MARKETS INC.**, as Sole Lead Arranger and Sole Bookrunner (in such capacity, the "**Lead Arranger**"), **CITICORP NORTH AMERICA, INC.**, as Administrative Agent (together with its permitted successors, in such capacity, the "**Administrative Agent**") and **CITICORP NORTH AMERICA, INC.**, as Collateral Agent (together with its permitted successors, in such capacity, the "**Collateral Agent**").

## RECITALS:

**WHEREAS**, capitalized terms used in these Recitals and not otherwise defined herein shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, on March [ ], 2010 (the "**Petition Date**"), the Borrower and the Guarantors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and commenced proceedings (the "**Cases**") under chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, the Borrower has requested that the Banks extend, and the Banks have agreed to extend, a term loan and revolving credit facility to the Borrower in an aggregate amount not to exceed $80,000,000, on the terms and subject to the conditions set forth herein;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.     DEFINITIONS AND INTERPRETATION

1.1     **Definitions**. The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**ABR Loan**" means a Loan or any portion thereof bearing interest by reference to the Alternate Base Rate.

"**Additional Permitted Liens**" means (i) non-avoidable, valid, enforceable and perfected Permitted Liens (as defined in the Prepetition Credit Agreement) in existence on the Petition Date, (ii) non-avoidable, valid, enforceable and perfected liens that are capitalized leases listed on Schedule 6.1(i), purchase money security interests listed on Schedule 6.1(i) or mechanics' or other statutory liens in existence on the Petition Date, and (iii) non-avoidable, valid, enforceable

liens that are capitalized leases listed on <u>Schedule 6.1(i)</u>, purchase money security interests listed on <u>Schedule 6.1(i)</u> or mechanics' or other statutory liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and (iv) mechanics', warehousemen's or other statutory liens arising after the Petition Date in the Ordinary Course.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Borrower or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of the Borrower or any of its Subsidiaries, threatened against or affecting the Borrower or any of its Subsidiaries or any property of the Borrower or any of its Subsidiaries.

"**Affected Bank**" as defined in Section 2.15(b).

"**Affected Loans**" as defined in Section 2.15(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agent**" means each of the Administrative Agent, the Collateral Agent and the Lead Arranger.

"**Agent Parties**" as defined in Section 5.1(o)(iii).

"**Aggregate Amounts Due**" as defined in Section 2.14.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Superpriority Priming Senior Secured Debtor-in-Possession Credit and Guaranty Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Allowed Professional Fees**" as defined in Section 2.22(c).

"**Alternate Base Rate**" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the greater of (i) LIBOR for a one month Interest Period beginning on such day (or if such day is not a

Business Day, the immediately preceding Business Day), plus 1% and (ii) 3.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or LIBOR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or LIBOR, respectively. If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability of the Administrative Agent to obtain sufficient quotations in accordance with the terms thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the first sentence of this definition until the circumstances giving rise to such inability no longer exist.

"**Alternative Currency**" means Euros, Canadian dollars, Australian dollars and Swedish krona.

"**Apax Partners**" means Apax Europe IV GP, L.P., a Delaware limited partnership, and its Affiliates.

"**Applicable Margin**" means (i) with respect to LIBOR Loans, 4.50% and (ii) with respect to ABR Loans, 3.50%.

"**Applicable Revolving Commitment Fee Percentage**'' means 1.00%.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sub-lessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person (other than the Borrower or any of its Subsidiaries), in one transaction or a series of transactions, of all or any part of the Borrower's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the Capital Stock of any of the Borrower's Subsidiaries, other than (i) inventory (or other assets) sold or leased in the Ordinary Course (excluding any such sales by operations or divisions discontinued or to be discontinued), (ii) substantially worn, damaged or obsolete property disposed of in the Ordinary Course, (iii) returns of inventory in the Ordinary Course, (iv) the use of cash and Cash Equivalents in a manner not inconsistent with the provisions of this Agreement and the other Credit Documents, (v) leases of real property in the Ordinary Course and (vi) licenses or sublicenses of patents, trademarks, copyrights and other intellectual property in the Ordinary Course.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit A, with such amendments or modifications as may be approved by the Administrative Agent.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

"**Availability**" means, as of any time, the difference between (i) the Revolving Commitments at such time and (ii) the aggregate principal amount of outstanding Revolving Loans at such time.

