of Exhibit G), as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Pre-Petition Credit Agreement**" means the Amended and Restated Credit Agreement dated as of May 30, 2008 among the Borrower and certain Subsidiaries thereof, as Borrowers, certain Subsidiaries of the Borrower, as Guarantors, various banks party thereto, and Citicorp North America, Inc., as collateral agent and as administrative agent, as amended, supplemented or otherwise modified from time to time.

"**Pre-Petition Lenders**" means the financial institutions party to the Pre-Petition Credit Agreement as "Banks."

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective on the date such change is publicly announced as effective.

"**Principal Office**" means, for each of the Administrative Agent and the Issuing Bank, such Person's "Principal Office" as set forth on Appendix A, or such other office as such Person may from time to time designate in writing to the Borrower, the Administrative Agent and each Bank.

"**Projected Information**" as defined in Section 5.1(p).

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term Loan Commitment or Term Loan of any Bank, the percentage obtained by dividing (a) the Term Loan Exposure of such Bank by (b) the aggregate Term Loan Exposures of all Banks; and (ii) with respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Bank, the percentage obtained by dividing (a) the Revolving Exposure of that Bank by (b) the aggregate Revolving Exposure of all Banks. For all other purposes with respect to each Bank, "**Pro Rata Share**" means the percentage obtained by dividing (A) an amount equal to the sum of the Term Loan Exposure and the Revolving Exposure of that Bank by (B) an amount equal to the sum of the aggregate Term Loan Exposure and the aggregate Revolving Exposure of all Banks.

"**Qualifying Lender**" means:

(a)     a Bank which is a bank as defined in Section 991 Income Tax Act 2007 of the United Kingdom, beneficially entitled to all amounts payable to it by a Credit Party under the Credit Documents and within the charge to United Kingdom corporation tax as respects such amounts; or

(b)     a bank in respect of which an order under Section 991(2)(e) Income Tax Act 2007 designating it as a bank for the purposes of Section 879 Income Tax Act 2007 of the United Kingdom provides that Section 879 Income Tax Act 2007 shall apply to it as if the words from "if" to the end in that section were omitted; or

22

(c)      a Treaty Lender.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Reference Banks**" means, in relation to LIBOR, the principal London offices of Citibank, N.A. and such two other banks as may be appointed by the Administrative Agent in consultation with the Borrower.

"**Register**" as defined in Section 2.5(b).

"**Reimbursement Date**" as defined in Section 2.2(e).

"**Related Fund**" means, with respect to any Bank that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Bank or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Bank**" as defined in Section 2.21.

"**Requisite Banks**" means, collectively (i) one or more Term Loan Banks having or holding Term Loan Exposure and representing more than 50.0% of the sum of the aggregate Term Loan Exposure of all Term Loan Banks and (ii) one or more Revolving Banks having or holding Revolving Exposure and representing more than 50.0% of the sum of the aggregate Revolving Exposure of all Revolving Banks.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of the Borrower now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of the Borrower now or hereafter outstanding, except any payment made solely in shares of that class of stock to the holders of that class; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of the Borrower now or hereafter outstanding; and (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to, any subordinated debt, excluding, in respect of this clause (iv), payments in kind.

"**Revolving Bank**" means, at any time, any Bank that has a Revolving Commitment at such time.

"**Revolving Commitment**" means the commitment of a Bank to make or otherwise fund any Revolving Loan and "**Revolving Commitments**" means such commitments of all Banks in the aggregate. The amount of each Bank's Revolving Commitment is set forth on Appendix B or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Commitments as of the Closing Date is $20,000,000.

"**Revolving Commitment Period**" means the period from the Closing Date to but excluding the Termination Date.

"**Revolving Exposure**" means, with respect to any Bank as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Bank's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of the aggregate outstanding principal amount of the Revolving Loans of that Bank.

"**Revolving Loan**" as defined in Section 2.1(a)(ii).

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Companies.

"**Scheduled Maturity Date**" means [July/August __,] 2010.

"**Screen Rate**" means in relation to LIBOR, the offered rate for deposits in Dollars for the applicable Interest Period appearing on the Reuters Screen LIBOR 01 Page. If such page is replaced or service ceases to be available, the Administrative Agent may specify another page or service displaying the appropriate rate after consultation with the Borrower and the Banks.

"**Secured Parties**" mean the Beneficiaries.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securities Collateral**" means, collectively, the Pledged Securities and the Distributions.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or

24

controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; <u>provided</u>, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Superpriority Claim**" means a claim against a Credit Party in any of the Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) and/or 726 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, whether disputed or not, including any interest, penalties or additions thereto and any installments in respect thereof; <u>provided</u>, "Tax on the overall net income" of a Person shall be construed as a reference to a Tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Bank, its lending office) is located or in which that Person (and/or, in the case of a Bank, its lending office) is deemed to be doing business on all or part of the net income, profits, or gains (whether worldwide, or only insofar as such income, profits, or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Bank, its applicable lending office).

"**Tax Confirmation**" means a confirmation by a Bank that it is a 991Bank.

"**Tax Credit**" means a credit against, relief or remission for or repayment of any Tax.

"**Term LC Deposit Date**" as defined in Section 2.2(g)

"**Term LC Unreimbursed Amount**" as defined in Section 2.2(e)

"**Term Loan**" as defined in Section 2.1(a)(i).

"**Term Loan Bank**" means, at any time, any Bank that has a Term Loan Commitment or holds a Term Loan at such time.

"**Term Loan Commitment**" means the commitment of a Bank to make or otherwise fund a Term Loan and "**Term Loan Commitments**" means such commitments of all Banks in the aggregate. The amount of each Bank's Term Loan Commitment is set forth on <u>Appendix C</u> or in the applicable Assignment Agreement. The aggregate amount of Term Loan Commitments as of the Closing Date is $60,000,000.

"**Term Loan Deposit Account**" as defined in Section 2.1(c).

"**Term Loan Deposit Account Control Agreement**" means the Account Control Agreement (Term Loan Deposit Account), dated as of the Closing Date, among the Borrower,

the Collateral Agent, the Administrative Agent and Citibank, N.A., as amended, supplemented or otherwise modified from time to time.

"**Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of Term Loans of such Bank; provided, at any time prior to the making of the Term Loans, the Term Loan Exposure of any Bank shall be equal to such Bank's Term Loan Commitment.

"**Term Loan LC Collateral Account**" as defined in Section 2.2(j) and shall include any sub-accounts or additional accounts contemplated by Section 2.2(j)(iii).

"**Term Loan LC Collateral Account Control Agreement**" means the Account Control Agreement (Term Loan LC Collateral Account), dated as of the Closing Date, among the Borrower, the Collateral Agent, the Administrative Agent and Citibank, N.A., as amended, supplemented or otherwise modified from time to time.

"**Terminated Bank**" as defined in Section 2.21.

"**Termination Date**" means the earliest to occur of (i) the Scheduled Maturity Date, (ii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.10(b) or 2.11, (iii) the date of the termination of the Revolving Commitments pursuant to Section 8.1 or the date the Loans become due and payable pursuant to Section 8.1, (iv) 35 days following the entry of the Interim Order, if the Final Order has not been entered on or before such date, (v) the closing date of any sale of the Credit Parties or all or substantially all of the assets of the Credit Parties pursuant to section 363 of the Bankruptcy Code in the Cases that has been approved by an order of the Bankruptcy Court, and (vi) the Consummation Date.

"**Trademarks**" means, collectively, with respect to each Credit Party, all trademarks (including service marks), slogans, logos, certification marks, trade dress, corporate names and trade names, whether registered or unregistered, owned by or assigned to such Credit Party and all registrations and applications for the foregoing (whether statutory or common law and whether established or registered in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to such Credit Party's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof (including, without limitation, the Trademarks listed on Schedule 2.23(g)).

"**Treaty Lender**" means a Bank which at the time the payment is made is beneficially entitled to all amounts payable to it under the Credit Documents and is entitled pursuant to the interpretation of the taxation authorities of the jurisdiction from which the payment is made or deemed to be made under a double taxation agreement in force at that date (subject only to the completion of any necessary formalities or administrative procedures, (including, without limitation, the matters referred to in Section 2.17(e)) to receive any payments of principal,

interest, fees or other amounts under the Credit Documents without deduction or withholding for or on account of Tax.

"**Type of Loan**" means a LIBOR Loan or an ABR Loan.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided, however, in the event that by reason of mandatory provisions of law, any of the attachment, perfection or priority of the Collateral Agent's and the Secured Parties' security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "**UCC**" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of the Credit Documents relating to such attachment, perfection or priority and for purposes of definitions relating to such provisions.

"**Unpaid Sum**" means any sum due and payable but unpaid by a Credit Party under the Credit Documents.

"**Weekly Cash Flow Forecast**" as defined in Section 5.1(p)(i).

"**Withdrawal Request**" means a request by the Borrower of a withdrawal of funds from the Term Loan Deposit Account in the form of <u>Exhibit J</u>.

"**991 Bank**" means a Bank falling within paragraph (a) or (b) of the definition of Qualifying Lender.

The following terms shall have the meanings assigned to them in the UCC:

"**Account Debtor**"; "**Accounts**"; "**Chattel Paper**"; "**Commercial Tort Claim**"; "**Documents**"; "**Electronic Chattel Paper**"; "**Equipment**"; "**Fixtures**"; "**General Intangibles**"; "**Goods**"; "**Inventory**"; "**Instruments**"; "**Investment Property**"; "**Letter-of-Credit Rights**"; "**Money**"; "**Proceeds**"; "**Records**"; "**Supporting Obligations**"; and "**Tangible Chattel Paper**".

1.2    **Accounting Terms**.  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by the Borrower to the Banks pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation.  Notwithstanding the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements for the Fiscal Year ended December 31, 2009 only.

1.3    **Interpretation, etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the

specific items or matters set forth immediately following such word or to similar items or matters, whether or not limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

## SECTION 2.        LOANS AND LETTERS OF CREDIT

### 2.1    **Loans.**

(a)    <u>Commitments</u>.

(i)    Subject to the terms and conditions hereof, each Term Loan Bank severally agrees to make a term loan in Dollars to the Borrower on the Closing Date (a "**Term Loan**") in an amount equal to such Term Loan Bank's Term Loan Commitment.  Any amount borrowed under this Section 2.1(a)(i) and subsequently repaid or prepaid may not be reborrowed.  The Term Loan Commitment of each Term Loan Bank shall terminate upon the Term Loan borrowing on the Closing Date.  Subject to Sections 2.10(a), 2.11 and 2.25, all amounts owed hereunder with respect to Term Loans shall be paid in full no later than the Termination Date.

(ii)    During the Revolving Commitment Period, subject to the terms and conditions hereof, each Revolving Bank severally agrees to make revolving loans in Dollars to the Borrower ("**Revolving Loans**") in an aggregate amount up to but not exceeding such Revolving Bank's Revolving Commitment; <u>provided</u>, that after giving effect to the making of any Revolving Loans in no event shall the principal amount of all Revolving Loans exceed the Revolving Commitments then in effect.  Subject to Sections 2.10(a) and 2.11, all amounts owed hereunder with respect to Revolving Loans shall be paid in full no later than the Termination Date.

(b)    <u>Borrowing Mechanics for Revolving Loans Generally</u>.

