Subsidiary of the Borrower, (B) all regular and periodic reports and all registration statements and prospectuses, if any, filed by the Borrower or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission and (C) all press releases and other statements made available generally by the Borrower or any of its Subsidiaries to the public concerning material developments in the business of the Borrower or any of its Subsidiaries, and (ii) such other information and data with respect to the Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Administrative Agent;

(o)     Electronic Delivery.

(i)     Notwithstanding anything in any Credit Document to the contrary, each Credit Party hereby agrees that it will use its reasonable best efforts to provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for a new Credit Extension or other extension of credit (including any election of an interest rate relating thereto), (B) relates to the payment of any principal or other amount due under any Credit Document prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under any Credit Document or (D) is required to be delivered to satisfy any condition set forth in Sections 3.1 and/or 3.2 (all such non-excluded communications being referred to herein collectively as the "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to oploanswebadmin@citi.com, with a copy to [          ]@citi.com.  In addition, each Credit Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Credit Documents, but only to the extent requested by the Administrative Agent.

(ii)     Each Credit Party further agrees that the Administrative Agent may make the Communications available to the Banks by posting the Communications on IntraLinks, Fixed Income Direct or a substantially similar electronic transmission system (each such system, a "**Platform**").  Each Credit Party acknowledges that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution.

(iii)     **EACH PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS,  OR THE ADEQUACY OF ANY PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS**

FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR ANY PLATFORM. IN NO EVENT SHALL ANY AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, THE "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY OTHER CREDIT PARTY, ANY BANK OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE AGENTS' TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(iv)    The Administrative Agent agrees that the receipt of the Communications by it at its e-mail address set forth in Annex B shall constitute effective delivery of the Communications to the Administrative Agent for purposes of this Section 5.1(o). Each Bank agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to a Platform shall constitute effective delivery of the Communications to such Bank for purposes of this Section 5.1(o). Each Bank agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Bank's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(v)    Nothing in this Section 5.1(o) shall prejudice the right of any Agent or any Bank to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(p)    <u>Cash Flow Forecasts</u>.

(i)    By no later than 10:00 am on the Friday of each week, commencing April [__], 2010, the Borrower shall prepare and deliver to the Administrative Agent and the Banks on a weekly basis a thirteen (13) week cash flow forecast in the form attached hereto as <u>Exhibit M</u> (a "**Weekly Cash Flow Forecast**") setting forth for the periods covered thereby (i) the projected operating cash receipts and resulting cash balances, (ii) the projected weekly operating cash disbursements, (iii) the projected aggregate principal amount of Loans, and (iv) projected weekly Availability (including estimates of the Allowed

Professional Fees used by the Borrower in computing such Availability); provided, however, that if Monthly DIP Budget Cash Flow Update is required to be delivered during the same week that a Weekly Cash Flow Forecast is required to be delivered pursuant to this Section 5.1(p)(i), then the Borrower shall not be required to deliver the Weekly Cash Flow Forecast for such week.

(ii) By no later than 10:00 am on the 20th calendar day of each month, commencing April [__], 2010, the Borrower shall prepare and deliver to the Administrative Agent and the Banks on a monthly basis a thirteen (13) week cash flow forecast in form and substance satisfactory to the Administrative Agent and based on the same format and methodology used in the preparation of the DIP Budget (a "**Monthly DIP Budget Cash Flow Update**") setting forth for the periods covered thereby (i) the projected operating cash receipts and resulting cash balances, (ii) the projected weekly operating cash disbursements, (iii) the projected aggregate principal amount of Loans, and (iv) projected weekly Availability (including estimates of the Allowed Professional Fees used by the Borrower in computing such Availability) (collectively, the "**Projected Information**"). The Monthly DIP Budget Cash Flow Update, as updated in accordance with the terms hereof, shall be reviewed by the Borrower and its management and shall set forth for the periods covered thereby the Projected Information for each week covered by such Monthly DIP Budget Cash Flow Update. Together with such Monthly DIP Budget Cash Flow Update, the Borrower shall furnish to the Administrative Agent, in form and substance satisfactory to the Administrative Agent, a report that sets forth for the immediately preceding four weeks a detailed comparison of the cash receipts, cash disbursements, Loan balance and Availability to the Projected Information for such weekly periods set forth in the applicable Monthly DIP Budget Cash Flow Update on a cumulative, four-weeks roll-forward basis, together with a detailed explanation from the chief financial officer or treasurer of the Borrower as to any material deviations that may have occurred with respect thereto.

(iii) If the Borrower becomes aware of any inaccuracies or errors in a Weekly Cash Flow Forecast or Monthly DIP Budget Cash Flow Update previously delivered under this Section 5.1(p), the Borrower shall immediately furnish to the Administrative Agent a revised Weekly Cash Flow Forecast or Monthly DIP Budget Cash Flow Update, together with a detailed explanation of the inaccuracy or error from the chief financial officer or treasurer of the Borrower.

(q) <u>Financial Covenant Certificate</u>. Commencing with [_____],[2] 2010 and every Friday thereafter, the Borrower shall deliver to the Administrative Agent an officer's certificate certifying compliance with the covenants set forth in Section 6.8

---

[2] Date that is the fifth week anniversary of the Closing Date to be inserted.

for the immediately preceding week, and setting forth in reasonable detail calculations demonstrating such compliance.

5.2 **Existence**. Except as otherwise permitted under Section 6.9, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; provided, no Credit Party or any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Banks.

5.3 **Payment of Taxes and Claims**. Each Credit Party will, and will cause each of its Subsidiaries to, pay all material Taxes imposed upon it or any of its properties or assets or in respect of any of its profits, income, capital, capital gains, payroll businesses or franchises before any penalty or fine accrues thereon, and all Taxes or claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP, shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim. No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than the Borrower or any of its Subsidiaries).

5.4 **Maintenance of Properties**. Each Credit Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of the Borrower and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof except where the failure to maintain such properties could not reasonably be expected in any individual case or in the aggregate to have a Material Adverse Effect.

5.5 **Insurance**. The Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrower and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Without limiting the generality of the foregoing, the Borrower will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any

applicable regulations of the Board of Governors of the Federal Reserve System, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses. Each such policy of insurance issued by an insurer organized or incorporated in the United States shall (i) name the Collateral Agent, on behalf of the Banks as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to the Collateral Agent, that names the Collateral Agent, on behalf of the Banks, as the loss payee thereunder for losses of $1,000,000 or greater and provides for at least thirty days' prior written notice to the Collateral Agent of any modification or cancellation of such policy.

5.6     **Books and Records; Inspections**. Each Credit Party will, and will cause each of its respective Subsidiaries to, keep books and records which accurately reflect its business affairs in all material respects and material transactions and each Credit Party will, and will cause each of its respective Subsidiaries to, permit any authorized representatives designated by the Administrative Agent to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested. Each Credit Party will cause its officers to participate in update calls with the Agents and the Banks, upon reasonable notice and request from the Administrative Agent.

