**[EXIT CREDIT AGREEMENT]**

[See attached]

# CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)

### dated as of [_____], 2010

### among

## XERIUM TECHNOLOGIES, INC., XTI LLC, XERIUM ITALIA S.P.A., XERIUM CANADA INC. , HUYCK.WANGNER AUSTRIA GMBH and XERIUM GERMANY HOLDING GMBH
### as Borrowers,

### CERTAIN SUBSIDIARIES OF THE BORROWERS,
### as Guarantors,

### VARIOUS BANKS,

## CITIGROUP GLOBAL MARKETS INC.
### as Sole Lead Arranger and Sole Bookrunner,

## CITICORP NORTH AMERICA, INC.,
### as Collateral Agent,

### and

## CITICORP NORTH AMERICA, INC.,
### as Administrative Agent

_____

### U.S. $80,000,000
_____

"**NOTE**: THE TAKING OF THIS DOCUMENT OR ANY CERTIFIED COPY OR ANY DOCUMENT WHICH CONSTITUTES SUBSTITUTE DOCUMENTATION THEREOF, INCLUDING WRITTEN CONFIRMATIONS OR REFERENCES THERETO, INTO AUSTRIA AS WELL AS PRINTING OUT ANY E-MAIL COMMUNICATION WHICH REFERS TO THIS DOCUMENT IN AUSTRIA OR SENDING ANY E-MAIL COMMUNICATION TO WHICH A PDF SCAN OF THIS DOCUMENT IS ATTACHED TO AN AUSTRIAN ADDRESSEE OR SENDING ANY E-MAIL COMMUNICATION CARRYING AN ELECTRONIC OR DIGITAL SIGNATURE WHICH REFERS TO THIS DOCUMENT TO AN AUSTRIAN ADDRESSEE MAY CAUSE THE IMPOSITION OF AUSTRIAN STAMP DUTY.  ACCORDINGLY, IN PARTICULAR KEEP THE ORIGINAL DOCUMENT AS WELL AS ALL CERTIFIED COPIES THEREOF AND WRITTEN AND SIGNED REFERENCES THERETO OUTSIDE OF AUSTRIA AND AVOID PRINTING OUT ANY EMAIL COMMUNICATION WHICH REFERS TO THIS DOCUMENT IN AUSTRIA OR SENDING ANY E-MAIL COMMUNICATION TO WHICH A PDF SCAN OF THIS DOCUMENT IS ATTACHED TO AN AUSTRIAN ADDRESSEE OR SENDING ANY E-MAIL COMMUNICATION CARRYING AN ELECTRONIC OR DIGITAL SIGNATURE WHICH REFERS TO THIS DOCUMENT TO AN AUSTRIAN ADDRESSEE."

# TABLE OF CONTENTS

**Page**

SECTION 1.     DEFINITIONS AND INTERPRETATION ...................................................2

    1.1     Definitions...........................................................................................................2

    1.2     Accounting Terms.............................................................................................38

    1.3     Interpretation, etc .............................................................................................38

SECTION 2.     LOANS AND LETTERS OF CREDIT ....................................................38

    2.1     Term Loans .......................................................................................................38

    2.2     Revolving Loans ...............................................................................................39

    2.3     [Reserved].........................................................................................................40

    2.4     Letters of Credit................................................................................................40

    2.5     Pro Rata Shares; Availability of Funds.............................................................48

    2.6     Use of Proceeds.................................................................................................49

    2.7     Evidence of Debt; Register; Banks' Books and Records; Promissory Notes. ................................................................................................................49

    2.8     Interest on Loans...............................................................................................50

    2.9     Conversion/Continuation. .................................................................................54

    2.10    Default Interest..................................................................................................55

    2.11    Fees ...................................................................................................................55

    2.12    Scheduled Payments .........................................................................................56

    2.13    Voluntary Prepayments/Commitment Reductions. ..........................................57

    2.14    Mandatory Prepayments/Commitment Reductions. .........................................58

    2.15    Application of Prepayments/Reductions/Scheduled Payments. .......................60

    2.16    General Provisions Regarding Payments...........................................................61

    2.17    Ratable Sharing..................................................................................................62

    2.18    Making or Maintaining LIBOR Loans. ............................................................63

    2.19    Increased Costs; Capital Adequacy. .................................................................65

    2.20    Taxes; Withholding, etc. ...................................................................................67

    2.21    Obligation to Mitigate.......................................................................................71

    2.22    Tax Credit .........................................................................................................71

    2.23    Defaulting Banks ..............................................................................................72

i

2.24          Removal or Replacement of a Bank ...............................................................74

2.25          Joint and Several Liability. ...........................................................................75

2.26          Loans to Non-US Borrowers .........................................................................77

2.27          Intercreditor Agreement................................................................................78

2.28          Assumption of Obligations ...........................................................................78

2.29          Conversion of DIP Term Loans, DIP Revolving Loans and Existing
Letters of Credit ...........................................................................................78

SECTION 3.        CONDITIONS PRECEDENT .......................................................................78

3.1           Conditions to Closing Date ...........................................................................78

3.2           Conditions to Each Credit Extension. ...........................................................85

SECTION 4.        REPRESENTATIONS AND WARRANTIES...............................................87

4.1           Organization; Requisite Power and Authority; Qualification.........................87

4.2           Capital Stock and Ownership.........................................................................87

4.3           Due Authorization .........................................................................................87

4.4           No Conflict.....................................................................................................87

4.5           Governmental Consents .................................................................................88

4.6           Binding Obligation.........................................................................................88

4.7           Historical Financial Statements ....................................................................88

4.8           Business Plan .................................................................................................89

4.9           No Material Adverse Change..........................................................................89

4.10          [Intentionally Omitted]. .................................................................................89

4.11          Adverse Proceedings, etc ..............................................................................89

4.12          Payment of Taxes..........................................................................................89

4.13          Properties .......................................................................................................89

4.14          Environmental Matters...................................................................................90

4.15          No Defaults ....................................................................................................91

4.16          Material Contracts..........................................................................................91

4.17          Governmental Regulation ..............................................................................91

4.18          Margin Stock..................................................................................................91

4.19          Employee Matters..........................................................................................91

4.20          Employee Benefit Plans.................................................................................92

4.21          Certain Fees ...................................................................................................93

| | | |
|---|---|---|
| 4.22 | Solvency | 93 |
| 4.23 | [Reserved] | 93 |
| 4.24 | Compliance with Statutes, etc | 93 |
| 4.25 | Disclosure | 93 |
| 4.26 | Insurance | 94 |
| 4.27 | Use of Proceeds | 94 |
| 4.28 | Deposit and Securities Accounts | 94 |
| 4.29 | UK Establishment | 94 |
| SECTION 5. | AFFIRMATIVE COVENANTS | 94 |
| 5.1 | Financial Statements and Other Reports | 94 |
| 5.2 | Existence | 100 |
| 5.3 | Payment of Taxes and Claims | 100 |
| 5.4 | Maintenance of Properties | 100 |
| 5.5 | Insurance | 101 |
| 5.6 | Books and Records; Inspections | 101 |
| 5.7 | [Intentionally Omitted] | 102 |
| 5.8 | Compliance with Laws; SEC Filings | 102 |
| 5.9 | Environmental | 102 |
| 5.10 | Subsidiaries | 103 |
| 5.11 | Additional Material Real Estate Assets | 104 |
| 5.12 | [Intentionally Omitted] | 104 |
| 5.13 | Further Assurances | 104 |
| 5.14 | Intellectual Property | 104 |
| 5.15 | Know-Your-Customer Rules | 105 |
| 5.16 | Pari Passu Ranking | 106 |
| 5.17 | 2009 Audit Opinion | 106 |
| SECTION 6. | NEGATIVE COVENANTS | 106 |
| 6.1 | Indebtedness | 106 |
| 6.2 | Liens | 109 |
| 6.3 | Equitable Lien | 111 |
| 6.4 | No Further Negative Pledges | 111 |

NY3 - 504826.09

| | | |
|---|---|---|
| 6.5 | Restricted Junior Payments | 112 |
| 6.6 | Restrictions on Subsidiary Distributions | 112 |
| 6.7 | Investments | 113 |
| 6.8 | Financial Covenants | 114 |
| 6.9 | Fundamental Changes; Disposition of Assets; Acquisitions | 117 |
| 6.10 | Disposal of Subsidiary Interests | 118 |
| 6.11 | Sales and Lease Backs | 118 |
| 6.12 | Transactions with Shareholders and Affiliates | 118 |
| 6.13 | Conduct of Business | 119 |
| 6.14 | [Intentionally Omitted]. | 119 |
| 6.15 | Amendments or Waivers of Organizational Documents | 119 |
| 6.16 | Amendments or Waivers of with respect to Subordinated Debt and the Second Lien Credit Agreement | 119 |
| 6.17 | Fiscal Year | 119 |
| 6.18 | Account Control Agreements; Cash Management | 119 |
| SECTION 7. | GUARANTY | 120 |
| 7.1 | Guaranty of the Obligations. | 120 |
| 7.2 | Contribution by Guarantors. | 120 |
| 7.3 | Payment by Guarantors | 122 |
| 7.4 | Liability of Guarantors Absolute | 123 |
| 7.5 | Waivers by Guarantors | 126 |
| 7.6 | Guarantors' Rights of Subrogation, Contribution, etc | 127 |
| 7.7 | Subordination of Other Obligations | 128 |
| 7.8 | Continuing Guaranty | 128 |
| 7.9 | Authority of Guarantors or Borrowers | 129 |
| 7.10 | Financial Condition of Each Borrower | 129 |
| 7.11 | Bankruptcy, etc. | 129 |
| 7.12 | Discharge of Guaranty Upon Sale of Guarantor | 130 |
| 7.13 | Validity of Pledge of Shares held by Xerium Technologies Limited, Xerium (France) SAS and the German Guarantors; Parallel Obligations. | 130 |
| 7.14 | Limitation of Non-US Guaranteed Obligations. | 132 |
| 7.15 | Validity and Effectiveness | 137 |

