(d) <u>Letters of Credit Generally</u>.  Each Letter of Credit is subject to the following applicable conditions: (i) each Term Loan Letter of Credit shall be denominated in Dollars or an Alternative Currency; (ii) each Revolving Letter of Credit shall be denominated in Dollars, (iii) the stated amount of each Letter of Credit shall not be less than a Dollar Equivalent of $500,000 (or the Dollar Equivalent thereof if issued in an Alternative Currency) or such lesser amount as is acceptable to the Issuing Bank and (iii) in no event shall a Letter of Credit be issued if such Letter of Credit is not in a form acceptable to the Issuing Bank in its reasonable discretion.  Subject to the foregoing, the Issuing Bank may agree that a standby Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each, unless the Issuing Bank elects not to extend for any such additional period; <u>provided</u>, the Issuing Bank shall not extend any such Letter of Credit if it has received written notice from the Administrative Agent, acting on behalf of the Requisite Banks, that an Event of Default has occurred and is continuing.

(e) <u>Notice of Issuance</u>.  Whenever a Borrower desires the issuance of a Letter of Credit, it shall deliver an Issuance Notice to the Administrative Agent no later than 9:30 a.m. (New York City time) at least three (3) Business Days (in the case of standby letters of credit) or five (5) Business Days (in the case of commercial letters of credit), or in each case such shorter period as may be agreed to by the Issuing Bank in any particular instance, in advance of the proposed date of issuance, which Issuance Notice shall state whether the requested Letter of Credit is to be a Revolving Letter of Credit or a Term Loan Letter of Credit.  Upon satisfaction or waiver of the conditions set forth in Section 3.2, the Issuing Bank shall issue the requested Letter of Credit only in accordance with the Issuing Bank's standard operating procedures.  Upon the issuance of any Letter of Credit or any amendment or modification to a Letter of Credit, the Issuing Bank shall promptly notify the Administrative Agent thereof, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and, in the case of Revolving Letters of Credit, the amount of each Revolving Bank's respective participation in such Letter of Credit pursuant to Section 2.4(f).

(f) <u>Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments</u>.  In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, the Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit.  As between each Borrower and the Issuing Bank, each Borrower assumes all risks of the acts and omissions of, or misuse of, the Letters of Credit issued by the Issuing Bank by the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, the Issuing Bank shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects

NY3 - 504826.09

invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of the Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of the Issuing Bank's rights or powers hereunder.  Without limiting the foregoing and in furtherance thereof, any action taken or omitted by the Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of the Issuing Bank to any Borrower.  Notwithstanding anything to the contrary contained in this Section 2.4(f), each Borrower shall retain any and all rights it may have against the Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of the Issuing Bank.

(g) Reimbursement by a Borrower of Amounts Drawn or Paid Under Revolving Letters of Credit.  In the event the Issuing Bank has determined to honor a drawing under a Revolving Letter of Credit, it shall immediately notify the applicable Borrower and Administrative Agent, and such Borrower shall reimburse Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the "**Reimbursement Date**") in Dollars in same day funds equal to the amount of such honored drawing (each such amount so paid until reimbursed, an "**Unpaid Drawing**"); provided, anything contained herein to the contrary notwithstanding, (i) unless such Borrower shall have notified Administrative Agent and Issuing Bank prior to 9:30 a.m. (New York City time) on the date three (3) Business Days prior to the date such drawing is honored that such Borrower intends to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Revolving Loans, such Borrower shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Banks to make Revolving Loans that are ABR Loans on the Reimbursement Date in Dollars in the same amount of such honored drawing, and (ii) subject to satisfaction or waiver of the conditions specified in Section 3.2, Revolving Banks having a Revolving Commitment shall, on the Reimbursement Date, make Revolving Loans that are ABR Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse the Issuing Bank for the amount of such honored drawing; and provided further, if for any reason proceeds of Revolving Loans are not received by the Issuing Bank on the Reimbursement Date in an

amount equal to the amount of such honored drawing, such Borrower shall reimburse the Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Revolving Loans, if any, which are so received.  Nothing in this Section 2.4(g) shall be deemed to relieve any Revolving Bank from its obligation to make Revolving Loans on the terms and conditions set forth herein, and each Borrower shall retain any and all rights it may have against any Revolving Bank resulting from the failure of such Bank to make such Revolving Loans under this Section 2.4(g).

(h) <u>Banks' Purchase of Participations in Revolving Letters of Credit</u>.  Immediately upon the issuance of each Revolving Letter of Credit, each Revolving Bank having a Revolving Commitment shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from the Issuing Bank a participation in such Revolving Letter of Credit and any drawings honored thereunder in an amount equal to such Bank's Pro Rata Share (with respect to the Revolving Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder.  In the event that a Borrower shall fail for any reason to reimburse the Issuing Bank as provided in Section 2.4(e), the Issuing Bank shall promptly notify each Bank of the unreimbursed amount of such honored drawing and of such Bank's respective participation therein based on such Bank's Pro Rata Share of the Revolving Commitments.  Each Bank shall make available to the Issuing Bank an amount equal to its respective participation, in same day funds, at the office of the Issuing Bank specified in such notice, not later than 12:00 p.m. (New York City time) on the first Business Day (under the laws of the jurisdiction in which such office of the Issuing Bank is located) after the date notified by the Issuing Bank.  In the event that any Bank fails to make available to the Issuing Bank on such Business Day the amount of such Bank's participation in such Revolving Letter of Credit as provided in this Section 2.4(h), the Issuing Bank shall be entitled to recover such amount on demand from such Bank together with interest thereon for three (3) Business Days at the rate customarily used by the Issuing Bank for the correction of errors among banks and thereafter at the Alternate Base Rate.  Nothing in this Section 2.4(h) shall be deemed to prejudice the right of any Bank to recover from Issuing Bank any amounts made available by such Bank to the Issuing Bank pursuant to this Section in the event that it is determined that the payment with respect to a Revolving Letter of Credit in respect of which payment was made by such Bank constituted gross negligence or willful misconduct on the part of the Issuing Bank.  In the event the Issuing Bank shall have been reimbursed by other Banks pursuant to this Section 2.4(h) for all or any portion of any drawing honored by the Issuing Bank under a Revolving Letter of Credit, such Issuing Bank shall distribute to each Bank which has paid all amounts payable by it under this Section 2.4(h) with respect to such honored drawing such Bank's Pro Rata Share of all payments subsequently received by the Issuing Bank from such Borrower in reimbursement of such honored drawing when such payments are received.  Any such distribution shall be made to a Bank at its primary address set forth below its name on Appendix B or at such other address as such Bank may request.

NY3 - 504826.09

(i) <u>Reimbursement of Amounts Drawn or Paid Under Term Loan Letters of Credit</u>. In the event the Issuing Bank has determined to honor a drawing under a Term Loan Letter of Credit, it shall immediately notify the applicable Borrower and the Administrative Agent, and such Borrower shall reimburse the Issuing Bank in an amount equal to the Dollar Equivalent of such drawing plus any FX Currency Losses no later than 1:00 p.m. (New York City time) on the date such drawing is honored (the "**Term LC Reimbursement Date**"), if such Borrower shall have received such notice prior to 11:00 a.m. (New York City time) on such date, or, if such notice has not been received by such Borrower prior to such time on such date, then not later than 1:00 p.m. (New York City time) on the next Business Day; provided that (subject to the immediately succeeding sentence) unless such Borrower shall reimburse the Issuing Bank by 1:00 p.m. (New York City time) on the same day on which such drawing is made, the unpaid amount thereof shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin, for each day commencing on the date the drawing is made until the date that the Borrower pays the Issuing Bank for the Dollar Equivalent of the amount of such drawing plus any FX Currency Losses. If such Borrower does not so reimburse the Issuing Bank at or prior to the time for payment specified above in respect of such drawing under such Term Loan Letter of Credit, the Administrative Agent shall promptly cause the amounts on deposit in the Term Loan LC Collateral Account to be applied to repay in full such amounts (such amounts, including any FX Currency Losses accrued interest thereon, the "**Term LC Unreimbursed Amount**"). If amounts on deposit in the Term LC Collateral Account is less than such Term LC Unreimbursed Amount, then such Borrower shall be deemed to have given a timely Funding Notice to the Administrative Agent requesting Revolving Banks to make a Revolving Loan on the Term LC Reimbursement Date in the amount equal to the Term LC Unreimbursed Amount, less the amounts withdrawn from the Term LC Collateral Account pursuant to the preceding sentence, and the Revolving Banks shall, on the Term LC Reimbursement Date, make Revolving Loans in such amount, the proceeds of which shall be applied directly by the Administrative Agent to reimburse the Issuing Bank for the Term LC Unreimbursed Amount. The conditions to the making of a Revolving Loan set forth in Section 3.2 and the minimum amount of Revolving Loans set forth in Section 2.2(b)(i) shall not apply to Revolving Loans made pursuant to this Section 2.4(i), and the Revolving Loans made pursuant to this Section 2.4(i) shall initially be ABR Loans.

(j) <u>Investing Funds in Term LC Collateral Account</u>. Funds on deposit in the Term LC Collateral Account shall be held in the form of Cash, except as described below. So long as no Default or Event of Default shall have occurred and be continuing, Xerium is authorized to direct the Administrative Agent to make investments of funds on deposit in the Term LC Collateral Account in Investment Cash Equivalents as directed by Xerium. Upon the occurrence and during the continuation of a Default or an Event of Default, the funds on deposit in the Term LC Collateral Account shall be invested in accordance with the Term Loan LC Collateral Account Control Agreement.

NY3 - 504826.09

(k) Top-Up and Release of Funds in the Term LC Collateral Account.  If on the last Business Day of any month the aggregate amount of Cash and Investment Cash Equivalents on deposit in the Term LC Collateral Account exceeds 103% of the Dollar Equivalent of the amount available to be drawn under the Letters of Credit (such excess, the "**Excess Amount**"), then, upon the written request of Xerium, no later than the second Business Day after such request the Administrative Agent shall cause an amount of Cash (including cash proceeds from the liquidation of any Investment Cash Equivalents) equal to the Excess Amount (calculated at the date of withdrawal), to be withdrawn from the Term LC Collateral Account and transferred to Xerium.  If, however, on any Determination Date the aggregate amount of Cash and Investment Cash Equivalents on deposit in the Term LC Collateral Account is less than 103% of the Dollar Equivalent of the amount available to be drawn under the Letters of Credit (such shortfall, the "**Deficiency Amount**"), then no later than the next Business Day (the "**Term LC Deposit Date**") after notice thereof to Xerium from the Administrative Agent, Xerium shall deposit Cash or Investment Cash Equivalents into the Term LC Collateral Account in an amount or with a value equal to the Deficiency Amount.  If by 11:00 a.m. (New York City time) on the Term LC Deposit Date Xerium has failed to make such deposit, then the Borrower shall be deemed to have given a timely Funding Notice to the Administrative Agent requesting Revolving Banks to make a Revolving Loan on the Term LC Deposit Date in the amount of the Deficiency Amount, and the Revolving Banks shall, on the Term LC Deposit Date, make Revolving Loans in such amount, the proceeds of which shall be deposited by the Administrative Agent into the Term LC Collateral Account.  The conditions to the making of a Revolving Loan set forth in Section 3.2 and the minimum amount of Revolving Loans set forth in Section 2.2(b)(i) shall not apply to Revolving Loans made pursuant to this Section 2.4(k) and the Revolving Loans made pursuant to this Section 2.4(k) shall be ABR Loans.

