liens upon (the "First Liens" and collectively, with the Priming Liens, the "Financing Liens"), all existing and after acquired real and personal, tangible and intangible, property of the DIP Borrower and the DIP Guarantors that is not collateral of the DIP Borrower and the DIP Guarantors under the Prepetition Credit Agreement, existing, or acquired prior or subsequent to the commencement of the Cases, including, but not limited to, upon entry of the Final Order, all causes of action arising under Chapter 5 of the Bankruptcy Code, and any and all proceeds thereof, (the "First Lien Collateral" and together with the Priming Lien Collateral, the "DIP Collateral"), which liens are subject only to Permitted Liens and Additional Permitted Liens.

22. *Priority:*    Pursuant to section 364(c)(1) of the Bankruptcy Code, all amounts owing by the Debtors under the DIP Facility in respect thereof at all times will constitute allowed superpriority administrative expense claims in the Debtors' respective Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code ("Superpriority"), subject to indebtedness secured by Permitted Liens and Additional Permitted Liens and the Carve-out (as defined herein).

23. *Adequate Protection:*    The Prepetition First Lien Lenders and Merrill Lynch Capital Services, Inc., as secured swap counterparty (the "Secured Swap Counterparty") are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Priming Lien Collateral equal in amount to the aggregate diminution in value (each such diminution, a "Diminution in Value"), calculated in accordance with Section 506(a) of the Bankruptcy Code, of their respective interests in the Priming Lien Collateral, including without limitation, any such diminution resulting from (i) the sale, lease or use by the Debtors of any Priming Lien Collateral, and (ii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code

NY3 - 504309.02

(respectively, the "<u>Adequate Protection Claim</u>").

As adequate protection, the administrative agent under the Prepetition Credit Agreement (the "<u>Prepetition First Lien Agent</u>"), the Prepetition First Lien Lenders and the Secured Swap Counterparty shall be granted the following:

(a) <u>Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value of the pre-petition security interest, the Prepetition First Lien Agent (for the benefit of the Prepetition First Lien Lenders) and the Secured Swap Counterparty shall be granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) replacement security interests in and liens upon all the DIP Collateral, subject and subordinate only to (i) the security interests and liens granted to the DIP Facility Agent for the benefit of the DIP Facility Lenders in the Interim Order and pursuant to the DIP Loan Agreement and (ii) Permitted Liens, (iii) Additional Permitted Liens and (iv) the Carve-out.

(b) <u>Adequate Protection Claim</u>.  The Adequate Protection Claim of the Prepetition First Lien Lenders and the Secured Swap Counterparty shall have Superpriority status, subject only to the Superpriority status of the obligations under the DIP Facility, claims secured by Permitted Liens, and the Carve-out.

(c) <u>Payment of Debt Service</u>.  Payment of accrued but unpaid interest (whether prepetition or postpetition) to the Prepetition First Lien Lenders and the Secured Swap Counterparty at the rate of 1.00% per annum in excess of the non-default interest rate payable on the LIBOR Loans under the Prepetition Credit Agreement.

(d) <u>Fees and Expenses</u>.  The Debtors shall pay all reasonable fees, out-of-pocket costs and expenses of (i) the Prepetition First Lien Agent

10

and the Prepetition First Lien Lenders under the Prepetition Credit Agreement (including fees and expenses of legal advisors, financial advisors and investment banks) promptly upon receipt of invoices therefor and (ii) the Secured Swap Counterparty under the secured swap agreement.

(e) <u>Other Adequate Protection</u>.  The Prepetition First Lien Lenders and the Secured Swap Counterparty shall be entitled to such other adequate protection as (i) reasonably agreed upon by the DIP Facility Agent, the DIP Facility Lenders, Prepetition First Lien Lenders and the Secured Swap Counterparty, as applicable, and the Debtors and approved by the Court, or (ii) as otherwise granted by the Court.

| 24. | *Carve-out:* | As used in this Term Sheet, the term "Carve-out" shall mean the following amounts:  (i) all fees required to be paid to the Clerk of the Court, all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), and all fees, expenses, and disbursements payable to any professionals retained by the Debtors pursuant to 28 U.S.C. § 156(c); and (ii) in the event of an occurrence and during the continuance of an Event of Default, the "<u>Case Professionals Carve-out</u>", comprising the sum of (a) all allowed unpaid fees, expenses and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) for any professionals retained by the Debtors or any statutory committee appointed in the Cases pursuant to sections 327, 328, 363, or 1103, as applicable, of the Bankruptcy Code (the "<u>Case Professionals</u>") incurred subsequent to receipt of notice delivered by the DIP Facility Agent to counsel for the Debtors following the occurrence of an Event of Default expressly stating that the Carve-out has been invoked (a "<u>Carve-out Trigger Notice</u>") in an aggregate amount not in excess of US$3,000,000 (the "<u>Carve-out Cap</u>"), plus (b) all unpaid professional fees, expenses, and disbursements of such Case Professionals incurred prior to receipt of the Carve-out Trigger Notice to the extent previously or subsequently allowed pursuant to an order of the |

Court (collectively, "<u>Allowed Professional Fees</u>") under sections 328, 330 and/or 331 of the Bankruptcy Code. So long as a Carve-out Trigger Notice has not been delivered, the Carve-out Cap shall not be reduced by the payment of fees or expenses allowed by the Court (whether allowed before or after delivery of the Carve-out Trigger Notice) and payable under sections 328, 330, or 331 of the Bankruptcy Code, or 28 U.S.C. §156(c).

25. ***Conditions to Closing***

The closing of the DIP Facility shall be subject to the satisfaction of the conditions customary for a transaction of this type, including:

(a) The Interim Order shall have been entered by the Court;

(b) Any "first day" order authorizing the use of cash collateral, and any other orders affecting or concerning the DIP Collateral shall be in form and substance reasonably satisfactory to the DIP Facility Agent and the DIP Facility Lenders, the DIP Borrower and the DIP Guarantors;

(c) All fees and other payments required to be made to the DIP Facility Lenders, the DIP Facility Agent and the Sole Lead Arranger and their respective advisors and counsel under the DIP Loan Agreement or any other written agreement shall have been paid;

(d) Delivery of the DIP Budget;

(e) Delivery of the business plan in form and substance reasonably satisfactory to the DIP Facility Lenders.

(f) The Interim Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed (or application therefor made);

(g) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist;

(h) Representations and warranties in the DIP Loan

12

Agreement shall be true and correct in all material respects;

(i) No administrative claim that is senior to or <u>pari passu</u> with the Superpriority claims of the DIP Facility Agent and the DIP Facility Lenders shall exist, except the Permitted Liens, Additional Permitted Liens and the Carve-out;

(j) All documentation relating to the DIP Facility shall be in form and substance consistent with this Term Sheet and otherwise reasonably satisfactory to the Debtors and their counsel and the DIP Facility Agent and its counsel;

(k) The DIP Facility Agent shall have received satisfactory opinions of independent counsel to the DIP Borrower and the DIP Guarantors, addressing such customary matters as the DIP Facility Agent shall reasonably request;

(l) The absence of a DIP Material Adverse Effect, or any event or occurrence which could reasonably be expected to result in a material adverse change, in (i) the business, assets, financial condition or prospects of the DIP Borrower, the DIP Guarantors and their respective subsidiaries, taken as a whole, since September 30, 2009 (other than events leading up to and resulting from the anticipated filing of the Cases), (ii) ability of the DIP Borrower or any DIP Guarantor to perform any of its obligations in accordance with the terms under the DIP Loan Agreement or any loan document, or (iii) the ability of the DIP Facility Agent and the DIP Facility Lenders to enforce the DIP Loan Agreement or any DIP Facility loan document, provided that the filing of the Cases will not be deemed to constitute an impediment to enforcement hereunder;

(m) There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing, in each case, based on actual knowledge, in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to

13

result in a DIP Material Adverse Effect.

(n) All material necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Facility Lenders) and shall remain in effect, and all applicable governmental filings have been made and all applicable waiting periods shall have expired without in either case any action being taken by any competent authority; and no law or regulation shall be applicable in the judgment of the DIP Facility Lenders that restrains, prevents or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby;

(o) The DIP Facility Lenders shall have a valid and perfected lien on and security interest in the DIP Collateral having the priority described herein; searches necessary or desirable in connection with such liens and security interests that have been requested by the DIP Facility Agent shall have been duly made;

(p) The DIP Facility Agent shall have received endorsements naming the DIP Facility Agent, on behalf of the DIP Facility Lenders, as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the DIP Borrower, the DIP Guarantors and their respective subsidiaries forming part of the DIP Collateral;

(q) The filing of the Cases shall have occurred; and

(r) The DIP Borrower shall have received the requisite votes needed to confirm the DIP Borrower's Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code.

