(i) Xerium (France) SAS shall pay to the Collateral Agent sums equal to, and in the currency of, its obligations owing by it to a Secured Party (other than the Collateral Agent) as and when the same fall due for payment under the Credit Documents and each of the German Guarantors shall pay to the Collateral Agent sums equal to, and in the currency of, the Non-US Obligations as and when the same fall due for payment under the Credit Documents (the "**Parallel Obligations**");

(ii) the rights of the Secured Parties to receive payment under the Credit Documents are several and independent from the rights of the Collateral Agent to receive the Parallel Obligations;

(iii) the Collateral Agent shall have its own independent right to demand payment of the Parallel Obligations by Xerium Technologies Limited, Xerium (France) SAS and the German Guarantors;

(iv) the payment by Xerium Technologies Limited, Xerium (France) SAS or any of the German Guarantors of its Parallel Obligations to the Collateral Agent in accordance with this Section 7.13 shall be a good discharge of the corresponding obligations owed by it to the relevant Secured Party under the relevant Credit Document, or the corresponding Non-US Obligations, as the case may be, and payment by Xerium (France) SAS or any of the German Guarantors of its obligations owed by it to the relevant Secured Party under the relevant Credit Document, or the corresponding Non-US Obligations, as the case may be, shall be a good discharge of the corresponding Parallel Obligations to the Collateral Agent; and

(v) with regard to Xerium Technologies Limited, Xerium (France) SAS and the German Guarantors, nothing in any Credit Document shall in any way limit the Collateral Agent's right to act in the protection or preservation of the rights under, or to enforce any, Collateral Document as contemplated by this Section 7.13 or the relevant Collateral Document.

(b) Despite the foregoing, any such payment shall be made to the Administrative Agent unless the Administrative Agent directs such payment to be made to the Collateral Agent.

(c) Without limiting or affecting the Collateral Agent's rights against Xerium Technologies Limited, Xerium (France) SAS or any of the German Guarantors (whether under this Section 7.13 or under any other provision of the Credit Documents and subject to paragraph (a)(v) of this Section 7.13), the Collateral Agent agrees with each other Secured Party or creditor of a Non-US Obligation, as the case may be, that it will not exercise its rights in respect of the Parallel Obligations except with the consent of the relevant Secured Party or the creditor of a Non-US Obligation or the Requisite Banks, as the case may be.

131

NY3 - 504826.09

(d) A Secured Party and the Collateral Agent may not, by virtue of this Section 7.13, pursue Xerium (France) SAS or any of the German Guarantors concurrently for the same obligation.

### 7.14 **Limitation of Non-US Guaranteed Obligations**.[3]

(a) <u>Austrian guarantee</u>.  The obligations of each Non-US Guarantor organized under Austrian law (each, an "**Austrian Guarantor**") shall be limited so as not to result in the violation of Austrian capital maintenance rules pursuant to Austrian company law, in particular Section 82 of the Act on Limited Liability Companies (*Gesetz über Gesellschaften mit beschränkter Haftung*) and Section 52 of the Austrian Act on Stock Corporations (*Aktiengesetz*)(Austrian Capital Maintenance Rules), and all obligations hereunder of such Austrian Guarantor shall be limited in accordance with these rules.  Further, the subordination of obligations pursuant to Section 7.7 hereof shall not be binding on any Obligee Guarantor organized under Austrian law to the extent such subordination would constitute a violation of mandatory Austrian capital maintenance provisions.  No reduction of the amount enforceable against an Austrian Guarantor pursuant to this paragraph in accordance with the above limitations will prejudice the rights of the Administrative Agent to continue to enforce the guarantee pursuant to Section 7.1 (subject always to the operation of the limitation set forth above at the time of such enforcement) until the Non-US Obligations have been satisfied in full.

(b) <u>Italian guarantee</u>.  This liability of each Non-US Guarantor organized under the laws of the Republic of Italy (each, an "**Italian Guarantor**") shall:

(i) at no time require an Italian Guarantor to pay an amount which exceeds an amount corresponding from time to time to the aggregate of the outstanding indebtedness of the Italian Guarantor under the Italia Term Loan; and

(ii) the guarantee obligations of an Italian Guarantor under this Section 7.14(b) shall be limited to the extent required to comply with Italian mandatory provisions on financial assistance and corporate benefit (including, without limitation, Article 2358 of the Italian Civil Code) and, accordingly, such guarantee obligations shall not include and shall not extend to any indebtedness incurred by any Borrower and/or Guarantor in relation to the financing of the acquisition or subscription for of shares issued or to be issued

---

[3] Under review and discussion by local counsel.

by such Italian Guarantor or by any direct or indirect controlling entity of such Italian Guarantor, unless the conditions and procedure provided for under Article 2358 of the Italian Civil Code are complied with; without prejudice to the foregoing and for the specific purposes of article 1938 of the Italian Civil Code (if applicable), the maximum amount that each Italian Guarantor may be required to pay under this Section 7.14 shall in no event exceed Euro [_____].

(c) Intentionally omitted.

(d) French guarantee.  The liability of each Non-US Guarantor organized under the laws of France (a "**French Guarantor**") shall (A) not include any obligations which if incurred would constitute the provision of financial assistance as defined by article L225-216 of the French Commercial Code, (B) only guarantee obligations to the extent that the proceeds are used to finance or refinance the working capital needs or the debt of any Borrower and (C) be limited at any time to the greater of:

(i) the equivalent to Euros of the Loans (plus any accrued interest thereon, commissions and fees) made available to any obligor (other than, if applicable, the French Guarantor) to the extent directly or indirectly on-lent by the obligor to the French Guarantor calculated by the Facility Agent on the date on which such moneys are paid; and

(ii) 80% of the greater of:

(A) the Net Asset Value of the French Guarantor calculated and certified by the statutory auditors of the French Guarantor on the basis of the last audited financial statements available at the date hereof; and

(B) the Net Asset Value of the French Guarantor calculated and certified by the statutory auditors of the French Guarantor on the basis of the last audited financial statements available at the date on which demand is made on it pursuant to this Section 7.

For the purposes of this Section 7.14(d) "**Net Asset Value**" of the French Guarantor means the *capitaux propres* (as defined under the provisions of French accounting laws, decrees and regulations consistently applied) of the French Guarantor.  A certificate of the statutory auditors of the French Guarantor as to the Net Asset Value shall be prima facie evidence as to the amount to which it relates.

The liability of any French Guarantor under Section 7 (Guaranty) of this Agreement for the obligations under the Credit Documents of any Non-US Credit Party which is its Subsidiary shall not, in relation to amounts due by such Non-US Credit Party, be limited.

(e) Canadian guarantee.  No Guarantor existing under the laws of Canada or any province thereof (a "**Canadian Guarantor**") shall guarantee, undertake, or provide any indemnity in respect of, the obligations of any person

133

under this Section 7 unless at the time such guarantee or undertaking is given or indemnity is provided (i) such person is a Subsidiary of the Canadian Guarantor or (ii) the Canadian Guarantor is a wholly owned Subsidiary of such person or (iii) such Canadian Guarantor is not prohibited by applicable laws from giving such guarantee or undertaking or providing such indemnity.

(f) <u>German guarantees</u>.

(i) To the extent that any of the guarantees granted hereunder by any Guarantor organized under the laws of the Federal Republic of Germany as a German limited liability company (*GmbH*) or a German limited partnership with a German limited liability company (*GmbH*) as general partner (*GmbH & Co. KG*) is enforced with respect to Non-US Guaranteed Obligations owed and payable by an affiliated company (*verbundenes Unternehmen*) within the meaning of Section 15 *et seq*. of the German Stock Corporation Act (*Aktiengesetz*) of the relevant Guarantor other than affiliated companies as to which such Guarantor (or, in the case of a GmbH & Co. KG, it or its general partner) is a direct or indirect shareholder, the right to enforce the Guarantee against the relevant Guarantor shall, but only with respect to such Guarantor, be limited

(1) to such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) net assets, being its total assets less its liabilities each as calculated in accordance with the accounting standards applicable to such Guarantor (or, in the case of a GmbH & Co. KG, its general partner) by law from time to time, (*Nettovermögen*) (the "**Net Assets**"), however only if and to the extent that such Guarantor provides sufficient evidence to the Administrative Agent that

(A) such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) Net Assets are reduced below the amount of its (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital (*Stammkapital*) as a result of the enforcement, the application of the proceeds towards the Non-US Guaranteed Obligations would thus constitute a violation of Section 30 German Limited Liability Company Act (*GmbH-Gesetz*), and such payment of proceeds to such Guarantor is therefore required to allow such Guarantor (or, in the case of a GmbH & Co. KG, its general partner) to maintain its stated share capital in accordance with Section 30 German Limited Liability Company Act, or

(B) such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) Net Assets had already been reduced prior to the enforcement to an amount below its (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital, the application of the proceeds towards the Non-US Guaranteed Obligations would thus constitute a violation of Section 30 German Limited Liability Company Act, and such payment of proceeds to such Guarantor is

134

therefore required to restore such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital in accordance with Section 30 German Limited Liability Company Act;

(2) to such an amount as such limitation is required to prevent a destruction of such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) existence, however only if and to the extent that such Guarantor provides sufficient evidence to the Administrative Agent that such destruction of existence would otherwise occur and be deemed to have been brought about by a lack of minimum considerateness of such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) interests (*Rücksichtnahme auf die Eigenbelange der GmbH*) on the part of such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) sole shareholder (*existenzvernichtender Eingriff*);

however in each case only if and to the extent that such Guarantor further provides sufficient evidence to the Administrative Agent that the Non-US Guaranteed Obligations, including without limitation any interest or ancillary obligations relating thereto, with respect to which the guarantee is enforced do not correspond to funds that have been directly or indirectly passed on by any of the Borrowers of such Non-US Guaranteed Obligations (1) in the form of a loan to such Guarantor (or, in the case of a GmbH & Co. KG, to it or its general partner) or (2) in the form of a loan or of equity to an affiliated company of such Guarantor (or, in the case of a GmbH & Co. KG, of it or its general partner) as to which it (or, in the case of a GmbH & Co. KG, it or its general partner) is a direct or indirect shareholder and that is not itself a Credit Party.

(ii) The foregoing subsection 7.14(f)(i)(1) shall apply only subject to the provisos that

(1) for the purposes of the determination of the relevant Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital the amount of any increase of such stated share capital after the date hereof shall be disregarded to the extent such increase (A) has been effected without the prior written consent of the Administrative Agent, (B) is effected out of company funds (*Kapitalerhöhung aus Gesellschaftsmitteln*) or (C) is not fully paid up; and

(2) for the purposes of the calculation of the relevant Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) Net Assets the following items shall be adjusted as follows:

1. (A) obligations under loans provided to the relevant Guarantor (or, in the case of a GmbH & Co. KG, to it or its general partner) by its (or, in the case of a GmbH & Co. KG, its or its general partner's) direct or indirect shareholders or their affiliates to the extent that such obligations (x) are subordinated pursuant to contractual arrangements or if the conditions of Section 39(1) no. 5 or (2) of the *German Insolvency Act* (*Insolvenzordnung*) are met  or (y) qualify as obligations which may not be repaid under Section 30 of the German Limited Liability Company Act;

135

2.  (B)    rights for payment under loans granted by the relevant Guarantor (or, in the case of a GmbH & Co. KG, by it or its general partner) to any of its (or, in the case of a GmbH & Co. KG, its or its general partner's) direct or indirect shareholders or their affiliates to the extent the granting of such loans constituted a violation of Section 30 German Limited Liability Company Act shall be accounted for with their full nominal value; without prejudice to the foregoing, rights for payment under loans (other than or in excess of those accounted for with their full value pursuant to the foregoing) shall be disregarded to the extent such rights do not qualify as assets of the relevant Guarantor (or, in the case of a GmbH & Co. KG, of its general partner) for purposes of Section  30 German Limited Liability Company Act provided that such loans were made by such Guarantor (or, in the case of a GmbH & Co. KG, by its general partner) to one of its (or, in the case of a GmbH & Co. KG, its general partner's) direct or indirect shareholders or their affiliates and such shareholder or affiliate is fully liable for the payment of the Non-US Guaranteed Obligations;

3.  (C)    obligations under loans or other contractual liabilities incurred by the relevant Guarantor (or, in the case of a GmbH & Co. KG, by it or its general partner) in violation of any Credit Document to which it (or, in the case of a GmbH & Co. KG, it or its general partner, respectively) is a party shall be disregarded; and

4.  (D)    any asset that is not necessary for the relevant Guarantor's (or, in the case of a GmbH & Co. KG, its or its general partner's) business (nicht betriebsnotwendig), that is shown in such Guarantor's (or, in the case of a GmbH & Co. KG, its or its general partner's, respectively) balance sheet with a book value (Buchwert) which is lower than the market value of such asset, and that can be realized, shall be taken into account with its market value, except where such Guarantor provides sufficient evidence to the Administrative Agent that (x) such realization would not be legally permitted or (y) the proceeds achievable through such realization would not exceed the total of the book value plus the expenses in connection with such realization.

(iii) The limitations set out above in (i) and (ii) shall not apply if the relevant German Guarantor has entered into a domination and or profit and loss transfer agreement (Beherrschungs- und/oder Gewinnabführungsvertrags) as the dominated party.

(g) Swedish guarantees.  The obligations of any Swedish Guarantor as a Non-US Guarantor under the Credit Documents shall be limited, if required by the provisions of the Swedish Companies Act (Sw. Aktiebolagslagen 2005:551) regulating distribution of assets (Chapter 17, Section 3 or the equivalent clause/s from time to time) and it is understood that the liability of such Swedish Guarantor only applies to the extent and in such amount permitted by the above mentioned provisions of the Swedish Companies Act.

(h) Mexican guarantees.  To the extent that the Guarantor is a Mexican Guarantor, the enforcement of the obligations under this Section 7 against the Mexican Guarantor shall be subject and may be limited:

136

(i) by the fact that the obligations of the Mexican Guarantor under the Credit Documents are invalid, illegal or unenforceable obligations of the Mexican Guarantor;

(ii) by Mexican bankruptcy, insolvency, fraudulent conveyance, suspension of payments, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally; and

(iii) by the fact that the obligations guaranteed by the Mexican Guarantor are inherent to its corporate purpose.

7.15 **Validity and Effectiveness**.  This Guaranty shall remain wholly valid and effective until the full, unconditional and irrevocable performance and discharge of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, and for all the period during which payments effected in such respect are subject to the claw back and/or avoidance under any applicable law.

