Form of Assignment

For value received, the undersigned registered Holder of the within Warrant Certificate hereby sells, assigns and transfers unto the Assignee(s) named below (including the undersigned with respect to any Warrants constituting a part of the Warrants evidenced by the within Warrant Certificate not being assigned hereby) all of the right, title and interest of the undersigned under the within Warrant Certificate with respect to the number of Warrants set forth below.

| **Name of Assignees** | **Address** | **Number of Warrants** | **Social Security Number or other Identifying Number** |
|---|---|---|---|
| | | | |

and does irrevocably constitute and appoint **[●]**, the undersigned's attorney, to make such transfer on the books of the Company maintained for the purpose, with full power of substitution in the premises.

Dated:

Holder: _____
By: _____
Name: _____
Title: _____

Signature guaranteed by (if a guarantee is required):

_____

Form of Assignment

DRAFT

WARRANT AGREEMENT

Dated as of

**[**April __**]**, 2010

between

Xerium Technologies, Inc.

and

American Stock Transfer & Trust Company, LLC,
as Warrant Agent

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

Section 1.01    Definitions.................................................................................................1
Section 1.02    Other Definitions .......................................................................................3
Section 1.03    Rules of Construction .................................................................................3

ARTICLE II

WARRANTS

Section 2.01    Form...........................................................................................................3
Section 2.02    Execution and Countersignature ................................................................4
Section 2.03    Registry .....................................................................................................5
Section 2.04    Transfer and Exchange ..............................................................................6
Section 2.05    Global Warrant in Exchange for Definitive Warrant...........................................8
Section 2.06    Replacement Certificates ...........................................................................9
Section 2.07    Outstanding Warrants ................................................................................9
Section 2.08    Cancellation .............................................................................................10
Section 2.09    CUSIP Numbers.......................................................................................10

ARTICLE III

EXERCISE TERMS

Section 3.01    Exercise....................................................................................................10
Section 3.02    Manner of Exercise and Issuance of Shares .............................................10
Section 3.03    Covenant to Make Stock Certificates Available.......................................10

ARTICLE IV

ANTIDILUTION PROVISIONS

Section 4.01    Antidilution Adjustments; Notice of Adjustment.....................................10
Section 4.02    Adjustment to Warrant Certificate............................................................11

## ARTICLE V

## WARRANT AGENT

Section 5.01    Appointment of Warrant Agent ....................................................................11
Section 5.02    Rights and Duties of Warrant Agent..............................................................11
Section 5.03    Individual Rights of Warrant Agent ...............................................................13
Section 5.04    Warrant Agent's Disclaimer ..........................................................................13
Section 5.05    Compensation and Indemnity ........................................................................13
Section 5.06    Successor Warrant Agent................................................................................14
Section 5.07    Representations of the Company ....................................................................15

## ARTICLE VI

## MISCELLANEOUS

Section 6.01    Persons Benefitting ........................................................................................16
Section 6.02    Amendment......................................................................................................16
Section 6.03    Notices ............................................................................................................16
Section 6.04    Governing Law ...............................................................................................17
Section 6.05    Successors .......................................................................................................18
Section 6.06    Multiple Originals...........................................................................................18
Section 6.07    Inspection of Agreement.................................................................................18
Section 6.08    Table of Contents............................................................................................18
Section 6.09    Severability .....................................................................................................18
Section 6.10    Waiver of Jury Trial........................................................................................18

EXHIBITS

Exhibit A – Form of Warrant

CWT DRAFT 3/23/2010
[IN COURT VERSION]

This **WARRANT AGREEMENT** (this "*Agreement*"), dated as of [April __], 2010, is entered into between Xerium Technologies, Inc., a Delaware corporation (the "*Company*"), and American Stock Transfer & Trust Company, LLC, a [_____] limited liability company, as Warrant Agent (the "*Warrant Agent*").

**RECITALS:**

WHEREAS, the Company has issued [_____] warrants (the "*Warrants*") to its holders of Common Stock (as defined below) of record as of [April __], 2010, pursuant to, and upon the terms set forth in, the plan of reorganization of the Company and certain of its subsidiaries and affiliates under Chapter 11 of Title 11 of the United States Code (the "*Plan*");

WHEREAS, each Warrant entitles the registered holder thereof (the "*Holder*") to purchase [one (1)] share of common stock of the Company, $0.001 par value per share (the "*Common Stock*"), subject to the provisions of this Agreement and the relevant Warrant Certificate; and

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing so to act, in connection with the issuance, registration, transfer, exchange, redemption, exercise, cancellation and replacement of the Warrants and, in the Warrant Agent's capacity as the Company's transfer agent, the delivery of the Exercise Shares.

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein set forth, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.01.   Definitions.

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with, such other Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") when used with respect to any Person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agent Members*" means the securities brokers and dealers, banks and trust companies, clearing organizations and certain other organizations that are participants in the Depositary's system.

"*Business Day*" means a day, other than a Saturday or Sunday, on which banks in New York City are open for the general transaction of business.

"*Certificated Holder*" means such Holder who shall receive a Definitive Warrant, pursuant to the Plan, as a result of owning shares of Common Stock in such Holder's name as of April **[__]**, 2010 on the stock registry of the Company.

"*Depositary*" means The Depository Trust Company, its nominees and their respective successors.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"*Exercise Price*" has the meaning set forth in the form of Warrant Certificate attached as Exhibit A hereto.

"*Exercise Share*" has the meaning set forth in the form of Warrant Certificate attached as Exhibit A hereto.

"*Officer*" means the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary, any Assistant Secretary or any Controller of the Company.

"*Officers' Certificate*" means a certificate signed by two (2) Officers of the Company.

"*Opinion of Counsel*" means a written opinion from legal counsel who is reasonably acceptable to the Warrant Agent.  Such counsel may be an employee of or counsel to the Company.

"*Person*" means an individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, limited liability partnership, trust, unincorporated organization, or government or any agency or political subdivision thereof or any other entity.

"*Warrant Certificate*" means any fully registered certificate (including a Global Warrant) issued by the Company and authenticated by the Warrant Agent under this Agreement evidencing Warrants, in the form attached as Exhibit A hereto.

"*Warrant Share Number*" has the meaning set forth in the form of Warrant Certificate attached as Exhibit A hereto.

Section 1.02.   Other Definitions.

| Term | Defined in Section |
|------|--------------------|
| "*Agreement*" | Preamble |
| "*Company*" | Preamble |
| "*Common Stock*" | Recitals |
| "*Definitive Warrant*" | 2.01(a) |
| "*Global Warrant*" | 2.01(b) |
| "*Holder*" | Recitals |
| "*Plan*" | Recitals |
| "*Registry*" | 2.03(a) |
| "*Warrant*" | Recitals |
| "*Warrant Agent*" | Preamble |

Section 1.03.   Rules of Construction.   Unless the text otherwise requires:

(i)      a defined term has the meaning assigned to it;

(ii)      an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect on the date hereof;

(iii)      "or" is not exclusive;

(iv)      "including" means including, without limitation; and

(v)      words in the singular include the plural and words in the plural include the singular.

## ARTICLE II

## WARRANTS

Section 2.01.   Form.

(a)      Definitive Warrants.   Warrants shall be issued to each Certificated Holder in the form of one or more definitive Warrants in fully registered form without the global securities legend set forth in Exhibit A hereto (each, a "*Definitive Warrant*"), and registered in the name of the Certificated Holder or a nominee of the Certificated Holder, duly executed by the Company and countersigned by the Warrant Agent as hereinafter provided.

(b)      Global Warrants. Except as provided in Section 2.01(a), Section 2.04 or Section 2.05, Warrants issued upon any transfer or exchange thereof shall be issued in the form of one or more permanent global Warrants in fully registered form with the global securities legend set forth in Exhibit A hereto (each, a "*Global Warrant*"), which shall be deposited on behalf of the Company with the Warrant Agent, as custodian for the Depositary (or with such other custodian as the Depositary may direct), and registered in the name of the Depositary or a

nominee of the Depositary, duly executed by the Company and countersigned by the Warrant Agent as hereinafter provided.

(c)   Book-Entry Provisions. This Section 2.01(c) shall apply only to a Global Warrant deposited with or on behalf of the Depositary.

(i)   The Company shall execute and the Warrant Agent shall, in accordance with Section 2.02, countersign, either by manual or facsimile signature, and deliver one or more Global Warrants that (A) shall be registered in the name of the Depositary or the nominee of the Depositary and (B) shall be delivered by the Warrant Agent to the Depositary or pursuant to the Depositary's instructions or held by the Warrant Agent as custodian for the Depositary.   Each Global Warrant shall be dated the date of its countersignature.

(ii)   Agent Members shall have no rights under this Agreement with respect to any Global Warrant held on their behalf by the Depositary or by the Warrant Agent as the custodian of the Depositary or under such Global Warrant except to the extent set forth herein or in a Warrant Certificate, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes whatsoever.   Notwithstanding the foregoing, nothing herein shall (A) prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or (B) impair, as between the Depositary and the Agent Members, the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Warrant.

(d)   Warrant Certificates.   Warrant Certificates shall be in substantially the form attached as Exhibit A hereto and shall be typed, printed, lithographed or engraved or produced by any combination of such methods or, if applicable, produced in any other manner permitted by the rules of any securities exchange on which the Warrants may be listed, all as determined by the Officer or Officers of the Company executing such Warrant Certificates, as evidenced by their execution thereof.   Any Warrant Certificate shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, (i) as the Company may deem appropriate and as are not inconsistent with the provisions of this Agreement, (ii) such as may be required to comply with this Agreement, any law or any rule of any securities exchange on which the Warrants may be listed, and (iii) such as may be necessary to conform to customary usage.

Section 2.02.   Execution and Countersignature.

(a)   At least one Officer shall sign the Warrant Certificates for the Company by manual or facsimile signature.

(b)     If an Officer whose signature is on a Warrant Certificate no longer holds that office at the time the Warrant Agent countersigns the Warrant Certificate, the Warrants evidenced by such Warrant Certificate shall be valid nevertheless.

(c)     The Warrant Agent shall initially countersign, either by manual or facsimile signature, and deliver Warrant Certificates entitling the Holders thereof to purchase in the aggregate not more than **[_____]** shares of Common Stock (subject to adjustment as provided in such Warrant Certificates) upon a written order of the Company signed by one Officer of the Company.  Such order shall specify the number of Warrants to be evidenced on the Warrant Certificate to be countersigned, the date on which such Warrant Certificate is to be countersigned and the number of Warrants then authorized.  Each Warrant Certificate shall be dated the date of its countersignature.

(d)     At any time and from time to time after the execution of this Agreement, the Warrant Agent shall upon receipt of a written order of the Company signed by an Officer of the Company countersign, either by manual or facsimile signature, for issue a Warrant Certificate evidencing the number of Warrants specified in such order; provided, however, that the Warrant Agent shall be entitled to receive an Officers' Certificate and an Opinion of Counsel of the Company to the effect that issuance and execution of such Warrants is authorized or permitted by this Agreement in connection with such countersignature of Warrants.

(e)     The Warrants evidenced by a Warrant Certificate shall not be valid until an authorized signatory of the Warrant Agent countersigns the Warrant Certificate.  Such signature shall be solely for the purpose of authenticating the Warrant Certificate and shall be conclusive evidence that the Warrant Certificate so countersigned has been duly authenticated and issued under this Agreement.

Section 2.03.  Registry.  (a) The Warrants shall be issued in registered form only. The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a registry (the "*Registry*") of the Warrant Certificates and of their transfer, exchange and substitution.  The Registry shall show the names and addresses of the respective Holders and the date and number of Warrants evidenced on the face of each of the Warrant Certificates.  The Holder of a Definitive Warrant will be the Person in whose name the Definitive Warrant is registered.  The Holder of any Global Warrant will be the Depositary or a nominee of the Depositary in whose name the Global Warrant is registered.  The Warrant holdings of Agent Members will be recorded on the books of the Depositary.  The beneficial interests in the Global Warrant held by customers of Agent Members will be reflected on the books and records of such Agent Members and will not be known to the Warrant Agent, the Company or to the Depositary.

(b)     The Company and the Warrant Agent may deem and treat any Person in whose name a Warrant Certificate is registered in the Registry as the absolute owner of such Warrant Certificate for all purposes whatsoever and neither the Company nor the Warrant Agent shall be affected by notice to the contrary.

Section 2.04.   Transfer and Exchange.

(a)      Transfer and Exchange of Definitive Warrants by Certificated Holders.

(i)      A Certificated Holder may transfer a Definitive Warrant only upon surrender of such Definitive Warrant for registration of transfer.  Definitive Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Certificated Holder or by such Certificated Holder's attorney, duly authorized in writing.  No such transfer shall be effected until, and the transferee shall succeed to the rights of a Certificated Holder only upon, final acceptance and registration of the transfer in the Registry by the Warrant Agent.

(ii)      Every Definitive Warrant presented or surrendered for registration of transfer or for exchange or substitution under this Section 2.04(a) shall be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Certificated Holder's attorney duly authorized in writing.

(iii)      A Definitive Warrant may be exchanged at the option of the Certificated Holder or Certificated Holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like number of Warrants.  If less than all Warrants represented by a Definitive Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Certificated Holder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

(b)      Transfer and Exchange of Global Warrants.

(i)      The transfer and exchange of Global Warrants or beneficial interests therein shall be effected through the book-entry system maintained by the Depositary, in accordance with this Agreement and the procedures of the Depositary therefor. A transferor of a beneficial interest in a Global Warrant (or the relevant Agent Member on behalf of such transferor) shall deliver to the Warrant Agent a written order given in accordance with the Depositary's procedures containing information regarding the account of the Agent Member to be credited with a beneficial interest in the Global Warrant.  The Warrant Agent shall, in accordance with such instructions, instruct the Depositary to credit to the account of the Agent Member specified in such instructions a beneficial interest in the Global Warrant and to debit the account of the Agent Member making the transfer of the beneficial interest in the Warrant being transferred.

(ii)    Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 2.05), a Global Warrant may only be transferred as a whole, and not in part, and only by (i) the Depositary to a nominee of the Depositary, (ii) a nominee of the Depositary to the Depositary or another nominee of the Depositary or (iii) the Depositary or any such nominee to a successor Depositary or its nominee.

(iii)    In the event that a Global Warrant is exchanged and transferred for Definitive Warrants pursuant to Section 2.05, such Warrants may be exchanged only in accordance with such procedures as are substantially consistent with the provisions of this Section 2.04 and the requirements of any Warrant Certificate and such other procedures as may from time to time be adopted by the Company that are not inconsistent with the terms of this Agreement or of any Warrant Certificate.

(c)    Cancellation or Adjustment of Global Warrant. At such time as all beneficial interests in a Global Warrant have been exchanged for Definitive Warrants, redeemed, repurchased, exercised or canceled, such Global Warrant shall be returned to the Depositary for cancellation or retained and canceled by the Warrant Agent.  At any time prior to such cancellation, if any beneficial interest in a Global Warrant is transferred or exchanged for Definitive Warrants, redeemed, repurchased, exercised or canceled, the number of Warrants represented by such Global Warrant shall be reduced and an adjustment shall be made on the books and records of the Warrant Agent to reflect such reduction.

(d)    Registration or Transfer in Name of Fiduciary.  Neither the Company nor the Warrant Agent will be liable or responsible for any registration or transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

(e)    Obligations with Respect to Transfers and Exchanges of Definitive Warrants and Global Warrants.

(i)    To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent shall countersign, by either manual or facsimile signature, Global Warrants and Definitive Warrants as required pursuant to the provisions of Section 2.02 and this Section 2.04.

(ii)    No service charge shall be made to a Holder for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax, assessments, or governmental charge payable in connection therewith.  The Warrant Agent shall have no duty or obligation under any Section of this Agreement requiring the payment of taxes, assessments, and/or governmental charges unless and until it is satisfied that all such taxes, assessments, and/or governmental charges have been paid.

(iii)    All Warrants issued upon any transfer or exchange pursuant to the terms of this Agreement shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Warrants surrendered upon such transfer or exchange.

(f)     No Obligation of the Warrant Agent.

(i)     The Warrant Agent shall have no responsibility or obligation to any beneficial owner of a Global Warrant, any Agent Member or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Global Warrants or with respect to the delivery to any Agent Member, beneficial owner or other Person (other than the Depositary) of any notice or the payment of any amount, under or with respect to such Warrants.  All notices and communications to be given to the Holders and all payments to be made to Holders under the Warrants shall be given or made only to or upon the order of the registered Holders (which, in the case of a Global Warrant, shall be the Depositary or its nominee).  The rights of beneficial owners in any Global Warrant shall be exercised through the Depositary subject to the applicable rules and procedures of the Depositary.  The Warrant Agent may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners.

(ii)     The Warrant Agent shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Agreement or under applicable law with respect to any transfer of any interest in any Warrant (including any transfer between or among the Agent Members or beneficial owners in any Global Warrant) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Agreement, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.05.  Global Warrant in Exchange for Definitive Warrant.    (a) Beneficial interests in a Global Warrant deposited with the Depositary or with the Warrant Agent as custodian for the Depositary pursuant to Section 2.01(b) shall be transferred to each beneficial owner thereof in the form of Definitive Warrants evidencing a number of Warrants equivalent to such owner's beneficial interest in such Global Warrant, in exchange for such Global Warrant, only if such transfer complies with Section 2.04 and (i) the Depositary notifies the Company that it is unwilling or unable to continue as Depositary for such Global Warrant or if at any time the Depositary ceases to be a "clearing agency" registered under the Exchange Act and, in each such case, a successor Depositary is not appointed by the Company within 90 days of such notice, (ii) the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to cause the issuance of Definitive Warrants under this Agreement, or (iii) the Company shall be adjudged a bankrupt or insolvent or make an assignment for the benefit of its creditors or institute proceedings to be adjudicated a bankrupt or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization under federal bankruptcy laws or any other similar applicable federal or state law, or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or custodian of all or any substantial part of its property, or shall admit in writing its inability to pay or meet its debts as they mature, or if a receiver or custodian of it or all or any substantial part of its property shall be appointed, or if a public officer shall have taken charge or control of the Company or of its property or affairs, for the purpose of rehabilitation, conservation or liquidation.

(b)     Any Global Warrant that is transferable to the beneficial owners thereof in the form of Definitive Warrants pursuant to this Section 2.05 shall be surrendered by the Depositary to the Warrant Agent, to be so transferred, in whole, without charge, and the Warrant Agent shall countersign, by either manual or facsimile signature, and deliver to each beneficial owner in the name of such beneficial owner, upon such transfer of such Global Warrant, Definitive Warrants evidencing a number of Warrants equivalent to such beneficial owner's beneficial interest in the Global Warrant. The Warrant Agent shall register such transfer in the Registry, and upon such transfer the surrendered Global Warrant shall be cancelled by the Warrant Agent.

(c)     All Definitive Warrants issued upon transfer pursuant to this Section 2.05 shall be the valid obligations of the Company, evidencing the same obligations of the Company and entitled to the same benefits under this Agreement and the Global Warrant surrendered upon such transfer.

(d)     Subject to the provisions of Section 2.05(b), the registered Holder of a Global Warrant may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action that a Holder is entitled to take under this Agreement or the Warrants.

(e)     In the event of the occurrence of any of the events specified in Section 2.05(a), the Company will promptly make available to the Warrant Agent a reasonable supply of Definitive Warrants in definitive, fully registered form.

Section 2.06.   Replacement Certificates.   If a mutilated Warrant Certificate is surrendered to the Warrant Agent or if the Holder of a Warrant Certificate provides proof reasonably satisfactory to the Company and the Warrant Agent that the Warrant Certificate has been lost, destroyed or wrongfully taken, the Company shall issue and the Warrant Agent shall countersign a replacement Warrant Certificate of like tenor and representing an equivalent number of Warrants, if the reasonable requirements of the Warrant Agent and of Section 8-405 of the Uniform Commercial Code as in effect in the state of New York are met.  If required by the Warrant Agent or the Company, such Holder shall furnish an indemnity bond sufficient in the reasonable judgment of the Company and the Warrant Agent to protect the Company and the Warrant Agent from any loss that either of them may suffer if a Warrant Certificate is replaced. The Company and the Warrant Agent may charge the Holder for their expenses in replacing a Warrant Certificate.

