- 18 -

(3)    The term "contracts, documents or instruments in writing" as used in this by-law shall include deeds, mortgages, hypothecs, charges, conveyances, transfers and assignments of property, real or personal, immoveable or moveable, agreements, releases, receipts and discharges for the payment of money or other obligations, conveyances, transfers and assignments of shares, warrants, bonds, debentures or other securities and all paper writings.

(4)    In particular, without limiting the generality of the foregoing, any one of the directors or officers of the Corporation are hereby authorized to sell, assign, transfer, exchange, convert or convey all shares, bonds, debentures, rights, warrants or other securities owned by or registered in the name of the Corporation and to sign and execute (under the seal of the Corporation or otherwise) all assignments, transfers, conveyances, powers of attorney and other instruments that may be necessary for the purpose of selling, assigning, transferring, exchanging, converting or conveying or enforcing or exercising any voting rights in respect of any such shares, bonds, debentures, rights, warrants or other securities.  Where the Corporation has only one director and officer, being the same person, that person may perform the functions and exercise the powers herein contemplated.

## AUDITOR

66.    At each annual meeting of the shareholders of the Corporation an auditor may be appointed for the purpose of auditing and verifying the accounts of the Corporation for the then current year and his report shall be submitted at the next annual meeting of the shareholders. The auditor shall not be a director or an officer of the Corporation. Unless fixed by the meeting of shareholders at which he is appointed, the remuneration of the auditor shall be determined from time to time by the directors.

## FISCAL YEAR

67.    The fiscal period of the Corporation shall terminate on such day in each year as the directors may from time to time by resolution determine.

## BORROWING

68.    General Borrowing. The directors may from time to time:

(a)    borrow money upon the credit of the Corporation;

(b)    issue, reissue, sell or pledge debt obligations of the Corporation;

(c)    give a guarantee on behalf of the Corporation to secure performance of an obligation of any person; and

(d)    mortgage, hypothecate, pledge or otherwise create a security interest in all or any property of the Corporation, owned or subsequently acquired, to secure any obligation of the Corporation.

The directors may from time to time authorize any director or directors, or officer or officers, of the Corporation, to make arrangements with reference to the money borrowed or to be borrowed

- 19 -

as aforesaid, and as to the terms and conditions of the loan thereof, and as to the securities to be given therefor, with power to vary or modify such arrangements, terms and conditions and to give such additional securities for any moneys borrowed or remaining due by the Corporation as the directors of the Corporation may authorize, and generally to manage, transact and settle the borrowing of money by the Corporation.

* * * * * * * * * * * * * * * * * *

ENACTED by the sole shareholder of the Corporation on the 1st day of January, 2008.

_____
Donald R. Walker
Secretary

* * * * * * * * * * * * * * * * * *

APPROVED, RATIFIED AND CONFIRMED by the sole shareholder of the Corporation on 1st day of January, 2008.

XERIUM V (US) LIMITED

By:_____
Donald R. Walker
Vice President and Assistant Secretary

3615204.1

# Erklärung über die Errichtung der Gesellschaft

# (Gesellschaftsvertrag)

# der

# HUYCK.WANGNER Austria GmbH

§ 1

Firma der Gesellschaft

Die Firma der Gesellschaft lautet:

HUYCK.WANGNER Austria GmbH

§ 2

Sitz der Gesellschaft

Der Sitz der Gesellschaft ist Gloggnitz, Niederösterreich.

§ 3

Dauer der Gesellschaft

Die Gesellschaft ist auf unbestimmte Zeit errichtet.

§ 4

Gegenstand des Unternehmens

1. Gegenstand des Unternehmens ist die fabriksmäßige Erzeugung und Verarbeitung von Filztuchen, Wollwaren, Garnen, Gespinsten, Geweben, Gewirken und Geflechten aus Material jeder Art sowie der Handel mit diesen Waren.

2. Die Gesellschaft ist zu allen Geschäften und Maßnahmen berechtigt, die zur Erreichung des Gesellschaftszweckes notwendig oder nützlich erscheinen, insbesondere zum Erwerb von Liegenschaften, zur Errichtung von Zweigniederlassungen und Tochtergesellschaften im In- und Ausland sowie zur Beteiligung an anderen Unternehmen.

- 2 -

§ 5

Stammkapital und Stammeinlagen

1.  Das Stammkapital der Gesellschaft beträgt € 6.178.000,00 (Euro sechs Millionen einhundertachtundsiebzigtausend).

2.  Die Stammeinlagen sind zur Gänze bar eingezahlt.

§ 6

Geschäftsanteile

1.  Die Teilung, Übertragung und Verpfändung von Geschäftsanteilen bedarf der Zustimmung der Gesellschafter.

2.  Die Ausgabe von nicht stimmberechtigten Geschäftsanteilen ist untersagt.

§ 7

Geschäftsjahr

Die Geschäftsjahre sind die Kalenderjahre.

§ 8

Organe der Gesellschaft

Die Organe der Gesellschaft sind die Geschäftsführer, der Aufsichtsrat und die Generalversammlung.

§ 9

Geschäftsführer

1.  Die Gesellschafter bestellen durch Beschluss einen oder mehrere Geschäftsführer.

2.  Ist nur ein Geschäftsführer bestellt, so vertritt dieser die Gesellschaft allein. Sind mehrere Geschäftsführer bestellt, so wird die Gesellschaft durch zwei Geschäftsführer oder durch einen Geschäftsführer und einen Prokuristen gemeinsam vertreten. Die Gesellschaft kann mit den gesetzlichen Einschränkungen auch durch zwei Prokuristen vertreten werden.

- 3 -

Die Generalversammlung kann bestimmen, dass einzelne Geschäftsführer allein zur Vertretung der Gesellschaft befugt sein sollen.

3.    Die Gesellschafter haben, wenn mehrere Geschäftsführer bestellt sind, die Verteilung der Geschäfte zwischen den Geschäftsführern zu bestimmen, sowie die Geschäfte festzulegen, die ihrer Zustimmung bedürfen.

§ 10
Aufsichtsrat

Die Generalversammlung kann einen Aufsichtsrat bestellen; geschieht dies, dann gelten folgende Bestimmungen:

1.    Zusammensetzung des Aufsichtsrates:

a)    Der Aufsichtsrat besteht aus mindestens drei bis zwölf von der Generalversammlung gewählten Mitgliedern.

b)    Die Funktionsperiode des Aufsichtsrates währt jeweils längstens bis zur Beschlussfassung über den vierten Jahresabschluss nach der Wahl.

c)    Scheidet ein Aufsichtsratsmitglied während der Dauer seiner Funktionsperiode aus dem Aufsichtsrat aus, dann ist eine Ersatzwahl nur erforderlich, wenn durch das Ausscheiden die Zahl der Aufsichtsratsmitglieder unter drei sinkt.

d)    Die Funktionsperiode eines auf diese Weise gewählten Aufsichtsratsmitgliedes endet gleichzeitig mit der Funktionsperiode der übrigen Mitglieder, soweit die Gesellschafter nicht etwas anderes beschließen.

e)    Jedes Mitglied des Aufsichtsrates kann sein Amt unter Einhaltung einer vierwöchigen Frist auch ohne wichtigen Grund mit schriftlicher Anzeige niederlegen.

f)    Der Aufsichtsrat wählt in einer im Anschluss an die ordentliche Generalversammlung abzuhaltenden Sitzung in der ein oder mehrere Mitglieder in den Aufsichtsrat gewählt wurden und zu der es keiner besonderen Einladung bedarf,

- 4 -

aus seiner Mitte einen Vorsitzenden und einen oder zwei Stellvertreter.

g) Erhält bei einer Wahl keiner die absolute Mehrheit, so erfolgt eine Stichwahl zwischen denjenigen, welche die meisten Stimmen erhalten haben.

h) Willenserklärungen des Aufsichtsrates und seiner Ausschüsse sind vom Vorsitzenden des Aufsichtsrates, im alle seiner Verhinderung von einem seiner Stellvertreter, abzugeben.

2. Sitzungen und Beschlussfassungen des Aufsichtsrates:

a) Der Aufsichtsrat hat sich seine Geschäftsordnung selbst zu geben.

b) Zu den Sitzungen des Aufsichtsrates beruft der Vorsitzende, im Falle seiner Verhinderung einen Stellvertreter, die Mitglieder unter der zuletzt bekannt gegebenen Anschrift brieflich, mittels Telefax oder E-Mail ein.

c) Der Aufsichtsrat ist beschlussfähig, wenn mindestens drei Mitglieder, darunter der Vorsitzende oder ein Stellvertreter, anwesend sind. Der Vorsitzende, im Fall seiner Verhinderung ein Stellvertreter, leitet die Sitzung. Die Art der Abstimmung bestimmt der Leiter der Sitzung.

d) Beschlüsse werden mit einfacher Mehrheit der abgegebenen Stimmen gefasst. Im Falle der Stimmengleichheit entscheidet — auch bei Wahlen — die Stimme des Leiters die Sitzung.

e) An den Sitzungen des Aufsichtsrates können mit Zustimmung des Aufsichtsrates auch nicht dem Aufsichtsrat angehörige Personen anstelle der Aufsichtsratmitglieder teilnehmen, wenn sie von diesen hiezu schriftlich ermächtigt sind. Ein von der Sitzung abwesendes Aufsichtsratsmitglied kann mit schriftlicher Vollmacht ein anderes Mitglied, das an der Sitzung teilnimmt, zur Ausübung seines Stimmrechts bei allen der Sitzung unterbreiteten Angelegenheiten oder zur Überreichung seiner Stimmabgabe ermächtigen.

f) Über die Verhandlungen und Beschlüsse des Aufsichtsrates ist eine Niederschrift anzufertigen, die vom Leiter der Sitzung zu unterzeichnen ist.

- 5 -

g)   Beschlüsse können auch auf schriftlichem Wege gefasst werden, wenn der Vorsitzende oder im Falle seiner Verhinderung ein Stellvertreter eine solche Beschlussfassung anordnet und kein Mitglied des Aufsichtsrates diesem Verfahren widerspricht.

Für die schriftliche Stimmabgabe gelten die Bestimmungen von lit. d) entsprechend.

3.   Ausschüsse des Aufsichtsrates:

a)   Der Aufsichtsrat kann aus seiner Mitte Ausschüsse bilden. Ihre Aufgaben, Befugnisse und deren Geschäftsordnungen werden vom Aufsichtsrat festgesetzt; den Ausschüssen kann auch die Befugnis zu Entscheidungen übertragen werden.

b)   Die Bestimmungen des Absatzes 2 (zwei) lit. b) bis g) gelten sinngemäß auch für die Ausschüsse des Aufsichtsrates. Besteht ein Ausschuss nur aus zwei Mitgliedern, so ist der Ausschuss nur beschlussfähig, wenn beide Mitglieder anwesend sind.

4.   Zustimmungspflichtige Geschäfte:

Folgende in § 30j Absatz (5) des Gesetzes über Gesellschaften mit beschränkter Haftung bezeichneten Geschäfte sollen unabhängig von der Betragshöhe nur mit Zustimmung des Aufsichtsrates vorgenommen werden:

a)   der Erwerb und die Veräußerung von Beteiligungen (§ 228 UGB) sowie Erwerb, Veräußerung und Stilllegung von Unternehmen und Betrieben;

b)   die Gewährung von Darlehen und Krediten an Unternehmen, die nicht der Xerium Gruppe angehören;

c)   die Aufnahme von Anleihen, folgende Geschäfte nur, sofern die nachfolgend festgelegten Betragsgrenzen überschritten werden;

d)   € 7 Millionen (Euro sieben Millionen) für Investitionen im einzelnen und € 18 Millionen (Euro achtzehn Millionen) insgesamt in einem Geschäftsjahr;

e)   € 7 Millionen (Euro sieben Millionen) im einzelnen und € 18 Millionen (Euro

- 6 -

achtzehn Millionen) insgesamt in einem Geschäftsjahr für die Aufnahme von Darlehen und Krediten;

f)   € 18 Millionen (Euro achtzehn Millionen) für die Gewährung von Darlehen und Krediten an Unternehmen, die der Xerium Gruppe, angehören.

## § 11
### Generalversammlung

1   Die Generalversammlung wird durch die Geschäftsführer oder den Aufsichtsrat einberufen und am Sitze der Gesellschaft oder in einer österreichischen Landeshauptstadt abgehalten.

2.   Den Vorsitz in der Generalversammlung führt der von den Gesellschaftern dazu Bestimmte; haben sie keinen Vorsitzenden bestellt oder ist der Bestellte nicht erschienen oder nicht zur Leitung der Versammlung bereit, so leitet die Generalversammlung der an Jahren älteste Teilnehmer. Der Vorsitzende der Generalversammlung leitet die Verhandlungen und bestimmt die Reihenfolge die Art der Gegenstände der Tagesordnungen sowie die Art der Abstimmung.

3.   Sofern das Gesetz nicht zwingend eine andere Mehrheit vorschreibt, beschließt die Generalversammlung mit einfacher Mehrheit der abgegebenen Stimmen. Wenn sämtliche Gesellschafter damit einverstanden sind, kann eine Beschlussfassung auch auf schriftlichem Weg erfolgen, wobei die erforderliche Mehrheit nicht nach der Zahl der abgegebenen, sondern nach der Gesamtzahl der allen Gesellschaftern zustehenden Stimmen berechnet wird.

4.   Die Ausübung des Stimmrechtes durch Bevollmächtigte ist nur mit schriftlicher Vollmacht möglich.

5.   Die gesetzlichen Minderheitsrechte stehen, soweit gesetzlich zulässig, Gesellschaftern zu, deren Stammeinlagen den zwanzigsten Teil des Stammkapitals erreichen.

## § 12
### Jahresabschluss

1.   Innerhalb der ersten fünf Monate eines jeden Geschäftsjahres haben die Geschäftsführer für das vergangene Geschäftsjahr den Jahresabschluss samt Anhang und Lagebericht aufzustellen.

- 7 -

2. Die Generalversammlung beschließt alljährlich die Genehmigung des Jahresabschlusses, Verteilung des Reingewinnes und die Entlastung der Geschäftsführer sowie der Mitglieder des Aufsichtsrates, falls ein Aufsichtsrat bestellt wurde (ordentliche Generalversammlung).

## § 13
### Gewinnverteilung

1. Der Reingewinn, der sich nach Vornahme der Vorschreibungen, Wertberichtigungen, sowie nach Bildung von Rückstellungen und Rücklagen ergibt, unterliegt der Verteilung durch Gesellschafterbeschluss.

2. Die Gewinnanteile der Gesellschafter werden im Verhältnis der eingezahlten Stammeinlagen verteilt.

3. Die Gewinnanteile sind, falls die Generalversammlung nichts anderes beschlossen hat, dreißig Tage nach Abhaltung der Generalversammlung zur Zahlung fällig. Binnen drei Jahren nach Fälligkeit nicht behobene Gewinnanteile der Gesellschafter verfallen zugunsten der Gesellschaft.

## § 14
### Bekanntmachungen

Die Bekanntmachungen der Gesellschaft und unter den Gesellschaftern erfolgen durch eingeschriebene Briefe an die Gesellschafter, und zwar an deren der Gesellschaft zuletzt bekannt gegebenen Adresse.

## § 15
### Ergänzungsbestimmungen

Soweit in diesem Vertrag keine besonderen Bestimmungen getroffen wurden, gelten ergänzend die Bestimmungen des Gesetzes über die Gesellschaft mit beschränkter Haftung (GmbH-Gesetz) in seiner jeweils aktuellen Fassung.

# Gesellschaftsvertrag

## der

## Xerium Germany Holding GmbH

### Artikel 1
### Firma und Sitz der Gesellschaft

(1) Die Firma der Gesellschaft lautet

Xerium Germany Holding GmbH.

(2) Die Gesellschaft hat ihren Sitz in Reutlingen.

### Artikel 2
### Gegenstand der Gesellschaft

(1) Gegenstand des Unternehmens der Gesellschaft ist die unternehmerische Führung von Tochterunternehmen sowie die Erbringung von Dienstleistungen im Zusammenhang mit dem Betrieb elektronischer Datenverarbeitungssysteme, die Beteiligung an anderen Gesellschaften und das Halten und Verwalten von Geschäftsanteilen.

(2) Innerhalb dieses Gegenstands der Gesellschaft ist die Gesellschaft berechtigt, weitere Unternehmen innerhalb Deutschlands oder im Ausland zu errichten, bestehende zu erwerben oder sich an ihnen zu beteiligen, Unternehmen zu leiten und/oder Zweigstellen oder Tochtergesellschaften in Deutschland oder im Ausland zu errichten.

(3) Die Gesellschaft ist weiterhin zur Vornahme aller Handlungen berechtigt, die für die Gesellschaft vorteilhaft sind oder sein könnten und nicht gesetzlich verboten sind, insbesondere Patente, Warenzeichen, Lizenzen, Franchise Verträge und alle anderen

#570262

2

gegenständlichen und immateriellen Eigentumsrechte zu erwerben, zu benutzen, zu übertragen oder zu verkaufen sowie Grundstücke und Rechte an Grundstücken zu erwerben, zu verkaufen, zu mieten oder mit Hypotheken zu belasten.

**Artikel 3**

**Dauer**

Die Gesellschaft wird auf unbestimmte Zeit errichtet.

**Artikel 4**

**Geschäftsjahr**

Das Geschäftsjahr ist das Kalenderjahr.

Die Zeit vom 1. Juli 2004 bis zum 31. Dezember 2004 ist ein Rumpfgeschäftsjahr.

**Artikel 5**

**Stammkapital; Geschäftsanteile**

(1)    Das Stammkapital der Gesellschaft beträgt Euro 25.100,00 (in Worten: Euro fünfundzwanzigtausendeinhundert).

(2)    Die Ausgabe von stimmrechtslosen Geschäftsanteilen ist ausgeschlossen.

**Artikel 6**

**Geschäftsführung und Vertretung der Gesellschaft**

#570262

(1)    Die Gesellschaft wird durch einen oder mehrere Geschäftsführer vertreten, die durch einen Gesellschafterbeschluss mit einfacher Mehrheit ernannt oder abberufen werden.

(2)    Falls mehrere Geschäftsführer ernannt sind, wird die Gesellschaft durch zwei Geschäftsführer gemeinsam oder durch einen Geschäftsführer zusammen mit einem Prokuristen vertreten. Die Gesellschafter können jedoch bestimmen, dass einer oder mehrere oder alle Geschäftsführer die Gesellschaft einzeln vertreten können. Falls nur ein Geschäftsführer bestellt ist, vertritt er die Gesellschaft allein.

(3)    Die Gesellschafter können einen oder mehrere Geschäftsführer von den Beschränkungen des § 181 BGB befreien.

**Artikel 7**

**Veröffentlichungen**

Veröffentlichungen der Gesellschaft erfolgen nur im Bundesanzeiger.

**Artikel 8**

**Gründungskosten**

Die durch die Gründung der Gesellschaft verursachten Notar-, Gerichts- und Veröffentlichungskosten und Steuern trägt die Gesellschaft bis zu einem Betrag von Euro 1.500,00.

#570262

**S T A T U T O**

===============

## DENOMINAZIONE - OGGETTO - SEDE - DURATA

1.  E' costituita una società  per azioni con la denominazione


" XERIUM ITALIA S.p.A."


2.  La Società ha per oggetto, in via prevalente, lo svolgimento di attività di natura finanziaria, incluso l'assunzione, sia direttamente che indirettamente, di interessenze e partecipazioni in altre società e/o  imprese e/o enti costituiti o costituendi, non nei confronti del pubblico ma unicamente nei confronti di società controllate o collegate ai sensi dell'art. 2359 c.c.

La Società ha altresì per oggetto, sempre non nei confronti del pubblico e comunque riguardo alle società controllanti, controllate o collegate, di una o più delle seguenti attività:
-   concessione di finanziamenti sotto qualsiasi forma;
-   servizi di incasso, pagamento e trasferimento fondi, con conseguente addebito ed accredito dei relativi oneri ed interessi;
-   coordinamento tecnico, amministrativo e finanziario delle  società controllanti, controllate o collegate;
-   raccolta di fondi presso i propri soci, sotto forma di mutui con o senza interessi, in ottemperanza alle disposizioni di legge e nel rispetto della deliberazione C.I.C.R. del 3 marzo 1994 e delle altre norme di legge e regolamenti di volta in volta applicabili;
-   prestazione di avalli, fideiussioni ed ogni altra garanzia, anche reale.

Sono in ogni caso tassativamente escluse:

-   l'attività di locazione finanziaria;
-   le attività professionali riservate;
-   la sollecitazione del pubblico risparmio ai sensi delle vigenti norme;
-   l'esercizio nei confronti del pubblico delle attività di cui all'articolo 106 del Decreto legislativo 1 settembre 1993 n. 385; l'erogazione del credito al consumo, e ciò anche nell'ambito dei propri soci, secondo quanto disposto dal Ministero del Tesoro con decreto del 27 settembre 1991, pubblicato sulla Gazzetta Ufficiale n. 227;
-   le attività di cui alla legge 2 gennaio 1991 n. 1;
-   le attività di cui al D. L. 20 novembre 1990 n. 356;
-   l'attività di factoring di qualsiasi tipo, rientrante o meno nel disposto della legge 21 febbraio 1991 n. 52.

Al fine di realizzare l'oggetto sociale, la Società potrà inoltre, in via non prevalente, compiere tutte le operazioni commerciali, industriali, mobiliari ed immobiliari, nel rispetto della corrente normativa legale e regolamentare, ritenute dall'Organo Amministrativo necessarie od utili ed in particolare, la produzione, l'acquisto, la vendita, l'importazione, l'esportazione, l'immagazzinaggio, l'assemblaggio e, in genere, il commercio, sia in proprio che quale rappresentante, agente o commissionaria di altre ditte o imprese, anche estere, di qualsiasi genere di prodotto comunque collegato con la produzione della carta. La Società potrà inoltre, acquistare o cedere, concedere od accettare licenze d'uso di brevetti industriali, know how e diritti di proprietà industriale e commerciale in genere.

3.      La Società ha la sede legale in Milano.

        La Società potrà istituire, in Italia ed all'estero, sedi secondarie, filiali, succursali, agenzie e rappresentanze.

4.      Il domicilio dei soci, per quel che concerne i loro rapporti con la Società, è quello che risulta dal libro dei soci.

5.      La durata della Società è stabilita sino al  31 dicembre 2100 e può essere prorogata.

## CAPITALE

6.      Il capitale sociale è di Euro 6.759.320 ed è suddiviso in  6.759.320 azioni ordinarie del valore nominale di Euro 1 cadauna. La Società non potrà emettere azioni prive di diritto di voto.

7.      I versamenti sulle azioni non liberate sono richiesti dall'Organo Amministrativo nei termini e nei modi da esso ritenuti convenienti, fermo il disposto dell'art. 2344 del Codice Civile.

8.      In caso di esuberanza del capitale, l'Assemblea Straordinaria può deliberarne la riduzione, oltre che nei modi stabiliti dall'art. 2482 C.C., anche mediante assegnazione a singoli soci o gruppi di soci di determinate attività sociali.

## ASSEMBLEA

9.      La convocazione dell'Assemblea è fatta a cura dell'Organo Amministrativo mediante avviso comunicato agli azionisti con qualsiasi mezzo che garantisca la prova dell'avvenuto ricevimento tra cui lettera raccomandata, fax o messaggio di posta elettronica, almeno 15 giorni prima dell'assemblea. L'avviso deve contenere l'indicazione del giorno, dell'ora e del luogo dell'adunanza, nonché dell'elenco delle materie da trattare. Nello stesso avviso potrà essere fissata per altro giorno la seconda adunanza o successiva adunanza, qualora la prima andasse deserta.

        L'avviso di convocazione dell'Assemblea può essere sottoscritto da persona delegata dall'Organo Amministrativo.

        E', tuttavia, valida l'Assemblea non convocata a norma delle procedure sopra indicate qualora venga rappresentato l'intero capitale sociale e partecipi all'Assemblea stessa,

anche mediante mezzi di telecomunicazione, anche la maggioranza dei componenti dell'organo amministrativo e dei componenti del collegio sindacale.

10. L'Assemblea è ordinaria o straordinaria ai sensi di legge e di Statuto.

Essa può essere convocata anche in luogo diverso dalla sede sociale purché in Italia, in qualunque paese dell'Unione Europea e negli U.S.A.

Quando particolari esigenze relative alla struttura ed all'oggetto della società lo richiedano, l'Assemblea Ordinaria per l'approvazione del bilancio può essere convocata entro 180 giorni dalla chiusura dell'esercizio sociale.

L'Assemblea potrà svolgersi anche in più luoghi, contigui o distanti, e sarà possibile intervenire in Assemblea mediante mezzi di telecomunicazione tra cui mezzi di audio/video collegamento. L'Assemblea dovrà, in ogni caso, svolgersi con modalità tali che tutti coloro che hanno il diritto di parteciparvi possano rendersi conto in tempo reale degli eventi, formare liberamente il proprio convincimento ed esprimere liberamente e tempestivamente il proprio voto. Il verbale dovrà dare atto delle modalità in cui si è svolta l'Assemblea.
Verificandosi questi requisiti l'Assemblea si considererà tenuta nel luogo in cui si trova il Presidente e dove pure deve trovarsi il segretario onde consentire la stesura e la sottoscrizione dei verbali sul relativo libro.

11. Il Presidente dell'Assemblea e il segretario che lo assiste, anche non soci, sono designati a maggioranza dei soci intervenuti all'Assemblea.

Il Presidente dell'Assemblea verifica il diritto di intervento all'Assemblea e la regolarità delle deleghe.

12. Le deliberazioni dell'Assemblea ordinaria e straordinaria dei soci saranno validamente prese con le maggioranze stabilite dall'art. 2368 C.C. e, in caso di seconda  o successiva convocazione, dall'art. 2369 C.C..

Quando per la validità delle deliberazioni la legge ritiene sufficiente la maggioranza assoluta dei voti, essa viene calcolata senza che si tenga conto delle astensioni dal voto.

13. Le nomine alle cariche sociali così come tutte le altre delibere si fanno per votazione palese.

### AMMINISTRAZIONE

14. La Società è amministrata da un Amministratore Unico o da un Consiglio composto da due (2) ad undici (11) membri anche non soci, eletti dall'Assemblea Ordinaria dei soci, che determina anche il numero dei componenti del Consiglio e la durata della carica sia degli stessi che, a seconda dei casi, dell'Amministratore Unico.

L'Amministratore Unico o i consiglieri restano in carica per tre (3) esercizi, salvo diversa disposizione della delibera di nomina che può anche stabilire scadenze diverse

del mandato di singoli consiglieri e comunque per un periodo non superiore a tre (3) esercizi; decadono e si sostituiscono a norma di legge, e possono essere rieletti.

In caso di scadenza per qualunque causa del mandato, l'Organo Amministrativo resterà peraltro in carica fino a che l'Assemblea Ordinaria avrà deliberato in merito al suo rinnovo e sarà intervenuta l'accettazione da parte di almeno metà dei nuovi consiglieri.

15. Qualora per dimissioni o per altra causa venga a mancare, prima della scadenza del mandato, più della metà dei consiglieri in carica, o, nel caso in cui il Consiglio di Amministrazione sia composto da due membri e per dimissioni o per altra causa venga a mancare uno dei due membri, l'intero Consiglio s'intende scaduto e deve convocarsi senza ritardo l'Assemblea ordinaria per l'elezione di un nuovo Organo Amministrativo.

Nel Consiglio di Amministrazione composto di due membri il dissenso sulla revoca del Consigliere Delegato determina la decadenza dell'intero Consiglio.

16. Ove non sia già stato eletto dall'Assemblea ordinaria il Consiglio elegge per votazione palese fra i suoi membri il Presidente. Può eleggere anche uno o più Vice-Presidenti.

Il segretario, anche non consigliere o non socio, viene designato dai consiglieri intervenuti a ciascuna riunione del Consiglio.

17. Il Consiglio si raduna sia presso la sede sociale, sia altrove, in Italia o in qualunque altro luogo designato dagli amministratori, anche mediante mezzi di telecomunicazione.

Le riunioni del Consiglio di Amministrazione sono convocate dal Presidente o da un Vice-Presidente allorché sia necessario o qualora ne sia fatta richiesta scritta da almeno un consigliere. Le formalità di convocazione del Consiglio possono essere delegate ad un terzo, anche non consigliere o non socio, per conto del Presidente o di un Vice-Presidente.

18. Il Consiglio viene convocato con lettera raccomandata da spedirsi almeno sette (7) giorni prima della adunanza a ciascun consigliere e sindaco effettivo e, nei casi di urgenza, con telegramma, e-mail o telefax da spedirsi ai medesimi almeno ventiquattro (24) ore prima dell'adunanza.

Tuttavia, anche in mancanza di dette formalità, il Consiglio potrà validamente deliberare qualora siano presenti, anche mediante mezzi di telecomunicazione, tutti i consiglieri e sindaci effettivi in carica.

19. Per la validità delle deliberazioni del Consiglio è necessaria la presenza, effettiva o mediante mezzi di telecomunicazione, della maggioranza dei consiglieri in carica. Il Consiglio di Amministrazione può riunirsi e validamente deliberare anche mediante mezzi di telecomunicazione, tra cui mezzi di audio/video collegamento, purché la riunione si svolga con modalità tali che tutti coloro che hanno il diritto di parteciparvi possano rendersi conto in tempo reale degli eventi, formare liberamente il proprio convincimento ed esprimere liberamente e tempestivamente il proprio voto.

Verificandosi questi requisiti il consiglio di amministrazione si considererà tenuto nel luogo in cui si trova il Presidente e dove pure deve trovarsi il segretario onde consentire la stesura e la sottoscrizione dei verbali sul relativo libro. In caso di parità di voti prevale il voto di chi presiede.

In assenza del Presidente e di Vice-Presidenti la riunione è presieduta dal consigliere designato a maggioranza dagli intervenuti. Le deliberazioni sono prese a maggioranza assoluta di voti dei presenti.

Le deliberazioni del Consiglio devono essere verbalizzate nel libro dei verbali delle riunioni del Consiglio, o, qualora ciò non sia immediatamente possibile, in un documento firmato da chi presiede la riunione e dal segretario designato per la medesima. In questo ultimo caso il verbale deve essere trascritto nel libro dei verbali delle riunioni del Consiglio e, qualora fosse redatto in lingua straniera, deve essere previamente tradotto in lingua italiana sotto la responsabilità di chi presiede la riunione. Il verbale trascritto nel libro dei verbali delle riunioni del Consiglio deve in ogni caso essere sottoscritto da chi presiede la riunione e dal segretario designato per la medesima.

20.    L'Organo Amministrativo ha i più ampi poteri per la gestione ordinaria e straordinaria della Società, ed ha facoltà di compiere tutti gli atti che ritenga opportuni per l'attuazione dell'oggetto sociale, esclusi soltanto quelli che la legge riserva inderogabilmente alla competenza dell'Assemblea.

21.    Il Consiglio di Amministrazione può delegare parte delle proprie attribuzioni, congiuntamente o disgiuntamente, a norma dell'art. 2381 del Cod. Civ.

22.    L'Organo Amministrativo può nominare direttori, institori e procuratori negoziali delegando ai medesimi, congiuntamente o disgiuntamente, il potere di compiere determinati atti o categorie di atti in nome e per conto della Società, con eventuale facoltà di subdelega.

23.    Le eventuali obbligazioni dei legali rappresentanti, dei consiglieri di amministrazione e dei procuratori della società derivanti da sanzioni tributarie non penali e connesse spese ed onorari legali, che siano state applicate nei loro confronti in relazioni a violazioni di norme tributarie compiute nell'esercizio di funzioni loro delegate, sono assunte dalla società entro i limiti di legge, ed in particolare entro i limiti fissati dall'art. 11 comma 6° del D.L.G.S. 18.12.97 n. 472, come modificato dal DLV n. 203/1998, salvo che tali violazioni risultino commesse con dolo o colpa grave, così come attualmente definiti all'art. 5, comma 3°, del D.L.G.S. 18.12.1997 n. 472, come modificato dal DLV n. 203/1998. In caso di ulteriori modifiche legislative il richiamo si intenderà effettuato alla norma di legge in vigore al momento della commissione della violazione. L'assunzione da parte della società, e la relativa manleva a favore dell'obbligato, saranno efficaci a condizione che i suddetti legali rappresentanti, amministratori e procuratori (a) abbiano prontamente dato comunicazione alla società del provvedimento di irrogazione delle sanzioni; (b) si siano conformati alle legittime istruzioni della società concernenti tali sanzioni, con riguardo in particolare all'eventuale opposizione o alla quiescenza rispetto alle stesse; (c) abbiano collaborato pienamente con la società nella difesa dei relativi procedimenti dinanzi a qualsiasi competente autorità amministrativa o giurisdizionale.

## RAPPRESENTANZA DELLA SOCIETA'

24.    La rappresentanza della Società, nei confronti di terzi ed anche in giudizio, spetta, a seconda dei casi, all'Amministratore Unico o al Presidente del Consiglio di Amministrazione. Essa spetta anche ai Vice Presidenti e all'Amministratore Delegato, ove nominati, a ciascuno dei Consiglieri nei limiti dei poteri ad essi conferiti,  nonché a coloro cui venga, di volta in volta, conferita dall'Organo Amministrativo.

## CONTROLLO CONTABILE

25.    Il Collegio Sindacale è composto da tre Sindaci effettivi e due supplenti, nominati ai sensi di legge, i quali durano in carica tre esercizi, sono rieleggibili e scadono alla data dell'assemblea convocata per l'approvazione  del bilancio relativo al terzo esercizio della carica.
Le funzione del Collegio Sindacale sono determinate dalla legge.
L'Assemblea che procede alla nomina designerà il Presidente del Collegio Sindacale e fisserà la retribuzione dei Sindaci.

L'Assemblea ordinaria  può  stabilire  altresì che il controllo contabile venga affidato al Collegio Sindacale oppure ad un revisore contabile o ad una Società di revisione.
Nel caso in cui il controllo contabile venga affidato al Collegio Sindacale, tutti i sindaci dovranno essere revisori contabili iscritti nel Registro istituito presso il Ministero di Giustizia.
Qualora la società sia tenuta alla redazione del bilancio consolidato, il controllo contabile  deve essere attribuito ad un revisore contabile o da una Società di revisione; nel caso in cui la Società faccia ricorso al mercato del capitale di rischio, il controllo contabile verrà affidato ad una Società di Revisione. L'Assemblea fisserà la retribuzione e la durata dell'incarico del revisore contabile o della Società di Revisione che comunque non potrà essere superiore a tre esercizi e scadrà alla data dell'assemblea convocata per l'approvazione del bilancio relativo al terzo esercizio dell'incarico.
Le funzioni della Società di Revisione o del Revisore Contabile sono determinati dalla legge.

## ESERCIZI SOCIALI ED UTILI

26.    Gli esercizi sociali si chiudono al 31 dicembre di ogni anno.

27.    Gli utili netti di ciascun esercizio, dopo prelevata una somma non inferiore al 5% per la Riserva Legale, fino a che questa non abbia raggiunto il 20% del capitale sociale, possono essere accantonati o distribuiti agli azionisti o destinati ad altri scopi nell'interesse della Società con deliberazione dell'Assemblea Ordinaria dei soci.

28.    Il pagamento dei dividendi è effettuato nei termini e modi stabiliti dall'Assemblea Ordinaria che ne delibera la distribuzione o, in mancanza, dall'Organo Amministrativo.

Il diritto al pagamento dei dividendi la cui distribuzione sia stata deliberata ai sensi del comma precedente si prescrive nel termine di cinque (5) anni.

## SCIOGLIMENTO E LIQUIDAZIONE

29. Addivenendosi in qualsiasi tempo e per qualsiasi causa allo scioglimento della Società, l'Assemblea stabilisce le modalità della liquidazione e nomina uno o più Liquidatori determinandone i poteri.

   Il bilancio finale di liquidazione approvato con voto unanime dall'Assemblea Ordinaria, costituita con la presenza di tutti i soci, non è soggetto a reclamo e si intende approvato ai fini dell'art. 2454 del Cod. Civ. anche se non sia compiuto il termine ivi previsto.

## RINVIO

30. Tutto quanto non è specificatamente previsto dal presente Statuto è regolato dalle disposizioni di legge vigenti.

## SCHEDULE 1.83

**Restated Charters of each Reorganized Debtor**

STATE OF DELAWARE

RESTATED CERTIFICATE OF AMENDMENT

OF

XERIUM TECHNOLOGIES, INC.

The name of the corporation is XERIUM TECHNOLOGIES, INC (the "Corporation"). XERIUM TECHNOLOGIES, INC., a corporation organized and existing under the laws of the State of Delaware, hereby certifies that this Second Amended and Restated Certificate of Incorporation, which has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware, as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Xerium Technologies, Inc. and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on October 29, 2002, under the name Xerium Holdings Inc.  Pursuant to a Certificate of Amendment dated April 2, 2004, as corrected pursuant to a Certificate of Correction dated July 28, 2004, each filed with the Secretary of the State of Delaware, the name of the Corporation was changed to Xerium Technologies, Inc.  An Amended and Restated Certificate of Incorporation was filed with the Secretary of the State of Delaware on May 13, 2005.

Xerium Technologies, Inc. hereby amends and restates its certificate of incorporation as follows:

## ARTICLE I

The name of the Corporation is Xerium Technologies, Inc.

## ARTICLE II

The registered office of the Corporation in the State of Delaware is located at 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.  The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

USActive 18780356.2

The total number of shares of all classes of stock that this Corporation shall have authority to issue is 21,000,000 shares, consisting of (i) 20,000,000 shares of Common Stock, $0.001 par value per share (the "Common Stock") and (ii) 1,000,000 shares of Preferred Stock, $0.001 par value per share (the "Preferred Stock").

The Corporation shall not issue any non-voting equity securities as contemplated by section 1123(a)(6) of Title 11 of the United States Code.

The whole or any part of any unissued balance of the authorized capital stock of the Corporation, including the whole or any part of any unissued balance of the authorized capital stock of the Corporation held in its treasury, may be issued, sold, transferred or otherwise disposed of in such manner, for such consideration and on such terms as the Board of Directors may determine.

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of this Corporation.

1.     Common Stock.

    A.     General. The voting, dividend and liquidation rights of the holders of the Common Stock are subject to and qualified by the rights of the holders of the Preferred Stock of any series as may be designated by the Board of Directors upon issuance of any such Preferred Stock. The holders of the Common Stock have no preemptive rights to subscribe for any shares of any class of stock of the Corporation whether now or hereafter authorized.

    B.     Voting. The holders of the Common Stock are entitled to one vote for each share of Common Stock held at all meetings of stockholders.

    C.     Number. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority in voting power of the then outstanding shares of capital stock of the Corporation.

    D.     Dividends. Except as otherwise provided in the By-Laws of the Corporation, dividends may be declared and paid on the Common Stock from funds lawfully available therefore as and when determined by the Board of Directors.

    E.     Liquidation. Upon the dissolution or liquidation of the Corporation, whether voluntary or involuntary, holders of Common Stock will be entitled to receive and will share ratably in all assets of the Corporation available for distribution to its stockholders, subject to any preferential rights of any then outstanding Preferred Stock.

2.      Preferred Stock.

Preferred Stock may be issued from time to time in one or more series, each of such series to have such terms as stated or expressed herein and in the resolution or resolutions providing for the issue of such series adopted by the Board of Directors as hereinafter provided. Any shares of Preferred Stock which may be redeemed, purchased or acquired by the Corporation may be reissued except as otherwise provided by law or this Certificate of Incorporation. Different series of Preferred Stock shall not be construed to constitute different classes of shares for the purposes of voting by classes unless expressly provided in the resolution or resolutions providing for the issue of such series adopted by the Board of Directors as hereinafter provided.

Authority is hereby expressly granted to the Board of Directors from time to time to issue the Preferred Stock in one or more series, and in connection with the creation of any such series, by resolution or resolutions providing for the issue of the shares thereof, to determine and fix such voting powers, full or limited, or no voting powers, and such designations, preferences and relative participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation thereof, dividend rights, conversion rights, redemption privileges and liquidation preferences, as shall be stated and expressed in such resolutions, all to the full extent now or hereafter permitted by the DGCL. Without limiting the generality of the foregoing, the resolutions providing for issuance of any series of Preferred Stock may provide that such series shall be superior or rank equally or be junior to the Preferred Stock of any other series to the extent permitted by law and this Certificate of Incorporation. Except as otherwise provided in this Certificate of Incorporation, no vote of the holders of the Preferred Stock or Common Stock shall be a prerequisite to the designation or issuance of any shares of any series of the Preferred Stock authorized by and complying with the conditions of this Certificate of Incorporation, the right to have such vote being expressly waived by all present and future holders of the capital stock of the Corporation.

Notwithstanding anything to the contrary contained herein, no shares of Preferred Stock may be issued by the Corporation that would be deemed to be non-voting equity securities as contemplated by section 1123(a)(6) of Title 11 of the United States Code.

ARTICLE V

The Corporation shall have a perpetual existence.

ARTICLE VI

In furtherance of and not in limitation of the powers expressly conferred by statute, the Board of Directors is expressly authorized to adopt, amend and repeal the By-Laws of the Corporation in any manner not inconsistent with the DGCL or this Certificate of Incorporation, subject to the right of the stockholders, upon the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation, to adopt, amend and repeal the By-Laws, including to amend or repeal the By-Laws adopted or amended by the Board of Directors. Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then

outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Article VI.

## ARTICLE VII

The directors of the Corporation shall be entitled to the benefits of all limitations on the liability of directors generally that are now or hereafter become available under the DGCL. Without limiting the generality of the foregoing, to the fullest extent from time to time permitted by law, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. No amendment or repeal of this Article VII, or adoption of any provision to this Certificate of Incorporation which is inconsistent with this Article VII, shall eliminate or reduce or otherwise adversely affect any right or protection of a director of the Corporation existing hereunder in respect of any act or omission occurring prior to such amendment, repeal or adoption.  Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Article VII.

## ARTICLE VIII

1.     Indemnification.  The Corporation shall, to the maximum extent permitted under the DGCL and except as set forth below, indemnify, hold harmless, and, upon request, advance expenses to each person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was, or has agreed to become, a director or officer of the Corporation, or, while a director or officer of this Corporation, is or was serving, or has agreed to serve, at the request of the Corporation, as a director, manager, officer, partner, employee, agent or trustee of, or in a similar capacity with, another corporation, partnership, joint venture, trust or other enterprise, including any employee benefit plan (all such persons being referred to hereafter as an "Indemnitee"), or by reason of any action alleged to have been taken or omitted in such capacity, against all expenses (including attorneys' fees), judgments, fines and amounts paid in settlement incurred (and not otherwise recovered) by such person or on behalf of such person, in connection with such action, suit or proceeding and any appeal therefrom, if such person acted in good faith and in a manner such person reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful.  Notwithstanding anything to the contrary in this Article VIII, the Corporation shall not indemnify an Indemnitee seeking indemnification in connection with any action, suit, proceeding, claim or counterclaim, or part thereof, initiated by the Indemnitee unless the initiation thereof was approved by the Board of Directors of the Corporation.

Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Section 1 of this Article VIII.

2.      Advance of Expenses.   Notwithstanding any other provisions of this Certificate of Incorporation, the By-Laws, or any agreement, vote of stockholders or disinterested directors, or arrangement to the contrary, the Corporation shall advance payment of expenses incurred by an Indemnitee in advance of the final disposition of any matter, but only to the extent such advance is not prohibited by applicable law and, then, only upon receipt of an undertaking by or on behalf of the Indemnitee to repay amounts so advanced in the event that it shall ultimately be determined that the Indemnitee is not entitled to be indemnified by the Corporation as authorized in this Article VIII.   Such undertaking may be accepted without reference to the financial ability of the Indemnitee to make such repayment.   Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Section 2 of this Article VIII.

3.      Subsequent Amendment.   No amendment, termination or repeal of this Article VIII or of the relevant provisions of the DGCL or any other applicable laws shall affect or diminish in any way the rights of any Indemnitee to indemnification under the provisions hereof with respect to any action, suit, proceeding or investigation arising out of or relating to any actions, omissions, transactions or facts occurring prior to the final adoption of such amendment, termination or repeal.

4.      Other Rights.   The Corporation may, to the extent authorized from time to time by its Board of Directors, grant indemnification rights to other employees or agents of the Corporation or other persons serving the Corporation and such rights may be equivalent to, or greater or less than, those set forth in this Article VIII.

5.      Merger or Consolidation.   If the Corporation is merged into or consolidated with another corporation and this Corporation is not the surviving corporation, the surviving corporation shall assume the obligations of this Corporation under this Article VIII with respect to any action, suit, proceeding or investigation arising out of or relating to any actions, omissions, transactions or facts occurring prior to the date of such merger or consolidation.

6.      Savings Clause.   If this Article VIII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each Indemnitee as to any expenses, including attorneys' fees, judgments, fines and amounts paid in settlement in connection with any action, suit, proceeding or investigation, whether civil, criminal or administrative, including an action by or in the right of the Corporation, to the fullest extent permitted by any applicable portion of this Article VIII that shall not have been invalidated and to the fullest extent permitted by applicable law.

7.      Scope of Article.   Indemnification and advancement of expenses, as authorized by the preceding provisions of this Article VIII, shall not be deemed exclusive of any other rights to

which those seeking indemnification or advancement of expenses may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office. The indemnification and advancement of expenses provided by or granted pursuant to this Article VIII shall continue as to a person who has ceased to serve in the capacity which causes such person to be an Indemnitee and shall inure to the benefit of the heirs, executors and administrators of such a person.

8.      Insurance.  The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, trustee, employee or agent of another corporation, partnership, joint venture, trust or other enterprise or is or was otherwise serving the Corporation against all expenses (including attorney's fees), judgments, fines or amounts paid in settlement incurred by such person in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article.

9.      Reliance.  Persons who after the date of the adoption of this provision become or remain Indemnitees shall be conclusively presumed to have relied on the rights to indemnity, advance of expenses and other rights contained in this Article VIII in entering into or continuing such service.  The rights to indemnification and to the advance of expenses conferred in this Article VIII shall apply to claims made against an Indemnitee arising out of acts or omissions which occurred or occur both prior and subsequent to the adoption of this Certificate of Incorporation.

## ARTICLE IX

The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute and this Certificate of Incorporation, and all rights conferred upon stockholders herein are granted subject to this reservation.

## ARTICLE X

This Article is inserted for the management of the business and for the conduct of the affairs of the Corporation.

1.      Number of Directors.  The number of directors of the Corporation shall not be less than three. The exact number of directors, subject to the limitation specified in the preceding sentence, shall be fixed from time to time by, or in the manner provided in, the By-Laws of the Corporation, and may not be divided into classes. Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Section 1 of this Article X.

2.      Election of Directors.  Elections of directors need not be by written ballot, unless and except to the extent that the By-Laws shall so require.

3.      Terms of Office.  Each director shall hold office for a term that will expire at the annual meeting of stockholders immediately following such director's election, and until his or her successor shall have been elected, or until his or her sooner death, resignation or removal from office.

4.      Vacancies.  Any vacancy in the Board of Directors, however occurring, including a vacancy resulting from an enlargement of the Board, shall be filled only by a vote of a majority of the directors then in office, although less than a quorum, or by a sole remaining director.  A director elected to fill a vacancy shall hold office until the next annual meeting of stockholders, and until his or her successor shall have been elected, or until his or her sooner death, resignation or removal from office.

5.      Stockholder Nominations and Introduction of Business, Etc.   Advance notice of stockholder nominations for election of directors and other business to be brought by stockholders before either an annual or special meeting of stockholders shall be given in the manner provided by the By-Laws of this Corporation.

6.      Quorum.  Except as otherwise provided by law or this Certificate of Incorporation, the holders of a majority in voting power of the then outstanding shares of capital stock of the Corporation present in person, by means of remote communication, if authorized, or represented by proxy, shall constitute a quorum for the transaction of business at any meeting of the stockholders.  Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Section 6 of this Article X.

7.      Stockholder Action by Written Consent.  At any time during which a class of capital stock of this Corporation is registered under Section 12 of the Securities Exchange Act of 1934 or any similar successor statute, stockholders of the Corporation may not take any action by written consent in lieu of a meeting.  Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Section 7 of this Article X.

ARTICLE XI

Except as otherwise provided in the By-Laws, the stockholders of the Corporation and the Board of Directors may hold their meetings and have an office or offices outside of the State of Delaware and, subject to the provisions of the laws of said State, may keep the books of the Corporation outside of said State at such places as may, from time to time, be designated by the Board of Directors or by the By-Laws of this Corporation.

ARTICLE XII

The Board of Directors of the Corporation, when evaluating any offer of another party to make a tender or exchange offer for any equity security of the Corporation, shall, in connection with the exercise of its judgment in determining what is in the best interests of the Corporation as

a whole, be authorized to give due consideration to any such factors as the Board of Directors determines to be relevant, including without limitation: (i) the interests of the stockholders of the Corporation; (ii) whether the proposed transaction might violate federal or state laws; (iii) the consideration being offered in the proposed transaction, in relation to any of (a) the then current market price for the outstanding capital stock of the Corporation, (b) the market price for the capital stock of the Corporation over a period of years, (c) the estimated price that might be achieved in a negotiated sale of the Corporation as a whole or in part or through orderly liquidation, (d) the premiums over market price for the securities of other corporations in similar transactions, (e) current political, economic and other factors bearing on securities prices and (f) the Corporation's financial condition and future prospects; and (iv) the social, legal and economic effects upon employees, suppliers, customers and others having similar relationships with the Corporation, and the communities in which the Corporation conducts its business.

In connection with any such evaluation, the Board of Directors is authorized to conduct such investigations and to engage in such legal proceedings as the Board of Directors may determine.

## ARTICLE XIII

Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, any provision of this Certificate of Incorporation requiring the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation.  Notwithstanding any provision of law, this Certificate of Incorporation or the By-Laws, each as amended, the affirmative vote of at least two-thirds in voting power of the then outstanding shares of capital stock of the Corporation shall be required to amend or repeal, or to adopt any provisions inconsistent with the purposes or intent of, this Article XIII.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed on its behalf by _____ its duly elected _____, this ____ day of _____, _____.

**XERIUM TECHNOLOGIES, INC.**

By:_____

Name:
Title:

STATE OF DELAWARE

RESTATED CERTIFICATE OF AMENDMENT

OF

HUYCK LICENSCO INC.

The name of the corporation is HUYCK LICENSCO INC (the "Corporation"). HUYCK LICENSCO INC., a corporation organized and existing under the laws of the State of Delaware, hereby certifies that this Amended and Restated Certificate of Incorporation, which has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware, as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Huyck Licensco Inc. and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on December 5, 1988.

Huyck Licensco Inc. hereby amends and restates its certificate of incorporation as follows:

ARTICLE 1

The name of the corporation is Huyck Licensco Inc. (the "Corporation").

ARTICLE 2

The address of its registered office in the State of Delaware is 1209 Orange Street, in the County of New Castle, Wilmington, Delaware, and the name of its registered agent at such address is The Corporation Trust Company.

ARTICLE 3

The nature of the business or purposes to be conducted or promoted are:

To engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware; and

In general, to possess and exercise all the powers and privileges granted by the General Corporation Law of The State of Delaware or by any other law of Delaware or by this certificate of incorporation, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business or purposes of the Corporation.

ARTICLE 4

The total number of shares of stock which the Corporation shall have authority to issue is one thousand (1,000) shares of Common Stock, par value $.10 per share, amounting in the aggregate to one hundred dollars ($100).

The Corporation shall not issue any non-voting equity securities as contemplated by section 1123(a)(6) of Title 11 of the United States Code.

ARTICLE 5

The name and mailing address of the incorporator is Mary Jo Cisternino, c/o Cummings & Lockwood, Ten Stamford Forum, P.O. Box 120, Stamford, Connecticut 06904.

ARTICLE 6

The Board of Directors is expressly authorized to exercise all powers granted to the directors by law except insofar as such powers are limited or denied herein or in the By-Laws of the Corporation. In furtherance of such powers, the Board of Directors shall have the right to make, alter or repeal the By-Laws of the Corporation.

ARTICLE 7

Meetings of stockholders may be held within or without the State of Delaware, as the By-Laws may provide.  The books of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the By-Laws of the Corporation.  Elections of directors need not be by written ballot unless the By-Laws of the Corporation shall so provide.

ARTICLE 8

Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or between the Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of Title 8 of the Delaware Code, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such a manner as the said court directs.  If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application is made, be binding upon all of the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the Corporation, as the case may be, and also on the Corporation.

## ARTICLE 9

No director shall have any personal liability to the Corporation or its stockholders for any monetary damages for breach of fiduciary duty as a director, except that this Article shall not eliminate or limit the liability of each director (i) for any breach of such director's duty of loyalty to the Corporation or its stockholder, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which such director derived an improper personal benefit.

## ARTICLE 10

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed by statute.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed on its behalf by _____ its duly elected _____, this ____ day of _____, _____.

**HUYCK LICENSCO INC.**

By:_____

Name:
Title:

USActive 18780357.2

# STOWE WOODWARD LICENSCO LLC

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

USActive 18780359.2

**TABLE OF CONTENTS**

|  |  | **PAGE** |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| ARTICLE 2 | FORMATION OF THE COMPANY | 1 |
| 2.1 | CONVERSION AND FORMATION | 1 |
| 2.2 | PRINCIPAL PLACE OF BUSINESS | 2 |
| 2.3 | REGISTERED OFFICE AND REGISTERED AGENT | 2 |
| 2.4 | TERM | 2 |
| ARTICLE 3 | BUSINESS OF COMPANY | 2 |
| ARTICLE 4 | UNITS AND CONTRIBUTIONS TO CAPITAL | 2 |
| 4.1 | UNITS; CERTIFICATES | 2 |
| 4.2 | CAPITAL CONTRIBUTIONS | 2 |
| ARTICLE 5 | RIGHTS AND OBLIGATIONS OF MEMBER | 3 |
| 5.1 | MANNER OF ACTING | 3 |
| 5.2 | LIMITATION OF LIABILITY | 3 |
| 5.3 | COMPANY BOOKS | 3 |
| ARTICLE 6 | MANAGEMENT - BOARD OF DIRECTORS AND OFFICERS | 3 |
| 6.1 | MANAGEMENT BY DIRECTORS | 3 |
| 6.2 | NUMBER, ELECTION, TENURE AND QUALIFICATIONS | 3 |
| 6.3 | MANNER OF ACTING | 4 |
| 6.4 | DIRECTORS HAVE NO EXCLUSIVE DUTY TO COMPANY | 4 |
| 6.5 | RESIGNATION | 4 |
| 6.6 | REMOVAL | 4 |
| 6.7 | OFFICERS OF COMPANY | 4 |
| 6.8 | ELECTION AND TERM OF OFFICE | 4 |
| 6.9 | REMOVAL | 5 |
| 6.10 | DUTIES OF OFFICERS | 5 |
| ARTICLE 7 | STANDARD OF CARE AND INDEMNIFICATION | 5 |
| 7.1 | STANDARD OF CARE | 5 |
| 7.2 | INDEMNIFICATION OF MEMBER, OFFICERS AND ORGANIZER | 5 |
| ARTICLE 8 | ALLOCATIONS AND DISTRIBUTIONS | 5 |
| 8.1 | ALLOCATIONS OF NET PROFITS AND NET LOSSES | 5 |
| 8.2 | DISTRIBUTIONS | 5 |
| ARTICLE 9 | DISSOLUTION AND TERMINATION | 6 |

**TABLE OF CONTENTS**
**(Continued)**

|  |  |  |  |
|---|---|---|---|
| 9.1 | DISSOLUTION |  | 6 |
| 9.2 | WINDING UP, LIQUIDATION AND DISTRIBUTION OF ASSETS |  | 6 |
| 9.3 | CERTIFICATE OF CANCELLATION |  | 6 |
| ARTICLE 10 | MISCELLANEOUS PROVISIONS |  | 7 |
| 10.1 | NOTICES |  | 7 |
| 10.2 | AMENDMENTS |  | 7 |
| 10.3 | SEVERABILITY |  | 7 |
| 10.4 | CREDITORS |  | 7 |
| 10.5 | CONSTRUCTION |  | 7 |
| 10.6 | GOVERNING LAW |  | 7 |
| SCHEDULE 6.1 |  |  | 9 |
| SCHEDULE 6.7 |  |  | 11 |

# STOWE WOODWARD LICENSCO LLC

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated  Limited Liability Company Agreement ("Agreement") of Stowe Woodward Licensco LLC (the "Company") is made as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Stowe Woodward Licensco LLC and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

The undersigned hereby declares as follows:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, the following terms have the meanings indicated (unless otherwise expressly provided herein):

"Certificate of Conversion" means the Certificate converting the Company from a corporation to a limited liability company as filed with the Delaware Secretary of State.

"Certificate of Formation" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State, as the same may be amended from time to time.

"Conversion" means the conversion of Stowe Woodward Licensco Inc. into a limited liability company pursuant to Section 18-214 of the Delaware Act and Section 266 of the Delaware General Corporation Law and the Certificate of Conversion.

"Delaware Act" means the Delaware Limited Liability Company Act at Title 6 of the Delaware Code, §§ 18-101 *et seq*.

"Director" means a member of the Board of Directors of the Company.

"Member" means the undersigned and any other person who becomes a member of the Company in accordance with this Agreement.

"Unit" means a measure of ownership interest in the Company.

## ARTICLE 2

## FORMATION OF THE COMPANY

**2.1     CONVERSION AND FORMATION**

The Company has been converted from a Delaware corporation to a Delaware limited liability company by executing and delivering the Certificate of Conversion, together with the Certificate of Formation, to the Delaware Secretary of State in accordance with and pursuant to the Delaware Act.

**2.2    PRINCIPAL PLACE OF BUSINESS**

The principal place of business of the Company will be One Technology Drive, Westborough Technology Park, Westborough, Massachusetts 01581. The Company may locate its places of business and registered office at any other place or places as the Member may deem advisable.

**2.3    REGISTERED OFFICE AND REGISTERED AGENT**

The Company's initial registered office will be at the office of its registered agent at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, County of New Castle, and the name of its initial registered agent is The Corporation Trust Company.

**2.4    TERM**

The term of the Company will be perpetual.

## ARTICLE 3

## BUSINESS OF COMPANY

The Company will continue the business conducted by Stowe Woodward Licensco Inc. prior to the Conversion and will carry on any other lawful business or activity in connection with the foregoing or otherwise, and will have and exercise all of the powers, rights and privileges which a limited liability company organized pursuant to the Delaware Act may have and exercise.

## ARTICLE 4

## UNITS AND CONTRIBUTIONS TO CAPITAL

**4.1    UNITS; CERTIFICATES**

The capital of the Company will be represented by Units.  Notwithstanding anything to the contrary contained herein, the Company may not issue Units that would be deemed to be non-voting securities as contemplated by section 1123(a)(6) of the Title 11 of the United States Code, and any provision contained herein that would render the Units non-voting equity units  as contemplated by section 1123(a)(6) of Title 11 of the United States Code shall be deemed null and void.  The Board of Directors may make such rules and regulations as it may deem appropriate concerning the issuance and registration of Units, including the issuance of certificates representing Units. The Board of Directors may authorize the issuance of any Units without certificates. The Units are expressly deemed to be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware.

**4.2     CAPITAL CONTRIBUTIONS**

In connection with the Conversion, each of the 100 shares of capital stock the Member owned in Stowe Woodward Licensco Inc. has been automatically converted into a Unit. The amount designated as the capital contribution of the Member for the Units issued in the Conversion will be the same amount as was designated as capital on the books and records of Stowe Woodward Licensco Inc. immediately prior to the Conversion. The Member will not be required to make additional capital contributions.

## ARTICLE 5

## RIGHTS AND OBLIGATIONS OF MEMBER

**5.1     MANNER OF ACTING**

The Member may act to appoint the Board of Directors or otherwise through written or unwritten resolutions or certifications of any nature.

**5.2     LIMITATION OF LIABILITY**

The Member will not be personally liable to creditors of the Company for any debts, obligations, liabilities or losses of the Company, whether arising in contract, tort or otherwise, beyond the Member's capital contribution set forth in Section 4.2 and any additional capital contribution.

**5.3     COMPANY BOOKS**

The Company will maintain and preserve, during the term of the Company, all accounts, books and other relevant Company documents.

## ARTICLE 6

## MANAGEMENT - BOARD OF DIRECTORS AND OFFICERS

**6.1     MANAGEMENT BY DIRECTORS**

The business and affairs of the Company will be managed by its Board of Directors. The Board of Directors will have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, including the powers set forth in Schedule 6.1, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business and objectives. No one Director may take or effect any action on behalf of the Company or otherwise bind the Company in the absence of a formal delegation of authority by the Board of Directors to such Director.

**6.2     NUMBER, ELECTION, TENURE AND QUALIFICATIONS**

The number of directors constituting the first Board of Directors will be three. Thereafter, the number of Directors of the Company may be fixed from time to time by the Member. Directors will be appointed by the Member. Each Director will hold office until his successor has been duly appointed and qualified or until his earlier death, resignation or removal. Directors need not be Members of the Company.

## 6.3     MANNER OF ACTING

The Board of Directors may designate any place, either within or outside the State of Delaware, as the place of meeting of the Board of Directors. A majority of the Board of Directors will constitute a quorum at meetings of the Board of Directors. If a quorum is present, the affirmative vote of a majority of all Directors will constitute the act of the Board of Directors. Any Director may participate in a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting by means of such equipment will constitute presence in a person at such meeting. Action may be taken without a meeting if the action is evidenced by one or more written consents signed by a majority of the directors.

## 6.4     DIRECTORS HAVE NO EXCLUSIVE DUTY TO COMPANY

A Director will not be required to manage the Company as his sole and exclusive function, and he may have other business interests and engage in activities in addition to those relating to the Company. Neither the Company, the Member, nor any other Director will have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Director or in the income or proceeds derived therefrom.

## 6.5     RESIGNATION

Any Director of the Company may resign at any time by giving written notice to the Member and the other Directors of the Company. The resignation of any Director will take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation will not be necessary to make it effective.

## 6.6     REMOVAL

All or any lesser number of Directors may be removed at any time, with or without cause, by the Member.

## 6.7     OFFICERS OF COMPANY

The officers of the Company will consist of the officers listed in Schedule 6.7 and such other officers or agents as may be elected and appointed by the Board of Directors. Any two or more offices may be held by the same person. The officers will act in the name of the Company and will supervise its operation under the direction and management of the Board of Directors, as further described below.

**6.8      ELECTION AND TERM OF OFFICE**

The officers of the Company will be elected by the Board of Directors. Each officer will hold office until his successor is duly elected and has qualified, or until his earlier death, resignation, or removal. Election or appointment of an officer will not of itself create contract rights.

**6.9      REMOVAL**

Any officer may be removed by the Board of Directors at any time.

**6.10     DUTIES OF OFFICERS**

The officers will have such duties and powers as described in Schedule 6.7.

**ARTICLE 7**

**STANDARD OF CARE AND INDEMNIFICATION**

**7.1      STANDARD OF CARE**

No Member, Director or officer of the Company will be liable to the Company by reason of the actions of such person in the conduct of the business of the Company except for fraud, gross negligence or willful misconduct.

**7.2      INDEMNIFICATION OF MEMBER, OFFICERS AND ORGANIZER**

The Company will, to the fullest extent to which it is empowered to do so by the Delaware Act or any other applicable law, indemnify and make advances for expenses to any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a Member, Director, officer or employee of the Company, against losses, damages, expenses (including attorney's fees), judgments, fines and amounts reasonably incurred by him in connection with such action, suit or proceeding.

**ARTICLE 8**

**ALLOCATIONS AND DISTRIBUTIONS**

**8.1 ALLOCATIONS OF NET PROFITS AND NET LOSSES**

The profits, losses, and other items of the Company will be allocated to the Member. There will be no "special allocations."

**8.2      DISTRIBUTIONS**

Distributions will be made as follows:

(a)    Subject to Section 18-607 of the Delaware Act, the Company will make interim distributions as the Member will determine.

(b)    Upon liquidation of the Company, liquidating distributions will be made in accordance with Section 9.2.

# ARTICLE 9

## DISSOLUTION AND TERMINATION

**9.1    DISSOLUTION**

(a)    The Company will be dissolved only upon the occurrence of any of the following events:

(i)    by written decision of the Member; or

(ii)    upon the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act.

(b)    Dissolution of the Company will be effective on the day on which an event described in Section 9.1(a) occurs, but the Company will not terminate until a certificate of cancellation is filed with the Secretary of State of the State of Delaware and the assets of the Company are distributed as provided in Section 9.2. Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Member will continue to be governed by this Agreement.

**9.2    WINDING UP, LIQUIDATION AND DISTRIBUTION OF ASSETS**

Upon dissolution, an accounting will be made of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Member will:

(a)    sell or otherwise liquidate all of the Company's assets as promptly as practicable;

(b)    discharge all liabilities of the Company, including liabilities to the Member as a creditor of the Company to the extent permitted by law, excluding liabilities for distributions to Members; and

(c)    distribute all remaining assets to the Member.

**9.3    CERTIFICATE OF CANCELLATION**

When all debts, liabilities and obligations of the Company have been paid and discharged, or adequate provisions have been made for their payment and discharge, and all of the remaining property and assets of the Company have been distributed, a certificate of

cancellation setting forth the information required by the Delaware Act will be executed by one or more authorized persons and filed with the Delaware Secretary of State.

Upon such filing, the existence of the Company will cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Delaware Act. The Member will have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

## ARTICLE 10

## MISCELLANEOUS PROVISIONS

### 10.1    NOTICES

All notices, demands, waivers and other communications required or permitted by this Agreement will be in writing and will be deemed given to a party or the Company when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested. Any such communication will be addressed to a Member as shown on the records of the Company, to the Company at its principal office, or in either case to such other address as the Member or the Company may from time to time designate by written notice to all parties.

### 10.2    AMENDMENTS

This Agreement may be amended at any time by a writing executed by the Member.

### 10.3    SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 10.4    CREDITORS

None of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company.

### 10.5    CONSTRUCTION

All references in this Agreement to "Articles" and "Sections" refer to the corresponding Articles and Sections of this Agreement unless the context indicates otherwise. The headings of Articles and Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate

examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time.

## 10.6  GOVERNING LAW

This Agreement will be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to conflicts of laws principles that would require the application of any other law, and the Certificate of Formation.

The Member has caused its duly authorized representative to execute this Agreement as of the date indicated in the first sentence of this Agreement.

MEMBER:

Xerium Inc.

By: _____

Its: _____

## SCHEDULE 6.1

## POWERS AND AUTHORITY OF BOARD OF DIRECTORS

**Powers**

The Board of Directors will have the following powers and authority:

(a)     to acquire property from any person as the Board of Directors may determine, whether or not such person is directly or indirectly affiliated or connected with any Director or Member;

(b)     to open bank accounts in the name and on behalf of the Company, and to determine who will have the signatory power over such accounts;

(c)     to borrow money for the Company on such terms as the Board of Directors deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(d)     to purchase liability and other insurance to protect the Company's property and business;

(e)     to hold and own Company real and personal property in the name of the Company;

(f)     to invest Company funds;

(g)     to authorize the execution of all instruments and documents, including checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(h)     to employ accountants, legal counsel, agents or other experts to perform services for the Company;

(i)     to appoint such agents, officers and delegees as may be necessary or appropriate to the conduct of the business;

(j)     to take actions by or on behalf of the Company in respect of any equity interests held by the Company in another entity;

(k)     to authorize any and all other agreements on behalf of the Company, in such forms as the Board of Directors may approve; and

(1)     to do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

**Limitations**

The Board of Directors will not have the power or authority to take any of the following actions without the advance approval of the Member:

Amend the limited liability company agreement Amend the certificate of formation

Admit members

Sell, transfer or dispose of (or contract to sell, transfer or dispose of) all or substantially all of the assets of the Company

Dissolve the Company

Merge or consolidate the Company or convert the Company to a different type of entity Initiating a bankruptcy or similar proceeding.

**SCHEDULE 6.7**

**DUTIES OF OFFICERS**

**President**.

The president will be the chief executive officer of the Company in charge of the entire business and all the affairs of the Company and will have the powers and perform the duties incident to that position, including the power to bind the Company in accordance with this Schedule. The president will, when present, preside at all meetings of the Board of Directors. He will have such other powers and perform such duties as are specified in this Agreement and as may from time to time be assigned to him by the Board of Directors.

The president will have general and active management of the business of the Company and will see that all orders and resolutions of the Board of Directors are carried into effect. The president may execute bonds, mortgages and other contracts (whenever requiring a seal, under the seal of the Company), except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof is expressly delegated by the Board of Directors to some other officer or agent of the Company. The president will have general powers of supervision and will be the final arbiter of all differences between officers of the Company, and such decision as to any matter affecting the Company will be final and binding as between the officers of the Company subject only to review by the Board of Directors.

**Vice Presidents**.

At the request of or in the absence of the president or in the event of his inability or refusal to act, a vice president (or in the event there be more than one vice president, the vice presidents in the order designated, or in the absence of any designation, then in the order of their election) will perform the duties of the president, and when so acting, will have all the powers of and be subject to all the restrictions upon the president. Any vice president will perform such other duties as from time to time may be assigned to him by the chairman, the president or the Board of Directors of the Company. Vice presidents may be assigned primary responsibility for certain operations of the Company.

**Chief Financial Officer**.

The chief financial officer will: (i) have primary responsibility for the financial affairs of the Company and be responsible for its financial books and records; (ii) render to the president or the board of directors, upon request, an account of the financial condition of the corporation and assist with financial projections for the Company's operations; (iii) plan for adequate financing and liquidity for the Company's operations; and (iv) in general perform all the duties incident to the office of chief financial officer and such other duties as from time to time may be assigned to him by the president or by the Board of Directors of the Company. He will not be required to give a bond for the faithful discharge of his duties.

**Treasurer**.

The treasurer will: (i) be responsible for all funds and securities of the Company; (ii) disburse the funds of the Company as ordered by the board of directors, the president or the chief financial officer or as otherwise required in the conduct of the business of the corporation; (iii) receive and give receipts for moneys due and payable to the Company from any source whatsoever, and deposit all such moneys in the name of the Company in such banks, trust companies or other depositaries as will be selected by the Board of Directors of the Company; and (iv) in general, perform all duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the president, the chief financial officer or by the Board of Directors of the Company. He will not be required to give a bond for the faithful discharge of his duties.

**Secretary**.

The secretary will: (a) keep the minutes of the Board of Directors' meetings in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of this Agreement or as required by law; (c) be custodian of Company records; (d) sign with the president, any certificates representing Units; (e) certify the resolutions of the Board of Directors and other documents of the Company as true and correct; and (f) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the president or the Board of Directors.

**Assistant Treasurers and Assistant Secretaries**.

The assistant treasurers and assistant secretaries, if any, shall perform all functions and duties which the secretary or treasurer, as the case may be, may assign or delegate; but such assignment or delegation shall not relieve the principal officer from the responsibilities of his or her office.

**STOWE WOODWARD LLC**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

USActive 18780358.2

**TABLE OF CONTENTS**

**PAGE**

ARTICLE 1   DEFINITIONS                                                      1

ARTICLE 2   FORMATION OF THE COMPANY                                         1

    2.1   CONVERSION AND FORMATION                                     1

    2.2   PRINCIPAL PLACE OF BUSINESS                                  2

    2.3   REGISTERED OFFICE AND REGISTERED AGENT                       2

    2.4   TERM                                                         2

ARTICLE 3   BUSINESS OF COMPANY                                              2

ARTICLE 4   UNITS AND CONTRIBUTIONS TO CAPITAL                               2

    4.1   UNITS; CERTIFICATES                                          2

    4.2   CAPITAL CONTRIBUTIONS                                        2

ARTICLE 5   RIGHTS AND OBLIGATIONS OF MEMBER                                 3

    5.1   MANNER OF ACTING                                             3

    5.2   LIMITATION OF LIABILITY                                      3

    5.3   COMPANY BOOKS                                                3

ARTICLE 6   MANAGEMENT - BOARD OF DIRECTORS AND OFFICERS                     3

    6.1   MANAGEMENT BY DIRECTORS                                      3

    6.2   NUMBER, ELECTION, TENURE AND QUALIFICATIONS                  3

    6.3   MANNER OF ACTING                                             3

    6.4   DIRECTORS HAVE NO EXCLUSIVE DUTY TO COMPANY                  4

    6.5   RESIGNATION                                                  4

    6.6   REMOVAL                                                      4

    6.7   OFFICERS OF COMPANY                                          4

    6.8   ELECTION AND TERM OF OFFICE                                  4

    6.9   REMOVAL                                                      4

    6.10  DUTIES OF OFFICERS                                           5

ARTICLE 7   STANDARD OF CARE AND INDEMNIFICATION                             5

    7.1   STANDARD OF CARE                                             5

    7.2   INDEMNIFICATION OF MEMBER, OFFICERS AND ORGANIZER            5

ARTICLE 8   ALLOCATIONS AND DISTRIBUTIONS                                    5

    8.1   ALLOCATIONS OF NET PROFITS AND NET LOSSES                    5

    8.2   DISTRIBUTIONS                                                5

ARTICLE 9   DISSOLUTION AND TERMINATION                                      6

USActive 18780358.2

**TABLE OF CONTENTS**
**(Continued)**

| | | |
|---|---|---|
| 9.1 | DISSOLUTION | 6 |
| 9.2 | WINDING UP, LIQUIDATION AND DISTRIBUTION OF ASSETS | 6 |
| 9.3 | CERTIFICATE OF CANCELLATION | 6 |
| ARTICLE 10 MISCELLANEOUS PROVISIONS | | 7 |
| 10.1 | NOTICES | 7 |
| 10.2 | AMENDMENTS | 7 |
| 10.3 | SEVERABILITY | 7 |
| 10.4 | CREDITORS | 7 |
| 10.5 | CONSTRUCTION | 7 |
| 10.6 | GOVERNING LAW | 7 |
| SCHEDULE 6.1 | | 9 |
| SCHEDULE 6.7 | | 11 |

# STOWE WOODWARD LLC

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated  Limited Liability Company Agreement ("Agreement") of Stowe Woodward LLC (the "Company") is made as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Stowe Woodward LLC and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

The undersigned hereby declares as follows:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, the following terms have the meanings indicated (unless otherwise expressly provided herein):

"Certificate of Conversion" means the Certificate converting the Company from a corporation to a limited liability company as filed with the Delaware Secretary of State.

"Certificate of Formation" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State, as the same may be amended from time to time.

"Conversion" means the conversion of Stowe Woodward Inc. into a limited liability company pursuant to Section 18-214 of the Delaware Act and Section 266 of the Delaware General Corporation Law and the Certificate of Conversion.

"Delaware Act" means the Delaware Limited Liability Company Act at Title 6 of the Delaware Code, §§ 18-101 *et seq*.

"Director" means a member of the Board of Directors of the Company.

"Member" means the undersigned and any other person who becomes a member of the Company in accordance with this Agreement.

"Unit" means a measure of ownership interest in the Company.

USActive 18780358.2

## ARTICLE 2

## FORMATION OF THE COMPANY

**2.1    CONVERSION AND FORMATION**

The Company has been converted from a Delaware corporation to a Delaware limited liability company by executing and delivering the Certificate of Conversion, together with the Certificate of Formation, to the Delaware Secretary of State in accordance with and pursuant to the Delaware Act.

**2.2    PRINCIPAL PLACE OF BUSINESS**

The principal place of business of the Company will be One Technology Drive, Westborough Technology Park, Westborough, Massachusetts 01581. The Company may locate its places of business and registered office at any other place or places as the Member may deem advisable.

**2.3    REGISTERED OFFICE AND REGISTERED AGENT**

The Company's initial registered office will be at the office of its registered agent at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, County of New Castle, and the name of its initial registered agent is The Corporation Trust Company.

**2.4    TERM**

The term of the Company will be perpetual.

## ARTICLE 3

## BUSINESS OF COMPANY

The Company will continue the business conducted by Stowe Woodward Inc. prior to the Conversion and will carry on any other lawful business or activity in connection with the foregoing or otherwise, and will have and exercise all of the powers, rights and privileges which a limited liability company organized pursuant to the Delaware Act may have and exercise.

## ARTICLE 4

## UNITS AND CONTRIBUTIONS TO CAPITAL

**4.1    UNITS; CERTIFICATES**

The capital of the Company will be represented by Units.  Notwithstanding anything to the contrary contained herein, the Company may not issue Units that would be deemed to be non-voting securities as contemplated by section 1123(a)(6) of the Title 11 of the United States Code, and any provision contained herein that would render the Units non-voting equity units  as contemplated by section 1123(a)(6) of Title 11 of the United States Code shall be deemed null and void.   The Board of Directors may make such rules and regulations as it may deem

USActive 18780358.2                                -2-

appropriate concerning the issuance and registration of Units, including the issuance of certificates representing Units. The Board of Directors may authorize the issuance of any Units without certificates. The Units are expressly deemed to be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware.

**4.2   CAPITAL CONTRIBUTIONS**

In connection with the Conversion, each of the 100 shares of capital stock the former Member, Stowe Woodward Licensco Inc., owned in Stowe Woodward Inc. has been automatically converted into a Unit. The amount designated as the capital contribution of the Member for the Units issued in the Conversion will be the same amount as was designated as capital on the books and records of Stowe Woodward Inc. immediately prior to the Conversion. The Member will not be required to make additional capital contributions.

## ARTICLE 5

## RIGHTS AND OBLIGATIONS OF MEMBER

**5.1   MANNER OF ACTING**

The Member may act to appoint the Board of Directors or otherwise through written or unwritten resolutions or certifications of any nature.

**5.2   LIMITATION OF LIABILITY**

The Member will not be personally liable to creditors of the Company for any debts, obligations, liabilities or losses of the Company, whether arising in contract, tort or otherwise, beyond the Member's capital contribution set forth in Section 4.2 and any additional capital contribution.

**5.3   COMPANY BOOKS**

The Company will maintain and preserve, during the term of the Company, all accounts, books and other relevant Company documents.

## ARTICLE 6

## MANAGEMENT - BOARD OF DIRECTORS AND OFFICERS

**6.1   MANAGEMENT BY DIRECTORS**

The business and affairs of the Company will be managed by its Board of Directors. The Board of Directors will have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, including the powers set forth in Schedule 6.1, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business and objectives. No one Director may take or effect any action on behalf of the Company or otherwise bind the

Company in the absence of a formal delegation of authority by the Board of Directors to such Director.

## 6.2   NUMBER, ELECTION, TENURE AND QUALIFICATIONS

The number of directors constituting the first Board of Directors will be three. Thereafter, the number of Directors of the Company may be fixed from time to time by the Member. Directors will be appointed by the Member. Each Director will hold office until his successor has been duly appointed and qualified or until his earlier death, resignation or removal. Directors need not be Members of the Company.

## 6.3   MANNER OF ACTING

The Board of Directors may designate any place, either within or outside the State of Delaware, as the place of meeting of the Board of Directors. A majority of the Board of Directors will constitute a quorum at meetings of the Board of Directors. If a quorum is present, the affirmative vote of a majority of all Directors will constitute the act of the Board of Directors. Any Director may participate in a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting by means of such equipment will constitute presence in a person at such meeting. Action may be taken without a meeting if the action is evidenced by one or more written consents signed by a majority of the directors.

## 6.4   DIRECTORS HAVE NO EXCLUSIVE DUTY TO COMPANY

A Director will not be required to manage the Company as his sole and exclusive function, and he may have other business interests and engage in activities in addition to those relating to the Company. Neither the Company, the Member, nor any other Director will have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Director or in the income or proceeds derived therefrom.

## 6.5   RESIGNATION

Any Director of the Company may resign at any time by giving written notice to the Member and the other Directors of the Company. The resignation of any Director will take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation will not be necessary to make it effective.

## 6.6   REMOVAL

All or any lesser number of Directors may be removed at any time, with or without cause, by the Member.

## 6.7   OFFICERS OF COMPANY

The officers of the Company will consist of the officers listed in Schedule 6.7 and such other officers or agents as may be elected and appointed by the Board of Directors. Any two or more offices may be held by the same person. The officers will act in the name of the Company

and will supervise its operation under the direction and management of the Board of Directors, as further described below.

**6.8      ELECTION AND TERM OF OFFICE**

The officers of the Company will be elected by the Board of Directors. Each officer will hold office until his successor is duly elected and has qualified, or until his earlier death, resignation, or removal. Election or appointment of an officer will not of itself create contract rights.

**6.9      REMOVAL**

Any officer may be removed by the Board of Directors at any time.

**6.10     DUTIES OF OFFICERS**

The officers will have such duties and powers as described in Schedule 6.7.

## ARTICLE 7

### STANDARD OF CARE AND INDEMNIFICATION

**7.1      STANDARD OF CARE**

No Member, Director or officer of the Company will be liable to the Company by reason of the actions of such person in the conduct of the business of the Company except for fraud, gross negligence or willful misconduct.

**7.2      INDEMNIFICATION OF MEMBER, OFFICERS AND ORGANIZER**

The Company will, to the fullest extent to which it is empowered to do so by the Delaware Act or any other applicable law, indemnify and make advances for expenses to any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a Member, Director, officer or employee of the Company, against losses, damages, expenses (including attorney's fees), judgments, fines and amounts reasonably incurred by him in connection with such action, suit or proceeding.

## ARTICLE 8

### ALLOCATIONS AND DISTRIBUTIONS

**8.1 ALLOCATIONS OF NET PROFITS AND NET LOSSES**

The profits, losses, and other items of the Company will be allocated to the Member. There will be no "special allocations."

**8.2     DISTRIBUTIONS**

Distributions will be made as follows:

(a)     Subject to Section 18-607 of the Delaware Act, the Company will make interim distributions as the Member will determine.

(b)     Upon liquidation of the Company, liquidating distributions will be made in accordance with Section 9.2.

## ARTICLE 9

## DISSOLUTION AND TERMINATION

**9.1     DISSOLUTION**

(a)     The Company will be dissolved only upon the occurrence of any of the following events:

(i)      by written decision of the Member; or

(ii)     upon the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act.

(b)     Dissolution of the Company will be effective on the day on which an event described in Section 9.1(a) occurs, but the Company will not terminate until a certificate of cancellation is filed with the Secretary of State of the State of Delaware and the assets of the Company are distributed as provided in Section 9.2. Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Member will continue to be governed by this Agreement.

**9.2     WINDING UP, LIQUIDATION AND DISTRIBUTION OF ASSETS**

Upon dissolution, an accounting will be made of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Member will:

(a)     sell or otherwise liquidate all of the Company's assets as promptly as practicable;

(b)     discharge all liabilities of the Company, including liabilities to the Member as a creditor of the Company to the extent permitted by law, excluding liabilities for distributions to Members; and

(c)    distribute all remaining assets to the Member.

## 9.3    CERTIFICATE OF CANCELLATION

When all debts, liabilities and obligations of the Company have been paid and discharged, or adequate provisions have been made for their payment and discharge, and all of the remaining property and assets of the Company have been distributed, a certificate of cancellation setting forth the information required by the Delaware Act will be executed by one or more authorized persons and filed with the Delaware Secretary of State.

Upon such filing, the existence of the Company will cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Delaware Act. The Member will have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

## ARTICLE 10

## MISCELLANEOUS PROVISIONS

### 10.1    NOTICES

All notices, demands, waivers and other communications required or permitted by this Agreement will be in writing and will be deemed given to a party or the Company when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested. Any such communication will be addressed to a Member as shown on the records of the Company, to the Company at its principal office, or in either case to such other address as the Member or the Company may from time to time designate by written notice to all parties.

### 10.2    AMENDMENTS

This Agreement may be amended at any time by a writing executed by the Member.

### 10.3    SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 10.4    CREDITORS

None of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company.

**10.5    CONSTRUCTION**

All references in this Agreement to "Articles" and "Sections" refer to the corresponding Articles and Sections of this Agreement unless the context indicates otherwise. The headings of Articles and Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time.

**10.6    GOVERNING LAW**

This Agreement will be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to conflicts of laws principles that would require the application of any other law, and the Certificate of Formation.

The Member has caused its duly authorized representative to execute this Agreement as of the date indicated in the first sentence of this Agreement.

MEMBER:

Xerium Inc.

By: _____

Its: _____

**SCHEDULE 6.1**

**POWERS AND AUTHORITY OF BOARD OF DIRECTORS**

**Powers**

The Board of Directors will have the following powers and authority:

(a)     to acquire property from any person as the Board of Directors may determine, whether or not such person is directly or indirectly affiliated or connected with any Director or Member;

(b)     to open bank accounts in the name and on behalf of the Company, and to determine who will have the signatory power over such accounts;

(c)     to borrow money for the Company on such terms as the Board of Directors deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(d)     to purchase liability and other insurance to protect the Company's property and business;

(e)     to hold and own Company real and personal property in the name of the Company;

(f)     to invest Company funds;

(g)     to authorize the execution of all instruments and documents, including checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(h)     to employ accountants, legal counsel, agents or other experts to perform services for the Company;

(i)     to appoint such agents, officers and delegees as may be necessary or appropriate to the conduct of the business;

(j)     to take actions by or on behalf of the Company in respect of any equity interests held by the Company in another entity;

(k)     to authorize any and all other agreements on behalf of the Company, in such forms as the Board of Directors may approve; and

(1)     to do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

**Limitations**

The Board of Directors will not have the power or authority to take any of the following actions without the advance approval of the Member:

Amend the limited liability company agreement

Amend the certificate of formation

Admit members

Sell, transfer or dispose of (or contract to sell, transfer or dispose of) all or substantially all of the assets of the Company

Dissolve the Company

Merge or consolidate the Company or convert the Company to a different type of entity Initiating a bankruptcy or similar proceeding

## SCHEDULE 6.7

## DUTIES OF OFFICERS

**President**.

The president will be the chief executive officer of the Company in charge of the entire business and all the affairs of the Company and will have the powers and perform the duties incident to that position, including the power to bind the Company in accordance with this Schedule. The president will, when present, preside at all meetings of the Board of Directors. He will have such other powers and perform such duties as are specified in this Agreement and as may from time to time be assigned to him by the Board of Directors.

The president will have general and active management of the business of the Company and will see that all orders and resolutions of the Board of Directors are carried into effect. The president may execute bonds, mortgages and other contracts (whenever requiring a seal, under the seal of the Company), except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof is expressly delegated by the Board of Directors to some other officer or agent of the Company. The president will have general powers of supervision and will be the final arbiter of all differences between officers of the Company, and such decision as to any matter affecting the Company will be final and binding as between the officers of the Company subject only to review by the Board of Directors.

**Vice Presidents**.

At the request of or in the absence of the president or in the event of his inability or refusal to act, a vice president (or in the event there be more than one vice president, the vice presidents in the order designated, or in the absence of any designation, then in the order of their election) will perform the duties of the president, and when so acting, will have all the powers of and be subject to all the restrictions upon the president. Any vice president will perform such other duties as from time to time may be assigned to him by the chairman, the president or the Board of Directors of the Company. Vice presidents may be assigned primary responsibility for certain operations of the Company.

**Chief Financial Officer**.

The chief financial officer will: (i) have primary responsibility for the financial affairs of the Company and be responsible for its financial books and records; (ii) render to the president or the board of directors, upon request, an account of the financial condition of the corporation and assist with financial projections for the Company's operations; (iii) plan for adequate financing and liquidity for the Company's operations; and (iv) in general perform all the duties incident to the office of chief financial officer and such other duties as from time to time may be assigned to him by the president or by the Board of Directors of the Company. He will not be required to give a bond for the faithful discharge of his duties.

**Treasurer**.

The treasurer will: (i) be responsible for all funds and securities of the Company; (ii) disburse the funds of the Company as ordered by the board of directors, the president or the chief financial officer or as otherwise required in the conduct of the business of the corporation; (iii) receive and give receipts for moneys due and payable to the Company from any source whatsoever, and deposit all such moneys in the name of the Company in such banks, trust companies or other depositaries as will be selected by the Board of Directors of the Company; and (iv) in general, perform all duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the president, the chief financial officer or by the Board of Directors of the Company. He will not be required to give a bond for the faithful discharge of his duties.

**Secretary**.

The secretary will: (a) keep the minutes of the Board of Directors' meetings in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of this Agreement or as required by law; (c) be custodian of Company records; (d) sign with the president, any certificates representing Units; (e) certify the resolutions of the Board of Directors and other documents of the Company as true and correct; and (f) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the president or the Board of Directors.

**Assistant Treasurers and Assistant Secretaries**.

The assistant treasurers and assistant secretaries, if any, shall perform all functions and duties which the secretary or treasurer, as the case may be, may assign or delegate; but such assignment or delegation shall not relieve the principal officer from the responsibilities of his or her office.

WANGNER ITELPA I LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Dated as of _____, 2010

WANGNER ITELPA I LLC
AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated  Limited Liability Company Agreement ("Agreement") of Wangner Itelpa I LLC (the "Company") is made as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Wangner Itelpa I LLC and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

WHEREAS, Xerium Technologies, Inc, (the "Original Member") wishes to form a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act in order to conduct the business described herein.

NOW, THEREFORE, the Original Member agrees with the Company as follows:

ARTICLE 1
DEFINITIONS

For purposes of this Agreement the following terms have the following meanings:

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.) as amended and in effect from time to time.

"Affiliate" means, with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Amended and Restated Limited Liability Company Agreement of the Company dated as of _____, 2010 as amended from time to time.

"Capital Contribution" means the amount of cash and the fair market value of any other property contributed to the Company with respect to any Interest held by a Member.

"Certificate" means the Certificate of Formation of the Company filed on December 1, 2004 and any and all amendments thereto and restatements thereof filed on behalf of the Company as permitted hereunder with the office of the Secretary of State of the State of Delaware.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the corresponding provisions of any future federal tax law.

"Company" means the limited liability company formed by virtue of this Agreement and the filing of the Certificate in accordance with the Act.

"Distribution" means the amount of cash and the fair market value of any other property distributed in respect of a Member's Interest in the Company.

"Fiscal Year" means the fiscal year of the Company which shall end on December 31 in each year or on such other date in each year as determined by the Board of Managers.

"Indemnified Party" is defined in Section 10.1.

"Interest" means the interest of a Member in the capital and profits of the Company, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"Member" means the Original Member and any other Person that both acquires an Interest in the Company and is admitted to the Company as a Member pursuant to this Agreement, from time to time.

"Original Member" is defined in Section 3.1.

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, or any other legal entity.

"Unit Certificate" is defined in Section 3.6.

"Units" are a measure of a Member's Interest in the Company.

ARTICLE 2
FORMATION AND PURPOSE

2.1     Formation, etc. The Company was formed as a limited liability company in accordance with the Act by the filing of the Certificate with the Secretary of State of Delaware on December 1, 2004. The rights, duties and liabilities of each Member and the Board of Managers shall be determined pursuant to the Act and this Agreement. To the extent that such rights, duties or obligations are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name. The name of the Company is WANGNER ITELPA I LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable. The Board of Managers shall file, or shall cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the Board of Managers considers appropriate or advisable.

2

2.3     Registered Office/Agent. The registered office required to be maintained by the Company in the State of Delaware pursuant to the Act shall initially be c/o Corporation Service

Company, 2711 Centerville Road, Suite 400, County of New Castle, Wilmington, Delaware 19808. The name and address of the registered agent of the Company pursuant to the Act shall initially be Corporation Service Company, 2711 Centerville Road, Suite 400, County of New Castle, Wilmington, Delaware 19808. The Company may, upon compliance with the applicable provisions of the Act, change its registered office or registered agent from time to time in the discretion of the Board of Managers.

2.4     Term. The term of the Company shall continue indefinitely unless sooner terminated as provided herein. The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate as provided in the Act.

2.5     Purpose. The Company is formed for the purpose of, and the nature of the business to be conducted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any activities necessary, advisable, convenient or incidental thereto.

2.6     Specific Powers. Without limiting the generality of Section 2.5, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 2.5, including, but not limited to, the power:

2.6.1    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any country, state, territory, district or other jurisdiction, whether domestic or foreign;

2.6.2    to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property;

2.6.3    to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, perform and carry out and take any other action with respect to contracts or agreements of any kind, including without limitation leases, licenses, guarantees and other contracts for the benefit of or with any Member or any Affiliate of any Member, without regard to whether such contracts may be deemed necessary, convenient to, or incidental to the accomplishment of the purposes of the Company;

2.6.4    to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, trusts, limited liability companies, or individuals or other persons or direct or indirect obligations of the United States or of any government, state, territory, governmental district or municipality or of any instrumentality of any of them;

3

2.6.5    to lend money, to invest and reinvest its funds, and to accept real and personal property for the payment of funds so loaned or invested;

2.6.6    to borrow money and issue evidence of indebtedness, and to secure the same by a mortgage, pledge, security interest or other lien on the assets of the Company;

2.6.7    to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

2.6.8    to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

2.6.9    to appoint employees, officers, agents and representatives of the Company, and define their duties and fix their compensation;

2.6.10  to indemnify any Person in accordance with the Act and this Agreement;

2.6.11  to cease its activities and cancel its Certificate; and

2.6.12  to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company.

2.7      Certificate. The filing of the Certificate by Michael J. Stick is hereby ratified and confirmed and said Person is hereby designated as an "authorized person" within the meaning of the Act to execute, deliver and file the Certificate and Stephen R. Light, David Maffucci, Ted Orban and Elizabeth Leete and such other Persons as may be designated from time to time by the Board of Managers are designated as authorized persons, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate or any certificate of cancellation of the Certificate and any other certificates necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.8.     Principal Office. The principal executive office of the Company shall be located at such place within or without the State of Delaware as the Board of Managers shall establish, and the Board of Managers may from time to time change the location of the principal executive office of the Company to any place within or without the State of Delaware. The Board of Managers may establish and maintain such additional offices and places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

ARTICLE 3
ORIGINAL MEMBER; CAPITAL CONTRIBUTIONS; AND UNITS

3.1      Initial Capital Contribution. Upon the making of the initial Capital Contribution to the Company, which shall be in the amount of $100 and the Person making such Capital Contribution agreeing in writing to be bound by this Agreement as a Member, such Person shall

4

be admitted as the first Member (the "Original Member") and acquire a limited liability company interest in the Company. The initial Capital Contribution shall be allocated to a stated capital account of the Company.

3.2     Additional Capital Contributions. The Members shall make additional Capital Contributions to the Company for such purposes, at such times and in such amounts as shall be agreed by the Members holding not less than 75.0% of the then outstanding Units at a meeting of the Members held pursuant to Section 4.4 and Exhibit 4.4.

3.3     Return of Capital Contributions. No Member shall have the right to demand a return of all or any part of its Capital Contributions, and any return of the Capital Contributions of a Member shall be made solely from the assets of the Company and only in accordance with the terms of this Agreement. No interest shall be paid to any Member with respect to its Capital Contributions.

3.4     Registration of Interests. Each Interest constitutes a "security," as such term is defined in 6 Del. C. § 8-102(15), governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del. C. 8-101, et seq.). The Company shall maintain a record of the ownership of the Interests which shall be in the form set forth on Schedule A and which shall be amended from time to time to reflect transfers of the ownership of the Interests. An Interest shall be transferred by delivery to the Company of an instruction by the registered owner of the Interest requesting registration of transfer of such Interest (accompanied by a duly indorsed security certificate representing such Interest or affidavit of loss therefore) and the recording of such transfer in the records of the Company.

3.5     Units. Upon the admission of the Original Member as a Member, the Interest of the Original Member shall be divided into 100 Units.  Notwithstanding anything to the contrary contained herein, the Company may not issue Units that would be deemed to be non-voting securities as contemplated by section 1123(a)(6) of the Title 11 of the United States Code, and any provision contained herein that would render the Units non-voting equity units  as contemplated by section 1123(a)(6) of Title 11 of the United States Code shall be deemed null and void.  The Board of Managers may issue additional Units to any Member in respect of additional Capital Contributions.

3.6     Unit Certificate. Each Member shall be entitled to a certificate stating the number of Units held by the Member in such form as shall, in conformity with law and this Agreement, be prescribed from time to time by the Board of Managers (a "Unit Certificate"). Such Unit Certificate shall be signed by the Chair of the Board of Managers or the President or any Vice President and by the Treasurer or an Assistant Treasurer or by the Secretary or an Assistant Secretary.

3.7     Loss of Certificate. In the case of the alleged theft, loss, destruction or mutilation of a Unit Certificate, a duplicate certificate may be issued in place thereof, upon such terms, including receipt of a bond sufficient to indemnify the Company against any claim on account thereof, as the Board of Managers may prescribe.

ARTICLE 4
STATUS AND RIGHTS OF MEMBERS

4.1     Limited Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member, no member of the Board of Managers and no other Indemnified Party shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, a member of the

Board of Managers or an Indemnified Party. All Persons dealing with the Company shall look solely to the assets of the Company for the payment of the debts, obligations or liabilities of the Company.

4.2     Return of Distributions of Capital. Except as otherwise expressly required by law, no Member, in its capacity as such, shall have any liability either to the Company or any of its creditors in excess of (a) any assets and undistributed profits of the Company and (b) to the extent required by law, the amount of any Distributions wrongfully distributed to it. Except as required by law or a court of competent jurisdiction, no Member or investor in or partner of a Member shall be obligated by this Agreement to return any Distribution to the Company or pay the amount of any Distribution for the account of the Company or to any creditor of the Company. The amount of any Distribution returned to the Company by or on behalf of a Member or paid by or on behalf of a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to such Member.

4.3     No Management or Control. No Member shall take any part in or interfere in any manner with the management of the business and affairs of the Company or have any right or authority to act for or bind the Company.

4.4     Meetings of Members. Meetings of Members shall be held and conducted, and the voting rights of Members shall be, as set forth on Exhibit 4.4 hereto.

ARTICLE 5
DISTRIBUTIONS

5.1     Distributions. Subject to the requirements of the Act, the amount and timing of all Distributions shall be determined by the Member or Members at a meeting called for such purpose. All Distributions shall be made ratably to each Member in accordance with the number of Units then held by such Member. Distributions may be made in cash, securities or other property.

5.2     Withholding. The Company is hereby authorized to withhold and pay over any withholding or other taxes payable by the Company as a result of a Member's status as a Member hereunder.

6

ARTICLE 6
MANAGEMENT

6.1    Management. The business of the Company shall be managed by a Board of Managers, and the Persons constituting the Board of Managers shall be the "managers" of the Company for all purposes under the Act. The Board of Managers as of the date hereof shall be the Persons set forth in Exhibit 6.1. Thereafter, the Persons constituting the Board of Managers shall be elected by the Members in accordance with Exhibit 4.4 hereto. Decisions of the Board of Managers shall be embodied in a vote or resolution adopted in accordance with the procedures set forth in Exhibit 6.1. Such decisions shall be decisions of the "manager" for all purposes of

the Act and shall be carried out by any member of the Board of Managers or by officers or agents of the Company designated by the Board of Managers in the vote or resolution in question or in one or more standing votes or resolutions or with the power and authority to do so under Section 6.3. A decision of the Board of Managers may be amended, modified or repealed in the same manner in which it was adopted or in accordance with the procedures set forth in Exhibit 6.1 as then in effect, but no such amendment, modification or repeal shall affect any Person who has been furnished a copy of the original vote or resolution, certified by a duly authorized agent of the Company, until such Person has been notified in writing of such amendment, modification or repeal.

6.2    Authority of Board of Managers. The Board of Managers shall have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. Except as otherwise expressly provided in this Agreement, the Board of Managers or Persons designated by the Board of Managers, including officers and agents appointed by the Board of Managers, shall be the only Persons authorized to execute documents which shall be binding on the Company. To the fullest extent permitted by Delaware law, the Board of Managers shall have the power to do any and all acts, statutory or otherwise, with respect to the Company of this Agreement, which would otherwise be possessed by the Member or Members under the laws of the State of Delaware, and the Member or Members shall have no power whatsoever with respect to the management of the business and affairs of the Company. The owner and authority granted to the Board of Managers hereunder shall include all those necessary or convenient for the furtherance of the purposes of the Company and shall include the power to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company, including without limitation, the power and authority to undertake and make decisions concerning: (a) hiring and firing of employees, attorneys, accountants, brokers, investment bankers and other advisors and consultants, (b) entering into of leases for real or personal property, (c) opening of bank and other deposit accounts and operations thereunder, (d) purchasing, constructing, improving, developing and maintaining of real property, (e) purchasing of insurance, goods, supplies, equipment, materials and other personal property, (f) borrowing of money, obtaining of credit, issuance of notes, debentures, securities, equity or other interests of or in the Company and securing of the obligations undertaken in connection therewith with mortgages on and security interests in all or any portion of the real or personal property of the Company, (g) making of investments in or the acquisition of securities of any Person, (h) giving of guarantees and indemnities, (i) entering into of contracts or agreements whether in the ordinary course of business or otherwise, (j) mergers with or acquisitions of other Persons, (k) the sale or lease of all or any portion of the assets of the

7

Company, (1) forming subsidiaries or joint ventures, (m) compromising, arbitrating, adjusting and litigating claims in favor of or against the Company and (n) all other acts or activities necessary or desirable for the carrying out of the purposes of the Company including those referred to in Section 2.6.

6.3     Officers; Agents. The Board of Managers by vote or resolution shall have the power to appoint officers and agents to act for the Company with such titles, if any, as the Board of Managers deems appropriate and to delegate to such officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may in its sole discretion determine; provided, however, that no such delegation by the Board of Managers shall cause the Persons constituting the Board of Managers to cease to be the "managers" of the Company within the meaning of the Act. The officers or agents so appointed may include persons holding titles such as Chairman, Chief Executive Officer, Chief Operating Officer, President, Chief Financial Officer, Executive Vice President, Vice President, Treasurer, Controller, Secretary or Assistant Secretary. An officer may be removed at any time with or without cause. The officers of the Company as of the date hereof are set forth on Exhibit 6.3. Unless the authority of the agent designated as the officer in question is limited in the document appointing such officer or is otherwise specified by the Board of Managers, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a corporation in the absence of a specific delegation of authority and all deeds, leases, transfers, contracts, bonds, notes, checks, drafts or other obligations made, accepted or endorsed by the corporation may be signed by the Chairman, if any, the President, a Vice President or the Treasurer, Controller, Secretary or Assistant Secretary at the time in office. The Board of Managers, in its sole discretion, may by vote or resolution of the Board of Managers ratify any act previously taken by an officer or agent acting on behalf of the Company.

6.4     Reliance by Third Parties. Any person or entity dealing with the Company or any Member may rely upon a certificate signed by a member of the Board of Managers as to: (a) the identity of the Member or the members of the Board of Managers, (b) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Member or the Board of Managers or are in any other manner germane to the affairs of the Company, (c) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of the Company, (d) the authorization of any action taken by or on behalf of the Company, the Board of Managers or any officer or agent acting on behalf of the Company or (e) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or the Member.

ARTICLE 7
TRANSFER OF INTERESTS

Any Member may sell, assign, pledge, encumber, dispose of or otherwise transfer all or any part of the economic or other rights that comprise its Interest. If so determined by such Member, the transferee shall have the right to be substituted for the Member under this Agreement for the transferor or as an additional Member if the Member transfers less than all of its Interest. No Member may withdraw or resign as Member except as a result of a transfer pursuant to this Article 7 in which the transferee is substituted for the Member. None of the

8

events described in Section 18-304 of the Act shall cause a Member to cease to be a Member of the Company.

ARTICLE 8
AMENDMENTS TO AGREEMENT

This Agreement may be amended or modified as shall be agreed by the Members holding not less than 75.0% of the then outstanding Units at a meeting of the Members held pursuant to Section 4.4 and Exhibit 4.4. The Board of Managers shall cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any such amendment or modification.

ARTICLE 9
DISSOLUTION OF COMPANY

9.1     Events of Dissolution or Liquidation. The Company shall be dissolved and its affairs wound up upon the happening of either of the following events: (a) the written determination of each of the Members or (b) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

9.2     Liquidation. After termination of the business of the Company, the assets of the Company shall be distributed in the following order of priority:

(a)     to creditors of the Company, including any Member if a creditor to the extent permitted by law, in satisfaction of liabilities of the Company (whether by payment thereof or the making of reasonable provision for payment thereof) other than liabilities for Distributions to the Member; and then

(b)     ratably to each Member in accordance with the number of Units then held by such Member.

ARTICLE 10
INDEMNIFICATION

9

10.1     General. The Company shall indemnify, defend, and hold harmless any Member, any director, officer, partner, stockholder, controlling Person or employee of any Member, each member of the Board of Managers, any officer, employee or agent of the Company and any Person serving at the request of the Company as a director, officer, employee, partner, trustee or independent contractor of another corporation, partnership, limited liability company, joint venture, trust or other enterprise (all of the foregoing Persons being referred to collectively as "Indemnified Parties" and individually as an "Indemnified Party") from any liability, loss or damage incurred by the Indemnified Party by reason of any act performed or omitted to be performed by the Indemnified Party pursuant to the authority granted by this Agreement or otherwise in connection with the business or affairs of the Company and from liabilities or obligations of the Company imposed on such Indemnified Party by virtue of such Indemnified Party's position with the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage, except for liabilities, losses, damages or obligations resulting from the Indemnified Party's gross negligence or willful misconduct; provided, however, that the indemnification under this Section 10.1 shall be recoverable only from the assets of the Company and not from any assets of any Member. Unless the Board of Managers determines in good faith that the Indemnified Party is unlikely to be entitled to indemnification under this Article 10, the Company shall pay or reimburse reasonable attorneys' fees of an Indemnified Party as incurred, provided that such Indemnified Party executes an undertaking, with appropriate security if requested by the Board of Managers, to repay the amount so paid or reimbursed in the event that a final non-appealable determination by a court of competent jurisdiction that such Indemnified Party is not entitled to indemnification under this Article 10. The Company may pay for insurance covering liability of the Indemnified Party for negligence in operation of the Company's affairs.

10.2     Exculpation. No Indemnified Party shall be liable, in damages or otherwise, to the Company or to any Member for any liability, loss or damage that arises out of any act performed or omitted to be performed by the Indemnified Party pursuant to the authority granted by this Agreement or otherwise in connection with the business or affairs of the Company. except for liabilities, losses or damages resulting from the Indemnified Party's gross negligence or willful misconduct.

10.3     Persons Entitled to Indemnity. Any Person who is within the definition of "Indemnified Party" at the time of any action or inaction in connection with the business of the Company shall be entitled to the benefits of this Article 10 as an "Indemnified Party" with respect thereto, regardless whether such Person continues to be within the definition of "Indemnified Party" at the time of such Indemnified Party's claim for indemnification or exculpation hereunder.

10.4     Procedure Agreements. The Company may enter into an agreement with any of its officers, employees, consultants, counsel and agents, any member of the Board of Managers or any Member, setting forth procedures consistent with applicable law for implementing the indemnities provided in this Article 10.

ARTICLE 11
MISCELLANEOUS

10

11.1     General. This Agreement: (a) shall be binding upon the legal successors of any Member; (b) shall be governed by and construed in accordance with the laws of the State of Delaware; and (c) contains the entire agreement as to the subject matter hereof. The waiver of any of the provisions, terms, or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms, or conditions hereof.

11.2     Notices, Etc. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery or receipt (which may be evidenced by a return receipt if sent by registered mail or by signature if delivered by courier or delivery service), addressed to any Member at its address in the records of the Company or otherwise specified by the Member.

11.3     Gender and Number. Whenever required by the context, as used in this Agreement the singular number shall include the plural, the plural shall include the singular, and all words herein in any gender shall be deemed to include the masculine, feminine and neuter genders.

11.4     Severability. If any provision of this Agreement is determined by a court to be invalid or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein. That invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each said provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

11.5     Headings. The headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing the terms of this Agreement.

11.6     No Third Party Rights. Except for the provisions of Section 6.4, the provisions of this Agreement are for the benefit of the Company, each Member and permitted assignees and no other Person, including creditors of the Company, shall have any right or claim against the Company or any Member by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement.

IN WITNESS WHEREOF, the Company has executed this Agreement as of the day and year first set forth above.

WANGNER ITELPA I LLC

By:_____

Name:
Title:

Schedule A

REGISTER OF INTEREST

Holder of Interest                    Unit Certificate Number                    Units

Exhibit 4.4

MEETINGS OF MEMBERS, ETC.

1.      Annual Meeting.  There shall be an annual meeting of the Members which shall be (a) held at Westborough, Massachusetts on the second Thursday in June in each year, unless that day be a legal holiday at the place where the meeting is to be held, in which case the meeting shall be held at the same hour on the next succeeding day not a legal holiday, or (b) at such other place, date and time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, at which meeting they shall elect a Board of Managers, determine Distributions, if any, and transact such other business as may be required by law or this Agreement or as may properly come before the meeting.

2.      Special Meetings.  A special meeting of the Members may be called at any time by the Chairman of the Board, if any, the President, the Board of Managers, or by the Members holding at least 50.0% of the Units then outstanding. A special meeting of the Members shall be called by the Secretary, or in the case of the death, absence, incapacity or refusal of the Secretary, by an Assistant Secretary or some other officer, upon application of a majority of the Board of Managers. Any such application shall state the purpose or purposes of the proposed meeting. Any such call shall state the place, date, hour and purposes of the meeting.

3.      Notice of Meetings.  Except as otherwise provided by law, a written notice of each meeting of the Members stating the place, day and hour thereof and, in the case of a special meeting, the purposes for which the meeting is called, shall be given not less then ten nor more than sixty days before the meeting, to each Member entitled to vote thereat, and to each Member who, by law or by this Agreement, is entitled to notice, by leaving such notice with such Member or at such Member's residence or usual place of business, or by depositing it in the United States mail, postage prepaid, and addressed to such Member at such Member's address as it appears in the records of the Company. Such notice shall be given by the Secretary, or by an officer or person designated by the Board of Managers, or in the case of a special meeting by the officer calling the meeting. As to any adjourned session of any meeting of the Members, notice of the adjourned meeting need not be given if the time and place thereof are announced at the meeting at which the adjournment was taken, except that if the adjournment is for more than thirty days or if after the adjournment a new record date is set for the adjourned session, notice of any such adjourned session of the meeting shall be given in the manner heretofore described. No notice of any meeting of the Members or any adjourned session thereof need be given to a Member if a written waiver of notice, executed before or after the meeting or such adjourned session by such Member, is filed with the records of the meeting or if such Member attends such meeting without objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members or any adjourned session thereof need be specified in any written waiver of notice.

4.      Quorum of Members.  At any meeting of the Members a quorum as to any matter shall consist of a majority of the votes entitled to be cast on the matter, except where a larger quorum is required by law or by this Agreement. Any meeting may be adjourned from time to time by a

majority of the votes properly cast upon the question, whether or not a quorum is present. If a quorum is present at an original meeting, a quorum need not be present at an adjourned session of that meeting.

5.     Action by Vote. Each Member shall be entitled to one vote for each Unit held by such Member on all matters on which Members are entitled to vote at a meeting of Members or otherwise when a quorum is present at any meeting, a plurality of the votes properly cast for election to any office shall elect to such office and a majority of the votes properly cast upon any question other than an election to an office shall decide the question, except when a larger vote is required by law or by this Agreement. No ballot shall be required for any election unless requested by a Member present or represented at the meeting and entitled to vote in the election.

6.     Action without Meetings. Any action required or permitted to be taken by Members for or in connection with any action of the Company may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted and shall be delivered to the Company by delivery to its registered office in Delaware by hand or certified or registered mail, return receipt requested, to its principal place of business or to an officer or agent of the Company having custody of the book in which proceedings of meetings of Members are recorded. Each such written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action referred to therein unless written consents signed by a number of Members sufficient to take such action are delivered to the Company in the manner specified in this paragraph within sixty days of the earliest dated consent so delivered.

If action is taken by consent of Members and in accordance with the foregoing, there shall be filed with the records of the meetings of Members the writing or writings comprising such consent.

If action is taken by less than unanimous consent of Members, prompt notice of the taking of such action without a meeting shall be given to those who have not consented in writing and a certificate signed and attested to by the Secretary that such notice was given shall be filed with the records of the meetings of Members.

7.     Proxy Representation. Every Member may authorize another person or persons to act for such Member by proxy in all matters in which a Member is entitled to participate, whether by waiving notice of any meeting, objecting to or voting or participating at a meeting, or expressing consent or dissent without a meeting. Every proxy must be signed by the Member or by such Member's attorney-in-fact. No proxy shall be voted or acted upon after three years from its date unless such proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable where the interest with which it is coupled is an interest in the Interest of such Member. The authorization of a proxy may but need not be limited to specified action; provided, however, that if a proxy limits its authorization to a meeting or meetings of Members, unless otherwise specifically provided such

proxy shall entitle the holder thereof to vote at any adjourned session but shall not be valid after the final adjournment thereof.

8.      Resolution of Issues.  To the extent that any dispute shall arise with respect thereto, the Board of Managers shall be entitled to decide all issues such as the existence of a quorum, the validity of proxies, the number of votes, the Members entitled to vote or consent and other similar procedural questions that are raised at any meeting of Members.

<u>Exhibit 6.1</u>

<u>BOARD OF MANAGERS</u>

1.      <u>Number: Appointment</u>.  The Board of Managers initially shall consist of three members (each such member, along with any other members appointed from time to time, the "Board Members"). Thereafter, the Board of Managers shall be elected either at the Annual Meeting of Members or at a special meeting called for such purposes. The Board of Managers may increase or decrease the number of Board Members from time to time upon a vote of the Board of Managers.

2.      <u>Initial Board of Managers</u>.  The following individuals will be the initial Board Members:

Stephen R. Light

David Maffucci

Ted Orban

3.      <u>Tenure</u>.  Each Board Member shall, unless otherwise provided by law, hold office until the next Annual Meeting of Members and until such Board Member's successor is elected and qualified, or until such Board Member sooner dies, resigns, is removed or becomes disqualified. Any Board Member may be removed by the Members, at any time without giving any reason for such removal. A Board Member may resign by written notice to the Company which resignation shall not require acceptance and, unless otherwise specified in the resignation notice, shall be effective upon receipt by the Company. Vacancies and any newly created positions on the Board of Managers resulting from any increase in the number of the Board of Managers may be filled by vote of the Members or by a majority of the Board Members then in office, although less than a quorum, or by a sole remaining Board member.

4.      <u>Meetings</u>.  Meetings of the Board of Managers may be held at any time at such places within or without the State of Delaware designated in the notice of the meeting, when called by the Chair of the Board of Managers, if any, the President or any two Board Members acting together, reasonable notice thereof being given to each Board Member.

5.      <u>Notice</u>.  It shall be reasonable and sufficient notice to a Board Member to send notice by overnight delivery at least forty-eight hours or by facsimile at least twenty-four hours before the meeting addressed to such Board Member at such Board Member's usual or last known business or residence address or to give notice to such Board Member in person or by telephone at least twenty-four hours before the meeting. Notice of a meeting need not be given to any Board Member if a written waiver of notice, executed by such Board Member before or after the meeting, is filed with the records of the meeting, or to any Board Member who attends the meeting without protesting prior thereto or at its commencement the lack of notice to such Board Member. Neither notice of a meeting nor a waiver of a notice need specify the purposes of the meeting.

6.      <u>Quorum</u>.  Except as may be otherwise provided by law, at any meeting of the Board of Managers a majority of the Board Members then in office shall constitute a quorum. Any meeting may be adjourned from time to time by a majority of the votes cast upon the question, whether or not a quorum is present, and the meeting may be held as adjourned without further notice.

7.      <u>Action by Vote</u>.  Except as may be otherwise provided by law, when a quorum is present at any meeting the vote of a majority of the Board Members present shall be the act of the Board of Managers.

8.      <u>Action Without a Meeting</u>.  Any action required or permitted to be taken at any meeting of the Board of Managers may be taken without a meeting if all the Board Members consent thereto in writing, and such writing or writings are filed with the records of the meetings of the Board of Managers. Such consent shall be treated for all purposes as the act of the Board of Managers.

9.      <u>Participation in Meetings by Conference Telephone</u>.  Board Members may participate in a meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

10.     <u>Interested Transactions</u>.

(a)      No contract or transaction between the Company and one or more of the Board Members or officers, or between the Company and any other company, partnership, association, or other organization in which one or more of the Board Members or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Board Member or officer is present at or participates in the meeting of the Board of Managers which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(i)      The material facts as to such Board Member's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Managers, and the Board of Managers in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Board Members, even though the disinterested Board Members be less than a quorum; or

(ii)      The contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board of Managers.

(b)      Common or interested Board Members may be counted in determining the presence of a quorum at a meeting of the Board of Managers which authorizes the contract or transaction.

Exhibit 6.3

## OFFICERS

| |
|---|
| Stephen R. Light -- President and Assistant Secretary |
| David Maffucci -- Executive Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban -- Secretary |
| Elizabeth Leete -- Assistant Secretary |

WANGNER ITELPA II LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Dated as of _____, 2010

WANGNER ITELPA II LLC
AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated  Limited Liability Company Agreement ("Agreement") of Wangner Itelpa II LLC (the "Company") is made as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Wangner Itelpa II LLC and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

WHEREAS, Xerium Technologies, Inc, (the "Original Member") wishes to form a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act in order to conduct the business described herein.

NOW, THEREFORE, the Original Member agrees with the Company as follows:

ARTICLE 1
DEFINITIONS

For purposes of this Agreement the following terms have the following meanings:

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.) as amended and in effect from time to time.

"Affiliate" means, with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Amended and Restated Limited Liability Company Agreement of the Company dated as of _____, 2010 as amended from time to time.

"Capital Contribution" means the amount of cash and the fair market value of any other property contributed to the Company with respect to any Interest held by a Member.

"Certificate" means the Certificate of Formation of the Company filed on December 1, 2004 and any and all amendments thereto and restatements thereof filed on behalf of the Company as permitted hereunder with the office of the Secretary of State of the State of Delaware.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the corresponding provisions of any future federal tax law.

"Company" means the limited liability company formed by virtue of this Agreement and the filing of the Certificate in accordance with the Act.

"Distribution" means the amount of cash and the fair market value of any other property distributed in respect of a Member's Interest in the Company.

"Fiscal Year" means the fiscal year of the Company which shall end on December 31 in each year or on such other date in each year as determined by the Board of Managers.

"Indemnified Party" is defined in Section 10.1.

"Interest" means the interest of a Member in the capital and profits of the Company, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"Member" means the Original Member and any other Person that both acquires an Interest in the Company and is admitted to the Company as a Member pursuant to this Agreement, from time to time.

"Original Member" is defined in Section 3.1.

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, or any other legal entity.

"Unit Certificate" is defined in Section 3.6.

"Units" are a measure of a Member's Interest in the Company.


ARTICLE 2
FORMATION AND PURPOSE

2.1     Formation, etc. The Company was formed as a limited liability company in accordance with the Act by the filing of the Certificate with the Secretary of State of Delaware on December 1, 2004. The rights, duties and liabilities of each Member and the Board of Managers shall be determined pursuant to the Act and this Agreement. To the extent that such rights, duties or obligations are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name. The name of the Company is WANGNER ITELPA II LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable. The Board of Managers shall file, or shall cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the Board of Managers considers appropriate or advisable.

2.3    Registered Office/Agent. The registered office required to be maintained by the Company in the State of Delaware pursuant to the Act shall initially be c/o Corporation Service

Company, 2711 Centerville Road, Suite 400, County of New Castle, Wilmington, Delaware 19808. The name and address of the registered agent of the Company pursuant to the Act shall initially be Corporation Service Company, 2711 Centerville Road, Suite 400, County of New Castle, Wilmington, Delaware 19808. The Company may, upon compliance with the applicable provisions of the Act, change its registered office or registered agent from time to time in the discretion of the Board of Managers.

2.4    Term. The term of the Company shall continue indefinitely unless sooner terminated as provided herein. The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate as provided in the Act.

2.5    Purpose. The Company is formed for the purpose of, and the nature of the business to be conducted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any activities necessary, advisable, convenient or incidental thereto.

2.6    Specific Powers. Without limiting the generality of Section 2.5, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 2.5, including, but not limited to, the power:

2.6.1    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any country, state, territory, district or other jurisdiction, whether domestic or foreign;

2.6.2    to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property;

2.6.3    to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, perform and carry out and take any other action with respect to contracts or agreements of any kind, including without limitation leases, licenses, guarantees and other contracts for the benefit of or with any Member or any Affiliate of any Member, without regard to whether such contracts may be deemed necessary, convenient to, or incidental to the accomplishment of the purposes of the Company;

2.6.4    to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, trusts, limited liability companies, or individuals or other persons or direct or indirect obligations of the United States or of any government, state, territory, governmental district or municipality or of any instrumentality of any of them;

2.6.5   to lend money, to invest and reinvest its funds, and to accept real and personal property for the payment of funds so loaned or invested;

2.6.6   to borrow money and issue evidence of indebtedness, and to secure the same by a mortgage, pledge, security interest or other lien on the assets of the Company;

2.6.7   to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

2.6.8   to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

2.6.9   to appoint employees, officers, agents and representatives of the Company, and define their duties and fix their compensation;

2.6.10  to indemnify any Person in accordance with the Act and this Agreement;

2.6.11  to cease its activities and cancel its Certificate; and

2.6.12  to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company.

2.7     Certificate. The filing of the Certificate by Michael J. Stick is hereby ratified and confirmed and said Person is hereby designated as an "authorized person" within the meaning of the Act to execute, deliver and file the Certificate and Stephen R. Light, David Maffucci, Ted Orban and Elizabeth Leete and such other Persons as may be designated from time to time by the Board of Managers are designated as authorized persons, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate or any certificate of cancellation of the Certificate and any other certificates necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.8.    Principal Office. The principal executive office of the Company shall be located at such place within or without the State of Delaware as the Board of Managers shall establish, and the Board of Managers may from time to time change the location of the principal executive office of the Company to any place within or without the State of Delaware. The Board of Managers may establish and maintain such additional offices and places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

ARTICLE 3
ORIGINAL MEMBER; CAPITAL CONTRIBUTIONS; AND UNITS

3.1     Initial Capital Contribution. Upon the making of the initial Capital Contribution to the Company, which shall be in the amount of $100 and the Person making such Capital Contribution agreeing in writing to be bound by this Agreement as a Member, such Person shall

be admitted as the first Member (the "Original Member") and acquire a limited liability company interest in the Company. The initial Capital Contribution shall be allocated to a stated capital account of the Company.

3.2     Additional Capital Contributions. The Members shall make additional Capital Contributions to the Company for such purposes, at such times and in such amounts as shall be agreed by the Members holding not less than 75.0% of the then outstanding Units at a meeting of the Members held pursuant to Section 4.4 and Exhibit 4.4.

3.3     Return of Capital Contributions. No Member shall have the right to demand a return of all or any part of its Capital Contributions, and any return of the Capital Contributions of a Member shall be made solely from the assets of the Company and only in accordance with the terms of this Agreement. No interest shall be paid to any Member with respect to its Capital Contributions.

3.4     Registration of Interests. Each Interest constitutes a "security," as such term is defined in 6 Del. C. § 8-102(15), governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del. C. 8-101, et seq.). The Company shall maintain a record of the ownership of the Interests which shall be in the form set forth on Schedule A and which shall be amended from time to time to reflect transfers of the ownership of the Interests. An Interest shall be transferred by delivery to the Company of an instruction by the registered owner of the Interest requesting registration of transfer of such Interest (accompanied by a duly indorsed security certificate representing such Interest or affidavit of loss therefore) and the recording of such transfer in the records of the Company.

3.5     Units. Upon the admission of the Original Member as a Member, the Interest of the Original Member shall be divided into 100 Units. Notwithstanding anything to the contrary contained herein, the Company may not issue Units that would be deemed to be non-voting securities as contemplated by section 1123(a)(6) of the Title 11 of the United States Code, and any provision contained herein that would render the Units non-voting equity units as contemplated by section 1123(a)(6) of Title 11 of the United States Code shall be deemed null and void. The Board of Managers may issue additional Units to any Member in respect of additional Capital Contributions.

3.6     Unit Certificate. Each Member shall be entitled to a certificate stating the number of Units held by the Member in such form as shall, in conformity with law and this Agreement, be prescribed from time to time by the Board of Managers (a "Unit Certificate"). Such Unit Certificate shall be signed by the Chair of the Board of Managers or the President or any Vice President and by the Treasurer or an Assistant Treasurer or by the Secretary or an Assistant Secretary.

3.7     Loss of Certificate. In the case of the alleged theft, loss, destruction or mutilation of a Unit Certificate, a duplicate certificate may be issued in place thereof, upon such terms, including receipt of a bond sufficient to indemnify the Company against any claim on account thereof, as the Board of Managers may prescribe.

## ARTICLE 4
## STATUS AND RIGHTS OF MEMBERS

4.1    Limited Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member, no member of the Board of Managers and no other Indemnified Party shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, a member of the Board of Managers or an Indemnified Party. All Persons dealing with the Company shall look solely to the assets of the Company for the payment of the debts, obligations or liabilities of the Company.

4.2    Return of Distributions of Capital. Except as otherwise expressly required by law, no Member, in its capacity as such, shall have any liability either to the Company or any of its creditors in excess of (a) any assets and undistributed profits of the Company and (b) to the extent required by law, the amount of any Distributions wrongfully distributed to it. Except as required by law or a court of competent jurisdiction, no Member or investor in or partner of a Member shall be obligated by this Agreement to return any Distribution to the Company or pay the amount of any Distribution for the account of the Company or to any creditor of the Company. The amount of any Distribution returned to the Company by or on behalf of a Member or paid by or on behalf of a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to such Member.

4.3    No Management or Control. No Member shall take any part in or interfere in any manner with the management of the business and affairs of the Company or have any right or authority to act for or bind the Company.

4.4    Meetings of Members. Meetings of Members shall be held and conducted, and the voting rights of Members shall be, as set forth on Exhibit 4.4 hereto.

## ARTICLE 5
## DISTRIBUTIONS

5.1    Distributions. Subject to the requirements of the Act, the amount and timing of all Distributions shall be determined by the Member or Members at a meeting called for such purpose. All Distributions shall be made ratably to each Member in accordance with the number of Units then held by such Member. Distributions may be made in cash, securities or other property.

5.2    Withholding. The Company is hereby authorized to withhold and pay over any withholding or other taxes payable by the Company as a result of a Member's status as a Member hereunder.

## ARTICLE 6
## MANAGEMENT

6.1    _Management_. The business of the Company shall be managed by a Board of Managers, and the Persons constituting the Board of Managers shall be the "managers" of the Company for all purposes under the Act. The Board of Managers as of the date hereof shall be the Persons set forth in Exhibit 6.1. Thereafter, the Persons constituting the Board of Managers shall be elected by the Members in accordance with Exhibit 4.4 hereto. Decisions of the Board of Managers shall be embodied in a vote or resolution adopted in accordance with the procedures set forth in Exhibit 6.1. Such decisions shall be decisions of the "manager" for all purposes of the Act and shall be carried out by any member of the Board of Managers or by officers or agents of the Company designated by the Board of Managers in the vote or resolution in question or in one or more standing votes or resolutions or with the power and authority to do so under Section 6.3. A decision of the Board of Managers may be amended, modified or repealed in the same manner in which it was adopted or in accordance with the procedures set forth in Exhibit 6.1 as then in effect, but no such amendment, modification or repeal shall affect any Person who has been furnished a copy of the original vote or resolution, certified by a duly authorized agent of the Company, until such Person has been notified in writing of such amendment, modification or repeal.

6.2    _Authority of Board of Managers_. The Board of Managers shall have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. Except as otherwise expressly provided in this Agreement, the Board of Managers or Persons designated by the Board of Managers, including officers and agents appointed by the Board of Managers, shall be the only Persons authorized to execute documents which shall be binding on the Company. To the fullest extent permitted by Delaware law, the Board of Managers shall have the power to do any and all acts, statutory or otherwise, with respect to the Company of this Agreement, which would otherwise be possessed by the Member or Members under the laws of the State of Delaware, and the Member or Members shall have no power whatsoever with respect to the management of the business and affairs of the Company. The owner and authority granted to the Board of Managers hereunder shall include all those necessary or convenient for the furtherance of the purposes of the Company and shall include the power to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company, including without limitation, the power and authority to undertake and make decisions concerning: (a) hiring and firing of employees, attorneys, accountants, brokers, investment bankers and other advisors and consultants, (b) entering into of leases for real or personal property, (c) opening of bank and other deposit accounts and operations thereunder, (d) purchasing, constructing, improving, developing and maintaining of real property, (e) purchasing of insurance, goods, supplies, equipment, materials and other personal property, (f) borrowing of money, obtaining of credit, issuance of notes, debentures, securities, equity or other interests of or in the Company and securing of the obligations undertaken in connection therewith with mortgages on and security interests in all or any portion of the real or personal property of the Company, (g) making of investments in or the acquisition of securities of any Person, (h) giving of guarantees and indemnities, (i) entering into of contracts or agreements whether in the ordinary course of business or otherwise, (j) mergers with or acquisitions of other Persons, (k) the sale or lease of all or any portion of the assets of the Company, (1) forming subsidiaries or joint ventures, (m) compromising, arbitrating, adjusting and litigating claims in favor of or against the Company and (n) all other acts or activities necessary or desirable for the carrying out of the purposes of the Company including those referred to in Section 2.6.

6.3     Officers; Agents. The Board of Managers by vote or resolution shall have the power to appoint officers and agents to act for the Company with such titles, if any, as the Board of Managers deems appropriate and to delegate to such officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may in its sole discretion determine; provided, however, that no such delegation by the Board of Managers shall cause the Persons constituting the Board of Managers to cease to be the "managers" of the Company within the meaning of the Act. The officers or agents so appointed may include persons holding titles such as Chairman, Chief Executive Officer, Chief Operating Officer, President, Chief Financial Officer, Executive Vice President, Vice President, Treasurer, Controller, Secretary or Assistant Secretary. An officer may be removed at any time with or without cause. The officers of the Company as of the date hereof are set forth on Exhibit 6.3. Unless the authority of the agent designated as the officer in question is limited in the document appointing such officer or is otherwise specified by the Board of Managers, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a corporation in the absence of a specific delegation of authority and all deeds, leases, transfers, contracts, bonds, notes, checks, drafts or other obligations made, accepted or endorsed by the corporation may be signed by the Chairman, if any, the President, a Vice President or the Treasurer, Controller, Secretary or Assistant Secretary at the time in office. The Board of Managers, in its sole discretion, may by vote or resolution of the Board of Managers ratify any act previously taken by an officer or agent acting on behalf of the Company.

6.4     Reliance by Third Parties. Any person or entity dealing with the Company or any Member may rely upon a certificate signed by a member of the Board of Managers as to: (a) the identity of the Member or the members of the Board of Managers, (b) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Member or the Board of Managers or are in any other manner germane to the affairs of the Company, (c) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of the Company, (d) the authorization of any action taken by or on behalf of the Company, the Board of Managers or any officer or agent acting on behalf of the Company or (e) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or the Member.

ARTICLE 7
TRANSFER OF INTERESTS

Any Member may sell, assign, pledge, encumber, dispose of or otherwise transfer all or any part of the economic or other rights that comprise its Interest. If so determined by such Member, the transferee shall have the right to be substituted for the Member under this Agreement for the transferor or as an additional Member if the Member transfers less than all of its Interest. No Member may withdraw or resign as Member except as a result of a transfer pursuant to this Article 7 in which the transferee is substituted for the Member. None of the events described in Section 18-304 of the Act shall cause a Member to cease to be a Member of the Company.

ARTICLE 8
AMENDMENTS TO AGREEMENT

This Agreement may be amended or modified as shall be agreed by the Members holding not less than 75.0% of the then outstanding Units at a meeting of the Members held pursuant to Section 4.4 and Exhibit 4.4. The Board of Managers shall cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any such amendment or modification.

ARTICLE 9
DISSOLUTION OF COMPANY

9.1     Events of Dissolution or Liquidation. The Company shall be dissolved and its affairs wound up upon the happening of either of the following events: (a) the written determination of each of the Members or (b) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

9.2     Liquidation. After termination of the business of the Company, the assets of the Company shall be distributed in the following order of priority:

(a)     to creditors of the Company, including any Member if a creditor to the extent permitted by law, in satisfaction of liabilities of the Company (whether by payment thereof or the making of reasonable provision for payment thereof) other than liabilities for Distributions to the Member; and then

(b)     ratably to each Member in accordance with the number of Units then held by such Member.

ARTICLE 10
INDEMNIFICATION

10.1     General. The Company shall indemnify, defend, and hold harmless any Member, any director, officer, partner, stockholder, controlling Person or employee of any Member, each member of the Board of Managers, any officer, employee or agent of the Company and any Person serving at the request of the Company as a director, officer, employee, partner, trustee or independent contractor of another corporation, partnership, limited liability company, joint venture, trust or other enterprise (all of the foregoing Persons being referred to collectively as

"Indemnified Parties" and individually as an "Indemnified Party") from any liability, loss or damage incurred by the Indemnified Party by reason of any act performed or omitted to be performed by the Indemnified Party pursuant to the authority granted by this Agreement or otherwise in connection with the business or affairs of the Company and from liabilities or obligations of the Company imposed on such Indemnified Party by virtue of such Indemnified Party's position with the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage, except for liabilities, losses, damages or obligations resulting from the Indemnified Party's gross negligence or willful misconduct; provided, however, that the indemnification under this Section 10.1 shall be recoverable only from the assets of the Company and not from any assets of any Member. Unless the Board of Managers determines in good faith that the Indemnified Party is unlikely to be entitled to indemnification under this Article 10, the Company shall pay or reimburse reasonable attorneys' fees of an Indemnified Party as incurred, provided that such Indemnified Party executes an undertaking, with appropriate security if requested by the Board of Managers, to repay the amount so paid or reimbursed in the event that a final non-appealable determination by a court of competent jurisdiction that such Indemnified Party is not entitled to indemnification under this Article 10. The Company may pay for insurance covering liability of the Indemnified Party for negligence in operation of the Company's affairs.

10.2   Exculpation. No Indemnified Party shall be liable, in damages or otherwise, to the Company or to any Member for any liability, loss or damage that arises out of any act performed or omitted to be performed by the Indemnified Party pursuant to the authority granted by this Agreement or otherwise in connection with the business or affairs of the Company. except for liabilities, losses or damages resulting from the Indemnified Party's gross negligence or willful misconduct.

10.3   Persons Entitled to Indemnity. Any Person who is within the definition of "Indemnified Party" at the time of any action or inaction in connection with the business of the Company shall be entitled to the benefits of this Article 10 as an "Indemnified Party" with respect thereto, regardless whether such Person continues to be within the definition of "Indemnified Party" at the time of such Indemnified Party's claim for indemnification or exculpation hereunder.

10.4   Procedure Agreements. The Company may enter into an agreement with any of its officers, employees, consultants, counsel and agents, any member of the Board of Managers or any Member, setting forth procedures consistent with applicable law for implementing the indemnities provided in this Article 10.

ARTICLE 11
MISCELLANEOUS

11.1   General. This Agreement: (a) shall be binding upon the legal successors of any Member; (b) shall be governed by and construed in accordance with the laws of the State of Delaware; and (c) contains the entire agreement as to the subject matter hereof. The waiver of any of the provisions, terms, or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms, or conditions hereof.

11.2     Notices, Etc. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery or receipt (which may be evidenced by a return receipt if sent by registered mail or by signature if delivered by courier or delivery service), addressed to any Member at its address in the records of the Company or otherwise specified by the Member.

11.3     Gender and Number. Whenever required by the context, as used in this Agreement the singular number shall include the plural, the plural shall include the singular, and all words herein in any gender shall be deemed to include the masculine, feminine and neuter genders.

11.4     Severability. If any provision of this Agreement is determined by a court to be invalid or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein. That invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each said provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

11.5     Headings. The headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing the terms of this Agreement.

11.6     No Third Party Rights. Except for the provisions of Section 6.4, the provisions of this Agreement are for the benefit of the Company, each Member and permitted assignees and no other Person, including creditors of the Company, shall have any right or claim against the Company or any Member by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement.

IN WITNESS WHEREOF, the Company has executed this Agreement as of the day and year first set forth above.

WANGNER ITELPA II LLC

By:_____

Name:
Title:

Schedule A

## REGISTER OF INTEREST

Holder of Interest                     Unit Certificate Number                Units

Exhibit 4.4

MEETINGS OF MEMBERS, ETC.

1.      Annual Meeting.  There shall be an annual meeting of the Members which shall be (a) held at Westborough, Massachusetts on the second Thursday in June in each year, unless that day be a legal holiday at the place where the meeting is to be held, in which case the meeting shall be held at the same hour on the next succeeding day not a legal holiday, or (b) at such other place, date and time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, at which meeting they shall elect a Board of Managers, determine Distributions, if any, and transact such other business as may be required by law or this Agreement or as may properly come before the meeting.

2.      Special Meetings.  A special meeting of the Members may be called at any time by the Chairman of the Board, if any, the President, the Board of Managers, or by the Members holding at least 50.0% of the Units then outstanding. A special meeting of the Members shall be called by the Secretary, or in the case of the death, absence, incapacity or refusal of the Secretary, by an Assistant Secretary or some other officer, upon application of a majority of the Board of Managers. Any such application shall state the purpose or purposes of the proposed meeting. Any such call shall state the place, date, hour and purposes of the meeting.

3.      Notice of Meetings.  Except as otherwise provided by law, a written notice of each meeting of the Members stating the place, day and hour thereof and, in the case of a special meeting, the purposes for which the meeting is called, shall be given not less then ten nor more than sixty days before the meeting, to each Member entitled to vote thereat, and to each Member who, by law or by this Agreement, is entitled to notice, by leaving such notice with such Member or at such Member's residence or usual place of business, or by depositing it in the United States mail, postage prepaid, and addressed to such Member at such Member's address as it appears in the records of the Company. Such notice shall be given by the Secretary, or by an officer or person designated by the Board of Managers, or in the case of a special meeting by the officer calling the meeting. As to any adjourned session of any meeting of the Members, notice of the adjourned meeting need not be given if the time and place thereof are announced at the meeting at which the adjournment was taken, except that if the adjournment is for more than thirty days or if after the adjournment a new record date is set for the adjourned session, notice of any such adjourned session of the meeting shall be given in the manner heretofore described. No notice of any meeting of the Members or any adjourned session thereof need be given to a Member if a written waiver of notice, executed before or after the meeting or such adjourned session by such Member, is filed with the records of the meeting or if such Member attends such meeting without objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members or any adjourned session thereof need be specified in any written waiver of notice.

4.      Quorum of Members.  At any meeting of the Members a quorum as to any matter shall consist of a majority of the votes entitled to be cast on the matter, except where a larger quorum is required by law or by this Agreement. Any meeting may be adjourned from time to time by a

majority of the votes properly cast upon the question, whether or not a quorum is present. If a quorum is present at an original meeting, a quorum need not be present at an adjourned session of that meeting.

5.      Action by Vote.  Each Member shall be entitled to one vote for each Unit held by such Member on all matters on which Members are entitled to vote at a meeting of Members or otherwise when a quorum is present at any meeting, a plurality of the votes properly cast for election to any office shall elect to such office and a majority of the votes properly cast upon any question other than an election to an office shall decide the question, except when a larger vote is required by law or by this Agreement. No ballot shall be required for any election unless requested by a Member present or represented at the meeting and entitled to vote in the election.

6.      Action without Meetings.  Any action required or permitted to be taken by Members for or in connection with any action of the Company may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted and shall be delivered to the Company by delivery to its registered office in Delaware by hand or certified or registered mail, return receipt requested, to its principal place of business or to an officer or agent of the Company having custody of the book in which proceedings of meetings of Members are recorded. Each such written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action referred to therein unless written consents signed by a number of Members sufficient to take such action are delivered to the Company in the manner specified in this paragraph within sixty days of the earliest dated consent so delivered.

        If action is taken by consent of Members and in accordance with the foregoing, there shall be filed with the records of the meetings of Members the writing or writings comprising such consent.

        If action is taken by less than unanimous consent of Members, prompt notice of the taking of such action without a meeting shall be given to those who have not consented in writing and a certificate signed and attested to by the Secretary that such notice was given shall be filed with the records of the meetings of Members.

7.      Proxy Representation. Every Member may authorize another person or persons to act for such Member by proxy in all matters in which a Member is entitled to participate, whether by waiving notice of any meeting, objecting to or voting or participating at a meeting, or expressing consent or dissent without a meeting. Every proxy must be signed by the Member or by such Member's attorney-in-fact. No proxy shall be voted or acted upon after three years from its date unless such proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable where the interest with which it is coupled is an interest in the Interest of such Member. The authorization of a proxy may but need not be limited to specified action; provided, however, that if a proxy limits its authorization to a meeting or meetings of Members, unless otherwise specifically provided such

proxy shall entitle the holder thereof to vote at any adjourned session but shall not be valid after the final adjournment thereof.

8.      Resolution of Issues.  To the extent that any dispute shall arise with respect thereto, the Board of Managers shall be entitled to decide all issues such as the existence of a quorum, the validity of proxies, the number of votes, the Members entitled to vote or consent and other similar procedural questions that are raised at any meeting of Members.

<u>Exhibit 6.1</u>

<u>BOARD OF MANAGERS</u>

1.      <u>Number: Appointment</u>.  The Board of Managers initially shall consist of three members (each such member, along with any other members appointed from time to time, the "Board Members"). Thereafter, the Board of Managers shall be elected either at the Annual Meeting of Members or at a special meeting called for such purposes. The Board of Managers may increase or decrease the number of Board Members from time to time upon a vote of the Board of Managers.

2.      <u>Initial Board of Managers</u>.  The following individuals will be the initial Board Members:

Stephen R. Light

David Maffucci

Ted Orban

3.      <u>Tenure</u>.  Each Board Member shall, unless otherwise provided by law, hold office until the next Annual Meeting of Members and until such Board Member's successor is elected and qualified, or until such Board Member sooner dies, resigns, is removed or becomes disqualified. Any Board Member may be removed by the Members, at any time without giving any reason for such removal. A Board Member may resign by written notice to the Company which resignation shall not require acceptance and, unless otherwise specified in the resignation notice, shall be effective upon receipt by the Company. Vacancies and any newly created positions on the Board of Managers resulting from any increase in the number of the Board of Managers may be filled by vote of the Members or by a majority of the Board Members then in office, although less than a quorum, or by a sole remaining Board member.

4.      <u>Meetings</u>.  Meetings of the Board of Managers may be held at any time at such places within or without the State of Delaware designated in the notice of the meeting, when called by the Chair of the Board of Managers, if any, the President or any two Board Members acting together, reasonable notice thereof being given to each Board Member.

5.      <u>Notice</u>.  It shall be reasonable and sufficient notice to a Board Member to send notice by overnight delivery at least forty-eight hours or by facsimile at least twenty-four hours before the meeting addressed to such Board Member at such Board Member's usual or last known business or residence address or to give notice to such Board Member in person or by telephone at least twenty-four hours before the meeting. Notice of a meeting need not be given to any Board Member if a written waiver of notice, executed by such Board Member before or after the meeting, is filed with the records of the meeting, or to any Board Member who attends the meeting without protesting prior thereto or at its commencement the lack of notice to such Board Member. Neither notice of a meeting nor a waiver of a notice need specify the purposes of the meeting.

6.     Quorum.  Except as may be otherwise provided by law, at any meeting of the Board of Managers a majority of the Board Members then in office shall constitute a quorum. Any meeting may be adjourned from time to time by a majority of the votes cast upon the question, whether or not a quorum is present, and the meeting may be held as adjourned without further notice.

7.     Action by Vote.  Except as may be otherwise provided by law, when a quorum is present at any meeting the vote of a majority of the Board Members present shall be the act of the Board of Managers.

8.     Action Without a Meeting.  Any action required or permitted to be taken at any meeting of the Board of Managers may be taken without a meeting if all the Board Members consent thereto in writing, and such writing or writings are filed with the records of the meetings of the Board of Managers. Such consent shall be treated for all purposes as the act of the Board of Managers.

9.     Participation in Meetings by Conference Telephone.  Board Members may participate in a meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

10.    Interested Transactions.

    (a)     No contract or transaction between the Company and one or more of the Board Members or officers, or between the Company and any other company, partnership, association, or other organization in which one or more of the Board Members or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Board Member or officer is present at or participates in the meeting of the Board of Managers which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

        (i)     The material facts as to such Board Member's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Managers, and the Board of Managers in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Board Members, even though the disinterested Board Members be less than a quorum; or

        (ii)     The contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board of Managers.

    (b) Common or interested Board Members may be counted in determining the presence of a quorum at a meeting of the Board of Managers which authorizes the contract or transaction.

Exhibit 6.3

## OFFICERS

| |
|---|
| Stephen R. Light -- President and Assistant Secretary |
| David Maffucci -- Executive Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban -- Secretary |
| Elizabeth Leete -- Assistant Secretary |

**WEAVEXX, LLC**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

This Amended and Restated  Limited Liability Company Agreement ("Agreement") of Weavexx, LLC (the "Company") is made as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Weavexx, LLC and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

**SECTION 1. Formation.** The LLC was formed upon the filing of its certificate of formation (the "Certificate of Formation") with the Secretary of State of the State of Delaware. The LLC was formed upon the conversion of Weavexx Corporation, a Delaware corporation.

**SECTION 2. Purpose and Powers.** The purpose of the LLC is to engage in any activity for which limited liability companies may be organized in the State of Delaware. The LLC shall possess and may exercise all of the powers and privileges granted by the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act") or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the LLC.

**SECTION 3. Registered Office.** The initial registered office of the LLC in the State of Delaware shall be located at the address for such office as set forth in the certificate of formation for the LLC filed with the Office of the Secretary of State of the State of Delaware. The registered office of the LLC may changed from time to time with the approval of the Board of Managers (as defined in Section 9).

**SECTION 4. Registered Agent.** The name of the initial registered agent of the LLC for service of process on the LLC in the State of Delaware shall be as set forth in the Certificate of Formation. The registered agent of the LLC may be changed from time to time with the approval of the Board of Managers (as defined in Section 9).

**SECTION 5. Admission of Member.** Simultaneously with the filing of the Certificate of Formation with the Office of the Secretary of State of the State of Delaware, Xerium Technologies, Inc. is admitted as the sole member of the LLC in respect of the Interest (as hereinafter defined).

**SECTION 6. Interest and LLC Unit.** The LLC shall be authorized to issue a single class of limited liability company interest (as defined in the Act). The entire limited liability company interest of the LLC, together with the rights of the sole member of the LLC under this

USActive 18780362.2

Agreement and the Act (the "Interest"), shall be represented by a certificate in the form attached hereto as Exhibit A. The Interest shall be represented by one (1) unit of interest (the "LLC Unit"). Notwithstanding anything to the contrary contained herein, the Company may not issue LLC Units that would be deemed to be non-voting securities as contemplated by section 1123(a)(6) of the Title 11 of the United States Code, and any provision contained herein that would render the Units non-voting equity units as contemplated by section 1123(a)(6) of Title 11 of the United States Code shall be deemed null and void.

**SECTION 7. Capital Contributions.** The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

**SECTION 8. Tax Characterization and Returns.** So long as the LLC has only one member, it is the intention of the Member that the LLC be disregarded for federal and state income tax purposes and that the activities of the LLC be deemed to be the activities of the Member for such purposes. All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status under those circumstances. Prior to any transaction that would result in the LLC having more than one member (including, without limitation, the admission of another member by the LLC or the transfer by the Member of less than all of the Interest), appropriate amendments shall be made to this Agreement to reflect the change in the Company's classification for federal and state income tax purposes that would result from such transfer or admission.

**SECTION 9. Management.**

**(a)  Board of Managers.** The management of the LLC shall be vested in a Board of Managers (the "Board of Managers") elected by the Member. The total number of members on the Board of Managers (the "Managers") shall be three unless otherwise fixed at a different number by an amendment hereto. The Member hereby elects Stephen Light, Michael O'Donnell and Marshall Woodworth as the initial Managers of the LLC, to serve until their successors are elected and qualified. A Manager shall remain in office until removed by a written instrument signed by the Member or until such Manager resigns in a written instrument delivered to the Member or such Manager dies or is unable to serve. In the event of any vacancy on the Board of Managers, the Member may fill the vacancy by written instrument. Each Manager shall have one (1) vote. Except as otherwise provided in this Agreement, the Board of Managers shall act by the affirmative vote of a majority of the total number of Managers and no single Manager shall have the right, power or authority to bind the LLC. Each Manager shall perform his or her duties as such in good faith, in a manner he reasonably believes to be in the best interests of the LLC, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties shall not have any liability by reason of serving or having served as a Manager. A Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the LLC.

**(b)  Meetings and Powers of Board of Managers.** The Board of Managers shall establish meeting times, dates and places and requisite notice requirements and adopt rules or procedures consistent with the terms of this Agreement. Any action required to be taken at a meeting of the Board of Managers, or any action that may be taken at a meeting of the Board of Managers, may be taken at a meeting held by means of conference telephone or other

communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting.

Notwithstanding anything to the contrary in this Section 9, the Board of Managers may take any action that may be taken by the Board of Managers under this Agreement without a meeting if such action is approved by the unanimous written consent of the Managers. Except as otherwise provided in this Agreement, all powers to control and manage the business and affairs of the LLC shall be exclusively vested in the Board of Managers, and the Board of Managers may exercise all powers of the LLC and do all such lawful acts as are not by statute, the Certificate of Formation or this Agreement directed or required to be exercised or done by the Member and in so doing shall have the right and authority to take all actions which the Board of Managers deems necessary, useful or appropriate for the management and conduct of the business of the LLC; provided, however, that the Member may amend this Agreement at any time and thereby broaden or limit the Board of Managers' power and authority.

**(c)** **Officers.** The LLC shall have officers who are appointed by the Board of Managers (the "Officers" and each an "Officer"). The Officers of the LLC shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other positions as the Board of Managers deems appropriate from time to time. The initial Officers of the LLC shall be:

|  |
| --- |
| Stephen R. Light -- Chief Executive Officer and President |
| David Maffucci -- Vice President, Chief Financial Officer and Assistant Secretary |
| David Pretty -- Vice President and Assistant Secretary |
| Ted Orban -- Secretary and Treasurer |
| Elizabeth Leete -- Assistant Secretary |

The powers and duties of each Officer shall be as follows:

**The President.** The President shall have, subject to the supervision, direction and control of the Board of Managers, the general powers and duties of supervision, direction and management of the affairs and business of the LLC usually vested in the president of a corporation, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the LLC and the power to execute any agreements, deeds, certificates, notes or other documents on behalf of the LLC, provided that the approval of the Board of Managers or the Member is first obtained if such approval is required under the other provisions of this Agreement or the Act.

**The Chief Executive Officer.** The Chief Executive Officer shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers.

**The Chief Financial Officer**.  The Chief Executive Officer shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers, President or Chief Executive Officer.

**The Vice Presidents.** Each Vice President shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers or the President.

**The Secretary.** The Secretary shall attend meetings of the Board of Managers and meetings of the Member and record all votes and minutes of all such proceedings in a book kept for such purpose. He or she shall have all such further powers and duties as generally are incident to the position of a secretary of a corporation or as may from time to time be assigned to him or her by the Board of Managers or the President.

**Assistant Secretary.**  Each Assistant Secretary shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers, President or Secretary.

**The Treasurer.** The Treasurer shall have custody of the LLC's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the LLC and shall deposit or cause to be deposited moneys or other valuable effects in the name and to the credit of the LLC in such depositories as may be designated by the Board of Managers. The Treasurer shall also maintain adequate records of all assets, liabilities, and transactions of the LLC and shall see that adequate audits thereof are currently and regularly made. The Treasurer shall have such other powers and perform such other duties that generally are incident to the position of a treasurer of a corporation or as may from time to time be assigned to him or her by the Board of Managers or the President.

The powers and duties of each Officer set forth herein shall be deemed to be delegated by the Board of Managers to such Officer pursuant to Section 18-407 of the Act.

Each of the Officers of the LLC shall be an "authorized person" within the meaning of the Act for purposes of executing certificates and other documents to be filed by the LLC.

**(d)    Indemnification of the Managers and Officers.** Unless otherwise provided in this Section 9, the LLC shall indemnify, save harmless, and pay all judgments and claims against any Manager or Officer relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any Manager or Officer in connection with the business of the LLC, including reasonable attorneys' fees incurred by the Manager or Officer in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred. Unless otherwise provided in this Section 9, in the event of any action by the Member against any Manager or Officer, including a derivative suit, the LLC shall indemnify, save harmless, and pay all expenses of such Manager or Officer, including reasonable attorneys' fees incurred in the defense of such action. Notwithstanding the provisions of this Section 9, this Section shall be enforced only to the maximum extent permitted by law, and no Manager or Officer shall be indemnified from any liability for the fraud, intentional misconduct, gross negligence or a knowing violation of the law which was material to the cause of action.

**(e)     Rights and Powers of the Member.** The Member shall not have any right or power to take part in the management or control of the LLC or its business and affairs or to act for or bind the LLC in any way. Notwithstanding the foregoing, the Member has all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act. The Member has no voting rights except with respect to those matters specifically set forth in this Agreement and, to the extent not inconsistent herewith, as required in the Act. Notwithstanding any other provision of this Agreement, no action may be taken by the LLC (whether by the Board of Managers or otherwise) in connection with any of the following matters without the prior written consent of the Member:

**i.**     the dissolution or liquidation, in whole or in part, of the LLC, or the institution of proceedings to have the LLC adjudicated bankrupt or insolvent;

**ii.**     the filing of a petition seeking or consenting to reorganization or relief under any applicable federal or state bankruptcy law;

**iii.**     consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the LLC or a substantial part of its property;

**iv.**     the merger of the LLC with any other entity or the conversion of the LLC into another type of legal entity;

**v.**     the sale of all or substantially all of the LLC's assets;

**vi.**     any change in the classification of the LLC for federal or state income tax purposes; or

**vii.**     the amendment of this Agreement.

**SECTION 10.          Distributions.** Subject to section 18-607 and 19-804 of the Delaware Limited Liability Company Act, the Board of Managers may cause the LLC to distribute any cash held by it which is not reasonably necessary for the operation of the LLC.

**SECTION 11.          Assignments.** The Member may assign all or any part of the Interest, subject to Section 8.

**SECTION 12.          Dissolution.** The LLC shall dissolve, and its affairs shall be wound up, upon the earlier to occur of (a) the decision of the Member to dissolve the LLC, or (b) an event of dissolution of the LLC under the Act; provided, however, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other Person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

**SECTION 13.          Distributions Upon Dissolution.** Upon the occurrence of an event set forth in Section 12 hereof, the Member shall be entitled to receive, after paying or making

reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

**SECTION 14.** **Limited Liability.** No Member or Manager shall have any liability for the obligations of the LLC except to the extent required by the Act.

**SECTION 15.** **Amendment.** This Agreement may be amended only in a writing signed by the Member.

**SECTION 16.** **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

**SECTION 17.** **Severability.** Every term and provision of this Agreement is intended to be severable, and if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

[*signature page follows*]

[*signature page to Limited Liability Company Agreement of Weavexx, LLC*]

IN WITNESS WHEREOF, the undersigned has caused this Agreement of Limited Liability Company to be executed as of the ___day of _____, 2010.

XERIUM TECHNOLOGIES, INC.

By:_____

Name:
Title:

USActive 18780362.2

EXHIBIT A
Form of Certificate

*See attached [Certificate of Membership Interest.]*

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW. ACCORDINGLY, THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, OFFERED FOR SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE ACT OR APPLICABLE STATE SECURITIES LAW OR ANY OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT OR ANY APPLICABLE STATE SECURITIES LAW.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE, AND THE TRANSFER THEREOF, ARE SUBJECT TO THE PROVISIONS OF THE OPERATING AGREEMENT OF THE COMPANY, A COPY OF WHICH IS ON FILE AND MAY BE EXAMINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

FOR VALUE RECEIVED, _____ HEREBY SELLS, ASSIGNS, AND TRANSFERS

PLEASE INSERT SOCIAL SECURITY OR OTHER INDENTIFYING NUMBER OF ASSIGNEE

_____

UNTO _____ THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST REPRESENTED BY THE CERTIFICATE of MEMBERSHIP INTEREST, AND DOES HEREBY IRREVOCABLY CONSTITUTE AND APPOINT _____ ATTORNEY TO TRANSFER THE SAID CERTIFICATE OF MEMBERSHIP INTEREST REPRESENTING LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS ON THE BOOKS OF THE WITHIN-NAMED LIMITED LIABILITY COMPANY WITH FULL POWER OF SUBSTITUTION IN THE PREMISES.

DATED,

MEMBER

IN THE PRESENCE OF

USActive 18780362.2

# XERIUM ASIA, LLC

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated  Limited Liability Company Agreement ("Agreement") of Xerium, Asia, LLC (the "Company") is made as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Xerium Asia, LLC and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

**SECTION 1. Formation.** The LLC was formed upon the filing of its certificate of formation (the "Certificate of Formation") with the Secretary of State of the State of Delaware. The LLC was formed upon the conversion of Xerium Asia, Inc., a Delaware corporation.

**SECTION 2. Purpose and Powers.** The purpose of the LLC is to engage in any activity for which limited liability companies may be organized in the State of Delaware. The LLC shall possess and may exercise all of the powers and privileges granted by the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act") or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the LLC.

**SECTION 3. Registered Office.** The initial registered office of the LLC in the State of Delaware shall be located at the address for such office as set forth in the certificate of formation for the LLC filed with the Office of the Secretary of State of the State of Delaware. The registered office of the LLC may changed from time to time with the approval of the Board of Managers (as defined in Section 9).

**SECTION 4. Registered Agent.** The name of the initial registered agent of the LLC for service of process on the LLC in the State of Delaware shall be as set forth in the Certificate of Formation. The registered agent of the LLC may be changed from time to time with the approval of the Board of Managers (as defined in Section 9).

**SECTION 5. Admission of Member.** Simultaneously with the filing of the Certificate of Formation with the Office of the Secretary of State of the State of Delaware, Xerium Technologies, Inc. is admitted as the sole member of the LLC in respect of the Interest (as hereinafter defined).

**SECTION 6. Interest and LLC Unit.** efined in the Act). The entire limited liability company interest of the LLC, together with the rights of the sole member of the LLC under this Agreement and the Act (the "Interest"), shall be represented by a certificate in the form attached hereto as Exhibit A. The Interest shall be represented by one (1) unit of interest (the "LLC

Unit"). Notwithstanding anything to the contrary contained herein, the Company may not issue LLC Units that would be deemed to be non-voting securities as contemplated by section 1123(a)(6) of the Title 11 of the United States Code, and any provision contained herein that would render the Units non-voting equity units as contemplated by section 1123(a)(6) of Title 11 of the United States Code shall be deemed null and void.

SECTION 7. Capital Contributions. The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

SECTION 8. Tax Characterization and Returns. So long as the LLC has only one member, it is the intention of the Member that the LLC be disregarded for federal and state income tax purposes and that the activities of the LLC be deemed to be the activities of the Member for such purposes. All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status under those circumstances. Prior to any transaction that would result in the LLC having more than one member (including, without limitation, the admission of another member by the LLC or the transfer by the Member of less than all of the Interest), appropriate amendments shall be made to this Agreement to reflect the change in the Company's classification for federal and state income tax purposes that would result from such transfer or admission.

SECTION 9. Management.

(a)    Board of Managers. The management of the LLC shall be vested in a Board of Managers (the "Board of Managers") elected by the Member. The total number of members on the Board of Managers (the "Managers") shall be three unless otherwise fixed at a different number by an amendment hereto. The Member hereby elects Stephen Light, Michael O'Donnell and Marshall Woodworth as the initial Managers of the LLC, to serve until their successors are elected and qualified. A Manager shall remain in office until removed by a written instrument signed by the Member or until such Manager resigns in a written instrument delivered to the Member or such Manager dies or is unable to serve. In the event of any vacancy on the Board of Managers, the Member may fill the vacancy by written instrument. Each Manager shall have one (1) vote. Except as otherwise provided in this Agreement, the Board of Managers shall act by the affirmative vote of a majority of the total number of Managers and no single Manager shall have the right, power or authority to bind the LLC. Each Manager shall perform his or her duties as such in good faith, in a manner he reasonably believes to be in the best interests of the LLC, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties shall not have any liability by reason of serving or having served as a Manager. A Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the LLC.

(b)    Meetings and Powers of Board of Managers. The Board of Managers shall establish meeting times, dates and places and requisite notice requirements and adopt rules or procedures consistent with the terms of this Agreement. Any action required to be taken at a meeting of the Board of Managers, or any action that may be taken at a meeting of the Board of Managers, may be taken at a meeting held by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting.

USActive 18780363.2                                    -2-

Notwithstanding anything to the contrary in this Section 9, the Board of Managers may take any action that may be taken by the Board of Managers under this Agreement without a meeting if such action is approved by the unanimous written consent of the Managers. Except as otherwise provided in this Agreement, all powers to control and manage the business and affairs of the LLC shall be exclusively vested in the Board of Managers, and the Board of Managers may exercise all powers of the LLC and do all such lawful acts as are not by statute, the Certificate of Formation or this Agreement directed or required to be exercised or done by the Member and in so doing shall have the right and authority to take all actions which the Board of Managers deems necessary, useful or appropriate for the management and conduct of the business of the LLC; provided, however, that the Member may amend this Agreement at any time and thereby broaden or limit the Board of Managers' power and authority.

**(c)** **Officers.** The LLC shall have officers who are appointed by the Board of Managers (the "Officers" and each an "Officer"). The Officers of the LLC shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other positions as the Board of Managers deems appropriate from time to time. The initial Officers of the LLC shall be:

| |
|---|
| Stephen R. Light -- Chief Executive Officer and President |
| David Maffucci -- Vice President, Chief Financial Officer and Assistant Secretary |
| David Pretty -- Vice President and Assistant Secretary |
| Ted Orban -- Secretary and Treasurer |
| Elizabeth Leete -- Assistant Secretary |

The powers and duties of each Officer shall be as follows:

**The President.** The President shall have, subject to the supervision, direction and control of the Board of Managers, the general powers and duties of supervision, direction and management of the affairs and business of the LLC usually vested in the president of a corporation, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the LLC and the power to execute any agreements, deeds, certificates, notes or other documents on behalf of the LLC, provided that the approval of the Board of Managers or the Member is first obtained if such approval is required under the other provisions of this Agreement or the Act.

**The Chief Executive Officer.** The Chief Executive Officer shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers.

**The Chief Financial Officer**. The Chief Executive Officer shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers, President or Chief Executive Officer.

**The Vice Presidents.** Each Vice President shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers or the President.

USActive 18780363.2                     -3-

**The Secretary.** The Secretary shall attend meetings of the Board of Managers and meetings of the Member and record all votes and minutes of all such proceedings in a book kept for such purpose. He or she shall have all such further powers and duties as generally are incident to the position of a secretary of a corporation or as may from time to time be assigned to him or her by the Board of Managers or the President.

**Assistant Secretary.**  Each Assistant Secretary shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Managers, President or Secretary.

**The Treasurer.** The Treasurer shall have custody of the LLC's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the LLC and shall deposit or cause to be deposited moneys or other valuable effects in the name and to the credit of the LLC in such depositories as may be designated by the Board of Managers. The Treasurer shall also maintain adequate records of all assets, liabilities, and transactions of the LLC and shall see that adequate audits thereof are currently and regularly made. The Treasurer shall have such other powers and perform such other duties that generally are incident to the position of a treasurer of a corporation or as may from time to time be assigned to him or her by the Board of Managers or the President.

The powers and duties of each Officer set forth herein shall be deemed to be delegated by the Board of Managers to such Officer pursuant to Section 18-407 of the Act.

Each of the Officers of the LLC shall be an "authorized person" within the meaning of the Act for purposes of executing certificates and other documents to be filed by the LLC.

(d)	**Indemnification of the Managers and Officers.** Unless otherwise provided in this Section 9, the LLC shall indemnify, save harmless, and pay all judgments and claims against any Manager or Officer relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any Manager or Officer in connection with the business of the LLC, including reasonable attorneys' fees incurred by the Manager or Officer in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred. Unless otherwise provided in this Section 9, in the event of any action by the Member against any Manager or Officer, including a derivative suit, the LLC shall indemnify, save harmless, and pay all expenses of such Manager or Officer, including reasonable attorneys' fees incurred in the defense of such action. Notwithstanding the provisions of this Section 9, this Section shall be enforced only to the maximum extent permitted by law, and no Manager or Officer shall be indemnified from any liability for the fraud, intentional misconduct, gross negligence or a knowing violation of the law which was material to the cause of action.

(e)	**Rights and Powers of the Member.** The Member shall not have any right or power to take part in the management or control of the LLC or its business and affairs or to act for or bind the LLC in any way. Notwithstanding the foregoing, the Member has all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act. The Member has no voting rights except with respect to those matters specifically set forth in this Agreement and, to the extent not inconsistent herewith, as required in the Act. Notwithstanding any other provision of this Agreement, no action may be taken by the

LLC (whether by the Board of Managers or otherwise) in connection with any of the following matters without the prior written consent of the Member:

        **i.**     the dissolution or liquidation, in whole or in part, of the LLC, or the institution of proceedings to have the LLC adjudicated bankrupt or insolvent;

        **ii.**     the filing of a petition seeking or consenting to reorganization or relief under any applicable federal or state bankruptcy law;

        **iii.**     consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the LLC or a substantial part of its property;

        **iv.**     the merger of the LLC with any other entity or the conversion of the LLC into another type of legal entity;

        **v.**     the sale of all or substantially all of the LLC's assets;

        **vi.**     any change in the classification of the LLC for federal or state income tax purposes; or

        **vii.**     the amendment of this Agreement.

**SECTION 10.**     **Distributions.** Subject to section 18-607 and 19-804 of the Delaware Limited Liability Company Act, the Board of Managers may cause the LLC to distribute any cash held by it which is not reasonably necessary for the operation of the LLC.

**SECTION 11.**     **Assignments.** The Member may assign all or any part of the Interest, subject to Section 8.

**SECTION 12.**     **Dissolution.** The LLC shall dissolve, and its affairs shall be wound up, upon the earlier to occur of (a) the decision of the Member to dissolve the LLC, or (b) an event of dissolution of the LLC under the Act; provided, however, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other Person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

**SECTION 13.**     **Distributions Upon Dissolution.** Upon the occurrence of an event set forth in Section 12 hereof, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

**SECTION 14.**     **Limited Liability.** No Member or Manager shall have any liability for the obligations of the LLC except to the extent required by the Act.

**SECTION 15.**     **Amendment.** This Agreement may be amended only in a writing signed by the Member.

**SECTION 16.**          **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

**SECTION 17.**          **Severability.** Every term and provision of this Agreement is intended to be severable, and if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

[*signature page follows*]

-7-

[*signature page to Limited Liability Company Agreement of Xerium Asia, LLC*]

IN WITNESS WHEREOF, the undersigned has caused this Agreement of Limited Liability Company to be executed as of the ___day of _____, 2010.

                                        XERIUM TECHNOLOGIES, INC.

                                        By:_____

                                        Name:
                                        Title:

STATE OF DELAWARE

RESTATED CERTIFICATE OF AMENDMENT

OF

XERIUM III (US) LIMITED

The name of the corporation is XERIUM III (US) LIMITED (the "Corporation"). XERIUM III (US) LIMITED, a corporation organized and existing under the laws of the State of Delaware, hereby certifies that this Amended and Restated Certificate of Incorporation, which has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware, as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Xerium III (US) Limited and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on October 25, 1999, under the name Apax Acquisition Co. III.  Pursuant to a Certificate of Amendment filed November 9, 1999, the name of the Corporation was changed to Xerium III (US) Limited.

Xerium III (US) Limited hereby amends and restates its certificate of incorporation as follows:

ARTICLE 1

The name of the corporation is Xerium III (US) Limited (the "Corporation").

ARTICLE 2

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, Wilmington, New Castle County, Delaware.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

ARTICLE 3

The nature of the business or the objects or purposes to be conducted or promoted by the Corporation are to engage in any part of the world and in any capacity in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as now in force or as hereafter amended and to possess, exercise and enjoy all the powers, rights and privileges granted by the General Corporation Law of the State of Delaware, together with any lawful powers, rights and privileges incidental thereto.

## ARTICLE 4

The total number of shares of stock which the Corporation shall have authority to issue is 3,000, all of which shall be common stock having a par value per share of $.01.

The Corporation shall not issue any non-voting equity securities as contemplated by section 1123(a)(6) of Title 11 of the United States Code.

## ARTICLE 5

The name and mailing address of the sole incorporator are as follows:

NAME                                MAILING ADDRESS

Carol L. Helfrich                   Baker & McKenzie
                                    130 East Randolph Drive, Suite 3500
                                    Chicago, Illinois 60601

## ARTICLE 6

The Corporation shall have perpetual existence.

## ARTICLE 7

In furtherance and not in limitation of the powers conferred by statute, the board of directors is expressly authorized to adopt, amend or repeal the by-laws of the Corporation; provided, however, that such authorization shall not divest the stockholders of the power or limit the power of the stockholders to adopt, amend or repeal the by-laws of the Corporation.

## ARTICLE 8

Meetings of stockholders may be held within or without the State of Delaware, as the by-laws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the board of directors or in the by-laws of the Corporation. Election of directors need not be by written ballot unless the by-laws of the Corporation so provide.

## ARTICLE 9

The Corporation shall have the power to indemnify its directors, officers, employees or agents to the full extent permitted by the General Corporation Law of the State of Delaware as now in force or hereafter amended.

## ARTICLE 10

No director shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director except as provided for in Section 102(b)(7) of the General Corporation Law of the State of Delaware as now in force or as hereafter amended. Any repeal

or modification of this Article 10 shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE 11

Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under the provisions of section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of section 279 of Title 8 of the Delaware Code, order a meeting of the creditors or class of creditors and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs.  If a majority in number representing three-fourths in value of the creditors or class of creditors and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

## ARTICLE 12

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed by the laws of the State of Delaware, and all rights and powers conferred upon stockholders herein are granted subject to this reservation.

[remainder of page intentionally blank]

USActive 18780364.3                                   -3-

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed on its behalf by _____ its duly elected _____, this ____ day of _____, _____.


**XERIUM III (US) LIMITED**


By:_____


Name:
Title:

USActive 18780364.3

STATE OF DELAWARE

RESTATED CERTIFICATE OF AMENDMENT

OF

XERIUM IV (US) LIMITED

The name of the corporation is XERIUM IV (US) LIMITED (the "Corporation"). XERIUM IV (US) LIMITED, a corporation organized and existing under the laws of the State of Delaware, hereby certifies that this Amended and Restated Certificate of Incorporation, which has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware, as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Xerium IV (US) Limited and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on October 25, 1999, under the name Apax Acquisition Co. IV.  Pursuant to a Certificate of Amendment filed November 9, 1999, the name of the Corporation was changed to Xerium IV (US) Limited.

Xerium IV (US) Limited hereby amends and restates its certificate of incorporation as follows:

ARTICLE 1

The name of the corporation is Xerium IV (US) Limited (the "Corporation").

ARTICLE 2

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, Wilmington, New Castle County, Delaware.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

ARTICLE 3

The nature of the business or the objects or purposes to be conducted or promoted by the Corporation are to engage in any part of the world and in any capacity in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as now in force or as hereafter amended and to possess, exercise and enjoy all the powers, rights and privileges granted by the General Corporation Law of the State of Delaware, together with any lawful powers, rights and privileges incidental thereto.

ARTICLE 4

USActive 18780365.3

The total number of shares of stock which the Corporation shall have authority to issue is 3,000, all of which shall be common stock having a par value per share of $.01.

The Corporation shall not issue any non-voting equity securities as contemplated by section 1123(a)(6) of Title 11 of the United States Code.

## ARTICLE 5

The name and mailing address of the sole incorporator are as follows:

| NAME | MAILING ADDRESS |
|---|---|
| Carol L. Helfrich | Baker & McKenzie<br>130 East Randolph Drive, Suite 3500<br>Chicago, Illinois 60601 |

## ARTICLE 6

The Corporation shall have perpetual existence.

## ARTICLE 7

In furtherance and not in limitation of the powers conferred by statute, the board of directors is expressly authorized to adopt, amend or repeal the by-laws of the Corporation; provided, however, that such authorization shall not divest the stockholders of the power or limit the power of the stockholders to adopt, amend or repeal the by-laws of the Corporation.

## ARTICLE 8

Meetings of stockholders may be held within or without the State of Delaware, as the by-laws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the board of directors or in the by-laws of the Corporation. Election of directors need not be by written ballot unless the by-laws of the Corporation so provide.

## ARTICLE 9

The Corporation shall have the power to indemnify its directors, officers, employees or agents to the full extent permitted by the General Corporation Law of the State of Delaware as now in force or hereafter amended.

## ARTICLE 10

No director shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director except as provided for in Section 102(b)(7) of the General Corporation Law of the State of Delaware as now in force or as hereafter amended. Any repeal or modification of this Article 10 shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE 11

Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under the provisions of section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of section 279 of Title S of the Delaware Code, order a meeting of the creditors or class of creditors and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

## ARTICLE 12

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed by the laws of the State of Delaware, and all rights and powers conferred upon stockholders herein are granted subject to this reservation.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed on its behalf by _____ its duly elected _____, this _____ day of _____, _____.

**XERIUM IV (US) LIMITED**

By:_____

Name:
Title:

USActive 18780365.3

STATE OF DELAWARE

RESTATED CERTIFICATE OF AMENDMENT

OF

XERIUM V (US) LIMITED

The name of the corporation is XERIUM V (US) LIMITED (the "Corporation").  XERIUM V (US) LIMITED, a corporation organized and existing under the laws of the State of Delaware, hereby certifies that this Amended and Restated Certificate of Incorporation, which has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware, as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of Xerium V (US) Limited and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on October 25, 1999, under the name Apax Acquisition Co. V.  Pursuant to a Certificate of Amendment filed November 9, 1999, the name of the Corporation was changed to Xerium V (US) Limited.

Xerium V (US) Limited hereby amends and restates its certificate of incorporation as follows:

ARTICLE 1

The name of the corporation is Xerium V (US) Limited (the "Corporation").

ARTICLE 2

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, Wilmington, New Castle County, Delaware.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

ARTICLE 3

The nature of the business or the objects or purposes to be conducted or promoted by the Corporation are to engage in any part of the world and in any capacity in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as now in force or as hereafter amended and to possess, exercise and enjoy all the powers, rights and privileges granted by the General Corporation Law of the State of Delaware, together with any lawful powers, rights and privileges incidental thereto.

ARTICLE 4

The total number of shares of stock which the Corporation shall have authority to issue is 3,000, all of which shall be common stock having a par value per share of $.01.

The Corporation shall not issue any non-voting equity securities as contemplated by section 1123(a)(6) of Title 11 of the United States Code.

ARTICLE 5

The name and mailing address of the sole incorporator are as follows:

| NAME | MAILING ADDRESS |
|---|---|
| Carol L. Helfrich | Baker & McKenzie<br>130 East Randolph Drive, Suite 3500<br>Chicago, Illinois 60601 |

ARTICLE 6

The Corporation shall have perpetual existence.

ARTICLE 7

In furtherance and not in limitation of the powers conferred by statute, the board of directors is expressly authorized to adopt, amend or repeal the by-laws of the Corporation; provided, however, that such authorization shall not divest the stockholders of the power or limit the power of the stockholders to adopt, amend or repeal the by-laws of the Corporation.

ARTICLE 8

Meetings of stockholders may be held within or without the State of Delaware, as the by-laws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the board of directors or in the by-laws of the Corporation.  Election of directors need not be by written ballot unless the by-laws of the Corporation so provide.

ARTICLE. 9

The Corporation shall have the power to indemnify its directors, officers, employees or agents to the full extent permitted by the General Corporation Law of the State of Delaware as now in force or hereafter amended.

ARTICLE 10

No director shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director except as provided for in Section 102(b)(7) of the General Corporation Law of the State of Delaware as now in force or as hereafter amended.  Any repeal

or modification of this Article 10 shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE 11

Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under the provisions of section 291 of Title S of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of section 279 of Title 8 of the Delaware Code, order a meeting of the creditors or class of creditors and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

## ARTICLE 12

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed by the laws of the State of Delaware, and all rights and powers conferred upon stockholders herein are granted subject to this reservation.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed on its behalf by _____ its duly elected _____, this ____ day of _____, ____.

**XERIUM V (US) LIMITED**

By:_____

Name:
Title:

XTI LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Dated as of _____, 2010

USActive 18780367.2

XTI LLC

AMENDED AND RESTATAED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated  Limited Liability Company Agreement ("Agreement") of XTI LLC (the "Company") is made as of _____, ____, as required by that certain amended joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code of XTI LLC and certain of its debtor affiliates, as filed with the United States Bankruptcy Court for the District of Delaware (the "Court") on March 30, 2010 (Case No. 10-_____ (___)) and confirmed by the Court on _____, ____ (the "Plan").

WHEREAS, Xerium Technologies, Inc, (the "Original Member") wishes to form a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act in order to conduct the business described herein.

NOW, THEREFORE, the Original Member agrees with the Company as follows

ARTICLE 1
DEFINITIONS

For purposes of this Agreement the following terms have the following meanings:

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18401, et seq.) as amended and in effect from time to time.

"Affiliate" means, with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Limited Liability Company Agreement of the Company dated as of _____,  2010, as amended from time to time.

"Capital Contribution" means the amount of cash and the fair market value of any other property contributed to the Company with respect to any Interest held by a Member.

"Certificate" means the Certificate of Formation of the Company filed on June 23, 2004 and any and all amendments thereto and restatements thereof filed on behalf of the Company as permitted hereunder with the office of the Secretary of State of the State of Delaware.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the corresponding provisions of any future federal tax law.

"Company" means the limited liability company formed by virtue of this Agreement and the filing of the Certificate in accordance with the Act.

"Distribution" means the amount of cash and the fair market value of any other property distributed in respect of a Member's Interest in the Company.

"Fiscal Year" means the fiscal year of the Company which shall end on June 30 in each year or on such other date in each year as determined by the Board of Managers.

"Indemnified Party" is defined in Section 10.1.

"Interest" means the interest of a Member in the capital and profits of the Company, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"Member" means the Original Member and any other Person that both acquires an Interest in the Company and is admitted to the Company as a Member pursuant to this Agreement, from time to time.

"Original Member" means Xerium 3 S.A.

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, or any other legal entity.

"Unit Certificate" is defined in Section 3.7.

"Units" are a measure of a Member's Interest in the Company.

ARTICLE 2
FORMATION AND PURPOSE

2.1    Formation, etc. The Company was formed as a limited liability company in accordance with the Act by the filing of the Certificate with the Secretary of State of Delaware on June 24, 2004. The rights, duties and liabilities of each Member and the Board of Managers shall be determined pursuant to the Act and this Agreement. To the extent that such rights, duties or obligations are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control. By execution hereof, the Original Member is admitted as a Member of the Company and shall acquire a limited liability interest in the Company.

2.2    Name. The name of the Company is XTI LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable. The Board of Managers shall file, or shall

cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the Board of Managers considers appropriate or advisable.

2.3     Registered Office/Agent. The registered office required to be maintained by the Company in the State of Delaware pursuant to the Act shall initially be do The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. The name and address of the registered agent of the Company pursuant to the Act shall initially be Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. The Company may, upon compliance with the applicable provisions of the Act, change its registered office or registered agent from time to time in the discretion of the Board of Managers.

2.4     Term. The term of the Company shall continue indefinitely unless sooner terminated as provided herein. The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate as provided in the Act.

2.5     Purpose. The Company is formed for the purpose of, and the nature of the business to be conducted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any activities necessary, advisable, convenient or incidental thereto.

2.6     Specific Powers. Without limiting the generality of Section 2.5, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 2.5, including, but not limited to, the power:

2.6.1     to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any country, state, territory, district or other jurisdiction, whether domestic or foreign;

2.6.2     to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property;

2.6.3     to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, perform and carry out and take any other action with respect to contracts or agreements of any kind, including without limitation leases, licenses, guarantees and other contracts for the benefit of or with any Member or any Affiliate of any Member, without regard to whether such contracts may be deemed necessary, convenient to, or incidental to the accomplishment of the purposes of the Company;

2.6.4     to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, trusts, limited liability companies, or individuals or other persons or direct or indirect obligations of the United States or of any government, state, territory, governmental district or municipality or of any instrumentality of any of them;

2.6.5    to lend money, to invest and reinvest its funds, and to accept real and personal property for the payment of funds so loaned or invested;

2.6.6    to borrow money and issue evidence of indebtedness, and to secure the same by a mortgage, pledge, security interest or other lien on the assets of the Company;

2.6.7    to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

2.6.8    to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

2.6.9    to appoint employees, officers, agents and representatives of the Company, and define their duties and fix their compensation;

2.6.10  to indemnify any Person in accordance with the Act and this Agreement;

2.6.11  to cease its activities and cancel its Certificate; and

2.6.12  to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company.

2.7     Certificate. The filing of the Certificate by Joshua M. Aronson is hereby ratified and confirmed and said Person is hereby designated as an "authorized person" within the meaning of the Act to execute, deliver and file the Certificate and Stephen R. Light, David Maffucci, Ted Orban and Elizabeth Leete and such other Persons as may be designated from time to time by the Board of Managers are designated as authorized persons, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate or any certificate of cancellation of the Certificate and any other certificates necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.8.    Principal Office. The principal executive office of the Company shall be located at such place within or without the State of Delaware as the Board of Managers shall establish, and the Board of Managers may from time to time change the location of the principal executive office of the Company to any place within or without the State of Delaware. The Board of Managers may establish and maintain such additional offices and places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

ARTICLE 3
ORIGINAL MEMBER; CAPITAL CONTRIBUTIONS; AND UNITS

3.1     Member. The name and the business address of the Original Member of the Company is as follows:

Name                                    Address

Xerium Technologies, Inc.


3.2     Initial Capital Contribution. Contemporaneously with the execution hereof the Original Member is making an Initial Capital Contribution to the Company of $100. The Initial Capital Contribution shall be allocated to a stated capital account of the Company.

3.3     Additional Capital Contributions. The Members shall make additional Capital Contributions to the Company for such purposes, at such times and in such amounts as shall be agreed by the Members holding not less than 75.0% of the then outstanding Units at a meeting of the Members held pursuant to Section 4.4 and Exhibit 4.4.

3.4     Return of Capital Contributions. No Member shall have the right to demand a return of all or any part of its Capital Contributions, and any return of the Capital Contributions of a Member shall be made solely from the assets of the Company and only in accordance with the terms of this Agreement. No interest shall be paid to any Member with respect to its Capital Contributions.

3.5     Registration of Interests. Each Interest constitutes a "security," as such term is defined in 6 Del. C. § 8-102(15), governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del. C. § 8-101, et seq.). The Company shall maintain a record of the ownership of the Interests which shall, initially, be as set forth on Schedule A and which shall be amended from time to time to reflect transfers of the ownership of the Interests. An Interest shall be transferred by delivery to the Company of an instruction by the registered owner of the Interest requesting registration of transfer of such Interest (accompanied by a duly indorsed security certificate representing such Interest or affidavit of loss therefore) and the recording of such transfer in the records of the Company.

3.6     Units. Upon the admission of the Original Member as a Member, the Interest of the Original Member shall be divided into 100 Units.  Notwithstanding anything to the contrary contained herein, the Company may not issue Units that would be deemed to be non-voting securities as contemplated by section 1123(a)(6) of the Title 11 of the United States Code, and any provision contained herein that would render the Units non-voting equity units  as contemplated by section 1123(a)(6) of Title 11 of the United States Code shall be deemed null and void.  The Board of Managers may issue additional Units to any Member in respect of additional Capital Contributions.

3.7     Unit Certificate. Each Member shall be entitled to a certificate stating the number of Units held by the Member in such form as shall, in conformity with law and this Agreement, be prescribed from time to time by the Board of Managers (a "Unit Certificate"). Such Unit Certificate shall be signed by the Chair of the Board of Managers or the President or any Vice President and by the Treasurer or an Assistant Treasurer or by the Secretary or an Assistant Secretary.

3.8     Loss of Certificate. In the case of the alleged theft, loss, destruction or mutilation of a Unit Certificate, a duplicate certificate may be issued in place thereof, upon such terms,

including receipt of a bond sufficient to indemnify the Company against any claim on account thereof, as the Board of Managers may prescribe.

## ARTICLE 4
## STATUS AND RIGHTS OF MEMBERS

4.1     Limited Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member, no member of the Board of Managers and no other Indemnified Party shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, a member of the Board of Managers or an Indemnified Party. All Persons dealing with the Company shall look solely to the assets of the Company for the payment of the debts, obligations or liabilities of the Company.

4.2     Return of Distributions of Capital. Except as otherwise expressly required by law, no Member, in its capacity as such, shall have any liability either to the Company or any of its creditors in excess of (a) in the case of the Original Member, its obligation to make a capital contribution pursuant to Section 3.2, if not previously made, (b) any assets and undistributed profits of the Company and (c) to the extent required by law, the amount of any Distributions wrongfully distributed to it. Except as required by law or a court of competent jurisdiction, no Member or investor in or partner of a Member shall be obligated by this Agreement to return any Distribution to the Company or pay the amount of any Distribution for the account of the Company or to any creditor of the Company. The amount of any Distribution returned to the Company by or on behalf of a Member or paid by or on behalf of a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to such Member.

4.3     No Management or Control. No Member shall take any part in or interfere in any manner with the management of the business and affairs of the Company or have any right or authority to act for or bind the Company.

4.4     Meetings of Members. Meetings of Members shall be held and conducted, and the voting rights of Members shall be, as set forth on Exhibit 4.4 hereto. .

## ARTICLE 5
## DISTRIBUTIONS

5.1     Distributions. Subject to the requirements of the Act, the amount and timing of all Distributions shall be determined by the Member or Members at a meeting called for such purpose. All Distributions shall be made ratably to each Member in accordance with the number of Units then held by such Member. Distributions may be made in cash, securities or other property. .

5.2     Withholding. The Company is hereby authorized to withhold and pay over any withholding or other taxes payable by the Company as a result of a Member's status as a Member hereunder.

ARTICLE 6
MANAGEMENT

6.1     Management. The business of the Company shall be managed by a Board of Managers, and the Persons constituting the Board of Managers shall be the "managers" of the Company for all purposes under the Act. The Board of Managers as of the date hereof shall be the Persons set forth in Exhibit 6.1. Thereafter, the Persons constituting the Board of Managers shall be elected by the Members in accordance with Exhibit 4.4 hereto. Decisions of the Board of Managers shall be embodied in a vote or resolution adopted in accordance with the procedures set forth in Exhibit 6.1. Such decisions shall be decisions of the "manager" for all purposes of the Act and shall be carried out by any member of the Board of Managers or by officers or agents of the Company designated by the Board of Managers in the vote or resolution in question or in one or more standing votes or resolutions or with the power and authority to do so under Section 6.3. A decision of the Board of Managers may be amended, modified or repealed in the same manner in which it was adopted or in accordance with the procedures set forth in Exhibit 6.1 as then in effect, but no such amendment, modification or repeal shall affect any Person who has been furnished a copy of the original vote or resolution, certified by a duly authorized agent of the Company, until such Person has been notified in writing of such amendment, modification or repeal.

6.2     Authority of Board of Managers. The Board of Managers shall have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. Except as otherwise expressly provided in this Agreement, the Board of Managers or Persons designated by the Board of Managers, including officers and agents appointed by the Board of Managers, shall be the only Persons authorized to execute documents which shall be binding on the Company. To the fullest extent permitted by Delaware law, the Board of Managers shall have the power to do any and all acts, statutory or otherwise, with respect to the Company of this Agreement, which would otherwise be possessed by the Member or Members under the laws of the State of Delaware, and the Member or Members shall have no power whatsoever with respect to the management of the business and affairs of the Company. The owner and authority granted to the Board of Managers hereunder shall include all those necessary or convenient for the furtherance of the purposes of the Company and shall include the power to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company, including without limitation, the power and authority to undertake and make decisions concerning: (a) hiring and firing of employees,

attorneys, accountants, brokers, investment bankers and other advisors and consultants, (b) entering into of leases for real or personal property, (c) opening of bank and other deposit accounts and operations thereunder, (d) purchasing, constructing, improving, developing and maintaining of real property, (e) purchasing of insurance, goods, supplies, equipment, materials and other personal property, (f) borrowing of money, obtaining of credit, issuance of notes, debentures, securities, equity or other interests of or in the Company and securing of the obligations undertaken in connection therewith with mortgages on and security interests in all or any portion of the real or personal property of the Company, (g) making of investments in or the acquisition of securities of any Person, (h) giving of guarantees and indemnities, (i) entering into of contracts or agreements whether in the ordinary course of business or otherwise, (j) mergers with or acquisitions of other Persons, (k) the sale or lease of all or any portion of the assets of the Company, (1) forming subsidiaries or joint ventures, (m) compromising, arbitrating, adjusting and litigating claims in favor of or against the Company and (n) all other acts or activities necessary or desirable for the carrying out of the purposes of the Company including those referred to in Section 2.6.

6.3    Officers; Agents. The Board of Managers by vote or resolution shall have the power to appoint officers and agents to act for the Company with such titles, if any, as the Board of Managers deems appropriate and to delegate to such officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may in its sole discretion determine; provided, however, that no such delegation by the Board of Managers shall cause the Persons constituting the Board of Managers to cease to be the "managers" of the Company within the meaning of the Act. The officers or agents so appointed may include persons holding titles such as Chairman, Chief Executive Officer, Chief Operating Officer, President, Chief Financial Officer, Executive Vice President, Vice President, Treasurer, Controller, Secretary or Assistant Secretary. An officer may be removed at any time with or without cause. The officers of the Company as of the date hereof are set forth on Exhibit 6.3. Unless the authority of the agent designated as the officer in question is limited in the document appointing such officer or is otherwise specified by the Board of Managers, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a corporation in the absence of a specific delegation of authority and all deeds, leases, transfers, contracts, bonds, notes, checks, drafts or other obligations made, accepted or endorsed by the corporation may be signed by the Chairman, if any, the President, a Vice President or the Treasurer, Controller, Secretary or Assistant Secretary at the time in office. The Board of Managers, in its sole discretion, may by vote or resolution of the Board of Managers ratify any act previously taken by an officer or agent acting on behalf of the Company.

6.4    Reliance by Third Parties. Any person or entity dealing with the Company or any Member may rely upon a certificate signed by a member of the Board of Managers as to: (a) the identity of the Member or the members of the Board of Managers, (b) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Member or the Board of Managers or are in any other manner germane to the affairs of the Company, (c) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of the Company, (d) the authorization of any action taken by or on behalf of the Company, the Board of Managers or any officer or agent acting on behalf of the Company or (e) any act or

failure to act by the Company or as to any other matter whatsoever involving the Company or the Member.

## ARTICLE 7
## TRANSFER OF INTERESTS

Any Member may sell, assign, pledge, encumber, dispose of or otherwise transfer all or any part of the economic or other rights that comprise its Interest. If so determined by such Member, the transferee shall have the right to be substituted for the Member under this Agreement for the transferor or as an additional Member if the Member transfers less than all of its Interest. No Member may withdraw or resign as Member except as a result of a transfer pursuant to this Article 7 in which the transferee is substituted for the Member. None of the events described in Section 18-304 of the Act shall cause a Member to cease to be a Member of the Company.

## ARTICLE 8
## AMENDMENTS TO AGREEMENT

This Agreement may be amended or modified as shall be agreed by the Members holding not less than 75.0% of the then outstanding Units at a meeting of the Members held pursuant to Section 4.4 and Exhibit 4.4. The Board of Managers shall cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any such amendment or modification.

## ARTICLE 9
## DISSOLUTION OF COMPANY

9.1     Events of Dissolution or Liquidation. The Company shall be dissolved and its affairs wound up upon the happening of either of the following events: (a) the written determination of each of the Members or (b) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

9.2     Liquidation. After termination of the business of the Company, the assets of the Company shall be distributed in the following order of priority:

(a)     to creditors of the Company, including any Member if a creditor to the extent permitted by law, in satisfaction of liabilities of the Company (whether by payment thereof or the making of reasonable provision for payment thereof) other than liabilities for Distributions to the Member; and then

(b)     ratably to each Member in accordance with the number of Units then held by such Member.

# ARTICLE 10
## INDEMNIFICATION

10.1    General. The Company shall indemnify, defend, and hold harmless any Member, any director, officer, partner, stockholder, controlling Person or employee of any Member, each member of the Board of Managers, any officer, employee or agent of the Company and any Person serving at the request of the Company as a director, officer, employee, partner, trustee or independent contractor of another corporation, partnership, limited liability company, joint venture, trust or other enterprise (all of the foregoing Persons being referred to collectively as "Indemnified Parties" and individually as an "Indemnified Party") from any liability, loss or damage incurred by the Indemnified Party by reason of any act performed or omitted to be performed by the Indemnified Party pursuant to the authority granted by this Agreement or otherwise in connection with the business or affairs of the Company and from liabilities or obligations of the Company imposed on such Indemnified Party by virtue of such Indemnified Party's position with the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage, except for liabilities, losses, damages or obligations resulting from the Indemnified Party's gross negligence or willful misconduct; provided, however, that the indemnification under this Section 10.1 shall be recoverable only from the assets of the Company and not from any assets of any Member. Unless the Board of Managers determines in good faith that the Indemnified Party is unlikely to be entitled to indemnification under this Article 10, the Company shall pay or reimburse reasonable attorneys' fees of an Indemnified Party as incurred, provided that such Indemnified Party executes an undertaking, with appropriate security if requested by the Board of Managers, to repay the amount so paid or reimbursed in the event that a final non-appealable determination by a court of competent jurisdiction that such Indemnified Party is not entitled to indemnification under this Article 10. The Company may pay for insurance covering liability of the Indemnified Party for negligence in operation of the Company's affairs.

10.2    Exculpation. No Indemnified Party shall be liable, in damages or otherwise, to the Company or to any Member for any liability, loss or damage that arises out of any act performed or omitted to be performed by the Indemnified Party pursuant to the authority granted by this Agreement or otherwise in connection with the business or affairs of the Company. except for liabilities, losses or damages resulting from the Indemnified Party's gross negligence or willful misconduct.

10.3    Persons Entitled to Indemnity. Any Person who is within the definition of "Indemnified Party" at the time of any action or inaction in connection with the business of the Company shall be entitled to the benefits of this Article 10 as an "Indemnified Party" with respect thereto, regardless whether such Person continues to be within the definition of "Indemnified Party" at the time of such Indemnified Party's claim for indemnification or exculpation hereunder.

10.4    Procedure Agreements. The Company may enter into an agreement with any of its officers, employees, consultants, counsel and agents, any member of the Board of Managers or any Member, setting forth procedures consistent with applicable law for implementing the indemnities provided in this Article 10.

ARTICLE 11
MISCELLANEOUS

11.1    General. This Agreement: (a) shall be binding upon the legal successors of any Member; (b) shall be governed by and construed in accordance with the laws of the State of Delaware; and (c) contains the entire agreement as to the subject matter hereof. The waiver of any of the provisions, terms, or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms, or conditions hereof.

11.2    Notices, Etc. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery or receipt (which may be evidenced by a return receipt if sent by registered mail or by signature if delivered by courier or delivery service), addressed to any Member at its address in the records of the Company or otherwise specified by the Member.

11.3    Gender and Number. Whenever required by the context, as used in this Agreement the singular number shall include the plural, the plural shall include the singular, and all words herein in any gender shall be deemed to include the masculine, feminine and neuter genders.

11.4    Severability. If any provision of this Agreement is determined by a court to be invalid or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein. That invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each said provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

11.5    Headings. The headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing the terms of this Agreement.

11.6    No Third Party Rights. Except for the provisions of Section 6.4, the provisions of this Agreement are for the benefit of the Company, each Member and permitted assignees and no other Person, including creditors of the Company, shall have any right or claim against the Company or any Member by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement.

IN WITNESS WHEREOF, the Company has executed this Agreement as of the day and year first set forth above.

**XTI, LLC**

By:_____

Name:
Title:

Schedule A

REGISTER OF INTEREST

| Holder of Interest | Unit Certificate Number | Units |
|---|---|---|
| Xerium Technologies, Inc. | 1 | 100 |

USActive 18780367.2

Exhibit 4.4

## MEETINGS OF MEMBERS, ETC.

1.      Annual Meeting.  There shall be an annual meeting of the Members which shall be (a) held at Westborough, Massachusetts on the second Thursday in June in each year, unless that day be a legal holiday at the place where the meeting is to be held, in which case the meeting shall be held at the same hour on the next succeeding day not a legal holiday, or (b) at such other place, date and time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, at which meeting they shall elect a Board of Managers, determine Distributions, Zany, and transact such other business as may be required by law or this Agreement or as may properly come before the meeting.

2.      Special Meetings.  A special meeting of the Members may be called at any time by the Chairman of the Board, if any, the President, the Board of Managers, or by the Members holding at least 50.0% of the Units then outstanding. A special meeting of the Members shall be called by the Secretary, or in the case of the death, absence, incapacity or refusal of the Secretary, by an Assistant Secretary or some other officer, upon application of a majority of the Board of Managers. Any such application shall state the purpose or purposes of the proposed meeting. Any such call shall state the place, date, hour and purposes of the meeting.

3.      Notice of Meetings.  Except as otherwise provided by law, a written notice of each meeting of the Members stating the place, day and hour thereof and, in the case of a special meeting, the purposes for which the meeting is called, shall be given not less then ten nor more than sixty days before the meeting, to each Member entitled to vote thereat, and to each Member who, by law or by this Agreement, is entitled to notice, by leaving such notice with such Member or at such Member's residence or usual place of business, or by depositing it in the United States mail, postage prepaid, and addressed to such Member at such Member's address as it appears in the records of the Company. Such notice shall be given by the Secretary, or by an officer or person designated by the Board of Managers, or in the case of a special meeting by the officer calling the meeting. As to any adjourned session of any meeting of the Members, notice of the adjourned meeting need not be given if the time and place thereof are announced at the meeting at which the adjournment was taken, except that if the adjournment is for more than thirty days or if after the adjournment a new record date is set for the adjourned session, notice of any such adjourned session of the meeting shall be given in the manner heretofore described. No notice of any meeting of the Members or any adjourned session thereof need be given to a Member if a written waiver of notice, executed before or after the meeting or such adjourned session by such Member, is filed with the records of the meeting or if such Member attends such meeting without objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members or any adjourned session thereof need be specified in any written waiver of notice.

4.      Quorum of Members.  At any meeting of the Members a quorum as to any matter shall consist of a majority of the votes entitled to be cast on the matter, except where a larger quorum is required by law or by this Agreement. Any meeting may be adjourned from time to time by a

majority of the votes properly cast upon the question, whether or not a quorum is present. If a quorum is present at an original meeting, a quorum need not be present at an adjourned session of that meeting.

5.      Action by Vote.  Each Member shall be entitled to one vote for each Unit held by such Member on all matters on which Members are entitled to vote at a meeting of Members or otherwise when a quorum is present at any meeting, a plurality of the votes properly cast for election to any office shall elect to such office and a majority of the votes properly cast upon any question other than an election to an office shall decide the question, except when a larger vote is required by law or by this Agreement. No ballot shall be required for any election unless requested by a Member present or represented at the meeting and entitled to vote in the election.

6.      Action without Meetings.  Any action required or permitted to be taken by Members for or in connection with any action of the Company may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted and shall be delivered to the Company by delivery to its registered office in Delaware by hand or certified or registered mail, return receipt requested, to its principal place of business or to an officer or agent of the Company having custody of the book in which proceedings of meetings of Members are recorded. Each such written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action referred to therein unless written consents signed by a number of Members sufficient to take such action are delivered to the Company in the manner specified in this paragraph within sixty days of the earliest dated consent so delivered.

        If action is taken by consent of Members and in accordance with the foregoing, there shall be filed with the records of the meetings of Members the writing or writings comprising such consent.

        If action is taken by less than unanimous consent of Members, prompt notice of the taking of such action without a meeting shall be given to those who have not consented in writing and a certificate signed and attested to by the Secretary that such notice was given shall be filed with the records of the meetings of Members.

7.      Proxy Representation. Every Member may authorize another person or persons to act for such Member by proxy in all matters in which a Member is entitled to participate, whether by waiving notice of any meeting, objecting to or voting or participating at a meeting, or expressing consent or dissent without a meeting. Every proxy must be signed by the Member or by such Member's attorney-in-fact. No proxy shall be voted or acted upon after three years from its date unless such proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable where the interest with which it is coupled is an interest in the Interest of such Member. The authorization of a proxy may but need not be limited to specified action; provided, however, that if a proxy limits its authorization to a meeting or meetings of Members, unless otherwise specifically provided such

proxy shall entitle the holder thereof to vote at any adjourned session but shall not be valid after the final adjournment thereof.

8.      <u>Resolution of Issues</u>.  To the extent that any dispute shall arise with respect thereto, the Board of Managers shall be entitled to decide all issues such as the existence of a quorum, the validity of proxies, the number of votes, the Members entitled to vote or consent and other similar procedural questions that are raised at any meeting of Members.

<u>Exhibit 6.1</u>

<u>BOARD OF MANAGERS</u>

1.      <u>Number: Appointment</u>.  The Board of Managers initially shall consist of three members (each such member, along with any other members appointed from time to time, the "Board Members"). Thereafter, the Board of Managers shall be elected either at the Annual Meeting of Members or at a special meeting called for such purposes. The Board of Managers may increase or decrease the number of Board Members from time to time upon a vote of the Board of Managers.

2.      <u>Initial Board of Managers</u>.  The following individuals will be the initial Board Members:

Stephen R. Light

David Maffucci

Ted Orban

3.      <u>Tenure</u>.  Each Board Member shall, unless otherwise provided by law, hold office until the next Annual Meeting of Members and until such Board Member's successor is elected and qualified, or until such Board Member sooner dies, resigns, is removed or becomes disqualified. Any Board Member may be removed by the Members, at any time without giving any reason for such removal. A Board Member may resign by written notice to the Company which resignation shall not require acceptance and, unless otherwise specified in the resignation notice, shall be effective upon receipt by the Company. Vacancies and any newly created positions on the Board of Managers resulting from any increase in the number of the Board of Managers may be filled by vote of the Members or by a majority of the Board Members then in office, although less than a quorum, or by a sole remaining Board member.

4.      <u>Meetings</u>.  Meetings of the Board of Managers may be held at any time at such places within or without the State of Delaware designated in the notice of the meeting, when called by the Chair of the Board of Managers, if any, the President or any two Board Members acting together, reasonable notice thereof being given to each Board Member.

5.      <u>Notice</u>.  It shall be reasonable and sufficient notice to a Board Member to send notice by overnight delivery at least forty-eight hours or by facsimile at least twenty-four hours before the meeting addressed to such Board Member at such Board Member's usual or last known business or residence address or to give notice to such Board Member in person or by telephone at least twenty-four hours before the meeting. Notice of a meeting need not be given to any Board Member if a written waiver of notice, executed by such Board Member before or after the meeting, is filed with the records of the meeting, or to any Board Member who attends the meeting without protesting prior thereto or at its commencement the lack of notice to such Board Member. Neither notice of a meeting nor a waiver of a notice need specify the purposes of the meeting.

6.      Quorum.  Except as may be otherwise provided by law, at any meeting of the Board of Managers a majority of the Board Members then in office shall constitute a quorum. Any meeting may be adjourned from time to time by a majority of the votes cast upon the question, whether or not a quorum is present, and the meeting may be held as adjourned without further notice.

7.      Action by Vote.  Except as may be otherwise provided by law, when a quorum is present at any meeting the vote of a majority of the Board Members present shall be the act of the Board of Managers.

8.      Action Without a Meeting.  Any action required or permitted to be taken at any meeting of the Board of Managers may be taken without a meeting if all the Board Members consent thereto in writing, and such writing or writings are filed with the records of the meetings of the Board of Managers. Such consent shall be treated for all purposes as the act of the Board of Managers.

9.      Participation in Meetings by Conference Telephone.  Board Members may participate in a meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

10.     Interested Transactions.

(a)      No contract or transaction between the Company and one or more of the Board Members or officers, or between the Company and any other company, partnership, association, or other organization in which one or more of the Board Members or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Board Member or officer is present at or participates in the meeting of the Board of Managers which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(i)      The material facts as to such Board Member's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Managers, and the Board of Managers in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Board Members, even though the disinterested Board Members be less than a quorum; or

(ii)      The contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board of Managers.

(b)      Common or interested Board Members may be counted in determining the presence of a quorum at a meeting of the Board of Managers which authorizes the contract or transaction.

USActive 18780367.2

<u>Exhibit 6.3</u>

<u>OFFICERS</u>

| |
|---|
| Stephen R. Light -- President and Assistant Secretary |
| David Maffucci -- Executive Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban -- Secretary |
| Elizabeth Leete -- Assistant Secretary |

**New Brunswick / Nouveau Brunswick**

| BUSINESS CORPORATIONS ACT<br>FORM 5<br>RESTATED ARTICLES OF INCORPORATION<br>(SECTION 119) | LOI SUR LES CORPORATIONS<br>COMMERCIALES<br>FORMULE 5<br>STATUTS CONSTITUTIFS MIS À JOUR<br>(ARTICLE 119) |
|---|---|

| 1 - Name of Corporation - Raison sociale de la corporation: | Corporation No. - N°. de corporation: |
|---|---|
| **XERIUM CANADA INC.** | **635756** |

2 - The classes and any maximum number of shares that the corporation is authorized to issue and any maximum aggregate amount for which shares may be issued including shares without par value and/or with par value and the amount of the par value:

Les catégories et le nombre maximal d'actions que la corporation peut émettre ainsi que le montant maximal global pour lequel les actions peuvent être émises y compris les actions sans valeur au pair ou avec valeur au pair ou les deux et le montant de la valeur au pair :

**See Schedule A Attached**

3 - Restrictions, if any, on share transfers:

Restrictions, s'il y en a, au transfert d'actions:

**No share shall be transferred without the consent of the directors or shareholders of the Corporation expressed by a resolution passed at a meeting of the board of directors or shareholders or by an instrument or instruments in writing signed by all such directors or shareholders.**

4 - Number (or minimum and maximum number) of directors:

Nombre (ou nombre minimum et maximum) des administrateurs:

**A minimum of one (1) and a maximum of ten (10) as determined by resolution of the board of directors.**

5 - Restrictions, if any, on business the corporation may carry on:

Restrictions, s'il y en a, à l'activité que peut exercer la corporation:

**None**

6 - Other provisions, if any:

D'autres dispositions, le cas échéant:

**See Schedule B Attached**

The foregoing Restated Articles of Incorporation correctly set out, without substantive change, the corresponding provisions of the Articles of Incorporation as amended and supersede the original Articles of Incorporation.

Les statuts constitutifs mis à jour indiquent, sans changement substantif, les dispositions correspondantes des statuts consitutifs modifiés qui remplaçent les statuts constitutifs originaux.

| Date | Signature | Description of Office<br>Fonction |
|---|---|---|
|  |  |  |

FOR DEPARTMENT USE ONLY

RÉSERVÉ À L'USAGE DU MINISTÈRE

Filed - Déposé:

SN0254/440307 / 45-4106 (1/09)

**XERIUM CANADA INC.**

**(hereinafter referred to as the "Corporation")**

**THIS IS SCHEDULE "A" TO THE FOREGOING FORM 5 UNDER THE**

**NEW BRUNSWICK BUSINESS CORPORATIONS ACT**

The Corporation shall be authorized to issue:

(i)    one hundred (100) Preferred Shares without nominal or par value; and

(ii)    an unlimited number of Common Shares without nominal or par value;

having attached thereto the following rights, privileges, restrictions and conditions:

**PREFERRED SHARES**

(a)    Voting Rights

The holders of the Preferred Shares shall be entitled to receive notice of and to attend and vote at meetings of the shareholders of the Corporation except meetings at which only holders of a specified class of shares are entitled by law to vote.  Each holder of Preferred Shares shall be entitled to one (1) vote in respect of each Preferred Share held by that holder.

(b)    Dividends

The holders of Preferred Shares shall be entitled to receive and the Corporation shall pay thereon, subject to the rights, privileges and conditions attached to any other class of shares of the Corporation, out of the monies of the Corporation properly applicable to the payment of dividends, non-cumulative dividends, in such amount and at such rate as the directors may from time to time determine.  The directors may declare unequal dividends on any of the Preferred Shares or Common Shares or may declare dividends on only one or such of the said classes of shares, if desired, as the directors may in their absolute discretion determine, and none of the Preferred Shares or Common Shares shall be entitled to participate in any dividends declared on any other class and, for greater certainty, there shall be no requirement that any of the foregoing classes be treated equally or rateably by the directors with respect to the declaration and payment of dividends.

(c)    Rights on Dissolution

In the event of the liquidation, dissolution or winding-up of the Corporation whether voluntary or involuntary, the holders of Preferred Shares shall be entitled to receive in respect of each such share, before any distribution of any part of the assets of the Corporation among the holders of Common Shares and any other class of shares of the

660884.v1

Corporation ranking junior to the Preferred Shares, an amount equal to the Redemption Price (as hereinafter defined).

(d)      Redemption at the Option of the Corporation

Subject to the New Brunswick *Business Corporations Act*  (the "**Act**"), the Corporation shall, at its option, be entitled to redeem at any time or times all or any part of the Preferred Shares registered in the name of any holder of any such Preferred Shares on the books of the Corporation with or without the consent of such holder by giving notice in writing to such holder specifying:

   i)      that the Corporation desires to redeem all or any part of the Preferred Shares registered in the name of such holder;

   ii)     if part only of the Preferred Shares registered in the name of such holder is to be redeemed, the number thereof to be so redeemed;

   iii)    the business day (in this paragraph referred to as the "redemption date") on which the Corporation desires to redeem such Preferred Shares.  Such notice shall specify a redemption date which shall not be less than thirty (30) days after the date on which the notice is given by the Corporation or such shorter period of time as the Corporation and the holder of any such Preferred Shares may agree; and

   iv)     the place of redemption.

The Corporation shall, on the redemption date, redeem such Preferred Shares by paying to such holder an amount equal to the Redemption Price on presentation and surrender of the certificate(s) for the Preferred Shares so called for redemption at such place as may be specified in such notice.  The certificate(s) for such Preferred Shares shall thereupon be cancelled and the Preferred Shares represented thereby shall thereupon be redeemed. Such payment shall be made by delivery to such holder of a cheque payable in the amount of or at the option of the Corporation, a demand note with a principal amount equal to the aggregate Redemption Price for the Preferred Shares to be redeemed.  From and after the redemption date the holder thereof shall not be entitled to exercise any of the rights of holders of Preferred Shares in respect thereof unless payment of the said Redemption Price, is not made on the redemption date, or on presentation and surrender of the certificate(s) for the Preferred Shares so called for redemption, whichever is later in which case the rights of the holder of the said Preferred Shares shall remain unaffected until payment in full of the Redemption Price.

Where at any time some but not all of such Preferred Shares are to be redeemed the Preferred Shares to be redeemed shall be selected by lot in such manner as the board of directors determines, or as nearly as may be in proportion to the number of Preferred Shares registered in the name of each holder, or in such other manner as the board of directors determines.

(e)    Redemption at the Option of the Holder

Subject to the Act, a holder of any Preferred Shares shall be entitled to require the Corporation to redeem at any time or times any Preferred Shares registered in the name of such holder on the books of the Corporation by tendering to the Corporation at its registered office a share certificate or certificates representing the Preferred Shares which the holder desires to have the Corporation redeem together with a request in writing specifying (in this paragraph referred to as a "redemption demand"):

i)     that the holder desires to have the Preferred Shares represented by such certificate redeemed by the Corporation; and

ii)    the business day (in this paragraph referred to as the "redemption date") on which the holder desires to have the Corporation redeem such Preferred Shares.  The redemption demand shall specify a redemption date which shall not be less than thirty (30) days after the date on which the redemption demand is tendered to the Corporation or such other date as the holder and the Corporation may agree.

The Corporation shall, on such redemption date, redeem all Preferred Shares required to be redeemed by paying to such holder an amount equal to the aggregate Redemption Price therefor on presentation and surrender of the certificate(s) for the Preferred Shares to be so redeemed at the registered office of the Corporation.  The certificate(s) for such Preferred Shares shall thereupon be cancelled and the Preferred Shares represented thereby shall thereupon be redeemed.  Such payment shall be made by delivery to such holder of a cheque in the amount of or, at the option of the Corporation, a demand note with a principal amount equal to the aggregate Redemption Price for the Preferred Shares to be redeemed.  From and after the redemption date, such Preferred Shares shall cease to be entitled to dividends and the holder thereof shall not be entitled to exercise any of the rights of holders of Preferred Shares in respect thereof unless payment of the said Redemption Price is not made on the redemption date, in which case the rights of the holder of the said Preferred Shares shall remain unaffected until payment in full of the Redemption Price.

If less than all Preferred Shares represented by a certificate are redeemed, the holder shall be entitled to receive, at the expense of the Corporation, a new certificate representing the Preferred Shares which have not been redeemed.

(f)    Definitions

With respect to the Preferred Shares, the following term shall have the meaning ascribed to them below:

"**Redemption Price**" of a Preferred Share means an amount equal to the aggregate of: (i) the Canadian dollar equivalent of the value of the Xerium Canada Distribution, as defined in the Joint Prepackaged Plan of Reorganization

660884.v1

under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Plan"), determined in accordance with the provisions of the Plan, based on the Bank of Canada nominal noon exchange rate calculated 2 business days prior to the date of issuance divided by 100 (the "Issue Price"); plus (ii) any dividends declared thereon and unpaid; less (iii) the amount of any reduction or return of capital in respect of such share.

It is hereby declared that it is the intention of the Corporation, its directors and its shareholders that the Issue Price of a Preferred Share be equal to the fair market value of such share on the date of issuance of such share. In the event that it is determined by: (a) any revenue authority having jurisdiction, with which determination the parties concur; (b) any decision of a court of competent jurisdiction from which there are no further rights of appeal or the parties' rights to appeal have expired; or (c) by the parties themselves, that the fair market value of a Preferred Share is an amount (the "Revised Amount") different from the Issue Price of that share as determined by the board of directors of the Corporation, the Issue Price in respect of such Preferred Share shall, for all purposes, be adjusted, *nunc pro tunc*, to be equal to such Revised Amount.

In the event that any portion of the Preferred Shares shall have been redeemed or purchased for cancellation by the Corporation (whether or not at the option of the Corporation) prior to any adjustment pursuant to the above provisions, then:

(i)     if the amount paid on redemption or purchase for cancellation exceeds the aggregate Revised Amount, the difference between the amount paid on redemption and the aggregate Revised Amount shall be a debt due and owing by the former holders of such Preferred Share to the Corporation;

(ii)    if the amount paid on redemption or purchase for cancellation is less than the aggregate Revised Amount, then the difference between the amount paid on redemption or purchase for cancellation and the aggregate Revised Amount shall be a debt due and owing by the Corporation to the former holders of such Preferred Shares.

## COMMON SHARES

(a)     Voting Rights

Each holder of Common Shares shall be entitled to receive notice of and to attend all meetings of shareholders of the Corporation and to vote thereat, except meetings at which only holders of a specified class of shares (other than Common Shares) or specified series of shares are entitled to vote. At all meetings of which notice must be given to the holders of Common Shares, each holder of Common Shares shall be entitled to one vote in respect of each Common Share held by that holder.

(b)      Dividends

The holders of Common Shares shall be entitled to receive and the Corporation shall pay thereon, subject to the rights, privileges and conditions attached to any other class of shares of the Corporation, out of the monies of the Corporation properly applicable to the payment of dividends, non-cumulative dividends, in such amount and at such rate as the directors may from time to time determine.  The directors may declare unequal dividends on any of the Preferred Shares or Common Shares or may declare dividends on only one or such of the said classes of shares, if desired, as the directors may in their absolute discretion determine, and none of the Preferred Shares or Common Shares shall be entitled to participate in any dividends declared on any other class and, for greater certainty, there shall be no requirement that any of the foregoing classes be treated equally or rateably by the directors with respect to the declaration and payment of dividends.

(c)      Rights on Dissolution

The holders of the Common Shares shall be entitled, subject to the rights, privileges, restrictions and conditions attaching to the Preferred Shares any other class of shares of the Corporation, to receive the remaining property of the Corporation on a liquidation, dissolution or winding-up of the Corporation, whether voluntary or involuntary.

660884.v1

**XERIUM CANADA INC.**

**(hereinafter referred to as the "Corporation")**

**THIS IS SCHEDULE "B" TO THE FOREGOING FORM 5 UNDER THE**

**NEW BRUNSWICK BUSINESS CORPORATIONS ACT**

1.   **PLACE OF SHAREHOLDER MEETINGS**

Notwithstanding subsections (1) and (2) of Section 84 of the *Business Corporations Act*, as from time to time in force, meetings of shareholders of the Corporation may be held outside New Brunswick at such place or places as the shareholders may resolve to meet.

2.   **NOTICE OF SHAREHOLDER MEETINGS**

Notwithstanding subsection (1) of Section 87 of the *Business Corporations Act*, as from time to time in force, notice of time and place of a meeting of shareholders of the Corporation shall be deemed to be properly given if sent not less than three (3) days nor more than fifty (50) days before such meeting:

(a)   to each shareholder entitled to vote at the meeting;

(b)   to each director; and

(c)   to the auditor, if any.

3.   **PRE-EMPTIVE RIGHTS**

(A)   Notwithstanding subsection (2) of Section 27 of the *Business Corporations Act*, as from time to time in force, but subject however to any rights arising under any unanimous shareholders agreements, the holders of equity shares of any class, in the case of the proposed issuance by the Corporation of, or the proposed granting by the Corporation of rights or options to purchase, its equity shares of any class of any shares or other securities convertible into or carrying rights or options to purchase its equity shares of any class, shall not as such, even if the issuance of the equity shares proposed to be issued or issuable upon exercise of such rights or options or upon conversion of such other securities would adversely affect the unlimited dividend rights of such holders, have the pre-emptive right as provided by Section 27 of the *Business Corporations Act* to purchase such shares or other securities.

(B)   Notwithstanding subsection (3) of Section 27 of the *Business Corporations Act*, as from time to time in force, but subject however to any rights arising under any unanimous shareholders agreements, the holders of voting shares of any class, in case of the proposed issuance by the Corporation of, or the proposed granting by

– 2 –

the Corporation of rights or options to purchase, its voting shares of any class or any shares or options to purchase its voting shares of any class, shall not as such, even if the issuance of the voting shares proposed to be issued or issuable upon exercise of such rights or options or upon conversion of such other securities would adversely affect the voting rights of such holders, have the pre-emptive right as provided by Section 27 of the *Business Corporations Act* to purchase such shares or other securities.

4.    **PRIVATE CORPORATION RESTRICTIONS**

(A)    The number of shareholders, exclusive of persons who are in the employment of the Corporation and are shareholders of the Corporation and persons who, having been formerly in the employment of the Corporation, have continued to be shareholders of the Corporation after termination of that employment, is limited to not more than Fifty (50) persons, two or more persons who are joint registered holders of one or more shares being counted as one shareholder.

(B)    Any invitation to the public to subscribe for any shares, debentures or other securities of the Corporation shall be prohibited.

5.    **FINANCIAL ASSISTANCE**

The Corporation may, directly or indirectly, give financial assistance by means of a loan, guarantee or otherwise:

(a)    to any shareholder, director, officer or employee of the Corporation or of an affiliated corporation, or

(b)    to any associate of a shareholder, director, officer or employee of the Corporation or of an affiliated corporation;

whether or not:

(c)    the Corporation is, or after giving the financial assistance would be, unable to pay its liabilities as they become due; or

(d)    the realizable value of the Corporation's assets, excluding the amount of any financial assistance in the form of a loan or in the form of assets pledged or encumbered to secure a guarantee, after giving the financial assistance, would be less than the aggregate of the Corporation's liabilities and stated capital of all classes.

6.    **RESTRICTION – NON-VOTING SHARES**

The Corporation is restricted from (i) increasing or otherwise amending its authorized capital by the creation of any class of non-voting shares, or (ii) amending this restriction, without the prior unanimous consent of all holders of Preferred Shares and Common Shares, in addition to any other approval required by law.

660880.v1

# Erklärung über die Errichtung der Gesellschaft

# (Gesellschaftsvertrag)

# der

# HUYCK.WANGNER Austria GmbH

§ 1
Firma der Gesellschaft

Die Firma der Gesellschaft lautet:

HUYCK.WANGNER Austria GmbH

§ 2
Sitz der Gesellschaft

Der Sitz der Gesellschaft ist Gloggnitz, Niederösterreich.

§ 3
Dauer der Gesellschaft

Die Gesellschaft ist auf unbestimmte Zeit errichtet.

§ 4
Gegenstand des Unternehmens

1. Gegenstand des Unternehmens ist die fabriksmäßige Erzeugung und Verarbeitung von Filztuchen, Wollwaren, Garnen, Gespinsten, Geweben, Gewirken und Geflechten aus Material jeder Art sowie der Handel mit diesen Waren.

2. Die Gesellschaft ist zu allen Geschäften und Maßnahmen berechtigt, die zur Erreichung des Gesellschaftszweckes notwendig oder nützlich erscheinen, insbesondere zum Erwerb von Liegenschaften, zur Errichtung von Zweigniederlassungen und Tochtergesellschaften im In- und Ausland sowie zur Beteiligung an anderen Unternehmen.

- 2 -

§ 5
Stammkapital und Stammeinlagen

1.	Das Stammkapital der Gesellschaft beträgt € 6.178.000,00 (Euro sechs Millionen einhundertachtundsiebzigtausend).

2.	Die Stammeinlagen sind zur Gänze bar eingezahlt.

§ 6
Geschäftsanteile

1.	Die Teilung, Übertragung und Verpfändung von Geschäftsanteilen bedarf der Zustimmung der Gesellschafter.

2.	Die Ausgabe von nicht stimmberechtigten Geschäftsanteilen ist untersagt.

§ 7
Geschäftsjahr

Die Geschäftsjahre sind die Kalenderjahre.

§ 8
Organe der Gesellschaft

Die Organe der Gesellschaft sind die Geschäftsführer, der Aufsichtsrat und die Generalversammlung.

§ 9
Geschäftsführer

1.	Die Gesellschafter bestellen durch Beschluss einen oder mehrere Geschäftsführer.

2.	Ist nur ein Geschäftsführer bestellt, so vertritt dieser die Gesellschaft allein. Sind mehrere Geschäftsführer bestellt, so wird die Gesellschaft durch zwei Geschäftsführer oder durch einen Geschäftsführer und einen Prokuristen gemeinsam vertreten. Die Gesellschaft kann mit den gesetzlichen Einschränkungen auch durch zwei Prokuristen vertreten werden.

- 3 -

Die Generalversammlung kann bestimmen, dass einzelne Geschäftsführer allein zur Vertretung der Gesellschaft befugt sein sollen.

3.    Die Gesellschafter haben, wenn mehrere Geschäftsführer bestellt sind, die Verteilung der Geschäfte zwischen den Geschäftsführern zu bestimmen, sowie die Geschäfte festzulegen, die ihrer Zustimmung bedürfen.

§ 10
Aufsichtsrat

Die Generalversammlung kann einen Aufsichtsrat bestellen; geschieht dies, dann gelten folgende Bestimmungen:

1.    Zusammensetzung des Aufsichtsrates:

a)    Der Aufsichtsrat besteht aus mindestens drei bis zwölf von der Generalversammlung gewählten Mitgliedern.

b)    Die Funktionsperiode des Aufsichtsrates währt jeweils längstens bis zur Beschlussfassung über den vierten Jahresabschluss nach der Wahl.

c)    Scheidet ein Aufsichtsratsmitglied während der Dauer seiner Funktionsperiode aus dem Aufsichtsrat aus, dann ist eine Ersatzwahl nur erforderlich, wenn durch das Ausscheiden die Zahl der Aufsichtsratsmitglieder unter drei sinkt.

d)    Die Funktionsperiode eines auf diese Weise gewählten Aufsichtsratsmitgliedes endet gleichzeitig mit der Funktionsperiode der übrigen Mitglieder, soweit die Gesellschafter nicht etwas anderes beschließen.

e)    Jedes Mitglied des Aufsichtsrates kann sein Amt unter Einhaltung einer vierwöchigen Frist auch ohne wichtigen Grund mit schriftlicher Anzeige niederlegen.

f)    Der Aufsichtsrat wählt in einer im Anschluss an die ordentliche Generalversammlung abzuhaltenden Sitzung in der ein oder mehrere Mitglieder in den Aufsichtsrat gewählt wurden und zu der es keiner besonderen Einladung bedarf,

- 4 -

aus seiner Mitte einen Vorsitzenden und einen oder zwei Stellvertreter.

g) Erhält bei einer Wahl keiner die absolute Mehrheit, so erfolgt eine Stichwahl zwischen denjenigen, welche die meisten Stimmen erhalten haben.

h) Willenserklärungen des Aufsichtsrates und seiner Ausschüsse sind vom Vorsitzenden des Aufsichtsrates, im alle seiner Verhinderung von einem seiner Stellvertreter, abzugeben.

2. Sitzungen und Beschlussfassungen des Aufsichtsrates:

a) Der Aufsichtsrat hat sich seine Geschäftsordnung selbst zu geben.

b) Zu den Sitzungen des Aufsichtsrates beruft der Vorsitzende, im Falle seiner Verhinderung einen Stellvertreter, die Mitglieder unter der zuletzt bekannt gegebenen Anschrift brieflich, mittels Telefax oder E-Mail ein.

c) Der Aufsichtsrat ist beschlussfähig, wenn mindestens drei Mitglieder, darunter der Vorsitzende oder ein Stellvertreter, anwesend sind. Der Vorsitzende, im Fall seiner Verhinderung ein Stellvertreter, leitet die Sitzung. Die Art der Abstimmung bestimmt der Leiter der Sitzung.

d) Beschlüsse werden mit einfacher Mehrheit der abgegebenen Stimmen gefasst. Im Falle der Stimmengleichheit entscheidet — auch bei Wahlen — die Stimme des Leiters die Sitzung.

e) An den Sitzungen des Aufsichtsrates können mit Zustimmung des Aufsichtsrates auch nicht dem Aufsichtsrat angehörige Personen anstelle der Aufsichtsratmitglieder teilnehmen, wenn sie von diesen hiezu schriftlich ermächtigt sind. Ein von der Sitzung abwesendes Aufsichtsratsmitglied kann mit schriftlicher Vollmacht ein anderes Mitglied, das an der Sitzung teilnimmt, zur Ausübung seines Stimmrechts bei allen der Sitzung unterbreiteten Angelegenheiten oder zur Überreichung seiner Stimmabgabe ermächtigen.

f) Über die Verhandlungen und Beschlüsse des Aufsichtsrates ist eine Niederschrift anzufertigen, die vom Leiter der Sitzung zu unterzeichnen ist.

- 5 -

g) Beschlüsse können auch auf schriftlichem Wege gefasst werden, wenn der Vorsitzende oder im Falle seiner Verhinderung ein Stellvertreter eine solche Beschlussfassung anordnet und kein Mitglied des Aufsichtsrates diesem Verfahren widerspricht.

Für die schriftliche Stimmabgabe gelten die Bestimmungen von lit. d) entsprechend.

3. Ausschüsse des Aufsichtsrates:

a) Der Aufsichtsrat kann aus seiner Mitte Ausschüsse bilden. Ihre Aufgaben, Befugnisse und deren Geschäftsordnungen werden vom Aufsichtsrat festgesetzt; den Ausschüssen kann auch die Befugnis zu Entscheidungen übertragen werden.

b) Die Bestimmungen des Absatzes 2 (zwei) lit. b) bis g) gelten sinngemäß auch für die Ausschüsse des Aufsichtsrates. Besteht ein Ausschuss nur aus zwei Mitgliedern, so ist der Ausschuss nur beschlussfähig, wenn beide Mitglieder anwesend sind.

4. Zustimmungspflichtige Geschäfte:

Folgende in § 30j Absatz (5) des Gesetzes über Gesellschaften mit beschränkter Haftung bezeichneten Geschäfte sollen unabhängig von der Betragshöhe nur mit Zustimmung des Aufsichtsrates vorgenommen werden:

a) der Erwerb und die Veräußerung von Beteiligungen (§ 228 UGB) sowie Erwerb, Veräußerung und Stilllegung von Unternehmen und Betrieben;

b) die Gewährung von Darlehen und Krediten an Unternehmen, die nicht der Xerium Gruppe angehören;

c) die Aufnahme von Anleihen, folgende Geschäfte nur, sofern die nachfolgend festgelegten Betragsgrenzen überschritten werden;

d) € 7 Millionen (Euro sieben Millionen) für Investitionen im einzelnen und € 18 Millionen (Euro achtzehn Millionen) insgesamt in einem Geschäftsjahr;

e) € 7 Millionen (Euro sieben Millionen) im einzelnen und € 18 Millionen (Euro

- 6 -

achtzehn Millionen) insgesamt in einem Geschäftsjahr für die Aufnahme von Darlehen und Krediten;

f)      € 18 Millionen (Euro achtzehn Millionen) für die Gewährung von Darlehen und Krediten an Unternehmen, die der Xerium Gruppe, angehören.

§ 11
Generalversammlung

1      Die Generalversammlung wird durch die Geschäftsführer oder den Aufsichtsrat einberufen und am Sitze der Gesellschaft oder in einer österreichischen Landeshauptstadt abgehalten.

2.      Den Vorsitz in der Generalversammlung führt der von den Gesellschaftern dazu Bestimmte; haben sie keinen Vorsitzenden bestellt oder ist der Bestellte nicht erschienen oder nicht zur Leitung der Versammlung bereit, so leitet die Generalversammlung der an Jahren älteste Teilnehmer. Der Vorsitzende der Generalversammlung leitet die Verhandlungen und bestimmt die Reihenfolge die Art der Gegenstände der Tagesordnungen sowie die Art der Abstimmung.

3.      Sofern das Gesetz nicht zwingend eine andere Mehrheit vorschreibt, beschließt die Generalversammlung mit einfacher Mehrheit der abgegebenen Stimmen. Wenn sämtliche Gesellschafter damit einverstanden sind, kann eine Beschlussfassung auch auf schriftlichem Weg erfolgen, wobei die erforderliche Mehrheit nicht nach der Zahl der abgegebenen, sondern nach der Gesamtzahl der allen Gesellschaftern zustehenden Stimmen berechnet wird.

4.      Die Ausübung des Stimmrechtes durch Bevollmächtigte ist nur mit schriftlicher Vollmacht möglich.

5.      Die gesetzlichen Minderheitsrechte stehen, soweit gesetzlich zulässig, Gesellschaftern zu, deren Stammeinlagen den zwanzigsten Teil des Stammkapitals erreichen.

§ 12
Jahresabschluss

1.      Innerhalb der ersten fünf Monate eines jeden Geschäftsjahres haben die Geschäftsführer für das vergangene Geschäftsjahr den Jahresabschluss samt Anhang und Lagebericht aufzustellen.

- 7 -

2.    Die Generalversammlung beschließt alljährlich die Genehmigung des Jahresabschlusses, Verteilung des Reingewinnes und die Entlastung der Geschäftsführer sowie der Mitglieder des Aufsichtsrates, falls ein Aufsichtsrat bestellt wurde (ordentliche Generalversammlung).

## § 13
### Gewinnverteilung

1.    Der Reingewinn, der sich nach Vornahme der Vorschreibungen, Wertberichtigungen, sowie nach Bildung von Rückstellungen und Rücklagen ergibt, unterliegt der Verteilung durch Gesellschafterbeschluss.

2.    Die Gewinnanteile der Gesellschafter werden im Verhältnis der eingezahlten Stammeinlagen verteilt.

3.    Die Gewinnanteile sind, falls die Generalversammlung nichts anderes beschlossen hat, dreißig Tage nach Abhaltung der Generalversammlung zur Zahlung fällig. Binnen drei Jahren nach Fälligkeit nicht behobene Gewinnanteile der Gesellschafter verfallen zugunsten der Gesellschaft.

## § 14
### Bekanntmachungen

Die Bekanntmachungen der Gesellschaft und unter den Gesellschaftern erfolgen durch eingeschriebene Briefe an die Gesellschafter, und zwar an deren der Gesellschaft zuletzt bekannt gegebenen Adresse.

## § 15
### Ergänzungsbestimmungen

Soweit in diesem Vertrag keine besonderen Bestimmungen getroffen wurden, gelten ergänzend die Bestimmungen des Gesetzes über die Gesellschaft mit beschränkter Haftung (GmbH-Gesetz) in seiner jeweils aktuellen Fassung.

# Gesellschaftsvertrag

**der**

## Xerium Germany Holding GmbH

### Artikel 1
### Firma und Sitz der Gesellschaft

(1)    Die Firma der Gesellschaft lautet

Xerium Germany Holding GmbH.

(2)    Die Gesellschaft hat ihren Sitz in Reutlingen.

### Artikel 2
### Gegenstand der Gesellschaft

(1)    Gegenstand des Unternehmens der Gesellschaft ist die unternehmerische Führung von Tochterunternehmen sowie die Erbringung von Dienstleistungen im Zusammenhang mit dem Betrieb elektronischer Datenverarbeitungssysteme, die Beteiligung an anderen Gesellschaften und das Halten und Verwalten von Geschäftsanteilen.

(2)    Innerhalb dieses Gegenstands der Gesellschaft ist die Gesellschaft berechtigt, weitere Unternehmen innerhalb Deutschlands oder im Ausland zu errichten, bestehende zu erwerben oder sich an ihnen zu beteiligen, Unternehmen zu leiten und/oder Zweigstellen oder Tochtergesellschaften in Deutschland oder im Ausland zu errichten.

(3)    Die Gesellschaft ist weiterhin zur Vornahme aller Handlungen berechtigt, die für die Gesellschaft vorteilhaft sind oder sein könnten und nicht gesetzlich verboten sind, insbesondere Patente, Warenzeichen, Lizenzen, Franchise Verträge und alle anderen

#570262

2

gegenständlichen und immateriellen Eigentumsrechte zu erwerben, zu benutzen, zu übertragen oder zu verkaufen sowie Grundstücke und Rechte an Grundstücken zu erwerben, zu verkaufen, zu mieten oder mit Hypotheken zu belasten.

**Artikel 3**

**<u>Dauer</u>**

Die Gesellschaft wird auf unbestimmte Zeit errichtet.

**Artikel 4**

**<u>Geschäftsjahr</u>**

Das Geschäftsjahr ist das Kalenderjahr.

Die Zeit vom 1. Juli 2004 bis zum 31. Dezember 2004 ist ein Rumpfgeschäftsjahr.

**Artikel 5**

**<u>Stammkapital; Geschäftsanteile</u>**

(1)    Das Stammkapital der Gesellschaft beträgt Euro 25.100,00 (in Worten: Euro fünfundzwanzigtausendeinhundert).

(2)    Die Ausgabe von stimmrechtslosen Geschäftsanteilen ist ausgeschlossen.

**Artikel 6**

**<u>Geschäftsführung und Vertretung der Gesellschaft</u>**

#570262

(1)    Die Gesellschaft wird durch einen oder mehrere Geschäftsführer vertreten, die durch einen Gesellschafterbeschluss mit einfacher Mehrheit ernannt oder abberufen werden.

(2)    Falls mehrere Geschäftsführer ernannt sind, wird die Gesellschaft durch zwei Geschäftsführer gemeinsam oder durch einen Geschäftsführer zusammen mit einem Prokuristen vertreten. Die Gesellschafter können jedoch bestimmen, dass einer oder mehrere oder alle Geschäftsführer die Gesellschaft einzeln vertreten können. Falls nur ein Geschäftsführer bestellt ist, vertritt er die Gesellschaft allein.

(3)    Die Gesellschafter können einen oder mehrere Geschäftsführer von den Beschränkungen des § 181 BGB befreien.

**Artikel 7**

**Veröffentlichungen**

Veröffentlichungen der Gesellschaft erfolgen nur im Bundesanzeiger.

**Artikel 8**

**Gründungskosten**

Die durch die Gründung der Gesellschaft verursachten Notar-, Gerichts- und Veröffentlichungskosten und Steuern trägt die Gesellschaft bis zu einem Betrag von Euro 1.500,00.

#570262

**S T A T U T O**

==============

**DENOMINAZIONE - OGGETTO - SEDE - DURATA**

1.  E' costituita una società  per azioni con la denominazione


    " XERIUM ITALIA S.p.A."


2.  La Società ha per oggetto, in via prevalente, lo svolgimento di attività di natura finanziaria, incluso l'assunzione, sia direttamente che indirettamente, di interessenze e partecipazioni in altre società e/o  imprese e/o enti costituiti o costituendi, non nei confronti del pubblico ma unicamente nei confronti di società controllate o collegate ai sensi dell'art. 2359 c.c.

    La Società ha altresì per oggetto, sempre non nei confronti del pubblico e comunque riguardo alle società controllanti, controllate o collegate, di una o più delle seguenti attività:
-   concessione di finanziamenti sotto qualsiasi forma;
-   servizi di incasso, pagamento e trasferimento fondi, con conseguente addebito ed accredito dei relativi oneri ed interessi;
-   coordinamento tecnico, amministrativo e finanziario delle  società controllanti, controllate o collegate;
-   raccolta di fondi presso i propri soci, sotto forma di mutui con o senza interessi, in ottemperanza alle disposizioni di legge e nel rispetto della deliberazione C.I.C.R. del 3 marzo 1994 e delle altre norme di legge e regolamenti di volta in volta applicabili;
-   prestazione di avalli, fideiussioni ed ogni altra garanzia, anche reale.

Sono in ogni caso tassativamente escluse:

-   l'attività di locazione finanziaria;
-   le attività professionali riservate;
-   la sollecitazione del pubblico risparmio ai sensi delle vigenti norme;
-   l'esercizio nei confronti del pubblico delle attività di cui all'articolo 106 del Decreto legislativo 1 settembre 1993 n. 385; l'erogazione del credito al consumo, e ciò anche nell'ambito dei propri soci, secondo quanto disposto dal Ministero del Tesoro con decreto del 27 settembre 1991, pubblicato sulla Gazzetta Ufficiale n. 227;
-   le attività di cui alla legge 2 gennaio 1991 n. 1;
-   le attività di cui al D. L. 20 novembre 1990 n. 356;
-   l'attività di factoring di qualsiasi tipo, rientrante o meno nel disposto della legge 21 febbraio 1991 n. 52.

Al fine di realizzare l'oggetto sociale, la Società potrà inoltre, in via non prevalente, compiere tutte le operazioni commerciali, industriali, mobiliari ed immobiliari, nel rispetto della corrente normativa legale e regolamentare, ritenute dall'Organo Amministrativo necessarie od utili ed in particolare, la produzione, l'acquisto, la vendita, l'importazione, l'esportazione, l'immagazzinaggio, l'assemblaggio e, in genere, il commercio, sia in proprio che quale rappresentante, agente o commissionaria di altre ditte o imprese, anche estere, di qualsiasi genere di prodotto comunque collegato con la produzione della carta. La Società potrà inoltre, acquistare o cedere, concedere od accettare licenze d'uso di brevetti industriali, know how e diritti di proprietà industriale e commerciale in genere.

3.      La Società ha la sede legale in Milano.

        La Società potrà istituire, in Italia ed all'estero, sedi secondarie, filiali, succursali, agenzie e rappresentanze.

4.      Il domicilio dei soci, per quel che concerne i loro rapporti con la Società, è quello che risulta dal libro dei soci.

5.      La durata della Società è stabilita sino al  31 dicembre 2100 e può essere prorogata.

### CAPITALE

6.      Il capitale sociale è di Euro 6.759.320 ed è suddiviso in  6.759.320 azioni ordinarie del valore nominale di Euro 1 cadauna. La Società non potrà emettere azioni prive di diritto di voto.

7.      I versamenti sulle azioni non liberate sono richiesti dall'Organo Amministrativo nei termini e nei modi da esso ritenuti convenienti, fermo il disposto dell'art. 2344 del Codice Civile.

8.      In caso di esuberanza del capitale, l'Assemblea Straordinaria può deliberarne la riduzione, oltre che nei modi stabiliti dall'art. 2482 C.C., anche mediante assegnazione a singoli soci o gruppi di soci di determinate attività sociali.

### ASSEMBLEA

9.      La convocazione dell'Assemblea è fatta a cura dell'Organo Amministrativo mediante avviso comunicato agli azionisti con qualsiasi mezzo che garantisca la prova dell'avvenuto ricevimento tra cui lettera raccomandata, fax o messaggio di posta elettronica, almeno 15 giorni prima dell'assemblea. L'avviso deve contenere l'indicazione del giorno, dell'ora e del luogo dell'adunanza, nonché dell'elenco delle materie da trattare. Nello stesso avviso potrà essere fissata per altro giorno la seconda adunanza o successiva adunanza, qualora la prima andasse deserta.

        L'avviso di convocazione dell'Assemblea può essere sottoscritto da persona delegata dall'Organo Amministrativo.

        E', tuttavia, valida l'Assemblea non convocata a norma delle procedure sopra indicate qualora venga rappresentato l'intero capitale sociale e partecipi all'Assemblea stessa,

anche mediante mezzi di telecomunicazione, anche la maggioranza dei componenti dell'organo amministrativo e dei componenti del collegio sindacale.

10. L'Assemblea è ordinaria o straordinaria ai sensi di legge e di Statuto.

Essa può essere convocata anche in luogo diverso dalla sede sociale purché in Italia, in qualunque paese dell'Unione Europea e negli U.S.A.

Quando particolari esigenze relative alla struttura ed all'oggetto della società lo richiedano, l'Assemblea Ordinaria per l'approvazione del bilancio può essere convocata entro 180 giorni dalla chiusura dell'esercizio sociale.

L'Assemblea potrà svolgersi anche in più luoghi, contigui o distanti, e sarà possibile intervenire in Assemblea mediante mezzi di telecomunicazione tra cui mezzi di audio/video collegamento. L'Assemblea dovrà, in ogni caso, svolgersi con modalità tali che tutti coloro che hanno il diritto di parteciparvi possano rendersi conto in tempo reale degli eventi, formare liberamente il proprio convincimento ed esprimere liberamente e tempestivamente il proprio voto. Il verbale dovrà dare atto delle modalità in cui si è svolta l'Assemblea.
Verificandosi questi requisiti l'Assemblea si considererà tenuta nel luogo in cui si trova il Presidente e dove pure deve trovarsi il segretario onde consentire la stesura e la sottoscrizione dei verbali sul relativo libro.

11. Il Presidente dell'Assemblea e il segretario che lo assiste, anche non soci, sono designati a maggioranza dei soci intervenuti all'Assemblea.

Il Presidente dell'Assemblea verifica il diritto di intervento all'Assemblea e la regolarità delle deleghe.

12. Le deliberazioni dell'Assemblea ordinaria e straordinaria dei soci saranno validamente prese con le maggioranze stabilite dall'art. 2368 C.C. e, in caso di seconda  o successiva convocazione, dall'art. 2369 C.C..

Quando per la validità delle deliberazioni la legge ritiene sufficiente la maggioranza assoluta dei voti, essa viene calcolata senza che si tenga conto delle astensioni dal voto.

13. Le nomine alle cariche sociali così come tutte le altre delibere si fanno per votazione palese.

### AMMINISTRAZIONE

14. La Società è amministrata da un Amministratore Unico o da un Consiglio composto da due (2) ad undici (11) membri anche non soci, eletti dall'Assemblea Ordinaria dei soci, che determina anche il numero dei componenti del Consiglio e la durata della carica sia degli stessi che, a seconda dei casi, dell'Amministratore Unico.

L'Amministratore Unico o i consiglieri restano in carica per tre (3) esercizi, salvo diversa disposizione della delibera di nomina che può anche stabilire scadenze diverse

del mandato di singoli consiglieri e comunque per un periodo non superiore a tre (3) esercizi; decadono e si sostituiscono a norma di legge, e possono essere rieletti.

In caso di scadenza per qualunque causa del mandato, l'Organo Amministrativo resterà peraltro in carica fino a che l'Assemblea Ordinaria avrà deliberato in merito al suo rinnovo e sarà intervenuta l'accettazione da parte di almeno metà dei nuovi consiglieri.

15.    Qualora per dimissioni o per altra causa venga a mancare, prima della scadenza del mandato, più della metà dei consiglieri in carica, o, nel caso in cui il Consiglio di Amministrazione sia composto da due membri e per dimissioni o per altra causa venga a mancare uno dei due membri, l'intero Consiglio s'intende scaduto e deve convocarsi senza ritardo l'Assemblea ordinaria per l'elezione di un nuovo Organo Amministrativo.

Nel Consiglio di Amministrazione composto di due membri il dissenso sulla revoca del Consigliere Delegato determina la decadenza dell'intero Consiglio.

16.    Ove non sia già stato eletto dall'Assemblea ordinaria il Consiglio elegge per votazione palese fra i suoi membri il Presidente. Può eleggere anche uno o più Vice-Presidenti.

Il segretario, anche non consigliere o non socio, viene designato dai consiglieri intervenuti a ciascuna riunione del Consiglio.

17.    Il Consiglio si raduna sia presso la sede sociale, sia altrove, in Italia o in qualunque altro luogo designato dagli amministratori, anche mediante mezzi di telecomunicazione.

Le riunioni del Consiglio di Amministrazione sono convocate dal Presidente o da un Vice-Presidente allorché sia necessario o qualora ne sia fatta richiesta scritta da almeno un consigliere. Le formalità di convocazione del Consiglio possono essere delegate ad un terzo, anche non consigliere o non socio, per conto del Presidente o di un Vice-Presidente.

18.    Il Consiglio viene convocato con lettera raccomandata da spedirsi almeno sette (7) giorni prima della adunanza a ciascun consigliere e sindaco effettivo e, nei casi di urgenza, con telegramma, e-mail o telefax da spedirsi ai medesimi almeno ventiquattro (24) ore prima dell'adunanza.

Tuttavia, anche in mancanza di dette formalità, il Consiglio potrà validamente deliberare qualora siano presenti, anche mediante mezzi di telecomunicazione, tutti i consiglieri e sindaci effettivi in carica.

19.    Per la validità delle deliberazioni del Consiglio è necessaria la presenza, effettiva o mediante mezzi di telecomunicazione, della maggioranza dei consiglieri in carica. Il Consiglio di Amministrazione può riunirsi e validamente deliberare anche mediante mezzi di telecomunicazione, tra cui mezzi di audio/video collegamento, purché la riunione si svolga con modalità tali che tutti coloro che hanno il diritto di parteciparvi possano rendersi conto in tempo reale degli eventi, formare liberamente il proprio convincimento ed esprimere liberamente e tempestivamente il proprio voto.

Verificandosi questi requisiti il consiglio di amministrazione si considererà tenuto nel luogo in cui si trova il Presidente e dove pure deve trovarsi il segretario onde consentire la stesura e la sottoscrizione dei verbali sul relativo libro. In caso di parità di voti prevale il voto di chi presiede.

In assenza del Presidente e di Vice-Presidenti la riunione è presieduta dal consigliere designato a maggioranza dagli intervenuti. Le deliberazioni sono prese a maggioranza assoluta di voti dei presenti.

Le deliberazioni del Consiglio devono essere verbalizzate nel libro dei verbali delle riunioni del Consiglio, o, qualora ciò non sia immediatamente possibile, in un documento firmato da chi presiede la riunione e dal segretario designato per la medesima. In questo ultimo caso il verbale deve essere trascritto nel libro dei verbali delle riunioni del Consiglio e, qualora fosse redatto in lingua straniera, deve essere previamente tradotto in lingua italiana sotto la responsabilità di chi presiede la riunione. Il verbale trascritto nel libro dei verbali delle riunioni del Consiglio deve in ogni caso essere sottoscritto da chi presiede la riunione e dal segretario designato per la medesima.

20.   L'Organo Amministrativo ha i più ampi poteri per la gestione ordinaria e straordinaria della Società, ed ha facoltà di compiere tutti gli atti che ritenga opportuni per l'attuazione dell'oggetto sociale, esclusi soltanto quelli che la legge riserva inderogabilmente alla competenza dell'Assemblea.

21.   Il Consiglio di Amministrazione può delegare parte delle proprie attribuzioni, congiuntamente o disgiuntamente, a norma dell'art. 2381 del Cod. Civ.

22.   L'Organo Amministrativo può nominare direttori, institori e procuratori negoziali delegando ai medesimi, congiuntamente o disgiuntamente, il potere di compiere determinati atti o categorie di atti in nome e per conto della Società, con eventuale facoltà di subdelega.

23.   Le eventuali obbligazioni dei legali rappresentanti, dei consiglieri di amministrazione e dei procuratori della società derivanti da sanzioni tributarie non penali e connesse spese ed onorari legali, che siano state applicate nei loro confronti in relazioni a violazioni di norme tributarie compiute nell'esercizio di funzioni loro delegate, sono assunte dalla società entro i limiti di legge, ed in particolare entro i limiti fissati dall'art. 11 comma 6° del D.L.G.S. 18.12.97 n. 472, come modificato dal DLV n. 203/1998, salvo che tali violazioni risultino commesse con dolo o colpa grave, così come attualmente definiti all'art. 5, comma 3°, del D.L.G.S. 18.12.1997 n. 472, come modificato dal DLV n. 203/1998. In caso di ulteriori modifiche legislative il richiamo si intenderà effettuato alla norma di legge in vigore al momento della commissione della violazione. L'assunzione da parte della società, e la relativa manleva a favore dell'obbligato, saranno efficaci a condizione che i suddetti legali rappresentanti, amministratori e procuratori (a) abbiano prontamente dato comunicazione alla società del provvedimento di irrogazione delle sanzioni; (b) si siano conformati alle legittime istruzioni della società concernenti tali sanzioni, con riguardo in particolare all'eventuale opposizione o alla quiescenza rispetto alle stesse; (c) abbiano collaborato pienamente con la società nella difesa dei relativi procedimenti dinanzi a qualsiasi competente autorità amministrativa o giurisdizionale.

## RAPPRESENTANZA DELLA SOCIETA'

24. La rappresentanza della Società, nei confronti di terzi ed anche in giudizio, spetta, a seconda dei casi, all'Amministratore Unico o al Presidente del Consiglio di Amministrazione. Essa spetta anche ai Vice Presidenti e all'Amministratore Delegato, ove nominati, a ciascuno dei Consiglieri nei limiti dei poteri ad essi conferiti, nonché a coloro cui venga, di volta in volta, conferita dall'Organo Amministrativo.

## CONTROLLO CONTABILE

25. Il Collegio Sindacale è composto da tre Sindaci effettivi e due supplenti, nominati ai sensi di legge, i quali durano in carica tre esercizi, sono rieleggibili e scadono alla data dell'assemblea convocata per l'approvazione del bilancio relativo al terzo esercizio della carica.
Le funzione del Collegio Sindacale sono determinate dalla legge.
L'Assemblea che procede alla nomina designerà il Presidente del Collegio Sindacale e fisserà la retribuzione dei Sindaci.

L'Assemblea ordinaria può stabilire altresì che il controllo contabile venga affidato al Collegio Sindacale oppure ad un revisore contabile o ad una Società di revisione.
Nel caso in cui il controllo contabile venga affidato al Collegio Sindacale, tutti i sindaci dovranno essere revisori contabili iscritti nel Registro istituito presso il Ministero di Giustizia.
Qualora la società sia tenuta alla redazione del bilancio consolidato, il controllo contabile deve essere attribuito ad un revisore contabile o da una Società di revisione; nel caso in cui la Società faccia ricorso al mercato del capitale di rischio, il controllo contabile verrà affidato ad una Società di Revisione. L'Assemblea fisserà la retribuzione e la durata dell'incarico del revisore contabile o della Società di Revisione che comunque non potrà essere superiore a tre esercizi e scadrà alla data dell'assemblea convocata per l'approvazione del bilancio relativo al terzo esercizio dell'incarico.
Le funzioni della Società di Revisione o del Revisore Contabile sono determinati dalla legge.

## ESERCIZI SOCIALI ED UTILI

26. Gli esercizi sociali si chiudono al 31 dicembre di ogni anno.

27. Gli utili netti di ciascun esercizio, dopo prelevata una somma non inferiore al 5% per la Riserva Legale, fino a che questa non abbia raggiunto il 20% del capitale sociale, possono essere accantonati o distribuiti agli azionisti o destinati ad altri scopi nell'interesse della Società con deliberazione dell'Assemblea Ordinaria dei soci.

28. Il pagamento dei dividendi è effettuato nei termini e modi stabiliti dall'Assemblea Ordinaria che ne delibera la distribuzione o, in mancanza, dall'Organo Amministrativo.

Il diritto al pagamento dei dividendi la cui distribuzione sia stata deliberata ai sensi del comma precedente si prescrive nel termine di cinque (5) anni.

## SCIOGLIMENTO E LIQUIDAZIONE

29.    Addivenendosi in qualsiasi tempo e per qualsiasi causa allo scioglimento della Società, l'Assemblea stabilisce le modalità della liquidazione e nomina uno o più Liquidatori determinandone i poteri.

Il bilancio finale di liquidazione approvato con voto unanime dall'Assemblea Ordinaria, costituita con la presenza di tutti i soci, non è soggetto a reclamo e si intende approvato ai fini dell'art. 2454 del Cod. Civ. anche se non sia compiuto il termine ivi previsto.

## RINVIO

30.    Tutto quanto non è specificatamente previsto dal presente Statuto è regolato dalle disposizioni di legge vigenti.

## SCHEDULE 1.90

## Shareholder Rights Plan

DRAFT

XERIUM TECHNOLOGIES, INC.


and


AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC
as Rights Agent


Rights Agreement


Dated as of [●], 2010

**TABLE OF CONTENTS**

Page

Section 1    Certain Definitions.................................................................................1

Section 2    Appointment of Rights Agent.................................................................4

Section 3    Issue of Right Certificates.....................................................................4

Section 4    Form of Right Certificates.....................................................................6

Section 5    Countersignature and Registration..........................................................6

Section 6    Transfer, Split Up, Combination and Exchange of Right Certificates; Mutilated, Destroyed, Lost or Stolen Right Certificates ..................................................7

Section 7    Exercise of Rights; Purchase Price; Expiration Date of Rights.............7

Section 8    Cancellation and Destruction of Right Certificates ...............................8

Section 9    Availability of Preferred Shares.............................................................8

Section 10    Preferred Shares Record Date .............................................................9

Section 11    Adjustment of Purchase Price, Number of Shares or Number of Rights.................9

Section 12    Certificate of Adjusted Purchase Price or Number of Shares................15

Section 13    Consolidation, Merger or Sale or Transfer of Assets or Earning Power ..............15

Section 14    Fractional Rights and Fractional Shares ................................................16

Section 15    Rights of Action...................................................................................17

Section 16    Agreement of Right Holders..................................................................17

Section 17    Right Certificate Holder Not Deemed a Stockholder ............................18

Section 18    Concerning the Rights Agent.................................................................18

Section 19    Merger or Consolidation or Change of Name of Rights Agent.............19

Section 20    Duties of Rights Agent..........................................................................19

Section 21    Change of Rights Agent.........................................................................21

Section 22    Issuance of New Right Certificates.......................................................21

Section 23    Redemption ...........................................................................................22

Section 24    Exchange...............................................................................................22

Section 25    Notice of Certain Events.......................................................................23

Section 26    Notices ..................................................................................................24

Section 27    Supplements and Amendments..............................................................25

Section 28    Successors.............................................................................................25

Section 29    Benefits of this Rights Agreement.........................................................25

Section 30    Severability ........................................................................................25

Section 31    Governing Law ...................................................................................25

Section 32    Counterparts .......................................................................................25

Section 33    Descriptive Headings.........................................................................26

Exhibit A — Form of Certificate of Designations

Exhibit B — Form of Right Certificate

Exhibit C — Summary of Rights to Purchase Preferred Shares

**RIGHTS AGREEMENT**

Rights Agreement, dated as of [●], 2010, between Xerium Technologies, Inc., a Delaware corporation (the "Company"), and American Stock Transfer & Trust Company, LLC (the "Rights Agent").

WHEREAS, on [●], 2010, the Board of Directors of the Company authorized and declared a dividend of one preferred share purchase right (a "Right") for each Common Share of the Company outstanding as of the Close of Business on [●], 2010 (the "Record Date"), each Right representing the right to purchase one one-thousandth (subject to adjustment) of a Preferred Share, upon the terms and subject to the conditions herein set forth, and the Board of Directors has further authorized and directed the issuance of one Right (subject to adjustment as provided herein) with respect to each Common Share that shall become outstanding between the Record Date and the earliest of the Distribution Date, the Redemption Date and the Expiration Date; provided, however, that Rights may be issued with respect to Common Shares that shall become outstanding after the Distribution Date and prior to the earlier of the Redemption Date and the Expiration Date in accordance with the provisions of Section 22 hereof.

NOW THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the parties hereby agree as follows:

Section 1.    Certain Definitions. For purposes of this Rights Agreement, the following terms have the meanings indicated:

(a)    "Acquiring Person" shall mean any Person who or which, together with all Affiliates and Associates of such Person, shall be the Beneficial Owner of 15% or more of the Common Shares then outstanding, but shall not include (i) the Company, any Subsidiary of the Company, any employee benefit plan of the Company or of any Subsidiary of the Company, or any entity or trustee holding Common Shares for or pursuant to the terms of any such plan or for the purpose of funding any such plan or funding other employee benefits for employees of the Company or of any Subsidiary of the Company, (ii) any Person who or which becomes the Beneficial Owner of 15% or more of the Common Shares then outstanding as the result of a reduction in the outstanding Common Shares resulting from acquisition of Common Shares by the Company approved by the Board of Directors, unless and until such Person becomes the Beneficial Owner of any additional Common Shares (other than pursuant to a stock split, stock dividend or similar transaction) and immediately thereafter becomes the Beneficial Owner of 15% or more of the Common Shares, (iv) any Person who or which the Board of Directors of the Company determines, in good faith, became an Acquiring Person inadvertently, if such Person divests as promptly as practicable a sufficient number of Common Shares so that such Person would no longer be an Acquiring Person, (v) any Person who or which the Board of Directors of the Company determines, prior to the time such Person would otherwise be an Acquiring Person, should be exempted from the definition of Acquiring Person, provided that the Board of Directors may make such exemption subject to such conditions, if any, which the Board may determine or (vi) [American Securities], [Carl Marks] and [Cerberus] (each, an "Exempt Person") or any Affiliate or Associate of an Exempt Person; provided that any Exempt Person

who shall become Beneficial Owner of 20% or more of the Common Shares then outstanding shall become an Acquiring Person; provided, however, that in no event shall any Exempt Person become an Acquiring Person solely as a result of a reduction in the outstanding Common Shares resulting from acquisition of Common Shares by the Company approved by the Board of Directors, unless and until such Exempt Person becomes the Beneficial Owner of any additional Common Shares (other than pursuant to a stock split, stock dividend or similar transaction) and immediately thereafter becomes the Beneficial Owner of 20% or more of the Common Shares.

(b)     "Affiliate" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 under the Exchange Act.

(c)     A Person shall be deemed the "Beneficial Owner" of and shall be deemed to "Beneficially Own" any securities:

(i)     which such Person or any of such Person's Affiliates or Associates beneficially owns, directly or indirectly;

(ii)     which such Person or any of such Person's Affiliates or Associates has (A) the right to acquire (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding (other than customary agreements with and between underwriters and selling group members with respect to a bona fide public offering of securities), or upon the exercise of conversion rights, exchange rights, rights (other than these Rights), warrants or options, or otherwise; provided, however, that a Person shall not be deemed the Beneficial Owner of, or to Beneficially Own, securities tendered pursuant to a tender or exchange offer made by or on behalf of such Person or any of such Person's Affiliates or Associates until such tendered securities are accepted for purchase or exchange or (B) the right to vote pursuant to any agreement, arrangement or understanding; provided, however, that a Person shall not be deemed the Beneficial Owner of, or to Beneficially Own, any security if the agreement, arrangement or understanding to vote such security (1) arises solely from a revocable proxy or consent given to such Person in response to a public proxy or consent solicitation made pursuant to, and in accordance with, the applicable rules and regulations promulgated under the Exchange Act and (2) is not also then reportable on Schedule 13D under the Exchange Act (or any comparable or successor report);

(iii)     which are beneficially owned, directly or indirectly, by any other Person with which such Person or any of such Person's Affiliates or Associates has any agreement, arrangement or understanding (other than customary agreements with and between underwriters and selling group members with respect to a bona fide public offering of securities) for the purpose of acquiring, holding, voting (except to the extent contemplated by the proviso to Section 1(c)(ii)(B)) or disposing of any securities of the Company; or

(iv)     which are the subject of a derivative transaction entered into by such Person, or derivative security acquired by such Person, which gives such Person the economic equivalent of ownership of an amount of such securities due to the fact that the value of the derivative is explicitly determined by reference to the price or value of such

securities, without regard to whether (A) such derivative conveys any voting rights in such securities to such Person, (B) the derivative is required to be, or capable of being, settled through delivery of such securities, or (C) such Person may have entered into other transactions that hedge the economic effect of such derivative. In determining the number of Common Shares deemed Beneficially Owned by virtue of the operation of this subparagraph (iv) of this paragraph (c), the subject Person shall be deemed to Beneficially Own (without duplication) the number of Common Shares that are synthetically owned pursuant to such derivative transactions or such derivative securities.

Notwithstanding anything in this definition of Beneficial Ownership to the contrary, the phrase "then outstanding," when used with reference to a Person's Beneficial Ownership of securities of the Company, shall mean the number of such securities then issued and outstanding together with the number of such securities not then actually issued and outstanding which such Person would be deemed to Beneficially Own hereunder.

(d)    "Business Day" shall mean any day other than a Saturday, a Sunday, or a day on which banking institutions in New York are authorized or obligated by law or executive order to close.

(e)    "Close of Business" on any given date shall mean 5:00 p.m., New York City time, on such date, provided, however, that, if such date is not a Business Day, it shall mean 5:00 p.m., New York City time, on the next succeeding Business Day.

(f)    "Common Shares" shall mean the shares of common stock, par value $.01 per share, of the Company, except that "Common Shares" when used with reference to any Person other than the Company shall mean the capital stock (or equity interest) with the greatest voting power of such other Person or, if such other Person is a Subsidiary of another Person, the Person or Persons which ultimately control such first-mentioned Person.

(g)    "Company" shall have the meaning set forth in the preamble hereof.

(h)    "Current per share market price" shall have the meaning set forth in Section 11(d) hereof.

(i)    "Distribution Date" shall have the meaning set forth in Section 3(a) hereof.

(j)    "Equivalent preferred shares" shall have the meaning set forth in Section 11(b) hereof.

(k)    "Exchange Act" shall mean the Securities Exchange Act of 1934.

(l)    "Exchange Ratio" shall have the meaning set forth in Section 24(a) hereof.

(m)    "Expiration Date" shall mean the Close of Business on [●], 2013.

(n)    "Person" shall mean any individual, firm, corporation, partnership or other entity, and shall include any successor (by merger or otherwise) of such entity.

(o)    "Preferred Shares" shall mean shares of Series A Junior Participating Preferred Stock, par value $.01 per share, of the Company having the rights and preferences set forth in the Form of Certificate of Designations attached to this Rights Agreement as Exhibit A.

(p)    "Purchase Price" shall initially be $[●] for each one one-thousandth of a Preferred Share purchasable pursuant to the exercise of a Right, and shall be subject to adjustment from time to time as provided in Section 11 or 13 hereof.

(q)    "Record Date" shall have the meaning set forth in the second paragraph hereof.

(r)    "Redemption Date" shall mean the time at which the Rights are redeemed as provided in Section 23 hereof.

(s)    "Redemption Price" shall have the meaning set forth in Section 23(a) hereof.

(t)    "Right" shall have the meaning set forth in the second paragraph hereof.

(u)    "Right Certificate" shall have the meaning set forth in Section 3(a) hereof.

(v)    "Rights Agent" shall have the meaning set forth in the preamble hereof.

(w)    "Security" shall have the meaning set forth in Section 11(d)(i) hereof.

(x)    "Stock Acquisition Date" shall mean the first date of public announcement (including, without limitation, by a filing under the Exchange Act) by the Company or an Acquiring Person that an Acquiring Person has become such or such earlier date as a majority of the Board shall become aware of the existence of an Acquiring Person.

(y)    "Subsidiary" of any Person shall mean any corporation or other entity of which a majority of the voting power of the voting equity securities or equity interest is owned or otherwise controlled, directly or indirectly, by such Person.

(z)    "Trading Day" shall have the meaning set forth in Section 11(d)(i) hereof.

Section 2.    Appointment of Rights Agent. The Company hereby appoints the Rights Agent to act as agent for the Company and the holders of the Rights (who, in accordance with Section 3 hereof, shall prior to the Distribution Date also be the holders of the Common Shares) in accordance with the terms and conditions hereof, and the Rights Agent hereby accepts such appointment. The Company may from time to time appoint such co-Rights Agents as it may deem necessary or desirable.

Section 3.    Issue of Right Certificates.  (a) Until the earlier of the Close of Business on (i) the tenth day after the Stock Acquisition Date or (ii) such date, if any, as may be determined by action of the Board of Directors of the Company after the date of the commencement by any Person (other than the Company, any Subsidiary of the Company, any employee benefit plan of the Company or of any Subsidiary of the Company, or any entity or

trustee holding Common Shares for or pursuant to the terms of any such plan or for the purpose of funding any such plan or funding other employee benefits for employees of the Company or of any Subsidiary of the Company) of, or of the first public announcement of the intention of any Person (other than the Company, any Subsidiary of the Company, any employee benefit plan of the Company or of any Subsidiary of the Company, or any entity or trustee holding Common Shares for or pursuant to the terms of any such plan or for the purpose of funding any such plan or funding other employee benefits for employees of the Company or of any Subsidiary of the Company) to commence, a tender or exchange offer the consummation of which would result in any Person becoming an Acquiring Person (including any such date which is after the date of this Rights Agreement and prior to the issuance of the Rights; the earlier of such dates being herein referred to as the "Distribution Date"), (x) the Rights will attach to (subject to the provisions of Section 3(b) hereof) the Common Shares (whether in book-entry, certificated or uncertificated form) issued and outstanding, and the Rights will be owned by the registered holder of the Common Shares and will not be evidenced by separate Right Certificates and (y) the right to receive Right Certificates will be transferable only in connection with the transfer of Common Shares. As soon as practicable after the Distribution Date, the Company will prepare and execute, the Rights Agent will countersign, and the Company will send or cause to be sent (and the Rights Agent will, if requested, send) by first-class, insured, postage-prepaid mail, to each record holder of Common Shares as of the Close of Business on the Distribution Date, at the address of such holder shown on the records of the Company, a Right Certificate, in substantially the form of Exhibit B hereto (a "Right Certificate"), evidencing one Right for each Common Share so held, subject, in the case of Common Shares held in uncertificated form on the Distribution Date, to the rights provided by law to a registered pledgee whose security interest has been duly registered with the Company. As of the Distribution Date, the Rights will be evidenced solely by such Right Certificates.

(b)     The Company will make available, as promptly as practicable following the Record Date, a Summary of Rights to Purchase Preferred Shares, in substantially the form of Exhibit C hereto, to any holder of Rights who may so request from time to time prior to the Expiration Date. With respect to certificates for Common Shares outstanding as of the Record Date, until the Distribution Date, the Rights will be evidenced by such certificates and the registered holders of the Common Shares shall also be the registered holders of the associated Rights. Until the Distribution Date (or the earlier of the Redemption Date or the Expiration Date), the surrender for transfer of any certificate for Common Shares in respect of which Rights have been issued shall also constitute the transfer of the Rights associated with such Common Shares.

(c)     Rights shall be issued in respect of all Common Shares which are issued in certificated form (whether originally issued or from the Company's treasury) after the Record Date but prior to the earliest of the Distribution Date, the Redemption Date or the Expiration Date, and certificates representing such Common Shares shall have impressed on, printed on, written on or otherwise affixed to them substantially the following legend:

> This certificate also evidences and entitles the holder hereof to certain rights as set forth in a Rights Agreement between Xerium Technologies, Inc. (the "Company") and the Rights Agent thereunder (the "Rights Agreement"), the terms of which are

hereby incorporated herein by reference and a copy of which is on file at the principal offices of the Company. Under certain circumstances, as set forth in the Rights Agreement, such rights will be evidenced by separate certificates and will no longer be evidenced by this certificate. The Company will mail to the holder of this certificate a copy of the Rights Agreement without charge after receipt of a written request therefor. UNDER CERTAIN CIRCUMSTANCES, AS SET FORTH IN THE RIGHTS AGREEMENT, RIGHTS ISSUED TO ANY PERSON WHO BECOMES AN ACQUIRING PERSON (AS DEFINED IN THE RIGHTS AGREEMENT), INCLUDING SUCH RIGHTS HELD BY A SUBSEQUENT HOLDER, MAY BECOME NULL AND VOID.

With respect to such certificates of Common Shares containing the foregoing legend, until the the earliest of the Distribution Date, the Redemption Date or the Expiration Date, the Rights associated with the Common Shares represented by such certificates shall be evidenced by such certificates alone, and the surrender for transfer of any such certificate shall also constitute the transfer of the Rights associated with the Common Shares represented thereby.

(d)     Rights shall be issued in respect of all Common Shares which are issued in book-entry or uncertificated form (whether originally issued or from the Company's treasury) after the Record Date but prior to the earliest of the Distribution Date, the Redemption Date or the Expiration Date, and confirmations and account statements sent to holders of Common Shares  in book-entry form and initial transaction statements relating to the registration, pledge or release from pledge of Common Shares in uncertificated form shall have impressed on, printed on, written on or otherwise affixed to them substantially the following legend:

The Common Stock, par value $0.01 per share, of Xerium Technologies, Inc. (the "Company") to which this statement relates also evidences and entitles the holder thereof to certain rights as set forth in a Rights Agreement between the Company and the Rights Agent thereunder (the "Rights Agreement"), the terms of which are hereby incorporated herein by reference and a copy of which is on file at the principal offices of the Company.  Under certain circumstances, as set forth in the Rights Agreement, such rights will be evidenced by separate certificates and will no longer be evidenced by the shares to which this statement relates.  The Company will mail to the holder of the shares to which this statement relates and any registered pledgee of uncertificated shares a copy of the Rights Agreement without charge after receipt of a written request therefor.   UNDER CERTAIN CIRCUMSTANCES, AS SET FORTH IN THE RIGHTS AGREEMENT, RIGHTS ISSUED TO ANY PERSON WHO BECOMES AN ACQUIRING PERSON (AS DEFINED IN THE RIGHTS AGREEMENT), INCLUDING SUCH RIGHTS HELD

BY A SUBSEQUENT HOLDER, MAY BECOME NULL AND VOID.

With respect to Common Shares in book-entry form for which there has been sent a confirmation or account statement and Common Shares in uncertificated form for which there has been sent an initial transaction statement containing the foregoing legend, until the earliest of the Distribution Date, the Redemption Date or the Expiration Date, the Rights associated with such Common Shares shall be evidenced by such Common Shares alone, and the registration of transfer or pledge, or the release from pledge, of any such Common Shares shall also constitute the registration of transfer or pledge, or the release from pledge, as the case may be, of the Rights associated with such Common Shares.

(e)    In the event that the Company purchases or acquires any Common Shares after the Record Date but prior to the Distribution Date, any Rights associated with such Common Shares shall be deemed cancelled and retired so that the Company shall not be entitled to exercise any Rights associated with the Common Shares which are no longer outstanding.

Section 4.    Form of Right Certificates. Subject to the provisions of Section 22 hereof, the Right Certificates (and the forms of election to purchase Preferred Shares and of assignment to be printed on the reverse thereof) shall be substantially the same as Exhibit B hereto and may have such marks of identification or designation and such legends, summaries or endorsements printed thereon as the Company may deem appropriate and as are not inconsistent with the provisions of this Rights Agreement, or as may be required to comply with any applicable law or with any rule or regulation made pursuant thereto or with any rule or regulation of any stock exchange or automated quotation system on which the Rights may from time to time be listed, or to conform to usage. Subject to the provisions of Sections 11 and 22 hereof, the Right Certificates shall entitle the holders thereof to purchase such number of one one-thousandths of a Preferred Share as shall be set forth therein at the price per one one-thousandth of a Preferred Share set forth therein, but the number of one one-thousandths of a Preferred Share and the Purchase Price shall be subject to adjustment as provided herein.

Section 5.    Countersignature and Registration.  (a) The Right Certificates shall be executed on behalf of the Company by its Chairman of the Board, its Chief Executive Officer, its President, any of its Vice Presidents, or its Treasurer, either manually or by facsimile signature, shall have affixed thereto the Company's seal or a facsimile thereof, and shall be attested by the Secretary or an Assistant Secretary of the Company, either manually or by facsimile signature. The Right Certificates shall be countersigned by the Rights Agent, either manually or by facsimile signature, and shall not be valid for any purpose unless so countersigned. In case any officer of the Company who shall have signed any of the Right Certificates shall cease to be such officer of the Company before countersignature by the Rights Agent and issuance and delivery by the Company, such Right Certificates, nevertheless, may be countersigned by the Rights Agent and issued and delivered by the Company with the same force and effect as though the Person who signed such Right Certificates had not ceased to be such officer of the Company; and any Right Certificate may be signed on behalf of the Company by any Person who, at the actual date of the execution of such Right Certificate, shall be a proper officer of the Company to sign such Right Certificate although at the date of the execution of this Rights Agreement any such Person was not such an officer.

(b)    Following the Distribution Date, the Rights Agent will keep or cause to be kept, at its principal office, books for registration and transfer of the Right Certificates issued hereunder. Such books shall show the names and addresses of the respective holders of the Right Certificates, the number of Rights evidenced on its face by each of the Right Certificates and the date of each of the Right Certificates.

Section 6.    <u>Transfer, Split Up, Combination and Exchange of Right Certificates; Mutilated, Destroyed, Lost or Stolen Right Certificates</u>.    (a) Subject to the provisions of Section 14 hereof, at any time after the Close of Business on the Distribution Date, and at or prior to the Close of Business on the earlier of the Redemption Date or the Expiration Date, any Right Certificate or Right Certificates (other than Right Certificates representing Rights that have become void pursuant to Section 11(a)(ii) hereof or that have been exchanged pursuant to Section 24 hereof) may be transferred, split up, combined or exchanged for another Right Certificate or Right Certificates entitling the registered holder to purchase a like number of one one-thousandths of a Preferred Share as the Right Certificate or Right Certificates surrendered then entitled such holder to purchase. Any registered holder desiring to transfer, split up, combine or exchange any Right Certificate or Right Certificates shall make such request in writing delivered to the Rights Agent, and shall surrender the Right Certificate or Right Certificates to be transferred, split up, combined or exchanged at the principal office of the Rights Agent. Thereupon the Rights Agent shall countersign and deliver to the Person entitled thereto a Right Certificate or Right Certificates, as the case may be, as so requested. The Company may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer, split up, combination or exchange of Right Certificates.

(b)    Upon receipt by the Company and the Rights Agent of evidence reasonably satisfactory to them of the loss, theft, destruction or mutilation of a Right Certificate, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to them, and, at the Company's request, reimbursement to the Company and the Rights Agent of all reasonable expenses incidental thereto, and upon surrender to the Rights Agent and cancellation of the Right Certificate if mutilated, the Company will make and deliver a new Right Certificate of like tenor to the Rights Agent for delivery to the registered holder in lieu of the Right Certificate so lost, stolen, destroyed or mutilated.

Section 7.    <u>Exercise of Rights; Purchase Price; Expiration Date of Rights</u>. (a) The registered holder of any Right Certificate may exercise the Rights evidenced thereby (except as otherwise provided herein), in whole or in part, at any time after the Distribution Date, upon surrender of the Right Certificate, with the form of election to purchase on the reverse side thereof duly executed, to the Rights Agent at the principal office of the Rights Agent, together with payment of the Purchase Price for each one one-thousandth of a Preferred Share as to which the Rights are exercised, at or prior to the earliest of (i) the Expiration Date, (ii) the Redemption Date or (iii) the time at which such Rights are exchanged as provided in Section 24 hereof.

(b)    The Purchase Price shall be payable in lawful money of the United States of America in accordance with paragraph (c) below.

(c)     Upon receipt of a Right Certificate representing exercisable Rights, with the form of election to purchase duly executed, accompanied by payment of the Purchase Price for the shares to be purchased and an amount equal to any applicable transfer tax required to be paid by the holder of such Right Certificate in accordance with Section 9 hereof by certified check, cashier's check or money order payable to the order of the Company, the Rights Agent shall thereupon promptly (i) (A) requisition from any transfer agent of the Preferred Shares certificates for the number of Preferred Shares to be purchased and the Company hereby irrevocably authorizes any such transfer agent to comply with all such requests, or (B) requisition from the depositary agent depositary receipts representing such number of one one-thousandths of a Preferred Share as are to be purchased (in which case certificates for the Preferred Shares represented by such receipts shall be deposited by the transfer agent of the Preferred Shares with such depositary agent) and the Company hereby directs such depositary agent to comply with such request; (ii) when appropriate, requisition from the Company the amount of cash to be paid in lieu of issuance of fractional shares in accordance with Section 14 hereof; (iii) promptly after receipt of such certificates or depositary receipts, cause the same to be delivered to or upon the order of the registered holder of such Right Certificate, registered in such name or names as may be designated by such holder; and (iv) when appropriate, after receipt, promptly deliver such cash to or upon the order of the registered holder of such Right Certificate.

(d)     In case the registered holder of any Right Certificate shall exercise less than all the Rights evidenced thereby, a new Right Certificate evidencing Rights equivalent to the Rights remaining unexercised shall be issued by the Rights Agent to the registered holder of such Right Certificate or to such holder's duly authorized assigns, subject to the provisions of Section 14 hereof.

Section 8.     <u>Cancellation and Destruction of Right Certificates</u>. All Right Certificates surrendered for the purpose of exercise, transfer, split up, combination or exchange shall, if surrendered to the Company or to any of its agents, be delivered to the Rights Agent for cancellation or in cancelled form, or, if surrendered to the Rights Agent, shall be cancelled by it, and no Right Certificates shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Rights Agreement. The Company shall deliver to the Rights Agent for cancellation and retirement, and the Rights Agent shall so cancel and retire, any other Right Certificate purchased or acquired by the Company otherwise than upon the exercise thereof. The Rights Agent shall deliver all cancelled Right Certificates to the Company, or shall, at the written request of the Company, destroy such cancelled Right Certificates, and, in such case, shall deliver a certificate of destruction thereof to the Company.

Section 9.     <u>Availability of Preferred Shares</u>. (a) The Company covenants and agrees that it will cause to be reserved and kept available out of its authorized and unissued Preferred Shares or any Preferred Shares held in its treasury, the number of Preferred Shares that will be sufficient to permit the exercise in full of all outstanding Rights in accordance with Section 7. The Company covenants and agrees that it will take all such action as may be necessary to ensure that all securities delivered upon exercise of Rights shall, at the time of delivery of the certificates for such securities (subject to payment of the Purchase Price), be duly and validly authorized and issued and fully paid and nonassessable.

(b)    The Company further covenants and agrees that it will pay when due and payable any and all federal and state transfer taxes and charges which may be payable in respect of the issuance or delivery of the Right Certificates or of any Preferred Shares upon the exercise of Rights. The Company shall not, however, be required to pay any transfer tax which may be payable in respect of any transfer or delivery of Right Certificates to a Person other than, or the issuance or delivery of certificates or depositary receipts for the Preferred Shares in a name other than that of, the registered holder of the Right Certificate evidencing Rights surrendered for exercise or to issue or to deliver any certificates or depositary receipts for Preferred Shares upon the exercise of any Rights until any such tax shall have been paid (any such tax being payable by the holder of such Right Certificate at the time of surrender) or until it has been established to the Company's reasonable satisfaction that no such tax is due.

(c)    The Company will use its best efforts to ensure that any securities issued pursuant hereto are issued in compliance with all applicable laws.

Section 10.    <u>Preferred Shares Record Date</u>. Each Person in whose name any certificate for Preferred Shares is issued upon the exercise of Rights shall for all purposes be deemed to have become the holder of record of the Preferred Shares represented thereby on, and such certificate shall be dated, the date upon which the Right Certificate evidencing such Rights was duly surrendered and payment of the Purchase Price (and any applicable transfer taxes) was made; <u>provided</u>, <u>however</u>, that if the date of such surrender and payment is a date upon which the Preferred Shares transfer books of the Company are closed, such Person shall be deemed to have become the record holder of such shares on, and such certificate shall be dated, the next succeeding Business Day on which the Preferred Shares transfer books of the Company are open. Prior to the exercise of the Rights evidenced thereby, the holder of a Right Certificate shall not be entitled to any rights of a holder of Preferred Shares for which the Rights shall be exercisable, including, without limitation, the right to vote, to receive dividends or other distributions or to exercise any preemptive rights, and shall not be entitled to receive any notice of any proceedings of the Company, except as provided herein.

Section 11.    <u>Adjustment of Purchase Price, Number of Shares or Number of Rights</u>. The Purchase Price, the number of Preferred Shares covered by each Right and the number of Rights outstanding are subject to adjustment from time to time as provided in this Section 11.

(a)    (i) In the event the Company shall at any time after the date of this Rights Agreement (A) declare a dividend on the Preferred Shares payable in Preferred Shares, (B) subdivide the outstanding Preferred Shares, (C) combine the outstanding Preferred Shares into a smaller number of Preferred Shares or (D) issue any shares of its capital stock in a reclassification of the Preferred Shares (including any such reclassification in connection with a consolidation or merger in which the Company is the continuing or surviving corporation), except as otherwise provided in this Section 11(a), the Purchase Price in effect at the time of the record date for such dividend or of the effective date of such subdivision, combination or reclassification, and the number and kind of shares of capital stock issuable on such date, shall be proportionately adjusted so that the holder of any Right exercised after such time shall be entitled to receive the aggregate number and kind of shares of capital stock which, if such Right had been exercised immediately prior

to such date and at a time when the Preferred Shares transfer books of the Company were open, such holder would have owned upon such exercise and been entitled to receive by virtue of such dividend, subdivision, combination or reclassification; provided, however, that in no event shall the consideration to be paid upon the exercise of one Right be less than the aggregate par value of the shares of capital stock of the Company issuable upon exercise of one Right.

(ii)     Subject to Section 24 of this Rights Agreement, in the event any Person becomes an Acquiring Person, each holder of a Right shall thereafter have a right to receive, upon exercise thereof at a price equal to the then current Purchase Price multiplied by the number of one one-thousandths of a Preferred Share for which a Right is then exercisable, in accordance with the terms of this Rights Agreement and in lieu of Preferred Shares, such number of Common Shares as shall equal the result obtained by (A) multiplying the then current Purchase Price by the number of one one-thousandths of a Preferred Share for which a Right is then exercisable and dividing that product by (B) 50% of the then current per share market price of the Company's Common Shares (determined pursuant to Section 11(d) hereof) on the date of the occurrence of such event. In the event that any Person shall become an Acquiring Person and the Rights shall then be outstanding, the Company shall not take any action which would eliminate or diminish the benefits intended to be afforded by the Rights.

Notwithstanding anything in this Agreement to the contrary, from and after the time when any Person first becomes an Acquiring Person, any Rights that are or were acquired or Beneficially Owned by any Acquiring Person (or any Associate or Affiliate of such Acquiring Person) shall be void and any holder of such Rights shall thereafter have no right to exercise such Rights under any provision of this Rights Agreement. No Right Certificate shall be issued pursuant to Section 3 that represents Rights Beneficially Owned by an Acquiring Person whose Rights would be void pursuant to the preceding sentence or any Associate or Affiliate thereof; no Right Certificate shall be issued at any time upon the transfer of any Rights to an Acquiring Person whose Rights would be void pursuant to the preceding sentence or any Associate or Affiliate thereof or to any nominee of such Acquiring Person, Associate or Affiliate; and any Right Certificate delivered to the Rights Agent for transfer to an Acquiring Person whose Rights would be void pursuant to the preceding sentence shall be cancelled.

(iii)     If there shall not be sufficient Common Shares issued but not outstanding or authorized but unissued to permit the exercise in full of the Rights in accordance with the foregoing subparagraph (ii), the Company shall take all such action as may be necessary to authorize additional Common Shares for issuance upon exercise of the Rights. If the Company shall, after good faith effort, be unable to take all such action as may be necessary to authorize such additional Common Shares, the Company shall substitute, for each Common Share that would otherwise be issuable upon exercise of a Right, a number of Preferred Shares or fraction thereof (or a security with substantially similar rights, privileges, preferences, voting power and economic rights) such that the current per share market price of one Preferred Share (or such other security) multiplied by such number or fraction is equal to the current per share market price of one Common

Share as of the date of issuance of such Preferred Shares or fraction thereof (or other security).

(b)    In case the Company shall fix a record date for the issuance of rights, options or warrants to all holders of Preferred Shares entitling them (for a period expiring within 45 calendar days after such record date) to subscribe for or purchase Preferred Shares (or shares having the same rights, privileges and preferences as the Preferred Shares ("equivalent preferred shares")) or securities convertible into Preferred Shares or equivalent preferred shares at a price per Preferred Share or equivalent preferred share (or having a conversion price per share, if a security convertible into Preferred Shares or equivalent preferred shares) less than the then current per share market price of the Preferred Shares on such record date, the Purchase Price to be in effect after such record date shall be determined by multiplying the Purchase Price in effect immediately prior to such record date by a fraction, the numerator of which shall be the number of Preferred Shares outstanding on such record date plus the number of Preferred Shares which the aggregate offering price of the total number of Preferred Shares and/or equivalent preferred shares so to be offered (and/or the aggregate initial conversion price of the convertible securities so to be offered) would purchase at such current market price and the denominator of which shall be the number of Preferred Shares outstanding on such record date plus the number of additional Preferred Shares and/or equivalent preferred shares to be offered for subscription or purchase (or into which the convertible securities so to be offered are initially convertible); provided, however, that in no event shall the consideration to be paid upon the exercise of one Right be less than the aggregate par value of the shares of capital stock of the Company issuable upon exercise of one Right. In case such subscription price may be paid in a consideration part or all of which shall be in a form other than cash, the value of such consideration shall be as determined in good faith by the Board of Directors of the Company, whose determination shall be described in a statement filed with the Rights Agent and shall be binding on the Rights Agent and the holders of the Rights. Preferred Shares owned by or held for the account of the Company shall not be deemed outstanding for the purpose of any such computation. Such adjustment shall be made successively whenever such a record date is fixed; and in the event that such rights, options or warrants are not so issued, the Purchase Price shall be adjusted to be the Purchase Price which would then be in effect if such record date had not been fixed.

(c)    In case the Company shall fix a record date for the making of a distribution to all holders of the Preferred Shares (including any such distribution made in connection with a consolidation or merger in which the Company is the continuing or surviving corporation) of evidences of indebtedness or assets (other than a regular quarterly cash dividend or a dividend payable in Preferred Shares) or subscription rights or warrants (excluding those referred to in Section 11(b) hereof), the Purchase Price to be in effect after such record date shall be determined by multiplying the Purchase Price in effect immediately prior to such record date by a fraction, the numerator of which shall be the then current per share market price of the Preferred Shares on such record date, less the fair market value (as determined in good faith by the Board of Directors of the Company, whose determination shall be described in a statement filed with the Rights Agent and shall be binding on the Rights Agent and holders of the Rights) of the portion of the assets or evidences of indebtedness so to be distributed or of such subscription rights or warrants applicable to one Preferred Share and the denominator of which shall be such current per share market price of the Preferred Shares; provided, however, that in no event shall the consideration to be paid upon the exercise of one Right be less than the

aggregate par value of the shares of capital stock of the Company to be issued upon exercise of one Right. Such adjustments shall be made successively whenever such a record date is fixed; and in the event that such distribution is not so made, the Purchase Price shall again be adjusted to be the Purchase Price which would then be in effect if such record date had not been fixed.

(d)    (i) For the purpose of any computation hereunder, the "current per share market price" of any security (a "Security" for the purpose of this Section 11(d)(i)) on any date shall be deemed to be the average of the daily closing prices per share of such Security for the 30 consecutive Trading Days immediately prior to such date; provided, however, that in the event that the current per share market price of the Security is determined during a period following the announcement by the issuer of such Security of (A) a dividend or distribution on such Security payable in shares of such Security or securities convertible into such shares, or (B) any subdivision, combination or reclassification of such Security and prior to the expiration of 30 Trading Days after the ex-dividend date for such dividend or distribution, or the record date for such subdivision, combination or reclassification, then, and in each such case, the current per share market price shall be appropriately adjusted to reflect the current market price per share equivalent of such Security. The closing price for each day shall be the last sale price, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, in either case, as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the New York Stock Exchange or, if the Security is not listed or admitted to trading on the New York Stock Exchange, as reported in the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which the Security is listed or admitted to trading or, if the Security is not listed or admitted to trading on any national securities exchange, the last quoted price or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the OTC Bulletin Board, the Pink Sheets or such other system then in use, or, if on any such date the Security is not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the Security selected by the Board of Directors of the Company. If on any such date no such market maker is making a market in the Security, the fair value of the Security on such date as determined in good faith by the Board of Directors of the Company shall be used. The term "Trading Day" shall mean a day on which the principal national securities exchange on which the Security is listed or admitted to trading is open for the transaction of business or, if the Security is not listed or admitted to trading on any national securities exchange, a Business Day.

(ii)    For the purpose of any computation hereunder, the "current per share market price" of the Preferred Shares shall be determined in accordance with the method set forth in Section 11(d)(i). If the Preferred Shares are not publicly traded, the "current per share market price" of the Preferred Shares shall be conclusively deemed to be the current per share market price of the Common Shares as determined pursuant to Section 11(d)(i) (appropriately adjusted to reflect any stock split, stock dividend or similar transaction occurring after the date hereof), multiplied by one thousand. If neither the Common Shares nor the Preferred Shares are publicly held or so listed or traded, "current per share market price" shall mean the fair value per share as determined in good faith by

the Board of Directors of the Company, whose determination shall be described in a statement filed with the Rights Agent.

(e)     No adjustment in the Purchase Price shall be required unless such adjustment would require an increase or decrease of at least 1% in the Purchase Price; provided, however, that any adjustments which by reason of this Section 11(e) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Section 11 shall be made to the nearest cent or to the nearest one-millionth of a Preferred Share or one ten-thousandth of any other share or security as the case may be. Notwithstanding the first sentence of this Section 11(e), any adjustment required by this Section 11 shall be made no later than the earlier of (i) three years from the date of the transaction which requires such adjustment or (ii) the Expiration Date.

(f)     If, as a result of an adjustment made pursuant to Section 11(a) hereof, the holder of any Right thereafter exercised shall become entitled to receive any shares of capital stock of the Company other than Preferred Shares, thereafter the number of such other shares so receivable upon exercise of any Right shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Preferred Shares contained in Section 11(a) through (c), inclusive, and the provisions of Sections 7, 9, 10 and 13 with respect to the Preferred Shares shall apply on like terms to any such other shares.

(g)     All Rights originally issued by the Company subsequent to any adjustment made to the Purchase Price hereunder shall evidence the right to purchase, at the adjusted Purchase Price, the number of one one-thousandths of a Preferred Share purchasable from time to time hereunder upon exercise of the Rights, all subject to further adjustment as provided herein.

(h)     Unless the Company shall have exercised its election as provided in Section 11(i), upon each adjustment of the Purchase Price as a result of the calculations made in Sections 11(b) and (c), each Right outstanding immediately prior to the making of such adjustment shall thereafter evidence the right to purchase, at the adjusted Purchase Price, that number of one one-thousandths of a Preferred Share (calculated to the nearest one millionth of a Preferred Share) obtained by (A) multiplying (x) the number of one one-thousandths of a Preferred Share covered by a Right immediately prior to this adjustment by (y) the Purchase Price in effect immediately prior to such adjustment of the Purchase Price and (B) dividing the product so obtained by the Purchase Price in effect immediately after such adjustment of the Purchase Price.

(i)     The Company may elect on or after the date of any adjustment of the Purchase Price to adjust the number of Rights in substitution for any adjustment in the number of one one-thousandths of a Preferred Share purchasable upon the exercise of a Right. Each of the Rights outstanding after such adjustment of the number of Rights shall be exercisable for the number of one one-thousandths of a Preferred Share for which a Right was exercisable immediately prior to such adjustment. Each Right held of record prior to such adjustment of the number of Rights shall become that number of Rights (calculated to the nearest one millionth) obtained by dividing the Purchase Price in effect immediately prior to adjustment of the Purchase

Price by the Purchase Price in effect immediately after adjustment of the Purchase Price. The Company shall make a public announcement of its election to adjust the number of Rights, indicating the record date for the adjustment, and, if known at the time, the amount of the adjustment to be made. This record date may be the date on which the Purchase Price is adjusted or any day thereafter, but, if the Right Certificates have been issued, shall be at least 10 days later than the date of the public announcement. If Right Certificates have been issued, upon each adjustment of the number of Rights pursuant to this Section 11(i), the Company shall, as promptly as practicable, cause to be distributed to holders of record of Right Certificates on such record date Right Certificates evidencing, subject to Section 14 hereof, the additional Rights to which such holders shall be entitled as a result of such adjustment, or, at the option of the Company, shall cause to be distributed to such holders of record in substitution and replacement for the Right Certificates held by such holders prior to the date of adjustment, and upon surrender thereof, if required by the Company, new Right Certificates evidencing all the Rights to which such holders shall be entitled after such adjustment. Right Certificates so to be distributed shall be issued, executed and countersigned in the manner provided for herein and shall be registered in the names of the holders of record of Right Certificates on the record date specified in the public announcement.

(j)    Irrespective of any adjustment or change in the Purchase Price or the number of one one-thousandths of a Preferred Share issuable upon the exercise of the Rights, the Right Certificates theretofore and thereafter issued may continue to express the Purchase Price and the number of one one-thousandths of a Preferred Share which were expressed in the initial Right Certificates issued hereunder.

(k)    Before taking any action that would cause an adjustment reducing the Purchase Price below one one-thousandth of the then par value, if any, of the Preferred Shares issuable upon exercise of the Rights, the Company shall take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable Preferred Shares at such adjusted Purchase Price.

(l)    In any case in which this Section 11 shall require that an adjustment in the Purchase Price be made effective as of a record date for a specified event, the Company may elect to defer until the occurrence of such event the issuing to the holder of any Right exercised after such record date of the Preferred Shares and other capital stock or securities of the Company, if any, issuable upon such exercise over and above the Preferred Shares and other capital stock or securities of the Company, if any, issuable upon such exercise on the basis of the Purchase Price in effect prior to such adjustment; provided, however, that the Company shall deliver to such holder a due bill or other appropriate instrument evidencing such holder's right to receive such additional shares upon the occurrence of the event requiring such adjustment.

(m)    Anything in this Section 11 to the contrary notwithstanding, the Company shall be entitled to make such reductions in the Purchase Price, in addition to those adjustments expressly required by this Section 11, as and to the extent that, it, in its sole discretion, shall determine to be advisable in order that any consolidation or subdivision of the Preferred Shares, issuance wholly for cash of any Preferred Shares at less than the current market price, issuance wholly for cash of Preferred Shares or securities which by their terms are convertible into or exchangeable for Preferred Shares, dividends on Preferred Shares payable in Preferred Shares or

USActive 18441435.6                    -15-

issuance of rights, options or warrants referred to hereinabove in Section 11(b), hereafter made by the Company to holders of its Preferred Shares shall not be taxable to such stockholders.

(n)    In the event that at any time after the date of this Rights Agreement and prior to the Distribution Date, the Company shall (i) declare or pay any dividend on the Common Shares payable in Common Shares or (ii) effect a subdivision, combination or consolidation of the Common Shares (by reclassification or otherwise than by payment of dividends in Common Shares) into a greater or lesser number of Common Shares, then in any such case (A) the number of one one-thousandths of a Preferred Share purchasable after such event upon proper exercise of each Right shall be determined by multiplying the number of one one-thousandths of a Preferred Share so purchasable immediately prior to such event by a fraction, the numerator of which is the number of Common Shares outstanding immediately before such event and the denominator of which is the number of Common Shares outstanding immediately after such event, and (B) each Common Share outstanding immediately after such event shall have issued with respect to it that number of Rights which each Common Share outstanding immediately prior to such event had issued with respect to it. The adjustments provided for in this Section 11(n) shall be made successively whenever such a dividend is declared or paid or such a subdivision, combination or consolidation is effected.

Section 12.    Certificate of Adjusted Purchase Price or Number of Shares. Whenever an adjustment is made as provided in Sections 11 or 13 hereof, the Company shall promptly (a) prepare a certificate setting forth such adjustment, and a brief statement of the facts accounting for such adjustment, (b) file with the Rights Agent and with each transfer agent for the Common Shares or the Preferred Shares a copy of such certificate and (c) if a Distribution Date has occurred, mail a brief summary thereof to each holder of a Right Certificate in accordance with Section 25 hereof.

Section 13.    Consolidation, Merger or Sale or Transfer of Assets or Earning Power. In the event, directly or indirectly, at any time after a Person has become an Acquiring Person, (a) the Company shall consolidate with, or merge with and into, any other Person, (b) any Person shall consolidate with the Company, or merge with and into the Company and the Company shall be the continuing or surviving corporation of such merger and, in connection with such merger, all or part of the Common Shares shall be changed into or exchanged for stock or other securities of any other Person (or the Company) or cash or any other property or (c) the Company shall sell or otherwise transfer (or one or more of its Subsidiaries shall sell or otherwise transfer), in one or more transactions, assets or earning power aggregating 50% or more of the assets or earning power of the Company and its Subsidiaries (taken as a whole) to any other Person other than the Company or one or more of its wholly-owned Subsidiaries, then, and in each such case, proper provision shall be made so that

(i)    each holder of a Right (other than Rights which have become void pursuant to Section 11(a)(ii)) shall thereafter have the right to receive, upon the exercise thereof at a price equal to the then current Purchase Price multiplied by the number of one one-thousandths of a Preferred Share for which a Right is then exercisable, in accordance with the terms of this Rights Agreement and in lieu of Preferred Shares, such number of Common Shares of such other Person (including the Company as successor thereto or as the surviving corporation) as shall equal the result obtained by (A) multiplying the then

current Purchase Price by the number of one one-thousandths of a Preferred Share for which a Right is then exercisable and dividing that product by (B) 50% of the then current per share market price of the Common Shares of such other Person (determined pursuant to Section 11(d) hereof) on the date of consummation of such consolidation, merger, sale or transfer;

(ii)     the issuer of such Common Shares shall thereafter be liable for, and shall assume, by virtue of such consolidation, merger, sale or transfer, all the obligations and duties of the Company pursuant to this Rights Agreement;

(iii)     the term "Company" shall thereafter be deemed to refer to such issuer; and

(iv)     such issuer shall take such steps (including, but not limited to, the reservation of a sufficient number of its Common Shares in accordance with Section 9 hereof) in connection with such consummation as may be necessary to assure that the provisions hereof shall thereafter be applicable, as nearly as reasonably may be, in relation to the Common Shares thereafter deliverable upon the exercise of the Rights.

The Company shall not consummate any such consolidation, merger, sale or transfer unless prior thereto the Company and such issuer shall have executed and delivered to the Rights Agent a supplemental agreement so providing. The Company shall not enter into any transaction of the kind referred to in this Section 13 if at the time of such transaction there are any rights, warrants, instruments or securities outstanding or any agreements or arrangements which, as a result of the consummation of such transaction, would eliminate or substantially diminish the benefits intended to be afforded by the Rights. The provisions of this Section 13 shall similarly apply to successive mergers or consolidations or sales or other transfers.

Section 14.     Fractional Rights and Fractional Shares.  (a) The Company shall not be required to issue fractions of Rights or to distribute Right Certificates which evidence fractional Rights. In lieu of such fractional Rights, there shall be paid to the registered holders of the Right Certificates with regard to which such fractional Rights would otherwise be issuable, an amount in cash equal to the same fraction of the current market value of a whole Right. For the purposes of this Section 14(a), the current market value of a whole Right shall be the closing price of the Rights for the Trading Day immediately prior to the date on which such fractional Rights would have been otherwise issuable. The closing price for any day shall be the last sale price, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, in either case, as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the New York Stock Exchange or, if the Rights are not listed or admitted to trading on the New York Stock Exchange, as reported in the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which the Rights are listed or admitted to trading or, if the Rights are not listed or admitted to trading on any national securities exchange, the last quoted price or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the OTC Bulletin Board, the Pink Sheets or such other system then in use or, if on any such date the Rights are not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the Rights selected by the Board of Directors of the Company. If on any such date no

such market maker is making a market in the Rights, the fair value of the Rights on such date as determined in good faith by the Board of Directors of the Company shall be used.

(b)     The Company shall not be required to issue fractions of Preferred Shares (other than fractions which are integral multiples of one one-thousandth of a Preferred Share) upon exercise of the Rights or to distribute certificates which evidence fractional Preferred Shares (other than fractions which are integral multiples of one one-thousandth of a Preferred Share). Fractions of Preferred Shares in integral multiples of one one-thousandth of a Preferred Share may, at the election of the Company, be evidenced by depositary receipts, pursuant to an appropriate agreement between the Company and a depositary selected by it; provided that such agreement shall provide that the holders of such depositary receipts shall have all the rights, privileges and preferences to which they are entitled as Beneficial Owners of the Preferred Shares represented by such depositary receipts. In lieu of fractional Preferred Shares that are not integral multiples of one one-thousandth of a Preferred Share, the Company shall pay to the registered holders of Right Certificates at the time such Rights are exercised as herein provided an amount in cash equal to the same fraction of the current market value of one Preferred Share. For the purposes of this Section 14(b), the current market value of a Preferred Share shall be the closing price of a Preferred Share (as determined pursuant to the second sentence of Section 11(d)(i) hereof) for the Trading Day immediately prior to the date of such exercise.

(c)     The holder of a Right by the acceptance of the Right expressly waives such holder's right to receive any fractional Rights or any fractional shares upon exercise of a Right (except as expressly provided above).

Section 15.     Rights of Action. All rights of action in respect of this Rights Agreement, except the rights of action given to the Rights Agent under Section 18 hereof, are vested in the respective registered holders of the Right Certificates (and, prior to the Distribution Date, the registered holders of the Common Shares); and any registered holder of any Right Certificate (or, prior to the Distribution Date, of the Common Shares), without the consent of the Rights Agent or of the holder of any other Right Certificate (or, prior to the Distribution Date, of the Common Shares), may, in such holder's own behalf and for such holder's own benefit, enforce, and may institute and maintain any suit, action or proceeding against the Company to enforce, or otherwise act in respect of, such holder's right to exercise the Rights evidenced by such Right Certificate in the manner provided in such Right Certificate and in this Rights Agreement. Without limiting the foregoing or any remedies available to the holders of Rights, it is specifically acknowledged that the holders of Rights would not have an adequate remedy at law for any breach of this Rights Agreement and will be entitled to specific performance of the obligations under, and injunctive relief against actual or threatened violations of the obligations of any Person subject to, this Rights Agreement.

Section 16.     Agreement of Right Holders. Every holder of a Right, by accepting the same, consents and agrees with the Company and the Rights Agent and with every other holder of a Right that:

(a)     prior to the Distribution Date, the Rights will be transferable only in connection with the transfer of the Common Shares;

(b)      after the Distribution Date, the Right Certificates are transferable only on the registry books of the Rights Agent if surrendered at the principal office of the Rights Agent, duly endorsed or accompanied by a proper instrument of transfer; and

(c)      the Company and the Rights Agent may deem and treat the Person in whose name the Right Certificate (or, prior to the Distribution Date, the associated Common Shares certificate) is registered as the absolute owner thereof and of the Rights evidenced thereby (notwithstanding any notations of ownership or writing on the Right Certificate or the associated Common Shares certificate made by anyone other than the Company or the Rights Agent) for all purposes whatsoever, and neither the Company nor the Rights Agent shall be affected by any notice to the contrary.

Section 17.     <u>Right Certificate Holder Not Deemed a Stockholder</u>. No holder, as such, of any Right Certificate shall be entitled to vote, receive dividends or be deemed for any purpose the holder of the Preferred Shares or any other securities of the Company which may at any time be issuable on the exercise of the Rights represented thereby, nor shall anything contained herein or in any Right Certificate be construed to confer upon the holder of any Right Certificate, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action, or to receive notice of meetings or other actions affecting stockholders (except as provided in Section 25 hereof), or to receive dividends or subscription rights, or otherwise, until the Right or Rights evidenced by such Right Certificate shall have been exercised in accordance with the provisions hereof.

Section 18.     <u>Concerning the Rights Agent</u>.  (a) The Company agrees to pay to the Rights Agent reasonable compensation for all services rendered by it hereunder and, from time to time, on demand of the Rights Agent, its reasonable expenses and counsel fees and other disbursements incurred in the administration and execution of this Rights Agreement and the exercise and performance of its duties hereunder. The Company also agrees to indemnify the Rights Agent for, and to hold it harmless against, any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of the Rights Agent, for anything done or omitted by the Rights Agent in connection with the acceptance and administration of this Rights Agreement, including the costs and expenses of defending against any claim of liability in the premises.

(b)      The Rights Agent shall be protected and shall incur no liability for, or in respect of any action taken, suffered or omitted by it in connection with, its administration of this Rights Agreement in reliance upon any Right Certificate or certificate for the Preferred Shares or Common Shares or for other securities of the Company, instrument of assignment or transfer, power of attorney, endorsement, affidavit, letter, notice, direction, consent, certificate, statement, or other paper or document believed by it to be genuine and to be signed, executed and, where necessary, verified or acknowledged, by the proper Person or Persons, or otherwise upon the advice of counsel as set forth in Section 20 hereof.

Section 19.     <u>Merger or Consolidation or Change of Name of Rights Agent</u>. (a) Any corporation into which the Rights Agent or any successor Rights Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or

consolidation to which the Rights Agent or any successor Rights Agent shall be a party, or any corporation succeeding to the stock transfer or corporate trust powers of the Rights Agent or any successor Rights Agent, shall be the successor to the Rights Agent under this Rights Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided that such corporation would be eligible for appointment as a successor Rights Agent under the provisions of Section 21 hereof. In case at the time such successor Rights Agent shall succeed to the agency created by this Rights Agreement, any of the Right Certificates shall have been countersigned but not delivered, any such successor Rights Agent may adopt the countersignature of the predecessor Rights Agent and deliver such Right Certificates so countersigned; and, in case at that time any of the Right Certificates shall not have been countersigned, any successor Rights Agent may countersign such Right Certificates either in the name of the predecessor Rights Agent or in the name of the successor Rights Agent; and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Rights Agreement.

(b)    In case at any time the name of the Rights Agent shall be changed and at such time any of the Right Certificates shall have been countersigned but not delivered, the Rights Agent may adopt the countersignature under its prior name and deliver Right Certificates so countersigned; and in case at that time any of the Right Certificates shall not have been countersigned, the Rights Agent may countersign such Right Certificates either in its prior name or in its changed name; and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Rights Agreement.

Section 20.    Duties of Rights Agent. The Rights Agent undertakes the duties and obligations imposed by this Rights Agreement upon the following terms and conditions, by all of which the Company and the holders of Right Certificates, by their acceptance thereof, shall be bound:

(a)    The Rights Agent may consult with legal counsel (who may be legal counsel for the Company), and the opinion of such counsel shall be full and complete authorization and protection to the Rights Agent as to any action taken or omitted by it in good faith and in accordance with such opinion.

(b)    Whenever in the performance of its duties under this Rights Agreement the Rights Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by any one of the Chairman of the Board, the Chief Executive Officer, the President, any Vice President, the Treasurer or the Secretary of the Company and delivered to the Rights Agent; and such certificate shall be full authorization to the Rights Agent for any action taken or suffered in good faith by it under the provisions of this Rights Agreement in reliance upon such certificate.

(c)    The Rights Agent shall be liable hereunder to the Company and any other Person only for its own negligence, bad faith or willful misconduct.

(d)     The Rights Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Rights Agreement or in the Right Certificates (except its countersignature thereof) or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the Company only.

(e)     The Rights Agent shall not be under any responsibility in respect of the validity of this Rights Agreement or the execution and delivery hereof (except the due execution hereof by the Rights Agent) or in respect of the validity or execution of any Right Certificate (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Rights Agreement or in any Right Certificate; nor shall it be responsible for any change in the exercisability of the Rights (including the Rights becoming void pursuant to Section 11(a)(ii) hereof) or any adjustment in the terms of the Rights (including the manner, method or amount thereof) provided for in Section 3, 11, 13, 23 or 24, or the ascertaining of the existence of facts that would require any such change or adjustment (except with respect to the exercise of Rights evidenced by Right Certificates after actual notice that such change or adjustment is required); nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Preferred Shares to be issued pursuant to this Rights Agreement or any Right Certificate or as to whether any Preferred Shares will, when issued, be validly authorized and issued, fully paid and nonassessable.

(f)     The Company agrees that it will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Rights Agent for the carrying out or performing by the Rights Agent of the provisions of this Rights Agreement.

(g)     The Rights Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from any one of the Chairman of the Board, the Chief Executive Officer, the President, any Vice President, the Secretary or the Treasurer of the Company, and to apply to such officers for advice or instructions in connection with its duties, and it shall not be liable for any action taken or suffered by it in good faith in accordance with instructions of any such officer or for any delay in acting while waiting for those instructions.

(h)     The Rights Agent and any stockholder, director, officer or employee of the Rights Agent may buy, sell or deal in any of the Rights or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Rights Agent under this Rights Agreement. Nothing herein shall preclude the Rights Agent from acting in any other capacity for the Company or for any other legal entity.

(i)     The Rights Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents, and the Rights Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, provided reasonable care was exercised in the selection and continued employment thereof.

Section 21.    <u>Change of Rights Agent</u>. The Rights Agent or any successor Rights Agent may resign and be discharged from its duties under this Rights Agreement upon 30-days' notice in writing mailed to the Company and to each transfer agent of the Common Shares or Preferred Shares by registered or certified mail, and, if such resignation occurs after the Distribution Date, to the holders of the Right Certificates by first-class mail. The Company may remove the Rights Agent or any successor Rights Agent upon 30-days' notice in writing, mailed to the Rights Agent or successor Rights Agent, as the case may be, and to each transfer agent of the Common Shares or Preferred Shares by registered or certified mail, and, if such removal occurs after the Distribution Date, to the holders of the Right Certificates by first-class mail. If the Rights Agent shall resign or be removed or shall otherwise become incapable of acting, the Company shall appoint a successor to the Rights Agent. If the Company shall fail to make such appointment within a period of 30 days after giving notice of such removal or after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated Rights Agent or by the holder of a Right Certificate (who or which shall, with such notice, submit such holder's Right Certificate for inspection by the Company), then the registered holder of any Right Certificate may apply to any court of competent jurisdiction for the appointment of a new Rights Agent. Any successor Rights Agent, whether appointed by the Company or by such a court, shall be a corporation organized and doing business under the laws of the United States or of the State of New York (or of any other state of the United States so long as such corporation is authorized to do business as a banking institution in the State of New York), in good standing, having an office in the State of New York, which is authorized under such laws to exercise corporate trust or stock transfer powers and is subject to supervision or examination by federal or state authority and which has at the time of its appointment as Rights Agent a combined capital and surplus of at least $50 million. After appointment, the successor Rights Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Rights Agent without further act or deed; but the predecessor Rights Agent shall deliver and transfer to the successor Rights Agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose. Not later than the effective date of any such appointment, the Company shall file notice thereof in writing with the predecessor Rights Agent and each transfer agent of the Common Shares or Preferred Shares, and mail a notice thereof in writing to the registered holders of the Right Certificates. Failure to give any notice provided for in this Section 21, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the Rights Agent or the appointment of the successor Rights Agent, as the case may be.

Section 22.    <u>Issuance of New Right Certificates</u>. Notwithstanding any of the provisions of this Rights Agreement or of the Rights to the contrary, the Company may, at its option, issue new Right Certificates evidencing Rights in such form as may be approved by the Board of Directors of the Company to reflect any adjustment or change in the Purchase Price and the number or kind or class of shares or other securities or property purchasable under the Right Certificates made in accordance with the provisions of this Rights Agreement. In addition, in connection with the issuance or sale of Common Shares following the Distribution Date and prior to the earlier of the Redemption Date and the Expiration Date, the Company (a) shall with respect to Common Shares so issued or sold pursuant to the exercise of stock options or under any employee plan or arrangement in existence prior to the Distribution Date, or upon the exercise, conversion or exchange of any securities, notes or debentures (pursuant to the terms

thereof) issued by the Company and in existence prior to the Distribution Date, and (b) may, in any other case, if deemed necessary or appropriate by the Board of Directors of the Company, issue Right Certificates representing the appropriate number of Rights in connection with such issuance or sale; provided, however, that (i) the Company shall not be obligated to issue any such Right Certificates if, and to the extent that, the Company shall be advised by counsel that such issuance would create a significant risk of material adverse tax consequences to the Company or the Person to whom such Right Certificate would be issued or would create a significant risk of such options or employee plans or arrangements failing to qualify for otherwise available special tax treatment, and (ii) no such Right Certificate shall be issued if, and to the extent that, appropriate adjustment shall otherwise have been made in lieu of the issuance thereof.

Section 23.    Redemption.  (a) The Board of Directors of the Company may, at its option, at any time prior to such time as any Person becomes an Acquiring Person, redeem all but not less than all the then outstanding Rights at a redemption price of $.01 per Right, appropriately adjusted to reflect any stock split, stock combination, stock dividend or similar transaction occurring after the date hereof (such redemption price being hereinafter referred to as the "Redemption Price"). The redemption of the Rights by the Board of Directors of the Company may be made effective at such time, on such basis and with such conditions as the Board of Directors of the Company, in its sole discretion, may establish. The Company may, at its option, pay the Redemption Price in cash, Common Shares (based on the current market price at the time of redemption) or any other form of consideration deemed appropriate by the Board of Directors.

(b)    Immediately upon the action of the Board of Directors of the Company ordering the redemption of the Rights pursuant to paragraph (a) of this Section 23, and without any further action and without any notice, the right to exercise the Rights will terminate and the only right thereafter of the holders of Rights shall be to receive the Redemption Price. The Company shall promptly give public notice of any such redemption; provided, however, that the failure to give, or any defect in, any such notice shall not affect the validity of such redemption. Within 10 days after such action of the Board of Directors of the Company ordering the redemption of the Rights, the Company shall mail a notice of redemption to all the holders of the then outstanding Rights at their last addresses as they appear upon the registry books of the Rights Agent or, prior to the Distribution Date, on the registry books of the transfer agent for the Common Shares. Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the notice. Each such notice of redemption will state the method by which the payment of the Redemption Price will be made. Neither the Company nor any of its Affiliates or Associates may redeem, acquire or purchase for value any Rights at any time in any manner other than that specifically set forth in this Section 23 or in Section 24 hereof, and other than in connection with the purchase of Common Shares prior to the Distribution Date.

Section 24.    Exchange.  (a) The Board of Directors of the Company may, at its option, at any time after any Person becomes an Acquiring Person, exchange all or part of the then outstanding and exercisable Rights (which shall not include Rights that have become void pursuant to the provisions of Section 11(a)(ii) hereof) for Common Shares at an exchange ratio of one Common Share per Right, appropriately adjusted to reflect any adjustment in the number of Rights pursuant to Section 11(i) (such exchange ratio being hereinafter referred to as the

"Exchange Ratio"). Notwithstanding the foregoing, the Board of Directors of the Company shall not be empowered to effect such exchange at any time after any Person (other than the Company, any Subsidiary of the Company, any employee benefit plan of the Company or of any Subsidiary of the Company, or any entity or trustee holding Common Shares for or pursuant to the terms of any such plan or for the purpose of funding any such plan or funding other employee benefits for employees of the Company or of any Subsidiary of the Company), together with all Affiliates and Associates of such Person, becomes the Beneficial Owner of 50% or more of the Common Shares then outstanding.

(b)      Immediately upon the action of the Board of Directors of the Company ordering the exchange of any Rights pursuant to paragraph (a) of this Section 24 and without any further action and without any notice, the right to exercise such Rights shall terminate and the only right thereafter of a holder of such Rights shall be to receive that number of Common Shares equal to the number of such Rights held by such holder multiplied by the Exchange Ratio. The Company shall promptly give public notice of any such exchange; provided, however, that the failure to give, or any defect in, such notice shall not affect the validity of such exchange. The Company promptly shall mail a notice of any such exchange to all of the holders of such Rights at their last addresses as they appear upon the registry books of the Rights Agent. Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the notice. Each such notice of exchange will state the method by which the exchange of the Common Shares for Rights will be effected and, in the event of any partial exchange, the number of Rights which will be exchanged. Any partial exchange shall be effected pro rata based on the number of Rights (other than Rights which have become void pursuant to the provisions of Section 11(a)(ii) hereof) held by each holder of Rights.

(c)      In the event that there shall not be sufficient Common Shares issued but not outstanding or authorized but unissued to permit any exchange of Rights as contemplated in accordance with this Section 24, the Company shall take all such action as may be necessary to authorize additional Common Shares for issuance upon exchange of the Rights. In the event the Company shall, after good faith effort, be unable to take all such action as may be necessary to authorize such additional Common Shares, the Company shall substitute, for each Common Share that would otherwise be issuable upon exchange of a Right, a number of Preferred Shares or fraction thereof (or a security with substantially similar rights, privileges, preferences, voting power and economic rights) such that the current per share market price of one Preferred Share (or other such security) multiplied by such number or fraction is equal to the current per share market price of one Common Share as of the date of issuance of such Preferred Shares or fraction thereof (or other such security).

(d)      The Company shall not be required to issue fractions of Common Shares or to distribute certificates which evidence fractional Common Shares. In lieu of such fractional Common Shares, the Company shall pay to the registered holders of the Right Certificates with regard to which such fractional Common Shares would otherwise be issuable an amount in cash equal to the same fraction of the current market value of a whole Common Share. For the purposes of this paragraph (d), the current market value of a whole Common Share shall be the closing price of a Common Share (as determined pursuant to the second sentence of Section 11(d)(i) hereof) for the Trading Day immediately prior to the date of exchange pursuant to this Section 24.

Section 25.    Notice of Certain Events.  (a) In case the Company, at any time after the Distribution Date, shall propose (i) to pay any dividend payable in stock of any class to the holders of its Preferred Shares or to make any other distribution to the holders of its Preferred Shares (other than a regular quarterly cash dividend), (ii) to offer to the holders of its Preferred Shares rights or warrants to subscribe for or to purchase any additional Preferred Shares or shares of stock of any class or any other securities, rights or options, (iii) to effect any reclassification of its Preferred Shares (other than a reclassification involving only the subdivision of outstanding Preferred Shares), (iv) to effect any consolidation or merger into or with, or to effect any sale or other transfer (or to permit one or more of its Subsidiaries to effect any sale or other transfer), in one or more transactions, of 50% or more of the assets or earning power of the Company and its Subsidiaries (taken as a whole) to, any other Person, (v) to effect the liquidation, dissolution or winding up of the Company, or (vi) to declare or pay any dividend on the Common Shares payable in Common Shares or to effect a subdivision, combination or consolidation of the Common Shares (by reclassification or otherwise than by payment of dividends in Common Shares), then, in each such case, the Company shall give to each holder of a Right Certificate, in accordance with Section 26 hereof, a notice of such proposed action, which shall specify the record date for the purposes of such stock dividend, or distribution of rights or warrants, or the date on which such reclassification, consolidation, merger, sale, transfer, liquidation, dissolution, or winding up is to take place and the date of participation therein by the holders of the Common Shares and/or Preferred Shares, if any such date is to be fixed, and such notice shall be so given in the case of any action covered by clause (i) or (ii) above at least 10 days prior to the record date for determining holders of the Preferred Shares for purposes of such action, and in the case of any such other action, at least 10 days prior to the date of the taking of such proposed action or the date of participation therein by the holders of the Common Shares and/or Preferred Shares, whichever shall be the earlier.

(b)    In case the event set forth in Section 11(a)(ii) hereof shall occur, then the Company shall as soon as practicable thereafter give to each holder of a Right Certificate, in accordance with Section 26 hereof, a notice of the occurrence of such event, which notice shall describe such event and the consequences of such event to holders of Rights under Section 11(a)(ii) hereof.

Section 26.    Notices. Notices or demands authorized by this Rights Agreement to be given or made by the Rights Agent or by the holder of any Right Certificate to or on the Company shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Rights Agent) as follows:

Xerium Technologies, Inc.
8537 Six Forks Road, Suite 300
Raleigh, North Carolina 27615

Subject to the provisions of Section 21 hereof, any notice or demand authorized by this Rights Agreement to be given or made by the Company or by the holder of any Right Certificate to or on the Rights Agent shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Company) as follows:

USActive 18441435.6                        -25-

American Stock Transfer & Trust Company, LLC
59 Maiden Lane
New York, NY 10038

Notices or demands authorized by this Rights Agreement to be given or made by the Company or the Rights Agent to the holder of any Right Certificate shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed to such holder at the address of such holder as shown on the registry books of the Company or the registry books of the holders of the Rights maintained by the Rights Agent after the Distribution Date as herein provided.  Any notice or demand given prior to the Distribution Date by the Company or the Rights Agent to the holders of the Rights shall also be given to any registered pledgee of any uncertificated Common Share by first-class mail, postage prepaid, addressed to such registered pledgee at the address of such registered pledgee as shown on the registry books of the Company.

Section 27.    Supplements and Amendments. Other than with respect to the definition of "Exempt Person" and the 20% Beneficial Ownership threshold applicable to Exempt Persons, the Board of Directors of the Company may from time to time supplement or amend this Rights Agreement without the approval of any holders of Right Certificates in order to cure any ambiguity, to correct or supplement any provision contained herein which may be defective or inconsistent with any other provisions herein, or to make any other provisions with respect to the Rights which the Board of Directors of the Company may deem necessary or desirable, any such supplement or amendment to be evidenced by a writing signed by the Company and the Rights Agent, provided, however, after any Person becomes an Acquiring Person, this Rights Agreement shall not be amended in any manner which would adversely affect the interests of the holders of Rights (other than an Acquiring Person or Affiliate or Associate thereof). Without limiting the foregoing, the Company may, except (for the avoidance of doubt) with respect to any Exempt Person and the 20% Beneficial Ownership threshold applicable to Exempt Persons, at any time prior to such time as any Person becomes an Acquiring Person amend this Agreement to lower the thresholds set forth in Section 1(a) to not less than the greater of (i) the sum of 0.001% and the largest percentage of the outstanding Common Shares then known by the Company to be beneficially owned by any Person (other than the Company, any Subsidiary of the Company, any employee benefit plan of the Company or any Subsidiary of the Company, or any entity holding Common Shares for or pursuant to the terms of any such plan) and (ii) 10%.  Upon the delivery of a certificate from an appropriate officer of the Company which states that the proposed supplement or amendment is in compliance with the terms of this Section 27, the Rights Agent shall execute such supplement or amendment.

Section 28.    Successors. All the covenants and provisions of this Rights Agreement by or for the benefit of the Company or the Rights Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 29.    Benefits of this Rights Agreement. Nothing in this Rights Agreement shall be construed to give to any Person, other than the Company, the Rights Agent and the registered holders of the Right Certificates (and, prior to the Distribution Date, the Common Shares) any legal or equitable right, remedy or claim under this Rights Agreement; but this Rights Agreement shall be for the sole and exclusive benefit of the Company, the Rights

Agent and the registered holders of the Right Certificates (and, prior to the Distribution Date, the Common Shares).

Section 30. <u>Severability</u>. If any term, provision, covenant or restriction of this Rights Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Rights Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 31. <u>Governing Law</u>. This Rights Agreement and each Right Certificate issued hereunder shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such State applicable to contracts to be made and performed entirely within such State.

Section 32. <u>Counterparts</u>. This Rights Agreement may be executed in one or more counterparts (including by means of facsimile or other electronic transmission), each of which shall be deemed an original but all of which together will constitute one and the same instrument. The exchange of copies of this Rights Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Rights Agreement as to the parties and may be used in lieu of an original Rights Agreement for all purposes. Signatures of the parties transmitted by facsimile or other electronic transmission shall be deemed to be original signatures for all purposes.

Section 33. <u>Descriptive Headings</u>. Descriptive headings of the several Sections of this Rights Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Rights Agreement to be duly executed and attested, all as of the day and year first above written.

XERIUM TECHNOLOGIES, INC.

By:_____
   Name:
   Title:

AMERICAN STOCK TRANSFER & TRUST
   COMPANY, LLC

By:_____
   Name:
   Title:

<u>Exhibit A</u>

**FORM
OF
CERTIFICATE OF DESIGNATIONS
OF
SERIES A JUNIOR PARTICIPATING PREFERRED STOCK
OF
XERIUM TECHNOLOGIES, INC.**

**(Pursuant to Section 151 of the
General Corporation Law of the State of Delaware)**

Xerium Technologies, Inc., a corporation organized and existing under the General Corporation Law of the State of Delaware (hereinafter called the "<u>Corporation</u>"), hereby certifies that the following resolution was adopted by the Board of Directors of the Corporation as required by Section 151 of the General Corporation Law of the State of Delaware on [●], 2010:

RESOLVED, that pursuant to the authority granted to and vested in the Board of Directors of this Corporation (hereinafter called the "<u>Board of Directors</u>" or the "<u>Board</u>") in accordance with the provisions of the Amended and Restated Certificate of Incorporation of the Corporation, as amended to date (the "<u>Certificate of Incorporation</u>") the Board of Directors hereby creates a series of preferred stock of the Corporation, par value $.01 per share, to be designated the "Series A Junior Participating Preferred Stock" and hereby adopts the resolution establishing the designations, number of shares, preferences, voting powers and other rights and the restrictions and limitations thereof, of the shares of such series as set forth below:

Section 1.     <u>Designation and Amount</u>. The shares of such series shall be designated as "<u>Series A Junior Participating Preferred Stock</u>" (the "<u>Series A Preferred Stock</u>") and the number of shares constituting the Series A Preferred Stock shall be [●]; <u>provided</u>, <u>however</u>, that, if more than a total of [●] shares of Series A Preferred Stock shall be issuable upon the exercise of Rights (the "<u>Rights</u>") issued pursuant to the Rights Agreement, dated as of [●], 2010, between the Corporation and American Stock Transfer & Trust Company, LLC, as Rights Agent, the Board, pursuant to Section 151(g) of the General Corporation Law of the State of Delaware, shall direct by resolution or resolutions that a certificate be properly executed, acknowledged, filed and recorded, in accordance with the provisions of Section 103 thereof, providing for the total number of shares of Series A Preferred Stock authorized to be issued to be increased (to the extent that the Certificate of Incorporation then permits) to the largest number of whole shares (rounded up to the nearest whole number) issuable upon exercise of such Rights.

Section 2.     <u>Dividends and Distributions</u>.

(A)     Subject to the rights of the holders of any shares of any series of preferred stock of the Corporation (the "<u>Preferred Stock</u>") (or any similar stock) ranking prior and superior to the Series A Preferred Stock with respect to dividends, the holders of shares of Series A

Exh. A-1

Preferred Stock, in preference to the holders of Common Stock, par value $.01 per share (the "Common Stock"), of the Corporation, and of any other junior stock, shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose, quarterly dividends payable in cash on the first day of March, June, September and December in each year (each such date being referred to herein as a "Quarterly Dividend Payment Date"), commencing on the first Quarterly Dividend Payment Date after the first issuance of a share or fraction of a share of Series A Preferred Stock (the "Issue Date"), in an amount per share (rounded to the nearest cent) equal to the greater of (a) $1 or (b) subject to the provision for adjustment hereinafter set forth, 1,000 times the aggregate per share amount of all cash dividends, and 1,000 times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions, other than a dividend payable in shares of Common Stock or a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise), declared on the Common Stock since the immediately preceding Quarterly Dividend Payment Date or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series A Preferred Stock. In the event the Corporation shall at any time after the Issue Date declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the amount to which holders of shares of Series A Preferred Stock were entitled immediately prior to such event under clause (b) of the preceding sentence shall be adjusted by multiplying such amount by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B)     The Corporation shall declare a dividend or distribution on the Series A Preferred Stock as provided in paragraph (A) of this Section 2 immediately after it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock); provided that, in the event no dividend or distribution shall have been declared on the Common Stock during the period between any Quarterly Dividend Payment Date and the next subsequent Quarterly Dividend Payment Date, a dividend of $1 per share on the Series A Preferred Stock shall nevertheless be payable on such subsequent Quarterly Dividend Payment Date.

(C)     Dividends shall begin to accrue and be cumulative on outstanding shares of Series A Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issue of such shares, unless the date of issue of such shares is prior to the record date for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue from the date of issue of such shares, or unless the date of issue is a Quarterly Dividend Payment Date or is a date after the record date for the determination of holders of shares of Series A Preferred Stock entitled to receive a quarterly dividend and before such Quarterly Dividend Payment Date, in either of which events such dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date. Accrued but unpaid dividends shall not bear interest. Dividends paid on the shares of Series A Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding. The Board of Directors may fix a record date for the determination of holders of shares of Series A Preferred

Stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall be not more than 60 days prior to the date fixed for the payment thereof.

Section 3.    Voting Rights.  The holders of shares of Series A Preferred Stock shall have the following voting rights:

(A)    Subject to the provision for adjustment hereinafter set forth, each share of Series A Preferred Stock shall entitle the holder thereof to 1,000 votes on all matters submitted to a vote of the stockholders of the Corporation. In the event the Corporation shall at any time after the Issue Date declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the number of votes per share to which holders of shares of Series A Preferred Stock were entitled immediately prior to such event shall be adjusted by multiplying such number by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B)    Except as otherwise provided herein, in any other Certificate of Designations creating a series of Preferred Stock or any similar stock, or by law, the holders of shares of Series A Preferred Stock and the holders of shares of Common Stock and any other capital stock of the Corporation having general voting rights shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

(C)    Except as set forth herein, or as otherwise provided by law, holders of Series A Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

Section 4.    Certain Restrictions.

(A)    Whenever quarterly dividends or other dividends or distributions payable on the Series A Preferred Stock as provided in Section 2 are in arrears, thereafter and until all accrued and unpaid dividends and distributions, whether or not declared, on shares of Series A Preferred Stock outstanding shall have been paid in full, the Corporation shall not:

(i)    declare or pay dividends, or make any other distributions, on any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock;

(ii)    declare or pay dividends, or make any other distributions, on any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Preferred Stock, except dividends paid ratably on the Series A Preferred Stock and all such parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled;

(iii)    redeem or purchase or otherwise acquire for consideration shares of any stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such junior stock in exchange for shares of any stock of the Corporation ranking junior (either as to dividends or upon dissolution, liquidation or winding up) to the Series A Preferred Stock; or

(iv)    redeem or purchase or otherwise acquire for consideration any shares of Series A Preferred Stock, or any shares of stock ranking on a parity with the Series A Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board of Directors) to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

(B)    The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under paragraph (A) of this Section 4, purchase or otherwise acquire such shares at such time and in such manner.

Section 5.    Reacquired Shares. Any shares of Series A Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and cancelled promptly after the acquisition thereof. All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock and may be reissued as part of a new series of Preferred Stock subject to the conditions and restrictions on issuance set forth herein, in the Certificate of Incorporation, or in any other Certificate of Designations creating a series of Preferred Stock or any similar stock or as otherwise required by law.

Section 6.    Liquidation, Dissolution or Winding Up. Upon any liquidation, dissolution or winding up of the Corporation, no distribution shall be made (1) to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock unless, prior thereto, the holders of shares of Series A Preferred Stock shall have received $1,000 per share, plus an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment, provided that the holders of shares of Series A Preferred Stock shall be entitled to receive an aggregate amount per share, subject to the provision for adjustment hereinafter set forth, equal to 1,000 times the aggregate amount to be distributed per share to holders of shares of Common Stock, or (2) to the holders of shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Preferred Stock, except distributions made ratably on the Series A Preferred Stock and all such parity stock in proportion to the total amounts to which the holders of all such shares are entitled upon such liquidation, dissolution or winding up. In the event the Corporation shall at any time after the Issue Date declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the aggregate amount to which

Exh. A-4

holders of shares of Series A Preferred Stock were entitled immediately prior to such event under the proviso in clause (1) of the preceding sentence shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Neither the merger or consolidation of the Corporation into or with another entity nor the merger or consolidation of any other entity into or with the Corporation (nor the sale of all or substantially all of the assets of the Corporation) shall be deemed to be a liquidation, dissolution or winding up of the Corporation within the meaning of this Section 6.

Section 7.   Consolidation, Merger, etc.   In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case each share of Series A Preferred Stock shall at the same time be similarly exchanged or changed into an amount per share, subject to the provision for adjustment hereinafter set forth, equal to 1,000 times the aggregate amount of stock, securities, cash and/or any other property (payable in kind), as the case may be, into which or for which each share of Common Stock is changed or exchanged. In the event the Corporation shall at any time after the Issue Date declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the amount set forth in the preceding sentence with respect to the exchange or change of shares of Series A Preferred Stock shall be adjusted by multiplying such amount by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 8.   No Redemption.   The shares of Series A Preferred Stock shall not be redeemable from any holder.

Section 9.   Rank.   The Series A Preferred Stock shall rank, with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up of the Corporation, junior to all other series of Preferred Stock and senior to the Common Stock.

Section 10.   Amendment.   The Certificate of Incorporation of the Corporation (including this Certificate of Designations) shall not be amended in any manner which would materially alter or change the powers, preferences or special rights of the Series A Preferred Stock so as to affect them adversely without the affirmative vote of the holders of at least two-thirds of the outstanding shares of Series A Preferred Stock, voting together as a single class.

Section 11.   Fractional Shares.   The Series A Preferred Stock may be issued in fractions of a share that shall entitle the holder, in proportion to such holder's fractional shares, to exercise voting rights, receive dividends, participate in distributions and to have the benefit of all other rights of holders of Series A Preferred Stock.

USActive 18441435.6                                    Exh. A-5

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designations to be duly executed in its corporate name on this the [●] day of [●], 2010.

XERIUM TECHNOLOGIES, INC.

By:_____
   Name:
   Title:

Exh. A-6

<u>Exhibit B</u>

**Form of Right Certificate**

**Certificate No. R-**

**_____ Rights**

NOT EXERCISABLE AFTER [●], 2013 OR EARLIER IF REDEMPTION OR EXCHANGE OCCURS. THE RIGHTS ARE SUBJECT TO REDEMPTION AT $.01 PER RIGHT AND TO EXCHANGE ON THE TERMS SET FORTH IN THE RIGHTS AGREEMENT.

**Rights Certificate**

**XERIUM TECHNOLOGIES, INC.**

This certifies that _____, or registered assigns, is the registered owner of the number of Rights set forth above, each of which entitles the owner thereof, subject to the terms, provisions and conditions of the Rights Agreement, dated as of [●], 2010 (the "<u>Rights Agreement</u>"), between Xerium Technologies, Inc., a Delaware corporation (the "<u>Company</u>"), and American Stock Transfer & Trust Company, LLC (the "<u>Rights Agent</u>"), to purchase from the Company at any time after the Distribution Date (as such term is defined in the Rights Agreement) and prior to 5:00 p.m., New York time, on [●], 2013 at the principal office of the Rights Agent, or at the office of its successor as Rights Agent, one one-thousandth of a fully paid non-assessable share of Series A Junior Participating Preferred Stock of the Company, par value $.01 per share (the "<u>Preferred Shares</u>"), at a purchase price of $[●] per one one-thousandth of a Preferred Share (the "<u>Purchase Price</u>"), upon presentation and surrender of this Right Certificate with the Form of Election to Purchase duly executed. The number of Rights evidenced by this Right Certificate (and the number of one one-thousandths of a Preferred Share which may be purchased upon exercise hereof) set forth above, and the Purchase Price set forth above, are the number and Purchase Price as of [●], 2010, based on the Preferred Shares as constituted at such date. As provided in the Rights Agreement, the Purchase Price and the number of one one-thousandths of a Preferred Share which may be purchased upon the exercise of the Rights evidenced by this Right Certificate are subject to modification and adjustment upon the happening of certain events.

This Right Certificate is subject to all of the terms, provisions and conditions of the Rights Agreement, which terms, provisions and conditions are hereby incorporated herein by reference and made a part hereof and to which Rights Agreement reference is hereby made for a full description of the rights, limitations of rights, obligations, duties and immunities hereunder of the Rights Agent, the Company and the holders of the Right Certificates. Copies of the Rights Agreement are on file at the principal executive offices of the Company and the offices of the Rights Agent.

This Right Certificate, with or without other Right Certificates, upon surrender at the principal office of the Rights Agent, may be exchanged for another Right Certificate or Right Certificates of like tenor and date evidencing Rights entitling the holder to purchase a like aggregate number of Preferred Shares as the Rights evidenced by the Right Certificate or Right

Certificates surrendered shall have entitled such holder to purchase. If this Right Certificate shall be exercised in part, the holder shall be entitled to receive upon surrender hereof another Right Certificate or Right Certificates for the number of whole Rights not exercised.

Subject to the provisions of the Rights Agreement, the Rights evidenced by this Right Certificate (i) may be redeemed by the Company at a redemption price of $.01 per Right or (ii) may be exchanged, in whole or in part, for Preferred Shares or shares of the Company's Common Stock, par value $.01 per share.

No fractional Preferred Shares will be issued upon the exercise of any Right or Rights evidenced hereby (other than fractions which are integral multiples of one one-thousandth of a Preferred Share, which may, at the election of the Company, be evidenced by depositary receipts), but in, lieu thereof, a cash payment will be made, as provided in the Rights Agreement.

No holder of this Right Certificate shall be entitled to vote or receive dividends or be deemed for any purpose the holder of the Preferred Shares or of any other securities of the Company which may at any time be issuable on the exercise hereof, nor shall anything contained in the Rights Agreement or herein be construed to confer upon the holder hereof, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action, or to receive notice of meetings or other actions affecting stockholders (except as provided in the Rights Agreement), or to receive dividends or subscription rights, or otherwise, until the Right or Rights evidenced by this Right Certificate shall have been exercised as provided in the Rights Agreement.

This Right Certificate shall not be valid or obligatory for any purpose until it shall have been countersigned by the Rights Agent.

WITNESS the facsimile signature of the proper officers of the Company and its corporate seal.

Dated: as of  .

XERIUM TECHNOLOGIES, INC.

By:_____
    Name:
    Title:

COUNTERSIGNED:

By:_____
    Name:
    Title:

Exh. B-3

[Form of Reverse Side of Right Certificate]

**FORM OF ASSIGNMENT**
**(To be executed by the registered holder**
**if such holder desires to transfer the Right Certificate.)**

FOR VALUE RECEIVED

_____ hereby sells, assigns and transfers unto

_____
(Please print name and address of transferee)

this Right Certificate, together with all right, title and interest therein, and does hereby irrevocably constitute and appoint  Attorney, to transfer the within Right Certificate on the books of the within-named Company, with full power of substitution.

Dated: _____

Signature _____

Signature Guaranteed: _____

Signatures must be guaranteed by an "eligible guarantor institution" as defined in Rule 17Ad-15 promulgated under the Securities Exchange Act of 1934, as amended.

**Certificate**

The undersigned hereby certifies that the Rights evidenced by this Right Certificate are not beneficially owned by an Acquiring Person or an Affiliate or Associate thereof (as defined in the Rights Agreement). After due inquiry and to the best knowledge of the undersigned, the Rights evidenced by this Right Certificate were not acquired or beneficially owned by an Acquiring Person or an Affiliate or Associate thereof.

Dated: _____

Signature _____

The signature to the foregoing Assignment and Certificate must correspond to the name as written upon the face of this Right Certificate in every particular, without alteration or enlargement or any change whatsoever.

## FORM OF ELECTION TO PURCHASE
### (To be executed if holder desires to exercise Rights represented by the Right Certificate.)

To:

        The undersigned hereby irrevocably elects to exercise Rights represented by this Right Certificate to purchase the Preferred Shares issuable upon the exercise of such Rights and requests that certificates for such Preferred Shares be issued in the name of:

_____

Please insert social security or other identifying number:

_____

(Please print name and address)

If such number of Rights shall not be all the Rights evidenced by this Right Certificate, a new Right Certificate for the balance remaining of such Rights shall be registered in the name of and delivered to:

_____

Please insert social security or other identifying number:

(Please print name and address)

Dated:

Dated: _____

Signature _____

Signature Guaranteed: _____

Signatures must be guaranteed by an "eligible guarantor institution" as defined in Rule 17Ad-15 promulgated under the Securities Exchange Act of 1934, as amended.

### Certificate

        The undersigned hereby certifies that the Rights evidenced by this Right Certificate are not beneficially owned by an Acquiring Person or an Affiliate or Associate thereof (as defined in the Rights Agreement). After due inquiry and to the best knowledge of the undersigned, the Rights evidenced by this Right Certificate were not acquired or beneficially owned by an Acquiring Person or an Affiliate or Associate thereof.

Dated: _____

Signature _____

Exh. B-5

The signature in the Form of Assignment or Form of Election to Purchase, as the case may be, must conform to the name as written upon the face of this Right Certificate in every particular, without alteration or enlargement or any change whatsoever.

In the event the certification set forth above in the Form of Assignment or the Form of Election to Purchase, as the case may be, is not completed, the Company and the Rights Agent will deem the beneficial owner of the Rights evidenced by this Right Certificate to be an Acquiring Person or an Affiliate or Associate thereof (as defined in the Rights Agreement) and such Assignment or Election to Purchase will not be honored.

Exhibit C

## SUMMARY OF RIGHTS TO PURCHASE PREFERRED SHARES

On [●], 2010, the Board of Directors of Xerium Technologies, Inc. (the "Company") declared a dividend of one preferred share purchase right (a "Right") for each outstanding share of common stock, par value $.01 per share (the "Common Shares"), of the Company. The dividend is payable on [●], 2010 (the "Record Date") to the stockholders of record on that date. Each Right entitles the registered holder to purchase from the Company one one-thousandth of a share of Series A Junior Participating Preferred Stock of the Company, par value $.01 per share (the "Preferred Shares"), at a price of $[●] per one one-thousandth of a Preferred Share (the "Purchase Price"), subject to adjustment. The description and terms of the Rights are set forth in a Rights Agreement (the "Rights Agreement") between the Company and American Stock Transfer & Trust Company, LLC, as Rights Agent (the "Rights Agent").

**Distribution Date; Exercisability**

Initially, the Rights will be attached to all Common Shares (whether in book-entry, certificated or uncertificated form) issued and outstanding and the Rights will be owned by the registered holder of the Common Shares, and no separate Rights certificates will be issued. Separate certificates evidencing the Rights ("Right Certificates") will be mailed to holders of record of all Common Shares as of the close of business on the earlier to occur of (i) a public announcement that an Acquiring Person (as discussed below) has acquired beneficial ownership of 15% or more of the outstanding Common Shares or (ii) such date as may be determined by action of the Board of Directors of the Company following the commencement of, or announcement of an intention to make, a tender offer or exchange offer the consummation of which would result in the beneficial ownership by a person or group of 15% or more of the outstanding Common Shares (the earlier of such dates being the "Distribution Date").

The Rights Agreement provides that, until the Distribution Date (or earlier redemption or expiration of the Rights), (i) the Rights will be transferred with and only with the Common Shares, (ii) certificates or book-entry statements with respect to new Common Share certificates issued after the Record Date upon transfer or new issuance of Common Shares will contain a notation incorporating the Rights Agreement by reference and (iii) the surrender for transfer of any certificates for Common Shares outstanding as of the Record Date will also constitute the transfer of the Rights associated with the Common Shares represented by such certificate.

The Rights are not exercisable until the Distribution Date. The Rights will expire on [●], 2013 (the "Expiration Date"), unless the Expiration Date is extended or unless the Rights are earlier redeemed or exchanged by the Company, in each case, as described below.

**Acquiring Person**

The Rights Agreement defines the term "Acquiring Person" generally to mean any person who, together with all affiliates and associates of such person, is the beneficial owner of 15% or more of the Common Shares then outstanding. However, that definition does not

generally include (i) the Company, any Subsidiary of the Company, any employee benefit plan of the Company or any Subsidiary of the Company, or any entity or trustee holding Common Shares for or pursuant to the terms of any such plan, (ii) any person who or which becomes the beneficial owner of 15% or more of the Common Shares then outstanding as the result of a reduction in the outstanding Common Shares resulting from acquisition of Common Shares by the Company approved by the Board of Directors, (iv) any person who or which the Board of Directors of the Company determines, in good faith, became an Acquiring Person inadvertently, if such person divests as promptly as practicable a sufficient number of Common Shares so that such person would no longer be an Acquiring Person, (v) any person who or which the Board of Directors of the Company determines, prior to the time such person would otherwise be an Acquiring Person, should be exempted from the definition of Acquiring Person, provided that the Board of Directors may make such exemption subject to such conditions, if any, which the Board may determine or (vi) [American Securities], [Carl Marks] and [Cerberus] (each, an "Exempt Person") or any affiliate or associate of an Exempt Person.  However, any Exempt Person who becomes the beneficial owner of 20% or more of the Common Shares then outstanding shall become an Acquiring Person.

**Flip-In**

If a person or group becomes an Acquiring Person, each holder of a Right will thereafter have the right to receive, upon exercise, Common Shares (or, in certain circumstances, Preferred Shares or other similar securities of the Company) having a value equal to two times the exercise price of the Right. Notwithstanding any of the foregoing, following the existence of an Acquiring Person, all Rights that are, or (under certain circumstances specified in the Rights Agreement) were, beneficially owned by any Acquiring Person will be null and void.

**Flip-Over**

In the event that the Company is acquired in a merger or other business combination transaction or 50% or more of its consolidated assets or earning power are sold after a person or group has become an Acquiring Person, proper provision will be made so that each holder of a Right will thereafter have the right to receive, upon the exercise thereof at the then current exercise price of the Right, that number of shares of common stock of the acquiring company which at the time of such transaction will have a market value of two times the exercise price of the Right. In the event that any person or group becomes an Acquiring Person, proper provision shall be made so that each holder of a Right, other than Rights beneficially owned by the Acquiring Person (which will thereafter be void), will thereafter have the right to receive upon exercise that number of Common Shares having a market value of two times the exercise price of the Right.

**Exchange**

At any time after any person or group becomes an Acquiring Person and prior to the acquisition by such person or group of 50% or more of the outstanding Common Shares, the Board of Directors of the Company may exchange the Rights (other than Rights owned by such person or group which will have become void), in whole or in part, at an exchange ratio of one Common Share, or one one-thousandth of a Preferred Share (or of a share of a class or series of

the Company's preferred stock having equivalent rights, preferences and privileges), per Right (subject to adjustment).

**Redemption**

At any time prior to the existence of an Acquiring Person, the Board of Directors of the Company may redeem the Rights, in whole but not in part, at a price of $.01 per Right (the "Redemption Price"). The redemption of the Rights may be made effective at such time on such basis with such conditions as the Board of Directors, in its sole discretion, may establish. Immediately upon any redemption of the Rights, the right to exercise the Rights will terminate and the only right of the holders of Rights will be to receive the Redemption Price.

**Amendment**

The terms of the Rights may be amended by the Board of Directors of the Company without the consent of the holders of the Rights, except that from and after the existence of an Acquiring Person no such amendment may adversely affect the interests of the holders of the Rights (other than the Acquiring Person).

**Adjustment**

The number of outstanding Rights and the number of one one-thousandths of a Preferred Share issuable upon exercise of each Right are subject to adjustment under certain circumstances.

**Preferred Stock**

Because of the nature of the Preferred Shares' dividend, liquidation and voting rights, the value of the one one-thousandth interest in a Preferred Share purchasable upon exercise of each Right should approximate the value of one Common Share.

**Rights of Holders**

Until a Right is exercised, the holder thereof, as such, will have no rights as a stockholder of the Company, including, without limitation, the right to vote or to receive dividends.

**Further Information**

A copy of the Rights Agreement has been filed with the Securities and Exchange Commission as an Exhibit to a Registration Statement on Form 8-A dated [●], 2010. A copy of the Rights Agreement is available free of charge from the Company. This summary description of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which is hereby incorporated herein by reference.

## SCHEDULE 1.98

**U.S. Direction Letter Agreement**

## US DIRECTION LETTER AGREEMENT

B E T W E E N:

XERIUM V (U.S.) LIMITED, a Corporation incorporated and organized pursuant to the laws of the State of Delaware, United States

Hereinafter called "Xerium V"

- and –

XERIUM TECHNOLOGIES, INC, a Corporation incorporated and organized pursuant to the laws of the State of Delaware, United States

Hereinafter called "Xerium"

WHEREAS on the ● day of ●, 2010 (the "Commencement Date"), Xerium and certain of its direct and indirect subsidiaries, (collectively, the "Debtors") including Xerium V and Xerium Canada Inc. ("Xerium Canada"), commenced a voluntary case under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Code");

AND WHEREAS prior to the Commencement Date the Debtors solicited votes on the proposed Joint Prepackaged Plan of Reorganization under the Code (the "Plan") pursuant to a disclosure statement dated March 2, 2010 (as supplemented and amended the "Disclosure Statement");

AND WHEREAS the Plan has been accepted by all classes entitled to vote;

AND WHEREAS capitalized terms used in this Agreement and not otherwise defined herein shall be given the meaning ascribed thereto in the Disclosure Statement;

AND WHEREAS the Holders have Allowed Credit Facility Claims and Allowed Unsecured Swap Termination Claims against Xerium Canada (collectively the "Holders") which are to be paid, in accordance with the Plan, in part, by delivery to them of the Xerium Canada Distributions;

AND WHEREAS Xerium intends to make a deemed capital contribution for US federal income tax purposes to Xerium V in exchange for a deemed transfer of Xerium V common stock to Xerium;

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, the parties hereto agree to the terms set out below.

1.    Xerium V hereby directs Xerium to deliver to the Holders the Xerium Canada Distributions in the manner set out below, in satisfaction of the Xerium V's obligations under the Canada Direction Letter Agreement between Xerium V and Xerium Canada.

- 2 -

2.  The Xerium Canada Distributions shall be delivered by Xerium in accordance with the provisions of the Plan as follows:

    (a)  US$● to be delivered to ● or as [they] may otherwise direct;

    (b)  ● shares of New Common Stock to be delivered to ● or as they may otherwise direct.

3.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

4.  The division of this Agreement into articles and sections and the insertion of headings are for convenience of reference only and are not to effect or be used in a constructional interpretation of this Agreement.

5.  All demands, notices, communication and reports provided for in this Agreement shall be in writing and shall be sent either by facsimile transmission with confirmation to the numbers specified below or personally delivered or sent by reputable overnight courier service to any party at the address specified below or at such address to the attention of such other person and with such other copy as the recipient party has specified by a prior written notice to the parties sent pursuant to the provisions of this section 5.

    If to Xerium V:

    Xerium V (US) Limited.
    8537 Six Forks Road, Suite 300
    Raleigh, NC 27615
    Attention:  Chief Financial Officer
    Facsimile:  (919) 556-2432

    And if to Xerium:

    Xerium Technologies, Inc.
    8537 Six Forks Road, Suite 300
    Raleigh, NC 27615
    Attention:  Chief Financial Officer
    Facsimile:  (919) 556-2432

    Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission or on the calendar day after deposit with a reputable overnight courier service, as applicable.

6.  The parties may execute this Agreement in one or more counterparts (no one of which may need contain the signatures of all parties) each of which will be an original and all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF the parties have executed this Agreement as of the ● day of ●, 2010.

DRAFT

USActive 18874263.1

- 3 -

XERIUM V (US) LIMITED

Per: _____

    Name:

    Title:

XERIUM TECHNOLOGIES INC.

Per: _____

    Name:

    Title:

DRAFT

## SCHEDULE 5.9

**Initial Directors and Initial Officers of the Reorganized Debtors**

## I.   Proposed Post-Effective Date[1] Directors and Officers

**Xerium Technologies, Inc.**

| Board of Directors[2] | Officers |
|---|---|
| Stephen R. Light, Chairman | Stephen R. Light -- President and Chief Executive Officer |
| Edward Paquette | David Maffucci -- Executive Vice President, Vice President, Chief Financial Officer and Asst. Secretary |
| Jay Gurandiano | David Pretty -- Vice President; President – Xerium North America |
| John F. McGovern | Eduardo Fracasso -- Vice President; President – Xerium South America |
| Marc L. Saiontz | Tom Johnson -- Vice President; President – Xerium Asia |
| James F. Wilson | Ted Orban --Secretary & Treasurer |
| | Dennis Carroll -- Vice President, Controller |
| | Elizabeth Leete -- Assistant Secretary, Vice President – Tax |
| | Joan "John" Badrinas Ardevol -- Vice President, Chief Technology Officer |
| | Donna Meserve -- Vice President, Human Resources |
| | Kevin McDougall -- Executive Vice President & General Counsel* |

*\* Mr. McDougall employment commences effective as of April 6, 2010.*

Reorganized Xerium shall take all requisite action such that, immediately following the Effective Date, the Compensation Committee of the New Board of Reorganized Xerium (the "Compensation Committee") shall consist of three directors, of which two directors (one of whom shall be the chairperson) shall be designated prior to the Effective Date by the members of the Secured Lender Ad Hoc Working Group.  The Compensation Committee shall act by a majority vote of the whole committee (without taking into account any vacancies).  Each member of the foregoing committee shall meet applicable independence and other requirements of any applicable laws and the rules of the NYSE.

**Huyck Licensco Inc.**

| Board of Directors | Officers |
|---|---|
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary & Treasurer |
| | Elizabeth Leete -- Assistant Secretary |

---

[1]   Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the amended joint prepackaged plan of reorganization filed by the Debtors with the Bankruptcy Court on March 30, 2010 (the "Plan").

[2]   Prior to the Confirmation Hearing, the Debtors will file a supplement to this Schedule 5.9 to the Plan Supplement with the Bankruptcy Court, which provides the requisite information with respect to the seventh director of Xerium Technologies, Inc.

## Stowe Woodward Licensco LLC

| Board of Directors | Officers |
| --- | --- |
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary & Treasurer |
|  | Elizabeth Leete -- Assistant Secretary |

## Stowe Woodward LLC

| Board of Directors | Officers |
| --- | --- |
| Stephen R. Light | Stephen R. Light -- Chief Executive Officer and President |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary & Treasurer |
|  | Elizabeth Leete -- Assistant Secretary |

## Wangner Itelpa I LLC

| Board of Managers | Officers |
| --- | --- |
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Executive Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary |
|  | Elizabeth Leete -- Assistant Secretary |

## Wangner Itelpa II LLC

| Board of Managers | Officers |
| --- | --- |
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Executive Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary |
|  | Elizabeth Leete -- Assistant Secretary |

## Weavexx, LLC

| Board of Managers | Officers |
| --- | --- |
| Stephen R. Light | Stephen R. Light -- Chief Executive Officer and President |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | David Pretty -- Vice President and Assistant Secretary |
|  | Ted Orban -- Secretary and Treasurer |
|  | Elizabeth Leete -- Assistant Secretary |

## Xerium Asia, LLC

| Board of Managers | Officers |
|---|---|
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Tom Johnson -- Vice President and Assistant Secretary |
|  | Ted Orban -- Secretary and Treasurer |
|  | Elizabeth Leete -- Assistant Secretary |

## Xerium III (US) Limited

| Board of Directors | Officers |
|---|---|
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary & Treasurer |
|  | Elizabeth Leete -- Assistant Secretary |

## Xerium IV (US) Limited

| Board of Directors | Officers |
|---|---|
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary & Treasurer |
|  | Elizabeth Leete -- Assistant Secretary |

## Xerium V (US) Limited

| Board of Directors | Officers |
|---|---|
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary & Treasurer |
|  | Elizabeth Leete -- Assistant Secretary |

## XTI LLC

| Board of Managers | Officers |
|---|---|
| Stephen R. Light | Stephen R. Light -- President and Assistant Secretary |
| David Maffucci | David Maffucci -- Executive Vice President, Chief Financial Officer and Asst. Secretary |
| Ted Orban | Ted Orban -- Secretary |
|  | Elizabeth Leete -- Assistant Secretary |

## Xerium Canada Inc.

| Board of Directors | Officers |
|---|---|
| Stephen R. Light | Stephen R. Light -- President and Chief Executive Officer |
| David Maffucci | David Maffucci -- Chief Financial Officer/Accounting Officer |

| Ted Orban | David Pretty -- Executive Vice President, Stowe-Woodward Canada and Weavexx Canada Divisions |
| --- | --- |
| | Ted Orban -- Treasurer & Secretary |
| | Elizabeth I. Leete -- Assistant Secretary |
| | William VanderBurgh -- Assistant Secretary* |

*  *Mr. VanderBurgh is not an employee of Xerium Canada, Inc. or any other Xerium entity.*

## Huyck.Wangner Austria GmbH

| Supervisory Board | |
| --- | --- |
| Stephen R. Light, Chairman (Shareholder Representative) | David Pretty – Managing Director* |
| Alois Leeb, Vice Chairman | |
| Joan "John" Badrinas Ardevol (Shareholder Representative) | |
| Andrea Schremser, Employee Representative | |
| Liliana Mock, Employee Representative | |

*  *This entity has no officers, but the day-to-day operations are managed by the Managing Director.*

## Xerium Germany Holding GmbH

| Managing Directors | |
| --- | --- |
| Stephen R. Light | Stephen R. Light -- Managing Director* |
| Joan "John" Badrinas Ardevol | Joan "John" Badrinas Ardevol -- Managing Director* |
| David Maffucci | David Maffucci -- Managing Director* |

*  *This entity has no officers, but the day-to-day operations are managed by the Managing Directors.*

## Xerium Italia S.p.A.

| Board of Directors | |
| --- | --- |
| Stephen R. Light, Chairman | Stephen R. Light, Chairman |
| David Maffucci | |
| Luigi Alessandrini | |
| Alexander Karnowsky | |

*  *This entity has no officers, but the day-to-day operations are managed by the Managing Directors.*

## II.   Biographical Information of Officers and Directors

*Stephen R. Light* has served as the Company's President, Chief Executive Officer and as a director since February 2008.  Beginning in July 2008, Mr. Light has also served as Chairman.  Mr. Light was previously President and Chief Executive Officer of Flow International Corp., a publicly traded producer of industrial waterjet cutting and cleaning equipment from January 2003 to July 2007.  Prior to Flow, Mr. Light was President and Chief Executive Officer of OmniQuip Textron from October 2000 to January 2003.  Mr. Light has also held various management positions within General Electric Company, Emerson Electric Co. and Koninklijke Philips N.V.

*John F. McGovern* is the founder, and since 1999 a partner, of Aurora Capital LLC, a private investment and consulting firm based in Atlanta, Georgia.  Prior to founding Aurora Capital, Mr. McGovern served in a number of positions of increasing responsibility at Georgia-Pacific Corporation from 1981 to 1999, including Executive Vice President/Chief Financial Officer from

1994 to 1999.  Previously Mr. McGovern had been Vice President and Director, Forest Products and Package Division of Chase Manhattan Bank.  He currently serves as a Director of Neenah Paper Inc. and Collective Brands Inc.  Formerly Mr. McGovern served on the Boards of Golden Bear Inc., Seabulk International Inc., Gentek Inc., Chart Industries and Maxim Crane.

*Marc L. Saiontz* is currently a Managing Director of American Securities, with whom he has been with for more than a dozen years.  Mr. Saiontz is currently a director of Weasler Engineering, PDM Bridge, NEP Broadcasting and Unison Holdings.  He was previously a director of Unifrax Corporation.  Mr. Saiontz attended Stanford Graduate School of Business and during this time worked overseas with a European-based telecommunications and infrastructure investment firm.  Earlier in his career, Mr. Saiontz was with Morgan Stanley Capital Partners where he focused on private equity investments.  He is a member of the Development Committee and co-Chair of the Social Investment Council of Echoing Green.

*James F. Wilson* has been a principal of Carl Marks Management Company, LLC since 2001, which manages investment partnerships focused on distressed securities.  Mr. Wilson earned a B.A. in Economics from Dartmouth College, and an MBA from Harvard Graduate School of Business Administration.

*Jay J. Gurandiano* has served as a director since December 1, 2008.  He has been the Managing Director of Stone House Investment Holdings Inc., an investment holdings company, since January 2001.  He also serves as the Chairman of the Board of Directors of Ainsworth Lumber Co. Ltd., a lumber and wood products company.

*Nico Hansen* has served as a director since August 2008.  He has been a partner at Apax Partners, L.P., a private equity and venture capital consulting firm, since January 2007.  Previously, Dr. Hansen was a partner at Apax Partners Beteiligungsberatung GmbH, which he joined in May 2000.

*David G. Maffucci* has served as the Company's Executive Vice President and Chief Financial Officer since June 8, 2009, and as a director since December 1, 2008.  Mr. Maffucci served as Executive Vice President and President of the Newsprint Division of Bowater Incorporated, a manufacturer of newsprint and other specialty paper, pulp, and solid wood products, from 2005 until 2006.  Previously, from 2002 to 2005, he was Executive Vice President and Chief Financial Officer, and from 1995 to 2002, he was Senior Vice President and Chief Financial Officer of Bowater Incorporated.  Mr. Maffucci also serves as a director of Martin Marietta Materials, Inc., a producer of construction aggregates.

*Edward Paquette* has served as a director since July 2004.  He served as Vice President, Chief Financial Officer and a director of Standex International Corp., a diversified manufacturing company listed on the New York Stock Exchange ("NYSE"), from September 1997 to August 2001, when he retired.  Prior to joining Standex International Corp., he was a certified public accountant and partner at Deloitte & Touche LLP for 26 years.

*Michael Phillips* has served as a director since December 1999.  He has been a partner at Apax Partners Beteiligungsberatung GmbH, a private equity and venture capital consulting firm, since March 1996.  He joined Apax Partners Beteiligungsberatung GmbH in October 1992.  He is also

a director of IFCO Systems NV, Sulo Entsorgungs GmbH, Tommy Hilfiger Corporation, Mueller Brot AG and Anker Brot AG.

*John G. Raos* has served as a director since December 1, 2008. Since June 2000, he has served as the Chief Executive Officer and a director of Precision Partners, Inc., a contract manufacturing company. Mr. Raos also serves as a director of Numerex Corp., a communications and technology company.

*Joan "John" Badrinas Ardevol* has served as the Company's Chief Technology Officer since February 2008. Mr. Badrinas served as the Company's President—Clothing Europe since joining the Company in July 2006 until February 2008. He served as President of Trelleborg Automotive Europe from September 2000 until July 2006. From May 1996 until 2000, Mr. Badrinas was Group Technical Director of BTR Anti-Vibrations Systems, which was sold to Trelleborg AB and became Trelleborg Automotive Europe. Previously, from 1984 to 1996, he held a series of positions ranging from Product Development Engineer to Industrial Operations Director with Pendelastica s.a. in Spain, a manufacturer of rubber and metal anti-vibration components used in automotive applications.

*Thomas Johnson* has served as the Company's President—Xerium Asia since September 2008. Mr. Johnson served as the Company's Executive Vice President—Corporate Operations since joining the Company in April 2008 until September 2008. From August 1996 until November 2007, he served as Executive Vice President – Flow Asia of Flow International Corporation, a company that develops and manufactures ultrahigh-pressure (UHP) waterjet technology, and is a provider of robotics and assembly equipment.

*David Pretty* has served as President—Xerium North America since February 2008. He served as President—Weavexx, the Company's North American clothing operation, from December 2005 until February 2008. From November 2004 to December 2005 he was the Senior Vice President—Sales, Marketing, Technology and Operations for Weavexx. From August 2003 to November 2004 he was the Senior Vice President—Sales, Marketing and Technology for Weavexx. From August 2000 until August 2003 he was the Vice President – Sales and Marketing for Weavexx.

*Eduardo Fracasso* has served as President—Xerium South America since January 2008. From June 2007 to December 2007 he served as President—Xerium Brazil. Prior to that, he held various operational positions within the Company's Brazilian subsidiaries over a period of approximately 18 years, most recently as Operational Director.

*Elizabeth Leete* joined Xerium Technologies, Inc. in April 2009 as the Vice President, Global Tax. From 2005-2009 she was the Director of Global Tax and Assistant Treasurer at RockTenn Company.

*Ted Orban* has served as Vice President and Treasurer since 2006. Prior to joining Xerium Mr. Orban was the Assistant Treasurer at Freescale Semiconductor from 2004-2005.

*Dennis Carroll* has served as the Vice President and Corporate Controller since August 2004. Prior to that, he held the position of Director of Technical Accounting from March 2004. Mr.

Carroll worked as the Vice President and Controller for Keyspan Corporation from 1990-1999 prior to joining Xerium.

*Donna Meserve* has served as the Vice President of Human Resources since May 2005. From January 2000 to April 2004 she was the Manager of Human Resources for Xerium North America. Prior to joining Xerium she worked at BTR.

*Luigi Alessandrini* has served as the Site Manager at HWIT Latina since 2007. Prior to that, he held various operational positions in HWIT Latina over a period of thirty-seven years.

*Alexander Karnowsky* joined the Company in October 2006 as VP Finance PMC Europe, was promoted to VP Finance Xerium Europe in July 2008. From 2001 to 2006 he served as the European Group Controller- Masco Corporation- Luxemburg.

*Kurt Medlitsch* joined the Company in 2003 as Director Finance in HWAT. From 1997 to 2003, he served as Philips Electronics Finance Director (for Philips Hungary).

*William VanderBurgh* is an outside director and assistant secretary of Xerium Canada Inc. He is a partner at the law firm of Aird & Berlis LLP in Ontario Canada.

### III.    Nature of Post-Effective Date Compensation of Directors and Officers

### Compensation of Directors

#### Reorganized Xerium

The table below describes the nature of the compensation for non-management directors of the New Board of Reorganized Xerium as in effect as of the Effective Date of the Plan.

**Post-Effective Date Compensation of Non-Management Directors of Reorganized Xerium\***

| Annual Cash Retainer | Additional Annual Committee Chair Fees | Board and Committee Meeting Attendance Fees | Annual Restricted Stock Unit ("RSU") Awards (1) |
|---|---|---|---|
| $30,000 | Audit: $10,000<br><br>Compensation: $5,000<br><br>Nominating and Governance: $5,000 | -- $1,500 (in person)<br><br>-- $500 (telephonic for more than one hour) | Annual RSU award covering shares of New Common Stock having a grant date value of $40,000 (based on the 20 day average closing price prior to annual meeting) |

\*      All cash amounts will be paid quarterly in arrears. Reorganized Xerium will also reimburse its non-management directors for out-of-pocket expenses incurred in connection with attending board and committee meetings.

(1)      The RSU awards will be made promptly following Reorganized Xerium's Annual Meeting of Stockholders. The RSU awards will be fully vested on the date of grant and, upon the termination of service on the New Board of Reorganized Xerium, each director will be

entitled to receive the number of shares of New Common Stock subject to the then outstanding RSU awards.  In addition, upon termination of a non-management director's service on the New Board, he or she will receive an additional pro-rata RSU award in respect of his or her board service from the date of the last annual meeting through the date of termination, which shall be settled immediately in shares of New Common Stock.

All directors of Reorganized Xerium and the other Debtors will also be eligible to receive equity-based awards under the New Management Incentive Plan, which becomes effective as of the Effective Date.  The amount and type, if any, of such awards made to directors will be determined by the New Board of Reorganized Xerium (or a committee thereof).  In addition, as of the Effective Date, (i) pre-Effective Date RSU awards granted under the Existing Management Incentive Plan, as amended (the "Existing MIP"), to Messrs. Gurandiano and Paquette will be converted into RSU awards covering approximately 3,556 and 5,689 shares of New Common Stock of Reorganized Xerium, respectively, and (ii) Messrs. Gurandiano and Paquette will be granted options to purchase 2,299 and 3,678 shares of New Common Stock of Reorganized Xerium, respectively, pursuant to the Existing MIP, which options shall have an exercise price equal to the greater of (1) $1.04 per share, or (2) the fair market value of a share of New Common Stock on the Effective Date.

As of the Effective Date, directors of Reorganized Xerium who are also officers of Reorganized Xerium will not be entitled to receive compensation for their service on the New Board of Reorganized Xerium (other than compensation received in their capacity as officers).  See "Compensation of Officers" below for a description of the nature of compensation provided to officers of Reorganized Xerium as of the Effective Date.

### Other Debtors

As of the Effective Date, directors of the Debtors other than Reorganized Xerium (the "Other Debtors") will not be entitled to receive compensation for their service as directors of such Debtors (other than compensation received in their capacity as officers of Reorganized Xerium or as employees of Xerium Italia S.p.A.[3]).  See "Compensation of Officers" below for a

---

[3]       The table below describes the nature of the compensation provided to directors of Xerium Italia S.p.A. (other than Mr. Light) for their services as employees of Xerium Italia S.p.A. as of the Effective Date:

**Xerium Italia S.p.A.**

| Name | Base Salary ($) | 2010 Target Annual Bonus | RSU Awards | Employment Agreement | Other Compensation (1) |
|---|---|---|---|---|---|
| Luigi Alessandrini | 133,826* | -- | -- | Yes | -- |
| Alexander Karnowsky | 195,631* | 50% | -- | Yes | (i) automobile allowance and (ii) monthly pension scheme contribution |
| Kurt Medlitsch | 167,859* | 25% | -- | Yes | automobile allowance |

*  *Converted into U.S. Dollars as of March 23, 2010.*

description of the nature of compensation provided to officers of Reorganized Xerium as of the Effective Date.

**Compensation of Officers**

**Reorganized Xerium**

The table below describes the nature of the compensation arrangements for officers of Reorganized Xerium as in effect as of the Effective Date of the Plan.

**Post-Effective Date Compensation of Officers of Reorganized Xerium**

| Name | Base Salary ($) | 2010 Target Annual Bonus (1) | RSU Awards (2) | Employment Agreement (3) | Other Compensation (4) |
|---|---|---|---|---|---|
| Stephen R. Light | 710,000 | 80% of base salary | 50,549 | Yes | (i) supplemental executive retirement plan, (ii) $45K per annum perquisite allowance, (iii) annual physical, (iv) travel rescue, (iv) supplemental life insurance and (v) tax gross up for any golden parachute taxes |
| David Maffucci | 415,000 | 60% of base salary | 3,750 | Yes | (i) housing allowance, (ii) automobile allowance and (iii) country club membership |
| David Pretty | 350,000 | 50% of base salary | 650 | Yes | (i) automobile allowance and (ii) country club membership |
| Eduardo Fracasso | 368,173* | 50% of base salary | 1,833 | Yes | automobile allowance |
| Tom Johnson | 300,000 | 50% of base salary | 1,317 | Yes | (i) automobile allowance and (ii) country club membership |
| Ted Orban | 195,624 | 50% of base salary | -- | No (5) | -- |
| Dennis Carroll | 212,121 | 50% of base salary | -- | Yes | -- |
| Elizabeth Leete | 210,000 | 25% of base salary | 500 | No (5) | -- |
| Joan "John" Badrinas Ardevol | 374,732* | 75% of base | 650 | Yes | (i) living allowance and (ii) automobile allowance |

*(1) Officers are eligible to participate in all broad-based employee benefit plans and programs maintained by Reorganized Xerium and the Debtors in the particular country in which the officer is employed and are eligible to receive equity-based awards under the New Management Incentive Plan, which becomes effective as of the Effective Date.*

| | | salary | | | |
|---|---|---|---|---|---|
| Donna Meserve | 180,000 | 50% of base salary | 325 | Yes | (i) automobile allowance and (ii) housing allowance |
| Kevin McDougall | 330,000 | 50% of base salary | -- | Yes | relocation allowance |

*\* Converted into U.S. Dollars as of March 8, 2010.*

*(1) The target bonus percentages in this column are specified in the applicable officer's employment agreement or employment offer letter.*

*(2) As of the Effective Date, pre-Effective Date RSU awards granted under the Existing Management Incentive Plan, as amended, to the officers were converted into RSU awards covering shares of New Common Stock of Reorganized Xerium. This column shows the approximate number of shares of New Common Stock of Reorganized Xerium that will be subject to the converted RSU awards as of the Effective Date (which, for purposes of this column is assumed to be May 31, 2010), which numbers are subject to adjustment in accordance with the Plan. In addition, all officers of Reorganized Xerium and the other Debtors will be eligible to receive equity-based awards under the New Management Incentive Plan, which becomes effective as of the Effective Date. The amount and type, if any, of any such awards made to the officers will be determined by the New Board of Reorganized Xerium (or a committee thereof) in its sole discretion.*

*(3) The employment agreements with Mr. Light, Mr. Maffucci, Mr. Pretty, Mr. Fracasso, Mr. Johnson, Mr. Carroll, Mr. Ardevol and Ms. Meserve provide for the payment of specified severance amounts and benefits upon an officer's termination of employment due to certain events.*

*(4) Officers are eligible to participate in all broad-based employee benefit plans and programs maintained by Reorganized Xerium and the Debtors in the particular country in which the officer is employed, including, for U.S.-based officers the following: term life insurance and the Company's 401(k) plan.*

*(5) Mr. Orban and Ms. Leete received employment offer letters upon their commencement of employment.*

### Other Debtors

As of the Effective Date, none of the officers of the Other Debtors will be entitled to receive compensation for their service as officers of such Other Debtors (other than compensation received in their capacity as officers of Reorganized Xerium).

**SCHEDULE 7.5**

**Retained Actions**

| | | | |
|---|---|---|---|
| **Retained Actions** | | | |
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| Xerium Canada Inc. | Xerium Canada, Inc. vs. Ontario Health and Safety | | Claim of failure to safeguard worker from injury |
| Xerium Technologies, Inc.<br><br>Weavexx Corporation | Sharon Bodaford et al. v. A.W. Chesterton Co. et al. (Case No. SN07C-11-167) | | |
| Xerium Technologies, Inc. | Xerium Technologies, Inc. v. Voith Paper Fabric<br><br>Franklin County Superior Court (Case No. 07 cvs 00415) | | |
| Stowe Woodward LLC (as successor to Stowe-Woodward Inc.)<br><br>Xerium Canada Inc. (as successor to Stowe-Woodward/ Mount Hope Inc.) | Daishowa-Marubeni International Ltd. and Stowe-Woodward Inc. and Stowe-Woodward/Mount Hope Inc.<br><br>Court of Queen's Bench of Alberta Judicial District of Calgary (Action No. 9901-12880) | Daishowa-Marubeni International Ltd. | Claim related to alleged failure of roll |
| Stowe Woodward LLC | Robert Harwell and Kelly Harwell v. Stowe Woodward LLC and Robert Hinkle<br><br>Superior Court of Spalding County (Civil Action No. 07V-317) | Robert Harwell and Kelly Harwell | Alleged workers' compensation claim for injuries sustained in the workplace |
| Stowe Woodward LLC<br><br>Stowe Woodard Licensco LLC | Steve Woodward Licensco, LLC and Stowe Woodward, Inc. v. Rapid Pacific Roll Covering Pty Ltd.<br><br>Supreme Court of Victoria at Melbourne Commercial and Equity Division | Rapid Pacific Roll Covering Pty Ltd. | Action seeking to recover damages for the breach of a contract which licensed the defendant to use certain intellectual property used in the production of rolls and roll coverings |
| Stowe Woodward LLC | Farmville Property | Virginia Department of Environmental Quality | Claim related to alleged ground contamination in landfill area |
| Xerium Technologies, Inc. | Porter v. Xerium Technologies, | Alvester Porter | Alleged race |

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| Stowe Woodward LLC | Inc. (Case No. 3:2009cv00085) | | discrimination claim |
| Weavexx, LLC | Quincy, Florida site | Florida Environmental Department Niagara/Lockport | Alleged contamination at Quincy, Florida site |
| Weavexx, LLC | Mt. Hope, North Carolina site | None | Alleged ground contamination |
| Weavexx, LLC | Greenville Forming | State of Tennessee EPA | Cleanup and continued monitoring of ground water |
| Weavexx Corporation f/k/a/ BTR Fabrics (USA) Inc., Huyck Corp. | David M. Cameron, and Jean E. Cameron v. John Crane-Houdaille, Inc. et al Circuit Court for the City of Baltimore (Case No. 24X09000313) | David M. Cameron Jean E. Cameron | Alleged asbestos claim |
| Weavexx Corporation Individually Xerium Technologies, Inc. Individually and as successor in interest to Huyck Corp. | Samantha Gordon Individually and as Personal Representative of the Heirs and Estate of Ralph Mallory v. A.O. Smith Corporation, et al Circuit Court of the Third Judicial Circuit Madison County, IL (Case No. 09-L-1134) | Samantha Gordon Estate of Ralph Mallory | Alleged asbestos claim |
| Weavexx Corporation, individually and as successor in interest to Huyck Corporation | Kenneth MacDowell & Patricia MacDowell v. A.W. Chesterton, et al Commonwealth of Massachusetts Superior Court (Case No. CA 08-4775) | Kenneth MacDowell Patricia MacDowell | Alleged asbestos claim |
| Weavexx Corp, f/k/a Huyck Felt, Huyck Formex, Huyck Forming Drytex and/or Lockport Dryer Felts, individually | Roger Neil Falls & Elizabeth Falls Harris, co-executors of the estate of Floyd S. Falls v. Garlock Sealing Technologies, LLC, et al. | Roger Neil Falls Elizabeth Falls Harris Estate of Floyd S. Falls | Alleged asbestos claim |

2

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| and as successor in interest to Industrial Holdings Corp, f/k/a Lockport Dryer, Niagara Lockport Industries, Inc., Niagara Lockport and/or Felts | In the Circuit Court for the City of Newport News, State of Virginia (Case No. 700CL0901252-AF) | | |
| Weavexx Corp., as successor in interest to Huyck<br><br>Xerium Technologies, individually and as successor in interest to Huyck Corp. | Verlie Hubbard v. A.W. Chesterton, et al.<br><br>Circuit Court of the Third Judicial Circuit Madison County, IL (Case No. 08-L-1226) | Verlie Hubbard | Alleged asbestos claim |
| Xerium Technologies, Inc. | Nancy Brix Individually and as Special Administrator on behalf of the Estate of Gerald Brix v. Albany International, Corp. a/k/a/ Albany Felt Co., Inc., et al<br><br>United States District Court for the Eastern District of Wisconsin (Case No. 08-C-1006) | Nancy Brix Individually and as Special Administrator on behalf of the Estate of Gerald Brix | Alleged asbestos claim |
| Weavexx Corp. (individually and as successor in interest to Huyck Corp)<br><br>Xerium Technologies Inc. (individually and as successor in interest to Huyck Corp.) | Charles R. Lewis and Nancy Lewis, his wife v. Afton Pumps, Inc., et al<br><br>55th Judicial District District Court of Harris County, TX (Case No. 2008-62125 (MDL)) | Charles R. Lewis Nancy Lewis | Alleged asbestos claim |
| Weavexx Corp., as successor in interest to Huyck<br>Xerium Technologies, individually and as | Nancy Houlihan, individually and as special administrator of the Estate of Clifford Houlihan v. A.W. Chesterton, et al | Nancy Houlihan, Estate of Clifford Houlihan | Alleged asbestos claim |

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| successor in interest to Huyck Corp. | Circuit Court of the Third Judicial Circuit Madison County, IL (Case No. 08-L-711) | | |
| Weavexx Corporation, individually and as successor in interest to Huyck Corporation | Cheryl Stevens, individually and as the representative of the heirs and Estate of Albert T. Rook v. Allis-Chalmers Corporation Product Liability Trust, et al.<br><br>11th Judicial District Court of Harris County, TX (Case No. 200847744) | Cheryl Stevens, Estate of Albert T. Rook | Alleged asbestos claim |
| Weavexx Corporation f/k/a/ Huyck Felt, Huyck Formex, Huyck | Dennis H. Davidson and Jinx Davidson, his wife v. JohnCrane-Houdaille, Inc., et al.<br><br>Circuit Court for Baltimore City (Case No. 24X08000099) | Dennis H. Davidson Jinx Davidson | Alleged asbestos claim |
| Xerium Technologies, Inc., individually and as successor in interest to Weavexx Corp. and Huyck Corp. | James M. Harvey and Joan Harvey v. A.W. Chesterton, et al.<br><br>Circuit Court of the Third Judicial Circuit Madison County, IL (Case No. 07-L-381) | James M. Harvey Joan Harvey | Alleged asbestos claim |
| Weavexx Corp., as successor in interest to Huyck<br>Xerium Technologies, individually and as successor in interest to Huyck Corp. | Raymond Zellner v. A.W. Chesterton, et al<br><br>Circuit Court of the Third Judicial Circuit Madison County, IL (Case No. 06-L-501) | Raymond Zellner | Alleged asbestos claim |
| Weavexx Corp., as successor in interest to Huyck<br>Xerium Technologies, individually and as | Joann Manske and Ned Manske v. A.W. Chesterton, et al<br><br>Circuit Court of the Third | Joann Manske Ned Manske | Alleged asbestos claim |

4

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| successor in interest to Huyck Corp. | Judicial Circuit Madison County, IL (Case No. 04-L-1083) | | |
| Weavexx Corp., successor by merger to Niagara Lockport Industries, Inc., f/k/a/ Niagara Wires, Inc., successor in interest to Carborundum Co., successor in interest to Lockport Felt Co. | Steven M. Swearingen, Kari Swearingen, individually and as guardian ad litem for Janie Swearingen, a minor, Spencer Swearingen, a minor, Sophie Swearingen, a minor, and Luke Swearingen, a minor v. Metropolitan Life Insurance, et al<br><br>Superior Court for the State of Delaware, New Castle County (Case No. 06C-08-303ASB) | Steven M. Swearingen Kari Swearingen Janie Swearingen Spencer Swearingen Sophie Swearingen Luke Swearingen | Alleged asbestos claim |
| Weavexx Corp, f/k/a/ Huyck Corp, Huyck Felt, Huyck formex, Huyck forming Fabrics Drytex and/or Lockport Dryer Felts, individually and as successor in interest to Industrial Holdings Corp. f/k/a/ Lockport Dryer Felts, Niagara Lockport Industries, Inc., Niagara Lockport and/or Lockport Felts | All Asbestos Cases v. Union Carbide Corp., et al<br><br>Circuit Court for the City of Portsmouth, VA (Case No. CL99-000399-00) | | Alleged asbestos claim |
| Weavexx | John Kemp, Jr., et al v. A.W. Chesterton, et al<br><br>136th District Court of Jefferson County, TX (Case No. D-0173917) | John Kemp, Jr. | Alleged asbestos claim |
| Weavexx Corp, f/k/a/ Huyck Corp, Huyck Felt, Huyck formex, Huyck forming Fabrics Drytex and/or Lockport Dryer Felts, individually and as successor in interest to Industrial Holdings Corp. | Clyde Custalow, Sr. v. Union Carbide, et al<br><br>Newport News Circuit Court, VA (Case No. 700CL05438815V-04) | Clyde Custalow, Sr. | Alleged asbestos claim |

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| f/k/a/ Lockport Dryer Felts, Niagara Lockport Industries, Inc., Niagara Lockport and/or Lockport Felts | | | |
| Weavexx Corporation individually and as successor in interest to Huyck Corp.<br><br>Xerium Technologies, Inc. individually and as successor in interest to Huyck Corp. | Charles Michael Butts, individually and as personal representative of the heirs and Estate of Charles Truman Butts and Lois Butts v. A.W. Chesterton Co., et al<br><br>Superior Court of the State of Delaware, New Castle County (Case No. 06C-10-221ASB) | Charles Michael Butts<br>Estate of Charles Truman Butts and Lois Butts | Alleged asbestos claim |
| Weavexx | Dennis Colbus and Anita Colbus v. Albany International Corp.<br><br>State of Rhode Island, Providence Superior Court (Case No. 052455) | Dennis Colbus<br>Anita Colbus | Alleged asbestos claim |
| Weavexx | Oliver L. Jackson, et al v. A.W. Chesterton, et al<br><br>164th Judicial District, Harris County, TX (Case No. 2005-32266) | Oliver L. Jackson | Alleged asbestos claim |
| Weavexx | Larence Jordan, et al. v. A.K. Steel, et al.<br><br>17th Judicial District, Harris County, TX (Case No. 2001-13352) | Larance Clarence Jordan<br>Frances Jordan | Alleged asbestos claim |
| Weavexx | Robert Altman, et al. v. A.K. Steel, et al.<br><br>17th Judicial District, Harris County, TX (Case No. 2003-5610) | Robert Altman<br>Annette Altman | Alleged asbestos claim |

6

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| Weavexx | Sara Murphy, personal representative of the Estate of Charles Murphy, deceased v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia<br>(Case No. 2005VS078454D) | Sara Murphy<br>Estate of Charles Murphy | Alleged asbestos claim |
| Weavexx | Louis P. Hayes, personal representative of the Estate of Virgil Hayes, deceased v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia<br>(Case No. 2005VS078095D) | Louis P. Hayes<br>Estate of Virgil Hayes | Alleged asbestos claim |
| Weavexx | Ricky Charles Armstrong, personal representative of the state of Charles Edward Armstrong, deceased v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia<br>(Case No. 2005VS078434D) | Ricky Charles Armstrong<br>Estate of Charles Edward Armstrong | Alleged asbestos claim |
| Weavexx | George Veto Edwards and Sandra Edwards v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia<br>(Case No. 2005VS078303D) | George Veto Edwards<br>Sandra Edwards | Alleged asbestos claim |
| Weavexx Corp. | John Baird, et al, v. Georgia Pacific Corp., et al<br><br>State Court of Fulton County State of Georgia<br>(Case No. 2003VS060726D) | John Baird | Alleged asbestos claim |
| Weavexx Corp. | Wendall Alvis and Linda Alvis, et al v. Georgia Pacific Corp., et al | Wendall Alvis<br>Linda Alvis | Alleged asbestos claim |

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| | State Court of Fulton County State of Georgia (Case No. 2003VS060727) | | |
| Weavexx Corp. | Mildred Armstead, individually and as the surviving spouse and as the representative of the Estate of Robert Armstead, et al v. Georgia Pacific Corp., et al

In the Circuit Court of Cobb County, State of Georgia (Case No. 03-A11943-5) | Mildred Armstead Estate of Robert Armstead | Alleged asbestos claim |
| Weavexx Corp. | Lois Voss, individually and as the surviving spouse of and as the representative of the Estate of Charles Voss, et al v. Georgia Pacific corp., et al

State Court of Fulton County State of Georgia (Case No. 03-VS-059640D) | Lois Voss Estate of Charles Voss | Alleged asbestos claim |
| Weavexx Corp. | Tracy Herndon, individually and as the surviving child and as the representative of the Estate of G. C. Kersey, et al v. Georgia Pacific corp., et al

State Court of Fulton County State of Georgia (Case No. 2003-CA00003B) | Tracy Herndon Estate of G.C. Kersey | Alleged asbestos claim |
| Weavexx Corp. | Wanda Sue Brewer, individually and as the surviving spouse and representative of the Estate of McArthur Brewer, et al v. Georgia Pacific corp., et al

State Court of Fulton County State of Georgia (Case No. 2003-CV- 75250) | Wanda Sue Brewer Estate of McArthur Brewer | Alleged asbestos claim |

8

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| | | | |
| Carborundum Corporation<br><br>Industrial Holdings Corporation (Corborundum Interests) (k/k/a Lockport Dryer Felts)<br><br>Weavexx Corporation (f/k/a Huyck-formex and/or Huyck Forming Fabrics Drytex)<br><br>Weavexx, Inc. (n/k/a Lockport Dryer Felts) | Mary Brown, executrix of the Estate of Elbert Thornton Tarkington v. Abney Mills Corp., et al<br><br>United States District Court Eastern District of North Carolina, Northern Division (Case No. 2:99-CV-62-BO(2)) | Mary Brown<br>Estate of Elbert Thronton Tarkington | Alleged asbestos claim |
| Carborundum Corporation<br><br>Industrial Holdings Corporation (Corborundum Interests) (k/k/a Lockport Dryer Felts)<br><br>Weavexx Corporation (f/k/a Huyck-formex and/or Huyck Forming Fabrics Drytex)<br><br>Weavexx, Inc. (n/k/a Lockport Dryer Felts) | John Warren Hobbs and Ida Muriel Hobbs v. Abney Mills Corporation, et al<br><br>United States District Court Eastern District of North Carolina, Southern Division (Case No. 7:99-CV-197-F(1)) | John Warren Hobbs<br>Ida Muriel Hobbs | Alleged asbestos claim |
| Carborundum Corporation<br><br>Industrial Holdings Corporation (Corborundum Interests) (k/k/a Lockport Dryer Felts)<br><br>Weavexx Corporation (f/k/a Huyck-formex and/or Huyck Forming Fabrics Drytex) | Douglas Webster Lewis and Gladys L. Lewis v. Abney Mills Corporation, et al<br><br>United States District Court Eastern District of North Carolina, Southern Division (Case No. 7:99-CV-188-BR(3)) | Douglas Webster Lewis<br>Gladys L. Lewis | Alleged asbestos claim |

9

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| Weavexx, Inc. (n/k/a Lockport Dryer Felts) | | | |
| Carborundum Corporation<br><br>Industrial Holdings Corporation (Corborundum Interests) (k/k/a Lockport Dryer Felts)<br><br>Weavexx Corporation (f/k/a Huyck-formex and/or Huyck Forming Fabrics Drytex)<br><br>Weavexx, Inc. (f/k/a Lockport Dryer Felts) | George Walton Grey and Marjorie Elizabeth Grey v. Abney Mills, et al<br><br>United States District Court Eastern District of North Carolina, Northern Division (Case No. 2:99-CV-74-BO(2)) | George Walton Gray<br><br>Marjorie Elizabeth Gray | Alleged asbestos claim |
| | Judy Taylor Gardner, individually and as executrix of Estate of Billy Leroy Gardner v. Abex Corp, et al<br><br>United States District Court Eastern District of North Carolina (Case No. 4:00-CV-39-H(4)) | Judy Taylor Gardner<br><br>Estate of Billy Leroy Gardner | Alleged asbestos claim |

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| Carborundum Corporation<br><br>Industrial Holdings Corporation (Corborundum Interests) (k/k/a Lockport Dryer Felts)<br><br>Weavexx Corporation (f/k/a Huyck-formex and/or Huyck Forming Fabrics Drytex)<br><br>Weavexx, Inc. (n/k/a Lockport Dryer Felts) | Norman Sasser and Eva Blackwell Sasser v. Abney Mills Corp, et al<br><br>United States District Court Eastern District of North Carolina, Southern Division (Case No. 7:99-CV-155- F(1)) | Norman Sasser<br>Eva Blackwell Sasser | Alleged asbestos claim |
| Carborundum Corp.<br><br>Weavexx Corp | Bobby Miller, et al v. Abex Corp.<br><br>United States District Court Eastern District of North Carolina, (Case No. 2:99-CV-50- BO(2)) | Bobby Miller | Alleged asbestos claim |
| Carborundum Corp.<br><br>Weavexx Corp | Henry C. Cowan, et al v. Abex Corp., et al<br><br>United States District Court Eastern District of North Carolina, (Case No. 4:99-CV-140- H(3)) | Henry C. Cowan | Alleged asbestos claim |
| Carborundum Corp.<br><br>Weavexx Corp | Wayne A. Britt, et al v. Abex Corp, et al<br><br>United States District Court Eastern District of North Carolina, (Case No. 2:99-CV-49- BO(2)) | Wayne A. Britt | Alleged asbestos claim |
| Carborundum Corp.<br><br>Weavexx Corp | Melvin L. Price, et al v. Abex Corp., et al<br><br>United States District Court Eastern District of North | Melvin L. Price | Alleged asbestos claim |

11

| | Retained Actions | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| | Carolina (Case No. 4:99-CV-141- H(4)) | | |
| Weavexx | Robert Alvin Griffin and Katherine T. Griffin v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia<br>(Case No. 05EV00041D) | Robert Alvin Griffin Katherine T. Griffin | Alleged asbestos claim |
| Weavexx | Joseph C. Hill and Ann Cole Hill v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia (Case No. 05EV00039D) | Joseph C. Hill<br>Ann Cole Hill | Alleged asbestos claim |
| Weavexx | Earnest Lewis and Georgia Lewis v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia (Case No. 2005VS078515D) | Earnest Lewis Georgia Lewis | Alleged asbestos claim |
| Weavexx | Sharyn Annette Jackson and Roy Jackson v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia (Case No. 05EV00036D) | Sharyn Annette Jackson and Roy Jackson | Alleged asbestos claim |
| Weavexx | Ruby Phillips Whitfield v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia (Case No. 2005VS078505D) | Ruby Phillips Whitfield | Alleged asbestos claim |
| Weavexx | Van Samuel Thomas v. Aerofin Corp., et al.<br><br>State Court of Fulton County, State of Georgia (Case No. 2005VS078515D) | Van Samuel Thomas | Alleged asbestos claim |
| Weavexx Corporation | Paul Bence and Margaret Bence v. A.C.&S. Inc., et al | Paul Bence and Margaret Bence | Alleged asbestos claim |

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| | Supreme Court of the State of New York, Essex County (Case No. 000357-2002) | | |
| Weavexx Corporation (f/k/a/ Huyck-Formex, and/or Huyck Forming Fabrics Drytex) | David Dell and Lillian Dell v. A.P. Green Industries, et al<br><br>Court of Common Pleas Of Philadelphia County Civil Section (Case No. 000332) | David Dell and Lillian Dell | Alleged asbestos claim |
| Weavexx Corporation (f/k/a/ Huyck-Formex, and/or Huyck Forming Fabrics Drytex) | Donald Torrence, executor of the Estate of Donald Torrence, Sr. and Bessie Torrence v. A.P. Green Industries, Inc., et al<br><br>Court of Common Pleas Of Philadelphia County Civil Section (Case No. 001139) | Donald Torrence, Estate of Donald Torrence, Sr. Bessie Torrence | Alleged asbestos claim |
| Weavexx Corporation (f/k/a/ Huyck-Formex, and/or Huyck Forming Fabrics Drytex) | Cecil Palmer and Ruth Palmer v. A.P. Green Industries, et al<br><br>Court of Common Pleas Of Philadelphia County Civil Section (Case No. 002535) | Cecil Palmer and Ruth Palmer | Alleged asbestos claim |
| Industrial Holdings Corp (individually and as successor to Carborundum Co., Lockport Felt Division) Weavexx Corp. | Leonard Saunders and Daunne Saunders v. A.W. Chesterton, et al<br><br>State of New York, Supreme Court, County of Washington (Case No. 5244E) | Leonard Saunders Daunne Saunders | Alleged asbestos claim |
| Weavexx Corporation | John S. McDonald and Elizabeth L. McDonald v. 84 Lumber Co., et al<br><br>State of New York, Supreme Court, County of New York (Case No. 03-108379) | John S. McDonald Elizabeth L. McDonald | Alleged asbestos claim |

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| Weavexx, Inc. | John H. Gooden and Marie Gooden, husband and wife v. A.W. Chesterton et al<br><br>State of Indiana<br>County of Marion<br>Marion County Superior Court (Case No. #49D02-9601-MI-0001-788) | John H. Gooden<br>Marie Gooden | Alleged asbestos claim |
| Weavexx Corporation (f/k/a Huyck-formex and/or Huyck forming Fabrics Drytex)<br><br>Weavexx, Inc. | Dixie Haley, personal representative of the Estate of Warren E. Haley, deceased, and widow in her own right v. A.W. Chesterton, Inc., et al<br><br>State of Indiana<br>County of Marion<br>Marion County Superior Court (Case No. D02-9601-MI-0001-293) | Dixie Haley Estate of Warren E. Haley | Alleged asbestos claim |
| Weavexx, a subsidiary of Xerium, S.A. f/k/a/ Lockport Felts | Shelley J. Jent and John DeGraff, as co-personal Representatives of the Estate of Martha DeGraff v. A.W. Chesterton, et al<br><br>State of Indiana<br>County of Marion<br>Marion County Superior Court (Case No. 49D02-9801-MI-0001-214) | Shelley J. Jent<br>John DeGraff<br>Estate of Martha DeGraff | Alleged asbestos claim |
| Weavexx | Freddie Bell, et al v. Cades Ace Hardware, et al<br><br>Circuit Court of Humphreys County, Mississippi (Case No. 03-0092) | Freddie Bell | Alleged asbestos claim |
| Huyck Felt Company, Inc. a/k/a Weavexx Corporation | Betty Jean Graves v. A.W. Chesterton, et al<br><br>In the Circuit Court of Jefferson County, Mississippi | Betty Jean Graves | Alleged asbestos claim |

14

| Retained Actions | | | |
|---|---|---|---|
| **Debtor** | **Case Name** | **Other Entities Involved** | **Description of Matter** |
| | (Case No. 2003-85) | | |
| Huyck Felt Company, Inc. a/k/a Weavexx Corporation | Mattie Butler, individually and as wrongful death beneficiary of Adolph Butler, Sr., deceased; Besse Bruins, Floyd Gaylord and M.L. Good, Jr. v. A.W. Chesterton, et al<br><br>Circuit Court of Adams County, Mississippi (Case No. 03-KV-0132-S) | Mattie Butler<br>Adolph Butler, Sr.<br>Besse Bruins<br>Floyd Gaylord<br>M.L. Good, Jr. | Alleged asbestos claim |
| Weavexx | Clifton Abbott, et al v. Abex Corp.<br><br>Circuit Court of Humphreys County, Mississippi (Case No. 03-0108) | Clifton Abbott | Alleged asbestos claim |
| Weavexx Corporation | Karen G. Kent, individually and as the executrix of the Estate of William H. Kent v.Albany International Corp., et al<br><br>Circuit Court of Colbert County, State of Alabama (Case No. CV05-162JMH) | Karen G. Kent<br>Estate of William H. Kent | Alleged asbestos claim |
| Weavexx Corporation | Gordon B. Skelly and Judy M. Skelly v. 3M Company, et al<br><br>District Court, Second Judicial District, County of Ramsey, State of Minnesota (Case No. 62-CV-07-4527) | Gordon B. Skelly<br>Judy M. Skelly | Alleged asbestos claim |

| Retained Bankruptcy Actions | | |
|---|---|---|
| **Case Name** | **Bankruptcy Court** | **Case Number** |
| In re White Burch Paper Company | Eastern District of Virginia | 10-31234 (DOT) |
| In re Smurfit-Stone Container Corporation | District of Delaware | 09-10235 (BLS) |
| In re AbitibiBowater Inc. | District of Delaware | 09-11296 (KJC) |
| In re Red Shield Environmental LLC | District of Maine | 08-10633 (LHK) |
| In re Blue Heron Paper Company | District of Oregon | 09-40921 (RLD) |
| In re Caraustar Industries, Inc. | Northern District of Georgia | 09-73830 (MGD) |
| Crown Vantage Inc. and Crown Paper | Northern District of California | 00-41584 (RJN) |
| In re Venture Holdings Company, LLC | Eastern District of Michigan – Southern Division | 03-48939 (MBM) AP Case No. 05-4852 (MBM) |
| PPH Liquidation LLC (Premium Papers HoldCo LLC) | District of Delware | 06-10269 (CSS) |
| Fraser Papers, Inc. | District of Delaware<br><br>Ontario Superior Court of Justice (Commercial List) | Chapter 15 -- 09-12123 (KJC) |
| Marcal Paper Mills, Inc. | District of New Jersey | 06-21886-MS |
| Thunder Bay Fine Papers | Ontario Canada | |

## SCHEDULE 12.7

**Additional Intercompany Transactions**

**<u>Additional Intercompany Transactions</u>**

        In connection with the Exit Facility, on the Effective Date, the following intercompany transactions will occur pursuant to Section 12.7 of the Plan:

- XTI LLC, as reorganized on and after the Effective Date in accordance with the Plan ("<u>Reorganized XTI LLC</u>"), shall assume $23.5 million of indebtedness obligations from Reorganized Xerium in exchange for (i) a promissory note issued by Reorganized Xerium to Reorganized XTI LLC in the principal amount of $20.8 million and (ii) the reduction of existing intercompany indebtedness owing to Reorganized Xerium in the amount of 2 million Euro ($2.7 million).

- Xerium Technologies Ltd ("<u>XTL UK</u>") shall assume $19.5 million of indebtedness obligations from Reorganized XTI LLC in exchange for reduction of existing intercompany indebtedness owing to Reorganized XTI LLC by the same amount.

- Reorganized Xerium Germany shall assume $12.5 million of indebtedness obligations from XTL UK in exchange for reduction of existing intercompany indebtedness owing to XTL UK by the same amount.

- Reorganized Xerium Austria shall assume $7 million of indebtedness obligations from XTL UK in exchange for reduction of existing intercompany indebtedness owing to XTL UK by the same amount.

- Reorganized Xerium Italy shall assume $3 million of indebtedness obligations from Reorganized Xerium Austria in exchange for reduction of existing intercompany indebtedness owing to Reorganized Xerium Austria.

- Reorganized Xerium Canada shall assume $7 million of indebtedness obligations from Reorganized Xerium in exchange for reduction of existing intercompany indebtedness owing to Reorganized Xerium.

        The purpose of these intercompany transactions, whereby a portion of Reorganized Xerium's liability under the DIP Facility is assumed by certain of its foreign subsidiaries, is to satisfy the requirement of the Exit Facility lenders that each foreign subsidiary that was a Borrower also be a direct borrower under the Exit Facility. Because these foreign subsidiaries do not receive any cash or other property as consideration for their liability assumptions under the Exit Facility, additional intercompany transactions must be undertaken to provide for such consideration.