**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| XERIUM TECHNOLOGIES, INC., <u>et al.</u>, | Case No. 10-_____ (   ) |
| Debtors. | Joint Administration Requested |

-----------------------------------------------------------------------------x

## DISCLOSURE STATEMENT RELATING TO THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

CADWALADER, WICKERSHAM & TAFT LLP
Co-Attorneys for Proposed Debtors and
    Debtors in Possession
One World Financial Center
New York, New York 10281
Telephone:  (212) 504-6000

RICHARDS, LAYTON & FINGER, P.A.
Co-Attorneys for Proposed Debtors and
    Debtors in Possession
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700

**THIS SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PROPOSED PLAN OF REORGANIZATION BEFORE THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (II) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PROPOSED PLAN OF REORGANIZATION.**

### DISCLOSURE STATEMENT, DATED MARCH 2, 2010

**Solicitation of Votes on the Joint
Prepackaged Plan of Reorganization of**

## XERIUM TECHNOLOGIES, INC., and certain
### of its direct and indirect subsidiaries

**from the holders of outstanding**

### CREDIT FACILITY CLAIMS
### SECURED SWAP TERMINATION CLAIMS
### UNSECURED SWAP TERMINATION CLAIMS

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PREPACKAGED PLAN OF REORGANIZATION IS 4:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 22, 2010, UNLESS EXTENDED BY XERIUM TECHNOLOGIES, INC.**

**RECOMMENDATION BY THE DEBTORS**

The board of directors of Xerium Technologies, Inc. ("Xerium"), and the board of directors or other governing body of each of the direct and indirect subsidiaries of Xerium identified in the Introduction below have unanimously approved the solicitation, the form of proposed joint prepackaged plan of reorganization attached as Exhibit A to this Disclosure Statement (the "Plan"), and the transactions contemplated thereby, and recommend that prior to the voting deadline of 4:00 p.m. (prevailing Eastern time) on March 22, 2010, all creditors whose votes are being solicited submit ballots indicating their acceptance of the Plan.

**RECOMMENDATION BY THE SECURED LENDER AD HOC WORKING GROUP**

The Plan is supported by members of the Secured Lender Ad Hoc Working Group holding 51.9% of the Debtors' obligations under the Credit Facility. The Secured Lender Ad Hoc Working Group also strongly urges all creditors to vote in favor of the Plan. The Secured Lender Ad Hoc Working Group was actively involved in the formulation of the Plan and believes that the Plan provides the highest and best recoveries for the Debtors' creditors.

**READERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT (THIS "DISCLOSURE STATEMENT") AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE ON THE PLAN.**

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS PROVIDED IN THIS DISCLOSURE STATEMENT ARE SUBJECT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, WITHOUT LIMITATION, RISKS ASSOCIATED WITH (I) FUTURE FINANCIAL RESULTS AND LIQUIDITY, (II) VARIOUS FACTORS THAT MAY AFFECT THE VALUE OF THE NEW COMMON STOCK TO BE ISSUED UNDER THE PLAN, (III) THE RELATIONSHIPS WITH, AND PAYMENT TERMS PROVIDED BY, TRADE CREDITORS, (IV) ADDITIONAL FINANCING REQUIREMENTS POST-RESTRUCTURING, (V) FUTURE DISPOSITIONS AND ACQUISITIONS, (VI) THE PROPOSED RESTRUCTURING AND COSTS ASSOCIATED THEREWITH, (VII) THE ABILITY TO OBTAIN RELIEF FROM THE BANKRUPTCY COURT TO FACILITATE THE SMOOTH OPERATION OF THE DEBTORS' BUSINESSES UNDER CHAPTER 11, (VIII) THE CONFIRMATION AND CONSUMMATION OF THE PLAN, (IX) THE RISKS DESCRIBED UNDER THE HEADING "RISK FACTORS" IN XERIUM'S ANNUAL REPORT ON FORM

10-K FOR THE YEAR ENDED DECEMBER 31, 2008 FILED WITH THE SECURITIES AND EXCHANGE COMMISSION AND SUBSEQUENT FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION, AND (X) EACH OF THE OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION (AND EXPRESSLY DISCLAIM ANY OBLIGATION) TO UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

STATEMENTS IN THIS DISCLOSURE STATEMENT, INCLUDING, WITHOUT LIMITATION, THE INFORMATION SET FORTH AS TO FUTURE FINANCIAL AND OPERATING INFORMATION, THAT ARE NOT CURRENT OR HISTORICAL FACTUAL STATEMENTS MAY CONSTITUTE "FORWARD-LOOKING" INFORMATION WITHIN THE MEANING OF CANADIAN PROVINCIAL AND TERRITORIAL SECURITIES LAWS. SUCH FORWARD-LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER FACTORS THAT MAY CAUSE THE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS OF XERIUM, OR INDUSTRY RESULTS, TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE, OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. WHEN USED IN THIS DISCLOSURE STATEMENT SUCH STATEMENTS MAY INCLUDE, WITHOUT LIMITATION, SUCH WORDS AS "MAY", "WILL", "EXPECT", "BELIEVE", "PLAN", "ANTICIPATE", "INTEND", "ESTIMATE", AND OTHER SIMILAR TERMINOLOGY. THESE STATEMENTS REFLECT CURRENT EXPECTATIONS, ESTIMATES, AND PROJECTIONS REGARDING FUTURE EVENTS AND OPERATING PERFORMANCE AND SPEAK ONLY AS TO THE DATE OF THIS DISCLOSURE STATEMENT.

READERS SHOULD NOT PLACE UNDUE IMPORTANCE ON FORWARD-LOOKING STATEMENTS AND SHOULD NOT RELY UPON THIS INFORMATION AS OF ANY OTHER DATE. THESE FORWARD-LOOKING STATEMENTS INVOLVE A NUMBER OF RISKS AND UNCERTAINTIES. SOME OF THE FACTORS FACING XERIUM THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN OR UNDERLYING SUCH FORWARD-LOOKING STATEMENTS INCLUDE THOSE FACTORS IDENTIFIED ABOVE. READERS ARE CAUTIONED THAT FORWARD-LOOKING STATEMENTS ARE NOT GUARANTEES OF FUTURE PERFORMANCE, AND SHOULD NOT PLACE UNDUE RELIANCE ON THEM. IN FORMULATING THE FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, IT HAS BEEN ASSUMED THAT BUSINESS AND ECONOMIC CONDITIONS AFFECTING XERIUM WILL CONTINUE SUBSTANTIALLY IN THE ORDINARY COURSE. THESE ASSUMPTIONS, ALTHOUGH CONSIDERED REASONABLE AT THE TIME OF PREPARATION, MAY PROVE TO BE INCORRECT.

THE PLAN PROVIDES FOR XERIUM TO ISSUE SHARES OF NEW COMMON STOCK AND NEW WARRANTS AS MORE FULLY DESCRIBED IN SECTION IV OF THIS DISCLOSURE STATEMENT.

TO THE EXTENT IT IS DEEMED THAT ANY OFFER OF COMMON STOCK IS MADE TO HOLDERS OF ALLOWED CLAIMS PRIOR TO THE COMMENCEMENT OF THE REORGANIZATION CASES, THE OFFER OF SUCH SECURITIES IS BEING OFFERED UNDER THE PRIVATE PLACEMENT EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT OF 1933, RULE 506 OF REGULATION D, OR REGULATION S PROMULGATED UNDER THE SECURITIES ACT OF 1933, AND SIMILAR PROVISIONS OF APPLICABLE STATE SECURITIES LAWS.

VOTES ARE NOT BEING SOLICITED FROM ANY HOLDERS OF EQUITY INTERESTS IN XERIUM.  ACCORDINGLY, FOR THE AVOIDANCE OF DOUBT, XERIUM HAS NOT MADE, AND SHALL NOT MAKE, AN OFFER OF SECURITIES TO ANY OF THE EXISTING HOLDERS OF EQUITY INTERESTS IN XERIUM PRIOR TO THE COMMENCEMENT OF THE REORGANIZATION CASES.

THE DEBTORS WILL RELY ON SECTION 1145 OF THE BANKRUPTCY CODE TO EXEMPT THE ISSUANCE OF SHARES OF NEW COMMON STOCK AND NEW WARRANTS PURSUANT TO THE PLAN FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR SIMILAR PROVISIONS OF APPLICABLE STATE SECURITIES LAWS.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE SECURITIES DESCRIBED HEREIN IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.**

HOLDERS OF PREPETITION TRADE CLAIMS AND THE DEBTORS' CUSTOMERS AND EMPLOYEES WILL NOT BE IMPAIRED BY THE PLAN, AND AS A RESULT THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN.

NO INDEPENDENT AUDITOR HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN AND THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**<u>INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:</u>**

**TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF SUCH CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING U.S. FEDERAL, STATE, OR LOCAL TAX PENALTIES, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

# INTRODUCTION

## IMPORTANT — PLEASE READ

Xerium Technologies, Inc. ("Xerium"); Huyck Licensco Inc.; Stowe Woodward Licensco LLC; Stowe Woodward LLC; Wangner Itelpa I LLC; Wangner Itelpa II LLC; Weavexx, LLC; Xerium Asia, LLC; Xerium III (US) Limited; Xerium IV (US) Limited; Xerium V (US) Limited; XTI LLC; Xerium Canada Inc.; Huyck.Wanger Austria GmbH; Xerium Germany Holding GmbH; and Xerium Italia S.p.A. (collectively with Xerium, the "Debtors"), submit this disclosure statement (the "Disclosure Statement") in connection with (a) the solicitation from eligible holders of acceptances of the joint prepackaged plan of reorganization substantially in the form set forth in Exhibit A (the "Plan") to be filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and (b) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), which will be scheduled by the Bankruptcy Court after the commencement of the Debtors' chapter 11 cases (the "Reorganization Cases"). The date on which the Clerk of the Bankruptcy Court enters the order confirming the Plan (the "Confirmation Order") pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") will be the "Confirmation Date". The date on which the Plan is substantially consummated will be the "Effective Date".

Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to them in the Plan. **Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.**

The Debtors have not commenced Reorganization Cases. This solicitation is being conducted at this time in order to obtain sufficient acceptances of the Plan that will enable the Plan to be confirmed by the Bankruptcy Court in the event the Debtors are unable to reach an agreement on the terms of an out-of-court restructuring with the holders of Credit Facility Claims, Secured Swap Termination Claims, and Unsecured Swap Termination Claims against the Debtors. In order to enable the Debtors to pursue and effect an out-of-court restructuring in lieu of commencing Reorganization Cases and seeking confirmation of the Plan, the ballots delivered to holders of Credit Facility Claims, Secured Swap Termination Claims, and Unsecured Swap Termination Claims, which enable such holders to vote on the Plan, also allow for (a) holders of Credit Facility Claims to agree to (i) waive (x) any defaults that were waived in the Fourth Credit Facility Waiver and (y) any defaults that may occur under the Credit Facility as a result of failure by Xerium, XTI, Xerium Germany, Xerium Canada, Xerium Italy, or Xerium Austria to pay principal or interest due March 31, 2010 under the Credit Facility and (ii) forbear from exercising any remedies as a result of such defaults through April 30, 2010 and (b) holders of Secured Swap Termination Claims and Unsecured Swap Termination Claims to agree to forbear from exercising any rights or remedies under their respective Swap Termination Agreements through April 30, 2010.

**\*\*IMPORTANT NOTE WITH RESPECT TO XERIUM CANADA INC., HUYCK.WANGNER AUSTRIA GmbH, XERIUM GERMANY HOLDING GmbH, AND XERIUM ITALIA S.p.A. (COLLECTIVELY, THE "<u>NON-U.S. BORROWERS</u>"):**

**THIS SOLICITATION INCLUDES A SOLICITATION OF (I) THE HOLDERS OF CREDIT FACILITY CLAIMS AGAINST NON-U.S. BORROWERS AND (II) THE HOLDERS OF UNSECURED SWAP TERMINATION CLAIMS AGAINST NON-U.S. BORROWERS, TO EXCHANGE THEIR CREDIT FACILITY CLAIMS OR UNSECURED SWAP TERMINATION CLAIMS, AS APPLICABLE, AGAINST NON-U.S. BORROWERS FOR THE TREATMENT AND CONSIDERATION PROVIDED TO CLASS 2 AND CLASS 5, AS APPLICABLE, UNDER THE PLAN. IF 100% OF THE HOLDERS OF IMPAIRED CLAIMS AGAINST ANY NON-U.S. BORROWER OBLIGATED WITH RESPECT THERETO ACCEPT THE PLAN, SUCH NON-U.S. BORROWER MAY DETERMINE TO EFFECTUATE THE EXCHANGE WITHOUT COMMENCING A REORGANIZATION CASE. IF THE PLAN IS ACCEPTED BY LESS THAN 100% OF THE HOLDERS OF IMPAIRED CLAIMS AGAINST ANY NON-U.S. BORROWER SUCH NON-U.S. BORROWER INTENDS TO COMMENCE A REORGANIZATION CASE AND EFFECTUATE THE EXCHANGE THEREUNDER.\*\***

Under the Bankruptcy Code, only holders of Claims or Equity Interests in Impaired Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are presumed to accept or deemed to reject the Plan). Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is deemed to be Impaired under the Plan unless (a) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Equity Interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such Claim or Equity Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Equity Interest as it existed before the default.

Through this vote, the Debtors' goal is to consummate a financial restructuring transaction that will significantly reduce the Debtors' institutional indebtedness and place the Debtors in a stronger financial position for future growth and stability.

Pursuant to the Plan, and as discussed more fully below, on the Effective Date, the Reorganized Debtors will enter into the Exit Facility, the Credit Facility will be amended and restated as the Amended and Restated Credit Facility (including, without limitation, amended to terminate the revolving credit facility commitments thereunder), and in full and final satisfaction of all Allowed Credit Facility Claims, Allowed Secured Swap Termination Claims, and Allowed Unsecured Swap Termination Claims, the holders of such Claims will receive their ratable shares of (a) $10 million in Cash, (b) $410 million in principal amount of Term Notes, to be issued pursuant to the Amended and Restated Credit Facility, and (c) 82.6% of the shares of the New Common Stock to be issued on the Effective Date prior to any dilution by (i) equity incentive awards to be granted under the New Management Incentive Plan on or after the Effective Date and (ii) the exercise of the New Warrants. Holders of all other Claims will be unimpaired. Moreover, pursuant to the Plan, on the Effective Date, the Existing Common Stock will be canceled and holders of Allowed Equity Interests in Class 8 will receive their Pro Rata Share of (a) a number of shares of New Common Stock that is equal to the difference between (i) 17.4%

of the shares of New Common Stock to be issued on the Effective Date pursuant to Section 5.2(a)(ii) of the Plan and (ii) the number of shares of New Common Stock to be reserved pursuant to Section 5.2(a)(iii) of the Plan and (b) New Warrants to purchase up to 10% of the issued and outstanding shares of New Common Stock as of the Effective Date (on a fully diluted basis).

The following table summarizes the treatment and estimated recovery for creditors and stockholders under the Plan. For a complete explanation, please refer to the discussion in Section IV of this Disclosure Statement, entitled "THE PLAN," and the Plan itself:

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| 1 | Priority Non-Tax Claims | Unimpaired. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, on the latest of (a) the Effective Date, (b) the date on which such Priority Non-Tax Claim is Allowed, and (c) the date on which such Allowed Priority Non-Tax Claim is due and payable in the ordinary course of business under any agreement or understanding between the applicable Debtor and the holder of such Claim, or, in each case, as soon as practicable thereafter, each Allowed Priority Non-Tax Claim shall be paid in Cash in an amount equal to the Allowed amount of such Claim, together with postpetition interest to the extent required to render such Claim unimpaired. | No (presumed to accept) | 100% |
| 2 | Shared Collateral Claims | Impaired. Except to the extent that a holder of an Allowed Shared Collateral Claim agrees to a less favorable treatment, on the Effective Date or as soon as practicable thereafter, each holder of an Allowed Shared Collateral Claim shall receive (a) its Distributable Share of (i) Cash in an amount equal to $10,000,000, (ii) the Term Notes, and (iii) 82.6% of the shares of New Common Stock to be issued on the Effective Date (subject to dilution by equity incentive awards to be granted under the New Management Incentive Plan on or after the Effective Date and the exercise of the New Warrants) and (b) Cash in an amount equal to (i) the unpaid interest on the principal amount of such holder's Allowed Credit Facility Claim or Allowed Secured Swap Termination Claim, as the case may be, accrued through the date immediately prior to the Effective Date at the rate set forth in section 4 of the Fourth Credit Facility Waiver, with respect to Allowed Credit Facility Claims, and at the rate set forth in section 3(a) of the Secured Swap Termination Agreement, with respect to Allowed Secured Swap Termination Claims less (ii) any amounts paid to such holder during the Reorganization Cases, as adequate protection or otherwise. | Yes | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| 3 | Other Secured Claims | Unimpaired.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Allowed Other Secured Claim shall be, at the option of the Debtors or Reorganized Debtors, as applicable, (a) reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, (b) paid in full, in Cash, together with postpetition interest to the extent required to render such Claim unimpaired, (c) satisfied by the surrender of the Collateral securing such Claim, or (d) otherwise rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default. Notwithstanding the foregoing, the Allowed Deferred Waiver Claim shall be paid by the Debtors or the Reorganized Debtors, as applicable, in full, in Cash, on the Effective Date, together with postpetition interest at the rate set forth in section 4 of the First Credit Facility Waiver, to the Administrative Agent and the Administrative Agent shall thereafter distribute such Cash to the applicable lender under the Credit Facility. | No (presumed to accept) | 100% |
| 4 | General Unsecured Claims | Unimpaired.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, on the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim is Allowed, and (c) the date on which such General Unsecured Claim is due and payable in the ordinary course of business under any agreement or understanding between the applicable Debtor and the holder of such Claim, or, in each case, as soon as practicable thereafter, each Allowed General Unsecured Claim shall, at the Reorganized Debtors' option, (i) be paid in full, in Cash, together with postpetition interest to the extent required to render such claim unimpaired or (ii) otherwise be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. | No (presumed to accept) | 100% |
| 5 | Unsecured Swap Termination Claims | Impaired.  Except to the extent that a holder of an Allowed Unsecured Swap Claim agrees to a less favorable treatment, on the Effective Date or as soon as thereafter practicable, each holder of an Allowed Unsecured Swap Claim shall receive its (a) Distributable Share of (i) Cash in an amount equal to $10,000,000, (ii) the Term Notes, and (iii) 82.6 % of the shares of New Common Stock to be issued on the Effective Date (subject to dilution by equity incentive awards to be granted under the New Management Incentive Plan on or after the Effective Date and the exercise of the New | Yes | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
|       |             | Warrants) and (b) Pro Rata Share of Cash in an amount equal to the Unsecured Swap Termination Interest Component. |                  |                    |
| 6     | Intercompany Claims | Unimpaired.  On the Effective Date or as soon as practicable thereafter, all Allowed Intercompany Claims shall either be reinstated to the extent determined to be appropriate by the Reorganized Debtors or adjusted, continued or capitalized, either directly or indirectly, in whole or in part. | No (presumed to accept) | 100% |
| 7     | Equity Interests in Subsidiary Debtors | Unimpaired.  On the Effective Date, all Allowed Equity Interests in the Subsidiary Debtors shall be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. | No (presumed to accept) | 100% |
| 8     | Equity Interests in Xerium | Impaired.  On the Effective Date, the Existing Common Stock shall be canceled and each holder of an Allowed Equity Interest in Class 8 shall receive its Pro Rata Share of (a) a number of shares of New Common Stock that is equal to the difference between (i) 17.4% of the shares of New Common Stock to be issued on the Effective Date pursuant to Section 5.2(a)(ii) of the Plan and (ii) the number of shares of New Common Stock to be reserved pursuant to Section 5.2(a)(iii) of the Plan and (b) New Warrants to purchase up to 10% of the issued and outstanding shares of New Common Stock as of the Effective Date (on a fully diluted basis). | No (deemed to reject) | |

**WHERE TO FIND ADDITIONAL INFORMATION:**  For detailed historical and projected financial information and financial estimates, see Section VI of this Disclosure Statement, entitled "PROJECTIONS AND VALUATION ANALYSIS," and the following documents:  (a) Xerium's Form 10-K for the fiscal year ended December 31, 2008, filed with the U.S. Securities and Exchange Commission (the "SEC") on March 12, 2009, (b) Xerium's Form 10-Q for the quarterly period ended March 31, 2009, filed with the SEC on May 7, 2009, (c) Xerium's Form 10-Q for the quarterly period ended June 30, 2009, filed with the SEC on August 6, 2009, (d) Xerium's Form 10-Q for the quarterly period ended September 30, 2009, filed with the SEC on November 6, 2009, each as attached to this Disclosure Statement as Exhibits B, C, D, and E, respectively, and (e) Xerium's subsequent filings with the SEC, available at http://www.xerium.com.

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement submitted to the holders (as of the February 23, 2010 voting record date) of Allowed Credit Facility Claims, Allowed Secured Swap Termination Claims, and Allowed Unsecured Swap Termination Claims entitled to vote on the Plan.  If you hold Claims in more than one Class entitled to vote, you will receive more than one ballot.

The Debtors are commencing this solicitation after extensive discussions with the Administrative Agent under the Credit Facility and the Secured Lender Ad Hoc Working Group,

as well as discussions with the holders of Secured Swap Termination Claims and Unsecured Swap Termination Claims. The members of the Secured Lender Ad Hoc Working Group hold, in the aggregate, 51.9% in principal amount of the Debtors' outstanding obligations under the Credit Facility. The members of the Secured Lender Ad Hoc Working Group are American Securities LLC, on behalf of its affiliated funds, ING Investment Management Co., on behalf of its affiliated funds, Carl Marks Strategic Investments, L.P., Citicorp North America, Inc., Cerberus Capital Management, L.P., on behalf of its affiliated funds and accounts, and Harbourmaster Capital Management Ltd. The Administrative Agent under the Credit Facility has been represented by the law firm of Chadbourne & Parke LLP. The Administrative Agent's financial advisor is Lazard Ltd. and its restructuring advisor is Capstone Advisory Group, LLC.

The Debtors have not commenced Reorganization Cases. This solicitation is being conducted at this time in order to obtain sufficient acceptances of the Plan that will enable the Plan to be confirmed by the Bankruptcy Court in the event that the Debtors are unable to reach an agreement on the terms of an out-of-court restructuring with the holders of Credit Facility Claims, Secured Swap Termination Claims, and Unsecured Swap Termination Claims against the Debtors. In order to enable the Debtors to pursue and effect an out-of-court restructuring in lieu of commencing Reorganization Cases and seeking confirmation of the Plan, the ballots delivered to holders of Credit Facility Claims, Secured Swap Termination Claims, and Unsecured Swap Termination Claims, which enable such holders to vote on the Plan, also allow for (a) holders of Credit Facility Claims to agree to (i) waive (x) any defaults that were waived in the Fourth Credit Facility Waiver and (y) any defaults that may occur under the Credit Facility as a result of failure by Xerium, XTI, Xerium Germany, Xerium Canada, Xerium Italy, or Xerium Austria to pay principal or interest due March 31, 2010 under the Credit Facility and (ii) forbear from exercising any remedies as a result of such defaults through April 30, 2010 and (b) holders of Secured Swap Termination Claims and Unsecured Swap Termination Claims to agree to forbear from exercising any rights or remedies under their respective Swap Termination Agreements through April 30, 2010.

If the Debtors are unable to reach agreement on an out-of-court restructuring and do commence Reorganization Cases, the Debtors anticipate that by conducting the solicitation in advance of commencing chapter 11 Reorganization Cases, the pendency of the cases will be shortened sufficiently and their administration will be simplified and less costly. Subject to the qualification described on page 2 of this Introduction with respect to the Non-U.S. Borrowers, the Debtors intend to commence chapter 11 Reorganization Cases if votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, and to seek as promptly as practicable thereafter, a hearing before the Bankruptcy Court to (a) approve this Disclosure Statement as complying with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure or as otherwise containing adequate information of a kind, and in sufficient, detail to enable hypothetical investors of the relevant Classes to make an informed judgment whether to accept or reject the Plan and (b) confirm the Plan. If the Plan is confirmed, the Claims against, and Equity Interests in, the Debtors will be classified and treated as described in this Disclosure Statement. In the event that sufficient votes are not received to confirm the Plan, the Debtors may nevertheless file petitions for relief under chapter 11 of the Bankruptcy Code.

The Debtors' legal advisors are Cadwalader, Wickersham & Taft LLP and Richards, Layton & Finger, P.A.  The Debtors' restructuring advisor is AlixPartners, LLP and the Debtors' financial advisor and investment banker is Rothschild Inc.  The Debtors' advisors can be contacted at:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York  10281
(212) 504-6000
Attn:  John J. Rapisardi, Esq.
    Sharon J. Richardson, Esq.

Rothschild Inc.
1251 Avenue of the Americas, 51st Floor
New York, New York  10020
(212) 403-3500
Attn:  Mr. Stephen S. Ledoux
    Mr. Daniel Gilligan

-and-

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
(302) 651-7700
Attn:  Mark D. Collins, Esq.

AlixPartners, LLP
40 West 57th Street
New York, New York  10019
(212) 490-2500
Attn:  Mr. Brian J. Fox

The Debtors, the Administrative Agent, and the Secured Lender Ad Hoc Working Group strongly urge holders of Claims entitled to vote, to vote to accept the Plan.

**Summary of Voting Procedures**

To be counted, your vote must be received, pursuant to the following instructions, by the Garden City Group, Inc. (the "Voting Agent") at the following address, on or before 4:00 p.m. (prevailing Eastern time) on March 22, 2010 (the "Voting Deadline"):

If by mail:

Xerium Ballot Processing
The Garden City Group, Inc.
P.O. Box 9572
Dublin, Ohio  43017-4872

If by personal delivery or overnight courier:

Xerium Ballot Processing
The Garden City Group, Inc.
5151 Blazer Parkway, Suite A
Dublin, Ohio  43017

IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, YOU MAY CONTACT THE VOTING AGENT AT:

U.S. and Canada 1-866-249-8108 (toll-free)

International countries +1-614-553-1930

**ONLY HOLDERS OF CERTAIN CLAIMS AGAINST THE DEBTORS AS OF THE FEBRUARY 23, 2010 VOTING RECORD DATE ARE ELIGIBLE TO VOTE ON THE PLAN. IT IS IMPORTANT THAT THE HOLDERS OF CREDIT FACILITY CLAIMS AND SECURED SWAP TERMINATION CLAIMS IN CLASS 2 (DEFINED IN THE PLAN AS "SHARED COLLATERAL CLAIMS") AND THE HOLDERS OF UNSECURED SWAP TERMINATION CLAIMS IN CLASS 5 EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Please complete the information requested on the ballot, sign, date, indicate your vote on the ballot, and return your completed and signed ballot in the enclosed pre-addressed postage-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline.

IF YOU ARE ENTITLED TO VOTE AND YOU HAVE RETURNED YOUR BALLOT BUT FAILED TO INDICATE ON THE BALLOT WHETHER YOU ACCEPT OR REJECT THE PLAN, YOUR VOTE WILL NOT BE COUNTED.

\*\*\*

For detailed voting instructions, see Section VIII below, entitled "VOTING PROCEDURES AND REQUIREMENTS," and the instructions on your ballot.

**TABLE OF CONTENTS**

**Page**

I.      General Information ................................................................................................1

    A.      Description of the Debtors .........................................................................1

            1.      The Debtors' Businesses ...............................................................2

                    (a)      The Clothing Segment .....................................................2

                    (b)      The Roll Covers Segment ................................................3

                    (c)      Employees ........................................................................3

                    (d)      Benefit Plans ....................................................................4

                    (e)      Existing Management Incentive Plan ...............................4

                    (f)      Properties .........................................................................5

            2.      Corporate History ..........................................................................5

            3.      Selected Financial Information ......................................................6

    B.      Prepetition Indebtedness and Capital Structure ........................................6

            1.      Credit Facility ...............................................................................6

            2.      Derivative Financial Instruments ..................................................7

            3.      Unsecured Lines of Credit .............................................................8

                    (a)      R&D Facility ....................................................................8

                    (b)      Umbrella Facility .............................................................8

II.     Key Events Leading to the Decision to Commence
        the Voluntary Chapter 11 Reorganization Cases ..................................................8

    A.      Industry-Specific Events ...........................................................................8

    B.      Liquidity Constraints and Prepetition Negotiations ..................................9

    C.      Restructuring Negotiations ........................................................................9

    D.      Purpose of the Financial Restructuring ...................................................11

III.    Anticipated Events During the Reorganization Cases .........................................12

    A.      Administration of the Reorganization Cases ...........................................12

    B.      Postpetition Financing ............................................................................12

    C.      Part IV Proceeding ..................................................................................12

D.      Confirmation Hearing ..............................................................................12

E.      Timetable for the Chapter 11 Cases ........................................................13

IV.     The Plan ................................................................................................................13

A.      Overview of the Plan ...............................................................................13

B.      Classification and Treatment of Claims and Equity Interests Under the Plan .........................................................................................................13

        1.      Unclassified Claims ......................................................................15

        2.      Classified Claims and Equity Interests .........................................17

C.      Indebtedness and Securities to Be Issued Pursuant to the Plan .............22

        1.      The Exit Facility ...........................................................................22

        2.      The Amended and Restated Credit Facility ..................................24

        3.      New Warrants ................................................................................27

D.      Means of Implementation of the Plan .....................................................28

        1.      Procedural Consolidation of the Debtors for Plan Purposes Only.............28

        2.      Exit Financing ...............................................................................29

        3.      Amended and Restated Credit Facility .........................................29

        4.      Intercreditor Agreement................................................................29

        5.      Issuance of Capital Stock and New Warrants...............................33

        6.      Capitalization of Reorganized Xerium on the Effective Date; No Fractional Shares or Warrants................................................34

                (a)     Capitalization of Reorganized Xerium ..........................34

                (b)     No Fractional Shares or Warrants...................................34

        7.      Registration Rights Agreement......................................................35

        8.      Nominating Agreements ................................................................35

        9.      Shareholder Rights Plan.................................................................35

        10.     Intercompany Transactions............................................................36

        11.     Existing Debt Securities and Agreements; Release of Liens....................37

        12.     Surrender of Existing Securities ...................................................38

        13.     New Management Incentive Plan ..................................................38

        14.     Corporate Action............................................................................39

| | | | |
|---|---|---|---|
| | (a) | Due Authorization | 39 |
| | (b) | General | 40 |
| | (c) | Restated Charters and Restated Bylaws of the Reorganized Debtors | 40 |
| | (d) | Boards of Directors of the Reorganized Debtors | 40 |
| | (e) | Officers of Reorganized Debtors | 41 |
| 15. | | Compromise of Controversies | 41 |
| 16. | | Exemptions from Transfer Taxes | 41 |
| E. | | Provisions Governing Distributions | 42 |
| 1. | | Timing and Conditions of Distributions | 42 |
| | (a) | Distribution Record Date | 42 |
| | (b) | Date of Distributions | 42 |
| | (c) | Sources of Cash for Distribution | 42 |
| | (d) | Disbursement Agent | 42 |
| | (e) | Rights and Powers of Disbursement Agent | 43 |
| | (f) | Expenses of the Disbursement Agent | 43 |
| | (g) | Delivery of Distributions | 43 |
| | (h) | Manner of Payment Under the Plan | 43 |
| | (i) | Setoffs and Recoupment | 44 |
| | (j) | Distributions After Effective Date | 44 |
| | (k) | Allocations of Distributions Between Principal and Interest | 44 |
| | (l) | No Postpetition Interest on Claims | 44 |
| 2. | | Procedures for Disputed Claims and Equity Interests Under the Plan | 44 |
| | (a) | Proofs of Claims and Equity Interests | 44 |
| | (b) | Objections to Claims and Equity Interests/Requests for Estimation | 45 |
| | (c) | No Distributions Pending Allowance | 46 |
| | (d) | Distributions after Allowance | 46 |
| | (e) | Preservation of Claims and Rights to Settle Claims | 46 |
| F. | | Treatment of Executory Contracts and Unexpired Leases | 47 |
| 1. | | Assumption and Rejection of Contracts and Leases | 47 |

# TABLE OF CONTENTS
## (continued)

2.      Cure of Defaults ...................................................................................48

3.      Rejection Damage Claims .....................................................................48

4.      Indemnification Obligations .................................................................48

     (a)     Directors, Officers, Agents, and Employees ..................................48

     (b)     Administrative Agent ....................................................................49

5.      Compensation and Benefit Plans ..........................................................49

6.      Retiree Benefits ....................................................................................49

7.      Insurance Policies .................................................................................49

G.     Conditions Precedent to the Effective Date ...................................................50

1.      Conditions Precedent to Effective Date ...............................................50

     (a)     Entry of Confirmation Order .........................................................50

     (b)     Administrative Agent ....................................................................50

     (c)     Execution and Delivery of Other Documents ................................50

     (d)     Access to Funding .........................................................................50

     (e)     Regulatory Approvals ....................................................................50

     (f)     Consents ........................................................................................50

     (g)     Corporate Formalities ...................................................................50

     (h)     Other Acts .....................................................................................51

2.      Waiver of Conditions Precedent ...........................................................51

3.      Effect of Failure of Conditions .............................................................51

H.     Effect of Confirmation ...................................................................................51

1.      Vesting of Assets ..................................................................................51

2.      Binding Effect ......................................................................................52

3.      Discharge of the Debtors ......................................................................52

     (a)     Scope ............................................................................................52

     (b)     Statutory Injunction ......................................................................52

4.      Exculpation ...........................................................................................52

I.      Other Provisions of the Plan ..........................................................................53

1.      Additional Intercompany Transactions ................................................53

2.      Reservation of Rights ...........................................................................53

3.      Revocation or Withdrawal of the Plan ..................................................53

4. Plan Supplement ...............................................................................53

5. Solicitation ......................................................................................54

J. Securities Law Matters ........................................................................54

1. New Warrants and Shares of New Common Stock ..................................54

2. Issuance and Resale of Securities Under the Plan ...................................55

(a) Exemption from Registration.............................................55

(b) Resales of the Shares of New Common Stock and the New Warrants; Definition of Underwriter ...........................56

3. European Securities Law Matters ........................................................57

4. Canadian Securities Law Matters .......................................................57

(a) Exemption from Prospectus Requirements...................57

(b) Subsequent Transfers of Securities.............................57

V. Financial Information..........................................................................58

A. Historical Financial Information ..........................................................58

1. General ...........................................................................................58

2. Selected Financial Data.....................................................................59

3. Management's Discussion and Analysis of Financial Condition and Results of Operations.....................................59

4. Recent Performance .........................................................................59

VI. Projections and Valuation Analysis ......................................................59

A. Consolidated Condensed Projected Financial Information........................59

B. Valuation........................................................................................60

1. Overview.........................................................................................60

2. Estimate of Value.............................................................................61

3. Valuation Methodology .....................................................................62

(a) Comparable Company Analysis ...................................62

(b) Precedent Transactions Analysis .................................63

(c) Discounted Cash Flow Analysis...................................63

4. Recoveries.......................................................................................64

VII.  Certain Factors to be Considered ......................................................................65

    A.  Certain Bankruptcy Considerations ......................................................66

        1.  Risk of Failure to Satisfy Vote Requirement ..............................66

        2.  Risk of Non-Approval of the Disclosure Statement or Solicitation ..........66

        3.  Risk of Non-Confirmation of the Plan.........................................67

        4.  Risk of Conversion to Cases Under Chapter 7 of the Bankruptcy Code ......67

        5.  Risk of Non-Occurrence of the Effective Date.............................67

        6.  The Debtors May Be Unsuccessful in Obtaining First Day Orders to Authorize Payment in the Ordinary Course of Business ......68

        7.  The Debtors May Be Unsuccessful in Obtaining Working Capital Financing.........68

        8.  Uncertainty with Respect to the Duration of the Reorganization Cases ......68

    B.  Risks to Recovery By Holders of Allowed Class 2 Claims, Allowed Class 5 Claims and Allowed Class 8 Equity Interests .....................................69

        1.  Variances from Projections.........................................................69

        2.  Unforeseen Events .....................................................................69

    C.  Risks Associated with the Debtors' Businesses and the Paper Production Industry .........70

        1.  Industry Concerns ......................................................................70

        2.  The Loss of the Debtors' Major Customers Could Adversely Affect Sales and Profitability.........................71

        3.  Competitive Conditions ..............................................................72

        4.  The International Scope of the Debtors' Operations ....................72

        5.  Currency Exchange Rate Fluctuations........................................74

        6.  Environmental Liabilities............................................................74

        7.  Adverse Labor Relations.............................................................75

        8.  Proprietary Technology ..............................................................75

        9.  Product Liability Claims .............................................................76

        10.  Material Disruption of the Debtors' Facilities ...........................76

VIII.   Voting Procedures and Requirements ................................................................77

    A.   Vote Required for Acceptance by a Class .............................................77

    B.   Voting ...................................................................................................78

        1.   Waivers and Forbearances ..........................................................78

        2.   Miscellaneous ............................................................................78

        3.   Fiduciaries And Other Representatives ......................................79

        4.   Change of Vote ...........................................................................79

    C.   Waivers of Defects, Irregularities, etc. .................................................79

    D.   Further Information, Additional Copies .................................................80

IX.   Confirmation of the Plan ..................................................................................80

    A.   Confirmation Hearing ............................................................................80

    B.   General Requirements of Section 1129 .................................................81

        1.   Requirements of Section 1129(a) of the Bankruptcy Code .....81

            (a)   General Requirements .....................................................81