3

"**Bank**" means each financial institution listed on the signature pages hereto as a Bank, and any other Person that becomes a Bank party hereto pursuant to an Assignment Agreement.

"**Bank Insolvency Event**" means that (i) a Bank or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (ii) such Bank or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor, or sequestrator or the like has been appointed for such Bank or its Parent Company, or such Bank or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended, and applicable to the Cases.

"**Bankruptcy Court**" as defined in the preamble hereto.

"**Beneficiary**" means each Agent, the Issuing Bank and each Bank.

"**Borrower**" as defined in the preamble hereto.

"**Business Day**" means (i) with respect to all matters except those addressed in clause (ii), any day, excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state or jurisdiction are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with LIBOR Loans, means any such day that is a Business Day described in clause (i) and that is also a day on which banks in the City of London are generally open for interbank or foreign exchange.

"**Business Plan**" as defined in Section 3.1(p).

"**Capital Expenditures**" means, with respect to any Person, all expenditures that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the cash flows of such Person.

"**Capitalized Lease Obligation**" means, as applied to any Person, any obligation incurred or arising out of in connection with a Capital Lease.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests, membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Carve-Out**" as defined in Section 2.22(c).

"**Carve-Out Cap**" as defined in Section 2.22(c).

"**Carve-Out Trigger Notice**" as defined in Section 2.22(c).

"**Case Professionals**" as defined in Section 2.22(c).

"**Case Professionals Carve-Out**" as defined in Section 2.22(c).

"**Cases**" as defined in the preamble hereto.

"**Cash**" means money, currency or a credit balance in any Deposit Account.

"**Cash Collateralize**" means, in respect of an obligation, to provide and pledge (as a First Priority perfected security interest) cash collateral in Dollars, at a location and pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent (and "**Cash Collateralization**" has a corresponding meaning).

"**Cash Equivalents**" means (i) Dollars and, only if Section 2.2(j)(iii) is applicable, Alternative Currencies, (ii) securities issued or directly and fully guaranteed or insured by the US government or any agency or instrumentality thereof, (iii) certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $1.0 billion and whose long-term debt is rated at least "A" or the equivalent thereof by Moody's or S&P, (iv) repurchase obligations for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in the immediately preceding clause, (v) commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-2" or the equivalent thereof by Moody's or S&P and in each case maturing within one year after the date of acquisition, (vi) investment funds investing substantially all of their assets in securities of the types described in clauses (i) through (v) above, (vii) readily marketable direct obligations issued by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P, and (viii) money market funds as defined in Rule 2a-7 of the General Rules and Regulations as promulgated under the Investment Company Act of 1940.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit B.

"**Change of Control**" means, at any time, (i) any Person or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act), other than Apax Partners and its Affiliates, shall have acquired beneficial ownership (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 35% or more on a fully diluted basis of the voting and/or economic interest in the Capital Stock of the Borrower; (ii) the Borrower shall cease to directly or indirectly beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of its Subsidiaries (other than Xerium Technologies Brasil Indústria e Comércio S.A., Stowe Woodward AG and PMP Xibe Roll Covering Co Ltd) including, but not

limited to, if a Person shall attain the right, even if not exercised, by contract, share ownership or otherwise, to appoint the majority of the board of directors of any such Subsidiary or to direct the manner in which the board of directors of any such Subsidiary conducts its affairs; or (iii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of the Borrower cease to be occupied by Persons who either (a) were members of the board of directors of the Borrower on the Closing Date or (b) were nominated for election by the board of directors of the Borrower, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors. Notwithstanding the foregoing, the consummation of the transactions contemplated by the Prepackaged Plan of Reorganization shall not constitute a Change of Control.

"**Closing Date**" means the date on which all conditions precedent set forth in Section 3.1 are satisfied or waived in accordance with the terms of this Agreement.