(i)    Except pursuant to Sections 2.2(e) and 2.2(g), Revolving Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii)    Whenever the Borrower desires that Revolving Banks make Revolving Loans, the Borrower shall deliver to the Administrative Agent a fully executed and delivered Funding Notice no later than (A) 9:30 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a LIBOR Loan or (B) 9:30 a.m. (New York City time) on the proposed Credit Date in the case of an ABR Loan.  Except as otherwise provided herein, a Funding Notice for a Loan that is a LIBOR Loan shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be

bound to make a borrowing in accordance therewith. No Funding Notice may be delivered in respect of Terms Loans other than a single Funding Notice requesting Terms Loans be made on the Closing Date.

(iii) Notice of receipt of each Funding Notice in respect of Loans, together with the amount of each Bank's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by the Administrative Agent to each applicable Bank by telefacsimile with reasonable promptness, but (provided the Administrative Agent shall have received such notice by 9:30 a.m. (New York City time)) not later than 3:00 p.m. (New York City time) on the same day as the Administrative Agent's receipt of such Funding Notice from the Borrower.

(iv) Each Bank shall make the amount of its Revolving Loan available to the Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Administrative Agent's Principal Office. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, the Administrative Agent shall make the proceeds of such Loans available to the Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the Administrative Agent from Banks to be credited to the account of the Borrower at the Administrative Agent's Principal Office or such other account as may be reasonably designated in writing no later than 3 days before to the Administrative Agent by the Borrower.

(c) Term Loan Proceeds and Term Loan Deposit Account. Proceeds from the Term Loans made on the Closing Date in the amount of $[_____][1] shall be deposited into the Term Loan LC Collateral Account (the "**Initial Term Loan LC Deposit Amount**") and utilized pursuant to and in accordance with Section 2.2(j). On or prior to the Closing Date, the Borrower shall establish a Deposit Account maintained with the Depositary Bank (the "**Term Loan Deposit Account**"). After the portion of the proceeds from the Term Loans equal to the Initial Term Loan LC Deposit Amount is deposited into the Term Loan LC Collateral Account pursuant to the immediately preceding sentence, the remainder of the proceeds from the Term Loans made on the Closing Date (other than those applied to pay fees and expenses associated with the transactions contemplated by the Credit Documents) shall be deposited into the Term Loan Deposit Account. Funds on deposit in the Term Loan Deposit Account shall be held in the form of Cash, except as described below. So long as no Default or Event of Default shall have occurred and be continuing, the Borrower is authorized to direct the Administrative Agent to make (or cause to be made) investments of funds on deposit in the Term Loan Deposit Account in Cash Equivalents as directed by the Borrower and in

---

[1] Amount to equal 103% of the Dollar Equivalent of the amounts available to be drawn under Existing Letters of Credit, but not to exceed $20,000,000.

accordance with the Term Loan Deposit Account Control Agreement. Upon the occurrence and during the continuation of a Default or an Event of Default, the funds on deposit in the Term Loan Deposit Account shall be invested in accordance with the Term Loan Deposit Account Control Agreement. Subject to the satisfaction, or waiver in accordance with Section 10.6, of the conditions set forth in Section 3.3, the Borrower shall have the right to request withdrawals from the Term Loan Deposit Account for use in accordance with clauses (ii) through (v) of Section 2.4. The Borrower hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in the Term Loan Deposit Account and all Cash, balances and Cash Equivalents therein and all proceeds of the foregoing, as security for the Borrower's Obligations.

2.2 **Issuance of Letters of Credit.**

(a) <u>Issuance of Letters of Credit</u>. Subject to the terms and conditions hereof, the Issuing Bank agrees to issue Letters of Credit for the account of the Borrower or any of its Subsidiaries in the aggregate amount which, when combined with the Dollar Equivalent of the aggregate face amount of Existing Letters of Credit, does not exceed the Letter of Credit Sublimit; <u>provided</u>, (i) each Letter of Credit (other than the Existing Letters of Credit) shall be denominated in Dollars or an Alternative Currency; (ii) the stated amount of each Letter of Credit (other than the Existing Letters of Credit) shall not be less than $500,000 (or the Dollar Equivalent thereof if issued in an Alternative Currency) or such lesser amount as is acceptable to the Issuing Bank; (iii) after giving effect to such issuance, in no event shall the amount of Cash and Cash Equivalents on deposit in the Term Loan LC Collateral Account be less than 103% of the Dollar Equivalent of the amount available to be drawn under all Letters of Credit (including the Existing Letters of Credit); (iv) in no event shall any Letter of Credit (other than the Existing Letters of Credit) have an expiration date later than 180 days from the Closing Date; and (v) in no event shall a Letter of Credit be issued if such Letter of Credit is not in a form acceptable to the Issuing Bank in its reasonable discretion. Subject to the foregoing, the Issuing Bank shall not extend any such Letter of Credit if it has received written notice from the Administrative Agent, acting on behalf of the Requisite Banks, that an Event of Default has occurred and is continuing.

(b) <u>Existing Letters of Credit</u>. <u>Schedule 2.2(b)</u> contains a schedule of certain letters of credit issued prior to the Closing Date (the "**Existing Letters of Credit**") for the account of the Borrower or one of its Subsidiaries by Citicorp North America, Inc. On the Closing Date, (i) the Existing Letters of Credit, to the extent outstanding, shall be automatically, and without further action by the parties hereto, converted to Letters of Credit issued and outstanding under this Agreement and subject to the provisions hereof, as if such Existing Letters of Credit had been issued on the Closing Date hereunder, (ii) the issuing bank of the Existing Letters of Credit shall be deemed to be the "Issuing Bank" hereunder solely for the purpose of maintaining such Existing Letters of Credit, and (iii) all liabilities of the Borrower or any of its Subsidiaries with respect to Existing Letters of Credit shall constitute Obligations. No Existing Letter of Credit shall be amended, extended or renewed without the prior written consent of the Administrative Agent.

(c)     Notice of Issuance.  Whenever the Borrower desires the issuance of a Letter of Credit, it shall deliver an Issuance Notice to the Administrative Agent no later than 9:30 a.m. (New York City time) at least three (3) Business Days (in the case of standby letters of credit) or five (5) Business Days (in the case of commercial letters of credit), or in each case such shorter period as may be agreed to by the Issuing Bank in any particular instance, in advance of the proposed date of issuance.  Upon satisfaction or waiver of the conditions set forth in Section 3.2, the Issuing Bank shall issue the requested Letter of Credit only in accordance with the Issuing Bank's standard operating procedures.  Upon the issuance of any Letter of Credit or any amendment or modification to a Letter of Credit, the Issuing Bank shall promptly notify the Administrative Agent thereof, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit.

(d)     Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments.  In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, the Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit.  As between the Borrower and the Issuing Bank, the Borrower assumes all risks of the acts and omissions of, or misuse of, the Letters of Credit issued by the Issuing Bank by the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, the Issuing Bank shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of the Issuing Bank's rights or powers hereunder.  Without limiting the foregoing and in furtherance thereof, any action taken or omitted by the Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of the Issuing Bank to the Borrower.  Notwithstanding anything to the contrary contained in this Section 2.2(d), the Borrower shall retain any and all rights it may have against the Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of the Issuing Bank.

31

(e)     Reimbursement of Amounts Drawn or Paid Under Letters of Credit.  In the event the Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall immediately notify the Borrower and the Administrative Agent, and the Borrower shall reimburse the Issuing Bank in an amount equal to the Dollar Equivalent of such drawing plus any FX Currency Losses no later than 1:00 p.m. (New York City time) on the date such drawing is honored (the "**Reimbursement Date**"), if the Borrower shall have received such notice prior to 11:00 a.m. (New York City time) on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 1:00 p.m. (New York City time) on the next Business Day; provided that (subject to the immediately succeeding sentence) unless the Borrower shall reimburse the Issuing Bank by 1:00 p.m. (New York City time) on the same day on which such drawing is made, the unpaid amount thereof shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin, for each day commencing on the date the drawing is made until the date that the Borrower pays the Issuing Bank for the Dollar Equivalent of the amount of such drawing plus any FX Currency Losses. If the Borrower does not so reimburse the Issuing Bank at or prior to the time for payment specified above in respect of such drawing under such Letter of Credit, the Administrative Agent shall promptly cause the amounts on deposit in the Term Loan LC Collateral Account to be applied to repay in full such amounts (such amounts, including any FX Currency Losses and accrued interest thereon, the "**Term LC Unreimbursed Amount**"). If amounts on deposit in the Term Loan LC Collateral Account is less than such Term LC Unreimbursed Amount, then the Administrative Agent shall promptly cause the amounts on deposit in the Term Loan Deposit Account to be applied repay in full such Term LC Unreimbursed Amount. If the application of amounts from the Term Loan Deposit Account in accordance with the immediately preceding sentence does not satisfy such Term LC Unreimbursed Amount in full then the Borrower shall be deemed to have given a timely Funding Notice to the Administrative Agent requesting Banks to make a Revolving Loan on the Reimbursement Date in the amount sufficient equal to the Term LC Unreimbursed Amount, less the amounts withdrawn from the Term Loan LC Collateral Account and the Term Loan Deposit Account pursuant to the preceding two sentences, and the Banks shall, on the Reimbursement Date, make Revolving Loans in such amount, the proceeds of which shall be applied directly by the Administrative Agent to reimburse the Issuing Bank for the Term LC Unreimbursed Amount. The conditions to the making of a Revolving Loan set forth in Section 3.2 and the minimum amount of Revolving Loans set forth in Section 2.1(b) shall not apply to Revolving Loans made pursuant to this Section 2.2(e), and the Revolving Loans made pursuant to this Section 2.2(e) shall initially be ABR Loans.

(f)     Investing Funds in Term Loan LC Collateral Account.  Funds on deposit in the Term Loan LC Collateral Account shall be held in the form of Cash.  So long as no Default or Event of Default shall have occurred and be continuing, the Borrower is authorized to direct the Administrative Agent to make (or cause to be made) investments of funds on deposit in the Term Loan LC Collateral Account in Cash Equivalents as directed by the Borrower and in accordance with the Term Loan LC Collateral Account Control Agreement.  Upon the occurrence and during the continuation of a Default or an Event of Default, the funds on deposit in the Term Loan LC Collateral

32

Account shall be invested in accordance with the Term Loan LC Collateral Account Control Agreement.