5.7     **[Reserved]**

5.8     **Compliance with Laws**. Each Credit Party will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply in all material respects, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws).

5.9     **Environmental.**

(a)     <u>Environmental Disclosure</u>.  The Borrower will deliver to the Administrative Agent:

(i)     as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of the Borrower or any of its Subsidiaries or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Facility or with respect to any Environmental Claims that could reasonably be expected to have a Material Adverse Effect;

(ii)     promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any

76

federal, provincial, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by the Borrower or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) the Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)     as soon as practicable following the sending or receipt thereof by the Borrower or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is investigating whether the Borrower or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv)     prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by the Borrower or any of its Subsidiaries that could reasonably be expected to (A) expose the Borrower or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) adversely affect the ability of the Borrower or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (2) any proposed action to be taken by the Borrower or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject the Borrower or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v)     with reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b)     <u>Hazardous Materials Activities, Etc.</u>  Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could

77

reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

        5.10    **Further Assurances**.  At any time or from time to time upon the request of the Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by the Collateral.

        5.11    **Intellectual Property**.  The Borrower and each of its Subsidiaries will continue to own or possess the right to use, free from any restrictions, all patents, trademarks, copyrights, and domain names that are used in the operation of their respective businesses as presently conducted and as proposed to be conducted, except to the extent the failure to so own or possess would not reasonably be expected to have a Material Adverse Effect.

        5.12    **Know-Your-Customer Rules.**

    If:

            (i)    (A)  the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the Closing Date;

            (B)  any change in the status of a Credit Party after the Closing Date; or

            (C)  a proposed assignment or transfer by a Bank of any of its rights and obligations under this Agreement to a party that is not a Bank prior to such assignment or transfer,

obliges the Administrative Agent or any Bank (or, in the case of paragraph (C) above, any prospective new Bank) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Credit Party shall promptly upon the request of the Administrative Agent or any Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Bank) or any Bank (for itself or, in the case of the event described in paragraph (C) above, on behalf of any prospective new Bank) in order for the Administrative Agent, such Bank or, in the case of the event described in paragraph (C) above, any prospective new Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Credit Documents.

            (ii)    Each Bank shall promptly upon the request of the Administrative Agent supply, or procure the supply of, such documentation and

other evidence as is reasonably requested by the Administrative Agent (for itself) in order for the Administrative Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Credit Documents.

Following the giving of any notice pursuant to paragraph (iii) above, if the accession of such Subsidiary obliges the Administrative Agent or any Bank to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Borrower shall promptly upon the request of the Administrative Agent or any Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Bank) or any Bank (for itself or on behalf of any prospective new Bank) in order for the Administrative Agent or such Bank or any prospective new Bank to carry out and be satisfied it has complied with the results of all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement.

5.13 **Final Order**. Not later than 35 days after the entry of the Interim Order by the Bankruptcy Court, the Bankruptcy Court shall have entered an order in form and substance satisfactory to the Administrative Agent and the Requisite Banks (the "**Final Order**") on an application or motion by the Debtors, such motion to be in form and substance reasonably satisfactory to the Administrative Agent and the Requisite Banks, approving, on a final basis (but which Final Order need not have become final and non-appealable) the transactions contemplated by the Credit Documents, granting allowed Superpriority Claim status to the Loans and the other Obligations of the Borrower and granting the Liens set forth in Section 2.23 (with the priority there described in Section 2.22 and Section 2.23) and which Final Order, among other things, shall (a) approve the transactions contemplated by the Credit Documents and authorize the extensions of credit under this Agreement, (b) approve the payment by the Borrower and the Guarantors of all the fees provided for herein, (c) provide, after five (5) Business Days' written notice of an Event of Default, which notice shall be provided by the Administrative Agent to the Debtors, counsel to the Debtors, counsel to any statutory committee(s) appointed in the Cases, and the Office of the United States Trustee for the District of Delaware, and which notice shall be filed with the Bankruptcy Court by counsel to the Administrative Agent, for the automatic termination of the automatic stay (but solely with respect to the transactions contemplated by the Credit Documents), with a full waiver by the Borrower and the Guarantors of all rights to contest such termination except with respect to the existence of an Event of Default, (d) not have been reversed, modified, amended, or stayed, and (e) contain such other findings, orders and relief typical for financings of the type contemplated by the Credit Documents. The Final Order shall have been entered on such notice to such parties as may be reasonably satisfactory to the Banks and as required by the Bankruptcy Court, the Federal Rules of Bankruptcy Procedure, orders of the Bankruptcy Court, and any applicable local bankruptcy rules.

**SECTION 6.      NEGATIVE COVENANTS**

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations and cancellation or expiration of all Letters of Credit, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

      6.1      **Indebtedness**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

      (a)      the Obligations;

      (b)      Indebtedness of (i) any Credit Party to any other Credit Party, and (ii) intercompany loans made by Credit Party to a Foreign Subsidiary in an aggregate amount, when added to the Investments made pursuant to Section 6.7(f), not to exceed $7,500,000 from the Closing Date through May 31, 2010 and $5,000,000 thereafter; provided, (x) all such Indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a Superpriority Claim pursuant to this Agreement, (y) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to the Administrative Agent, and (z) any payment by any such Credit Party under any guaranty of the Obligations shall result in a *pro tanto* reduction of the amount of any Indebtedness owed by such Credit Party to the Borrower or to any of its Subsidiaries for whose benefit such payment is made;

      (c)      [Reserved];

      (d)      [Reserved];

      (e)      Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the Ordinary Course;

      (f)      Indebtedness in respect of netting services, overdraft protections and otherwise in connection with Deposit Accounts;

      (g)      guaranties in the Ordinary Course of obligations to suppliers, customers, franchisees and licensees of the Borrower and its Subsidiaries;

      (h)      guaranties by (i) any Credit Party of Indebtedness of another Credit Party or (ii) any non-Credit Party of Indebtedness of a Credit Party, in each case, with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1; and

      (i)      existing Indebtedness described in Schedule 6.1(i) and, except with respect to any such Indebtedness of a Credit Party (as a primary obligor or guarantor),

any refinancings, refundings, renewals or extensions thereof (without increasing or shortening the maturity or principal amount thereof) (any such indebtedness, "Refinancing Indebtedness"); provided, however, that (i)the obligors in respect of such Refinancing Indebtedness (including in their capacities as primary obligor and guarantor) are the same as for the Indebtedness being refinanced, (ii) the aggregate principal amount of the Indebtedness being refinanced shall not be increased and (iii) the Refinancing Indebtedness shall not rank senior to the Indebtedness being refinanced;

(j)      Indebtedness secured by Permitted Liens and Additional Permitted Liens; and

(k)      Hedging Obligations entered into for the purpose of hedging currency exchange risks associated with the operations of the Borrower and its Subsidiaries.