SECTION 8.      EVENTS OF DEFAULT ..................................................................137

    8.1      Events of Default ........................................................................137

    8.2      CAM Exchange............................................................................141

SECTION 9.      AGENTS ...................................................................................141

    9.1      Appointment of Agents................................................................141

    9.2      Powers and Duties........................................................................142

    9.3      General Immunity. .......................................................................142

    9.4      Agents Entitled to Act as Bank ...................................................143

    9.5      Banks' Representations, Warranties and Acknowledgment.........143

    9.6      Right to Indemnity ......................................................................144

    9.7      Successor Administrative Agent and Collateral Agent ................144

    9.8      Collateral Documents and Guaranty............................................145

    9.9      Reliance and Engagement Letters................................................147

SECTION 10.      MISCELLANEOUS ................................................................147

    10.1      Notices ........................................................................................147

    10.2      Expenses .....................................................................................147

    10.3      VAT .............................................................................................148

    10.4      Indemnity ....................................................................................148

    10.5      Set Off.........................................................................................150

    10.6      Amendments and Waivers. .........................................................150

    10.7      Successors and Assigns; Participations. .....................................152

    10.8      Independence of Covenants ........................................................156

    10.9      Survival of Representations, Warranties and Agreements ...........156

    10.10      No Waiver; Remedies Cumulative .............................................156

    10.11      Marshalling; Payments Set Aside ...............................................157

    10.12      Severability .................................................................................157

    10.13      Obligations Several .....................................................................157

    10.14      Headings ......................................................................................157

    10.15      APPLICABLE LAW ...................................................................157

    10.16      CONSENT TO JURISDICTION AND SERVICE OF PROCESS...............158

    10.17      WAIVER OF JURY TRIAL.......................................................159

NY3 - 504826.09

10.18      Confidentiality ............................................................................................160

10.19      Usury Savings Clause ...................................................................................161

10.20      Counterparts...................................................................................................161

10.21      Effective Date ...............................................................................................162

10.22      Importation of Credit Documents into Austria ............................................162

10.23      Place of Performance ....................................................................................162

10.24      USA Patriot Act Notice ................................................................................162

10.25      No Setoffs and Defenses ...............................................................................163

NY3 - 504826.09

**APPENDICES:**

A-1     Xerium Term Loan Amounts
A-2     XTI Term Loan Amounts
A-3     Italia Term Loan Amounts
A-4     Xerium Canada Term Loan Amounts
A-5     Austria Term Loan Amounts
A-6     Germany Term Loan Amounts
B       Revolving Commitments
C       Notice Addresses

**SCHEDULES:**

1.1(a)      Factoring Agreements
1.1(b)      Guarantors
2.4(c)      Existing Letters of Credit
2.29        Intercompany Arrangements
3.1(i)      Closing Date Mortgaged Property
4.1         Jurisdictions of Organization
4.2         Capital Stock and Ownership
4.13(b)     Real Estate Assets
4.14        Environmental Matters
4.16        Material Contracts
4.28        Primary Accounts
6.1(i)      Certain Indebtedness
6.2(l)      Certain Liens
6.7(i)      Certain Investments
6.12        Certain Affiliate Transactions

**EXHIBITS:**

A 1     Funding Notice
A 2     Conversion/Continuation Notice
A 3     Issuance Notice
B       Compliance Certificate
C       Assignment Agreement
D       Certificate Re Non-Bank Status
E       Closing Date Certificate
F       Counterpart Agreement
G       Pledge and Security Agreement
H       Mortgage
I       Landlord Waiver and Consent Agreement
J       Affiliate Subordination Agreement
K       Intercreditor Agreement
L       Formalities Certificate
M       Initial Business Plan
N       Solvency Certificate

# CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)

This **CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**, dated as of [_____], 2010, is entered into by and among **XERIUM TECHNOLOGIES, INC**. ("**Xerium**"), a Delaware corporation, as reorganized pursuant to and under the Plan of Reorganization (as defined herein), **XTI LLC** ("**XTI**"), a Delaware limited liability company, as reorganized pursuant to and under the Plan of Reorganization, **XERIUM ITALIA S.P.A. ("Italia SpA")**, an Italian società per azioni, as reorganized pursuant to and under the Plan of Reorganization, **XERIUM CANADA INC. ("Xerium Canada")**, a New Brunswick (Canada) corporation, as reorganized pursuant to and under the Plan of Reorganization, **HUYCK.WANGNER AUSTRIA GMBH ("Huyck Austria")**, an Austrian limited liability company (formerly known as Huyck Austria GmbH) , as reorganized pursuant to and under the Plan of Reorganization, and **XERIUM GERMANY HOLDING GMBH ("Germany Holdings")**, a German limited liability company, as reorganized pursuant to and under the Plan of Reorganization, (each of Xerium, XTI, Italia SpA, Xerium Canada, Huyck Austria and Germany Holdings, individually, a "**Borrower**" and, collectively, the "**Borrowers**"), **CERTAIN SUBSIDIARIES OF THE BORROWERS**, as Guarantors, the Banks party hereto from time to time, **CITIGROUP GLOBAL MARKETS INC.,** as Sole Lead Arranger and Sole Bookrunner (in such capacity, "**Lead Arranger**"), **CITICORP NORTH AMERICA, INC.,** as Administrative Agent (together with its permitted successors, in such capacity, "**Administrative Agent**") and **CITICORP NORTH AMERICA, INC.,** as Collateral Agent (together with its permitted successors, in such capacity, "**Collateral Agent**").

## RECITALS:

**WHEREAS**, capitalized terms used in these Recitals and not otherwise defined herein shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, on March [_____], 2010 (the "**Petition Date**") the Borrowers, together with certain direct and indirect wholly-owned Subsidiaries of Xerium (collectively, the "**Debtors**"), filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court and the cases in the Bankruptcy Court have been consolidated for purposes of joint administration of the Debtors (the "**Bankruptcy Cases**");

**WHEREAS,** the Debtors' respective chapter 11 cases (collectively, the "**Bankruptcy Cases**") have been consolidated for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, pursuant to the DIP Credit Agreement, the Banks party hereto extended term loans and revolving loans to Xerium and the Issuing Bank issued or, with respect to certain existing letters of credit, was deemed to have issued, certain letters of credit;

**WHEREAS**, as agreed by the Banks and pursuant to the DIP Credit Agreement and the Plan of Reorganization, and as approved by the order entered by the Bankruptcy Court confirming the Plan of Reorganization (the "**Confirmation Order**"), the loans under the DIP Credit Agreement will continue to be outstanding loans under this Agreement, the letters of credit outstanding

under the DIP Credit Agreement will continue as Term Loan Letters of Credit under this Agreement, and the DIP Credit Agreement shall be superseded and replaced by this Agreement;

**WHEREAS**, pursuant to the Plan of Reorganization and the Confirmation Order, the Obligations of the Borrowers under this Agreement shall be secured by the grant to the Collateral Agent, for the benefit of the Secured Parties, of a First Priority Lien on the Collateral owned by them; and

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS AND INTERPRETATION

1.1 **Definitions**. The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**ABR Loan**" means a Loan or any portion thereof bearing interest by reference to the Alternate Base Rate.

"**Adjusted EBITDA**" means, with respect to any Person for any period, the total of (A) the Consolidated Net Income of such Person and its Subsidiaries for such period, plus (B), without duplication, to the extent that any of the following were included in computing such Consolidated Net Income for such period: (i) provision for taxes based on income or profits, (ii) Consolidated Interest Expense, (iii) Consolidated Depreciation and Amortization Expense, (iv) reserves for inventory in connection with plant closures, (v) Consolidated Operational Restructuring Costs, (vi) Consolidated Financial Restructuring Costs, (vii) non-cash charges or gains resulting from the application of purchase accounting, including push-down accounting, (viii) non-cash expenses resulting from the granting of stock options, restricted stock or restricted stock unit awards under equity compensation programs solely with respect to Common Stock, (ix) non-cash items related to a change in or adoption of accounting policies, and (x) expenses incurred as a result of the repurchase, redemption or retention by Xerium of Common Stock earned under equity compensation programs solely in order to make withholding tax payments. Notwithstanding the foregoing, taxes paid and provision for taxes based on the income or profits of, and the Consolidated Depreciation and Amortization Expense of, a Subsidiary of such Person shall be added to Consolidated Net Income of such Person to compute Adjusted EBITDA only to the extent (and in the same proportion) that the Consolidated Net Income of such Subsidiary was included in calculating Consolidated Net Income of such Person. Notwithstanding the foregoing, Adjusted EBITDA for the Fiscal Quarter ended December 31, 2009 shall be $24,600,000.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Xerium or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Xerium or any of its Subsidiaries, threatened against or affecting Xerium or any of its Subsidiaries or any property of Xerium or any of its Subsidiaries.

2

"**Affected Bank**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Affiliate Subordination Agreement**" means the Affiliate Subordination Agreement, dated the date hereof, among the Credit Parties and the Administrative Agent, substantially in the form of Exhibit J, as amended, supplemented or otherwise modified from time to time.

"**Agent**" means each of the Administrative Agent, the Collateral Agent and the Lead Arranger.

"**Agent Parties**" as defined in Section 5.1(o)(iii).

"**Agent's Spot Rate of Exchange**" means the Administrative Agent's spot rate of exchange for the purchase of the relevant currency with Dollars in the foreign exchange market at or about 11:00 a.m. (New York City time) on a particular day.

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Agreement**" means this Credit and Guaranty Agreement (First Lien), as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Alternate Base Rate**" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the greater of (i) LIBOR for a one month Interest Period beginning on such day (or if such day is not a Business Day, the immediately preceding Business Day), plus 1% and (ii) 3.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or LIBOR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or LIBOR, respectively. If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability of the Administrative Agent to obtain sufficient quotations in accordance with the terms thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the first sentence of this definition until the circumstances giving rise to such inability no longer exist.

"**Alternative Currency**" means Euros, Canadian dollars, Australian dollar and Swedish krona.

"**Applicable Margin**" means (i) with respect to LIBOR Loans, 4.50% and (ii) with respect to ABR Loans, 3.50%.

"**Applicable Revolving Commitment Fee Percentage**'' means 1.00%.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sub-lessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person (other than Xerium or any of its Subsidiaries), in one transaction or a series of transactions, of all or any part of Xerium's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the Capital Stock of any of Xerium's Subsidiaries, other than (i) inventory (or other assets) sold or leased in the Ordinary Course (excluding any such sales by operations or divisions discontinued or to be discontinued), (ii) substantially worn, damaged or obsolete property disposed of in the Ordinary Course, (iii) returns of inventory in the Ordinary Course, (iv) the use of cash and Cash Equivalents in a manner not inconsistent with the provisions of this Agreement and the other Credit Documents, (v) leases of real property in the Ordinary Course, (vi) licenses or sublicenses of patents, trademarks, copyrights and other intellectual property in the Ordinary Course and (vii) sales of other assets for gross consideration of less than $100,000 with respect to any transaction or series of related transactions.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit C, with such amendments or modifications as may be approved by the Administrative Agent.