(l) Obligations Absolute.  The obligation of each Borrower to reimburse Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Revolving Loans made by Banks pursuant to Section 2.4(e) and the obligations of Banks under Section 2.4(g) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set off, defense or other right which any Borrower or any Bank may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), the Issuing Bank, Bank or any other Person or, in the case of a Bank, against any Borrower, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between such Borrower or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by the Issuing

46

Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; provided, in each case, that payment by the Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank under the circumstances in question.

(m) Indemnification. Without duplication of any obligation of each Borrower under Section 10.2, 10.3 or 10.4, in addition to amounts payable as provided herein, each Borrower hereby agrees to protect, indemnify, pay and save harmless the Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance and maintenance of any Letter of Credit by the Issuing Bank, other than as a result of (1) the gross negligence or willful misconduct of the Issuing Bank or (2) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of the Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

(n) Term Loan LC Collateral Account.

(i) Xerium shall maintain and continue the existence of the Term Loan LC Collateral Account established under the DIP Credit Agreement with the Depositary Bank for the purpose of Cash Collateralizing a Borrower's obligations to the Issuing Bank in respect of the Term Loan Letters of Credit.

(ii) Xerium hereby grants to the Collateral Agent, for the benefit of the Issuing Bank, a security interest in the Term Loan LC Collateral Account and all Cash, balances and Investment Cash Equivalents therein and all proceeds of the foregoing, as security for the Borrowers' obligations in respect of the Term Loan Letters of Credit (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations, provided that amounts on deposit in the Term Loan LC Collateral Account shall be applied, *first*, to repay the Borrowers' obligations to the Issuing Bank in respect of Term Loan Letters of Credit and, *second*, to all other Obligations). Except as expressly provided herein or in any other Credit Document, no Person shall have the right to make any withdrawal from the Term Loan LC Collateral Account or to exercise any right or power with respect thereto.

47

(iii) If an Event of Default shall have occurred and is continuing, then the Administrative Agent shall convert, or cause to be converted, amounts on deposit in the Term Loan LC Collateral Account into Alternative Currencies, to the extent necessary, so that after giving effect to such conversion the amounts on deposit in the Term Loan LC Collateral Account are in the currency which corresponds to the currency in which the Term Loan Letters of Credit are issued. The Borrowers agree that the Administrative Agent is authorized to establish additional accounts or sub-accounts as necessary to hold such funds in an Alternative Currency, and the Borrowers shall execute all documents necessary to effectuate any transfers to any other accounts or sub-accounts and to create, continue or maintain the security interest and lien perfection in the applicable accounts or sub-accounts and the Cash and Investment Cash Equivalents held therein, including the entering into any control agreements.  All cost and expenses incurred by the Administrative Agent and the Collateral Agent in connection with the matters set forth in this Section 2.4(n)(iii) shall be borne by the Borrowers.

(o) <u>Resignation of Issuing Bank</u>.  If a Bank becomes, and during the period it remains, a Defaulting Bank or a Potential Defaulting Bank, the Issuing Bank may, upon prior written notice to Xerium  and the Administrative Agent, resign as Issuing Bank, effective at the close of business New York time on a date specified in such notice (which date may not be less than five (5) Business Days after the date of such notice); <u>provided</u> that such resignation by the Issuing Bank will have no effect on the validity or enforceability of any Letter of Credit then outstanding or on the obligations of the Borrowers or any Bank under this Agreement with respect to any such outstanding Letter of Credit or otherwise to the Issuing Bank.

(p) <u>Defaulting Banks</u>.  In addition to the other conditions precedent herein set forth, if any Bank becomes, and during the period it remains, a Defaulting Bank or a Potential Defaulting Bank, the Issuing Bank will not be required to issue any Letter of Credit or to amend any outstanding Letter of Credit to increase the face amount thereof, alter the drawing terms thereunder or extend the expiry date thereof, unless the Issuing Bank is satisfied that any exposure that would result therefrom is eliminated or fully covered by the Revolving Commitments of the Non-Defaulting Banks or by Cash Collateralization or a combination thereof satisfactory to the Issuing

2.5 **Pro Rata Shares; Availability of Funds**.

(a) <u>Pro Rata Shares</u>.  All Loans shall be made, and all participations purchased, by Banks simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Bank shall be responsible for any default by any other Bank in such other Bank's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Revolving Commitment of any Bank be increased or decreased as a result of a

48

default by any other Bank in such other Bank's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b) <u>Availability of Funds</u>.  Unless the Administrative Agent shall have been notified by any Bank prior to the applicable Credit Date that such Bank does not intend to make available to the Administrative Agent the amount of such Bank's Loan requested on such Credit Date, the Administrative Agent may assume that such Bank has made such amount available to the Administrative Agent on such Credit Date and the Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to the Borrower a corresponding amount on such Credit Date.  If such corresponding amount is not in fact made available to the Administrative Agent by such Bank, the Administrative Agent shall be entitled to recover such amount on demand from such Bank together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the customary rate set by the Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the LIBOR Rate.  If such Bank does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such amount to the Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the rate payable hereunder for LIBOR Rate Loans.  Nothing in this Section 2.5(b) shall be deemed to relieve any Bank from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Bank as a result of any default by such Bank hereunder.

2.6 **Use of Proceeds**.  The proceeds of the Loans shall be applied by each Borrower for working capital and general corporate purposes, to pay fees and expenses in connection with the transactions contemplated hereby, to make payments of fees, expenses and any other amounts owing under the DIP Credit Agreement and to pay costs, fees and expenses incurred in connection with the consummation of the Plan of Reorganization.  The proceeds of the Revolving Loans and Letters of Credit made after the Closing Date shall be applied by each Borrower for working capital and general corporate purposes of Xerium and its Subsidiaries and pay fees and expenses hereunder; <u>provided</u>, that in no event will the proceeds of Loans be used for the purposes of repurchasing Loans as permitted under Section 2.13 hereof.  No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

2.7 **Evidence of Debt; Register; Banks' Books and Records; Promissory Notes**.

(a) <u>Banks' Evidence of Debt</u>.  Each Bank may maintain on its internal records an account or accounts evidencing the Obligations of each Borrower to such Bank, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on such Borrower, absent manifest error; <u>provided</u>, that the failure to make any such recordation, or any error in such recordation, shall not affect any Bank's Revolving Commitments or such Borrower's Obligations in respect of any applicable Loans; and <u>provided further</u>, in the event of any inconsistency between the Register and any Bank's records, the recordations in the Register shall govern.

(b) <u>Register</u>.  The Administrative Agent may maintain at its Principal Office a register for the recordation of the names and addresses of Banks and the Revolving Commitments and Loans of each Bank from time to time (the "**Register**").  The Administrative Agent may record in the Register the Revolving Commitments and the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on such Borrower and each Bank, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect any Bank's Revolving Commitments or such Borrower's Obligations in respect of any Loan.  Each Borrower hereby designates the Administrative Agent to serve as each Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.7, and each Borrower hereby agrees that, to the extent the Administrative Agent serves in such capacity, the Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c) **Notes**.  If so requested by any Bank by written notice to Xerium (with a copy to the Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, each Borrower shall execute and deliver to such Bank (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Bank pursuant to Section 10.7) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Xerium's receipt of such notice) a promissory note or promissory notes, in a form reasonably acceptable to the Administrative Agent and Xerium, to evidence such Bank's Term Loans or Revolving Loans, as the case may be.

2.8 **Interest on Loans**.

(a) Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i) if a LIBOR Loan, at the LIBOR Rate plus the Applicable Margin; or

(ii) if an ABR Loan, at the Alternate Base Rate plus the Applicable Margin.

(b) The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any LIBOR Loan, shall be selected by each Borrower and notified to the Administrative Agent and Banks pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to the Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then such Loan will automatically convert into an ABR Loan.

(c) In connection with LIBOR Loans there shall be no more than six (6) Interest Periods in the aggregate outstanding at any time. In the event a Borrower fails to specify between an ABR Loan or a LIBOR Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a LIBOR Loan) will be automatically continued as a LIBOR Loan with an Interest Period of one month beginning on the last day of the then-current Interest Period for such Loan), or (if outstanding as an ABR Loan) will be automatically continued as an ABR Loan, or (if not then outstanding) will be automatically made as a LIBOR Loan with an Interest Period of one month. In the event a Borrower fails to specify an Interest Period for any LIBOR Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Borrower shall be deemed to have selected an Interest Period of one month. As soon as practicable after 11:00 a.m. (London time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to each Borrower and each Bank.

(d) Interest payable pursuant to Section 2.8(a) and any other interest, commission or fee accruing under a Credit Document (other than interest payable pursuant to Section 2.8(a)(ii)) will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days. Interest payable pursuant to Section 2.6(a)(ii) will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 or 366 days, as appropriate, when determined by reference to clause (a) of the definition of "Alternate Base Rate", and a year of 360 days at all other times. For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid under a Credit Document or in connection therewith is to be calculated on the basis of any period of time that is less than a calendar year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided

51

by 360 or 365 days, as applicable to such interest or fee pursuant to such Credit Document. The rates of interest hereunder are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation hereunder.

(e) Except as otherwise set forth herein, interest on each Loan shall be payable in arrears on and to (i) each Interest Payment Date applicable to that Loan; (ii) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity, and on the Revolving Commitment Termination Date and the Term Loan Maturity Date.

(f) Xerium agrees to pay to the Issuing Bank, with respect to drawings honored under any Revolving Letter of Credit, interest on the amount paid by the Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of Xerium at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Revolving Loans that are LIBOR Loans, or ABR Loans, and (ii) thereafter, to the extent permitted by applicable law, a rate which is 2% per annum in excess of the rate of interest otherwise payable hereunder with respect to Revolving Loans that are LIBOR Loans or ABR Loans.

(g) Interest payable pursuant to Section 2.8(f) shall be computed on the basis of a 365/366 day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Revolving Letter of Credit is reimbursed in full. Promptly upon receipt by the Issuing Bank of any payment of interest pursuant to Section 2.8(f), the Issuing Bank shall distribute to each Revolving Bank, out of the interest received by the Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which the Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Revolving Loans), the amount that such Revolving Bank would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Revolving Letter of Credit for such period if no drawing had been honored under such Revolving Letter of Credit. In the event the Issuing Bank shall have been reimbursed (other than with the proceeds of a Revolving Loan) by Revolving Banks for all or any portion of such honored drawing, Issuing Bank shall distribute to each Revolving Bank which has paid all amounts payable by it under Section 2.4(f) with respect to such honored drawing such Revolving Bank's Pro Rata Share of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by Revolving Banks for the period from the date on which the Issuing Bank was so reimbursed by Revolving Banks to but excluding the date on which such portion of such honored drawing is reimbursed by the applicable Borrower.

NY3 - 504826.09

(h) For purposes of disclosure pursuant to the Interest Act (Canada), the annual rates of interest or fees to which the rates of interest or fees provided in this Agreement and the other Credit Documents (and stated herein or therein, as applicable, to be computed on the basis of a three hundred sixty (360) day year or any other period of time less than a calendar year) are equivalent to the rates so determined multiplied by the actual number of days in the applicable calendar year and divided by three hundred sixty (360) or such other period of time, respectively.