26. ***Conditions to All***    Each extension of credit under the DIP Facility shall be subject to the satisfaction of the conditions

NY3 - 504309.02

**Extensions of Credit**

customary for a transaction of this type, including:

(a) If the proceeds from the requested extension of credit are to be used in a manner or for a purpose which requires the prior approval of the Court, such approval shall have been obtained;

(b) The Interim Order or the Final Order, as the case may be, shall be in full force and effect and shall not have been reversed, modified, amended or stayed (or application therefor made), except for modifications and amendments that are reasonably acceptable to the DIP Facility Agent and the Debtors;

(c) Absence of any administrative claim that is senior to, or pari passu with, the Superpriority Claim of the DIP Facility Agent and the DIP Facility Lenders, other than claims secured by Permitted Liens, Additional Permitted Liens and the Carve-out;

(d) With respect to any DIP Revolving Loan, the receipt of a notice of borrowing or with respect to the issuance of a DIP Letter of Credit, a letter of credit application from the DIP Borrower. The request for and the acceptance of each extension of credit by the DIP Borrower shall constitute a representation and warranty that the conditions to each extension of credit shall have been satisfied;

(e) The extension of credit shall be consistent with the DIP Budget;

(f) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist; and

(g) Representations and warranties shall be true and correct in all material respects, except where such representation or warranty relates to an earlier date, in which case it shall be true and correct in all material respects as of such earlier date; provided that any representation or warranty that is by its terms qualified by

15

materiality shall be true and correct in all respects.

27. ***Representations and Warranties***:

The DIP Loan Agreement will contain representations and warranties that are customary for a transaction of this type, subject to materiality qualifiers and exceptions to be agreed upon, as well as matters disclosed in SEC filings and Disclosure Statement, including:

(a) Confirmation of corporate status and authority of the DIP Borrower and its subsidiaries.

(b) Due authorization, execution and delivery of the DIP Loan Agreement and the related documents;

(c) Execution, delivery, and performance by the DIP Borrower and the DIP Guarantors of the DIP Loan Agreement and the related documents do not conflict with law, existing agreements or organization documents except where such conflict would not reasonably be expected to result in a DIP Material Adverse Effect;

(d) No governmental or regulatory approvals required other than the Interim Order or the Final Order, as the case may be;

(e) Subject to the Interim Order or the Final Order, as the case may be, legality, validity, binding effect and enforceability of the DIP Loan Agreement and the related documents;

(f) Accuracy of information and financial statements in all material respects;

(g) Projections based on good faith estimates;

(h) No occurrence of any event, matter or circumstance since the Petition Date: (a) which is materially adverse to: (i) the business, assets or financial condition or prospects of the DIP Borrower and its subsidiaries taken as a whole; or (ii) the ability of any DIP Borrower or any DIP Guarantor to perform any of its obligations in accordance with their terms

16

under the DIP Loan Agreement and the related documents; or (b) which results in (i) the DIP Loan Agreement or any related loan document not being legal, valid and binding on, and enforceable against, any party thereto, from and after the date the Interim Order becomes effective, and/or (ii) any collateral document not being a valid and effective security interest, from and after the date the Interim Order becomes effective, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any DIP Facility Lender under the DIP Loan Agreement or any related document ("<u>DIP Material Adverse Effect</u>");

(i)    Payment of taxes by the Company and its subsidiaries, except those taxes being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(j)    Good, sufficient and legal title to properties owned by the Company or its subsidiaries;

(k)    Environmental compliance by the Company and its subsidiaries, except where non-compliance would not reasonably be expected to result in a DIP Material Adverse Effect;

(l)    No defaults by the Company or its subsidiaries in any contractual obligations except where such conflict would not reasonably be expected to result in a DIP Material Adverse Effect;

(m)    List of material contracts in effect on the DIP Closing Date is true, correct and complete;

(n)    Neither the Company nor any of its subsidiaries is an investment company;

(o)    Neither the Company nor any of its subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock and no part of the proceeds of the DIP Loans made will be used

to purchase or carry any such margin stock;

(p) No unfair labor practices by the Company or its subsidiaries and other employee matters, employment law non-compliance matters that could reasonably be expected to result in a DIP Material Adverse Effect;

(q) Compliance by the Company and its subsidiaries with employee benefit plans, except where non-compliance would not reasonably be expected to result in a DIP Material Adverse Effect;

(r) No broker's or finder's fee or commission will be payable in connection with the transactions contemplated by the DIP Loan Agreement and the related documents;

(s) Full and accurate disclosure by Borrowers and Guarantors;

(t) Compliance with applicable laws, except where non-compliance would not reasonably be expected to result in a DIP Material Adverse Effect;

(u) Continued effectiveness of the Interim Order or the Final Order, as applicable;

(v) Use of proceeds in accordance with the DIP Loan Agreement, the Interim Order and the Final Order (as applicable);

(w) No action, suit, investigation, litigation or proceeding pending or threatened that could have a DIP Material Adverse Effect, other than proceedings attendant to confirmation of the Plan of Reorganization;

(x) Insurance matters;

(y) Validity, priority and perfection of security interests in the DIP Collateral; and

(z) Status of the DIP Facility as senior debt entitled to superpriority administrative claim

NY3 - 504309.02

status in the Cases.

28.  ***Reporting Covenants:***    The DIP Loan Agreement will contain reporting covenants that are customary for a transaction of this type, including:

(a)  Delivery of independently audited annual consolidated financial statements and unaudited quarterly and monthly consolidated financial statements, together with a comparison to the DIP Borrower's prior corresponding financial statements and annual financial plan and, with respect to quarterly and annual financial statements, a detailed explanation of material variances, provided that the annual consolidated financial statements for fiscal year 2009 may include a going concern qualification;

(b)  Delivery each week of a rolling 13-week forecast of receipts and disbursements, and a report setting forth in reasonable detail any material variances from the weekly cash flows and disbursements on the basis of the actual prior week as well as on a cumulative basis (the "Cash Flow Forecast"); and

(c)  Other reporting requirements and notices, including notices of default and litigation and ERISA notices.

29.  ***Affirmative Covenants:***    The DIP Loan Agreement will contain affirmative covenants that are customary for a transaction of this type, including;

(a)  The DIP Borrower, each DIP Guarantor and their respective subsidiaries to preserve and maintain in full force and effect its corporate existence and all rights and franchises, licenses and permits material to its business, except where its board of directors determines that such preservation is no longer desirable in the conduct of its business and the loss is not disadvantageous in any material respect to it or the DIP Facility Lenders;

(b)  The DIP Borrower, each DIP Guarantor and

19

their respective subsidiaries to pay all material taxes, except those taxes being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(c) The DIP Borrower, each DIP Guarantor and their respective subsidiaries to maintain in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of the DIP Borrower and its subsidiaries and make all appropriate repairs, renewals and replacements thereof, except where failure to do so would not reasonably be expected to have a DIP Material Adverse Effect;

(d) The DIP Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the DIP Borrower and its subsidiaries as may customarily be carried or maintained under similar circumstances by persons of established reputation engaged in similar businesses, in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such persons;

(e) The DIP Borrower, each DIP Guarantor and their respective subsidiaries to maintain accurate books and records and, as reasonably requested and with reasonable advance notice, permit visitation and inspection by the DIP Facility Agent representatives;

(f) The DIP Borrower, each DIP Guarantor and their respective subsidiaries to comply in all material respects, with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (including all

20

environmental laws);

(g) The DIP Borrower and each DIP Guarantors to take all actions the DIP Facility Agent may reasonably request in order to effect fully the purposes of the DIP Loan Agreement and the related documents;

(h) The DIP Borrower and each of its subsidiaries will continue to own or possess the right to use, free from any restrictions, all patents, trademarks, copyrights, and domain names that are used in the operation of their respective businesses as presently conducted and as proposed to be conducted, except where such failure to do so will not result in a DIP Material Adverse Effect;

(i) The DIP Borrower and each DIP Guarantor to supply to the DIP Facility Agent or any DIP Facility Lender documents and evidence necessary to comply with "know your customer" or other similar checks; and

(j) Not later than thirty-five (35) days after the entry of the Interim Order, the Court shall have entered an order (in form and substance acceptable to the DIP Facility Lenders and the DIP Facility Agent) (the "Final Order") on an application or motion by the DIP Borrower and the DIP Guarantors, that motion to be in form and substance satisfactory to the DIP Facility Lenders and the DIP Facility Agent, approving, on a final basis (but which Final Order need not have become final and non-appealable), the financing transactions contemplated herein and granting the superpriority claim status and liens referred to above, and which Final Order, among other things, shall (i) approve the DIP Facility and authorize extensions of credit under the DIP Facility, (ii) approve the payment by the DIP Borrower and DIP Guarantors of all the fees provided for herein, (iii) provide for the automatic termination of the automatic stay (but solely with respect to the DIP Facility) to permit the DIP Facility Agent and the DIP

21

Facility Lenders to exercise their remedies, with respect to the DIP Facility, after five (5) business days' written notice (the "<u>Notice Period</u>") of an Event of Default, which notice shall be provided by the DIP Facility Agent to the Debtors, counsel to the Debtors, counsel to any statutory committee(s) appointed in the Cases, and the Office of the United States Trustee for the District of Delaware, and which notice shall be filed with the Court, with a full waiver by the DIP Borrower and the DIP Guarantors of all rights to contest such termination except with respect to the existence of an Event of Default, (iv) not have been reversed, modified, amended or stayed, and (v) have such other findings, orders and relief typical for financings of the type contemplated herein. The Final Order shall have been entered on such notice to such parties as may be reasonably satisfactory to the DIP Facility Lenders and as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, orders of the Court, and any applicable local bankruptcy rules.