## SECTION 8. EVENTS OF DEFAULT

8.1 **Events of Default**.  If any one or more of the following conditions or events shall occur:

(a) Failure to Make Payments When Due.  Failure by a Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) when due any amount payable to Issuing Bank in reimbursement of any drawing under a Letter of Credit; or (iii) any interest on any Loan or any fee or any other amount due hereunder, which failure continues for three (3) Business Days only if as a result of a transmission failure due to a failure of the banking markets; or

(b) Default in Other Agreements.  (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) with an aggregate principal amount of $5,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, originally provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

137

(c) <u>Breach of Certain Covenants</u>.  Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.6, Section 2.23(a)(ii)(A), Section 5.1(g)(i), Section 5.1(q), Section 5.2 or Section 6; or

(d) <u>Breach of Representations, etc</u>.  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e) <u>Other Defaults Under Credit Documents</u>.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other subsection of this Section 8.1, and such default shall not have been remedied or waived within twenty (20) Business Days after the earlier of (i) an officer of such Credit Party becoming aware of such default or (ii) receipt by Xerium of notice from the Administrative Agent or any Bank of such default; or

(f) <u>Involuntary Bankruptcy; Appointment of Receiver, etc</u>.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Xerium or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, provincial or state law; or (ii) an involuntary case (including, without limitation, a winding-up, dissolution, reorganization, compromise or arrangement) shall be commenced against Xerium or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or any application shall have been made, or is required by applicable law to be made, with a court for the opening of insolvency proceedings with regard to Xerium or any of its Subsidiaries; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Xerium or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Xerium or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Xerium or any of its Subsidiaries, and (A) in relation only to any Non-US Borrower and any Foreign Subsidiary, any such event described in this clause (ii) shall continue for seven days without having been dismissed, bonded or discharged, and (B) in relation only to Xerium or any Domestic Subsidiary, any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged; or

138

(g) <u>Voluntary Bankruptcy; Appointment of Receiver, etc</u>. (i) Xerium or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case (including, without limitation, a winding-up, dissolution, reorganization, compromise or arrangement) under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Xerium or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Xerium or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Xerium or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f), other than any Bankruptcy Cases not closed as of the Closing Date; or

(h) <u>Judgments and Attachments</u>.  Any money judgment, writ or warrant of attachment or similar process involving in the aggregate at any time an amount in excess of $5,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Xerium or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days (or in any event later than five days prior to the date of any proposed sale thereunder); or

(i) <u>Dissolution</u>.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30)days; or

(j) <u>Employee Benefit Plans</u>.  (i) There shall occur one or more ERISA Events and/or Canadian Pension Plan Events which individually or in the aggregate results in or could reasonably be expected to result in liability of Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $5,000,000 during the term hereof; or (ii) there exists any fact or circumstance that would reasonably be expected to result in the imposition of a Lien or security interest under Section 412(n) of the Internal Revenue Code or under ERISA; or

(k) <u>Change of Control</u>.  A Change of Control shall occur, other than as contemplated under the Plan of Reorganization; or

(l) <u>Guaranties, Collateral Documents and Other Credit Documents</u>. At any time after the execution and delivery thereof, (i) any Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in

139

full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof or any other termination of such Collateral Document in accordance with the terms thereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of the Collateral Agent or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Banks, under any Credit Document to which it is a party or any Credit Document shall cease to be in full force and effect  or shall be declared null and void;

(m) <u>Material Adverse Effect</u>.  Any event, condition or situation shall occur that has a Material Adverse Effect, provided that the consummation of the transactions contemplated by the Plan of Reorganization shall not constitute a Material Adverse Effect;

(n) <u>Failure to Reimburse Issuing Bank from Revolving Loans</u>. The failure of the Issuing Bank to be reimbursed in full for any drawings under any Letter of Credit from proceeds of Revolving Loans required to be made pursuant to Section 2.4(i); or

(o) <u>Failure to Top-Up the Term LC Collateral Account from Revolving Loans</u>. The failure of the Term LC Collateral Account to be funded from proceeds of Revolving Loans required to be made pursuant to Section 2.4(k);

**THEN**, (1) upon the occurrence of any Event of Default described in Sections 8.1(f), (g) or (k), automatically, and (2) upon the occurrence and continuation of any other Event of Default, at the request of (or with the consent of) Requisite Banks, upon notice to Xerium by the Administrative Agent, (A) the Revolving Commitments, if any, of each Bank having such Revolving Commitments and the obligation of Issuing Bank to issue any Letter of Credit shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest on the Loans, (II) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (regardless of whether any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letters of Credit), and (III) all other Obligations; <u>provided</u>, the foregoing shall not affect in any way the obligations of Banks under Section 2.4(g); (C) the Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Collateral Documents; and

140

(D) Administrative Agent shall direct each Borrower to pay (and each Borrower hereby agrees upon receipt of such notice, or upon the occurrence of any Event of Default specified in Section 8.1(f) and (g) to pay) to Administrative Agent such additional amounts of cash, to be held as security for each Borrower's reimbursement Obligations in respect of Letters of Credit then outstanding, equal to the Letter of Credit Usage at such time.

8.2 **CAM Exchange**.  On the CAM Exchange Date, the Banks shall automatically and without further act be deemed to have exchanged interests in the Designated Obligations such that, in lieu of the interests of each Bank in the Designated Obligations under each Loan in which it shall participate as of such date, such Bank shall own an interest equal to such Bank's CAM Percentage in the Designated Obligations under each of the Loans.  Each Bank, each Person acquiring a participation from any Bank as contemplated by Section 10.6 and each Borrower hereby consents and agrees to the CAM Exchange.  Each of the Borrowers and the Banks agrees from time to time to execute and deliver to the Administrative Agent all such promissory notes and other instruments and documents as the Administrative Agent shall reasonably request to evidence and confirm the respective interests and obligations of the Banks after giving effect to the CAM Exchange, and each Bank agrees to surrender any promissory notes originally received by it in connection with its Loans hereunder to the Administrative Agent against delivery of any promissory notes so executed and delivered; provided that the failure of any Borrower to execute or deliver or of any Bank to accept any such promissory note, instrument or document shall not affect the validity or effectiveness of the CAM Exchange.

As a result of the CAM Exchange, on and after the CAM Exchange Date, each payment received by the Administrative Agent pursuant to any Credit Document in respect of the Designated Obligations shall be distributed to the Bank pro rata in accordance with their respective CAM Percentages (to be redetermined as of each such date of payment).  Any direct payment received by a Bank upon or after the CAM Exchange Date, including by way of setoff, in respect of a Designated Obligation shall be paid over to the Administrative Agent for distribution to the Banks in accordance herewith.

**SECTION 9. AGENTS**

9.1 **Appointment of Agents**.  Citigroup Global Markets, Inc. is hereby appointed Lead Arranger hereunder, and each Bank hereby authorizes the Lead Arranger (under release from the restrictions of Section 181 of the *German Civil Code*) to act as its agent in accordance with the terms hereof and the other Credit Documents.  Citicorp North America, Inc. is hereby appointed the Administrative Agent hereunder and under the other Credit Documents and each Bank hereby authorizes the Administrative Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  Citicorp North America, Inc. is hereby appointed the Collateral Agent hereunder and under the other Credit Documents and each Bank hereby authorizes the Collateral Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act upon the express conditions contained herein and the

141

other Credit Documents, as applicable. The provisions of this Section 9 are solely for the benefit of the Agents and the Banks and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Banks and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Xerium or any of its Subsidiaries. The Lead Arranger, without consent of or notice to any party hereto, may assign any and all of its respective rights or obligations hereunder to any of its Affiliates. As of the Closing Date, Citigroup Global Markets Inc, in its capacity as the Lead Arranger, shall not have any obligations hereunder but shall be entitled to all benefits of this Section 9.

9.2 **Powers and Duties**. Each Bank irrevocably authorizes each Agent (under release from the restrictions of Section 181 of the *German Civil Code*) to take such action on such Bank's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Bank; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein..

9.3 **General Immunity**.

(a) <u>No Responsibility for Certain Matters</u>. No Agent shall be responsible to any Bank for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Banks or by or on behalf of any Credit Party to any Agent or any Bank in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not

142

NY3 - 504826.09

have any liability arising from confirmations of the amount of outstanding Loans or the Letter of Credit Usage or the component amounts thereof.

(b) <u>Exculpatory Provisions</u>.  No Agent or any of its officers, partners, directors, employees or agents shall be liable to the Banks for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct.  No Agent shall have an obligation to act without receiving a satisfactory indemnity from the parties to this Agreement.  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from the Requisite Banks (or such other Banks as may be required to give such instructions under Section 10.6) and, upon receipt of such instructions from the Requisite Banks (or such other Banks, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Xerium and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Bank shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Banks (or such other Banks as may be required to give such instructions under Section 10.6).

9.4 **Agents Entitled to Act as Bank**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Bank hereunder.  With respect to its participation in the Loans and the Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Bank and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Bank" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Xerium or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from each Borrower for services in connection herewith and otherwise without having to account for the same to Banks.

9.5 **Banks' Representations, Warranties and Acknowledgment**.  Each Bank represents and warrants that it has made its own independent

143

investigation of the financial condition and affairs of Xerium and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Xerium and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Banks or to provide any Bank with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Banks.

9.6 **Right to Indemnity**.  Each Bank, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party (and without limiting the Borrowers' obligation to do so), for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; provided, no Bank shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Bank to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Bank's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Bank to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

9.7 **Successor Administrative Agent and Collateral Agent**.  The Administrative Agent and the Collateral Agent may resign at any time by giving thirty days' prior written notice thereof to the Banks and Xerium, and the Administrative Agent and the Collateral Agent may be removed at any time (with or without cause) by the Requisite Banks giving ten days' prior written notice thereof delivered to Xerium and the Administrative Agent and the Collateral Agent and the Administrative Agent shall then promptly give notice of such removal to the Banks.  During the first two Business Days after notice from the Administrative Agent and the Collateral Agent of its resignation or removal, one or more Revolving Banks (other than the then Administrative Agent and Collateral Agent if it is a Revolving Bank) shall have the right to propose a

144

successor Administrative Agent and Collateral Agent (the "**Proposed Successor Agent**").  The Proposed Successor Agent shall become the Administrative Agent and Collateral Agent if approved by the Requisite Banks.  If such Proposed Successor Agent is not approved by the Requisite Banks within five Business Days after proposed by such Revolving Banks, then the Requisite Banks shall have the right upon five Business Days' notice to Xerium, to appoint a successor Administrative Agent and Collateral Agent.  Upon the acceptance of any appointment as Administrative Agent or Collateral Agent hereunder by a successor Administrative Agent or Collateral Agent, that successor Administrative Agent or Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent or Collateral Agent and the retiring or removed Administrative Agent or Collateral Agent shall promptly (i) transfer to such successor Administrative Agent or Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent or Collateral Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent or Collateral Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent or Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Administrative Agent or Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents.  Regardless of whether a replacement Administrative Agent or Collateral Agent, as applicable, has been appointed, the removal or resignation will, to the fullest extent permitted by applicable law, be effective upon the earlier (i) the date the successor Administrative Agent or Collateral Agent is appointed and (ii) the date that is thirty days after the giving of the written notice of resignation or removal.  After any retiring or removed Administrative Agent's or Collateral Agent's resignation or removal hereunder as Administrative Agent or Collateral Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent or Collateral Agent hereunder.

9.8 **Collateral Documents and Guaranty**.

(a) Agents under Collateral Documents and Guaranty.  Each Bank hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable (each under release from the restrictions of Section 181 of the German Civil Code) on behalf of and for the benefit of the Banks, to be the agent for and representative of the Banks with respect to the Guaranty, the Collateral and the Collateral Documents.  Pursuant to the Plan of Reorganization, the Agents, on behalf of the Banks, are empowered and authorized to execute and deliver to the Credit Parties the other Credit Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Credit Documents.  Subject to Section 10.6, without further

145

written consent or authorization from the Banks, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Requisite Banks (or such other Banks as may be required to give such consent under Section 10.6) have otherwise consented or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which the Requisite Banks (or such other Banks as may be required to give such consent under Section 10.6) have otherwise consented.

(b) <u>Right to Realize on Collateral and Enforce Guaranty</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, each Borrower, the Administrative Agent, the Collateral Agent and each Bank hereby agrees that (i) no Bank shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Banks in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Collateral Agent or any Bank may be the purchaser of any or all of such Collateral at any such sale and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Bank or Banks in its or their respective individual capacities unless the Requisite Banks shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale.

(c) <u>Collateral Agent's Power of Attorney</u>.  Each Secured Party, including in its capacity as Bank Counterparty, irrevocably constitutes, to the extent necessary, the Collateral Agent as the holder of an irrevocable power of attorney (i.e. "*fondé de pouvoirs*" within the meaning of Article 2692 of the *Civil Code of Québec*) in order to hold security granted by any Credit Party in the Province of Quebec to secure the Indebtedness of such Credit Party under any bond issued by such Credit Party.  Notwithstanding the provisions of section 32 of an *Act respecting the special powers of a legal person* (Québec), each Secured Party, including in its capacity as Bank Counterparty, acknowledges that the Collateral Agent may acquire and be the holder of any bond issued by any Credit Party.  Each assignee Bank that enters into an Assignment Agreement shall be deemed to have confirmed and ratified the constitution of the Collateral Agent as the holder of such irrevocable power of attorney ("*fondé de pouvoirs*") and the acquisition and holding by the Collateral Agent of any bonds issued by any Credit Party.  Each of the Credit Parties hereby acknowledge that, for the purposes of holding any security granted by any Credit Party on property pursuant to the laws of the Province of Québec to secure obligations of any Credit Party under any bonds issued by any Credit Party, the Collateral Agent shall be the holder of an

146

irrevocable power of attorney (i.e. "*fondé de pouvoirs*" within the meaning of Article 2692 of the *Civil Code of Québec*) for each Secured Party, including in its capacity as Bank Counterparty).  Each of the Credit Parties hereby acknowledges that such bond constitutes a title on indebtedness, as such term is used in Article 2692 of the *Civil Code of Québec*.  The execution by the Collateral Agent, acting as fondé de pouvoir as aforesaid, prior to the date of this Agreement of any deeds of hypothec or other security documents is hereby ratified and confirmed.

9.9 **Reliance and Engagement Letters**.  Each Bank confirms that each of the Lead Arranger and the Administrative Agent has authority (and is released from the restrictions of Section 181 of the *German Civil Code*) to accept on its behalf the terms of any reliance or engagement letters relating to any reports or letters provided by accountants in connection with the Credit Documents or the transactions contemplated in the Credit Documents (including any net asset letter in connection with the financial assistance procedures) and to bind it in respect of those reports or letters and to sign such on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

## SECTION 10. MISCELLANEOUS

10.1 **Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party, the Collateral Agent, the Administrative Agent or the Lead Arranger, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Bank, the address as indicated on Appendix B or otherwise indicated to the Administrative Agent in writing.  Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the mail with postage prepaid and properly addressed; provided, no notice to any Agent shall be effective until received by such Agent and all notices from or to a Credit Party shall be sent through the applicable Agent.

10.2 **Expenses**.  Whether or not the transactions contemplated hereby shall be consummated, each Borrower agrees to pay promptly (a) all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for each Borrower and the other Credit Parties; (c) the reasonable fees, expenses and disbursements of counsel to the Agents (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents, advising the Administrative Agent and the Collateral Agent of their respective rights and obligations under the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by any Borrower; (d) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of the Collateral Agent, for the

147

benefit of the Secured Parties pursuant hereto, including filing and recording fees, expenses stamp, registration, transfer, documentary and other similar taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or the Requisite Banks may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents or any Agent's rights and obligations under any Credit Document; (e) all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants, advisors or appraisers retained by the Administrative or the Collateral Agent with the prior consent of Xerium (not to be unreasonably withheld); (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and the Banks in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

10.3 **VAT**.  All amounts set out or expressed to be payable under a Credit Document by a Credit Party to a Bank shall be exclusive of any applicable VAT and (subject to the provisions regarding reimbursement of VAT below) the Credit Party shall in addition pay to the Bank an amount equal to the amount of the VAT, following receipt by the Credit Party of a valid VAT invoice.  Where a Credit Party is required by a Credit Document to reimburse a Bank for any costs or expenses, that Credit Party shall also reimburse the Bank for any VAT incurred by the Bank in respect of the relevant costs or expenses to the extent that neither the Bank nor any member of any group of which it is a member for VAT purposes is entitled to credit or repayment from the relevant Tax authority in respect of the VAT.

10.4 **Indemnity**.  In addition to the payment of expenses pursuant to Sections 10.2 and 10.3, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' reasonable approval of counsel), indemnify, pay and hold harmless, each Agent and Bank and the officers, partners, directors, trustees, investment advisors, employees, agents and Affiliates of each Agent and each Bank (each, an

148

"**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.4 may be unenforceable in whole or in part because they are in violation of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(a) To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against the Banks, the Agents and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) in connection with, arising out of, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and Xerium and each other Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(b) Currency indemnity.

(i) If any sum due from a Credit Party under the Credit Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(A) making or filing a claim or proof against that Credit Party; or

(B) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Credit Party shall as an independent obligation, within three Business Days of demand, indemnify the Agent and each Bank to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (x) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (y) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

149

NY3 - 504826.09

(ii) Each Credit Party waives any right it may have in any jurisdiction to pay any amount under the Credit Documents in a currency or currency unit other than that in which it is expressed to be payable.

10.5 **Set Off**.  Subject to the terms of the Intercreditor Agreement, in addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and continuation of any Event of Default each Bank and each of its respective Affiliates is hereby authorized by each Credit Party at any time or from time to time subject to the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than the Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Bank or its Affiliate to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Bank hereunder, the Letters of Credit and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, the Letters of Credit and participations therein or with any other Credit Document, irrespective of whether or not (a) such Bank shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured.

10.6 **Amendments and Waivers**.

(a) Requisite Banks' and Borrower Consent.  Subject to Section 10.6(b) and 10.6(c), no amendment, modification, termination or waiver of any provision of the Credit Documents (other than the Fee Letters), or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Credit Parties and the Requisite Banks.