Section 2.07.   Outstanding Warrants.   (a) Warrants outstanding at any time are all Warrants evidenced on all Warrant Certificates authenticated by the Warrant Agent except for those canceled by it and those delivered to it for cancellation.  A Warrant ceases to be outstanding if the Company or an Affiliate of the Company holds the Warrant.

(b)     If a Warrant Certificate is replaced pursuant to Section 2.06, the Warrants evidenced thereby cease to be outstanding unless the Warrant Agent and the Company receive proof satisfactory to them that the replaced Warrant Certificate is held by a bona fide purchaser.

Section 2.08.  <u>Cancellation</u>.  (a) In the event the Company shall purchase or otherwise acquire Definitive Warrants, the same shall thereupon be delivered to the Warrant Agent for cancellation.

(b)       The Warrant Agent and no one else shall cancel and destroy all Warrant Certificates surrendered for transfer, exchange, replacement, exercise or cancellation and deliver a certificate of such destruction to the Company unless the Company directs the Warrant Agent to deliver canceled Warrant Certificates to the Company. The Company may not issue new Warrant Certificates to replace Warrant Certificates to the extent they evidence Warrants that have been exercised or Warrants that the Company has purchased or otherwise acquired.

Section 2.09.  <u>CUSIP Numbers</u>.  The Company in issuing the Warrants may use "CUSIP" numbers (if then generally in use) and, if so, the Warrant Agent shall use "CUSIP" numbers in notices as a convenience to Holders; <u>provided</u>, <u>however</u>, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Warrant Certificates or as contained in any notice and that reliance may be placed only on the other identification numbers printed on the Warrant Certificates.

## ARTICLE III

## EXERCISE TERMS

Section 3.01.  <u>Exercise</u>.  The Exercise Price of each Warrant, the Warrant Share Number, the number of Warrants evidenced by any Warrant Certificate and the Exercise Period of each Warrant shall be set forth in the related Warrant Certificate.  The Exercise Price of each Warrant and the Warrant Share Number are subject to adjustment pursuant to the terms set forth in the Warrant Certificate.

Section 3.02.  <u>Manner of Exercise and Issuance of Shares</u>.  Warrants may be exercised in the manner set forth in <u>Section 2</u> of the Warrant Certificate, and upon any such exercise, Exercise Shares shall be issued in the manner set forth in <u>Section 2.1</u> of the Warrant Certificate.

Section 3.03.  <u>Covenant to Make Stock Certificates Available</u>.  The Warrant Agent is hereby authorized to request from time to time from any stock transfer agents of the Company stock certificates required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Agreement, and the Company agrees to authorize and direct such transfer agents to comply with all such requests of the Warrant Agent.  The Company shall supply such transfer agents with duly executed stock certificates for such purposes.

## ARTICLE IV

## ANTIDILUTION PROVISIONS

Section 4.01.  <u>Antidilution Adjustments; Notice of Adjustment</u>.  The Exercise Price and the Warrant Share Number shall be subject to adjustment from time to time as provided in <u>Section 3</u> of the Warrant Certificate.  Whenever the Exercise Price or the Warrant

Share Number is so adjusted or is proposed to be adjusted as provided in <u>Section 3</u> of the Warrant Certificate, the Company shall deliver to the Warrant Agent the notices or statements, and shall cause a copy of such notices or statements to be sent or communicated to each Holder pursuant to <u>Section 6.03</u>, as provided in <u>Section 3(B)</u> of the Warrant Certificate.

Section 4.02.  <u>Adjustment to Warrant Certificate</u>.   The form of Warrant Certificate need not be changed because of any adjustment made pursuant to the Warrant Certificate, and Warrant Certificates issued after such adjustment may state the same Exercise Price and the same Warrant Share Number as are stated in the Warrant Certificates initially issued pursuant to this Agreement.   The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

## ARTICLE V

## WARRANT AGENT

Section 5.01.  <u>Appointment of Warrant Agent</u>.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the provisions of this Agreement and the Warrant Agent hereby accepts such appointment.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in connection with this Agreement, except for its own gross negligence, willful misconduct or bad faith.

Section 5.02.  <u>Rights and Duties of Warrant Agent</u>.

(a) <u>Agent for the Company</u>.  In acting under this Warrant Agreement and in connection with the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship or agency or trust for or with any of the holders of Warrant Certificates or beneficial owners of Warrants.

(b) <u>Counsel</u>.  The Warrant Agent may consult with counsel satisfactory to it (who may be counsel to the Company), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the advice of such counsel.

(c) <u>Documents</u>.  The Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken or thing suffered by it in reliance upon any Warrant Certificate, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties.

(d) <u>No Implied Obligations</u>. The Warrant Agent shall be obligated to perform only such duties as are specifically set forth herein and in the Warrant Certificates, and no implied duties or obligations of the Warrant Agent shall be read into this Agreement or the

USActive 18874271.1                                    -11-

Warrant Certificates against the Warrant Agent.  The Warrant Agent shall not be under any obligation to take any action hereunder that may involve it in any expense or liability for which it does not receive indemnity if such indemnity is reasonably requested.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Holders or on behalf of the Holders pursuant to this Agreement or for the application by the Company of the proceeds of the Warrants.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder with respect to such default, including any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise.  The Warrant Agent shall have no duty or responsibility to insure compliance with any applicable federal or state securities law in connection with the issuance, transfer or exchange or any Warrants hereunder.

(e)     Not Responsible for Adjustments or Validity of Stock.  The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist that may require an adjustment of the Warrant Share Number or the Exercise Price, or with respect to the nature or extent of any adjustment when made, or with respect to the method employed, or herein or in any supplemental agreement provided to be employed, in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value of any Exercise Shares or of any securities or property that may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 3 of the Warrant Certificate, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to issue, transfer or deliver any Exercise Shares or stock certificates upon the surrender of any Warrant Certificate for the purpose of exercise or upon any adjustment pursuant to Section 3 of the Warrant Certificate, or to comply with any of the covenants of the Company contained in the Warrant Certificate or this Agreement.

(f)     Notices.  If the Warrant Agent shall receive any notice or demand (other than Notice of Exercise of Warrants) addressed to the Company by the Holder of a Warrant, the Warrant Agent shall promptly forward such notice or demand to the Company.

(g)     Liability.  In no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action.

(h)     No Liability for Interest.  The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(i)     Ambiguity or Uncertainty.  In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent shall seek clarification and direction from the Company and shall be fully protected and shall not be in any way liable to the Company or any Holder for any action taken or omitted in accordance

with written instructions signed by the Company which eliminates such ambiguity or uncertainty.

Section 5.03.  <u>Individual Rights of Warrant Agent</u>.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or its affiliates or become pecuniarily interested in transactions in which the Company or its affiliates may be interested, or contract with or lend money to the Company or its affiliates or otherwise act as fully and freely as though it were not the Warrant Agent under this Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

Section 5.04.  <u>Warrant Agent's Disclaimer</u>.  The Warrant Agent shall not be responsible for, and makes no representation as to the validity or adequacy of this Agreement or the Warrant Certificates and it shall not be responsible for any statement of fact or recitals in this Agreement or the Warrant Certificates other than its countersignature thereon.  The Warrant Agent will not be under any responsibility or liability in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent) or in respect of the validity or execution of any Warrant Certificate (except the due countersignature thereof by the Warrant Agent)); nor will it be responsible or liable for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant Certificate; nor will it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of stock or other securities to be issued pursuant to this Agreement or any Warrant Certificate or as to whether any shares of stock or other securities will, when issued, be validly authorized and issued, fully paid and nonassessable.

Section 5.05.  <u>Compensation and Indemnity</u>.  (a) The Company agrees to pay the Warrant Agent from time to time reasonable compensation for its services as agreed and to reimburse the Warrant Agent upon request for all reasonable out-of-pocket expenses, including the reasonable compensation and expenses of the Warrant Agent's agents and counsel, incurred by the Warrant Agent in connection with the preparation, delivery, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder.  The Company shall indemnify the Warrant Agent, its officers and directors, against any loss, liability or expense (including reasonable attorneys' fees and expenses) incurred by it without gross negligence, willful misconduct or bad faith on its part for any action taken, suffered or omitted by the Warrant Agent in connection with the acceptance and administration of this Agreement, including the costs and expenses of defending against any claim of liability arising therefrom. The Company need not reimburse any expense or indemnify against any loss or liability incurred by the Warrant Agent through willful misconduct, gross negligence or bad faith. The Company's payment obligations pursuant to this Section shall survive the termination of this Agreement.

(b)     To secure the Company's payment obligations under this Agreement, the Warrant Agent shall have a lien prior to the Holders on all money or property held or collected by the Warrant Agent.

(c)     No provision of this Agreement shall require the Warrant Agent to risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or

in the exercise of its rights and powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

Section 5.06.   Successor Warrant Agent

(a)    Company to Provide and Maintain Warrant Agent. The Company agrees for the benefit of the Holders that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or cancelled or are no longer exercisable.

(b)    Resignation and Removal. (i) The Warrant Agent may at any time resign by giving written notice to the Company of such intention on its part, specifying the date on which its desired resignation shall become effective; provided, however, that such date shall not be less than 60 days after the date on which such notice is given unless the Company otherwise agrees.

(ii)    The Warrant Agent hereunder may be removed at any time by the filing with it of an instrument in writing signed by or on behalf of the Company and specifying such removal and the date when it shall become effective, which date shall not be less than 60 days after such notice is given unless the Warrant Agent otherwise agrees. Any removal under this Section shall take effect upon the appointment by the Company as hereinafter provided of a successor Warrant Agent (which shall be (i) a bank or trust company, (ii) organized under the laws of the United states of America or one of the states thereof, (iii) authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers, (iv) having a combined capital and surplus of at least $50,000,000 (as set forth in its most recent reports of condition published pursuant to law or to the requirements of any United states federal or state regulatory or supervisory authority) and (v) having an office in the Borough of Manhattan, The City of New York) and the acceptance of such appointment by such successor Warrant Agent. The obligations of the Company under Section 5.05 shall continue to the extent set forth herein notwithstanding the resignation or removal of the Warrant Agent.

(c)    Company to Appoint Successor.  In the event that at any time the Warrant Agent shall resign, or shall be removed, or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or shall commence a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or under any other applicable federal or state bankruptcy, insolvency or similar law or shall consent to the appointment of or taking possession by a receiver, custodian, liquidator, assignee, trustee, sequestrator (or other similar official) of the Warrant Agent or its property or affairs, or shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall take corporate action in furtherance of any such action, or a decree or order for relief by a court having jurisdiction in the premises shall have been entered in respect of the Warrant Agent in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or similar law, or a decree or order by a court having jurisdiction in the premises shall have been entered for the appointment of a receiver, custodian, liquidator, assignee, trustee, sequestrator (or similar official) of the Warrant Agent or of its property or affairs, or any public officer shall take charge or control of the Warrant Agent

or of its property or affairs for the purpose of rehabilitation, conservation, winding up or liquidation, a successor Warrant Agent, qualified as aforesaid, shall be appointed by the Company by an instrument in writing, filed with the successor Warrant Agent.  In the event that a successor Warrant Agent is not appointed by the Company, a successor Warrant Agent, qualified as aforesaid, may be appointed by the Warrant Agent or the Warrant Agent may petition a court, at the expense of the Company, to appoint a successor Warrant Agent, at the expense of the Company.  Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by the successor Warrant Agent of such appointment, the Warrant Agent shall cease to be Warrant Agent hereunder; provided, however, that in the event of the resignation of the Warrant Agent under this subsection (c), such resignation shall be effective on the earlier of (i) the date specified in the Warrant Agent's notice of resignation and (ii) the appointment and acceptance of a successor Warrant Agent hereunder.

(d)      Successor to Expressly Assume Duties.  Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and to the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the rights and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor, upon payment of its charges and disbursements then unpaid, shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor, as Warrant Agent hereunder.

(e)      Successor by Merger.  Any entity into which the Warrant Agent hereunder may be merged or consolidated, or any entity resulting from any merger or consolidation to which the Warrant Agent shall be a party, or any entity to which the Warrant Agent shall sell or otherwise transfer all or substantially all of its assets and business, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto, including, without limitation, any successor to the Warrant Agent first named above; provided, however, that it shall be qualified as aforesaid.

Section 5.07.  Representations of the Company. The Company represents and warrants to the Warrant Agent that:

(a)      the Company has been duly organized and is validly existing under the laws of the jurisdiction of its incorporation;

(b)      this Agreement has been duly authorized, executed and delivered by the Company and is enforceable against the Company in accordance with its terms, except as may be limited by bankruptcy, insolvency, moratorium, reorganization and other similar laws affecting the enforcement of creditors' rights generally; and

(c)      the execution and delivery of this Agreement does not, and the issuance of the Warrants in accordance with the terms of this Agreement and the Warrant Certificate will not, (i) violate the Company's certificate of incorporation or by-laws, (ii) violate any law or regulation applicable to the Company or order or decree of any court or public authority having jurisdiction over the Company, or (iii) result in a breach of any mortgage, indenture, contract,

agreement or undertaking to which the Company is a party or by which it is bound, except in the case of (ii) and (iii) for any violations or breaches that could not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

## ARTICLE VI

## MISCELLANEOUS

Section 6.01.  Persons Benefitting.  Nothing in this Agreement is intended or shall be construed to confer upon any Person other than the Company, the Warrant Agent and the Holders any right, remedy or claim under or by reason of this Agreement or any part hereof.

Section 6.02.  Amendment.  This Agreement and the Warrants may be amended by the parties hereto without the consent of any Holder for the purpose of curing any ambiguity, or of curing, correcting or supplementing any defective provision contained herein or therein or adding or changing any other provisions with respect to matters or questions arising under this Agreement or the Warrants as the Company and the Warrant Agent may deem necessary or desirable; provided, however, that such action shall not adversely affect the rights of any of the Holders in any material respect.  Any amendment or supplement to this Agreement or the Warrants that has a material adverse effect on the interests of any of the Holders or owners of a beneficial interest in a Global Warrant shall require the written consent of the Holders of a majority of the then outstanding Warrants; provided that the consent of each Holder affected thereby shall be required for any amendment pursuant to which (i) the Exercise Price would be increased or the Warrant Share Number would be decreased (in each case, other than pursuant to adjustments provided for in Section 3 of the Warrant Certificate), (ii) the Exercise Period would be shortened or (iii) any change adverse to the Holder would be made to the anti-dilution provisions set forth in Article IV of this Agreement or Section 3 of the Warrant Certificate.  In determining whether the Holders of the required number of Warrants have concurred in any direction, waiver or consent, Warrants owned by the Company or by any Affiliate of the Company shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Warrant Agent shall be protected in relying on any such direction, waiver or consent, only Warrants that the Warrant Agent knows are so owned shall be so disregarded.  Also, subject to the foregoing, only Warrants outstanding at the time shall be considered in any such determination.  The Warrant Agent shall have no duty to determine whether any such amendment would have an effect on the rights or interests of the holders of the Warrants.  Upon receipt by the Warrant Agent of an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the execution of the amendment have been complied with and such execution is permitted by this Agreement and the Warrant Certificate, the Warrant Agent shall join in the execution of such amendment; provided, that the Warrant Agent may, but shall not be obligated to, execute any amendment or supplement which affects the rights or changes or increases the duties or obligations of the Warrant Agent.

Section 6.03.  Notices.  (a) Any notice or communication shall be in writing and delivered in person, mailed by certified or registered mail, return receipt requested, or nationally recognized next-Business Day courier, addressed as follows:

if to the Company:

> Xerium Technologies, Inc.
> 8537 Six Forks Road, Suite 300
> Raleigh, NC  27615
> Attn:
> Telephone:
> Facsimile:

if to the Warrant Agent:

> American Stock Transfer & Trust Company, LLC
> 59 Maiden Lane
> Plaza Level
> New York, NY 10038
> Telephone:  718-921-8208
> Facsimile:  718-921-8335
> Attention:  Geraldine Zarbo

The Company or the Warrant Agent by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)    Unless the Warrant is a Global Warrant, any notice or communication mailed to a Holder shall be mailed to the Holder at the Holder's address as it appears on the Registry and shall be sufficiently given if so mailed within the time prescribed.  Any notice to the owners of a beneficial interest in a Global Warrant shall be distributed through the Depositary in accordance with the procedures of the Depositary.  Communications to such Holder shall be deemed to be effective at the time of dispatch to the Depositary.

(c)    Failure to provide a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is provided in the manner provided above, it is duly given, whether or not the intended recipient actually receives it.

Section 6.04.  <u>Governing Law</u>.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof.  Each of the Company and the Warrant Agent hereby irrevocably waives personal service of process and consents to process being served in any proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it hereunder and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

Section 6.05. <u>Successors</u>.  All agreements of the Company in this Agreement and the Warrants shall bind its successors.  All agreements of the Warrant Agent in this Agreement shall bind its successors.

Section 6.06. <u>Multiple Originals</u>.  The parties may sign any number of copies of this Agreement.  Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Agreement.

Section 6.07. <u>Inspection of Agreement</u>.  A copy of this Agreement shall be available at all reasonable times for inspection by any registered Holder or any owner of a beneficial interest in a Global Warrant at the principal office of the Warrant Agent (or successor warrant agent).

Section 6.08. <u>Table of Contents</u>.  The table of contents and headings of the Articles and Sections of this Agreement have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

Section 6.09. <u>Severability</u>.  The provisions of this Agreement are severable, and if any clause or provision shall be held invalid, illegal or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect in that jurisdiction only such clause or provision, or part thereof, and shall not in any manner affect such clause or provision in any other jurisdiction or any other clause or provision of this Agreement in any jurisdiction.

Section 6.10. <u>Waiver of Jury Trial</u>.  THE COMPANY AND THE WARRANT AGENT EACH IRREVOCABLY WAIVES, TO THE FULLEST EXTENT THAT IT MAY EFFECTIVELY DO SO UNDER APPLICABLE LAW, TRIAL BY JURY.

IN WITNESS WHEREOF, the parties have caused this Warrant Agreement to be duly executed as of the date first written above.

XERIUM TECHNOLOGIES, INC.

By:_____
    Name:
    Title:

AMERICAN STOCK TRANSFER & TRUST
    COMPANY, LLC, as Warrant Agent

By:_____
    Name:
    Title:

## SCHEDULE 1.57

**Nominating Agreement**

DRAFT

DIRECTOR NOMINATION AGREEMENT

This Director Nomination Agreement (this "Agreement") is made as of [_____], 2010(the "Effective Time"), between Xerium Technologies, Inc., a Delaware corporation (the "Company"), and the stockholder party hereto (the "Stockholder"). Unless otherwise specified herein, all of the capitalized terms used herein are defined in Section 4 hereof.

WHEREAS, the Company has issued shares of its common stock, par value, $0.001 per share, of the Company (the "Common Stock") pursuant to, and upon the terms set forth in, the plan of reorganization of the Company and certain of its subsidiaries under Chapter 11 of Title 11 of the United States Code; and

WHEREAS, the Company has agreed to permit the Stockholder, who Beneficially Owns [ ] shares (the "Number of Shares") of Common Stock on the date hereof, to designate one or more persons for nomination for election to the board of directors of the Company (the "Board") on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

Section 1. Board of Directors.

(a) Subject to the terms and conditions of this Agreement, from and after the Effective Time and until a Termination Event shall have occurred, the Stockholder shall have the right to designate one person to be nominated for election to the Board (the "Nominee") by giving written notice to the Company in accordance with the Company's Bylaws, but in no event later than sixty (60) days prior to the deadline for receipt of a stockholder proposal to be eligible for inclusion in the Company's proxy statement pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, with respect to any meeting of the Company's stockholders at which directors are to be elected, which notice shall include all information regarding the Nominee that is required by applicable law, the Company's Bylaws, the rules and regulations of the Securities and Exchange Commission and the listing standards of any national securities exchange on which the Common Stock is listed, provided however, that, before the Nominee will be included in the Board's slate of nominees submitted to the stockholders for election as members of the Board at the next meeting of stockholders called with respect to such election, the Nominating and Corporate Governance Committee of the Board must consent to his/her nomination, such consent not to be unreasonably withheld.

(b) For a period of thirty (30) days from the date of receipt of the Stockholder's nomination pursuant to Section 1(a) hereof (the "Initial Review Period"), the Stockholder will (i) provide such additional information about the Nominee as reasonably requested by the Nominating and Governance Committee of the Board and (ii) cause the Nominee to be available for interviews and discussions with the Nominating and Corporate Governance Committee of the Board.