            (b)   Best Interests Test ...........................................................82

            (c)   Feasibility of the Plan .....................................................84

        2.   Requirements of Section 1129(b) of the Bankruptcy Code .....84

X.   Alternatives to Confirmation and Consummation of the Plan ..........................85

    A.   Liquidation Under Chapter 7 .................................................................85

    B.   Alternative Plans ...................................................................................86

    C.   Commencement of a "Conventional" Chapter 11 Case .........................86

XI.   Certain Tax Consequences of the Plan .............................................................86

    A.   Certain U.S. Federal Income Tax Consequences of the Plan ................86

        1.   Certain Consequences to the Debtors .........................................88

            (a)   COD Income and Attribute Reduction ...........................88

            (b)   Limitation on Utilization of NOLs and Other Tax
                Attributes .........................................................................89

            (c)   Alternative Minimum Tax ...............................................91

2.      Certain Consequences to Holders of Allowed Shared Collateral Claims or Allowed Unsecured Swap Termination Claims ........................91

     (a)      Taxable Exchange ...........................................................................91

     (b)      Character of Gain or Loss .............................................................92

     (c)      Payment of Accrued Interest........................................................93

     (d)      Ownership and Disposition of Term Notes ..................................94

     (e)      Ownership and Disposition of New Common Stock .....................95

3.      Certain Consequences to Holders of Allowed Equity Interests in Class 8 ............................................................................................96

     (a)      Recapitalization..............................................................................96

     (b)      Ownership and Disposition of New Common Stock .....................96

     (c)      Ownership and Disposition of New Warrants ..............................97

4.      Information Reporting and Withholding Requirements ...........................97

B.      Certain German Tax Consequences of the Plan ....................................................98

     1.      German Income Tax Consequences for Xerium Germany ........................99

     2.      Forfeiture of Net Operating Losses (NOLs) .............................................99

     3.      Real Estate Transfer Tax (RETT) ...........................................................100

     4.      German Income Tax Consequences for German Resident Lenders ........101

         (a)      Assumption of Debt ....................................................................101

         (b)      Settlement and Replacement of Debt..........................................101

         (c)      Interest Income.............................................................................101

     5.      German Income Tax Consequences for Non-German Resident Lenders....................................................................................................101

     6.      Withholding Tax on Interest ...................................................................101

C.      Certain Austrian Tax Consequences of the Plan...................................................102

     1.      Austrian Tax Consequences of the Austrian Debt Restructuring Transactions to Xerium Austria ..............................................................102

         (a)      Austrian Tax Consequences of Austria Purchase Agreement and Austria Note ......................................................102

         (b)      Austrian Tax Consequences of the Austria Contribution Agreement..................................................................................103

         (c)      Austrian Tax Consequences of the Plan ....................................104

(d) Austrian Tax Consequences of the Transfer of Xerium Austria Shares Distribution to the Holders of Allowed Credit Facility Claims .................................................... 106

(e) Austrian Tax Consequences of Issuing a New Note to the Lenders ........................................................................ 107

2. Austrian Tax Consequences of the Austrian Debt Restructuring Transactions to Holders of Allowed Credit Facility Claims .................. 108

(a) Holders that are Resident in Austria or have an Austrian permanent Establishment ............................................. 108

(b) Holders that are not Resident in Austria and do not have an Austrian Permanent Establishment .............................. 110

3. Austrian Tax Consequences of the Italian Debt Restructuring Transactions to Xerium Austria ............................................... 111

(a) Contribution of Portion of Allowed Credit Facility Claims ....... 111

(b) Forgiveness of Debt by Reorganized Xerium Austria ................ 111

D. Certain Canadian Tax Consequences of the Plan ................................. 112

1. Summary Conclusions ................................................................. 112

2. Canadian Income Tax Consequences ........................................... 113

(a) Debt Forgiveness Rules on Distributions on Account of Credit Facility Claims ................................................... 113

(b) Debt Parking Rules re Transfers of Rights to the Revolver Facility or the Term Loan ............................................ 113

(c) Taxation of Holders of the Reorganized Xerium Canada Term Note .................................................................. 115

E. Certain Italian Tax Consequences of the Plan .................................... 117

1. Italian Tax Consequences of the Exchange of Xerium Shares with a Loan Receivable ............................................................. 117

(a) Income Tax ............................................................... 118

(b) Stamp Duty and Other Indirect Taxation ............................ 118

2. Italian Tax Consequences of the Forgiveness of Allowed Credit Facility Claims Against Xerium Italy ........................................... 118

(a) Income Tax ............................................................... 118

(b) Withholding Tax ........................................................ 119

(c) Stamp Duty, Other Indirect Taxation ............................... 119

3.   Italian Tax Implications for Xerium Italy and Xerium Italy Lenders
     Regarding the Residual Balance of the Loans ........................................119

     (a)   Income Tax ...................................................................................119

     (b)   Stamp Duty, Other Indirect Taxation...........................................119

XII.   Conclusion ........................................................................................................120

# TABLE OF CONTENTS
## (continued)

| | |
|---|---|
| Exhibit A | Joint Prepackaged Plan of Reorganization |
| Exhibit B | Xerium's Form 10-K for the fiscal year ended December 31, 2008, filed with the SEC on March 12, 2009 |
| Exhibit C | Xerium's Form 10-Q for the quarterly period ended March 31, 2009, filed with the SEC on May 7, 2009 |
| Exhibit D | Xerium's Form 10-Q for the quarterly period ended June 30, 2009, filed with the SEC on August 6, 2009 |
| Exhibit E | Xerium's Form 10-Q for the quarterly period ended September 30, 2009, filed with the SEC on November 6, 2009 |
| Exhibit F | Xerium Organizational Chart |
| Exhibit G | Projected Financial Information |
| Exhibit H | Liquidation Analysis |

# I.

## GENERAL INFORMATION

**A.     Description of the Debtors**

      Xerium is a public company, whose shares of Existing Common Stock are traded on the New York Stock Exchange under the ticker symbol "XRM."  The prospective Debtors in the Reorganization Cases include Xerium and the following direct and indirect subsidiaries of Xerium:

Huyck Licensco Inc.
Stowe Woodward Licensco LLC
Stowe Woodward LLC
Wangner Itelpa I LLC
Wangner Itelpa II LLC
Weavexx, LLC
Xerium Asia, LLC
Xerium III (US) Limited
Xerium IV (US) Limited
Xerium V (US) Limited
XTI LLC
Xerium Canada Inc.
Huyck.Wangner Austria GmbH
Xerium Germany Holding GmbH
Xerium Italia S.p.A.

      In the event, however, that 100% of the holders of Impaired Claims (i.e., Credit Facility Claims or Unsecured Swap Termination Claims) against any of the Non-U.S. Borrowers (Xerium Canada Inc., Huyck.Wangner Austria GmbH, Xerium Germany Holding GmbH, or Xerium Italia S.p.A.) vote to accept the Plan, such respective Non-U.S. Borrower may determine to effectuate the transactions contemplated by the Plan with respect to such holders without commencing a Reorganization Case.  In such event, the treatment and distributions afforded under the Plan in respect of Credit Facility Claims and Unsecured Swap Termination Claims will be afforded to the holders of, and in exchange for and in full and final satisfaction, discharge, and release of, such Claims against the Non-U.S. Borrowers, including those which have not commenced Reorganization Cases, and of any guarantees thereof.

      The organizational chart set forth in <u>Exhibit F</u> to this Disclosure Statement illustrates the Debtors' corporate family and includes Entities in which the Debtors have a substantial or controlling interest, which are not publicly traded and are not anticipated to commence Reorganization Cases.

1.       **The Debtors' Businesses**

The Debtors, together with their non-Debtor subsidiaries and affiliates (collectively, the "Company"), are a leading global manufacturer and supplier of two categories of consumable products installed in paper-making machines, which are used in the production of paper machine clothing products (the "Clothing Segment") and roll technology products (the "Roll Covers Segment"). The Clothing Segment consists of engineered synthetic textile belts, which range in size from 15 feet in width to more than 460 feet in length, that allow for the extraction of water while transporting paper through a paper-making machine. The Roll Covers Segment encompasses the covering and servicing of large metal rolls (up to 39 feet in length, six feet in diameter, and 140,000 pounds) upon which paper machine clothing products are often mounted and between which paper travels as it is processed from a "wet slurry" to a finished paper product. Both paper machine clothing and certain rolls are in constant contact with paper as it is produced and have a significant effect on the paper's quality and the paper producer's ability to differentiate its products. Because paper-making machines vary widely in size and design, the Company customizes clothing and roll covers to each individual paper-making machine. Paper machine clothing and roll covers must be replaced regularly to sustain high quality paper output and to ensure efficient paper production. Rolls and roll covers also require regular refurbishment, a service that the Company provides to its customers.

The Company's customers include paper and container manufacturers, such as International Paper Company, MeadWestvaco Corporation, and Smurfit-Stone Corporation. The Company's key competitors include Albany International Corporation (a publicly held U.S. corporation), Voith AG (a privately held German company), and Metso Corporation (a publicly owned Finnish company).

(a)       The Clothing Segment

The Company manufactures three general types of clothing products that are utilized at various stages of the paper making process: forming fabrics, press felts, and dryer fabrics, which accounted for approximately 45%, 38%, and 5%, respectively, of the Clothing Segment's net sales in 2008. Forming fabrics receive wet paper slurry and allow water to drain from paper stock in order to create an initial wet sheet. Press felts carry paper through the paper pressing process and facilitate water removal. Dryer fabrics are used to transport a paper sheet through the drying section of paper-making machines. The Company's Clothing Segment also produces certain machine clothing products used in other (non-paper) industrial applications, such as steel, plastics, leather, and textiles manufacturing, sales of which accounted for approximately 11% of the Company's net clothing sales in 2008. Finally, sales of certain auto-joining equipment accounted for approximately 1% of the Clothing Segment's net sales in 2008.

The Company operates its Clothing Segment through two brands: Weavexx, in North America, and Huyck.Wangner, outside North America. In North America, clothing products are manufactured by Xerium's domestic operating subsidiary Weavexx, LLC and by Xerium Canada Inc. Outside North America, clothing products are manufactured by various worldwide operating subsidiaries operating in Germany, Austria, Italy, Spain, Argentina, Japan, and Brazil under the Huyck.Wangner name.

(b)    The Roll Covers Segment

Paper-making machines contain large steel cylinders known as rolls over which paper machine clothing is mounted and between which paper travels as it is processed. Paper-machine rolls are covered with roll covers comprised of rubber, polyurethane, composite, or ceramic compounds, depending upon the specific function of the roll. The Company manufactures, refurbishes, and replaces roll covers through the Roll Covers Segment. Sale of roll covers accounted for approximately 59% of total sales in the Roll Covers Segment in 2008. Roll cover refurbishment and mechanical services accounted for approximately 15% of total sales in the Roll Covers Segment in 2008. The Company also produces and repairs "spreader rolls," which are small-diameter curved rolls used throughout a paper-making machine to stretch, smooth, and remove wrinkles from the paper and clothing. Sales of spreader rolls accounted for approximately 26% of sales in the Roll Covers Segment in 2008.

The Company operates its Roll Covers Segment worldwide under the brand name Stowe Woodward, and in China, under the brand name Xibe. Roll covers are manufactured by certain of Xerium's Debtor and non-Debtor worldwide subsidiaries operating in the United States, Canada, Germany, Finland, France, Italy, Brazil, China, and Mexico. The Company produces and distributes spreader rolls worldwide under the brand name Mount Hope, and in Europe, under the brand name Robec.

(c)    Employees

As of January 1, 2010, the Company employs approximately 3,290 people worldwide, of which approximately 2,500 are manufacturing employees, 400 are sales and marketing employees, 100 employees are in research and development, and 300 are administrative and other employees.

Approximately 72% of the Company's employees are subject to various collective bargaining agreements or are members of trade unions, predominantly outside the United States. The Debtors are parties to collective bargaining agreements with the following unions: (i) the Local #1855 of the International Association of Machinists and Aerospace Workers (AFL-CIO), (ii) the Local #58 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Independent, (iii) the General Drivers, Statesmen, and Warehousemen's Local Union 984, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, (iv) the International Association of Machinists and Aerospace Workers, Local 922, CLC-FTQ-AFL-CIO, (v) the Workers United Ontario Council and its Local 2360, (vi) the United Food and Commercial Workers International Union AFL-CIO & CLC, and (vii) the Syndicat Des Salarié(e)s De Weavexx, C.S.D. Approximately 37% of the employees subject to collective bargaining agreements (or approximately 6% of the total number of the Company's employees) are covered by collective bargaining agreements that expire prior to December 31, 2010. Approximately 74% of the employees are subject to job protection as members of trade unions, employee associations, or workers' councils (or approximately 41% of the total number of the Company's employees) for which arrangements expire prior to December 31, 2010.

(d)     Benefit Plans

The Debtors maintain various defined benefit plans covering substantially all of the Debtors' U.S. and Canadian employees as well as employees of certain Xerium subsidiaries in other countries.  On December 31, 2008, Xerium froze benefit pension accruals under the Xerium Pension Plan for U.S. Salaried and Non-Union Hourly Employees (the "U.S. Pension Plan").  Employees vested under the U.S. Pension Plan as of December 31, 2008, are entitled to their pension benefits under the plan as of December 31, 2008.  Employees who were not vested under the U.S. Pension Plan as of December 31, 2008 will be entitled to their benefits earned as of December 31, 2008 upon five years of continuous employment from the date of such employee's hire.  Salaried employees were notified on May 11, 2009 of Xerium's intent to freeze the Canadian pension plan as of December 31, 2010.

The Debtors also maintain various defined contribution plans that provide for retirement benefits to the Debtors' employees.  On January 7, 2009, Xerium suspended its 401(k) match in the United States; the 401(k) match was reinstated as of January 1, 2010.

As of December 31, 2008, Xerium curtailed funding of its U.S. retiree health insurance program under which Xerium offered health care benefits to retired U.S. employees and their covered dependents and beneficiaries.  Xerium terminated all retiree health insurance programs except with respect to one individual who was under contract.

(e)     Existing Management Incentive Plan

On May 19, 2005, Xerium adopted an equity incentive plan which authorized the issuance of 2,500,000 shares of Existing Common Stock pursuant to equity-based awards granted under the plan (which was subsequently increased to 7,500,000 at Xerium's annual meeting of stockholders on August 6, 2008) (as amended, the "Existing Management Incentive Plan").

Pursuant to the Existing Management Incentive Plan, Xerium has issued performance-based and time-based restricted stock unit ("RSU") awards to executive officers, including Xerium's Chairman, President and Chief Executive Officer, Stephen R. Light and Xerium's Executive Vice President and Chief Financial Officer, David G. Maffucci.  The performance-based RSU awards generally would vest if the share price of the Existing Common Stock plus dividends paid thereon satisfied annual targets established by the Equity and Executive Compensation Subcommittee of Xerium's board of directors (the "Compensation Committee") and the officer continued to be employed with Xerium through a certain date.  Performance-based RSUs also would vest, in whole or in part, if a change of control occurred and performance-based requirements had been satisfied or were satisfied based on the transaction price.  Generally, the time-based RSU awards were scheduled to vest, in substantially equal installments, on the first, second, and third anniversaries of the date of the grant of such awards, provided that the officer continued to be employed by Xerium on the applicable vesting date.  The time-based RSUs also would vest, in whole or in part, in connection with a change of control and/or termination of employment under the circumstances set forth in the RSU awards.

During 2009, Xerium issued 77,027 shares of Existing Common Stock in settlement of 120,710 time-based RSUs (net of applicable tax withholdings).

In furtherance of the Debtors' restructuring efforts, the Compensation Committee approved the modification of the terms of certain incentive-based compensation, including RSUs. SEE SECTION II(C) BELOW, ENTITLED "Restructuring Negotiations."

      (f)      Properties

The Company operates 38 facilities in 13 countries, 32 of which are manufacturing facilities. The Company's facilities are strategically located in the major paper-producing regions of North America, Europe, South America, and Asia-Pacific. Eleven of these facilities manufacture clothing, 20 facilities manufacture and service roll covers, and one facility manufactures both clothing and roll covers. The Company owns substantially all of its manufacturing facilities.

In 2007, the Company began construction of a clothing manufacturing facility in Vietnam; however, in December 2008, the Company discontinued construction of the Vietnam facility. While construction of the Vietnam facility has been discontinued, the Company remains under contractual obligations for certain equipment ordered for the Vietnam facility that the Company has since deployed to its other facilities. In 2009, the Company closed and ceased performance of all manufacturing activities at its roll manufacturing facility in Sherbrooke, Canada and its clothing manufacturing facility in Australia. Additionally, in 2009, the Company sold its Swedish roll manufacturing facility, which the Company had closed in 2008.

The Company also has license agreements with three licensees that manufacture roll cover products for the Company at the licensees' facilities in Japan, South Korea, and India. In addition, the Company has license agreements with a licensee that manufactures the Company's clothing products in North America, various European countries, and certain Pacific Rim countries.

      2.      **Corporate History**

The Company grew out of the holdings of United Kingdom industrial conglomerate BTR, plc ("BTR") and traces its U.S. origins to the late 1800s. In 1976, BTR acquired two Massachusetts-based producers of roll covers and spreader rolls, Stowe Woodward, Inc., the predecessor to Stowe Woodward LLC ("Stowe Woodward") (the U.S. Stowe Woodward Operating Entity), and Mount Hope Machinery. Stowe Woodward was founded in the late 1800's as a manufacturer of rubber-covered balls and ebonite bowling balls, as well as rubber covers used to protect the steel rolls used in the textile and tannery industries. In 1980, BTR acquired two paper machine clothing producers: Huyck Corporation in upstate New York, one of the oldest machine clothing companies in the United States, and the Becker Company of West Germany. BTR quickly began to act as an industry consolidator, acquiring paper machine clothing manufacturers in Finland, Brazil, Italy, and Canada, among other locations. Over the course of the 1990s, BTR continued to increase its paper machine clothing and roll covers capabilities by implementing targeted global acquisitions and investing in cutting edge research and development.

In 1999, BTR was acquired by Siebe, plc, and the resulting company, which took the name Invensys, plc ("Invensys"), became the world's largest controls-automation company. Invensys sold a 90% stake in BTR's paper technology segment to certain funds managed by Apax Partners in 1999, which incorporated the business as Xerium. Xerium continued to drive the trend of industry consolidation by acquiring additional clothing and rolls businesses in the early 2000s, including holdings in Germany and Italy. Currently, Xerium is the direct or indirect parent of 45 worldwide subsidiaries.

On May 19, 2005, Xerium completed an initial public offering (the "IPO") and a reorganization. In connection with the IPO, Xerium entered into a credit facility and repaid approximately $752.5 million of principal and interest on its previously existing senior bank debt, mezzanine bank debt, and certain non-interest bearing shareholder notes. Today, approximately 51% of the Existing Common Stock is owned by Apax WW Nominees Ltd. and Apax-Xerium APIA LP.

3. **Selected Financial Information**

For the fiscal year ended December 31, 2008, the Company generated, on a consolidated basis, $638.1 million in net sales. For the nine months ended September 30, 2009, the Company generated, on a consolidated basis, $367.7 million in net sales. As of September 30, 2009, the Company reported, on a consolidated basis, total assets of $784.5 million and total liabilities of $807.9 million, including approximately $5.2 million of long-term debt and $585.2 million of long-term debt that has been reclassified as current.

B. **Prepetition Indebtedness and Capital Structure**

1. **Credit Facility**

Xerium is party to an Amended and Restated Credit and Guaranty Agreement, dated as of May 30, 2008 (as amended from time to time, the "Credit Facility"), by and among Xerium; XTI LLC ("XTI"), a Delaware limited liability company; Xerium Italia S.p.A. ("Xerium Italy"), an Italian società per azioni; Xerium Canada Inc. ("Xerium Canada"), a New Brunswick (Canada) corporation resulting from the amalgamation of Stowe-Woodward/Mount Hope Inc. and Weavexx Corporation; Huyck.Wangner Austria GmbH ("Xerium Austria"), an Austrian limited liability company (formerly known as Huyck Austria GmbH); and Xerium Germany Holding GmbH ("Xerium Germany"), a German limited liability company, as borrowers, certain subsidiaries of the borrowers as guarantors, various financial institutions and other persons from time to time, as lenders, and Citicorp North America, Inc., as administrative agent and collateral agent.

The Credit Facility consists of (i) a $50 million revolving credit facility (the "Prepetition Revolver") and (ii) seven term loans with an aggregate original principal balance of $650 million (the "Prepetition Term Loans"). The Prepetition Revolver matures on November 19, 2011, and the Prepetition Term Loans mature on May 19, 2012. As of January 1, 2010, $28.1 million was outstanding on the Prepetition Revolver, and $583.6 million was outstanding on the Prepetition Term Loans. Each of the Debtors is a borrower or a guarantor under the Credit Facility (collectively, the "Prepetition Credit Parties"). The U.S.

Debtors guarantee all obligations under the Credit Facility. The Non-U.S. Debtors guarantee only the non-U.S. obligations under the Credit Facility.

To secure the obligations under the Credit Facility, pursuant to that certain Pledge and Security Agreement, dated as of May 19, 2005, and pursuant to other collateral documents, certain Prepetition Credit Parties granted the lenders a security interest in, and continuing liens on, substantially all of such Prepetition Credit Parties' assets.

2. **Derivative Financial Instruments**

Xerium enters into derivative financial instruments to manage exposures that arise from business activities that result in the receipt or payment of future known cash amounts, the value of which are determined by interest rates or foreign exchange rates. Such instruments include certain interest rate swaps to hedge variable interest related to the Credit Facility and foreign exchange contracts to protect the value of certain assets and obligations.

With respect to the interest rate swaps, (a) Xerium was counterparty to that certain Confirmation, dated as of November 16, 2007, by and among Xerium and Deutsche Bank AG ("DB"), with an original notional amount of $132,808,000; (b) Xerium Canada was counterparty to that certain Confirmation, dated as of November 17, 2007, by and among Xerium Canada (as successor-in-interest to Weavexx Corporation) and DB, with an original notional amount of C$27,233,000; (c) Xerium Canada was counterparty to that certain Confirmation, dated as of November 17, 2007, by and among Xerium Canada (as successor-in-interest to Stowe-Woodward/Mount Hope Inc.) and DB, with an original notional amount of C$35,908,000; (d) XTI was counterparty to that certain Confirmation, dated as of November 17, 2007, by and among XTI and DB, with an original notional amount of €77,723,000 (collectively with the interest rate swaps referenced in clauses (a) thorough (c) above, the "DB Swaps"); (e) Xerium was counterparty to that certain 1992 ISDA Master Agreement (Multicurrency – Cross Border) and Schedule, dated as of November 16, 2007, and that certain Confirmation, dated as of November 19, 2007, in each case, by and among Xerium and Merrill Lynch Capital Services, Inc. ("MLCS" and together with DB, the "Swap Counterparties"), with an original notional amount of $132,808,000; and (f) XTI was counterparty to that certain 1992 ISDA Master Agreement (Multicurrency - Cross Border) and Schedule, dated as of November 16, 2007, and that certain Confirmation, dated as of November 19, 2007, in each case, by and among XTI and MLCS, with an original notional amount of €77,723,000 (together with the interest rate swap referenced in clause (e) above, the "MLCS Swaps"). The Debtors' obligations under the DB Swaps were unsecured, and the Debtors' obligations under the MLCS Swaps were secured by the prepetition collateral, ratably with the Debtors' obligations under the Credit Facility. As more fully described in Section II(C) below, the DB Swaps and the MLCS Swaps have been terminated.

3. **Unsecured Lines of Credit**

(a) R&D Facility

As of December 31, 2009, Xerium Austria has outstanding borrowings in an amount equal to €1.2 million pursuant to four unsecured term loans from Österreichische Forschungsförderungsgesellschaft mbH (Austrian Research Promotion Agency (FFG)) ("R&D Facility Lender"), the national funding institution for applied industrial research in Austria (each term loan, a "R&D Facility"). Each R&D Facility loan agreement requires Xerium Austria to use loan proceeds for specified research and development projects and in instances of default, Xerium Austria must assign to the R&D Facility Lender all receivables derived from the specified research and development projects.

Each R&D Facility bears interest at rate of 2% per annum, which is subsidized by the Austrian government, and the facilities have maturity dates of June 30, 2011, September 30, 2011, September 30, 2011, and March 31, 2014.

(b) Umbrella Facility

Pursuant to the Umbrella Facility Agreement dated as of July 15, 2008, by and among Xerium Technologies Limited ("Xerium UK"), as borrower, and DB, as lender, Xerium Austria, Xerium Italy, and Xerium Germany draw funds under a Guarantee Facility (defined below) and/or a Margin Facility (defined below). The umbrella facility consists of a (i) €3,000,000 revolving credit facility that may be used for general corporate and working capital purposes, (ii) €1,000,000 guarantee facility that may be used through indemnities or bank guarantees (the "Guarantee Facility"), and (iii) €1,000,000 margin facility that may be used in connection with foreign exchange transactions (the "Margin Facility"). In connection with the Umbrella Facility Agreement, non-Debtor Xerium UK provided a guarantee in the amount of €5,000,000 that permits companies, for which Xerium UK is indirectly or directly the majority shareholder, to execute bank guarantees under the Guarantee Facility and to execute foreign exchange contracts under the Margin Facility. As of January 1, 2010, Xerium Austria, Xerium Italy, and Xerium Germany have been allocated for use portions of the Margin Facility and the Guarantee Facility in the amounts of €100,000, €0, and €0, respectively.

## II.

## KEY EVENTS LEADING TO THE DECISION TO COMMENCE THE VOLUNTARY CHAPTER 11 REORGANIZATION CASES

A. **Industry-Specific Events**

Xerium's operations are highly dependent upon general trends in the paper production industry as well as the degree to which the paper production industry is affected by global economic conditions. In recent years, paper producers have seen decreased demand for their products from the newsprint and printing and writing sectors due to the increasing prevalence of electronic media. This trend has been exacerbated by the current global economic crisis, which has prompted a dramatic slow-down in print advertising as well as in packaging

materials. The drop in global demand for paper products has resulted in a surplus of paper inventory at paper-making companies and corresponding curtailments and idling of paper-making machines. In addition, as Xerium's customers have experienced difficulty raising funds in the capital markets, customers' demand for Xerium's products and services has necessarily contracted.

Xerium's revenues have been adversely affected by the reduced capacity of, and demand by, its customers. In response, Xerium has taken a variety of cost cutting initiatives designed to improve its competitive position, including the closure of twelve manufacturing facilities between 2002 and 2008. Xerium's operational restructuring initiatives, however, have not kept pace with the transformation of its customer-base.

## B.    Liquidity Constraints and Prepetition Negotiations

Xerium anticipated that it would not be in compliance with certain financial covenants under the Credit Facility for the period ended September 30, 2009. Accordingly, the Prepetition Credit Parties and the lenders under the Credit Facility entered into that certain Waiver and Amendment No. 1, dated as of September 29, 2009 (the "First Credit Facility Waiver"), by and among the borrowers, the guarantors and the Administrative Agent. Pursuant to the First Credit Facility Waiver, the lenders agreed to waive any violation of the interest coverage, leverage, and fixed charge covenants under the Credit Facility until the earliest of (a) the occurrence of any other default under the Credit Facility, (b) the Prepetition Credit Parties' failure to comply with any term of the First Credit Facility Waiver, or (c) December 15, 2009 (the "First Waiver Period"). In addition, the issuing banks agreed to issue new letters of credit in accordance with the terms of the Credit Facility in an outstanding amount of up to $3,500,000, for equipment purchases. In return, Xerium agreed, among other things, that during the First Waiver Period, no new revolving loans could be made to Xerium and the lenders would not be required to extend credit to Xerium. In addition, in connection with the First Credit Facility Waiver, Xerium was required to pay an increased interest rate on the Credit Facility from September 29, 2009 through December 15, 2009. Absent the First Credit Facility Waiver, failure to meet these financial covenants would have constituted an event of default under the Credit Facility and potentially could have led to acceleration of Xerium's loan obligations.

## C.    Restructuring Negotiations

During the First Waiver Period, Xerium engaged in extensive negotiations with the Administrative Agent and the Secured Lender Ad Hoc Working Group regarding possible restructuring scenarios. The negotiations progressed smoothly and the parties worked toward various consensual restructuring scenarios. As a result, the Prepetition Credit Parties and the lenders under the Credit Facility entered into that certain Waiver and Amendment No. 2, dated as of December 14, 2009 (the "Second Credit Facility Waiver"), pursuant to which, the lenders agreed to waive (a) any violation of the interest coverage, leverage, and fixed charge covenants under the Credit Facility that may have occurred but for the First Credit Facility Waiver and (b) any further violation of the interest coverage, leverage, and fixed charge covenants under the Credit Facility that may occur or have occurred until the earliest of (i) the occurrence of any other default under the Credit Facility, (ii) the Prepetition Credit Parties' failure to comply with

any term of the Second Credit Facility Waiver, (iii) the failure of Xerium and the Administrative Agent to negotiate in good faith and execute a term sheet for the restructuring of Xerium's debt and equity by no later than December 31, 2009, or (iv) February 1, 2010. The lenders also agreed to waive any hedging obligation defaults by Xerium, XTI, or Xerium Canada that may have occurred under the Credit Facility. In return, Xerium agreed, among other things, to pay each of the consenting lenders a consent fee equal to 0.05% of the outstanding principal amount of all loans under the Credit Facility (other than the Tranche 1 Revolving Loans) and the Tranche 1 Revolving Commitments of such lender.

On December 22, 2009, Xerium, the Administrative Agent, and the Secured Lender Ad Hoc Working Group reached an agreement in principal to pursue a restructuring on the terms set forth in the proposed Plan.

Also in connection with the restructuring, the Debtors commenced discussions with the Swap Counterparties to address a mutual termination of the swap agreements, establish the amount of the Swap Counterparties' respective termination claims, and reach an agreement on the treatment of those claims under a plan of reorganization. As a result of the parties' discussions, on December 31, 2009, Xerium, XTI, Xerium Canada, and DB entered into the Unsecured Swap Termination Agreement, pursuant to which, the parties thereto terminated the DB Swaps effective as of December 31, 2009, fixed the amounts due to DB with respect to termination of the DB Swaps at (a) CAD 2,922,609.90 with respect to Xerium Canada, (b) $5,950,176.58 with respect to Xerium, and (c) €3,130,475.78 with respect to XTI, and DB agreed to forbear until February 1, 2010 from exercising any of its rights and remedies under the DB Swaps or in respect of DB's Unsecured Swap Termination Claim. In accordance with the terms of the Unsecured Swap Termination Agreement, Xerium, XTI, and Xerium Canada made a partial payment to DB (a) on December 31, 2009 of (i) $48,364.28 and (ii) CAD 23,755.59 and (b) on January 4, 2010 of €25,445.16, in reduction of DB's Unsecured Swap Termination Claim.

In addition, on January 4, 2010, Xerium, XTI, and MLCS entered into the Secured Swap Termination Agreement, pursuant to which, the parties thereto terminated the USD MLCS Swaps effective as of December 31, 2009, and the EUR MLCS Swaps effective as of January 4, 2010, and fixed the amounts due to MLCS with respect to the termination of the MLCS Swaps at (a) $5,989,522.00 with respect to Xerium and (b) €619,097.58 with respect to XTI, and MLCS agreed to forbear until February 1, 2010 from exercising any of its rights and remedies under the MLCS Swaps or in respect of MLCS' Secured Swap Termination Claim. In accordance with the terms of the Secured Swap Termination Agreement, on January 4, 2010, Xerium and XTI made a partial payment to MLCS of $48,684.09 and €5,032.15, in reduction of MLCS' Secured Swap Termination Claim.

Pursuant to the Unsecured Swap Termination Agreement and the Secured Swap Termination Agreement, DB and MLCS agreed in principal to the satisfaction of their respective Swap Termination Claims on the terms set forth in the proposed Plan.

To enable the parties to successfully negotiate the definitive documentation memorializing the parties' agreement in principal and enable the Debtors to solicit votes and pursue the contemplated restructuring set forth in the Plan, the Prepetition Credit Parties and the

lenders under the Credit Facility entered into certain waiver and amendment agreements, Xerium, XTI, Xerium Canada, and DB entered into certain forbearance amendment agreements, and Xerium, XTI, and MLCS entered into certain forbearance amendment agreements, all extending the waiver and forbearances discussed above through April 1, 2010, in exchange for certain consent fees.

On December 24, 2009, the Compensation Committee amended the outstanding performance-based RSUs under the Existing Management Incentive Plan to provide that the performance-based RSUs will vest and settle in full on the completion of a successful debt restructuring of the Company, which will be deemed to occur on the Confirmation Date. The terms of time-based RSUs outstanding on December 24, 2009 were not modified and, accordingly, such awards will continue to vest in accordance with their previously-established time-vesting features.

In addition, on December 24, 2009, the Compensation Committee approved the creation of a $1.25 million discretionary bonus pool, which was paid to Xerium's key employees in January 2010 for performance rendered by employees in 2009, including payments in the aggregate amount of $325,000 to Xerium's chief executive officer and chief financial officer.

On December 31, 2009, Xerium entered into an amendment to the employment agreement by and between Xerium and its President and Chief Executive Officer, Stephen R. Light, dated February 11, 2008 (the "CEO Employment Agreement"), pursuant to which Xerium granted Mr. Light 500,000 performance-based RSUs on January 1, 2010 (in lieu of granting Mr. Light RSUs with an aggregate value of $1.25 million). The RSUs are scheduled to vest in substantially equal annual installments over a three-year period based if the price of the Existing Common Stock meets or exceeds certain price targets approved by the Compensation Committee. In addition to the RSUs, on January 2, 2010, Xerium paid a $825,000 bonus to Mr. Light, the net proceeds of which were used by Mr. Light to purchase shares of Existing Common Stock at a per share price equal to the average closing price over the final twenty trading days in 2009 of $0.6775.

## D.     Purpose of the Financial Restructuring

The purpose of the financial restructuring is to reduce the Debtors' leverage and to enhance their long-term growth and competitive position. Specifically, the financial restructuring is designed to reduce the notional value of the Debtors' total outstanding debt obligations from approximately $640 million as of December 31, 2009, including swap termination liabilities, to a notional value currently estimated to be approximately $480 million on a pro forma basis as of the consummation of the financial restructuring. The Debtors will also be able to improve their liquidity by extending the maturity dates on the Prepetition Revolver and the Prepetition Term Loans from 2011 and 2012, respectively, to 2015.

The Debtors believe that the financial restructuring will reassure customers and suppliers that the Debtors are financially sound, reduce any reluctance to conduct business with the Debtors and allow the Debtors to improve the terms of transactions with their customers and suppliers. Furthermore, resolution of liquidity concerns and completion of the financial

restructuring will allow the Debtors' management to focus its attention on operations and long-term planning rather than on short-term financial management.

<h2 style="text-align:center">III.</h2>

<h3 style="text-align:center"><u>ANTICIPATED EVENTS DURING THE REORGANIZATION CASES</u></h3>

**A.      Administration of the Reorganization Cases**

   The Debtors intend to continue to operate their businesses in the ordinary course throughout the Reorganization Cases as they had prior to the Commencement Date.  For the Debtors, their employees, and their customers, it is anticipated to be business as usual.

   The Debtors do not expect the Reorganization Cases to be protracted.  To facilitate the administration of the Reorganization Cases, the Debtors intend to request a series of orders from the Bankruptcy Court designed to minimize any disruption of business operations.  The Debtors anticipate that such requests will include requests for authorization of the Debtors, among other things, to satisfy certain pre-Commencement Date obligations that may be outstanding, including wages and benefits that may be due to employees, as well as obligations to certain vendors, customers, and suppliers.  The Debtors also intend to request certain orders from the Bankruptcy Court permitting them to continue, on an uninterrupted basis, their centralized cash management systems and their customer service programs.

**B.      Postpetition Financing**

   The Debtors anticipate obtaining, subject to the approval of the Bankruptcy Court, a revolving credit facility of up to $20 million and a term loan facility in the approximate amount of $60 million for use in funding the Debtors' working capital needs during the pendency of the Reorganization Cases.  The principal terms and conditions of the DIP Facility are set forth in the Commitment Letter, attached as Exhibit B to the Plan.

**C.      Part IV Proceeding**

   On or about the Commencement Date, the Debtors may file an application for recognition of the Reorganization Cases under Part IV of the Companies' Creditors Arrangement Act with the appropriate Canadian court.  In such event, the Debtors expect that they would request that the Bankruptcy Court appoint Xerium as the Debtors' foreign representative in Canada.  The Debtors anticipate that the recognition by the Canadian court of the Reorganization Cases and the orders entered by the Bankruptcy Court will advance the orderly cross-border restructuring of the Debtors' indebtedness.