"**Closing Date Certificate**" means the Closing Date Certificate substantially in the form of <u>Exhibit L</u>.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) and interests therein and proceeds and products thereof, whether now or hereafter acquired, in or upon which Liens are purported to be granted pursuant to this Agreement, the Collateral Documents, the Interim Order or the Final Order (as applicable) as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means this Agreement, the Interim Order, the Final Order, the Term Loan Deposit Account Control Agreement, the Term Loan LC Collateral Account Control Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate in form satisfactory to the Collateral Agent that provides information with respect to the personal, real and mixed property of each Credit Party.

"**Commitment**" means any Revolving Commitment or Term Loan Commitment.

"**Communications**" as defined in Section 5.1(o)(i).

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of <u>Exhibit C</u>.

"**Constitutional Documents**" means the constitutional documents of the Credit Parties as amended from time to time in accordance with the terms of this Agreement.

"**Consummation Date**" means the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later

than the effective date) of the Prepackaged Plan of Reorganization that is confirmed pursuant to an order of the Bankruptcy Court.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion of a Loan, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit D.

"**Copyrights**" means, collectively, with respect to each Credit Party, all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Credit Party, in each case, whether now owned or hereafter created or acquired by or assigned to such Credit Party, together with any and all (i) rights and privileges arising under applicable law with respect to such Credit Party's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof (including, without limitation, the Copyrights listed on Schedule 2.23(g)).

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Interim Order, the Final Order, the Letters of Credit, the Collateral Documents, the Fee Letters, any documents or certificates executed by the Borrower in favor of the Issuing Bank relating to Letters of Credit, and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, the Issuing Bank or any Bank in connection herewith.

"**Credit Extension**" means the making of a Loan or the issuance of a Letter of Credit.

"**Credit Party**" means the Borrower and each Guarantor.

"**Debtors**" means the Borrower, the Guarantors and any other Subsidiary of the Borrower listed as a debtor under the Prepackaged Plan of Reorganization.

"**Default**" means a condition or event that, after notice or expiry of an applicable grace period, or the making of any determination under the Credit Documents, or any combination of any of the foregoing, would constitute an Event of Default.

"**Defaulting Bank**" means, at any time, a Bank as to which the Administrative Agent has notified the Borrower that (i) such Bank has failed for three or more Business Days to comply with its obligations under this Agreement to make a Loan (each a "**funding obligation**"), (ii) such Bank has notified the Administrative Agent or has stated publicly, that it will not comply with any such funding obligation hereunder, or has defaulted on its funding obligations under any other loan agreement or credit agreement or similar agreement, (iii) such Bank has, for three or more Business Days, failed to confirm in writing to the Administrative Agent, in response to a written request of the Administrative Agent, that it will comply with its funding obligations hereunder, or (iv) a Bank Insolvency Event has occurred and is continuing with respect to such Bank. Any determination that a Bank is a Defaulting Bank under clauses (i) through (iv) above will be made by the Administrative Agent in its sole discretion acting in good faith. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"**Deficiency Amount**" as defined in Section 2.2(g).

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Depositary Bank**" means Citibank, N.A.

"**Determination Date**" means, with respect to any Letter of Credit, (i) the most recent date upon which one of the following shall have occurred: (x) the date of issuance of such Letter of Credit, (y) the date on which the Issuing Bank was or is, as applicable, required to deliver a notice of non-renewal with respect to such Letter of Credit, and (z) the first Business Day of each month, commencing on the first Business Day following the issuance of such Letter of Credit; and (ii) such other date determined by the Administrative Agent in its sole discretion.

"**DIP Budget**" means the 13-week forecast of receipts and disbursements of the Borrower and the Guarantors attached hereto as <u>Exhibit H</u>.

"**Distributions**" means, collectively, with respect to each Credit Party, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Pledged Securities, from time to time received, receivable or otherwise distributed to such Credit Party in respect of or in exchange for any or all of the Pledged Securities or Intercompany Notes.