(g)     Top-Up and Release of Funds in the Term Loan LC Collateral Account. If on the last Business Day of any month the aggregate amount of Cash and Cash Equivalents on deposit in the Term Loan LC Collateral Account exceeds 103% of the Dollar Equivalent of the amount available to be drawn under the Letters of Credit (such excess, the "**Excess Amount**"), then, upon the written request of the Borrower, no later than the second Business Day after such request the Administrative Agent shall cause an amount of Cash (including cash proceeds from the liquidation of any Cash Equivalents) equal to the Excess Amount (calculated at the date of withdrawal), to be withdrawn from the Term Loan LC Collateral Account and transferred to the Term Loan Deposit Account. If, however, on any Determination Date the aggregate amount of Cash and Cash Equivalents on deposit in the Term Loan LC Collateral Account is less than 103% of the Dollar Equivalent of the amount available to be drawn under the Letters of Credit (such shortfall, the "**Deficiency Amount**"), then no later than the next Business Day (the "**Term LC Deposit Date**") after notice thereof to the Borrower from the Administrative Agent, the Borrower shall deposit Cash or Cash Equivalents into the Term Loan LC Collateral Account in an amount or with a value equal to the Deficiency Amount. If by 11:00 a.m. (New York City time) on the Term LC Deposit Date the Borrower has failed to make such deposit, then the Administrative Agent shall promptly cause the amounts on deposit in the Term Loan Deposit Account equal to the Deficiency to be transferred to the Term Loan LC Collateral Account; provided that the conditions to the withdrawals from the Term Loan Deposit Account set forth in Section 3.3 shall not apply to withdrawals made pursuant to this Section 2.2(g). If the application of amounts from the Term Loan Deposit Account in accordance with the immediately preceding sentence does result in amounts on deposit in the Term Loan LC Collateral Account to equal or exceed 103% of the Dollar Equivalent of the amount available to be drawn under the Letters of Credit then the Borrower shall be deemed to have given a timely Funding Notice to the Administrative Agent requesting Banks to make a Revolving Loan on the Term LC Deposit Date in the amount of the Deficiency Amount, less the amounts withdrawn from the Term Loan Deposit Account pursuant to the preceding sentence, and the Banks shall, on the Term LC Deposit Date, make Revolving Loans in such amount, the proceeds of which shall be deposited by the Administrative Agent into the Term Loan LC Collateral Account. The conditions to the making of a Revolving Loan set forth in Section 3.2 and the minimum amount of Revolving Loans set forth in Section 2.1(b) shall not apply to Revolving Loans made pursuant to this Section 2.2(g) and the Revolving Loans made pursuant to this Section 2.2(g) shall be ABR Loans.

(h)     Obligations Absolute. The obligation of the Borrower to reimburse the Issuing Bank for drawings honored under the Letters of Credit issued by it under Section 2.2(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set off, defense or other right which the Borrower or any Bank may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), the Issuing Bank, any Bank or

33

any other Person or, in the case of a Bank, against the Borrower, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between the Borrower or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by the Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; provided, in each case, that payment by the Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of the Issuing Bank under the circumstances in question.

(i)  Indemnification.  Without duplication of any obligation of the Borrower under Section 10.2 or 10.4, in addition to amounts payable as provided herein, the Borrower hereby agrees to protect, indemnify, pay and save harmless the Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance and maintenance of any Letter of Credit by the Issuing Bank, other than as a result of (1) the gross negligence or willful misconduct of the Issuing Bank or (2) the wrongful dishonor by the Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of the Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

(j)  Term Loan LC Collateral Account.

(i)  On or prior to the Closing Date, the Borrower shall establish a Deposit Account maintained with the Depositary Bank (the "**Term Loan LC Collateral Account**") for the purpose of Cash Collateralizing the Borrower's obligations to the Issuing Bank in respect of the Letters of Credit. Pursuant to Section 2.1(c), on the Closing Date, the Initial Term Loan LC Deposit Amount shall be deposited into the Term Loan LC Collateral Account.

(ii)  The Borrower hereby grants to the Collateral Agent, for the benefit of the Issuing Bank, a security interest in the Term Loan LC Collateral Account and all Cash, balances and Cash Equivalents therein and all proceeds of the foregoing, as security for the Borrower's obligations in respect of the Letters of Credit (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations, provided that amounts on deposit in the Term Loan LC Collateral Account shall be applied, *first*, to repay the Borrower's obligations to the Issuing Bank in respect of Letters of

NY3 - 500429.13

Credit and, *second*, to all other Obligations). Except as expressly provided herein or in any other Credit Document, no Person shall have the right to make any withdrawal from the Term Loan LC Collateral Account or to exercise any right or power with respect thereto.

(iii)     If an Event of Default shall have occurred and is continuing or the conversion of the Loans and the Revolving Commitment into the Exit Facility as described in Section 2.25 shall not have occurred on or before ten (10) Business Days prior to the Scheduled Maturity Date, then the Administrative Agent shall convert, or cause to be converted, amounts on deposit in the Term Loan LC Collateral Account into Alternative Currencies, to the extent necessary, so that after giving effect to such conversion the amounts on deposit in the Term Loan LC Collateral Account are in the currency which corresponds to the currency in which the Term Loan Letters of Credit are issued. The Borrower agrees that the Administrative Agent is authorized to establish additional accounts or sub-accounts as necessary to hold such funds in an Alternative Currency, and the Borrower shall execute all documents necessary to effectuate any transfers to any other accounts or sub-accounts and to create, continue or maintain the security interest and lien perfection in the applicable accounts or sub-accounts and the Cash and Cash Equivalents held therein, including the entering into any control agreements. All cost and expenses incurred by the Administrative Agent and the Collateral Agent in connection with the matters set forth in this Section 2.2(j)(iii) shall be borne by the Borrower.

## 2.3     **Pro Rata Shares; Availability of Funds.**

(a)     <u>Pro Rata Shares</u>.     All Loans shall be made, by Banks simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Bank shall be responsible for any default by any other Bank in such other Bank's obligation to make a Loan requested hereunder nor shall any Commitment of any Bank be increased or decreased as a result of a default by any other Bank in such other Bank's obligation to make a Loan requested hereunder.

(b)     <u>Availability of Funds</u>. Unless the Administrative Agent shall have been notified by any Bank prior to the applicable Credit Date that such Bank does not intend to make available to the Administrative Agent the amount of such Bank's Loan requested on such Credit Date, the Administrative Agent may assume that such Bank has made such amount available to the Administrative Agent on such Credit Date and the Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to the Borrower a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to the Administrative Agent by such Bank, the Administrative Agent shall be entitled to recover such amount on demand from such Bank together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the customary rate set by the Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the LIBOR Rate. If such Bank does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall

promptly notify the Borrower and the Borrower shall immediately pay such amount to the Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the rate payable hereunder for LIBOR Rate Loans. Nothing in this Section 2.3(b) shall be deemed to relieve any Bank from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Bank as a result of any default by such Bank hereunder.

2.4 **Use of Proceeds.** The proceeds of the Loans shall be applied as follows, in each case, consistent with the DIP Budget and in compliance with Section 6.8: (i) the proceeds of the Term Loans shall be applied in accordance with Section 2.1(c) and (ii) the proceeds of the Revolving Loans and funds withdrawn from the Term Loan Deposit Account shall be applied by the Borrower (i) to pay the fees and expenses associated with the transactions contemplated hereby, (ii) to fund working capital and general corporate purposes of the Borrower and its Subsidiaries during the pendency of the Cases, (iii) to make adequate protection payments approved by the Bankruptcy Court pursuant to the Interim Order or the Final Order (as applicable), (iv) to fund the costs and expenses incurred in connection with the administration and prosecution of the Cases, and (v) and otherwise in compliance with this Agreement; provided that in no event will the proceeds of Loans be used for the purposes of repurchasing Loans as permitted under Section 2.10. No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

2.5 **Evidence of Debt; Register; Banks' Books and Records; Promissory Notes.**

(a) <u>Banks' Evidence of Debt</u>. Each Bank may maintain on its internal records an account or accounts evidencing the Obligations of the Borrower to such Bank, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect any Bank's Commitments or the Borrower's Obligations in respect of any Loans; and provided <u>further</u>, in the event of any inconsistency between the Register and any Bank's records, the recordations in the Register shall govern.

(b) <u>Register</u>. The Administrative Agent may maintain at its Principal Office a register for the recordation of the names and addresses of Banks and the Commitments and Loans of each Bank from time to time (the "**Register**"). The Administrative Agent may record in the Register the Commitments and the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on the Borrower and each Bank, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Bank's Commitments or the Borrower's Obligations in respect of any Loan. The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent solely for purposes of maintaining the Register as provided in

this Section 2.5, and the Borrower hereby agrees that, to the extent the Administrative Agent serves in such capacity, the Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c)      Notes.  If so requested by any Bank by written notice to the Borrower (with a copy to the Administrative Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, the Borrower shall execute and deliver to such Bank (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Bank pursuant to Section 10.7) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after the Borrower's receipt of such notice) a promissory note or promissory notes, in a form reasonably acceptable to the Administrative Agent and the Borrower, to evidence such Bank's Term Loans and/or Revolving Loans.

2.6      **Interest on Loans.**

(a)      Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i)      if a LIBOR Loan, at the LIBOR Rate plus the Applicable Margin; or

(ii)      if an ABR Loan, at the Alternate Base Rate plus the Applicable Margin.

(b)      The basis for determining the rate of interest with respect to any Loan, shall be selected by the Borrower and notified to the Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to the Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then such Loan will automatically convert into an ABR Loan.

(c)      In connection with LIBOR Loans there shall be no more than three (3) Interest Periods in the aggregate outstanding at any time.  In the event the Borrower fails to specify between an ABR Loan or a LIBOR Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a LIBOR Loan) will be automatically continued as a LIBOR Loan with an Interest Period of one month beginning on the last day of the then-current Interest Period for such Loan), or (if outstanding as an ABR Loan) will be automatically continued as an ABR Loan, or (if not then outstanding) will be automatically made as a LIBOR Loan with an Interest Period of one month. In the event the Borrower fails to specify an Interest Period for any LIBOR Loan in the applicable Funding Notice or Conversion/Continuation Notice, the Borrower shall be deemed to have selected an Interest Period of one month.  As soon as practicable after 11:00 a.m. (London time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error,

37

be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Bank.

(d)     Interest payable pursuant to Section 2.6(a)(i) and any other interest, commission or fee accruing under a Credit Document (other than interest payable pursuant to Section 2.6(a)(ii)) will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days.  Interest payable pursuant to Section 2.6(a)(ii) will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 or 366 days, as appropriate, when determined by reference to clause (a) of the definition of "Alternate Base Rate", and a year of 360 days at all other times.

(e)     Except as otherwise set forth herein, interest on each Loan shall be payable in arrears on and to (i) each Interest Payment Date applicable to that Loan; (ii) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity, and on the Termination Date.

(f)     Interest payable pursuant to Section 2.2(e) shall be computed on the basis of a 365/366 day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Letter of Credit is reimbursed in full by the Borrower, including or pursuant to Section 2.2(e).

2.7     **Conversion and Continuation.**

(a)     Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, the Borrower shall have the option:

(i)     to convert at any time all or any part of any Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a LIBOR Loan may only be converted on the expiration of the Interest Period applicable to such LIBOR Loan unless the Borrower shall pay all amounts due under Section 2.15 in connection with any such conversion; or

(ii)     upon the expiration of any Interest Period applicable to any LIBOR Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount as a LIBOR Loan.

(b)     The Borrower shall deliver a Conversion/Continuation Notice to the Administrative Agent no later than noon (New York City time) on the date of the proposed conversion date (in the case of a conversion to an ABR Loan) and at least three Business Days in advance of the proposed Conversion/Continuation Date (in the case of a conversion to, or a continuation of, a LIBOR Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any LIBOR

38

Loans (or telephonic notice in lieu thereof) shall be irrevocable and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

(c)     Notwithstanding anything to the contrary in the foregoing, no conversion in whole or in part to a LIBOR Loan shall be permitted at any time at which (i) a Default or Event of Default shall have occurred and be continuing or (ii) the continuation of, or conversion into, a LIBOR Loan would violate any provision of Sections 2.15 or 2.16.

(d)     If a Default or Event of Default shall have occurred and be continuing, LIBOR Loans shall automatically convert to ABR Loans upon the expiration of the Interest Period applicable thereto.

2.8     **Default Interest**.     Notwithstanding anything to the contrary in Section 2.6, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder shall thereafter bear interest payable upon demand, at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable under this Agreement for ABR Loans).  Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Default or Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Bank.