6.2      **Liens**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the Uniform Commercial Code of any State or under any similar recording or notice statute, except:

(a)      Liens in favor of the Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document;

(b)      Liens for Taxes not then due or if due obligations with respect to such Taxes that are not at such time required to be paid pursuant to Section 5.3 or which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(c)      statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the Ordinary Course (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of fifteen (15) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(d)      Liens incurred in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other

similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e)     easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)     any (i) interest or title of a lessor or sublessor under any lease of real estate permitted hereunder, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii), so long as the holder of such restriction or encumbrance agrees to recognize the rights of such lessee or sublessee under such lease, each as in effect on the Closing Date;

(g)     [Reserved];

(h)     purported Liens evidenced by the filing of precautionary UCC financing statements or, for property located in foreign jurisdictions, the preparation and/or filing of functionally similar documents, relating solely to operating leases of personal property entered into in the Ordinary Course;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k)     (i) licenses of patents, trademarks and other intellectual property rights granted by the Borrower or any of its Subsidiaries in the Ordinary Course and not interfering in any material respect with the ordinary conduct of the business of the Borrower or such Subsidiary and (ii) leases or subleases granted by the Borrower of any of its Subsidiaries to third parties in respect of surplus property which is not fundamental to the operation of the business in the Ordinary Course; provided that such leases and subleases are on arms-length commercial terms and are otherwise satisfactory to the Administrative Agent;

(l)     existing Liens described in Schedule 6.2(l); and

(m)     Additional Permitted Liens.

6.3     **[Reserved.]**

6.4     **No Further Negative Pledges**.  Except with respect to (a)  restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in

leases, licenses and similar agreements entered into in the Ordinary Course (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), (b) Liens permitted to be incurred under Section 6.2 and restrictions in the agreements relating thereto that limit the right of any Credit Party to dispose of or transfer the assets subject to such Liens, and (c) restrictions imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements that restrict the transfer of ownership interest in such partnership, limited liability company, joint venture or similar Person, each as in effect on the Closing Date, no Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

6.5 **Restricted Junior Payments**. No Credit Party shall, nor shall it permit any of its Subsidiaries or Affiliates through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment, except Restricted Junior Payments by any Subsidiary of the Borrower to the Borrower, any Guarantor or wholly-owned Subsidiary of the Borrower.

6.6 **Restrictions on Subsidiary Distributions**. Except as provided herein, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of the Borrower to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by the Borrower or any other Subsidiary of the Borrower, (b) repay or prepay any Indebtedness owed by such Subsidiary to the Borrower or any other Subsidiary of the Borrower, (c) make loans or advances to the Borrower or any other Subsidiary of the Borrower, or (d) transfer any of its property or assets to the Borrower or any other Subsidiary of the Borrower, other than restrictions (i) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, and similar agreements entered into in the Ordinary Course; (ii) in the Pre-Petition Credit Agreement as in effect on the Closing Date; and (iii) set forth in the agreements, documents or instruments in effect on the Closing Date and set forth on Schedule 6.6.

6.7 **Investments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a) Investments by a Credit Party (other than XTI LLC) in Cash and Cash Equivalents (other than Alternative Currencies), (ii) Investments by Subsidiaries of the Borrower (other than the Credit Parties) in Cash and Non-Credit Party Cash Equivalents, and (iii) Investments by XTI LLC in Cash and Cash Equivalents (other than Alternative Currencies except for Euros);

(b) (i) equity Investments as of the Closing Date in any Subsidiary, (ii) equity Investments made after the Closing Date by any Credit Party in another Credit Party and (iii) equity Investments made on the Consummation Date as contemplated by the Prepackaged Plan of Reorganization by any Credit Party in Foreign Subsidiaries;

(c)     Investments (i) in any Securities received in satisfaction or partial satisfaction of obligations of financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the Borrower's and its Subsidiaries' Ordinary Course;

(d)     intercompany loans and guaranties to the extent permitted under Section 6.1(b), (e), (g) and (h);

(e)     loans and advances to employees of the Borrower and its Subsidiaries made in the Ordinary Course in an aggregate principal amount not to exceed $50,000 in the aggregate;

(f)     Investments in Foreign Subsidiaries in an aggregate amount, when added to the intercompany loans permitted under Section 6.1(b)(ii), not to exceed $7,500,000 from the Closing Date through May 31, 2010 and $5,000,000 thereafter; and

(g)     existing Investments described in <u>Schedule 6.7(g)</u>.

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.5.

6.8     **Financial Covenants.**

(a)     <u>Minimum Cash, Cash Equivalents and Availability</u>.  The Borrower and the Guarantors shall maintain at all times during the periods set forth below Availability and unrestricted Cash and Cash Equivalents on hand and amounts held in the Term Loan Deposit Account in an amount equal to or greater than the amount set forth below for the applicable period:

| <u>Period</u> | <u>Amount</u> |
|---|---|
| From the Closing Date through May 31, 2010 | $40,000,000 |
| From June 1, 2010 and thereafter | $35,000,000 |

For the purpose of this Section 6.8, Cash and Cash Equivalents shall not include Cash or Cash Equivalents of any Subsidiary of the Borrower other than the Guarantors.

(b)     <u>Compliance with Cash Flow Forecast</u>.  The Credit Parties shall not permit, for any period of four weeks (i) actual average cash receipts of the Credit Parties for such period to be less than 80% of projected average cash receipts for such period as set forth in the DIP Budget, or (ii) actual average cash expenditures (calculated without giving effect to debt service, professional fees, and other restructuring expenses) of the Credit Parties for such period to be more than 120% of projected average cash

expenditures for such period as set forth in the DIP Budget, in each case tested on a rolling weekly basis, commencing with the four-week period beginning [     ], 2010[3].

6.9    **Fundamental Changes; Disposition of Assets; Acquisitions**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment in the Ordinary Course) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a)    any Subsidiary of the Borrower may be merged with or into the Borrower, any Guarantor or any other wholly-owned Subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to the Borrower or any Guarantor; provided, however, in the case of such a merger involving the Borrower or a Guarantor merging with a non-Guarantor, the Borrower or Guarantor shall be the continuing or surviving Person;

(b)    sales or other dispositions of assets that do not constitute Asset Sales;

(c)    disposals of obsolete, worn out or surplus property in the Ordinary Course; and

(d)    Investments made in accordance with Section 6.7.

6.10    **Disposal of Subsidiary Interests**.  Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.9, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualify directors if required by applicable law; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law.

6.11    **Sales and Lease Backs**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell

---

[3] Date that is four weeks following Closing Date to be inserted.

or to transfer to any other Person (other than the Borrower or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than the Borrower or any of its Subsidiaries) in connection with such lease.

6.12 **Transactions with Shareholders and Affiliates**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of Capital Stock of the Borrower or any of its Subsidiaries or with any Affiliate of the Borrower or of any such holder, on terms that are (x) outside of the Ordinary Course or (y) less favorable to the Borrower or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, the foregoing restriction shall not apply to (a) any transaction between the Borrower or any Guarantor or between Guarantors; (b) reasonable and customary fees paid to members of the board of directors (or similar governing body) of the Borrower and its Subsidiaries; (c) compensation arrangements for officers and other employees of the Borrower and its Subsidiaries entered into in the Ordinary Course; (d) the agreements and instruments listed on <u>Schedule 2.25</u> and the transactions related thereto (which agreements and instruments shall be in form and substance reasonably satisfactory to the Administrative Agent); and [(e) transactions described in <u>Schedule 6.12</u>.]