"**Australia Asset Sales**" means Asset Sales relating to the business, assets or properties of Huyck.Wangner Australia Pty Limited.

"**Australian Obligor**" means Huyck.Wangner Australia Pty Limited.

"**Austria Term Loan**" means an Austria Term Loan deemed made by a Bank to Huyck Austria pursuant to Section 2.1(a)(v).

"**Austria Term Loan Amount**" means the principal amount of the Austria Term Loan a Bank is deemed to have made on the Closing Date. The "Austria Term Loan Amount" of each Bank, if any, is set forth on Appendix A-5 or in the applicable Assignment Agreement. The aggregate amount of the Austria Term Loan Amounts as of the Closing Date is set forth on Appendix A-5.

"**Austria Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the Austria Term Loans of such Bank.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

NY3 - 504826.09

"**Bank**" means each financial institution listed on Appendix A-1, A-2, A-3, A-4, A-5, A-6 or B, and any other Person that becomes a Bank party hereto pursuant to an Assignment Agreement.

"**Bank Counterparty**" means each Bank, or any Affiliate of a Bank, counterparty to the applicable documentation creating Hedging Obligations (including any Person who is a Bank (and any Affiliate thereof) as of the Closing Date and party to such documentation as of the Closing Date but subsequently, after entering into the applicable documentation creating Hedging Obligations, ceases to be a Bank) including, without limitation, each such Affiliate that enters into a joinder agreement with the Collateral Agent.

"**Bank Insolvency Event**" means that (i) a Bank or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (ii) such Bank or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor, or sequestrator or the like has been appointed for such Bank or its Parent Company, or such Bank or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment.

"**Bankruptcy Cases**" as defined in the recitals hereto.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended, and applicable to the Bankruptcy Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Beneficiary**" means each Agent, the Issuing Bank, Bank and each Bank Counterparty.

"**Borrower**" as defined in the preamble hereto.

"**Business Day**" means (i) with respect to all matters except those addressed in clause (ii), any day, excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state or jurisdiction are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with LIBOR Loans, means any such day that is a Business Day described in clause (i) and that is also a day on which banks in the City of London are generally open for interbank or foreign exchange.

"**Business Plan**" as defined in Section 5.1(q).

"**CAM Exchange**" means the exchange of the Banks' interests provided for in Section 8.2.

"**CAM Exchange Date**" means the date on which any Event of Default referred to in Section 8.01(f) or (g) shall occur.

"**CAM Percentage**" means, as to each Bank, a fraction, expressed as a decimal, of which (a) the numerator shall be the aggregate outstanding principal amount of the Designated Obligations owed to such Bank (whether or not at the time due and payable) on the date immediately prior to the CAM Exchange Date and (b) the denominator shall be the aggregate amount of the Designated Obligations owed to all the Banks (whether or not at the time due and payable) on the date immediately prior to the CAM Exchange Date.

"**Canadian Guarantor**" as defined in 7.14(e).

"**Canadian Pension Plan Event**" means (i) the failure by Xerium Canada, or any Affiliate of Xerium Canada to make any required contribution or premium payment to a Canadian Registered Pension Plan in a timely manner in accordance with the terms of the applicable Canadian Registered Pension Plan and all applicable laws; (ii) the withdrawal by Xerium Canada or any Affiliate of Xerium Canada as a participating employer under any multi-employer pension plan, as defined under applicable laws; (iii) the termination, in whole or in part, of any Canadian Registered Pension Plan; (iv) the institution of proceedings by a pension regulator which has jurisdiction over a Canadian Registered Pension Plan to terminate the Canadian Registered Pension Plan in whole or in part; or (v) the occurrence of any event or condition which could reasonably be expected to result in the institution of proceedings by the applicable pension regulator to terminate a Canadian Registered Pension Plan, in whole or in part.

"**Canadian Registered Pension Plan**" means a "registered pension plan", as defined in subsection 248(1) of the Income Tax Act (Canada) which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed to by, Xerium Canada or any Affiliate of Xerium Canada.

"**Capital Expenditures**" means, with respect to any Person, all expenditures that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the cash flows of such Person.

"**Capitalized Lease Obligation**" means, as applied to any Person, any obligation incurred or arising out of in connection with a Capital Lease.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests, membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means money, currency or a credit balance in any Deposit Account.

"**Cash Collateral Account**" means a deposit account maintained by the Borrowers with the Administrative Agent, for the Secured Parties, for the purpose of holding deposits of Net

Asset Sale Proceeds and Net Insurance/Condemnation Proceeds that are allowed to be reinvested by the Borrowers in accordance with Sections 2.14(a) and 2.14(b), respectively; provided that the Administrative Agent shall require any such deposits remaining in such deposit account for three hundred sixty-one (361) days to be applied by the Borrowers to repay Loans, in each case, to the extent required by and in a manner consistent with Section 2.15(b).

"**Cash Collateralize**" means, in respect of an obligation, to provide and pledge (as a First Priority perfected security interest) cash collateral in Dollars, at a location and pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent (and "**Cash Collateralization**" has a corresponding meaning).

"**Cash Equivalents**" means (i) Dollars or any foreign currency freely exchangeable into Dollars and, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the Ordinary Course, (ii) securities issued or directly and fully guaranteed or insured by the US government or any agency or instrumentality thereof, (iii) certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $1 billion and whose long-term debt is rated at least "A" or the equivalent thereof by Moody's or S&P, (iv) repurchase obligations for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in the immediately preceding clause, (v) commercial paper issued by a corporation (other than an Affiliate of Xerium) rated at least "A-2" or the equivalent thereof by Moody's or S&P and in each case maturing within one year after the date of acquisition, (vi) investment funds investing substantially all of their assets in securities of the types described in clauses (i) through (v) above, (vii) readily marketable direct obligations issued by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P, (viii) instruments equivalent to those referred to above denominated in Euros or any other foreign currency that are comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States and (ix) money market funds as defined in Rule 2a-7 of the General Rules and Regulations as promulgated under the Investment Company Act of 1940.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit D.

"**Change of Control**" means, at any time, (i) any Person or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act) shall have acquired beneficial ownership (as defined in Rule13d-3 under the Exchange Act), directly or indirectly, of 35% or more on a fully diluted basis of the voting and/or economic interest in the Capital Stock of Xerium; (ii) Xerium shall cease to directly or indirectly beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of its Subsidiaries (other than Xerium Technologies Brasil Indústria e Comércio S.A., Stowe Woodward AG and PMP Xibe Roll Covering Co Ltd and except as a result of transactions permitted under this Agreement) including, but not limited to, if a Person shall attain the right, even if not exercised, by contract, share ownership or otherwise, to appoint the majority of the board of directors of any such Subsidiary or to direct the manner in which the board of directors of such Subsidiary conducts its

affairs; (iii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Xerium cease to be occupied by Persons who either (a) were members of the board of directors of Xerium on the Closing Date or (b) were nominated for election by the board of directors of Xerium, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors; or (iv) any "change of control" or similar event under the Second Lien Credit Agreement or the documents governing Subordinated Debt, if any, shall occur. Notwithstanding the foregoing, the consummation of the transactions contemplated by the Plan of Reorganization shall not constitute a Change of Control.

"**Closing Date**" means the date on which all conditions precedent set forth in Section 3.1 are satisfied or waived in accordance with the terms of this Agreement.

"**Closing Date Bank Affiliate**" means [American Securities LLC, Carl Marks Strategic Investments, L.P., Cerberus Capital Management, L.P., on behalf of its affiliated funds and accounts].

"**Closing Date Certificate**" means the Closing Date Certificate substantially in the form of Exhibit E.

"**Closing Date Mortgaged Property**" means, each Real Estate Asset listed in Schedule 3.1(i) and which has been encumbered by fully executed and notarized Mortgages, and recorded in all appropriate places in all applicable jurisdictions.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) and interests therein and proceeds and products thereof, whether now or hereafter acquired, in or upon which Liens are purported to be granted and/or confirmed pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreements, the Mortgages, the Landlord Personal Property Collateral Access Agreements, if any, the Term Loan LC Collateral Account Control Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant and/or confirm to the Collateral Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate in form satisfactory to the Collateral Agent that provides information with respect to the personal, real and mixed property of each Credit Party.

"**Common Stock**" means the common stock of Xerium, par value [$0.001] per share.

"**Communications**" as defined in Section 5.1(p)(i).

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit B.

"**Confirmation Order**" as defined in the recitals.

"**Consolidated Capital Expenditures**" means, with respect to any Person for any period, the aggregate of all Capital Expenditures of such Person and its Subsidiaries during such period determined on a consolidated basis.

"**Consolidated Current Assets**" means, at any date of the determination, the total assets (other than cash and Cash Equivalents) of Xerium and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP), excluding the current portion of current and deferred income taxes, deferred debt expense and property held for sale so long as any future changes in the balance sheet values of such property held for sale are non-cash events, and the proceeds from the sale of such property is intended to be applied to prepay the Loans in accordance with Section 2.14(a).

"**Consolidated Current Liabilities**" means, at any date of determination, the total liabilities of Xerium and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of any Indebtedness, accruals of interest expense, and the current portion of current and deferred income taxes.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, including without limitation non-cash impairment charges resulting from the application of Statements of Financial Accounting Standards No. 142 and No. 144 and any amortization of intangibles arising pursuant to Statement of Financial Accounting Standards No. 141.

"**Consolidated Financial Restructuring Costs**" means cash, fees and expenses (including professional and accounting fees and expenses) incurred in connection with the Recapitalization; provided, that the amount of such costs for Fiscal Year 2010 shall not exceed $30 million in the aggregate.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, consolidated interest expense of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided, however, that for the purpose of calculating the Interest Coverage Ratio only, amortization of deferred financing fees and any non-cash gains and losses resulting from marking to market Hedging Obligations shall be excluded from the calculation of Consolidated Interest Expense. For purposes of clarifying the intention of the parties, the calculation of Consolidated Interest Expense shall be net of interest income and the effect of all interest rate Hedging Obligations.