(i) If any provision of this Agreement or any other Credit Document would obligate Xerium Canada to make any payment of interest or other amount payable to (including for the account of) any Bank in an amount, or calculated at a rate, that would be prohibited by law or would result in a receipt by such Bank of interest at a criminal rate (as such terms are construed under the Criminal Code (Canada)) then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by such Bank of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (A) first, by reducing the amount or rate of interest required to be paid to such Bank; and (B) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to such Bank that would constitute interest for purposes of Section 347 of the Criminal Code (Canada). Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if a Bank shall have received an amount in excess of the maximum amount permitted by that section of the Criminal Code (Canada), then Xerium Canada shall be entitled, by notice in writing to such Bank, to obtain reimbursement from such Bank in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by such Bank to Xerium Canada. Any amount or rate of interest referred to in this section with respect to the Non-US Obligations shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the Non-US Obligations remain outstanding on the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the Criminal Code (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the Revolving Commitment Period and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by Agent shall be conclusive for the purposes of such determination.

(j) Notwithstanding any provision to the contrary contained in this Agreement, in no event shall the aggregate "interest" (as defined in Section 347 of the Criminal Code, Revised Statutes of Canada, 1985, c. 46 as the same may be amended, replaced or re-enacted from time to time) payable under this Agreement exceed the effective annual rate of interest on the "credit advanced" (as defined in that section) under this Agreement lawfully permitted under that section and, if any payment, collection or demand pursuant to this Agreement in respect of

"interest" (as defined in that section) is determined to be contrary to the provisions of that section, such payment, collection or demand shall be deemed to have been made by mutual mistake of Xerium Canada and the Banks and the amount of such payment or collection shall be refunded to Xerium Canada. For the purposes of this Agreement, the effective annual rate of interest shall be determined in accordance with generally accepted actuarial practices and principles over the term of a Loan made to Xerium Canada on the basis of annual compounding of the lawfully permitted rate of interest and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent will be conclusive for the purposes of such determination.

(k) Notwithstanding any other provisions contained herein, if the remuneration stated to be applicable under this Agreement would cause a breach of Law n. 108/1996 and Law n. 24/2001 ("**Italian Usury Law**"), then the remuneration payable by any Borrower organized under the laws of the Republic of Italy under this Agreement (including fees and expenses which would be considered as interest for the purpose of Italian Usury Law) shall be capped to the maximum rate permitted to be payable under Italian Usury Law.

2.9 **Conversion/Continuation**.

(a) Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, each Borrower shall have the option:

(i) to convert at any time all or any part of any Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a LIBOR Loan may only be converted on the expiration of the Interest Period applicable to such LIBOR Loan unless the Borrower shall pay all amounts due under Section 2.15 in connection with any such conversion; or

(ii) upon the expiration of any Interest Period applicable to any LIBOR Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount as a LIBOR Loan.

(b) Such Borrower shall deliver a Conversion/Continuation Notice to the Administrative Agent no later than noon (New York City time) on the date of the proposed conversion date (in the case of a conversion to an ABR Loan) and at least three (3) Business Days in advance of the proposed Conversion/Continuation Date (in the case of a conversion to, or a continuation of, a LIBOR Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any LIBOR Loans (or telephonic notice in lieu thereof) shall be irrevocable and such Borrower shall be bound to effect a conversion or continuation in accordance therewith.

54

(c) Notwithstanding anything to the contrary in the foregoing, no conversion in whole or in part to a LIBOR Loan shall be permitted at any time at which (i) a Default or Event of Default shall have occurred and be continuing or (ii) the continuation of, or conversion into, a LIBOR Loan would violate any provision of Sections 2.15 or 2.16.

(d) If a Default or Event of Default shall have occurred and be continuing, LIBOR Loans shall automatically convert to ABR Loans upon the expiration of the Interest Period applicable thereto.

2.10 **Default Interest**.  Notwithstanding anything to the contrary in Section 2.9, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand, at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable under this Agreement for ABR Loans).  Payment or acceptance of the increased rates of interest provided for in this Section 2.10 is not a permitted alternative to timely payment and shall not constitute a waiver of any Default or Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Bank.

2.11 **Fees**

(a) The Borrowers agree to pay to Banks having:

(i) Revolving Exposure (A) commitment fees equal to (1) the average daily Unused Revolving Commitment times (2) the Applicable Revolving Commitment Fee Percentage; (B) letter of credit fees equal to (1) the Applicable Margin for Revolving Loans that are LIBOR Loans, times (2) the average aggregate daily maximum amount available to be drawn under all such Letters of Credit (regardless of whether any conditions for drawing could then be met and determined as of the close of business on any date of determination) and (C) an upfront fee equal to 2.00% times the aggregate amount of the Revolving Commitments;

(ii) Term Loan Exposure an upfront fee equal to 1.50% times the aggregate amount of the Term Loan Commitments; and

(iii) All fees referred to in this Section 2.11(a) shall be paid in Cash in Dollars to the Administrative Agent at its Principal Office and upon receipt, the Administrative Agent shall promptly distribute to each Revolving Bank (in the case of the fees set forth in Section 2.11(a)(i)) and to each Term Loan

Bank (in the case of the fees set forth in Section 2.11(a)(ii) its Pro Rata Share thereof.

(b) The Borrower agrees to pay directly to the Issuing Bank, for its own account, the following fees:

(i) a fronting fee equal to 0.25%, per annum, times the average aggregate daily amount available to be drawn under all Letters of Credit (determined as of the close of business on any date of determination); and

(ii) such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(c) The fees referred to in Section 2.11(a)(i)(A), 2.11(a)(i)(B) and in 2.11(b)(i) shall be calculated on the basis of a 360 day year and the actual number of days elapsed and shall be payable in arrears on the 15th day of each March, June, September and December during the Revolving Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Termination Date. The fees referred to in Sections 2.11(a)(i)(C) and 2.11(a)(ii) shall be payable on the Closing Date.

(d) In addition to any of the foregoing fees, the Borrower agrees to pay to the Agents and the Lead Arranger such other fees in the amounts and at the times separately agreed upon.

2.12 **Scheduled Payments**. Each Borrower shall make principal payments on its respective Term Loans in installments in amounts as set forth below and on the dates set forth below:

| Borrower:<br>Payment Date:[1] | **Xerium** | **XTI** | **Germany Holdings** | **Huyck Austria** | **Italia SpA** | **Xerium Canada** |
|---|---|---|---|---|---|---|
| 09/15/2010 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 12/15/2010 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

---

[1] 1.00% annual amortization on the Term Loans, with the balance paid on the Term Loan Maturity Date. Amounts and final payment date to be inserted prior to Closing Date, once the Closing Date is determined.

| | | | | | | |
|---|---|---|---|---|---|---|
| 03/15/2011 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 06/15/2011 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 09/15/2011 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 12/15/2011 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 03/15/2012 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 06/15/2012 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 09/15/2012 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 12/15/2012 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 03/15/2013 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 06/15/2013 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 09/15/2013 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 12/15/2013 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 03/15/2014 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 06/15/2014 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 09/15/2014 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |
| 12/15/2014 | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

All scheduled payments required to be made pursuant to this Section 2.12 shall be applied in accordance with Section 2.15(d).

2.13 **Voluntary Prepayments/Commitment Reductions**.

(a) <u>Voluntary Prepayments</u>.

(i) Any time and from time to time, each Borrower may prepay any Loans on any Business Day in whole or in part in an aggregate minimum principal amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii) All such prepayments shall be made upon not less than three (3) Business Days' prior written or telephonic notice (in the case of LIBOR Loans) or upon not less than one Business Days' prior written or telephonic notice (in the case of ABR Loans), in each case given to the Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to the Administrative Agent (and the Administrative Agent will promptly transmit such telephonic or original notice by telefacsimile or telephone to each Bank). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.15(a).

(b) <u>Voluntary Commitment Reductions</u>.

(i) Xerium may, upon not less than three (3) Business Days' prior written or telephonic notice confirmed in writing to the Administrative Agent (which original written or telephonic notice the Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Bank), at

57

any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the outstanding principal amount of the Revolving Loans at the time of such proposed termination or reduction; provided, any such partial reduction of the Revolving Commitments shall be in an aggregate minimum principal amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii) Xerium's notice to the Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in Xerium's notice and shall reduce the applicable Revolving Commitment of each Bank proportionately to its Pro Rata Share thereof.

2.14 **Mandatory Prepayments/Commitment Reductions**.

(a) <u>Asset Sales</u>. Subject to the sharing provisions set forth in Section 4.1(b) of the Intercreditor Agreement, no later than the fifth Business Day following the date of receipt by Xerium or any of its Subsidiaries of aggregate Net Asset Sale Proceeds in excess of $250,000, each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an amount of such Net Asset Sale Proceeds; <u>provided</u> that, subject to the sharing provisions set forth in Section 4.1(b) of the Intercreditor Agreement, with respect to the Australia Asset Sales and the Vietnam Asset Sales, each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced in an aggregate amount equal to only 50% of such Net Asset Sale Proceeds; <u>provided</u> <u>further</u>, so long as no Default or Event of Default shall have occurred and be continuing, the Borrowers shall have the option, directly or through one or more of its Subsidiaries, to invest up to $3,000,000 in the aggregate of Net Asset Sale Proceeds of Asset Sales (excluding Australia Asset Sales and Vietnam Asset Sales) consummated after the Closing Date, in one transaction or a series of transactions, within three hundred and sixty (360) days of receipt thereof in long term productive assets of the general type used in the business of Xerium and its Subsidiaries, which assets need not be of the same type as the assets sold or otherwise disposed of to generate such Net Asset Sale Proceeds; <u>provided</u>, <u>further</u>, pending any such investment all such Net Asset Sale Proceeds shall be deposited in the Cash Collateral Account.

(b) <u>Insurance/Condemnation Proceeds</u>. Subject to the sharing provisions set forth in Section 4.1(b) of the Intercreditor Agreement, no later than the second Business Day following the date of receipt by Xerium or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds (but not including the first $2,000,000 of Net Insurance/Condemnation Proceeds in the aggregate received after the Closing Date), each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate

58

amount equal to such Net Insurance/Condemnation Proceeds; _provided_, so long as no Default or Event of Default shall have occurred and be continuing, each Borrower shall have the option, directly or through one or more of its Subsidiaries to commit to invest within one hundred eighty (180) days and invest such Net Insurance/Condemnation Proceeds within three hundred sixty (360) days of receipt thereof in the acquisition of long term productive assets of the general type used in the business of Xerium and its Subsidiaries, which assets need not be the same as the assets lost or damaged and which Net Insurance/Condemnation Proceeds may, but need not, be invested in the repair, restoration or replacement of the applicable assets thereof; _provided_ _further_, pending any such investment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be deposited in the Cash Collateral Account.

(c) _Revolving Loans_.  Xerium shall from time to time prepay the Revolving Loans to the extent necessary so that the Total Utilization of Revolving Commitments shall not at any time exceed the Revolving Commitments then in effect.