30. ***Negative Covenants:***

The DIP Loan Agreement will contain negative covenants that are customary for a transaction of this type, including:

(a)  Limitation on debt;

(b)  Limitation on liens;

(c)  Limitation on negative pledges;

(d)  Limitation on dividends, redemptions and repurchases with respect to capital stock;

(e)  Limitations on investments and loans, <u>provided</u> that the DIP Borrower shall be permitted to make investments in foreign subsidiaries of no more than US$7,500,000 from the DIP Closing Date through May 31, 2010 and US$5,000,000 thereafter, and provided further that proceeds under the DIP Facility, subject to the limitations set forth herein, can be used to finance foreign operations and ensure foreign

22

companies maintain adequate liquidity to avoid the commencement of insolvency proceedings outside the U.S.;

(f)     Limitations on mergers, consolidations; acquisitions, sales, leases and sale/leaseback transactions;

(g)     Limitations on transactions with affiliates;

(h)     Limitations on changes in business and organizational documents;

(i)     No change in fiscal year; and

(j)     Limitations on voluntary and optional prepayments and redemptions of debt (other than DIP Loans).

31.  *Financial Covenants:*     The DIP Loan Agreement will contain the following financial covenants:

(a)     Minimum of US$40,000,000 from the DIP Closing Date through May 31, 2010 and US$35,000,000 thereafter of (x) unrestricted cash and cash equivalents of the DIP Borrower and the DIP Guarantors on hand and (y) undrawn and available commitments under the DIP Revolving Loan Facility at all times; and

(b)     Actual average cash receipts for any period of four weeks shall not be less than 80% of average cash receipts for such period projected in the initial Cash Flow Forecast, and actual average cash disbursements (calculated without giving effect to debt service, professional fees and other restructuring expenses) for any period of four weeks shall not be more than 120% of average cash disbursements for such period projected in the initial Cash Flow Forecast, in each case tested on a rolling weekly basis.

32.  *Events of Default:*     The DIP Loan Agreement will contain Events of Default that are customary for a transaction of this type, including:

(a)     Failure by the DIP Borrower to pay principal

23

when due and failure to pay interest, fees and other amounts within 3 business days of when due;

(b) Cross-default to payment defaults by the DIP Borrower, any DIP Guarantor or any of their subsidiaries on principal aggregating US$5 million, or to other events (other than the commencement of the Cases by the DIP Borrowers and the DIP Guarantors) if the effect is to accelerate or permit acceleration of such debt;

(c) Failure by the DIP Borrower or any DIP Guarantor to comply with any negative covenant, any financial covenant or the use of proceeds covenant;

(d) Any representations or warranty made by the DIP Borrower or any DIP Guarantor shall be false in any material respect as of the date made or deemed made;

(e) Failure by any DIP Borrower or any DIP Guarantor to comply with other covenants in the DIP Facility Loan Agreement or other related loan or collateral documents and such failure continues unremedied for a period of 20 business days following receipt of notice by an officer of the Company or actual knowledge by such officer;

(f) Involuntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of any subsidiary of the DIP Borrower (other than those subject to the Cases) if not dismissed within 60 days;

(g) Voluntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of any subsidiary of the DIP Borrower (other than those subject to the Cases);

(h) Failure to pay by the DIP Borrower or any of its subsidiaries of a final judgment or court

24

order if not stayed within 60 days in excess of US$5 million;

(i)     Occurrence of an ERISA event (which shall exclude the filing of the Cases) which would reasonably be expected to result in a DIP Material Adverse Effect;

(j)     Occurrence of a change of control of the DIP Borrower, other than as a result of the transactions contemplated by the Plan of Reorganization;

(k)     Any collateral document ceases to be in full force and effect other than in accordance with its terms or shall be declared null and void or the DIP Facility Agent shall not have or shall cease to have a valid and perfected lien in any Collateral purported to be covered by such collateral document with the priority required by such collateral document;

(l)     Actual invalidity, or any assertion by any the DIP Borrower, any DIP Guarantor or any of their affiliates of invalidity, of the DIP Loan Agreement or any related document;

(m)    Entry of an order granting relief from the automatic stay with respect to any claim in excess of specified amounts to be mutually agreed upon;

(n)     Entry of or application for order appointing a trustee under Section 1104 of the Bankruptcy Code or examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code;

(o)     Entry of an order converting any of the Cases into a chapter 7 case;

(p)     Submission by the Debtors of, or entry of an order confirming, a plan of reorganization that does not (i) provide for termination of the DIP Facility and payment in full in cash of all obligations payable under the DIP Loan Agreement and the related documents on or before the effective date of such plan or (ii) provide for (A) a conversion of the DIP

25

Facility to the Exit Facility as described in this Term Sheet, pursuant to such Plan of Reorganization and (B) the continuation of the liens and security interests of the DIP Facility Agent and continued priority thereof until such plan effective date;

(q) Entry of an order dismissing any of the Cases that does not provide for termination of the DIP Facility and payment in full in cash of all obligations under the DIP Loan Agreement and the related documents;

(r) Entry of an order to (i) revoke, reverse, stay, modify, supplement or amend the Interim Order or the Final Order, (ii) permit any administrative expense or claim to have administrative priority as to the DIP Borrower or any DIP Guarantor equal or superior to the priority of the DIP Facility Agent and the DIP Facility Lenders in respect of the DIP Facility, other than claims secured by Permitted Liens, Additional Permitted Liens and the Carve-out, or (iii) grant or permit the grant of the liens on the DIP Collateral other than as permitted by the DIP Loan Agreement and the related documents, including, but not limited to, the Interim Order and the Final Order (as applicable);

(s) Failure by the Court to enter a Final Order within 35 days of the Petition Date;

(t) There shall be filed by the DIP Borrower or any DIP Guarantor any motion to sell all or a substantial part of the Collateral on terms that are not acceptable to the Requisite Lenders;

(u) The DIP Borrower or any DIP Guarantor shall file any action, suit or other proceeding or contested matter challenging the validity, perfection or priority of any liens securing the Prepetition Credit Agreement, or the validity or enforceability of any of the Credit Documents (as defined therein), or asserting any avoidance claim against, or seeking to recover any monetary damages from, any

26

agent or lender under any of the Prepetition Credit Agreement or the DIP Facility; and

(v)    Without Requisite Lenders consent, the DIP Borrower or any DIP Guarantor shall discontinue or suspend all or any material part of its business operations or commence an orderly wind-down or liquidation of any material part of the DIP Collateral.

| | | |
|---|---|---|
| 33. | ***Remedies Upon Event of Default:*** | If an Event of Default shall have occurred and is continuing, upon receipt by the Debtors of the written notice referred to in section 29(j)(iii) above (which written notice shall be served by the DIP Facility Agent upon the parties identified therein and filed with the Court), and upon expiration of the Notice Period, the principal of and all accrued interest and fees and all other amounts owed to the DIP Facility Agent and the DIP Facility Lenders under the Interim Order, the Final Order or the DIP Loan Agreement shall be immediately due and payable, and the DIP Facility Agent and the DIP Facility Lenders shall have the rights and remedies provided in the Interim Order, the Final Order or the DIP Loan Agreement, as applicable. |
| 34. | ***Voting:*** | Amendments, modifications, terminations and waivers of any provision of the DIP Loan Agreement or any related document will require the approval of Requisite Lenders, except that in certain circumstances the consent of a greater percentage of the aggregate amount of the loans and commitments of the DIP Facility Lenders may be required. |
| 35. | ***Requisite Lenders:*** | "Requisite Lenders" shall mean (i) the DIP Facility Lenders holding DIP Revolving Loans and commitments in the aggregate representing more than 50% of (a) the unfunded commitments and the outstanding DIP Revolving Loans or (b) if the commitments have been terminated, the outstanding DIP Revolving Loans (the "DIP RL Facility Exposure") and (ii) the DIP Facility Lenders holding DIP Term Loans in the aggregate representing more than 50% of the outstanding DIP Term Loans (the "DIP TL Facility Exposure"); provided that with respect to any amendment or waiver that would adversely affect the holders of the |