(b) Affected Banks' Consent.  Without the written consent of the Credit Parties and each Bank  (other than a Defaulting Bank) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i) extend the scheduled final maturity of any Loan;

(ii) waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii) extend the stated expiration date of any Letter of Credit beyond the Revolving Commitment Termination Date;

150

(iv) reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee payable hereunder;

(v) extend the time for payment of any such interest or fees;

(vi) reduce or forgive the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(vii) amend, modify, terminate or waive any provision of this Section 10.6(b) or Section 10.6(c);

(viii) amend the definition of "**Requisite Banks**" or "**Pro Rata Share**"; provided, with the consent of Requisite Banks, additional extensions of credit pursuant hereto may be included in the determination of "**Requisite Banks**" or "**Pro Rata Share**" on substantially the same basis as the Term Loans, the Revolving Commitments and the Revolving Loans are included on the Closing Date;

(ix) extend the Revolving Commitment Termination Date;

(x) release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents;

(xi) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document (other than the Fee Letters);

(xii) amend, modify or waive any provision of Section 2.15 or 2.16(g); or

(xiii) consent to currency changes.

(c) Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents (other than the Fee Letters), or consent to any departure by any Credit Party therefrom, shall:

(i) increase any Revolving Commitment of any Bank over the amount thereof then in effect without the consent of each Credit Party and such Bank; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Revolving Commitment of any Bank;

(ii) amend, modify, terminate or waive any obligation of Banks relating to the purchase of participations in Letters of Credit as provided in Section 2.4(g) without the written consent of each Credit Party, Administrative Agent and of Issuing Bank; or

151

(iii) amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of each Credit Party and such Agent.

(d) <u>Execution of Amendments, etc</u>.  The Administrative Agent may, but shall have no obligation to, with the concurrence of any Bank, execute amendments, modifications, waivers or consents on behalf of such  Bank.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.6 shall be binding upon each Bank at the time outstanding, each future Bank and, if signed by a Credit Party, on such Credit Party.

(e) <u>Defaulting Banks</u>.  Anything herein to the contrary notwithstanding, during such period as a Bank is a Defaulting Bank, to the fullest extent permitted by applicable law, such Bank will not be entitled to vote in respect of amendments and waivers hereunder and the Revolving Commitment and the outstanding Loans of such Bank hereunder will not be taken into account in determining with the Requisite Banks or all of the Banks, as required, have approved any such amendment or waiver (and the definition of "Requisite Banks" will automatically be deemed modified accordingly for the duration of such period); provided that any such amendment or waiver that would increase or extend the term of the Revolving Commitment of such Defaulting Bank, extend the date fixed for the payment of principal or interest owing to such Defaulting Bank, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Bank or of any fee payable to such Defaulting Bank hereunder, or alter the terms of this proviso, will require the consent of such Defaulting Bank.

10.7 **Successors and Assigns; Participations**.

(a) <u>Generally</u>.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Banks.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Banks.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Banks) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Register</u>.  Each Borrower, the Administrative Agent and each Bank shall deem and treat the Persons listed as Banks in the Register as the

152

holders and owners of the corresponding Revolving Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Revolving Commitment or Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by the Administrative Agent and recorded in the Register as provided in Section 10.7(e).  Prior to such recordation, all amounts owed with respect to the applicable Revolving Commitment or Loan shall be owed to the Bank listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Bank shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Revolving Commitments or Loans.

(c) <u>Right to Assign</u>.  Each Bank shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including, without limitation, all or a portion of its Revolving Commitment or Loans owing to it or other Obligation (<u>provided</u>, <u>however</u>, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Revolving Commitments):

(i) to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to Xerium and the Administrative Agent; and

(ii) to any Person meeting the criteria of clause (ii) of the definition of the term "Eligible Assignee" upon the giving of notice to Xerium and the Administrative Agent; <u>subject</u>, <u>however</u>, in the case of assignments of Revolving Loans or Revolving Commitments to any such Person, to prior written consent by Xerium, the Administrative Agent and the Issuing Bank (such consent not to be (x) unreasonably withheld or delayed or, (y) in the case of Xerium, required at any time an Event of Default shall have occurred and then be continuing); <u>provided</u> that Xerium shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; <u>provided</u>, <u>further</u>, each such assignment pursuant to this Section 10.7(c)(ii) shall be in an aggregate amount of not less than (A) $2,500,000 (or such lesser amount as may be agreed to by the Administrative Agent (and so long as no Event of Default shall have occurred and be continuing) Xerium or as shall constitute the aggregate amount of the Revolving Commitments and Revolving Loans of the assigning Bank) with respect to the assignment of the Revolving Commitments and Revolving Loans and (B) $1,000,000 (or such lesser amount as may be agreed to by the Administrative Agent (and so long as no Event of Default shall have occurred and be continuing) Xerium or as shall constitute the aggregate amount or the Term Loans of the assigning Bank) with respect to the assignment of Term Loans.

153

(d) <u>Mechanics</u>.  The assigning Bank and the assignee thereof shall execute and deliver to the Administrative Agent an Assignment Agreement, together with (i) a processing and recordation fee of $3,500 (except (A) in the case of assignments pursuant to Section 10.7(c)(i), no processing or recordation fee shall be required and (B) that only one fee shall be payable in the case of contemporaneous assignments to or by  Related Funds), and (ii) such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to the Administrative Agent pursuant to Section 2.20(c).

(e) <u>Notice of Assignment</u>.  Upon its receipt of a duly executed and completed Assignment Agreement, together with the processing and recordation fee referred to in Section 10.7(d) (and any forms, certificates or other evidence required by this Agreement in connection therewith), the Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to each Borrower and shall maintain a copy of such Assignment Agreement.

(f) <u>Representations and Warranties of Assignee</u>.  Each Bank, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or  loans such as the applicable Revolving Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Revolving Commitments or Loans for its own account in the Ordinary Course and without a view to distribution of such Revolving Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.7, the disposition of such Revolving Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(g) <u>Effect of Assignment</u>.  Subject to the terms and conditions of this Section 10.7, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Bank" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Bank" for all purposes hereof, and in the case of an assignment from the Issuing Bank, shall have the rights and obligations of an "Issuing Bank" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be an "Issuing Bank" for all purposes hereof; (ii) the assigning Bank thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder (and, in the case of

154

an Assignment Agreement covering all or the remaining portion of an assigning Bank's rights and obligations hereunder, such Bank shall cease to be a party hereto and, if such Bank were an Issuing Bank, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder as an "Issuing Bank"; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Bank shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Bank as a Bank hereunder); (iii) the Revolving Commitments shall be modified to reflect the Revolving Commitment of such assignee and any Revolving Commitment of such assigning Bank, if any; and (iv) for the purposes of article 1263 of the Italian Civil Code, it is expressly agreed that the security created or evidenced by the Collateral Documents shall be preserved for the benefit of the assignee and each other Bank.  Any assignment or transfer by a Bank of rights or obligations under this Agreement that does not comply with subsections (c) through (g) of this Section 10.7 shall be treated for purposes of this Agreement as a sale by such Bank of a participation in such rights and obligations in accordance with clause (h).

(h) <u>Participations</u>.  Each Bank shall have the right at any time to sell one or more participations to any Person (other than Xerium, any of its Subsidiaries or any of its Affiliates (excluding Closing Date Bank Affiliates)) in all or any part of its Revolving Commitments or Loans or in any other Obligation. The holder of any such participation, other than an Affiliate of the Bank granting such participation, shall not be entitled to require such Bank to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan, or any Letter of Credit (unless, in the case of Revolving Letters of Credit, such Revolving Letter of Credit is not extended beyond the Revolving Commitment Termination Date, and in the case of Term Loan Letters of Credit, such Term Loan Letter of Credit is not extended beyond the Term Loan Maturity Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under the Collateral Documents (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.   The Borrowers agree that each participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 to the same extent as if it were a Bank and had acquired its interest by assignment pursuant to paragraph (c) of this Section;

155

provided, (i) a participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Bank would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with each Borrower's prior written consent, and (ii) a participant that would be a Non-US Bank if it were a Bank shall not be entitled to the benefits of Section 2.20 unless each Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of each Borrower, to comply with Section 2.20 as though it were a Bank.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.6 as though it were a Bank, provided such participant agrees to be subject to Section 2.17 as though it were a Bank.

(i) Certain Other Assignments.  In addition to any other assignment permitted pursuant to this Section 10.7, any Bank may assign and/or pledge all or any portion of its Loans, the other Obligations owed by or to such Bank, to secure obligations of such Bank including, without limitation, any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; provided, no Bank, as between each Borrower and such Bank, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided, further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Bank" or be entitled to require the assigning Bank to take or omit to take any action hereunder.

10.8 **Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.9 **Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.18(c), 2.19, 2.20, 10.2, 10.3, 10.4 and 10.5 and the agreements of the Banks set forth in Sections 2.17, 9.3(b) and 9.6 shall survive the payment of the Loans, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

10.10 **No Waiver; Remedies Cumulative**.  No failure or delay on the part of any Agent or any Bank in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.

156

The rights, powers and remedies given to each Agent and each Bank hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the applicable documentation creating Hedging Obligations.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.11 **Marshalling; Payments Set Aside**.  Neither any Agent nor any Bank shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Credit Party makes a payment or payments to the Administrative Agent or the Banks (or to the Administrative Agent, on behalf of the Banks), or the Administrative Agent or the Banks enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other provincial, state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

10.12 **Severability**.  In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.13 **Obligations Several**.  The obligations of the Banks hereunder are several and no Bank shall be responsible for the obligations or Revolving Commitment of any other Bank hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by Banks pursuant hereto or thereto, shall be deemed to constitute Banks as a partnership, an association, a joint venture or any other kind of entity.

10.14 **Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.15 **APPLICABLE LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK INCLUDING GENERAL OBLIGATIONS LAW 5-1401.**

157

10.16 **CONSENT TO JURISDICTION AND SERVICE OF PROCESS**.  (a)  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN THE CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON-CONVENIENS; (iii) AGREES THAT, NOTWITHSTANDING SECTION 10.16(c), SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (iv) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (iii) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (v) AGREES AGENTS AND BANKS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION;

(b) IN ADDITION TO SECTION 10.16(a), HUYCK.WANGNER AUSTRIA GMBH IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS IN ENGLAND FOR THE PURPOSE OF HEARING AND DETERMINING ANY DISPUTE ARISING OUT OF THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT OR ANY OF THE OBLIGATIONS OR RELATING HERETO AND FOR THE PURPOSES OF ENFORCEMENT OF ANY JUDGMENT AGAINST ITS ASSETS (IN NO EVENT SHALL THE COURTS OF AUSTRIA HAVE JURISDICTION FOR THE PURPOSE OF HEARING AND DETERMINING ANY DISPUTE ARISING OUT OF THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT OR ANY OF THE OBLIGATIONS OR RELATING HERETO AND FOR THE PURPOSES OF ENFORCEMENT OF ANY JUDGMENT AGAINST ITS ASSETS); AND

(c) EACH CREDIT PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY APPOINTS CT CORPORATION SYSTEM WITH AN OFFICE ON THE DATE HEREOF AT 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10001, UNITED STATES AND ITS SUCCESSORS HEREUNDER (THE "PROCESS AGENT"), AS ITS AGENT TO RECEIVE ON BEHALF OF SUCH CREDIT PARTY AND ITS PROPERTY SERVICE OF COPIES OF THE SUMMONS AND COMPLAINTS AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR

158

PROCEEDING BROUGHT IN ANY COURT SPECIFIED IN SECTION 10.16(a). SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO A CREDIT PARTY IN CARE OF THE PROCESS AGENT AT THE ADDRESS SPECIFIED ABOVE FOR THE PROCESS AGENT, AND EACH CREDIT PARTY HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS THE PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF. EACH CREDIT PARTY FURTHER CONSENTS TO MAILING COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH CREDIT PARTY AT ITS ADDRESSES FOR NOTICE HEREUNDER, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER MAILING. FAILURE OF THE PROCESS AGENT TO GIVE NOTICE TO ANY CREDIT PARTY OR FAILURE OF A CREDIT PARTY TO RECEIVE NOTICE OF SUCH SERVICES OF PROCESS SHALL NOT AFFECT IN ANY WAY THE VALIDITY OF SUCH SERVICE ON THE PROCESS AGENT OR SUCH CREDIT PARTY. EACH CREDIT PARTY COVENANTS AND AGREES THAT IT SHALL TAKE ANY AND ALL REASONABLE ACTION, INCLUDING THE EXECUTION AND FILING OF ANY AND ALL DOCUMENTS, THAT MAY BE NECESSARY FOR THE PROCESS AGENT TO ACT AS SUCH. IN THE EVENT THAT AT ANY TIME SUCH PROCESS AGENT SHALL FOR ANY REASON CEASE TO MAINTAIN AN OFFICE IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, OR CEASE TO ACT AS PROCESS AGENT, THEN, SUCH CREDIT PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ACCORDANCE WITH THE TERMS OF CLAUSE (iii) OF SECTION 10.16(a). EACH CREDIT PARTY ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS SECTION 10.16(b) SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

10.17 **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE BANK/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING**

159

**INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

10.18 **Confidentiality**. Each Agent, the Issuing Bank and each Bank agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, trustees, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, including the NAIC, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 10.18, to (i) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement, (ii) any rating agency, or (iii) the CUSIP Service Bureau or any similar organization, (g) with the consent of the Borrowers, (h) to any pledgee referred to in Section 10.7(i) or any actual or prospective party (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors or other representatives) to any swap or derivatives or similar transaction under which payments are to be made by reference to the Borrowers and the Obligations, this Agreement or payments hereunder, so long as such pledgee or any actual or prospective counterparty (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives) agrees to be bound by the provisions of this Section 10.18, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 10.18 or (ii) becomes available to any Agent, the Issuing Bank or any Bank on a non-confidential basis from a source other than the Borrowers. For the purposes of this Section 10.18, "Information" means all

160

information received from the Borrowers relating to the Borrowers or their business, other than any such information that is available to any Agent, the Issuing Bank or any Bank on a non-confidential basis prior to disclosure by the Borrowers.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.18 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding anything in this Agreement or in any other Credit Document to the contrary, the Borrowers and each Bank (and each employee, representative or other agent of the Borrowers) may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Borrower relating to such U.S. tax treatment and U.S. tax structure.

10.19 **Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, each Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of each Bank and each Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Bank contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Bank's option be applied to the outstanding amount of the Loans made hereunder or be refunded to each Borrower, as applicable.

10.20 **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile transmission or "PDF" shall be effective as delivery of a manually executed counterpart hereof.

161

10.21 **Effective Date**.  This Agreement shall become effective on the Closing Date.

10.22 **Importation of Credit Documents into Austria**.  Each of the parties hereto covenants and agrees that it will not send, or cause to be sent, bring or cause to be brought, or otherwise import, or cause otherwise to be imported, into the Republic of Austria any original counterpart or certified or conformed copy of any executed Credit Document or any document constituting or evidencing any transfer by any party of any right or interest under any Credit Document, or make use of any Credit Document or document before any fiscal or governmental authority or agency or any court of Austria; provided that, any party may, at the joint and several cost and expense of the Credit Parties, send, or cause to be sent, bring, or cause to be brought, or otherwise import, or cause otherwise to be imported, any such Credit Document or document into the Republic of Austria if required to do so by applicable law or if such Credit Document or document is required to be presented in Austria in order to assist, enforce, protect or preserve any right of or remedy available to such party arising under or in respect of any of the Credit Documents or applicable law.  Each of the parties hereto further agrees not to: (i) object to the introduction into evidence of (a) any uncertified copy of a signed original of a Credit Document or notarized or certified copy thereof or (b) any written minutes recording the transactions contemplated by a Credit Document and signed by a party or its representative (for the purpose of this Section 10.22, each an "**Original**"); (ii) raise as a defense to any action or exercise of a remedy a failure to introduce an Original into evidence; (iii) object to the submission of any uncertified copy of a Credit Document in any proceedings relating to a dispute before any court, arbitral body or governmental authority in Austria (for the purpose of this Section 10.22, the "**Proceedings**"); (iv) contest the authenticity, and conformity to the Original (*Ubereinstimmung mit dem echten Original*), of an uncertified copy of an Original, in each case, unless any such uncertified copy actually introduced into evidence in Proceedings does not accurately reflect the content of such Original.