(c) If the Nominating and Governance Committee consents to the nomination of the Nominee by the end of the Initial Review Period, the Company shall take all actions reasonably necessary to ensure that: (i) the Nominee is included in the Board's slate of nominees submitted to the stockholders for election as directors at the next meeting of stockholders called with respect to such election, and at every adjournment or postponement thereof (the "Next Election"); and (ii) the Nominee is included in the proxy statement prepared by management of the Company in connection with soliciting proxies for the Next Election.

(d) If the Nominating and Governance Committee does not provide its consent pursuant to Section 1(a) hereof, then the Stockholder shall have the right to designate an alternative person to be nominated for election by the Board (the "Alternate Nominee") by giving written notice to the Company in accordance with the Company's Bylaws, but in no event later than fifteen (15) days after the expiration of the Initial Review Period, which notice shall include all information regarding the Alternate Nominee that is required by applicable law, the Company's Bylaws, the rules and regulations of the Securities and Exchange Commission and the listing standards of any national securities exchange on which the Common Stock is listed.

(e) For a period of fifteen (15) days from the date of receipt of the Stockholder's written notice proposing an Alternate Nominee pursuant to Section 1(d) hereof (the "Second Review Period"), the Stockholder will (i) provide such additional information about the Alternate Nominee as reasonably requested by the Nominating and Governance Committee of the Board and (ii) cause the Alternate Nominee to be available for interviews and discussions with the Nominating and Governance Committee of the Board.

(f) If the Nominating and Governance Committee consents to the nomination of the Alternate Nominee by the end of the Second Review Period, the Company shall take all actions reasonably necessary to ensure that: (i) the Alternate Nominee is included in the Board's slate of nominees submitted to the stockholders for election as directors at the Next Election; and (ii) the Alternate Nominee is included in the proxy statement prepared by management of the Company in connection with soliciting proxies for the Next Election.

(g) The Company shall work in good faith with the Stockholder to identify and pre-clear Nominees and Alternate Nominees, as the case may be, in advance of deadlines contained in Sections 1(b) and 1(e) hereof and take such other actions as reasonably requested by the Stockholder to assist the Stockholder in submitting Nominees or Alternate Nominees, as the case may be, that will obtain the requisite consent required under Section 1(a) hereof.

(h) Notwithstanding anything to the contrary contained herein, the rights of the Stockholder under this Agreement shall terminate automatically as soon as the Stockholder, together with its Affiliates, ceases to Beneficially Own at least one-half of the Number of Shares of Common Stock (a "Termination Event"). The Stockholder shall notify the Company within three Business Days after the occurrence of a Termination Event. At the time of nomination, a Nominee or Alternate Nominee, as applicable, shall execute and deliver a resignation letter that shall be irrevocable upon election of such Nominee or Alternate Nominee as a member of the Board and shall be effective automatically upon the occurrence of a Termination Event.

(i) Prior to a Termination Event, if a vacancy occurs because of the death, disability, disqualification, resignation or removal of a Nominee or Alternate Nominee, as the case may be, as a member of the Board, the Company shall provide notice of such vacancy to the Stockholder within five (5) Business Days of such vacancy.  The Stockholder shall be entitled to designate such person's successor by giving written notice to the Company within thirty (30) days of the date the Stockholder receives notification of the vacancy from the Company (the "Initial Vacancy Review Period"), such notice to the Company to include all information regarding such proposed successor that is required by applicable law, the Company's Bylaws, the rules and regulations of the Securities and Exchange Commission and the listing standards of any national securities exchange on which the Common Stock is listed, provided however, that, before such successor will be appointed to fill such vacancy, the Nominating and Corporate Governance Committee of the Board must consent to his/her appointment, such consent not to be unreasonably withheld.  Any successor that is appointed to fill a vacancy pursuant to this Section 1(i) shall have the right to serve until the next meeting of the stockholders of the Company at which directors are elected, or until his/her successor is elected and duly qualified.  If the Nominating and Governance Committee does not provide its consent within the Initial Vacancy Review Period, then the Stockholder shall have the right to designate an alternative person to fill the vacancy (the "Alternative Vacancy Nominee") by giving written notice to the Company in accordance with the Company's Bylaws, but in no event later than fifteen (15) days after the expiration of the Initial Vacancy Review Period, which notice shall include all information regarding the Alternate Nominee that is required by applicable law, the Company's Bylaws, the rules and regulations of the Securities and Exchange Commission and the listing standards of any national securities exchange on which the Common Stock is listed. If the Nominating and Governance Committee does not provide its consent to the Alternative Vacancy Nominee within thirty (30) days of receipt of his/her designation from the Stockholder, then the Nominating and Governance Committee shall have the right to appoint a director to fill the vacancy, provided however, that so long as a Termination Event has not occurred prior to the next meeting of the stockholders of the Company at which directors are elected, the Stockholder shall have to right to designate the person to be nominated for election to the Board to fill the vacant Board seat subject of this Section 1(i) at such meeting in accordance with Sections 1(a) through (f) hereof and subject to the limitations therein.

(j) The Nominee or Alternate Nominee, as applicable, shall be entitled to all rights and privileges as a member of the Board as other similarly situated members of the Board for their service to the Company (e.g., out-of-pocket expenses for attending meetings, compensation for service to the Company).

(k) Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, the Stockholder shall only have the right to nominate or designate one person at a time to serve as a member of the Board, and in no event will the Company or the Board be obligated to nominate or designate a person to the Board that, upon such person's election by the stockholders of the Company or appointment by the Board, would result in more than one nominee or designee of the Stockholder serving as a member of the Board.

(l)  Notwithstanding anything herein to the contrary, the Company shall not be obligated to cause to be nominated for election to the Board or recommend to the stockholders the election of any person (i) who fails to submit to the Company on a timely basis such

questionnaires as the Company may reasonably require of its directors generally and such other information as the Company may reasonably request in connection with the preparation of its filings under the federal securities laws; or (ii) the nomination of whom the Board or the Nominating and Governance Committee determines in good faith, after consultation with outside legal counsel, would constitute a breach of its fiduciary duties or applicable law or violate the Company's Certificate of Incorporation; provided, however, that upon the occurrence of either (i) or (ii) above, the Company shall promptly notify the Stockholder of the occurrence of such event and permit the applicable Stockholder to provide an alternate person in accordance with the applicable provisions hereof (Section 1(d) for Nominees or Alternate Nominees for election at stockholder meetings and Section 1(i) with respect to the filling of vacancies on the Board) and the Company shall use commercially reasonable efforts to perform its obligations hereunder with respect to such alternate person, provided however, that, notwithstanding anything to the contrary contained herein, in no event shall the Company be obligated to postpone, reschedule or delay any scheduled meeting of the stockholders with respect to such election of any person nominated to the Board pursuant to the provisions of this Agreement.

Section 2. Further Obligations.

(a) The Company shall (i) maintain directors' and officers' liability insurance in an amount determined by the Board to be reasonable and customary, (ii) for so long as any Nominee or Alternate Nominee serves as a member of the Board, maintain such coverage with respect to such Nominee or Alternate Nominee and (iii) for two years after such Nominee or Alternate Nominee ceases to be a member of the Board maintain coverage with respect to any act or omission occurring while such Nominee or Alternate Nominee was a member of the Board.

(b) For so long as any Nominee or Alternate Nominee serves as a member of the Board, the Company shall not amend, alter or repeal any right to indemnification or exculpation covering or benefiting any such Nominee or Alternate Nominee.

(c) Notwithstanding anything to the contrary contained herein, it shall be reasonable for the Nominating and Governance Committee to withhold its consent for any person suggested for nomination or appointment to the Board pursuant to terms of this Agreement, if the Board or the Nominating and Governance Committee determines, in good faith, that none of the persons suggested for nomination or appointment to the Board pursuant to the terms of this Agreement and each of the Other Nomination Agreements is "independent" in accordance with the standards for director independence adopted by the Board, or, if the Common Stock is listed on any national securities exchange, such standards consistent with the rules of such national securities exchange.[1]

Section 3. Transfers; Termination.

(a) The Stockholder's rights hereunder do not attach to its shares of Common Stock and may only be assigned pursuant to a Permitted Assignment under Section 5 hereof.

---

[1] The three Stockholders who will be granting nominating rights should agree among themselves on a mechanism to determine who will nominate an independent director.

(b) Except pursuant to a Permitted Assignment under <u>Section 5</u> hereof, this Agreement shall terminate automatically upon the occurrence of a Termination Event and shall be of no further force and effect, and no party hereto shall have any surviving obligations, rights, or duties hereunder after a Termination Event; provided that the Stockholder shall be obligated to comply with <u>Section 1(h)</u> hereof..

<u>Section 4</u>. Definitions.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"Agreement" has the meaning set forth in the preamble.

"Alternate Nominee" has the meaning set forth in <u>Section 1(d)</u> hereof.

"Alternative Vacancy Nominee" has the meaning set forth in <u>Section 1(i)</u> hereof.

"Beneficially Own" has the meaning ascribed to it in Section 13(d) of the Securities Exchange Act of 1934, as amended.

"Board" has the meaning set forth in recitals.

"Common Stock" has the meaning set forth in the recitals.

"Company" has the meaning set forth in the preamble.

"Effective Time" has the meaning set forth in the preamble.

"Initial Review Period" has the meaning set forth in <u>Section 1(b)</u> hereof.

"Initial Vacancy Review Period" has the meaning set forth in <u>Section 1(i)</u> hereof.

"Joinder Agreement" has the meaning set forth in <u>Section 5</u> hereof.

"Next Election" has the meaning set forth in <u>Section 1(c)</u> hereof.

"Nominee" has the meaning set forth in <u>Section 1(a)</u> hereof.

"Number of Shares" has the meaning set forth in Recitals hereto.

"Other Nomination Agreements" means (i) the Nomination Agreement, dated as of the date hereof, between the Company and _____ and (ii) the Nomination Agreement, dated as of the date hereof, between the Company and _____.

"Permitted Assignee" means an Affiliate of the Stockholder so long as the Affiliate, together with the Stockholder and the other Affiliates of the Stockholder, hold in the aggregate at least one-half the Number of Shares of Common Stock.

"Permitted Assignment" has the meaning set forth in <u>Section 5</u> hereof.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Second Review Period" has the meaning set forth in <u>Section 1(e)</u> hereof.

"Stockholder" has the meaning set forth in the preamble.

"Termination Event" has the meaning set forth in <u>Section 1(h)</u> hereof.

"Transfer" means any sale, transfer, assignment or other disposition of (whether with or without consideration and whether voluntary or involuntary or by operation of law) of Common Stock.

<u>Section 5</u>. Assignment; Benefit of Parties; Transfer.

No party may assign this Agreement or any of its rights or obligations hereunder and any assignment hereof will be null and void except that (a) the Stockholder may assign, in whole, but not in part, this Agreement to a Permitted Assignee (a "<u>Permitted Assignment</u>"); provided that in each case the Permitted Assignee executes a joinder agreement pursuant to which such Permitted Assignee agrees to be bound by the terms hereof as the Stockholder hereunder (a "<u>Joinder Agreement</u>"). The Stockholder shall notify the Company immediately upon any such Permitted Assignment. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives and Permitted Assignees for the uses and purposes set forth and referred to herein. In the event of a Transfer by a Stockholder, the transferee shall not have the rights and powers of a Stockholder hereunder unless (i) the transferee is a Permitted Assignee of the Stockholder prior to and following the Transfer and (ii) the Stockholder and such transferee comply with the terms of this Agreement, including without limitation the obligation under this <u>Section 5</u> for the Transferee to execute a Joinder Agreement. Nothing herein contained shall confer or is intended to confer on any third party or entity that is not a party to this Agreement any rights under this Agreement. For the avoidance of doubt, in the event of a Permitted Assignment, the Permitted Assignee shall be deemed be the Stockholder for purposes of this Agreement

<u>Section 6</u>. Remedies.

The Company and the Stockholder shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that a breach of this Agreement would cause irreparable harm and money damages would not be an adequate remedy for any such breach and that, in addition to other rights and remedies hereunder, the Company and the Stockholder shall be entitled to specific performance and/or injunctive or other equitable relief (without posting a bond or other security) from any court of law or equity of competent jurisdiction in order to enforce or prevent any violation of the provisions of this Agreement.

<u>Section 7</u>. Notices.

All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (i) delivered personally to the recipient, (ii) telecopied or sent by facsimile to the recipient, or (iii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).  Such notices, demands and other communications shall be sent to the Stockholder or the Company at the address set forth below, or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

The Stockholder's address is:

_____
_____
_____
Attention:  _____
Facsimile:  _____

with copies to:

_____
_____
_____
Attention  _____
Facsimile:  _____

The Company's address is:

Xerium Technologies, Inc.
8537 Six Forks Road, Suite 300
Raleigh, NC 27615
Attention:  _____
Facsimile:  _____

with copies to:

Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP
2500 Wachovia Capital Center
Raleigh, NC 27601
Attention:  Gerald F. Roach
Facsimile:  (919) 821-6800

and

> Cadwalader, Wickersham & Taft LLP
> 1 World Financial Center
> New York, NY 10281
> Attention:  R. Ronald Hopkinson
> Facsimile:  (212) 504-6666

Section 8. Adjustments.

If, and as often as, there are any changes in the Common Stock by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization, recapitalization or sale, or by any other means, appropriate adjustment shall be made to the definition of Number of Shares and in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to the Common Stock as so changed.

Section 9. Descriptive Headings, Interpretation, No Strict Construction.

The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa.  Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof.  The words "include," "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation."  The use of the words "or," "either" or "any" shall not be exclusive.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time.  All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

Section 10. No Third-Party Beneficiaries.

Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any person or entity other than the parties hereto and their respective successors and assigns any remedy or claim under or by reason of this Agreement or any terms, covenants or conditions hereof, and all of the terms, covenants, conditions, promises and

agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and their respective successors and assigns.

Section 11. Further Assurances.

Each of the parties hereby agrees that it will hereafter execute and deliver any further document, agreement, instruments of assignment, transfer or conveyance as may be necessary or desirable to effectuate the purposes hereof.

Section 12. Counterparts.

This Agreement may be executed in one or more counterparts, and may be delivered by means of facsimile or electronic transmission in portable document format, each of which shall be deemed to be an original and shall be binding upon the party who executed the same, but all of such counterparts shall constitute the same agreement.

Section 13. Delivery by Facsimile and Electronic Means.

This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 14. Arm's Length Agreement.

Each of the parties to this Agreement agrees and acknowledges that this Agreement has been negotiated in good faith, at arm's length, and not by any means prohibited by law.

Section 15. Sophisticated Parties; Advice of Counsel.

Each of the parties to this Agreement specifically acknowledges that (i) it is a knowledgeable, informed, sophisticated Person capable of understanding and evaluating the provisions set forth in this Agreement and (ii) it has been fully advised and represented by legal counsel of its own independent selection and has relied wholly upon its independent judgment and the advice of such counsel in negotiating and entering into this Agreement.

Section 16. Governing Law.

This Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 17. Submission to Jurisdiction.

Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought in the United States District Court located in the State of Delaware or any Delaware state court, and each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 18. Waiver of Jury Trial.

Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings.  Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 18 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

Section 19. Complete Agreement.

This Agreement and any Joinder Agreements hereto represent the complete agreement between the parties hereto as to all matters covered hereby, and supersedes any prior agreements or understandings between the parties.

Section 20. Severability.

In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 21. Amendment and Waiver.

Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement shall be effective against the Company or the Stockholder unless such modification is approved in writing by the Company and the Stockholder. The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

Company:

XERIUM TECHNOLOGIES, INC

By:_____
    Name:
    Title:

Stockholder:

[_____]

By:_____
    Name:
    Title:

## SCHEDULE 1.69

**Registration Rights Agreement**

DRAFT

REGISTRATION RIGHTS AGREEMENT

by and among

XERIUM TECHNOLOGIES, INC.

and

THE HOLDERS NAMED HEREIN

Dated as of _____, 2010

USActive 18874267.1

TABLE OF CONTENTS

Page

Section 1    Definitions.................................................................................................................1

Section 2    Demand Registrations; General Provisions ...............................................................5

Section 3    Shelf Registrations; Underwritten Shelf Takedowns................................................7

Section 4    Piggyback Registrations; Piggyback Takedowns ......................................................8

Section 5    Deferrals and Suspensions ........................................................................................9

Section 6    Holdback Agreements................................................................................................9

Section 7    Company Undertakings ...........................................................................................10

Section 8    Registration Expenses .............................................................................................15

Section 9    Selection of Underwriters .......................................................................................15

Section 10   Indemnification; Contribution .................................................................................15

Section 11   Conditions on Participation in Underwritten Offering/Sale of
            Registrable Securities...............................................................................................19

Section 12   Rule 144 ..................................................................................................................20

Section 13   Private Placement.....................................................................................................20

Section 14   Transfer of Registration Rights................................................................................20

Section 15   Amendment, Modification and Waivers; Further Assurances...................................20

Section 16   Miscellaneous .........................................................................................................21

REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "<u>Agreement</u>") is made as of _____, 2010 by and among Xerium Technologies, Inc., a Delaware corporation (the "<u>Company</u>"), and the shareholders[1] identified as "<u>Investors</u>" on the signature page hereto and any parties identified on the signature page of any joinder agreements executed and delivered pursuant to <u>Section 14</u> hereof (each, including the Investors, a "<u>Holder</u>" and, collectively, the "<u>Holders</u>").

RECITALS:

WHEREAS, the Company proposes to issue the Common Stock (as defined below) pursuant to, and upon the terms set forth in, the plan of reorganization of the Company and certain of its subsidiaries and affiliates under Chapter 11 of Title 11 of the United States Code (the "<u>Plan</u>"); and

WHEREAS, in accordance with the Plan, the Company has agreed for the benefit of the Holders to enter into this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Holders hereby agree as follows:

**Section 1.      Definitions.**

"<u>Affiliate</u>" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person.

"<u>Agreement</u>" has the meaning specified in the first paragraph hereof.

"<u>beneficially own</u>", "<u>beneficial ownership</u>" and similar phrase as such terms are used in Rule 13d-3 and Rule 13d-5 promulgated under the Exchange Act, <u>provided</u> that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, irrespective of whether such right is currently exercisable, is exercisable only after the lapse of any period of time, is exercisable only upon the occurrence of a subsequent condition or event, or is exercisable only upon any act by the Holder or by any other Person.

"<u>Board</u>" means the Board of Directors of the Company.

---

[1]   NOTE: American Securities, Carl Marks, Cerberus and Apax. – Please provide contact information for notice sections on signature pages.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by applicable law or executive order to close.

"Commission" means the United States Securities and Exchange Commission or any successor governmental agency.

"Common Stock" means the shares of common stock, par value $0.01 per share, of the Company, in each case, issued on or after the Effective Date.

"Company" has the meaning specified in the first paragraph hereof.

"Company Demand Registration Notice" has the meaning specified in Section 2(b).

"Company Shelf Takedown Notice" has the meaning specified in Section 3(c).

"control" (including the terms "controlling," "controlled by" and "under common control with") means, unless otherwise noted, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract, or otherwise.

"Counsel to the Holders" means one (1) firm of counsel representing the Holders in the aggregate, as selected by the Holders of a majority of the Registrable Securities.

"Demand Registration" has the meaning specified in Section 2(a)(ii).

"Demand Registration Notice" has the meaning specified in Section 2(b).

"Demand Shelf Takedown Notice" has the meaning specified in Section 3(c).

"Disclosure Package" means, with respect to any offering of securities, (i) the preliminary Prospectus, (ii) the price to the public and the number of securities included in the offering to be included on the cover page of the Prospectus; (iii) each Free Writing Prospectus and (iv) all other information, in each case, that is deemed, under Rule 159 promulgated under the Securities Act, to have been conveyed to purchasers of securities at the time of sale of such securities (including a contract of sale).

"Effective Date" has the meaning assigned to such term in the Plan.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

"FINRA" means the Financial Industry Regulatory Authority.

"Form S-3 Shelf" has the meaning specified in Section 3(a).

"Free Writing Prospectus" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

"Holder" and "Holders" have the meanings given to those terms in the first paragraph hereof.