**D.      Confirmation Hearing**

   To facilitate the prompt confirmation and consummation of the Plan, the Debtors anticipate that as soon as practicable after commencing the Reorganization Cases, the Debtors will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (a) the adequacy of the Disclosure Statement and the solicitation of votes in connection

therewith and (b) confirmation of the Plan. The Debtors anticipate that notice of the Confirmation Hearing will be published and mailed to the Debtors' creditors and equity interest holders.

**E.**     **Timetable for the Chapter 11 Cases**

Assuming that the Bankruptcy Court approves the scheduling motion with respect to the Confirmation Hearing, the Debtors anticipate that the Confirmation Hearing will occur within approximately forty days of the Commencement Date. The Debtors do not currently anticipate any significant objections to confirmation of the Plan. If such objections were to be raised, the anticipated timing for the Confirmation Hearing could be delayed, perhaps substantially.

**IV.**

**THE PLAN**

**A.**     **Overview of the Plan**

THE FOLLOWING SUMMARY OF THE KEY PROVISIONS OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE PLAN SUPPLEMENT, THE TERMS OF WHICH ARE CONTROLLING.

A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

**B.**     **Classification and Treatment of Claims and Equity Interests Under the Plan**

One of the key concepts under the Bankruptcy Code is that "Allowed" Claims and Equity Interests may receive distributions under a chapter 11 plan. The term is used throughout the Plan and in the description below. In general, an "Allowed" Claim or "Allowed" Equity Interest simply means that the Debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the Claim or Equity Interest, including the amount, is in fact, a valid obligation of the Debtor.

The Bankruptcy Code also requires that, for purposes of treatment and voting, the chapter 11 Plan divide the different Claims against, and Equity Interests in, the Debtors into separate Classes based upon their legal nature. Claims of substantially similar legal nature are usually classified together, as are Equity Interests of a substantially similar legal nature. Because an Entity may hold multiple Claims or Equity Interests which give rise to different legal rights, the "Claims" and "Equity Interests" themselves, rather than their holders, are classified. As a result, under the Debtors' Plan, for example, an entity that holds a Shared Collateral Claim and shares of Existing Common Stock would have its Allowed Shared

13

Collateral Claim classified in Class 2 and its Allowed Equity Interests in Xerium classified in Class 8. To the extent of the holder's Allowed Shared Collateral Claim, the holder would be entitled to the voting and treatment rights that the Plan provides with respect to Class 2, and to the extent of the holders' Allowed Equity Interests in Xerium, the holder would be entitled to the voting and treatment rights that the Plan provides with respect to Class 8.

Under a chapter 11 Plan, the separate Classes of Claims and Equity Interests must be designated either as "impaired" (affected by the Plan) or "unimpaired" (unaffected by the Plan). If a Class of Claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such Claims, such as the right to vote on the Plan (unless the Plan has deemed the Class to reject the Plan), and the right to receive under the chapter 11 Plan, no less value than the holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is "impaired" unless the Plan (a) does not alter the legal, equitable, and contractual rights of the holders or (b) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the Debtors' insolvency, the commencement of the case, or nonperformance of a nonmonetary obligation), reinstates the maturity of the Claims or Equity Interests in the Class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Typically, this means the holder of an unimpaired Claim will receive on the later of the Effective Date and the date on which amounts owing are due and payable, payment in full, in Cash, with postpetition interest to the extent provided under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the Debtors' obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than the right to accelerate the Debtors' obligations, the holder of an unimpaired Claim will be placed in the position it would have been in had the Reorganization Cases not been commenced.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following Classes:

| | | |
|---|---|---|
| Unclassified.......................................... | Administrative Expense Claims | |
| Unclassified.......................................... | Priority Tax Claims | |
| Class 1.................................................. | Priority Non-Tax Claims | Unimpaired |
| Class 2.................................................. | Shared Collateral Claims | Impaired |
| Class 3.................................................. | Other Secured Claims | Unimpaired |
| Class 4.................................................. | General Unsecured Claims | Unimpaired |
| Class 5.................................................. | Unsecured Swap Termination Claims | Impaired |
| Class 6.................................................. | Intercompany Claims | Unimpaired |
| Class 7.................................................. | Equity Interests in Subsidiary Debtors | Unimpaired |
| Class 8.................................................. | Equity Interests in Xerium | Impaired |

Because Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims, Allowed Intercompany Claims, and Allowed Equity Interests in Subsidiary Debtors are unimpaired by the Plan, the Debtors do not anticipate that a deadline (or "bar date") for the filing of proofs of claims or proofs of equity interests will be

established in the Reorganization Cases, except for Claims arising from the rejection of executory contracts and unexpired leases.

For purposes of this Disclosure Statement, the Claim estimates set forth below (a) assume a March 23, 2010 Commencement Date and a May 31, 2010 Effective Date and (b) do not reflect the satisfaction of any prepetition obligations during the Reorganization Cases pursuant to orders that may be entered by the Bankruptcy Court. There can be no assurances that such assumptions will not differ materially from actual Claim amounts and dates.

1.    **Unclassified Claims**

Generally, the Plan provides for the payment in full of Allowed Administrative Expense Claims and Allowed Priority Tax Claims. The Debtors estimate that the amount of such Allowed Claims will be approximately $66.1 million in Administrative Expense Claims (of which approximately $12.1 million is estimated for fees and expenses of the Debtors' professionals) and $919,000 in Priority Tax Claims. Delays in the case due to unforeseen events could materially increase the amount of such Claims.

**Administrative Expense Claims**

Administrative Expense Claims are the costs and expenses of administration of the Reorganization Cases Allowed under and in accordance with, as applicable, sections 330, 364, 365, 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code. Administrative Expense Claims may include, but are not limited to, (a) any actual and necessary costs and expenses of preserving the Debtors' estates or operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Reorganization Cases, and (c) any compensation for professional services rendered, and reimbursement of expenses incurred by, a professional retained by order of the Bankruptcy Court or otherwise Allowed pursuant to section 503(b) of the Bankruptcy Code. Pursuant to the Plan, any fees or charges assessed against the estate of any of the Debtors under section 1930, chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and will be paid in accordance with Section 12.1 of the Plan.

The Plan provides that except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, and except as provided in the Plan with respect to compensation of professionals, each Allowed Administrative Expense Claim will be paid in full, in Cash, on the latest of (a) the Effective Date, (b) the date on which such Administrative Expense Claim is Allowed, and (c) the date on which such Administrative Expense Claim is due and payable in the ordinary course of business under any agreement or understanding between the applicable Debtor and the holder of such Allowed Administrative Expense Claim, or, in each case, as soon as practicable thereafter; provided, however, that Allowed Administrative Expense Claims representing obligations incurred in the ordinary course of business or assumed by any of the Debtors will be paid in full, in Cash, or performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing, or other documents relating to, such transactions.

All payments to professionals for compensation and reimbursement of expenses and all payments to reimburse expenses of members of statutory committees, if any, will be made in accordance with the procedures established by the Bankruptcy Court and the Bankruptcy Rules relating to the payment of interim and final compensation and expenses. The Bankruptcy Court will review and determine all such requests. In addition to the foregoing, section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees, and other persons making a "substantial contribution" to a chapter 11 case, and to attorneys for, and other professional advisors to, such persons. Requests for such compensation must be approved by the Bankruptcy Court after notice and an opportunity for a hearing at which the Debtors and other parties in interest may participate, and if appropriate, object to the allowance thereof.

The Plan provides that all Entities seeking awards of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (a) must file their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred on or before the date that is forty-five days after the Effective Date and (b) will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court. The Debtors or the Reorganized Debtors, as applicable, will be authorized to pay compensation for services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### Priority Tax Claims

Priority Tax Claims consist of any Claims of governmental authorities of the kind entitled to a statutory priority in right of payment as specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, sales and use taxes, excise taxes, and withholding taxes.

The Plan provides that except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, on the later of (a) the Effective Date and (b) the date on which such Priority Tax Claim is Allowed, or, in each case, as soon as practicable thereafter, each holder of an Allowed Priority Tax Claim will, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim, (i) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date or (ii) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash (x) in accordance with the terms of any agreement between the Debtors and the holder of such Claim, (y) as may be due and owing under applicable nonbankruptcy law, or (z) in the ordinary course of business.

### DIP Financing Claims

Pursuant to the Plan, in satisfaction of the Debtors' respective obligations under the DIP Facility, on the Effective Date or as soon thereafter as practicable, (a) all obligations of the Debtors under the DIP Facility will be assumed under, and become subject to the terms and conditions of, the Exit Facility and (b) all liens and security interests granted to secure the Debtors' obligations under the DIP Facility will be satisfied, discharged, and terminated in full and of no further force or effect.

2. **Classified Claims and Equity Interests**

**Class 1 -- Priority Non-Tax Claims**
*(Unimpaired. Conclusively presumed to accept the Plan and not entitled to vote.)*

Priority Non-Tax Claims include certain Allowed employee compensation and benefit Claims of the Debtors' employees incurred within 90 days and 180 days, respectively, prior to the Commencement Date in aggregate amounts up to $10,950 per employee. These Claims are granted priority in payment pursuant to section 507(a) of the Bankruptcy Code. The Debtors estimate that on the Commencement Date, the Allowed Claims in Class 1 will aggregate approximately $7.3 million.

The Plan provides that except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, on the latest of (a) the Effective Date, (b) the date on which such Priority Non-Tax Claim is Allowed, and (c) the date on which such Allowed Priority Non-Tax Claim is due and payable in the ordinary course of business under any agreement or understanding between the applicable Debtor and the holder of such Claim, or, in each case, as soon as practicable thereafter, each Allowed Priority Non-Tax Claim will be paid in Cash in an amount equal to the Allowed amount of such Claim, together with postpetition interest to the extent required to render such Claim unimpaired.

**Class 2 -- Shared Collateral Claims**
*(Impaired. Entitled to vote.)*

Allowed Shared Collateral Claims consist of all Allowed Credit Facility Claims and Allowed Secured Swap Termination Claims, which Claims are secured ratably by the same collateral. Pursuant to the Plan, (a) the Credit Facility Claims will be Allowed in the aggregate principal amount of $597,069,009 and (b) the Secured Swap Termination Claims will be Allowed in the aggregate principal amount of $6,769,826, plus, in each case, any interest accrued thereon through the date immediately prior to the Effective Date, as provided in the Credit Facility or Secured Swap Termination Agreement, as applicable. Notwithstanding that a portion of the Allowed Credit Facility Claims and the Allowed Secured Swap Termination Claims is denominated in a currency other than U.S. dollars, the Allowed amounts set forth in the Plan with respect to the Allowed Credit Facility Claims and Allowed Secured Swap Termination Claims are stated in U.S. dollars after converting the amounts of such Claims using the "New York Closing" conversion rate published online at http://online.wsj.com for February 23, 2010. The final amount of the Allowed Credit Facility Claims and the Allowed Secured Swap Termination Claims will be restated as of the date that is two (2) business days prior to the Effective Date (a) using the "New York Closing" conversion rate published online at http://online.wsj.com for such date and (b) to reflect any payments made thereon during the Reorganization Cases, as adequate protection or otherwise. Distributions required under the Plan with respect to Allowed Credit Facility Claims and Allowed Secured Swap Termination Claims will be made in accordance with such restated amounts.

The Plan provides that except to the extent that a holder of an Allowed Shared Collateral Claim agrees to a less favorable treatment, on the Effective Date or as soon as practicable thereafter, each holder of an Allowed Shared Collateral Claim will receive (a) its proportionate share (together with holders of Unsecured Swap Termination Claims) of (i) Cash in an amount equal to $10 million dollars, (ii) $410 million in principal amount of Term Notes, and (iii) 82.6% of the shares of New Common Stock to be issued on the Effective Date pursuant to Section 5.2(a)(ii) of the Plan, subject to dilution by equity incentive awards to be granted under the New Management Incentive Plan on or after the Effective Date and the exercise of the New Warrants and (b) Cash in an amount equal to (i) the unpaid interest on the principal amount of such holder's Allowed Credit Facility Claim or Allowed Secured Swap Termination Claim, as the case may be, accrued through the date immediately prior to the Effective Date at the rate set forth in section 4 of the Fourth Credit Facility Waiver, with respect to Allowed Credit Facility Claims, and at the rate set forth in section 3(a) of the Secured Swap Termination Agreement, with respect to Allowed Secured Swap Termination Claims less (ii) any amounts paid to such holder during the Reorganization Cases, as adequate protection or otherwise. The Debtors estimate that on the Effective Date, (a) the aggregate interest on the principal amount of Allowed Credit Facility Claims will approximate $17,080,064 and (b) the aggregate interest on the principal amount of Allowed Secured Swap Termination Claims will approximate $192,612 (in each case, without giving effect to payments that may be made during the Reorganization Cases and assuming that current LIBOR/floating rates continue through the Effective Date).

FOR A SUMMARY OF THE TERM NOTES, SEE SECTION IV(C)(2) BELOW, ENTITLED "THE AMENDED AND RESTATED CREDIT FACILITY".

Except as otherwise provided in the Plan, including Section 5.9(i) of the Plan, the Cash and Term Notes distributable pursuant to Section 4.2(c) of the Plan to the holders of Class 2 Claims against (a) U.S. Debtors, will be issued and distributed by Xerium and (b) Non-U.S. Debtors, will be issued and distributed by the respective Non-U.S. Debtor as borrower under the Credit Facility, against which borrower such Class 2 Claim is held. Except as otherwise provide in the Plan, including Section 5.9(i) of the Plan, the New Common Stock distributable pursuant to Section 4.2(c) of the Plan to the holders of Class 2 Claims against (a) U.S. Debtors, will be distributed by Xerium and (b) Non-U.S. Debtors, will be distributed by the respective Non-U.S. Debtor as borrower under the Credit Facility, against which borrower such Class 2 Claim is held.

Except as otherwise provided in Section 5.9(i) of the Plan, on the Effective Date, the applicable Debtors or Reorganized Debtors will make all distributions of (a) Cash and Term Notes required under the Plan with respect to Allowed Credit Facility Claims to the Administrative Agent, and the Administrative Agent will thereafter distribute such Cash and Term Notes to the holders of Allowed Credit Facility Claims and (b) New Common Stock required under the Plan with respect to Allowed Credit Facility Claims to the holders of Allowed Credit Facility Claims. Such distributions by the Debtors or Reorganized Debtors, as applicable, will be in complete satisfaction and discharge of all the obligations of the Debtors and the Non-Debtor Guarantors to the holders of Allowed Credit Facility Claims. Without limiting Section 10 of the Plan or section 524 or 1141 of the Bankruptcy Code, each holder of an Allowed Credit Facility Claim that accepts such distribution will be deemed to consent to the amendment and restatement of the Credit Facility pursuant to the Plan.

### Class 3 -- Other Secured Claims
*(Unimpaired.  Conclusively presumed to accept the Plan and not entitled to vote.)*

Class 3 consists of all Allowed Other Secured Claims, which are Secured Claims other than Credit Facility Claims, Secured Swap Termination Claims, and Claims arising under the DIP Facility.  Class 3 Claims include, without limitation, the Deferred Waiver Claim and Claims arising under certain equipment leases and other obligations for which a security deposit has been given by the Debtors.  Pursuant to the Plan, the Deferred Waiver Claim will be Allowed in the amount set forth in section 4 of the First Credit Facility Waiver.  The Debtors estimate that on the Commencement Date, the Allowed Claims in Class 3 will aggregate approximately $1.7 million.

The Plan provides that except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Allowed Other Secured Claim will be, at the option of the Debtors or Reorganized Debtors, as applicable, (a) reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, (b) paid in full, in Cash, together with postpetition interest to the extent required to render such Claim unimpaired, (c) satisfied by the surrender of the Collateral securing such Claim, or (d) otherwise rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default.  Notwithstanding the foregoing, the Allowed Deferred Waiver Claim will be paid by the Debtors or the Reorganized Debtors, as applicable, in full, in Cash, on the Effective Date, together with postpetition interest at the rate set forth in section 4 of the First Credit Facility Waiver, to the Administrative Agent and the Administrative Agent will thereafter distribute such Cash to the applicable lender under the Credit Facility.  Such payment by the Debtors or the Reorganized Debtors, as applicable, will be in complete satisfaction and discharge of all obligations of the Debtors and the Non-Debtor Guarantors with respect to the Allowed Deferred Waiver Claim.

### Class 4 -- General Unsecured Claims
*(Unimpaired.  Conclusively presumed to accept the Plan and not entitled to vote.)*

Class 4 consists of all Allowed General Unsecured Claims.  Such Claims include Allowed unsecured Claims of the Debtors' trade creditors, Allowed Claims arising under unsecured credit facilities, and Allowed Claims arising from the rejection, if any, of executory contracts and unexpired leases.  The Debtors estimate that on the Commencement Date, the Allowed Claims in Class 4 will aggregate approximately $12.8 million.

The Plan provides that except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, on the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim is Allowed, and (c) the date on which such General Unsecured Claim is due and payable in the ordinary course of business under any agreement or understanding between the applicable Debtor and the holder of such Claim, or, in

each case, as soon as practicable thereafter, each Allowed General Unsecured Claim will, at the Reorganized Debtors' option, (i) be paid in full, in Cash, together with postpetition interest to the extent required to render such claim unimpaired or (ii) otherwise be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

### Class 5 -- Unsecured Swap Termination Claims
*(Impaired. Entitled to vote.)*

Class 5 consists of all Allowed Unsecured Swap Termination Claims. Pursuant to the Plan, the Unsecured Swap Termination Claims will be Allowed in the aggregate principal amount of $12,837,079, plus the amount of the Unsecured Swap Termination Interest Component. Notwithstanding that a portion of the Allowed Unsecured Swap Termination Claims is denominated in a currency other than U.S. dollars, the Allowed amount set forth in the Plan with respect to the Allowed Unsecured Swap Termination Claims is stated in U.S. dollars after converting the amount of such Claims using the "New York Closing" conversion rate published online at http://online.wsj.com for February 23, 2010. The final amount of the Allowed Unsecured Swap Termination Claims will be restated as of the date that is two (2) business days prior to the Effective Date, using the "New York Closing" conversion rate published online at http://online.wsj.com for such date. Distributions required under the Plan with respect to Allowed Unsecured Swap Termination Claims will be made in accordance with such restated amounts.

The Plan provides that except to the extent that a holder of an Allowed Unsecured Swap Termination Claim agrees to a less favorable treatment, on the Effective Date or as soon as practicable thereafter, each holder of an Allowed Unsecured Swap Termination Claim will receive its (a) proportionate share (together with holders of Shared Collateral Claims) of (i) Cash in an amount equal to $10 million dollars, (ii) $410 million in principal amount of Term Notes, and (iii) 82.6% of the shares of New Common Stock to be issued on the Effective Date pursuant to Section 5.2(a)(ii) of the Plan, subject to dilution by equity incentive awards to be granted under the New Management Incentive Plan on or after the Effective Date and the exercise of the New Warrants and (b) Pro Rata Share of Cash in an amount equal to the Unsecured Swap Termination Interest Component. The Debtors estimate that on the Effective Date, the Unsecured Swap Termination Interest Component will approximate $370,330 (assuming that current LIBOR/floating rates continue through the Effective Date).

FOR A SUMMARY OF THE TERM NOTES, SEE SECTION IV(C)(2) BELOW, ENTITLED "THE AMENDED AND RESTATED CREDIT FACILITY".

Except as otherwise provided in the Plan, including Section 5.9(i) of the Plan, the Cash and Term Notes distributable pursuant to Section 4.5(c) of the Plan to the holders of Class 5 Claims against (a) U.S. Debtors, will be issued and distributed by Xerium and (b) Non-U.S. Debtors, will be issued and distributed by the respective Non-U.S. Debtor identified in Schedule 1 to the Unsecured Swap Termination Agreement, against which Non-U.S. Debtor such Class 5 Claim is held. Except as otherwise provided in the Plan, including Section 5.9(i) of the Plan, the New Common Stock distributable pursuant to Section 4.5(c) of the Plan to the holders of Class 5 Claims against (a) U.S. Debtors, will be distributed by Xerium and (b) Non-U.S. Debtors, will be distributed by the respective Non-U.S. Debtor identified in Schedule 1 to the

Unsecured Swap Termination Agreement, against which Non-U.S. Debtor such Class 5 Claim is held.

### Class 6 -- Intercompany Claims
*(Unimpaired. Conclusively presumed to accept the Plan and not entitled to vote.)*

Intercompany Claims are Claims against any of the Debtors held by a Debtor or a non-Debtor Subsidiary. Such Claims generally represent intercompany obligations relating to loans and the purchase of products and inventory made in the ordinary course of the Debtors' businesses. The Debtors estimate that on the Commencement Date, the Allowed Claims in Class 6 will aggregate approximately $0 (on a net basis).

The Plan provides that on the Effective Date or as soon as practicable thereafter, all Allowed Intercompany Claims will either be reinstated to the extent determined to be appropriate by the Reorganized Debtors or adjusted, continued or capitalized, either directly or indirectly, in whole or in part.

### Class 7 -- Equity Interests in Subsidiary Debtors
*(Unimpaired. Conclusively presumed to accept the Plan and not entitled to vote.)*

Class 7 consists of all Allowed Equity Interests in the Subsidiary Debtors. The Plan provides that on the Effective Date, all Allowed Equity Interests in the Subsidiary Debtors will be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

### Class 8 -- Equity Interests in Xerium
*(Impaired. Deemed to reject the Plan and not entitled to vote.)*

Class 8 consists of all Equity Interests in Xerium represented by shares of Existing Common Stock issued and outstanding immediately prior to the Effective Date. The Plan provides that on the Effective Date, the Existing Common Stock will be canceled and each holder of an Allowed Equity Interest in Class 8 will receive its proportionate share of (a) a number of shares of New Common Stock that is equal to the difference between (i) 17.4% of the shares of New Common Stock to be issued on the Effective Date pursuant to Section 5.2(a)(ii) of the Plan and (ii) the number of shares of New Common Stock to be reserved pursuant to Section 5.2(a)(iii) of the Plan and (b) New Warrants to purchase up to 10% of the issued and outstanding shares of New Common Stock as of the Effective Date (on a fully diluted basis).

FOR A SUMMARY OF THE NEW WARRANTS, SEE SECTION IV(C)(3) BELOW, ENTITLED "NEW WARRANTS".

C.    **Indebtedness and Securities to Be Issued Pursuant to the Plan**

    1.    **The Exit Facility**

        The Debtors anticipate that on the Effective Date, the Reorganized Debtors will enter into the Exit Facility Credit Agreement, in form and substance reasonably satisfactory to the Secured Lender Ad Hoc Working Group, which will provide for a revolving loan of up to $20 million and a term loan of $60 million to be used to satisfy the Debtors' outstanding obligations under the DIP Facility on the Effective Date and for the Debtors' ongoing working capital (including letters of credit) requirements. The Debtors obligations under the Exit Facility will be secured by first priority liens against, and security interests in, substantially all the assets of the Reorganized Debtors. The principal terms and conditions (subject to changes that may be made in connection with a syndication) of the Exit Facility are set forth in the Commitment Letter, which is attached as Exhibit B to the Plan, and summarized as follows:

<strong>Exit Facility</strong>

| | |
|---|---|
| Borrowers | Xerium, XTI, Xerium Canada, Xerium Austria, Xerium Italy, and Xerium Germany. |
| Guarantors | The guarantors under the Credit Facility and Robec Brazil LLC. |
| Facility | $20 million revolving loan and $60 million term loan. |
| Administrative and Collateral Agent | Citicorp North America, Inc. |
| Maturity | Revolving loan: Three (3) years following the closing date. |
| | Term loan: Four and one-half (4 ½) years following the closing date. |
| Amortization | 1% annual amortization on the term loan, payable on the 15th day of the last month of each calendar quarter, beginning in the first full calendar quarter after the closing date, with the balance paid at maturity. |
| Interest | At the borrowers' election, the Exit Facility loans will be Eurodollar Loans or Base Rate Loans. Eurodollar Loans will bear interest at the annual rate equal to LIBOR plus the Applicable Margin, with a LIBOR floor of 2% per annum. Base Rate Loans will bear interest at the annual rate equal to the Base Rate plus the Applicable Margin. |
| | <u>Base Rate</u>: a fluctuating rate equal to the highest of (a) the Prime Rate of an agreed upon financial institution, (b) the Federal Funds Effective Rate plus ½ of 1%, and (c) LIBOR plus 1%, with a LIBOR floor of 2%. |
| | <u>Applicable Margin</u>: 4.50% <u>per</u> <u>annum</u> with respect to Eurodollar Loans and 3.50% <u>per</u> <u>annum</u> with respect to Base Rate Loans. |
| | Interest periods will be 1, 2, 3, or 6 months. |

If any event of default occurs and is continuing, then the borrowers will pay interest on the unpaid balance of the outstanding Exit Facility loans at a per annum rate of two percent (2%) greater than the rate of interest specified above.

If any event of default occurs and is continuing under the Exit Facility, each Eurodollar Loan will convert to a Base Rate Loan at the end of the interest period then in effect for such Eurodollar Loan.

The terms "Eurodollar Loans", "Base Rate Loans", "Prime Rate", and "Federal Funds Effective Rate" will have the same meanings as set forth in the Commitment Letter.

| | |
|---|---|
| Security and First Priority | The administrative and collateral agent, on behalf of the lenders under the Exit Facility and each secured currency exchange, interest rate, or commodity swap counterparty in connection with the Exit Facility, will have perfected first priority security interests in and liens upon (a) all existing and after acquired real and personal, tangible and intangible, property of the U.S. borrowers and U.S. guarantors and (b) the real and personal, tangible and intangible, property of the non-U.S. borrowers and non-U.S. guarantors securing the obligations under the Credit Facility. |

All amounts owing and liens granted under the Exit Facility and the related loan documents in respect thereof at all times will be senior to the amounts owing and liens granted under the Amended and Restated Credit Facility and any indebtedness which replaces or refinances the Amended and Restated Credit Facility, subject to the terms of the Intercreditor Agreement.

| | |
|---|---|
| Mandatory Prepayment | Mandatory prepayment of the Exit Facility loans will be made from (a) 100% of the net cash proceeds from asset sales in excess of US$100,000 (with the obligation to mandatorily prepay commencing when such asset sales are greater than US$250,000) made outside the ordinary course of business, less any taxes payable by the borrowers with respect to such asset sales, <u>provided</u> that with respect to the net cash proceeds from assets sales of Huyck Wangner Australia and Huyck Wangner Vietnam, only 50% of the net cash proceeds will be subject to mandatory prepayment proceeds of the sale of such assets, (b) 100% of insurance and condemnation award payments, less any taxes payable by the borrowers with respect to such award payments, (c) cash proceeds from debt issuances, other than permitted debt and permitted refinancing debt, and (d) 50% of excess cash flow, which will exclude non-cash items and will include certain working capital adjustments, after the end of each fiscal year, beginning at the end of fiscal year 2011 (payable in 2012) with (in the case of clauses (a), (b), and (c)) exceptions, baskets, and reinvestment rights to be agreed upon. |

Mandatory prepayments pursuant to clauses (a), (b), and (d) will be shared ratably with the lenders under the Amended and Restated Credit Facility

|  | pursuant to the terms of the Intercreditor Agreement. Mandatory prepayments pursuant to clause (c) will be applied first to obligations under the term loans and thereafter to obligations under the revolving loans. Borrowers will bear all costs related to any mandatory prepayment of Exit Facility loans on a day that is not the last day of an interest period, <u>provided</u> that such mandatory prepayments will be applied to base rate Exit Facility loans and then Eurodollar Exit Facility loans. |
|---|---|
| Voluntary Prepayment | The Exit Facility loans may be prepaid without penalty, on three (3) business days' notice, in minimum amounts of and increments to be agreed upon. Borrowers will bear all costs related to the voluntary prepayment of Exit Facility loans prior to the last day of the interest period thereof. |
| Covenants | The covenants will be customary for a transaction of this type and will be based on the covenants set forth in the Credit Facility. |
| Financial Covenants | (a) Interest coverage ratio measured quarterly for a rolling 12 month period at levels to be agreed upon. |
|  | (b) Leverage ratio measured quarterly for a rolling 12 month period at levels to be agreed upon. |
|  | (c) Maximum capital expenditures each year in amounts to be agreed upon. |
| Events of Default | Events of default will be customary for a transaction of this type and will be based on the events of default set forth in the Credit Facility. |

2. **The Amended and Restated Credit Facility**

On the Effective Date, (a) the commitments under the Prepetition Revolver will be terminated, (b) the Reorganized Borrowers, as borrowers, the Reorganized Debtors, the Non-Debtor Guarantors, and Robec Brazil LLC, as guarantors, and Citicorp North America, Inc., as administrative and collateral agent will enter into the Amended and Restated Credit Facility, in form and substance reasonably satisfactory to the Secured Lender Ad Hoc Working Group and having principal terms and conditions not materially less favorable to the Reorganized Debtors than those set forth in Exhibit A to the Plan, and summarized below, and (c) the Reorganized Borrowers will issue the Term Notes, which will be secured by second priority liens against, and security interests in, the collateral that secures the Exit Facility. The Term Notes may be represented by notes or other documents or instruments or by notations in the register that will be established by the administrative agent under the Amended and Restated Credit Agreement on or before the Effective Date.

**Amended and Restated Credit Facility**

| | |
|---|---|
| Borrowers | Xerium, XTI, Xerium Canada, Xerium Austria, Xerium Italy, and Xerium Germany. |
| Guarantors | The guarantors under the Credit Facility and Robec Brazil LLC. |
| Principal | $410 million. |
| Administrative and Collateral Agent | Citicorp North America, Inc. |
| Maturity | Five years following the closing date. |
| Amortization | 2% annual amortization, payable on the 15th day of the last month of each calendar quarter, beginning in the first full calendar quarter after the closing date. |
| Interest | The Term Notes will bear interest as follows: |

(a)      in the case of the Term Notes issued by Xerium Canada, at the BA Rate plus the Applicable Margin;

(b)      in the case of the Term Notes issued by Xerium, at the LIBOR Rate plus the Applicable Margin; and

(c)      in the case of the Term Notes issued by XTI, Xerium Italy, Xerium Austria, and Xerium Germany, at the Euribor Rate plus the Applicable Margin.

The terms "BA Rate", "LIBOR Rate", and "Euribor Rate" will have the same meanings as set forth in the Credit Facility except that the BA Rate, the LIBOR Rate, and the Euribor Rate will not be less than 2.00% <u>per annum</u>.

The term "Applicable Margin" means (i) 625 bps if the leverage ratio equals or exceeds 2.75:1.00 or (ii) 575 bps if the leverage ratio is less than 2.75:1.00.

Interest periods will be 1, 2, 3, or 6 months.

If any event of default occurs and is continuing, then the borrowers will pay interest on the unpaid balance of the outstanding Term Notes at a <u>per annum</u> rate of two percent (2%) greater than the rate of interest specified above.

| | |
|---|---|
| Security and Second Priority | The new agent for and on behalf of the lenders under the Amended and Restated Credit Facility will have perfected second priority security interests in and liens upon (a) all existing and after acquired real and personal, tangible and intangible, property of the U.S. borrowers and U.S. |

guarantors and (b) the real and personal, tangible and intangible, property of the Non U.S. Borrowers and non U.S. guarantors securing the obligations under the Credit Facility.

All amounts owing under the Amended and Restated Credit Facility and the related loan documents in respect thereof at all times will be subject and subordinate to the liens granted under the Debtors' $80,000,000 revolving and term loan credit facility to become effective concurrently with the Amended and Restated Credit Facility, subject to the terms of the Intercreditor Agreement.

| | |
|---|---|
| Mandatory Prepayment | Mandatory prepayment of the Amended and Restated Credit Facility will be made from (a) 100% of the net Cash proceeds from asset sales in excess of US$100,000 (with the obligation to mandatorily prepay commencing when such asset sales are greater than US$250,000) made outside the ordinary course of business, less any taxes payable by the borrowers with respect to such asset sales, <u>provided</u> that with respect to the net cash proceeds from asset sales of Huyck Wangner Australia and Huyck Wangner Vietnam, only 50% of the net cash proceeds will be subject to mandatory prepayment proceeds of the sale of such assets, (b) 100% of insurance and condemnation award payments, less any taxes payable by the borrowers with respect to such award payments, (c) cash proceeds from debt issuances, other than permitted debt and permitted refinancing debt, and (d) 50% of excess cash flow, which will exclude non-cash items and will include certain working capital adjustments, after the end of each fiscal year, beginning at the end of fiscal year 2011 (payable in 2012) with (in the case of clauses (a), (b), and (c)) exceptions, baskets, and reinvestment rights to be agreed upon. |

Mandatory prepayments pursuant to clauses (a), (b), and (d) will be shared ratably with the lenders under the Exit Facility pursuant to the terms of the Intercreditor Agreement. Borrowers will bear all costs related to any mandatory prepayment of Term Notes on a day that is not the last day of an interest period.

| | |
|---|---|
| Voluntary Prepayment | The Term Notes may be prepaid without penalty, on three (3) business days' notice, in minimum amounts and increments to be agreed upon. Borrowers will bear all costs related to the voluntary prepayment of the Term Notes prior to the last day of the interest period thereof. |
| Covenants | The Covenants will be customary for a transaction of this type and will be based on the covenants set forth in the Credit Facility. |
| Financial Covenants | (a) Interest coverage ratio measured quarterly for a rolling 12 month period at levels to be agreed upon. |

(b)     Leverage ratio measured quarterly for a rolling 12 month period at levels to be agreed upon.

| | (c)　　Maximum capital expenditures each year in amounts to be agreed upon. |
|---|---|
| Events of Default | Events of default will be customary for a transaction of this type and will be based on the events of default set forth in the Credit Facility. |

3.　　**New Warrants**

Pursuant to the Plan, on the Effective Date, Reorganized Xerium will issue to the holders of Allowed Class 8 Equity Interests the New Warrants, in form and substance reasonably satisfactory to the Secured Lender Ad Hoc Working Group, to purchase up to 10% of the issued and outstanding shares of the New Common Stock as of the Effective Date (on a fully diluted basis) (approximately 1,665,738 shares) at a purchase price of $20.81 per share based on the "New York Closing" conversion rate published online at http://online.wsj.com for February 23, 2010, which purchase price will be restated as of the date that is two (2) business days prior to the Effective Date using the "New York Closing" conversion rate published online at http://online.wsj.com for such date.  The anticipated principal terms of the New Warrants are as follows:

| | |
|---|---|
| Warrants to Be Issued | Holders of Allowed Equity Interests in Class 8 will receive their proportionate shares of the New Warrants to purchase up to 10% of the fully diluted shares of New Common Stock as of the Effective Date, calculated after giving effect to (a) the issuance of the New Common Stock and (b) the full exercise of the New Warrants, in each case, prior to the issuance of any New Common Stock reserved for the New Management Incentive Plan. |
| Exercise Price | An exercise price equal to the value per share of all New Common Stock issued or outstanding at the time of exercise of the New Warrant equal to (a) 1.1 multiplied by (i) an amount equal to the sum of the final amount of the Allowed Credit Facility Claims, the final amount of the Allowed Secured Swap Termination Claims, and the final amount of the Allowed Unsecured Swap Termination Claims minus (ii) the aggregate principal amount of the Term Notes at the time of issuance minus (iii) $10 million in Cash divided by (b) the number of shares of New Common Stock distributed pursuant to Sections 4.2 and 4.5 of the Plan, which number may be adjusted from time to time for stock splits and reverse stock splits. |
| Issue Date | Effective Date. |
| Term | The New Warrants will be exercisable for a term of four years from the Issue Date. |
| Exercise Date | The date that the Exercise Price is received by Reorganized Xerium. |
| Form of Delivery | Upon exercise of any of the New Warrants, each holder will provide Reorganized Xerium with (a) payment of the aggregate Exercise Price for |

all New Warrants exercised (unless the consideration being distributed is cash and a cashless exercise is elected by such holder), (b) all certificates evidencing the New Warrants, and (c) any other documentation reasonably requested by Reorganized Xerium. In the event that any of the New Warrants are exercised, Reorganized Xerium will deliver shares of New Common Stock to the holder of such New Warrants or will deliver proceeds from a sale of Reorganized Xerium on an "as exercised" basis.

| | |
|---|---|
| Anti-dilution | The New Warrant certificates will provide for adjustment of the Exercise Price and the number of shares of New Common Stock purchasable upon the exercise of each New Warrant in the case of (a) the distribution of any stock dividends in New Common Stock after the Issue Date or (b) a stock split or a reverse stock split of the New Common Stock after the Issue Date. |
| Transferability | The New Warrants will be transferable, subject to federal and state securities law. |
| Compliance With Securities Laws | To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of New Warrants and New Common Stock issuable upon exercise of the New Warrants will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. |

## D. Means of Implementation of the Plan

### 1. <u>Procedural Consolidation of the Debtors for Plan Purposes Only</u>

The Plan provides for the procedural consolidation of the Debtors for Plan purposes only and will serve as a motion by the Debtors for entry of an order of the Bankruptcy Court granting such relief. The Debtors propose procedural consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of entity-specific Claims. Accordingly, except as otherwise provided in the Plan, on the Effective Date, all of the Debtors and their estates will, for purposes of the Plan only, be treated as though they were merged and (a) all assets and liabilities of the Debtors will, for purposes of the Plan only, be treated as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtor will be eliminated and canceled, (c) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations, will be considered a single Claim against the Debtors, and (d) any Claim filed in the Reorganization Cases will be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth herein, such consolidation will not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors (including the corporate ownership of the Subsidiary Debtors), (ii) any Intercompany Claims, or (iii) the substantive rights of any creditor. If any party in interest challenges the proposed procedural consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

2.    **Exit Financing**

On the Effective Date, without the need for further corporate action and without further action by the holders of Claims or Equity Interests, the Reorganized Debtors will enter into the Exit Facility.