"**Dollar Equivalent**" means (i) with respect to all matters other than the Letters of Credit, (x) with respect to any amount denominated in Dollars, such amount and (y) with respect to any amount denominated in an Alternative Currency, the amount converted into Dollars using the 12:00 p.m. New York CitiFx Benchmark rate for such Alternative Currency on such day or, if such day is not a Business Day, on the immediately preceding Business Day and (ii) with respect to the Letters of Credit issued (x) in Dollars, such amount on any Determination Date and (y) in an Alternative Currency, the amount converted into Dollars using the 12:00 p.m. New

York CitiFx Benchmark rate for such Alternative Currency on such Determination Date or, if such day is not a Business Day, on the immediately preceding Business Day.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Eligible Assignee**" means (i) any Bank, any Affiliate of any Bank and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, financial institution, trust fund, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans as one of its businesses or in the ordinary course or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets; provided, neither the Borrower nor any Affiliate of the Borrower or Apax Partners shall be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed by, the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, provincial or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to the Borrower or any of its Subsidiaries or any Facility.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation

9

described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of the Borrower or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of the Borrower or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Borrower or such Subsidiary and with respect to liabilities arising after such period for which the Borrower or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation under subsections .21, .22, .23, .27, .28, .29, .31 and .32); (ii) the failure to meet the minimum funding standard of or other requirements of Section 412, 430 or 436 of the Internal Revenue Code with respect to any Pension Plan whether or not waived, the failure to meet the funding standards or other requirements of Section 431 or 432 of the Internal Revenue Code with respect to any Multiemployer Plan or the failure to make by its due date any required installment, contribution or premium payment to or in respect of any Pension Plan or Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that is in endangered, seriously endangered or critical status pursuant to Section 432 of the Internal Revenue Code or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; or (viii) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; provided that, notwithstanding the foregoing, the filing and continuation of the Cases shall not constitute an ERISA Event.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Excess Amount**" as defined in Section 2.2(g).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" as defined in Section 2.16(a).

"**Existing Letters of Credit**" as defined in Section 2.2(b).

"**Exit Agents**" means the administrative agent and the collateral agent under the Exit Credit Agreement.

"**Exit Borrowers**" mean the borrowers under the Exit Credit Agreement.

"**Exit Credit Agreement**" means the Credit and Guaranty Agreement for the Exit Facility of reorganized Xerium Technologies, Inc. and the other Exit Borrowers, substantially in the form of <u>Exhibit E</u>, with such amendments, modifications, supplements and changes permitted or agreed to pursuant to the terms thereof.

"**Exit Credit Documents**" means the Credit Documents as defined in the Exit Credit Agreement.

"**Exit Facility**" means the revolving and term loan facilities under the Exit Credit Agreement.

"**Exit Guarantors**" mean the guarantors under the Exit Credit Agreement.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by the Borrower or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Facility Office**" means the office or offices notified by a Bank or the Issuing Bank to the Administrative Agent in writing on or before the date it becomes a Bank or the Issuing Bank (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Federal Funds Effective Rate**" means, for any day, for any day, the rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate quoted to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letters**" means collectively, any fee letter between the Borrower or any Credit Party on the one hand and any of the Agents or the Lead Arranger on the other hand.

"**Final Order**" as defined in Section 5.13.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of the Borrower that such financial statements fairly present, in all material respects, the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year end adjustments.

"**First Day Orders**" means all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date, granting motions or applications filed by the Debtors on or about the Petition Date.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to this Agreement, any Collateral Document, the Interim Order or the Final Order (as applicable), that such Lien is the only Lien to which such Collateral is subject, other than Permitted Liens which are junior in priority to the Collateral Agent's Lien on such Collateral.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset owned by the Borrower or any Guarantor and located in an area designated by the Federal Emergency Management Agency or other Governmental Authority as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means a Subsidiary organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"**Funding Guarantor**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit F.