2.9     **Fees**.  (a)  The Borrower agrees to pay to Banks having:

(i)     Revolving Exposure (A) commitment fees equal to (1) the average of the daily Availability, times (2) the Applicable Revolving Commitment Fee Percentage; and (B) an upfront fee equal to 1.00% times the aggregate amount of the Revolving Commitments;

(ii)     Term Loan Exposure an upfront fee equal to 0.50% times the aggregate amount of the Term Loan Commitments; and

(iii)     All fees referred to in this Section 2.9(a) shall be paid in Cash in Dollars to the Administrative Agent at its Principal Office and upon receipt, the Administrative Agent shall promptly distribute to each Bank its Pro Rata Share thereof.

(b)     The Borrower agrees to pay directly to the Issuing Bank, for its own account, the following fees:

(i)     a fronting fee equal to 0.25%, per annum, times the average aggregate daily amount available to be drawn under all Letters of Credit (determined as of the close of business on any date of determination); and

(ii)     such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(c)     The fees referred to in Sections 2.9(a)(i)(A) and in Section 2.9(b)(i) shall be calculated on the basis of a 360 day year and the actual number of days elapsed and shall be payable in arrears on the first Business Day of each calendar month during the Revolving Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Termination Date.  The fees referred to in Sections 2.9(a)(i)(B) and 2.9(a)(ii) shall be payable on the Closing Date.

(d)     In addition to any of the foregoing fees, the Borrower agrees to pay to the Agents and the Lead Arranger such other fees in the amounts and at the times separately agreed upon.

## 2.10    Voluntary Prepayments/Commitment Reductions.

(a)     <u>Voluntary Prepayments</u>.

(i)     Any time and from time to time, the Borrower may prepay any Loans on any Business Day in whole or in part in an aggregate minimum principal amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii)     All such prepayments shall be made upon not less than three Business Days' prior written or telephonic notice (in the case of LIBOR Loans) or upon not less than one Business Days' prior written or telephonic notice (in the case of ABR Loans), in each case given to the Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to the Administrative Agent (and the Administrative Agent will promptly transmit such telephonic or original notice by telefacsimile or telephone to each Bank).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment shall be applied as specified in Section 2.12(a).

(b)     <u>Voluntary Commitment Reductions</u>.

(i)     The Borrower may, upon not less than three Business Days' prior written or telephonic notice confirmed in writing to the Administrative Agent (which original written or telephonic notice the Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Bank), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the outstanding principal amount of the Revolving Loans at the time of such proposed termination or reduction; <u>provided</u>, any such partial

reduction of the Revolving Commitments shall be in an aggregate minimum principal amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii)    The Borrower's notice to the Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in the Borrower's notice and shall reduce the applicable Revolving Commitment of each Bank proportionately to its Pro Rata Share thereof.

2.11    **Mandatory Prepayments/Commitment Reductions.**

(a)    <u>Asset Sales</u>.  No later than the second Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any Net Asset Sale Proceeds, the Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.12(b) in an aggregate amount equal to such Net Asset Sale Proceeds; <u>provided</u>, <u>however</u>, that the Borrower shall not be required to make any prepayment hereunder with Net Asset Sales proceeds unless and until the aggregate amount of all such Net Asset Sales Proceeds that have not theretofore been applied to prepay the Loans exceeds $250,000 (and at such time the Borrower shall be required to make a prepayment hereunder with such excess Net Asset Sales Proceeds).

(b)    <u>Insurance/Condemnation Proceeds</u>.  No later than the second Business Day following the date of receipt by the Borrower or any of its Subsidiaries, or the Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.12(b) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.

(c)    <u>Revolving Loans</u>.  The Borrower shall from time to time prepay the Revolving Loans to the extent necessary so that the outstanding principal amount of the Revolving Loans shall not at any time exceed the Revolving Commitments then in effect.

(d)    <u>Prepayment Certificate</u>.  Concurrently with any prepayment of the Loans and/or reduction of the Revolving Commitments pursuant to Sections 2.11(a) and 2.11(b), the Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds; <u>provided</u>, if such officer's certificate is subsequently determined to be inaccurate, such Authorized Officer (or such Authorized Officer's successor) must deliver a new certificate setting forth in detail the adjustments necessary to make the prior certificate accurate in all respects.  In the event that the Borrower shall subsequently determine that the actual amount exceeded the amount set forth in such certificate, the Borrower shall promptly make an additional prepayment of the Loans and/or the Revolving Commitments shall be permanently reduced in an amount equal to such

excess, and the Borrower shall concurrently therewith deliver to the Administrative Agent the certificate as set forth above in this Section 2.11(d).

### 2.12 **Application of Prepayments/Reductions.**

(a) <u>Application of Voluntary Prepayments</u>. Any prepayment of any Loan pursuant to Section 2.10(a) shall be applied, at the Borrower's sole discretion, to prepay Revolving Loans or the Term Loans.

(b) <u>Application of Mandatory Prepayments</u>. Any amount required to be paid pursuant to Sections 2.11(a) and (b) shall be applied as follows:

*first*, to prepay the Term Loans to the full extent thereof;

*second*, to prepay the Revolving Loans to the full extent thereof and to further permanently reduce the Revolving Commitments by the amount of such prepayment; and

*third*, to further permanently reduce the Revolving Commitments to the full extent thereof.

### 2.13 **General Provisions Regarding Payments.**

(a) Except as otherwise provided in Section 2.17, all payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars and in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at the Administrative Agent's Principal Office for the account of Banks; funds received by the Administrative Agent after that time on such due date shall be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b) All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

(c) The Administrative Agent shall promptly distribute to each Bank at such address as such Bank shall indicate in writing, such Bank's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by the Administrative Agent.

(d) Subject to the provisos set forth in the definition of "Interest Period", whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

NY3 - 500429.13

(e)     The Borrower hereby authorizes the Administrative Agent to charge the Borrower's accounts with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(f)     The Administrative Agent shall deem any payment by or on behalf of the Borrower hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  The Administrative Agent shall give prompt telephonic notice to the Borrower and each applicable Bank (confirmed in writing) if any payment is non-conforming.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a).  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.8 from the date such amount was due and payable until the date such amount is paid in full.

(g)     If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1, all payments or proceeds received by any Agents hereunder in respect of any of the Obligations (except as expressly provided elsewhere in a Credit Document), shall be forwarded to the Administrative Agent and applied in full or in part by the Administrative Agent against, the Obligations in the following order of priority: _first_, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to the Administrative Agent and Collateral Agent and their agents and counsel, and all other expenses, liabilities and advances made or incurred by the Administrative Agent or Collateral Agent in connection therewith, and all amounts for which the Administrative Agent or Collateral Agent is entitled to indemnification hereunder (each in its capacity as the Administrative Agent or Collateral Agent, and not as a Bank) and all advances made by the Administrative Agent or Collateral Agent hereunder for the account of the applicable Credit Party, and to the payment of all costs and expenses paid or incurred by the Administrative Agent or Collateral Agent in connection with the exercise of any right or remedy hereunder or under any Credit Document, all in accordance with the terms hereof or thereof; _second_, to the extent of any excess of such proceeds, to the payment of all other Obligations for the ratable benefit of the Banks; and _third_, to the extent of any excess of such proceeds, to the payment to or upon the order of such Credit Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

2.14    **Ratable Sharing.**

The Banks hereby agree among themselves that, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by

43

counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to such Bank hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Bank) which is greater than the proportion received by any other Bank in respect of the Aggregate Amounts Due to such other Bank, then the Bank receiving such proportionately greater payment shall (a) notify the Administrative Agent and each other Bank of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Banks so that all such recoveries of Aggregate Amounts Due shall be shared by all Banks in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Bank is thereafter recovered from such Bank upon the bankruptcy or reorganization of such Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Bank ratably to the extent of such recovery, but without interest. The Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by the Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

2.15 **Making or Maintaining LIBOR Loans.**

(a) <u>Inability to Determine Applicable Interest Rate</u>. In the event that the Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Loans, that by reasons of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Loans on the basis provided for in the definition of LIBOR Rate, the Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to the Borrower and each Bank of such determination, whereupon (i) no Loans may be made as, or converted to, LIBOR Loans until such time as the Administrative Agent notifies the Borrower and Banks that the circumstances giving rise to such notice no longer exist, (ii) any Funding Notice or Conversion/Continuation Notice given by the Borrower with respect to the LIBOR Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower and (iii) the interest rate applicable to such LIBOR Loans shall be the Alternate Base Rate until such time as the Administrative Agent notifies the Borrower and Banks that the circumstances giving rise to such notice no longer exist.

(b) <u>Illegality or Impracticability of LIBOR Loans</u>. In the event that on any date any Bank shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrower and the Administrative Agent) that the making, maintaining or continuation of all or any of its Loans, (i) has become unlawful as a result of compliance

by such Bank in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Bank in that market, then, and in any such event, such Bank shall be an "**Affected Bank**" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Bank). Thereafter (1) the Commitments and obligation of the Affected Bank to make Loans as, or to convert Loans to, LIBOR Loans shall be suspended until such notice shall be withdrawn by the Affected Bank, (2) to the extent such determination by the Affected Lender relates to a LIBOR Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) an ABR Loan, (3) the Affected Bank's obligation to maintain its outstanding LIBOR Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the interest rate applicable to such Affected Loans shall be the Alternate Base Rate, provided the Affected Bank shall make commercially reasonable efforts to assign the Affected Loans according to Section 10.7. Notwithstanding the foregoing, to the extent a determination by an Affected Bank as described above relates to a LIBOR Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Borrower shall have the option, subject to the provisions of Section 2.15(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Banks by giving notice (by telefacsimile or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Bank gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Bank). Except as provided in the immediately preceding sentence, nothing in this Section 2.15(b) shall affect the obligation of any Bank other than an Affected Bank to make or maintain Loans as, or to convert Loans to, LIBOR Loans in accordance with the terms hereof.

(c) <u>Compensation for Breakage or Non-Commencement of Interest Periods</u>. The Borrower shall compensate each Bank, upon written request by such Bank to the Administrative Agent within five (5) Business Days after the applicable event (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Bank to banks of funds borrowed by it to make or carry its LIBOR Loans and any loss, expense or liability sustained by such Bank in connection with the liquidation or re employment of such funds but excluding loss of anticipated profits) which such Bank may sustain: (i) if for any reason (other than a default by such Bank) a borrowing of any LIBOR Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing or a conversion or continuation of any LIBOR Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any conversion or any prepayment or other principal

45

payment occurs on a date prior to the last day of an Interest Period applicable to that LIBOR Loan (including, without limitation, pursuant to Section 2.15(b) hereof); or (iii) if any prepayment of any of its LIBOR Loans is not made on any date specified in a notice of prepayment given by the Borrower.

(d) <u>Booking of LIBOR Loans</u>. Any Bank may make, carry or transfer LIBOR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Bank.

(e) <u>Assumptions Concerning Funding of LIBOR Loans</u>. Calculation of all amounts payable to a Bank under this Section 2.15 and under Section 2.16 shall be made as though such Bank had actually funded each of its relevant LIBOR Loans through the purchase of a LIBOR deposit bearing interest at the rate in an amount equal to the amount of such LIBOR Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such LIBOR deposit from an offshore office of such Bank to a domestic office of such Bank in the United States of America; <u>provided</u>, <u>however</u>, each Bank may fund each of its LIBOR Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.15 and under Section 2.16.