6.13 **Conduct of Business**.  From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than the businesses engaged in by one or more Credit Parties on the Closing Date and reasonably related businesses.

6.14 **Limitation on Issuance of Capital Stock**.  Neither the Borrower nor any Subsidiary shall issue any Capital Stock (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Capital Stock, except such issuances on the Consummation Date as contemplated by the Prepackaged Plan of Reorganization.

6.15 **Amendments or Waivers of Organizational Documents**.  No Credit Party shall terminate or agree to any amendment, restatement, supplement or other modification to, any Organizational Document that would be materially adverse to the Banks.

6.16 **Prepayments of Other Indebtedness; Modification of Other Documents, etc.**

(a) <u>Prepayments, etc.</u>  Except as otherwise allowed pursuant to the Interim Order, the Final Order or any order of the Bankruptcy Court, in each case as approved by the Requisite Banks, no Credit Party shall make (or give any notice in respect thereof), nor shall it permit any of its Subsidiaries to make (or give any notice in respect thereof), any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment as a result of any asset sale, change of control or similar event of, any Indebtedness other than Indebtedness consisting of Obligations.

(b)  Modification of Other Documents.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, amend or modify, or permit the amendment or modification of, any provision of any agreement governing Indebtedness in any manner that is adverse in any material respect to the Banks.

6.17  **Fiscal Year; Accounting Changes**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its Fiscal Year end from December 31st.

6.18  **Chapter 11 Claims**.  No Credit Party shall incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is senior to, or *pari passu* with, the Obligations hereunder, in each case, except for the Permitted Liens, the Additional Permitted Liens and the Carve-Out.

## SECTION 7.      GUARANTY

7.1  **Guaranty of the Obligations**.  Subject to the provisions of Section 7.2, the Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the "**Guaranteed Obligations**").

7.2  **Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceed its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed.  "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an

amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

7.3     **Payment by Guarantors**.  Subject to Section 7.2, the Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, the Guarantors will upon demand pay, or cause to be paid, in Cash, to the Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

7.4     **Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of such Guarantor and not merely a contract of surety;

(b)     subject to the five (5) Business Day notice requirement in Section 8.1, the Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default;

(c)     the obligations of such Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Administrative Agent is awarded a

88

judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations, provided, however, that no Credit Document to which such Guarantor is party may be amended without its written consent; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations, and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)     this Guaranty and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms

or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of the Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; (viii) any law or regulation of any jurisdiction or any other event affecting any term of the Guaranteed Obligations and (ix) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5 **Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations, or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property

subject thereto; (f) other than with respect to written notice of an Event of Default as provided in Section 8.1, notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its respective obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including, without limitation, any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against the Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for the Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.6 **Subordination of Other Obligations**. Any Indebtedness of the Borrower or any Guarantor now or hereafter held by the Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of Beneficiaries and shall

91

forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.7 **Continuing Guaranty**. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.8 **Authority of Guarantors or Borrower**. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

7.9 **Financial Condition of the Borrower**. Any Credit Extension may be made to the Borrower or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower. Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its respective obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of non-payment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Beneficiary.

7.10 **Payments Set Aside**. In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary for any reason, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

7.11 **Validity and Effectiveness**. This Guaranty shall remain wholly valid and effective until the full, unconditional and irrevocable performance and discharge of the Guaranteed Obligations, and for all the period during which payments effected in such respect are subject to the claw back and/or avoidance under any applicable law.

NY3 - 500429.13

**SECTION 8.    EVENTS OF DEFAULT**

8.1    **Events of Default**.  If any one or more of the following conditions or events shall occur:

(a)    Failure to Make Payments When Due.  Failure by the Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder, which failure continues for three (3) Business Days; or

(b)    Default in Other Agreements.  (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a) and other than Indebtedness arising under the Prepetition Credit Agreement) with an aggregate principal amount of $5,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, originally provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; provided that this Section 8.1(b) shall not apply to any failure, default or breach resulting solely from or caused only by the filing of the Cases; or

(c)    Breach of Certain Covenants.  Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.4, Section 5.1(g)(i), Section 5.1(p), Section 5.1(q), Section 5.2 or Section 6; or

(d)    Breach of Representations, etc.  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    Other Defaults Under Credit Documents.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other subsection of this Section 8.1, and such default shall not have been remedied or waived within twenty (20) Business Days after the earlier of (i) an officer of such Credit Party becoming aware of such default or (ii) receipt by the Borrower of notice from the Administrative Agent or any Bank of such default; or

(f)     Involuntary Bankruptcy; Appointment of Receiver, etc.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of any of the Borrower's Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, provincial or state law; or (ii) an involuntary case shall be commenced against any of the Borrower's Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or any application shall have been made, or is required by applicable law to be made, with a court for the opening of insolvency proceedings with regard to any of such Subsidiaries; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over any of such Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any of such Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of any of such Subsidiaries, and any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged, provided, however, that this Section 8.1(f) shall not apply with respect to any Subsidiaries that are the subject of the Cases; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, etc.  (i) Any of the Borrower's Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or any of the Borrower's Subsidiaries shall make any assignment for the benefit of creditors; or (ii) any of the Borrower's Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of any of the Borrower's Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f) provided, however, that this Section 8.1 (g) shall not apply with respect to any Subsidiaries that are the subject of the Cases; or

(h)     Judgments and Attachments.  Any money judgment, writ or warrant of attachment or similar process involving in the aggregate at any time an amount in excess of $5,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against the Borrower or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days (or in any event later than five days prior to the date of any proposed sale thereunder); or

(i)     [Reserved]

94

(j)     Employee Benefit Plans.  There shall occur one or more ERISA Events which individually or in the aggregate results in or could reasonably be expected to result in a Material Adverse Effect; or

(k)     Change of Control.  A Change of Control shall occur other than as a result of the transactions contemplated by the Prepackaged Plan of Reorganization; or

(l)     Guaranties, Collateral Documents and Other Credit Documents. At any time after the execution and delivery thereof, (i) any Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any other Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof or any other termination of such Collateral Document in accordance with the terms thereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of the Collateral Agent or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Banks, under any Credit Document to which it is a party; or

(m)     Relief from Automatic Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Credit Party which have a value in excess of $1,000,000; or

(n)     Order Appointing Trustee or Examiner.  Entry of an order by the Bankruptcy Court in any of the Cases appointing a trustee under section 1104 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code; or

(o)     Conversion of Cases.  Any of the Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code; or