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided, however, that the following, without duplication, shall be excluded in determining Consolidated Net Income: (i) any net after-tax extraordinary or non-recurring gains, losses or expenses (less all fees and expenses relating thereto), (ii) the cumulative effect of changes in accounting principles, (iii) any fees and

9

expenses incurred during such period in connection with the issuance or repayment of Indebtedness, any refinancing transaction or amendment or modification of any debt instrument, in each case, as permitted under this Agreement and (iv) any gains resulting from the returned surplus assets of any Pension Plan or Canadian Registered Pension Plan; and provided, further that, without duplication, (x) the net income for such period of any Person that is not a Subsidiary of such Person or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to such Person or a wholly-owned Subsidiary thereof in respect of such period (and if such net income is a loss it will be included only to the extent such loss has been funded with cash by such Person or a wholly-owned Subsidiary therein in respect of such period), and (y) the net income (loss) for such period of any Subsidiary shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of its net income is not at the date of determination permitted without any prior governmental approval (which has not been obtained and which is not expected by Xerium to be obtained in the Ordinary Course) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders (other than any loan agreement or similar agreement which restricts the payment of dividends or similar distributions upon the occurrence of or during the existence or continuance of a default or event of default), unless such restrictions with respect to the payment of dividends or in similar distributions have been legally waived and except that this clause (y) shall not apply to any Subsidiary that is also a Guarantor in the calculation of Xerium's Leverage Ratio.

"**Consolidated Operational Restructuring Costs**" means, with respect to any Person for any period, any restructuring or related impairment costs for such Person and its Subsidiaries resulting from the restructuring activities of such Person and its Subsidiaries; provided, that the amount of such costs for the applicable Fiscal Year shall not exceed the Maximum Consolidated Operational Restructuring Costs.

"**Consolidated Working Capital**" means, at any date, the excess of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period.

"**Constitutional Documents**" means the constitutional documents of the Credit Parties as amended from time to time in accordance with the terms of this Agreement.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

NY3 - 504826.09

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion of a Loan, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit F delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Letters of Credit, the Collateral Documents, the Affiliate Subordination Agreement, the Intercreditor Agreement, the Fee Letters, any documents or certificates executed by any Borrower in favor of the Issuing Bank relating to any Letters of Credit, and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, the Issuing Bank or any Bank in connection herewith.

"**Credit Extension**" means the making, or deemed making, of a Loan or the issuance, or deemed issuance, of a Letter of Credit.

"**Credit Party**" means each US Credit Party and Non-US Credit Party.

"**Debt**" means, with respect to Xerium, on a consolidated basis on any date, the actual outstanding amount of funded indebtedness of Xerium and its Subsidiaries, plus, without duplication, the principal component of all Capitalized Lease Obligations and, without duplication, other Indebtedness of Xerium and its Subsidiaries on such date. For purposes of computing Debt, Indebtedness which is payable in any currency other than Dollars shall be converted into Dollars using the average New York CitiFx Benchmark rate for the most recently ended four Fiscal Quarters for which Xerium's financial statements are available.

"**Debtors**" as defined in the recitals hereto.

"**Default**" means a condition or event that, after notice or expiry of an applicable grace period, or the making of any determination under the Credit Documents, or any combination of any of the foregoing, would constitute an Event of Default.

"**Defaulting Bank**" means, at any time, a Bank as to which the Administrative Agent has notified the Borrower that (i) such Bank has failed for three or more Business Days to comply with its obligations under this Agreement to make a Loan or make a payment to the Issuing Bank in respect of a Letter of Credit (each a "**funding obligation**"), (ii) such Bank has notified the Administrative Agent or has stated publicly, that it will not comply with any such funding obligation hereunder, or has defaulted on its funding obligations under any other loan agreement or credit agreement or similar agreement, (iii) such Bank has, for three or more Business Days, failed to confirm in writing to the Administrative Agent, in response to a written request of the Administrative Agent, that it will comply with its funding obligations hereunder, or (iv) a Bank Insolvency Event has occurred and is continuing with respect to such Bank (provided that neither

11

the reallocation of funding obligations provided in Section 2.24(a) as a result of a Bank being a Defaulting Bank nor the performance by Non-Defaulting Banks of such reallocation of funding obligations will by themselves cause the relevant Defaulting Bank to become a Non-Defaulting Bank). Any determination that a Bank is a Defaulting Bank under clauses (i) through (iv) above will be made by the Administrative Agent in its sole discretion acting in good faith. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"**Deficiency Amount**" as defined in Section 2.4(k).

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Depositary Bank**" means Citibank, N.A.

"**Designated Obligations**" means all obligations of the Borrowers with respect to (a) principal of and interest on the Loans and (b) accrued and unpaid fees under the Credit Documents.

"**Determination Date**" means, with respect to any Term Loan Letter of Credit, (i) the most recent date upon which one of the following shall have occurred: (x) the date of issuance of such Term Loan Letter of Credit, (y) the date on which the Issuing Bank was or is, as applicable, required to deliver a notice of non-renewal with respect to such Letter of Credit, and (z) the first Business Day of each month, commencing on the first Business Day following the issuance of such Letter of Credit; and (ii) such other date determined by the Administrative Agent in its sole discretion.

"**DIP Credit Agreement**" means the Superpriority Priming Senior Secured Credit and Guaranty Agreement, dated as of March [__], 2010, among Xerium, the guarantors named therein, the several lenders and agent banks from time to time parties thereto, as amended, supplemented, restated or otherwise modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**DIP Revolving Loans**" means the revolving loans made under the DIP Credit Agreement.

"**DIP Term Loan Deposit Account**" means the deposit account maintained by the agent under the DIP Credit Agreement and referred therein as the "Term Loan Deposit Account".

"**DIP Term Loans**" means the term loans made under the DIP Credit Agreement.

"**Disclosure Statement**" means that certain disclosure statement related to the Plan of Reorganization and filed by the Debtors with the Bankruptcy Court on [_____], 2010, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Dollar Equivalent**" means (i) with respect to all matters other than the Letters of Credit, (x) with respect to any amount denominated in Dollars, such amount and (y) with respect to any

amount denominated in an Alternative Currency, the amount converted into Dollars using the 12:00 p.m. New York CitiFx Benchmark rate for such Alternative Currency on such day or, if such day is not a Business Day, on the immediately preceding Business Day and (ii) with respect to the Letters of Credit issued (x) in Dollars, such amount on any Determination Date and (y) in an Alternative Currency, the amount converted into Dollars using the 12:00 p.m. New York CitiFx Benchmark rate for such Alternative Currency on such Determination Date or, if such day is not a Business Day, on the immediately preceding Business Day.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Effective Date**" means the date that is determined to be the "Effective Date" of and as defined in the Plan of Reorganization.

"**Eligible Assignee**" means (i) any Bank, any Affiliate of any Bank and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, financial institution, trust fund, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans as one of its businesses or in the ordinary course or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets; neither Xerium nor any Affiliate of Xerium (other than a Closing Date Bank Affiliate) shall be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed by, Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, provincial or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Xerium or any of its Subsidiaries or any Facility.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Xerium or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Xerium or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Xerium or such Subsidiary and with respect to liabilities arising after such period for which Xerium or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation under subsections .21, .22, .23, .27, .28, .29, .31 and .32); (ii) the failure to meet the minimum funding standard of or other requirements of Section 412, 430 or 436 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived), the failure to meet the funding standards or other requirements of Section 431 or 432 of the Internal Revenue Code with respect to any Multiemployer Plan or the failure to make by its due date any required installment, contribution or premium payment to or in respect of any Pension Plan or Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Xerium, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that is in endangered, seriously endangered or critical status pursuant to Section 432 of the Internal Revenue Code or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; or (viii) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to

any Pension Plan; <u>provided</u> that, notwithstanding the forgoing, the filing and continuation of the Bankruptcy Cases shall not constitute an ERISA Event.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Excess Cash**" means commencing with Fiscal Year 2011, with respect to any period, the total of (A) the sum, without duplication, of (i) Adjusted EBITDA for such period and (ii) the Consolidated Working Capital Adjustment <u>minus</u> (B) the sum, without duplication, for such period of: (i) Consolidated Interest Expense paid in cash, (ii) cash income tax expense, net of cash income tax refunds and cash income tax rebates received by Xerium and its Subsidiaries, (iii) Consolidated Capital Expenditures (except to the extent (I) financed or refinanced with an incurrence of Indebtedness, until such Indebtedness is repaid (other than through the refinancing thereof), (II) financed with insurance or condemnation proceeds or (III) financed with the cash proceeds from any Asset Sale) permitted under Section 6.8(d), (iv) Consolidated Operational Restructuring Costs paid in cash, (v) cash payments of withholding taxes from proceeds of the repurchase, redemption or retention of Common Stock permitted under Section 6.5(c) and (vi) scheduled amortization payments of Debt permitted under this Agreement.

"**Excess Amount**" as defined in Section 2.4(k).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Existing Letters of Credit**" as defined in Section 2.4(c).

"**Excluded Taxes**" as defined in Section 2.19(a).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Xerium or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Facility Office**" means the office or offices notified by a Bank or the Issuing Bank to the Administrative Agent in writing on or before the date it becomes a Bank or the Issuing Bank (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement.

"**Factoring Agreements**" means those certain agreements set forth on Schedule 1.1(a) and provided to the Administrative Agent and its counsel, providing for Xerium or any of its Subsidiaries to sell or otherwise dispose of any receivable:

(A)     on arm's length terms for cash payable at the time of disposal in accordance with the terms of the Japanese Promissory Note Discounting Facilities as in effect on the date hereof, provided that the maximum aggregate amount of receivables which  have been so sold or disposed of and which remain outstanding (other than as a result of a default by the relevant debtor) does not exceed ¥1,500,000,000 at any time; or

(B)     on non-recourse (as regards default by the relevant debtor(s)) and arm's length terms for cash payable at the time of disposal by Huyck.Wangner Australia Pty

15

Limited in respect of customer-provided letters of credit, provided that the maximum aggregate amount of receivables which have been so sold or disposed of and which remain outstanding (other than as a result of a default by the relevant debtor) does not exceed AUD 7,500,000 at any time.

"**Federal Funds Effective Rate**" means, for any day, for any day, the rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate quoted to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letters**" means collectively, any fee letter between the Borrower or any Credit Party on the one hand and any of the Agents or the Lead Arranger on the other hand.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Xerium that such financial statements fairly present, in all material respects, the financial condition of Xerium and its Subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year end adjustments.

"**First Currency**" as defined in Section 10.4(b).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than Permitted Liens which are junior in priority to the Collateral Agent's Lien on such Collateral.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Xerium and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Banks, and located in an area designated by the Federal Emergency Management Agency or other Governmental Authority as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Formalities Certificate**" means a Formalities Certificate substantially in the form of Exhibit L.

"**Fraudulent Transfer Laws**" as defined in Section 2.25(a).

"**French Guarantor**" as defined in Section 7.14(d).

"**Funding Borrower**" as defined in Section 2.25(b).