(d) _Issuance of Debt_.  No later than the second Business Day following the date of receipt by Xerium or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Xerium or any of its Subsidiaries not permitted pursuant to Section 6.1, each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e) _Excess Cash_.  Subject to the sharing provisions of Section 4.1(b) of the Intercreditor Agreement in the event that there shall be Excess Cash for any Fiscal Year (commencing with Fiscal Year 2011), each Borrower shall, no later than 90 days after the end of such Fiscal Year, prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to the remainder of (i) 50% of such Excess Cash for such Fiscal Year minus (ii) the amount of voluntary prepayments of the Term Loan during such Fiscal Year and the amount of voluntary prepayments of Revolving Loans which are accompanied by a reduction of the Revolving Commitments during such Fiscal Year.

(f) _Prepayment Certificate_.  Concurrently with any prepayment of the Loans and/or the Revolving Commitments shall be permanently reduced pursuant to Sections 2.14(a) through 2.14(e), each Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds or Excess Cash, as the case may be; _provided_, if such officer's certificate is subsequently determined to be inaccurate, such Authorized Officer (or such Authorized Officer's successor) must deliver a new certificate setting forth in detail the adjustments necessary to make the prior certificate accurate in all respects.  In the event that a Borrower

59

shall subsequently determine that the actual amount exceeded the amount set forth in such certificate, each Borrower shall promptly make an additional prepayment of the Loans and/or the Revolving Commitments shall be permanently reduced in an amount equal to such excess, and such Borrower shall concurrently therewith deliver to Administrative Agent the certificate as set forth above in this Section 2.14(f).

(g) <u>Notification of Mandatory Prepayment</u>.  Xerium shall notify the Administrative Agent of the amount and date of any mandatory prepayment not less than five (5) Business Days prior to the date of such mandatory prepayment, in accordance with Section 2.15(c).

## 2.15 **Application of Prepayments/Reductions/Scheduled Payments.**

(a) <u>Application of Voluntary Prepayments</u>.  Any prepayment of any Loan pursuant to Section 2.13(a) shall be applied, at a Borrower's sole discretion, to prepay Revolving Loans or the Term Loans on a <u>pro rata</u> basis (in accordance with the respective outstanding principal amounts thereof).

(b) <u>Application of Mandatory Prepayments</u>.  Any amount required to be paid pursuant to Sections 2.14(a), (b), (d) and (e) shall be applied as follows:

*first*, to prepay the Term Loans on a <u>pro rata</u> basis (in accordance with the respective outstanding principal amounts thereof) to the full extent thereof;

*second*, to prepay the Revolving Loans on a <u>pro rata</u> basis to the full extent thereof and to further permanently reduce the Revolving Commitments by the amount of such prepayment; and

*third*, to further permanently reduce the Revolving Commitments to the full extent thereof.

(c) <u>Waivable Mandatory Prepayment</u>.  Anything contained herein to the contrary notwithstanding, so long as any Term Loans are outstanding, in the event a Borrower is required to make any mandatory prepayment (a "**Waivable Mandatory Prepayment**") of the Term Loans, not less than five (5) Business Days prior to the date (the "**Required Prepayment Date**") on which such Borrower is required to make such Waivable Mandatory Prepayment, such Borrower shall notify Administrative Agent of the amount and date of such prepayment, and Administrative Agent will promptly thereafter notify each Bank holding an outstanding Term Loan of the amount of such Bank's Pro Rata Share of such Waivable Mandatory Prepayment and such Bank's option to refuse such amount.  Each such Bank may exercise such option by giving written notice to such Borrower and Administrative Agent of its election to do so on or before the first Business Day prior to the Required Prepayment Date (it being understood that any Bank which does not notify such Borrower and Administrative Agent of its election to exercise such option on or before the first Business Day prior to the

Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Required Prepayment Date, such Borrower shall pay to Administrative Agent the amount of the Waivable Mandatory Prepayment, which amount shall be applied in accordance with Section 2.15(b) (except prepayments of the Term Loans shall only be applied to the Term Loans of such Banks that have elected not to exercise such option).

(d) <u>Application of Scheduled Payments</u>. Any amount required to be paid pursuant to Section 2.12 shall be applied to pay the applicable Term Loans, on a <u>pro rata</u> basis (in accordance with the respective outstanding principal amounts thereof).

2.16 **General Provisions Regarding Payments**.

(a) Except as otherwise provided in Section 2.20, all payments by each Borrower of principal, interest, fees and other Obligations shall be made in Dollars and in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at the Administrative Agent's Principal Office for the account of the Banks; funds received by the Administrative Agent after that time on such due date shall be deemed to have been paid by such Borrower on the next succeeding Business Day.

(b) All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

(c) The Administrative Agent shall promptly distribute to each Bank at such address as such Bank shall indicate in writing, such Bank's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by the Administrative Agent.

(d) Subject to the provisos set forth in the definition of "Interest Period", whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

(e) Each Borrower hereby authorizes the Administrative Agent to charge such Borrower's accounts with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

NY3 - 504826.09

(f) The Administrative Agent shall deem any payment by or on behalf of each Borrower hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by the Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. The Administrative Agent shall give prompt telephonic notice to such Borrower and each applicable Bank (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.10 from the date such amount was due and payable until the date such amount is paid in full.

(g) If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1, all payments or proceeds received by any Agents hereunder in respect of any of the Obligations (except as expressly provided elsewhere in a Credit Document), shall be forwarded to the Administrative Agent and applied in full or in part by the Administrative Agent against, the Obligations in the following order of priority: _first_, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to the Administrative Agent and Collateral Agent and their agents and counsel, and all other expenses, liabilities and advances made or incurred by the Administrative Agent or Collateral Agent in connection therewith, and all amounts for which the Administrative Agent or Collateral Agent is entitled to indemnification hereunder (each in its capacity as the Administrative Agent or Collateral Agent, and not as a Bank) and all advances made by the Administrative Agent or Collateral Agent hereunder for the account of the applicable Credit Party, and to the payment of all costs and expenses paid or incurred by the Administrative Agent or Collateral Agent in connection with the exercise of any right or remedy hereunder or under any Credit Document, all in accordance with the terms hereof or thereof; _second_, to the extent of any excess of such proceeds, to the payment of all other Obligations for the ratable benefit of the Banks and the Bank Counterparties; and _third_, to the extent of any excess of such proceeds, to the payment to or upon the order of such Credit Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

2.17 **Ratable Sharing**. The Banks hereby agree among themselves that, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under

the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to such Bank hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Bank) which is greater than the proportion received by any other Bank in respect of the Aggregate Amounts Due to such other Bank, then the Bank receiving such proportionately greater payment shall (a) notify the Administrative Agent and each other Bank of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Banks so that all such recoveries of Aggregate Amounts Due shall be shared by all Banks in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Bank is thereafter recovered from such Bank upon the bankruptcy or reorganization of such Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Bank ratably to the extent of such recovery, but without interest.  Each Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by each Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

### 2.18 **Making or Maintaining LIBOR Loans.**

(a) <u>Inability to Determine Applicable Interest Rate</u>.  In the event that the Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Loans, that by reasons of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Loans on the basis provided for in the definition of LIBOR Rate, the Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to such Borrower and each Bank of such determination, whereupon (i) no Loans may be made as, or converted to, LIBOR Loans until such time as the Administrative Agent notifies such Borrower and Banks that the circumstances giving rise to such notice no longer exist, (ii) any Funding Notice or Conversion/Continuation Notice given by such Borrower with respect to the LIBOR Loans in respect of which such determination was made shall be deemed to be rescinded by such Borrower and (iii) the interest rate applicable to such LIBOR Loans shall be the Alternate Base Rate until such time as the Administrative Agent notifies such Borrower and Banks that the circumstances giving rise to such notice no longer exist.

(b) <u>Illegality or Impracticability of LIBOR Loans</u>.  In the event that on any date any Bank shall have determined (which determination shall be

final and conclusive and binding upon all parties hereto but shall be made only after consultation with such Borrower and the Administrative Agent) that the making, maintaining or continuation of all or any of its Loans, (i) has become unlawful as a result of compliance by such Bank in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Bank in that market, then, and in any such event, such Bank shall be an "**Affected Bank**" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to each Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Bank). Thereafter (1) the Revolving Commitments and obligation of the Affected Bank to make or maintain Loans as, or to convert Loans to, LIBOR Loans shall be suspended until such notice shall be withdrawn by the Affected Bank, (2) to the extent such determination by the Affected Bank relates to a LIBOR Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Bank shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) an ABR Loan, (3) the Affected Bank's obligation to maintain its outstanding LIBOR Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the interest rate applicable to such Affected Loans shall be the Alternate Base Rate, provided the Affected Bank shall make commercially reasonable efforts to assign the Affected Loans according to Section 10.7. Notwithstanding the foregoing, to the extent a determination by an Affected Bank as described above relates to a LIBOR Loan then being requested by a Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, such Borrower shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Banks by giving notice (by telefacsimile or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Bank gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Bank). Except as provided in the immediately preceding sentence, nothing in this Section 2.18(b) shall affect the obligation of any Bank other than an Affected Bank to make or maintain Loans as, or to convert Loans to, LIBOR Loans in accordance with the terms hereof.

(c) Compensation for Breakage or Non-Commencement of Interest Periods. Each Borrower shall compensate each Bank, upon written request by such Bank to the Administrative Agent within five (5) Business Days after the applicable event (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Bank to banks of funds borrowed by it to make or carry its LIBOR Loans and any loss, expense or liability sustained by such Bank in connection

with the liquidation or re employment of such funds but excluding loss of anticipated profits) which such Bank may sustain: (i) if for any reason (other than a default by such Bank) a borrowing of any LIBOR Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing or a conversion or continuation of any LIBOR Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any conversion or any prepayment or other principal payment occurs on a date prior to the last day of an Interest Period applicable to that LIBOR Loan (including, without limitation, pursuant to Section 2.18(b) hereof); or (iii) if any prepayment of any of its LIBOR Loans is not made on any date specified in a notice of prepayment given by such Borrower.

(d) <u>Booking of LIBOR Loans</u>.  Any Bank may make, carry or transfer LIBOR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Bank.

(e) <u>Assumptions Concerning Funding of LIBOR Loans</u>. Calculation of all amounts payable to a Bank under this Section 2.18 and under Section 2.19 shall be made as though such Bank had actually funded each of its relevant LIBOR Loans through the purchase of a LIBOR deposit bearing interest at the rate in an amount equal to the amount of such LIBOR Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such LIBOR deposit from an offshore office of such Bank to a domestic office of such Bank in the United States of America; provided, however, each Bank may fund each of its LIBOR Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.18 and under Section 2.19.