DIP RL Facility Exposure or the DIP TL Facility Exposure, as the case may be, differently from the rights of any other DIP Facility Lender, then the consent of only the holders of more than 50% of the DIP RL Facility Exposure or the DIP TL Facility Exposure, as the case may be, shall be required. The unfunded commitments of, and the outstanding DIP Loans held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Requisite Lenders.

| 36. | *Assignments and Participations* | Each DIP Facility Lender may sell or assign all or any portion of its DIP Loans with the prior consent of the DIP Facility Agent. Each DIP Facility Lender may sell, assign or grant participations in all or any of its DIP Loans without the prior consent of the DIP Borrower. Minimum aggregate assignment level (which shall not be applicable to assignments to affiliates of the assigning DIP Facility Lenders and other DIP Lenders and their affiliates) of US$2,500,000 and increments of US$1,000,000 in excess thereof. The parties to the assignment shall pay to the DIP Facility Agent an administrative fee of US$3,500. |
|---|---|---|
| 37. | *Defaulting Lenders:* | The DIP Loan Agreement shall contain defaulting lender provisions, including that (i) no defaulting lender (to be defined in the DIP Loan Agreement) will earn a DIP Commitment Fee so long that it remains a defaulting lender, (ii) no defaulting lender will be entitled to be counted in any matter requiring the consent of only the Requisite Lenders, and (iii) subject to receipt by a defaulting lender of all amounts due and owing to it, the DIP Borrower will have the right to replace such defaulting lender. |
| 38. | *Other Terms:* | The DIP Loan Agreement will provide additional terms that are usual and customary for a transaction of this type and will be based on the Prepetition Credit Agreement. |
| 39. | *Expenses:* | The DIP Borrower shall reimburse the DIP Facility Agent for all reasonable fees, expenses and disbursements, including reasonable fees, expenses and disbursements of counsel to the DIP Facility Agent, incurred in connection with the transaction, including, without limitation, related preparation, |

28

negotiation, execution and administration of the definitive documentation and ongoing expenses related to the DIP Facility. After the occurrence of a default or an Event of Default, the DIP Borrower shall reimburse the DIP Facility Agent and the DIP Facility Lenders for all costs and expenses and costs of settlement incurred in enforcing any obligation under the DIP Loan Agreement and the related loan documents or in collecting any payments due or in connection with any refinancing and restructuring of the credit arrangements.

40. **_Indemnification:_**   The DIP Borrower and the DIP Guarantors shall indemnify the DIP Facility Agent, the DIP Issuing Bank and DIP Facility Lenders and their respective affiliates, officers, partners, directors trustees, investment advisors, employees and agents for any liability, obligation, loss, damage, claim, costs, expense and disbursement (including reasonable fees and disbursements of counsel to the indemnitees) arising out of (i) the DIP Loan Agreement and the related loan documents and the transactions contemplated under the DIP Facility, the use or proposed use of proceeds of the loans or any enforcement of the DIP Loan Agreement or any related loan documents or (ii) any environmental claims or hazardous materials activity arising from activity of the DIP Borrower and its subsidiaries, provided that such indemnification obligation does not extend to any damages, liabilities, or other costs arising from gross negligence or willful misconduct.

41. **_Yield Protection and Taxes:_**   The DIP Loan Agreement and the related documents will contain yield protection provisions and tax gross-up provisions that are customary and based on the yield protection and tax gross-up provisions set forth in the Prepetition Credit Agreement.

42. **_Governing Law:_**   The DIP Facility and all documentation in connection with the DIP Facility shall be governed by the laws of the State of New York applicable to agreements made and performed in such state, except as governed by the Bankruptcy Code.

43. **_Counsel to the DIP Facility_**   Chadbourne & Parke LLP.

29

| | | |
|---|---|---|
| 44. | ***Counsel to the DIP Borrower and DIP Guarantors:*** | Cadwalader, Wickersham & Taft LLP. |
| 45. | ***Conflicts:*** | In the event of any conflict between any of the terms of the DIP Loan Agreement and the Interim Order, the terms of the Interim Order shall govern. In the event of any conflict between or among any of the terms of the DIP Loan Agreement, the Interim Order and the Final Order, the Final Order shall govern. |

## II. TERMS OF EXIT FACILITY

On the Exit Closing Date pursuant to the Plan of Reorganization and the order of the Court confirming same (the "Confirmation Order"), the obligations of the DIP Borrower and the DIP Guarantors under the DIP Facility shall be assumed by the reorganized Company and certain of its affiliates, provided that, pursuant to the Plan of Reorganization and the Confirmation Order, and effective as of the Exit Closing Date, the terms of the DIP Facility shall be modified consistent with the terms set forth below (and such modified facility, which remains subject to definitive documentation in all respects, shall be referred to as the "Exit Facility"):

On the Exit Closing Date (a) the DIP Term Loans outstanding under the DIP Facility will continue as term loans under the Exit Facility, (b) the DIP Revolving Loans outstanding under the DIP Facility will continue as revolving loans under the Exit Facility, (c) the DIP Term Loan Letters of Credit outstanding under the DIP Term Loan L/C Facility shall be deemed to be outstanding letters of credit under the Exit Term Loan L/C Facility and (d) the commitment of the DIP Facility Lenders to make the DIP Revolving Loans shall be converted into their commitment to make Exit Revolving Loans under the Exit Facility.

| | | |
|---|---|---|
| 1. | ***Administrative and Collateral Agent:*** | An affiliate of Citigroup Global Markets, Inc. (in such capacity, the "Exit Facility Agent"). |
| 2. | ***Sole Lead Arranger and Sole Bookrunner:*** | Citigroup Global Markets, Inc. ("CGMI") |
| 3. | ***Exit Issuing Bank:*** | Citicorp North America, Inc. |
| 4. | ***Lenders:*** | The lenders under the DIP Facility (the "Exit Facility Lenders"). |
| 5. | ***Borrowers:*** | Xerium Technologies, Inc. (the "Company"), XTI LLC ("XTI", and together with the Company, the "U.S. Borrowers"), Xerium Canada, Inc. ("Xerium |

30

Canada"), Huyck Wangner Austria GmbH ("Huyck Austria"), Xerium Italia S.p.A. ("Xerium Italia") and Xerium Germany Holding GmbH ("Xerium Germany", and together with Xerium Canada, Huyck Austria and Xerium Italia, the "Non U.S. Borrowers").

| | | |
|---|---|---|
| 6. | ***Guarantors:*** | The guarantors under Prepetition Credit Agreement and Robec Brazil LLC (the "Guarantors"). The Guarantors organized under the laws of the United States or any state thereof are referred to as the "U.S. Guarantors", and the Guarantors organized outside the United States are referred to as the "Non U.S. Guarantors." |
| 7. | ***Joint and Several Obligations; Limitation on Obligations:*** | The obligations of the Borrowers under the Exit Facility and the related loan documents shall be joint and several, provided that none of the Non U.S. Borrowers shall be liable for any of the obligations of any U.S. Borrower. |
| | | The obligations of the Guarantors under the loan documents shall be joint and several, provided that none of the Non U.S. Guarantors shall be liable for any of the obligations of any U.S. Guarantor. |
| | | Notwithstanding the foregoing, any payments received by the Exit Facility Agent with respect to the Exit Loans or the Exit Collateral shall be applied to the payment of the obligations under the loan documents for the ratable benefit of the Exit Facility Lenders. |
| 8. | ***Exit Facility:*** | *Exit Term Loan Facility* |
| | | The Exit Facility Lenders shall provide the Borrowers with a term loan credit facility (the "Exit Term Loan Facility") providing for extensions of term loans (the "Exit Term Loans") not to exceed US$60,000,000 (the "Exit TL Commitment Amount"). Exit Term Loans that are repaid shall not be reborrowed. |
| | | All Exit Term Loans shall be made in U.S. dollars. |
| | | The Exit Term Loan Facility shall have a letter of credit sublimit in the amount of US$20,000,000 as |

31

described in paragraph 9 below (the "Exit Term Loan L/C Facility") and the DIP Term Loan Letters of Credit shall be deemed to be outstanding letters of credit under the Exit Term Loan L/C Facility (the "Exit Term Loan Letters of Credit").