10.23 **Place of Performance**.  The place of performance for all parties under this Agreement and the other Credit Documents shall be any jurisdiction other than the Republic of Austria.  Nothing in this Agreement shall be construed in a way as to entitle or oblige any party hereto to render or request any performance contemplated by this Agreement, including, but not limited to, payment obligations, within the Republic of Austria.  In particular, all payments to be made by, or to, a party to a Credit Document under or in connection with the Credit Documents shall be effected to and from bank accounts outside of Austria.

10.24 **USA Patriot Act Notice**.  Each Bank and the Agents (for the Agents and not on behalf of any Bank) hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-5 (signed into law on October 26, 2001)), as amended  (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other

162

information that will allow such Bank or the applicable Agent, as applicable, to identify the Borrowers in accordance with the Patriot Act.

10.25 **No Setoffs and Defenses**.  Each Credit Party acknowledges it has no setoffs or defenses to their respective obligations under the Credit Documents and no claims or counterclaims against any of the Agents or the Banks.

**[Remainder of page intentionally left blank]**

163

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

> XERIUM TECHNOLOGIES, INC.
>
> By: _____
>   Name:
>   Title:
>
> XTI LLC
>
> By: _____
>   Name:
>   Title:
>
> XERIUM ITALIA S.P.A.
>
> By: _____
>   Name:
>   Title:
>
> XERIUM CANADA INC.
>
> By: _____
>   Name:
>   Title:
>
> HUYCK.WANGNER AUSTRIA GMBH
>
> By: _____
>   Name:
>   Title:
>
> XERIUM GERMANY HOLDING GMBH
>
> By: _____
>   Name:
>   Title:

HUYCK.WANGNER GERMANY GMBH

By: _____
    Name:
    Title:


Signed by

HUYCK.WANGNER AUSTRALIA PTY LIMITED (ACN 004 624 015)
in accordance with section 127 of the *Corporations Act 2001 (Australia)* by
two directors:


| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |


| | |
|---|---|
| _____ | _____ |
| Name of director (please print) | Name of director (please print) |


ROBEC WALZEN GMBH

By: _____
    Name:
    Title:


WANGNER ITELPA PARTICIPAÇÕES LTDA.

By: _____
    Name:
    Title:


XERIUM TECHNOLOGIES DO BRASIL
INDÚSTRIA E COMÉRCIO S.A.

By: _____
    Name:
    Title:


XERIUM DO BRASIL LTDA.

By: _____
    Name:
    Title:

XERIUM (FRANCE) SAS

By: _____
     Name:
     Title:

STOWE WOODWARD FRANCE SAS

By: _____
     Name:
     Title:

STOWE WOODWARD AG

By: _____
     Name:
     Title:

HUYCK. WANGNER JAPAN LIMITED

By: _____
     Name:
     Title:

STOWE WOODWARD MÉXICO, S.A. DE C.V.

By: _____
     Name:
     Title:

HUYCK. WANGNER (UK) LIMITED

By: _____
     Name:
     Title:

STOWE-WOODWARD (UK) LIMITED

By: _____
    Name:
    Title:


XERIUM TECHNOLOGIES LIMITED

By: _____
    Name:
    Title:


HUYCK LICENSCO INC.

By: _____
    Name:
    Title:


STOWE WOODWARD LLC

By: _____
    Name:
    Title:


STOWE WOODWARD LICENSCO LLC

By: _____
    Name:
    Title:


WEAVEXX, LLC

By: _____
    Name:
    Title:


XERIUM III (US) LIMITED

By: _____
    Name:
    Title:

NY3 - 504826.09

XERIUM IV (US) LIMITED

By: _____
    Name:
    Title:


XERIUM V (US) LIMITED

By: _____
    Name:
    Title:


WANGNER ITELPA I LLC

By: _____
    Name:
    Title:


WANGNER ITELPA II LLC

By: _____
    Name:
    Title:


XERIUM ASIA LLC

By: _____
    Name:
    Title:


ROBEC BRAZIL LLC

By:

    Name:
    Title:


HUYCK WANGNER VIETNAM CO LTD

By: _____

NY3 - 504826.09

Name:
Title:


HUYCK WANGNER SCANDINAVIA AB

By: _____
    Name:
    Title:


STOWE WOODWARD SWEDEN AB

By: _____
    Name:
    Title:

NY3 - 504826.09

**CITIGROUP GLOBAL MARKETS INC.,**
as Lead Arranger and Bookrunner

By: _____
Name:
Title:

NY3 - 504826.09

**CITICORP NORTH AMERICA, INC.,**
as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

_____ , as a
Bank (please print name of institution)


By[4]::_____
  Name:
  Title:

---

[4]   Bank:  If more than one signature is required, please add accordingly.  Please <u>delete</u> this footnote before executing.

NY3 - 504826.09

**APPENDIX A-1**
**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**Xerium Term Loan Amounts**

| Bank | Xerium Term Loan Amount | Pro Rata Share |
|---|---|---|
| [                    ] | $           [                    ] | [        ]% |
| [                    ] | $           [                    ] | [        ]% |
| [                    ] | $           [                    ] | [        ]% |
| **Total** | **$        29,500,000.00** | **100%** |

APPENDIX A-1-1

NY3 - 504826.09

**APPENDIX A-2**

**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**XTI Term Loan Amounts**

| Bank | XTI Term Loan Amount | Pro Rata Share |
|---|---|---|
| [            ] | $        [            ] | [      ]% |
| [            ] | $        [            ] | [      ]% |
| [            ] | $        [            ] | [      ]% |
| **Total** | **$       4,000,000.00** | **100%** |

APPENDIX A-2-1

NY3 - 504826.09

**APPENDIX A-3**
**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**Italia Term Loan Amounts**

| Bank | Italia Term Loan Amount | Pro Rata Share |
|------|---|---|
| [          ] | $  [          ] | [     ]% |
| [          ] | $  [          ] | [     ]% |
| [          ] | $  [          ] | [     ]% |
| **Total** | **$   3,000,000.00** | **100%** |

APPENDIX A-3-1

NY3 - 504826.09

**APPENDIX A-4**
**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**Xerium Canada Term Loan Amounts**

| Bank | Xerium Canada Term Loan Amount | Pro Rata Share |
|------|-------------------------------|----------------|
| [                    ] | $    [                ] | [        ]% |
| [                    ] | $    [                ] | [        ]% |
| [                    ] | $    [                ] | [        ]% |
| **Total** | **$      7,000,000.00** | **100%** |

APPENDIX A-4-1

NY3 - 504826.09

**APPENDIX A-5**
**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**Austria Term Loan Amounts**

| Bank | Austria Term Loan Amount | Pro Rata Share |
|------|---|---|
| [          ] | $ [          ] | [      ]% |
| [          ] | $ [          ] | [      ]% |
| [          ] | $ [          ] | [      ]% |
| Total | $     4,000,000.00 | 100% |

APPENDIX A-5-1

NY3 - 504826.09

**APPENDIX A-6**
**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**Germany Holdings Term Loan Amounts**

| Bank | Germany Holdings Term Loan Amount | Pro Rata Share |
|---|---|---|
| [               ] | $ [               ] | [      ]% |
| [               ] | $ [               ] | [      ]% |
| [               ] | $ [               ] | [      ]% |
| **Total** | **$        12,500,000.00** | **100%** |

APPENDIX A-6-1

NY3 - 504826.09

**APPENDIX B**
**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**Revolving Loan Commitments**

| Bank | Revolving Loan Commitment | Pro Rata Share |
|------|---------------------------|----------------|
| [_____] | $  [_____] | [_____]% |
| [_____] | $  [_____] | [_____]% |
| [_____] | $  [_____] | [_____]% |
| **Total** | **$     20,000,000.00** | **100%** |

APPENDIX B-1

NY3 - 504826.09

**APPENDIX C**
**TO CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**

**Notice Addresses**

*[Xerium to Update Borrower and Guarantor addresses]*

"**NOTE**: THE TAKING OF THIS DOCUMENT OR ANY CERTIFIED COPY OR ANY DOCUMENT WHICH CONSTITUTES SUBSTITUTE DOCUMENTATION THEREOF, INCLUDING WRITTEN CONFIRMATIONS OR REFERENCES THERETO, INTO AUSTRIA AS WELL AS PRINTING OUT ANY E-MAIL COMMUNICATION WHICH REFERS TO THIS DOCUMENT IN AUSTRIA OR SENDING ANY E-MAIL COMMUNICATION TO WHICH A PDF SCAN OF THIS DOCUMENT IS ATTACHED TO AN AUSTRIAN ADDRESSEE OR SENDING ANY E-MAIL COMMUNICATION CARRYING AN ELECTRONIC OR DIGITAL SIGNATURE WHICH REFERS TO THIS DOCUMENT TO AN AUSTRIAN ADDRESSEE MAY CAUSE THE IMPOSITION OF AUSTRIAN STAMP DUTY.  ACCORDINGLY, IN PARTICULAR KEEP THE ORIGINAL DOCUMENT AS WELL AS ALL CERTIFIED COPIES THEREOF AND WRITTEN AND SIGNED REFERENCES THERETO OUTSIDE OF AUSTRIA AND AVOID PRINTING OUT ANY EMAIL COMMUNICATION WHICH REFERS TO THIS DOCUMENT IN AUSTRIA OR SENDING ANY E-MAIL COMMUNICATION TO WHICH A PDF SCAN OF THIS DOCUMENT IS ATTACHED TO AN AUSTRIAN ADDRESSEE OR SENDING ANY E-MAIL COMMUNICATION CARRYING AN ELECTRONIC OR DIGITAL SIGNATURE WHICH REFERS TO THIS DOCUMENT TO AN AUSTRIAN ADDRESSEE."

XERIUM TECHNOLOGIES, INC.
14101 Capital Blvd., Suite 14101
Youngsville, NC 27596
U.S.A.
Attention:  Michael O'Donnell
Telecopier: 1-919-556-2432

XTI LLC
14101 Capital Blvd., Suite 14101
Youngsville, NC 27596
U.S.A.
Attention:  Michael O'Donnell
Telecopier: 1-919-556-2432

XERIUM ITALIA S.P.A.
Casella Postale 109
Via Persicara 70
04100 Latina,
Italy
Attention:  Michael O'Donnell
Telecopier:  39-077-362-9008

APPENDIX C-1

NY3 - 504826.09

XERIUM CANADA INC.
Aird & Berlis
181 Bay Street
Suite 1800
Toronto, Ontario M5J279
Attention:  Michael O'Donnell
Telecopier:  416-863-1515

HUYCK.WANGNER AUSTRIA GMBH
[ADDRESS OUTSIDE OF AUSTRIA]
Attention:  [OUTSIDE OF AUSTRIA]
Telecopier:  [OUTSIDE OF AUSTRIA]
[NB: Please state an address which is outside of Austria, e.g. notices could be directed to a German subsidiary]

XERIUM GERMANY HOLDING GMBH
Föehrstrasse 39
72760 Reutlingen
Germany
Attention: Michael O'Donnell
Telecopier: 49-712-130-6396

HUYCK LICENSCO INC.
STOWE WOODWARD LLC
STOWE WOODWARD LICENSCO LLC
WEAVEXX, LLC
XERIUM III (US) LIMITED
XERIUM IV (US) LIMITED
XERIUM V (US) LIMITED
WANGNER ITELPA I LLC
WANGNER ITELPA II LLC
XERIUM ASIA LLC
ROBEC BRAZIL LLC
14101 Capital Blvd., Suite 14101
Youngsville, NC 27596
U.S.A.
Attention: Michael O'Donnell
Telecopier: 1-919-556-2432

HUYCK.WANGNER AUSTRALIA PTY. LIMITED
P.O. Box 757
Geelong Vic. 3220
Australia
Attention: Michael O'Donnell
Telecopier: 61-352-237-099

APPENDIX C-2

NY3 - 504826.09

WANGNER ITELPA PARTICIPAÇÕES LTDA.
Av. Carlos Botelho
378 – Vila Progresso
CEP 13416-140
City of Piracicaba, State of São Paulo, Brazil
Attention: Michael O'Donnell
Telecopier: 55-19-3424-1947

XERIUM TECHNOLOGIES BRASIL INDÚSTRIA E COMÉRCIO S.A.
Rod. Americana Piracicaba, S/N, Km 156,5
Dois Córregos
CEP 13400-970
City of Piracicaba, State of São Paulo, Brazil
Attention: Michael O'Donnell
Telecopier: 55-19-3424-1947

XERIUM DO BRASIL LTDA.
Avenida Barão do Rio Branco, 1958/2000
Parte, Suite B, Centro - CEP 25680-270
City of Petrópolis, State of Rio de Janeiro, Brazil
Attention: Michael O'Donnell
Telecopier: 55-24-2237-5449

XERIUM (FRANCE) SAS
102 avenue des Champs-Elysees
75008 Paris France
Attention: Michael O'Donnell
Telecopier: 33-4-50382593

STOWE WOODWARD FRANCE SAS
12 rue Jean Jaurès
Meyzieu, France 69330
Attention: Michael O'Donnell
Telecopier: 33-4-50382593

STOWE WOODWARD AG
Am Langen Graben 22
52353 Düeren Germany or
Postfach 10 02 37, 52302 Düeren Germany
Attention: Michael O'Donnell
Telecopier: 49-242-184-05319

ROBEC WALZEN GMBH
Am Langen Graben 22
52353 Düeren Germany or
Postfach 10 02 37, 52302 Düeren Germany

APPENDIX C-3

Attention: Michael O'Donnell
Telecopier: 49-242-184-05319

HUYCK.WANGNER GERMANY GMBH
Föhrstrasse 39
72760 Reutlingen
Germany
Attention: Michael O'Donnell
Telecopier: 49-7121-30-6396

HUYCK.WANGNER JAPAN LIMITED
5F, Kokusai Bldg., 2-13-11
Nihonbashi Kayabacho
Chuo-ku, Tokyo, 103-0025
Japan
Attention: Michael O'Donnell
Telecopier: 81-336-670-986

STOWE WOODWARD MÉXICO, S.A. DE C.V.
Circuito Balvanera No. 2
Fracc. Agro Ind. Balvanera
KM 7 Carr. Libre A Celaya
Villa Corregidora 79920
Queretaro, Mexico
Attention: Michael O'Donnell
Telecopier: 52-442-225-0618

HUYCK.WANGNER (UK) LIMITED
National House, Herne Bay
Kent, CT6 5LN
England
Attention: Michael O'Donnell
Telecopier: 44-1227-744039

STOWE-WOODWARD (UK) LIMITED
Am Langen Graben 22
52353 Düren
Germany
Attention: Michael O'Donnell
Telecopier: 49-242-184-05319

XERIUM TECHNOLOGIES LIMITED
National House, Herne Bay
Kent, CT6 5LN
England
Attention: Michael O'Donnell
Telecopier: 44-1227-744039

APPENDIX C-4

NY3 - 504826.09

STOWE WOODWARD SWEDEN AB
Dalaslingan 9
231 32 Trelleborg
Sweden
Attention: [Stephen Light]
Telecopier: [___]

HUYCK. WANGNER SCANDINAVIA AB
Box 296
751 05 Uppsala
Sweden
Attention: [Stephen Light]
Telecopier:[___]

in each case, with a copy to:

Xerium Technologies, Inc.
14101 Capital Blvd., Suite 14101
Youngsville, NC 27596
U.S.A.
Attention: Michael Stick
Telecopier: 1-919-556-2432

and to

Xerium Technologies, Inc.
14101 Capital Blvd., Suite 14101
Youngsville, NC 27596
U.S.A.
Attention: Michael O'Donnell
Telecopier: 1-919-556-2432

APPENDIX C-5

NY3 - 504826.09

CITIGROUP GLOBAL MARKETS INC.,
as Lead Arranger and Bookrunner

Citibank, N.A.
390 Greenwich St., 1st Floor
New York, NY 10013
Attention: [Blake Gronich]
Telecopier: (646) 291-1653
Email: [blake.gronich@citi.com]

APPENDIX C-6

NY3 - 504826.09

CITICORP NORTH AMERICA, INC.,
as Administrative Agent, Collateral Agent and a Bank

Citicorp North America, Inc.
390 Greenwich St., 1st Floor
New York, NY 10013
Attention: [Blake Gronich]
Telecopier: [(646) 710-5361 and (646) 710-1064]
Email: [blake.gronich@citi.com]

APPENDIX C-7

NY3 - 504826.09

CITIBANK, N.A., CANADIAN BRANCH,
as a Bank

Citibank, N.A., Canadian Branch
Citibank Place, 10th floor
123 Front Street West
Toronto, CANADA
Attention: [Adeel Kheraj]
Telecopier: (416) 947-5650
Email: [adeel.kheraj@citigroup.com]