"Holder Free Writing Prospectus" means each Free Writing Prospectus prepared by or on behalf of the relevant Holder or used or referred to by such Holder in connection with the offering of Registrable Securities.

"Investors" has the meaning specified in the first paragraph hereof.

"Lock-Up Period" has the meaning specified in Section 6(a).

"Losses" has the meaning specified in Section 10(d).

"Material Adverse Change" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or over-the-counter market in the United States of America; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States of America; (c) a material outbreak or escalation of armed hostilities or other international or national calamity (including an act of terrorism) involving the United States of America or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any material adverse change in the business, assets or condition (financial or otherwise) of the Company and its subsidiaries, taken as a whole.

"NYSE" means the New York Stock Exchange.

"Other Holders" has the meaning specified in Section 4(c).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity or any department, agency or political subdivision thereof or any other entity.

"Piggyback Registration" has the meaning specified in Section 4(a).

"Piggyback Takedown" has the meaning specified in Section 4(a).

"Plan" has the meaning specified in the Recitals.

"Prospectus" means the prospectus used in connection with a Registration Statement.

"Registrable Securities" means at any time any shares of Common Stock (i) issued on or after the Effective Date to any Holder pursuant to the Plan or (ii) held or beneficially owned by any Holder, including any Common Stock issued pursuant to the Plan or upon the conversion, exercise or exchange, as applicable, of any other securities and/or interests issued pursuant to the Plan; provided, however, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (A) the date on which such securities are disposed of pursuant to an effective registration statement

under the Securities Act; (B) the date on which such securities are disposed of pursuant to Rule 144 (or any successor provision) under the Securities Act; (C) the date on which such securities cease to be outstanding; or (D) are held or beneficially owned by any Person that is not a Holder.

"Registration Expenses" means all expenses (other than underwriting discounts and commissions) arising from or incident to the registration of Registrable Securities in compliance with this Agreement, including:

(i)     stock exchange, Commission, FINRA and other registration and filing fees,

(ii)     all fees and expenses incurred in connection with complying with any securities or blue sky laws (including fees, charges and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities),

(iii)     all printing, messenger and delivery expenses,

(iv)     the fees, charges and disbursements of counsel to the Company and of its independent public accountants and any other accounting and legal fees, charges and expenses incurred by the Company (including any expenses arising from any special audits or "comfort letters" required in connection with or incident to any registration),

(v)     the fees and expenses incurred in connection with the listing of the Registrable Securities on NYSE (or any other national securities exchange),

(vi)     the fees and expenses incurred in connection with any "road show" for underwritten offerings, and

(vii)     reasonable and documented out-of-pocket fees, charges and disbursements of Counsel to the Holders, reasonably acceptable to the Company, including, for the avoidance of doubt, any expenses of Counsel to the Holders in connection with reviewing or filing of any Registration Statement, Prospectus or Free Writing Prospectus or any amendment or supplement thereto hereunder;

provided that, in no instance shall Registration Expenses include Selling Expenses.

"Registration Statement" means any registration statement filed hereunder or in connection with a Piggyback Takedown.

"Requesting Holder" has the meaning specified in Section 2(a)(i).

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Selling Expenses" means the underwriting fees, discounts, selling commissions and stock transfer taxes applicable to all Registrable Securities registered by the Holders and legal expenses not included within the definition of Registration Expenses.

"Shelf" has the meaning specified in Section 3(a).

"Shelf Registration" means a registration of securities pursuant to a registration statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

"Shelf Takedown" means either an Underwritten Shelf Takedown or a Piggyback Takedown.

"Suspension Period" has the meaning specified in Section 5(a).

"Underwritten Shelf Takedown" has the meaning specified in Section 3(b).

**Section 2.    Demand Registrations; General Provisions.**

(a)    Requests for Registration; Limitations on Holders.

(i)    Commencing on the 90th day after the Effective Date, any Holder or group of Holders (such Holder or group of Holders, in such capacity, a "Requesting Holder") may request registration under the Securities Act of all or any portion of the Registrable Securities held by such Requesting Holder on Form S-1 or, under the circumstances specified in Section 3, on Form S-3 (a "Demand Registration").

(ii)    A Requesting Holder shall not be permitted to submit a Demand Registration Notice or effect any Demand Registration for a Form S-1 or, under the circumstances specified in Section 3, a Form S-3, unless such Demand Registration is for a number of Registrable Securities (A) the total offering price of which (including piggyback shares and before deduction of fees and underwriting discounts) is reasonably expected to be at least, in the aggregate, $50 million (in the case of a Form S-1) or $20 million (in the case of a Form S-3), or (B) representing at least 10% (including piggyback shares) of the outstanding Common Stock in the aggregate

(b)    Demand Registration Notices.    All requests for Demand Registrations by a Requesting Holder shall be made by giving written notice to the Company (the "Demand Registration Notice").  Each Demand Registration Notice shall specify (i) whether the Registrable Securities to be in included in such Demand Registration shall, at the request of the Requesting Holder, be sold in an underwritten offering, (ii) the number of Registrable Securities proposed to be sold in the Demand Registration and (iii) the expected price range (net of underwriting discounts and commissions) of such Demand Registration.  Within five (5) Business Days after receipt of any Demand Registration Notice, the Company shall give written notice of such requested Demand Registration to all other Holders of Registrable Securities (the "Company Demand Registration Notice") and, shall include in such Demand Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 20 days after sending the Company Demand Registration Notice.

(c)     Withdrawals from Registration or Underwritten Offerings.  Any Holder may withdraw its Registrable Securities from a Demand Registration or underwritten offering at any time (prior to a sale thereunder) by providing the Company with written notice, provided that the Requesting Holder effecting such withdrawal shall pay or reimburse the Company  for all out-of-pocket fees and expenses reasonably incurred in connection with such Demand Registration or underwritten offering pro rata of the Registrable Securities held by such Holder.  Upon receipt of such written notice, the Company shall continue all commercial reasonable efforts to secure registration or effect the underwritten offering of the remaining Registrable Securities not requested to be withdrawn, unless the remaining Registrable Securities would not meet the requirements of Section 2(a)(ii), in which case, the Company may in its sole discretion cease all efforts to proceed with registration or the underwritten offering, it being understood, for the avoidance of doubt, that such Demand Registration or request underwritten offering shall count for purposes of Section 2(e) and Section 3(d).  If the Company ceases all efforts to secure registration or effect the underwritten offering pursuant to this provision, then such registration or underwritten offering shall nonetheless be deemed an effective or completed Demand Registration or completed underwritten offering for all purposes hereunder unless (i) the withdrawal is made following the occurrence of a Material Adverse Change not known to the Requesting Holders at the time of the Demand Registration Notice or Demand Shelf Takedown Notice or (ii) the Requesting Holders pay or reimburse the Company  for all out-of-pocket fees and expenses reasonably incurred in connection with such Demand Registration or underwritten offering.

(d)     Priority on Demand Registrations.  If the Demand Registration is an underwritten offering and the managing underwriters for such Demand Registration advise the Company and the applicable Requesting Holders that the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such Demand Registration exceeds the number of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within a price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in the Demand Registration, the Company shall include in such Demand Registration the number of Registrable Securities which can be so sold in the following order of priority:  (i) first, the Registrable Securities requested to be included in such Demand Registration by the Requesting Holders or any other Holder who elects to be included in such Demand Registration in accordance with the terms of this Agreement, which in the judgment of such underwriter can be sold in an orderly manner within the price range of such offering, *pro rata* among the respective Requesting Holders on the basis of the number of shares of Common Stock beneficially owned by each such Requesting Holder; (ii) second, any securities to be offered by and on behalf of the Company in such underwritten offering, and (iii) third, other securities requested to be included in such Demand Registration to the extent permitted hereunder.

(e)     Company Restrictions on Demand Registrations and Underwritten Shelf Takedowns.  Notwithstanding anything to the contrary herein, the Company shall not be required to effect (i) more than one (1) Demand Registration (which shall include for purposes of this Section 2(e) any Underwritten Shelf Takedowns) in the aggregate during any consecutive nine (9) month period, and (ii) any Demand Registration within 120 days after the effective date thereof of a previous registration in which the Holders of Registrable Securities exercised their piggyback rights pursuant to Section 4 of this Agreement.  For the avoidance of doubt, the

restrictions set forth in this <u>Section 2(e)</u> shall not apply to any non-underwritten Take-Down by any Holder under a Shelf.

**Section 3.        Shelf Registrations; Underwritten Shelf Takedowns.**

(a)        <u>Transition to Form S-3</u>.  As soon as the Company is eligible to use Form S-3, or an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) on Form S-3 with respect to the Registrable Securities, a Requesting Holder shall no longer be entitled to request that a Demand Registration be effected on Form S-1. In lieu of a Form S-1, the Company, upon receiving a Demand Registration Notice shall (i) file a registration statement pursuant to Rule 415 under the Securities Act (or any successor rule) to effect such Demand Registration (such Form S-3, together with any successor forms, the "<u>Form S-3 Shelf</u>" or the "<u>Shelf</u>"), or (ii) at any time that a Form S-3 Shelf covering Registrable Securities is effective, register additional Registrable Securities of a  Requesting Holder pursuant to a post-effective amendment to such shelf registration statement to effect such Demand Registration (in either case, a "<u>Shelf Registration</u>"), in each case in accordance with <u>Section 7</u>.  For the avoidance of doubt, a Shelf Registration shall be deemed a "Demand Registration" subject to the thresholds and limitations provided in <u>Section 2(a)(ii)</u> and <u>2(e)</u>.

(b)        <u>Demand Shelf Takedown Notices</u>.  Subject to <u>Section 2(a)(ii)</u> and <u>Section 2(e),</u> at any time and from time to time after the Shelf has been declared effective by the Commission, any Requesting Holder may request to sell all or any portion of its Registrable Securities in an underwritten offering pursuant to the Shelf (each, an "<u>Underwritten Shelf Takedown</u>") by giving written notice to the Company (the "<u>Demand Shelf Takedown Notice</u>"). Each Demand Shelf Takedown Notice shall specify the number of Registrable Securities proposed to be sold in the Underwritten Shelf Takedown and the expected price range (net of underwriting discounts and commissions) of such Underwritten Shelf Takedown.  Within five (5) Business Days after receipt of any Demand Shelf Takedown Notice, the Company shall give written notice of such requested Underwritten Shelf Takedown to all other Holders of Registrable Securities (the "<u>Company Shelf Takedown Notice</u>") and, subject to the provisions of <u>Section 3(d)</u> below, shall include in such Underwritten Shelf Takedown all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 20 Business Days after sending the Company Shelf Takedown Notice.

(c)        <u>Priority on Underwritten Shelf Takedowns</u>.  If the managing underwriters for such Underwritten Shelf Takedown advise the Company that the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such Underwritten Shelf Takedown exceeds the number of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within a price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in the Underwritten Shelf Takedown, the Company shall include in such Underwritten Shelf Takedown the number of Registrable Securities which can be so sold in the following order of priority:  (i) <u>first</u>, the Registrable Securities requested to be included in such Underwritten Shelf Takedown pursuant to <u>Section 3(b)</u>, which in the judgment of such underwriter can be sold in an orderly manner within the price range of such offering, *pro rata* among the respective Holders of such Registrable Securities on the basis of the number of Registrable Securities requested to be included therein by each such Holder; (ii) <u>second</u>, any securities to offered by and on behalf of

the Company under such Shelf Takedown; and (iii) <u>third</u>, other securities requested to be included in such Underwritten Shelf Takedown to the extent permitted hereunder.

(d)      <u>Holder Limitations; Company Restrictions on Underwritten Shelf Takedowns</u>.   Subject to the restrictions of <u>Section 2(e)</u>, a Requesting Holder or group of Requesting Holders shall not be permitted to submit a Demand Shelf Takedown Notice unless such Demand Shelf Takedown Notice is for a number of Registrable Securities (A) the total offering price of which (including piggyback shares and before deduction of fees and underwriting discounts) is reasonably expected to be at least, in the aggregate, $20 million, or (B) representing at least 10% (including piggyback shares) of the outstanding Common Stock in the aggregate.

**Section 4.      Piggyback Registrations; Piggyback Takedowns.**

(a)      <u>Right to Piggyback</u>.   Whenever the Company proposes to register any of its securities (whether or not following a Demand Registration Notice by a Requesting Holder) (a "<u>Piggyback Registration</u>"), or proposes to offer any Common Stock pursuant to a registration statement in an underwritten offering of Common Stock under the Securities Act (whether or not following a request by a Requesting Holder) (together with a Piggyback Registration, a "<u>Piggyback Takedown</u>"), the Company shall give written notice to all Holders of Registrable Securities of its intention to effect such Piggyback Takedown as promptly as practicable.   In the case of a Piggyback Takedown that is an underwritten offering under a shelf registration statement, such notice shall be given not less than seven (7) Business Days prior to the expected date of commencement of marketing efforts for such Piggyback Takedown.   In the case of a Piggyback Takedown that is an underwritten offering under a registration statement that is not a shelf registration statement, such notice shall be given not less than seven (7) Business Days prior to the expected date of filing of such registration statement.   The Company shall, subject to the provisions of <u>Section 4(b)</u> and <u>Section 4(c)</u> below, include in such Piggyback Takedown, as applicable, all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five (5) Business Days after sending the Company's notice.   Notwithstanding anything to the contrary contained herein, (i) the Company may determine not to proceed with any Piggyback Takedown upon written notice to the Holders of Registrable Securities requesting to include their Registrable Securities in such Piggyback Takedown, and (ii) any Holder of Registrable Securities may withdraw its request for inclusion by giving written notice to the Company of its intention to withdraw that registration; <u>provided</u>, <u>however</u>, that the withdrawal shall be irrevocable and after making the withdrawal, a Holder shall no longer have any right to include its Registrable Securities in that Piggyback Takedown.

(b)      <u>Priority on Primary Piggyback Takedowns</u>.   If a Piggyback Takedown is an underwritten primary registration on behalf of the Company, and the managing underwriters for a Piggyback Takedown advise the Company that the number of securities requested to be included in such Piggyback Takedown exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Company, the Company shall include in such Piggyback Takedown the number which can be so sold in the following order of priority:  (i) <u>first</u>, the securities the Company proposes to sell; (ii) <u>second</u>, the Registrable Securities requested to be included in such Piggyback Takedown (*pro rata* among the Holders of such Registrable Securities on the basis of the number of shares of Common

Stock beneficially owned by each such Holder); and (iii) <u>third</u>, other securities requested to be included in such Piggyback Takedown.

(c)     <u>Priority on Secondary Piggyback Takedowns</u>.   If a Piggyback Takedown is an underwritten secondary registration on behalf of holders of the Company's securities that are not Holders under this Agreement ("<u>Other Holders</u>"), and the managing underwriters advise the Company that the number of securities requested to be included in such Piggyback Takedown exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Other Holders, the Company shall include in such registration the number which can be so sold in the following order of priority:  (i) <u>first</u>, the Registrable Securities requested to be included in such registration (*pro rata* among the Holders of any such securities and Registrable Securities on the basis of the number of securities and Registrable Securities owned by each such Holder); (ii) <u>second</u>, the securities requested to be included therein by the Other Holders requesting such registration (*pro rata* among the holders of any such securities on the basis of the number of securities owned by each such holder); and (iii) <u>third</u>, other securities requested to be included in such registration.

## Section 5.     Deferrals and Suspensions.

(a)     <u>Deferral and Suspension Triggers</u>.   Notwithstanding anything to the contrary herein, if the Board determines in good faith that the registration or distribution, as applicable, of Registrable Securities would reasonably be expected to impede, delay or interfere with, or require premature disclosure of, any material financing, offering, acquisition, merger, corporate reorganization, segment reclassification, discontinuance of operations or other material corporate action, or other significant transaction or any negotiations, discussions or pending proposals with respect thereto, or any other bona fide material business purpose involving the Company or any of its subsidiaries, the Company shall be entitled to defer or suspend (each, a "<u>Suspension Period</u>"), the filing or use, as applicable, of any Registration Statement or Prospectus and shall not be required to amend or supplement the Registration Statement, any related Prospectus or any document incorporated therein by reference.   The Company as promptly as practicable will give written notice of any such Suspension Period to each Holder that has securities registered on a Registration Statement filed or requested to be filed pursuant to <u>Section 2(a)</u> hereunder.

(b)     <u>Limitations on Suspension Periods</u>.   Notwithstanding anything contained in this <u>Section 5</u> to the contrary, the Company shall not be entitled to more than two (2) Suspension Periods in any consecutive 12-month period, and in no event shall the number of days included in all Suspension Periods during such consecutive 12-month period exceed 120 days in the aggregate.

## Section 6.     Holdback Agreements.

(a)     <u>Lock-up for Holders of Registrable Securities</u>.   In connection with any Shelf Takedown that is an underwritten offering or any other underwritten public offering of equity securities by the Company, no Holder of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, shall dispose of any

Registrable Securities without prior written consent from the Company, during the 60-day period beginning on the date of pricing of such Shelf Takedown that is an underwritten offering or other underwritten public offering (the "Lock-Up Period"), except as part of such Shelf Takedown or other underwritten public offering in accordance with the terms of this Agreement, and (i) unless the underwriters managing the Shelf Takedown that is an underwritten offering or other underwritten public equity offering by the Company otherwise agree by written consent and (ii) only if such Lock-Up Period is applicable on substantially similar terms to the Company and the executive officers and directors of the Company; provided that nothing herein will prevent any Holder that is a partnership or corporation from making a distribution of Registrable Securities to the partners or stockholders thereof or a transfer to an Affiliate that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees agree to be bound by the restrictions set forth in this Section 6(a). Each Holder agrees to execute a lock-up agreement in favor of the Company's underwriters to such effect (in each case on substantially the same terms and conditions as all Holders) and, in any event, that the Company's underwriters in any relevant Shelf Takedown that is an underwritten offering or other underwritten public offering shall be third party beneficiaries of this Section 6(a); provided, however, that the term of such lock-up agreement shall not exceed 90 days from the date of pricing such offering. The provisions of this Section 6(a) will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

(b) The Company. In connection with any Shelf Takedown or any other underwritten public offering of equity securities, the Company shall not effect any public sale or distribution of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities (except pursuant to registrations on Form S-8 or Form S-4 under the Securities Act), during the seven days prior to and the 90-day period beginning on the date of pricing of such Shelf Takedown or other underwritten public offering.

Section 7. Company Undertakings. Whenever Registrable Securities are registered pursuant to this Agreement, the Company shall use its commercially reasonable efforts to effect the registration and the sale of such Registrable Securities as soon as reasonably practicable in accordance with the intended method of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(a) use its commercially reasonable efforts to (i) file with the Commission (A) a Registration Statement on Form S-1 , or (B) as soon as the Company is eligible to use Form S-3, a Form S-3 Shelf, in each case no later than 45 days after receiving the respective Demand Registration Notice relating thereto, and (ii) cause the applicable Registration Statement or Form S-3 Shelf to be declared effective by the Commission as soon as practicable thereafter;

(b) before filing a Registration Statement or Prospectus or any amendments or supplements thereto in electronic format furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference, proposed to be filed and such other documents reasonably requested by such Holders, which documents shall be subject to the review and comment of the Counsel to the Holders;

(c)      notify as promptly as practicable each Holder of Registrable Securities of the effectiveness of each Registration Statement and prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for a period ending on the date on which all Registrable Securities have been sold under such Registration Statement or have otherwise ceased to be Registrable Securities (provided that the Company shall not be required to keep any Shelf in effect for more than one (1) year after the date on which the Commission has declared such Shelf effective, or, in the event the Shelf is filed as an automatic shelf registration statement (as defined in Rule 405 under the Securities Act), for one (1) year after the date on which it is filed with the Commission), and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(d)      furnish to each seller of Registrable Securities, and the managing underwriters, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act)), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities;

(e)      use its commercially reasonable efforts (i) to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests, and (ii) to keep such registration or qualification in effect for so long as such Registration Statement remains in effect (provided that the Company shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction);

(f)      notify as promptly as practicable each seller of such Registrable Securities and the managing underwriters:  (i) at any time when a Prospectus relating to the applicable Registration Statement is required to be delivered under the Securities Act, (A) upon discovery that, or upon the happening of any event as a result of which, such Registration Statement, or the Prospectus or Free Writing Prospectus relating to such Registration Statement, or any document incorporated or deemed to be incorporated therein by reference contains an untrue statement of a material fact or omits any fact necessary to make the statements in the Registration Statement or the Prospectus or Free Writing Prospectus relating thereto not misleading or otherwise requires the making of any changes in such Registration Statement, Prospectus, Free Writing Prospectus or document, and, at the request of any such seller and subject to Section 5(a) hereof, the Company shall as promptly as possible prepare a supplement or amendment to such Prospectus or Free Writing Prospectus, furnish a reasonable number of copies of such supplement or amendment to each seller of such Registrable Securities and the managing underwriters and file such supplement or amendment with the Commission so that, as thereafter delivered to the purchasers of such Registrable Securities, such Prospectus or Free

Writing Prospectus as so amended or supplemented shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading, (B) as soon as the Company becomes aware of any comments or inquiries by the Commission or any Federal or state governmental authority or any requests by the Commission or any Federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or Free Writing Prospectus covering Registrable Securities or for additional information relating thereto, (C) as soon as the Company becomes aware of the issuance by the Commission of any stop order suspending the effectiveness of a Registration Statement covering the Registrable Securities or (D) of the receipt by the Company of any written notification with respect to the suspension of the qualification or exemption from qualification of any Registrable Security for sale in any jurisdiction, or the initiation of any proceeding for such purpose; and (ii) when each Registration Statement or any amendment thereto has been filed with the Commission and when each Registration Statement or the related Prospectus or Free Writing Prospectus or any Prospectus supplement or any post effective amendment thereto has become effective.