3.    **Amended and Restated Credit Facility**

On the Effective Date and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests: (a) the Reorganized Borrowers, as borrowers, and the Reorganized Debtors, the Non-Debtor Guarantors, and Robec Brazil LLC, as guarantors, will enter into the Amended and Restated Credit Facility having principal terms and conditions set forth in the term sheet attached as Exhibit A to the Plan and (b) the Reorganized Borrowers will issue and distribute the Term Notes. The Term Notes may be represented by notes or other documents or instruments or by notations in the register that will be established by the administrative agent under the Amended and Restated Credit Agreement on or before the Effective Date.

4.    **Intercreditor Agreement**

On the Effective Date, the collateral agent under the Exit Facility, the collateral agent under the Amended and Restated Credit Facility, the Reorganized Debtors, the Non-Debtor Guarantors, and Robec Brazil LLC will enter into the Intercreditor Agreement, in form and substance reasonably satisfactory to the Secured Lender Ad Hoc Working Group, in substantially the form to be included in the Plan Supplement, and summarized below. The Intercreditor Agreement will include provisions relating to the distribution of collateral and proceeds among lenders under the Exit Facility and the Amended and Restated Credit Facility and certain rights of the lenders between and among themselves.

**Intercreditor Agreement**

| | |
|---|---|
| Loan Parties: | Xerium and each of its subsidiaries that are either a borrower or guarantor under the first lien (Exit Facility) loan documents and second lien (Amended and Restated Credit Facility) loan documents. |
| First Lien and Second Lien Collateral Agent: | Citicorp North America, Inc. |
| Collateral: | The collateral granted under the first lien collateral documents and under the second lien collateral documents. The collateral under the first lien loan documents and under the second lien loan documents will be identical. |

| | |
|---|---|
| No Contesting Liens: | The Second Lien Collateral Agent and the First Lien Collateral Agent will not contest or support any person in contesting the priority, validity, perfection, or enforceability of a lien held by or on behalf of any of the first lien claimholders or by or on behalf of any second lien claimholders, as the case may be, in the Collateral. |
| No New Liens: | So long as the discharge of the first lien obligations has not occurred, neither Xerium nor any other Loan Party will grant or permit to exist any additional liens on any asset or property (a) to secure any second lien obligation, unless it has granted or concurrently grants a lien on such asset or property to secure the first lien obligations, or (b) to secure any first lien obligation, unless it has granted or concurrently grants a lien on such asset or property to secure the second lien obligations, such liens, in each case, to be subject to the terms set forth in the Intercreditor Agreement. |
| Exercise of Remedies and Standstill Period: | Until the discharge of first lien obligations, the Second Lien Collateral Agent and the second lien claimholders will not exercise or seek to exercise any rights or remedies with respect to any collateral or initiate any action or proceeding with respect to such rights or remedies, provided that the Second Lien Collateral Agent may exercise any and all such rights or remedies after the passage of 180 days since the later of (a) the date on which an event of default under the second lien loan documents has been declared and demand for repayment of the principal amount of the second lien obligations has been made and (b) the date on which the First Lien Collateral Agent has been notified in writing by the Second Lien Collateral Agent that an event of default under the second lien loan documents has been declared (the "Standstill Period"); provided, however, that in no event will the Second Lien Collateral Agent or the second lien claimholders exercise any rights or remedies with respect to any collateral if, notwithstanding the expiration of the Standstill Period, the First Lien Collateral Agent, or first lien claimholders will have commenced and be diligently pursuing the exercise of their rights or remedies with respect to all or a material portion of the collateral. |
| Permitted Actions by the Second Lien Collateral Agent: | Notwithstanding the limitations set forth above under the heading "Exercise of Remedies and Standstill Period", the Second Lien Collateral Agent and any Second Lien Claimholder may (a) file a claim or statement of interest with respect to the Second Lien Obligations if a bankruptcy or insolvency proceeding has been commenced by or against Xerium or any of the other Loan Parties, (b) take any action (not adverse to the priority status of the liens on the Collateral securing the First Lien Obligations or the rights of the First Lien Collateral Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to create, perfect, preserve, or protect its lien on the Collateral, (c) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any person objecting to or |

otherwise seeking the disallowance of the claims of the Second Lien Claimholders, (d) vote on any plan of reorganization, file any proof of claim, or make any arguments and motions with respect to the Second Lien Obligations and the Collateral that are not inconsistent with the terms of the Intercreditor Agreement, (e) bid for or purchase for cash any Collateral at any public or private sale of such Collateral initiated by the First Lien Collateral Agent, (f) join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the Collateral initiated by the First Lien Collateral Agent, or (g) exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period as set forth under the heading "Exercise of Remedies and Standstill Period".

**Payments to Second Lien Claimholders:**

Except as contemplated above under the heading "Exercise of Remedies and Standstill Period", the Second Lien Collateral Agent and the second lien claimholders may receive the payments of interest, principal and other scheduled amounts owed in respect of the second lien obligations.

**Payment Blockage:**

No payments are to be made to the Second Lien Collateral Agent or the second lien claimholders prior to the discharge of first lien obligations if (a) any default (other than a bankruptcy default) on the first lien obligations occurs and is continuing beyond the applicable grace period under the first lien loan documents and the Second Lien Collateral Agent receives written notice thereof from the First Lien Collateral Agent or (b) a bankruptcy default occurs and is continuing under the first lien loan documents, provided that the Loan Parties may resume payments in respect of the second lien obligations: (i) in the case of a payment default, upon the earlier of (x) the discharge of first lien obligations and (y) the date upon which such payment default is cured or waived; (ii) in the case of a non-payment default (other than a bankruptcy default), upon the earliest of (x) the discharge of first lien obligations, (y) the date upon which such default is cured or waived, and (z) a to be agreed upon amount of time following receipt by the Second Lien Collateral Agent of the payment blockage notice described above; and (iii) in the case of a bankruptcy default, upon the discharge of first lien obligations.

**Application of Payments:**

So long as the discharge of first lien obligations has not occurred, the collateral or proceeds thereof received in connection with the sale or disposition of the collateral upon the exercise of remedies by the First Lien Collateral Agent or first lien claimholders will be applied by the First Lien Collateral Agent to the first lien obligations in such order as provided in the first lien loan documents. Upon the discharge of first lien obligations, the First Lien Collateral Agent will deliver to the Second Lien Collateral Agent any collateral or proceeds held or received by it in the same form as received, with any necessary endorsements.

Mandatory prepayments under the first lien loan documents and second

lien loan documents with proceeds from asset sales, insurance, and condemnation payments and 50% of excess cash flow will be shared ratably between the first lien claimholders and the second lien claimholders, and mandatory prepayments under the first lien loan documents and second lien loan documents with proceeds from debt issuances (other than permitted debt and permitted refinancing debt) will be applied first to the first lien obligations until the discharge of first lien obligations and then to the second lien obligations.

| | |
|---|---|
| **Turning Over Payments:** | So long as the discharge of first lien obligations has not occurred, (a) any collateral or proceeds thereof received by the Second Lien Collateral Agent or any second lien claimholders in connection with the exercise of remedies relating to the collateral will be segregated and held in trust and paid over to the First Lien Collateral Agent and (b) if in any bankruptcy or insolvency proceeding with respect to Xerium or any other Loan Party the Second Lien Collateral Agent or any second lien claimholders will receive any distribution of money or other property in respect of the collateral, such money or other property will be paid over to the First Lien Collateral Agent in the same form received, with any necessary endorsements, and any lien received by the Second Lien Collateral Agent or any second lien claimholder will be subject to the terms of the Intercreditor Agreement. |
| **Amendments to First Lien Loan Documents:** | The consent of the Second Lien Collateral Agent is required for any amendment to the first lien loan documents which (a) increases the principal amount of the loans or commitments under the first lien loan documents in excess of a to be agreed upon cap amount, (b) extends the scheduled maturity date under the first lien loan documents beyond the scheduled maturity of loans under the second lien loan documents, (c) contravenes any of the terms set forth in the Intercreditor Agreement, or (d) involves any other provision to be agreed to. |
| **Amendments to Second Lien Loan Documents** | The consent of the First Lien Collateral Agent is required for any amendment to the second lien loan documents which (a) increases the principal amount of the loans under the second lien loan documents, (b) changes (to earlier dates) any dates upon which payments of principal or interest are due thereon, including any provisions or defined terms relating thereto, (c) changes the prepayment provisions thereof, or (d) involves any other provision to be agreed to. |
| **Purchase Right of Second Lien Claimholders:** | At any time following (a) an acceleration of the first lien obligations, (b) a payment default under the first lien loan documents that has not been cured or waived by the first lien claimholders within a to be agreed upon period of time following the occurrence thereof, or (c) the commencement of any bankruptcy or insolvency proceeding involving Xerium or any other Loan Party, the First Lien Collateral Agent, on behalf of the first lien claimholders, will offer the second lien claimholders the option (but the second lien claimholders will not have the obligation) to purchase the |

entire aggregate amount of outstanding first lien obligations at par plus accrued interest, without warranty or representation or recourse, on a pro rata basis across the first lien claimholders. The second lien claimholders will irrevocably accept or reject such offer within 10 business days of the receipt of such offer, it being understood that any failure by the second lien claimholders to respond during that timeframe will be deemed a rejection of such offer.

5. **Issuance of Capital Stock and New Warrants**

On the Effective Date, the issuance of the shares of New Common Stock, shares of Preferred Stock, and New Warrants by Reorganized Xerium will be authorized without the need for any further corporate action and without further action by the holders of Claims or Equity Interests. On the Effective Date:

(a) The capital stock of Reorganized Xerium will consist of (i) 20,000,000 shares of New Common Stock, $0.001 par value per share, which shares will be duly authorized, fully paid, and nonassessable and (ii) 1,000,000 shares of Preferred Stock, $0.001 par value per share. The Preferred Stock may be issued in one or more series at any time, and from time to time for future corporate purposes as determined by the New Board of Reorganized Xerium and authorized by the Restated Charter of Reorganized Xerium, including in connection with the Shareholder Rights Plan.

(b) 14,991,640 shares of New Common Stock will be issued and distributed pursuant to Section 4 of the Plan, or withheld pursuant to Section 7.3 of the Plan, as applicable.

(c) 39,729 shares of New Common Stock will be issued and distributed or reserved for further distribution, as applicable, pursuant to the Existing Management Incentive Plan and the Existing Management Agreements; provided, however, that to the extent that equity incentive awards granted prior to the Effective Date pursuant to the Existing Management Incentive Plan or the Existing Management Agreements do not vest on or after the Effective Date in accordance with their terms, the shares of New Common Stock reserved pursuant to Section 5.2(a)(iii) of the Plan with respect thereto will be added to the number of shares of New Common Stock reserved for distribution pursuant to the New Management Incentive Plan under Section 5.2(a)(iv)(A) of the Plan.

(d) The remaining authorized shares of New Common Stock will be reserved as follows:

(i) 463,525 shares of New Common Stock will be reserved for future distribution pursuant to the New Management Incentive Plan, from which distributions may be granted by a committee comprised of disinterested members of the New Board of Reorganized Xerium; provided, however, that to the extent that equity incentive awards granted prior to the Effective Date pursuant to the Existing Management Incentive Plan or the Existing Management Agreements do not vest on or after the Effective Date in accordance with their terms, the shares of New Common Stock reserved pursuant to Section 5.2(a)(iii) of the Plan with respect thereto

will be added to the number of shares of New Common Stock reserved for distribution pursuant to the New Management Incentive Plan under Section 5.2(a)(iv)(A) of the Plan;

(ii)     1,665,738 shares of New Common Stock will be reserved for issuance upon exercise of the New Warrants; and

(iii)     2,839,368 shares of New Common Stock will be reserved for future corporate purposes as determined by the New Board of Reorganized Xerium consistent with its Restated Charter.

(e)     New Warrants to purchase up to 10% of the issued and outstanding shares of New Common Stock as of the Effective Date (on a fully diluted basis) will be issued and distributed pursuant to Section 4 of the Plan.

Pursuant to the Plan, the issuance of one hundred (100) shares of Reorganized Xerium Canada Preferred Stock, with no par value, will be authorized without further action by the holders of Claims or Equity Interests.  On the Effective Date, one hundred (100) shares of Reorganized Xerium Canada Preferred Stock will be issued by Reorganized Xerium Canada and transferred pursuant to Section 5.9(i)(iv) of the Plan.  The Reorganized Xerium Canada Preferred Stock will have: (i) the right to be redeemed at the option of its holder for an amount per share equal to one one-hundredth (1/100) of the value of the Xerium Canada Distribution on the Effective Date (the "<u>Preferred Redemption Amount</u>"), (ii) the same voting rights that each share of common stock of Reorganized Xerium Canada has on the Effective Date, (iii) the right to payment of discretionary, non-cumulative dividends prior to the payment of any declared dividends to any holder of common shares of Reorganized Xerium Canada, and (iv) the right to receive as a distribution in a dissolution or liquidation of Reorganized Xerium Canada an amount equal to the Preferred Redemption Amount prior to any distributions to any holder of common stock of Reorganized Xerium Canada.

6.     **Capitalization of Reorganized Xerium on the Effective Date;**
       **No Fractional Shares or Warrants**

(a)     Capitalization of Reorganized Xerium

All shares of New Common Stock distributable pursuant to Section 4 of the Plan will be subject to dilution by (i) equity incentive awards to be granted under the New Management Incentive Plan on or after the Effective Date and (ii) the exercise of the New Warrants.  All shares of New Common Stock distributable on account of equity incentive awards granted prior to but that are scheduled to vest on or after the Effective Date (x) will not dilute the shares of New Common Stock distributed to holders of Allowed Claims in Class 2 and Class 5 pursuant to Section 4 of the Plan and (y) will be reserved for in accordance with Section 5.2(a)(iii) of the Plan.

(b)     No Fractional Shares or Warrants

No fractional shares of New Common Stock or fractional New Warrants will be issued or distributed under the Plan and no Cash will be distributed in lieu of such fractional shares or warrants.  When any distribution pursuant to the Plan on account of an Allowed Claim

or Allowed Equity Interest would otherwise result in the issuance of a number of shares of New Common Stock or number of New Warrants that is not a whole number, the actual number of shares of New Common Stock or New Warrants distributed will be rounded as follows: (i) fractions of ½ (one half) or greater will be rounded up to the next whole number and (ii) fractions of less than ½ (one half) will be rounded down to the next whole number with no further payment therefor. All Claims and Equity Interests of a holder will be aggregated in making such determination. The total number of authorized shares of New Common Stock and number of New Warrants to be distributed to holders of Allowed Claims or Allowed Equity Interests will be adjusted as necessary to account for the foregoing rounding.

7. **Registration Rights Agreement**

On the Effective Date, and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, Reorganized Xerium, American Securities LLC, Carl Marks Strategic Investments, L.P., Cerberus Capital Management, L.P., on behalf of its affiliated funds and accounts, and certain other holders of New Common Stock or New Warrants that may be deemed to be "underwriters" under section 1145 of the Bankruptcy Code or section 2(a)(11) of the Securities Act, or "issuers" under section 2(a)(11) of the Securities Act, will enter into the Registration Rights Agreement, in form and substance reasonably satisfactory to the parties thereto and in substantially the form to be included in the Plan Supplement. The Registration Rights Agreement will provide to the holders party thereto certain demand and incidental (or "piggyback") and shelf registration rights.

8. **Nominating Agreements**

On the Effective Date, and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, Reorganized Xerium and each of American Securities LLC, Carl Marks Strategic Investments, L.P., and Cerberus Capital Management, L.P., on behalf of its affiliated funds and accounts, will enter into the Nominating Agreements, in each case, in form and substance reasonably satisfactory to the parties thereto and in substantially the form to be included in the Plan Supplement.

The Nominating Agreements will provide that as long as American Securities LLC, Carl Marks Strategic Investments, L.P., or Cerberus Capital Management, L.P., on behalf of its affiliated funds and accounts, is the beneficial owner of a number of shares of New Common Stock that is 50% or more of the number of shares distributed to such entity pursuant to Section 4.2(b) of the Plan (in such capacity, a "Continuing 50% Holder"), Reorganized Xerium will nominate for election to membership on its New Board one individual designated by each such Continuing 50% Holder.

9. **Shareholder Rights Plan**

On the Effective Date, and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, Reorganized Xerium will adopt the Shareholder Rights Plan, which will be in form and substance reasonably satisfactory to the Secured Lender Ad Hoc Working Group and in substantially the form to be included in

the Plan Supplement and will dividend one preferred share purchase right for each outstanding share of New Common Stock to the recipients of the New Common Stock pursuant to Section 4 of the Plan. Pursuant to the terms of the Shareholder Rights Plan, in the event a third party acquires beneficial ownership of certain amounts of New Common Stock without prior approval from the New Board of Reorganized Xerium, holders of New Common Stock, other than the third party acquiror, may exercise their preferred share purchase rights to purchase, at the then-current exercise price, shares of New Common Stock or, in certain circumstances, shares of the acquiring person, at a significant discount to market value.

10. **Intercompany Transactions**

In order to permit the Subsidiary Debtors to satisfy their obligations under the Plan in a cost-efficient manner, the Debtors will implement the following arm's length intercompany transactions, which will result in the distribution of Plan consideration to the holders of (a) Allowed Credit Facility Claims by the respective Non-U.S. Debtor that is obligated, as borrower under the Credit Facility, with respect thereto and (b) Unsecured Swap Termination Claims by the respective Non-U.S. Debtor that is obligated with respect thereto:

On the Effective Date, and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, (a) Reorganized Xerium and Reorganized Xerium Austria will (i) enter into the Austria Purchase Agreement, pursuant to which Reorganized Xerium will sell and Reorganized Xerium Austria will purchase 99% of the Xerium Austria Shares Distribution in exchange for the Austria Note and (ii) enter into the Austria Contribution Agreement, pursuant to which Reorganized Xerium will contribute to Reorganized Xerium Austria 1% of the Xerium Austria Shares Distribution and (b) Reorganized Xerium Austria will, in exchange for the portion of the Allowed Credit Facility Claims against Xerium Austria to be exchanged for the Xerium Austria Shares Distribution, transfer the Xerium Austria Shares Distribution to the holders of such Allowed Credit Facility Claims pursuant to Section 4.2(b) of the Plan.

On the Effective Date, and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, (a) Reorganized Xerium and Reorganized Xerium Germany will enter into the Germany Assumption Agreement, pursuant to which Reorganized Xerium will (i) assume with discharging effect the obligations of Xerium Germany with respect to the portion of Allowed Credit Facility Claims against Xerium Germany to be exchanged for the Xerium Germany Shares Distribution and (ii) unconditionally waive any recourse it may have against Xerium Germany with respect thereto and (b) Reorganized Xerium will (i) in exchange for the portion of Allowed Credit Facility Claims against Xerium Germany assumed by Reorganized Xerium, transfer the Xerium Germany Shares Distribution to the holders of such Allowed Credit Facility Claims pursuant to Section 4.2(b) of the Plan and (ii) forgive such Allowed Credit Facility Claims against Xerium Germany.

On the Effective Date, and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, (a) Reorganized Xerium will, in exchange for the portion of Allowed Credit Facility Claims against Xerium Italy to be exchanged for the Xerium Italy Shares Distribution, transfer the Xerium Italy Shares

Distribution to the holders of such Allowed Credit Facility Claims pursuant to Section 4.2(b) of the Plan and (b) pursuant to the Austria Contribution Agreement and the Xerium Italy Exchange (i) Reorganized Xerium will contribute to Reorganized Xerium Austria the portion of Allowed Credit Facility Claims against Xerium Italy exchanged for the Xerium Italy Shares Distribution and all receivables related thereto and (ii) Reorganized Xerium Austria will forgive such Allowed Credit Facility Claims against Xerium Italy.

On the Effective Date, and without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, (a) Reorganized Xerium Canada and Reorganized Xerium V will enter into the Canada Direction Letter Agreement, pursuant to which (i) Reorganized Xerium Canada will direct Reorganized Xerium V, and Reorganized Xerium V will agree, to transfer or cause the transfer by Reorganized Xerium of the Xerium Canada Distribution to the holders of Allowed Credit Facility Claims and Allowed Unsecured Swap Termination Claims against Xerium Canada, and in consideration therefor, (ii) Reorganized Xerium Canada will transfer to Reorganized Xerium V one hundred (100) shares of Reorganized Xerium Canada Preferred Stock and (b) Reorganized Xerium V and Reorganized Xerium will enter into the U.S. Direction Letter Agreement, pursuant to which (i) Reorganized Xerium V will direct Reorganized Xerium, and Reorganized Xerium will agree, to transfer the Xerium Canada Distribution to the holders of Allowed Credit Facility Claims and Allowed Unsecured Swap Termination Claims against Xerium Canada in satisfaction of Reorganized Xerium V's obligations under the Canada Direction Letter Agreement, and in consideration therefor, (ii) Reorganized Xerium will be deemed for U.S. federal income tax purposes to make a capital contribution to Reorganized Xerium in exchange for a deemed transfer of Reorganized Xerium V shares to Reorganized Xerium, and (iii) Reorganized Xerium will, in exchange for the portion of the Allowed Credit Facility Claims and the Allowed Unsecured Swap Termination Claims against Xerium Canada to be exchanged for the Xerium Canada Distribution, transfer the Xerium Canada Distribution to the holders of such Allowed Credit Facility Claims and Allowed Unsecured Swap Termination Claims pursuant to Sections 4.2(b) and 4.5(b), respectively, of the Plan.

11. **Existing Debt Securities and Agreements; Release of Liens**

On the Effective Date, (a) the commitments under the Prepetition Revolver will terminate, the Credit Facility will be amended and restated as the Amended and Restated Credit Facility, and each of the guarantees by (i) the Non-U.S. Debtors and the Non-Debtor Guarantors under the Credit Facility will be amended and restated to reduce the aggregate amount of such guaranteed obligations to an amount that is not more than the lesser of (x) the maximum amount permitted under the laws of the jurisdiction of the respective Non-U.S. Debtor or Non-Debtor Guarantor, as the case may be and (y) the aggregate amount of Non-U.S. Term Note obligations and all other obligations of the Non-U.S. Debtors and the Non-Debtor Guarantors under the Amended and Restated Credit Facility and (ii) the U.S. Debtors under the Credit Facility will be amended and restated to reduce the aggregate amount of such guaranteed obligations to an amount that is not more than the aggregate amount of the Term Notes and all other obligations of the U.S. Debtors, the Non-U.S. Debtors, and the Non-Debtor Guarantors under the Amended and Restated Credit Facility and (b) with respect to Secured Claims other than Credit Facility Claims, except to the extent the Plan provides otherwise, all liens, security interests, and pledges securing the obligations of the Debtors will be released and the holders of such Secured Claims

will be authorized and directed to release any Collateral or other property and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such liens, security interests, and pledges, including the execution, delivery, and filing or recording of such releases. Pursuant to the Plan, the filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such liens, security interests, and pledges.

12.    **Surrender of Existing Securities**

The Plan provides that as a condition to receiving any distribution under the Plan, each holder of a promissory note, certificate, or other instrument evidencing a Claim must surrender such promissory note, certificate, or other instrument to Reorganized Xerium or its designee. The Plan provides that any holder of a Claim that fails to (a) surrender such instrument or (b) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to Reorganized Xerium before the later to occur of (i) the second anniversary of the Effective Date and (ii) six months following the date such holder's Claim is Allowed, will be deemed to have forfeited all rights and claims with respect thereto, may not participate in any distribution under the Plan on account thereof, and all amounts owing with respect to such Allowed Claim will be retained by Reorganized Xerium; provided, however, that any promissory note, certificate, or other instrument, if any, issued under the Credit Facility will be canceled on the Effective Date and holders of Allowed Credit Facility Claims will not be required to surrender any such instruments prior to receiving distributions pursuant to the Plan.

13.    **New Management Incentive Plan**

On the Effective Date, without the need for any further corporate action and without further action by the holders of Claims or Equity Interests, the New Management Incentive Plan will become effective, in substantially the form set forth in Exhibit C to the Plan. Awards and distributions to be made under the New Management Incentive Plan will be determined and granted by a committee comprised of disinterested members of the New Board of Reorganized Xerium. The solicitation of votes on the Plan will include, and be deemed to be, a solicitation for approval of the New Management Incentive Plan. Entry of the Confirmation Order will constitute such approval.

The following is a summary of the New Management Incentive Plan. For the specific terms please refer to the form of the New Management Incentive Plan included in Exhibit C to the Plan.

- Share Reserve: 463,525 shares of New Common Stock (representing approximately 3% of issued and outstanding New Common Stock on the Effective Date prior to dilution by the exercise of the New Warrants).

- Types of Awards: Stock options, stock appreciation rights ("SARs"), restricted stock, unrestricted stock, and restricted stock unit awards.

- Eligibility: Employees (including officers), directors ,and consultants of Reorganized Xerium and its affiliates.

- <u>Individual Award Limits</u>:  In any single calendar year, no employee may receive (a) options or SARs covering more than 150,000 shares of New Common Stock or (b) other stock awards covering more than 150,000 shares of New Common Stock.

- <u>Performance Awards</u>:  Performance-based awards (other than options and SARs) that are intended to satisfy the exemption for qualified performance-based compensation under Section 162(m) of the Internal Revenue Code of 1986, as amended, must be subject to an objectively determinable measure of performance relating to any or any combination of the following: sales; revenues; assets; expenses; earnings before or after deduction for all or any portion of interest, taxes, depreciation, or amortization, whether or not on a continuing operations or an aggregate or per share basis; return on equity, investment, capital or assets; one or more operating ratios; borrowing levels, leverage ratios, or credit rating; market share; capital expenditures; cash flow; net cash from operations plus or minus such expenditures, expenses, cash proceeds from dispositions; stock price; stockholder return; sales of particular products or services; customer acquisition or retention; acquisitions and divestitures; joint ventures and strategic alliances; spin-offs, split-ups and the like; reorganizations; or recapitalizations, restructurings, financings (issuance of debt or equity) or re-financings.

- <u>Change in Control</u>:  Upon a change in control of Reorganized Xerium, (a) all stock options, SARs, and time-based stock awards fully vest, (b) all stock awards with vesting conditions tied to the attainment of stock price targets in respect of New Common Stock vest to the extent that the per share transaction price exceeds the stock price targets, and (c) all other performance-based stock awards vest at "target" level performance.

- <u>Option/SAR Repricing</u>:  Prohibited unless approved by stockholders.

- <u>Administration</u>:  Compensation committee of the New Board of Reorganized Xerium.

- <u>Plan Term</u>:  Ten years.

- <u>Adoption</u>:  The New Management Incentive Plan will become effective on the Effective Date.

14. **<u>Corporate Action</u>**

(a)  Due Authorization

On the Effective Date, all matters provided for under the Plan that otherwise would require approval of the stockholders or directors of one or more of the Debtors will be deemed to have occurred and will be in effect on and after the Effective Date pursuant to the

applicable general corporation (or similar) law of the jurisdictions in which the Debtors are incorporated, formed, or organized, as applicable, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

(b)     General

On the Effective Date, all actions contemplated by the Plan (including, without limitation, the transactions contemplated by Section 5.9(i) of the Plan) will be deemed authorized and approved in all respects without the need for any further corporate action and without further action by the holders of Claims or Equity Interests.  On the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, will be authorized and directed to issue, execute, and deliver the agreements, documents, shares and other securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, the Amended and Restated Credit Facility, the Exit Facility, the Nominating Agreements, the Registration Rights Agreement, the Shareholder Rights Plan, the New Warrants, the Restated Charters, the Restated Bylaws, the Intercreditor Agreement, the Austria Contribution Agreement, the Austria Purchase Agreement, the Austria Note, the Germany Assumption Agreement, the Canada Direction Letter Agreement, the U.S. Direction Letter Agreement, the New Management Incentive Plan, and any and all other agreements, documents, securities, and instruments relating to the foregoing (including, without limitation, security documents).  Such authorizations and approvals contemplated by the Plan will be effective notwithstanding any requirements under nonbankruptcy law.

(c)     Restated Charters and Restated Bylaws of the Reorganized Debtors

On the Effective Date, each of the Reorganized Debtors will be deemed to have adopted its respective Restated Charter and Restated Bylaws, each in form and substance reasonably satisfactory to the Secured Lender Ad Hoc Working Group.  On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors will file their respective Restated Charters in the respective jurisdictions of their incorporation, formation, or organization, as applicable.  Pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Restated Charters will include, among other things, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.  The Restated Charter of Reorganized Xerium also will include, among other things, an election by Reorganized Xerium to be governed by section 203 of the Delaware General Corporation Law.

(d)     Boards of Directors of the Reorganized Debtors

On the Effective Date, the operation of the Reorganized Debtors will become the general responsibility of their New Boards, subject to, and in accordance with, their respective Restated Charters and Restated Bylaws.  The initial New Board of Reorganized Xerium will consist of seven (7) directors, as follows: (i) the Chief Executive Officer of Xerium in office immediately prior to the Effective Date, (ii) one (1) director by the board of directors of Xerium, and (iii) five (5) directors nominated by members of the Secured Lender Ad Hoc Working Group.  The initial directors of the Reorganized Debtors will be disclosed, together with

biographical information, in the Plan Supplement and will be deemed elected or appointed, as the case may be, pursuant to the Confirmation Order, but will not take office and will not be deemed to be elected or appointed until the occurrence of the Effective Date. Those directors not continuing in office will be deemed removed therefrom as of the Effective Date pursuant to the Confirmation Order.

(e)     Officers of Reorganized Debtors

The initial officers of the Reorganized Debtors will be disclosed, together with biographical information, in the Plan Supplement and will be deemed elected or appointed, as the case may be, pursuant to the Confirmation Order, but will not take office and will not be deemed to be elected or appointed until the occurrence of the Effective Date. Those officers not continuing in office will be deemed removed therefrom as of the Effective Date pursuant to the Confirmation Order.

15.     **Compromise of Controversies**

The Plan provides that in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under Fed. R. Bankr. P. 9019.

16.     **Exemptions from Transfer Taxes**

The Plan provides that pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from a Debtor to a Reorganized Debtor or any other Entity pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Plan provides that the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan will be exempt from the imposition and payment of any and all transfer taxes (including, without limitation, any and all stamp taxes or similar taxes and any interest, penalties, and addition to the tax that may be required to be paid in connection with the consummation of the Plan and the Plan Documents) pursuant to sections 1146(a), 505(a), 106, and 1141 of the Bankruptcy Code.

**E.      Provisions Governing Distributions**

      1.      <u>**Timing and Conditions of Distributions**</u>

          (a)      Distribution Record Date

Pursuant to the Plan, the Distribution Record Date will be (i) the Confirmation Date with respect to (x) all Allowed Claims and (y) all Allowed Equity Interests in the Subsidiary Debtors and (ii) the day immediately preceding the Effective Date with respect to all Allowed Equity Interests in Xerium represented by issued and outstanding shares of Existing Common Stock.  Pursuant to the Plan, as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Equity Interests as maintained by the Debtors, or their respective agents, will be deemed closed, there will be no further changes in the record holders of any Claims or Equity Interests for purposes of Plan distributions, and the Debtors or the Reorganized Debtors, as applicable, will have no obligation to recognize, for distribution purposes, any transfer of Claims or Equity Interests occurring on or after the Distribution Record Date.  The Debtors, the Reorganized Debtors, or any party responsible for making distributions pursuant to Section 6 of the Plan will be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

          (b)      Date of Distributions

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan will be made on the Effective Date or as soon as practicable thereafter.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

          (c)      Sources of Cash for Distribution

All Cash required for the payments to be made under the Plan will be obtained from the Debtors' and the Reorganized Debtors' operations, Cash on hand, and borrowings under the Exit Facility.

          (d)      Disbursement Agent

Unless otherwise provided in the Plan, all distributions under the Plan will be made on the Effective Date by Reorganized Xerium as Disbursement Agent or such other entity designated by Reorganized Xerium as a Disbursement Agent.  No Disbursement Agent under the Plan, including, without limitation, the Administrative Agent, will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(e)     Rights and Powers of Disbursement Agent

Each Disbursement Agent will be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursement Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by such Disbursement Agent to be necessary and proper to implement the provisions in the Plan.

(f)     Expenses of the Disbursement Agent

The amount of any reasonable fees and expenses incurred by each Disbursement Agent acting in such capacity (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date will be paid in Cash by the Reorganized Debtors in the ordinary course of business.

(g)     Delivery of Distributions

Subject to Fed. R. Bankr. P. 9010, all distributions to any holder of an Allowed Claim or Equity Interest will be made to the address of such holder as set forth in the books and records of the Debtors or their agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including by the filing of a proof of Claim or interest by such holder that contains an address for such holder different from the address reflected in the Debtors' books and records.  In the event that any distribution to any holder is returned as undeliverable, the Disbursement Agent will use reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Disbursement Agent has determined the then-current address of such holder, at which time such distribution will be made to such holder without interest; provided, however, that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property will revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property will be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(h)     Manner of Payment Under the Plan

(i)     Cash distributable to holders of Allowed Claims against Non-U.S. Debtors will be (x) converted to the legal tender of the country in which such Non-U.S. Debtor is incorporated, formed, or organized, as applicable, using the "New York Closing" conversion rate published online at http://online.wsj.com for the date that is two (2) business days prior to the Effective Date and (y) distributed to such holders in such converted legal tender.

(ii)     Term Notes distributable to holders of Allowed Claims against Non-U.S. Debtors will be (x) converted to the currency of the country in which such Non-U.S. Debtor is incorporated, formed, or organized, as applicable, using the "New York Closing" conversion rate published online at http://online.wsj.com for the date that is two (2) business days prior to the Effective Date and (y) distributed as so converted.

(iii)    At the option of the applicable Disbursement Agent, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

(iv)    Except as otherwise provided in Section 5.9(i) of the Plan, all distributions of Cash, Term Notes, New Common Stock, and New Warrants to the holders of Claims against, or Equity Interests in, Debtors domiciled in the United States of America will be made by, or on behalf of, the applicable Debtor.

(i)    Setoffs and Recoupment

The Debtors and Reorganized Debtors may, but will not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution will be made) any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.

(j)    Distributions After Effective Date

Distributions made after the Effective Date to holders of Disputed Claims or Disputed Equity Interests that are not Allowed Claims or Allowed Equity Interests, as the case may be, as of the Effective Date but which later become Allowed Claims or Allowed Equity Interests will be deemed to have been made on the Effective Date.

(k)    Allocations of Distributions Between Principal and Interest

The Plan provides that the aggregate consideration to be distributed to the holders of Allowed Claims under the Plan will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claims of such holders, as determined for federal income tax purposes, and any remaining consideration as satisfying accrued, but unpaid, interest, if any.

(l)    No Postpetition Interest on Claims

Pursuant to the Plan, unless otherwise specifically provided for in the Plan, the Confirmation Order, or any other order entered by the Bankruptcy Court, or as required by applicable law, postpetition interest will not accrue on or after the Commencement Date on account of any Claim.

2.    **Procedures for Disputed Claims and Equity Interests Under the Plan**

(a)    Proofs of Claims and Equity Interests

The Plan provides that proofs of Claims arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be served and filed in accordance with Section 8.3 of the Plan.  See Section IV(F)(3) below, entitled "Rejection Damage Claims."

Except as otherwise provided in the Plan or by order of the Bankruptcy Court, holders of other Claims or Equity Interests will not be required to file proofs of Claims or Equity Interests in the Reorganization Cases.

(b)     Objections to Claims and Equity Interests/Requests for Estimation

The Plan provides that the Debtors and Reorganized Debtors will be entitled to dispute Claims and Equity Interests, and if the Debtors dispute any Claim or Equity Interest, such dispute will be determined, resolved, or adjudicated, as the case may be, by the Bankruptcy Court.  On and after the Effective Date, except to the extent that the Reorganized Debtors consent, only the Reorganized Debtors will have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to, and requests for estimation of, Claims and Equity Interests.