"**FX Currency Losses**" means any losses incurred by the Issuing Bank as a result of purchasing currencies other than Dollars or exchanging Dollars into another currency in connection with any drawing under any Letter of Credit.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, for the Borrower and its Subsidiaries, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Goodwill**" means, collectively, with respect to each Credit Party, the goodwill connected with such Credit Party's business, including all goodwill connected with (i) the use of and symbolized by any Trademark or Intellectual Property License with respect to any Trademark in which such Credit Party has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, consulting agreements,

engineering contracts and such other assets which relate to such goodwill and (iii) all product lines of such Credit Party's business.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, provincial, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or any foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each Guarantor listed in Schedule 1.1(a) as a Guarantor, which shall not include any Foreign Subsidiaries.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7 or any other guaranty which purports to guaranty all or a portion of the Obligations.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under (i) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements entered into in the Borrower's or any of its Subsidiaries' Ordinary Course and not for speculative purposes and (ii) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices in the Borrower's or any of its Subsidiaries' Ordinary Course and not for speculative purposes.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Bank which are presently in effect or, to the extent allowed by law, under such applicable laws

which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of the Borrower and its Subsidiaries, for the immediately preceding three Fiscal Years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial statements of the Borrower and its Subsidiaries as at the most recently ended Fiscal Quarter, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three, six or nine month period, as applicable, ending on such date, and, in the case of clauses (i) and (ii), certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year end adjustments.

"**Increased Cost Banks**" as defined in Section 2.21.

"**Indebtedness**" means, with respect to any Person, the principal and premium (if any) of any indebtedness of such Person, whether or not contingent: (i) in respect of borrowed money, (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (iii) representing the deferred and unpaid purchase price of any property, other than trade payables incurred in the Ordinary Course, (iv) in respect of Capitalized Lease Obligations, (v) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (vi) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof or (vii) representing any Hedging Obligations, if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP. To the extent not otherwise included, Indebtedness shall include (a) any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the Indebtedness of another Person (other than by endorsement of negotiable instruments for collection in the Ordinary Course), and (b) Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); <u>provided</u>, <u>however</u>, that the amount of such Indebtedness will be the lesser of (A) the fair market value of such asset at such date of determination and (B) the amount of such Indebtedness of such other Person. Notwithstanding the foregoing, any obligation of such Person or any of its Subsidiaries in respect of (x) minimum guaranteed commissions, or other similar payments, to clients, minimum returns to clients or stop loss limits in favor of clients or indemnification obligations to clients, in each case pursuant to contracts to provide services to clients entered into in the Ordinary Course, and (y) account credits to participants under any compensation plan, shall be deemed not to constitute Indebtedness.

NY3 - 500429.13

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, provincial, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws and including any fees or expenses resulting from changes in laws in effect on the date of this Agreement), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Banks' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of the Borrower or any of its Subsidiaries.

"**Indemnified Taxes**" as defined in Section 2.17(a).

"**Indemnitee**" as defined in Section 10.4.

"**Information**" as defined in Section 10.18.

"**Initial Term Loan LC Deposit Amount**" as defined in Section 2.1(c).

"**Intellectual Property Collateral**" means, collectively, the Patents, Trademarks, Copyrights, Intellectual Property Licenses and Goodwill.

"**Intellectual Property Licenses**" means collectively, with respect to each Credit Party, all license and distribution agreements with, and covenants not to sue, any other party with respect to any Patent, Trademark or Copyright or any other patent, trademark or copyright, whether such Credit Party is a licensor or licensee, distributor or distributee under any such license or distribution agreement, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements or violations thereof, (iii) rights to sue for past, present and future infringements or violations thereof and (iv) other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights or any other patent, trademark or copyright.

"**Intercompany Notes**" means, with respect to each Credit Party, all intercompany notes described in Schedule 2.23(e) and intercompany notes hereafter acquired by such Credit Party and all certificates, instruments or agreements evidencing such intercompany notes, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof to the extent permitted pursuant to the terms hereof.

"**Intercreditor Agreement**" means the Intercreditor Agreement relating to the Exit Facility, substantially in the form of Exhibit K, with such amendments, modifications, supplements and changes permitted or agreed pursuant to the terms thereof.

"**Interest Payment Date**" means (i) with respect to any LIBOR Loan, the last day of each Interest Period applicable to such LIBOR Loan, and (ii) with respect to any ABR Loan, the first Business Day of each calendar month, commencing on the first such day following the making of such ABR Loan.