2.16 **Increased Costs; Capital Adequacy.**

(a) <u>Compensation For Increased Costs and Taxes</u>. Subject to the provisions of Section 2.17 (which shall be controlling with respect to the matters covered thereby), in the event that any Bank (which term shall include the Issuing Bank for purposes of this Section 2.16(a)) shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Bank with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi governmental authority (whether or not having the force of law): (i) subjects such Bank (or its applicable lending office) to any additional Tax (other than (A) any Tax on the overall net income of such Bank or its applicable lending office or (B) any Tax imposed as a result of the Administrative Agent's or any Bank's (including the Issuing Bank's) failure to satisfy the applicable requirements as set forth in any statute enacted (or regulation or administrative guidance promulgated thereunder) after the date hereof that is based on, or similar to, Subtitle A - Foreign Account Tax Compliance of H.R. 2847, as passed by the United States House of Representatives on March 4, 2010 ((A) and (B), collectively, "**Excluded Taxes**")) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Bank (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or

deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Bank (other than any such reserve or other requirements with respect to LIBOR Loans); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Bank (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Bank of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Bank (or its applicable lending office) with respect thereto; then, in any such case, the Borrower shall promptly pay to such Bank, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Bank in its sole discretion shall determine) as may be necessary to compensate such Bank for any such increased cost or reduction in amounts received or receivable hereunder. Such Bank shall deliver to the Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Bank under this Section 2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)  Capital Adequacy Adjustment. In the event that any Bank (which term shall include the Issuing Bank for purposes of this Section 2.16(b)) shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Bank (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Bank or any corporation controlling such Bank as a consequence of, or with reference to, such Bank's Loans or Commitments or Letters of Credit, or other obligations hereunder with respect to the Loans or the Letters of Credit to a level below that which such Bank or such controlling corporation could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such Bank or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by the Borrower from such Bank of the statement referred to in the next sentence, the Borrower shall pay to such Bank such additional amount or amounts as will compensate such Bank or such controlling corporation on an after tax basis for such reduction. Such Bank shall deliver to the Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Bank under this Section 2.16(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

2.17   **Taxes; Withholding, etc.**

(a)  Payments to Be Free and Clear. All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent

required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than any Excluded Taxes) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment (such Taxes, "**Indemnified Taxes**").

(b)     Withholding of Taxes.  If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any Tax from any sum paid or payable by any Credit Party to the Administrative Agent or any Bank (which term shall include the Issuing Bank for purposes of this Section 2.17(b)) under any of the Credit Documents: (i) the Borrower shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as the Borrower becomes aware of it; (ii) the Borrower shall pay to the appropriate taxing or other authority any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on the Administrative Agent or such Bank, as the case may be) on behalf of and in the name of the Administrative Agent or such Bank; (iii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, (including deductions, withholdings or payments applicable to additional sums payable under this Section 2.17(b)) the Administrative Agent or such Bank, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made in respect of Indemnified Taxes; and (iv) within thirty days after paying any sum from which it is required by law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay, each Credit Party shall deliver to the Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.  Each Credit Party shall indemnify the Administrative Agent, each Bank and the Issuing Bank, within 10 days after written demand therefor, which demand shall identify in reasonable detail the nature and amount of such Indemnified Taxes (and provide such other evidence thereof as has been received by the Administrative Agent, such Bank or the Issuing Bank, as the case may be), for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Bank or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of such Credit Party hereunder and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to a Credit Party by a Bank or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Bank or the Issuing Bank, shall be conclusive absent manifest error.

(c)     Evidence of Exemption From U.S. Withholding Tax.  Each Bank that is not a United States Person (as such term is defined in Section 7701(a)(30) of the

Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-US Bank**") shall deliver to the Administrative Agent for transmission to the Borrower, on or prior to the Closing Date (in the case of each Bank listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Bank (in the case of each other Bank), and at such other times as may be necessary in the determination of the Borrower or the Administrative Agent (each in the reasonable exercise of its discretion), (i) two original copies of Internal Revenue Service Form W-8BEN or W-8ECI (or any successor forms), properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by the Borrower to establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Bank is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver Internal Revenue Service Form W-8ECI pursuant to clause (i) above, a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by the Borrower to establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents.  Each Bank that is a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**US Bank**") shall deliver to the Administrative Agent for transmission to the Borrower, on or prior to the Closing Date (in the case of each Bank listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Bank (in the case of each other Bank), and at such times as may be necessary in the determination of the Borrower or the Administrative Agent (each in the reasonable exercise of its discretion), such other form or forms, certificates or documentation, including two original copies of Internal Revenue Service Form W-9, as reasonably requested by the Borrower to confirm or establish that such Bank is not subject to deduction, withholding, or backup withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents.  Each Bank required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.17(c) hereby agrees, from time to time after the initial delivery by such Bank of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Bank shall promptly deliver to the Administrative Agent for transmission to the Borrower two new original copies of Internal Revenue Service Form W-8BEN or W-8ECI, or a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN (or any successor form), or two new original copies of Internal Revenue Service Form W-9, as the case may be, properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by the Borrower to confirm or establish that such Bank is not subject to deduction or

49

withholding of United States federal income tax with respect to payments to such Bank under the Credit Documents, or notify the Administrative Agent and the Borrower of its inability to deliver any such forms, certificates or other evidence. The Borrower shall not be required to pay any additional amount to any Non-US Bank under Section 2.17(b) if such Bank shall have failed (1) to deliver the forms, certificates or other evidence referred to in the first three sentences of this Section 2.17(c), or (2) to notify the Administrative Agent and the Borrower of its inability to deliver any such forms, certificates or other evidence, as the case may be; provided, if such Bank shall have satisfied the requirements of the first sentence of this Section 2.17(c) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Bank, as applicable, nothing in this last sentence of Section 2.17(c) shall relieve each Borrower of its obligation to pay any additional amounts pursuant to this Section 2.17 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Bank is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Bank is not subject to withholding as described herein.

(d)     Withholding or Deduction for or on Account of Non-US Tax.  A Credit Party shall not be required to pay any additional amount under Section 2.17(b) if, on the date on which the payment falls due (i) the payment could have been made to the relevant Bank without deduction or withholding for or on account of any Tax imposed by any jurisdiction other than the United States ("**Non-US Tax**") if that Bank was a Qualifying Lender but on that date that Bank is not or has ceased to be a Qualifying Lender (other than where such Bank was a Qualifying Lender on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Bank, as applicable, and has ceased to be a Qualifying Lender as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof);  (ii) the relevant Bank is a Treaty Lender and the payment could have been made to the Lender without deduction or withholding for or on account of Non-US Tax had that Bank complied with its obligations under Section 2.17(e) below; or (iii) the relevant Bank is a 991 Bank and has not given a Tax Confirmation to the Administrative Agent (other than by reason of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof after the Closing Date or the date of the Assignment Agreement pursuant to which the relevant Bank became a Bank, as applicable).  The provisions of this Section 2.17(d) are subject always to the proviso contained in Section 2.17(b) above.

(e)     Completion of Procedural Formalities.  A Treaty Lender and each Credit Party which makes a payment to which that Treaty Lender is entitled shall co-operate in completing as soon as reasonably practicable after the Closing Date (or the date of the Assignment Agreement pursuant to which the relevant Bank becomes a Bank, as applicable) any procedural formalities necessary for that Credit Party to obtain authorization to make that payment without deduction or withholding for or on account of Non-US Tax (including for the avoidance of doubt the completion and submission to the Tax authority in the relevant Treaty Lender's country of incorporation (or, if

50

different, its country of residence for the purposes of the relevant double taxation agreement) of appropriate forms and documents that are provided to it by the relevant Credit Party).

(f)     Change in Circumstance.     A Bank that is a 991 Bank shall promptly notify the Administrative Agent if there is any change in the position from that set out in the Tax Confirmation.

(g)     Certain Documents.     If any Tax was not correctly or legally asserted, the relevant Bank(s) shall, upon the Borrower's reasonable request and at the expense of the Borrower, provide such documents to the Borrower to enable the Borrower to contest such Tax pursuant to appropriate proceedings then available to the relevant Bank(s) (so long as providing such documents shall not, in the good faith determination of the relevant Bank(s) result in any liability to the relevant Bank(s) and doing so is otherwise permitted under applicable law as determined by the relevant Bank(s)).

2.18     **Obligation to Mitigate**.  Each Bank (which term shall include the Issuing Bank for purposes of this Section 2.18) agrees that, as promptly as practicable after the officer of such Bank responsible for administering its Loans or Letters of Credit, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would cause such Bank to become an Affected Bank or that would entitle such Bank to receive payments under Section 2.15, 2.16 or 2.17, it will, to the extent not inconsistent with the internal policies of such Bank and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Bank, or (b) take such other measures as such Bank may deem reasonable, if as a result thereof the circumstances which would cause such Bank to be an Affected Bank would cease to exist or the additional amounts which would otherwise be required to be paid to such Bank pursuant to Section 2.15, 2.16 or 2.17 would be materially reduced and if, as determined by such Bank in its sole discretion, the making, issuing, funding or maintaining of such Commitments, Loans or Letters of Credit through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments, Loans or Letters of Credit or the interests of such Bank; provided, such Bank will not be obligated to utilize such other office pursuant to this Section 2.18 unless the Borrower agrees to pay all incremental expenses incurred by such Bank as a result of utilizing such other office as described in clause (a) above.  A certificate as to the amount of any such expenses payable by the Borrower pursuant to this Section 2.18 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Bank to the Borrower (with a copy to the Administrative Agent) shall be conclusive absent manifest error.

2.19     **Tax Credit.**     If a Credit Party pays any additional amount under Section 2.17(b) and the relevant Bank (or the Administrative Agent, as the case may be) determines in its sole discretion that (a) a Tax Credit is attributable either to an increased payment of which that additional amount forms part, or to that additional amount and (b) that Bank (or the Administrative Agent, as the case may be) has obtained, utilized and retained that Tax Credit, the Bank (or the Administrative Agent, as the case may be) shall, to the extent that it can do so without prejudice to the retention of the Tax Credit, pay an amount to the Credit Party

51

which that Credit Party determines in its absolute discretion but in good faith will leave it (after that payment) in the same after-Tax position as it would have been in had the additional amount not been required to be paid by the Credit Party. Nothing herein contained shall interfere with the right of any Bank (or the Administrative Agent, as the case may be) to arrange its affairs in whatever manner it thinks fit and, in particular, no Bank (or the Administrative Agent, as the case may be) shall be under any obligation to claim a Tax Credit on its corporate profits or otherwise, or to claim such relief in priority to any other claims, reliefs, credits or deductions available to it or to disclose details of its affairs. Any amount to be paid by a bank pursuant to this Section 2.19 shall be made promptly on the date of receipt of the relevant Tax Credit by such Bank(or the Administrative Agent, as the case may be) or, if later, on the last date on which the applicable taxation authority would be able in accordance with applicable law to reclaim or reduce such Tax Credit.

2.20    **Defaulting Banks.**

(a)    No Fees. Anything herein to the contrary notwithstanding, during such period as a Bank is a Defaulting Bank, such Defaulting Bank will not be entitled to any fees accruing during such period pursuant to Section 2.9(a)(i)(A) (without prejudice to the rights of the Banks other than Defaulting Banks in respect of such fees).