(p)     Invalid Plan; Dismissal of Cases.  (i) Submission by any Credit Party of, or entry of, an order in any of the Cases confirming a Plan of Reorganization that does not (A) provide for termination of the Revolving Commitments and payment in full in cash of the Obligations, in each case, on or before the effective date of such Plan of Reorganization, except pursuant to a conversion of the credit facility governed by this Agreement to the Exit Facility substantially in accordance with the terms and conditions contained in the Exit Credit Agreement, with such changes as may be agreed to with the

95

unanimous written consent of the Banks (as defined in the Exit Credit Agreement) or (B) provide for the continuation of the Liens of the Collateral Agent under this Agreement and the other Collateral Documents and continued priority thereof, in each case, until the Consummation Date pursuant to such Plan of Reorganization; or (ii) an entry of an order by the Bankruptcy Court dismissing any of the Cases and which order does not provide for termination of the Commitments and payment in full in cash of the Obligations; or (iii) any Credit Party shall seek or support the filing or confirmation of such a Plan of Reorganization or the entry of such an order; or (iv) the board of directors of any Credit Party shall have authorized a liquidation of any Credit Party; or

(q)     Orders.  (i) The Final Order shall not have been entered by the Bankruptcy Court on or before 35 days after the Interim Order is entered by the Bankruptcy Court, (ii) an order of the Bankruptcy Court shall be entered revoking, reversing, amended, supplementing staying, vacating or otherwise modifying the Interim Order or the Final Order, (iii) an order of the Bankruptcy Court shall be entered which permits any administrative priority under the Bankruptcy Code as to any Credit Party equal to or superior to the Superpriority Claim of the Agents and the Banks hereunder and pursuant to the Interim Order or Final Order, as applicable, other than the Permitted Liens, the Additional Permitted Liens and the Carve-Out, (iv) an order of the Bankruptcy Court shall be entered which grants or permits the granting of Liens on the Collateral other than Liens permitted hereby and permitted under the Interim Order or Final Order, as applicable, (v) the Interim Order or the Final Order (as applicable) shall cease to create a valid and perfected Lien or to be in fully force and effect or (vi) any Credit Party shall fail to comply with any material term, provision or condition of the Interim Order or the Final Order; or

(r)     Superpriority Claims.  An application shall be filed by any Credit Party for the approval of any Superpriority Claim (other than claims secured by Permitted Liens, Additional Permitted Liens and the Carve-Out) in any of the Cases which is *pari passu* with or senior to the claims of the Beneficiaries against any Credit Party, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim; or

(s)     Supportive Actions.  Any Credit Party or any of its Subsidiaries shall take any action in support of any matter set forth in paragraph (n), (o), (p), (q) or (r) above or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(t)     Sale of Collateral.  There shall be filed by any Credit Party any motion to sell all or a substantial part of the Collateral on terms that are not acceptable to the Requisite Banks; or

(u)     Liens.  Any Credit Party shall file any action, suit or other proceeding or contested matter challenging the validity, perfection or priority of any Liens securing the Pre-Petition Credit Agreement, or the validity or enforceability of any of the Credit Documents (as defined in the Pre-Petition Credit Agreement), or asserting

any avoidance claim against, or seeking to recover any monetary damages from, any agent or lender under the Pre-Petition Credit Agreement; or

(v)     Operations.  Without the consent of the Requisite Banks, any Credit Party shall discontinue or suspend all or any material part of its business or commence an orderly wind-down or liquidation of any material part of the Collateral; or

(w)     Failure to Reimburse Issuing Bank from Revolving Loans. The failure of the Issuing Bank to be reimbursed in full for any drawings under any Letter of Credit from proceeds of Revolving Loans required to be made pursuant to Section 2.2(e); or

(x)     Failure to Top-Up the Term Loan LC Collateral Account from Revolving Loans. The failure of the Term Loan LC Collateral Account to be funded from proceeds of Revolving Loans required to be made pursuant to Section 2.2(g); or

(y)     Consolidation of the Credit Parties.  Except for the procedural consolidation relating to the administration of the Cases as contemplated in the Plan of Reorganization, the entry of an order of by the Bankruptcy Court substantively consolidating the Credit Parties;

**THEN**, (1) upon the occurrence of any Event of Default described in Section 8.1(f), (g), (k), (n), (o) or (p), the Administrative Agent (with or without the consent or request of the Requisite Banks) and (2) upon the occurrence and during the continuance of any other Event of Default, at the request of (or with the consent of) the Requisite Banks, and, in each case upon (a) the provision by the Administrative Agent to the Debtors of five (5) Business Days' written notice of such Event of Default, which written notice shall also be provided by the Administrative Agent to counsel to the Debtors, counsel to any statutory committee(s) appointed in the Cases, and the Office of the United States Trustee for the District of Delaware, and which written notice shall be filed by counsel to the Administrative Agent with the Bankruptcy Court, and (b) the expiration of such five (5) Business Day period, (i) the Commitments, if any, of each Bank having such Commitments shall immediately and automatically terminate; (ii) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (A) the unpaid principal amount of and accrued interest on the Loans, and (B) all other Obligations; and (iii) the Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to this Agreement and the Collateral Documents and may seek any and all other remedies provided for in the Interim Order or the Final Order; provided, for the avoidance of doubt, that neither the Administrative Agent, the Collateral Agent, nor any Bank shall exercise such rights and remedies on account of an Event of Default until after expiration of the above-referenced five (5) Business Days' written notice period.

**SECTION 9.    AGENTS**

9.1    **Appointment of Agents**.    Citigroup Global Markets Inc. is hereby appointed Lead Arranger hereunder, and each Bank hereby authorizes the Lead Arranger to act as its agent in accordance with the terms hereof and the other Credit Documents.  Citicorp North America, Inc. is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Bank hereby authorizes the Administrative Agent and the Collateral Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Section 9 are solely for the benefit of the Agents and Banks and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of Banks and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries.  The Lead Arranger, without consent of or notice to any party hereto, may assign any and all of its respective rights or obligations hereunder to any of its Affiliates.  As of the Closing Date, Citigroup Global Markets Inc, in its capacity as Lead Arranger, shall not have any obligations hereunder but shall be entitled to all benefits of this Section 9.

9.2    **Powers and Duties**.  Each Bank irrevocably authorizes each Agent to take such action on such Bank's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Bank; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

9.3    **General Immunity**

(a)    <u>No Responsibility for Certain Matters</u>.    No Agent shall be responsible to any Bank for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Banks or by or on behalf of any Credit Party to any Agent or any Bank in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Revolving Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Anything contained

herein to the contrary notwithstanding, the Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Revolving Loans or the Letter of Credit Usage or the component amounts thereof.

(b)  Exculpatory Provisions.  No Agent or any of its officers, partners, directors, employees or agents shall be liable to Banks for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct.  No Agent shall have an obligation to act without receiving a satisfactory indemnity from the parties to this Agreement.  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from the Requisite Banks (or such other Banks as may be required to give such instructions under Section 10.6) and, upon receipt of such instructions from the Requisite Banks (or such other Banks, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for the Borrower and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Bank shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Banks (or such other Banks as may be required to give such instructions under Section 10.6).