"**Funding Default**" means a default by a Bank in its obligation to fund any Revolving Loan or its portion of any unreimbursed payment under Section 2.2(b)(iv) or 2.4(g).

"**Funding Notice**" means a notice substantially in the form of Exhibit A 1.

"**FX Currency Losses**" means any losses incurred by the Issuing Bank as a result of purchasing currencies other than Dollars or exchanging Dollars into another currency in connection with any drawing under any Term Loan Letter of Credit.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, for Xerium and its Subsidiaries, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**German Term Loan**" means a German Term Loan deemed made by a Bank to Germany Holdings pursuant to Section 2.1(a)(vi).

"**German Term Loan Amount**" means the principal amount of the German Term Loan a Bank is deemed to have made on the Closing Date. The "German Term Loan Amount" of each Bank, if any, is set forth on Appendix A-6 or in the applicable Assignment Agreement. The aggregate amount of the German Term Loan Amounts as of the Closing Date is set forth on Appendix A-6.

"**German Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the German Term Loans of such Bank.

"**German Guarantors**" means Robec Walzen GmbH, formerly known as Stowe Woodward Forschungs- und Entwicklungs GmbH (also as universal successor of Robec GmbH), Stowe Woodward AG, Huyck.Wangner Germany GmbH, formerly known as Wangner Beteiligungsgesellschaft mbH (also as universal successor of Wangner Service GmbH, Wangner Verwaltungsgesellschaft mbH and Wangner Finckh GmbH & Co. KG).

"**Germany Holdings**" as defined in the preamble hereto.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, provincial, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or any foreign entity or government.

NY3 - 504826.09

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" as defined in the Pledge and Security Agreement.

"**Guaranteed Obligations**" as defined in Section 7.1(b).

"**Guarantor**" means each Non-US Guarantor and each US Guarantor.

"**Guarantor Subsidiary**" means each Guarantor other than Xerium.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7 or any other guaranty which purports to guaranty all or a portion of the Obligations.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under (i) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements entered into with a Bank Counterparty in Xerium's or any of its Subsidiaries' Ordinary Course and not for speculative purposes and (ii) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices entered into with a Bank Counterparty in Xerium's or any of its Subsidiaries' Ordinary Course and not for speculative purposes.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Bank which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Xerium and its Subsidiaries, for the immediately preceding three Fiscal Years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial statements of Xerium and its Subsidiaries as at the most recently ended Fiscal Quarter, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three , six or nine month period, as applicable, ending on such date, and, in the

NY3 - 504826.09

case of clauses (i) and (ii), certified by the chief financial officer of Xerium that they fairly present, in all material respects, the financial condition of Xerium and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year end adjustments.

"**Huyck Austria**" as defined in the preamble hereto.

"**Increased Cost Banks**" as defined in Section 2.24.

"**Indebtedness**" means, with respect to any Person, the principal and premium (if any) of any indebtedness of such Person, whether or not contingent:  (i) in respect of borrowed money, (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (iii) representing the deferred and unpaid purchase price of any property, other than trade payables incurred in the Ordinary Course, (iv) in respect of Capitalized Lease Obligations, (v) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (vi) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof or (vii) representing any Hedging Obligations, if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP.  To the extent not otherwise included, Indebtedness shall include (a) any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the Indebtedness of another Person (other than by endorsement of negotiable instruments for collection in the Ordinary Course), and (b) Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); provided, however, that the amount of such Indebtedness will be the lesser of (A) the fair market value of such asset at such date of determination and (B) the amount of such Indebtedness of such other Person. Notwithstanding the foregoing, any obligation of such Person or any of its Subsidiaries in respect of (x) minimum guaranteed commissions, or other similar payments, to clients, minimum returns to clients or stop loss limits in favor of clients or indemnification obligations to clients, in each case pursuant to contracts to provide services to clients entered into in the Ordinary Course, and (y) account credits to participants under any compensation plan, shall be deemed not to constitute Indebtedness.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this

indemnity), whether direct, indirect or consequential and whether based on any federal, provincial, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws and including any fees or expenses resulting from changes in laws in effect on the date of this Agreement), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Banks' agreement to make a Credit Extension or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Xerium or any of its Subsidiaries.

"**Indemnified Taxes**" as defined in Section 2.20(a).

"**Indemnitee**" as defined in Section 10.4.

"**Information**" as defined in Section 10.18.

"**Initial Business Plan**" means the business plan of Xerium and its Subsidiaries delivered in connection with the closing of the DIP Credit Agreement and attached hereto as Exhibit M.

"**Intercreditor Agreement**" means the Intercreditor Agreement to be executed and delivered by the Administrative Agent and the Collateral Agent, the Second Lien Agent and the Credit Parties, substantially in the form of Exhibit K, as amended, restated, modified and supplemented from time to time.

"**Interest Coverage Ratio**" means, with respect to Xerium for any period, the ratio of (A) the Adjusted EBITDA for the four-Fiscal Quarters period then ending to (B) the Consolidated Interest Expense for the four-Fiscal Quarters then ending; provided, that in computing Consolidated Interest Expense for any period commencing on or prior to the Closing Date and ending as of the close of any Fiscal Quarter on or prior to the first anniversary of the Closing Date, Consolidated Interest Expense for such period shall equal the product of (x) Consolidated Interest Expense for the period commencing on the first day of the first full calendar month following the Closing Date and ending on the last day of such Fiscal Quarter multiplied by (y) a fraction, the numerator of which is equal to 365 and the denominator of which is equal to the number of days that have elapsed in such period commencing on the first day of the first full calendar month following the Closing Date and ending on the last day of such Fiscal Quarter.

"**Interest Payment Date**" means (i) with respect to any LIBOR Loan, the last day of each Interest Period applicable to such LIBOR Loan, provided, in the case of each Interest Period of longer than three months "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period and (ii) with respect to any ABR Loan, the 15th day of each March, June, September and

December, commencing on the first such day following the making of such ABR Loan or conversion from a LIBOR Loan to an ABR Loan.

"**Interest Period**" means, in connection with a LIBOR Loan, an interest period of one, two, three or six months, as selected by each Borrower in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; (b) no Interest Period with respect to any portion of Term Loans shall extend beyond the Term Loan Maturity Date; (c) no Interest Period with respect to any portion of Revolving Loans shall extend beyond the Revolving Commitment Termination Date; and (d) all interest periods of the same currency having the same commencing date and expiration date shall be considered one Interest Period.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Xerium's and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period  the date that is two Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Xerium or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than Xerium, any other Borrower or a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Xerium from any Person (other than Xerium, any other Borrower or a Guarantor Subsidiary), of any Capital Stock of such Person; and (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course) or capital contribution by Xerium or any of its Subsidiaries to any other Person (other than Xerium, any other Borrower or a Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write ups, write downs or write offs with respect to such Investment.

"**Investment Cash Equivalents**" means (i) Dollars and, only if Section 2.4(n)(iii) is applicable, Alternative Currencies, (ii) securities issued or directly and fully guaranteed or insured by the US government or any agency or instrumentality thereof, (iii) certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of

$1.0 billion and whose long-term debt is rated at least "A" or the equivalent thereof by Moody's or S&P, (iv) repurchase obligations for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in the immediately preceding clause, (v) commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-2" or the equivalent thereof by Moody's or S&P and in each case maturing within one year after the date of acquisition, (vi) investment funds investing substantially all of their assets in securities of the types described in clauses (i) through (v) above, (vii) readily marketable direct obligations issued by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P and (viii) money market funds as defined in Rule 2a-7 of the General Rules and Regulations as promulgated under the Investment Company Act of 1940.

"**Issuance Notice**" means an Issuance Notice substantially in the form of Exhibit A 3.

"**Issuing Bank**" means Citicorp North America, Inc., together with its permitted successors and assigns in such capacity.

"**Italia SpA**" as defined in the preamble hereto.

"**Italia Term Loan**" means an Italia Term Loan deemed made by a Bank to Italia SpA pursuant to Section 2.1(a)(iii).

"**Italia Term Loan Amount**" means the principal amount of the Italia Term Loan a Bank is deemed to have made on the Closing Date. The "Italia Term Loan Amount" of each Bank, if any, is set forth on Appendix A-3 or in the applicable Assignment Agreement. The aggregate amount of the Italia Term Loan Amounts as of the Closing Date is set forth on Appendix A-3.

"**Italia Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal of the Italia Term Loans of such Bank.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; <u>provided</u>, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Landlord Consent and Estoppel**" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, pursuant to which, among other things, the landlord consents to the granting of a Mortgage on such Leasehold Property by the Credit Party tenant, such Landlord Consent and Estoppel to be in form and substance acceptable to Collateral Agent in its reasonable discretion, but in any event sufficient for Collateral Agent to obtain a Title Policy with respect to such Mortgage.

"**Landlord Personal Property Collateral Access Agreement**" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit K with such amendments or modifications as may be approved by Collateral Agent.

"**Lead Arranger**" as defined in the preamble hereto.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Letter of Credit**" means each Revolving Letter of Credit and Term Loan Letter of Credit, including the Existing Letters of Credit.

"**Letter of Credit Exposure**" means, as at any date of determination, the sum of (i) the aggregate undrawn amount under all Revolving Letters of Credit then outstanding, and (ii) the aggregate amount of all Unpaid Drawings.

"**Letter of Credit Usage**" means, as at any date of determination, the sum of (i) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Revolving Letters of Credit then outstanding, and (ii) the aggregate amount of all drawings under Revolving Letters of Credit honored by Issuing Bank and not theretofore reimbursed by or on behalf of each Borrower.

"**Leverage Ratio**" means, with respect to Xerium on any date, the ratio of (A) the Debt of Xerium and its Subsidiaries as of such date to (B) the Adjusted EBITDA of Xerium and its Subsidiaries for the period of four consecutive Fiscal Quarters ending on such date (or if such date is not the last day of a Fiscal Quarter of Xerium, for the period of four consecutive Fiscal Quarters most recently ended).

"**LIBOR**" means, in relation to any LIBOR Loan, the greater of:

> (i)     (a) the applicable Screen Rate; or (b) (if no Screen Rate is available for the currency or Interest Period of that LIBOR Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Administrative Agent at its request quoted by the Reference Banks to leading banks in the London interbank market, as of approximately 11:00 a.m. (London time) on the Interest Rate Determination Date for the offering of deposits in the currency of that LIBOR Loan and for a period comparable to the Interest Period for that LIBOR Loan; and

> (ii)     2.00%.

"**LIBOR Loan**" means a Loan or any portion thereof bearing interest by reference to the LIBOR Rate.