## 2.19 **Increased Costs; Capital Adequacy**.

(a) <u>Compensation For Increased Costs and Taxes</u>.  Subject to the provisions of Section 2.20 (which shall be controlling with respect to the matters covered thereby), in the event that any Bank (which term shall include the Issuing Bank for purposes of this Section 2.19(a)) shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Bank with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi governmental authority (whether or not having the force of law): (i) subjects such Bank (or its applicable lending office) to any additional Tax (other than (A) any Tax on the overall net income of such Bank or its applicable lending office or (B) any Tax imposed as a result of the Administrative Agent's or any Bank's (including the Issuing Bank's)

failure to satisfy the applicable requirements as set forth in any statute enacted (or regulation or administrative guidance promulgated thereunder) after the date hereof that is based on, or similar to, Subtitle A - Foreign Account Tax Compliance of H.R. 2847, as passed by the United States House of Representatives on March 4, 2010 ((A) and (B), collectively, "**Excluded Taxes**")) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Bank (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Bank (other than any such reserve or other requirements with respect to LIBOR Loans); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Bank (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Bank of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Bank (or its applicable lending office) with respect thereto; then, in any such case, such Borrower shall promptly pay to such Bank, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Bank in its sole discretion shall determine) as may be necessary to compensate such Bank for any such increased cost or reduction in amounts received or receivable hereunder. Such Bank shall deliver to such Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Bank under this Section 2.19(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b) <u>Capital Adequacy Adjustment</u>. In the event that any Bank (which term shall include the Issuing Bank for purposes of this Section 2.19(b)) shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Bank (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Bank or any corporation controlling such Bank as a consequence of, or with reference to, such Bank's Loans or Revolving Commitments or Letters of Credit, or participations therein or other obligations hereunder with respect to the Loans or the Letters of Credit to a level below that which such Bank or such controlling corporation could have achieved but for such adoption, effectiveness, phase in,

applicability, change or compliance (taking into consideration the policies of such Bank or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by such Borrower from such Bank of the statement referred to in the next sentence, such Borrower shall pay to such Bank such additional amount or amounts as will compensate such Bank or such controlling corporation on an after tax basis for such reduction. Such Bank shall deliver to such Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Bank under this Section 2.19(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

2.20 **Taxes; Withholding, etc**.

(a) <u>Payments to Be Free and Clear</u>. All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than any Excluded Taxes) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment (such Taxes, "**Indemnified Taxes**").

(b) <u>Withholding of Taxes</u>. If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any Tax from any sum paid or payable by any Credit Party to the Administrative Agent or any Bank (which term shall include the Issuing Bank for purposes of this Section 2.20(b)) under any of the Credit Documents: (i) each Borrower shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as each Borrower becomes aware of it; (ii) each Borrower shall pay to the appropriate taxing or other authority any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on the Administrative Agent or such Bank, as the case may be) on behalf of and in the name of the Administrative Agent or such Bank; (iii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, (including deductions, withholdings or payments applicable to additional sums payable under this Section 2.20(b)) the Administrative Agent or such Bank, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made in respect of Indemnified Taxes; and (iv) within thirty days after paying any sum from which it is required by law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay, each Credit Party shall deliver to

67

the Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.  Each Credit Party shall indemnify the Administrative Agent, each Bank and the Issuing Bank, within 10 days after written demand therefor, which demand shall identify in reasonable detail the nature and amount of such Indemnified Taxes (and provide such other evidence thereof as has been received by the Administrative Agent, such Bank or the Issuing Bank, as the case may be), for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Bank or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of such Credit Party hereunder and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to a Credit Party by a Bank or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Bank or the Issuing Bank, shall be conclusive absent manifest error.

(c) Evidence of Exemption From U.S. Withholding Tax.  Each Bank that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-US Bank**") shall deliver to the Administrative Agent for transmission to Xerium, on or prior to the Closing Date (in the case of each Bank listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Bank (in the case of each other Bank), and at such other times as may be necessary in the determination of Xerium or the Administrative Agent (each in the reasonable exercise of its discretion), (i) two original copies of Internal Revenue Service Form W-8BEN or W-8ECI (or any successor forms), properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by Xerium to establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Bank is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver Internal Revenue Service Form W-8ECI pursuant to clause (i) above, a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by each Borrower to establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents.  Each Bank that is a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**US Bank**") shall deliver to the Administrative Agent for transmission to Xerium, on or prior to the Closing Date (in the case of each Bank

listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Bank (in the case of each other Bank), and at such times as may be necessary in the determination of Xerium or the Administrative Agent (each in the reasonable exercise of its discretion), such other form or forms, certificates or documentation, including two original copies of Internal Revenue Service Form W-9, as reasonably requested by any Borrower to confirm or establish that such Bank is not subject to deduction, withholding, or backup withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents. Each Bank required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.20(c) hereby agrees, from time to time after the initial delivery by such Bank of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Bank shall promptly deliver to the Administrative Agent for transmission to each Borrower two new original copies of Internal Revenue Service Form W-8BEN or W-8ECI, or a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN (or any successor form), or two new original copies of Internal Revenue Service Form W-9, as the case may be, properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by any Borrower to confirm or establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to payments to such Bank under the Credit Documents, or notify the Administrative Agent and each Borrower of its inability to deliver any such forms, certificates or other evidence. Each Borrower shall not be required to pay any additional amount to any Non-US Bank under Section 2.20(b) if such Bank shall have failed (1) to deliver the forms, certificates or other evidence referred to in the first three sentences of this Section 2.20(c), or (2) to notify the Administrative Agent and each Borrower of its inability to deliver any such forms, certificates or other evidence, as the case may be; provided, if such Bank shall have satisfied the requirements of the first sentence of this Section 2.20(c) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Bank, as applicable, nothing in this last sentence of Section 2.20(c) shall relieve each Borrower of its obligation to pay any additional amounts pursuant to this Section 2.20 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Bank is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Bank is not subject to withholding as described herein.

(d) <u>Withholding or Deduction for or on Account of Non-US Tax</u>. A Credit Party shall not be required to pay any additional amount under Section 2.20(b) if, on the date on which the payment falls due (i) the payment could have been made to the relevant Bank without deduction or withholding for

or on account of any Tax imposed by any jurisdiction other than the United States ("**Non-US Tax**") if that Bank was a Qualifying Lender but on that date that Bank is not or has ceased to be a Qualifying Lender (other than where such Bank was a Qualifying Lender on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Bank, as applicable, and has ceased to be a Qualifying Lender as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof);  (ii) the relevant Bank is a Treaty Lender and the payment could have been made to the Bank without deduction or withholding for or on account of Non-US Tax had that Bank complied with its obligations under Section 2.20(e) below; or (iii) the relevant Bank is a 991 Bank and has not given a Tax Confirmation to the Administrative Agent (other than by reason of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof after the Closing Date or the date of the Assignment Agreement pursuant to which the relevant Bank became a Bank, as applicable). The provisions of this Section 2.20(d) are subject always to the proviso contained in Section 2.20(c) above.

(e) <u>Completion of Procedural Formalities</u>.  A Treaty Lender and each Credit Party which makes a payment to which that Treaty Lender is entitled shall co-operate in completing as soon as reasonably practicable after the Closing Date (or the date of the Assignment Agreement pursuant to which the relevant Bank becomes a Bank, as applicable) any procedural formalities necessary for that Credit Party to obtain authorization to make that payment without deduction or withholding for or on account of Non-US Tax (including for the avoidance of doubt the completion and submission to the Tax authority in the relevant Treaty Lender's country of incorporation (or, if different, its country of residence for the purposes of the relevant double taxation agreement) of appropriate forms and documents that are provided to it by the relevant Credit Party).

(f) <u>Change in Circumstance</u>.  A Bank that is a 991 Bank shall promptly notify the Administrative Agent if there is any change in the position from that set out in the Tax Confirmation.

(g) <u>Certain Documents</u>.  If any Tax was not correctly or legally asserted, the relevant Bank(s) shall, upon Xerium's reasonable request and at the expense of Xerium, provide such documents to Xerium to enable Xerium to contest such Tax pursuant to appropriate proceedings then available to the relevant Bank(s) (so long as providing such documents shall not, in the good faith determination of the relevant Bank(s) result in any liability to the relevant Bank(s) and doing so is otherwise permitted under applicable law as determined by the relevant Bank(s)).

(h) <u>Withholdings for Certain German Taxes</u>.  The provisions of Section 2.20(a) through (g) shall, in addition to all other deductions and withholdings on account of any German Taxes, also apply to deductions and

withholdings that are to be made by a Credit Party with respect to any sums payable under the Credit Documents that constitute deemed distributions by a Credit Party.  As among the Credit Parties on the one hand and the Administrative Agent and the Banks on the other hand, the Credit Parties shall be responsible for, and effect, the payment of these deductions and withholdings and indemnify the Administrative Agent and the Banks against any sums paid or damages incurred as a result of being required to make the respective payments; Section 2.20(b) shall in such event apply, *mutatis mutandis*.

2.21 **Obligation to Mitigate**.  Each Bank (which term shall include Issuing Bank for purposes of this Section 2.21) agrees that, as promptly as practicable after the officer of such Bank responsible for administering its Loans or Letters of Credit, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would cause such Bank to become an Affected Bank or that would entitle such Bank to receive payments under Sections 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Bank and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Bank, or (b) take such other measures as such Bank may deem reasonable, if as a result thereof the circumstances which would cause such Bank to be an Affected Bank would cease to exist or the additional amounts which would otherwise be required to be paid to such Bank pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Bank in its sole discretion, the making, issuing, funding or maintaining of such Revolving Commitments, Loans or Letters of Credit through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Revolving Commitments, Loans or Letters of Credit or the interests of such Bank; provided, such Bank will not be obligated to utilize such other office pursuant to this Section 2.21 unless each Borrower agrees to pay all incremental expenses incurred by such Bank as a result of utilizing such other office as described in clause (a) above.  A certificate as to the amount of any such expenses payable by each Borrower pursuant to this Section 2.21 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Bank to such Borrower (with a copy to the Administrative Agent) shall be conclusive absent manifest error.

2.22 **Tax Credit**.  If a Credit Party pays any additional amount under Section 2.20(b) and the relevant Bank (or the Administrative Agent, as the case may be) determines in its sole discretion that (a) a Tax Credit is attributable either to an increased payment of which that additional amount forms part, or to that additional amount and (b) that Bank (or the Administrative Agent, as the case may be) has obtained, utilized and retained that Tax Credit, the Bank (or the Administrative Agent, as the case may be) shall, to the extent that it can do so without prejudice to the retention of the Tax Credit, pay an amount to the Credit Party which that Credit Party determines in its absolute discretion but in good faith will leave it (after that payment) in the same after-Tax position as it would have been in had the additional amount not been required to be paid by the Credit

Party.  Nothing herein contained shall interfere with the right of any Bank (or the Administrative Agent, as the case may be) to arrange its affairs in whatever manner it thinks fit and, in particular, no Bank (or the Administrative Agent, as the case may be) shall be under any obligation to claim a Tax Credit on its corporate profits or otherwise, or to claim such relief in priority to any other claims, reliefs, credits or deductions available to it or to disclose details of its affairs.  Any amount to be paid by a bank pursuant to this Section 2.22 shall be made promptly on the date of receipt of the relevant Tax Credit by such Bank(or the Administrative Agent, as the case may be) or, if later, on the last date on which the applicable taxation authority would be able in accordance with applicable law to reclaim or reduce such Tax Credit.