Outstanding DIP Term Loans under the DIP Facility shall be deemed to be outstanding Exit Term Loans under the Exit Facility as of the Exit Closing Date.

*Exit Revolving Facility*

The Exit Facility Lenders shall provide the Borrowers with a revolving credit facility (the "Exit Revolving Facility") providing for extensions of revolving loans (the "Exit Revolving Loans", and together with the Exit Term Loans, the "Exit Loans") and letters of credit (the "Exit Revolving Letters of Credit"), with the principal amount of Exit Revolving Loans and the face amount of Exit Letters of Credit not to exceed US$20,000,000 in the aggregate (the "Exit RL Commitment Amount").

From the Exit Closing Date and prior to the Exit Revolving Commitment Termination Date, the Borrowers may, subject to the terms of the Exit Loan Agreement, borrow, repay and reborrow Exit Revolving Loans, subject to satisfaction of applicable conditions to borrowing. Exit Revolving Loans will be in minimum principal amounts to be agreed to. All Exit Revolving Loans will be made by the Exit Facility Lenders ratably in proportion to their respective Exit RL Commitment Amounts. Exit Revolving Loans will be available on 3 business days' notice in the case of Exit Revolving Loans that are Eurodollar Loans and same business day notice in the case of Exit Revolving Loans that are Base Rate Loans. The Borrowers will repay each Exit Revolving Loan no later than on the Exit Revolving Commitment Termination Date.

Outstanding DIP Revolving Loans under the DIP Facility shall be deemed to be outstanding Exit Revolving Loans under the Exit Facility as of the

Exit Closing Date.

Exit Revolving Loans shall be made in U.S. dollars.

9.    ***Exit Letters of Credit:***        *Exit Revolving Facility Sublimit*

A portion of the Exit Revolving Facility not in excess of (a) US$3,000,000 for the period from the Exit Closing Date through the one year anniversary of the Exit Closing Date and (b) US$7,500,000 after the one year anniversary of the Exit Closing Date shall be available for the issuance of Exit Revolving Letters of Credit by the Exit Issuing Bank.

Drawings under any Exit Revolving Letter of Credit shall be reimbursed by the Borrowers on the next business day. To the extent the Borrowers do not so reimburse the Exit Issuing Bank, the Exit Facility Lenders under the Exit Facility shall be irrevocably and unconditionally obligated to reimburse the Exit Issuing Bank on a pro rata basis.

No Exit Revolving Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance and (b) five business days prior to the Exit Maturity Date.

*Exit Term Loan Deposit Letter of Credit Subfacility*

On the Exit Closing Date the amounts on deposit in the Term Loan LC Collateral Account will serve as collateral support for the Borrowers' reimbursement obligation with respect to the Exit Term Loan Letters of Credit. Amounts on deposit in the Term Loan LC Collateral Account shall secure the Borrowers' reimbursement obligation to the Exit Issuing Bank with respect to the Exit Term Loan Letters of Credit. If the Borrowers fail to reimburse the Exit Issuing Bank for drawings under the Exit Term Loan Letters of Credit then the Exit Facility Agent shall withdraw funds from the Term Loan LC Collateral Account equal to such drawings and remit such funds to the Exit Issuing Bank.

Funds on deposit in the Term Loan LC Collateral Account shall be invested in acceptable cash equivalents. The Exit Facility Agent, for the benefit of the Exit Issuing Bank, shall have a lien on the

33

Term Loan LC Collateral Account and all funds and amounts held therein.  If on the last business day of any month the amount on deposit in the Term Loan LC Collateral Account exceeds 103% of the amount available to be drawn under the Exit Term Loan Letters of Credit, then no later than the second succeeding business day the Exit Facility Agent shall remit such excess amount to the Borrowers so long as no default or event of default shall have occurred and be continuing.

If on the last business day of any month (or such other date as determined by the Exit Facility Agent in its sole discretion) the amount on deposit in the Term Loan LC Collateral Account is less than 103% of the amount available to be drawn under the Exit Term Loan Letters of Credit, then the Borrowers shall cause additional amounts to be deposited within one business day after notice from the Exit Facility Agent into the Term Loan LC Collateral Account equal to such deficiency.  If the Borrowers shall fail to make such deposit, the Exit Facility Lenders shall make an Exit Revolving Loan under the Exit Revolving Facility in an amount of such deficiency and the proceeds of which shall be deposited into the Term Loan LC Collateral Account.  The conditions precedent to making Exit Revolving Loans and the minimum amounts of Exit Revolving Loans shall not apply to Exit Revolving Loans made pursuant to this paragraph.  If there is not sufficient availability under the Exit Revolving Facility to make such Exit Revolving Loans provided for in this paragraph, such event shall constitute an Event of Default.

No Exit Term Loan Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance or the date of its continuance or extension and (b) five business days prior to the Exit Maturity Date.

| | | |
|---|---|---|
| 10. | ***Withdrawal from Term Loan Deposit Account:*** | On the Exit Closing Date, all funds on deposit in the Term Loan Deposit Account established under the DIP Facility shall be withdrawn and remitted to the Company to be used in accordance with the terms of this Term Sheet. |

NY3 - 504309.02

| 11. | *Exit Closing Date:* | The date on which the conditions precedent to the closing of the Exit Facility shall have been satisfied or waived. |
| 12. | *Exit Revolving Commitment Termination Date* | Three (3) years following the Exit Closing Date. |
| 13. | *Exit Maturity Date:* | Four and a half (4.5) years following the Exit Closing Date. |
| 14. | *Purpose and Use of Proceeds:* | The proceeds of the Exit Facility will be used by the Borrowers to solely (i) pay fees and expenses associated with the Exit Facility, (ii) fund working capital and general corporate purposes of the Borrowers and (iii) refinance the DIP Facility. |
| 15. | *Amortization* | 1.00% annual amortization on the Exit Term Loans, payable on the 15th day of the last month of each calendar quarter, beginning in the first full calendar quarter after the Exit Closing Date, with the balance paid on the Exit Maturity Date. |
| 16. | *Interest:* | At the Borrower's election, Exit Loans shall be Eurodollar Loans or Base Rate Loans. Eurodollar Loans shall bear interest at the annual rate equal to LIBOR plus the Applicable Margin, with a LIBOR floor of 2.00% per annum. Base Rate Loans shall bear interest at the annual rate equal to the Base Rate plus the Applicable Margin. |

Base Rate: a fluctuating rate equal to the highest of (a) the Prime Rate of the Exit Facility Agent, (b) the Federal Funds Effective Rate plus 1/2 of 1% and (c) LIBOR plus 1%, with a LIBOR floor of 2.00%.

Applicable Margin: 4.50% per annum with respect to Eurodollar Loans and 3.50% per annum with respect to Base Rate Loans.

Interest periods will be 1, 2, 3 or 6 months.

If any Event of Default occurs and is continuing, then the Borrowers will pay interest on the unpaid balance of the outstanding Exit Loans at a per annum rate of two percent (2%) greater than the rate of interest specified above.

35

If any Event of Default occurs and is continuing under the Exit Facility, each Eurodollar Loan will convert to a Base Rate Loan at the end of the Interest Period then in effect for such Eurodollar Loan.

| | | |
|---|---|---|
| 17. | *Interest Payments:* | Interest shall be payable in arrears on the last day of each interest period. |
| 18. | *Exit Upfront Fee:* | To be determined in connection with the syndication. |
| 19. | *Exit Commitment Fee:* | 1.00% per annum on the daily average amount of the unused Exit RL Commitment Amount of each Exit Facility Lender, payable quarterly in arrears to each Exit Facility Lender from the Exit Closing Date until the Exit Revolving Commitment Termination Date. |
| 20. | *Exit Letter of Credit Fee:* | A fronting fee equal to 0.25% per annum of the amounts available to be drawn under all Exit Letters of Credit, payable to the Exit Issuing Bank quarterly in arrears. |
| | | A letter of credit fee equal to the Applicable Margin with respect to LIBOR Rate Loans on the amounts available to be drawn under all Exit Letters of Credit, payable to the Exit Facility Lenders quarterly in arrears. |
| 21. | *Mandatory Prepayment:* | Mandatory prepayment of the Exit Loans shall be made from (i) 100% of the net cash proceeds from asset sales in excess of US$100,000 (with the obligation to mandatorily prepay commencing when such asset sales are greater than US$250,000) made outside the ordinary course of business, less any taxes payable by the Borrowers with respect to such asset sales, provided that with respect to the net cash proceeds from the Australia and Vietnam Assets (as defined in Section 29(h)), only 50% of the net cash proceeds shall be subject to mandatory prepayment, (ii) 100% of insurance and condemnation award payments, less any taxes payable by the Borrowers with respect to such award payments, (iii) cash proceeds from debt issuances, other than permitted debt and permitted refinancing debt and (iv) 50% of excess cash flow, which shall exclude non-cash |

items and shall include certain working capital adjustments, after the end of each fiscal year, beginning at the end of fiscal year 2011 (payable in 2012), with (in the case of clauses (i), (ii) and (iii)) exceptions, baskets and reinvestment rights to be agreed upon. Mandatory prepayments pursuant to clauses (i), (ii) and (iv) will be shared ratably with the lenders under the Second Lien Term Loan Facility pursuant to the terms of the Intercreditor Agreement. Mandatory prepayments pursuant to clause (iii) will be applied first to obligations under the Exit Term Loan Facility and thereafter to obligations under the Exit Revolving Facility. Borrowers will bear all costs related to any mandatory prepayment of Exit Loans on a day that is not the last day of an interest period, provided that such mandatory prepayments shall be applied to base rate Loans and then to Eurodollar Loans.