APPENDIX C-8

NY3 - 504826.09

CITIBANK, N.A., as a Bank

Citibank, N.A.
390 Greenwich St., 1st Floor
New York, NY 10013
Attention: [Blake Gronich]
Telecopier: [(646) 291-1653]
Email: [blake.gronich@citi.com]

APPENDIX C-9

NY3 - 504826.09

## SCHEDULE 1.44

**Exit Facility Pledge and Security Agreement**

**PLEDGE AND SECURITY AGREEMENT (FIRST LIEN)**

**dated as of [_____], 2010**

**between**

**EACH OF THE GRANTORS PARTY HERETO**

**and**

**CITICORP NORTH AMERICA, INC.,**

**as the Collateral Agent**

NY3 - 505036.04

**TABLE OF CONTENTS**

PAGE

SECTION 1. DEFINITIONS..................................................................................1
    1.1    General Definitions ...............................................................................1
    1.2    Definitions; Interpretation ..................................................................11

SECTION 2. GRANT OF SECURITY. ...............................................................12
    2.1    Grant of Security ................................................................................12
    2.2    Certain Limited Exclusions................................................................13

SECTION 3. SECURITY FOR OBLIGATIONS; GRANTORS REMAIN  LIABLE....14
    3.1    Security for Obligations .....................................................................14
    3.2    Continuing Liability Under Collateral ...............................................14
    3.3    Swedish Grantors ...............................................................................14

SECTION 4. REPRESENTATIONS AND WARRANTIES AND COVENANTS........15
    4.1    Generally. ...........................................................................................15
    4.2    Equipment and Inventory. ..................................................................18
    4.3    Receivables.........................................................................................20
    4.4    Investment Related Property ..............................................................22
    4.5    Material Contracts..............................................................................31
    4.6    Letter of Credit Rights........................................................................32
    4.7    Insurance. ...........................................................................................33
    4.8    Intellectual Property. ..........................................................................34
    4.9    Commercial Tort Claims.....................................................................40

SECTION 5. ACCESS; RIGHT OF INSPECTION AND FURTHER ASSURANCES;
ADDITIONAL GRANTORS. ........................................................................40
    5.1    Access; Right of Inspection................................................................40
    5.2    Further Assurances..............................................................................40
    5.3    Additional Grantors............................................................................42

SECTION 6. COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT.............42
    6.1    Power of Attorney ..............................................................................42
    6.2    No Duty on the Part of Collateral Agent or Secured Parties..............44

SECTION 7. REMEDIES....................................................................................44
    7.1    Generally. ...........................................................................................44
    7.2    Application of Proceeds ......................................................................46
    7.3    Sales on Credit ...................................................................................46
    7.4    Deposit Accounts. ..............................................................................46
    7.5    Investment Related Property. ..............................................................46
    7.6    Intellectual Property. ..........................................................................47
    7.7    Cash Proceeds ....................................................................................49

i

NY3 - 505036.04

SECTION 8. COLLATERAL AGENT. ...........................................................50

SECTION 9. CONTINUING SECURITY INTEREST; TRANSFER OF LOANS. ........51

SECTION 10. STANDARD OF CARE; COLLATERAL AGENT MAY PERFORM. .51

SECTION 11. INDEMNITY AND EXPENSES. ............................................52

SECTION 12. MISCELLANEOUS. ............................................................52

NY3 - 505036.04

SCHEDULES

SCHEDULE 2.2 — LIMITED FOREIGN ENTITIES

SCHEDULE 4.1 — GENERAL INFORMATION

SCHEDULE 4.2  — LOCATION OF EQUIPMENT AND INVENTORY

SCHEDULE 4.4 — INVESTMENT RELATED PROPERTY

SCHEDULE 4.5 — MATERIAL CONTRACTS

SCHEDULE 4.6 — LETTERS OF CREDIT

SCHEDULE 4.8 — INTELLECTUAL PROPERTY

SCHEDULE 4.9 — COMMERCIAL TORT CLAIMS

EXHIBITS

EXHIBIT A — PLEDGE SUPPLEMENT

EXHIBIT B — UNCERTIFICATED SECURITIES CONTROL AGREEMENT

NY3 - 505036.04

This **PLEDGE AND SECURITY AGREEMENT (FIRST LIEN)**, dated as of [_____], 2010 (this "**Security Agreement**"), between **EACH OF THE UNDERSIGNED**, whether as an original signatory hereto or as an Additional Grantor (as herein defined) (each, a "**Grantor**"), and **CITICORP NORTH AMERICA, INC.**, as collateral agent for the Secured Parties (as herein defined) (in such capacity as collateral agent, the "**Collateral Agent**").

## RECITALS:

**WHEREAS,** reference is made to that certain Credit and Guaranty Agreement (First Lien) dated [_____], 2010 (as it may be amended, supplemented or otherwise modified, the "**First Lien Credit Agreement**"; terms defined therein and not otherwise defined herein being used herein as therein defined) among Xerium Technologies, Inc. ("**Xerium**"), XTI LLC, Xerium Italia S.p.A., Xerium Canada Inc., Huyck.Wangner Austria GmbH and Xerium Germany Holding GmbH as Borrowers, the subsidiaries of Xerium named therein as Guarantors, Citigroup Global Markets Inc. as Sole Lead Arranger and Sole Bookrunner, Citicorp North America, Inc. as Administrative Agent and as Collateral Agent, and the other Banks party thereto;

**WHEREAS,** subject to the terms and conditions of the Credit Agreement, certain Grantors may enter into one or more Hedge Agreements (as defined in the Credit Agreement) with one or more Bank Counterparties;

**WHEREAS**, in consideration of the extensions of credit and other accommodations of Banks and Bank Counterparties as set forth in the Credit Agreement and the Hedge Agreements, respectively, each Grantor has agreed to secure such Grantor's obligations under the Credit Documents and the Hedge Agreements as set forth herein;

**WHEREAS**, the obligations under the Second Lien Credit Agreement and the other Second Lien Credit Documents are secured by a second priority security interest in the Collateral and the relative rights and priorities in respect of the Collateral are governed by the Intercreditor Agreement (as defined herein); and

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, each Grantor and the Collateral Agent agree as follows:

## SECTION 1.   DEFINITIONS.

**1.1    General Definitions**.  In this Security Agreement, the following terms shall have the following meanings:

1

NY3 - 505036.04

"**Account Debtor**" shall mean "account debtor" as defined in Article 9 of the UCC and shall include each Person who is obligated on a Receivable or any Supporting Obligation related thereto.

"**Accounts**" shall mean all "accounts" as defined in Article 9 of the UCC.

"**Additional Grantors**" shall have the meaning assigned in Section 5.3.

"**Applicable Law**" means, with respect to any Person, any domestic or foreign, federal, state, provincial or local statute, law, ordinance, rule, administrative interpretation, regulation, order, writ, injunction, directive, judgment, decree or other requirement of any Governmental Entity applicable to such Person or any of their respective properties or assets.

"**Assigned Agreements**" shall mean all agreements and contracts to which such Grantor is a party as of the date hereof, or to which such Grantor becomes a party after the date hereof, including, without limitation, each Material Contract, as each such agreement may be amended, supplemented or otherwise modified from time to time.

"**Bank**" shall have the meaning set forth in the recitals.

"**Bank Counterparty**" shall have the meaning assigned to such term in the First Lien Credit Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Cash Proceeds**" shall have the meaning assigned in Section 7.7.

"**Chattel Paper**" shall mean all "chattel paper" as defined in Article 9 of the UCC.

"**Collateral**" shall have the meaning assigned in Section 2.1.

"**Collateral Account**" shall mean any account or accounts established by the Collateral Agent.

"**Collateral Agent**" shall have the meaning set forth in the preamble.

"**Collateral Records**" shall mean books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the

NY3 - 505036.04

Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Collateral Support**" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"**Commercial Tort Claims**" shall mean all "commercial tort claims" as defined in Article 9 of the UCC as listed on Schedule 4.9 (as such schedule may be amended or supplemented from time to time).

"**Commodities Accounts**" (i) shall mean all "commodity accounts" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all of the accounts listed on Schedule 4.4 under the heading "Commodities Accounts" (as such schedule may be amended or supplemented from time to time).

"**Copyright Licenses**" shall mean any and all agreements granting any right in, to or under Copyrights (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.8 (as such schedule may be amended or supplemented from time to time).

"**Copyrights**" shall mean all United States, state and foreign copyrights, including but not limited to copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. §901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the applications referred to in Schedule 4.8 (as such schedule may be amended or supplemented from time to time), (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof, (v) all licenses, claims, damages and proceeds of suit arising therefrom, and (vi) all payments and rights to payments arising out of the sale, lease, license, assignment, or other disposition thereof.

"**Deposit Accounts**" (i) shall mean all "deposit accounts" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all of the accounts listed on Schedule 4.4 under the heading "Deposit Accounts" (as such schedule may be amended or supplemented from time to time).

"**Discharge of First Lien Obligations**" shall have the meaning set forth in the Intercreditor Agreement.

3

"**Documents**" shall mean all "documents" as defined in Article 9 of the UCC.

"**Electronic Chattel Paper**" shall mean all "electronic chattel paper" as defined in Article 9 of the UCC.

"**Equipment**" shall mean:  (i) all "equipment" as defined in Article 9 of the UCC, (ii) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether characterized as equipment under the UCC) and (iii) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

"**First Lien Credit Agreement**" shall have the meaning set forth in the recitals.

"**Foreign Entity**" shall mean "controlled foreign corporation" as defined in  Section 957(a) or any successor provision of the Tax Code.

"**GAAP**" means, subject to the limitations on the application thereof set forth in the First Lien Credit Agreement, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**General Intangibles**" (i) shall mean all "general intangibles" as defined in Article 9 of the UCC, and (ii) shall include, without limitation, all interest rate or currency protection or hedging arrangements, all tax refunds, all licenses, permits, concessions and authorizations, all Assigned Agreements and all Intellectual Property (in each case, regardless of whether characterized as general intangibles under the UCC).

"**Goods**" (i) shall mean all "goods" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all Inventory and Equipment (in each case, regardless of whether characterized as goods under the UCC).

"**Grantors**" shall have the meaning set forth in the preamble.

"**Hedge Agreement**" shall mean any agreement in respect of any Grantor's Hedging Obligations to any Bank Counterparty under the First Lien Credit Agreement.

"**Instruments**" shall mean all "instruments" as defined in Article 9 of the UCC.

NY3 - 505036.04

"**Insurance**" shall mean (i) all insurance policies covering any or all of the Collateral (regardless of whether the Collateral Agent is the loss payee thereof) and (ii) any key man life insurance policies.

"**Intellectual Property**" shall mean, collectively, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets, and the Trade Secret Licenses.

"**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of the date hereof, among the Collateral Agent, the Administrative Agent and the collateral agent and the administrative agent under the Second Lien Credit Agreement, Xerium and certain of its Subsidiaries party or that may become party thereto from time to time, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"**Inventory**" shall mean (i) all "inventory" as defined in Article 9 of the UCC and (ii) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods, and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in any Grantor's business; all goods in which any Grantor has an interest in mass or a joint or other interest or right of any kind; and all goods which are returned to or repossessed by any Grantor, all computer programs embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether characterized as inventory under the UCC).

"**Investment Accounts**" shall mean the Collateral Account, Securities Accounts, Commodities Accounts and Deposit Accounts, including the Term Loan LC Collateral Account (as defined in the First Lien Credit Agreement).

"**Investment Property**" shall mean all "investment property" as defined in Article 9 of the UCC.

"**Investment Related Property**" shall mean:  (i) all Investment Property, and (ii) all of the following (regardless of whether classified as investment property under the UCC): all Pledged Equity Interests, Pledged Debt, the Investment Accounts and certificates of deposit.

"**Letters of Credit**" shall mean "letters of credit" as defined in Article 9 of the UCC.

5

"**Letter of Credit Right**" shall mean "letter-of-credit right" as defined in Article 9 of the UCC.

"**Licenses**" means collectively Copyright Licenses, Patent Licenses, Trade Secrets Licenses and Trademark Licenses.

"**Lien**" shall mean (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Pledged Equity Interests, any purchase option, call or similar right of a third party with respect to such Pledged Equity Interests.

"**Limited Foreign Entity**" shall mean entities designated as such on Schedule 2.2.

"**Material Contract**" shall mean any contract or other arrangement to which any Grantor is a party (other than the Credit Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Money**" shall mean "money" as defined in the UCC.

"**Non-Assignable Contract**" shall mean any agreement, contract or license to which any the Grantor is a party that by its terms purports to restrict or prevent the assignment or granting of a security interest therein (either by its terms or by any federal or state statutory prohibition or otherwise irrespective of whether such prohibition or restriction is enforceable under Section 9-406 through 409 of the UCC).

"**Other Intercompany Debt**" shall have the meaning ascribed in Section 4.4.3(a)(ii).

"**Patent Licenses**" shall mean all agreements providing for the granting of any right in or to Patents (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.8 (as such schedule may be amended or supplemented from time to time).

"**Patents**" shall mean all United States and foreign patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including, but not limited to: (i) each patent and patent application referred to in Schedule 4.8 hereto (as such schedule may be amended or supplemented from time to

6

time), (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (ii) all rights corresponding thereto throughout the world, (ii) all inventions and improvements described therein, (iv) all rights to sue for past, present and future infringements thereof, (v) all licenses, claims, damages, and proceeds of suit arising therefrom, and (v) all Proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"**Permitted Sale**" shall mean those sales, transfers, assignments or other dispositions permitted by the First Lien Credit Agreement.

"**Person**" shall mean and include natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Pledge Supplement**" shall mean any supplement to this Security Agreement in substantially the form of Exhibit A.

"**Pledged Debt**" shall mean all Indebtedness owed to such Grantor, including, without limitation, all Indebtedness described on Schedule 4.4 under the heading "Pledged Debt" (as such schedule may be amended or supplemented from time to time), issued by the obligors named therein, the instruments evidencing such Indebtedness, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

"**Pledged Equity Interests**" shall mean all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests.

"**Pledged LLC Interests**" shall mean all interests in any limited liability company including, without limitation, all limited liability company interests listed on Schedule 4.4 under the heading "Pledged LLC Interests" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such limited liability company interests and any interest of such Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

7

"**Pledged Partnership Interests**" shall mean all interests in any general partnership, limited partnership, limited liability partnership or other partnership including, without limitation, all partnership interests listed on Schedule 4.4 under the heading "Pledged Partnership Interests" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such partnership interests and any interest of such Grantor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests.

"**Pledged Stock**" shall mean all shares of capital stock owned by such Grantor, including, without limitation, all shares of capital stock described on Schedule 4.4 under the heading "Pledged Stock" (as such schedule may be amended or supplemented from time to time), and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

"**Pledged Trust Interests**" shall mean all interests in a Delaware business trust or other trust including, without limitation, all trust interests listed on Schedule 4.4 under the heading "Pledged Trust Interests" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such trust interests and any interest of such Grantor on the books and records of such trust or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such trust interests.

"**Primary Accounts**" shall mean primary Dollar denominated master deposit and investment accounts and primary Euro denominated master deposit and investment accounts of each Grantor.

"**Proceeds**" shall mean all "proceeds" as defined in Article 9 of the UCC.

"**Receivables**" shall mean all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General

8

Intangible or Investment Related Property, together with all of Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"**Receivables Records**" shall mean (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of Grantor or any computer bureau or agent from time to time acting for Grantor or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (iv) all credit information, reports and memoranda relating thereto and (v) all other written or nonwritten forms of information related in any way to the foregoing or any Receivable.

"**Record**" shall have the meaning specified in Article 9 of the UCC.

"**Related Contracts**" means any and all obligations, leases, security agreements, letters of credit and other contracts related to the Receivables.

"**Second Lien Collateral Agent**" means the collateral agent under the Second Lien Collateral Documents.

"**Second Lien Collateral Documents**" means the "Collateral Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means the Second Amended and Restated Credit and Guaranty Agreement (Second Lien) dated as of the date hereof among Xerium, XTI, Xerium Italia S.p.A., Xerium Canada Inc., Huyck Wangner Austria GmbH and Xerium Germany Holding GmbH as borrowers, the subsidiaries of Xerium named therein as Guarantors, Citigroup Global Markets Inc. as Lead Arranger and Bookrunner, Citicorp North America, Inc. as administrative agent and as collateral agent, and the other banks party thereto, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"**Secured Obligations**" shall have the meaning assigned in Section 3.1.