(g)     use its commercially reasonable efforts to cause all such Registrable Securities to continue to be so listed on the NYSE or another national securities exchange on which the Company's Common Stock is then traded;

(h)     provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of the applicable Registration Statement;

(i)     enter into and perform under such customary agreements (including underwriting agreements in customary form, including customary representations and warranties and provisions with respect to indemnification and contribution) in order to expedite or facilitate the disposition of such Registrable Securities and, if the Demand Registration Notice or Demand Shelf Takedown Notice specifies that disposition of Registrable Securities shall be conducted through an underwritten offering,  provide reasonable cooperation, including causing appropriate officers to attend and participate in "road shows" and analyst or investor presentations and such other selling or other informational meetings organized by the underwriters, if any;

(j)     for a reasonable period prior to the filing of any Registration Statement or the commencement of marketing efforts for a Shelf Takedown, as applicable, pursuant to this Agreement, during normal business hours, make available for reasonable inspection by the Holders of Registrable Securities, Counsel to the Holders, the lead underwriter managing any disposition pursuant to such Registration Statement or Shelf Takedown, and any other attorney, accountant or other agent retained by such Holder, as applicable, such financial and other records and pertinent corporate documents of the Company as are reasonably required to conduct customary documentary due diligence, and cause the Company's appropriate executive officers to participate in one (1) customary due diligence session in connection with such Registration Statement or Shelf Takedown, as applicable, provided that the Holders and their respective representatives shall conduct any such due diligence in a manner so as to minimize disruption of the Company's business and operations, and provided, further, that the recipients of such financial and other records and pertinent corporate documents and any other type of information in any format agree in writing to keep the confidentiality thereof pursuant to

a written agreement reasonably acceptable to the Company, <u>provided</u>, that such information is deemed by the Company to be "non-public" information;

(k)     permit any Holder of Registrable Securities, Counsel to the Holders, any underwriter participating in any disposition pursuant to a Registration Statement, and any other attorney, accountant or other agent retained by such Holder, to participate (including, but not limited to, reviewing, commenting on and attending all meetings) in the preparation of such Registration Statement and any Prospectus supplements relating to a Shelf Takedown, if applicable, <u>provided</u> that the Holders and their respective representatives shall conduct any such due diligence in a manner so as to minimize disruption of the Company's business and operations;

(l)     in connection with any Shelf Takedown, obtain and furnish to each such Holder of Registrable Securities including Registrable Securities in such Shelf Takedown a signed copies of (i) a cold comfort letter from the Company's independent public accountants and (ii) a legal opinion of counsel to the Company addressed to the relevant underwriters and/or such Holders of Registrable Securities, in each case in customary form and covering such matters of the type customarily covered by such letters as the managing underwriters and/or Holders of a majority of the Registrable Securities included in such Shelf Takedown reasonably request;

(m)     with respect to each Free Writing Prospectus or other materials to be included in the Disclosure Package, ensure that no Registrable Securities be sold "by means of" (as defined in Rule 159A(b) under the Securities Act) such Free Writing Prospectus or other materials without the prior written consent of a majority of the Holders of the Registrable Securities that are being sold pursuant to such Free Writing Prospectus, which Free Writing Prospectuses or other materials shall be subject to the review of Counsel to the Holders; <u>provided</u>, <u>however</u>, the Company shall not be responsible or liable for any breach by a Holder that has not obtained the prior written consent of the Company pursuant to <u>Section 16(m)</u>;

(n)     provide a CUSIP number for the Registrable Securities prior to the effective date of the first Registration Statement including Registrable Securities;

(o)     (i) prepare and file with the Commission such amendments and supplements to each Registration Statement as may be necessary to comply with the provisions of the Securities Act, including post effective amendments to each Registration Statement as may be necessary to keep such Registration Statement continuously effective for the applicable time period required hereunder, and if applicable, file any Registration Statements pursuant to Rule 462(b) under the Securities Act; (ii) cause the related Prospectus to be supplemented by any required Prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; and (iii) comply with the provisions of the Securities Act and the Exchange Act and any applicable securities exchange or other recognized trading market with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented;

(p)      reasonably cooperate with each Holder of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and underwriters' counsel in connection with any filings required to be made with FINRA;

(q)      within the deadlines specified by the Securities Act, make all required filing fee payments in respect of any Registration Statement or Prospectus used under this Agreement (and any offering covered thereby);

(r)      in the case of certificated Registrable Securities, cooperate with the participating Holders of Registrable Securities and the managing underwriters to facilitate the timely preparation and delivery of certificates (not bearing any legends) representing Registrable Securities to be sold after receiving written representations from each participating Holder that the Registrable Securities represented by the certificates so delivered by such Holder will be transferred in accordance with the Registration Statement, and enable such Registrable Securities to be in such denominations and registered in such names as the Holders or managing underwriters may reasonably request at least two (2) Business Days prior to any sale of Registrable Securities;

(s)      in the event of the issuance (or, in the case of any threatened issuance that the Company has knowledge of) of any stop order suspending the effectiveness of a Registration Statement, or of any order suspending or preventing the use of any related Prospectus or suspending the qualification of any Registrable Securities included in such Registration Statement for sale in any jurisdiction, the Company shall use its commercially reasonable efforts to, as promptly as practicable, (i) prevent the issuance of any such stop order, and in the event of such issuance, to obtain the withdrawal of such order and (ii) obtain the withdrawal of any order suspending or preventing the use of any related Prospectus or Free Writing Prospectus or suspending qualification of any Registrable Securities included in such Registration Statement for sale in any jurisdiction at the earliest practicable date;

(t)      as promptly as practicable notify in writing the Holders, the sales or placement agent, if any, therefor and the managing underwriters of the securities being sold, (i) when such Registration Statement or related Prospectus or Free Writing Prospectus or any Prospectus amendment or supplement or post effective amendment has been filed, and, with respect to any such Registration Statement or any post effective amendment, when the same has become effective and (ii) of any written comments by the Commission and by the blue sky or securities commissioner or regulator of any state with respect thereto;

(u)      if requested by any participating Holder of Registrable Securities or the managing underwriters, as promptly as practicable include in a Prospectus supplement or amendment such information as the Holder or managing underwriters may reasonably request, including in order to permit the intended method of distribution of such securities, and make all required filings of such Prospectus supplement or such amendment as soon as reasonably practicable after the Company has received such request; and

(v)      use its commercially reasonable efforts to take all other actions necessary to effect the registration and sale of the Registrable Securities contemplated hereby.

**Section 8.    Registration Expenses.**  All Registration Expenses shall be borne by the Company.  For the avoidance of doubt, subject to the proviso in Section 2(c) of this Agreement, all reasonable Registration Expenses in connection with any registration initiated as a Demand Registration shall be borne by the Company regardless of whether or not such registration has become effective and whether or not such registration has counted as one of the permitted Long-Form Registrations pursuant to Section 2(c) of this Agreement.  All Selling Expenses relating to Registrable Securities registered shall be borne by the selling Holders of such Registrable Securities *pro rata* on the basis of the number of Registrable Securities sold.

**Section 9.    Selection of Underwriters.**

(a)    Demand Registrations; Underwritten Shelf Takedowns.  In connection with a Demand Registration that is distributed as an underwritten offering or an Underwritten Shelf Takedown, the Holders of a majority of the Registrable Securities to be included in such underwritten offering or underwritten takedown shall have the right to select the investment banker(s) and manager(s) to administer the offering, subject to the approval of the Company, which approval shall not be unreasonably withheld, conditioned or delayed.

(b)    Piggyback Takedown.  If any Piggyback Takedown is an underwritten offering, the Company will have the sole right to select the investment banker(s) and manager(s) for the offering.

**Section 10.    Indemnification; Contribution.**

(a)    Indemnification by the Company.  The Company agrees to indemnify and hold harmless each Holder of Registrable Securities and each Person who controls any such Holder within the meaning of either the Securities Act or the Exchange Act, each Affiliate of any thereof, and all directors, officers, employees, members, managers and agents of each of the foregoing Persons, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating, preparing or defending same) (collectively, "Losses") to which they or any of them may become subject insofar as such Losses arise out of or are based upon (i) any untrue statement or alleged untrue statement of a material fact contained in a Registration Statement as originally filed or in any amendment thereof, or the Disclosure Package, or any Free Writing Prospectus or any preliminary, final or summary Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, or (ii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any other federal law, any state or foreign securities law, or any rule or regulation promulgated under of the foregoing laws, relating to the offer or sale of the Registrable Securities, and in any such case, the Company agrees to reimburse each such indemnified party, as incurred, for any reasonable legal or other expenses reasonably incurred by them in connection with investigating, preparing or defending any such Loss, action or investigation (whether or not the indemnified party is a party to any proceeding); provided, however, that the Company will not be liable in any case to the

extent that any such Loss arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information relating to such Holder furnished to the Company by or on behalf of any such Holder specifically for inclusion therein, including any notice and questionnaire.  This indemnity obligation will be in addition to any liability which the Company may otherwise have.

(b)    <u>Indemnification by the Holders</u>.    Each Holder of Registrable Securities severally (and not jointly) agrees to indemnify and hold harmless the Company and each Person who controls the Company within the meaning of either the Securities Act or the Exchange Act, each Affiliate of the Company, and all directors, officers, employees, members, managers and agents of the foregoing Persons, to the fullest extent permitted by applicable law, from and against any and all Losses to which they or any of them may become subject insofar as such Losses arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in a Registration Statement as originally filed or in any amendment thereof, or in the Disclosure Package or any Free Writing Prospectus, preliminary, final or summary Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that any such untrue statement or alleged untrue statement or omission or alleged omission is contained in any written information relating to such Holder furnished to the Company by or on behalf of such Holder specifically for inclusion therein; <u>provided</u>, <u>however</u>, that the total amount to be indemnified by such Holder pursuant to this <u>Section 10(b)</u> shall be limited to the net proceeds (after deducting underwriters' discounts and commissions) received by such Holder in the offering to which such Registration Statement or Prospectus relates; and <u>provided</u>, <u>further</u>, that a Holder shall not be liable in any case to the extent that prior to the filing of any such Registration Statement, Disclosure Package, Prospectus, or Free Writing Prospectus or any amendment thereof or supplement thereto, each Holder has furnished in writing to the Company, information expressly for use in, and within a reasonable period of time prior to the effectiveness of such Registration Statement or use of such Disclosure Package, Prospectus, or Free Writing Prospectus or any amendment thereof or supplement thereto which corrected or made not misleading information previously provided to the Company.  This indemnity obligation will be in addition to any liability which any such Holder may otherwise have.

(c)    <u>Conduct of Indemnification Proceedings</u>.

(i)    Promptly after receipt by an indemnified party under this <u>Section 10</u> of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this <u>Section 10</u>, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (x) will not relieve it from liability under <u>Section 10(a)</u> or <u>Section 10(b)</u> above unless and to the extent such action and such failure results in material prejudice to the indemnifying party and forfeiture by the indemnifying party of substantial rights and defenses; and (y) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation

provided in <u>Section 10(a)</u> or <u>Section 10(b)</u> above. The indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, except as provided in the next sentence, after notice from the indemnifying party to such indemnified party of its election to so assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal expenses of other counsel or any other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation. Notwithstanding the indemnifying party's rights in the prior sentence, the indemnified party shall have the right to employ one (1) firm of separate counsel, and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if:

(A) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with an actual or potential conflict of interest;

(B) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party;

(C) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within 10 days after notice of the institution of such action or such earlier time as may be necessary to pursue appropriate defenses, rights, and remedies; or

(D) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party.

(ii)   No indemnifying party shall, in connection with any one action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general circumstances or allegations, be liable for the fees and expenses of more than one separate firm of attorneys for all indemnified parties. An indemnifying party shall not be liable under this <u>Section 10</u> to any indemnified party regarding any settlement or compromise or consent to the entry of any judgment with respect to any pending claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent is consented to by such indemnifying party, which consent shall not be unreasonably withheld.

No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement or compromise that (x) does not include as an unconditional term thereof the giving by the claimant or plaintiff therein, to such indemnified party and its Affiliates, of a full and final release from all liability in respect to such claim or litigation or (y) includes a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of such indemnified party or any of its Affiliates.

(d)     Contribution.

(i)     In the event that the indemnity provided in Section 10(a) or Section 10(b) above is unavailable to or insufficient to hold harmless an indemnified party for any reason, then each applicable indemnifying party agrees to contribute to the aggregate Losses to which such indemnifying party may be subject in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party on the one hand and by the indemnified party on the other from the offering of the Registrable Securities.  If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the indemnifying party on the one hand and the indemnified party on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations.  The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party on the one hand or the indemnified party on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(ii)     The parties agree that it would not be just and equitable if contribution pursuant to this Section 10(d) were determined by *pro rata* allocation (even if the Holders of Registrable Securities or any agents or underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 10(d).  The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this Section 10(d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating, preparing or defending any such action or claim.

(iii)     Notwithstanding the provisions of this Section 10(d), no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(iv)    For purposes of this Section 10, each Person who controls any Holder of Registrable Securities, agent or underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of any such Holder, agent or underwriter shall have the same rights to contribution as such Holder, agent or underwriter, and each Person who controls the Company within the meaning of either the Securities Act or the Exchange Act and each officer and director of the Company shall have the same rights to contribution as the Company, subject in each case to the applicable terms and conditions of this Section 10(d).

(e)    The provisions of this Section 10 will remain in full force and effect, regardless of any investigation made by or on behalf of any Holder of Registrable Securities or the Company or any of the officers, directors or controlling Persons referred to in this Section 10 hereof, and will survive the transfer of Registrable Securities.

(f)    To the extent any indemnification by an indemnifying party is prohibited or limited by law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under Section 10 to the fullest extent permitted by law; provided, however, that:  (i) no Person involved in the sale of Registrable Securities which Person is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) in connection with such sale shall be entitled to contribution from any Person involved in such sale of Registrable Securities who was not guilty of fraudulent misrepresentation; and (ii) contribution by any seller of Registrable Securities shall be limited in amount to the net amount of proceeds received by such seller from the sale of such Registrable Securities pursuant to such Shelf Registration.

**Section 11.    Conditions on Participation in Underwritten Offering/Sale of Registrable Securities.**

(a)    No Person may participate in any underwritten offering hereunder unless such Person (i) agrees to enter into an underwriting agreement in customary form and provide the representations and warranties, and indemnities to the underwriters and the Company and to sell such Person's securities on the basis provided in any such underwriting agreement and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; provided that no Holder of Registrable Securities included in any underwritten offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (A) such Holder's ownership of its Registrable Securities to be sold or transferred free and clear of liens, (B) such Holder's power and authority to effect, and lack of conflicts in effecting, such transfer and (C) such matters pertaining to compliance with securities laws as may be reasonably requested) or to undertake any indemnification obligations to the Company.

(b)    Each Person that has securities registered on a Registration Statement filed hereunder agrees that, upon receipt of any notice contemplated in Section 5(a), such Person will forthwith discontinue the disposition of its Registrable Securities pursuant to the applicable Registration Statement.

(c)     No Holder shall use a Holder Free Writing Prospectus without the prior written consent of the Company, which consent shall not be unreasonably withheld.

**Section 12.     Rule 144.**   With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 under the Securities Act, the Company covenants that it will make available information necessary to comply with Rule 144, if available with respect to resales of the Registrable Securities under the Securities Act, and take such further action as such Holder may reasonably request, in each case to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act (if available with respect to resales of the Registrable Securities), as such rule may be amended from time to time or any similar rule or regulation hereafter adopted by the Commission until all Registrable Securities have ceased to be Registrable Securities.

**Section 13.     Private Placement.**   Except for Section 6(a), the Company agrees that nothing in this Agreement shall prohibit the Holders, at any time and from time to time, from selling or otherwise transferring Registrable Securities pursuant to a private placement or other transaction which is not registered pursuant to the Securities Act.  To the extent requested by a Holder, the Company shall take all reasonable steps to assist and cooperate with such Holder to facilitate such sale or transfer, including providing reasonable due diligence access to potential purchasers.

**Section 14.     Transfer of Registration Rights.**   The rights of a Holder hereunder may be transferred, assigned, or otherwise conveyed on a pro rata basis in connection with any transfer, assignment, or other conveyance of Registrable Securities to any transferee or assignee (except with respect to transfers of Demand Registration rights which may be transferred in whole and not in part as provided in Section 2(h)); provided that all of the following additional conditions are satisfied with respect to any transfer, assignment or conveyance of rights hereunder:  (a) such transfer or assignment is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement by executing a joinder or similar document; and (c) the Company is given written notice by such Holder of such transfer or assignment, stating the name and address of the transferee or assignee, identifying the Registrable Securities with respect to which such rights are being transferred or assigned and specifying whether or not the Demand Registration rights pursuant to Section 2 have been assigned.  Any transfer, assignment or other conveyance of the rights of a Holder in breach of this Agreement shall be void and of no effect.

**Section 15.     Amendment, Modification and Waivers; Further Assurances.**

(a)     Amendment.  This Agreement may be amended with the consent of the Company and the written consent of each Holder entitled to registration rights hereunder; provided that no such amendment, action or omission that adversely affects, alters or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder.

(b)     <u>Effect of Waiver</u>.  No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.  The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(c)     <u>Further Assurances</u>.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

**Section 16.     Miscellaneous.**

(a)     <u>Adjustments</u>.  If, and as often as, there are any changes in the Registrable Securities by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization, recapitalization or sale, or by any other means, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to the Registrable Securities as so changed.

(b)     <u>Successors and Assigns</u>.  All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto (including any trustee in bankruptcy) whether so expressed or not.  In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or Holders of Registrable Securities are also for the benefit of, and enforceable by, any subsequent Holder of Registrable Securities.  No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(c)     <u>Notices</u>.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (i) delivered personally to the recipient, (ii) telecopied or sent by facsimile to the recipient, or (iii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).  Such notices, demands and other communications shall be sent to the Company at the address set forth below and to any Holder of Registrable Securities at the address set forth on the signature page hereto, or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

The Company's address is:

> Xerium Technologies, Inc.
> 8537 Six Forks Road, Suite 300
> Raleigh, NC 27615
> Attention:  Chief Financial Officer
> Facsimile:  (919) 556-2432

with copies to, which shall not constitute notice:

> Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP
> 2500 Wachovia Capitol Center
> Raleigh, NC 27601
> Attention:  Gerald F. Roach
> Facsimile:  (919) 821-6800

and

> Cadwalader, Wickersham & Taft LLP
> 1 World Financial Center
> New York, NY 10281
> Attention:  R. Ronald Hopkinson
>                    Peter C. Gyr
> Facsimile:  (212) 504-6666

(d)    <u>Business Day Convention</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(e)    <u>No Inconsistent Agreements</u>.    The Company represents and warrants that it is not a party to, or otherwise subject to, any other agreement granting registration rights to any other Person with respect to any securities of the Company, including securities convertible, exercisable or exchangeable into or for shares of any equity securities of the Company. The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders of Registrable Securities in this Agreement.