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claims or Disputed Equity Interests pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim or Equity Interest at any time during litigation concerning any objection to any Claim or Equity Interest, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Disputed Equity Interest, the amount so estimated will constitute either the Allowed amount of such Claim or Equity Interest or a maximum limitation on such Claim or Equity Interest, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim or Equity Interest, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim or Equity Interest.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

Any objections to Claims or Equity Interests or requests for estimation thereof must be served and filed (i) in the case of Claims and Equity Interests known to the Debtors prior to the Effective Date, on or before the date that is the later of (x) one hundred and twenty (120) days after the Effective Date and (y) such later date as may be fixed by the Bankruptcy Court, (ii) in the case of Claims arising from the rejection of executory contracts or unexpired leases pursuant to the Plan, on or before the date that is the later of (x) one hundred and twenty (120) days after the date on which proof of such Claim is served and filed in accordance with Section 8.3 of the Plan and (y) such later date as may be fixed by the Bankruptcy Court, and (iii) in the case of Claims or Equity Interests not known to the Debtors prior to the Effective Date, on or before the date that is the later of (x) the date that is one hundred and twenty (120) days after such Claim or Equity Interest is known to the Debtors and (y) such later date as may be fixed by the Bankruptcy Court.

(c)     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if all or any portion of a Claim or Equity Interest is a Disputed Claim or Disputed Equity Interest, as the case may be, no payment or distribution provided under the Plan will be made on account of such Claim or Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be.  In the event that a Claim or an Equity Interest in Xerium is Disputed, until such time as such Disputed Claim or Disputed Equity Interest is determined by Final Order, the Debtors or the Reorganized Debtors, as applicable, will withhold on account of such Claim or Equity Interest the distribution to which the holder of such Claim or Equity Interest would be entitled under Section 4 of the Plan if such Claim or Equity Interest were Allowed in full.

(d)     Distributions after Allowance

At such time as a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be, the Disbursement Agent will distribute to the holder of such Claim or Equity Interest the property distributable to such holder pursuant to Section 4 of the Plan.  To the extent that all or a portion of a Disputed Claim or Disputed Equity Interest is disallowed, the holder of such Claim or Equity Interest will not receive any distribution on account of the portion of such Claim or Equity Interest, as the case may be, that is disallowed.

(e)     Preservation of Claims and Rights to Settle Claims

Except as otherwise provided in the Plan, or in any contract, instrument, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss all claims, rights, causes of action, suits, and proceedings (collectively, the "Retained Actions"), whether at law or in equity, whether known or unknown, that the Debtors or their estates may hold against any Entity, without the approval of the Bankruptcy Court, subject to the terms of Section 7.2 of the Plan with respect to objections to, and requests for, estimation of Claims and Equity Interests, the Confirmation Order, and any contract, instrument, release, or other agreement entered into in connection therewith.  The Reorganized Debtors or their successor(s) may pursue such Retained Actions, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) that hold such rights.  Such Retained Action include, without limitation:

- those arising under sections 542, 543, 544, 545, 547 through 551, and 553 of the Bankruptcy Code;

- those against certain of the Debtors' customers, including, without limitation, any of the causes of action described in the Plan Supplement;

- those against any party to an executory contract or unexpired lease arising out of, or relating to, such executory contracts or unexpired leases,

including, without limitation, any of the causes of action described in the Plan Supplement;

- those against certain of the Debtors' current or former employees, officers, and directors, including, without limitation, any of the causes of action described in the Plan Supplement;

- those against any of the Debtors' vendors or customers including, without limitation, those customers or vendors set forth in the Plan Supplement, who have commenced, or may commence, (i) a case under chapter 7, 9, or 11 of the Bankruptcy Code or (ii) a similar proceeding under foreign insolvency law,

- those arising out of any litigation pending against any of the Debtors as of the Commencement Date, including without limitation, any of the causes of action described in the Plan Supplement; and

- in addition to the foregoing, the Debtors may have, in the ordinary course of business, numerous causes of action, claims, or rights against vendors, customers, or other parties with whom they deal in the ordinary course of business (the "Ordinary Course Claims"). The Reorganized Debtors reserve their right to enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss (or decline to do any of the foregoing) the Ordinary Course Claims, as well as the claims and causes of action listed herein.

ALL OF THE ABOVE PERSONS OR ENTITIES INCLUDE THEIR AGENTS, EMPLOYEES, PROFESSIONALS, REPRESENTATIVES, OFFICERS, DIRECTORS, MEMBERS, PARTNERS, SUCCESSORS, AFFILIATES, AND ASSIGNS. THE DEBTORS EXPRESSLY RESERVE ALL RIGHTS, DEFENSES, AND COUNTERCLAIMS AGAINST ANY PERSON OR ENTITY THAT HAS ASSERTED OR COULD ASSERT A CAUSE OF ACTION OR CLAIM AGAINST THE DEBTORS. FURTHER, THE DEBTORS EXPRESSLY RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS LIST AT ANY TIME PRIOR TO THE CONFIRMATION HEARING.

**F.     Treatment of Executory Contracts and Unexpired Leases**

1.     **Assumption and Rejection of Contracts and Leases**

Except for any executory contracts or unexpired leases that are (a) the subject of a motion to assume or reject that is pending on the Confirmation Date, which will be assumed or rejected in accordance with the disposition of such motions or (b) listed on Exhibit E to the Plan or in any amendment to Exhibit E that may be included in the Plan Supplement, which are specifically rejected pursuant to the Plan, all executory contracts (including, without limitation, the Existing Management Incentive Plan and the Existing Management Agreements) and unexpired leases to which any of the Debtors is a party are specifically assumed pursuant to the Plan (i) as of the Confirmation Date, with respect to the Existing Management Incentive Plan

and the CEO Employment Agreement and (ii) as of the Effective Date, with respect to all other executory contracts and unexpired leases assumed pursuant to the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court will constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Confirmation Date or the Effective Date, as applicable, and determining that, with respect to such assumptions pursuant to the Plan, that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the Reorganized Debtors has been demonstrated and no further adequate assurance is required.

2. **Cure of Defaults**

Any monetary amounts by which any executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors upon assumption thereof or as soon as practicable thereafter. If there is a dispute regarding (a) the nature or amount of any cure, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, any cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

3. **Rejection Damage Claims**

All Claims arising from the rejection of executory contracts and unexpired leases pursuant to the Plan (including those listed on Exhibit E to the Plan or in any amendment to Exhibit E that may be included in the Plan Supplement), must be served upon the Debtors and their counsel on or before the date that is thirty (30) days after the later of (a) the Confirmation Date and (b) the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time will be forever barred from assertion against the Debtors, their estates, the Reorganized Debtors, and their property.

4. **Indemnification Obligations**

(a) Directors, Officers, Agents, and Employees

Any obligations of the Debtors pursuant to their certificates of incorporation and bylaws, or organizational documents, as applicable, or any other agreements entered into by any Debtor at any time prior to the Effective Date, to indemnify current and former directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Commencement Date, will not be discharged or impaired by confirmation of the Plan. Such obligations will be deemed and treated as executory contracts assumed by the Debtors under the Plan and will continue as obligations of the Reorganized Debtors.

(b)    Administrative Agent

The obligations of the Debtors to indemnify the Administrative Agent pursuant to section 10.4 of the Credit Facility irrespective of whether such indemnification is owed in connection with an event occurring before or after the Commencement Date, will not be discharged or Impaired by confirmation of the Plan and will continue as obligations of the Reorganization Debtors.

5.    **Compensation and Benefit Plans**

All employee compensation and benefit plans, policies, and programs of the Debtors entered into before or after the Commencement Date and not since terminated will be deemed to be, and will be treated as if they were, executory contracts assumed pursuant to the Plan. Employee benefit plans, policies, and programs include, without limitation, the Existing Management Incentive Plan, all medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, retirement plans, retention plans, severance plans, and other such benefits. The Debtors' obligations under such plans, policies, and programs will survive confirmation of the Plan and will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing, or other documents relating to, such plans, policies, and programs, except for (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (b) such executory contracts or employee benefit plans that are the subject of a motion to reject pending as of the Confirmation Date.

6.    **Retiree Benefits**

The Plan provides that on and after the Effective Date, the payment of retiree benefits (as defined in section 1114 of the Bankruptcy Code), if any, at the level established pursuant to section 1114 of the Bankruptcy Code, will continue for the duration of the period the Debtors have obligated themselves to provide such benefits.

7.    **Insurance Policies**

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order will be deemed and treated as executory contracts pursuant to the Plan and will be assumed by the respective Debtors and Reorganized Debtors and will continue in full force and effect. All other insurance policies will re-vest in the Reorganized Debtors.

**G. Conditions Precedent to the Effective Date**

    1.    **Conditions Precedent to Effective Date**

        The Plan provides that the Effective Date will not occur and the Plan will not become effective unless and until the following conditions have been satisfied in full or waived in accordance with Section 9.2 of the Plan (see Section IV(G)(2) below):

        (a)     Entry of Confirmation Order

        The Confirmation Order, in form and substance satisfactory to the Debtors, shall have been entered and shall be in full force and effect and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

        (b)     Administrative Agent

        The Confirmation Order shall be in form and substance reasonably satisfactory to the Administrative Agent and shall have been entered and shall be in full force and effect and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

        (c)     Execution and Delivery of Other Documents

        All other actions and all agreements, instruments or other documents necessary to implement the Plan, including, without limitation, the Exit Facility and the Amended and Restated Credit Facility, shall have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

        (d)     Access to Funding

        The Debtors shall have access to funding under the Exit Facility.

        (e)     Regulatory Approvals

        The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents necessary to implement the Plan and that are required by law, regulation, or order.

        (f)     Consents

        All authorizations, consents, and approvals determined by the Debtors to be necessary to implement the Plan shall have been obtained.

        (g)     Corporate Formalities

        Prior to or simultaneously with the effectiveness of the Plan, the Restated Charters shall have been filed in the Debtors' respective jurisdictions of incorporation, formation, or organization.

(h)     Other Acts

Any other actions the Debtors determine are necessary to implement the terms of the Plan shall have been taken.

2.     **Waiver of Conditions Precedent**

Each of the conditions precedent to the effectiveness of the Plan set forth in Section 9.1(b)-(h) of the Plan (see Section IV(G)(1) above) may be waived, in whole or in part, by the Debtors in writing without notice to third parties or order of the Bankruptcy Court or any other formal action; provided, however, the condition precedent in Section 9.1(b) of the Plan and the condition precedent in Section 9.1(c) of the Plan that the Amended and Restated Credit Facility shall have been duly and validly executed, may be waived, in whole or in part, only with the consent of the Administrative Agent.

3.     **Effect of Failure of Conditions**

The Plan provides that if the conditions precedent to effectiveness of the Plan have not been satisfied or waived on or before the date that is thirty (30) days after the Confirmation Date, then (a) the Confirmation Order will be of no further force or effect, (b) no distributions under the Plan will be made, (c) the Debtors and all holders of Claims against, and Equity Interests in, the Debtors will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (d) all of the Debtors' obligations with respect to the Claims and Equity Interests will remain unaffected by the Plan and nothing contained herein will be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and (e) the Plan will be deemed withdrawn.

H.     **Effect of Confirmation**

1.     **Vesting of Assets**

On the Effective Date, except as otherwise provided in the Plan, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates will vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests.  Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, will continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.  On and after the Effective Date, the Reorganized Debtors will be authorized to operate their respective businesses, and to use, acquire, or dispose of assets, without supervision or approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

2. **Binding Effect**

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

3. **Discharge of the Debtors**

(a)   Scope

Except to the extent otherwise provided in the Plan, the rights afforded in the Plan and the treatment of all Claims against, or Equity Interests in, the Debtors under the Plan will be in exchange for and in complete satisfaction, discharge, and release of all Claims against, and Equity Interests in, the Debtors of any nature whatsoever, known or unknown, including, without limitation, any interest accrued or expenses incurred thereon from and after the Commencement Date, or against their estates, the Reorganized Debtors, or their properties or interests in property. Except as otherwise provided in the Plan, upon the Effective Date, all Claims against, and Equity Interests in, the Debtors will be satisfied, discharged, and released in full exchange for the consideration, if any, provided under the Plan. Except as otherwise provided in the Plan, all Entities will be precluded from asserting against the Debtors, the Reorganized Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

(b)   Statutory Injunction

In accordance with section 524 of the Bankruptcy Code, the discharge provided by the Plan and section 1141 of the Bankruptcy Code, among other things, acts as an injunction against the commencement or continuation of any action, employment of process, or an act, to collect, recover, or offset the Claims discharged upon confirmation of the Plan.

4. **Exculpation**

The Plan provides that the Debtors, the Reorganized Debtors, the Administrative Agent, the lender parties to the Credit Facility, the administrative agent under the DIP Facility, the lender parties to the DIP Facility, Deutsche Bank AG, Merrill Lynch Capital Services, Inc., the members of the Secured Lender Ad Hoc Working Group, and their respective principals, members, partners, officers, directors, employees, agents, managers, representatives, advisors, attorneys, accountants, and professionals will neither have nor incur any liability to any Entity for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the negotiation, formulation, dissemination, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Reorganization Cases, the Plan, this Disclosure Statement, or any contract, instrument, or other agreement or document related thereto or delivered thereunder, or any act taken or omitted to be taken in connection with the restructuring of the Debtors; provided, however, that the foregoing will not affect the liability of any Entity that

otherwise would result from any such act or omission to the extent that such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

## I.    Other Provisions of the Plan

### 1.    Additional Intercompany Transactions

Pursuant to the Plan, the Debtors and the Reorganized Debtors, as applicable, will be authorized without the need for any further corporate action and without further action by the holders of Claims or Equity Interests to (a) engage in intercompany transactions to transfer Cash for distribution pursuant to the Plan and (b) continue to engage in intercompany transactions (subject to applicable contractual limitations, including those in the Exit Facility Credit Agreement and the Amended and Restated Credit Agreement), including, without limitation, transactions relating to the incurrence of intercompany indebtedness.

In that regard, Reorganized Xerium Austria, Reorganized Xerium Germany, and Xerium UK may participate in a series of related party transactions after the Effective Date. It is currently contemplated that, upon the conclusion of such transactions, Xerium UK will hold a note issued by Reorganized Xerium Austria, which will be payable by Reorganized Xerium Austria pursuant to arm's length terms and will be subordinated to all other indebtedness of Reorganized Xerium Austria. The purpose of the related party transactions would be to permit Reorganized Xerium's foreign affiliates to realize certain tax benefits, which would improve Reorganized Xerium's cash flow and so benefit all shareholders and creditors.

### 2.    Reservation of Rights

The Plan will have no force or effect unless and until the Effective Date. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan will be, or will be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

### 3.    Revocation or Withdrawal of the Plan

The Plan provides that the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors take such action, the Plan will be deemed null and void. In such event, nothing contained in the Plan will constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in further proceedings involving the Debtors.

### 4.    Plan Supplement

The Plan Supplement will include certain documents relating to the Plan and its consummation and implementation, including the form of the New Warrants, the Restated Charters, the Restated Bylaws, the Amended and Restated Credit Agreement, the Amended and Restated Pledge and Security Agreement, the Intercreditor Agreement, the Exit Facility Credit Agreement, the Exit Facility Pledge and Security Agreement, the Nominating Agreements, the Registration Rights Agreement, the Shareholder Rights Plan, the Austria Contribution

Agreement, the Austria Purchase Agreement, the Austria Note, the Germany Assumption Agreement, the Canada Direction Letter Agreement, the U.S. Direction Letter Agreement, a description of the claims, rights, causes of action, suits, and proceedings to be retained by the Reorganized Debtors, and amendments or modifications, if any, to Exhibit E to the Plan. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court on the Commencement Date. Upon its filing with the Bankruptcy Court, the Plan Supplement may be accessed on the docket electronically maintained by the Clerk of the Bankruptcy Court or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

5. **Solicitation**

The Plan provides that the Debtors have, and upon the Confirmation Date will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a), 1125(e), and 1126(b) of the Bankruptcy Code, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation. The Debtors, the Reorganized Debtors, and each of their respective principals, members, partners, officers, directors, employees, agents, managers, representatives, advisors, attorneys, accountants, and professionals will be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of any securities offered or sold under the Plan, and therefore, are not, and on account of such offer, issuance, sale, solicitation, or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of any securities offered or sold under the Plan.

**J.      Securities Law Matters**

1. **New Warrants and Shares of New Common Stock**

As described in this Disclosure Statement, the Plan provides for Reorganized Xerium to issue (a) shares of New Common Stock to holders of Allowed Claims in Class 2 and Class 5 and (b) shares of New Common Stock and New Warrants to holders of Allowed Equity Interests in Class 8.

The Debtors believe that the shares of New Common Stock and the New Warrants to be issued pursuant to the Plan constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws. The Debtors further believe that the offer and sale of the shares of New Common Stock and the New Warrants pursuant to the Plan, and any subsequent transfers by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and section 1145(b)(1) of the Bankruptcy Code, are and will be exempt from securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and applicable state securities laws.

2.    **Issuance and Resale of Securities Under the Plan**

(a)    Exemption from Registration

Section 4(2) of the Securities Act provides that the registration requirements of Section 5 of the Securities Act will not apply to the offer or sale of a security in connection with transactions by an issuer not involving any public offering.  By virtue of Section 18 of the Securities Act, any registration requirements under state securities laws will not apply to such offers or sales conducted in compliance with SEC rules or regulations issued under Section 4(2), such as Regulation D promulgated under the Securities Act.

The Debtors believe that Section 4(2) of the Securities Act, Rule 506 of Regulation D promulgated under the Securities Act, and similar provisions of applicable state securities laws exempt from securities registration requirements any offer of the shares of New Common Stock that may be deemed to be made to the holders of Allowed Claims in Class 2 and Class 5 by Xerium prior to the commencement of the Reorganization Cases.  For the avoidance of doubt, Xerium has not made, and will not make, an offer of any of the New Securities to any holders of Equity Interests in Xerium prior to the commencement of the Reorganization Cases.  Neither this Disclosure Statement nor the disclosures contained herein, nor any other communication, written or otherwise, that the holders of Equity Interests in Xerium may receive prior to the commencement of the Reorganization Cases, constitute an offer of Securities to the holders of Equity Interests in Xerium.

The Debtors will issue shares of New Common Stock and New Warrants to holders of Allowed Equity Interests in Class 8.  Section 1145 of the Bankruptcy Code provides that, except with respect to an entity that is an "underwriter," as defined in section 1145(b)(1) of the Bankruptcy Code, the registration requirements of Section 5 of the Securities Act (and of any state or local securities laws) will not apply to (i) the offer or sale of stock, warrants, or other securities of a debtor if (x) the offer or sale occurs under a plan of reorganization, (y) the recipients of the securities hold a claim against, an interest in, or a claim for administrative expense in the case concerning, the debtor, and (z) the securities are issued in exchange for a claim against or interest in the debtor or are issued principally in such exchange and partly for cash or property or (ii) the offer of a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in clause (i), or the sale of a security upon the exercise of such a warrant, option, right, or privilege.

In reliance upon the exemptions described above, the offer and sale of the shares of New Common Stock and the New Warrants will not be registered under the Securities Act or any state securities laws.

To the extent that the issuance of the shares of New Common Stock and the New Warrants is covered by section 1145 of the Bankruptcy Code, the shares of New Common Stock and the New Warrants may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter," as defined in section 1145(b)(1) the Bankruptcy Code, with respect to such securities.  The shares of New Common Stock and the New Warrants generally may also be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective state securities laws;

however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state securities laws in any given instance and as to any applicable requirements or conditions to such availability.

      (b)      Resales of the Shares of New Common Stock and the New Warrants; Definition of Underwriter

      Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as an entity that, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (i) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, (ii) offers to sell securities offered or sold under a plan for the holders of such securities, (iii) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (x) with a view to distribution of such securities and (y) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (iv) is an "issuer," within the meaning of Section 2(a)(11) of the Securities Act, with respect to such securities.

      Under Section 2(a)(11) of the Securities Act, an "issuer" includes, in addition to an issuer, any person or entity directly or indirectly controlling or controlled by the issuer, or any person or entity under direct or indirect common control with the issuer. In addition, the term "issuer" includes "controlling persons" of the issuer of the securities. The term "controlling person" refers to any person or entity with possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the issuer of the securities.

      Resales of the shares of New Common Stock and the New Warrants by holders deemed to be "underwriters" (which definition includes "controlling persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders deemed to be "underwriters" may be entitled to resell their shares of New Common Stock and the New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act. Generally, Rule 144 would permit the public sale of securities received by such holder if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements, and certain other conditions are met. Whether any particular holder would be deemed to be an "underwriter" with respect to the shares of New Common Stock and the New Warrants would depend upon various facts and circumstances applicable to that holder. Accordingly, the Debtors express no view as to whether any holder would be deemed an "underwriter" with respect to the shares of New Common Stock and the New Warrants. In view of the complex nature of the question of whether a particular holder may be an "underwriter," the Debtors make no representations concerning the right of any holder to freely resell the shares of New Common Stock and the New Warrants. Accordingly, the Debtors recommend that potential recipients of the shares of New Common Stock and the New Warrants consult their own counsel concerning their ability to freely resell the securities.

3.      **European Securities Law Matters**

The Debtors believe that in relation to each member state of the European Economic Area which has implemented the Prospectus Directive (each, a "Member State"), this communication does not constitute an offer of the securities to the public in that Member State. It is exclusively made to the existing creditors of Xerium of which there are fewer than 100 per country in each Member State and consequently, it does not require the publication of a prospectus pursuant to Article 3 (2)(b) of the Prospectus Directive. Therefore, no prospectus has been or will be submitted to or approved by the competent supervisory authorities in the European Economic Area.

In Member States where the applicability of the exemption is subject to additional requirements, the recipient may have to meet such additional requirements, for instance must be duly registered.

You are not permitted to disseminate this communication or any other document relating to the securities to any other person or to make an offer of the securities to the public, except if that is in compliance with the Prospectus Directive and any other applicable law.

For the purposes of this provision, the term "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Member State; the term "offer of the securities to the public" means a communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe to the securities, as the same may be varied in the Member States by any measures implementing the Prospectus Directive in the Member States.

4.      **Canadian Securities Law Matters**

(a)      Exemption from Prospectus Requirements

The issuance of the New Common Stock to holders of Claims resident in Canada may take place in reliance on exemptions from the prospectus requirements, and will not be subject to the registration requirements, of the securities laws in such jurisdictions. Section 2.11 of National Instrument 45-106 provides that the prospectus requirements do not apply in respect of a trade in a security in connection with a reorganization that is under a statutory procedure. The Canadian securities regulatory authorities interpret the phrase "statutory procedure" broadly; it includes procedures done under any statutes of a foreign jurisdiction under which the entities involved exist or under which the transaction is taking place. The Debtors believe that the offer and sale of the New Common Stock and New Warrants under the Plan to holders of Claims resident in Canada would constitute trades made in connection with a reorganization that is under a statutory procedure and would therefore be exempt from the registration requirements of provincial and territorial securities laws in Canada.

(b)      Subsequent Transfers of Securities

Recipients of the New Common Stock and New Warrants resident in Canada will be subject to certain restrictions on resale imposed by Canadian provincial and territorial

securities laws.  Recipients of securities under the Plan are encouraged to seek legal advice prior to any resale of such securities.  In general, recipients of securities under the Plan resident in Canada may not resell their shares to Canadian purchasers and must resell their shares outside of Canada.

THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON RESIDENT IN CANADA TO TRADE IN THE SHARES OF NEW COMMON STOCK OR NEW WARRANTS ISSUED UNDER THE PLAN.  THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS RESIDENT IN CANADA CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE APPLICABLE SECURITIES LAWS IN THE JURISDICTION IN WHICH THEY ARE RESIDENT.

THE FOREGOING DISCLOSURE IS GENERAL IN NATURE AND IS INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY ADVICE WITH RESPECT TO THE SECURITIES LAW MATTERS ADDRESSED HEREIN.  GIVEN THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, THE DEBTORS ENCOURAGE EACH CREDITOR AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.

## V.

## FINANCIAL INFORMATION

A.  **Historical Financial Information**

1.  **General**

The audited consolidated balance sheet as of December 31, 2008, and the related consolidated statements of operations and consolidated statements of cash flows of Xerium for each of the three fiscal years in the three year period ended December 31, 2008 are contained in Item 8 – "Financial Statements and Supplementary Data" in Xerium's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, a copy of which is attached as Exhibit B to this Disclosure Statement and the full text of which is incorporated herein by reference.  The unaudited consolidated balance sheets as of March 31, 2009, June 30, 2009, and September 30, 2009 and the related consolidated statements of operations and consolidated statements of cash flows of Xerium for the three months ended March 31, 2009 and 2008, the three and six months ended June 30, 2009 and 2008, and the three and nine months ended September 30, 2009 and 2008 are contained in Xerium's Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2009, June 30, 2009, and September 30, 2009, respectively, copies of which are attached as Exhibit C, Exhibit D, and Exhibit E, respectively, to this Disclosure Statement and the full text of which is incorporated herein by reference.  This

financial information is provided to permit the holders of Claims against, and Equity Interests in, the Debtors to better understand the Debtors' historical business performance and the impact of the Reorganization Cases on the Debtors' businesses.

2.    **Selected Financial Data**

See Item 6 – "Selected Financial Data" set forth in Xerium's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, a copy of which is attached as Exhibit B to this Disclosure Statement and the full text of which is incorporated herein by reference.

3.    **Management's Discussion and Analysis
of Financial Condition and Results of Operations**

For a detailed discussion by management of the Debtors' financial condition, results of operations, and liquidity and capital resources, see Item 7 – "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Annual Report on Form 10-K for the fiscal year ended December 31, 2008, a copy of which is attached as Exhibit B to this Disclosure Statement and the full text of which is incorporated herein by reference and Part 1-Item 2 – "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2009, a copy of which is attached as Exhibit E to this Disclosure Statement and the full text of which is incorporated herein by reference.

4.    **Recent Performance**

See Xerium's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2009, attached hereto as Exhibit E.

**VI.**

**PROJECTIONS AND VALUATION ANALYSIS**

A.    **Consolidated Condensed Projected Financial Information**

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management and professionals have analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.

The condensed Projected Financial Information set forth in <u>Exhibit G</u> to this Disclosure Statement (the "<u>Projections</u>") should be read in conjunction with Section VII, below, entitled "CERTAIN FACTORS TO BE CONSIDERED" and with the assumptions, qualifications, and footnotes to tables containing the Projections set forth therein, the historical

consolidated financial information (including the notes and schedules thereto) and the other information set forth in Xerium's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, Xerium's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2009, Xerium's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2009, and Xerium's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2009, annexed hereto as Exhibits B, C, D, and E, respectively, the full texts of which are incorporated herein by reference. The Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

## B.    Valuation

Rothschild Inc. ("Rothschild") has prepared a valuation analysis (the "Valuation") of the estimated value of the Reorganized Debtors on a going-concern basis for the purpose of evaluating whether the Plan meets the so-called "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

### 1.    **Overview**

In preparing the Valuation, Rothschild has, among other things: (a) reviewed certain recent available financial results of the Debtors, (b) reviewed certain internal financial and operating data of the Debtors, including the most recent business Projections prepared and provided by the Debtors' management to Rothschild relating to the Debtors' businesses and their prospects, (c) discussed with certain of the Debtors' senior executives the current operations and prospects of the Debtors, (d) discussed with certain of the Debtors' senior executives key assumptions related to the Projections, (e) prepared discounted cash flow analyses based on the Projections, utilizing various discount rates, (f) considered the market value of certain publicly-traded companies in businesses reasonably comparable to the businesses of the Debtors, (g) considered the applicability of certain precedent change-in-control transactions for businesses similar to the Debtors, (h) separately valued and accounted for the New Warrants utilizing the standard Black-Scholes methodology, (i) considered certain economic and industry information relevant to the Debtors' businesses, (j) conducted such other analyses as Rothschild deemed necessary and/or appropriate under the circumstances, and (k) considered a range of potential risk factors.

Rothschild assumed, without independent verification, the accuracy, completeness, and fairness of all of the financial and other information available to it from public sources or as provided to Rothschild by the Debtors or their representatives. Rothschild also assumed that the Projections have been reasonably prepared on a basis reflecting the Debtors' best estimates and judgment as to future operating and financial performance. Rothschild did not make any independent evaluation of the Debtors' assets; neither did Rothschild independently verify any of the information it reviewed. Rothschild does not make any representation or warranty as to the fairness of the terms of the Plan.

In addition to the foregoing, Rothschild relied upon the following assumptions with respect to the Valuation:

- The Debtors are able to maintain adequate liquidity to operate in accordance with the Projections;

- The Debtors operate consistently with the level specified in the Projections;

- Future values are discounted to May 31, 2010;

- The Effective Date of the Plan is May 31, 2010 (the "<u>Assumed Effective Date</u>");

- Foreign denominated debt converted into U.S. Dollars using the exchange rates in the Wall Street Journal Online (New York Closing) as of February 23, 2010;

- The _pro forma_ net debt on the Effective Date is expected to be approximately $470 million, consisting of an Exit Facility balance of $60 million, $410 million in Term Notes, approximately $8 million of other debt and approximately $8 million of excess cash;

- General financial and market conditions as of the Assumed Effective Date will not differ materially from those conditions prevailing as of February 23, 2010 (the "<u>Valuation Date</u>");

- Rothschild has not considered the impact of a prolonged bankruptcy case and has assumed the Debtors' operations will continue in the ordinary course consistent with the Projections; and

- Rothschild did not prepare a valuation analysis or other potential outcomes under alternative scenarios such as a prolonged bankruptcy case or a partial or full break-up and sale of the various businesses of the Debtors.

2. **<u>Estimate of Value</u>**

As a result of such analyses, review, discussions, considerations, and assumptions, Rothschild estimates the total enterprise value ("<u>TEV</u>") of the Reorganized Debtors at approximately $680 million to $860 million. Rothschild reduced such TEV estimates by the projected _pro forma_ net debt levels of Reorganized Xerium (approximately $470 million) to estimate the implied reorganized equity value of Reorganized Xerium ("<u>Reorganized Equity Value</u>"). Rothschild estimates that Reorganized Xerium's implied total reorganized common equity value ranges from $211 million to $391 million. After deducting the estimated value for the New Warrants of approximately $6 million to $18 million, Rothschild estimates the implied distributable reorganized equity value ("<u>Distributable Equity Value</u>") will range from $205 million to $372 million. This equity value is subject to dilution as

a result of the implementation of the New Management Incentive Plan. For purposes of determining the distributions contemplated under the Plan, Rothschild used an indicative TEV of the Reorganized Debtors of approximately $715 million.

| Rothschild Valuation ($m) | Low | Distribution | High |
|---|---|---|---|
| TEV | $680.0 | $715.5 | $860.0 |
| | | | |
| Less: New 1st Lien Revolver | - | - | - |
| Less: New 1st Lien Term Loan | (60.0) | (60.0) | (60.0) |
| Less: New 2nd Lien Term Loan | (410.0) | (410.0) | (410.0) |
| Less: Other debt (existing) [1] | (7.8) | (7.8) | (7.8) |
| Plus: Excess Cash [2] | 8.2 | 8.2 | 8.2 |
| Net Debt | $469.6 | $469.6 | $469.6 |
| Total Reorganized Equity Value | $210.4 | $245.9 | $390.4 |
| Less: Value of Warrants | (5.7) | (7.8) | (18.1) |
| Distributable Equity Value | $204.7 | $238.1 | $372.3 |
| | | | |
| 2010 Pro forma EBITDA [3] | 104.5 | 104.5 | 104.5 |
| | | | |
| Implied Multiple | 6.5 x | 6.8 x | 8.2 x |

(1) Based on exchange rates based in the Wall Street Journal Online (New York Market Closing) as of 2/23/10

(2) Cash on balance sheet, less cash reserved for letters of credit, less $15m minimum cash balance

(3) 2010PF EBITDA excludes $21.6m of financial and $10.1m of operational restructuring costs. Assumes approximately $3.5m of operational restructuring costs are recurring

These estimated ranges of values are based on a hypothetical value that reflects the estimated intrinsic value of the Reorganized Debtors derived through the application of various valuation methodologies. The implied Reorganized Equity Value ascribed in this analysis does not purport to be an estimate of any post-reorganization market trading value. Any such trading value may be materially different from the implied Reorganized Equity Value ranges associated with Rothschild's valuation analysis. Rothschild's estimate is based on economic, market, financial, and other conditions as they exist on, and on the information made available as of, the Valuation Date. It should be understood that, although subsequent developments may affect Rothschild's conclusions, before or after the Confirmation Hearing, Rothschild does not have any obligation to update, revise, or reaffirm its estimate.

3. **Valuation Methodology**

The following is a brief summary of certain financial analyses performed by Rothschild to arrive at its range of estimated TEVs. This Valuation must be considered as a whole and should be read in conjunction with the Plan and this Disclosure Statement. Rothschild has assigned a weighting to each methodology to arrive at its TEV range to reflect Rothschild's view of the appropriateness of each methodology for the Debtors' circumstances.

(a) Comparable Company Analysis

The comparable companies analysis estimates the value of a company based on a comparison of such company's financial statistics with the financial statistics of publicly-traded companies having characteristics similar to those of the particular company being analyzed

(the "Comparable Company Analysis"). Criteria for selecting comparable companies for this analysis include, among other relevant characteristics, similar lines of business, business risks, growth prospects, maturity of businesses, market presence, size, and scale of operations. The analysis establishes benchmarks for valuation by deriving financial multiples and ratios for the comparable companies, standardized using common variables such as revenue or earnings before interest, taxes, depreciation, and amortization ("EBITDA").

Rothschild selected the following publicly traded companies for the comparable company analysis: Albany International Corp., Andritz AG, and Metso Corp. In evaluating comparable publicly-traded companies, Rothschild used a range of 5.7x to 7.7x multiples of 2010 Pro Forma EBITDA for its comparable company analysis. 2010 Pro Forma EBITDA adds back $21.6 million of financial restructuring costs and $10.1 million of operational restructuring costs, for a total Pro Forma EBITDA of $104.5 million. Rothschild applied a weighting of 50% to the comparable company analysis.

(b)     Precedent Transactions Analysis

Rothschild considered a valuation analysis based upon precedent transactions or comparable transactions, which estimate value by examining public merger and acquisition transactions that involve companies similar to the Reorganized Debtors. However, due to economic dynamics over the past two years and limited recent meaningful data points in this respect, Rothschild concluded that the precedent transactions analysis is not applicable in this Valuation.

(c)     Discounted Cash Flow Analysis

The discounted cash flow analysis ("DCF") estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The DCF discounts the expected cash flows by a theoretical or observed discount rate. This approach has two components: (i) calculating the present value of the projected unlevered after-tax free cash flows for a determined period of time and (ii) adding the present value of the terminal value of the cash flows. The terminal value represents the portion of TEV that lies beyond the time horizon of the available projections.

The DCF calculations were performed on unlevered after-tax free cash flows for the period beginning June 1, 2010 through December 31, 2015, discounted to the Assumed Effective Date (the "Projection Period"). Rothschild used the Projections for performing these calculations.

In performing the DCF calculation, Rothschild made assumptions for (i) the weighted average cost of capital (the "Discount Rate"), which is used to calculate the present value of future cash flows, (ii) the terminal EBITDA multiple, which is used to determine the value of the Reorganized Debtors represented by the time period beyond the Projection Period, and (iii) a perpetuity growth rate, which is another methodology used to determine the value of the Reorganized Debtors represented by the time period beyond the Projection Period. Rothschild calculated a Discount Rate utilizing a traditional cost of equity capital calculation using the Capital Asset Pricing Model. Based on this methodology, Rothschild used a discount

rate of approximately 11.2% for the Reorganized Debtors, which reflects a number of company- and market-specific factors, and is calculated based on the cost of capital for companies that Rothschild deemed comparable. To calculate the terminal value, Rothschild averaged the results from using a terminal EBITDA multiple approach and using a perpetuity growth rate approach. Rothschild used a terminal EBITDA multiple range of 5.7x to 7.7x for the Reorganized Debtors. Rothschild used a perpetuity growth rate range of 1.0% to 3.0% for the Reorganized Debtors. Rothschild applied a weighting of 50% to the DCF.

The DCF does not ascribe any value at this time to any potential net operating losses that Reorganized Xerium may retain.

4.   **Recoveries**

As described above, Rothschild estimates a Reorganized Equity Value range of $211 million to $391 million and a Distributable Equity Value range of $205 million to $372 million. At the TEV point used for purposes of determining distributions under the Plan (approximately $715 million), Rothschild estimates the hypothetical recoveries by the holders of Allowed Credit Facility Claims, Allowed Secured Swap Termination Claims, and Allowed Unsecured Swap Termination Claims to be 100%, after attributing value to the New Warrants and prior to any potential dilution by the New Management Incentive Plan.

The projected recovery listed above is an estimate derived from the Projections and other assumptions. The projected recovery is substantially based on the assumptions in the business plans underlying the Projections in Exhibit G to this Disclosure Statement. The projected recovery does not take into account shares of New Common Stock to be issued pursuant to the New Management Incentive Plan; the deduction of such shares will cause the projected recoveries to be lower than those specified, dependent upon future management and company performance. The actual recovery may be different than the projected recovery based upon, among other things: (a) the market price of shares of New Common Stock and (b) the dilutive or accretive effects of issuance of shares of New Common Stock by Reorganized Xerium from time to time (including the dilutive effect of future issuances under the Existing Management Incentive Plan and the New Management Incentive Plan).