"**Interest Period**" means, in connection with a LIBOR Loan, a period of one month, with the first such interest period to begin on the Closing Date and with any subsequent interest periods to begin on the last day of the prior one month interest period theretofore in effect, (i) initially, commencing on the Credit Date thereof or Conversion/Continuation Date thereof; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of Loans shall extend beyond the Termination Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim Order**" as defined in Section 3.1(t).

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than the Borrower or a Guarantor); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of the Borrower from any Person (other than the Borrower or a Guarantor), of any Capital Stock of such Person; and (iii) any direct or indirect loan, advance (other than advances to employees for moving,

16

entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course) or capital contribution by the Borrower or any of its Subsidiaries to any other Person (other than the Borrower or a Guarantor), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write ups, write downs or write offs with respect to such Investment.

"**Issuance Notice**" means an Issuance Notice in the form of <u>Exhibit I</u>.

"**Issuing Bank**" means Citicorp North America, Inc., together with its permitted successors and assigns in such capacity.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; <u>provided</u>, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Lead Arranger**" as defined in the preamble hereto.

"**Letter of Credit**" means the Existing Letters of Credit and a commercial or standby letter of credit issued or to be issued by the Issuing Bank pursuant to this Agreement and in form and substance acceptable to the Issuing Bank and the Administrative Agent.

"**Letter of Credit Sublimit**" means $20,000,000.

"**LIBOR**" means, in relation to any LIBOR Loan, the greater of:

> (i)     (a) the applicable Screen Rate; or (b) (if no Screen Rate is available for the currency or Interest Period of that LIBOR Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Administrative Agent at its request quoted by the Reference Banks to leading banks in the London interbank market, as of approximately 11:00 a.m. (London time) on the Interest Rate Determination Date for the offering of deposits in the currency of that LIBOR Loan and for a period comparable to the Interest Period for that LIBOR Loan; and

> (ii)    2.00%.

"**LIBOR Loan**" means a Loan or any portion thereof bearing interest by reference to the LIBOR Rate.

"**LIBOR Rate**" means the rate of interest for each Interest Period that is equal to the interest rate per annum which is the aggregate of the applicable LIBOR determined interest rate.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in

the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Term Loan and a Revolving Loan.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means any effect, event, matter or circumstance: (a) which is materially adverse to the: (i) business, assets or financial condition or prospects of the Borrower and its Subsidiaries taken as a whole; or (ii) ability of any Credit Party to perform any of its Obligations in accordance with their terms under any of the Credit Documents; or (b) which results in any (i) Credit Document not being legal, valid and binding on and, subject to reservations contained in the legal opinions provided as conditions precedent thereto, enforceable against any party thereto from and after the date the Interim Order is entered by the Bankruptcy Court and/or (ii) this Agreement or any other Collateral Document not being a valid and effective security interest from and after the date the Interim Order is entered by the Bankruptcy Court, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any Bank under the Credit Documents.

"**Material Contract**" means any contract or other arrangement to which the Borrower or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, non-performance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Monthly DIP Budget Cash Flow Update**" as defined in Section 5.1(p)(ii).

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Borrower or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs (including, without limitation, reasonable transaction costs) incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by the Borrower or any of its Subsidiaries in connection with such Asset Sale.

18

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by the Borrower or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder (excluding proceeds of business interruption insurance) or (b) as a result of the taking of any assets of the Borrower or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of the Borrower or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

"**Non-Consenting Bank**" as defined in Section 2.21.

"**Non-Credit Party Cash Equivalents**" means (i) Dollars or any foreign currency freely exchangeable into Dollars and, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the Ordinary Course, (ii) securities issued or directly and fully guaranteed or insured by the US government or any agency or instrumentality thereof, (iii) certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $1 billion and whose long-term debt is rated at least "A" or the equivalent thereof by Moody's or S&P, (iv) repurchase obligations for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in the immediately preceding clause, (v) commercial paper issued by a corporation (other than an Affiliate of Xerium) rated at least "A-2" or the equivalent thereof by Moody's or S&P and in each case maturing within one year after the date of acquisition, (vi) investment funds investing substantially all of their assets in securities of the types described in clauses (i) through (v) above, (vii) readily marketable direct obligations issued by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P and (viii) instruments equivalent to those referred to above denominated in Euros or any other foreign currency that are comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States.