(b)    Termination of Commitment. The Borrower may terminate the unused amount of the Commitment of a Defaulting Bank upon not less than three (3) Business Days' prior notice to the Administrative Agent (which will promptly notify the Banks thereof), and in such event the provisions of Section 2.13(g) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Bank under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts); provided that such termination will not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Bank or any Bank may have against such Defaulting Bank.

(c)    Reinstatement. If the Borrower, the Administrative Agent and the Issuing Bank agree in writing in their discretion that a Bank that is a Defaulting Bank or a Potential Defaulting Bank should no longer be deemed to be a Defaulting Bank or a Potential Defaulting Bank, as the case may be, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Bank will, to the extent applicable, purchase such portion of outstanding Loans of the other Banks and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Exposure of the Banks to be based upon their respective Pro Rata Shares, whereupon such Bank will cease to be a Defaulting Bank or Potential Defaulting Bank and will be a Non-Defaulting Bank (and the Revolving Exposure will automatically be adjusted on a prospective basis to reflect the foregoing); provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Bank was a Defaulting Bank; and provided further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Bank or Potential Defaulting Bank to Non-Defaulting Bank will constitute a

waiver or release of any claim of any party hereunder arising from such Bank's having been a Defaulting Bank or Potential Defaulting Bank.

2.21 **Removal or Replacement of a Bank.** Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Bank (an "**Increased Cost Bank**") shall give notice to the Borrower that such Bank is an Affected Bank or that such Bank is entitled to receive payments under Section 2.15, 2.16 or 2.17, (ii) the circumstances which have caused such Bank to be an Affected Bank or which entitle such Bank to receive such payments shall remain in effect, and (iii) such Bank shall fail to withdraw such notice within five Business Days after the Borrower's request for such withdrawal; (b) any Bank is a Defaulting Bank; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.6(b), the consent of Requisite Banks shall have been obtained but the consent of one or more of such other Banks (each a "**Non-Consenting Bank**") whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Bank, Defaulting Bank or Non-Consenting Bank (the "**Terminated Bank**"), the Borrower may, by giving written notice to Administrative Agent and any Terminated Bank of its election to do so, elect to cause such Terminated Bank (and such Terminated Bank hereby irrevocably agrees) to assign its outstanding Loans and its Commitments, if any, in full to one or more Eligible Assignees (each a "**Replacement Bank**") in accordance with the provisions of Section 10.6 and the Borrower shall pay any fees payable thereunder in connection with such assignment; <u>provided</u>, (1) on the date of such assignment, the Replacement Bank shall pay to the Terminated Bank an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Bank, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Bank, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Bank pursuant to Section 2.9; (2) on the date of such assignment, the Borrower shall pay any amounts payable to such Terminated Bank pursuant to Section 2.15(c), 2.16 or 2.17 or otherwise as if it were a prepayment; and (3) in the event such Terminated Bank is a Non-Consenting Bank, each Replacement Bank shall consent, at the time of such assignment, to each matter in respect of which such Terminated Bank was a Non-Consenting Bank; <u>provided</u>, the Borrower may not make such election with respect to any Terminated Bank that is also the Issuing Bank unless, prior to the effectiveness of such election, the Borrower shall have caused each outstanding Letter of Credit issued thereby to be cancelled. Upon the prepayment of all amounts owing to any Terminated Bank and the termination of such Terminated Bank's Commitments, if any, such Terminated Bank shall no longer constitute a "Bank" for purposes hereof; <u>provided</u>, any rights of such Terminated Bank to indemnification hereunder shall survive as to such Terminated Bank.

2.22 **Priority of Liens.**

(a) Each of the Credit Parties hereby covenants, represents and warrants that, as of the entry of the Interim Order (and except as otherwise provided in this Section 2.22(a)), the Obligations: (i) pursuant to section 364(c)(l) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim, subject and subordinated only to claims secured by Permitted Liens, claims secured by Additional Permitted Liens, and the Carve-Out, and (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, subject and subordinated only to

the Permitted Liens, Additional Permitted Liens, and the Carve-Out, shall at all times be secured by a perfected First Priority Lien on all existing and after acquired real and personal, tangible and intangible, property of the Credit Parties that is not otherwise subject to a Lien in favor of the Pre-Petition Lenders, including without limitation, (x) any such property that is subject to valid and perfected Liens in existence on the Petition Date which Liens are thereafter released or otherwise extinguished in connection with the satisfaction of the obligations secured by such Liens, (y) all cash maintained as cash collateral with respect to outstanding Obligations in respect of Letters of Credit (including pursuant to Section 2.2(j)) and any investment of such cash collateral funds, and (z) upon entry of the Final Order, all causes of action arising under chapter 5 of the Bankruptcy Code and all proceeds thereof; and (iii) pursuant to Section 364(d)(l) of the Bankruptcy Code, shall at all times be secured by a fully perfected First Priority priming Lien upon all existing and after acquired real and personal, tangible and intangible, property of the Credit Parties that is subject to Liens securing the Pre-Petition Credit Agreement, including without limitation, all cash maintained as cash collateral with respect to outstanding Obligations in respect of Letters of Credit (including pursuant to Section 2.2(j)) and any investment of such cash collateral funds that is subject to any other Lien subject and subordinated only to the Permitted Liens, Additional Permitted Liens, and the Carve-Out.

(b)    Each of the Credit Parties hereby covenants, represents and warrants that, as of the entry of the Interim Order, the covenants, representations and warranties set forth in Section 2.22(a) shall be true and correct in all respects, provided that in addition thereto, pursuant to section 364(c)(2) of the Bankruptcy Code, upon entry of the Final Order, the Obligations shall be secured at all times by all causes of action arising under Chapter 5 of the Bankruptcy Code, and any and all proceeds thereof, subject only to the Permitted Liens, the Additional Permitted Liens and the Carve-Out.

(c)    For purposes hereof, the term "**Carve-Out**" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), and all fees, expenses, and disbursements payable to any professionals retained by the Debtors pursuant to 28 U.S.C. $ 156(c); and (ii) in the event of an occurrence and during the continuance of an Event of Default, the "**Case Professionals Carve-Out**", comprising the sum of (A) all allowed unpaid fees, expenses and disbursements (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) for any professionals retained by the Debtors or any statutory committee appointed in the Cases pursuant to sections 327, 328, 363 or 1103, as applicable, of the Bankruptcy Code (the "**Case Professionals**") incurred subsequent to receipt of notice delivered by the Administrative Agent to counsel for the Debtors following the occurrence of an Event of Default expressly stating that the Carve-Out has been invoked (a "**Carve-Out Trigger Notice**") in an aggregate amount not in excess of $3,000,000 (the "**Carve-Out Cap**"), plus (B) all unpaid professional fees, expenses and disbursements of such Case Professionals incurred prior to receipt of the Carve-Out Trigger Notice to the extent previously or subsequently allowed pursuant to an order of the Bankruptcy Court (collectively, "**Allowed Professional Fees**") under sections 328, 330 and/or 331 of the Bankruptcy Code. For the avoidance of doubt, so long as a Carve-Out Trigger Notice has not been delivered, the Carve-Out Cap shall not be reduced by the payment of fees or expense allowed by the Bankruptcy Court (whether allowed before or after delivery of any Carve-Out Trigger Notice) and payable under sections 328, 330, or 331 of the Bankruptcy Code, or 28 U.S.C. § 156(c).

NY3 - 500429.13

2.23    **Grant of Security Interest.**

As collateral security for the payment and performance in full of all the Obligations, each Credit Party hereby pledges and grants to the Collateral Agent for the benefit of the Secured Parties, a First Priority Lien on and security interest in (subject to the Permitted Liens, the Additional Permitted Liens, the Carve-Out and, in the case of the Term Loan LC Collateral Account, the provisions of Section 2.2(j)) all of the right, title and interest of such Credit Party in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time:

(a)    all Accounts;

(b)    all Equipment, Goods, Inventory and Fixtures;

(c)    all Documents, Instruments and Chattel Paper, including the Instruments and Tangible Chattel Paper described on <u>Schedule 2.23(c)</u>;

(d)    all Letters of Credit (as defined in the UCC) and Letter-of-Credit Rights;

(e)    all Securities Collateral;

(f)    all Investment Property;

(g)    all Intellectual Property Collateral;

(h)    all Commercial Tort Claims described on <u>Schedule 2.23(h)</u>;

(i)    all General Intangibles;

(j)    all Money and all Deposit Accounts (as defined in the UCC), including the Term Loan Deposit Account;

(k)    all Supporting Obligations;

(l)    all Real Estate Assets;

(m)    all books and records relating to the Collateral;

(n)    upon entry of the Final Order, all causes of action arising under Chapter 5 of the Bankruptcy Code; and

(o)    to the extent not covered by clauses (a) through (n) of this Section 2.23, all other real and personal property of such Credit Party, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Credit Party from time to time with respect to any of the foregoing.

55

2.24    **No Filings Required.**

(a) The Liens and security interests in favor of the Collateral Agent referred to herein shall be deemed valid and perfected by entry of the Interim Order; provided, however, that any liens on the Debtors' causes of action arising under chapter 5 of the Bankruptcy Code and all proceeds thereof shall be deemed valid and perfected only upon entry of the Final Order.  The Collateral Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement or any other Credit Document.

2.25    **Conversion to Exit Facility.**  Upon the satisfaction or waiver by the Requisite Banks of the conditions precedent set forth in Section [3.1] of the Exit Credit Agreement, automatically and without any further consent or action required by the Administrative Agent, any Bank or any Credit Party, (i) the Borrower, in its capacity as reorganized Xerium Technologies, Inc., each Guarantor, in its respective capacity as a reorganized Debtor, and the Exit Borrowers and Exit Guarantor (other than the aforementioned reorganized Borrower and reorganized Guarantor) and the other Borrowers under the Exit Credit Agreement shall assume all Obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) the Borrower shall cause the Exit Borrowers and Exit Guarantors to execute the Exit Credit Agreement, the agreements and instruments listed on Schedule 2.25 (which shall be in form and substance reasonably satisfactory to the Administrative Agent) and all other Exit Credit Documents, (iii) each outstanding Term Loan hereunder shall be continued as a Term Loan (as defined in the Exit Credit Agreement) under the Exit Facility, (iv) each outstanding Revolving Loan hereunder shall be continued as a Revolving Loan (as defined in the Exit Credit Agreement), (v) each Bank hereunder shall be a Bank (as defined in the Exit Credit Agreement) under the Exit Facility, (vi) each of the Letters of Credit (including the Existing Letters of Credit) shall be continued as Letters of Credit (as defined in the Exit Credit Agreement), and (vii) this Agreement and the Credit Documents shall be superseded and replaced by the Exit Credit Documents. Each of the Credit Parties, the Administrative Agent, the Issuing Bank and the Banks shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.25 and as are required to complete the Schedules to the Exit Credit Documentation; provided, however, that any such action by the Administrative Agent or any of the Banks shall not be a condition precedent to the effectiveness of the provisions of this Section 2.25.

**SECTION 3.    CONDITIONS PRECEDENT**

3.1    **Conditions to Closing Date**.  The occurrence of the Closing Date and the obligation of each Bank to make Credit Extensions hereunder, in each case as of the Closing Date, are, in addition to the conditions specified in Section 3.2, subject at the time of the occurrence of the Closing Date to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions on or before April 12, 2010:

56

(a) <u>Credit Documents</u>. The Administrative Agent shall have received sufficient copies of each Credit Document to be executed by the appropriate Credit Party on the Closing Date and delivered by each applicable Credit Party for each Bank (which may be delivered by facsimile or other electronic means for the purposes of satisfying this Section 3.1(a) on the Closing Date, with signed originals to be delivered promptly thereafter), and such Credit Documents shall be in form and substance satisfactory to the Borrower and its counsel and the Administrative Agent and its counsel.