9.4  **Agents Entitled to Act as Bank**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Bank hereunder.  With respect to its participation in the Revolving Loans and the Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Bank and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Bank" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with the Borrower or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Borrower for services in connection herewith and otherwise without having to account for the same to Banks.

9.5  **Banks' Representations, Warranties and Acknowledgment**.  Each Bank represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Borrower and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Borrower and its Subsidiaries.  No Agent shall have any duty or

99

responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Banks or to provide any Bank with any credit or other information with respect thereto, whether coming into its possession before the making of the Revolving Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Banks.

9.6    **Right to Indemnity**.  Each Bank, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party (and without limiting the Borrower's obligation to do so), for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; <u>provided</u>, no Bank shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; <u>provided</u>, in no event shall this sentence require any Bank to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Bank's Pro Rata Share thereof; and <u>provided further</u>, this sentence shall not be deemed to require any Bank to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

9.7    **Successor Administrative Agent and Collateral Agent**.  The Administrative Agent and the Collateral Agent may resign at any time by giving thirty days' prior written notice thereof to the Banks and Xerium, and the Administrative Agent and the Collateral Agent may be removed at any time (with or without cause) by the Requisite Banks giving ten days' prior written notice thereof delivered to Xerium and the Administrative Agent and the Collateral Agent and the Administrative Agent shall then promptly give notice of such removal to the Banks.  During the first two Business Days after notice from the Administrative Agent and the Collateral Agent of its resignation or removal, one or more Revolving Banks (other than the then Administrative Agent and Collateral Agent if it is a Revolving Bank) shall have the right to propose a successor Administrative Agent and Collateral Agent (the "**Proposed Successor Agent**").  The Proposed Successor Agent shall become the Administrative Agent and Collateral Agent if approved by the Requisite Banks.  If such Proposed Successor Agent is not approved by the Requisite Banks within five Business Days after proposed by such Revolving Banks, then the Requisite Banks shall have the right upon five Business Days' notice to Xerium, to appoint a successor Administrative Agent and Collateral Agent.  Upon the acceptance of any appointment as Administrative Agent or Collateral Agent hereunder by a successor Administrative Agent or Collateral Agent, that successor Administrative Agent or Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent or Collateral Agent and the retiring or removed Administrative Agent or Collateral Agent shall promptly (i) transfer to such successor

Administrative Agent or Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent or Collateral Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent or Collateral Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent or Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Administrative Agent or Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents. Regardless of whether a replacement Administrative Agent or Collateral Agent, as applicable, has been appointed, the removal or resignation will, to the fullest extent permitted by applicable law, be effective upon the earlier (i) the date the successor Administrative Agent or Collateral Agent is appointed and (ii) the date that is thirty days after the giving of the written notice of resignation or removal. After any retiring or removed Administrative Agent's or Collateral Agent's resignation or removal hereunder as Administrative Agent or Collateral Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent or Collateral Agent hereunder.

9.8     **Collateral Documents and Guaranty; Intercreditor Agreement.**

(a)     <u>Agents under Collateral Documents and Guaranty</u>. Each Bank hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of Banks, to be the agent for and representative of the Banks with respect to the Guaranty, the Collateral and the Collateral Documents. Subject to Section 10.6, without further written consent or authorization from the Banks, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Requisite Banks (or such other Banks as may be required to give such consent under Section 10.6) have otherwise consented or (ii) release any Guarantor from the Guaranty with respect to which the Requisite Banks (or such other Banks as may be required to give such consent under Section 10.6) have otherwise consented.

(b)     <u>Right to Realize on Collateral and Enforce Guaranty</u>. Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Bank hereby agrees that (i) no Bank shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of Banks in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Collateral Agent or any Bank may be the purchaser of any or all of such Collateral at any such sale and the Collateral Agent, as agent for and representative of Secured Parties (but not any Bank or Banks in its or their respective individual capacities unless Requisite Banks shall otherwise agree in writing) shall be entitled, for the purpose

of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale.

(c)     Intercreditor Agreement.  Each Bank and the Issuing Bank hereby acknowledge that it has fully reviewed the Intercreditor Agreement and, by its execution of this Agreement, hereby consents to the execution and delivery of the Intercreditor Agreement by the Exit Agents on the closing date of the Exit Facility, and agrees to comply with the terms thereof as if such Bank or Issuing Bank were a direct signatory thereto.

9.9     **Reliance and Engagement Letters**.  Each Bank confirms that each of the Lead Arranger and the Administrative Agent has authority to accept on its behalf the terms of any reliance or engagement letters relating to any reports or letters provided by accountants in connection with the Credit Documents or the transactions contemplated in the Credit Documents (including any net asset letter in connection with the financial assistance procedures) and to bind it in respect of those reports or letters and to sign such on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.


**SECTION 10.     MISCELLANEOUS**

10.1     **Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party, the Collateral Agent, the Administrative Agent, the Issuing Bank or the Lead Arranger, shall be sent to such Person's address as set forth on Appendix D or in the other relevant Credit Document, and in the case of any Bank, the address as indicated on Appendix D or otherwise indicated to the Administrative Agent in writing.  Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the mail with postage prepaid and properly addressed; provided, no notice to any Agent shall be effective until received by such Agent and all notices from or to a Credit Party shall be sent through the applicable Agent.

10.2     **Expenses**.  Whether or not the transactions contemplated hereby shall be consummated, the Borrower agrees to pay promptly (a) all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for the Borrower and the other Credit Parties; (c) the reasonable fees, expenses and disbursements of counsel to the Agents (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents, advising the Administrative Agent with regard to its rights and obligations under the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Borrower; (d) all the actual costs and reasonable expenses

of creating and perfecting Liens in favor of the Collateral Agent, for the benefit of the Secured Parties pursuant hereto, including filing and recording fees, expenses stamp, registration, transfer, documentary and other similar taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or the Requisite Banks may reasonably request in respect of the Collateral, the Liens created pursuant to the Collateral Documents or any Agent's rights and obligations under any Credit Document; (e) all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants, advisors or appraisers retained by the Administrative or the Collateral Agent with the prior consent of the Borrower (not to be unreasonably withheld); (f) all actual cost and reasonable expenses of Lazard and Capstone Advisor Group, LLC (advisors to the Administrative Agent), in accordance with their respective engagement letters; (g) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (h) all other actual and reasonable costs and expenses incurred by each Agent in connection with the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (i) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and the Banks in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty).

10.3    **[Reserved]**

10.4    **Indemnity**.  (a) In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' reasonable approval of counsel), indemnify, pay and hold harmless, each Agent and Bank and the officers, partners, directors, trustees, investment advisors, employees, agents and Affiliates of each Agent and each Bank (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.4 may be unenforceable in whole or in part because they are in violation of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)      To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against the Banks, Agents and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages  (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) in connection with, arising out of, as a

result of, or in any way related to, this Agreement or any other Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and the Borrower and each other Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

10.5 **Set Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, subject to the terms of the Interim Order or the Final Order, as applicable, and upon the occurrence and continuation of an Event of Default, each Bank and each of its respective Affiliates is hereby authorized by each Credit Party at any time or from time to time subject to the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than the Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Bank or its Affiliate to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Bank hereunder, the Letters of Credit and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, the Letters of Credit or with any other Credit Document, irrespective of whether or not (a) such Bank shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured.