"**LIBOR Rate**" means the rate of interest for each Interest Period that is equal to the interest rate per annum which is the aggregate of the applicable LIBOR determined interest rate.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Term Loan and a Revolving Loan.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means any effect, event, matter or circumstance: (a) which is materially adverse to the: (i) business, assets or financial condition or prospects of Xerium and its Subsidiaries taken as a whole; or (ii) ability of any Credit Party to perform any of its Obligations in accordance with their terms under any of the Credit Documents; or (b) which in the reasonable opinion of the Requisite Banks results in any (i) Credit Document not being legal, valid and binding on and, subject to reservations contained in the legal opinions provided as conditions precedent thereto, enforceable against any party thereto from and after the Effective Date and/or (ii) Collateral Document not being a valid and effective security interest from and after the Effective Date, provided that the Bankruptcy Cases shall not be deemed to constitute an impediment to enforcement, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any Bank under the Credit Documents.

"**Material Contract**" means any contract or other arrangement to which Xerium or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, non-performance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Material Real Estate Asset**" means (i) (a) any fee-owned Real Estate Asset having a fair market value in excess of $1,000,000 as of the date of the acquisition thereof and (b) all Leasehold Properties other than those with respect to which the aggregate payments under the terms of the lease are less than $500,000 per annum, in each case located in the United States, Canada and the United Kingdom or (ii) any Real Estate Asset that the Requisite Banks have reasonably determined is material to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium or any Subsidiary thereof, including each Borrower.

"**Maximum Consolidated Capital Expenditures**" as defined in Section 6.8(d).

"**Maximum Consolidated Operational Restructuring Costs**" means the following amounts set forth below opposite the applicable Fiscal Year:

| Fiscal Year | Maximum Consolidated Operational Restructuring Costs |
|---|---|
| 2010 | $15,000,000 |
| 2011 | $6,000,000 |
| 2012 and each Fiscal Year thereafter | $5,000,000 |

NY3 - 504826.09

provided, that the Maximum Consolidated Operational Restructuring Costs for any Fiscal Year shall be increased by an amount equal to 50% of the portion of Maximum Consolidated Operational Restructuring Costs not incurred in the immediately preceding Fiscal Year (the "**Carry-Forward Amount**"); provided, further, that any Carry-Forward Amount not incurred in the applicable Fiscal Year shall not be added to the amount of Maximum Consolidated Operational Restructuring Costs for the immediately succeeding Fiscal Year.

"**Mexican Guarantor**" means each Guarantor incorporated in Mexico.

"**Mexico**" means the United Mexican States.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a Mortgage substantially in the form of Exhibit J, as it may be amended, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Xerium or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs (including, without limitation, reasonable transaction costs) incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Xerium or any of its Subsidiaries in connection with such Asset Sale.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Xerium or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder (excluding proceeds of business interruption insurance) or (b) as a result of the taking of any assets of Xerium or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Xerium or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Xerium or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

"**Non-Consenting Bank**" as defined in Section 2.24.

"**Non-Defaulting Bank**" means, at any time, a Bank that is not a Defaulting Bank or a Potential Defaulting Bank.

"**Non-US Aggregate Payments**" as defined in 7.2(a).

"**Non-US Bank**" as defined in Section 2.20(c).

"**Non-US Borrower**" means each Borrower other than Xerium and XTI.

"**Non-US Credit Party**" means each Non-US Borrower and each Non-US Guarantor.

"**Non-US Contributing Guarantor**" as defined in Section 7.2(a).

"**Non-US Fair Share**" as defined in Section 7.2(a).

"**Non-US Fair Share Contribution Amount**" as defined in Section 7.2(a).

"**Non-US Funding Guarantor**" as defined in Section 7.2(a).

"**Non-US Guaranteed Obligations**" as defined in Section 7.1(a).

"**Non-US Guarantor**" means each Guarantor listed as a Non-US guarantor in Schedule 1.1(b) and any other Foreign Subsidiary that becomes a party to the Guaranty.

"**Non-US Obligations**" mean the Obligations of the Non-US Borrowers and the Non-US Guarantors.

"**Notice**" means a Funding Notice, an Issuance Notice, or a Conversion/Continuation Notice.

"**Obligation Aggregate Payments**" as defined in Section 2.25(b).

"**Obligation Fair Share**" as defined in Section 2.25(b).

"**Obligation Fair Share Contribution Amount**" as defined in Section 2.25(b).

"**Obligation Fair Share Shortfall**" as defined in Section 2.25(b).

"**Obligations**" means all obligations of every nature of a US Credit Party or a Non-US Credit Party, as the case may be, from time to time owed to the Agents (including former Agents), the Banks, or any of them, any Issuing Bank and Bank Counterparties, including Hedging Obligations, under any Credit Document or the applicable documents creating the Hedging Obligations (including, without limitation, with respect to Hedging Obligations, obligations owed to any person who was a Bank or an Affiliate of a Bank at the time such Hedging Obligation was incurred), whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in

26

the related bankruptcy proceeding), reimbursement of amounts drawn under Letters of Credit, payments for early termination of Hedging Obligations, fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" as defined in Section 7.7.

"**Officers' Certificate**" means a certificate signed on behalf of Xerium by two officers of Xerium, one of whom must the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of Xerium.

"**Ordinary Course**" means ordinary course of business or ordinary trade activities that are customary, typical and carried out in a manner consistent with past practice.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its bylaws, as amended, and with respect to a German stock corporation (*Aktiengesellschaft*) an excerpt from the commercial register (*Handels-registerauszug*) (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, and with respect to a German limited partnership (*Kommanditgesellschaft*) an excerpt from the commercial register (Handels-registerauszug), (iii) with respect to any general partnership, its partnership agreement, as amended, and with respect to a German limited partnership (*Kommanditgesellschaft*) an excerpt from the commercial register (*Handels-registerauszug*), (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended, and with respect to a German limited liability company (GmbH) its list of shareholders (*Gesellschafterliste*) an excerpt from the commercial register (*Handels-registerauszug*), and (v) with respect to any other Foreign Subsidiary or entity, its memorandum or articles of association or other constitutional documents.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Parallel Obligations**" as defined in Section 7.13(a)(i).

"**Parent Company**" means, with respect to a Bank, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Bank and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Bank.

"**Patriot Act**" as defined in Section 10.21.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed by, Xerium, any of its Subsidiaries or any of its ERISA Affiliates.

"**Permitted Acquisition**" means any acquisition by a Borrower or any of its wholly owned Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all or substantially all of the Capital Stock of, or a business line or unit or a division of, any Person; provided,

(i) immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(ii) all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity with all applicable Governmental Authorizations;

(iii) in the case of the acquisition of Capital Stock, all of the Capital Stock (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law) acquired or otherwise issued by such Person or any newly formed Subsidiary of a Borrower in connection with such acquisition shall be owned (directly or indirectly) 100% by a Borrower or a Guarantor Subsidiary thereof; provided such Guarantor Subsidiary shall not have any limitations in respect of its guaranty of the Obligation similar to those set forth in Section 7.14, and each Borrower shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of each Borrower, each of the actions set forth in Sections 5.10 and/or 5.11, as applicable;

(iv) Xerium and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 6.8 on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended (as determined in accordance with Section 6.8(e));

(v) there are no material contingent liabilities (including, without limitation, Environmental Claims, but excluding for this purpose Ordinary Course Tax liabilities) relating to the company or business acquired;

(vi) Xerium shall have delivered to Administrative Agent at least fifteen (15) Business Days prior to such proposed acquisition, a Compliance Certificate evidencing compliance with Section 6.8 as required under clause (iv) above, together with all relevant financial information with respect to such acquired assets, including, without limitation, the aggregate consideration for such acquisition and any other information required to demonstrate compliance with Section 6.8; and

(vii) any Person or assets or division as acquired in accordance herewith (x) shall be in the same business or lines of business in which Xerium and/or any of its Subsidiaries are engaged as of the Closing Date and (y) shall have generated positive cash flow for the four quarter period most recently ended prior to the date of such acquisition adjusted on a pro forma basis as certified by the Chief Financial Officer of Xerium.

28

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Refinancing Indebtedness**" as defined in Section 6.1(p).

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" as defined in the recitals.

"**Plan of Reorganization**" means the prepackaged plan of reorganization filed by the Debtors with the Bankruptcy Court on March [_____], 2010, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Plan Supplement**" means the Plan Supplement filed with the Bankruptcy Court in connection with the Plan of Reorganization.

"**Platform**" as defined in Section 5.1(p)(ii).

"**Pledge and Security Agreements**" mean the Pledge and Security Agreement to be executed by each U.S. Credit Party substantially in the form of Exhibit I and each functionally similar agreement executed by any Non-U.S. Credit Party, as each may be amended, supplemented or otherwise modified from time to time.

"**Potential Defaulting Bank**" means, at any time, a Bank (i) as to which the Administrative Agent has notified the Borrower that an event of the kind referred to in the definition of "Bank Insolvency Event" has occurred and is continuing in respect of any financial institution affiliate of such Bank, (ii) as to which the Administrative Agent or the Issuing Bank has in good faith determined and notified the Borrower and the Administrative Agent that such Bank or its Parent Company or a financial institution affiliate thereof has notified the Administrative Agent, or has stated publicly, that it will not comply with its funding obligations under any other loan agreement or credit agreement or similar agreement or (iii) that has, or whose Parent Company has, a non-investment grade rating from Moody's or S&P or another national recognized rating agency.  Any determination that a Bank is a Potential Defaulting Bank under any of clauses (i) through (iii) above will be made by the Administrative Agent, in its sole discretion acting in good faith.  The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"**Primary Accounts**" as defined in Section 4.28.

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective on the date such change is publicly announced as effective.