### 2.23 **Defaulting Banks**

(a) <u>Effect on Letter of Credit Exposure</u>.  If a Bank becomes, and during the period it remains, a Defaulting Bank, the following provisions shall apply with respect to such Defaulting Bank's Letter of Credit Exposure:

(i) subject to the limitation in the first proviso below, the Letter of Credit Exposure of such Defaulting Bank shall automatically be reallocated (effective on the day such Bank becomes a Defaulting Bank) among the Non-Defaulting Bank's pro rata in accordance with their respective Revolving Commitments; provided that (A) the sum of (x) the amount of each Defaulting Bank's pro rata share of such Defaulting Bank's Letter of Credit Exposure, plus (y) the principal amount of such Non-Defaulting Bank's outstanding Revolving Loans at the time of such reallocation, plus (z) such Non-Defaulting Bank's Pro Rata Share of the Letter of Credit Exposure as in effect immediately prior to such reallocation may not exceed the Revolving Commitment of such Non-Defaulting Bank as in effect at the time of such reallocation, and (B) neither such reallocation nor any payment by a Non-Defaulting Bank pursuant thereto will constitute a waiver or release of any claim the Borrowers, the Administrative Agent, the Issuing Bank or any other Bank may have against such Defaulting Bank or cause such Defaulting Bank to be a Non-Defaulting Bank;

(ii) to the extent that any portion of such Defaulting Bank's Letter of Credit Exposure cannot be so reallocated (the "**Unreallocated Portion**"), whether by reason of the first proviso in clause (i) above or otherwise, the Borrowers will, not later than two (2) Business Days after demand by the Administrative Agent (at the direction of the Issuing Bank) (A) Cash Collateralize the obligations of the Borrowers to the Issuing Bank in respect of such Letter of Credit Exposure in an amount at least equal to the aggregate amount of the Unreallocated Portion of such Letter of Credit Exposure, or (B) make other arrangements satisfactory to the Administrative Agent and to the Issuing Bank in their sole discretion to protect them against the risk of non-payment by such Defaulting Bank; and

(iii) any amount paid by the Borrowers for the account of a Defaulting Bank under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Bank, but will instead be retained by the Administrative Agent in a segregated, non-interest bearing account until (subject to Section 2.23(e)) the termination of the Revolving Commitments and payment in full of all Secured Obligations, and will be applied by the Administrative Agent, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority: first, to the payment of any amounts owing by such Defaulting Bank to the Administrative Agent under this Agreement; second, to the payment of any amounts owing by such Defaulting Bank to the Issuing Bank under this Agreement (ratably in accordance with the amounts owing to the Issuing Bank); third, to the payment of post-default interest and then current interest due and payable to the Non-Defaulting Banks, ratably among them in accordance with the amounts of such interest then due and payable to them; fourth, to the payment of fees then due and payable to the Non-Defaulting Banks hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them; fifth, to pay principal and Unpaid Drawings under Revolving Letters of Credit honored by the Issuing Bank then due and payable to the Non-Defaulting Banks hereunder ratably in accordance with the amounts thereof then due and payable to them; sixth, to the ratable payment of other amounts then due and payable to the Non-Defaulting Banks; and seventh, after the termination of the Revolving Commitments and payment in full of all Revolving Loans or any other Obligations of any Loan Party under the Credit Documents, to pay amounts owing under this Agreement to such Defaulting Bank or as a court of competent jurisdiction may otherwise direct.

(b) <u>Authorization to Give Funding Notices</u>.  In furtherance of the foregoing, if any Bank becomes, and during the period it remains, a Defaulting Bank or a Potential Defaulting Bank, the Issuing Bank is hereby authorized by the Borrowers (which authorization is irrevocable and coupled with an interest) to give, in its discretion, through the Administrative Agent, Funding Notices pursuant to Section 2.2(b) in such amounts and in such times as may be required to (i) reimburse amounts representing Unpaid Drawings under Revolving Letters of Credit honored by the Issuing Bank and/or (ii) Cash Collateralize the obligations of the Borrowers in respect of outstanding Revolving Letters of Credit in an amount at least equal to the aggregate amount of the obligations (contingent or otherwise) of such Defaulting Bank or Potential Defaulting Bank in respect of such Revolving Letters of Credit.

(c) <u>No Fees</u>.  Anything herein to the contrary notwithstanding, during such period as a Bank is a Defaulting Bank, such Defaulting Bank will not be entitled to any fees accruing during such period pursuant to Section 2.11(a)(i)(A) and 2.11(a)(i)(B) (without prejudice to the rights of the Banks other than Defaulting Banks in respect of such fees); provided that (a) to the extent that a portion of the Letter of Credit Exposure of such Defaulting Bank

is reallocated to the Non-Defaulting Banks pursuant to Section 2.23(a)(i), such fees that would have accrued for the benefit of such Defaulting Bank will instead accrue for the benefit of and be payable to such Non-Defaulting Banks, pro rata in accordance with their respective Revolving Commitments, and (b) to the extent any portion of such Letter of Credit Exposure cannot be so reallocated, such fees will instead accrue for the benefit of and be payable to the Issuing Bank as its interests appear (and the pro rata payment provisions of Section 2.17 will automatically be deemed adjusted to reflect the provisions of this Section).

(d) <u>Termination of Commitment</u>.  The Borrowers may terminate the unused amount of the Revolving Commitment of a Defaulting Bank upon not less than three (3) Business Days' prior notice to the Administrative Agent (which will promptly notify the Banks thereof), and in such event the provisions of Section 2.16(g) will apply to all amounts thereafter paid by the Borrowers for the account of such Defaulting Bank under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts); <u>provided</u> that such termination will not be deemed to be a waiver or release of any claim the Borrowers, the Administrative Agent, the Issuing Bank or any Bank may have against such Defaulting Bank.

(e) <u>Reinstatement</u>.  If the Borrowers, the Administrative Agent and the Issuing Bank agree in writing in their discretion that a Bank that is a Defaulting Bank or a Potential Defaulting Bank should no longer be deemed to be a Defaulting Bank or Potential Defaulting Bank, as the case may be, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Bank will, to the extent applicable, purchase such portion of outstanding Loans of the other Banks and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Exposure of the Banks to be based upon their respective Pro Rata Shares, whereupon such Bank will cease to be a Defaulting Bank or Potential Defaulting Bank and will be a Non-Defaulting Bank (and the Revolving Exposure will automatically be adjusted on a prospective basis to reflect the foregoing); <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Bank was a Defaulting Bank; and <u>provided</u> <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Bank or Potential Defaulting Bank to Non-Defaulting Bank will constitute a waiver or release of any claim of any party hereunder arising from such Bank's having been a Defaulting Bank or Potential Defaulting Bank.

2.24 **Removal or Replacement of a Bank**.  Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Bank (an "**Increased Cost Bank**") shall give notice to each Borrower that such Bank is an Affected Bank or that such Bank is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Bank to be an Affected Bank or which entitle such Bank to receive such payments shall remain

in effect, and (iii) such Bank shall fail to withdraw such notice within five Business Days after a Borrower's request for such withdrawal; (b) any Bank is a Defaulting Bank; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.6(b), the consent of Requisite Banks shall have been obtained but the consent of one or more of such other Banks (each a "**Non-Consenting Bank**") whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Bank, Defaulting Bank or Non-Consenting Bank (the "**Terminated Bank**"), a Borrower may, by giving written notice to Administrative Agent and any Terminated Bank of its election to do so, elect to cause such Terminated Bank (and such Terminated Bank hereby irrevocably agrees) to assign its outstanding Loans and its Commitments, if any, in full to one or more Eligible Assignees (each a "**Replacement Bank**") in accordance with the provisions of Section 10.6 and Xerium shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Bank shall pay to the Terminated Bank an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Bank, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Bank, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Bank pursuant to Section 2.11; (2) on the date of such assignment, each Borrower shall pay any amounts payable to such Terminated Bank pursuant to Section 2.18(c), 2.19 or 2.20 or otherwise as if it were a prepayment; and (3) in the event such Terminated Bank is a Non-Consenting Bank, each Replacement Bank shall consent, at the time of such assignment, to each matter in respect of which such Terminated Bank was a Non-Consenting Bank; provided, a Borrower may not make such election with respect to any Terminated Bank that is also the Issuing Bank unless, prior to the effectiveness of such election, the Borrower shall have caused each outstanding Letter of Credit issued thereby to be cancelled. Upon the prepayment of all amounts owing to any Terminated Bank and the termination of such Terminated Bank's Revolving Commitments, if any, such Terminated Bank shall no longer constitute a "Bank" for purposes hereof; provided, any rights of such Terminated Bank to indemnification hereunder shall survive as to such Terminated Bank.

2.25 Joint and Several Liability.

(a) Joint and Several Liability.  All Obligations of the Borrowers under this Agreement and the other Credit Documents shall be joint and several Obligations of each Borrower to the extent (i) legally permissible and (ii) local restrictions apply and provided that, without prejudice to the limitations set forth in Section 7.14, none of Italia SpA, Huyck Austria, Xerium Canada, Germany Holdings or any Non-US Guarantor shall be liable for any Obligations of any Borrower organized in the United States.  Anything contained in this Agreement and the other Credit Documents to the contrary notwithstanding, the Obligations of each Borrower hereunder shall be limited to a maximum aggregate amount

equal to the largest amount that would not render its Obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under § 548 of the Bankruptcy Code, 11 U.S.C. § 548, or any applicable provisions of comparable law of a Governmental Authority (collectively, the "**Fraudulent Transfer Laws**"), in each case after giving effect to all other liabilities of such Borrower, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such Borrower in respect of intercompany Indebtedness to any other Credit Party or Affiliates of any other Credit Party to the extent that such Indebtedness would be discharged in an amount equal to the amount paid by such Credit Party hereunder) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation or contribution of such Borrower pursuant to (i) applicable law or (ii) any agreement providing for an equitable allocation among such Borrower and other Affiliates of any Credit Party of Obligations arising under Guaranties by such parties.

(b) <u>Subrogation</u>.  Until the Obligations shall have been paid in full in Cash, each Borrower shall withhold exercise of any right of subrogation, contribution or any other right to enforce any remedy which it now has or may hereafter have against any other Borrower or any other guarantor of the Obligations.  Each Borrower further agrees that, to the extent the waiver of its rights of subrogation, contribution and remedies as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any such rights such Borrower may have against any other Borrower, any collateral or security or any such other guarantor, shall be junior and subordinate to any rights Collateral Agent may have against any such other Borrower, any such collateral or security, and any such other guarantor.  The Borrowers under this Agreement and the other Credit Documents together desire to allocate among themselves, in a fair and equitable manner, their Obligations arising under this Agreement and the other Credit Documents.  Accordingly, in the event any payment or distribution is made on any date by any Borrower under this Agreement and the other Credit Documents (a "**Funding Borrower**") that exceeds its Obligation Fair Share (as defined below) as of such date, that Funding Borrower shall be entitled to a contribution from each of the other Borrowers in the amount of such other Borrowers' Obligation Fair Share Shortfall (as defined below) as of such date, with the result that all such contributions will cause each Borrowers' Obligation Aggregate Payments (as defined below) to equal its Obligation Fair Share as of such date.  "**Obligation Fair Share**" means, with respect to a Borrower as of any date of determination, an amount equal to (i) the ratio of (X) the Obligation Fair Share Contribution Amount (as defined below) with respect to such Borrower to (Y) the aggregate of the Obligation Fair Share Contribution Amounts with respect to all the Borrowers, <u>multiplied by</u> (ii) the aggregate amount paid or distributed on or before such date by all Funding Borrowers under this Agreement and the other Credit Documents in respect of the Obligations guarantied.  "**Obligation Fair Share Shortfall**" means, with respect to a Borrower as of any date of determination, the excess, if any, of the Obligation Fair Share of such Borrower over the Obligation Aggregate Payments of such Borrower.  "**Obligation Fair**

**Share Contribution Amount**" means, with respect to a Borrower as of any date of determination, the maximum aggregate amount of the Obligations of such Borrower under this Agreement and the other Credit Documents that would not render its Obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided that, solely for purposes of calculating the "Obligation Fair Share Contribution Amount" with respect to any Borrower for purposes of this Section 2.25, any assets or liabilities of such Credit Party arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or Obligations of contribution hereunder shall not be considered as assets or liabilities of such Borrower. "**Obligation Aggregate Payments**" means, with respect to a Borrower as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such Borrower in respect of this Agreement and the other Credit Documents (including in respect of this Section 2.25) minus (ii) the aggregate amount of all payments received on or before such date by such Borrower from the other Borrowers as contributions under this Section 2.25. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Borrower. The allocation among the Borrowers of their Obligations as set forth in this Section 2.25 shall not be construed in any way to limit the liability of any Borrower hereunder or under any other Credit Document. Nothing contained in this Section 2.25(b) shall be of prejudice to any more favorable provisions applicable to Italia SpA, Huyck Austria, Xerium Canada, Germany Holdings or any non-US Guarantor pursuant to Section 7.6.