| 22. | *Voluntary Prepayment:* | The Exit Loans may be prepaid without penalty, on 3 business days' notice, in minimum amounts of and increments to be agreed upon. Borrowers will bear all costs related to the voluntary prepayment of Exit Loans prior to the last day of the interest period thereof. |

| 23. | *Reduction of Commitments* | Borrowers may permanently terminate or reduce the unused commitments, on 3 business days' notice, in minimum amounts and increments of to be agreed upon. |

| 24. | *Security and First Priority:* | The Exit Facility Agent, for and on behalf of the Exit Facility Lenders and each Secured Hedge Counterparty (as defined below) shall have perfected first priority security interests in and liens upon (i) all existing and after acquired real and personal, tangible and intangible, property of the U.S. Borrowers and U.S. Guarantors and (ii) the real and personal, tangible and intangible, property of the Non U.S. Borrowers and Non U.S. Guarantors securing the obligations under the Prepetition Credit Agreement (together, the "Exit Collateral"). The term "Secured Hedge Counterparty" means each Exit Facility Lender, or any affiliate of a Exit Facility Lender, counterparty to the applicable documentation creating any currency exchange, interest rate or commodity swap |

agreement, or other similar agreements with the Company or any of its subsidiaries, entered into in the ordinary course of business and not for speculative purposes.

All amounts owing under the Exit Facility and the related loan documents in respect thereof at all times will be senior to the liens granted under the Company's US$410,000,000 term loan facility to become effective concurrently with the Exit Facility (the "Second Lien Term Loan Facility"), and any indebtedness which replaces or refinances the Second Lien Term Loan Facility, subject to the terms of the Intercreditor Agreement.

25. ***Conditions to Closing:***     The closing of the Exit Facility shall be subject to the satisfaction of the conditions customary for a transaction of this type, including:

(a)   All documentation relating to the Exit Facility (including the Intercreditor Agreement) shall be in form and substance consistent with this Term Sheet and otherwise satisfactory to the Borrowers and their counsel and the Exit Facility Agent and its counsel, it being understood that the Intercreditor Agreement to be included in the Plan Supplement (as defined in the Plan of Reorganization) shall be deemed to be in form and substance consistent with this Term Sheet and otherwise satisfactory to the Borrowers and their counsel and the Exit Facility Agent and its counsel, thus satisfying this condition to closing as it relates to the Intercreditor Agreement;

(b)   The terms of the Plan of Reorganization shall have been confirmed by an order entered by the Court in form and substance acceptable to the Requisite Lenders; the Requisite Lenders shall be satisfied with, to the extent not specifically described in the Plan of Reorganization, the Disclosure Statement of the Plan Supplement, the terms of the restructuring of the Borrowers and its subsidiaries (including, without limitation, changes to the current composition of the Boards of Directors and of senior management

38

and the capital and tax structure of the Borrowers and their subsidiaries), it being understood that the documents to be included in the Plan Supplement identifying the current composition of the Boards of Directors and of senior management and the capital and tax structure of the Borrowers and their subsidiaries shall be deemed to be in form and substance consistent with this Term Sheet and otherwise satisfactory to the Borrowers and their counsel and the Exit Facility Agent and its counsel, thus satisfying this condition to closing as it relates to the such aforementioned documents;

(c)     The Exit Facility Lenders shall have received, and the Requisite Lenders shall be satisfied with, (i) a pro forma estimated balance sheet of the Company and its subsidiaries at the Exit Closing Date after giving effect to the Plan of Reorganization and the transactions contemplated thereby, (ii) audited financial statements of the Borrower and its subsidiaries for the fiscal period ending December 31, 2009, (iii) interim unaudited monthly and quarterly financial statements of the Borrower and its subsidiaries through the fiscal month ending at least 30 days prior to the Exit Closing Date and the fiscal quarter ending at least 45 days prior to the Exit Closing Date, and (iv) the detailed business plan of the Company and its subsidiaries which shall include a projected consolidated balance sheet and related statements of projected operations and cash flow on a monthly basis for the fiscal year ending December 31, 2010, and on an annual basis through the fifth fiscal year after the Exit Closing Date, prepared by the Company's management;

(d)     The Exit Facility Agent shall be satisfied that (i) the Borrowers', the Guarantors', and their respective subsidiaries' existing debts and liens do not exceed an amount agreed upon prior to the Exit Closing Date, and (ii) there shall not occur as a result of, and after giving effect to, the consummation of the Plan of

39

Reorganization or the funding of the Exit Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrowers', the Guarantors' or their respective subsidiaries' debt instruments and other agreements that could reasonably be expected to result in an Exit Material Adverse Effect;

(e) The Company shall have delivered certificates, in form and substance satisfactory to the Exit Facility Agent, attesting to the solvency of each of the Borrowers and each of the Guarantors after giving effect to the transactions contemplated hereby, from its chief financial officer;

(f) The absence of an Exit Material Adverse Effect or event or occurrence which could reasonably be expected to result in a material adverse change, in (i) the business, assets, financial condition or prospects of the Borrowers, the Guarantors and their respective subsidiaries, taken as a whole, since the confirmation off the Plan of Reorganization, (ii) the ability of any Borrower or any Guarantor to perform any of its obligations in accordance with the terms under the Exit Loan Agreement or any loan document, or (iii) the ability of the Exit Facility Agent and the Exit Facility Lenders to enforce the Exit Loan Agreement or any loan document provided that the filing of the Cases will not be deemed to constitute an impediment to enforcement hereunder;

(g) There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in an Exit Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Exit Facility or the transactions contemplated thereby, other than

40

the Cases;

(h) The Exit Facility Agent shall have received endorsements naming the Exit Facility Agent as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the Borrowers, the Guarantors and their respective subsidiaries forming part of the Exit Collateral;

(i) The Borrowers and the Guarantors shall have at least US$35 million of unrestricted cash and cash equivalents on hand and undrawn and available commitments under the Exit Revolving Facility;

(j) All fees and other payments required to be made to the Exit Facility Lenders, the Exit Facility Agent and the Sole Lead Arranger and their respective advisors and counsel under the Exit Loan Agreement or any other written agreement shall have been paid;

(k) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist;

(l) Representations and warranties shall be true and correct in all material respects, except where such representation or warranty relates to an earlier date, in which case it shall be true and correct in all material respects as of such earlier date; provided that any representation or warranty that is by its terms qualified by materiality shall be true and correct in all respects;

(m) Execution and delivery of all collateral documents for the Exit Facility, including but not limited to mortgages, ALTA mortgage title insurance policies and evidence of flood insurance with respect to any property located in any flood hazard zone;

(n) The Exit Facility Agent shall have a perfected first priority security interest in the Exit

41

Collateral, and all filings and recordings and searches necessary or desirable in connection with such liens and security interest shall have been duly made;

(o) Delivery of legal opinion by counsel to the Borrowers and the Guarantors;

(p) Delivery of customary officers' and secretaries' certificates, incumbency/specimen signature certificates, resolutions and good standing certificates;

(q) All required consents shall have been obtained;

(r) The Exit Facility Agent shall have received the certificates representing the shares of capital stock pledged pursuant to the security documents, together with undated stock powers (or the equivalent) for each such certificate executed by the applicable Borrower or Guarantor; and

(s) The Company shall have received a rating on the Exit Facility from Moody's Investors Service, Inc. and shall have used commercially reasonable efforts to obtain a rating on the Exit Facility from Standard & Poor's Rating Group.

26. ***Conditions to All Extensions of Credit***

Each extension of credit shall be subject to the satisfaction of the conditions customary for a transaction of this type, including:

(a) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist; and

(b) Representations and warranties shall be true and correct in all material respects, except where such representation or warranty relates to an earlier date, in which case it shall be true and correct in all material respects as of such earlier date; provided that any representation or warranty that is by its terms qualified by materiality shall be true and correct in all respects.