9

"**Secured Parties**" shall mean the Banks and the Bank Counterparties and shall include, without limitation, all former Banks and Bank Counterparties to the extent that any Obligations owing to such Persons were incurred while such Persons were Banks or Bank Counterparties and such Obligations have not been paid or satisfied in full.

"**Securities**" shall mean any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Accounts**" (i) shall mean all "securities accounts" as defined in Article 8 of the UCC and (ii) shall include, without limitation, all of the accounts listed on Schedule 4.4 under the heading "Securities Accounts" (as such schedule may be amended or supplemented from time to time).

"**Securities Entitlements**" shall have the meaning specified in Article 8 of the UCC.

"**Security Agreement**" shall have the meaning set forth in the preamble.

"**Supporting Obligation**" shall mean all "supporting obligations" as defined in Article 9 of the UCC.

"**Swedish Grantor**" shall mean each Grantor incorporated or organized in Sweden.

"**Tangible Chattel Paper**" shall mean "tangible chattel paper" as defined in Article 9 of the UCC.

"**Tax Code**" shall mean the United States Internal Revenue Code of 1986, as amended from time to time.

"**Trademark Licenses**" shall mean any and all agreements providing for the granting of any right in or to Trademarks (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.8 (as such schedule may be amended or supplemented from time to time).

"**Trademarks**" shall mean all United States, and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other

10

source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing including, but not limited to: (i) the registrations and applications referred to in Schedule 4.8 (as such schedule may be amended or supplemented from time to time), (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by the foregoing, (iv) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and (v) all Proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"**Trade Secret Licenses**" shall mean any and all agreements providing for the granting of any right in or to Trade Secrets (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.8 (as such schedule may be amended or supplemented from time to time).

"**Trade Secrets**" shall mean all trade secrets and all other confidential or proprietary information and know-how whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, including but not limited to: (i) the right to sue for past, present and future misappropriation or other violation of any Trade Secret, and (ii) all Proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"**United States**" shall mean the United States of America.

"**Xerium**" shall have the meaning set forth in the recitals.

1.2    **Definitions; Interpretation**.  All capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the First Lien Credit Agreement or, if not defined therein, in the UCC.  References to "Sections," "Exhibits" and "Schedules" shall be to Sections, Exhibits and Schedules, as the case may be, of this Security Agreement unless otherwise specifically provided.  Section headings in this Security Agreement are included herein for convenience of reference only and shall not constitute a part of this Security Agreement for any other purpose or be given any substantive effect.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such

11

statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  If any conflict or inconsistency exists between this Security Agreement and the First Lien Credit Agreement, the First Lien Credit Agreement shall govern.  If any conflict or inconsistency exists between this Security Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern. All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

## SECTION 2.   GRANT OF SECURITY.

**2.1    Grant of Security**.  Each Grantor hereby grants to the Collateral Agent a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all personal property of such Grantor including, but not limited to the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (all of which being hereinafter collectively referred to as the "**Collateral**"):

(a)    all Accounts;

(b)    all Equipment and Inventory;

(c)    all Chattel Paper;

(d)    all Deposit Accounts;

(e)    all Documents;

(f)    all General Intangibles;

(g)    all Goods;

(h)    all Instruments;

(i)    all Insurance;

(j)    all Intellectual Property;

(k)    all Investment Related Property;

NY3 - 505036.04

(l)      all Letters of Credit and Letter-of-Credit Rights;

(m)     all Money;

(n)      all Commercial Tort Claims;

(o)      all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

(p)      to the extent not covered by clauses (a) through (o) of this Section 2.1, all other personal property of such Grantor, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

**2.2     Certain Limited Exclusions**.  Notwithstanding anything herein to the contrary, in no event shall the security interest granted under Section 2.1 hereof attach to (a) any lease, license, contract, property rights or agreement to which any Grantor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of any Grantor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other Applicable Law (including the Bankruptcy Code) or principles of equity), provided, however, that such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) above; and (b) in any of the outstanding capital stock of a Foreign Entity in excess of the percentage indicated on Schedule 2.2 of the voting power of all classes of capital stock of such Foreign Entity entitled to vote; provided that immediately upon the amendment of the Tax Code to allow the pledge of a greater percentage of the voting power of capital stock in a Foreign Entity without adverse tax consequences, the Collateral shall include, and the security interest granted by each Grantor shall attach to, such greater percentage of capital stock of each Foreign Entity (excluding any Foreign Entity designated as a Limited Foreign Entity).

13

**SECTION 3.    SECURITY FOR OBLIGATIONS; GRANTORS REMAIN LIABLE.**

**3.1    Security for Obligations**.  This Security Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a) (and any successor provision thereof)), of all Obligations with respect to every Grantor (the "**Secured Obligations**").

**3.2    Continuing Liability Under Collateral**.  Notwithstanding anything herein to the contrary, (i) each Grantor shall remain liable for all obligations under the Collateral and nothing contained herein is intended or shall be a delegation of duties to the Collateral Agent or any Secured Party, (ii) each Grantor shall remain liable under each of the agreements included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, to perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof and neither the Collateral Agent nor any Secured Party shall have any obligation or liability under any of such agreements by reason of or arising out of this Security Agreement or any other document related thereto nor shall the Collateral Agent nor any Secured Party have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, and (iii) the exercise by the Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

**3.3    Swedish Grantors**.  Notwithstanding anything to the contrary herein, the obligations of a Swedish Grantor under this Security Agreement shall be limited, if required by the provisions of the Swedish Companies Act (*Sw* Aktiebolagslagen 2005:551) regulating distribution of assets (Chapter 17, Section 3 or the equivalent clause/s from time to time), and it is understood that the liability of such Swedish Grantor only applies to the extent and in such amount permitted by the above mentioned provisions of the Swedish Companies Act.  The obligations of a Swedish Grantor under this Security Agreement shall furthermore be limited to the extent the Collateral can be legally provided under the laws of the jurisdiction where the assets are held by the Swedish Grantor and the Swedish Grantor shall only be under an obligation to perfect the security upon the Collateral Agent's reasonable request, in which case perfection shall be made in accordance with the laws of the relevant jurisdiction.

14

**SECTION 4.    REPRESENTATIONS AND WARRANTIES AND COVENANTS.**

    **4.1    Generally**.

        (a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

        (i)    it owns the Collateral purported to be owned by it or otherwise has the rights it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter acquired, and except for transfers or dispositions permitted under the First Lien Credit Agreement, will continue to own or have such rights in each item of the Collateral, in each case free and clear of any and all Liens, rights or claims of all other Persons, including, without limitation, liens arising as a result of such Grantor becoming bound (as a result of merger or otherwise) as debtor under a security agreement entered into by another Person other than Permitted Liens;

        (ii)    it has indicated on <u>Schedule 4.1(A)</u> (as such schedule may be amended or supplemented from time to time): (w) the type of organization of such Grantor, (x) the jurisdiction of organization of such Grantor, (y) its organizational identification number (as applicable) and (z) the jurisdiction where the chief executive office or its sole place of business is located.

        (iii)    the full legal name of such Grantor is as set forth on <u>Schedule 4.1(A)</u> and it has not done in the last five (5) years, and does not do, business under any other name (including any trade-name or fictitious business name) except for those names set forth on <u>Schedule 4.1(B)</u> (as such schedule may be amended or supplemented from time to time);

        (iv)    except as <u>provided</u> on <u>Schedule 4.1(C)</u>, it has not changed its name, jurisdiction of organization, chief executive office or sole place of business or its corporate structure in any way (e.g., by merger, consolidation, change in corporate form or otherwise) within the past five (5) years;

        (v)    it has not become bound (whether as a result of merger or otherwise) as debtor under a security agreement entered into by another Person, which has not heretofore been terminated other than the agreements identified on <u>Schedule 4.1(D)</u> hereof (as such schedule may be amended or supplemented from time to time);

        (vi)    with respect to each agreement identified on <u>Schedule 4.1(D)</u>, it has indicated on <u>Schedule 4.1(A)</u> and <u>Schedule 4.1(B)</u> the

15

NY3 - 505036.04

information required pursuant to Section 4.1(a)(ii), (iv) and (v) with respect to the debtor under each such agreement;

(vii)   upon the filing of all UCC financing statements naming each Grantor as "debtor" and the Collateral Agent as "secured party" and describing the Collateral in the filing offices set forth opposite such Grantor's name on Schedule 4.1(E) hereof (as such schedule may be amended or supplemented from time to time) and other filings delivered by each Grantor, and upon recordation of the security interests granted hereunder in Patents and Trademarks in the applicable intellectual property registries, including but not limited to the United States Patent and Trademark Office, the security interests granted to the Collateral Agent hereunder constitute valid and perfected first priority Liens (subject in the case of priority only to Permitted Liens and to the rights of the United States government (including any agency or department thereof) with respect to United States government Receivables) on all of the Collateral except with respect to foreign Patents and Trademarks;

(viii)   all actions and consents, including all filings, notices, registrations and recordings necessary for the exercise by the Collateral Agent of the voting or other rights provided for in this Security Agreement or the exercise of remedies in respect of the Collateral have been made or obtained;

(ix)   other than the financing statements filed in favor of the Collateral Agent, no effective UCC financing statement, fixture filing or other instrument similar in effect under any Applicable Law covering all or any part of the Collateral is on file in any filing or recording office except for (x) financing statements for which proper termination statements have been delivered to the Collateral Agent for filing and (y) financing statements filed in connection with Permitted Liens;

(x)   no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for either (i) the pledge or grant by any Grantor of the Liens purported to be created in favor of the Collateral Agent hereunder or (ii) the exercise by Collateral Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by Applicable Law), except (A) for the filings contemplated by clause (viii) above and (B) as may be required, in connection with the disposition of any Investment Related Property, by laws generally affecting the offering and sale of Securities;

(xi)   all information supplied by any Grantor with respect to any of the Collateral (in each case taken as a whole with respect to any particular

16

Collateral) is accurate and complete in all material respects;

(xii)     none of the Collateral constitutes, or is the Proceeds of, "farm products" (as defined in the UCC);

(xiii)    it does not own any "as extracted collateral" (as defined in the UCC) or any timber to be cut; and

(xiv)    such Grantor has been duly organized  as an entity of the type as set forth opposite such Grantor's name on Schedule 4.1(A) solely under the laws of the jurisdiction as set forth opposite such Grantor's name on Schedule 4.1(A) and remains duly existing as such.  Such Grantor has not filed any certificates of domestication, transfer or continuance in any other jurisdiction.

Notwithstanding the foregoing, the representations and warranties set out in Section 4.1(a)(vii), (viii), (ix) and (x) are not given, or deemed given, by any Swedish Grantor.

(b)     Covenants and Agreements.  Each Grantor hereby covenants and agrees that:

(i)     except for the security interest created by this Security Agreement, it shall not create or suffer to exist any Lien upon or with respect to any of the Collateral, except Permitted Liens, and such Grantor shall defend the Collateral against all Persons at any time claiming any interest therein;

(ii)     it shall not produce, use or permit any Collateral to be used unlawfully or in violation of any provision of this Security Agreement or any applicable statute, regulation or ordinance or any policy of insurance covering the Collateral in a material manner;

(iii)     it shall not change such Grantor's name, identity, corporate structure  (e.g., by merger, consolidation, change in corporate form or otherwise), sole place of business, chief executive office, type of organization or jurisdiction of organization or establish any trade names unless it shall have (a) notified the Collateral Agent in writing, by executing and delivering to the Collateral Agent a completed Pledge Supplement together with all supplements to schedules thereto, at least ten (10) Business Days prior to any such change or establishment, identifying such new proposed name, identity, corporate structure, sole place of business, chief executive office, jurisdiction of organization or trade name and providing such other information in connection therewith as the Collateral Agent may reasonably request and (b) taken all actions necessary or advisable to

17

maintain the continuous validity, perfection and the same or better priority of the Collateral Agent's security interest in the Collateral intended to be granted and agreed to hereby;

(iv)    if the Collateral Agent or any Secured Party gives value to enable Grantor to acquire rights in or the use of any Collateral, it shall use such value for such purposes and such Grantor further agrees that repayment of any Obligation shall apply on a "first-in, first-out" basis so that the portion of the value used to acquire rights in any Collateral shall be paid in the chronological order such Grantor acquired rights therein;

(v)    it shall pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity thereof is being contested in good faith; provided, such Grantor shall in any event pay such taxes, assessments, charges, levies or claims not later than five (5) days prior to the date of any proposed sale under any judgment, writ or warrant of attachment entered or filed against such Grantor or any of the Collateral as a result of the failure to make such payment;

(vi)    upon such Grantor or any officer of such Grantor obtaining knowledge thereof, it shall promptly notify the Collateral Agent in writing of any event that may have a Material Adverse Effect on the value of the Collateral or any portion thereof, the ability of any Grantor or the Collateral Agent to dispose of the Collateral or any portion thereof, or the rights and remedies of the Collateral Agent in relation thereto, including, without limitation, the levy of any legal process against the Collateral or any portion thereof;

(vii)    it shall not take or permit any action which could impair the Collateral Agent's rights in the Collateral; and

(viii)    it shall not sell, transfer or assign (by operation of law or otherwise) any Collateral except for Permitted Sales.

**4.2    Equipment and Inventory**.

(a)    Representations and Warranties.  Each Grantor represents and warrants, on the Closing Date and on each Credit Date, that:

(i)    any Goods now or hereafter produced by any Grantor in the United States included in the Collateral have been and will be produced in compliance with the requirements of the Fair Labor Standards Act, as amended;

18

NY3 - 505036.04

and

(ii)     none of the Inventory or Equipment is in the possession of an issuer of a negotiable document (as defined in Section 7-104 of the UCC) therefor or otherwise in the possession of a bailee or a warehouseman except as set forth on Schedule 4.2.

(b)     Covenants and Agreements.  Each Grantor covenants and agrees that:

(i)     it shall keep the Equipment, Inventory and any Documents evidencing any Equipment and Inventory in the locations specified on Schedule 4.2 (as such schedule may be amended or supplemented from time to time) unless it shall have (a) notified the Collateral Agent in writing, by executing and delivering to the Collateral Agent a completed Pledge Supplement together with all supplements to schedules thereto, at least fifteen (15) days prior to any change in locations, identifying such new locations and providing such other information in connection therewith as the Collateral Agent may reasonably request and (b) taken all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of the Collateral Agent's security interest in the Collateral intended to be granted and agreed to hereby, or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder, with respect to such Equipment and Inventory;

(ii)     it shall keep correct and accurate records of the Inventory as is customarily maintained under similar circumstances by Persons of established reputation engaged in similar business, and in any event in conformity with GAAP;

(iii)     it shall not deliver any Document evidencing the ownership of any Equipment and Inventory to any Person other than the issuer of such Document to claim the Goods evidenced therefor or the Collateral Agent, other than in connection with sales of Equipment or Inventory as permitted by the First Lien Credit Agreement; and

(iv)     if any Equipment or Inventory is in possession or control of any third party other than pursuant to a transfer or disposition permitted under the First Lien Credit Agreement, each Grantor shall assist the Collateral Agent in notifying the third party of the Collateral Agent's security interest and obtaining an acknowledgment from the third party that it is holding the Equipment and Inventory for the benefit of the Collateral Agent.

19

**4.3**    **Receivables**.

(a)    <u>Representations and Warranties</u>.  Each Grantor represents and warrants, on the Closing Date and on each Credit Date, that:

(i)    to the best of Grantor's knowledge each of its Receivables (a) is and will be the legal, valid and binding obligation of the Account Debtor in respect thereof, representing an unsatisfied obligation of such Account Debtor, (b) is and will be enforceable in accordance with its terms, (c) is not and will not be subject to any setoffs, defenses, taxes, counterclaims (except with respect to refunds, returns and allowances in the ordinary course of business with respect to damaged merchandise) and (d) is and will be in compliance with all Applicable Laws, whether federal, state, local or foreign;

(ii)    none of the Account Debtors in respect of any Receivable in excess of $1,000,000 individually is the government of the United States, any agency or instrumentality thereof, any state or municipality or any foreign sovereign.  No Receivable in excess of $1,000,000 individually requires the consent of the Account Debtor in respect thereof in connection with the pledge hereunder, except any consent which has been obtained; and

(iii)    no Receivable is evidenced by, or constitutes, an Instrument or Chattel Paper in excess of $1,000,000 which has not been delivered to, or otherwise subjected to the control of, the Collateral Agent to the extent required by, and in accordance with Section 4.3(c).