(f)    <u>Adjustments Affecting Registrable Securities</u>.  The Company shall not take any action, or permit any change to occur, with respect to its securities which would materially and adversely affect the ability of the Holders of Registrable Securities to include such Registrable Securities in a registration undertaken pursuant to this Agreement or which would materially and adversely affect the marketability of such Registrable Securities in any such registration (including effecting a stock split or a combination of shares).

(g)   Counterparts.  This Agreement may be executed in one or more counterparts, and may be delivered by means of facsimile or electronic transmission in portable document format, each of which shall be deemed to be an original and shall be binding upon the party who executed the same, but all of such counterparts shall constitute the same agreement.

(h)   Descriptive Headings; Interpretation; No Strict Construction.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa.  Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof.  The words "include," "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation."  The use of the words "or," "either" or "any" shall not be exclusive.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time.  All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(i)   Delivery by Facsimile and Electronic Means.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(j)   Arm's-Length Agreement.  Each of the parties to this Agreement agrees and acknowledges that this Agreement has been negotiated in good faith, at arm's length, and not by any means prohibited by law.

(k)   Sophisticated Parties; Advice of Counsel.  Each of the parties to this Agreement specifically acknowledges that (i) it is a knowledgeable, informed, sophisticated Person capable of understanding and evaluating the provisions set forth in this Agreement and (ii) it has been fully advised and represented by legal counsel of its own independent selection

and has relied wholly upon its independent judgment and the advice of such counsel in negotiating and entering into this Agreement.

(l)    Notification of Status.  Each Holder shall provide written notice to the Company within three (3) Business Days from the first day on which the Holder no longer holds Registrable Securities.

(m)    Governing Law.  This Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

(n)    Submission to Jurisdiction.  Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought in the United States District Court for the in the Southern District of New York or any New York state court, in each case, located in the Borough of Manhattan, of the City of New York, and each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(o)    Waiver of Jury Trial.  Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings.  Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 16(o) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(p)    Complete Agreement.  This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, represent the complete agreement between the parties hereto as to all matters covered hereby, and supersedes any prior agreements or understandings among the parties.

(q)     Severability.   In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).   The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(r)     Termination.   The rights and obligations of any Holder and of the Company with respect to such Holder, other than those contained in Section 10, shall terminate upon the earliest to occur of any of the following: (i) the securities held or beneficially owned by such Holder subject to this Agreement cease to be Registrable Securities, (ii) such Holder no longer holds any Registrable Securities, (iii) such Holder no longer holds or beneficially owns at least five percent (5%) of the then outstanding shares of Common Stock in the aggregate or (iv) the third anniversary of the date of this Agreement occurs.

(s)     Remedies; Specific Performance.   Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically, to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor.   The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement and shall not be required to prove irreparable injury to such party or that such party does not have an adequate remedy at law with respect to any breach of this Agreement (each of which elements the parties admit).   The parties hereto further agree and acknowledge that each and every obligation applicable to it contained in this Agreement shall be specifically enforceable against it and hereby waives and agrees not to assert any defenses against an action for specific performance of their respective obligations hereunder.   All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies available under this Agreement or otherwise.

(t)     Attorneys' Fees.   In the event of litigation or other proceedings in connection with or related to this Agreement, the prevailing party in such litigation or proceeding shall be entitled to reimbursement from the opposing party of all reasonable expenses, including reasonable attorneys' fees and expenses of investigation in connection with such litigation or proceeding.

(u)     Holders not Acting as a Group. Neither the fact of this Agreement nor anything contained herein shall be interpreted to mean or be deemed an admission by any of the Holders that they constitute a "group" as such term is used in Rule 13(d)(1)(k) under the Exchange Act.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

XERIUM TECHNOLOGIES, INC.

By:_____
   Name:
   Title:

-2-

INVESTORS

**[**NAME**]**

By:_____
    Name:
    Title:
    Address: **[_____]**
    Facsimile:

**[**NAME**]**

By:_____
    Name:
    Title:
    Address: **[_____]**
    Facsimile:

**[**NAME**]**

By:_____
    Name:
    Title:
    Address: **[_____]**
    Facsimile:

**[**NAME**]**

By:_____
    Name:
    Title:
    Address: **[_____]**
    Facsimile:

**SCHEDULE 1.82**

**Restated Bylaws of each Reorganized Debtor**

# AMENDED AND RESTATED BY-LAWS

## OF

## XERIUM TECHNOLOGIES, INC.

**Adopted: May 13, 2005**

By-laws (3)

# TABLE OF CONTENTS

**ARTICLE 1 - STOCKHOLDERS** ...................................................................................................................1

    1.1. PLACE OF MEETINGS....................................................................................................................1
    1.2. ANNUAL MEETING.......................................................................................................................1
    1.3. SPECIAL MEETING .......................................................................................................................1
    1.4. NOTICE OF MEETINGS .................................................................................................................1
    1.5. VOTING LIST................................................................................................................................1
    1.6. QUORUM......................................................................................................................................2
    1.7. ADJOURNMENTS ..........................................................................................................................2
    1.8. VOTING........................................................................................................................................2
    1.9. PROXY REPRESENTATION ............................................................................................................2
    1.10. ACTION AT MEETING .................................................................................................................3
    1.11. NOMINATION OF DIRECTORS .....................................................................................................3
    1.12. NOTICE OF BUSINESS AT ANNUAL MEETINGS ...........................................................................4

**ARTICLE 2 - DIRECTORS**..........................................................................................................................5

    2.1. GENERAL POWERS .......................................................................................................................5
    2.2. NUMBER; ELECTION AND QUALIFICATION...................................................................................5
    2.3. TERM OF OFFICE .........................................................................................................................5
    2.4. REMOVAL ....................................................................................................................................5
    2.5. RESIGNATION...............................................................................................................................5
    2.6. VACANCIES..................................................................................................................................6
    2.7. REGULAR MEETINGS ...................................................................................................................6
    2.8. SPECIAL MEETINGS.....................................................................................................................6
    2.9. NOTICE OF SPECIAL MEETINGS...................................................................................................6
    2.10. MEETINGS BY TELEPHONE CONFERENCE CALLS .......................................................................6
    2.11. QUORUM....................................................................................................................................6
    2.12. ACTION AT MEETING .................................................................................................................7
    2.13. ACTION BY CONSENT.................................................................................................................7
    2.14. COMMITTEES .............................................................................................................................7
    2.15. COMPENSATION OF DIRECTORS .................................................................................................7

**ARTICLE 3 - OFFICERS** .............................................................................................................................7

    3.1. ENUMERATION.............................................................................................................................7
    3.2. ELECTION.....................................................................................................................................7
    3.3. QUALIFICATION ...........................................................................................................................7
    3.4. TERM OF OFFICE .........................................................................................................................7
    3.5. RESIGNATION AND REMOVAL ......................................................................................................8
    3.6. VACANCIES..................................................................................................................................8
    3.7. CHAIRMAN OF THE BOARD ..........................................................................................................8
    3.8. CHIEF EXECUTIVE OFFICER ........................................................................................................8
    3.9. PRESIDENT...................................................................................................................................8
    3.10. CHIEF FINANCIAL OFFICER .......................................................................................................8
    3.11. VICE PRESIDENTS ......................................................................................................................9
    3.12. SECRETARY AND ASSISTANT SECRETARIES ...............................................................................9
    3.13. TREASURER AND ASSISTANT TREASURERS.................................................................................9
    3.14. CONTROLLERS ...........................................................................................................................9
    3.15. OTHER OFFICERS, ASSISTANT OFFICERS AND AGENTS ...............................................................9
    3.16. SALARIES.................................................................................................................................10

**ARTICLE 4 - CAPITAL STOCK**................................................................................................................10

    4.1. ISSUANCE OF STOCK .................................................................................................................10
    4.2. CERTIFICATES OF STOCK ...........................................................................................................10

4.3. TRANSFERS ................................................................................................................................ 10
4.4. LOST, STOLEN OR DESTROYED CERTIFICATES ...................................................................... 10
4.5. RECORD DATE ............................................................................................................................ 11
4.6. DIVIDENDS .................................................................................................................................. 11

**ARTICLE 5 - RECORDS AND REPORTS ............................................................................... 11**

5.1. MAINTENANCE AND INSPECTION OF RECORDS ....................................................................... 11
5.2. INSPECTION BY DIRECTOR ........................................................................................................ 11
5.3. REPRESENTATION OF SHARES OF OTHER CORPORATIONS ..................................................... 12

**ARTICLE 6 - GENERAL PROVISIONS .................................................................................. 12**

6.1. FISCAL YEAR .............................................................................................................................. 12
6.2. CORPORATE SEAL ...................................................................................................................... 12
6.3. WAIVER OF NOTICE .................................................................................................................... 12
6.4. CORPORATE CONTRACTS AND INSTRUMENTS; HOW EXECUTED ........................................... 12
6.5. EVIDENCE OF AUTHORITY .......................................................................................................... 12
6.6. CERTIFICATE OF INCORPORATION ............................................................................................. 12
6.7. TRANSACTIONS WITH INTERESTED PARTIES ............................................................................ 13
6.8. CONSTRUCTION; DEFINITIONS .................................................................................................. 13
6.9. PROVISIONS ADDITIONAL TO PROVISIONS OF LAW ................................................................. 13
6.10. PROVISIONS CONTRARY TO PROVISIONS OF LAW; SEVERABILITY ...................................... 13
6.11. INCONSISTENT PROVISIONS ..................................................................................................... 14
6.12. SECTION HEADINGS .................................................................................................................. 14

**ARTICLE 7 - AMENDMENTS .................................................................................................. 14**

ARTICLE 1 - STOCKHOLDERS

1.1     Place of Meetings. All meetings of stockholders shall be held at such place, within or without the State of Delaware, or, if so determined by the Board of Directors of the Corporation (the "Board of Directors") in its sole discretion, at no place (but rather by means of remote communication), as may be designated from time to time by the Board of Directors, or, if not so designated, at the principal executive office of the Corporation.

1.2     Annual Meeting. The annual meeting of stockholders for the election of directors and for the transaction of such other business as may properly be brought before the meeting shall be held at such date and time as shall be fixed by the Board of Directors and stated in the notice of the meeting. If no annual meeting is held in accordance with the foregoing provisions, a special meeting may be held in lieu of the annual meeting, and any action taken at that special meeting shall have the same effect as if it had been taken at the annual meeting, and in such case all references in these Amended and Restated By-Laws (the "By-Laws") to the annual meeting of stockholders shall be deemed to refer to such special meeting.

1.3     Special Meeting. A special meeting of the stockholders may be called at any time by the Chairman of the Board, the Chief Executive Officer, two or more directors, or by one director in the event that there is only a single director in office.

1.4     Notice of Meetings. Except as otherwise provided by law, written notice of each meeting of stockholders, whether annual or special, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. The notices of all meetings shall state the place, if any, the date, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and the hour of the meeting. The notice of a special meeting shall state, in addition, the purpose or purposes for which the meeting is called. Notice of any meeting of stockholders shall be given either personally or by mail, electronic mail, telecopy, telegram or other electronic or wireless means. Notices not personally delivered shall be sent charges prepaid and shall be addressed to the stockholder at the address of that stockholder appearing on the books of the Corporation. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or at the time of transmission when sent by electronic mail, telecopy, telegram or other electronic means. An affidavit of the mailing or other means of giving any notice of any stockholders' meeting, executed by the secretary, assistant secretary or any transfer agent of the Corporation giving the notice, shall be prima facie evidence of the giving of such notice or report.

1.5     Voting List. The officer who has charge of the stock ledger of the Corporation shall prepare, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for a period of at least ten (10) days prior to the meeting, for any purpose germane to the meeting on either, at the Corporation's sole discretion, (a) a reasonably accessible electronic network (for which such information required to access the electronic network shall be provided with the notice of the meeting) or (b) during ordinary business hours at the Corporation's principal place of business. If the

meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting during the whole time of the meeting, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

1.6    Quorum. Except as otherwise provided by law, the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation") or these By-Laws, the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation present in person, by means of remote communication, if authorized, or represented by proxy, shall constitute a quorum for the transaction of business.

1.7    Adjournments. Any meeting of stockholders may be adjourned to any other time and to any other place at which a meeting of stockholders may be held under these By-Laws by the stockholders present or represented at the meeting and entitled to vote, although less than a quorum, which hold a majority of the voting power so present or represented or, if no stockholder is present, by any officer entitled to preside at or to act as secretary of such meeting. It shall not be necessary to notify any stockholder of any adjournment of less than thirty (30) days if the time and place of the adjourned meeting are announced at the meeting at which adjournment is taken, unless after the adjournment a new record date is fixed for the adjourned meeting. At the adjourned meeting, the Corporation may transact any business that could have been transacted at the original meeting.

1.8    Voting. Each stockholder shall have one vote for each share of capital stock entitled to vote and held of record by such stockholder, unless otherwise provided by the Delaware General Corporation Law (the "DGCL"), the Certificate of Incorporation or these By-Laws. Each stockholder of record entitled to vote at a meeting of stockholders may vote in person or by electronic means, as determined by the Board of Directors in its sole discretion.

Any stockholder entitled to vote on any matter may vote part of the shares in favor of the proposal and refrain from voting the remaining shares or, except when the matter is the election of directors, may vote them against the proposal; but if the stockholder fails to specify the number of shares that the stockholder is voting affirmatively, it will be conclusively presumed that the stockholder's approving vote is with respect to all shares that the stockholder is entitled to vote.

1.9    Proxy Representation. Every stockholder may authorize another person or persons to act for him by proxy in all matters in which a stockholder is entitled to participate, whether by waiving notice of any meeting, objecting to or voting or participating at a meeting, or expressing consent or dissent without a meeting. The delivery of a proxy on behalf of a stockholder consistent with telephonic or electronically transmitted instructions obtained pursuant to procedures of the Corporation reasonably designed to verify that such instructions have been authorized by such stockholder shall constitute execution and delivery of the proxy by or on behalf of the stockholder. No proxy shall be voted or acted upon after three years from its date unless such proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient

By-laws (3)                                    -2-

in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally. The authorization of a proxy may but need not be limited to specified action, provided, however, that if a proxy limits its authorization to a meeting or meetings of stockholders, unless otherwise specifically provided such proxy shall entitle the holder thereof to vote at any adjourned session but shall not be valid after the final adjournment thereof. A proxy purporting to be authorized by or on behalf of a stockholder, if accepted by the Corporation in its discretion, shall be deemed valid unless challenged at or prior to its exercise, and the burden of proving invalidity shall rest on the challenger.

1.10    Action at Meeting. When a quorum is present at any meeting, a majority of the votes properly cast upon any question shall decide the question, except when a larger vote is required by law, by the Certificate of Incorporation or by these By-Laws. No written ballot shall be required for any election unless requested by a stockholder present or represented at the meeting and entitled to vote in the election.

1.11    Nomination of Directors. Only persons who are nominated in accordance with the procedures set forth in this Section 1.11 shall be eligible for election as directors. The nomination for election to the Board of Directors at a meeting of stockholders may be made by the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at such meeting who complies with the notice procedures set forth in this Section 1.11. Such nominations, other than those made by the Board of Directors, shall be made by notice in writing delivered or mailed by first class United States mail, postage prepaid, to the Secretary, and received at the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that if the annual meeting is not held within thirty (30) days before or after such anniversary date, or in the case of a special meeting, then such nomination shall be delivered or mailed and received by the Secretary not later than the close of business on the tenth day following the date on which the notice of the meeting is mailed or public disclosure is made, whichever occurs first. Such notice shall set forth: (a) as to each proposed nominee, (i) the name, age, business address and, if known, residence address of each such nominee, (ii) the principal occupation or employment of each such nominee, (iii) the class and number of shares of stock of the Corporation that are beneficially owned by each such nominee, (iv) a description of all arrangements or understandings between the stockholder and each nominee and any other person or persons (naming such person or persons) pursuant to which the nominations are to be made by the stockholder, and (v) any other information concerning the nominee that must be disclosed as to nominees in proxy solicitations pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "1934 Act"), including such person's written consent to be named as a nominee and to serve as a director if elected; and (b) as to the stockholder giving the notice, (i) the name and address, as they appear on the Corporation's books, of such stockholder, and (ii) the class and number of shares of the Corporation that are beneficially owned by such stockholder. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as a director of the Corporation.

By-laws (3)                                        -3-

The chair of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not properly brought before the meeting in accordance with the provisions of this Section 1.11, and if he or she should so determine, the chair shall so declare to the meeting and the defective nomination shall be disregarded.

Notwithstanding the foregoing provisions of this Section 1.11, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present a nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such vote may have been received by the Corporation.

Notwithstanding the foregoing provisions of this Section 1.11, a stockholder shall also comply with all applicable requirements of the 1934 Act and the rules and regulations thereunder with respect to the matters set forth in this Section 1.11. Nothing in this Section 1.11 shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the 1934 Act.

1.12   Notice of Business at Annual Meetings. At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be: (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors; (b) otherwise properly brought before the meeting by or at the direction of the Board of Directors; or (c) otherwise properly brought before the meeting by a stockholder. For business to be properly brought before an annual meeting by a stockholder, if such business relates to the election of directors of the Corporation, the procedures in Section 1.11 must be complied with. If such business relates to any other matter, the stockholder must have given timely notice thereof in writing to the Secretary. To be timely, a stockholder's notice must be delivered to or mailed by first class United States mail, postage prepaid, and received by the Secretary at the principal executive offices of the Corporation not less than ninety (90) calendar days nor more than one hundred twenty (120) calendar days in advance of the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that if the annual meeting is not held within thirty (30) days before or after such anniversary date, then for the notice by the stockholder to be timely it must be so received not later than the close of business on the tenth day following the date on which the notice of the meeting was mailed or public disclosure of the meeting was made, whichever occurs first. A stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting: (a) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting; (b) the name and address, as they appear on the Corporation's books, of the stockholder proposing such business; (c) the class and number of shares of the Corporation that are beneficially owned by the stockholder; and (d) any material interest of the stockholder in such business. Notwithstanding anything in these By-Laws to the contrary, no business shall be conducted at any annual meeting except in accordance with the procedures set forth in this Section 1.12, except that any stockholder proposal that complies with Rule 14a-8 of the proxy rules, or any successor provision promulgated under the 1934 Act that is to be included in the Corporation's proxy statement for an annual meeting of stockholders shall be deemed to comply with the requirements of this Section 1.12.

The chair of the meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting in accordance with the provisions of this Section 1.12, and if he or she should so determine, the chair shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

Notwithstanding the foregoing provisions of this Section 1.12, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation.

Notwithstanding the foregoing provisions of this Section 1.12, a stockholder shall also comply with all applicable requirements of the 1934 Act and the rules and regulations thereunder with respect to the matters set forth in this Section 1.12. Nothing in this Section 1.12 shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the 1934 Act.

## ARTICLE 2 - DIRECTORS

2.1     General Powers. The business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors, who may exercise all of the powers of the Corporation except as otherwise provided by law, the Certificate of Incorporation or these By-Laws. In the event of a vacancy in the Board of Directors, the remaining directors, except as otherwise provided by law, may exercise the powers of the full Board of Directors until the vacancy is filled.

2.2     Number; Election and Qualification. The number of directors that shall constitute the whole Board of Directors shall initially be seven (7). Except as otherwise provided by the Certificate of Incorporation, the number of directors that shall constitute the whole Board of Directors shall be established from time to time by resolution of the Board of Directors. The directors shall be elected at the annual meeting of stockholders by such stockholders as have the right to vote on such election. The directors need not be stockholders of the Corporation.

2.3     Term of Office. Each director shall hold office for a term that will expire at the annual meeting of stockholders immediately following such director's election, and until his or her successor shall have been elected, or until his or her sooner death, resignation or removal from office.

2.4     Removal. Any director may be removed, with or without cause, by the affirmative vote of a majority in voting power of the outstanding shares of capital stock of the Corporation cast at a meeting of stockholders called for that purpose.