The summary set forth above does not purport to be a complete description of the analyses performed by Rothschild. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of implied reorganized equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, estimates of implied reorganized equity value do not purport to be appraisals; neither do they necessarily reflect the values that might be realized if the Debtors' assets were sold. The estimates prepared by Rothschild assume that the Reorganized Debtors will continue as the owner and operator of their businesses and assets and that such assets are operated in accordance with the Reorganized Debtors' business plan. Depending on the results of the

Reorganized Debtors' operations or changes in the financial markets, the Valuation as of the Assumed Effective Date may differ from that disclosed herein.

In addition, the valuation of newly issued securities, such as the New Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by other factors not possible to predict. Accordingly, the implied reorganized equity value estimated by Rothschild does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE ESTIMATED CALCULATION OF ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH IS GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTORS' CONTROL.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED EQUITY VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATION IS ASSUMED TO REVISE THIS CALCULATION OF THE REORGANIZED DEBTORS' VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR.

## VII.

## CERTAIN FACTORS TO BE CONSIDERED

HOLDERS OF ALLOWED CREDIT FACILITY CLAIMS, ALLOWED SECURED SWAP TERMINATION CLAIMS, AND ALLOWED UNSECURED SWAP TERMINATION CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO

VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. IN ADDITION, THE RISK FACTORS SET FORTH IN ITEM 1A OF XERIUM'S ANNUAL REPORT ON FORM 10-K, ATTACHED HERETO AS EXHIBIT B SHALL BE INCORPORATED HEREIN BY REFERENCE, AS APPLICABLE.

**A.    Certain Bankruptcy Considerations**

**1.    Risk of Failure to Satisfy Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may nevertheless file petitions for relief under chapter 11 of the Bankruptcy Code. In such event, the Debtors may seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and equity holders. There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to the Debtors' creditors and equity holders as those proposed in the Plan.

**2.    Risk of Non-Approval of the Disclosure Statement or Solicitation**

In most instances, a plan of reorganization is filed and votes to accept or reject the plan are solicited after the filing of a petition commencing a chapter 11 case. Where a debtor proposes a prepackaged plan as the Debtors are here, a debtor may solicit votes prior to the commencement of a bankruptcy case in accordance with section 1126(b) of the Bankruptcy Code and Fed. R. Bankr. P. 3018(b). The Bankruptcy Court could conclude, however, that this Disclosure Statement does not meet the disclosure requirements set forth in section 1126 of the Bankruptcy Code.

With regard to solicitation of votes prior to the commencement of a bankruptcy case, if the Bankruptcy Court concludes that the requirements of section 1126(b) of the Bankruptcy Code or Fed. R. Bankr. P. 3018(b) have not been satisfied, the Bankruptcy Court could deem such votes invalid and the Plan would not be confirmed without a resolicitation of votes to accept or reject the Plan. Although the Debtors believe that the requirements of section 1126(b) of the Bankruptcy Code and Fed. R. Bankr. P. 3018 will be satisfied, the Bankruptcy Court may not reach the same conclusion. The United States Trustee or other parties in interest could move the Bankruptcy Court to "designate" the votes of holders of Claims pursuant to section 1126(e) of the Bankruptcy Code, which permits a bankruptcy court to designate – and nullify for purposes of determining acceptances and rejections of the subject plan – an Entity whose acceptance or rejection of a plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If the Bankruptcy Court were to find any of these deficiencies, the Debtors could be required to restart the process of filing another plan and disclosure statement by (a) seeking Bankruptcy Court approval of a disclosure statement, (b) soliciting votes from holders of claims

and equity interests, and (c) seeking Bankruptcy Court confirmation of the newly proposed plan of reorganization. If this occurs, confirmation would be delayed and possibly jeopardized. Additionally, should the Plan fail to be approved, confirmed, or consummated, certain parties in interest may be in a position to propose alternative plans of reorganization. Therefore, any failure to confirm the Plan would likely entail significantly greater risk of delay, expense, and uncertainty, which would likely have a material adverse effect upon the Debtors' businesses and financial condition.

3. **Risk of Non-Confirmation of the Plan**

Confirmation of the Plan is subject to certain conditions and requirements of the Bankruptcy Code. Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. In the event that the Bankruptcy Court refuses to confirm the Plan, the Debtors may be required to seek an alternative restructuring of their obligations to their creditors and equity holders. There can be no assurance that the terms of any such alternative restructuring would be similar, or as favorable, to the Debtors' creditors and equity holders as those proposed in the Plan.

4. **Risk of Conversion to Cases Under Chapter 7 of the Bankruptcy Code**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of the Debtors' creditors, any of the Reorganization Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in no distributions being made to unsecured creditors and Xerium equity security holders and smaller distributions being made to the Debtors' secured lenders than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the Debtors' businesses as a going concern, (b) additional administrative expenses involved in the appointment of a trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation, and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

5. **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date will occur very shortly after the Confirmation Date, there can be no assurance as to such timing. Moreover, if the conditions precedent to the Effective Date have not occurred, the Plan may be vacated by the Bankruptcy Court.

6.    **The Debtors May Be Unsuccessful in Obtaining First Day Orders to Authorize Payment in the Ordinary Course of Business**

There can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court to authorize the Debtors' satisfaction of certain prepetition obligations in the ordinary course of business. As a result, the Debtors may be unable to make certain prepetition payments to customers, vendors, employees, and other key creditors, which, in turn, may adversely affect the Debtors' businesses.

7.    **The Debtors May Be Unsuccessful in Obtaining Working Capital Financing**

On or shortly after the Commencement Date, the Debtors intend to seek authorization from the Bankruptcy Court to enter into the DIP Facility. The DIP Facility is intended to fund the Debtors' working capital needs during the pendency of the Reorganization Cases. Although the agent under the DIP Facility has executed the Commitment Letter attached to the Plan as Exhibit B, there can be no assurances that the Bankruptcy Court will approve the DIP Facility on the terms requested by the Debtors. Additionally, if the Reorganization Cases take longer than expected to conclude, the Debtors may exhaust their financing under the DIP Facility. There is no assurance that the Debtors will be able to obtain additional financing from their existing lenders or otherwise. In either case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be materially impaired. In addition, even if the Debtors enter into the DIP Facility on substantially the terms set forth in the Commitment Letter, any inability of the Debtors to satisfy the financial covenants or conditions to funding included in the DIP Credit Agreement could restrict the ability of the Debtors to access maximum amounts that may be available under the DIP Facility. These uncertainties with respect to the DIP Facility may adversely affect the successful reorganization of the Debtors and the Debtors' emergence from chapter 11.

The Debtors intend to consummate the Plan and to obtain post-Effective Date working capital financing through projected operating cash flow and the Exit Facility. However, there can be no assurance that the Debtors will be able to enter into the Exit Facility. Additionally, if the Reorganized Debtors require working capital and trade financing greater than that provided by such sources, they may be required either to (a) obtain other sources of financing or (b) curtail their operations. No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors.

8.    **Uncertainty with Respect to the Duration of the Reorganization Cases**

The Debtors cannot be certain their Reorganization Cases will be of relatively short duration (e.g., forty days) and will not unduly disrupt their businesses. It is impossible to predict with certainty the amount of time needed in bankruptcy, and the Debtors cannot be certain that their Plan will be confirmed. Moreover, time limitations exist for which the Debtors have an exclusive right to file a plan of reorganization before other parties in interest can propose and file their own plan.

A lengthy chapter 11 case would also involve additional expenses and divert the attention of management from operation of the Debtors' businesses, as well as create concerns for employees, vendors, and customers. The disruption that a chapter 11 case would inflict upon the Debtors' businesses would increase with the length of time it takes to complete the cases and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including essential vendors, employees, and customers.

If the Debtors are unable to obtain confirmation of their Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while trying to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

**B.**     **Risks to Recovery By Holders of Allowed Class 2 Claims, Allowed Class 5 Claims and Allowed Class 8 Equity Interests**

The ultimate recoveries under the Plan to holders of Allowed Class 2 Claims and Allowed Class 5 Claims depend upon the realizable value of the New Common Stock and the Term Notes. The ultimate recovery under the Plan to holders of Allowed Class 8 Equity Interests depends upon the realizable value of the New Common Stock and the New Warrants. To the extent the actual value of the New Common Stock, the New Warrants, and the Term Notes varies from the amount estimated, the recoveries of holders of Allowed Class 2 Claims, Allowed Class 5 Claims, and Allowed Class 8 Equity Interests may be higher or lower. The New Common Stock, the New Warrants, and the Term Notes to be issued pursuant to the Plan are subject to a number of material risks, including, without limitation, those specified below.

1.     **Variances from Projections**

The Projections for the Reorganized Debtors included in this Disclosure Statement are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, the Reorganized Debtors' ability to operate their businesses consistent with the projections, comply with the covenants of their financing agreements, attract and retain key executives and customers, comply with the terms of their existing contracts and leases, and respond to adverse regulatory actions taken by the federal and state governments. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors. Although the Debtors believe that the Projections are reasonably attainable, variations between the actual financial results and those projected may occur and these variances may be material.

2.     **Unforeseen Events**

Future performance of the Reorganized Debtors is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond the Reorganized Debtors' control. While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flows described in this

Disclosure Statement, the Debtors believe that cash flow from operations, available Cash and borrowings under the Exit Facility will be adequate to fund the Plan and meet their future liquidity needs.

## C.    Risks Associated with the Debtors' Businesses and the Paper Production Industry

### 1.    Industry Concerns

The Debtors' businesses are highly dependent upon the paper production industry and the degree to which the paper industry is affected by global economic conditions and the availability of credit.  Demand for the Debtors' products could continue to decline if paper manufacturers are unable to obtain required financing, or if the economic crisis causes additional mill closures or extends current capacity curtailments.

The profitability of paper producers historically has been highly cyclical due to wide swings in the price of paper, driven to a high degree by the oversupply of paper during periods when paper producers have more aggregate capacity than the market requires.  A sustained downturn in the paper industry, either globally or in a particular region, can cause paper producers to reduce production or cease operations, which could adversely affect the Debtors' revenues and profitability.  Since 2000, paper producers have taken actions that seek to structurally improve the balance between the supply of, and demand for, paper.  As part of these efforts, paper producers have permanently shut down many paper-making machines or, in some circumstances, entire manufacturing facilities.  Paper producers continue to experience low levels of profitability, and the Debtors believe that further consolidation among papermakers, reducing the number of paper producers, and shutdowns of paper-making machines or facilities will occur in Europe and North America, until there is a better balance between supply and demand for paper and the profit levels of paper producers improve.  This rebalancing has been accelerated during the current global economic recession.

During 2008, the global paper industry experienced a sharp reduction in production levels, caused by the general slowdown in economic activity and the related paper consumption decline during the same period.  The production slowdown was across all grades of paper production, but most notably in the packaging grades and newsprint.  For packaging grades, demand is directly related to broad manufacturing and transportation activity reduction, while newsprint demand has been increasingly declining over a number of years due to the greater prevalence of electronic media, exacerbated in recent months by a reduction in print advertising.  One of the results of the recent reduction in demand for paper products is that the inventory of paper has increased significantly and production slowdowns, curtailments and idling of paper-making machines have been occurring at a sharply increasing rate, particularly in North America and Europe, since October 2008 and continuing into mid-2009.  Recently, however, there has been some abatement in these production declines and very modest improvements in paper and board manufacturers' operating rates that have begun to have a positive impact on the demand for some of the Debtors' products.  While the Debtors were successful in reducing the rate of price decreases in 2008 for the products the Debtors sell to paper producers and prices have remained relatively stable in the nine months ended September 30, 2009, there continues to be price pressure due to competitors pursuing market growth during the current period of lower overall demand in the Debtors' market.

Historically, demand for the Debtors' products has been driven primarily by the volume of paper produced on a worldwide basis. Generally, and over time, the Debtors expect growth in paper production to be greater in Asia, South America and Eastern Europe than in the more mature North American and Western European regions where demand potentially may decline. Global paper production growth that does occur would be moderated by the level of industry consolidation and paper-machine shutdown activity that is a continuing underlying trend in North America and Western Europe. The Debtors also believe that, in addition to industry consolidation and paper machine shutdown activity in North America and Western Europe, the trend toward new paper-machine designs that have fewer rolls and market recognition of extended life of the Debtors' roll cover products has been and will continue to negatively impact demand for these products, and that the volume potential for the roll covers business will slowly diminish. Additionally, the Debtors are seeing a trend that paper producers are placing an increasing emphasis on maintenance cost reduction and, as a result, are extending the life of roll covers through additional maintenance cycles before replacing them.

The Debtors anticipate that pricing pressure for their products will continue with the consolidation among paper producers and as the shift of paper production growth in Asia develops. In response to this pricing pressure, the Debtors expect to continue both their expenditure levels on research and development expenses and to develop their value added selling approach as part of their strategy to differentiate their products, while at the same time remaining focused on cost reduction and efficiency programs.

The negative paper industry trends described above are likely to continue. The Debtors believe that in the current economic environment, the paper industry will experience reduced demand, increased emphasis on cost reduction, and sustained paper-machine shutdown activity than would have been the case even in the absence of the economic crisis.

2. **The Loss of the Debtors' Major Customers
   Could Adversely Affect Sales and Profitability**

The Debtors' top ten customers generated 24% of their net sales during 2008. The loss of one or more of the Debtors' major customers, financial difficulties faced by their customers, or a substantial decrease in their customers' purchases, could have a material adverse effect on the Debtors' sales and profitability. For example, two of the Debtors' major customers, who collectively represent approximately 5% of 2008 revenues, have experienced financial difficulties and filed for bankruptcy protection in 2009. As of March 31, 2009, the Debtors had fully reserved for all amounts due from these customers. As of June 30, 2009, the Debtors determined that they no longer needed to reserve for the post-bankruptcy receivables of these customers, due to the customers' improved financial situation; however, the Debtors continue to reserve for the customers' pre-bankruptcy receivables. Decreases in orders from these customers or future payment problems from these or other customers could have a material adverse effect on the Debtors' sales and profitability. Because the Debtors generally do not have binding long-term purchasing agreements with their customers, there can be no assurance that the Debtors' existing customers will continue to purchase products from the Debtors.

3.    **Competitive Conditions**

The paper-making consumables industry is highly competitive. Some of the Debtors' competitors are larger than the Debtors, have greater financial and other resources than the Debtors, and are well-established as suppliers to the markets the Debtors serve. The Debtors' products may not be able to compete successfully with the products of the Debtors' competitors, which could result in a loss of customers and, as a result, decreased sales and profitability. The Debtors compete primarily based on the value of the Debtors' products delivered to the Debtors' customers. The Debtors' value proposition is based on a combination of price and the technology and performance of the Debtors' products, including the ability of the Debtors' products to help reduce the Debtors customers' production costs and increase the quality of the paper produced. The Debtors' competitors could develop new technology or products that lead to a reduced demand for the Debtors' products. In addition, the Debtors' business depends on the Debtors' customers regularly needing to replace the clothing and roll covers used on their paper-making machines. Either the Debtors or their competitors could develop new technologies that increase the useful life of clothing or roll covers, which could reduce the frequency with which the Debtors' customers would need to replace their clothing and refurbish or replace their roll covers, and consequently lead to fewer sales.

Additionally, new competitors could enter the Debtors' markets and/or existing competitors may decide to increase their marketing efforts to the Debtors' customers by broadening their product offerings or competing more aggressively on price. For example, due to the current economic downturn and continued pricing pressure from the Debtors' competitors the Debtors have reduced prices in some cases, and eliminated or decreased the size of proposed price increases in other cases, resulting in price decreases in both of the Debtors' business segments. Further pricing pressure from the Debtors' competitors may require further price decreases or make the Debtors unable to effect planned price increases and, thereby, adversely affect the Debtors' profitability. It is also possible that foreign-based competitors could seek to establish a presence in the United States market by acquisition or otherwise. If the Debtors cannot compete successfully, their sales and operating results could be materially and adversely affected.

4.    **The International Scope of the Debtors' Operations**

The Debtors have a geographically diverse customer base. For the nine months ended September 30, 2009, approximately 36% of the Debtors' sales were in North America, 35% were in Europe, 17% were in Asia-Pacific, 10% were in South America, and 2% were in the rest of the world. In 2008, the Debtors sold products in approximately sixty-two countries other than the United States, which represented approximately 73% of the Debtors' net sales. The Debtors have manufacturing facilities in 12 foreign countries as of December 31, 2009. Because the Debtors operate in a number of foreign countries, the Debtors may face challenges unique to those countries such as in hiring employees, relations with various parties, including suppliers and governmental agencies, and production.

The Debtors expect sales from international markets to continue to represent a significant portion of their revenue. Accordingly, the Debtors' businesses are subject to risks related to the differing legal, political, social, and regulatory requirements, and economic

conditions of many jurisdictions. Risks inherent in international operations include the following:

- the Debtors may be affected by unexpected adverse changes in foreign laws or regulatory requirements;

- foreign governments may impose or increase investment barriers or other restrictions affecting the Debtors' business;

- foreign governments may impose limitations on the Debtors' ability to repatriate funds;

- foreign governments may impose withholding or other taxes on remittances and other payments to the Debtors, or the amount of any such taxes may increase;

- the Debtors may experience unexpected adverse changes in export duties, quotas, and tariffs and difficulties in obtaining export licenses;

- agreements may be more difficult to enforce and receivables more difficult to collect;

- foreign governments may nationalize private enterprises;

- intellectual property rights may be more difficult to enforce; and

- the Debtors' business and profitability in a particular country could be affected by political or economic repercussions on a domestic, country specific or global level from terrorist activities and the response to such activities.

In addition, certain of the Debtors' operations are in high-risk regions of the world such as portions of Asia and Latin America. Unanticipated events, such as geopolitical changes, could adversely affect these operations.

The Debtors' foreign operations are subject to local laws, some of which may conflict with certain provisions of the Bankruptcy Code, including those relating to the Plan. In such instances, a foreign court may determine to enforce its local law or decline to enforce U.S. law, including provisions of the Bankruptcy Code governing the Plan and its effect. Moreover, pursuant to local laws, the directors of certain foreign Debtors may conclude that a chapter 11 filing by the Debtors requires heightened monitoring of the liquidity and indebtedness of foreign operations. In certain circumstances where such monitoring indicates illiquidity or over-indebtedness, such directors may be required by local laws to file an insolvency petition in a foreign jurisdiction within three weeks of such indication. Creditors in foreign jurisdictions may also take action under foreign law to seek available remedies.

The occurrence of any of these conditions or events could disrupt the Debtors' businesses in particular countries or regions of the world, or prevent the Debtors from conducting business in particular countries or regions, which could adversely affect the Debtors' revenues and profitability. In addition, as a holding company, Xerium relies on dividends and other payments or distributions from its subsidiaries to meet its debt obligations. If foreign

governments impose limitations on the Debtors' ability to repatriate funds or impose or increase taxes on remittances or other payments to Xerium, the amount of dividends and other distributions Xerium receives from its subsidiaries could be reduced, which could reduce the amount of cash available to the Debtors to meet their debt obligations. The Debtors' success as a global business will depend, in part, upon their ability to succeed in differing legal, regulatory, economic, social, and political conditions by developing, implementing and maintaining policies and strategies that are effective in each location where they do business.

5.    **Currency Exchange Rate Fluctuations**

As the Debtors conduct a significant portion of their operations outside the United States, fluctuations in currencies of other countries, especially the Euro, may materially affect the Debtors' operating results. The Debtors report their financial results in U.S. dollars, but a substantial portion of the Debtors' sales, expenses and debt are denominated in Euros and other currencies. A decrease in the value of the U.S. dollar relative to the value of the Euro and these other currencies may affect the Debtors' financial results since the translation of a certain number of Euros or units of such other currencies into U.S. dollars for financial reporting purposes will represent more U.S. dollars. In addition, in the case of sales to customers in certain locations, the Debtors' sales are denominated in U.S. dollars or Euros but all or a substantial portion of the Debtors' associated costs are denominated in a different currency. As a result, changes in the relative values of U.S. dollars, Euros and any such other currency may affect the Debtors' profitability.

6.    **Environmental Liabilities**

The Debtors' operations and facilities are subject to a number of national, state, and local laws and regulations protecting the environment and human health in the United States and foreign countries that govern, among other things, the handling, storage, and disposal of hazardous materials, discharges of pollutants into the air and water, and workplace safety. The Comprehensive Environmental Response, Compensation and Liability Act, (as amended, "<u>CERCLA</u>") provides for responses to, and, in some instances, joint and several liability for releases of hazardous substances into the environment. Environmental laws also hold current owners or operators of land or businesses liable for their own and for previous owners' or operators' releases of hazardous or toxic substances, materials or wastes, pollutants or contaminants, including petroleum and petroleum products. Because of the Debtors' operations, the history of industrial uses at some of the Debtors' facilities, the operations of predecessor owners or operators of some of the businesses, and the use and release of hazardous substances at these sites, the liability provisions of environmental laws may affect the Debtors. Many of the Debtors' facilities have experienced some level of regulatory scrutiny in the past and are or may be subject to further regulatory inspections, future requests for investigation, or liability for regulated materials management practices.

The Debtors cannot assure that they have been or will be at all times in complete compliance with all laws and regulations applicable to the Debtors which are designed to protect the environment and human health. The Debtors could incur substantial costs, including clean-up costs, fines and sanctions, and third party property damage or personal injury claims, as a result of violations of or liabilities under environmental laws, relevant common law or the

environmental permits required for the Debtors' operations. The Debtors are currently conducting environmental remediation projects at certain of their sites, and the Debtors have been identified as a potentially responsible party under CERCLA or similar state requirements for several off-site locations. In 2005, 2006, and 2007, the Debtors paid $2.8 million, $2.5 million, and $2.1 million, respectively, in connection with the environmental remediation of certain of their facilities. The Debtors believe that this environmental remediation is substantially complete. In the third quarter of 2008, the Debtors accrued $4.1 million for environmental remediation costs associated with their facility in Australia. A Phase II assessment of the groundwater contamination at the Australia facility performed for the Debtors during the second quarter of 2009 indicated the costs to remediate the contamination would be significantly less than originally estimated and accordingly, the Debtors reduced the accrual by $3.4 million during the second quarter of 2009 based on this assessment. The Debtors do not expect any significant further remediation costs to be incurred in connection with these matters and believe that any additional liability in excess of amounts provided which may result from the resolution of such matters will not have a material adverse effect on the Debtors' financial condition, liquidity or cash flow.

7.     **Adverse Labor Relations**

As of January 1, 2010, the Debtors employ approximately 3,290 employees, approximately 17% of whom are subject to protection of various collective bargaining agreements and approximately 55% of whom are subject to job protection as members of trade unions, employee associations or workers' councils. Approximately 37% of the employees subject to collective bargaining agreements (or approximately 6% of the total number of the Debtors' employees) are covered by collective bargaining agreements that expire prior to December 31, 2010. The Debtors cannot be certain that they will be able to renew such collective bargaining agreements, or enter into new collective bargaining agreements, which do not adversely affect the Debtors' operating results, and that the Debtors will be without production interruptions, including labor stoppages. In addition, approximately 74% of the employees are subject to job protection as members of trade unions, employee associations or workers' councils (or approximately 41% of the total number of the Debtors' employees) for which arrangements expire prior to December 31, 2010. The Debtors cannot be certain that the terms of employment applicable to such employees will not change in a manner which adversely affects the Debtors' operating results. The Debtors cannot be certain that they will not experience disruptions in their operations as a result of labor disputes or experience other labor relations issues. If the Debtors are unable to maintain good relations with their employees, the Debtors' ability to produce products and provide services to their customers could be reduced and/or the Debtors' production costs could increase, either of which could disrupt the Debtors' business and reduce profitability.

8.     **Proprietary Technology**

The Debtors rely upon trade secrets, proprietary know-how, and continuing technological innovation to develop new products and remain competitive. If the Debtors' competitors learn of the Debtors' proprietary technology, they may use this information to produce products that are equivalent or superior to the Debtors' products, which could reduce the sales of the Debtors' products. The Debtors' employees, consultants, and corporate

collaborators may breach their obligations not to reveal the Debtors' confidential information, and any remedies available to the Debtors may be insufficient to compensate the Debtors' damages. Even in the absence of such breaches, the Debtors' trade secrets and proprietary know-how may otherwise become known to their competitors, or be independently discovered by their competitors, which could adversely affect the Debtors' competitive position.

9.       **Product Liability Claims**

The Debtors' products could be defective, fail to perform as designed or otherwise cause harm to the Debtors' customers, their equipment or their products. If any of the Debtors' products are defective, the Debtors may be required to recall the products and/or repair or replace them, which could result in substantial expenses and affect the Debtors' profitability. Any problems with the performance of the Debtors' products could harm the Debtors' reputation, which could result in a loss of sales to customers and/or potential customers. In addition, if the Debtors' customers believe that they have suffered harm caused by the Debtors' products, they could bring claims against the Debtors that could result in significant liability. A failure of the Debtors' products could cause substantial damage to a paper-making machine. Any claims brought against the Debtors by customers may result in:

- diversion of management's time and attention;
- expenditure of large amounts of cash on legal fees, expenses, and payment of damages;
- decreased demand for the Debtors' products and services; and
- injury to the Debtors' reputation.

The Debtors' insurance may not sufficiently cover a large judgment against the Debtors or a large settlement payment, and is subject to customary deductibles, limits, and exclusions.

10.       **Material Disruption of the Debtors' Facilities**

Any of the Debtors' manufacturing facilities, or any of their machines within an otherwise operational facility, could cease operations unexpectedly due to a number of events, including maintenance outages, prolonged power failures, an equipment failure, disruption in the supply of raw materials, such as particle board, energy or chemicals, a chemical spill or release, closure because of environmental-related concerns, disruptions in the transportation infrastructure, including roads, bridges, railroad tracks, and tunnels, fires, floods, earthquakes, hurricanes, or other catastrophes, terrorism or threats of terrorism, labor difficulties, or other operational problems.

Future events may cause shutdowns, which may result in downtime and/or cause damage to the Debtors' facilities. Any such downtime or facility damage could prevent the Debtors from meeting customer demand for their products and/or require them to make unplanned capital expenditures. While the Debtors maintain insurance covering the facilities, including business interruption insurance, if a catastrophic loss of the use of all or a portion of one of their manufacturing facilities occurred, their ability to meet the production capacity

targets and satisfy customer requirements would be impaired, resulting in lower sales and net income.

## VIII.

### <u>VOTING PROCEDURES AND REQUIREMENTS</u>

Detailed instructions for voting on the Plan are provided with the ballot accompanying this Disclosure Statement. For purposes of the Plan, only holders of record of Claims in the following Classes, as of the February 23, 2010 voting record date established by the Debtors for purposes of this solicitation are entitled to vote:

- Class 2 -- Shared Collateral Claims (Credit Facility Claims and Secured Swap Termination Claims)

- Class 5 -- Unsecured Swap Termination Claims

If your Claim is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a ballot with this Disclosure Statement. If your Claim is in one of these Classes, you should read your ballot and follow the listed instructions carefully, Please use only the ballot that accompanies this Disclosure Statement.

---

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, YOU MAY CONTACT THE VOTING AGENT AT:**

|  |  |
|---|---|
| U.S. and Canada | 1-866-249-8108 (toll-free) |
| International countries | +1-614-553-1930 |

---

### A. Vote Required for Acceptance by a Class

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class which cast ballots for acceptance or rejection of the plan. Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the holders of claims voting cast their ballots to accept the plan.

## B.    Voting

The solicitation period for eligible creditors to vote to accept or reject the Plan is commencing prior to the Commencement Date.  In order for your vote to be counted, your signed ballot must be actually **received** by the Debtors' Voting Agent at the following address before the Voting Deadline of 4:00 p.m. (prevailing Eastern time) on March 22, 2010:

---

**Voting Agent:**

If by mail:

Xerium Ballot Processing
c/o The Garden City Group, Inc.
P.O. Box 9572
Dublin, Ohio  43017-4872


If by personal delivery or overnight courier:

Xerium Ballot Processing
c/o The Garden City Group, Inc.
5151 Blazer Parkway, Suite A
Dublin, Ohio  43017

---

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH ABOVE.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED EITHER AS A VOTE TO ACCEPT OR A VOTE TO REJECT THE PLAN.

### 1.    **Waivers and Forbearances**

In order to enable the Debtors to pursue and effect an out-of-court-restructuring in lieu of commencing Reorganization Cases and seeking confirmation of the Plan, the ballots delivered to holders of Credit Facility Claims, Secured Swap Termination Claims, and Unsecured Swap Termination Claims allow for (a) holders of Credit Facility Claims to agree to (i) waive (x) any defaults that were waived in the Fourth Credit Facility Waiver and (y) any defaults that may occur under the Credit Facility as a result of failure by Xerium, XTI, Xerium Germany, Xerium Canada, Xerium Italy, or Xerium Austria to pay principal or interest due March 31, 2010 under the Credit Facility and (ii) forbear from exercising any remedies as a result of such defaults through April 30, 2010 and (b) holders of Secured Swap Termination Claims and Unsecured Swap Termination Claims to agree to forbear from exercising any rights or remedies under their respective Swap Termination Agreements through April 30, 2010.

### 2.    **Miscellaneous**

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will

not be counted for voting purposes. Signed ballots that indicate the holder's agreement to waive defaults or forbear from exercising remedies will be treated as a valid waiver or forbearance irrespective of whether such holder votes on the Plan or whether such holder accepts or rejects the Plan. Where applicable, the Debtors, in their sole discretion, may request that the Voting Agent attempt to contact voters to cure any defects in their ballots.

Except as provided below, unless the ballot is actually received by the Voting Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

THE DEBTORS RESERVE THE RIGHT, AT THEIR SOLE DISCRETION, AND WITHOUT NOTICE EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE LAW, TO EXTEND THE SOLICITATION PERIOD OR TERMINATE THEIR SOLICITATION OF VOTES ON THE PLAN.

3. **Fiduciaries And Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing, and may be required, upon request, to submit proper evidence satisfactory to the Debtors of authority to so act.

UNLESS THE BALLOT IS ACTUALLY RECEIVED BY THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH VOTE BE COUNTED.

4. **Change of Vote**

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan.

C. **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all ballots submitted by any creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve their rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of their creditors. The interpretation (including the ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be

final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## D.     Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## IX.

## CONFIRMATION OF THE PLAN

## A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to conduct a hearing to consider confirmation of a plan. On, or as promptly as practicable after the Commencement Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to creditors, equity interest holders, and other parties in interest in accordance with the applicable orders of the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (a) Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq. and Sharon J. Richardson, Esq.), co-attorneys for the Debtors; (b) Richards, Layton & Finger, P.A. One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq.), co-attorneys for the Debtors; (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801; (d) Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Howard Seife, Esq. and Andrew Rosenblatt, Esq.), co-attorneys for the Administrative Agent; (e) Young Conaway Stargatt & Taylor, LLP, the Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391,

Wilmington, Delaware 19899-0391 (Attn: Joel A. Waite, Esq.), co-attorneys for the Administrative Agent; and (f) such other parties as the Bankruptcy Court may order.

Objections to confirmation of the Plan are governed by Fed. R. Bankr. P. 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.      General Requirements of Section 1129**

1.      <u>**Requirements of Section 1129(a) of the Bankruptcy Code**</u>

(a)      General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)      The Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)      The Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)      The Plan has been proposed in good faith and not by any means proscribed by law;

(iv)      Any payment made or promised by the Debtors or by an Entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider;

(vi)      With respect to each Class of Claims or Equity Interests, each holder of an Impaired Claim or Impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test," below;

(vii)　Except to the extent that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Equity Interests has either accepted the Plan or is unimpaired under the Plan;

(viii)　Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, and Priority Non-Tax Claims will be paid in full in Cash on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding five years after the Commencement Date, of a value as of the Effective Date, equal to the Allowed amount of such Claims with interest from the Effective Date;

(ix)　At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)　Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor of the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility," below;

(xi)　All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing have been paid or the Plan provides for the payment of all such fees on the Effective Date; and

(xii)　The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

(b)　Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Impaired Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in meeting the "best interests test" is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The total amount available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 cases.  The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of  liquidation, and such additional Administrative Expense Claims and priority Claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation. Finally, the present value of that amount (taking into account the time necessary to accomplish the liquidation) is allocated to creditors and shareholders in strict priority in accordance with

section 726 of the Bankruptcy Code (see discussion below) and can then be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that a trustee may engage, plus any unpaid expenses incurred by the Debtors during a chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors both prior to, and during the pendency of, the Reorganization Cases. The foregoing types of Claims, costs, expenses, and fees and such other Claims which may arise in a liquidation case or result from a pending chapter 11 case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims.

In applying the "best interests test," it is possible that Claims and Equity Interests in the chapter 7 case may not be classified as in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all prepetition unsecured Claims, which have the same rights upon liquidation would be treated as one class for purposes of determining the potential distribution of the liquidation proceeds resulting from the Debtors' chapter 7 cases. The distributions for the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each creditor. Therefore, creditors who are or claim to be third party beneficiaries of any contractual subordination provisions might be required to seek or enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. Section 510 of the Bankruptcy Code specifies that such contractual subordination provisions are enforceable in a chapter 7 liquidation case.

The Debtors believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full with interest. Consequently, the Debtors believe that in a liquidation, holders of Allowed Claims in Classes 1, 4, and 5 and Allowed Equity Interests in Class 8 would receive no distributions of property and holders of Allowed Claims in Class 2 would receive less than their anticipated recovery under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including, without limitation, (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the contexts of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (iii) the adverse effects on the salability of the New Common Stock as a result of the departure of key employees and the loss of major customers and suppliers, and (iv) substantial increases in Claims which would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case, the Debtors have

determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less that it would receive pursuant to a liquation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each Class of Allowed Claims in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in chapter 7 may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve Claims asserted in the chapter 7 cases, the delay would be further prolonged.

**The Debtors' liquidation analysis, which is attached as <u>Exhibit H</u> hereto, is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

(c)     Feasibility of the Plan

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This is the so-called "feasibility" test. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the Projections set forth in Exhibit G to this Disclosure Statement and described in Section VI above. Based upon such Projections, the Debtors believe that they will have sufficient Cash resources to make the payments required pursuant to the Plan, repay and service debt obligations and maintain operations on a going-forward basis. Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Debtors and therefore, the Plan complies with section 1129(a)(11) of the Bankruptcy Code.

2.     **<u>Requirements of Section 1129(b) of the Bankruptcy Code</u>**

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a Class of Claims or Equity Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

<u>No Unfair Discrimination</u>. This test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same but that such treatment be "fair."

<u>Fair and Equitable Test</u>. This test applies to Classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no Class of Claims receive more than 100% of the Allowed amount of the Claims in such Class. As to the

dissenting Class, the test sets different standards, depending on the type of Claims or Equity Interests in such Class:

- Secured Claims. Each holder of an impaired secured claim either (a) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (b) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Claims. Either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

- Equity Interests. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock or (b) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

The Plan requests that the Bankruptcy Court confirm the Plan notwithstanding the rejection or deemed rejection of the Plan by a Class. With respect to Class 8, which is deemed to reject the Plan, the Debtors believe the Plan will satisfy both the "no unfair discrimination" and the "fair and equitable" requirements because as to Class 8 (a) there is no Class of equal priority receiving more favorable treatment and (b) there is no Class that is junior. In the event any other Class rejects the Plan, the Debtors will demonstrate at the Confirmation Hearing that the requirements are satisfied as to such other rejecting Class, as well. The Debtors also may amend the Plan in accordance with Section 12.5 of the Plan and applicable provisions of the Bankruptcy Code.

## X.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A. Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of Claims is set forth in Section IX of this Disclosure Statement. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a

less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations. In a chapter 7 liquidation, the Debtors believe that there would be no distribution to holders of Allowed Claims in Classes 1, 4, and 5 and Allowed Equity Interests in Class 8, and the distribution to holders of Allowed Claims in Class 2 would be materially less.

## B.    Alternative Plans

If the Plan is not confirmed, the Debtors, or any other party in interest (if the Debtors' exclusive period in which to file a plan has expired) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets under chapter 11. The Debtors have concluded that the Plan enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors would still incur the expenses associated with closing or transferring to new operators numerous facilities. The process would be carried out in a more orderly fashion over a greater period of time. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe that liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## C.    Commencement of a "Conventional" Chapter 11 Case.