"**Non-Defaulting Bank**" means, at any time, a Bank that is not a Defaulting Bank or a Potential Defaulting Bank.

"**Notice**" means a Funding Notice, Issuance Notice, a Conversion/Continuation Notice or a Withdrawal Request.

"**Obligations**" means all obligations of every nature of a Credit Party, from time to time owed to the Agents (including former Agents), the Banks, or any of them, and any Issuing Bank under any Credit Document, whether for principal, interest, reimbursement of amounts drawn under Letters of Credit, fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" as defined in Section 7.6.

"**Officers' Certificate**" means a certificate signed on behalf of the Borrower by two officers of the Borrower, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Borrower.

"**Ordinary Course**" means ordinary course of business or ordinary trade activities that are customary, typical and carried out in a manner consistent with past practice.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its bylaws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Parent Company**" means, with respect to a Bank, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Bank and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Bank.

"**Patents**" means, collectively, with respect to each Credit Party, all patents issued or assigned to, and all patent applications and registrations made by, such Credit Party (whether filed in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to such Credit Party's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof (including, without limitation, the Patents listed on Schedule 2.23(g)).

"**Patriot Act**" as defined in Section 10.21.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed by, the Borrower, any of its Subsidiaries or any of its ERISA Affiliates.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies,

Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" as defined in the preamble hereto.

"**Plan of Reorganization**" means a plan of reorganization in the Cases.

"**Platform**" as defined in Section 5.1(o)(ii).

"**Pledged Securities**" means collectively, with respect to each Credit Party, (i) all issued and outstanding Capital Stock of each issuer set forth on Schedule 2.23(e) as being owned by such Credit Party and all options, warrants, rights, agreements and additional Capital Stock of whatever class of any such issuer acquired by such Credit Party (including by issuance), together with all rights, privileges, authority and powers of such Credit Party relating to such Capital Stock in each such issuer or under any Organizational Document of each such issuer, and the certificates, instruments and agreements representing such Capital Stock and any and all interest of such Credit Party in the entries on the books of any financial intermediary pertaining to such Capital Stock, (ii) all Capital Stock of any Subsidiary, which Capital Stock is hereafter acquired by such Credit Party (including by issuance) and all options, warrants, rights, agreements and additional Capital Stock of whatever class of any such Subsidiary acquired by such Credit Party (including by issuance), together with all rights, privileges, authority and powers of such Credit Party relating to such Capital Stock or under any Organizational Document of any such Subsidiary, and the certificates, instruments and agreements representing such Capital Stock and any and all interest of such Credit Party in the entries on the books of any financial intermediary pertaining to such Capital Stock, from time to time acquired by such Credit Party in any manner, and (iii) all Capital Stock of any successor Subsidiary owned by such Credit Party (unless such successor is such Credit Party itself) formed by or resulting from any consolidation or merger in which a Credit Party is not the surviving entity; provided that the foregoing shall be limited to no more than 65% of any outstanding Capital Stock of any first tier Foreign Subsidiary (as determined for U.S. federal income tax purposes).

"**Potential Defaulting Bank**" means, at any time, a Bank (i) as to which the Administrative Agent has notified the Borrower that an event of the kind referred to in the definition of "Bank Insolvency Event" has occurred and is continuing in respect of any financial institution affiliate of such Bank, (ii) as to which the Administrative Agent or the Issuing Bank has in good faith determined and notified the Borrower and the Administrative Agent that such Bank or its Parent Company or a financial institution affiliate thereof has notified the Administrative Agent, or has stated publicly, that it will not comply with its funding obligations under any other loan agreement or credit agreement or similar agreement or (iii) that has, or whose Parent Company has, a non-investment grade rating from Moody's or S&P or another national recognized rating agency. Any determination that a Bank is a Potential Defaulting Bank under any of clauses (i) through (iii) above will be made by the Administrative Agent, in its sole discretion acting in good faith. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"**Prepackaged Plan of Reorganization**" means the Debtors' Joint Prepackaged Plan of Reorganization filed by the Debtors with the Bankruptcy Court on March [   ], 2010 (in the form