(b) <u>Organizational Documents; Incumbency</u>. The Administrative Agent shall have received (i) a copy of each Organizational Document of each Credit Party, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of each Credit Party executing the Credit Documents to which it is a party; (iii) resolutions of the board of directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(c) <u>Closing Date Certificate</u>. The Administrative Agent shall have received a Closing Date Certificate, dated the Closing Date and signed by an Authorized Officer of the Borrower.

(d) <u>Governmental Authorizations and Consents</u>. All material necessary Governmental Authorizations and third party consents and approvals necessary in connection with the transactions contemplated by this Agreement and the other Credit Documents shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Banks) and shall remain in effect, and all applicable governmental filings shall have been made and all applicable waiting periods shall have expired without in either case any action being taken by any competent authority; and no law or regulation shall be applicable in the judgment of the Banks that restrains, prevents or imposes materially adverse conditions upon the Credit Documents or the transactions contemplated thereby.

(e) <u>Insurance</u>. The Collateral Agent shall have received a certificate from the Borrower's insurance broker or other evidence satisfactory to the Collateral Agent that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming the Collateral Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.5.

(f) <u>Opinions of Counsel to Credit Parties</u>. The Administrative Agent and its counsel shall have received executed copies of the favorable written opinions of counsel to the Credit Parties as to such customary matters as the Administrative Agent

may reasonably request, dated as of the Closing Date and otherwise in form and substance reasonably satisfactory to the Administrative Agent.

(g)    Financial Statements; DIP Budget and Cash Flow Forecast.  The Banks shall have received from the Borrower (i) the audited consolidated balance sheets of the Borrower and its Subsidiaries as of December 31, 2009 for the Fiscal Year then ended and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, together with a report thereon of Ernst & Young LLP, which financial statements and report shall be in form and substance reasonably satisfactory to the Administrative Agent, and (ii) the initial Weekly Cash Flow Forecast and the DIP Budget in form and substance satisfactory to the Banks.

(h)    Fees.  The Borrower shall have paid (i) the fees payable on the Closing Date referred to in Section 2.9 and (ii) all out-of-pocket fees and expenses (including reasonable fees and expenses of counsel) required to be paid to the Agents and the Banks.

(i)    No Litigation.  There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or Governmental Authority (other than the Cases) that (i) could reasonably be expected to have a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Credit Documents or the transactions contemplated thereby.

(j)    Completion of Proceedings.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated by the Credit Documents and all documents incidental thereto not previously found acceptable by the Banks and their counsel shall be satisfactory in form and substance to the Banks and such counsel, and the Banks and such counsel shall have received all such counterpart originals or certified copies of such documents as the Banks may reasonably request.

(k)    Representations and Warranties.  The representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Closing Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date.

(l)    No Default.  No event shall have occurred and be continuing or would result from the consummation of the transactions contemplated hereunder or under the Credit Documents that would constitute an Event of Default or a Default.

(m)    Material Adverse Effect.  There shall not have been a material adverse change, or any event or occurrence which could reasonably be expected to result in a material adverse change, in (i) the business, assets, financial condition or prospects

of the Credit Parties and their respective Subsidiaries, taken as a whole, since September 30, 2009 (other than events leading up to and resulting from the anticipated filing of the Cases), (ii) the ability of any Credit Party to perform any of its obligations in accordance with its terms under the Credit Documents, or (iii) the ability of the Administrative Agent and the Banks to enforce any of the Credit Documents, <u>provided</u> that the filing of the Cases will not be deemed to constitute an impediment to enforcement thereunder.

(n)    <u>Compliance with Law and Regulations</u>. All Loans and all other financings to the Borrower (and all guaranties thereof and security therefor), as well as the transactions contemplated by the Credit Documents and the consummation thereof, shall be in full compliance in all material respects with all applicable requirements of law, including Regulations T, U and X of the Federal Reserve Board.

(o)    <u>No Conflict with Material Contracts</u>. After giving effect to the transactions contemplated by the Credit Documents, there shall be no conflict with, or default under, any Material Contract, except as a result of the Cases.

(p)    <u>Business Plan</u>. The Administrative Agent shall have received a detailed consolidated business plan of the Borrower and its Subsidiaries through Fiscal Year 2015 (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of Fiscal Year 2015) in form and substance reasonably satisfactory to the Banks (the "**Business Plan**"); <u>provided</u> that with respect to Fiscal Year 2010, the Business Plan shall be prepared by calendar month.

(q)    <u>Patriot Act Information</u>. Each of the Credit Parties shall have provided the documentation and other information to the Banks that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(r)    <u>Security Interest</u>. The Secured Parties shall have a valid and perfected Lien on and security interest in the Collateral having the priority described in Section 2.22, and all searches necessary or desirable in connection with such Liens and security interests that have been reasonably requested by the Administrative Agent shall have been duly made.

(s)    <u>Bankruptcy Cases</u>. The Borrower and each Guarantor shall have filed with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Cases.

(t)    <u>Interim Order</u>. Not later than April 12, 2010, the Bankruptcy Court shall have entered an order (in form and substance acceptable to the Requisite Banks and the Administrative Agent) approving the transactions contemplated hereunder on an interim basis (the "**Interim Order**"), on motion by the Debtors, such motion to be in form and substance reasonably satisfactory to the Requisite Banks and the Administrative Agent, which Interim Order shall have been entered on such notice to such parties as may be reasonably satisfactory to the Requisite Banks and the

Administrative Agent and as otherwise required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, orders of the Bankruptcy Court, and any applicable local bankruptcy rules, and shall not have been reversed, modified, amended or stayed in any respect (or application therefor made), (i) approving the transactions contemplated by the Credit Documents and authorizing extensions of credit thereunder, (ii) approving the payment by the Borrower and the Guarantors of all the fees and expenses that are required to be paid under or in connection with the Credit Documents, (iii) providing, after five (5) Business Days' written notice of an Event of Default, which written notice shall be provided by the Administrative Agent to the Debtors, counsel to the Debtors, counsel to any statutory committee(s) appointed in the Cases, and the Office of the United States Trustee for the District of Delaware, and which written notice shall be filed with the Bankruptcy Court by counsel to the Administrative Agent, for the automatic termination of the automatic stay (but solely with respect to the transactions contemplated by the Credit Documents), with a full waiver by the Borrower and the Guarantors of all rights to contest such termination except with respect to the existence of an Event of Default, and (iv) having such other findings, orders and relief typical for financings of the type contemplated by this Agreement.

(u)     First Day Orders.  Any First Day Orders entered by the Bankruptcy Court authorizing the use of cash collateral and any other orders entered by the Bankruptcy Court affecting the Collateral shall be in form and substance reasonably satisfactory to the Administrative Agent and the Credit Parties.

(v)     Administrative Claims.  No administrative claim that is senior to, or pari passu with, the Superpriority Claims in respect of the Obligations shall exist, except claims secured by the Permitted Liens, the Additional Permitted Liens and the Carve-Out.

(w)     Votes.  The Debtors shall have received the requisite votes needed to confirm the Prepackaged Plan of Reorganization pursuant to chapter 11 of the Bankruptcy Code.

(x)     Collateral Questionnaire.  The Collateral Agent shall have received a completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby, including the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal, real or mixed property of any Credit Party in the jurisdictions specified in the Collateral Questionnaire, together with copies of all such filings disclosed by such search.

3.2     **Conditions to Each Credit Extension.**

(a)     Conditions Precedent.  The obligation of each Bank to make or convert any Loan, or the Issuing Bank to issue any Letter of Credit, on any Credit Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions precedent:

60

(i)     the Administrative Agent shall have received a fully executed and delivered Funding Notice or Issuance Notice, as the case may be;

(ii)     after making the Credit Extensions requested in respect of such Credit Date, the aggregate principal amount of all Revolving Loans shall not exceed the Revolving Commitments then in effect;

(iii)     as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iv)     as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default;

(v)     on or before the date of issuance of any Letter of Credit, the Administrative Agent shall have received all other information required by the applicable Issuance Notice, and such other documents or information as the Issuing Bank may reasonably require in connection with the issuance of such Letter of Credit;

(vi)     the conditions set forth in Section 3.1 shall have been satisfied or waived in accordance with Section 10.6;

(vii)     if the proceeds of the Credit Extension requested in respect of such Credit Date are to be used in a manner or for a purpose which requires the prior approval of the Bankruptcy Court, then such approval shall have been obtained;

(viii)     the Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended or stayed (or application therefor made, other than with respect to the Final Order, which need not become final and non-appealable), except for modifications and amendments reasonably acceptable to the Administrative Agent and the Credit Parties;

(ix)     there shall not be any administrative claim that ranks senior to, or pari passu with, the Superpriority Claim in respect of the Obligations except for claims secured by the Permitted Liens, the Additional Permitted Lines and the Carve-Out; and

(x)     the aggregate principal amount of Revolving Loans plus amounts withdrawn from the Term Loan Deposit Account pursuant to

Section 2.1(c) shall be consistent with the DIP Budget and in compliance with Section 6.8.

The request for and acceptance of each Credit Extension by the Borrower shall constitute a representation and warranty that the conditions to such Credit Extension as set forth in this Section 3.2 have been satisfied.

Any Agent or Requisite Banks shall be entitled, but not obligated to, request and receive, prior to the making of any Credit Extension, additional information reasonably satisfactory to the requesting party confirming the satisfaction of any of the foregoing if, in the good faith judgment of such Agent or Requisite Banks, such request is warranted under the circumstances.

(b)     Notices.  Any Notice shall be executed by an Authorized Officer in a writing delivered to the Administrative Agent.  In lieu of delivering a Notice, the Borrower may give the Administrative Agent telephonic notice by the required time of any proposed borrowing or conversion or continuation of any Loan, as the case may be; provided each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to the Administrative Agent on or before the applicable date of borrowing, conversion or continuation.  Neither the Administrative Agent nor any Bank shall incur any liability to the Borrower in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of the Borrower or for otherwise acting in good faith.

3.3     **Conditions Precedent to Withdrawals from the Term Loan Deposit Account.**  The obligation of the Administrative Agent to honor any request by the Borrower to withdraw funds on deposit in the Term Loan Deposit Account any time is subject to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions precedent:

(a)     the Administrative Agent shall have received a fully executed and delivered Withdrawal Request at least one (1) Business Day prior to the date on which the Borrower is requesting such funds to be withdrawn;

(b)     as of the date of the applicable Withdrawal Request and as of the date of the disbursement of funds from the Term Loan Deposit Account, no event shall have occurred and be continuing or would result from the consummation of such disbursement that would constitute an Event of Default or Default;

(c)     the aggregate principal amount of Revolving Loans plus amounts withdrawn from the Term Loan Deposit Account pursuant to Section 2.1(c) shall be consistent with the DIP Budget and in compliance with Section 6.8; and

(d)     the other conditions set forth in Section 3.2 shall have been satisfied.