### 10.6    Amendments and Waivers.

(a)    Requisite Banks' and Borrower Consent.    Subject to Section 10.6(b) and 10.6(c), no amendment, modification, termination or waiver of any provision of the Credit Documents (other than the Fee Letters), or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Credit Parties and the Requisite Banks.

(b)    Affected Banks' Consent.  Without the written consent of the Credit Parties and each Bank that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Loan;

(ii)    waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)    reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.8) or any fee payable hereunder;

(iv)     extend the time for payment of any such interest or fees;

(v)      reduce or forgive the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(vi)     amend, modify, terminate or waive any provision of this Section 10.6(b) or Section 10.6(c);

(vii)    amend the definition of "**Requisite Banks**" or "**Pro Rata Share**";

(viii)   extend the Termination Date;

(ix)     release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents;

(x)      consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document (other than the Fee Letters); or

(xi)     amend, modify or waive any provision of Section 2.12 or 2.13(g).

(c)      <u>Other Consents</u>.   No amendment, modification, termination or waiver of any provision of the Credit Documents (other than the Fee Letters), or consent to any departure by any Credit Party therefrom, shall:

(i)      increase any Commitment of any Bank over the amount thereof then in effect without the consent of each Credit Party and such Bank; <u>provided</u>, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Bank;

(ii)     amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of each Credit Party and such Agent; or

(iii)    amend, modify, terminate or waive any provision hereof as the same applies to the rights and obligations of the Issuing Bank without the consent of each Credit Party and the Issuing Bank.

(d)      <u>Execution of Amendments, etc.</u>   The Administrative Agent may, but shall have no obligation to, with the concurrence of any Bank, execute amendments, modifications, waivers or consents on behalf of such Bank.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit

Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.6 shall be binding upon each Bank at the time outstanding, each future Bank and, if signed by a Credit Party, on such Credit Party.

(e) <u>Defaulting Banks</u>. Anything herein to the contrary notwithstanding, during such period as a Bank is a Defaulting Bank, to the fullest extent permitted by applicable law, such Bank will not be entitled to vote in respect of amendments and waivers hereunder and the Commitment and the outstanding Loans of such Bank hereunder will not be taken into account in determining with the Requisite Banks or all of the Banks, as required, have approved any such amendment or waiver (and the definition of "Requisite Banks" will automatically be deemed modified accordingly for the duration of such period); <u>provided</u> that any such amendment or waiver that would increase or extend the term of the Commitment of such Defaulting Bank, extend the date fixed for the payment of principal or interest owing to such Defaulting Bank, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Bank or of any fee payable to such Defaulting Bank hereunder, or alter the terms of this proviso, will require the consent of such Defaulting Bank.

### 10.7   Successors and Assigns; Participations.

(a) <u>Generally</u>. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Banks. No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Banks. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Banks) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Register</u>. The Borrower, the Administrative Agent and each Bank shall deem and treat the Persons listed as Banks in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by the Administrative Agent and recorded in the Register as provided in Section 10.7(e). Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the Bank listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Bank shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c) <u>Right to Assign</u>. Each Bank shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including, without limitation, all or a portion of its Commitment or Loans owing to it or

other Obligation (provided, however, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Commitments):

(i) to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to the Borrower and the Administrative Agent; and

(ii) to any Person meeting the criteria of clause (ii) of the definition of the term "Eligible Assignee" upon the giving of notice to the Borrower and the Administrative Agent; subject, however, in the case of assignments of Revolving Loans or Revolving Commitments to any such Person, to prior written consent by, the Administrative Agent and the Issuing Bank (such consent not to be (x) unreasonably withheld or delayed); provided, further, each such assignment pursuant to this Section 10.7(c)(ii) shall be in an aggregate amount of not less than $2,500,000 and increments of $1,000,000 in excess thereof such lesser amount as may be agreed to by the Administrative Agent or as shall constitute the aggregate amount of the Commitments and Loans of the assigning Bank) with respect to the assignment of the Commitments and Loans.

(d) Mechanics. The assigning Bank and the assignee thereof shall execute and deliver to the Administrative Agent an Assignment Agreement, together with (i) a processing and recordation fee of $3,500 (except (A) in the case of assignments pursuant to Section 10.7(c)(i), no processing or recordation fee shall be required and (B) that only one fee shall be payable in the case of contemporaneous assignments to or by Related Funds), and (ii) such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to Section 2.17(c).

(e) Notice of Assignment. Upon its receipt of a duly executed and completed Assignment Agreement, together with the processing and recordation fee referred to in Section 10.7(d) (and any forms, certificates or other evidence required by this Agreement in connection therewith), the Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to the Borrower and shall maintain a copy of such Assignment Agreement.

(f) Representations and Warranties of Assignee. Each Bank, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the Ordinary Course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of

this Section 10.7, the disposition of such Revolving Commitments or Revolving Loans or any interests therein shall at all times remain within its exclusive control).

(g)     Effect of Assignment.  Subject to the terms and conditions of this Section 10.7, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Bank" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Bank" for all purposes hereof, and in the case of an assignment from the Issuing Bank, shall have the rights and obligations of an "Issuing Bank" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be an "Issuing Bank" for all purposes hereof; (ii) the assigning Bank thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Bank's rights and obligations hereunder, such Bank shall cease to be a party hereto and, if such Bank were an Issuing Bank, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder as an "Issuing Bank"; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Bank shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Bank as a Bank hereunder); and (iii) the Commitments shall be modified to reflect the Commitment of such assignee and any Commitment of such assigning Bank, if any.   Any assignment or transfer by a Bank of rights or obligations under this Agreement that does not comply with subsections (c) through (g) of this Section 10.7 shall be treated for purposes of this Agreement as a sale by such Bank of a participation in such rights and obligations in accordance with clause (h).

(h)     Participations.  Each Bank shall have the right at any time to sell one or more participations to any Person (other than the Borrower, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments or Loans or in any other Obligation.  The holder of any such participation, other than an Affiliate of the Bank granting such participation, shall not be entitled to require such Bank to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan, in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral

108

under the Collateral Documents (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.  The Borrower agrees that each participant shall be entitled to the benefits of Sections 2.15(c), 2.16 and 2.17 to the same extent as if it were a Bank and had acquired its interest by assignment pursuant to paragraph (c) of this Section; <u>provided</u>, (i) a participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Bank would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with the Borrower's prior written consent, and (ii) a participant that would be a Non-US Bank if it were a Bank shall not be entitled to the benefits of Section 2.17 unless the Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of the Borrower, to comply with Section 2.17 as though it were a Bank.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.6 as though it were a Bank, provided such participant agrees to be subject to Section 2.14 as though it were a Bank.