"**Principal Office**" means, for each of Administrative Agent and Issuing Bank, such Person's "Principal Office" as set forth on Appendix B, or such other office as such Person may

from time to time designate in writing to each Borrower, the Administrative Agent and each Bank.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Xerium Term Loan of any Bank, the percentage obtained by dividing (a) the Xerium Term Loan Exposure of that Bank by (b) the aggregate Xerium Term Loan Exposure of all Banks; (ii) with respect to all payments, computations and other matters relating to the XTI Term Loan of any Bank, the percentage obtained by dividing (a) the XTI Term Loan Exposure of that Bank by (b) the aggregate XTI Term Loan Exposure of all Banks; (iii) with respect to all payments, computations and other matters relating to the Italia Term Loan of any Bank, the percentage obtained by dividing (a) the Italia Term Loan Exposure of that Bank by (b) the aggregate Italia Term Loan Exposure of all Banks; (iv) with respect to all payments, computations and other matters relating to the Xerium Canada Term Loan of any Bank, the percentage obtained by dividing (a) the Xerium Canada Term Loan Exposure of that Bank by (b) the aggregate Xerium Canada Term Loan Exposure of all Banks; (v) with respect to all payments, computations and other matters relating to the Austria Term Loan of any Bank, the percentage obtained by dividing (a) the Austria Term Loan Exposure of that Bank by (b) the aggregate Austria Term Loan Exposure of all Banks; (vi) with respect to all payments, computations and other matters relating to the German Term Loan of any Bank, the percentage obtained by dividing (a) the German Term Loan Exposure of that Bank by (b) the aggregate German Term Loan Exposure of all Banks; and (vii) with respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Bank or any Letters of Credit issued or participations purchased therein by any Bank, the percentage obtained by dividing (a) the Revolving Exposure of that Bank by (b) the aggregate Revolving Exposure of all Banks. For all other purposes with respect to each Bank, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Xerium Term Loan Exposure, the XTI Term Loan Exposure, the Italia Term Loan Exposure, the Xerium Canada Term Loan Exposure, the Austria Term Loan Exposure, the German Term Loan Exposure and the Revolving Exposure of that Bank, by (B) an amount equal to the sum of the aggregate Xerium Term Loan Exposure, the aggregate XTI Term Loan Exposure, the aggregate Italia Term Loan Exposure, the aggregate Xerium Canada Term Loan Exposure, the aggregate Austria Term Loan Exposure, the aggregate German Term Loan Exposure and the aggregate Revolving Exposure of all Banks.

"**Qualifying Lender**" means:

(a)     a Bank which is a bank as defined in Section 991 Income Tax Act 2007 of the United Kingdom, beneficially entitled to all amounts payable to it by a Credit Party under the Credit Documents and within the charge to United Kingdom corporation tax as respects such amounts; or

(b)     a bank in respect of which an order under Section 991(2)(e) Income Tax Act 2007 designating it as a bank for the purposes of Section 879 Income Tax Act 2007 of the United Kingdom provides that Section 879 Income Tax Act 2007 shall apply to it as if the words from "if" to the end in that section were omitted; or

30

(c)     a Treaty Lender.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Recapitalization**" means the restructuring and recapitalization of the capital stock of Xerium and the Indebtedness of the Debtors and their Subsidiaries pursuant to the Plan of Reorganization.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Administrative Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third party purchasers and encumbrancers of the affected real property.

"**Reference Banks**" means, in relation to LIBOR, the principal London offices of Citibank, N.A. and such two other banks as may be appointed by the Administrative Agent in consultation with Xerium.

"**Register**" as defined in Section 2.7(b).

"**Reimbursement Date**" as defined in Section 2.4(e).

"**Related Fund**" means, with respect to any Bank that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Bank or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Bank**" as defined in Section 2.24.

"**Required Prepayment Date**" as defined in Section 2.15(c).

"**Requisite Banks**" means, collectively (i) one or more Term Loan Banks having or holding Term Loan Exposure and representing more than 50.0% of the sum of the aggregate Term Loan Exposure of all Term Loan Banks and (ii) one or more Revolving Banks having or

holding Revolving Exposure and representing more than 50.0% of the sum of the aggregate Revolving Exposure of all Revolving Banks.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Xerium now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Xerium now or hereafter outstanding, except any payment made solely in shares of that class of stock to the holders of that class; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Xerium now or hereafter outstanding; and (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to, any Subordinated Debt, excluding, in respect of this clause (iv), payments in kind.

"**Revolving Bank**" means, at any time, any Bank that has a Revolving Commitment at such time.

"**Revolving Commitment**" means the commitment of a Bank to make or otherwise fund any Revolving Loan and "**Revolving Commitments**" means such commitments of all Banks in the aggregate. The amount of each Bank's Revolving Commitment is set forth on Appendix B or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Commitments as of the Closing Date is $20,000,000.

"**Revolving Commitment Period**" means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"**Revolving Commitment Termination Date**" means the earlier of (i) the date that is three (3) years after the Closing Date, (ii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.13(b) or 2.14, and (iii) the date of the termination of the Revolving Commitments pursuant to Section 8.1.

"**Revolving Exposure**" means, with respect to any Bank as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Bank's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Loans of that Bank and (b) in the case of the Issuing Bank, the aggregate Letter of Credit Exposure in respect of all Revolving Letters of Credit issued by that Bank (net of any participations by other Revolving Banks in such Revolving Letters of Credit), and (c) the aggregate amount of all participations by that Bank in any outstanding Revolving Letters of Credit or any Unpaid Drawing under any Revolving Letter of Credit.

"**Revolving Letter of Credit**" means each commercial or standby letter of credit issued or to be issued by the Issuing Bank pursuant to Section 2.4(a) of this Agreement and in form and substance acceptable to the Issuing Bank and the Administrative Agent.

"**Revolving Letter of Credit Sublimit**" means (i) $3,000,000 for the period from the Closing Date through the one year anniversary of the Closing Date and (b) $7,500,000 thereafter.

"**Revolving Loan**" as defined in Section 2.2(a)(i).

"**Roll-Over Amount**" as defined in Section 6.8(d).

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Companies.

"**Scheduled Term Loan Maturity Date**" means the date that is four and one half (4.5) years after the Closing Date.

"**Screen Rate**" means in relation to LIBOR, the offered rate for deposits in Dollars for the applicable Interest Period appearing on the Reuters Screen LIBOR 01 Page. If such page is replaced or service ceases to be available, the Administrative Agent may specify another page or service displaying the appropriate rate after consultation with the Borrower and the Banks.

"**Second Currency**" as defined in Section 10.4(b).

"**Second Lien Agent**" means Citicorp North America, Inc., as the administrative agent and the collateral agent for the lenders under the Second Lien Credit Agreement, together with any of its successors and assigns.

"**Second Lien Credit Agreement**" means the Second Amended and Restated Credit and Guaranty Agreement (Second Lien), dated as of [_____], 2010, among the Borrowers, the Guarantors, the several lenders and agent banks from time to time parties thereto and the Second Lien Agent, as amended, supplemented, restated or otherwise modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**Second Lien Credit Documents**" means the "Credit Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means the "Obligations" as defined in the Second Lien Credit Agreement.

"**Second Lien Secured Parties**" means the "Secured Parties" as defined in the Second Lien Credit Agreement.

"**Secured Parties**" has the meaning assigned to that term in the Collateral Documents.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim

certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Solvency Certificate**" means a Solvency Certificate of the chief financial officer of each Borrower substantially in the form of Exhibit N.

"**Solvent**" means, with respect to any Credit Party, that as of the date of determination, both (i) (a) the sum of such Credit Party's debt (including contingent liabilities) does not exceed the present fair saleable value of such Credit Party's present assets; (b) such Credit Party's capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Initial Business Plan or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances and by the laws of the jurisdiction where such Credit Party is incorporated, formed or organized.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Subject Transaction**" as defined in Section 6.8(e).

"**Subordinated Debt**" means any unsecured subordinated Debt of any Credit Party which meets the requirements of Section 6.1(c).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; <u>provided</u>, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Sum**" as defined in Section 10.4(b).

"**Swedish Guarantor**" means each Guarantor incorporated in Sweden.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, whether disputed or not,

including any interest, penalties or additions thereto and any installments in respect thereof; provided, "Tax on the overall net income" of a Person shall be construed as a reference to a Tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Bank, its lending office) is located or in which that Person (and/or, in the case of a Bank, its lending office) is deemed to be doing business on all or part of the net income, profits, or gains (whether worldwide, or only insofar as such income, profits, or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Bank, its applicable lending office).

"**Tax Confirmation**" means a confirmation by a Bank that it is a 991 Bank.

"**Tax Credit**" means a credit against, relief or remission for or repayment of any Tax.

"**Term LC Deposit Date**" as defined in Section 2.4(k)

"**Term LC Reimbursement Date**" as defined in Section 2.4(i)

"**Term LC Unreimbursed Amount**" as defined in Section 2.4(i)

"**Term LC Collateral Account**" means the deposit account established for the purpose of Cash Collateralizing Xerium's obligations in respect of the letters of credit under the DIP Credit Agreement and, pursuant to the terms hereof, the Term Loan Letters of Credit and shall include any sub-accounts or additional accounts contemplated by Section 2.4(n)(iii).

"**Term Loan**" means a Xerium Term Loan, an XTI Term Loan, an Italia Term Loan, a Xerium Canada Term Loan, an Austria Term Loan or a German Term Loan.

"**Term Loan Amount**" means, as applicable, a Xerium Term Loan Amount, an XTI Term Loan Amount, an Italia Term Loan Amount, a Xerium Canada Term Loan Amount, an Austria Term Loan Amount or a German Term Loan Amount, and "Term Loan Amounts" means such amounts held by all Banks.

"**Term Loan Bank**" means, at any time, any Bank that holds a Term Loan at such time.

"**Term Loan LC Collateral Account Control Agreement**" means the Account Control Agreement (Term Loan LC Collateral Account), dated as of [_____], 2010, among Xerium, the Collateral Agent, the Administrative Agent and Citibank, N.A., as amended, supplemented or otherwise modified from time to time.

"**Term Loan Letter of Credit**" means each commercial or standby letter of credit issued, to be issued or deemed to have been issued by the Issuing Bank pursuant to Section 2.4(b) of this Agreement and in form and substance acceptable to the Issuing Bank and the Administrative Agent.

"**Term Loan Letter of Credit Sublimit**" means $20,000,000.

"**Term Loan Maturity Date**" means the earlier of (i) Scheduled Term Loan Maturity Date, and (ii) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Terminated Bank**" as defined in Section 2.24.

"**Title Policy**" as defined in Section 3.1(i).

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of reimbursing Issuing Bank for any amount drawn under any Letter of Credit, but not yet so applied) and (ii) the Letter of Credit Usage.

"**Treaty Lender**" means a Bank which at the time the payment is made is beneficially entitled to all amounts payable to it under the Credit Documents and is entitled pursuant to the interpretation of the taxation authorities of the jurisdiction from which the payment is made or deemed to be made under a double taxation agreement in force at that date (subject only to the completion of any necessary formalities or administrative procedures, (including, without limitation, the matters referred to in Section 2.20(e)) to receive any payments of principal, interest, fees or other amounts under the Credit Documents without deduction or withholding for or on account of Tax.

"**Type of Loan**" means a LIBOR Loan or an ABR Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unreallocated Portion**" as defined in Section 2.23(b).