(c) Parallel Debt and Collateral Agent. Notwithstanding anything to the contrary in any Credit Document, each of the Borrowers and Guarantors and each of the Secured Parties agree that the Collateral Agent shall be the joint and several creditor (together with the relevant Secured Party) of each and every obligation of any Borrower or Guarantor towards each of the Secured Parties (other than the Collateral Agent) under the Credit Documents, and that accordingly the Collateral Agent will have its own independent right to demand performance by the relevant Borrower or Guarantor of such obligations. However, any discharge of any such obligation to one of the Collateral Agent or any Secured Party (other than the Collateral Agent) shall, to that extent, discharge the corresponding obligation owing to the other. Nothing in this Agreement or in any other Credit Document shall in any way limit the Collateral Agent's right to enforce, protect and preserve all of its rights under each Collateral Document as contemplated by this Agreement or the relevant Collateral Document (or to perform any act reasonably incidental to any of the foregoing).

2.26 **Loans to Non-US Borrowers**. Each Bank may, at its option, make any Loan available to any Non-US Borrower by causing any foreign or domestic branch or Affiliate of such Bank to make such Loan; provided that any

77

exercise of such option shall not affect the obligation of such Non-US Borrower to repay such Loan in accordance with the terms of this Agreement.

2.27 **Intercreditor Agreement**.  Each Bank hereby authorizes and directs the Administrative Agent and the Collateral Agent to enter into the Intercreditor Agreement on its behalf and hereby approves and agrees to be bound by the terms of the Intercreditor Agreement.  Notwithstanding anything to the contrary herein, in the case of any inconsistency between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern.  The Banks acknowledge that the Second Lien Obligations are secured by the Collateral, subject to the Intercreditor Agreement.

2.28 **Assumption of Obligations**.  The Borrowers (other than Xerium) and the Guarantors acknowledge that they have received significant direct and indirect benefit from the loans and credit extension made to Xerium under the DIP Credit Agreement.  Each Borrower acknowledges and agrees that as of the Closing Date it they will become a borrower under this Agreement and shall be directly liable for its Obligations owed under the Credit Documents as set forth herein and in the other Credit Documents, and each Guarantor acknowledges and agrees that as of the Closing Date it will become a guarantor under this Agreement and shall be directly liable for the Obligations owed under the Credit Documents as set forth herein and in the other Credit Documents.

2.29 **Conversion of DIP Term Loans, DIP Revolving Loans and Existing Letters of Credit.**  As provided in Sections 2.1(a) and 2.2(a)(ii), the DIP Revolving Loans and DIP Term Loans outstanding on the Closing Date shall be converted into Revolving Loans and Term Loans, respectively, under this Agreement and, as provided in Section 2.4(c), the Existing Letters of Credit outstanding on the Closing Date shall be converted into Term Loan Letters of Credit under this Agreement and the agreements and instruments listed on Schedule 2.29 (which shall be in form and substance reasonably satisfactory to the Administrative Agent).  Each Bank (as defined in the DIP Credit Agreement) shall be a Bank hereunder and the Issuing Bank (as defined in the DIP Credit Agreement) that issued an Existing Letter of Credit shall be the Issuing Bank hereunder.  The Credit Documents (as defined in the DIP Credit Agreement) shall be superseded and replaced by the applicable Credit Documents. Each of the Administrative Agent, the Issuing Bank and the Banks shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.29; provided, however, that any such action by the Administrative Agent, the Issuing Bank or any of the Banks shall not be a condition precedent to the effectiveness of the provisions of this Section 2.29.

## SECTION 3. CONDITIONS PRECEDENT

3.1 **Conditions to Closing Date**.  The occurrence of the Closing Date and the obligation of each Bank to make Credit Extensions hereunder, in each

case as of the Closing Date, are, in addition to the conditions specified in Sections 3.2, subject at the time of the occurrence of the Closing Date to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions on or before [July/ August __], 2010[2]:

   (a) <u>Credit Documents</u>.  The Administrative Agent shall have received sufficient copies of each Credit Document to be executed by the appropriate Credit Party on the Closing Date and delivered by each applicable Credit Party for each Bank (which may be delivered by facsimile or other electronic means for the purposes of satisfying this Section 3.1(a) on the Closing Date, with signed originals to be delivered promptly thereafter) and such Credit Documents shall be in form and substance satisfactory to the Borrowers and their counsel and the Administrative Agent and its counsel.

   (b) <u>Organizational Documents; Incumbency</u>.  The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent: (i) a copy of each Organizational Document of each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Credit Party executing the Credit Documents to which it is a party; (iii) resolutions of the board of directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) resolution of the shareholder(s) of the Australian Obligor  and Guarantors incorporated in the United Kingdom approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment and (v) to the extent applicable, a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.  For Credit Parties organized, incorporated or formed outside of the United States, delivery of a Formalities Certificate shall suffice to satisfy this Section 3.1(b).

---

[2] Date that is four months after the closing date of the DIP Credit Agreement to be inserted.

NY3 - 504826.09

(c) <u>Closing Date Certificate</u>.  The Administrative Agent shall have received a Closing Date Certificate, dated the Closing Date and signed by an Authorized Officer of Xerium.

(d) <u>No Liabilities</u>.  Neither Xerium nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the audited financial statements delivered pursuant to Section 3.1(k) for Fiscal Year 2009 or the notes thereto (other than as contemplated by the Plan of Reorganization) and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium and any of its Subsidiaries taken as a whole.

(e) <u>Organizational and Capital Structure</u>.  The organizational structure and capital structure of Xerium and its Subsidiaries, after giving effect to the Recapitalization, shall be as set forth in the Plan of Reorganization and Disclosure Statement, provided that any changes to such Plan of Reorganization and Disclosure Statement which are adverse to the Banks shall be acceptable to the Banks.

(f) <u>Confirmation Order, Plan of Reorganization</u>. The Confirmation Order shall be in full force and effect and shall not have been reversed or modified, stayed, subject to a motion to stay or subject to appeal or petition for review, rehearing or certiorari, (ii) the Administrative Agent shall have received a copy of the Confirmation Order, certified as true, correct and complete by the clerk of the Bankruptcy Court, (iii) the Confirmation Order and the Plan of Reorganization shall each be in full force and effect and shall be in form and substance reasonably satisfactory to the Administrative Agent, (iv) all documents executed in connection with the implementation of the Plan of Reorganization shall be in accordance with the Plan of Reorganization and, if so required thereunder, shall be in form and substance reasonably satisfactory to the Administrative Agent, (v) all motions and proposed orders to be filed with the Bankruptcy Court in connection with this Agreement and the Plan of Reorganization shall be in form and substance reasonably satisfactory to the Administrative Agent and (vi) all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied or waived by the Administrative Agent, and the Effective Date and substantial consummation of the Plan of Reorganization shall have occurred.

(g) <u>Second Lien Credit Agreement</u>.  (i) The terms of the Second Lien Credit Agreement shall be reasonably satisfactory to the Administrative Agent, and (ii) the Administrative Agent shall have received reasonably satisfactory evidence that the conditions to the effectiveness of the Second Lien Credit Agreement shall have been satisfied or waived in accordance with its terms.

NY3 - 504826.09

(h) <u>Governmental Authorizations and Consents</u>. Each Credit Party shall have obtained all material necessary Governmental Authorizations and all consents of other Persons (including any necessary approvals of the Bankruptcy Court or otherwise in connection with the Recapitalization), in each case that are necessary in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(i) <u>Real Estate Assets</u>. In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected security interest in certain Real Estate Assets, the Collateral Agent shall have received from each applicable Borrower and each applicable Guarantor:

(i) fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.1(i) (each, a "**Closing Date Mortgaged Property**");

(ii) an opinion of counsel (which counsel shall be reasonably satisfactory to the Collateral Agent) in each state in which a Closing Date Mortgaged Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as the Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Collateral Agent;

(iii) (a) ALTA mortgagee title insurance policies or unconditional commitments therefor issued by one or more title companies reasonably satisfactory to the Collateral Agent with respect to each Closing Date Mortgaged Property located in the United States (each, a "**Title Policy**"), in amounts not less than the fair market value of each Closing Date Mortgaged Property, together with a title report issued by a title company with respect thereto, and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to the Collateral Agent and (B) evidence satisfactory to the Collateral Agent that such Credit Party has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording

and intangible taxes) payable in connection with recording the Mortgages for each Closing Date Mortgaged Property in the appropriate real estate records;

(iv) evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, in form and substance reasonably satisfactory to the Collateral Agent; and

(v) ALTA surveys of all Closing Date Mortgaged Properties located in the United States, certified to Collateral Agent and dated or updated not more than ninety (90) days prior to the Closing Date and a survey sufficient to remove the standard survey exception to coverage from the Title Policies which will insure the Mortgages.

(j) Personal Property Collateral. In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected security interest in the personal property Collateral, the Collateral Agent shall have received:

(i) evidence reasonably satisfactory to the Collateral Agent of the compliance by each Credit Party of their obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to execute and deliver UCC financing statements, other securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

(ii) the Collateral Agent shall have received (x) the originals of certificates representing the shares of capital stock pledged pursuant to the Pledge and Security Agreement and the other Collateral Documents, together with an original of an undated stock power for each such certificate executed in blank by a duly Authorized Officer of the pledgor thereof (if applicable and subject to the provisions of the relevant Collateral Document), and (y) originals of each promissory note (if any) pledged to the Collateral Agent pursuant to the Pledge and Security Agreement and the other Collateral Documents endorsed in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof;

(iii) a completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of Xerium, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal, real or mixed property of any Credit Party in the jurisdictions specified in the Collateral Questionnaire, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly executed by all applicable Persons for filing in all applicable jurisdictions as

may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

(iv) opinions of counsel (which counsel shall be reasonably satisfactory to the Collateral Agent) with respect to the creation and perfection of the security interests in favor of Collateral Agent in such Collateral and such other matters governed by the laws of each jurisdiction in which any Credit Party or any personal property Collateral is located as the Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Collateral Agent; and

(v) evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document, notice and instrument (including without limitation, any intercompany notes evidencing Indebtedness permitted to be incurred pursuant to Section 6.1(b)) and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by the Collateral Agent.