42

| 27. | ***Representations and Warranties:*** | The Exit Loan Agreement will contain representations and warranties that are customary for a transaction of this type and shall be based on the representations and warranties set forth in the Prepetition Credit Agreement (subject to materiality qualifiers and exceptions to be agreed upon, as well as matters disclosed in SEC filings and the Disclosure Statement), including: |

(a) Confirmation of corporate status and authority of the Company and its subsidiaries;

(b) Capital stock of each of the Company and its subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable;

(c) Due authorization, execution and delivery of the loan documents;

(d) Execution, delivery, and performance by the Borrowers and Guarantors of the loan documents do not conflict with law, existing agreements or organization documents except where such conflict would not reasonably be expected to result in an Exit Material Adverse Effect;

(e) No governmental or regulatory approvals required;

(f) Legality, validity, binding effect and enforceability of the loan documents;

(g) Accuracy of information and financial statements;

(h) Projections based on good faith estimates;

(i) No occurrence of any event, matter or circumstance since the Petition Date, other than the transactions consummated under the Plan of Reorganization: (a) which is materially adverse to the: (i) business, assets financial condition or prospects of Company and its subsidiaries taken as a whole; or (ii) ability of any Borrower or any Guarantor to perform any of its obligations in accordance with their terms

43

under any of the loan documents; or (b) which in the reasonable opinion of the Requisite Lenders results in any (i) loan document not being legal, valid and binding on and, subject to reservations contained in the legal opinions provided as conditions precedent thereto, enforceable against any party thereto, from and after the Effective Date of the Plan of Reorganization, and/or (ii) collateral document not being a valid and effective security interest, from and after the Effective Date of the Plan of Reorganization, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any Exit Facility Lender under the loan documents ("Exit Material Adverse Effect");

(j) Payment of taxes by the Company and its subsidiaries, except those taxes being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(k) Good, sufficient and legal title to properties owned by the Company or its subsidiaries;

(l) Environmental compliance by the Company and its subsidiaries, except where non-compliance would not reasonably be expected to result in an Exit Material Adverse Effect;

(m) No defaults by the Company or its subsidiaries in any contractual obligations, except where such default would not reasonably be expected to result in an Exit Material Adverse Effect and except as contemplated by the Plan of Reorganization;

(n) List of material contracts in effect on the Exit Closing Date is true, correct and complete;

(o) Neither the Company nor any of its subsidiaries is an investment company;

(p) Neither the Company nor any of its subsidiaries is engaged in the business of extending credit

44

for the purpose of purchasing or carrying any margin stock and no part of the proceeds of the Exit Loans made will be used to purchase or carry any such margin stock;

(q) No unfair labor practices by the Company or its subsidiaries and other employment law non-compliance matters that could reasonably be expected to result in an Exit Material Adverse Effect;

(r) Compliance by the Company and its subsidiaries with employee benefit plans, except where non-compliance would not reasonably be expected to result in an Exit Material Adverse Effect;

(s) No broker's or finder's fee or commission will be payable in connection with the transactions contemplated by the loan documents;

(t) Borrowers and Guarantors are solvent;

(u) Full and accurate disclosure by Borrowers and Guarantors;

(v) Compliance with laws, except where non-compliance would not reasonably be expected to result in an Exit Material Adverse Effect;

(w) Use of proceeds in accordance with the terms hereof and the Exit Loan Agreement;

(x) No action, suit, investigation, litigation or proceeding pending or threatened that could have an Exit Material Adverse Effect;

(y) Insurance matters;

(z) Validity, priority and perfection of security interests in the Exit Collateral; and

(aa) Status of the Exit Facility as senior debt.

28. ***Affirmative Covenants:***      The Exit Loan Agreement will contain affirmative covenants that are customary for a transaction of this type and shall be based on the affirmative covenants set forth in the Prepetition Credit

Agreement, including:

(a) The Company to deliver to the Exit Facility Agent the following:  (i) audited annual financial statements within 90 days after the end of each fiscal year; (ii) unaudited quarterly financial statements within 45 days after the end of each fiscal quarter; (iii) detailed consolidated budget and business plan of the Company and its subsidiaries through the fifth fiscal year after the Exit Closing Date (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of such fiscal year) on or before April 1 of each fiscal year; (iv) compliance certificates; (v) notices of default; (vi) notices of litigation; (vii) notices of ERISA events; (viii) annual collateral verification reports; and (ix) other information.

(b) The Company to file all reports and other documents with the Securities and Exchange Commission required under the Securities Exchange Act.

(c) Each Borrower, each Guarantor and their respective subsidiaries to preserve and maintain in full force and effect its corporate existence and all rights and franchises, licenses and permits material to its business, except where its board of directors determines that such preservation is no longer desirable in the conduct of its business and the loss is not disadvantageous in any material respect to it or the Exit Facility Lenders.

(d) Each Borrower, each Guarantor and their respective subsidiaries to pay all material taxes, except those taxes which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP.

(e) Each Borrower, each Guarantor and their respective subsidiaries to maintain in good repair, working order and condition, ordinary

46

wear and tear excepted, all material properties used or useful in the business of the Company and its subsidiaries and make all appropriate repairs, renewals and replacements thereof, except where failure to do so would not reasonably be expected to have an Exit Material Adverse Effect.

(f)     The Company will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Company and its subsidiaries as may customarily be carried or maintained under similar circumstances by persons of established reputation engaged in similar businesses, in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such persons.

(g)     Each Borrower, each Guarantor and their respective subsidiaries to maintain accurate books and records and, as reasonably requested and with reasonable notice, permit visitation and inspection by the Exit Facility Agent representatives.

(h)     Each Borrower, each Guarantor and their respective subsidiaries to comply in all material respects, with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (including all environmental laws), except where failure to do so would not reasonably be expected to have an Exit Material Adverse Effect.

(i)     The Company to deliver to the Exit Facility Agent environmental reports and disclosures.

(j)     Each Borrower to cause any person that becomes a material subsidiary to become a Guarantor and a grantor under the applicable

47

collateral documents.

(k)   Each Borrower, each Guarantor and their respective subsidiaries, upon acquisition of a material real estate asset, to take all actions to create in favor of Exit Facility Agent a valid and perfected first priority security interest.

(l)   Each Borrower and Guarantors to take all actions the Exit Facility Agent may reasonably request in order to effect fully the purposes of the loan and collateral documents.

(m)   Each Borrower and each of its subsidiaries will continue to own or possess the right to use, free from any restrictions, all patents, trademarks, copyrights, and domain names that are used in the operation of their respective businesses as presently conducted and as proposed to be conducted, except to the extent the failure to so own or possess would not reasonably be expected to have an Exit Material Adverse Effect.

(n)   Each Borrower and each Guarantor to supply to the Exit Facility Agent or any Exit Facility Lender documents and evidence reasonably requested and necessary to comply with "know your customer" or other similar checks.

(o)   Each Borrower, each Guarantor and their respective subsidiaries to ensure that its payment obligations under each of the loan and collateral documents rank and will at all times rank senior to the obligations under the Second Lien Term Loan Facility in accordance with the terms of the Intercreditor Agreement and Permitted Liens and will at all times rank at least pari passu to the obligations of all other present and future secured and unsubordinated indebtedness.