(b)    <u>Covenants and Agreements</u>:  Each Grantor hereby covenants and agrees that:

(i)    it shall keep and maintain at its own cost and expense satisfactory records of its Receivables as are customarily maintained under similar circumstances by Persons of established reputation engaged in similar businesses, and in any event, in conformity with GAAP;

(ii)    at the Collateral Agent's request, it shall mark conspicuously, in form and manner reasonably satisfactory to the Collateral Agent, all Chattel Paper, Instruments and other evidence of Receivables (other than any delivered to the Collateral Agent as <u>provided</u> herein), as well as the Receivables Records with an appropriate reference to the fact that the Collateral Agent has a security interest therein;

(iii)    it shall perform in all material respects all of its obligations

20

with respect to the Receivables;

(iv)    it shall not amend, modify, terminate or waive any provision of any Receivable in excess of $100,000 individually for any invoice or $500,000 in the aggregate for any account in any manner which could reasonably be expected to have a Material Adverse Effect on the value of such Receivable as Collateral.  Other than in the ordinary course of business as generally conducted by it on and prior to the date hereof, and except as otherwise provided in subsection (v) below, following an Event of Default, such Grantor shall not (w) grant any extension or renewal of the time of payment of any Receivable, (x) compromise or settle any dispute, claim or legal proceeding with respect to any Receivable for less than the total unpaid balance thereof, (y) release, wholly or partially, any Person liable for the payment thereof, or (z) allow any credit or discount thereon;

(v)    except as otherwise provided in this subsection and in the ordinary course of business, each Grantor shall continue to collect all amounts due or to become due to such Grantor under its Receivables and any Supporting Obligation and diligently exercise each material right it may have under any of its Receivables, any Supporting Obligation or Collateral Support, in each case, at its own expense, and in connection with such collections and exercise, such Grantor shall take such action as such Grantor may deem necessary or advisable. Notwithstanding the foregoing, upon the occurrence and during the continuance of a Default or an Event of Default, the Collateral Agent shall have the right at any time to notify, or require any Grantor to notify, any Account Debtor of the Collateral Agent's security interest in the Receivables and any Supporting Obligation and, in addition, at any time following the occurrence and during the continuation of an Event of Default, the Collateral Agent may:  (1) direct the Account Debtors under any Receivables to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent; (2) notify, or require any Grantor to notify, each Person maintaining a lockbox or similar arrangement to which Account Debtors under any Receivables have been directed to make payment to remit all amounts representing collections on checks and other payment items from time to time sent to or deposited in such lockbox or other arrangement directly to the Collateral Agent; and (3) enforce, at the expense of such Grantor, collection of any such Receivables and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done.  If the Collateral Agent notifies any Grantor that it has elected to collect the Receivables in accordance with the preceding sentence, any payments of Receivables received by such Grantor shall be forthwith (and in any event within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the

21

Collateral Agent if required, in the Collateral Account maintained under the sole dominion and control of the Collateral Agent, and until so turned over, all amounts and proceeds (including checks and other instruments) received by such Grantor in respect of the Receivables, any Supporting Obligation or Collateral Support shall be received in trust for the benefit of the Collateral Agent hereunder and shall be segregated from other funds of such Grantor and such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, or release wholly or partly any Account Debtor or obligor thereof, or allow any credit or discount thereon; and

(vi)     except as it shall determine otherwise in the ordinary course of business, it shall use commercially reasonable efforts to keep in full force and effect any Supporting Obligation or Collateral Support relating to any Receivable.

(c)     Delivery and Control of Receivables.  With respect to any of its Receivables in excess of $1,000,000 individually that is evidenced by, or constitutes, Chattel Paper or Instruments, each Grantor shall cause each originally executed copy thereof to be delivered to the Collateral Agent (or its agent or designee) appropriately indorsed to the Collateral Agent or indorsed in blank:  (i) with respect to any such Receivables in existence on the date hereof, on or prior to the date hereof and (ii) with respect to any such Receivables hereafter arising, within ten (10) days of such Grantor acquiring rights therein.  With respect to any Receivables in excess of $1,000,000 individually which would constitute "electronic chattel paper" under Article 9 of the UCC, each Grantor shall take all steps necessary to give the Collateral Agent control over such Receivables (within the meaning of Section 9-105 of the UCC):  (i) with respect to any such Receivables in existence on the date hereof, on or prior to the date hereof and (ii) with respect to any such Receivables hereafter arising, within ten (10) days of such Grantor acquiring rights therein.  Any Receivable not otherwise required to be delivered or subjected to the control of the Collateral Agent in accordance with this subsection (c) shall be delivered or subjected to such control upon request of the Collateral Agent.

**4.4     Investment Related Property**

**4.4.1     Investment Related Property Generally**

(a)     Covenants and Agreements.  Each Grantor hereby covenants and agrees that:

(i)     in the event it acquires rights in any Investment Related Property after the date hereof, it shall deliver to the Collateral Agent a completed Pledge Supplement together with all supplements to schedules thereto, reflecting

22

such new Investment Related Property and all other Investment Related Property. Notwithstanding the foregoing, it is understood and agreed that the security interest of the Collateral Agent shall attach to all Investment Related Property immediately upon any Grantor's acquisition of rights therein and shall not be affected by the failure of any Grantor to deliver a supplement to Schedule 4.4 as required hereby;

(ii)     except as provided in the next sentence, in the event such Grantor receives any dividends, interest or distributions on any Investment Related Property, or any securities or other property upon the merger, consolidation, liquidation or dissolution of any issuer of any Investment Related Property, then (a) such dividends, interest or distributions and securities or other property shall be included in the definition of Collateral without further action and (b) such Grantor shall immediately take all steps, if any, necessary or advisable to ensure the validity, perfection, priority and, if applicable, control of the Collateral Agent over such Investment Related Property (including, without limitation, delivery thereof to the Collateral Agent) and pending any such action such Grantor shall be deemed to hold such dividends, interest, distributions, securities or other property in trust for the benefit of the Collateral Agent and shall segregate such dividends, distributions, Securities or other property from all other property of such Grantor.  Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the Collateral Agent authorizes each Grantor to retain all ordinary cash dividends and distributions paid in the normal course of the business of the issuer and consistent with the past practice of the issuer and all payments of interest and principal; and

(iii)     each Grantor consents to the grant by each other Grantor of a Security Interest in all Investment Related Property to the Collateral Agent.

(b)     Delivery and Control.

(i)     Each Grantor agrees that with respect to any Investment Related Property in which it currently has rights it shall comply with the provisions of this Section 4.4.1(b) on or before the Closing Date and with respect to any Investment Related Property hereafter acquired by such Grantor it shall comply with the provisions of this Section 4.4.1(b) promptly upon acquiring rights therein, in each case in form and substance reasonably satisfactory to the Collateral Agent.  With respect to any Investment Related Property that is represented by a certificate or that is an "instrument" (other than any Investment Related Property credited to a Securities Account or any item of Other Intercompany Debt) it shall cause such certificate or instrument to be delivered to the Collateral Agent, indorsed in blank by an "effective endorsement" (as defined

23

in Section 8 107 of the UCC), regardless of whether such certificate constitutes a "certificated security" for purposes of the UCC.  With respect to any Investment Related Property that is an "uncertificated security" for purposes of the UCC (other than any "uncertificated securities" credited to a Securities Account), it shall cause the issuer of such uncertificated security to either (i) register the Collateral Agent as the registered owner thereof on the books and records of the issuer or (ii) execute an agreement substantially in the form of <u>Exhibit B</u> hereto, pursuant to which such issuer agrees to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

(c)    <u>Voting and Distributions</u>.

(i)    So long as no Event of Default shall have occurred and be continuing:

(1)    except as otherwise provided under the covenants and agreements relating to investment related property in this Security Agreement or elsewhere herein or in the First Lien Credit Agreement, each Grantor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Investment Related Property or any part thereof for any purpose not inconsistent with the terms of this Security Agreement or the Credit Agreement;

(2)    the Collateral Agent shall promptly execute and deliver (or cause to be executed and delivered) to each Grantor all proxies, and other instruments as such Grantor may from time to time reasonably request for the purpose of enabling such Grantor to exercise the voting and other consensual rights when and to the extent which it is entitled to exercise pursuant to clause (1) above; and

(3)    Upon the occurrence and during the continuation of an Event of Default, at the option of the Collateral Agent or request of the Requisite Banks,

(A)    all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights; and

24

NY3 - 505036.04

(B)    in order to permit the Collateral Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder: (1) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all proxies, dividend payment orders and other instruments as the Collateral Agent may from time to time reasonably request and (2) the each Grantor acknowledges that the Collateral Agent may utilize the power of attorney set forth in Section 6.1.

**4.4.2    Pledged Equity Interests**

(a)    Representations and Warranties.  Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)    Schedule 4.4 (as such schedule may be amended or supplemented from time to time) sets forth under the headings "Pledged Stock, "Pledged LLC Interests," "Pledged Partnership Interests" and "Pledged Trust Interests," respectively, all of the Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests owned by any Grantor and such Pledged Equity Interests constitute the percentage of issued and outstanding shares of stock, percentage of membership interests, percentage of partnership interests or percentage of beneficial interest of the respective issuers thereof indicated on such Schedule;

(ii)    except as set forth on Schedule 4.4, it has not acquired any equity interests of another entity or substantially all the assets of another entity within the past five (5) years;

(iii)    it is the record and beneficial owner of the Pledged Equity Interests free of all Liens, rights or claims of other Persons other than Permitted Liens and, except as set forth on Schedule 4.4 there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests;

(iv)    without limiting the generality of Section 4.1(a)(v), no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Pledged Equity

25

Interests or the exercise by the Collateral Agent of the voting or other rights provided for in this Security Agreement or the exercise of remedies in respect thereof; and

(v)     none of the Pledged LLC Interests nor Pledged Partnership Interests are or represent interests in issuers that: (a) are registered as investment companies or (b) are dealt in or traded on securities exchanges or markets; and

(vi)     except as indicated on <u>Schedule 4.4</u>, all of the Pledged LLC Interests and Pledged Partnership Interests are or represent interests in issuers that have opted to be treated as securities under the uniform commercial code of any jurisdiction.

(b)     <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that:

(i)     without the prior written consent of the Collateral Agent, it shall not vote to enable or take any other action to: (a) other than as permitted under the First Lien Credit Agreement, amend or terminate any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other organizational documents in any way that materially changes the rights of such Grantor with respect to any Investment Related Property or adversely affects the validity, perfection or priority of the Collateral Agent's security interest, (b) other than as permitted under the First Lien Credit Agreement, permit any issuer of any Pledged Equity Interest to issue any additional stock, partnership interests, limited liability company interests or other equity interests of any nature or to issue securities convertible into or granting the right of purchase or exchange for any stock or other equity interest of any nature of such issuer, (c) other than as permitted under the First Lien Credit Agreement, permit any issuer of any Pledged Equity Interest to dispose of all or a material portion of their assets, (d) waive any default under or breach of any terms of organizational document relating to the issuer of any Pledged Equity Interest or the terms of any Pledged Debt, or (e) cause any issuer of any Pledged Partnership Interests or Pledged LLC Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Partnership Interests or Pledged LLC Interests to be treated as securities for purposes of the UCC; <u>provided</u>, however, notwithstanding the foregoing, if any issuer of any Pledged Partnership Interests or Pledged LLC Interests takes any such action in violation of the foregoing in this clause (b), such Grantor shall promptly notify the Collateral Agent in writing of any such election or action and, in such event, shall take all steps necessary or advisable to establish the Collateral Agent's "control" thereof;

26

(ii)     it shall comply with all of its obligations in all material respects under any partnership agreement or limited liability company agreement relating to Pledged Partnership Interests or Pledged LLC Interests and shall enforce all of its rights with respect to any Investment Related Property;

(iii)     without the prior written consent of the Collateral Agent, it shall not permit any issuer of any Pledged Equity Interest to merge or consolidate unless (i) such issuer creates a security interest for the benefit of the Collateral Agent that is perfected by a filed financing statement (that is not effective solely under section 9-508 of the UCC) in collateral in which such new debtor has or acquires rights, and (ii) all the outstanding capital stock or other equity interests of the surviving or resulting corporation, limited liability company, partnership or other entity is, upon such merger or consolidation, pledged hereunder; provided that if the surviving or resulting Grantors upon any such merger or consolidation involving an issuer which is a Foreign Entity, then such Grantor shall only be required to pledge equity interests in accordance with Section 2.2 hereof;

(iv)     each Grantor consents to the grant by each other Grantor of a security interest in all Investment Related Property to the Collateral Agent and, without limiting the foregoing, consents to the transfer of any Pledged Partnership Interest and any Pledged LLC Interest to the Collateral Agent or its nominee following an Event of Default and to the substitution of the Collateral Agent or its nominee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto.

(v)     it shall notify the Collateral Agent of any default under any Pledged Equity that has caused, either in any case or in the aggregate, a Material Adverse Effect.

(vi)     if the Collateral Agent exercises its right to sell all or any of the Pledged Equity Interests of any Grantor pursuant to Section 7, each Grantor agrees that, upon request of the Collateral Agent, such Grantor will, at its own expense:

(1)     use its best efforts to qualify the Pledged Equity Interests under the state securities or "Blue Sky" laws and to obtain all necessary governmental approvals for the sale of the Pledged Equity Interests, as requested by the Collateral Agent;

(2)     cause each such issuer to make available to its security holders, as soon as practicable, an earnings statement that will satisfy the provisions of Section 13(a) of the Securities Act;

27

NY3 - 505036.04

(3)     provide the Collateral Agent with such other information and projections as may be necessary or, in the opinion of the Collateral Agent, advisable to enable the Collateral Agent to effect the sale of such Pledged Equity Interests; and

(4)     do or cause to be done all such other acts and things as may be necessary to make such sale of the Pledged Equity Interests or any part thereof valid and binding and in compliance with Applicable Law.

(vii)     The Collateral Agent is authorized, in connection with any sale of the Pledged Equity Interests pursuant to Section 7, to deliver or otherwise disclose to any prospective purchaser of the Pledged Equity Interests (i) any information and projections provided to it pursuant to clause (d) above and (ii) any other information in its possession relating to the Pledged Equity Interests.

### 4.4.3   Pledged Debt

(a)     <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)     Subject to Section 4.4.3(a)(ii), <u>Schedule 4.4</u> (as such schedule may be amended or supplemented from time to time) sets forth under the heading "Pledged Debt" all of the Pledged Debt owned by any Grantor and all of such Pledged Debt has been duly authorized, authenticated or issued, and delivered and is the legal, valid and binding obligation of the issuers thereof and is not in default and, together with the Other Intercompany Debt, constitutes all of the issued and outstanding intercompany Indebtedness.

(ii)     <u>Schedule 4.4(a)</u> sets forth under the heading "Other Intercompany Debt" certain intercompany debts (the "<u>Other Intercompany Debt</u>") evidenced by the Master Intercompany Note, dated as of the date hereof, which such Other Intercompany Debt has been duly authorized and is the legal, valid and binding obligation of the issuers thereof and is not in default.

(b)     <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that:

(i)     it shall notify the Collateral Agent of any default under any Pledged Debt that has caused or could cause, either in any individual case or in the aggregate, a Material Adverse Effect; and

28

NY3 - 505036.04

(ii)     it shall not deliver or otherwise transfer any instruments representing any Other Intercompany Debt to any Person other than the Collateral Agent.