2.5     Resignation. Any director may resign at any time by delivering his or her written resignation to the Corporation at its principal office or to the Secretary. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

2.6    Vacancies. Any vacancy in the Board, however occurring, including a vacancy resulting from an enlargement of the Board, shall be filled only by a vote of a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

2.7    Regular Meetings. The regular meetings of the Board of Directors may be held without notice at such time and place, either within or without the State of Delaware, as shall be determined from time to time by the Board of Directors; provided, that any director who is absent when such a determination is made shall be given notice of the determination. A regular meeting of the Board of Directors may be held without notice immediately after and at the same place as the annual meeting of stockholders.

2.8    Special Meetings. Special meetings of the Board of Directors may be called by the Chairman of the Board, the Chief Executive Officer, two or more directors, or by one director in the event that there is only a single director in office.

2.9    Notice of Special Meetings. Notice of any special meeting of the Board of Directors shall be given to each director by the Secretary or by the officer or one of the directors calling the meeting. The notices of any special meeting shall state the place, if any, the date, and the hour of the meeting. The notice shall be duly given to each director: (a) by giving notice to such director in person or by telephone at least twenty four (24) hours in advance of the meeting; (b) by sending a telegram, telecopy, electronic mail or other means of electronic transmission, or delivering written notice by hand, to the director's last known business or home address (including any facsimile number or email address) at least twenty four (24) hours in advance of the meeting; or (c) by mailing written notice to the director's last known business or home address at least seventy two (72) hours in advance of the meeting. Notice shall be deemed to have been given at the time when delivered personally or by telephone, at the time of transmission when sent by telegram, telecopy, electronic mail or other means of electronic transmission, or when deposited in the mail when given by mail. A notice or waiver of notice of a special meeting of the Board of Directors need not specify the purposes of the meeting.

2.10    Meetings by Telephone Conference Calls. Any meeting of the Board of Directors or any committee of the Board of Directors may be held by conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear one another. Participation by such means shall be deemed to constitute presence in person at the meeting.

2.11    Quorum. A majority of the total number of directors then in office shall constitute a quorum at all meetings of the Board of Directors. In the event one or more of the directors shall be disqualified to vote at any meeting, then the required quorum shall be reduced by one for each such director so disqualified. Notwithstanding anything to the contrary in the two immediately preceding sentences, a quorum shall not in any case be less than one-third (1/3) of the total number of directors constituting the whole Board of Directors. In the absence of a quorum at any such meeting, a majority of the directors present may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present.

2.12    Action at Meeting. At any meeting of the Board of Directors at which a quorum is present, the vote of a majority of those present shall be sufficient to take any action, unless a different vote is specified by law, the Certificate of Incorporation or these By-Laws.

2.13    Action by Consent. Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee of the Board of Directors may be taken without a meeting, if all members of the Board or committee, as the case may be, consent to the action in writing and the written consents are filed with the minutes of proceedings of the Board of Directors or committee of the Board of Directors, as applicable.

2.14    Committees. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee, to the extent provided in the resolution of the Board of Directors and subject to the provisions of the DGCL, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it. Each such committee shall keep minutes and make such reports as the Board of Directors may from time to time request. Except as the Board of Directors may otherwise determine, any committee may adopt a charter and make rules for the conduct of its business, but unless otherwise provided by the Board of Directors or in such charter or rules, its business shall be conducted as nearly as possible in the same manner as is provided in these By-Laws for the Board of Directors.

2.15    Compensation of Directors. The members of the Board of Directors may be paid such compensation for their services and such reimbursement for expenses of attendance at meetings as the Board of Directors may from time to time determine. No such payment shall preclude any director from serving the Corporation or any of its parent or subsidiary corporations in any other capacity and receiving compensation for such service.

## ARTICLE 3 - OFFICERS

3.1    Enumeration. The officers of the Corporation shall include a Chief Executive Officer, Chief Financial Officer and Secretary. The Board may appoint other officers with such other titles as it may deem appropriate, including, without limitation, President, Treasurer, and one or more Vice Presidents, Assistant Treasurers, Assistant Secretaries, and Controllers.

3.2    Election. The Chief Executive Officer, Chief Financial Officer and Secretary shall be elected annually by the Board at its first meeting following the annual meeting of stockholders. Other officers may be appointed by the Board at such meeting or at any other meeting.

3.3    Qualification. No officer need be a stockholder of the Corporation. Any two or more offices may be held by the same person.

3.4    Term of Office. Except as otherwise provided by law, by the Certificate of Incorporation or by these By-Laws, each officer shall hold office until his or her successor is

By-laws (3)                                    -7-

elected, unless a different term is specified in the vote choosing or appointing him or her, or until his or her sooner death, resignation or removal.

3.5     Resignation and Removal.  Any officer may resign by delivering his or her written resignation to the Corporation at its principal office or to the Chief Executive Officer or Secretary.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event. Any officer may be removed at any time, with or without cause, by vote of the Board of Directors at any regular or special meeting.

3.6     Vacancies.  The Board of Directors may fill any vacancy occurring in any office for any reason and may, in its discretion, leave unfilled for such period as it may determine any offices other than those of Chief Executive Officer, Chief Financial Officer and Secretary.  Each such successor shall hold office for the unexpired term of his or her predecessor and until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal.

3.7     Chairman of the Board.  The Board of Directors may appoint a Chairman of the Board.  If the Board of Directors appoints a Chairman of the Board, he or she shall perform such duties and possess such powers as the Board of Directors may from time to time prescribe.  Unless the Board of Directors otherwise specifies, the Chairman of the Board, or if there is none the Chief Executive Officer, the President or any Vice President, in the order named, shall preside, or designate the person who shall preside, at all meetings of stockholders and of the Board of Directors.

3.8     Chief Executive Officer.  The Chief Executive Officer shall, subject to the direction of the Board of Directors, have general charge and supervision of the business of the Corporation.  The Chief Executive Officer shall perform such other duties and shall have such other powers as the Board of Directors may from time to time prescribe.

3.9     President.  The President, if there is one, shall perform such duties and possess such powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe.  In the event of the absence, inability or refusal to act of the Chief Executive Officer, the President shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of and be subject to all the restrictions upon the office of the Chief Executive Officer.

3.10     Chief Financial Officer.  The Chief Financial Officer shall perform such duties and possess such powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe.  The Chief Financial Officer shall have the custody of the corporate funds and securities; shall keep full and accurate all books and accounts of the Corporation as shall be necessary or desirable in accordance with applicable law or generally accepted accounting principles; shall deposit all monies and other valuable effects in the name and to the credit of the Corporation as may be ordered by the Chairman of the Board or the Board of Directors; shall cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the Board of Directors, at its regular meeting or when the Board of Directors so requires, an account of the Corporation.

3.11    Vice Presidents. Any Vice President shall perform such duties and possess such powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe. In the event of the absence, inability or refusal to act of the President, the Vice President (or if there shall be more than one, the Vice Presidents in the order determined by the Board of Directors) shall perform the duties of the President and when so performing shall have all the powers of and be subject to all the restrictions upon the President. The Board of Directors may assign to any Vice President the title of Executive Vice President, Senior Vice President or any other title selected by the Board of Directors.

3.12    Secretary and Assistant Secretaries. The Secretary shall perform such duties and shall have such powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe. In addition, the Secretary shall perform such duties and have such powers as are incident to the office of the Secretary, including without limitation the duty and power to give notices of all meetings of stockholders and special meetings of the Board of Directors, to attend all meetings of stockholders and the Board of Directors and keep a record of the proceedings, to maintain a stock ledger and prepare lists of stockholders and their addresses as required, to be custodian of corporate records and the corporate seal and to affix and attest to the same on documents.

Any Assistant Secretary shall perform such duties and possess such powers as the Board of Directors, the Chief Executive Officer or the Secretary may from time to time assign. In the event of the absence, inability or refusal to act of the Secretary, the Assistant Secretary (or if there shall be more than one, the Assistant Secretaries in the order determined by the Board of Directors) shall perform the duties and exercise the powers of the Secretary.

In the absence of the Secretary or any Assistant Secretary at any meeting of stockholders or directors, the person presiding at the meeting shall designate a temporary secretary to keep a record of the meeting.

3.13    Treasurer and Assistant Treasurers. The Treasurer, if there is one, shall perform such duties and shall have such powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe.

The Assistant Treasurers shall perform such duties and possess such powers as the Board of Directors, the Chief Executive Officer or the Treasurer may from time to time prescribe. In the event of the absence, inability or refusal to act of the Treasurer, the Assistant Treasurer (or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors) shall perform the duties and exercise the powers of the Treasurer.

3.14    Controllers. Any Controller shall perform such duties and possess such powers as the Board of Directors, the Chief Executive Officer or any Vice President may from time to time prescribe.

3.15    Other Officers, Assistant Officers and Agents. Officers, assistant officers and agents, if any, other than those whose duties are provided for in these By-Laws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

3.16   Salaries. Officers of the Corporation shall be entitled to such salaries, compensation or reimbursement as shall be fixed or allowed from time to time by the Board of Directors or a committee thereof.

## ARTICLE 4 - CAPITAL STOCK

4.1   Issuance of Stock. Subject to the provisions of the Certificate of Incorporation, the whole or any part of any unissued balance of the authorized capital stock of the Corporation or the whole or any part of any balance of the authorized capital stock of the Corporation held in its treasury may be issued, sold, transferred or otherwise disposed of in such manner, for such consideration and on such terms as the Board of Directors may determine.

4.2   Certificates of Stock. Every holder of stock of the Corporation shall be entitled to have a certificate, in such form as may be prescribed by law and by the Board of Directors, certifying the number and class of shares owned in the Corporation. Each such certificate shall be signed by, or in the name of the Corporation by, the Chairman of the Board of Directors, the Chief Executive Officer or the President, and the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation. Any or all of the signatures on the certificate may be a facsimile.

Each certificate for shares of stock that are subject to any restriction on transfer pursuant to the Certificate of Incorporation, the By-Laws, applicable securities laws or any agreement among any number of stockholders or among such holders and the Corporation shall have conspicuously noted on the face or back of the certificate either the full text of the restriction or a statement of the existence of such restriction.

4.3   Transfers. Except as otherwise established by rules and regulations adopted by the Board of Directors, and subject to applicable law, shares of stock may be transferred on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate representing such shares properly endorsed or accompanied by a written assignment or power of attorney properly executed, and with such proof of authority or the authenticity of signature as the Corporation or its transfer agent may reasonably require. Except as may be otherwise required by law, by the Certificate of Incorporation or by these By-Laws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect to such stock, regardless of any transfer, pledge or other disposition of such stock, until the shares have been transferred on the books of the Corporation in accordance with the requirements of these By-Laws.

4.4   Lost, Stolen or Destroyed Certificates. The Corporation may issue a new certificate of stock in place of any previously issued certificate alleged to have been lost, stolen, or destroyed, upon such terms and conditions as the Board of Directors may prescribe, including the presentation of reasonable evidence of such loss, theft or destruction and the giving of such indemnity as the Board of Directors may require for the protection of the Corporation or any transfer agent or registrar.

By-laws (3)                                                    -10-

4.5     Record Date.  The Board of Directors may fix in advance a date as a record date for the determination of the stockholders entitled to notice of or to vote at any meeting of stockholders, or entitled to receive payment of any dividend or other distribution or allotment of any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action.  Such record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action to which such record date relates.

If no record date is fixed, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day before the day on which notice is given, or, if notice is waived, at the close of business on the day before the day on which the meeting is held.  The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating to such purpose.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

4.6     Dividends.  Subject to limitations contained in the DGCL, the Certificate of Incorporation and these By-Laws, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid either in cash, in property or in shares of the capital stock of the Corporation.

## ARTICLE 5 - RECORDS AND REPORTS

5.1     Maintenance and Inspection of Records.  The Corporation shall, either at its principal executive office or at such place or places as designated by the Board of Directors, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these By-Laws as amended to date, accounting books and other records.

The Board of Directors  shall have power from time to time to determine to what extent and at what times and places and under what conditions and regulations the accounts and books of the Corporation, or any of them, shall be open to the inspection of stockholders; and no stockholder shall have any right to inspect any account or book or document of the Corporation except as conferred by the laws of the State of Delaware, except as otherwise provided in these By-Laws or unless and until authorized to do so by resolution of the Board of Directors.

5.2     Inspection by Director.  Any director shall have the right to examine the Corporation's stock ledger, a list of its stockholders and its other books and records for a purpose reasonably related to his or her position as a director.  The Court of Chancery is hereby vested with the exclusive jurisdiction to determine whether a director is entitled to the inspection sought.  The Court may summarily order the Corporation to permit the director to inspect any and all books and records, the stock ledger, and the stock list and to make copies or extracts therefrom.  The Court may, in its discretion, prescribe any limitations or conditions with

By-laws (3)                                          -11-

reference to the inspection, or award such other and further relief as the Court may deem just and proper.

5.3    Representation of Shares of Other Corporations.  The Chief Executive Officer or the Secretary, or any other officer of this Corporation authorized by the Board of Directors is authorized to vote, represent, and exercise on behalf of this Corporation all rights incident to any and all shares or other ownership interests of any other corporation or entity standing in the name of this Corporation.  The authority herein granted may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

## ARTICLE 6 - GENERAL PROVISIONS

6.1    Fiscal Year.  The fiscal year of the Corporation shall end on December 31, except as from time to time otherwise designated by the Board of Directors.

6.2    Corporate Seal.  The corporate seal shall be in such form as shall be approved by the Board of Directors.

6.3    Waiver of Notice.  Whenever any notice is required to be given by law, by the Certificate of Incorporation or by these By-Laws, a waiver of such notice either in writing signed by the person entitled to such notice or such person's duly authorized attorney, or by telegraph, cable, electronic mail or any other available method, whether before, at or after the time of the meeting to which such notice relates, or the appearance of such person or persons at such meeting in person, by means of remote communications, if authorized, or by proxy, shall be deemed equivalent to such notice.  Where such an appearance is made for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened, the appearance shall not be deemed equivalent to notice.

6.4    Corporate Contracts and Instruments; How Executed.  The Board of Directors, except as otherwise provided in these By-Laws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances.  Unless so authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

6.5    Evidence of Authority.  A certificate by the Secretary, any Assistant Secretary, or any temporary secretary, as to any action taken by the stockholders, the Board of Directors, a committee of the Board of Directors, or any officer or representative of the Corporation shall, as to all persons who rely on the certificate in good faith, be conclusive evidence of such action.

6.6    Certificate of Incorporation.  All references in these By-Laws to the Certificate of Incorporation shall be deemed to refer to the Amended and Restated Certificate of Incorporation of the Corporation, as amended or restated and in effect from time to time.

By-laws (3)                                                    -12-

6.7     Transactions with Interested Parties. No contract or transaction between the Corporation and one or more of the directors or officers, or between the Corporation and any other corporation, partnership, association, or other organization in which one or more of the directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or a committee of the Board of Directors that authorizes the contract or transaction or solely because his, her or their votes are counted for such purpose, if:

(1)     The material facts as to his, her or their relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee of the Board of Directors in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum;

(2)     The material facts as to his, her or their relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or

(3)     The contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee of the Board of Directors, or the stockholders.

Interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee that authorizes the contract or transaction.

6.8     Construction; Definitions. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the DGCL shall govern the construction of these By-Laws. Without limiting the generality of this provision, (a) the singular number includes the plural, and the plural number includes the singular; (b) the term "person" includes a corporation, a partnership, an entity and a natural person; and (c) all pronouns include the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

6.9     Provisions Additional to Provisions of Law. All restrictions, limitations, requirements and other provisions of these By-Laws shall be construed, insofar as possible, as supplemental and additional to all provisions of law applicable to the subject matter thereof and shall be fully complied with in addition to the said provisions of law unless such compliance shall be illegal.

6.10     Provisions Contrary to Provisions of Law; Severability. Any article, section, subsection, subdivision, sentence, clause or phrase of these By-Laws that, upon being construed in the manner provided in Section 6.8 hereof, shall be contrary to or inconsistent with any applicable provisions of law, shall not apply so long as said provisions of law shall remain in effect, but such result shall not affect the validity or applicability of any other portions of these By-Laws, it being hereby declared that these By-Laws and each article, section, subsection, subdivision, sentence, clause or phrase thereof, would have been adopted irrespective of the fact

that any one or more articles, sections, subsections, subdivisions, sentences, clauses or phrases is or are illegal.

6.11    Inconsistent Provisions.  In the event that any provision of these By-Laws is or becomes inconsistent with any provision of the Certificate of Incorporation, the provision of these By-Laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

6.12    Section Headings.  Section headings in these By-Laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

ARTICLE 7 - AMENDMENTS

In furtherance of and not in limitation of the powers expressly conferred by statute, the Board of Directors is expressly authorized to adopt, amend and repeal the By-Laws in any manner not inconsistent with the DGCL or the Certificate of Incorporation, subject to the right of the stockholders, upon the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation, to adopt, amend and repeal the By-Laws, including to amend or repeal the By-Laws adopted or amended by the Board of Directors.

By-laws (3)                                                -14-

BY-LAWS

OF

HUYCK LICENSCO INC.

(a Delaware Corporation)

SECTION I.  NAME AND LOCATION

      1.1  Name.  The name of this corporation shall be Huyck Licensco Inc.

      1.2  Registered Office and Agent.  Its registered office shall be located at 1209 Orange Street, Wilmington, Delaware and its registered agent shall be The Corporation Trust Company.

      1.3  Changes.  The name, registered office and registered agent may be changed by the Directors from time to time, subject to the provisions of the Delaware General Corporation Law (hereinafter referred to as the "Law").

      1.4  Places of Business.  Places for the transaction of business shall be located as the Directors may from time to time determine.

SECTION II.  CORPORATE SEAL

      The corporation shall have a corporate seal of the following design:

HUYCK LICENSCO INC.
DELAWARE
1988

SECTION III.  FISCAL YEAR

      The fiscal year of the corporation shall be from January 1 of each year; except as from time to time otherwise provided by the Board of Directors.

## SECTION IV.   CAPITAL STOCK

4.1   Amount.   The amount of authorized capital stock of the corporation, with or without par value, shall be as is set forth in the Certificate of Incorporation, or as are hereafter set forth in amendments to the Certificate of Incorporation.

4.2   Division into Classes.   If the capital stock is divided into more than one class of stock, the description of such classes, including the terms upon which they are created, and the voting rights of each shall be as are set forth in the Certificate of Incorporation, or as are hereafter set forth in amendments to the Certificate of Incorporation.

4.3   Stock Certificates.   Each Stockholder shall be entitled to a certificate stating the number and the class and the designation of the series, if any, of the shares held by him, in such form as shall, in conformity to law, be prescribed from time to time by the Directors.   Such certificate shall be signed by the Chairman, the Vice-Chairman of the Board, the President or a Vice President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary.

4.4   Transfer of Shares of Stock.   Transfers of stock shall be made only in the manner prescribed by the Law. Only persons registered on the books of the corporation as the owners of shares and their personal representatives shall be entitled to receive dividends and to vote as such owners; and furthermore, the corporation, for the purposes of levying calls and assessments, may treat such persons so registered on its books as the owners of the shares registered in their names.   Upon delivery and surrender to the corporation of a stock certificate endorsed as by Law required to transfer title, or accompanied by a written assignment or power of attorney to sell, assign or transfer the same or the shares represented thereby, properly executed, the Secretary shall, subject to any valid restrictions on transfer, register the transferee as the owner of the shares so transferred.

4.5   Record Date.   The Board of Directors may in advance fix a date not more than sixty (60) days nor less than ten (10) days preceding the date of any meeting of stockholders nor more than sixty (60) days prior to the date for the payment of any dividend or the making of any distribution to stockholders, or the last day on which the consent or dissent of stockholders may be effectively expressed for any purpose, as the record date for determining the stockholders having the right to notice of and to vote at such

meeting, and any adjournment thereof, or the right to receive such dividend or distribution or the right to give such consent or dissent.  In such case, only stockholders of record on such date shall have such right, notwithstanding any transfer of stock on the books of the corporation after the record date.

      4.6  Loss of Certificate.  In the event of the loss, theft or destruction of any certificate of stock issued by the corporation, the owner thereof shall be entitled to have a new certificate or uncertificated shares for the same number of shares of stock issued in lieu of said certificate so lost, stolen or destroyed, upon satisfactory proof of ownership and upon the giving of such bond or security to the corporation to indemnify it against any loss, cost, damage or expense which may accrue to it by reason of the issue of said certificate in lieu of the certificate so lost, stolen or destroyed, as the Directors may deem necessary or convenient.