If the requisite acceptances are not received, the Debtors nevertheless could commence "conventional" chapter 11 cases, in which circumstance the Debtors could continue to operate their businesses and manage their properties as debtors in possession, but would become subject to the numerous restrictions imposed on debtors in possession by the Bankruptcy Code. The Debtors could have difficulty sustaining operations in the face of the high costs, erosion of customer confidence, loss of key employees and general liquidity difficulties that could well result if they remained chapter 11 debtors in possession for a protracted length of time. Ultimately, the Debtors (or other parties in interest) could propose another plan or liquidate the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

## XI.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

## A.    Certain U.S. Federal Income Tax Consequences of the Plan

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), in effect on the date of this Disclosure Statement, U.S. Treasury regulations in effect on such date, and judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which could apply retroactively

and could affect the U.S. federal income tax consequences described below.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not obtained an opinion of counsel, and do not intend to seek a ruling from the Internal Revenue Service ("IRS") or any other taxing authority as to any of the U.S. federal income tax consequences expected to result from the implementation of the Plan.  There can be no assurance that the IRS or another taxing authority will not take a contrary view with respect to any issue discussed below.

This summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder, including the potential recognition of foreign currency gain or loss upon the consummation of the transactions contemplated by the Plan.  The U.S. federal income tax treatment of a holder of an Allowed Claim or an Allowed Equity Interest may vary depending upon such holder's particular situation.  Except as otherwise stated below, the following summary assumes that a holder holds an Allowed Claim as a capital asset within the meaning of section 1221 of the Tax Code.  This summary assumes that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.  This summary does not address U.S. state or local tax considerations that may be applicable to the Debtors and holders of Allowed Claims or Allowed Equity Interests, nor does it address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest in, or a debt obligation of, a Debtor as a position in a straddle or as part of a hedging, conversion or integrated transaction for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, persons that have a functional currency other than the U.S. dollar, persons who acquired a debt obligation of a Debtor in connection with the performance of services, persons using a mark to market method of accounting and persons who are not U.S. persons (as defined in the Tax Code).  In addition, the following summary does not address the U.S. federal income tax consequences of the Plan to holders of Allowed Equity Interests in Subsidiary Debtors or holders of Allowed Claims, in each case, that are unimpaired under the Plan.  If a partnership (or other entity taxed as a partnership) holds an Allowed Claim, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and upon the activities of the partnership.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR AN ALLOWED EQUITY INTEREST.  HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN.**

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY**

INTERESTS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF SUCH CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING U.S. FEDERAL, STATE OR LOCAL TAX PENALTIES, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

1. **Certain Consequences to the Debtors**

For U.S. federal income tax purposes, Xerium and its U.S. corporate subsidiaries file a consolidated U.S. federal income tax return of which Xerium is the common parent of the consolidated group (the corporations in Xerium's consolidated group, the "Xerium Group"). The Xerium Group expects to report a consolidated net operating loss ("NOL") carryforward for U.S. federal income tax purposes of approximately $90 million as of December 31, 2009, and an additional NOL carryforward of approximately $44 million with respect to the group's 2010 taxable year. The Debtors expect that any taxable income recognized by the Xerium Group in connection with the transactions relating to the Plan should be offset by current operating losses of the Xerium Group and/or the group's NOL carryforward.

(a) COD Income and Attribute Reduction

Absent an exception, a debtor generally must recognize cancellation of indebtedness ("COD") income to the extent the discharged indebtedness exceeds any consideration received in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income. The amount of consideration received by a holder of indebtedness generally would equal the amount of Cash, the fair market value of property (including stock), and/or the issue price of any new debt instrument as determined under sections 1273 or 1274 of the Tax Code. The issue price of a publicly traded debt instrument generally is its fair market value, determined as of the issue date, and the issue price of any other debt instrument generally is its stated principal amount if such instrument's terms provide for the payment of adequate stated interest.

A taxpayer is not required to include any COD income in gross income if such taxpayer is a debtor under the jurisdiction of a court in a chapter 11 bankruptcy case and the discharge of debt occurs pursuant to such case. However, as a result of such exclusion, the debtor must generally reduce its tax attributes—such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets—by the amount of the excluded COD income (but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the debtor's aggregate liabilities immediately after the discharge).

The Debtors currently believe that they will not realize a material amount of COD income as a result of the implementation of the Plan. Notwithstanding the Debtors'

current expectation, the Debtors generally will realize additional COD income to the extent the issue price of the Term Notes and/or the fair market value of the New Common Stock are less than currently expected. The Debtors expect they will have significant NOL carryovers remaining after emergence from chapter 11, subject to the limitations discussed below, even if attribute reduction were required with respect to any excluded COD income. The Debtors believe that any COD recognized for U.S. federal income tax purposes by a Debtor that is a controlled foreign corporation generally should not constitute Subpart F income of the Xerium Group.

(b)       Limitation on Utilization of NOLs and Other Tax Attributes

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its NOL carryforwards ("pre-change losses") that may be utilized to offset future taxable income is subject to an annual limitation. This annual limitation applies in addition to, and not in lieu of, the attribute reduction that would result from any COD realized in connection with the Plan. The issuance and distribution of New Common Stock to holders of Allowed Shared Collateral Claims and Allowed Unsecured Swap Termination Claims pursuant to the Plan generally will constitute an ownership change of Reorganized Xerium under section 382.

(i)       General Section 382 Limitation

In general, an ownership change occurs when the percentage of a loss corporation's stock owned by certain "5% shareholders" increases by more than 50 percentage points over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of the three year period preceding the testing date or the period of time since the corporation's most recent ownership change). A 5% shareholder for these purposes generally includes an individual or entity that, directly or indirectly, owns at least 5% of a loss corporation's stock, and may include one or more groups of shareholders that, in the aggregate, own less than 5% of the value of such corporation's stock. Under applicable Treasury regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated federal income tax return generally is measured by changes in the stock ownership of a group's parent corporation.

Subject to the special bankruptcy rules discussed below, the annual limitation on the use of pre-change losses in any "post-change year" is equal to the product of the fair market value of the loss corporation's outstanding stock (or in the case of a consolidated group, the common parent's) immediately before the ownership change, and the long-term tax-exempt rate (which is published monthly by the United States Department of the Treasury) in effect for the month in which the ownership change occurs. If a loss corporation has a net unrealized built-in gain (as defined below), the annual limitation is increased by the amount of such built-in gains which are recognized during the five year period following the ownership change. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the loss corporation (or the consolidated group) does not constitute its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual

limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the loss corporation's pre-change losses.

Section 383 of the Tax Code generally applies a similar limitation to capital loss carryforwards and tax credits.

### (ii)     Built-In Gains and Losses

Under section 382 of the Tax Code, if a loss corporation (or consolidated group) has a net unrealized built-in gain (generally, the excess, if any, of the aggregate fair market value of the corporation's assets over the aggregate tax basis of such assets on the ownership change date) at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its otherwise limited pre-change losses against such built-in gain in addition to its regular annual allowance.   Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in loss (generally, the excess, if any, of the aggregate tax basis of the corporation's assets over the aggregate fair market value of such assets on the ownership change date) at the time of an ownership change, any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally would be treated as part of the pre-change losses that are subject to the annual limitation.   A loss corporation's (or consolidated group's) net unrealized built-in gain or net unrealized built-in loss generally will be deemed to be zero unless it is greater than the lesser of (x) $10 million or (y) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

### (iii)    Special Bankruptcy Exception

When an ownership change occurs pursuant to the implementation of a plan of reorganization under the Bankruptcy Code, the annual limitation may not apply if certain requirements are satisfied.  Under section 382(l)(5) of the Tax Code, the annual limitation may not apply to an ownership change of a loss corporation that is under the jurisdiction of a bankruptcy court immediately before the change if the shareholders and qualified creditors (generally, trade creditors and those who held the relevant indebtedness for at least 18 months prior to the bankruptcy filing) of the loss corporation immediately before the ownership change own at least 50% of the loss corporation's stock by value and voting power after the ownership change and as a result of being shareholders or creditors immediately before such ownership change.  If the exchanges contemplated by the Plan qualify under section 382(l)(5) of the Tax Code, and the Xerium Group does not elect alternative treatment (as discussed below), the Xerium Group would avoid the application of the annual limitation to its NOLs and recognized built-in losses, if any.  However, section 382(l)(5) of the Tax Code would require the Xerium Group to reduce its NOLs (and possibly other tax attributes) by the amount of any deductions for interest claimed by the group with respect to the indebtedness converted into stock for: (x) the three year period preceding the taxable year of the ownership change, and (y) the portion of the year of the ownership change prior to the Effective Date.  Under section 382(l)(5) of the Tax Code, if a second ownership change occurs during the two year period immediately following the Effective Date, the annual limitation after the second ownership change will be

zero, and thus would preclude the future use of any pre-change losses existing at the time of the second ownership change.

Alternatively, if the Xerium Group does not qualify under section 382(l)(5) of the Tax Code, or elects out of the application of such section, the Xerium Group's annual limitation will be determined in accordance with section 382(l)(6) of the Tax Code. Under this provision, the annual limitation is determined by reference to the net equity value of Reorganized Xerium's stock immediately after the ownership change (rather than immediately before the ownership change) after giving effect to the surrender of Allowed Claims but subject to certain adjustments (which can result in a reduced stock value). In no event, however, can the stock value for this purpose exceed the gross value of Reorganized Xerium's assets immediately before the ownership change.

The determination of the application of section 382(l)(5) of the Tax Code is highly fact specific. The Debtors have not yet determined whether, if they qualify for the special rule under section 382(l)(5) of the Tax Code, they would rely on section 382(l)(5) or section 382(l)(6). Any election to rely on section 382(l)(6) of the Tax Code rather than section 382(l)(5) would have to be made in the Xerium Group's consolidated U.S. federal income tax return for the taxable year in which the ownership change occurs. Under a current IRS Notice, which is subject to change or revocation at any time, a corporation (or consolidated group) whose assets have net unrealized built-in gain may increase its annual limitation during the five year period immediately following the ownership change by an amount equal to the additional depreciation deductions that a hypothetical purchaser of the Debtors' assets would have been permitted to claim if it had acquired the Debtors' assets in a taxable transaction.

(c)     Alternative Minimum Tax

In general, an alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income at a 20% tax rate if and to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation generally cannot offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards (as computed for AMT purposes). Any AMT paid by a corporation generally will be allowed as a nonrefundable credit against such corporation's regular federal income tax liability in any future taxable year when such corporation is no longer subject to AMT and otherwise becomes subject to regular tax.

2.     **Certain Consequences to Holders of Allowed Shared Collateral Claims or Allowed Unsecured Swap Termination Claims**

Pursuant to the Plan, each holder of an Allowed Shared Collateral Claim and each holder of an Allowed Unsecured Swap Termination Claim will receive its Distributable Share of Cash, Term Notes and New Common Stock.

(a)     Taxable Exchange

Although not entirely free from doubt, the Debtors believe, and this summary assumes, that a holder's exchange of any Allowed Shared Collateral Claims and/or Allowed

Unsecured Swap Termination Claims for consideration under the Plan generally should be a taxable transaction to such holder for U.S. federal income tax purposes.

Subject to the foregoing, a holder of any Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash, the "issue price" of the Term Notes (see "Ownership and Disposition of Term Notes" below) and the fair market value of any New Common Stock received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in the Allowed Shared Collateral Claims and/or an Allowed Unsecured Swap Termination Claims exchanged therefor (other than any tax basis attributable to accrued but unpaid interest). See "Character of Gain or Loss" below. In addition, a holder of Allowed Shared Collateral Claims and/or an Allowed Unsecured Swap Termination Claims generally will recognize interest income to the extent of any exchange consideration allocable to accrued and unpaid interest not previously included in such holder's taxable income. See "Payment of Accrued Interest" below. A holder's tax basis in the Term Notes received generally should equal the issue price of such notes, and a holder's tax basis in any New Common Stock received generally should equal the fair market value of such stock on the date of the exchange. A holder's holding period in such Term Notes and New Common Stock generally should begin the day following the exchange date.

(b)     Character of Gain or Loss

Where a holder of any Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims recognizes gain or loss in respect of the satisfaction and exchange of its Allowed Claims pursuant to the Plan, a number of factors will determine the character of such gain or loss as long term or short term capital gain or loss or as ordinary income or loss, including the tax status of the holder, whether the holder's Allowed Claims constitute a capital asset in the holder's hands, how long the Allowed Claims have been held, whether the holder acquired any of the Allowed Claims at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction with respect to its Allowed Claims. A holder of any Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims is urged to consult its own tax advisor for a determination of the character of any gain or loss recognized by the holder upon the exchange of such holder's Allowed Claims for consideration under the Plan.

A holder of any Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims who recognizes capital losses as a result of the distributions under the Plan generally will be subject to limits on its use of capital losses. A noncorporate holder generally may use capital losses to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains. Holders, other than corporations, generally may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. Conversely, a corporate holder may only use capital losses to offset capital gains. Corporate holders who have more capital losses than can be used in a taxable year generally may be allowed to carry over unused capital losses for the five taxable years following the capital loss

year, but generally are allowed to carry back unused capital losses to the three taxable years preceding the capital loss year.

A holder of an Allowed Claim that purchased the indebtedness underlying such Allowed Claim from a prior holder of such indebtedness at a "market discount" (relative to the principal amount of such indebtedness at the time of acquisition) generally would be subject to the market discount rules of the Tax Code, unless an exception applies. In general, a debt instrument is considered to have been acquired with "market discount" if the debt instrument's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount ("<u>OID</u>")) exceeds the tax basis of the debt instrument in the holder's hands immediately after its acquisition by more than a de minimis amount. If the holder is considered to have acquired the debt instrument with market discount, any gain recognized by the holder on the exchange of such debt instrument generally would be treated as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. In addition, if the holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry the market discount debt instrument, such deferred amounts generally would become deductible at the time of the exchange. A holder of any Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims is urged to consult its own tax advisor regarding the application of the market discount rules (including the exceptions under the Tax Code to the treatment of a debt instrument as a "market discount bond") to such holder's exchange of Allowed Claims under the Plan.

Finally, any gain recognized by a holder on a subsequent sale or exchange of New Common Stock received in exchange for Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims under the Plan generally should be treated as ordinary income to the extent of the sum of any (i) bad debt deductions or charges to bad debt reserves claimed with respect to such Allowed Claims, (ii) ordinary loss taken on the exchange of such Allowed Claims for New Common Stock, and (iii) income not recognized due to the use of the cash method of tax accounting with respect to such Allowed Claims exchanged. A holder of any Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims is urged to consult its own tax advisors regarding the application of this recapture rule with respect to New Common Stock received pursuant to the Plan.

(c)     Payment of Accrued Interest

The Plan provides that consideration distributed to a holder of Allowed Claims is treated as first satisfying an amount equal to the stated principal amount of such holder's Allowed Claims, as determined for U.S. federal income tax purposes, and any remaining consideration as satisfying any accrued but unpaid interest (in contrast, for example, to a pro rata allocation of the consideration received by a holder between principal and interest, or an allocation first to accrued but unpaid interest). Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes. There is no assurance that the IRS will respect this allocation for U.S. federal income tax purposes.

In general, to the extent that a holder of any Allowed Shared Collateral Claims and/or Allowed Unsecured Swap Termination Claims receives any consideration pursuant to the Plan in satisfaction of accrued interest (or OID) during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder may recognize a deductible loss under certain circumstances to the extent any accrued interest claimed was previously included in such holder's gross income and is not paid in full. A holder of any Allowed Shared Collateral Claims or Allowed Unsecured Swap Termination Claims is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

(d)     Ownership and Disposition of Term Notes

A holder of Term Notes must include stated interest on the notes in income in accordance with the holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in Cash or property (other than debt instruments of the issuer) at least annually.

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount. A debt instrument's "stated redemption price at maturity" includes all principal and interest payable over the term of the instrument, other than qualified stated interest. The "issue price" of the Term Notes generally should depend on whether, at any time during the 60-day period ending 30 days after the exchange date, the (i) Term Notes or (ii) indebtedness with respect to which a substantial amount of the Term Notes is issued ("exchanged debt") are treated as traded on an established market. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the relevant debt obligation appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, a debt obligation is considered to be publicly traded when price quotations for such debt are readily available from dealers, brokers or traders.

If the Term Notes or the exchanged debt are treated as traded on an established market under the above rules, the issue price of the Term Notes generally should equal their fair market value (or the fair market value of the exchanged debt, adjusted for the amount of Cash and fair market value of the New Common Stock also received in respect of Allowed Claims with respect to such exchanged debt, if such exchanged debt, rather than the Term Notes, are treated as traded on an established market) as of the Effective Date. If neither the Term Notes nor the exchanged debt are treated as traded on an established market, the issue price of the Term Notes generally should be their stated principal amount. The Debtors currently intend to treat the Term Notes as traded on an established market under the above rules.

A holder of a Term Note issued with OID generally must include any OID in income over the term of the note (for so long as the notes continue to be owned by the holder) in accordance with a constant yield-to-maturity method, regardless of whether the holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives Cash

payments of interest on the notes (other than Cash attributable to qualified stated interest). Accordingly, a holder could be treated as receiving interest income in advance of a corresponding receipt of Cash. Any OID that a holder includes in income will increase such holder's tax basis in its Term Notes. A holder of a Term Note generally will not be separately taxable on any Cash payments of interest that have already been taxed under the OID rules, but the holder generally will reduce its tax basis in such note by the amount of such payments.

Any gain or loss recognized by a holder on a sale, exchange or other taxable disposition of a Term Note generally should be capital gain or loss in an amount equal to the difference, if any, between such holder's amount realized and its adjusted tax basis in the note immediately before the disposition (increased for any OID accrued through the date of disposition). Any such gain or loss generally should be long term capital gain or loss if the holder's holding period in its Term Note is more than one year on the date of disposition.

(e)     Ownership and Disposition of New Common Stock

Distributions, if any, with respect to New Common Stock generally will be taxable as dividend income when paid to the extent of Reorganized Xerium's current and accumulated earnings and profits as determined for U.S. federal income tax purposes. To the extent the amount of any distributions exceeds Reorganized Xerium's earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis in its New Common Stock (but not below zero). Any remaining excess generally will be treated as gain or loss from the sale or exchange of such stock, with the consequences discussed below. The absence of an adjustment to the number of shares of New Common Stock into which New Warrants are exercisable or to the exercise price of such warrants may, under certain circumstances, result in a constructive distribution that could be taxable to the holders of the New Common Stock for U.S. federal income tax purposes.

Dividends are generally taxed as ordinary income. However, dividends received by non-corporate holders of New Common Stock in taxable years beginning before January 1, 2011, may qualify for taxation at lower rates applicable to long term capital gains, provided the holder satisfies certain holding period and other requirements. Non-corporate holders are urged to consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

In general, a distribution to a corporate holder of New Common Stock that is treated as a dividend for U.S. federal income tax purposes will qualify for the 70% dividends received deduction ("<u>DRD</u>") that is available to corporate shareholders that own less than 20% of the voting power or value of the distributing corporation's outstanding stock. A corporate shareholder holding at least 20% of the voting power or value of the distributing corporation's outstanding stock may be eligible for an 80% DRD. No assurance can be given that Reorganized Xerium will have sufficient earnings and profits (as determined for U.S. federal income tax purposes) to cause distributions, if any, to be eligible for a DRD. Dividend income that is not subject to regular U.S. federal income tax as a consequence of the DRD may be subject to the AMT. The DRD is only available if the relevant corporate holder satisfies certain holding period and taxable income requirements. The length of time that a holder has held its New Common Stock generally will be reduced for any period during which the holder's risk of

loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. Finally, the tax consequences of a corporate holder's receipt of a dividend on its New Common Stock may be different if the dividend is treated as an "extraordinary dividend" under applicable rules. Corporate holders are urged to consult their own tax advisors regarding the potential tax consequences of a receipt of distributions on New Common Stock.

Subject to the ordinary income recapture rule discussed above (see "Character of Gain or Loss" above), any gain or loss recognized by a holder on the sale, exchange or other taxable disposition of New Common Stock received under the Plan generally should be capital gain or loss in an amount equal to the difference, if any, between such holder's amount realized and its adjusted tax basis in its common stock immediately before the disposition. Any such gain or loss generally should be long term capital gain or loss if the holder's holding period in its New Common Stock is more than one year on the date of disposition.

3.  **Certain Consequences to Holders of Allowed Equity Interests in Class 8**

On the Effective Date, Existing Common Stock will be canceled, and each holder of an Allowed Equity Interest in Class 8 will receive New Common Stock and New Warrants to purchase shares of New Common Stock.

(a)  Recapitalization

The Debtors believe that the receipt of New Common Stock and New Warrants in exchange for Existing Common Stock generally should be treated for U.S. federal income tax purposes as a "recapitalization" to holders of Allowed Equity Interests in Class 8. Assuming this exchange constitutes a recapitalization, a holder of Allowed Equity Interests in Class 8 will not recognize loss, and generally should not recognize gain because such holders will not receive consideration other than New Common Stock and New Warrants. The portion of any consideration required to be treated as imputed interest due to the distribution of such consideration after the Effective Date is excluded from the above calculation and taxed under separate rules. In addition, assuming the above exchange constitutes a recapitalization, a holder's (i) aggregate tax basis in the New Common Stock and New Warrants received in exchange for such holder's Existing Common Stock generally will equal the holder's aggregate adjusted tax basis in such interest, increased by any gain recognized with respect to such interest and decreased by any consideration other than New Common Stock and New Warrants received with respect to such interest, (ii) tax basis generally will be allocated between the New Common Stock and New Warrants based on their relative fair market values, and (iii) holding period for the New Common Stock and New Warrants received generally will include the holder's holding period for its Existing Common Stock.

(b)  Ownership and Disposition of New Common Stock

For a discussion of the U.S. federal income tax consequences of the ownership and disposition of New Common Stock, see "Ownership and Disposition of New Common Stock" above.

(c)     Ownership and Disposition of New Warrants

A holder of New Warrants generally will not recognize gain or loss upon the exercise of such warrants for New Common Stock.  A holder's tax basis in the New Common Stock received upon exercise of New Warrants generally will equal the sum of the holder's tax basis in such New Warrants and the exercise price of such New Warrants.  The holding period of the New Common Stock received upon exercise of New Warrants generally will commence on the day following the exercise of such warrants.  Upon the lapse or disposition of New Warrants, the holder generally should recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and the holder's tax basis in such warrants.  This gain or loss generally should be long term capital gain or loss if the holder's holding period in its New Warrants is more than one year on the date of lapse or disposition.

The New Warrants provide in certain circumstances for adjustment to the number of shares of New Common Stock into which New Warrants are exercisable or to the exercise price of such warrants.  Under section 305 of the Tax Code, such an adjustment may constitute a constructive distribution to a holder of New Warrants if, and to the extent that, the adjustment has the effect of increasing such holder's proportionate interest in Reorganized Xerium's earnings and profits or assets.  However, an adjustment to the exercise price of New Warrants made pursuant to a bona fide reasonable adjustment formula that has the effect of preventing the dilution of the interest of holders of New Warrants generally should not be considered to result in a constructive distribution to such holders.  Holders of New Warrants should carefully review the exercise price adjustment provisions of the New Warrants and are urged to consult their own tax advisors with respect to the U.S. federal income tax consequences of ownership and exercise or disposition of New Warrants.

4.     **Information Reporting and Withholding Requirements**

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding requirements, including employment tax withholding.  Reorganized Xerium may be required to withhold and sell on behalf of a holder an amount of New Common Stock sufficient to satisfy the withholding requirements applicable to such holder, unless such holder makes other arrangements (such as remitting to Reorganized Xerium directly the amount of taxes owed).

In general, information reporting requirements may apply to distributions or payments under the Plan.  Furthermore, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding at the then-applicable rate (currently 28%).  Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) is notified by the IRS of a failure to report interest or dividends properly, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that the holder is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax.  The amount of backup withholding imposed on a payment to a holder may be refunded by the IRS or allowed as a credit against the holder's U.S. federal income tax liability, provided that the required information is properly furnished to the IRS.  Certain persons are exempt from backup

withholding, including, under certain circumstances, corporations and financial institutions. Holders of Allowed Claims and Allowed Equity Interests are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Allowed Claims and Allowed Equity Interests are urged to consult their own tax advisors regarding whether the exchanges contemplated by the Plan would be subject to these regulations and require disclosure on the applicable holder's tax returns.

**B.      Certain German Tax Consequences of the Plan**

The below summary of certain German tax consequences is based on the following assumptions:

- Xerium Germany has third party bank debt in the amount of approx. MEUR 90 of which MEUR 60 will be refinanced with new debt and the remaining MEUR 30 will be settled with New Common Stock;

- The debt in the amount of MEUR 30 that will ultimately be settled with New Common Stock will, in a first step, be assumed by Reorganized Xerium with discharging effect for Xerium Germany, and Reorganized Xerium will unconditionally waive any recourse it may have against Reorganized Xerium Germany for the repayment of such debt;

- Reorganized Xerium will transfer the New Common Stock to the lenders under the Credit Facility in satisfaction of any obligations Xerium may have to repay MEUR 30 of the existing bank debt assumed from Xerium Germany and the lenders under the Credit Facility shall be deemed to release Xerium from any obligation they may have to repay such debt;

- Following the debt to equity exchange, the amount of new Germany bank debt at Reorganized Xerium Germany will be MEUR 60 and Reorganized Xerium Germany will issue a note for this amount;

- The fair market value of the New Common Stock corresponds to the face value of the existing German debt it is used to settle;

- Reorganized Xerium has the financial capacity to settle the German debt assumed from Xerium Germany;

- Lenders under the Credit Facility are German or foreign banks, i.e., corporate entities rather than individuals.

The following summary of certain German tax consequences expected to result from the implementation of the Plan is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of an Allowed Claim. Holders of Allowed Claims are urged to consult their own tax advisors with respect to the German tax consequences expected to result from the implementation of the Plan.

1.     **German Income Tax Consequences for Xerium Germany**

If existing German debt in the amount of MEUR 30 is assumed by Reorganized Xerium in the manner described above, Reorganized Xerium Germany will account for a claim against Reorganized Xerium for settlement of its debt at the face value of the debt which, on the liabilities side of the balance sheet, will be recorded as a capital contribution. Since the debt has been assumed by, and thus transferred to, Reorganized Xerium, both the claim against Reorganized Xerium and the liability against the lenders in the same amount will be canceled from the books without income effect, and the Debtors believe that this should not result in any adverse German tax consequences.

The replacement of the remaining German debt in the amount of MEUR 60 by new debt in the same amount has no German income tax consequences.

Interest expenses on the new debt will be treated in the same manner as interest expense on the existing debt, i.e., they will generally qualify as tax deductible expenses at the level of Reorganized Xerium Germany, subject to German interest limitation rules. To the extent deductible under these rules, 25% of the interest expenses will be added back to the tax basis for trade tax purposes.

2.     **Forfeiture of Net Operating Losses (NOLs)**

The Debtors understand that Xerium Germany has tax NOLs. Under currently applicable change of control rules, NOLs of a corporation, both for corporate income tax and trade tax purposes, are entirely forfeited if more than 50% of the shares in the corporation are directly or indirectly transferred to a new owner, or to a group of new owners acting in concert. The definition of acting in concert is very broad, i.e., it is sufficient if a group of investors has similar interests. The lenders under the Credit Facility receiving the New Common Stock may therefore be qualified as a group of new owners if they are contractually or in any other way internally aligned and, if more than 50% of the shares in Xerium Germany are (indirectly) acquired, it is likely that NOLs available as of the end of 2009 and current losses created in 2010 until closing of the transaction can no longer be used.

However, according to a newly introduced law dated July 22, 2009 a restructuring exception came into force. Under this restructuring exception, a change in ownership would not result in a forfeiture of NOLs, if (a) the transfer of shares in a loss corporation is part of a plan to avoid an insolvent situation/overindebtedness or to make the loss corporation solvent/restore its equity and (b) in addition, the "structural integrity" of the loss corporation's business is preserved by the plan. A preservation of such structural integrity of a business should be found to exist if:

- There is an agreement with the German worker's council of the loss corporation concerning the preservation of jobs, and such agreement has been honored; or

- The company continued to pay at least 400% of the gross salaries of the year prior to the share transfer in total over a period of 5 years following the change in ownership, i.e. the entire gross salaries paid must not decline by more than 20% in the average over the next 5 years after the change in ownership; or

- The shareholder(s) make(s) significant contributions (at least 25% of the loss corporation's assets stated in its tax balance sheet as of the balance sheet date prior to the share transfer) to the equity of the loss corporation within a period of 12 months after the share transfer.

The restructuring exception shall not apply, if:

- The loss corporation's business had ceased before the time of the share transfer, or

- During a period of 5 years following the share transfer, the loss corporation discontinues its historic business and engages in a different business activity.

Under the new regulation, the restructuring exception initially became effective for all ownership changes that occurred between December 31, 2007 and December 31, 2009. However, the time limit has been abolished under the Act to Accelerate Economic Growth which has come into effect on January 01, 2010, i.e., the exception will continue to apply in tax years 2010 et seq. Although not free from doubt, the Debtors believe that Reorganized Xerium Germany will qualify for the restructuring exception with respect to the implementation of the transactions contemplated by the Plan.

3.  **Real Estate Transfer Tax (RETT)**

German real estate transfer tax ("RETT") is only triggered if the direct or indirect change in ownership in the real estate owning company is 95% or more or if, as a result of a share transfer, at least 95% of the shares are directly or indirectly unified in the hands of one purchaser. Under the Plan, the lenders under the Credit Facility along with holders of Secured Swap Termination Claims and Unsecured Swap Termination Claims will in total acquire approximately 82.6% of the New Common Stock. Also, as opposed to the change of control rules, the shares have to be acquired by, or unified in the hands of, one purchaser, i.e., it is not sufficient for a group of investors to act in concert, so RETT should not be an issue in the case at hand.

If German RETT would be triggered, it generally amounts to 3.5% (except for Berlin and Hamburg where the rate is 4.5%). The tax basis is a specially assessed value which, as a rule of thumb, can be estimated at approx. 70% of the fair market value of the real estate.

4. **German Income Tax Consequences for German Resident Lenders**

    (a)    Assumption of Debt

The assumption of debt by Reorganized Xerium from Xerium Germany merely qualifies as an exchange of the debtor from the perspective of the lenders and therefore has no German tax consequences, provided that the corresponding receivable of the respective lender has not previously been written down to a lower value with tax effect.

    (b)    Settlement and Replacement of Debt

The settlement and replacement of debt with New Common Stock, new debt, and Cash has no German tax consequences, provided that the aggregate fair market value of the New Common Stock, new debt, and Cash transferred corresponds to the face value of the debt settled and that the corresponding receivable of the respective lender has not previously been written down to a lower value with tax effect. To the extent that a lender's tax book value is less than the aggregate fair market value of the New Common stock, new debt, and Cash received, the lender would recognize taxable gain.

    (c)    Interest Income

Subject to the discussion below for non-resident lenders, interest income received by the lenders under the Credit Facility on the new debt from Reorganized Xerium Germany will be subject to German corporate income tax (plus solidarity surcharge) and trade tax at a combined rate of currently approx. 30%.

5. **German Income Tax Consequences for Non-German Resident Lenders**

Lenders not tax resident in Germany are generally only subject to limited German tax liability with German source income. Income derived from a loan granted by a non-resident lender to a German borrower only qualifies as German source income if the loan is either secured with German real estate, or is attributable to a German permanent establishment of the non-resident lender. The current collateral package that will continue to secure the new debt includes German real estate. Interest income received by a non-German resident lender on the debt secured by German real estate will therefore qualify as German source income under German local tax provisions and will be subject to German tax in the hands of such lender unless Germany's right to taxation is excluded by a double tax treaty between Germany and the country of tax residence of the lender, if any.

6. **Withholding Tax on Interest**

Irrespective of the residence of the lender, interest payments made by a German company are generally only subject to German withholding tax if the paying entity qualifies as a bank or other financial institution in terms of the German Credit System Act (Kreditwesengesetz).

**C.      Certain Austrian Tax Consequences of the Plan**

The following summary of certain Austrian tax consequences expected to result from the implementation of the Plan is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of an Allowed Claim.  Holders of Allowed Claims are urged to consult their own tax advisors with respect to the Austrian tax consequences expected to result from the implementation of the Plan.

1.      **Austrian Tax Consequences of the Austrian Debt Restructuring Transactions to Xerium Austria**

Xerium Austria is a limited liability company (GmbH) organized under the laws of, and having its statutory seat as well as management in, Austria.  It is subject to a corporate income tax of 25% on its profit which, for tax purposes, is determined as the profit according to Austrian GAAP and the Austrian Commercial Code (Unternehmensgesetzbuch) after book-to-tax adjustments.  In principle, all income of an Austrian company is taxed as a uniform type of income.  In particular, there is no specific tax regime for capital gains.

(a)      Austrian Tax Consequences of Austria Purchase Agreement and Austria Note

(i)      Income Tax

When Reorganized Xerium Austria purchases the Xerium Austria Shares Distribution from Reorganized Xerium, the purchase should lead to the following tax treatment based on the assumption that the purchase price is intended to be based on the fair market value of the shares.  The Xerium Austria Shares Distribution should be recorded on the assets side of Reorganized Xerium Austria's balance sheet, and the tax book value should be equal to the purchase price.

The note to be issued to Reorganized Xerium in order to fund the share purchase (the "Austria Note") should be recorded as a liability.  Interest accrued on this note should be deductible if it is used to fund taxable income of Reorganized Xerium Austria; such interest should also be deductible if it is connected to the acquisition of tax exempt shares qualifying for the national or international participation exemption.  As the Austria Note is issued in a related party transaction, for the interest to be deductible, the terms of the note need to be properly evidenced, need to meet the arm's length standard and Reorganized Xerium Austria needs to maintain an adequate equity ratio.  According to court rulings, the equity ratio is adequate if it enables the company to maintain its business on an on-going basis and is not considerably lower than the ratio of other companies operating in the same industry.

Interest paid on the Austria Note should not be subject to withholding tax.  Withholding tax would apply only if the debt is securitized as a bearer bond and if the interest is paid by Xerium Austria or an Austrian paying agent.  In case of interest paid to a creditor which is neither an Austrian resident nor has an Austrian permanent establishment, the withholding tax would be subject to a refund procedure upon application.

(ii)    Stamp Duty

Loans and credit facilities are subject to a stamp duty of 0.8% or 1.5% of the principal amount if a written agreement or certain substitute documentation is set up.  The rate of 1.5% applies in the case of revolving facilities granted for more than five years, the 0.8% rate applies to all other credit facilities and loans.

Based on this, the Austria Note is within the scope of Austrian stamp duty.

In principle, unless Austria recognizes the exemption provided under section 1146 of the Bankruptcy Code, both parties to the agreement, i.e., Reorganized Xerium and Reorganized Xerium Austria, would be liable to pay the stamp duty.

A written agreement, except in case of a loan or credit facility granted by a direct shareholder, does not trigger stamp duty, if the agreement is executed and kept outside of Austria and if none of the parties have rights or obligations subject to a place of performance inside of Austria.  If, in such a case, certain substitute documentation is executed subsequently, e.g., correspondence sent to an Austrian address of Xerium Austria which refers to the Austria Note, stamp duty is triggered by this substitute documentation, unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized by Austria.  The Austrian Ministry of Finance has published an opinion that even email correspondence can constitute such substitute documentation, which opinion has however not been upheld by the Austrian tax court upon appeal.  A decision by the Austrian Supreme Administrative Court is pending.

(b)    Austrian Tax Consequences of the Austria Contribution Agreement

(i)    Income Tax

When the Xerium Austria Shares Distribution is transferred from Reorganized Xerium to Reorganized Xerium Austria by means of a contribution into the capital of Reorganized Xerium Austria from an indirect shareholder ("grandparent contribution"), such transfer should not be recognized as taxable income of Xerium Austria.  The contribution may be carried out without new shares being issued.

For tax accounting purposes, the assets side of the balance sheet of Xerium Austria need to show the New Common Stock at its fair market value.  The same amount needs to be recorded as a capital reserve (Kapitalruecklage) in the equity section of the liabilities side of the company's balance sheet and should be part of the company's equity for tax purposes.  The valuation of the contributed New Common Stock at fair market value for tax accounting purposes applies outside the scope of the Austrian Reorganization Tax Act (Umgruendungssteuergesetz).  It also applies within the scope of the Austrian Reorganization Tax Act unless a differing valuation at book value or acquisition cost is elected in the Austria Contribution Agreement.

Tax losses carried forward by Xerium Austria, if any, will be forfeited as of the effective date of the Austria Contribution Agreement if the contribution is executed within the scope of the Reorganization Tax Act and if the business units which have generated the losses

are no longer comparable to the identity of these business units at the time when the losses were generated.  However, the Xerium Austria Shares Distribution could only fall within the scope of the Reorganization Tax Act if it constituted an interest of 25% or more in Reorganized Xerium, which is not likely.  Thus, a forfeiture of tax losses carried forward is unlikely.

(ii)    Capital Duty

When the Xerium Austria Shares Distribution is transferred to Xerium Austria by means of a contribution into the capital of Xerium Austria by an indirect shareholder without involvement of the interposed entities or a sister entity, in particular Xerium Germany ("grandparent contribution"), such transfer should not be subject to capital duty.  A sister entity is an entity which has at least one shareholder in common with the entity receiving the contribution.  This tax treatment is based on an opinion published by the Ministry of Finance, but has not been confirmed by the Supreme Administrative Court (Verwaltungsgerichtshof) so far.