**SECTION 4.          REPRESENTATIONS AND WARRANTIES**

In order to induce the Banks and the Issuing Bank to make each Credit Extension to be made by this Agreement, each Credit Party represents and warrants to each Bank, and the Issuing Bank, on the Closing Date, and each Credit Date, that the following statements are true and correct:

4.1     **Organization; Requisite Power and Authority; Qualification.**  Each of the Borrower and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

4.2     **Capital Stock and Ownership.**  The Capital Stock of each of the Borrower and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable.  Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which the Borrower or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of the Borrower or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by the Borrower or any of its Subsidiaries of any additional membership interests or other Capital Stock of the Borrower or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of the Borrower or any of its Subsidiaries.  Schedules 4.1 and 4.2 correctly set forth the ownership interest of the Borrower and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

4.3     **Due Authorization.**  The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

4.4     **No Conflict**.  The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to the Borrower or any of its Subsidiaries, any of the Organizational Documents of the Borrower or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on the Borrower or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of the Borrower or any of its Subsidiaries except to the extent such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of the Borrower or any of its Subsidiaries (other than any Liens created under any of the Credit Documents, under the Interim Order or under the

Final Order); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of the Borrower or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to the Banks and except for any such approvals or consents the failure of which to obtain will not have a Material Adverse Effect.

4.5 **Governmental Consents**. The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for entry of the Interim Order and Final Order, as required under the Bankruptcy Code and applicable state and federal bankruptcy rules.

4.6 **Binding Obligation**. Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and, subject to the entry by the Bankruptcy Court of (x) the Interim Order at any time prior to the entry of the Final Order and (y) the Final Order at any time thereafter, is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms.

4.7 **Historical Financial Statements**. The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year end adjustments. As of the Closing Date, neither the Borrower nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower and any of its Subsidiaries taken as a whole.

4.8 **Business Plan, DIP Budget and Cash Flow Forecast**. On and as of the Closing Date, the Business Plan, the DIP Budget and the initial Weekly Cash Flow Forecast are based on good faith estimates made by the management of the Borrower based on assumptions believed to be reasonable when made; provided, that it is understood and agreed that actual results of the Borrower and its Subsidiaries may differ from the results projected in the Business Plan, the DIP Budget and the initial Weekly Cash Flow Forecast.

4.9 **No Material Adverse Change**. Since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

4.10 **No Restricted Junior Payments**. Since the Petition Date, neither the Borrower nor any of its Subsidiaries has directly or indirectly declared, ordered, paid or made, or set apart any sum or property for, any Restricted Junior Payment or agreed to do so except as permitted pursuant to Section 6.5.

4.11    **Adverse Proceedings, etc.**    There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect other than proceedings attendant to confirmation of the Prepackage Plan of Reorganization.  Neither the Borrower nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, provincial, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.12    **Payment of Taxes**.  Except as otherwise permitted under Section 5.3, all tax returns and reports of the Borrower and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon the Borrower and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable.  The Borrower knows of no proposed tax assessment against the Borrower or any of its Subsidiaries which is not being actively contested by the Borrower or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.13    **Properties.**

(a)    <u>Title</u>.  Each of the Borrower and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the Ordinary Course or as otherwise permitted under Section 6.9.  Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b)    <u>Real Estate</u>.  As of the Closing Date, <u>Schedule 4.13(b)</u> contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.  Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and the Borrower does not have knowledge of any default that has occurred and is continuing thereunder except where the consequences, direct or indirect, of such default or defaults, if any, could not be reasonably expected to have a Material Adverse Effect, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization,

65

moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

4.14 **Environmental Matters**. Neither the Borrower nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. There are and, to each of the Borrower's and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any of its Subsidiaries nor, to any Credit Party's knowledge, any predecessor of the Borrower or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility that, individually or in the aggregate, could be reasonably expected to have a Material Adverse Effect, and none of the Borrower's or any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of Hazardous Materials, except as would not reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries, or as listed on Schedule 4.14. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to the Borrower or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

4.15 **No Defaults**. Neither the Borrower nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

4.16 **Material Contracts**. Schedule 4.16 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date, and except as described thereon, all such Material Contracts are in full force and effect and no defaults currently exist thereunder, any such default or failure to be in force and effect which could not reasonably be expected to result in an exercise of remedies or acceleration of the indebtedness created thereunder, except as a result of the Cases.

4.17 **Governmental Regulation**. Neither the Borrower nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal, provincial or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. Neither the Borrower nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a

"principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18    **Margin Stock**.   Neither the Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of said Board of Governors.

4.19    **Employee Matters**.   Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries, or to the best knowledge of the Borrower and each other Credit Party, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Borrower or any of its Subsidiaries or to the best knowledge of the Borrower and each other Credit Party, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Borrower or any of its Subsidiaries, and (c) to the best knowledge of the Borrower and each other Credit Party, no union representation question existing with respect to the employees of the Borrower or any of its Subsidiaries and, to the best knowledge of the Borrower and each other Credit Party, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

4.20    **Employee Benefit Plans.**   The Borrower, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan, other than any non-compliance or non-performance that would not be reasonably expected to have a Material Adverse Effect.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a recent favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status, except such defect that can be corrected pursuant to Rev. Proc. 2003-44 or any successor ruling or regulation without giving rise to a Material Adverse Effect.  No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA (other than Ordinary Course contribution obligations) has been or is expected to be incurred by the Borrower, any of its Subsidiaries or any of their ERISA Affiliates that could reasonably be expected to have a Material Adverse Effect.  No ERISA Event has occurred or is reasonably expected to occur which could reasonably be expected to result in a Material Adverse Effect.

4.21     **Certain Fees**.  No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated by the Credit Documents.

4.22     **Compliance with Statutes, etc.**     Each of the Borrower and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of the Borrower or any of its Subsidiaries), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

4.23     **Disclosure.**  No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements, including without limitation, information contained in the presentations made to the Banks, furnished to Banks by or on behalf of the Borrower or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to the Borrower or any other Credit Party, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Borrower or any other Credit Party to be reasonable at the time made, it being recognized by Banks that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to the Borrower or any other Credit Party (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Banks for use in connection with the transactions contemplated hereby.

4.24     **Insurance.**  All policies of insurance of the Borrower or any of its Subsidiaries, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity and workers' compensation, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of such Person.

4.25     **Use of Proceeds.**  The proceeds of the Loans shall be used by the Borrower solely in accordance with Section 2.4, the Interim Order and the Final Order, as applicable.

4.26     **Status as Superpriority Claim; Effectiveness of Order.**  The Loans and other Obligations constitute an allowed Superpriority Claim, and the Interim Order or the Final Order, as the case may be, is in full force and effect.

NY3 - 500429.13

4.27 **Perfection of Security Interests.** This Agreement and the Interim Order (and the Final Order when entered) create a valid and perfected security interest in the Collateral having the priority set forth herein and therein securing the payment of the Obligations, and all filings and other actions necessary to perfect and protect such security interest have been duly taken, provided that such security interest in the Debtors' causes of action arising under chapter 5 of the Bankruptcy Code and all proceeds thereof shall be created and become valid and perfected only upon entry of the Final Order.


## SECTION 5.      AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that so long as any Commitment is in effect and until payment in full of all Obligations and cancellation or expiration of all Letters of Credit, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

5.1 **Financial Statements and Other Reports**.  The Borrower will deliver to the Administrative Agent:

(a) <u>Monthly Financial Statements</u>.  As soon as available, and in any event within 15 Business Days after the end of each calendar month, or, in the case of a calendar month that is the end of a Fiscal Quarter, within 30 days after the end of each Fiscal Quarter, the consolidated unaudited balance sheets of the Borrower and its Subsidiaries as at the end of such calendar month and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such calendar month and for the period from the beginning of the then current Fiscal Year to the end of such calendar month, setting forth in each case in comparative form the corresponding figures for the previous calendar month and the corresponding figures contained in the Business Plan, together with a Financial Officer Certification with respect thereto and including a detailed explanation as to material variances that may have occurred from the prior calendar month and figures contained in the Business Plan for the current Fiscal Year;

(b) <u>Quarterly Financial Statements</u>.  As soon as available, and in any event within 45 days after the end of the first three Fiscal Quarters of each Fiscal Year, the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form (x) the corresponding figures for the corresponding periods of the previous Fiscal Year, and (y) the figures contained in the Business Plan for the current Fiscal Year, together with a Financial Officer Certification with respect thereto and including a detailed explanation as to the material variances that may have occurred from the prior Fiscal Quarter and the figures contained in the Business Plan for the current Fiscal Year;

(c) [Reserved];

(d)  Compliance Certificate.  Together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to Sections 5.1(a) and 5.1(b), a duly executed and completed Compliance Certificate; provided, that in respect of the fourth Fiscal Quarter of each Fiscal Year, it shall also deliver a duly executed and completed Compliance Certificate as soon as available, and in any event within 90 days after the end of the fourth Fiscal Quarter;

(e)  Statements of Reconciliation after Change in Accounting Principles.  If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the Compliance Certificate of the Borrower and its Subsidiaries delivered pursuant to Section 5.1(d) will differ in any material respect in the manner in which computations are derived from the Borrower's financial statements for the Compliance Certificate that would have been delivered pursuant to such subsection had no such change in accounting principles and policies been made, then, together with the first delivery of such Compliance Certificate after such change, the Borrower will deliver one or more statements of explanation of such difference(s) in form and substance satisfactory to the Administrative Agent and, if appropriate, the Borrower's proposal for amending any terms or requirements used or addressed in the Compliance Certificate to adjust for such change(s);

(f)  Sufficiency of Public Quarterly and Annual Reports.  Notwithstanding anything to the contrary contained herein, delivery to the Administrative Agent by the Borrower of its quarterly report on Form 10-Q and its annual report on form 10-K shall satisfy the requirements of Section 5.1(b), for so long as the Borrower remains a reporting company under the Exchange Act.

(g)  Notice of Default.  Promptly upon any officer of the Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to the Borrower with respect thereto; (ii) that any Person has given any notice to the Borrower or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Borrower has taken, is taking and proposes to take with respect thereto;

(h)  Notice of Litigation.  Promptly upon any officer of the Borrower obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Adverse Proceeding not previously disclosed in writing by the Borrower to the Banks, or (ii) any material development in any Adverse Proceeding that, in the case of either (i) or (ii) could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to the Borrower to enable the Banks and their counsel to evaluate such matters;

70

(i)     ERISA.  (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Administrative Agent shall reasonably request;

(j)     Insurance Report.  As soon as practicable following any material change in the insurance coverage, notice to the Administrative Agent of such change and an explanation in form and substance reasonably satisfactory to the Administrative Agent of such change;

(k)     Environmental Reports and Audits.  As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of the Borrower or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(l)     Information Regarding Collateral.  The Borrower will furnish to the Collateral Agent prompt written notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure or (iii) in any Credit Party's Federal Taxpayer Identification Number.  The Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents.  The Borrower also agrees promptly to notify Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(m)     Bankruptcy Pleadings.  As soon as practicable in advance of filing with the Bankruptcy Court, or providing to the United States Trustee for the District of Delaware, the Final Order, all other proposed orders, pleadings or other information and documents relating to the transactions contemplated by the Credit Documents, the Prepackaged Plan of Reorganization and/or any disclosure statement related thereto (which must be in form and substance satisfactory to the Administrative Agent);

(n)     Other Information.  (i) Promptly upon their becoming available, copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by the Borrower to its security holders acting in such capacity or by any Subsidiary of the Borrower to its security holders other than the Borrower or another

71