(i)       <u>Certain Other Assignments</u>.  In addition to any other assignment permitted pursuant to this Section 10.7, any Bank may assign and/or pledge all or any portion of its Loans, the other Obligations owed by or to such Bank, to secure obligations of such Bank including, without limitation, any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; <u>provided</u>, no Bank, as between the Borrower and such Bank, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and <u>provided</u>, <u>further</u>, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Bank" or be entitled to require the assigning Bank to take or omit to take any action hereunder.

10.8    **Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.9    **Survival of Representations, Warranties and Agreements**.    All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.15(c), 2.16, 2.17, 10.2, 10.4 and 10.5 and the agreements of the Banks set forth in Sections 2.14, 9.3(b) and 9.6 shall survive the payment of the Loans, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

10.10    **No Waiver; Remedies Cumulative**.  No failure or delay on the part of any Agent or any Bank in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or

privilege. The rights, powers and remedies given to each Agent and each Bank hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.11 **Marshalling; Payments Set Aside**. Neither any Agent nor any Bank shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to the Administrative Agent or the Banks (or to the Administrative Agent, on behalf of the Banks), or the Administrative Agent or the Banks enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other provincial, state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

10.12 **Severability**. In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.13 **Obligations Several**. The obligations of the Banks hereunder are several and no Bank shall be responsible for the obligations or Commitment of any other Bank hereunder. Nothing contained herein or in any other Credit Document, and no action taken by Banks pursuant hereto or thereto, shall be deemed to constitute Banks as a partnership, an association, a joint venture or any other kind of entity.

10.14 **Headings**. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.15 **APPLICABLE LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING GENERAL OBLIGATIONS LAW 5-1401, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

10.16 **CONSENT TO JURISDICTION AND SERVICE OF PROCESS**. EACH CREDIT PARTY IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK

OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY CREDIT DOCUMENT OR ANY OF THE OBLIGATIONS. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF *FORUM NON-CONVENIENS*; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (iv) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (iii) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (v) AGREES AGENTS AND BANKS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION;

10.17 **WAIVER OF JURY TRIAL**. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE BANK/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

10.18  **Confidentiality**.  Each of the Administrative Agent, the Issuing Bank and the Banks agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, trustees, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, including the NAIC, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 10.18, to (i) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement, (ii) any rating agency, or (iii) the CUSIP Service Bureau or any similar organization, (g) with the consent of the Borrower, (h) to any pledgee referred to in Section 10.7(i) or any actual or prospective party (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors or other representatives) to any swap or derivatives or similar transaction under which payments are to be made by reference to the Borrower and the Obligations, this Agreement or payments hereunder), so long as such pledgee or any actual or prospective counterparty (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives) agrees to be bound by the provisions of this Section 10.18, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 10.18 or (ii) becomes available to any Agent, the Issuing Bank or any Bank on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section 10.18, "**Information**" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to any Agent, the Issuing Bank or any Bank on a non-confidential basis prior to disclosure by the Borrower.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.18 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding anything in this Agreement or in any other Credit Document to the contrary, the Borrower and each Bank (and each employee, representative or other agent of the Borrower) may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Borrower relating to such U.S. tax treatment and U.S. tax structure.

10.19  **Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges and fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due

112

hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of each Bank and the Borrower to conform strictly to any applicable usury laws. Accordingly, if any Bank contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Bank's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

        10.20 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission or "PDF" shall be effective as delivery of a manually executed counterpart hereof.

        10.21 **USA Patriot Act Notice**. Each Bank and the Agents (for the Agents and not on behalf of any Bank) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-5 (signed into law on October 26, 2001)), as amended (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Bank or the applicable Agent, as applicable, to identify the Borrower in accordance with the Act.

        10.22 **No Setoffs and Defenses**. Each Credit Party acknowledges it has no setoffs or defenses to their respective obligations under the Credit Documents and no claims or counterclaims against any of the Agents or the Banks.

        10.23 **Conflicts**. If any term or provision of this Agreement conflicts with any of the terms of the Interim Order or Final Order, as applicable, the Interim Order or Final Order, as applicable, shall govern.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**XERIUM TECHNOLOGIES, INC.**

By: _____

    Name:
    Title:

**XERIUM III (US) LIMITED**, as a Guarantor

By:_____

    Name:
    Title:

**XERIUM IV (US) LIMITED**, as a Guarantor

By:_____

    Name:
    Title:

**XERIUM V (US) LIMITED**, as a Guarantor

By:_____

    Name:
    Title:

**HUYCK LICENSCO INC.**, as a Guarantor

By:_____

    Name:
    Title:

*[Signature Page to Superpriority Priming Senior Secured Debtor-in-Possession*
*Credit and Guaranty Agreement (Xerium)]*

**STOWE WOODWARD LLC**, as a Guarantor

By:_____
    Name:
    Title:

**STOWE WOODWARD LICENSCO LLC**, as a Guarantor

By:_____
    Name:
    Title:

**WEAVEXX, LLC**, as a Guarantor

By:_____
    Name:
    Title:

**WANGNER ITELPA I LLC**, as a Guarantor

By:_____
    Name:
    Title:

**WANGNER ITELPA II LLC**, as a Guarantor

By:_____
    Name:
    Title:

**XERIUM ASIA, LLC**, as a Guarantor

By:_____
    Name:
    Title:

**XTI LLC**, as a Guarantor

By:_____
    Name:
    Title:

**CITIGROUP GLOBAL MARKETS INC.,**
as Lead Arranger and Bookrunner

By:_____
    Name:
    Title:

**CITICORP NORTH AMERICA, INC.**
as Administrative Agent, Issuing Bank, Collateral
Agent and a Bank


By:_____
    Name:
    Title:

_____, as a
Bank (please print name of institution)


By[4]::_____
    Name:
    Title:

---

[4]    Bank:  If more than one signature is required, please add accordingly.  Please <u>delete</u> this footnote before executing.

*[Signature Page to Superpriority Priming Senior Secured Debtor-in-Possession*
*Credit and Guaranty Agreement (Xerium)]*

**PRINCIPAL OFFICE:**

Citicorp North America, Inc.
1615 Brett Rd
OPSIII
New Castle, DE 19720
Attention: Annemarie Pavco
Telephone: 302-894-6010
Facsimile: 212-994-0961
Email: Global.loans.Support@citi.com

For payments:
Bank: Citibank NA
ABA: 021000089
Acct#: 36852248
Acct Name: Medium Term Finance
Ref: Xerium

**Revolving Commitments**

| Bank | Revolving Commitment | Pro Rata Share |
|------|---------------------|----------------|
| Citicorp North America, Inc. | $ 15,000,000.00 | 75.000000000% |
| Tennenbaum DIP Opportunity Fund, LLC | $ 5,000,000.00 | 25.000000000% |
| **Total** | **$ 20,000,000.00** | **100.000000000%** |