"**Unpaid Drawing**" as defined in Section 2.03(g).

"**Unused Revolving Commitment**" means, at any time, (a) the Revolving Commitments at such time minus (b) the sum of (i) the aggregate principal amount of outstanding Revolving Loans plus (ii) the Letter of Credit Usage.

"**US Aggregate Payments**" as defined in 7.2(b).

"**US Credit Party**" means Xerium, XTI, and each US Guarantor.

"**US Contributing Guarantors**" as defined in 7.2(b).

"**US Funding Guarantor**" as defined in Section 7.2(b).

"**US Fair Share**" as defined in 7.2(b).

"**US Fair Share Contribution Amount**" as defined in 7.2(b).

"**US Guarantor**" means (i) each Guarantor listed in Schedule 1.1(b) as a US Guarantor and (ii) each other Domestic Subsidiary that becomes a party to the Guaranty.

"**VAT**" means value added tax, goods and services tax and any similar sales or turnover tax.

"**Vietnam Asset Sales**" means, Asset Sales relating to the business, assets or properties of Huyck Wangner Vietnam Co. Ltd.

"**Waivable Mandatory Prepayment**" as defined in Section 2.15(c).

"**Xerium**" as defined in the preamble hereto.

"**Xerium Canada**" as defined in the preamble hereto.

"**Xerium Canada Term Loan**" means a Xerium Canada Term Loan deemed made by a Bank to Xerium Canada Inc. pursuant to Section 2.1(a)(iv).

"**Xerium Canada Term Loan Amount**" means the principal amount of the Xerium Canada Term Loan a Bank is deemed to have made on the Closing Date. The "Xerium Canada Term Loan Amount" of each Bank, if any, is set forth on Appendix A-4 or in the applicable Assignment Agreement. The aggregate amount of the Xerium Canada Term Loan Amounts as of the Closing Date is set forth on Appendix A-4.

"**Xerium Canada Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the Xerium Canada Term Loans of such Bank.

"**Xerium Term Loan**" means a Xerium Term Loan deemed made by a Bank to Xerium. pursuant to Section 2.1(a)(i).

"**Xerium Term Loan Amount**" means the principal amount of the Xerium Term Loan a Bank is deemed to have made on the Closing Date. The "Xerium Term Loan Amount" of each Bank, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement. The aggregate amount of the Xerium Term Loan Amounts as of the Closing Date is set forth on Appendix A-1.

"**Xerium Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the Xerium Term Loans of such Bank.

"**XTI**" as defined in the preamble hereto.

"**XTI Term Loan**" means an XTI Term Loan deemed made by a Bank to XTI pursuant to Section 2.1(a)(ii).

"**XTI Term Loan Amount**" means the principal amount of the XTI Term Loan a Bank is deemed to have made on the Closing Date. The "XTI Term Loan Amount" of each Bank, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement. The aggregate amount of the XTI Term Loan Amounts as of the Closing Date is set forth on Appendix A-2.

"**XTI Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the XTI Term Loans of such Bank.

"**991 Bank**" means a Bank falling within paragraph (a) or (b) of the definition of Qualifying Lender.

1.2 **Accounting Terms**.  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by Xerium to the Banks pursuant to Section 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation.  Notwithstanding the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements for the Fiscal Year ended December 31, 2009 only.

1.3 **Interpretation, etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

## SECTION 2. LOANS AND LETTERS OF CREDIT

2.1 **Term Loans**.  (a) Subject to the terms and conditions hereof, each applicable Term Loan Bank agrees that on the Closing Date, the outstanding principal amount of the DIP Term Loans owing to such Term Loan Bank shall be converted into a Term Loan deemed to have been made by such Bank, on the Closing Date, as follows:

(i) a Xerium Term Loan to Xerium in Dollars in a principal amount equal to such Term Bank's Xerium Term Loan Amount;

(ii) an XTI Term Loan to XTI in Dollars in a principal amount equal to such Term Bank's XTI Term Loan Amount;

(iii) an Italia Term Loan to Italia SpA in Dollars in a principal amount equal to such Term Bank's Italia Term Loan Amount;

(iv) a Xerium Canada Term Loan to Xerium Canada in Dollars in a principal amount equal to such Term Bank's Xerium Canada Term Loan Amount;

(v) an Austria Term Loan to Huyck Austria in Dollars in a principal amount equal to such Term Bank's Austria Term Loan Amount; and

(vi) a German Term Loan to Germany Holdings in Dollars in an amount equal to such Term Bank's German Term Loan Amount.

Any Term Loan repaid or prepaid may not be reborrowed. Subject to Sections 2.13 and 2.14, all amounts owed hereunder with respect to all Term Loans shall be paid in full no later than the Term Loan Maturity Date. The Xerium Term Loans deemed made hereunder on the Closing Date shall be LIBOR Rate Loans. The Interest Period applicable to the DIP Term Loans on the day immediately preceding the Closing Date shall apply to the Term Loans on the Closing Date.

(b) Term Loan Deposit Account. After the payment of all fees and expenses required to be paid on the Closing Date, the Administrative Agent shall transfer all funds on deposit in the DIP Term Loan Deposit Account to Xerium on the Closing Date.

## 2.2 Revolving Loans

(a) Revolving Commitments.

(i) During the Revolving Commitment Period, subject to the terms and conditions hereof, each Revolving Bank severally agrees to make revolving loans in Dollars to Xerium ("**Revolving Loans**") in an aggregate amount up to but not exceeding such Revolving Bank's Revolving Commitment; provided, that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect. Subject to Sections 2.13(a) and 2.14, all amounts owed hereunder with respect to Revolving Loans shall be paid in full no later than the Revolving Loan Termination Date.

(ii) Subject to the terms and conditions hereof, each applicable Revolving Bank agrees that on the Closing Date, the outstanding principal amount of DIP Revolving Loans owing to such Revolving Bank shall be converted into a Revolving Loan deemed to have been made by such Revolving Bank to Xerium, on the Closing Date, as set forth in Appendix B.

(b) Borrowing Mechanics for Revolving Loans Generally.

(i) Except pursuant to Section 2.4(d), Revolving Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii) Whenever Xerium desires that Revolving Banks make Revolving Loans, Xerium shall deliver to the Administrative Agent a fully executed and delivered Funding Notice no later than (A) 9:30 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a LIBOR Loan or (B) 9:30 a.m. (New York City time) on the proposed Credit Date in the case of an ABR Loan. Except as otherwise provided herein, a Funding Notice for a Loan that is a LIBOR Loan shall be irrevocable on and after the related Interest Rate Determination Date, and Xerium shall be bound to make a borrowing in accordance therewith.

(iii) Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Revolving Bank's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by the Administrative Agent to each applicable Bank by telefacsimile with reasonable promptness, but (provided the Administrative Agent shall have received such notice by 9:30 a.m. (New York City time)) not later than 3:00 p.m. (New York City time) on the same day as the Administrative Agent's receipt of such Funding Notice from Xerium.

(iv) Each Revolving Bank shall make the amount of its Revolving Loan available to the Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, the Administrative Agent shall make the proceeds of such Revolving Loans available to Xerium on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by the Administrative Agent from the Revolving Banks to be credited to the account of Xerium at the Administrative Agent's Principal Office or such other account as may be reasonably designated in writing no later than three (3) days before to the Administrative Agent by Xerium.

2.3 **[Reserved]**

2.4 **Letters of Credit**.

(a) <u>Revolving Letters of Credit</u>. During the Revolving Commitment Period, subject to the terms and conditions hereof, the Issuing Bank agrees to issue Revolving Letters of Credit for the account of each Borrower in the aggregate amount up to but not exceeding the Revolving Letter of Credit Sublimit; <u>provided</u>, (i) after giving effect to such issuance, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect; (ii) after giving effect to such issuance, in no event shall the Letter of Credit Usage exceed the Revolving Letter of Credit Sublimit then in effect; (iii) in no event shall any standby Revolving Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior the Revolving

Commitment Termination Date and (2) the date which is one year from the date of issuance of such standby Revolving Letter of Credit; and (iv) in no event shall any commercial Revolving Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior to the Revolving Commitment Termination Date and (2) the date which is 180 days from the date of issuance of such commercial Revolving Letter of Credit; provided, further, in the event (x) a Funding Default exists or (y) a determination pursuant to Section 2.18 or 2.19 occurs, the Issuing Bank shall not be required to issue any Revolving Letter of Credit unless the Issuing Bank has entered into arrangements satisfactory to it and each Borrower to eliminate the Issuing Bank's risk with respect to the participation in the Revolving Letters of Credit of the Defaulting Bank, including by Cash Collateralizing such Defaulting Bank's Pro Rata Share of the Letter of Credit Usage.

(b) Term Loan Letters of Credit. Subject to the terms and conditions hereof, the Issuing Bank agrees to issue Term Loan Letters of Credit for the account of the Borrowers or any of their respective Subsidiaries in the aggregate amount which, when combined with the Dollar Equivalent of the aggregate face amount of Existing Letters of Credit, does not exceed the Term Loan Letter of Credit Sublimit; provided, (i) after giving effect to such issuance, in no event shall the amount of Cash and Investment Cash Equivalents on deposit in the Term LC Collateral Account be less than 103% of the Dollar Equivalent of the amount available to be drawn under all Term Loan Letters of Credit (including the Existing Term Loan Letters of Credit), (ii) in no event shall any standby Term Loan Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior to the Scheduled Term Loan Termination Date and (2) the date which is one year from the date of issuance of such standby Term Loan Letter of Credit and (iii) in no event shall any commercial Term Loan Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior to the Scheduled Term Loan Termination Date and (2) the date which is 180 days from the date of issuance of such commercial Term Loan Letter of Credit.

(c) Existing Letters of Credit. Schedule 2.4(c) contains a schedule of certain letters of credit issued or outstanding prior to the Closing Date under the DIP Credit Agreement (the "**Existing Letters of Credit**") for the account of Xerium or one of its Subsidiaries by Citicorp North America, Inc. On the Closing Date, (i) the Existing Letters of Credit, to the extent outstanding, shall be automatically, and without further action by the parties hereto, converted to Term Loan Letters of Credit issued and outstanding under this Agreement and subject to the provisions hereof, as if such Existing Letters of Credit had been issued on the Closing Date hereunder, (ii) the issuing bank of the Existing Letters of Credit shall be deemed to be the "Issuing Bank" hereunder solely for the purpose of maintaining such Existing Letters of Credit, and (iii) all liabilities of Xerium, the other Borrowers or any of their respective Subsidiaries with respect to Existing Letters of Credit shall constitute Obligations.

41