(k) Financial Statements; Business Plan. The Banks shall have received from Xerium (i) the audited consolidated balance sheets of Xerium and its Subsidiaries as of December 31, 2009 for the Fiscal Year then ended and the related consolidated statements of income, stockholders' equity and cash flows of Xerium and its Subsidiaries for such Fiscal Year, together with a report thereon of Ernst & Young LLP, which financial statements and report shall be in form and substance reasonably satisfactory to the Administrative Agent, and (ii) an Officer's Certificate executed by an Authorized Office of Xerium certifying that there have been no changes to the Initial Business Plan.

(l) Insurance. The Collateral Agent shall have received a certificate from Xerium's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming the Collateral Agent, for the benefit of Secured Parties, as additional insured and naming the Collateral Agent, on behalf of the Secured Parties and the Second Lien Secured Parties as loss payee thereunder to the extent required under Section 5.5.

(m) Opinions of Counsel to Credit Parties. The Administrative Agent and its counsel shall have received executed copies of the favorable written opinions of counsel to the Credit Parties as to such matters as the Administrative Agent may reasonably request, dated as of the Closing Date and otherwise in form and substance reasonably satisfactory to the Administrative Agent.

(n) Cash Payment and Common Stock Issuance. The Banks (or the Administrative Agent on behalf of the Banks) shall have received the cash payment and Common Stock contemplated by the Plan of Reorganization.

(o) <u>Fees and Expenses</u>.  The Administrative Agent shall have received payment in full of all fees and expenses invoiced and due to the Agents (including the reasonable fees and expenses due of their advisors and legal counsel) in connection with this Agreement.

(p) <u>No Litigation</u>.  There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority (other than the Bankruptcy Cases) that, in the reasonable opinion of the Administrative Agent, singly or in the aggregate, materially impairs the transactions contemplated by the Credit Documents or that could have a Material Adverse Effect.

(q) <u>Completion of Proceedings</u>.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated by the Credit Documents and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request.

(r) <u>Representations and Warranties</u>.  The representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Closing Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that any representation or warranty that is by its terms qualified by materiality shall be true and correct in all respects.

(s) <u>No Default</u>.  No event shall have occurred and be continuing or would result from the consummation of the transaction contemplated hereunder or under the Credit Documents that would constitute an Event of Default or a Default.

(t) <u>No Material Adverse Effect</u>.  Since the Petition Date, nothing shall have occurred (and neither the Administrative Agent nor the Requisite Banks shall have become aware of any facts or conditions not previously known) which the Administrative Agent or the Requisite Banks shall reasonably determine has had, or could reasonably be expected to have, a Material Adverse Effect.

(u) <u>Compliance with Law and Regulations</u>.  All Term Loans and all other financings to the Borrowers (and all guaranties thereof and security therefor), as well as the transactions contemplated by the Credit Documents and the consummation thereof, shall be in full compliance in all material respects with

NY3 - 504826.09

all applicable requirements of law, including Regulations T, U and X of the Federal Reserve Board.

(v) <u>No Conflict with Material Contracts</u>.  After giving effect to the transactions contemplated by the Credit Documents, there shall be no conflict with, or default under, any Material Contract.

(w) <u>Patriot Act Information</u>.  Each of the Credit Parties shall have provided the documentation and other information to the Banks that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(x) <u>Liquidity</u>.  The Borrowers and the Guarantors shall have unrestricted Cash and Cash Equivalents on hand plus, after giving effect to the making of any Revolving Loans on the Closing Date, Unused Revolving Commitments in an aggregate amount of at least the Dollar Equivalent of $35,000,000.

(y) <u>Rating of Term Loans</u>.  Xerium (i) shall have obtained a corporate family rating and a rating on the Term Loans from Moody's and (ii) shall have obtained, or the Administrative Agent shall be reasonably satisfied that Xerium used commercially reasonable efforts to obtain a corporate rating and a rating on the Term Loans from S&P.

(z) <u>Solvency Certificate</u>.  On the Closing Date, the Administrative Agent shall have received a Solvency Certificate from each Borrower dated the Closing Date and addressed to the Administrative Agent and the Banks.

(aa) <u>Account Control Agreements</u>.  The applicable Credit Party shall have entered into account control agreements with respect to each Primary Account in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent.

For the purpose of determining compliance with the conditions specified in this Section 3.1, each Bank that has accepted the distributions under the Plan of Reorganization shall be deemed to have accepted, and to be satisfied with, each document required to be delivered in a form satisfactory to the Banks or Requisite Banks under this Section 3.1 and which was included in the Plan Supplement.

### 3.2 **Conditions to Each Credit Extension**.

(a) <u>Conditions Precedent</u>.  The obligation of each Bank to make, convert or continue any Loan, or the Issuing Bank to issue any Letter of Credit, on any Credit Date or Conversion/Continuation Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions precedent:

85

(i) the Administrative Agent shall have received a fully executed and delivered Funding Notice, Conversion/Continuation Notice or Issuance Notice, as the case may be;

(ii) after making the Credit Extensions requested on such Credit Date or Conversion/Continuation Date, the Total Utilization of Revolving Commitments shall not exceed the Revolving Commitments then in effect;

(iii) as of such Credit Date or Conversion/Continuation Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date or Conversion/Continuation Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iv) as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default;

(v) on or before the date of issuance of any Letter of Credit, the Administrative Agent shall have received all other information required by the applicable Issuance Notice, and such other documents or information as the Issuing Bank may reasonably require in connection with the issuance of such Letter of Credit; and

(vi) the conditions set forth in Section 3.1 shall have been satisfied or waived in accordance with Section 10.6.

Any Agent or Requisite Banks shall be entitled, but not obligated to, request and receive, prior to the making of any Credit Extension, additional information reasonably satisfactory to the requesting party confirming the satisfaction of any of the foregoing if, in the good faith judgment of such Agent or Requisite Bank, such request is warranted under the circumstances.

(b) Notices. Any Notice shall be executed by an Authorized Officer in a writing delivered to Administrative Agent. In lieu of delivering a Notice, each Borrower may give Administrative Agent telephonic notice by the required time of any proposed borrowing or conversion or continuation of any Loan or issuance of a Letter of Credit, as the case may be; provided each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the applicable date of any such borrowing, conversion, continuation or issuance. Neither Administrative Agent nor any Bank shall incur any liability to any Borrower in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been

86

given by a duly authorized officer or other person authorized on behalf of a Borrower or for otherwise acting in good faith.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

In order to induce the Banks and the Issuing Bank to make each Credit Extension to be made by this Agreement, and to induce each Bank Counterparty to enter into any transaction in respect of Hedging Obligations, each Credit Party represents and warrants to each Bank, Bank Counterparty and the Issuing Bank, on the Closing Date, each Interest Payment Date and each Credit Date, that the following statements are true and correct:

4.1 **Organization; Requisite Power and Authority; Qualification**. Each of Xerium and its Subsidiaries (a) is duly organized, validly existing and in good standing (or, for Non-U.S. Credit Parties of equivalent status when reasonably ascertainable) under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

4.2 **Capital Stock and Ownership**. The Capital Stock of each of Xerium and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Xerium or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of Xerium or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Xerium or any of its Subsidiaries of any additional membership interests or other Capital Stock of Xerium or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of Xerium or any of its Subsidiaries. Schedules 4.1 and 4.2 correctly set forth the ownership interest of Xerium and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

4.3 **Due Authorization**. The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

4.4 **No Conflict**. The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation

87

applicable to Xerium or any of its Subsidiaries, any of the Organizational Documents of Xerium or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on Xerium or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Xerium or any of its Subsidiaries except to the extent such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Xerium or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral  Agent, on behalf of Secured Parties); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Xerium or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Banks and except for any such approvals or consents the failure of which to obtain will not have a Material Adverse Effect.

       4.5 **Governmental Consents**.  The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for (i) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Closing Date and (ii) filings and recordings to be made in connection with the perfection of Collateral acquired after the Closing Date.

       4.6 **Binding Obligation**.  Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

       4.7 **Historical Financial Statements**.  The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year end adjustments.  As of the Closing Date, neither Xerium nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in

relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium and any of its Subsidiaries taken as a whole.

4.8 **Business Plan**.  The Initial Business Plan and each Business Plan delivered pursuant to Section 5.1(q) is and will be based on good faith estimates and assumptions made by the management of Xerium; provided, that such Business Plan is not to be viewed as fact and that actual results during the period or periods covered by the Business Plan may differ from such Business Plan and that the differences may be material; provided, further, as of the Closing Date, management of Xerium believed that the Business Plan was reasonable and attainable.

4.9 **No Material Adverse Change**.  Since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

4.10 **[Intentionally Omitted]**.

4.11 **Adverse Proceedings, etc**.  There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.  Neither Xerium nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, provincial, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.12 **Payment of Taxes**.  Except as otherwise permitted under Section 5.3, all tax returns and reports of Xerium and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Xerium and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable.  Xerium knows of no proposed tax assessment against Xerium or any of its Subsidiaries which is not being actively contested by Xerium or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.13 **Properties**.  (a)  Title.  Each of Xerium and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective

Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the Ordinary Course or as otherwise permitted under Section 6.9. Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b) Real Estate. As of the Closing Date, Schedule 4.13(b) contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment. Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and Xerium does not have knowledge of any default that has occurred and is continuing thereunder except where the consequences, direct or indirect, of such default or defaults, if any, could not be reasonably expected to have a Material Adverse Effect, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

4.14 **Environmental Matters**. Neither Xerium nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. There are and, to each of Xerium's and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Xerium or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Xerium nor any of its Subsidiaries nor, to any Credit Party's knowledge, any predecessor of Xerium or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility that, individually or in the aggregate, could be reasonably expected to have a Material Adverse Effect, and none of Xerium's or any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of Hazardous Materials, except as would not reasonably be expected to form the basis of an Environmental Claim against Xerium or any of its Subsidiaries, or as listed on Schedule 4.14. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to Xerium or any of its Subsidiaries relating to any Environmental Law, any Release of

Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

4.15 **No Defaults**.  Neither Xerium nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect and except as contemplated by the Plan of Reorganization.

4.16 **Material Contracts**.  Schedule 4.16 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date, and except as described thereon, all such Material Contracts are in full force and effect and no defaults currently exist thereunder, except any such default or failure to be in force and effect which could not reasonably be expected to result in an exercise of remedies or acceleration of the indebtedness created thereunder.

4.17 **Governmental Regulation**.  Neither Xerium nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal, provincial or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither Xerium nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18 **Margin Stock**.  Neither Xerium nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of said Board of Governors.

4.19 **Employee Matters**.  Neither Xerium nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against Xerium or any of its Subsidiaries, or to the best knowledge of Xerium and each other Credit Party, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Xerium or any of its Subsidiaries or to the best knowledge of Xerium and each other Credit Party,

91