29.   ***Negative Covenants:***   The Exit Loan Agreement will contain negative covenants that are customary for a transaction of this type and shall be based on the negative covenants set forth in the Prepetition Credit

Agreement, including:

(a) No incurrence of indebtedness by any Borrower or any Guarantor or any of their subsidiaries, other than:

    1. the obligations under the Exit Loan Agreement and the related loan and collateral documents (the "<u>Obligations</u>");

    2. indebtedness of any subsidiary to any Borrower or to any other subsidiary, or of any Borrower to any subsidiary; <u>provided</u>, (i) all such indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a lien pursuant to the collateral documents, (ii) all such indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to the Exit Facility Agent, and (iii) any payment by any such subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any indebtedness owed by such subsidiary to the Company or to any of its subsidiaries for whose benefit such payment is made;

    3. senior or subordinated unsecured debt; <u>provided</u>, that (i) no default or event of default is continuing under the Exit Loan Agreement or would result from such issuance, (ii) each Borrower is in compliance (and certifies as to such compliance) with the financial covenants on a pro forma basis after giving effect to the such issuance, (iii) the proceeds of such issuance are applied in accordance with the mandatory prepayment provisions of the Second Lien Term Loan Facility, and if the loans thereunder are paid in full, then the proceeds of such issuance shall be used for permitted

acquisitions or to fund permitted capital expenditures, (iv) such debt shall have a maturity of not earlier than six months after the Exit Maturity Date and (v) the documentation relating to such debt shall not contain any covenant or event of default that is either (x) not substantially provided for in the Exit Loan Agreement or (y) more favorable to the holder of such debt than the comparable covenant or event of default set forth in the Exit Loan Agreement, and, in the case of any subordinated debt, shall contain customary subordination provisions pursuant to which such debt is subordinated to the prior payment in full of the obligations under the Exit Loan Agreement;

4.    indebtedness incurred by the Company or any of its subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of each Borrower or any such subsidiary pursuant to such agreements, in connection with certain permitted acquisitions or permitted dispositions of any business, assets or subsidiary of the Company or any of its subsidiaries;

5.    indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

6.    indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

7.    guaranties in the ordinary course of business of obligations to suppliers, customers, franchisees and licensees of

50

the Company and its subsidiaries;

8. guaranties or the provision of other credit support by a Borrower of indebtedness of a subsidiary or guaranties or the provision of other credit support by a subsidiary of a Borrower of indebtedness of a Borrower or a subsidiary with respect, in each case, to indebtedness otherwise permitted to be incurred pursuant to the lien covenant section below;

9. existing disclosed indebtedness, but not any extensions, renewals or replacements of such indebtedness except (i) renewals and extensions expressly provided for in the agreements evidencing any such indebtedness as the same are in effect on the Exit Closing Date and (ii) refinancings and extensions of any such indebtedness if the terms and conditions thereof are not materially less favorable to the obligor thereon or to the Exit Facility Lenders than the indebtedness being refinanced or extended, and the average life to maturity thereof is greater than or equal to that of the indebtedness being refinanced or extended; provided, such indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include indebtedness of an obligor that was not an obligor with respect to the indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the indebtedness being renewed, extended or refinanced or (C) be incurred, created or assumed if any default or event of default under the Exit Loan Agreement has occurred and is continuing or would result therefrom;

10. indebtedness with respect to capital leases or purchase money indebtedness in an amount not to exceed at any time US$25 million in the aggregate (including any indebtedness acquired in connection with certain permitted acquisitions); provided,

any such purchase money indebtedness shall be secured only to the asset(s) acquired in connection with the incurrence of such indebtedness;

11. other indebtedness of the Company and its subsidiaries in an aggregate amount not to exceed at any time US$25 million;

12. indebtedness under certain factoring agreements;

13. unsecured working capital facilities of any subsidiary in respect of which an Exit Letter of Credit in an amount equal to the maximum principal amount of such facilities has been issued under the Exit Facility;

14. hedging obligations entered into for the purpose of hedging risks associated with the operations of the Company and its subsidiaries;

15. the obligations under the Second Lien Term Loan Facility;

16. any replacement, renewal or refinancing of and debt described in 3, 10, 11 and 15 ("Permitted Refinancing Indebtedness") that (i) does not exceed the aggregate principal amount of the debt being replaced, renewed or refinanced, (ii) does not have a maturity date earlier than the debt being replaced renewed or refinanced, (iii) does not rank at the time of such replacement, renewal or refinancing senior to the debt being replaced, renewed or refinanced and (iv) the documentation relating to such debt shall not contain any covenant or event of default that is either (x) not substantially provided for in the Exit Loan Agreement or (y) more favorable to the holder of such debt than the comparable covenant or event of default set forth in the Exit

Loan Agreement; and

17. scheduled indebtedness existing on the Exit Closing Date.

(b) No liens on any property or assets of the Company or its subsidiaries, other than:

1. liens in favor of Exit Facility Agent for the benefit of Exit Facility Lenders granted pursuant to any security document;

2. liens for taxes not then due or if due obligations with respect to such taxes that are not at such time required to be paid pursuant to the payment of taxes covenant or which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

3. statutory liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other liens imposed by law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of 15 days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

4. liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts,

trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Exit Collateral on account thereof;

5. easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of the Company or any of its subsidiaries;

6. any (i) interest or title of a lessor or sublessor under any lease of real estate permitted under the Exit Loan Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii), so long as the holder of such restriction or encumbrance agrees to recognize the rights of such lessee or sublessee under such lease;

7. liens solely on any cash earnest money deposits made by the Company or any of its subsidiaries in connection with any letter of intent or purchase agreement permitted under the Exit Loan Agreement;

8. purported liens evidenced by the filing of precautionary UCC financing statements or, for property located in foreign jurisdictions, the preparation and/or filing of functionally similar documents, relating solely to operating leases of personal property entered into in the ordinary course of business;

NY3 - 504309.02

9. liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

10. any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

11. (i) licenses of patents, trademarks and other intellectual property rights granted by the Company or any of its subsidiaries in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of the Company or such subsidiary and (ii) leases or subleases granted by Company of any of its subsidiaries to third parties in respect of surplus property which is not fundamental to the operation of the business in the ordinary course of business; provided that such leases and subleases are on arms-length commercial terms and are otherwise satisfactory to the Exit Facility Agent;

12. liens described on a title report delivered in connection with any real property securing the obligations under the Exit Loan Agreement;

13. liens securing indebtedness permitted pursuant to clauses 10. and 11. of the debt covenant above; provided, any such lien shall encumber only the asset acquired with the proceeds of such indebtedness;

14. liens granted by entities acquired pursuant to the asset sale covenant prior to their acquisition and not in contemplation of such acquisition and which are discharged within three months of the date of acquisition and in relation to which the secured amount is not increased in contemplation of or after the date of the

NY3 - 504309.02

relevant acquisition;

15. liens in favor of the collateral agent under the security documents relating to the Second Lien Term Loan Facility;

16. liens securing Permitted Refinancing Indebtedness, provided that any such lien shall encumber only the assets that secure the debt being replaced, renewed or refinanced by such Permitted Refinancing Indebtedness;

17. scheduled liens outstanding on the Exit Closing Date and replacements thereof so long as the replacement liens encumber only the assets subject to the liens being replaced; and

18. a general lien basket of US$15 million so long as the assets subject to such lien is located outside the United States and are not included in the Exit Collateral, of which US$5 million of such general lien basket may apply to assets subject to such lien that are located in the United States and are not included in the Exit Collateral.

(c) If any Borrower or any of its subsidiaries creates any lien upon any of its properties or assets, other than Permitted Liens, it shall make provisions whereby the obligations under the Exit Loan Agreement will be secured by such lien equally and ratably.

(d) No further negative pledges by any Borrower, any Guarantor or their subsidiaries, other than:

1. specific property encumbered to secure payment of particular indebtedness or to be sold pursuant to an executed agreement with respect to a permitted asset sale;

2. restrictions contained in any documents evidencing subordinated debt; provided, that in respect of subordinated debt such restrictions do not restrict the ability to grant security interests under the Exit

Loan Agreement or any agreement that refinances the obligations under the Exit Loan Agreement;

3.  restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be);

4.  liens permitted to be incurred under lien and debt covenants in the Exit Loan Agreement and restrictions in the agreements relating thereto that limit the right of any Borrower or any Guarantor to dispose of or transfer the assets subject to such liens;

5.  provisions limiting the disposition or distribution of assets or property under sale-leaseback agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of such agreements;

6.  any encumbrance or restriction in connection with an acquisition of property, so long as such encumbrance or restriction relates solely to the property so acquired and was not created in connection with or in anticipation of such acquisition; and

7.  restrictions imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements that restrict the transfer of ownership interest in such partnership, limited liability company, joint venture or similar

57

person.

(e) No restricted junior payments (e.g., dividends and payments of subordinated debt) except distributions from a subsidiary to its shareholders, provided that such payments are made to all its shareholders proportionately, and so long as no default exists, the Company can repurchase or redeem common stock up to US$7 million per year for the purpose of repurchases of common stock from departing executives or satisfying the purchase price of equity awards under, or paying withholding taxes with respect to vested equity compensation programs.

(f) Limited restrictions on subsidiary ability to make distributions.

(g) No investments in any person (including joint ventures) by any Borrower, any Guarantor or their subsidiaries, other than:

1. investments in cash and cash equivalents;

2. equity investments and loans as of the Exit Closing Date in or to any subsidiary and equity investments and loans made after the Exit Closing Date in or to any subsidiary of any Borrower;

3. investments (i) in any securities received in satisfaction or partial satisfaction of obligations of financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the Company's and its subsidiaries' ordinary course of business;

4. intercompany loans and guaranties to the extent permitted by the provisions of the indebtedness covenant above;

5. capital expenditures permitted under the financial covenants below;

6. loans and advances to employees of the Company and its subsidiaries made in the