### 4.4.4  Investment Accounts

(a)     Representations and Warranties.  Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)     Schedule 4.4 hereto (as such schedule may be amended or supplemented from time to time) sets forth under the headings "Securities Accounts" and "Commodities Accounts," respectively, all of the Securities Accounts and Commodities Accounts that are Primary Accounts in which each Grantor has an interest.  Each Grantor is the sole entitlement holder of each such Securities Account and Commodity Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than the Collateral Agent pursuant thereto) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any other interest in, any such Securities Account or Commodity Account or securities or other property credited thereto;

(ii)     Schedule 4.4 hereto (as such schedule may be amended or supplemented from time to time) sets forth under the headings "Deposit Accounts" all of the Deposit Accounts that are Primary Accounts in which each Grantor has an interest.  Each Grantor is the sole account holder of each such Deposit Account and such Grantor has not consented to, and is not otherwise aware of, any Person (other than the Collateral Agent pursuant thereto) having either sole dominion and control (within the meaning of common law) or "control" (within the meanings of Section 9-104 of the UCC) over, or any other interest in, any such Deposit Account or any money or other property deposited therein; and

(iii)     Each Grantor has taken all actions necessary or desirable, including those specified in Section 4.4.4(c), to: (a) establish the Collateral Agent's "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over any portion of the Investment Related Property constituting Certificated Securities, Uncertificated Securities, Securities Accounts, Securities Entitlements or Commodities Accounts (each as defined in the UCC) that are Primary Accounts; (b) establish the Collateral Agent's "control" (within the meaning of Section 9-104 of the UCC) over all Deposit Accounts that are Primary Accounts; and (c) deliver all Instruments to the Collateral Agent.

29

(b)    Covenant and Agreement.  Each Grantor hereby covenants and agrees with the Collateral Agent and each other Secured Party that it shall not close or terminate any Investment Account that is a Primary Account unless a successor or replacement account has been established with the consent of the Collateral Agent with respect to which successor or replacement account a control agreement has been entered into by the appropriate Grantor, Collateral Agent and securities intermediary or depository institution at which such successor or replacement account is to be maintained in accordance with the provisions of Section 4.4.4(c).

(c)    Delivery and Control

(i)    With respect to any Investment Related Property consisting of Securities Accounts or Securities Entitlements that are Primary Accounts, it shall use its commercially best efforts to cause the securities intermediary maintaining such Securities Account or Securities Entitlement to enter into an agreement in a customary form agreed to by such intermediary and reasonably acceptable to the Collateral Agent, pursuant to which it shall agree to comply with the Collateral Agent's "entitlement orders" without further consent by such Grantor.  With respect to any Investment Related Property that is a "Deposit Account," it shall cause the depositary institution maintaining such account to enter into an agreement reasonably acceptable to the Collateral Agent, pursuant to which the Collateral Agent shall have both sole dominion and control over such Deposit Account (within the meaning of the common law) and "control" (within the meaning of Section 9-104 of the UCC) over such Deposit Account.  Within 45 days after opening such accounts, each Grantor shall have entered into such control agreement or agreements with respect to: (i) any Securities Accounts, Securities Entitlements or Deposit Accounts that exist on the Credit Date, as of or prior to the Credit Date and that are Primary Accounts (ii) any Securities Accounts, Securities Entitlements or Deposit Accounts that are created or acquired after the Credit Date, as of or prior to the deposit or transfer of any such Securities Entitlements or funds, whether constituting moneys or investments, into such Securities Accounts or Deposit Accounts that are Primary Accounts.

In addition to the foregoing, if any issuer of any Investment Related Property is located in a jurisdiction outside of the United States, each Grantor shall take such additional actions, including, without limitation, causing the issuer to register the pledge on its books and records or making such filings or recordings, in each case as may be necessary or advisable, under the laws of such issuer's jurisdiction to insure the validity, perfection and priority of the security interest of the Collateral Agent.  Upon the occurrence and during the continuation of an Event of Default, the Collateral Agent shall have the right, without notice to any Grantor, to transfer all or any portion of the Investment Related Property to its name or the name of

30

its nominee or agent.  In addition, the Collateral Agent shall have the right at any time, without notice to any Grantor, to exchange any certificates or instruments representing any Investment Related Property for certificates or instruments of smaller or larger denominations.

**4.5     Material Contracts**.

(a)     <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)     <u>Schedule 4.5</u> (as such schedule may be amended or supplemented from time to time) sets forth all of the Material Contracts to which such Grantor has rights;

(ii)     the Material Contracts, true and complete copies (including any amendments or supplements thereof) of which have been furnished to the Collateral Agent, have been duly authorized, executed and delivered by the Grantors party thereto, are in full force and effect and are binding upon and enforceable against the Grantors party thereto in accordance with their respective terms.  There exists no material default under any Material Contract by any party thereto and neither such Grantor, nor to its best knowledge, any other Person party thereto is likely to become in default thereunder and no Person party thereto has any defenses, counterclaims or right of set-off with respect to any Material Contract; and

(iii)     no Material Contract prohibits assignment or requires consent of or notice to any Person in connection with the assignment to the Collateral Agent hereunder.

(b)     <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that:

(i)     in addition to any rights under the Section of this Security Agreement relating to Receivables, upon the occurrence and during the continuance of a Default or an Event of Default, the Collateral Agent may at any time notify, or require any Grantor to so notify, the counterparty on any Material Contract of the security interest of the Collateral Agent therein.  In addition, after the occurrence and during the continuance of an Event of Default, the Collateral Agent may upon written notice to the applicable Grantor, notify, or require any Grantor to notify, the counterparty to make all payments under the Material Contracts directly to the Collateral Agent;

NY3 - 505036.04

(ii)     each Grantor shall deliver promptly to the Collateral Agent a copy of each material demand, notice or document received by it relating in any way to any Material Contract;

(iii)     each Grantor shall deliver promptly to the Collateral Agent, and in any event within ten (10) Business Days, after (1) any Material Contract of such Grantor is terminated or amended in a manner that is materially adverse to such Grantor or (2) any new Material Contract is entered into by such Grantor, a written statement describing such event, with copies of such material amendments or new contracts, delivered to the Collateral Agent (to the extent such delivery is permitted by the terms of any such Material Contract, provided, no prohibition on delivery shall be effective if it were bargained for by such Grantor with the intent of avoiding compliance with this Section 4.5(b)(iii)), and an explanation of any actions being taken with respect thereto;

(iv)     it shall perform in all material respects all of its obligations with respect to the Material Contracts;

(v)     it shall promptly and diligently exercise each material right (except the right of termination) it may have under any Material Contract, any Supporting Obligation or Collateral Support, in each case, at its own expense, and in connection with such collections and exercise, such Grantor shall take such action as such Grantor or the Collateral Agent may deem necessary or advisable; and

(vi)     it shall use its commercially reasonable efforts to keep in full force and effect any Supporting Obligation or Collateral Support relating to any Material Contract.

**4.6     Letter of Credit Rights**.

(a)     <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)     all letters of credit with a stated amount greater than $1,000,000 to which such Grantor has rights as beneficiary or assignee are listed on <u>Schedule 4.6</u> (as such schedule may be amended or supplemented from time to time) hereto; and

(ii)     it has obtained the consent of each issuer of any letter of credit with a stated amount greater than $1,000,000 to the assignment of the proceeds of the letter of credit to the Collateral Agent.

32

(b)      Covenants and Agreements, Generally.  Each Grantor hereby covenants and agrees that:

(i)      upon the reasonable request of the Collateral Agent, it will use its reasonable commercial efforts to have the issuer or other nominated person with respect to Letter of Credit Rights assigned to the Collateral Agent in excess of $1,000,000, whether now existing or after-acquired, consent to an assignment of proceeds of the related letter of credit to the Collateral Agent such that the Collateral Agent shall have control of the Letter of Credit Rights in the manner specified in Section 9-107 of the UCC; and

(ii)      it shall deliver to the Collateral Agent a completed Pledge Supplement together with all supplements to schedules thereto, for any after acquired Letter of Credit Rights.

(c)      Covenants and Agreements, US Grantors.  Each Grantor organized in the United States hereby covenants and agrees that:

(i)      by granting a Lien in its Letter of Credit Rights to the Collateral Agent, it intends to (and hereby does) assign to the Collateral Agent its rights (including its contingent rights) to the proceeds of all Related Contracts consisting of letters of credit of which it is or hereafter becomes a beneficiary or assignee; and

(ii)      upon the occurrence and during the continuation of an Event of Default, it will promptly upon the request of the Collateral Agent, (x) notify the issuer and each nominated person with respect to each of the Related Contracts consisting of letters of credit that the proceeds thereof have been assigned to the Collateral Agent hereunder and any payments due or to become due in respect thereof are to be made directly to the Collateral Agent or its designee, and (y) arrange for the Collateral Agent to become the transferee beneficiary of such letters of credit;

For the avoidance of doubt, nothing in this subsection 4.6(c) shall apply to Grantors organized under the laws of any jurisdiction other than a state of the United States.

**4.7      Insurance**.

(a)      Covenants and Agreement.  Each Grantor hereby covenants and agrees as follows:

(i)      It shall, at its own expense, maintain or cause to be

33

maintained insurance in accordance with the terms of the First Lien Credit Agreement. Each casualty insurance policy shall provide for all losses to be paid on behalf of the Collateral Agent and such Grantor as their interests may appear, and, in accordance with the First Lien Credit Agreement;

(ii) Reimbursement under any liability insurance maintained by any Grantor pursuant to this Section 4.7, may, except as otherwise provided in Section 2.14(b) of the First Lien Credit Agreement, be paid directly to the Person who shall have incurred liability covered by such insurance. Except as otherwise provided in Section 2.14(b) of the First Lien Credit Agreement, in case of any loss involving damage to Equipment or Inventory when subsection 4.7(a)(iii) is not applicable, the applicable Grantor shall make or cause to be made the necessary repairs to or replacements of such Equipment or Inventory granted by such Grantor, and any proceeds of insurance maintained by such Grantor pursuant to this Section 4.7 shall be paid to such Grantor as reimbursement for the costs of such repairs or replacements;

(iii) Except as otherwise provided in Section 2.14(b) of the First Lien Credit Agreement, upon the occurrence and during the continuance of any Event of Default or the actual or constructive total loss of any Equipment or Inventory, all insurance payments in respect of such Equipment or Inventory shall be paid to and applied by the Collateral Agent as specified in Section 7.7.

**4.8    Intellectual Property**.

(a)    <u>Representations and Warranties</u>.  Except as disclosed in <u>Schedule 4.8</u> (as such schedule may be amended or supplemented from time to time), each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)    <u>Schedule 4.8</u> (as such schedule may be amended or supplemented from time to time) sets forth a true and complete list of (i) all United States, state and, to the best knowledge of each Grantor, foreign registrations of and applications for Patents, Trademarks and Copyrights owned by each Grantor and (ii) all Patent Licenses, Trademark Licenses, Trade Secret Licenses and Copyright Licenses with annual payments in excess of $500,000, other than (x) Licenses solely between members of the Group, and (y) Licenses of computer software not specifically created for a Credit Party;

(ii)    it is the sole and exclusive owner of the entire right, title, and interest in and to all domestic Intellectual Property, and, to the best knowledge of each Grantor, all foreign Intellectual Property owned by it as listed

34

on <u>Schedule 4.8</u> (as such schedule may be amended or supplemented from time to time), and owns or has the valid right to use all other Intellectual Property necessary to conduct its business, free and clear of all Liens, claims, encumbrances and licenses, except for Permitted Liens and the licenses set forth on <u>Schedule 4.8</u> (as each may be amended or supplemented from time to time);

(iii)    no Intellectual Property listed on <u>Schedule 4.8</u> has been adjudged invalid or unenforceable, in whole or in part, and each Grantor has performed all acts and has paid all renewal, maintenance, and other fees and taxes required to maintain each and every registration and application of Copyrights, Patents and Trademarks it owns in full force and effect except where failure to do so would not reasonably be expected to have a Material Adverse Effect;

(iv)    all registered Intellectual Property is valid and enforceable; no holding, decision, or judgment has been rendered in any action or proceeding before any court or administrative authority challenging the validity of, such Grantor's right to register, or such Grantor's rights to own or use, any Intellectual Property and no such action or proceeding is pending or, to the best of such Grantor's knowledge, threatened, except where such invalidation or unenforceability of such Intellectual Property would not reasonably be expected to have a Material Adverse Effect;

(v)    all registrations and applications for Copyrights, Patents and Trademarks are standing in the name of each Grantor, and none of the Trademarks, Patents, Copyrights or Trade Secrets has been licensed by any Grantor to any Affiliate or third party, except as disclosed in <u>Schedule 4.8</u> (as each may be amended or supplemented from time to time) or except where failure to do so would not reasonably be expected to have a Material Adverse Effect;

(vi)    each Grantor has been using appropriate statutory notice of registration in connection with its use of registered Trademarks, proper marking practices in connection with the use of Patents, and appropriate notice of copyright in connection with the publication of Copyrights desirable to the business of such Grantor except where such failure to use appropriate statutory notice would not reasonably be expected to have a Material Adverse Effect; or

(vii)    each Grantor uses adequate standards of quality in the manufacture, distribution, and sale of all products sold and in the provision of all services rendered under or in connection with all Trademark Collateral and has taken all action necessary to insure that all licensees of the Trademark Collateral owned by such Grantor use such adequate standards of quality except where failure to do so would not reasonably be expected to have a Material Adverse

NY3 - 505036.04

Effect;

(viii)    the conduct of such Grantor's business does not infringe upon or otherwise violate any U.S. trademark, patent, copyright, trade secret or other intellectual property right owned or controlled by a third party in a manner reasonably likely to result in a Material Adverse Effect, and, to the best knowledge of each Grantor, such conduct does not infringe upon or otherwise violate any foreign trademark, patent, copyright, trade secret or other intellectual property right owned or controlled by a third party in a manner reasonably likely to result in a Material Adverse Effect; no written claim has been made that the use of any Intellectual Property owned or used by Grantor (or any of its respective licensees) violates the asserted rights of any third party except where such infringement or claim would not reasonably be expected to have a Material Adverse Effect;

(ix)    to the best of each Grantor's knowledge, no third party is infringing upon or otherwise violating any rights in any Intellectual Property owned or used by such Grantor, or any of its respective licensees except where such infringement or violation would not reasonably be expected to have a Material Adverse Effect;

(x)    no settlement or consents, covenants not to sue, nonassertion assurances, or releases  have been entered into by Grantor or to which Grantor is bound that materially adversely affect Grantor's rights to own or use any Intellectual Property;

(xi)    no Grantor has made any previous assignment, sale, transfer or agreement constituting a present or future assignment, sale, or transfer of any Intellectual Property that has not been terminated or released.  There is no effective financing statement or other document or instrument now executed, or now on file or recorded in any public office, granting a security interest in or otherwise encumbering any part of the Intellectual Property, other than in favor of the Collateral Agent;

(xii)    with respect to each License to which such Grantor is a party:  (A) such License is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such License; (B) such License will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interest granted herein, nor will the grant of such rights and interest constitute a breach or default under such License or otherwise give the licensor or licensee a right to terminate such License;

36

(C) such Grantor has not received any notice of termination or cancellation under such License; (D) such Grantor has not received any notice of a breach or default under such License, which breach or default has not been cured; (E) such Grantor has not granted to any other third party any rights, adverse or otherwise, under such License except as indicated on Schedule 4.8; and (F) neither such Grantor nor, to the best of such Grantor's knowledge, any other party to such License is in breach or default in any material respect, and no event has occurred that, with notice or lapse of time or both, would constitute such a breach or default or permit termination, modification or acceleration under such License, except in each case where the failure of any License to be valid, binding and in full force and effect, or the breach or default under any such License, or the termination or cancellation of such License or the grant to any third party of any rights under such License would not reasonably be expected to have a Material Adverse Effect; and

(xiii)    to best of such Grantor's knowledge, (A) none of the Trade Secrets of such Grantor has been used, divulged, disclosed or appropriated to the detriment of such Grantor for the benefit of any other Person other than such Grantor; (B) no employee, independent contractor or agent of such Grantor has misappropriated any trade secrets of any other Person in the course of the performance of his or her duties as an employee, independent contractor or agent of such Grantor; and (C) no employee, independent contractor or agent of such Grantor is in default or breach of any term of any employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of such Grantor's Intellectual Property, except where any such use, disclosure, appropriation, misappropriation, default or breach would not reasonably be expected to have a Material Adverse Effect.

(b)    Covenants and Agreements.  Each Grantor hereby covenants and agrees as follows:

(i)    it shall not do any act or omit to do any act whereby any of the Intellectual Property which is desirable to the business of Grantor may lapse, or become abandoned, dedicated to the public, or unenforceable, or which would adversely affect the validity, grant, or enforceability of the security interest granted therein except when such act or omission would not reasonably be expected to have a Material Adverse Effect;

(ii)    it shall not, with respect to any Trademarks which are desirable to the business of Grantor, cease the use of any of such Trademarks or fail to maintain the level of the quality of products sold and services rendered under any of such Trademark at a level at least substantially consistent with the

37

NY3 - 505036.04