      4.7  Transfer Agent and Registrar.  The Directors may from time to time appoint one or more Transfer Agents and/or one or more Registrars for any class or classes of stock; to provide that stock certificates shall not be valid unless countersigned by any such Transfer Agent or Transfer Agents and/or registered by such Registrar or Registrars; and to give such Transfer Agent or Transfer Agents and/or such Registrar or Registrars such powers and authority as may from time to time be deemed necessary or advisable.

      4.8  Restriction on Transfer of Stock.  The corporation shall have the right in case any Stockholder desires to sell any stock of the corporation to purchase said stock at the lowest price and upon the most lenient terms at which such Stockholder is willing to sell the same before such stock may be sold to any other party.  No sale of any stock to any party other than the corporation shall be valid unless such stock shall have first been so offered in writing to the corporation and unless such offer shall have been rejected or shall not have been acted upon by the corporation within thirty (30) days after such offer is made.  The Directors shall have the power to accept or reject such offer on behalf of the corporation.  Any Stockholder who shall have offered his stock for sale to the corporation in accordance with the foregoing provisions may at any time within sixty (60) days after the rejection of such offer by the corporation, or if the corporation shall neither accept nor reject such offer, then within ninety (90) days after such offer shall have been made to the corporation, sell the stock so offered to the corporation to any other party but not for a price lower nor

upon more lenient terms than that at which such stock shall have been previously offered to the corporation.

## SECTION V.   STOCKHOLDERS

5.1   Voting and Proxies.   Stockholders entitled to vote may vote either in person or by written proxy at all meetings, provided that such proxies are valid under the Law. Unless otherwise provided in the Certificate of Incorporation, each Stockholder is entitled to one vote for each share of stock.

5.2   Annual and Special Meetings.   The annual meetings of Stockholders for the election of Directors and the transaction of such other business as may come before the meeting shall be held at the registered office of the corporation, at any place of business of the corporation, at the office of BTR Inc., or at such other place within or without the State of Delaware as the Directors may hereafter determine, on the first Tuesday of the month which first commences after ninety (90) days from the end of the corporation's fiscal year, except when such day shall be a legal holiday, in which case the annual meeting shall be held on the next business day.   The annual meeting may be held on a different date, earlier or later, without amendment of this provision. Special meetings of the Stockholders shall be called by the Directors or the President.   The officer who has charge of the stock ledger of a corporation shall prepare and make, at least ten (10) days before every meeting of Stockholders, a complete list of the Stockholders entitled to vote at the meeting in accordance with the Law.

5.3   Notice and Waiver.   Written notice of each meeting of stockholders, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days prior to each meeting, to each stockholder or record entitled to vote at such meeting by leaving such notice with him personally or by transmitting such notice with confirmed delivery (including by telex, cable or other form of recorded communication, provided that delivery of such notice in written form is confirmed in a writing) to his residence or usual place of business, or by depositing such notice in the mails in a postage prepaid envelope addressed to him at his post office address as it appears on the corporate records of the Corporation.   Notice of any meeting of stockholders may be waived in writing by all stockholders entitled to vote at such meeting.   Attendance at a meeting by any stockholder shall constitute a waiver of notice of such meeting, except

when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

5.4   Quorum.   The holders of a majority of the stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders except as otherwise specially provided by these By-Laws, by the Certificate of Incorporation or by statute.   The affirmative vote, at a meeting of stockholders duly held and at which a quorum is present, of a majority of the voting power of the shares represented at such meeting which are entitled to vote on the subject matter shall be the act of the stockholders, except as is otherwise specially provided by a By-Law, by the Certificate of Incorporation or by statute.   If less than a majority of such outstanding shares are represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.   At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting.   If the adjournment is for more than thirty (30) days, or if after the adjournment, a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

5.5   Action Without a Meeting.   Any action required or permitted to be taken at a meeting of Stockholders by these Bylaws, may be taken without a meeting if all of the Stockholders entitled to vote thereon consent thereto in writing.   Any such action may be taken without a meeting upon the written consent of less than all of the Stockholders entitled to vote thereon, if the Stockholders who so consent would be entitled to cast at least the minimum number of votes which would be required to take such action at a meeting at which all Stockholders entitled to vote thereon are present and the action pursuant to this section is authorized by the Certificate of Incorporation.   Whenever action is taken pursuant to this section, the written consents of the Stockholders consenting thereto shall be filed with the minutes of the meetings of the Stockholders.   Prompt notice of the taking of corporate action without a meeting by less than unanimous consent shall be given to those stockholders who have not so consented.

## SECTION VI.   BOARD OF DIRECTORS

     6.1   Number.   The property, business and affairs of the corporation shall be managed by a Board of Directors, composed of such number as may from time to time be fixed by the Stockholders, except that there shall never be less than three Directors (unless all the shares of stock in the corporation are owned beneficially and of record by less than three Stockholders, in which event there may be less than three Directors but no less than the number of Stockholders). A Director need not be a Stockholder or a resident of the State of Delaware.

     6.2   Election.   Members of the initial Board of Directors as elected at the organization meeting shall hold office until the first annual meeting of the stockholders and until their successors have been elected and qualified.   At each annual meeting of stockholders, directors shall be elected to hold office until their successors are elected and qualified or until their earlier resignation or removal.

     6.3   Tenure.   Each Director shall hold office for the term for which he is elected and until his successor shall have been elected and qualified, or until his earlier death, resignation, removal, ineligibility or disqualification.

     6.4   Removal.   Any Director may be removed with or without cause by the Stockholders at any time, or by the Directors with cause at any time, except that any Director who is elected by any class or series of shares or holders of bonds which vote as a class may be removed only for cause and only by the applicable vote of the holders of such shares or bonds, voting as a class.   In the case of the corporation having cumulative voting, if less than the entire board is to be removed, no Director may be removed without cause if the votes against his removal would be sufficient to elect him if then cumulatively voted at an election of the entire Board of Directors, or, if there be a class of Directors, at an election of the class of Directors of which he is a part.

     6.5   Resignations.   Any Director may resign his office at any time, such resignation to be made in writing and to take effect from the time of its receipt by the corporation, unless some other but later time be fixed in the resignation, and then from that time.   The acceptance of a resignation shall not be required to make it effective.

     6.6   Powers.   Except as reserved to the Stockholders by the Law, by the Certificate of Incorporation or by

these Bylaws, the business of the corporation shall be managed by the Directors who shall have and may exercise all the powers of the corporation. In particular, and without limiting the generality of the foregoing, the Directors may, at any time, fix the compensation of Directors, issue all or from time to time any part of the unissued capital stock of the corporation from time to time authorized under the Certificate of Incorporation, and may determine, subject to the requirements of the Law and the Certificate of Incorporation, consideration for which stock is to be issued, the manner of allocating such consideration between capital and surplus, and, in the case of preferred or special classes of stock, the division of same into series and the relative rights and preferences of any series established by the Directors.

6.7   Committees.  The Directors may, by vote of a majority of the Directors then in office, elect from their number an executive committee and other committees and may by vote delegate to any such committee or committees some or all of the powers of the Directors except those which by the Law, by the Certificate of Incorporation or by these Bylaws they are prohibited from delegating. Except as the Directors may otherwise determine, any such committee may make rules for the conduct of its business, but unless otherwise provided by the Directors or such rules, its business shall be conducted as nearly as may be in the same manner as is provided by these Bylaws for the conduct of business by the Directors. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.

6.8   Regular and Special Meetings.  The annual meeting, regular and special meetings of the Directors for the election of officers and/or the transaction of such other business as may come before the Directors shall be held at such place, within or without the State of Delaware, as may be determined by the Directors. The annual meeting shall be held as soon as is convenient after the annual meeting of the Stockholders at which the Directors are elected and after each annual meeting of the Stockholders.

6.9   Meetings by Telephone Conference Circuit. Meetings of the Directors may be held by means of a telephone conference circuit or other similar communications and connection to such circuit or other means of communication shall constitute presence at such meetings.

6.10   Action Without a Meeting.   Any action which may be taken or is required to be taken at a meeting of the Directors or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed before or after such action by all of the Directors, or committee members as the case may be.

6.11   Place, Time and Notice of Meetings.   Regular and special meetings of the Board of Directors shall be held at any reasonable and suitable place upon the giving of twenty-four (24) hours notice, oral, written or by telephone to each Director.   Meetings shall be called by the Chairman, Vice-Chairman, President or Secretary of the corporation. Attendance at a meeting by a Director shall constitute a waiver of notice of such meeting, except when a Director attends solely to object to the transaction of business on the basis that the meeting was not lawfully called or convened.   The purpose of the meeting need not be stated in any notice thereof.

6.12   Quorum.   One-third of the number of Directors then holding office shall constitute a quorum for the transaction of business unless otherwise provided in the Certificate of Incorporation.   The act of the majority of Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors unless the act of a greater number is required by the Certificate of Incorporation or these Bylaws.

## Section VII.   OFFICERS AND AGENTS

7.1   Enumeration; Qualification.   The officers of the corporation shall be a President, a Treasurer, a Secretary, and such other officers, including a Chairman and Vice-Chairman of the Board of Directors, Vice-Presidents, Assistant Treasurers, Assistant Secretaries, as the Directors from time to time may, in their discretion, elect or appoint. The corporation may also have such agents, if any, as the Directors from time to time may, in their discretion, appoint.   Any officer may be but need not be a Director or Stockholder.   Any two or more offices may be held by the same person.   Any officer may be required by the Directors to give bond for the faithful performance of his duties to the corporation in such amount and with such sureties as the Directors may determine.

7.2   Powers.   Subject to the Law, the Certificate of Incorporation and the other provisions of these Bylaws, each officer shall have, in addition to the duties and powers herein set forth, such duties and powers as are commonly

incident to his office and such duties and powers as the Directors may from time to time designate. Securities of other corporations held by the Corporation may be voted by any officer designated by the Board and, in the absence of any such designation, by the President, any Vice-President, the Secretary or the Treasurer. The Board may require any officer, agent or employee to give security for the faithful performance of his duties.

7.3 Election. The President, the Vice-Presidents, the Treasurer and the Secretary shall be elected annually by the Directors at their first meeting following the annual meeting of the Stockholders, unless a vacancy occurs, in which event such vacancy may be filled at any time by the Directors. Other officers, if any, may be elected or appointed by the Directors at said meeting or at any other time.

7.4 Tenure. The President, the Vice-Presidents, the Treasurer, and the Secretary shall hold office until the first meeting of the Directors following the next annual meeting of the Stockholders and until their respective successors are chosen and qualified, and each other officer shall hold office until the first meeting of the Directors following the next annual meeting of the Stockholders, unless a shorter period shall have been specified by the terms of his election or appointment, or in each case until his earlier death, resignation, removal or disqualification. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Each agent shall retain his authority at the pleasure of the Directors.

7.5 Chairman and Vice-Chairman. The Chairman of the Board of Directors shall preside at all meetings of the Directors. The Vice-Chairman of the Board of Directors shall act as Chairman and be vested with his powers and authority in his absence or in the event of the Chairman's inability to serve or perform his duties.

7.6 President and Vice-Presidents. Except as otherwise voted by the Directors, the President shall be the chief executive officer of the corporation and, subject to the control of the Directors, shall have general charge and supervision of the business of the corporation. The President shall preside at all meetings of the Stockholders and, in the absence of a Chairman and Vice-Chairman, of the Directors at which he is present, except as otherwise voted by the Directors. Any Vice-President shall have such duties and

powers as shall be designated from time to time by the Directors.

7.7  **Treasurer and Assistant Treasurers**.  The Treasurer shall be the chief financial and accounting officer of the corporation and shall be in charge of its funds and valuable papers, books of account and accounting records, and shall have such other duties and powers as may be designated from time to time by the Directors or by the President.  Any Assistant Treasurers shall have such duties and powers as shall be designated from time to time by the Directors.

7.8  **Secretary and Assistant Secretaries**.  The Secretary shall record all proceedings of the Stockholders and Directors in a book to be kept therefor, which book shall be kept at the principal office of the corporation, at the office of its transfer agent or of its Secretary, or at the office of its legal counsel.  In the absence of the Secretary from any meeting of the Stockholders, an Assistant Secretary, or, if there be none or he is absent, a temporary Secretary chosen at the meeting, shall record the proceedings thereof in the aforesaid book.  Unless a transfer agent has been appointed, the Secretary shall keep or cause to be kept the stock and transfer records of the corporation, which shall contain the names and record addresses of all Stockholders and the amount of stock held by each.  The Secretary shall keep a true record of the proceedings of all meetings of the Directors and, in his absence from any such meeting, an Assistant Secretary, or, if there be none or he is absent, a temporary Secretary chosen at the meeting, shall record the proceedings thereof.  Any Assistant Secretary shall have such duties and powers as shall be designated from time to time by the Directors.

7.9  **Resignations**.  Any officer may resign at any time by delivering his resignation in writing to the President, the Treasurer or the Secretary or to a meeting of the Directors.  Such resignation shall be effective upon receipt unless specified to be effective at some other later time, at which date it shall become effective.  The acceptance of a resignation shall not be required to make it effective.

**SECTION VIII.  INDEMNIFICATION**

The corporation shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware.

## SECTION IX.   EXECUTION OF PAPERS

Unless in a particular case the Directors may also authorize others to do so, all contracts, mortgages, leases, deeds, transfer and other conveyances of the real or personal property of the corporation, all promissory notes, acceptances, checks, drafts, orders or other obligations of the corporation for the payment of money, all bonds, licenses, returns, reports, applications, and all other instruments or writings of any nature, shall be signed, executed, acknowledged, and delivered for and on behalf of the corporation by the President, any Vice-President or the Treasurer.

## X.   AMENDMENTS

To the extent permitted by the Law, these Bylaws may be added to, amended or repealed at any meeting of the Stockholders or at any meeting of the Board of Directors, provided that any amendments made by the Directors may be changed by the Stockholders.

**UNANIMOUS WRITTEN CONSENT
OF THE SOLE STOCKHOLDER AND
BOARD OF DIRECTORS OF
HUYCK LICENSCO, INC.**

The undersigned, Sole Stockholder and Board of Directors of

Huyck Licensco, Inc., a Delaware corporation (the "Corporation"), hereby

take the following action by written consent and adopt the following resolutions:

**RESOLVED:** That the attached grid note from the Corporation to BTR Dunlop Finance Inc., pursuant to which the Corporation has borrowed $5,388,000 as of July 30, 1991, is hereby ratified and confirmed as having been duly authorized and in the best interests of the Corporation.

**RESOLVED:** That the Corporation by any two, acting jointly, of the President, any Vice President or the Treasurer (the "Officers") of the Corporation is authorized and empowered to borrow money from BTR Dunlop Finance Inc. in such amounts, for such loan periods, at such interest rates and other terms and conditions and to execute and deliver all documents and do all things in connection therewith as any two of the Officers, acting jointly, may in their discretion deem advisable and in the best interests of the Corporation.

**RESOLVED:** That the Officers and any other person, designated in writing by any two Officers as having authority to act on behalf of the Corporation regarding these resolutions shall be deemed "Authorized Signatories" for purposes of the following resolutions.

**RESOLVED:** That the establishment of accounts for the deposit, retention, disbursement, and/or transfer of funds of the Corporation ("Bank Accounts") with banks and other financial institutions hereby are authorized and any two, acting jointly, of the Authorized Signatories, at least one of whom must be an Officer, are authorized and empowered to execute and deliver on behalf of the Corporation agreements, documents and instruments (which may or may not designate Authorized Signatories)

-2-

in connection with the establishment and/or continuation of such Bank Accounts, provided, however, that such agreements, documents and instruments shall not be inconsistent with the procedures and limitations on the exercise of authority over such Bank Accounts set forth in the following resolutions.

RESOLVED: That all authority over, and relating to, such Bank Accounts shall be exercised on behalf of the Corporation only by the manual signatures of any two jointly of the Authorized Signatories, at least one of whom must be an Officer, except that authority over payroll accounts may be exercised by any one Authorized Signatory.

RESOLVED:  That endorsements, powers of attorney, assignments and all agreements and documents made and issued in accordance with Bank Accounts adopted pursuant to these resolutions will continue until written notice of revocation has been given to and received by the appropriate financial institution.

RESOLVED:  That in order to effectuate the intent of the foregoing resolutions and without further action by the Board of Directors of the Corporation, any resolutions in the form prescribed by financial institutions are hereby deemed adopted in such form as of the date hereof, or as of some other later date as the Secretary, but not any Assistant Secretary, of the Corporation may select, with the same force and effect as if set forth herein in full, together with such modifications, renewals, confirmations, deletions, insertions and variations thereof as the Secretary, but not any Assistant Secretary, of the Corporation may, in his discretion, deem advisable, necessary or convenient and in the best interests of the Corporation, including such as shall from time to time be requested by such institutions, and the Secretary, but not any Assistant Secretary, of the Corporation, acting singly, is hereby authorized to execute and certify to the adoption of such resolutions, which will have been completed in accordance with the intent of the foregoing resolutions and which resolutions shall be thereafter inserted in the

-3-

Minutes of the proceedings of the Directors of the Corporation.

<u>RESOLVED:</u> That the provision, if any, in the By-Laws of the Corporation relating to indemnification of directors, officers and employees is hereby deleted and the following provision is substituted therefore, or if the By-Laws of the Corporation before the adoption of this resolution did not contain a provision for indemnification of directors, officers and employees the following provision is added to the By-Laws, effective as of the date of this resolution:

<u>Indemnification of Directors, Officers and Employees.</u> The Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to any action, suit or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that such person or such person's testator or intestate is or was a director, officer or employee of the Corporation or serves or served at the request of the Corporation in any other enterprise as a director, officer or employee. Expenses incurred by any such person in defending any such action, suit or proceeding shall be paid or reimbursed by the Corporation promptly upon receipt by it of an undertaking of such person to repay such expenses if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation. The rights provided to any person by this by-law shall be enforceable against the Corporation by such person who shall be presumed to have relied upon it in serving or continuing to serve as a director, officer or employee as provided above. No amendment of this by-law shall impair the rights of any person arising at any time with respect to events occurring prior to such amendment. For purposes of this by-law, the term "Corporation" shall include any predecessor of the Corporation and any constituent corporation (including any constituent of a constituent) absorbed by the Corporation in a consolidation or merger; the term "other enterprise" shall include any corporation, partnership, joint venture, trust or employee benefit plan; and service "at the request of the Corporation" shall include, without

-4-

limitation, service as a director, officer or employee of the Corporation which imposes duties on, or involves services by, such director, officer or employee with respect to an employee benefit plan, its participants or beneficiaries.

This consent is effective as of August 21, 1991.

HUYCK CORPORATION
Sole Stockholder

_____
Vice President

_____
Director

_____
Director

HUYCK LICENSCO INC.
a Delaware corporation

WRITTEN CONSENT OF THE SOLE STOCKHOLDER
IN LIEU OF A SPECIAL MEETING

The undersigned, being the sole stockholder of HUYCK LICENSCO INC., a Delaware corporation (the "Corporation"), in lieu of holding a special meeting of stockholders, does hereby take the following actions and adopts the following resolutions by written consent without a meeting pursuant to Section 228(a) of the General Corporation Law of the State of Delaware:

1.      Election of Board of Directors

RESOLVED, that pursuant to Section 141(k) of the Delaware General Corporation Law, the sole stockholder hereby removes the entire Board of Directors of the Corporation, effective immediately;

FURTHER RESOLVED, that the first sentence of Article 6.1 of the By-laws of the Corporation be, and it hereby is, amended to read as follows: "The number of directors which shall constitute the whole board shall be fixed from time to time by resolution of the Board of Directors or the stockholders, but shall not be less than two nor more than five."

FURTHER RESOLVED, that the number of directors that shall constitute the whole board be, and it hereby is, fixed at two; and

FURTHER RESOLVED, that Mr. Michael D. Collins and Mr. Manuel Tarano be, and they each hereby are, elected as members of the Board of Directors effective immediately, and shall serve for the remainder of the term as provided in the By-laws of the Corporation and until their successors shall have been duly elected and qualified, or until their earlier resignation or removal.

The actions taken by this Sole Stockholder Consent shall have the same force and effect as if taken at a special meeting of the stockholder of the Corporation, duly called and constituted, pursuant to the By-laws of the Corporation and the laws of the State of Delaware.

933412.02