(c)    Austrian Tax Consequences of the Plan

(i)    Income Tax

(1)    Exchange of a Debt into Another Debt

The exchange of debt owed by Xerium Austria into another debt in the same amount, but with different terms and conditions, should generally not result in the recognition of taxable income to Xerium Austria for Austrian tax purposes.

If, upon conversion, the amount of the debt will be reduced, the reduction of the debt should be treated as a partial waiver of debt for Austrian tax purposes.  Under circumstances where the debt is (fully or partially) waived for business reasons, i.e., because it cannot reasonably be expected that the debt will be (wholly) repaid, the profit derived from the waiver of debts for business reasons is taxable.

(2)    Exchange of a Debt Against Xerium Stock

The reduction of debt owed by Xerium Austria in exchange for the Xerium Austria Shares Distribution, where the transfer of the Xerium Austria Shares Distribution is accepted by the creditor as a partial repayment of debt, should generally not result in the recognition of taxable income to Xerium Austria for Austrian tax purposes.  If, in the course of such exchange, a portion of the debt owed by Xerium Austria is not considered as repaid but as waived by the creditor, the profit derived from the waiver of debts for business reasons is taxable to Xerium Austria.  Also, if the portion of debt considered repaid exceeds the tax book value of the Xerium Austria Shares Distribution, this differential would constitute taxable income for Reorganized Xerium Austria.

(ii)     Stamp Duty

(1)     Treatment of Existing Debt in the Plan

Loans and credit facilities are subject to a stamp duty of 0.8% or 1.5% of the principal amount if a written agreement or certain substitute documentation is set up.  The rate of 1.5% applies in case of revolving facilities granted for more than five years; the 0.8% rate applies to all other credit facilities and loans.

In principle, unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized by Austria, both parties to the agreement, i.e., the lender(s) and Xerium Austria, are liable to pay the stamp duty.  A written agreement, however, does not trigger stamp duty, if the agreement is executed and kept outside of Austria and if none of the parties have rights or obligations subject to a place of performance inside of Austria.  If, in such a case, certain substitute documentation is executed subsequently, e.g., correspondence sent to an Austrian address of Reorganized Xerium Austria which refers to such a loan or credit facility, stamp duty is triggered by this substitute documentation.  The Ministry of Finance has published an opinion that even email correspondence can constitute such substitute documentation, which opinion has however not been upheld by the Austrian tax court upon appeal.  A decision by the Austrian Supreme Administrative Court is pending.

The Plan would likely qualify as qualifying substitute documentation for existing loans and credit facilities which have not been subject to stamp duty as it would mention these existing debts.  Thus, stamp duty would become due for such existing loans and credit facilities as soon as the plan is executed.  If, however, the Plan is set up and kept outside of Austria and none of the parties have rights or obligations relating to the loans and credit facilities subject to a place of performance within Austria, the Plan as such should not trigger stamp duty.

(2)     Treatment of New Debt in the Plan

The Plan will contain provisions on the new debt issued by Xerium Austria and thus, unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized by Austria, will qualify as a written agreement on the new debt subject to stamp duty.  The stamp duty would be 0.8% or 1.5% of the principal amount of the new debt.  The rules described in the preceding paragraphs apply.

Certain (partial) exemptions from any such stamp duty may apply, in particular the exemptions for an extension of credit, for amendments of, or additions to, agreements and for debt restructuring.

The exemption for extensions of credits applies when the duration of an existing credit facility, which remains in force, is extended.  Extensions of credits are exempt up to an overall duration of five years.  Repeated extensions of revolving credit facilities are exempt, unless the overall duration exceeds a multiple of five years.

The partial exemption for amendments of, or additions to, agreements requires that an existing agreement, which remains in force and has been evidenced in a qualifying written document, is modified by the amendment.  If the parties agree on cancelling the existing

agreement and entering into a new agreement, the exemption does not apply. If the partial exemption applies, the amendment or addition is subject to stamp duty only to the extent that the base for the stamp duty is increased. As an example, an addition to a loan agreement would only be subject to stamp duty to the extent the principal amount is increased. In addition to that, stamp duty would also apply to any amount that had already been repaid, but which is, again, included in the new debt.

The partial exemption for debt restructuring applies to loan agreements and credit facilities if

- the existing debt was based on a written document that was subject to stamp duty,

- new debt is issued to a lender other than the lender of the existing debt,

- a written document on the new debt is set up containing a reference to the fact that it constitutes a debt restructuring within the meaning of the Stamp Duty Act,

- the old debt is fully repaid to the old lender and the agreement on the old debt is canceled, and both actions are completed within one month of execution of the written agreement on the new debt, and

- the debtor owing the new debt is the same as the one owing the old debt, even if by means of universal legal succession.

The partial exemption for debt restructuring provides that the new debt is not regarded as a new agreement, but as an amendment of the old agreement. Thus, the new debt would not be subject to stamp duty as a whole, but only to the extent that the base for stamp duty is increased.

In case these exemptions do not apply, the Plan should, however, not be subject to stamp duty, the Plan is executed and kept outside of Austria and if none of the parties have rights or obligations subject to a place of performance inside of Austria with respect to the new debt, even if such rights and obligations are just remotely related to the debt. Even if these requirements are met so that stamp duty does not become due on the Plan, stamp duty will become due if certain substitute documentation is executed subsequently. The preceding comments on stamp duty apply correspondingly.

(d)    Austrian Tax Consequences of the Transfer of Xerium Austria Shares Distribution to the Holders of Allowed Credit Facility Claims

(i)    Income Tax

When Reorganized Xerium Austria transfers the Xerium Austria Shares Distribution to the lenders in satisfaction of an obligation to repay debt, such transfer may lead to a capital gain or capital loss for tax accounting purposes depending on whether the proceeds of the transfer are greater or less than the tax book value of the New Common Stock at Xerium Austria. The proceeds would be determined as the amount of debt which is deemed repaid by transfer of the New Common Stock pursuant to the Plan. The tax book value should be,

- for the portion of shares purchased from Reorganized Xerium, equal to the purchase price of the shares under the Austria Purchase Agreement as described above,

- for the portion of shares received by means of a contribution from Reorganized Xerium, equal to the fair market value of the Xerium stock at the time of its contribution into the capital of Xerium Austria as described under "Austrian Tax Consequences of the Austria Contribution Agreement" above.

Such capital gain or loss is considered in the taxable income of Xerium Austria unless the international participation exemption applies. This exemption should, however, not apply when Xerium Austria transfers the Xerium stock because several of the conditions for the exemption do not exist. Inter alia, the exemption requires a holding period of one year which will not be met based on the Plan. Thus, the capital gain or loss, if any, resulting from the transfer of the Xerium stock should be considered in the taxable income of Xerium Austria.

However, as the transfer of the New Common Stock is intended to take place immediately after the stock has been contributed into the capital of Xerium Austria, there should not be a significant difference, if any, between the tax book value of the shares and the amount of debt deemed repaid by the transfer of the New Common Stock immediately after the contribution. Based on that, there should not be a significant taxable capital gain or loss from the transfer of the New Common Stock.

(e)     Austrian Tax Consequences of Issuing a New Note to the Lenders

(i)     Income Tax

When Xerium Austria incurs interest expenses for the new debt, these interest expenses will continue to be deductible as long as they are business related. If, however, the interest expenses are related to non taxable income, they are not deductible. As an exception, interest expenses incurred for the debt financing of shares are deductible even if these shares qualify for the national or international participation exemption.

(ii)     Withholding Tax

The interest that Xerium Austria pays for its new debt should be subject to withholding tax only if the new debt is securitized as a bearer bond and if the interest is paid by Xerium Austria or an Austrian paying agent. In other cases, the interest should not be subject to withholding tax. In case of interest paid to a creditor which is neither an Austrian resident nor has an Austrian permanent establishment, the withholding tax would be subject to a refund procedure upon application.

(iii)     Stamp Duty

Unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized by Austria, the new note(s) to be issued by Xerium Austria for the remaining amount of debt will likely qualify as a written agreement subject to stamp duty.

The stamp duty would be 0.8% or 1.5% of the principal amount. Stamp duty would not become due if the Plan or transactions effected pursuant to the confirmed Plan have already been subject to stamp duty and if the note does not constitute any additional or different rights and obligations; multiple documents evidencing one and the same loan or credit agreement are no longer subject to stamp duty following a ruling of the Austrian Constitutional Court.

The comments on the stamp duty consequences of the Plan apply accordingly.

2. **Austrian Tax Consequences of the Austrian Debt Restructuring Transactions to Holders of Allowed Credit Facility Claims**

Austrian Tax Consequences to holders of Allowed Credit Facility Claims are described based on the assumption that all such holders are organized as corporate entities, which may be resident in Austria or abroad.

(a) Holders that are Resident in Austria or have an Austrian permanent Establishment

(i) Income Tax

A holder is subject to unlimited corporate income tax liability in Austria if it has its registered seat or place of management within Austria. It is subject to a corporate income tax of 25% on its profit which, for tax purposes, is determined as the profit according to Austrian GAAP and the Austrian Commercial Code (Unternehmensgesetzbuch) after book-to-tax adjustments. In principle, all income is taxed as a uniform type of income.

A holder is subject to limited corporate income tax liability if it has neither its statutory seat nor its place of management within Austria, but maintains a permanent establishment within Austria. An Austrian branch of a foreign bank carrying out banking activities will, as a rule, be considered an Austrian permanent establishment. The profits of such a permanent establishment are subject to Austrian corporate income tax. Subject to some exceptions, the permanent establishment is subject to the same tax accounting rules as an Austrian resident company, which are described above. One of these exceptions relates to holders which are not established as a company covered by Appendix 2 to the EU Parent Subsidiary Directive (Directive 90/435/EEC); permanent establishments of such companies are not eligible for the participation exemption for dividends and capital gains. Another exception relates to the use of carried-forward losses; such carry-forwards may be offset only to the extent they are related to losses from the Austrian permanent establishment and to the extent that the losses exceeded the non-Austrian income of the holder for the year in which the losses were incurred; non-discrimination clauses for permanent establishments in certain tax treaties may modify these rules.

When Reorganized Xerium Austria transfers the Xerium Austria Shares Distribution to the holders of Allowed Credit Facility Claims in exchange for a portion of the Allowed Credit Facility Claims against Xerium Austria, this transaction may lead to the recognition of taxable income or a loss for the holders. If the fair market value of the portion of the Allowed Credit Facility Claims which is considered repaid upon transfer – which is intended to equal the fair market value of the Xerium Austria Shares Distribution – exceeds this portion's

tax book value, the exchange will lead to the recognition of a taxable profit of the holder. If, on the other hand, the fair market value of the portion of the Allowed Credit Facility Claims which is considered repaid upon transfer is lower than its tax book value, the exchange will lead to the recognition of a loss of the holder.

The exchange described in the preceding paragraph is considered an acquisition of the Xerium stock constituting the Xerium Austria Shares Distribution by the holders. The stock will initially be recorded in the current assets or investments of the holder at its acquisition price which is intended to be the fair market value of the exchanged portion of the Allowed Credit Facility Claims at the time of the exchange. Subsequent decreases in value of the Xerium stock leading to a write-off will be deductible unless the stock qualifies for the international participation exemption (described below); if, however, the holder has elected the stock to be tax effective in spite of qualifying for the international participation exemption, the write-off may be deductible. The loss in value needs to be substantiated by a valuation following a generally accepted method. If the stock is held for investment purposes, the loss in value needs to be a lasting loss in value in order to qualify for a tax deductible write off; write-offs shortly after the acquisition of stock held as an investment are likely not considered deductible. Subsequent capital gains from Xerium stock are taxable income to the holder unless the international participation exemption applies; if, however, the holder has elected the stock to be tax effective in spite of qualifying for the international participation exemption, the capital gain will be taxable.

Dividend income from the Xerium stock will lead to taxable income of the holders unless the international participation exemption applies. If the dividends are taxable, a foreign tax credit will likely be available based on the prorated underlying corporate income tax and prorated foreign withholding tax, limited to the tax allowed by the applicable treaty. The tax credit is limited to the Austrian tax due on the dividends, so that a foreign tax credit is not available, or not fully available, for periods without a sufficient taxable Austrian profit.

The newly introduced portfolio dividend exemption does not apply as this exemption is limited to certain European Union and European Economic Area sourced dividends. However, this limited scope of the exemption may contravene European law; a European Court of Justice judgment on this issue is pending and may lead to an exemption of dividends from Xerium stock for the holders regardless of the international participation exemption.

The international participation exemption applies to dividends and capital gains from Xerium stock subject to the following requirements:

- The holder is an Austrian resident company or a permanent establishment of a company covered by Appendix 2 to the EU Parent Subsidiary Directive (Directive 90/435/EEC).

- The holder has an interest of 10% or more in Reorganized Xerium which is held for an uninterrupted period of one year or more.

- The company in which the shares are held needs to be comparable to an Austrian company, which should be the case for a U.S. corporation based on an opinion published by the Austrian Ministry of Finance.

- The company in which the shares are held needs to pass an active business and taxation test. If the company is subject to taxation at a tax rate of 15% or less and if the company earns predominantly passive income (interest, capital gains from shares, rental income from movable property, royalties), the company will not pass the test. While normally the company needs to pass only the active business or taxation test, the participation exemption may still be denied in cases of extremely low taxation or extremely high levels of passive income.

(ii)     Stamp Duty

As a rule, unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized in Austria, all parties to a loan agreement or credit facility are liable for stamp duty due for such an agreement. Thus, all comments on Austrian stamp duty in the preceding text apply to the holders of Allowed Credit Facility Claims.

(b)     Holders that are not Resident in Austria and do not have an Austrian Permanent Establishment

(i)     Income Tax

Holders that are not resident in Austria and that do not have an Austrian permanent establishment are subject to limited corporate income tax liability.

Profits and losses related to the exchange of a portion of Allowed Credit Facility Claims for the Xerium Austria Share Distribution should, as a rule, not be within the scope of Austrian taxation for such holders.

Dividend income or future capital gains from the stock constituting the Xerium Austria Share Distribution should, as a rule, not be within the scope of Austrian taxation for such holders.

Interest income should, similar to the situation prior to the partial exchange of Allowed Credit Facility Claims, not be within the scope of Austrian taxation for such holders except for the following cases:

- The debt is securitized as a bearer bond and the interest is paid by Xerium Austria or an Austrian paying agent. In this case, interest withholding tax would apply. However, the withholding tax should be subject to a refund procedure upon application.

- The debt is directly or indirectly secured by Austrian real estate or vessels registered in Austria.

(ii)     Stamp Duty

As a rule, unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized in Austria, all parties to a loan agreement or credit facility are liable for stamp duty due for such an agreement. Thus, all comments on Austrian stamp duty in the preceding text apply to the holders of Allowed Credit Facility Claims accordingly.

3. **Austrian Tax Consequences of the Italian Debt Restructuring Transactions to Xerium Austria**

(a) Contribution of Portion of Allowed Credit Facility Claims

(i) Income Tax

When Reorganized Xerium contributes to Reorganized Xerium Austria the portion of Allowed Credit Facility Claims against Xerium Italy exchanged for the Xerium Italy Shares Distribution and all receivables related thereto, such transfer should not be recognized as taxable income of Reorganized Xerium Austria. The contribution may be carried out without new shares being issued.

For tax accounting purposes, the assets side of the balance sheet of Xerium Austria should show the Claims, which have been contributed, at fair market value. The same amount should be recorded as a capital reserve (Kapitalruecklage) in the equity section of the liabilities side of Reorganized Xerium Austria's balance sheet and should be part of the company's equity for tax purposes.

(ii) Capital Duty

When Claims against Xerium Italy are transferred to Xerium Austria by means of a contribution into the capital of Xerium Austria by Reorganized Xerium, being an indirect shareholder, without involvement of any interposed entity or a sister entity, in particular Xerium Germany ("grandparent contribution"), such transfer should not be subject to capital duty. A sister entity is an entity which has at least one shareholder in common with the entity receiving the contribution. This tax treatment is based on an opinion published by the Ministry of Finance, but has not been confirmed by the Supreme Administrative Court (Verwaltungsgerichtshof) yet.

(iii) Stamp Duty

Unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized in Austria, transfers of receivables against consideration are subject to Austrian stamp duty of 0.8% based on the consideration granted. In case of a contribution to an indirect subsidiary, the increase in value of the subsidiary and the interposed entities may be considered as consideration. If the Austria Contribution Agreement is executed outside of Austria, stamp duty should not become due on the contribution of the receivable.

(b) Forgiveness of Debt by Reorganized Xerium Austria

When Reorganized Xerium Austria forgives the Allowed Credit Facility Claims against Xerium Italy which have previously been transferred to Xerium Austria, such

forgiveness is likely considered to have its reason in the shareholder relationship between Reorganized Xerium Austria and Xerium Italy. A third party creditor would not be expected to forgive debt claims shortly after having acquired such a claim. Thus, the forgiveness would be considered an investment of Reorganized Xerium Austria into its subsidiary Xerium Italy, thus increasing the tax book value of the shares in Xerium Austria's books. The increased book value of the shares would replace the book value of the claims previously entered upon the contribution of the claims by Reorganized Xerium to Reorganized Xerium Austria. Depending on the fair market value of the Italian shares, writing off the shares may be necessary to a certain extent. If the Italian shares qualify under the international participation exemption described above, such write-off is not deductible for corporate income tax purposes unless Reorganized Xerium Austria has elected the shares in Xerium Italy to be tax effective. Even in the latter case, the write-off would only be deductible if the loss in value is permanent, supported by a valuation according to accepted standards, and does not occur within a short period of time within the acquisition of the Italian shares; if deductible, the deduction from the write-off would be spread evenly over a seven-year period.

## D. Certain Canadian Tax Consequences of the Plan

The following summary is intended to address certain Canadian income tax consequences of the proposed Plan to Xerium Canada (a wholly owned Canadian subsidiary of Xerium) and the holders of Allowed Credit Facility Claims and holders of Unsecured Swap Termination Claims.

Xerium Canada has outstanding borrowings of approximately C$57,832,000 which were issued as a C$ denominated loan. The Xerium Canada debts are not convertible into shares of either Xerium Canada or Xerium.

It is assumed that the lending syndicate will receive fair value consideration in the form of Cash, Term Notes issued by Reorganized Xerium Canada and New Common Stock as repayment of Xerium Canada's debt obligations.

It is also assumed that members of the lending syndicate may transfer their rights under the Credit Facility (due from Xerium Canada) to unrelated third parties either before or as part of the proposed arrangement transactions. Further, members of the lending syndicate may also transfer their rights to the Term Notes due from Reorganized Xerium Canada to unrelated third parties after the proposed arrangement transactions.

The following summary of certain Canadian tax consequences expected to result from the implementation of the Plan is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of an Allowed Claim. Holders of Allowed Claims are urged to consult their own tax advisors with respect to the Canadian tax consequences expected to result from the implementation of the Plan.

### 1. **Summary Conclusions**

The proposed distributions on account of the Plan should not result in a forgiveness of debt to Xerium Canada based on the understanding that the principal amount of

the Term Notes of Reorganized Xerium Canada, the amount of Cash and the value of the New Common Stock to be used to repay the debts is intended to equal the principal amount of the Allowed Credit Facility Claims against Xerium Canada (the debtor) being settled.

Any transfer of an outstanding debt due from Xerium Canada or Reorganized Xerium Canada is not expected to give rise to the application of the Canadian debt parking rules (discussed below) as the transfer price is expected to exceed 80% of the principal amount. However, even if the transfer price is less than 80% of the principal amount of the debt, it is expected that the transfer will occur between persons who deal with Xerium Canada or Reorganized Xerium Canada at arm's length and who would not have a significant interest in the debtor (Xerium Canada or Reorganized Xerium Canada). Accordingly, it is expected that the Canadian debt parking rules would not apply to such a transfer or as a result of the proposed transactions.

A transfer of debt instruments (due from Xerium Canada or Reorganized Xerium Canada) between arm's length persons should not give rise to adverse Canadian income tax consequences to either a Canadian resident or a non-resident transferor (i.e., any such transfer should be considered to occur for fair market value consideration and should not be subject to any loss limitation rule assuming the transfer would be to an arm's length unaffiliated person).

2.  **Canadian Income Tax Consequences**

(a)  Debt Forgiveness Rules on Distributions on Account of Credit Facility Claims

The proposed distributions on account of Xerium Canada debt through the payment of Cash consideration; the delivery of a new debt instrument (to be issued by Reorganized Xerium Canada); and the transfer of shares of New Common Stock should not give rise to debt forgiveness income based on the understanding that the aggregate of the Cash consideration plus the principal amount of the Term Notes to be issued by Reorganized Xerium Canada and the fair market value of the Reorganized Xerium share consideration are assumed to equal or exceed the principal amount of the debt obligation so repaid. The amount paid through the transfer of shares of New Common Stock is assumed to be equal to the fair market value thereof. Further, under paragraph 80(2)(h) of the Income Tax Act Canada R.S.C. 1985, c.1, 5th Supplement as amended (the "Canadian Act"), the amount deemed paid through the issuance of a new debt obligation will be equal to the principal amount of that new debt obligation.

(b)  Debt Parking Rules re Transfers of Rights to the Revolver Facility or the Term Loan

A commercial debt obligation of a corporate debtor (Xerium Canada) will be deemed to be settled at the cost of the debt instrument to the holder where:

(i)  the obligation is a "specified obligation" of the debtor (Xerium Canada);

(ii)  the holder of the debt instrument is a person who does not deal at arm's length with the debtor or is a person who has a significant interest in the debtor as

required by subparagraph 80.01(7)(a)(ii) of the Canadian Act (the "significant interest" test is set out in paragraph 80.01(2)(b) of the Canadian Act and requires that the holder (either alone or together with non-arm's length persons) hold 25% or more of the votes and value of the debtor corporation (Xerium Canada)); and

   (iii) the cost of the debt instrument was less than 80% of the principal amount of the obligation, as required by subsection 80.01(8) of the Canadian Act.

   An obligation will be a specified obligation if the debt instrument was previously held by a person who dealt at arm's length with the debtor and did not have a significant interest in the debtor or the debt instrument was acquired from a person unrelated to the holder or related only because of the application of paragraph 251(5)(b) of the Canadian Act (as required by subparagraph 80.01(6)(a)(ii)).

   In this context, in determining whether any two (2) persons (i.e., the holder of the debt and either Xerium Canada or Reorganized Xerium Canada, as the case may be) are related to each other or in determining whether any person is controlled by another person, the rules in paragraph 80(2)(j) of the Canadian Act will apply (the deeming rule in paragraph 80(2)(j) of the Canadian Act applies for purposes of the debt parking rules by virtue of the deeming rule in paragraph 80.01(2)(a)) to treat a partnership as if it were a corporation with a single class of voting shares divided into 100 issued shares AND each member of that partnership will be treated as owning the number of issued shares of that class that is equal to the proportion of 100 that the fair market value of that member's interest in the partnership is of the fair market value of all members' interests in the partnership. Where a partnership holds a portion of the Xerium Canada or Reorganized Xerium Canada debt instrument, the application of this deeming rule will need to be considered.

   Further, when considering an entity's related party status, each person that has a right to acquire a share (whether an absolute right or a contingent right) will be treated as having exercised that right pursuant to paragraph 251(5)(b) of the Canadian Act.

   It is expected that any transfer of the debt instrument from one lender to another would cause the debt instrument to become a specified obligation as the acquirer would either deal at arm's length with the debtor (Xerium Canada or Reorganized Xerium Canada) or would not have a significant interest in the debtor. Accordingly, it is expected that the first requirement for the application of the debt parking rules would be met.

   Even though the Allowed Credit Facility Claims against Xerium Canada or the Term Notes of Reorganized Xerium Canada may become a specified obligation, it is expected that the second requirement for the application of the debt parking rules would not be met. In this case, it is assumed that the holders of the debt instrument would at all times deal at arm's length with the Debtor (Xerium Canada or Reorganized Xerium Canada, as the case may be) and would not have a significant interest in the Debtor (Xerium Canada or Reorganized Xerium Canada, as the case may be) (per subparagraph 80.01(2)(b) of the Canadian Tax Act). It should be noted that in determining whether a particular holder would have a significant interest in Xerium Canada or Reorganized Xerium Canada as the case may be (25% or more of the votes or value of all issued shares), one would aggregate all shareholdings held by persons non-arm's

length to that holder.  It has been assumed that none of the holders of the debt instruments due from Xerium Canada (or Reorganized Xerium Canada as the case may be) could be considered to have (i) a significant interest in Xerium Canada (or Reorganized Xerium Canada as the case may be) as Xerium is indirectly the sole shareholder of Xerium Canada (and Reorganized Xerium Canada as the case may be), (ii) any relationship with Xerium Canada (or Reorganized Xerium Canada as the case may be) other than as a holder of debt instruments due from Xerium Canada (or Reorganized Xerium Canada as the case may be); or (iii) any relationship with Xerium (or Reorganized Xerium as the case may be) other than as a holder of debt instruments due from Xerium (or Reorganized Xerium as the case may be).  In addition, where there is no relationship of subordination and the parties act in their own self interest (i.e., no acting in concert or with a mutuality of interests), then unrelated persons should be considered to deal with each other on an arm's length basis.  Based solely on the foregoing, Xerium Canada, Xerium, Reorganized Xerium Canada and Reorganized Xerium should be treated as dealing with the holders of the debt instruments on an arm's length basis.

Further, it is noted that generally the cost of the debt instrument to the holder is expected to be at least equal to 80% of the principal amount of the obligation (in order for the debt parking rule in subsection 80.01(8) of the Canadian Act to apply, the cost of the debt instrument must be less than 80% of the principal amount of the obligation).  However, even where the transfer price is less than 80% of the principal amount, the debt parking rules should still not apply to Xerium Canada or Reorganized Xerium Canada where the transferee deals at arm's length with Xerium Canada, Xerium, Reorganized Xerium Canada and Reorganized Xerium.

(c)     Taxation of Holders of the Reorganized Xerium Canada Term Note

(i)     Canadian Consequences of the Plan to Holders of Allowed Credit Facility Claims - Canadian Residents

A Canadian resident holder of Allowed Credit Facility Claims should recognize a gain or loss for Canadian income tax purposes on the disposition of Allowed Credit Facility Claims as a result of the Plan.  Such a gain or loss would be equal to the difference between the net proceeds received (i.e., the sum of Cash, the fair value of New Common Stock and Term Notes less any costs of disposition) and the tax cost of the Allowed Credit Facility Claims.  The characterization of this gain or loss will depend on the intentions of the particular Canadian resident holder and the manner in which that holder has dealt with the Xerium Canada Allowed Credit Facility Claims.

A portion of any capital loss arising on the Plan will be denied for Canadian income tax purposes per paragraph 40(2)(e.2) of the Canadian Act (i.e., the percentage of total consideration received on the settlement of the Allowed Credit Facility Claims against Xerium Canada that consists of the Term Notes of Reorganized Xerium Canada).  This denied loss would be added to the tax cost of the Term Note per paragraph 53(1)(f.12) of the Canadian Act.

(ii)     Canadian Tax Consequences of the Plan to Holders of Allowed Credit Facility Claims - Non Residents of Canada

A non-resident of Canada should not be taxable in Canada as a result of the Plan as the Allowed Credit Facility Claims do not qualify as "taxable Canadian property" as they are not convertible or exchangeable into Xerium Canada shares or any other form of taxable Canadian property.

(iii)    Canadian Tax Consequences of the Plan to Holders of Unsecured Swap Termination Claims - Canadian Resident Recipients

A Canadian resident holder of an Unsecured Swap Termination Claim should recognize a gain or loss for Canadian income tax purposes on the disposition of that Unsecured Swap Termination Claim as a result of the Plan.  Such a gain or loss would be equal to the difference between the net proceeds received (i.e., the sum of Cash, the fair value of New Common Stock and Term Notes due from Reorganized Xerium Canada less any costs of disposition) and the tax cost of the Unsecured Swap Termination Claim.  The characterization of this gain or loss will depend on the intentions of the particular Canadian resident holder, the manner in which that holder has dealt with the Unsecured Swap Termination Claim, and the income tax treatment of the underlying transactions giving rise to the Swap Termination Claim. A portion of any capital loss arising as a result of the disposition of the Swap Termination Claim will be denied for Canadian income tax purposes (i.e., the percentage of total consideration received on the settlement of the Unsecured Swap Termination Claim that consists of the Term Notes of Reorganized Xerium Canada).  This denied loss would be added to the tax cost of the Term Note due from Reorganized Xerium Canada.

(iv)    Canadian Tax Consequences of the Plan to Holders of Unsecured Swap Termination Claims that are Non-Residents of Canada

There should not be any Canadian income tax consequences to a non-resident person on the disposition of property pursuant to the Plan if such person does not carry on business in Canada, is not employed in Canada, and does not dispose of taxable Canadian property.  The swap termination claim should not represent taxable Canadian property based on the understanding that it arose with respect to Allowed Credit Facility Claims that are not taxable Canadian property.

(v)    Canadian Taxation of Interest Income - Canadian Resident Persons

Canadian resident persons will be taxable on the payment or accrual of interest income on debt obligations issued by either Xerium, Xerium Canada, Reorganized Xerium or Reorganized Xerium Canada.  This should not change as a result of the proposed transactions.

(vi)    Canadian Taxation of Interest Income - Non-Resident Persons

Non-resident persons would not be subject to Canadian income tax on Canadian source interest income.

(vii)    Canadian Withholding Tax on Payments of Interest by Xerium Canada

Payments of interest to arm's length non-resident persons should generally not be subject to Canadian withholding tax. However, it must be clear that the payment is truly "interest" and is not a disguised profit allocation. In particular, no portion of the interest can be "participating interest" (i.e., where all or any portion of the interest is "contingent or dependent on the use of or production from property in Canada or is computed by reference to revenue, profit, cash flow, commodity price or any other similar criterion or by reference to dividends paid or payable to shareholders"). Provided that there is no relationship of subordination and the parties act in their own self-interest (i.e., no acting in concert or with a mutuality of interests), then unrelated persons should be considered to deal with each other on an arm's length basis.

In addition, interest payable by Reorganized Xerium Canada on its indebtedness may be exempt from Canadian withholding tax to the extent payable to a holder that is entitled to the benefits of the income tax treaty currently in effect between the United States and Canada. A holder of Xerium Canada indebtedness is urged to consult its own tax advisor regarding such holder's entitlement to an exemption from Canadian withholding tax with respect to interest payments made to such holder, including any applicable exemption pursuant to the income tax treaty currently in effect between the United States and Canada.

## E. Certain Italian Tax Consequences of the Plan

The following summary of certain Italian tax consequences expected to result from the implementation of the Plan is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of an Allowed Claim. Holders of Allowed Claims are urged to consult their own tax advisors with respect to the Italian tax consequences expected to result from the implementation of the Plan.

Xerium Italy is a limited liability company, organized under the law and having its statutory seat in Italy. The company is in fiscal unity with Huyck.Wangner Italia S.p.A., another Italian company. It is subject to a corporate income tax of 27% plus 3.9% IRAP on its profit which, for tax purposes, is determined as the profit according to Italian GAAP and the Italian Tax Code.

### 1. Italian Tax Consequences of the Exchange of Xerium Shares with a Loan Receivable

The Debtors understand that Reorganized Xerium will issue new shares and transfer such new shares to the lenders (the "Xerium Italy Lenders") to Xerium Italy under the Credit Facility. Under the Plan, the Xerium Italy Lenders will exchange a portion of the loans and all connected obligations to Reorganized Xerium. This transaction is referred to as "Xerium Italy Exchange" and the loan receivable and connected obligations are referred to as "Allowed Credit Facility Claims".

(a)     Income Tax

The transfer of a loan receivable by the lenders in exchange of shares would be deemed as a true sale, under Italian Tax Law, article 9 of Decree 917/1986, at a consideration equal to the fair market value of the assets received.

The difference between the tax base of the receivable and the fair market value of the shares received is taxable / deductible as business income, at 27% + 3.9% = 31.4% rate.

(b)     Stamp Duty and Other Indirect Taxation

There should be no stamp duty on this transaction.  In addition to the exemption provided under section 1146 of the Bankruptcy Code, a flat registration tax of €168.00 may apply if such deeds are notarized in Italy and deposited with the local Tax Office.

The transfer of shares is VAT exempt under Italian law.

2.     **Italian Tax Consequences of the Forgiveness of Allowed Credit Facility Claims Against Xerium Italy**

The Debtors understand that Xerium will contribute to the equity of Reorganized Xerium Austria a portion of the Allowed Credit Facility Claims.  As a consequence of such transaction, Reorganized Xerium Austria will be the beneficial owner of the contributed Allowed Credit Facility Claims.  Immediately thereafter, Reorganized Xerium Austria shall forgive the Allowed Credit Facility Claims against Xerium Italy.

(a)     Income Tax

According to Italian Tax Code, a forgiveness / waiver of a receivable is considered as a taxable event both for the creditor and the debtor.  The income / loss upon forgiveness is accounted as an extraordinary income / loss, according to Italian GAAP.

As a consequence, on the one hand, the lender should recognize a capital loss equal to the book value of the asset receivable forgiven, which is deductible for Italian tax purposes.  On the other hand, the debtor should recognize a capital gain, equal to the book value of the payable forgiven that is subject to tax.  Please note the above mentioned capital gain / loss is subject to IRES at 27.5%.

Italian tax law provides for an exception on the above rule.  According to article 84.4 of the Italian Income Tax Code, forgiveness / waiver of receivables is not taxable in the hands of the debtor to the extent the holder of the receivable is a direct shareholder.

Based on the above provisions, the forgiveness by Reorganized Xerium Austria of Allowed Credit Facility Claims against Xerium Italy is exempt from income tax consequences.

(b)     Withholding Tax

Forgiveness of the receivable by Reorganized Xerium Austria does not trigger any withholding tax from an Italian standpoint.

(c)     Stamp Duty, Other Indirect Taxation

There should be no stamp duty nor other indirect taxation related to such forgiveness.


3.     **Italian Tax Implications for Xerium Italy and Xerium Italy Lenders Regarding the Residual Balance of the Loans**

(a)     Income Tax

Interest expense accrued by Xerium Italy on the Term Notes will be deductible by Xerium Italy consolidated income according to the provisions set off by article 96 of the Italian Tax Code.  Based on such provision, interest expenses would be deductible on an accrual basis, up to the amount of interest income.  Any excess net interest expenses would be deductible on accrual, up to 30% of the Italian consolidated EBITDA.  Any further excess can be carried forward indefinitely and would be deductible within the above-described limitations.  However, for the interest paid with respect to the portion of the Credit Facility that is allocable to a Xerium Lender that is resident in a country currently considered as a "black listed country" under the provisions of article 110 of the Italian Tax Code, deduction of interest would not be allowed unless it is demonstrated that such Xerium Italy Lenders are effectively engaged in a bona fide trade or business and that a substantial benefit exists to Xerium Italy.

Xerium Italy Lenders resident in Italy would be taxed on the interest income from the Term Note on accrual basis.  Xerium Italy Lenders that are Italian non-residents would be subject to withholding tax of 12.5%, unless the beneficial owner of the interest is eligible for a reduced rate pursuant to an applicable double tax treaty between Italy and the country of residence of the applicable Xerium Italy Lender.

(b)     Stamp Duty, Other Indirect Taxation

The Term Notes to be issued by Reorganized Xerium Italy are anticipated to take the form of a financing ("finanziamento"), and should not be subject to Italian stamp duty.  However, if the Term Notes to be issued by Reorganized Xerium Italy are issued as "cambiale", then in principle, unless the exemption provided under section 1146 of the Bankruptcy Code referenced above is recognized by Italy, both parties to the agreement, i.e., the lender(s) and Xerium Italy, are liable to pay a 1.2% stamp duty on the issuance of such Term Notes (cambiale).

# XII.

## CONCLUSION

The Debtors believe the Plan is in the best interests of all creditors and urge the holders of Impaired Claims in Class 2 and Class 5 to vote to accept the Plan and to evidence such acceptance by returning their signed ballots so that they will be received by the Voting Agent no later than 4:00 p.m. (prevailing Eastern time) on March 22, 2010.

Dated: March 2, 2010

Respectfully submitted,

Xerium Technologies, Inc.

By: _____
    Stephen R. Light
    Chairman and Chief Executive Officer

Xerium III (US) Limited
Xerium IV (US) Limited
Xerium V (US) Limited
Huyck Licensco Inc.
Stowe Woodward Licensco LLC
Wangner Itelpa I LLC
Wangner Itelpa II LLC
Xerium Asia, LLC

By: _____
    Stephen R. Light
    President

Stowe Woodward LLC
Weavexx, LLC
Xerium Canada Inc.

By: _____
    Stephen R. Light
    President and Chief Executive Officer

Xerium Italia S.p.A.

By: _____
    Stephen R. Light
    Chairman

DS-1

XTI LLC

By: _____

David Maffucci
Executive Vice President

Xerium Germany Holding GmbH

By: _____

David Maffucci
Managing Director

Huyck.Wangner Austria GmbH

By: _____
     David Pretty
     Managing Director