## EXHIBIT C

**XERIUM'S FORM 10-Q FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2009**

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-Q

---

☒ **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**for the Quarterly Period Ended March 31, 2009**

or

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**for the Transition Period from          to**

### Commission File Number 001-32498

---

# Xerium Technologies, Inc.
#### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **DELAWARE** | **42-1558674** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **8537 Six Forks Road Suite 300 Raleigh, North Carolina** | **27615** |
| (Address of principal executive offices) | (Zip Code) |

#### (919) 556-7235
#### (Registrant's telephone number, including area code)

---

#### (Former name, former address and former fiscal year, if changed since last report)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer | ☒ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The number of shares of the registrant's common stock, $0.01 par value, outstanding as of May 1, 2009 was 48,885,248.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Part I. Financial Information |  |
|    Item 1. Financial Statements | 3 -25 |
|    Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 -43 |
|    Item 3. Quantitative and Qualitative Disclosures About Market Risk | 44 -45 |
|    Item 4. Controls and Procedures | 45 |
| Part II. Other Information |  |
|    Item 1. Legal Proceedings | 45 |
|    Item 1A. Risk Factors | 45 |
|    Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 46 |
|    Item 3. Defaults Upon Senior Securities | 46 |
|    Item 4. Submission of Matters to a Vote of Security Holders | 46 |
|    Item 5. Other Information | 46 |
|    Item 6. Exhibits | 46 |

Table of Contents

**PART I. FINANCIAL INFORMATION**

**ITEM 1.      FINANCIAL STATEMENTS**

<div align="center">

**Xerium Technologies, Inc.**
**Condensed Consolidated Balance Sheets—(Unaudited)**
**(dollars in thousands, except per share data)**

</div>

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 27,498 | $ 34,733 |
| Accounts receivable (net of allowance for doubtful accounts of $12,817 at March 31, 2009 and $14,937 at December 31, 2008) | 76,649 | 94,049 |
| Inventories | 84,565 | 85,543 |
| Prepaid expenses | 4,130 | 4,844 |
| Other current assets | 16,606 | 14,938 |
| Total current assets | 209,448 | 234,107 |
| Property and equipment, net | 366,236 | 384,590 |
| Goodwill | 151,038 | 155,205 |
| Intangible assets | 29,678 | 32,129 |
| Other assets | 4,567 | 5,541 |
| Total assets | $ 760,967 | $ 811,572 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Notes payable | $ 28,000 | $ — |
| Accounts payable | 35,184 | 53,076 |
| Accrued expenses | 77,155 | 83,139 |
| Current maturities of long-term debt | 23,740 | 39,687 |
| Total current liabilities | 164,079 | 175,902 |
| Long-term debt, net of current maturities | 557,596 | 577,270 |
| Deferred and long-term taxes | 10,900 | 13,358 |
| Pension, other postretirement and postemployment obligations | 63,621 | 67,029 |
| Other long-term liabilities | 4,885 | 5,594 |
| Commitments and contingencies | | |
| Stockholders' deficit | | |
| Preferred stock, $0.01 par value, 1,000,000 shares authorized; no shares outstanding as of March 31, 2009 and December 31, 2008 | — | — |
| Common stock, $0.01 par value, 150,000,000 shares authorized; 48,876,182 and 46,257,772 shares outstanding as of March 31, 2009 and December 31, 2008, respectively | 489 | 463 |
| Paid-in capital | 219,690 | 220,370 |
| Accumulated deficit | (228,363) | (218,915) |
| Accumulated other comprehensive loss | (31,930) | (29,499) |
| Total stockholders' deficit | (40,114) | (27,581) |
| Total liabilities and stockholders' deficit | $ 760,967 | $ 811,572 |

<div align="center">

See accompanying notes.

3

</div>

**Table of Contents**

**Xerium Technologies, Inc.**
**Condensed Consolidated Statements of Operations—(Unaudited)**
**(dollars in thousands, except per share data)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2009** | **2008** |
| Net sales | $ 116,503 | $ 158,987 |
| Costs and expenses: | | |
| Cost of products sold | 72,211 | 95,655 |
| Selling | 16,508 | 20,465 |
| General and administrative | 13,208 | 18,690 |
| Restructuring and impairments | 114 | 532 |
| Research and development | 2,720 | 3,003 |
| | 104,761 | 138,345 |
| Income from operations | 11,742 | 20,642 |
| Interest expense | (16,314) | (25,415) |
| Interest income | 357 | 194 |
| Foreign exchange gain (loss) | (1,341) | 3,509 |
| Loss before provision for income taxes | (5,556) | (1,070) |
| Provision for income taxes | 3,892 | 3,639 |
| Net loss | $ (9,448) | $ (4,709) |
| Net loss per share: | | |
| Basic and diluted | $ (0.19) | $ (0.10) |
| Shares used in computing net loss per share: | | |
| Basic and diluted | 48,863,512 | 46,048,667 |

See accompanying notes.

4

Table of Contents

**Xerium Technologies, Inc.**
**Condensed Consolidated Statements of Cash Flows—(Unaudited)**
**(dollars in thousands)**

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2009 | 2008 |
| **Operating activities** |  |  |
| Net loss | $ (9,448) | $ (4,709) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: |  |  |
| Stock-based compensation | 161 | 471 |
| Depreciation | 9,205 | 10,889 |
| Amortization of intangibles | 583 | 1,114 |
| Deferred financing cost amortization | 1,536 | 1,095 |
| Unrealized foreign exchange gain on revaluation of debt | (482) | (1,985) |
| Deferred taxes | 633 | (761) |
| Gain on disposition of property and equipment | (1,233) | — |
| Change in the fair value of interest rate swaps | 398 | 12,156 |
| Provision for bad debt expense | (1,634) | 108 |
| Change in assets and liabilities which provided (used) cash: |  |  |
| Accounts receivable | 16,354 | 5,500 |
| Inventories | (1,909) | (537) |
| Prepaid expenses | 567 | 1,317 |
| Other current assets | (34) | (2,170) |
| Accounts payable and accrued expenses | (21,292) | 7,547 |
| Deferred and other long term liabilities | (1,247) | (261) |
| Net cash (used in) provided by operating activities | (7,842) | 29,774 |
| **Investing activities** |  |  |
| Capital expenditures, gross | (6,983) | (12,103) |
| Proceeds from disposals of property and equipment | 1,924 | (33) |
| Net cash used in investing activities | (5,059) | (12,136) |
| **Financing activities** |  |  |
| Net increase (decrease) in borrowings (maturities of 90 days or less) | 28,000 | (837) |
| Principal payments on debt | (21,547) | (11,204) |
| Other | — | (108) |
| Net cash provided by (used in) financing activities | 6,453 | (12,149) |
| Effect of exchange rate changes on cash flows | (787) | 1,313 |
| Net (decrease) increase in cash | (7,235) | 6,802 |
| Cash and cash equivalents at beginning of period | 34,733 | 24,218 |
| Cash and cash equivalents at end of period | $ 27,498 | $ 31,020 |

See accompanying notes.

5

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**1. Company History**

Xerium Technologies, Inc. (the "Company") is a leading global manufacturer and supplier of two types of consumable products used primarily in the production of paper – clothing and roll covers. Operations are strategically located in the major paper-making regions of the world, including North America, Europe, South America and Asia-Pacific.

**2. Basis of Presentation**

The accompanying unaudited condensed consolidated interim financial statements at March 31, 2009 and for the three months ended March 31, 2009 and 2008 include the accounts of the Company and its wholly-owned subsidiaries and have been prepared in conformity with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and pursuant to the rules and regulations of the Securities and Exchange Commission. Accordingly, such financial statements do not include all of the information and footnotes required by GAAP for complete financial statements. GAAP requires the Company's management to make estimates and assumptions that affect the amounts reported in the financial statements. Actual results could differ from those estimates. The interim results presented herein are not necessarily indicative of the results to be expected for the entire year. In management's opinion, these unaudited condensed consolidated interim financial statements contain all adjustments of a normal recurring nature necessary for a fair presentation of the financial statements for the interim periods presented. These unaudited condensed consolidated interim financial statements should be read in conjunction with the Company's audited consolidated financial statements for the year ended December 31, 2008 as reported on Form 10-K filed on March 12, 2009.

**3. Accounting Policies**

*Derivatives and Hedging*

On January 1, 2009, the Company adopted Statement of Financial Accounting Standards No. 161, *Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133* ("SFAS No. 161"). SFAS No. 161 amends and expands the disclosure requirements of FASB Statement No. 133 ("SFAS No. 133") with the intent to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for under SFAS No. 133 and its related interpretations, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS No. 161 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative instruments.

6

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

### 3. Accounting Policies—(continued)

#### Derivatives and Hedging—(continued)

As required by SFAS No. 133, the Company records all derivatives on the balance sheet at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether the Company has elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to changes in the fair value of an asset, liability, or firm commitment attributable to a particular risk are considered fair value hedges. Derivatives designated and qualifying as a hedge of the exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Derivatives may also be designated as hedges of the foreign currency exposure of a net investment in a foreign operation. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the recognition of the changes in the fair value of the hedged asset or liability that are attributable to the hedged risk in a fair value hedge or the earnings effect of the hedged forecasted transactions in a cash flow hedge. The Company may enter into derivative contracts that are intended to economically hedge certain of its risks, even though hedge accounting does not apply or the Company elects not to apply hedge accounting under SFAS No. 133.

#### Goodwill

The Company accounts for goodwill and other intangible assets in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"). SFAS No. 142 requires that goodwill and intangible assets that have indefinite lives not be amortized but, instead, must be tested at least annually for impairment or whenever events or business conditions warrant. As a result of the tests as of December 31, 2008, the Company determined that no goodwill impairment exists. At March 31, 2009, the Company evaluated goodwill and intangible assets for impairment indicators and determined that no impairment exists.

#### Net Loss Per Common Share

Net loss per common share has been computed and presented pursuant to the provisions of SFAS No. 128, *Earnings per Share* ("SFAS No. 128"). Net loss per share is based on the weighted-average number of shares outstanding during the period. As of March 31, 2009 and 2008, the Company had outstanding restricted stock units ("RSUs") (see Note 14). For the three months ended March 31, 2009 and 2008, respectively, the Company excluded the dilutive impact of potential future issuances of common stock underlying the Company's RSUs from the calculation of diluted average shares outstanding because their effect would have been antidilutive as the Company had a net loss for those periods.

The following table sets forth the computation of basic and diluted earnings weighted average shares:

|  | Three Months Ended March 31, 2009 | Three Months Ended March 31, 2008 |
|---|---|---|
| Weighted-average common shares outstanding—basic | 48,863,512 | 46,048,667 |
| Dilutive effect of stock-based compensation awards outstanding | — | — |
| Weighted-average common shares outstanding—diluted | 48,863,512 | 46,048,667 |

#### Reclassifications

Certain prior period amounts have been reclassified to conform to the current period presentation.

7

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**3. Accounting Policies—(continued)**

*New Accounting Standards*

Effective January 1, 2008, the Company partially adopted SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"), for measuring its derivative assets and liabilities. See further discussion at Note 4 "Derivatives and Hedging". Financial Accounting Standards Board (FASB) Staff Position SFAS No. 157-2, *Effective Date of FASB Statement No. 157*, permits the Company to defer the recognition and measurement of its nonfinancial assets and nonfinancial liabilities until January 1, 2009. At January 1, 2009, the Company did not have any nonfinancial assets or nonfinancial liabilities that are recognized or disclosed at fair value.

Effective January 1, 2009, the Company adopted SFAS No. 161, *Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133* ("SFAS No. 161. See "Derivatives and Hedging" above. The Company's adoption of SFAS No. 161 did not have a material effect on its financial position or results of operations.

In December 2007, the FASB issued SFAS No. 141(R), *Business Combinations* ("SFAS No. 141R"). SFAS No. 141R requires that upon initially obtaining control, an acquirer will recognize 100% of the fair values of acquired assets, including goodwill, and assumed liabilities, with only limited exceptions, even if the acquirer has not acquired 100% of its target. SFAS No. 141R amends SFAS No. 109, *Accounting for Income Taxes*, to require the acquirer to recognize changes in the amount of its deferred tax benefits that are recognizable because of a business combination, either in income from continuing operations in the period of the combination or directly in contributed capital, depending on the circumstances. On January 1, 2009, the Company adopted SFAS No. 141R, which is effective for fiscal years beginning after December 15, 2008. The adoption of SFAS No. 141R had no impact on the Company's financial statements.

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements* ("SFAS No. 160"), an amendment of Accounting Research Bulletin ("ARB") No. 51 ("ARB No. 51"). SFAS No. 160 clarifies the classification of noncontrolling interests in consolidated statements of financial position and the accounting for, and reporting of, transactions between the reporting entity and holders of such noncontrolling interests. On January 1, 2009, the Company adopted SFAS No. 160, which is effective for the first annual reporting period beginning on or after December 15, 2008. SFAS No. 160 is required to be adopted prospectively, except for reclassifying noncontrolling interests to equity, separate from the parent's shareholders' equity, in the consolidated statement of financial position and recasting consolidated net income (loss) to include net income (loss) attributable to both the controlling and noncontrolling interests, both of which are required to be adopted retrospectively. Since essentially all of the Company's subsidiaries are 100% owned, the adoption of SFAS No. 160 did not have a significant impact to its financial statements.

8

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

### 4. Derivatives and Hedging

*Risk Management Objective of Using Derivatives*

The Company is exposed to certain risks arising from both its business operations and economic conditions. The Company principally manages its exposures to a wide variety of business and operational risks through management of its core business activities. The Company enters into derivative financial instruments to manage exposures that arise from business activities that result in the receipt or payment of future known cash amounts, the value of which are determined by interest rates or foreign exchange rates. Specifically, the Company has entered into interest rate swaps to hedge variable interest related to its senior debt and foreign exchange contracts to protect the value of certain assets and obligations.

*Cash Flow Hedges of Interest Rate Risk*

The Company's objectives in using interest rate derivatives are to add stability to interest expense and to manage its exposure to interest rate movements. To accomplish this objective, the Company primarily uses interest rate swaps as part of its interest rate risk management strategy. Interest rate swaps designated as cash flow hedges involve the receipt of variable-rate amounts from a counterparty in exchange for the Company making fixed-rate payments over the life of the agreements without exchange of the underlying notional amount.

The effective portion of changes in the fair value of derivatives designated and that qualify as cash flow hedges is recorded in Accumulated Other Comprehensive Income and is subsequently reclassified into earnings in the period that the hedged forecasted transaction affects earnings. The ineffective portion of the change in fair value of the derivatives is recognized directly in earnings.

Based on interest rates as of March 31, 2009, amounts reported in accumulated other comprehensive income related to derivatives will be reclassified to interest expense as interest payments are made on the Company's variable-rate debt. During the twelve months ended March 31, 2010, the Company estimates, based on interest rates as of March 31, 2009, that $12,700 will be reclassified as a charge to interest expense. As of March 31, 2009, the Company effectively fixed the variable interest rate on approximately 85% of the term loan portion of the Company's senior credit facility at 9.74%.

As of March 31, 2009, the Company had the following outstanding interest rate derivatives that were designated as cash flow hedges of interest rate risk:

| Interest Rate Derivative | Number of Instruments | Notional |
|---|---|---|
| Interest Rate Swaps – Canadian dollar instruments | 2 | $  49,462 |
| Interest Rate Swaps – Euro instruments | 2 | $174,111 |
| Interest Rate Swaps – U.S. dollar instruments | 2 | $261,896 |

9

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**4. Derivatives and Hedging—(continued)**

*Non-designated Hedges of Foreign Exchange Risk*

Derivatives not designated as hedges are not speculative and are used to manage the Company's exposure to foreign exchange rates but do not meet the strict hedge accounting requirements of SFAS No. 133. Changes in the fair value of derivatives not designated in hedging relationships are recorded directly in earnings.

The Company, from time to time, enters into foreign exchange forward contracts to fix currencies at specified rates based on expected future cash flows to protect against the fluctuations in cash flows resulting from sales denominated in foreign currency (cash flow hedges). Additionally, to manage its exposure to fluctuations in foreign currency on intercompany balances and certain purchase commitments, the Company uses foreign exchange forward contracts (fair value hedges).

As of March 31, 2009, the Company had the following outstanding derivatives that were not designated as hedges in qualifying hedging relationships. The value of these contracts is recognized at fair value based on market exchange forward rates. The change in fair value of these contracts is included in foreign exchange gain/(loss).

| Foreign Currency Derivative | Notional Sold | Notional Purchased |
|---|---|---|
| Cash flow hedges | $     — | $     3,259 |
| Fair value hedges | $   (35,914) | $   45,744 |

The table below presents the fair value of the Company's derivative financial instruments as well as their classification on the Consolidated Balance Sheet as of March 31, 2009.

**Tabular Disclosure of Fair Values of Derivative Instruments**

| | Asset Derivatives As of March 31, 2009 | | Liability Derivatives As of March 31, 2009 | |
|---|---|---|---|---|
| | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| Derivatives designated as hedging instruments under SFAS 133: | | | | |
| Interest Rate Swaps | Other current assets | $     — | Accrued expenses | $  16,451 |
| Total derivatives designated as hedging instruments under SFAS 133 | | $     — | | $  16,451 |
| Derivatives not designated as hedging instruments under SFAS 133: | | | | |
| Foreign Currency Hedges | Other current assets | $   1,162 | Accrued expenses | $   4,763 |
| Total derivatives not designated as hedging instruments under SFAS 133 | | $   1,162 | | $   4,763 |

10

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**4. Derivatives and Hedging—(continued)**

The tables below present the effect of the Company's derivative financial instruments on the Consolidated Statements of Operations for the three months ended March 31, 2009.

**Tabular Disclosure of the Effect of Derivative Instruments on the Consolidated Statements of Operations
for the Three Months Ended March 31, 2009**

| Derivatives in SFAS 133 Cash Flow Hedging Relationships | Amount of Gain or (Loss) Recognized in OCI on Derivative (Effective Portion), net of tax | Location of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion) | Amount of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion), net of tax | Location of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Amount of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) |
|---|---|---|---|---|---|
| Interest Rate Swaps | $ (3,156) | Interest expense | $ (2,803) | Interest expense | $ (398) |

| Derivatives Not Designated as Hedging Instruments Under SFAS 133 | Location of Gain or (Loss) Recognized in Income on Derivative | Amount of Gain or (Loss) Recognized in Income on Derivative |
|---|---|---|
| Foreign Currency Hedges | Foreign exchange gain (loss) | (224) |
| Total | | $ (224) |

*Credit-risk-related Contingent Features*

The Company has agreements with each of its derivative counterparties that contain a provision where if the Company either defaults or is capable of being declared in default on any of its indebtedness, then the Company could also be declared in default on its derivative obligations.

As of March 31, 2009, the fair value of derivatives in a net liability position, which includes accrued interest but excludes any adjustment for nonperformance risk, related to these agreements was $26,604. Included in this amount are certain derivative liabilities of $12,163 that are related to counterparties that are also lenders under the Company's senior credit facility. Liabilities to these counterparties for derivatives and borrowings made under the senior credit facility are secured by substantially all of the Company's assets. The Company has not posted any collateral related to other derivative agreements.

*Fair Value of Derivatives Under SFAS No. 157*

Effective January 1, 2008, the Company adopted SFAS No. 157 for measuring its derivative assets and liabilities. SFAS No. 157 emphasizes that fair value is a market-based measurement, not an entity-specific measurement. Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. As a basis for considering market participant assumptions in fair value measurements, SFAS No. 157 establishes a fair value hierarchy that distinguishes between market participant assumptions based on market data obtained from sources independent of the reporting entity (observable inputs that are classified within Levels 1 and 2 of the hierarchy) and the reporting entity's own assumptions about market participant assumptions (unobservable inputs classified within Level 3 of the hierarchy).

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**4. Derivatives and Hedging—(continued)**

*Fair Value of Derivatives Under SFAS No. 157—(continued)*

Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access. Level 2 inputs are inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs may include quoted prices for similar assets and liabilities in active markets, as well as inputs that are observable for the asset or liability (other than quoted prices), such as interest rates, foreign exchange rates, and yield curves that are observable at commonly quoted intervals. Level 3 inputs are unobservable inputs for the asset or liability, which are typically based on an entity's own assumptions, as there is little, if any, related market activity. In instances where the determination of the fair value measurement is based on inputs from different levels of the fair value hierarchy, the level in the fair value hierarchy within which the entire fair value measurement falls is based on the lowest level input that is significant to the fair value measurement in its entirety. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment, and considers factors specific to the asset or liability.

To comply with the provisions of SFAS No. 157, the Company incorporates credit valuation adjustments to appropriately reflect both its own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements. Although the Company has determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with its derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by itself and its counterparties. However, as of March 31, 2009, the Company has assessed the significance of the impact of the credit valuation adjustments on the overall valuation of its derivative positions and has determined that the credit valuation adjustments are not significant to the overall valuation of its derivatives. As a result, the Company has determined that its derivative valuations in their entirety are classified in Level 2 of the fair value hierarchy. The Company does not have any fair value measurements using significant unobservable inputs (Level 3) as of March 31, 2009.

The table below presents the Company's assets and liabilities measured at fair value on a recurring basis as of March 31, 2009, aggregated by the level in the fair value hierarchy within which those measurements fall.

|  | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observables Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets** |  |  |  |  |
| Derivatives | $  1,162 | $         — | $      1,162 | $      — |
| Total | $  1,162 | $         — | $      1,162 | $      — |
|  |  |  |  |  |
| Liabilities |  |  |  |  |
| Derivatives | $(21,214) | $         — | $    (21,214) | $      — |
| Total | $(21,214) | $         — | $    (21,214) | $      — |

Table of Contents

Xerium Technologies, Inc.

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

### 5. Inventories

The components of inventories are as follows at:

|  | March 31, 2009 | December 31, 2008 |
|---|---|---|
| Raw materials | $ 17,752 | $    17,357 |
| Work in process | 28,190 | 29,385 |
| Finished units | 38,623 | 38,801 |
|  | $ 84,565 | $    85,543 |

### 6. Debt

As of March 31, 2009, the Company was in compliance with the covenants under its senior credit facility agreement.

The Company was not in compliance with certain financial covenants for the period ended March 31, 2008 under its then existing credit facility and on April 8, 2008 and May 30, 2008, the Company amended its senior credit facility agreement with the lenders thereunder. Under the amended senior credit facility agreement, borrowings under the revolving credit facility and the term loans bear interest at the sum of, as applicable, LIBOR, the Euribor rate or CDOR plus, in each case, the applicable margin. The applicable margin increased from 2.75% to 5.50% through December 31, 2008 with three identified step downs (i.e., to 4.25%, 3.75% and 2.75%) that are contingent upon future improvements in the Company's credit rating levels beginning January 1, 2009. As a result, as of March 31, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 6.79%.

In March 2009 and 2008, the Company made mandatory debt repayments of approximately $16,100 and $9,400, respectively, based on the difference between its "pre-dividend free cash flow", as defined in its credit facility agreement, and cash dividends paid in the prior year, multiplied by the applicable percentage. Beginning in 2009, the sum of voluntary and scheduled debt payments made in the previous year is subtracted from this result to determine the mandatory debt repayment. The Company also made scheduled quarterly debt payments of approximately $4,700 and $1,800 during the first quarters of 2009 and 2008, respectively. During the first quarter of 2009, the Company made borrowings under its revolver of $28,000.

### 7. Income Taxes

The Company utilizes the asset and liability method for accounting for income taxes in accordance with SFAS No. 109. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities. Deferred tax assets and liabilities are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company reduces the deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Information evaluated includes the Company's financial position and results of operations for the current and preceding years as well as an evaluation of currently available information about future years. Because of the Company's accumulated loss position in certain tax jurisdictions (including the United States and Canada) on March 31, 2009, and the uncertainty of profitability in such jurisdictions in future periods, the Company has valuation allowances for deferred tax assets primarily related to net operating loss carryforwards in such jurisdictions.

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**7. Income Taxes—(continued)**

For the three months ended March 31, 2009 and 2008, the provision for income taxes was $3,892 and $3,639, respectively. The effective tax rate increased for the first quarter of 2009 principally due to the establishment of a valuation allowance in Canada of $2,850 and to actual operating losses incurred by certain of our foreign subsidiaries and those in the U.S. that had established valuation allowances. The effective tax rate increased for the first quarter of 2008 primarily due to (i) minimal tax benefit recognition on the change in the fair value of our interest rate swaps because of our tax loss carryforward position, (ii) increased profitability in certain of our foreign tax-paying subsidiaries and (iii) actual operating losses incurred by certain of our foreign subsidiaries and those in the U.S. that had established valuation allowances.

The Company adopted FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48") on January 1, 2007. As of December 31, 2008, the Company had a gross unrecognized tax benefit of $4,831. During the three months ended March 31, 2009, the Company's unrecognized tax benefit decreased by approximately $200 based principally on the outcome of a foreign tax audit.

The Company's policy is to recognize interest and penalties related to income tax matters as income tax expense, which were immaterial for the three months ended March 31, 2009 and 2008, respectively. The tax years 2000 through 2008 remain open to examination by the major taxing jurisdictions to which the Company and its subsidiaries are subject.

**8. Pensions, Other Postretirement and Postemployment Benefits**

The Company has defined benefit pension plans covering substantially all of its U.S. and Canadian employees and employees of certain subsidiaries in other countries. Benefits are generally based on the employee's years of service and compensation. These plans are funded in conformity with the funding requirements of applicable government regulations.

The Company also sponsors various unfunded defined contribution plans that provide for retirement benefits to employees, some in accordance with local government requirements.

Also, through December 31, 2008, the Company sponsored an unfunded plan that offered the opportunity to obtain health care benefits to a majority of all retired U.S. employees and their covered dependents and beneficiaries. A portion of this plan was contributory, with retiree contributions adjusted periodically. Eligibility varied according to date of hire, age and length of service. As of December 31, 2008, the Company no longer sponsors or funds its U.S. retiree health insurance program. Certain retirees have a life insurance benefit provided at no cost.

Effective December 31, 2008, the Company froze benefit pension accruals under its Pension Plan for U.S. Salaried and Non-Union Hourly Employees (the "Pension Plan") so that future service beyond December 31, 2008 will not be credited under the Pension Plan. Employees who are vested as of December 31, 2008 will be entitled to their benefit earned as of December 31, 2008. Current employees who were not vested as of December 31, 2008 will be entitled to their benefit earned as of December 31, 2008 upon five years of continuous employment from date of hire.

Additionally, during the first quarter of 2009 the Company suspended its 401(k) plan match in the United States until further notice.

14

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**8. Pensions, Other Postretirement and Postemployment Benefits—(continued)**

As required by SFAS No. 132 (revised 2003), *Employers' Disclosures about Pensions and Other Postretirement Benefits – an amendment of FASB Statements No. 87, 88, and 106*, the following tables summarize the components of net periodic benefit cost:

<u>**Defined Benefit Plans**</u>

|  | Three Months Ended | |
|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Service cost | $     709 | $   1,520 |
| Interest cost | 1,479 | 1,690 |
| Expected return on plan assets | (759) | (1,201) |
| Amortization of prior service cost | 21 | 30 |
| Amortization of net loss | 245 | 133 |
| Net periodic benefit cost | $   1,695 | $   2,172 |

<u>**Other Postretirement Benefit Plans**</u>

|  | Three Months Ended | |
|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Service cost | $      — | $     132 |
| Interest cost | 9 | 453 |
| Amortization of prior service cost | — | (140) |
| Amortization of net loss | (1) | (17) |
| Net periodic benefit cost | $        8 | $     428 |

**9. Comprehensive Income (Loss) and Accumulated Other Comprehensive Income**

Comprehensive income(loss) for the periods ended March 31, 2009 and 2008 is as follows:

|  | Three Months Ended | |
|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Net loss | $ (9,448) | $ (4,709) |
| Foreign currency translation adjustments | (2,451) | 5,705 |
| Minimum pension liability/SFAS No. 158 Liability | 69 | 93 |
| Change in value of derivative instruments | (49) | — |
| Comprehensive income (loss) | $(11,879) | $   1,089 |

The components of accumulated other comprehensive income (loss) are as follows:

|  | Foreign Currency Translation Adjustment | Minimum Pension Liability/SFAS No. 158 Liability | Change in Value of Derivative Instruments (Note 4) | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|
| Balance at December 31, 2008 | $   5,891 | $    (21,531) | $  (13,859) | $    (29,499) |
| Current period change, net of tax | (2,451) | 69 | (49) | (2,431) |
| Balance at March 31, 2009 | $   3,440 | $    (21,462) | $  (13,908) | $    (31,930) |

15

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

## 10. Warranties

The Company offers warranties on certain products that it sells. The specific terms and conditions of these warranties vary depending on the product sold, the country in which the product is sold and arrangements with the customer. The Company estimates the costs that may be incurred under its warranties and records a liability for such costs. Factors that affect the Company's warranty liability include the number of units sold, historical and anticipated rates of warranty claims, cost per claim and new product introduction. The Company periodically assesses the adequacy of its recorded warranty claims and adjusts the amounts as necessary. Changes in the Company's combined short-term and long-term warranty liabilities during the three months ended March 31, 2009 are as follows:

| | |
|---|---:|
| Balance at December 31, 2008 | $2,424 |
| Warranties provided during period | 654 |
| Settlements made during period | (419) |
| Changes in liability estimates, including expirations and currency effects | (339) |
| Balance at March 31, 2009 | $2,320 |

## 11. Restructuring and Impairments Expense

Restructuring and impairments expense included in the Company's income statements are the result of its long-term strategy to reduce production costs and improve long-term competitiveness. Restructuring and impairments expense consists principally of severance costs related to reductions in work force and of facility costs and impairments of assets principally related to closing facilities and/or shifting production from one facility to another. Facility costs are principally comprised of costs to relocate assets to the Company's other facilities, operating lease termination costs and other associated costs.

During the first quarter of 2009, the Company continued its program of streamlining its operating structure and recorded restructuring expenses of approximately $700 in connection therewith. Additionally during 2009, the Company sold its rolls manufacturing facility in Sweden at a gain of approximately $1,200, which was partially offset by approximately $600 of costs incurred to continue with actions related to the closure of manufacturing facilities previously announced prior to the first quarter of 2009. The Company expects to incur restructuring expenses of approximately $4,000 during the remainder of 2009, primarily related to headcount reductions resulting from the integration of the regional management structure in North America and similar actions in Europe.

The table below sets forth for the three months ended March 31, 2009, the significant components and activity under restructuring programs and asset impairments:

| | Balance at December 31, 2008 | Charges | Write-offs | Currency Effects | Cash Payments | Balance at March 31, 2009 |
|---|---:|---:|---:|---:|---:|---:|
| Severance | $ 5,422 | $ 844 | $ — | $ (5) | $ (4,437) | $ 1,824 |
| Asset impairment | — | — | — | — | — | — |
| Facility costs and other | 2,455 | (730) | — | (96) | 504 | 2,133 |
| Total | $ 7,877 | $ 114 | $ — | $ (101) | $ (3,933) | $ 3,957 |

16

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements – (Continued)
(dollars in thousands, except per share data)

**11. Restructuring and Impairments Expense—(continued)**

Restructuring and impairments expense by segment, which is not included in Segment Earnings (Loss) in Note 12, is as follows:

|  | For the Three Months Ended | |
| --- | --- | --- |
|  | March 31, 2009 | March 31, 2008 |
| Clothing | $      69 | $      — |
| Roll Covers | (629) | 434 |
| Corporate | 674 | 98 |
| Total | $    114 | $    532 |

**12. Business Segment Information**

The Company is a global manufacturer and supplier of consumable products used primarily in the production of paper, and is organized into two reportable segments: Clothing and Roll Covers. The Clothing segment represents the manufacture and sale of synthetic textile belts used to transport paper along the length of papermaking machines. The Roll Covers segment primarily represents the manufacture and refurbishment of covers used on the steel rolls of papermaking machines. The Company manages each of these operating segments separately.

Management evaluates segment performance based on earnings before interest, taxes, depreciation and amortization and before allocation of corporate charges. Such measure is then adjusted to exclude items that are of an unusual nature and are not used in measuring segment performance or are not segment specific ("Segment Earnings (Loss)"). The accounting policies of these segments are the same as those for the Company as a whole. Inter-segment net sales and inter-segment eliminations are not material for any of the periods presented.

Summarized financial information for the Company's reportable segments is presented in the tables that follow for the three months ended March 31, 2009 and 2008, respectively.

|  | Clothing | Roll Covers | Corporate | Total |
| --- | --- | --- | --- | --- |
| **Three Months Ended March 31, 2009:** | | | | |
| Net sales | $ 77,815 | $38,688 | $      — | $116,503 |
| Segment Earnings (Loss) | 17,612 | 7,898 | (5,046) | |
| **Three Months Ended March 31, 2008:** | | | | |
| Net sales | $103,579 | $55,408 | $      — | $158,987 |
| Segment Earnings (Loss) | 23,942 | 13,987 | (4,883) | |

Segment Earnings (Loss) above excludes restructuring and impairments expense.

Provided below is a reconciliation of Segment Earnings (Loss) to loss before provision for income taxes for the three months ended March 31, 2009 and 2008, respectively.

17

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**12. Business Segment Information—(continued)**

| | Three Months Ended March 31, | |
| | 2009 | 2008 |
|---|---|---|
| Segment Earnings (Loss): | | |
| Clothing | $    17,612 | $    23,942 |
| Roll Covers | 7,898 | 13,987 |
| Corporate | (5,046) | (4,883) |
| Non-cash compensation and related expenses | (161) | (471) |
| Net interest expense | (15,957) | (25,221) |
| Depreciation and amortization | (9,788) | (12,003) |
| Restructuring and impairments expense | (114) | (532) |
| Unrealized foreign exchange gain on revaluation of debt | — | 1,985 |
| Change in fair value of other derivatives | — | 2,126 |
| Loss before provision for income taxes | $    (5,556) | $    (1,070) |

**13. Commitments and Contingencies**

*Stockholder Litigation*

On June 7, 2006, a purported class action complaint was filed in the United States District Court for the District of Massachusetts on behalf of a putative class of investors who purchased shares pursuant or traceable to the Company's initial public offering on or about May 16, 2005 through November 15, 2005 against the Company, its former Chief Executive Officer and its Chief Financial Officer. An amended complaint was filed on November 3, 2006. On November 3, 2008, the Company agreed to a settlement with the plaintiffs, without admitting liability of any kind. On February 25, 2009, the Court entered a judgment granting final approval of the settlement. The settlement amount above the deductible was covered by the Company's Directors and Officers insurance and did not have a material adverse effect on the Company's financial position, results of operations or cash flow in 2008 or 2009.

The Company is involved in various legal matters, which have arisen in the ordinary course of business. The Company does not believe that the ultimate resolution of these matters will have a material adverse effect on its financial position, results of operations or cash flow.

*Environmental Matters*

During the third quarter of 2008, the Company, while evaluating its facility in Australia, discovered the possibility of contamination at that facility. Subsequently, the Company had a preliminary evaluation performed, which confirmed the existence of contamination and estimated preliminary costs to remediate this facility. Based upon this evaluation, the Company accrued $4,100 in 2008 as its best estimate of the remediation costs it expects to incur.

The Company believes that any additional liability in excess of amounts provided which may result from the resolution of such matters will not have a material adverse effect on the financial condition, liquidity or cash flow of the Company.

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

### 14. Stock-Based Compensation

Effective May 19, 2005, the Company adopted the 2005 Equity Incentive Plan (the "2005 Plan"), under which the Board of Directors authorized 2,500,000 shares for grant (subsequently increased to 7,500,000 at the Company's Annual Meeting of Stockholders on August 6, 2008).

The Company recorded compensation expense of $43 in the first quarter of 2009 related to RSUs awarded in and prior to 2009 and compensation expense of $471 for the three months ended March 31, 2008. The Company also recorded stock based compensation expense of $118 during the first quarter of 2009 related to the value of expected awards for the year ending December 31, 2009 under the Company's Performance Award Program, which was approved by the Company's Board of Directors on March 10, 2009.

As a result of adopting SFAS No. 123R on January 1, 2006, the Company has used the straight-line attribution method to recognize expense for RSUs granted after December 31, 2005. The Company used the graded attribution method to recognize expense for all RSUs granted prior to the adoption of SFAS No. 123R.

During 2005, 424,683 time-based RSUs and 801,843 performance-based RSUs were granted to officers and employees of the Company. Non-employee directors were also granted 12,500 RSUs during 2005. Each RSU represents one share of common stock.

To earn common stock under time-based RSUs granted in 2005, generally the grantee must be employed by the Company through the applicable vesting date, which occurred annually on May 19, 2006, 2007 and 2008. The final tranche of these RSUs vested on May 19, 2008.

To earn common stock under performance-based RSUs granted in 2005, generally defined shareholder return targets must be met over the four years following the completion of the Company's initial public offering on May 19, 2005 and the grantee must be employed by the Company through May 19, 2009.

On May 16, 2007, the Company granted 742,885 performance-based RSUs to certain officers and employees of the Company. Generally, to earn common stock under these performance-based RSUs, defined shareholder return targets must be met over the four years following the grant date and the grantee must be employed by the Company through May 16, 2011.

Awards to non-employee directors vest immediately under the 2005 Plan and the underlying shares will be issued to the director upon termination of service as a member of the Board or a change in control, as defined in the 2005 Plan. Annually during 2005, 2006 and 2007, the non-employee directors were granted 12,500 RSUs in the aggregate. In July 2008, they also were granted 48,820 RSUs in the aggregate. On November 30, 2008, three members of the Board retired, which resulted in an aggregate issuance of 81,351 shares of common stock to them underlying their vested RSUs.

19

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

On January 3, 2008, the Compensation Committee of the Company's Board of Directors approved 433,000 performance-based RSU awards (based on shareholder return targets) and 433,000 time-based RSU awards for certain of the Company's officers under the 2005 Plan, which were made contingent upon the approval by the Company's stockholders at or before the Company's 2008 annual meeting of stockholders of an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 5,000,000. On August 6, 2008, at the Company's 2008 annual meeting of stockholders, the stockholders approved an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 7,500,000. The shareholder return based awards will generally only vest if the share price of the Company's common stock plus dividends paid on the common stock from January 3, 2008 satisfies annual targets that the Compensation Committee has established in respect of the three years following January 3, 2008 and the named officer continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the awards) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price. The time-based restricted stock unit awards are scheduled to vest completely, in nearly equal installments on the first, second, and third anniversaries of January 3, 2008, provided that the named officer continues to be employed by the Company on such dates. Dividends, if any, on such time based restricted stock units will be paid at the same rate as dividends on the Company's common stock, but only in the form of additional restricted stock units. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the awards) and/or termination of employment under the circumstances set forth in the restricted stock unit awards. During the first quarter of 2009, 54,299 shares of common stock underlying 87,000 time-based RSUs were issued; the remaining 32,701 shares underlying the RSUs werewithheld from issuance in connection with minimum tax withholding requirements related to the issuance of such shares to the recipients.

On March 10, 2009, in accordance with the employment agreement between the Company and Mr. Stephen Light, the Company's Chairman, President and Chief Executive Officer, the Compensation Committee of the Company's Board of Directors approved RSU grants to Mr. Light as follows: (i) 341,761 time-based RSUs; (ii) 605,209 time-based RSUs that are contingent on shareholder approval of an increase in the maximum number of shares that may be granted as stock awards to any one person in any calendar year under the 2005 Plan; and (iii) 946,969 performance-based RSUs that are contingent on shareholder approval of the same increase. Mr. Light's employment agreement provides that he was to have been granted RSUs having a fair market value of $1,250 on January 1, 2009, or 1,893,939 RSUs, and that half of these are to vest based on his service over time while the other half vest based on the Company's performance. The 2005 Plan imposes a limit on the maximum number of shares that may be granted as stock awards to any one person in any calendar year. Those of the RSUs being granted to Mr. Light that are in excess of that limit have been granted contingent on shareholder approval of an amendment to the 2005 Plan that will increase the limit to enable these grants. The contingent awards are not considered outstanding until approved by the shareholders.

20

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

On March 10 2009, the Company granted to certain employees 39,000 time-based restricted stock units and 39,000 performance-based restricted stock units. The time-based restricted stock unit awards are scheduled to vest completely, in nearly equal installments on the first and second anniversaries of January 3, 2009, provided that the employee continues to be employed by the Company on such dates. Dividends, if any, on such time based restricted stock units will be paid at the same rate as dividends on the Company's common stock, but only in the form of additional restricted stock units. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the awards) and/or termination of employment under the circumstances set forth in the restricted stock unit awards. The shareholder return based awards will generally only vest if the share price of the Company's common stock plus dividends paid on the common stock from January 3, 2009 satisfies annual targets that the Compensation Committee has established in respect of the two years following January 3, 2009 and the named employee continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the awards) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price.

Certain time-based RSUs and all non-employee director RSUs automatically adjust to reflect awards of additional RSUs upon payment of dividends by the Company. During the year ended December 31 2008 and the first quarter of 2009, no RSUs were awarded in connection with the payment of dividends as no dividends were declared by the Company during any of those periods.

RSU activity during the three months ended March 31, 2009 is presented below.

| | Number of RSUs(2) | Price Range of Grant-Date Fair Value Price Per RSU | | Weighted Average Grant-Date Fair Value Price Per RSU |
|---|---|---|---|---|
| Outstanding, December 31, 2008 | 1,358,585 | $ | 3.77 -12.01 | $ 7.50 |
| Granted | 419,761 | | 0.54 - 0.66 | 0.64 |
| Forfeited | — | | — | — |
| Issued or withheld for tax withholding purposes | (87,000) | | 5.40 | 5.40 |
| Outstanding, March 31, 2009 | 1,691,346 | $ | 0.54 -12.01 | $ 5.91 |
| Vested, March 31, 2009 (1) | 36,539 | $ | 3.77 -12.01 | $ 6.42 |

(1)  Vested RSUs at March 31, 2009 consist entirely of non-employee director RSUs. The common stock underlying these RSUs will be issued to the directors upon termination of their service as members of the Board and/or a change in control, as defined in the 2005 Plan.

(2)  Excludes 605,209 time-based RSUs and 946,969 performance-based RSUs awarded to Mr. Light that are contingent on shareholder approval of an increase in the maximum number of shares that may be granted as stock awards to any one person in any calendar year under the 2005 Plan.

21

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

A summary of RSUs outstanding as of March 31, 2009 and their vesting dates is as follows:

| | Vesting Dates | Number of RSUs (1) |
|---|---|---|
| Time-based RSUs granted February 26, 2008 | Annually in equal installments on January 3, 2009, January 3, 2010 and January 3, 2011 | 50,000 |
| Time-based RSUs granted June 13, 2008 | With respect to 37,500 RSUs — annually in equal installments on June 13, 2009, June 13, 2010 and June 13, 2011; with respect to 60,000 RSUs—June 13, 2011 | 97,500 |
| Time-based RSUs granted August 6, 2008 (contingently awarded on January 3, 2008) | Annually in equal installments on January 3, 2009, January 3, 2010 and January 3, 2011 | 124,000 |
| Time-based RSUs granted during various dates in 2008 | Annually in equal installments over three or four years, as applicable. | 55,175 |
| Time-based RSUs granted January 1, 2009 | Annually in equal installments on January 1, 2010 and January 1, 2011 | 341,761 |
| Time-based RSUs granted March 9, 2009 | Annually in equal installments on January 1, 2010 and January 1, 2011 | 39,000 |
| Performance-based RSUs granted May 19, 2005 (based on shareholder return targets) | May 19, 2009, assuming performance criteria are achieved | 269,171 |
| Performance-based RSUs granted May 16, 2007 (based on shareholder return targets) | May 16, 2011, assuming performance criteria are achieved | 453,200 |
| Performance-based RSUs granted August 6, 2008 (based on shareholder return targets) (contingently awarded on January 3, 2008) | January 3, 2011, assuming performance criteria are achieved | 186,000 |
| Performance-based RSUs granted March 9, 2009 (based on shareholder return targets) | January 3, 2011, assuming performance criteria are achieved | 39,000 |
| Non-employee directors' RSUs | Date of grant | 36,539 |
| Total RSUs outstanding | | 1,691,346 |

(1)   Excludes 605,209 time-based RSUs and 946,969 performance-based RSUs awarded to Mr. Light that are contingent on shareholder approval of an increase in the maximum number of shares that may be granted as stock awards to any one person in any calendar year under the 2005 Plan.

22

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

**Assumptions**

Under SFAS No. 123R, the Company uses the following assumptions in determining compensation expense:

*Grant-Date Fair Value*

The Company calculates the grant-date fair value of time-based RSUs and non-employee directors' RSUs based on the closing price of the Company's common stock on the date of grant.

For the performance-based RSUs granted in 2008, 2007 and 2005 (none granted in 2006), the Company calculated the grant-date fair value of performance-based RSUs by using a Monte Carlo pricing model and the following assumptions:

|  | For Performance-Based RSUs Granted August 6, 2008 (contingently awarded January 3, 2008) | For Performance-Based RSUs Granted May 16, 2007 | For Performance-Based RSUs Granted May 19, 2005 |
| --- | --- | --- | --- |
| Expected term | Three years | Four years | Four years |
| Expected volatility | 44% | 39% | 37% |
| Expected dividends | None | $0.45 per year ($0.1125 per quarter) | $0.90 per year ($0.225 per quarter) |
| Risk-free interest rate | 2.64% | 4.32% | 3.73% |

(i) *Expected term.* Performance-based RSUs expire three years after the grant date for the 2008 awards and four years after the grant date for the 2007 and 2005 awards.

(ii) *Expected volatility.* The Company is responsible for estimating the volatility of the price of its common stock and has considered a number of factors, including third party estimates, to determine its expected volatility. For the 2008, 2007 and 2005 awards, the Company performed a peer group analysis of historical and implied volatility measures rather than using its own historical volatility because it had been a public company for a relatively short period of time (i.e., since its initial public offering on May 19, 2005). Based upon the peer group analysis, the Company determined to use a 44%, 39% and 37% volatility assumption for performance-based RSUs granted in 2008, 2007 and 2005, respectively, which is the midpoint of the range developed by looking at the peer group.

(iii) *Expected dividends.* Based on the Company's dividend policy in place at the time of the performance-based RSU grants on May 19, 2005, an assumed continuation of quarterly dividends at the rate of $0.225 per share of common stock was used for the purposes of the application of the Monte Carlo pricing model. On May 2, 2007, the Company modified its credit agreement to limit the amount of any quarterly dividends payable on its common stock to not more than $0.1125 per share. Accordingly, for the performance-based RSUs that were granted on May 16, 2007, the Company assumed continuation of quarterly dividends at the rate of $0.1125 per share of common stock for the purposes of the application of the Monte Carlo pricing model. On May 30, 2008, the Company amended its credit facility. No dividends are permitted to be paid on the Company's common stock through May 2012, the maturity date of the term loans under the amended senior credit facility. Accordingly no dividends were assumed for the 2008 awards for purposes of the application of the Monte Carlo pricing model.

23

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

**Assumptions—(continued)**

(iv) *Risk-free interest rate*. The yield on zero-coupon U.S. Treasury securities for the period that is commensurate with the expected term assumption (i.e., three years and four years, respectively).

The Company also granted time-based restricted stock unit awards to its new chief executive officer with respect to 75,000 shares on February 26, 2008 and 37,500 shares on June 13, 2008. These awards are scheduled to vest completely, in nearly equal installments on the first, second, and third anniversaries of January 3, 2008 and June 13, 2008, respectively, provided that the Company's chief executive officer continues to be employed by the Company on such dates. Additionally, on June 13, 2008, the Company granted a time-based restricted stock unit award to certain of its executive officers with respect to an aggregate 60,000 shares, which are scheduled to vest on the third anniversary of June 13, 2008, provided that the named officers continue to be employed by the Company on that date. During 2008, the Company granted to certain employees 55,175 time-based restricted stock units that vest equally in annual installments from the grant date over a period of three to four years.

*Forfeitures*

As the time-based and performance-based RSUs require continued employment up to the time of vesting, the amount of stock-based compensation recognized during a period is required to include an estimate of forfeitures. SFAS No. 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The term "forfeitures" is related to employee attrition and based on a historical analysis of its employee turnover. This analysis is re-evaluated quarterly and the forfeiture rate will be adjusted as necessary. Ultimately, the actual expense recognized over the vesting period will be only for those shares that meet the requirements of continued employment up to the time of vesting. The Company estimated its forfeiture rates as of March 31, 2009 to be as follows:

| Description of Award | Forfeiture Rates |
|---|---|
| Time-based RSUs granted on various dates in 2008 and in 2009 (and contingently granted on January 1, 2009), other than those on August 6, 2008 | 10% |
| Time-based RSUs granted on August 6, 2008 | 55% |
| Performance-based RSUs granted May 19, 2005 (based on shareholder return targets) | 74% |
| Performance-based RSUs granted May 19, 2007 (based on shareholder return targets) | 65% |
| Performance-based RSUs granted August 6, 2008 (based on shareholder return targets) | 70% |
| Performance-based RSUs granted in 2009 (and contingently granted on January 1, 2009 (based on shareholder return targets) | 10% |
| Non-employee directors' RSUs | Vest immediately upon grant so no forfeiture rate required. |

24

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

As of March 31, 2009, there was approximately $2,600 of total unrecognized compensation expense related to unvested share-based awards which is expected to be recognized over a weighted average period of 1.9 years.

*Certain Material Equity Awards*

On March 10, 2009, the Company's Board of Directors approved the issuance of 4,034,819 shares of common stock to eligible participants under the Company's performance award program for 2008. After withholding shares of common stock to satisfy minimum tax withholding requirements, a net number of 2,564,111 shares was issued to the eligible participants on March 11, 2009.

25

**Table of Contents**

**ITEM 2.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Forward Looking Statements**

The following discussion of our financial condition and results of operations should be read together with our unaudited condensed consolidated interim financial statements and the related notes thereto contained elsewhere in this Quarterly Report on Form 10-Q. The discussion included in this section, as well as other sections of this Quarterly Report on Form 10-Q contains forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties, and other factors that may cause our actual results, levels of activity, performance, or achievements to be materially different from any future results, levels of activity, performance, or achievements expressed or implied by these forward-looking statements. In some cases, you can identify forward-looking statements by the use of words such as "may," "could," "expect," "intend," "plan," "seek," "anticipate," "believe," "estimate," "predict," "potential," or "continue" or the negative of these terms or other comparable terminology. Undue reliance should not be placed on forward-looking statements because they involve known and unknown risks, uncertainties, and other factors that are, in some cases, beyond our control and that could materially affect actual results, levels of activity, performance, or achievements. Factors that could materially affect our actual results, levels of activity, performance or achievements include the following items:

- we are subject to the risk of weaker economic conditions in the locations around the world where we conduct business, including without limitation the current turmoil in the global paper markets and the impact of the current global economic crisis on the paper industry and our customers;

- we may be unable to maintain compliance with the restrictive covenants in our credit facility. Our ability to maintain compliance depends on our ability to achieve our financial forecasts, which are based on certain assumptions that may or may not materialize as we expect regarding (i) demand for paper products, (ii) the level of paper production and inventories, (iii) the number of mills producing paper, (iv) the financial health of our customers, (v) the stability of product prices, (vi) the strength of market acceptance of new products, (vii) the absence of dramatic increases in commodity prices, (viii) our ability to maintain hedge accounting for our interest rate swaps, (ix) the beginning of an economic recovery in the global paper market in mid-2009, with the effect of increasing our revenues and profits, (x) the value of the Euro relative to the US dollar increasing from its current level and (xi) our ability to implement planned cost reductions, including postponing deliveries of ordered equipment;

- our strategies and plans, including, but not limited to, those relating to the decrease in our financial leverage, developing new products and enhancing our operational efficiencies, may not result in the anticipated benefits;

- we may not achieve compliance with the NYSE continued listing standards;

- our profitability could be adversely affected by fluctuations in currency exchange and interest rates;

- we may not be able to develop and market new products successfully;

- we may not be successful in competing against new technologies developed by competitors;

- we may have insufficient cash to fund growth and unexpected cash needs after satisfying our debt service obligations due to our high degree of leverage and significant debt service obligations;

- we may not have sufficient cash to fund our operations; should the current conditions in the global paper market continue or worsen over time;

- there can be no assurance that in future periods we will be able to assert that the hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting;

- we may be required to incur significant costs to reorganize our operations in response to market changes in the paper industry;

**Table of Contents**

- we are subject to the risk of terrorist attacks or an outbreak or escalation of any insurrection or armed conflict involving the United States or any other country in which we conduct business, or any other national or international calamity;

- we are subject to any future changes in government regulation; and

- we are subject to any changes in U.S. or foreign government policies, laws and practices regarding the repatriation of funds or taxes.

Many of these risks are discussed elsewhere in this Form 10-Q, including in the sections below: "Recent Developments," "Overview," "Industry Trends and Outlook," "Liquidity and Capital Resources" and "Credit Facility." Other factors that could materially affect actual results, levels of activity, performance, or achievements can be found in Part I, Item 1A in our Annual Report on Form 10-K for the year ended December 31, 2008 filed with the Securities and Exchange Commission on March 12, 2009. If any of these risks or uncertainties materialize, or if our underlying assumptions prove to be incorrect, actual results may vary significantly from what we projected. Any forward-looking statement in this Quarterly Report on Form 10-Q reflects our current views with respect to future events and is subject to these and other risks, uncertainties, and assumptions relating to our operations, results of operations, growth strategy, and liquidity. We assume no obligation to publicly update or revise these forward-looking statements for any reason, whether as a result of new information, future events, or otherwise.

**Recent Developments**

*New York Stock Exchange ("NYSE")*

On December 29, 2008, we were notified by the NYSE that we were not in compliance with two NYSE standards for continued listing of our common stock on the exchange because the average closing price of our common stock was less than $1.00 per share over a consecutive 30 trading day period, and our average total market capitalization was less than $75 million over the same period and our most recently reported stockholders' equity was less than $75 million.

On March 27, 2009, we were notified by the NYSE that it has accepted our plan for continued listing on the NYSE. As a result, our common stock will continue to be listed on the NYSE during the compliance period, subject to quarterly reviews by the NYSE to monitor our progress against the plan.

As a result of the NYSE's acceptance of the plan, we have 18 months from the original notification date of December 29, 2008 in which to regain compliance with the average market capitalization standard, subject to its compliance with the NYSE's other continued listing requirements. With respect to the $1.00 minimum price standard, we initially had six months from the date of receipt of the notification from the NYSE to bring our share price and average share price over $1.00. However, the NYSE has suspended the $1.00 minimum price requirement through June 30, 2009. Once the NYSE reinstitutes the average share price standard, our six-month compliance period will recommence, and we will have the remainder of the period in which to regain compliance with the standard. Failure to make progress consistent with the plan or to regain compliance with the continued listing standards could result in our common stock being delisted from the NYSE.

*Global Economic Environment*

Our business is highly dependent upon the paper production industry and the degree to which the paper industry is affected by global economic conditions and the availability of credit. Demand for our products, could continue to decline if paper manufacturers are unable to obtain required financing or if the economic crisis causes additional mill closures or extends current capacity curtailments.

During 2008, especially the latter part of the year, the global paper industry experienced a sharp reduction in production levels, caused by the general slowdown in economic activity and the related paper consumption decline during the same period. The slowdown of production was across all grades of paper production, but most notably in the packaging grades and newsprint. For packaging grades, demand is directly related to broad manufacturing and transportation activity reduction, while newsprint demand has been increasingly declining over a number of years due to the greater prevalence of electronic media, exacerbated in recent months by a reduction in print advertising. One of the results of the recent reduction in demand for paper products is that the inventory of paper at the paper-makers has increased significantly and production slowdowns, curtailments and idling of

27

Table of Contents

paper-making machines have been occurring at a sharply increasing rate since October 2008 and are continuing into 2009. Regionally, North America and Europe have seen the most significant production declines. Paper production in those regions decreased in 2008 and is expected to decrease further in 2009. South America and Asia, while experiencing slowdowns, are still expected to increase tons of paper and pulp produced in 2009 compared to 2008. While we were successful in reducing the rate of price decrease in 2008 for the products we sell to the paper-makers, there continues to be price pressure due to our competitors pursuing market growth with slower overall demand for our products.

In the quarters ended September 30, 2008 and December 31, 2008, due to the global economic crisis and the lack of credit availability that may affect our customers' demand for products and their ability to pay their debts, we assessed the impact of this crisis on our customers and our industry, and changed our estimates of net realizable value of receivables and inventories. For example, two of our major customers, who collectively represent approximately 5% of 2008 revenues, have experienced recent financial difficulties and filed for bankruptcy protection in 2009. We have fully reserved for amounts due from these customers, however, decreases in orders from these customers or future payment problems from these or other customers could have a material adverse effect on our sales and profitability, which in turn could impact our ability to satisfy the covenant requirements in our credit facility.

## Overview

We are a leading global manufacturer and supplier of two categories of consumable products used primarily in the production of paper—clothing and roll covers. Our operations are strategically located in the major paper-producing regions of North America, Europe, South America and Asia-Pacific.

Our products play key roles in the formation and processing of paper along the length of a paper-making machine. Paper producers rely on our products and services to help improve the quality of their paper, differentiate their paper products, operate their paper-making machines more efficiently and reduce production costs. Our products and services typically represent only a small fraction of a paper producer's overall production costs, yet they can reduce costs by permitting the use of lower-cost raw materials and reducing energy consumption. Paper producers must replace clothing and refurbish or replace roll covers regularly as these products wear down during the paper production process. Our products are designed to withstand extreme temperature, chemical and pressure conditions, and are the result of a substantial investment in research and development and highly sophisticated manufacturing processes.

We operate in two principal business segments: clothing and roll covers. In our clothing segment, we manufacture and sell highly engineered synthetic textile belts that transport paper as it is processed on a paper-making machine. Clothing plays a significant role in the forming, pressing and drying stages of paper production. Because paper-making processes and machine specifications vary widely, the clothing size, form, material and function is selected to fit each individual paper-making machine and process. For the three months ended March 31, 2009, our clothing segment represented 67% of our net sales.

Our roll cover products provide a surface with the mechanical properties necessary to process the paper sheet in a cost-effective manner that delivers the sheet qualities desired by the paper producer. Roll covers are tailored to each individual paper-making machine and process, using different materials, treatments and finishings. In addition to manufacturing and selling new roll covers, we also provide refurbishment services for previously installed roll covers and manufacture spreader rolls. For the three months ended March 31, 2009, our roll covers segment represented 33% of our net sales.

## Industry Trends and Outlook

Historically, demand for our products has been driven primarily by the volume of paper produced on a worldwide basis. According to the Food and Agriculture Organization of the United Nations, the volume of paper productions between 1980 and 2007 increased at a compound annual growth rate of approximately 3.07%. There can be no assurance that the industry will continue to grow at a similar rate and it is possible that paper production may decline in any specific period compared to prior periods. Generally, and over time, we expect growth in paper production to be greater in Asia, South America and Eastern Europe than in the more mature North American and Western European regions.

Table of Contents

The profitability of paper producers has historically been highly cyclical due to wide swings in the price of paper, driven to a high degree by the oversupply of paper during periods when paper producers have more aggregate capacity than the market requires. A sustained downturn in the paper industry, either globally or in a particular region, can cause paper manufacturers to reduce production or cease operations, which could adversely affect our revenues and profitability. Since 2000, paper producers have taken actions that seek to structurally improve the balance between the supply of and demand for paper. As part of these efforts, they have permanently shut down many paper-making machines. Between 2001 and 2004 the bulk of these closures occurred in North America. Announcements by paper producers concerning temporary and permanent shutdowns of paper-making machines in both North America and Europe have continued. During 2005 through 2008, the sales and profitability of our North American and European operations were adversely affected by these shutdowns. Papermakers continue to experience low levels of profitability, and we believe that further consolidation among papermakers, reducing the number of paper producers, and shutdowns of paper-making machines will occur in Europe and North America, until there is a better balance between supply and demand for paper and the profit levels of paper producers improve. This rebalancing will be accelerated during the current global economic recession. Over a number of years, consumption growth of paper is expected to drive an increase in the global production rates required to maintain balance between supply and demand although it is highly likely that a consumption slow-down and related effect on global paper production will continue in the near term, exacerbated by the global economic crisis. Also affecting machine curtailments are structural productivity gains from improved products that we and our competitors supply.

Global paper production growth that does occur would be moderated by the level of industry consolidation and paper-machine shutdown activity that is a continuing underlying trend in North America and Western Europe. We also believe that, in addition to industry consolidation and paper machine shutdown activity in North America and Western Europe, the trend towards new paper machine designs which have fewer rolls and market recognition of extended life of our roll cover products has been and will continue to negatively impact demand for these products and that the volume potential for the roll covers business in North America and Western Europe will slowly diminish. Additionally, we are seeing a trend that paper producers are placing an increasing emphasis on maintenance cost reduction and, as a result, are extending the life of roll covers through additional maintenance cycles before replacing them. Accordingly, in November, 2007 we acquired two roll cover manufacturing plants in China to expand our served market, and are now focused on adding related products and services to our offerings in this new territory.

We anticipate that pricing pressure for our products will continue with the consolidation among paper producers and as the shift of paper production growth in Asia develops. In response to this pricing pressure, we expect to increase our expenditure levels on research and development expenses and continue to develop our value added selling approach as part of our strategy to differentiate our products, while at the same time remaining focused on cost reduction and efficiency programs.

The negative paper industry trends described above are likely to be accelerated by the general global economic crisis discussed in the section "Global Economic Environment." For example, we believe that in the current economic environment, the paper industry will experience reduced demand, increased emphasis on cost reduction, and increased paper-machine shutdown activity than would have been the case in the absence of the economic crisis.

### Sales and Expenses

Sales in both our clothing and roll covers segments are primarily driven by the following factors:

- The volume of worldwide paper production;

- Advances in the technology of our products, which can provide value to our customers by improving the efficiency of paper-making machines;

- Our ability to provide products and services which reduce paper-making machine downtime, while at the same time allowing the manufacture of high quality paper products; and

- Impact of currency fluctuations.

Sales in our roll covers segment include our mechanical services business. We have expanded this business in response to demand from paper producers that we perform work on the internal mechanisms of a roll while we refurbish or replace a roll cover. In our

29

**Table of Contents**

clothing segment, a portion of our business has been conducted pursuant to consignment arrangements under which we do not recognize a sale of a product to a customer until the customer places the product into use, which typically occurs some period after the product is shipped to the customer or to a warehouse location near the customer's facility. We are striving to reduce the number of consignment arrangements and increase the use of standard terms of sale under which we recognize a sale upon product shipment. We made progress with this initiative in 2008. We expect this effort to be successful over several years.

Our operating costs are driven primarily by our total sales volume, the impact of inflation and currency and the level and impact of cost reduction programs.

The level of our cost of products sold is primarily attributable to labor costs, raw material costs, shipping costs, plant utilization and depreciation, with labor costs constituting the largest component. We invest in facilities and equipment that enable innovative product development and improve production efficiency and costs. Recent examples of capital spending for such purposes include faster weaving looms and seaming machines with accurate electronic controls, automated compound mixing equipment and computer-controlled lathes and mills.

The level of research and development spending is driven by market demand for technology enhancements, including both specific customer needs and general market requirements, as well as by our own analysis of applied technology opportunities. With the exception of purchases of equipment and similar capital items used in our research and development activities, all research and development is expensed as incurred. Research and development expenses were $2.7 million and $3.0 million for the three months ended March 31, 2009 and 2008, respectively.

**Foreign Exchange**

We have a geographically diverse customer base. For the three months ended March 31, 2009, approximately 36% of our sales was in Europe, 35% was in North America, 17% was in Asia-Pacific, 10% was in South America and 2% was in the rest of the world.

A substantial portion of our sales is denominated in Euros or other currencies. As a result, changes in the relative values of U.S. Dollars, Euros and other currencies affect our reported levels of revenues and profitability as the results are translated into U.S. Dollars for reporting purposes. In particular, increases in the value of the U.S. Dollar relative to the value of the Euro and these other currencies negatively impact our levels of revenue and profitability because the translation of a certain number of Euros or units of such other currencies into U.S. Dollars for financial reporting purposes will represent fewer U.S. Dollars.

For certain transactions, our sales are denominated in U.S. Dollars or Euros but all or a substantial portion of the associated costs are denominated in a different currency. As a result, changes in the relative values of U.S. Dollars, Euros and other currencies can affect the level of the profitability of these transactions. The largest proportion of such transactions consist of transactions in which the sales are denominated in or indexed to U.S. Dollars and all or a substantial portion of the associated costs are denominated in Euros, Reals or other currencies.

Currency fluctuations have a greater effect on the level of our net sales than on the level of our income from operations. For example, for the three months ended March 31, 2009 as compared with the three months ended March 31, 2008, the change in the value of the U.S. Dollar against the currencies in which we conduct our business resulted in currency translation decreases in net sales and income from operations of $18.2 million and $2.6 million, respectively. Although the results for the three months ended March 31, 2009 reflect a period in which the value of the U.S. Dollar increased against most of the currencies in which we conduct the majority of our non-U.S. Dollar denominated business as compared to the three months ended March 31, 2008, we would expect a similar but opposite effect in a period in which the value of the U.S. Dollar decreases. For any period in which the value of the U.S. Dollar changes relative to other currencies, we would expect our income from operations to be proportionately affected less than our net sales.

During the three months ended March 31, 2009 we conducted business in 11 foreign currencies. The following table provides the average exchange rate for the three months ended March 31, 2009 and 2008, respectively, of the U.S. Dollar against each of the four foreign currencies in which we conduct the largest portion of our operations and indicates the percentage of our net sales for the three months ended March 31, 2009 denominated in such foreign currency.

30

**Table of Contents**

| Currency | Average exchange rate of the U.S. Dollar for the three months ended March 31, 2009 | Average exchange rate of the U.S. Dollar for the three months ended March 31, 2008 | Percentage of net sales for the three months ended March 31, 2009 denominated in such currency |
|---|---|---|---|
| Euro | $1.30 = 1 Euro | $1.50 = 1 Euro | 41.8% |
| Canadian Dollar | $0.80 = 1 Canadian Dollar | $1.00 = 1 Canadian Dollar | 6.1% |
| Brazilian Real | $0.43 = 1 Brazilian Real | $0.58 = 1 Brazilian Real | 10.4% |
| Australian Dollar | $0.66 = 1 Australian Dollar | $0.91 = 1 Australian Dollar | 6.2% |

To mitigate the risk of transactions in which a sale is made in one currency and associated costs are denominated in a different currency, we utilize forward currency contracts in certain circumstances to lock in exchange rates with the objective that the gain or loss on the forward contracts will approximate the loss or gain that results from the transaction or transactions being hedged. We determine whether to enter into hedging arrangements based upon the size of the underlying transaction or transactions, an assessment of the risk of adverse movements in the applicable currencies and the availability of a cost effective hedge strategy. To the extent we do not engage in hedging or such hedging is not effective, changes in the relative value of currencies can affect our profitability.

**Cost Reduction Programs**

An important part of our long-term operating strategy is to seek to reduce our overall costs and improve our competitiveness. As a part of this effort, we have engaged in a series of cost reduction programs since 2002, which were designed to improve the cost structure of our global operations in response to changing market conditions. These cost reduction programs include headcount reductions throughout the world as well as plant closures that have rationalized production among our facilities to better enable us to meet customer demands.

During the first quarter of 2009, we continued our program of streamlining our operating structure and recorded restructuring expenses of approximately $0.7 million in connection therewith. Additionally, during 2009 we sold our rolls manufacturing facility in Sweden at a gain of approximately $1.2 million, which was partially offset by approximately $0.6 million of costs incurred to continue with actions related to the closure of manufacturing facilities announced prior to the first quarter of 2009. We expect to incur restructuring expenses of approximately $4.0 million during the remainder of 2009, primarily related to headcount reductions resulting from the integration of the regional management structure in North America and similar actions in Europe.

During the first quarter of 2009, we also froze one of our U.S. employee pension plans, terminated our retiree medical plan, suspended contributions to our U.S. 401K program, froze salaries, delayed union contract wage increases, curtailed travel and halted work on our Vietnam project.

Table of Contents

## Results of Operations

The tables that follow set forth for the periods presented certain consolidated operating results and the percentage of net sales they represent:

| (in millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| Net sales | $ 116.5 | $ 159.0 |
| Cost of products sold | 72.2 | 95.7 |
| Selling expenses | 16.5 | 20.5 |
| General and administrative expenses | 13.2 | 18.7 |
| Restructuring and impairments expenses | 0.1 | 0.5 |
| Research and development expenses | 2.7 | 3.0 |
| Income from operations | 11.7 | 20.6 |
| Interest expense, net | (16.0) | (25.2) |
| Foreign exchange gain (loss) | (1.3) | 3.5 |
| Loss before provision for income taxes | (5.6) | (1.1) |
| Provision for income taxes | 3.9 | 3.6 |
| Net loss | $ (9.5) | $ (4.7) |

### Percentage of Sales

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| Net sales | 100.0% | 100.0% |
| Cost of products sold | 62.0 | 60.2 |
| Selling expenses | 14.2 | 12.9 |
| General and administrative expenses | 11.3 | 11.7 |
| Restructuring and impairments expenses | 0.1 | 0.3 |
| Research and development expenses | 2.3 | 1.9 |
| Income from operations | 10.0 | 13.0 |
| Interest expense, net | (13.7) | (15.8) |
| Foreign exchange gain (loss) | (1.1) | 2.2 |
| Loss before provision for income taxes | (4.8) | (0.6) |
| Provision for income taxes | 3.3 | 2.3 |
| Net income (loss) | (8.1)% | (2.9)% |

***Three Months Ended March 31, 2009 Compared to the Three Months Ended March 31, 2008.***

*Net Sales.* Net sales for the three months ended March 31, 2009 decreased by $42.5 million, or 26.7%, to $116.5 million from $159.0 million for the three months ended March 31, 2008. For the three months ended March 31, 2009, 67% of our net sales was in our clothing segment and 33% was in our roll covers segment.

In our clothing segment, net sales for the three months ended March 31, 2009 decreased by $25.8 million, or 24.9%, to $77.8 million from $103.6 million for the three months ended March 31, 2008 primarily due to (i) unfavorable currency effects on net sales of $13.6 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes and (ii) decreased sales volume, primarily in Europe and North and South America, partially offset by increased sales volume in Asia-Pacific. The decrease was partially offset by favorable currency effects on pricing related to sales prices indexed in U.S. Dollars by certain non-U.S. operations of $4.8 million. Overall pricing levels in our clothing segment decreased approximately 1% during the three months ended March 31, 2009 as compared with the three months ended March 31, 2008.

In our roll covers segment, net sales for the three months ended March 31, 2009 decreased by $16.7 million or 30.2%, to 38.7 million from $55.4 million for the three months ended March 31, 2008. The decrease was primarily due to (i) decreased sales volumes in

32

Table of Contents

Europe and North America and (ii) unfavorable currency effects on net sales of $4.6 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. Overall pricing levels in our roll covers segment increased by approximately 1% during the three months ended March 31, 2009 as compared with the three months ended March 31, 2008.

*Cost of Products Sold.* Cost of products sold for the three months ended March 31, 2009 decreased by $23.5 million, or 24.6%, to $72.2 million from $95.7 million for the three months ended March 31, 2008.

In our clothing segment, cost of products sold decreased by $15.6 million, or 25.0%, to $47.4 million for the three months ended March 31, 2009 from $62.4 million for the three months ended March 31, 2008 primarily due to favorable currency effects of $8.2 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes and to lower sales volumes during the three months ended March 31, 2009.

In our roll covers segment, cost of products sold decreased by $7.9 million, or 23.4%, to $25.4 million for the three months ended March 31, 2009 from $33.3 million for the three months ended March 31, 2008 primarily due to lower sales volumes during the three months ended March 31, 2009 and favorable currency effects of $2.8 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes.

*Selling Expenses.* For the three months ended March 31, 2009, selling expenses decreased by $4.0 million, or 19.5%, to $16.5 million from $20.5 million for the three months ended March 31, 2008. The decrease was primarily due to favorable currency effects of $2.5 million and the impact of a reduction in salaried sales positions and travel expenses during the three months ended March 31, 2009 as compared with the three months ended March 31, 2008.

*General and Administrative Expenses.* For the three months ended March 31, 2009, general and administrative expenses decreased by $5.5 million, or 29.4%, to $13.2 million from $18.7 million for the three months ended March 31, 2008. The decrease was primarily due (i) favorable currency translation effects of $2.0 million, (ii) decreased provisions for bad debts of approximately $1.7 million, and (iii) decreased salaries, travel, stock based compensation and other costs as a result of cost reduction efforts during the three months ended March 31, 2009 as compared with the three months ended March 31, 2008.

*Restructuring and Impairments Expenses.* For the three months ended March 31, 2009, restructuring and impairments expenses decreased by $0.4 million to $0.1 million from $0.5 million for the three months ended March 31, 2008. Restructuring expenses result from our long-term strategy to reduce production costs and improve long-term competitiveness as described above under "Cost Reduction Programs" by closing and/or transferring production from certain of our manufacturing facilities and through headcount reductions. For the three months ended March 31, 2009, restructuring expenses include a gain of $1.2 million on the sale of our Swedish roll covers facility on March 31, 2009, entirely offset by severance costs of $0.8 million and facility and other costs of $0.5 million.

*Research and Development Expenses.* For the three months ended March 31, 2009, research and development expenses decreased by $0.3 million, or 10.0%, to $2.7 million from $3.0 million for the three months ended March 31, 2008 primarily due favorable currency effects for the three months ended March 31, 2009 as compared with the three months ended March 31, 2008.

*Interest Expense, Net.* Net interest expense for the three months ended March 31, 2009 decreased by $9.2 million, or 36.5%, to $16.0 million from $25.2 million for the three months ended March 31, 2008. The decrease is primarily attributable to (i) the $12 million charge in 2008 in connection with the change in the fair value of our interest rate swaps due to the loss of hedge accounting for the first six months of 2008 and (ii) favorable currency effects of $1.1 million. These decreases were offset by increased interest rates during the three months ended March 31, 2009 as compared with the three months ended March 31, 2008 resulting from the amendment of our senior credit facility on May 30, 2008.

*Foreign Exchange Gain (Loss).* For the three months ended March 31, 2009 and 2008, we had a foreign exchange loss of $1.3 million and a foreign exchange gain of $3.5 million, respectively. The gain in 2008 was primarily attributable to mark-to-market gains on fair value hedges, including gains on hedges for which the underlying foreign exchange exposure on certain intercompany debt no longer

33

Table of Contents

existed in the first quarter of 2008, and gains on hedges on future purchases of equipment. Foreign exchange gains and losses during the first quarter of 2009 were primarily the result of hedging and intercompany activities.

*Provision for Income Taxes.* For the three months ended March 31, 2009 and 2008, the provision for income taxes was $3.9 million and $3.6 million, respectively. The effective tax rate increased for the first quarter of 2009 principally due to the establishment of a valuation allowance in Canada of $2.9 million and to actual operating losses incurred by certain of our foreign subsidiaries and those in the U.S. that had established valuation allowances. The effective tax rate increased for the first quarter of 2008 primarily due to (i) minimal tax benefit recognition on the change in the fair value of our interest rate swaps because of our tax loss carryforward position, (ii) increased profitability in certain of our foreign tax-paying subsidiaries and (iii) actual operating losses incurred by certain of our foreign subsidiaries and those in the U.S. that had established valuation allowances.

## LIQUIDITY AND CAPITAL RESOURCES

The Company's operations are highly dependent upon the paper production industry and the degree to which the paper industry is affected by global economic conditions and the availability of credit. Demand for our products could continue to decline if paper manufacturers are unable to obtain required financing or if the economic slowdown causes additional mill closures. In addition, the global economic crisis and the ensuing lack of credit availability may affect our customers' ability to pay their debts which could have a negative impact on our Company. These factors would impact our liquidity and our ability to satisfy the covenant requirements of our credit facility.

Our principal liquidity requirements are for debt service, working capital and capital expenditures. We plan to use cash generated by operations as our primary source of liquidity as well as borrowings, if necessary, under the revolving portion of the credit facility to meet normal operating requirements for at least the next twelve months. If expected revenue and profits are not realized, we may not be able to generate enough cash to meet our obligations. In addition, should the current conditions in the global paper market continue or worsen over time, we may not have sufficient cash to fund our operations or meet our other liquidity requirements.

Net cash used in operating activities was $7.8 million for the three months ended March 31, 2009 compared with net cash provided by operating activities of $29.8 million for the three months ended March 31, 2008. The $37.6 million decrease is due to a decrease in the volume of business as a result of the global economic crisis and an increase in working capital during the first quarter of 2009 as compared with the first quarter of 2008 principally due to the level of payment of payables and accruals since December 31, 2008.

Net cash used in investing activities was $5.1 million for the three months ended March 31, 2009 and $12.1 million for the three months ended March 31, 2008. The decrease of $7.0 million was primarily due to a decrease in capital equipment spending of $5.1 million in the three months ended March 31, 2009 as compared with the three months ended March 31, 2008 and the proceeds of $1.9 million from the sale of our Swedish roll covers facility on March 31, 2009.

Net cash provided by financing activities was $6.5 million for the three months ended March 31, 2009 and net cash used in financing activities was $12.1 million for the three months ended March 31, 2008. The fluctuation of $18.6 million was primarily the result of borrowings under our revolver of $28.0 million during the three months ended March 31, 2009, partially offset by higher debt payments of approximately $10 million during the three months ended March 31, 2009 as compared with the three months ended March 31, 2008. We made a mandatory principal repayment of $16.1 million in the first quarter of 2009 as compared with $9.4 million in the first quarter of 2008. The increase is due to the loan agreement requiring us to make such excess payments based on the prior year's Adjusted EBITDA, which during 2008 was impacted by gains of approximately $52 million related to the freezing one of our U.S. pension plans, terminating our U.S. retiree medical plan and the mark to market changes in the fair value of our interest rate swaps, partially offset by approximately $30 million related to increased restructuring expenses and increased noncash reserves. Because none of these events generated any cash, the effect of these actions reduced our available cash.

**Table of Contents**

As of March 31, 2009, there was a $572.0 million balance of term loans outstanding under our senior credit facility. During the first quarter of 2009, we made scheduled principal payments of $4.7 million and a mandatory principal repayment of $16.1 million. In addition, as of March 31, 2009, we had an aggregate of $28.0 million outstanding under our current revolving lines of credit, including the revolving credit facility under our senior credit facility and lines of credit in various foreign countries that are used to facilitate local short-term operating needs and an aggregate of $20.0 million available for additional borrowings under these revolving lines of credit. Our liquidity is substantially affected by the covenant requirements of our credit agreement. See "Credit Facility" below. We had cash and cash equivalents of $27.5 million at March 31, 2009 compared to $34.7 million at December 31, 2008.

## CAPITAL EXPENDITURES

For the three months ended March 31, 2009, we had capital expenditures of $7.0 million consisting of growth capital expenditures of $5.0 million and maintenance capital expenditures of $2.0 million. Growth capital expenditures consist of items that are intended to increase the manufacturing, production and/or distribution capacity or efficiencies of our operations in conjunction with the execution of our business strategies. Maintenance capital expenditures are designed to sustain the current capacity or efficiency of our operations and include items relating to the renovation of existing manufacturing or service facilities, the purchase of machinery and equipment for safety and environmental needs and information technology. For the three months ended March 31, 2008, capital expenditures were $12.1 million, consisting of growth capital expenditures of $9.8 million and maintenance capital expenditures of $2.3 million.

In the first quarter of 2008 we began an effort to reduce our planned capital expenditures. As part of this effort, we determined to delay the planned capital expenditures for the Vietnam facility and cancelled or rescheduled certain other previously planned capital expenditures. These cancellations did not result in any substantial penalties for us. In December 2008, we discontinued the construction of the Vietnam facility. While construction of the Vietnam facility has been discontinued, we continue to have contractual obligations with respect to certain equipment which was previously ordered for the facility. We are currently evaluating the possibility of redeploying this equipment to other locations and/or postponing the delivery of the equipment. Due to our assessment of the impact of the global economic crisis and the potential effect on our customers and our industry, we are currently evaluating additional capital expenditures reductions and cost reduction actions to improve long-term operating efficiencies and to better match our production with demand. We analyze our planned capital expenditures based on investment opportunities available to us and our financial and operating performance, and accordingly, actual capital expenditures may be more or less than these amounts. We target capital expenditures for 2009 to be approximately $30 million, and that capital expenditure levels in 2010 will be comparable to those in 2009.

We will require the agreement of our equipment suppliers to postpone delivery of contracted machines to achieve our reduced capital expenditure targets, and there can be no assurance that we will be successful in obtaining such agreements.

See "—Credit Facility" below for a description on limitations on capital expenditures imposed by our credit facility.

## CREDIT FACILITY

Upon the completion of the initial public offering of our common stock on May 19, 2005, we and certain of our subsidiaries entered into a senior secured credit facility. The credit facility was amended four times: on February 8, 2006, December 22, 2006, May 2, 2007 and April 8, 2008. The credit facility was amended and restated on May 30, 2008.

The description of the credit facility below describes the facility as amended and restated.

Our credit facility provides for a $50 million senior secured revolving credit facility and for term loans that had a total principal amount of $650 million as of May 2005. Because the term loans include portions denominated in Euros and Canadian dollars, in addition to a U.S. Dollar denominated portion, the aggregate outstanding principal on our term loans is affected by our currency exchange rates as well as principal repayments. The revolving credit facility matures on November 19, 2011, and the term loans mature on May 19, 2012. The credit facility is secured by substantially all of our assets and the assets of most of our subsidiaries, subject to legal and tax considerations and requirements.

**Table of Contents**

Borrowings under the revolving credit facility and the term loans bear interest at the sum of, as applicable, LIBOR, the Euribor rate or CDOR plus, in each case, the applicable margin. The applicable margin was set at 5.50% through December 31, 2008. Beginning January 1, 2009, the applicable margin depends upon our credit rating level: it will be 2.75% if our credit rating is Ba3 or higher by Moody's and BB- or higher by S&P, 3.75% if our credit rating is B1 by Moody's or B+ by S&P, 4.25% if our credit rating is B3 or higher but lower than B1 by Moody's and 'B-' or higher but lower than 'B+' by S&P, and 5.50% if our credit rating is lower than B3 by Moody's or lower than B- by S&P. In order to qualify at each level the rating must be with a stable outlook. Our current credit rating is Caa1 by Moody's and 'B-' by S&P. On September 29, 2008, Standard & Poor's Ratings Services raised its ratings on the Company, including raising the long-term corporate credit rating, from 'CCC+' to 'B-'.

On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. The interest rate swap arrangements effectively fixed the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. These interest rate swaps initially qualified for hedge accounting under SFAS No. 133. As a result of the financial covenant non-compliance for the period ended March 31, 2008 as discussed in Note 6 of the Notes to Unaudited Condensed Consolidated Financial Statements included elsewhere in this Quarterly Report, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under SFAS No. 133 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12 million was recorded as a non-cash charge to interest expense in the first quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. As a result, the mark to market changes of $0.4 million on these interest rate swaps were charged to accumulated other comprehensive income and the related ineffective portion of $0.4 million was charged to interest expense during the three months ended March 31, 2009. There can be no assurance that in future periods we will be able to assert that the hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting. The new interest rate swaps effectively fix the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. As of March 31, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 6.79%.

The credit facility provides for scheduled quarterly principal payments of the term loans as set out below:

| Currency: | USD | Euro | CAD |
|-----------|-----|------|-----|
| 2009 | 2,458,174 | 1,392,040 | 584,489 |
| 2010 | 3,318,535 | 1,879,254 | 789,059 |
| 2011 | 4,055,987 | 2,296,865 | 964,406 |
| 2012 (first quarter only) | 4,916,348 | 2,784,080 | 1,168,976 |

The credit facility provides, that for the purposes of computing debt, which is a part of the calculation of the leverage ratio, indebtedness which is payable in Canadian Dollars or Euros shall be converted into U.S. Dollars using the average exchange rate for the period of four consecutive fiscal quarters ended March 31, 2008. Accordingly, if the value of the U.S. Dollar increases relative to the Euro or the Canadian Dollar and our Adjusted EBITDA declines as a result of this currency effect, there would not be a corresponding decrease in the amount of our debt for purposes of the maximum leverage ratio covenant calculation.

**Table of Contents**

The credit facility also requires us to make additional prepayments of the term loans under the following circumstances:

- with 100% of the net cash proceeds received by us from any sale, transfer or other disposition of any assets (excluding inventory and certain discontinued manufacturing facilities), subject to an exemption for the reinvestment of up to $3 million of such proceeds within a year of our receipt thereof in long-term productive assets of the general type used in our business;

- with 100% of the net cash proceeds received by us from any insurance recovery or condemnation events, subject to certain exceptions and reinvestment rights and exempting the first $2 million;

- with 75% of the net cash proceeds from the issuance of any common stock, subject to customary exceptions and exempting the first $100,000;

- with 100% of the net cash proceeds from the incurrence of any indebtedness by us (excluding indebtedness permitted under the credit facility, but including any subordinated indebtedness), subject to customary exceptions; and

- with 75% of our excess cash on an annual basis; that is, our Adjusted EBITDA minus consolidated interest expense, cash income tax expense, consolidated capital expenditures (subject to certain exceptions), consolidated restructuring costs, cash payments of withholding taxes from proceeds of the repurchase, redemption or retention of common stock and the aggregate amount of scheduled and voluntary payments made during the past fiscal year.

Prior to the effectiveness of the amendment and restatement of our credit facility, the percentage of our annual excess cash required to be prepaid was 40% for 2007, 27.5% for 2008 and 50% for each fiscal year thereafter. We made mandatory principal prepayments from excess cash of $16.1 million and $9.4 million in the first quarters of 2009 and 2008, respectively.

Our credit facility requires that we observe and perform numerous affirmative and negative covenants, including certain financial covenants. The financial covenants per the amended credit facility are now as follows:

**Minimum Interest Coverage Ratio:**
The ratio of four quarter Adjusted EBITDA to interest expense.

| Four Fiscal Quarters Ending | Ratio |
| --- | --- |
| March 31, 2009 to March 31, 2010 | 2.00:1.00 |
| June 30, 2010 to March 31, 2011 | 2.25:1.00 |
| June 30, 2011 to December 31, 2011 | 2.50:1.00 |
| March 31, 2012 | 2.75:1.00 |

**Minimum Fixed Charge Coverage Ratio:**
The ratio of four quarter Adjusted EBITDA to fixed charges (interest expense, scheduled principal payments, and cash taxes).

| Four Fiscal Quarters Ending | Ratio |
| --- | --- |
| March 31, 2009 | 1.40:1.00 |
| June 30, 2009 to March 31, 2012 | 1.20:1.00 |

**Maximum Leverage Ratio:**
The ratio of outstanding debt to four quarter Adjusted EBITDA.

| Four Fiscal Quarters Ending | Ratio |
| --- | --- |
| March 31, 2009 | 5.50:1.00 |
| June 30, 2009 and September 30, 2009 | 5.25:1.00 |
| December 31, 2009 | 5.00:1.00 |
| March 31, 2010 and June 30, 2010 | 4.75:1.00 |
| September 30, 2010 | 4.50:1.00 |
| December 31, 2010 and March 31, 2011 | 4.25:1.00 |
| June 30, 2011 to March 31, 2012 | 4.00:1.00 |

Table of Contents

For the four fiscal quarters ended March 31, 2009 our interest coverage ratio was 2.67:1, our fixed charge coverage ratio was 1.71:1 and our leverage ratio was 4.27:1.

Our credit facility defines consolidated capital expenditures for a particular fiscal year as all expenditures required under GAAP to be included in "purchase of property and equipment" or similar items. The credit facility limits the amount of our consolidated capital expenditures in any given fiscal year to an amount not exceeding $50 million for fiscal year 2008 and $35 million for each of fiscal years 2009, 2010 and 2011, exclusive of capital expenditures paid with net insurance and condemnation proceeds; provided that the maximum amount of consolidated capital expenditures permitted in each fiscal year shall be increased by 50% of the amount below the maximum not spent in the prior fiscal year (determined without reference to any carryover amount); and provided, further, that solely for fiscal year 2008, the maximum amount that may be carried forward to fiscal year 2009 shall equal 100% of the first $10 million of any permitted consolidated capital expenditures not expended in fiscal year 2008 plus 50% of any remaining expenditures not expended in fiscal year 2008.

Our credit facility also prohibits the payment of dividends on our common stock.

Our ability to satisfy the covenants required by our credit facility is contingent on our ability to achieve our financial forecasts. These forecasts are based on certain assumptions regarding demand for paper products, the level of paper production and inventories, the number of mills producing paper and the financial health and access to capital of the paper producers. Our forecasts also assume, among other things, (i) that there will be no additional customer bankruptcies other than those for which we have already fully reserved for amounts due, (ii) that product prices will remain substantially stable, (iii) that there will be strong market acceptance of our new products, (iv) that no dramatic commodity price increases will occur, (v) that we will be able to maintain hedge accounting for our interest rate swaps, (vi) that an economic recovery will begin to occur in our primary markets in mid-2009, with the effect of increasing our revenue and profits, (vii) that the value of the Euro relative to the U.S. Dollar increases from its present levels, and (viii) that we will be successful in implementing cost reduction programs, including obtaining agreements from our equipment suppliers to postpone deliveries of contracted equipment.

The paper industry has been hard hit by the global economic downturn, and our forecasts incorporate our expectation that economic conditions in the paper industry will begin to recover in mid-2009. Should conditions in the paper industry fail to improve when we expect, or if the rate of improvement is slower than we anticipate, our business and financial results would be negatively impacted and we may not be able to satisfy the covenant requirements in our credit agreement.

Our failure to comply with the covenants in our credit agreement could result in an event of default, which, if not cured or waived, could result in our being required to repay the amounts outstanding under the credit agreement, together with accrued interest, before their scheduled due date. There can be no assurance that we will be successful in obtaining covenant relief, forbearance or a standstill agreement in the event of non-compliance with the then existing covenants. In light of this risk, and as part of our ongoing focus on enterprise risk management, we are continuing to evaluate market conditions and plan for contingencies, including, without limitation, the potential pursuit of modifications to our credit agreement. There can be no assurance that we will be successful in obtaining any modification of our credit agreement that we may seek to obtain. Any event of default under our credit facility also could cause our interest rate swaps to be terminated or to fail to qualify for hedge accounting and could trigger defaults under our other material agreements.

## CRITICAL ACCOUNTING POLICIES

The preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses. Actual results could differ from those estimates. We have formal accounting policies in place including those that address critical and complex accounting

38

Table of Contents

areas. Note 3 to the consolidated financial statements included elsewhere in this Quarterly Report identifies the significant accounting policies used in preparation of the consolidated financial statements. The most significant areas involving management judgments and estimates are described below.

*Derivatives and Hedging.* On January 1, 2009, we adopted Statement of Financial Accounting Standards No. 161, *Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133* ("SFAS No. 161"). SFAS No, 161 amends and expands the disclosure requirements of FASB Statement No. 133 ("SFAS No. 133") with the intent to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for under SFAS No. 133 and its related interpretations, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS No. 161 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative instruments.

As required by SFAS No. 133, we record all derivatives on the balance sheet at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether we have elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to changes in the fair value of an asset, liability, or firm commitment attributable to a particular risk are considered fair value hedges. Derivatives designated and qualifying as a hedge of the exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Derivatives may also be designated as hedges of the foreign currency exposure of a net investment in a foreign operation. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the recognition of the changes in the fair value of the hedged asset or liability that are attributable to the hedged risk in a fair value hedge or the earnings effect of the hedged forecasted transactions in a cash flow hedge. We may enter into derivative contracts that are intended to economically hedge certain of its risk, even though hedge accounting does not apply or if we elect not to apply hedge accounting under SFAS No. 133.

There are two types of hedges into which we enter: hedges of fair value exposure and hedges of cash flow exposure. Hedges of fair value exposure are entered into in order to hedge the fair value of a recognized asset or liability, or a firm commitment. Hedges of cash flow exposure are entered into in order to hedge a forecasted transaction or the variability of cash flows to be paid related to a recognized liability. Changes in derivative fair values are recognized in earnings as offsets to the changes in fair value of the related hedged assets and liabilities. Changes in the derivative fair values that are designated as cash flow hedges which meet the criteria for hedge accounting are recorded in other comprehensive income. On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. These interest rate swaps initially qualified for hedge accounting under SFAS No. 133. As a result of the financial covenant non-compliance for the period ended March 31, 2008 as discussed in Note 6 of the Notes to Unaudited Condensed Consolidated Financial Statements included elsewhere in this Quarterly Report, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under SFAS No. 133 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12 million was recorded as a non-cash charge to interest expense in the first quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. As a result, the mark to market changes of $0.4 million on these interest rate swaps were charged to accumulated other comprehensive income and the related ineffective portion of $0.4 million was charged to interest expense during the three months ended March 31, 2009. These interest rate swaps effectively fixed the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. As of March 31, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 6.79%. There can be no assurance that in future periods we will be able to assert that the hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting.

**Table of Contents**

Effective January 1, 2008, we adopted SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157") for measuring our derivative assets and liabilities. We have classified our interest rate swaps in Level 2 of the SFAS No. 157 fair value hierarchy, as the significant inputs to the overall valuations are based on market-observable data or information derived from or corroborated by market-observable data, including market-based inputs to models, model calibration to market-clearing transactions, broker or dealer quotations, or alternative pricing sources with reasonable levels of price transparency. Where models are used, the selection of a particular model to value a derivative depends upon the contractual terms of, and specific risks inherent in, the instrument as well as the availability of pricing information in the market. We use similar models to value similar instruments. Valuation models require a variety of inputs, including contractual terms, market prices, yield curves, credit curves, measures of volatility, and correlations of such inputs. For our derivatives, all of which trade in liquid markets, model inputs can generally be verified and model selection does not involve significant management judgment.

To comply with the provisions of SFAS No. 157, we incorporated credit valuation adjustments to appropriately reflect both our own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements of our derivatives. The credit valuation adjustments are calculated by determining the total expected exposure of the derivatives (which incorporates both the current and potential future exposure) and then applying each counterparty's credit spread to the applicable exposure. For derivatives with two-way exposure, such as interest rate swaps, the counterparty's credit spread is applied to our exposure to the counterparty, and our own credit spread is applied to the counterparty's exposure to us, and the net credit valuation adjustment is reflected in our derivative valuations. The total expected exposure of a derivative is derived using market-observable inputs, such as yield curves and volatilities. The inputs utilized for our own credit spread are based on implied spreads from its publicly-traded debt. For counterparties with publicly available credit information, the credit spreads over LIBOR used in the calculations represent implied credit default swap spreads obtained from a third party credit data provider. In adjusting the fair value of its derivative contracts for the effect of nonperformance risk, we have considered the impact of netting and any applicable credit enhancements, such as collateral postings, thresholds, mutual puts, and guarantees. Additionally, we actively monitor counterparty credit ratings for any significant changes.

Although we have determined that the majority of the inputs used to value our derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with our derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by us and our counterparties. However, as of March 31, 2009, we have assessed the net significance of the impact of the credit valuation adjustments on the overall valuation of our derivative positions and have determined that the credit valuation adjustments reduced the settlement values of our derivative liabilities by $6.5 million. Various factors impact changes in the credit are not significant to the overall valuation adjustments over time, including changes in the credit spreads of the parties to the contracts, as well as changes in market rates and volatilities, which affect the total expected exposure of the derivative instruments.

When appropriate, valuations are also adjusted for various factors such as liquidity and bid/offer spreads, which factors were deemed immaterial by us as of March 31, 2009. As a result, we have determined that our derivative valuations in their entirety are classified in Level 2 of the fair value hierarchy. We do not have any fair value measurements using significant unobservable inputs (Level 3) as of March 31, 2009.

*Goodwill.* We account for acquired goodwill and intangible assets in accordance with SFAS No. 141, *Business Combinations* ("SFAS No. 141"). Purchase accounting required by SFAS No. 141 involves judgment with respect to the valuation of the acquired assets and liabilities in order to determine the amount of goodwill. We believe that the estimates that we have used to record prior acquisitions are reasonable and in accordance with SFAS No. 141.

Table of Contents

*Impairment of Goodwill and Indefinite-Lived Intangible Assets.* We account for acquired goodwill and goodwill impairment in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"). This pronouncement requires considerable judgment in the valuation of acquired goodwill and the ongoing evaluation of goodwill impairment. SFAS No. 142 requires that goodwill and intangible assets that have indefinite lives not be amortized but, instead, must be tested at least annually for impairment or whenever events or business conditions warrant.

We perform an annual test for goodwill impairment as of December 31st at the business segment level. We have two business segments: clothing and roll covers. When our business was acquired in 1999, more than 80% of the goodwill was assigned to the roll covers segment based on relative fair values at the date of acquisition.

Goodwill impairment testing is a two-step process. Step 1 involves comparing the fair value of the Company's reporting unit to its carrying amount. If the fair value of the reporting unit is greater than its carrying amount, there is no impairment. If the reporting unit carrying amount is greater than the fair value then the second step must be completed to measure the amount of impairment, if any. Step 2 calculates the implied fair value of goodwill by deducting the fair value of all tangible and intangible assets, excluding goodwill, of the reporting unit from the fair value of the reporting unit as determined in Step 1. The implied fair value of goodwill determined in this step is compared to the carrying value of goodwill. If the implied fair value of goodwill is less than the carrying value of goodwill, an impairment loss is recognized equal to the difference.

For the purpose of performing the annual impairment test, we allocate all shared assets and liabilities to the business segments based upon the percentage of each segment's revenue to total revenue. Shared expenses are allocated to each segment to the extent necessary to allow them to operate as independent businesses. Fair value was determined by using a weighted combination of both a market multiple approach and an income approach. The market multiple approach utilizes our proprietary information to determine measures that are used to value our business segments. The income approach is a present value technique used to measure the fair value of future cash flows produced by each business segment. Determining the fair value of a business segment or an indefinite-lived purchased intangible asset is judgmental in nature and requires the use of significant estimates and assumptions, including revenue growth rates and operating margins, discount rates and future market conditions, among others. We believe that the assumptions and rates used in our annual impairment test under SFAS No. 142 are reasonable, but inherently uncertain.

Based on these assessments performed as of December 31, 2008, we determined that no impairment of goodwill exists. The excess of the fair value over the carrying value for our clothing and roll covers segment as of December 31, 2008, the annual test date, was approximately $134 million and $30 million, respectively. In order to evaluate the sensitivity of the analysis performed, we applied a hypothetical 5% decrease to the fair value of these business segments, which resulted in a fair value in excess of carrying value of approximately $110 million and $13 million for the clothing segment and roll covers segment, respectively.

At March 31, 2009, the Company evaluated goodwill and intangible assets for impairment indicators and determined that no impairment exists.

*Contingencies.* We are subject to various claims and contingencies associated with lawsuits, insurance, tax, environmental and other issues arising out of the normal course of business. Our consolidated financial statements reflect the treatment of claims and contingencies based on management's view of the expected outcome. We consult with legal counsel on those issues related to litigation with respect to matters in the ordinary course of business. If the likelihood of an adverse outcome is probable and the amount is estimable, we accrue a liability in accordance with SFAS No. 5, *Accounting for Contingencies.* While we believe that the current level of reserves is adequate, the adequacy of these reserves may change in the future due to new developments in particular matters. During the third quarter of 2008, while evaluating one of our foreign facilities, we discovered the possibility of contamination at the facility. Subsequently we had a preliminary evaluation performed, which confirmed the existence of contamination and estimated preliminary costs to clean up the facility. Based upon this evaluation, we recorded $4.1 million in 2008 as our best estimate of the remediation costs we expect to incur. No expenditures have been made in the first quarter of 2009.

*Income Taxes.* We utilize the asset and liability method for accounting for income taxes in accordance with SFAS No. 109, *Accounting for Income Taxes.* Under this method, deferred tax assets and liabilities are determined based on differences between

Table of Contents

financial reporting and tax bases of assets and liabilities. Deferred tax assets and liabilities are measured using the enacted tax rates and statutes that will be in effect when the differences are expected to reverse.

We reduce our deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Relevant evidence, both positive and negative, is considered in determining the need for a valuation allowance. Information evaluated includes our financial position and results of operations for the current and preceding years as well as an evaluation of currently available information about future years. In light of our accumulated loss position in certain tax jurisdictions, and the uncertainty of profitability in future periods, we recorded valuation allowances for deferred tax assets primarily related to net operating loss carryforwards in certain tax jurisdictions including the United States and Canada.

In addition, we operate within multiple taxing jurisdictions and could be subject to audit in these jurisdictions. These audits can involve complex issues and rely on estimates and assumptions. These audits may require an extended period of time to resolve and may cover multiple years. Although we believe that the estimates and assumptions are reasonable, the final determination of tax audits and any related litigation could be different than that which is reflected in historical income tax provisions and recorded assets and liabilities. There are currently no U.S. Federal or state audits or examinations underway. We are currently concluding an audit relating to our German subsidiaries for tax years 1999 through 2002. There are various minor adjustments proposed for which we have established reserves in amounts sufficient to meet any assessment. The Canadian Federal tax authorities contacted us in October of 2008 and have initiated an audit of our Canadian companies. The audit is still in the initial information gathering stages and no issues or assessments have been raised. We believe that there are no other jurisdictions in which the outcome of unresolved issues or claims is likely to be material to our results of operations, financial position or cash flows. We further believe that we have made adequate provision for all income tax uncertainties.

In June 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FAS No. 109. FIN 48 prescribes a two-step process to determine the amount of tax benefit to be recognized. First, the tax position must be evaluated to determine the likelihood that it will be sustained upon external examination. If the tax position is deemed "more-likely-than-not" to be sustained, the tax position is then assessed to determine the amount of benefit to recognize in the financial statements. The amount of the benefit that may be recognized is the largest amount that has a greater than 50% likelihood of being realized upon ultimate settlement.

## NON-GAAP LIQUIDITY MEASURES

We use EBITDA and Adjusted EBITDA as supplementary non-GAAP liquidity measures to assist us in evaluating our liquidity and financial performance, specifically our ability to service indebtedness and to fund ongoing capital expenditures. Our credit facility includes covenants based on Adjusted EBITDA. If our Adjusted EBITDA declines below certain levels, we will violate covenants resulting in a default condition under the credit facility or be required to prepay the credit facility. Neither EBITDA nor Adjusted EBITDA should be considered in isolation or as a substitute for net cash provided by operating activities (as determined in accordance with GAAP) or income (loss) from operations (as determined in accordance with GAAP).

EBITDA is defined as net income (loss) before interest expense, income tax provision (benefit) and depreciation and amortization. Adjusted EBITDA is defined in our credit facility and is EBITDA plus (i) restructuring or related impairment costs (not to exceed $5.0 million in the aggregate for 2008 and in each year thereafter, (ii) reserves for inventory in connection with plant closings, (iii) stock-based and other non-cash compensation charges, charges from forgiveness of loans made to employees in connection with the purchase of equity and any tax gross-up payments made in respect of such loan forgiveness in connection with or prior to the completion of our initial public offering, (iv) certain transaction costs, including costs incurred in connection with our initial public offering and the related debt financing, the legal reorganization of Brazilian subsidiaries and the preparation and closing of the existing credit agreement, (v) consolidated amendment/termination costs, which consist of costs incurred in connection with the consummation of the fourth and fifth amendments to the senior credit facility and the termination of the employment contract of the former Chief Executive Officer and transition to the new Chief Executive Officer, not to exceed $8.0 million in the aggregate,

**Table of Contents**

(vi) costs associated with payments to management prior to the completion of our initial public offering in connection with the termination of incentive plans, (vii) non-cash charges resulting from the application of purchase accounting, (viii) non-cash expenses resulting from the granting of stock options, restricted stock or restricted stock unit awards under equity compensation programs solely with respect to our common stock and (ix) expenses incurred not exceeding $7 million per year as a result of the repurchase, redemption or retention of our own common stock earned under equity compensation programs solely in order to make withholding tax payments. For certain historical periods, the amended credit agreement specified Adjusted EBITDA is $35,610, $36,514 and $38,431 for the quarters ended March 31, 2008, December 31, 2007 and September 30, 2007, respectively. For the quarter ended March 31, 2008, the amount reflects an increase of $800 over the originally disclosed amount in the first quarter of 2008, related to the transition to the new Chief Executive Officer. Adjusted EBITDA, as defined in the credit facility and calculated below, may not be comparable to similarly titled measurements used by other companies.

The following table provides a reconciliation from net income (loss), which is the most directly comparable GAAP financial measure, to EBITDA and Adjusted EBITDA.

|  | Three Months Ended March 31, | |
|---|---|---|
| *(in thousands)* | **2009** | **2008** |
| Net loss | $ (9,448) | $ (4,709) |
| Income tax provision | 3,892 | 3,639 |
| Interest expense, net | 15,957 | 25,221 |
| Depreciation and amortization | 9,788 | 12,003 |
| **EBITDA** | **20,189** | **36,154** |
| Unrealized foreign exchange gain on indebtedness, net (B) | — | (1,985) |
| Amendment/termination costs (D) | — | 800 |
| Change in fair value of interest rate swaps (C) | (398) | — |
| Change in fair value of other derivatives | — | (2,126) |
| Restructuring expenses | 114 | 532 |
| Growth program costs (A) | — | 1,764 |
| Inventory write-offs under restructuring programs | 103 | — |
| Non-cash compensation and related expenses | 161 | 471 |
| **Adjusted EBITDA** | **$20,169** | **$35,610** |

(A)   In accordance with the definition of Adjusted EBITDA in our credit facility, as amended on May 2, 2007, growth programs are those intended to increase productivity and economic efficiency or the market share capacity of the Company, reduce cost structure, improve equipment utilization or provide additional regional capacity to better serve growth markets. These growth program costs for the three months ended March 31, 2008 include expenses incurred for the Company's lean manufacturing initiatives, expansion into Vietnam and other such programs.

(B)   In accordance with the definition of Adjusted EBITDA in our credit facility, as amended on May 30, 2008, unrealized foreign exchange gains and losses on indebtedness are not added back to Adjusted EBITDA for periods beginning after the quarter ended March 31, 2008.

(C)   In accordance with the definition of Adjusted EBITDA in our credit facility agreement, as amended on May 30, 2008, interest expense added back to calculate Adjusted EBITDA excludes, for periods beginning after the quarter ended March 31, 2008, the effect of any non-cash gains and losses resulting from the marking to market of hedging obligations that has been charged to interest expense. Had this amended definition been in place for all periods presented, Adjusted EBITDA would have been $12,000 lower for the three months ended March 31, 2008.

(D)   Amendment/termination costs include an $800 increase to Adjusted EBITDA for the first quarter of 2008, in accordance with the agreement with our lenders.

Table of Contents

## ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

*Foreign Currency Hedging.* We have foreign currency cash flow and earnings exposure with respect to specific sale and intercompany debt transactions denominated in currencies other than the functional currency of the unit incurring the costs associated with such transactions. To mitigate the risks related to these exposures, we utilize forward currency contracts in certain circumstances, to lock in exchange rates with the objective that the gain or loss on the forward contracts will approximate the loss or gain on the transaction or transactions being hedged. We determine whether to enter into hedging arrangements based upon the size of the underlying transaction or transactions, an assessment of the risk of adverse movements in the applicable currencies and the availability of a cost-effective hedging strategy. In South America, substantially all of our sales are indexed to U.S. Dollars, but the associated costs are recorded in the local currencies of the operating units. Generally, we do not hedge this U.S. Dollar exposure as it would not be cost effective due to the relatively inefficient foreign exchange markets for local currencies in that region. To the extent we do not engage in hedging or such hedging is not effective, changes in the relative value of currencies can affect our profitability. The value of these contracts is recognized at fair value based on market exchange forward rates and amounted to a net liability position of $3.6 million at March 31, 2009. These contracts mature at various dates through March 2010.

Relative to foreign currency exposures existing at March 31, 2009, a 10% unfavorable movement in foreign currency exchange rates would not expose us to significant losses in earnings or cash flows because we hedge substantially all of our exposures against fluctuations in foreign currency exchange rates. As of March 31, 2009, we had open foreign currency exchange contracts maturing through March 2010 with total net notional amounts of approximately $5.7 million. At March 31, 2009, we prepared an analysis to determine the sensitivity of our forward foreign exchange contracts to changes in exchange rates. A hypothetical adverse exchange rate movement of 10% against our forward foreign exchange contracts would have resulted in potential net loss in fair value of these contracts of approximately $0.6 million. The calculation assumes that each exchange rate would change in the same direction relative to the U.S. Dollar. In addition to the direct effects of changes in exchange rates, such changes typically affect the volume of sales or the foreign currency sales price as competitors' products become more or less attractive. Our sensitivity analysis of the effects of changes in foreign currency exchange rates does not factor in a potential change in sales levels or local currency selling prices.

For additional information about the risks associated with fluctuations in currency exchange rates, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Foreign Exchange."

*Interest Rate Hedging.* Our senior credit facility has a variable interest rate. On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. These interest rate swaps initially qualified for hedge accounting under SFAS No. 133. As a result of the financial covenant non-compliance for the period ended March 31, 2008 as discussed in Note 6 of the Notes to Unaudited Condensed Consolidated Financial Statements included elsewhere in this Quarterly Report, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under SFAS No. 133 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12 million was recorded as a non-cash charge to interest expense in the first quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. As a result, the mark to market changes of $0.4 million on these interest rate swaps were charged to accumulated other comprehensive income and the related ineffective portion of $0.4 million was charged to interest expense during the three months ended March 31, 2009. The interest rate swaps effectively fix the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. As of March 31, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 6.79%. There can be no assurance that in future periods we will be able to assert that the hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting.

44

Table of Contents

As a result of the amendment of our senior credit facility agreement on May 30, 2008, the applicable margin for LIBOR term loans, LIBOR revolving loans, Euribor loans and CDOR loans under our senior credit facility increased from 2.75% to 5.50%. We estimate that a 1% increase in the LIBOR rate would increase our interest expense on the term debt by approximately $0.9 million on an annual basis through December 31, 2010, the period covered by the interest rate swap agreements.

## ITEM 4.        CONTROLS AND PROCEDURES

(a) *Evaluation of Disclosure Controls and Procedures.* We have carried out an evaluation, as of March 31, 2009, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Act"). Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Act is (i) recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms; and (ii) accumulated and communicated to our management, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosures. No evaluation of disclosure controls and procedures can provide absolute assurance that these controls and procedures will operate effectively under all circumstances. However, the Company's disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives, and the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective at the reasonable assurance level as set forth above.

(b) *Changes in Internal Control over Financial Reporting.* No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended March 31, 2009 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

## ITEM 1.        LEGAL PROCEEDINGS

On June 7, 2006, a purported class action complaint was filed in the United States District Court for the District of Massachusetts on behalf of a putative class of investors who purchased shares pursuant or traceable to our initial public offering on or about May 16, 2005 through November 15, 2005 against the us, our former Chief Executive Officer and our Chief Financial Officer. An amended complaint was filed on November 3, 2006. On November 3, 2008, we agreed to a settlement with the plaintiffs, without admitting liability of any kind. On February 25, 2009, the Court entered a judgment granting final approval of the settlement. The settlement amount above the deductible was covered by our Directors and Officers insurance and did not have a material adverse effect on our financial position, results of operations or cash flow in 2008 or 2009.

We are involved in various legal matters, which have arisen in the ordinary course of business. We do not believe that the ultimate resolution of these matters will have a material adverse effect on our financial position, results of operations or cash flow.

## ITEM 1A.        RISK FACTORS

The risks described in the risk factors included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 have not materially changed. However, our served market has deteriorated substantially from the decline in paper demand related to slowing global economic activity, which may substantially reduce our revenue, Adjusted EBITDA and cash flows and increase the potential of a loan covenant default.

**Table of Contents**

**ITEM 2.        UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.**

**Restrictions on Payment of Dividends**

For a description on restrictions imposed by Delaware law and our credit agreement on our payment of dividends, see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Credit Facility."

**ITEM 3.        DEFAULTS UPON SENIOR SECURITIES.**

See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Credit Facility."

**ITEM 4.        SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.**

Not applicable.

**ITEM 5.        OTHER INFORMATION.**

On May 5, 2009, the Board of Directors of Xerium Technologies, Inc. (the "Company") appointed Stephen R. Light, the Company's President, Chief Executive Officer and Chairman, to serve as the Company's interim principal financial officer while the Company continues its search for a permanent Chief Financial Officer.

Biographical and other information regarding Mr. Light can be found in the Company's proxy statement for the 2009 Annual Meeting of Stockholders, filed with the Securities and Exchange Commission on April 29, 2009.

**ITEM 6.        EXHIBITS**

See the exhibit index following the signature page to this quarterly report.

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**XERIUM TECHNOLOGIES, INC.**
(Registrant)

Date: May 7, 2009

By:    /s/ Stephen R. Light
      Stephen R. Light
      President, Chief Executive Officer and Chairman
      (Principal Executive Officer, Interim Principal Financial Officer)

47

**Table of Contents**

EXHIBIT INDEX

| Exhibit Number | Description of Exhibits |
|---|---|
| 10.1 | Settlement Agreement with Josef Mayer, dated January 15, 2009. |
| 10.2 | Description of Compensation for Non-Management Directors. |
| 31.1 | Certification Statement of Chief Executive Officer and Interim Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Statement of the Chief Executive Officer and Interim Principal Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

48

Exhibit 10.1

| ABWICKLUNGSVEREINBARUNG | SETTLEMENT AGREEMENT |
|---|---|

| Zwischen | Between |
|---|---|

<div align="center">

Xerium Germany Holding GmbH
Föhrstraße 39, 72760 Reutlingen

</div>

| - „Gesellschaft" - | - "Company" - |
|---|---|

| und | and |
|---|---|

<div align="center">

Josef Mayer
Hölderlinstrasse 20, 89134 Blaustein

</div>

| - „Geschäftsführer" - | -"Managing Director"- |
|---|---|

| wird folgende Vereinbarung geschlossen: | the following Agreement is made: |
|---|---|
| 1. Die Gesellschaft hat das Dienstverhältnis des Geschäftsführers mit Schreiben vom 16. Juni 2008 zum 30. Juni 2009 ordentlich gekündigt. | 1. The Company has terminated with regular notice of termination dated June 16, 2008 the Managing Director's service relationship effective as of June 30, 2009. |
| 2. Der Geschäftsführer hat den ihm zustehenden Resturlaub im Zeitraum seit dem 1. Juli 2008 genommen. Die Parteien sind sich einig, dass der Geschäftsführer damit seinen gesamten ihm bis zum 15. Januar 2009 zustehenden Urlaub genommen hat. Ferner wurde der Geschäftsführer von seiner Dienstverpflichtung freigestellt. | 2. The Managing Director has taken his outstanding vacation since July 1, 2008. The parties agree that with this the Managing Director has taken all vacation due to him until January 15, 2009. Furthermore, the Managing Director has been released from his obligation to work. |

3. Der Geschäftsführer wurde mit Gesellschafterbeschluss vom 16. Juni 2008 mit sofortiger Wirkung von seinem Amt abberufen. Ebenso hat er seine Ämter als Vice-President von Xerium Technologies, Inc., und Mitglied des Aufsichtsrats der Huyck.Wangner Austria GmbH niedergelegt. Sein Amt als Mitglied des Aufsichtsrats der Stowe Woodward AG hat er bereits am 9. Juli 2008 niedergelegt. Der Geschäftsführer wird auch alle sonstigen Positionen und Ämter in der Xerium-Gruppe niederlegen, sofern noch nicht geschehen.

4. Die Parteien kommen nunmehr überein, dass das Dienstverhältnis vorzeitig mit Wirkung zum 15. Januar 2009 aufgehoben wird.

5. Die Parteien sind sich einig, dass das vereinbarte nachvertragliche Wettbewerbsverbot nur noch bis zum 30. Juni 2009 Gültigkeit hat, danach aufgehoben wird, der Geschäftsführer nach dem 30. Juni 2009 in Wettbewerb zur Gesellschaft treten darf und die Gesellschaft für die Zeit nach dem 30. Juni 2009 keine Karenzentschädigung zu zahlen hat.

Die Parteien sind sich jedoch ebenfalls darüber einig, dass eine Wettbewerbstätigkeit im Sinne des aufgehobenen Wettbewerbsverbots jedenfalls bis zum 30. Juni 2009 nicht

3. The Managing Director's appointment was revoked by shareholder resolution dated June 16, 2008 with immediate effect. He has also resigned from his offices Vice President of Xerium Technologies, Inc., and member of the supervisory board of Huyck.Wangner Austria GmbH. He also resigned from his office as member of the supervisory board of Stowe Woodward AG on July 9, 2008. The Managing Director will, furthermore, resign from any other position or post he may hold within the Xerium Group, if this has not yet been made.

4. The Parties now agree that the service agreement shall end at the lapse of January 15, 2009.

5. The parties agree that the agreed post-contractual non-compete obligation shall be valid only until June 30, 2009, is waived after that date, that the Managing Director may unfold activities competing with the Company after June 30, 2009 and the Company is not obliged to pay compensation for the time after June 30, 2009.

The parties also agree, however, that at any rate any competing activity in the meaning of the waived post-contractual non-compete obligation shall not be permissible until June 30, 2009.

2

zulässig ist. Für die Zeit vom 16. Januar 2009 bis zum 30. Juni 2009 wird ihm zum Ausgleich für den Verzicht auf Wettbewerbstätigkeit eine monatliche Karenzentschädigung in Höhe von 80% (achtzig Prozent) (= EUR 18.333,34) brutto seines letzten Bruttogehaltes gezahlt. Die Gesamtsumme von (5,5 x EUR 18.333,34 =) EUR 100.833,34 brutto wird als Einmalzahlung gezahlt; der sich ergebende Nettobetrag wird zum Ende April 2009 fällig.

For the time period from January 16, 2009 until June 30, 2009, he shall receive as compensation for abstaining from competing activities a monthly compensation in the amount of 80% (eighty percent) (= EUR 18,333.34) gross of his last gross salary. The overall sum of (5.5 x EUR 18,333.34 =) EUR 100,833.34 gross shall be paid as lump sum; the resulting net amount shall be due at the end of April 2009.

6. Bis zum Beendigungsdatum (15. Januar 2009) erhält der Geschäftsführer seine vertragliche Vergütung in Höhe von EUR 22.916,67 brutto pro Kalendermonat.

Für das ganze Kalenderjahr 2008 nimmt der Geschäftsführer gemäß seinem Dienstvertrag am „MIC Bonus Program 2008" (= „Executive Incentice Plan") teil. Eine Auszahlung, sofern sie vorzunehmen ist, wird nach den Regelungen des „MIC Bonus Program 2008" vorgenommen. Für 2009 steht dem Geschäftsführer kein Bonus zu.

Gemäß den Regelungen des MIC Bonus Plan 2008 wird die Gesellschaft den Geschäftsführer über seine Ansprüche nach diesem Executive Incentive Plan informieren, sobald diese

6. Until Termination Date (January 15, 2009) the Managing Director shall receive his contractual base salary in the amount of EUR 22,916.67 gross per calendar month.

For the full calendar year 2008 the Managing Director shall participate in accordance with this Service Contract in the "MIC Bonus Program 2008" (= "Executive Incentice Plan"). A payment, if any, will be made in accordance with the "MIC Bonus Program 2008. For 2009 the Managing Director shall not be entitled to a bonus.

In accordance with the provisions of the MIC Bonus Program 2008 the company undertakes to inform the Managing Director about his entitlement under the Executive Incentive Plan as soon as the

3

Vergünstigungen an die anderen Berechtigten ausgezahlt oder gewährt werden. Die Berechnungsgrundlagen für die Berechnung der dem Geschäftsführer zustehenden Ansprüche müssen identisch sein mit den Berechnungsgrundlagen für die anderen Berechtigten in vergleichbarer Stellung.

7.  Der Geschäftsführer wird unverzüglich eine abschließende Reisekostenabrechnung einreichen. Unter Anrechnung etwaig gezahlter Vorschüsse wird die Gesellschaft sodann abrechnen. Überzahlte Vorschüsse sind umgehend an die Gesellschaft zu erstatten.

8.  Der Geschäftsführer gibt alle der Gesellschaft oder einem mit ihr verbundenen Unternehmen zustehenden Gegenstände unverzüglich nach Abschluss dieser Vereinbarung an deren Geschäftssitz zu Händen Jutta Gonell zurück, insbesondere:

    -   Kreditkarten,

    -   Büroschlüssel,

    -   sämtliche Geschäftsunterlagen und Kopien hiervon, gleich auf welchem Datenträger

Den Dienstwagen kann der Geschäftsführer jedoch noch bis zum Beendigungsdatum (15. Januar 2009) im bisherigen Umfang privat nutzen. Zum Beendigungsdatum hat er ihn

incentives are paid or granted to the other executives. The metrics that are used for the calculation of the entitlement of the Managing Director under the Executive Incentive Plan must be identical than those metrics used for the determination of the bonus of the other executives in a comparable position.

7.  The Managing Director shall immediately submit a complete final travel expense report. The Company shall then settle the accounts upon crediting any advances which may have been paid. Overpaid advances are to be paid back to the Company immediately.

8.  The Managing Director shall return all items pertaining to the Company or any of its affiliates at the location of its business offices without delay after conclusion of this Agreement to the attention of Jutta Gonell, in particular:

    -   credit cards,

    -   office keys,

    -   all business documents and copies thereof, irrespective of the data carrier

The Managing Director may, however, continue to use the company car privately to the previous extent until Termination Date (January 15, 2009). By Termination Date he will return it in

4

dann zu Händen von Jutta Gonell in ordnungsgemäßem Zustand nebst sämtlichen Papieren und Schlüsseln zurückzugeben.

Ein Zurückbehaltungsrecht an vorgenannten Gegenständen steht dem Geschäftsführer nicht zu.

9. Die Gesellschaft erteilt dem Geschäftsführer ein wohlwollendes, qualifiziertes Zeugnis.

10. Der Geschäftsführer ist auch über das Beendigungsdatum hinaus verpflichtet, alle ihm anvertrauten oder sonst bekannt gewordenen geschäftlichen, betrieblichen, technischen oder sonstigen Informationen, die sich auf die Gesellschaft oder verbundene Gesellschaften beziehen und vertraulichen Charakter haben, Dritten nicht zu offenbaren. Er sichert zu, Stillschweigen über den Inhalt dieser Vereinbarung gegenüber jedermann zu wahren, es sei denn, dass er gesetzlich zur Auskunft verpflichtet oder die Auskunft aus steuerlichen oder sozialversicherungsrechtlichen Gründen erforderlich ist.

11. Dem Geschäftsführer ist bekannt, dass die Gesellschaft keine verbindlichen Auskünfte über sozialversicherungs- oder steuerrechtliche Konsequenzen dieser Vereinbarung geben kann, sondern die zuständigen Behörden hierzu berufen und verpflichtet sind.

proper condition, including all documents and keys to the attention of Jutta Gonell.

The Managing Director shall have no right of retention to the above-mentioned items.

9. The Company shall provide the Managing Director with a favorable, qualified reference.

10. The Managing Director is obliged, even after the Termination Date, not to disclose to any third party any confidential business, company, technical or other information relating to the Company or its affiliates which has become known to him or with which he was entrusted during the term of his employment. The Managing Director shall keep confidential the contents of this Agreement unless he is obliged by statutory laws to divulge such information or the information is required for tax or social security purposes.

11. The Managing Director is aware that the Company is not competent to give binding information about the legal consequences of this Agreement under social or tax law, but that the appropriate authorities are competent and obliged to give such information.

5

Die Gesellschaft weist den Geschäftsführer auf seine Verpflichtung hin, sich unverzüglich bei der für ihn zuständigen Agentur für Arbeit arbeitssuchend zu melden sowie sich frühzeitig vor Beendigung des Dienstverhältnisses eigenverantwortlich um neue Beschäftigung zu bemühen.

The Company points out to the Managing Director that he is obliged to immediately register as a job-seeker with the appropriate Labor Authority and to look at his own responsibility for a new occupation in good time prior to the end of his service relationship.

12. Mit dieser Vereinbarung möchten die Parteien ihre gesamten Rechtsbeziehungen regeln. Sie sind sich darüber einig, dass mit Ausnahme der vorgenannten Ansprüche wechselseitig aus und im Zusammenhang mit dem Anstellungsverhältnis und seiner Beendigung keine weiteren Ansprüche mehr bestehen, gleich aus welchem Rechtsgrund, ob bekannt oder unbekannt und unabhängig vom Zeitpunkt des Entstehens. Hiervon ausgenommen sind unverzichtbare Rechte.

12. With this Agreement, the Parties intend to regulate their entire legal relationship. The parties agree that, with the exception of the above-mentioned claims, neither party hereto shall have any further rights or claims against the other party resulting from and in connection with the employment relationship and its termination, be they known or unknown, of whatever kind and irrespective of the date on which they originate. Not included hereunder are non-forfeitable rights.

13. Hinsichtlich dem Geschäftsführer gewährten Anteilen, RSUs oder ähnlichen Rechten sind sich die Parteien einig, dass sich mögliche Ansprüche des Geschäftsführers in diesem Zusammenhang ausschließlich gegen Xerium Technologies, Inc. („Xerium") richten und dass die Gesellschaft dafür nicht haftet. Diese Ansprüche bleiben von dieser Aufhebungsvereinbarung unberührt. Dieser Aufhebungsvertrag enthält keinerlei Verzichte auf Ansprüche , die der Geschäftsführer im Hinblick auf die vorgenannten RSU hat.

13. With respect to equity, RSUs or similar rights granted to the Managing Director the parties agree that possible entitlements in this context would exclusively be directed against Xerium Technologies, Inc. ("Xerium") and that the Company is not in any way liable. These rights remain unaffected and nothing in this agreement shall be interpreted as a waiver of any rights that the Managing Director has in respect of the afore mentioned RSU.

6

Zu solchen Rechten gilt folgendes:

a.  3.333 Einheiten nach der zeitabhängigen Anteilseinheiten-Vereinbarung vom 3. Januar 2008 zwischen Xerium und dem Geschäftsführer, die sich ursprünglich auf 20.000 Einheiten bezog (die „GF 2008 Zeitabhängige RSU") werden unverfallbar („vested") mit Abschluss dieser Vereinbarung, und alle übrigen Einheiten nach der GF 2008 Zeitabhängige RSU werden mit Abschluss dieser Vereinbarung aufgehoben; vorausgesetzt, dass die Ausgabe von Anteilen für diesen unverfallbaren Teil aufgeschoben wird, bis dass die Anteilseigner von Xerium der Planänderung (definiert gemäß GF 2008 Zeitabhängige RSU) zugestimmt haben, und weiterhin vorausgesetzt, dass keine Ausgabe von Anteilen für den unverfallbaren Teil stattfindet, wenn die Zustimmung nicht im oder vor der jährlichen Hauptversammlung der Anteilseigner für 2008 erteilt wird.

7

With respect to such rights the following shall apply:

a.  3,333 units under that certain time based restricted stock units agreement dated January 3, 2008 by and between Xerium and the Managing Director which originally related to 20,000 units (the "MD 2008 Time Based RSU"), shall become vested as of the date hereof and all other units under the MD 2008 Time Based RSU are cancelled as of the date hereof; provided that the issuance of shares in respect of such vested portion shall be delayed until the stockholders of Xerium have approved the Plan Amendment (as defined in the MD 2008 Time Based RSU) and provided further that there shall be no issuance of shares in respect of such vested portion if such approval is not obtained at or before Xerium's 2008 annual meeting of stockholders.

b.   Alle 20.000 Einheiten nach der Vereinbarung über Anteilseigner-renditeabhängige beschränkte Anteilseinheiten vom 3. Januar 2008 zwischen Xerium und dem Geschäftsführer sind mit Abschluss dieser Vereinbarung verfallen und aufgehoben.

c.   Alle 41.500 Einheiten nach der Vereinbarung über Anteilseigner-renditeabhängige beschränkte Anteilseinheiten vom 16. Mai 2007 bleiben nach ihren Regelungen bis zum 30. Juni 2009 ausstehend und verfallen und sind aufgehoben ab dem 30. Juni 2009, insoweit sie nicht am oder bis zum 30. Juni 2009 unverfallbar (wie in der Zuteilung definiert) sind (wobei vorausgesetzt wird, dass ohne den Eintritt einer Covered Transaction (wie sie in der Zusage definiert wird) vor dem 30. Juni 2009 und unter Erfüllung weiterer Bedingungen kein Teil der Zuteilung zum 30. Juni 2009 unverfallbar wird).

d.   Alle 62.500 Einheiten nach der Vereinbarung über Anteilseigner-renditeabhängige

b.   All 20,000 units under that certain shareholder return based restricted stock units agreement dated January 3, 2008 by and between Xerium and the Managing Director are forfeited and cancelled as of the date hereof.

c.   All 41,250 units under that certain shareholder return based restricted stock units agreement dated May 16, 2007 shall remain outstanding in accordance with its terms until June 30, 2009 and shall be forfeited and cancelled effective June 30, 2009 to the extent not Vested (as defined in such award) as of or prior to June 30, 2009 (it being understood that absent the occurrence of a Covered Transaction (as defined in such award) prior to June 30, 2009 and the satisfaction of certain other conditions, no portion of such award will be Vested as of June 30, 2009).

d.   All 62,500 units under that certain shareholder return based restricted stock units

8

beschränkte Anteilseinheiten vom 19. Mai 2005 bleiben nach ihren Regelungen bis zum 19. Mai 2009 ausstehend, und sie verfallen und sind aufgehoben mit Wirkung zum 19. Mai 2009, soweit sie nicht am oder bis zum 19. Mai 2009 unverfallbar (wie in der Zuteilung definiert) sind.

Soweit in dieser Ziffer 13 nicht anders vorgesehen, hat der Geschäftsführer keine weiteren Ansprüche gegen Xerium oder eine verbundene Gesellschaft im Zusammenhang mit Anteilsgewährungen nach dem 2005 Equity Incentive Plan oder aus anderen Gründen.

14. Der Geschäftsführer nimmt seine Klage vor dem Landgericht Tübingen zum Az. 2 O 191/08 zurück. Beide Parteien tragen ihre Anwaltskosten selbst; die Gerichtskosten werden hälftig geteilt.

15. Im Zweifelsfall hat die deutsche Fassung Vorrang

---

agreement dated May 19, 2005 shall remain outstanding in accordance with its terms until May 19, 2009 and shall be forfeited and cancelled effective May 19, 2009 to the extent not Vested (as defined in such award) as of or prior to May 19, 2009.

Except as set forth in this clause 13, the Managing Director shall have no further rights against Xerium or an affiliated entity with respect to equity awards of Xerium under its 2005 Equity Incentive Plan or otherwise.

14. The Managing Director will abandon the lawsuit brought before the Regional Court Tübingen (docket no 2 O 191/08). Each party shall bear the cost of its lawyer itself; the court fees shall be shared equally by each party.

15. In case of doubt, the German version shall prevail.

---

1-19-09
_____
Ort, Datum/Place, Date

/s/   Stephen R. Light
_____
Gesellschaft/Company
Xerium Technologies Limited,
  represented by Stephen R. Light, director

---

Blaustein 15.01.09
_____
Ort, Datum/Place, Date

/s/   Josef Mayer
_____
Geschäftsführer/Managing Director

9

**Bezüglich Ziffern 3, 6 und 13**
**zugestimmt und einverstanden:**

**With respect to clause 3, 6 and 13**
**agreed and accepted:**

_____
Ort, Datum/Place, Date

_____
/s/    Stephen R. Light
Xerium Technologies, Inc.
vertreten durch/represented by
Stephen R. Light, Chief Exectuive Officer

10

**Exhibit 10.2**

Xerium Technologies, Inc.
Description of Compensation for Non-Management Directors

Effective March 2009

Cash Compensation

Non-management directors receive an annual cash retainer of $30,000. The chairman of the Audit Committee also receives additional cash compensation at an annual rate of $10,000 per year, and the chairman of the Compensation Committee and the chairman of the Nominating and Governance Committee each receive additional cash compensation at an annual rate of $5,000 per year. These amounts are payable quarterly in arrears promptly following the end of the quarter. Directors are also reimbursed for out-of-pocket expenses for attending board and committee meetings.

Equity Compensation

Non-management directors also receive equity-based compensation in the form of a grant of restricted stock units following the annual meeting to stockholders in recognition of their services for the ensuing year. The number of restricted stock units granted to each non-management director is calculated by dividing $40,000 by the average closing price per share of the Company's common stock over the 20 trading days prior the annual meeting of stockholders. The restricted stock units shall be granted promptly after the 20-trading day period runs.

Dividends, if any, in respect of these restricted stock units are paid at the same rate as dividends on the Company's common stock but are paid only in the form of additional restricted stock units. The restricted stock units are fully vested at grant. Upon the termination of the director's service on the Company's board, such director is entitled to receive the number of shares of common stock that equals the number of restricted stock units the director has earned.

**Exhibit 31.1**

I, Stephen R. Light, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Xerium Technologies, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 7, 2009

/s/ Stephen R. Light
_____
Stephen R. Light
President, Chief Executive Officer and Chairman
(Principal Executive Officer, Interim Principal Financial
Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned, as principal executive officer and interim principal financial officer of Xerium Technologies, Inc. (the "Company"), does hereby certify that, to his knowledge:

1) the Company's Form 10-Q for the period ended March 31, 2009, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) the information contained in the Company's Form 10-Q for the period ended March 31, 2009, fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Stephen R. Light
_____
Stephen R. Light
President, Chief Executive Officer and Chairman
(Principal Executive Officer, Interim Principal Financial
Officer)

Dated: May 7, 2009

## EXHIBIT D

**XERIUM'S FORM 10-Q FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2009**

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

_____

# FORM 10-Q

_____

☒  **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**for the Quarterly Period Ended June 30, 2009**

or

☐  **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**for the Transition Period from _____ to _____**

### Commission File Number 001-32498

_____

# Xerium Technologies, Inc.
#### (Exact name of registrant as specified in its charter)

_____

| | |
|---|---|
| **DELAWARE** | **42-1558674** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

**8537 Six Forks Road**
**Suite 300**
**Raleigh, North Carolina**                          **27615**
**(Address of principal executive offices)**          **(Zip Code)**

**(919) 526-1400**
#### (Registrant's telephone number, including area code)

_____

#### (Former name, former address and former fiscal year, if changed since last report)

_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☐    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer | ☒ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

The number of shares of the registrant's common stock, $0.01 par value, outstanding as of August 3, 2009 was 48,934,820.

Table of Contents

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Part I. Financial Information | | | |
| Item 1. | Financial Statements | | 3 - 27 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 28 - 50 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | | 50 - 51 |
| Item 4. | Controls and Procedures | | 51 - 52 |
| Part II. Other Information | | | |
| Item 1. | Legal Proceedings | | 52 |
| Item 1A. | Risk Factors | | 52 - 53 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 54 |
| Item 3. | Defaults Upon Senior Securities | | 54 |
| Item 4. | Submission of Matters to a Vote of Security Holders | | 54 |
| Item 5. | Other Information | | 55 |
| Item 6. | Exhibits | | 55 |

2

Table of Contents

**PART I. FINANCIAL INFORMATION**

**ITEM 1.        FINANCIAL STATEMENTS**

<div align="center">

**Xerium Technologies, Inc.**
**Condensed Consolidated Balance Sheets—(Unaudited)**
**(dollars in thousands, except per share data)**

</div>

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 20,396 | $ 34,733 |
| Accounts receivable (net of allowance for doubtful accounts of $11,730 at June 30, 2009 and $14,937 at December 31, 2008) | 77,331 | 94,049 |
| Inventories | 86,259 | 85,543 |
| Prepaid expenses | 6,879 | 4,844 |
| Other current assets | 10,782 | 14,938 |
| Total current assets | 201,647 | 234,107 |
| Property and equipment, net | 383,222 | 384,590 |
| Goodwill | 153,604 | 155,205 |
| Intangible assets | 28,309 | 32,129 |
| Other assets | 5,061 | 5,541 |
| Total assets | $ 771,843 | $ 811,572 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Notes payable | $ 28,000 | $ — |
| Accounts payable | 30,172 | 53,076 |
| Accrued expenses | 65,268 | 83,139 |
| Current maturities of long-term debt | 27,444 | 39,687 |
| Total current liabilities | 150,884 | 175,902 |
| Long-term debt, net of current maturities | 563,308 | 577,270 |
| Deferred and long-term taxes | 13,028 | 13,358 |
| Pension, other postretirement and postemployment obligations | 66,361 | 67,029 |
| Other long-term liabilities | 4,625 | 5,594 |
| Commitments and contingencies | | |
| Stockholders' deficit | | |
| Preferred stock, $0.01 par value, 1,000,000 shares authorized; no shares outstanding as of June 30, 2009 and December 31, 2008 | — | — |
| Common stock, $0.01 par value, 150,000,000 shares authorized; 48,934,820 and 46,257,772 shares outstanding as of June 30, 2009 and December 31, 2008, respectively | 489 | 463 |
| Paid-in capital | 220,621 | 220,370 |
| Accumulated deficit | (226,762) | (218,915) |
| Accumulated other comprehensive loss | (20,711) | (29,499) |
| Total stockholders' deficit | (26,363) | (27,581) |
| Total liabilities and stockholders' deficit | $ 771,843 | $ 811,572 |

<div align="center">

See accompanying notes.

3

</div>

**Table of Contents**

**Xerium Technologies, Inc.**
**Condensed Consolidated Statements of Operations – (Unaudited)**
**(dollars in thousands, except per share data)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2009 | 2008 | 2009 | 2008 |
| Net sales | $ 120,843 | $ 170,393 | $ 237,346 | $ 329,380 |
| Costs and expenses: | | | | |
|     Cost of products sold | 75,225 | 101,595 | 147,436 | 197,250 |
|     Selling | 16,075 | 21,847 | 32,583 | 42,312 |
|     General and administrative | 6,464 | 23,367 | 19,672 | 42,057 |
|     Restructuring and impairments | 1,026 | 2,718 | 1,140 | 3,250 |
|     Research and development | 2,740 | 3,196 | 5,460 | 6,199 |
| | 101,530 | 152,723 | 206,291 | 291,068 |
| Income from operations | 19,313 | 17,670 | 31,055 | 38,312 |
| Interest expense | (15,934) | (1,135) | (32,248) | (26,550) |
| Interest income | 364 | 369 | 721 | 563 |
| Foreign exchange gain (loss) | 555 | (875) | (786) | 2,634 |
| Income (loss) before provision for income taxes | 4,298 | 16,029 | (1,258) | 14,959 |
| Provision for income taxes | 2,697 | 1,911 | 6,589 | 5,550 |
| Net income (loss) | $ 1,601 | $ 14,118 | $ (7,847) | $ 9,409 |
| Net income (loss) per share: | | | | |
|     Basic | $ 0.03 | $ 0.31 | $ (0.16) | $ 0.20 |
|     Diluted | $ 0.03 | $ 0.31 | $ (0.16) | $ 0.20 |
| Shares used in computing net income (loss) per share: | | | | |
|     Basic | 48,882,979 | 46,121,323 | 48,879,669 | 46,084,995 |
|     Diluted | 48,971,375 | 46,211,012 | 48,879,669 | 46,189,813 |

See accompanying notes.

4

Table of Contents

**Xerium Technologies, Inc.**
**Condensed Consolidated Statements of Cash Flows—(Unaudited)**
**(dollars in thousands)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| **Operating activities** | | |
| Net income (loss) | $ (7,847) | $ 9,409 |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | |
| Stock-based compensation | 1,046 | 274 |
| Depreciation | 18,752 | 22,152 |
| Amortization of intangibles | 1,166 | 1,807 |
| Deferred financing cost amortization | 2,694 | 2,344 |
| Unrealized foreign exchange gain on revaluation of debt | (570) | (1,476) |
| Deferred taxes | 1,439 | (3,012) |
| Asset impairment | — | 67 |
| Gain on disposition of property and equipment | (2,016) | (269) |
| Change in fair value of interest rate swaps | 794 | (1,548) |
| Provision for bad debt expense | (3,209) | (71) |
| Change in assets and liabilities which provided (used) cash: | | |
| Accounts receivable | 21,336 | 7,642 |
| Inventories | 1,294 | 859 |
| Prepaid expenses | (1,963) | (2,891) |
| Other current assets | 3,841 | (4,722) |
| Accounts payable and accrued expenses | (42,607) | 11,459 |
| Deferred and other long-term liabilities | (1,668) | (1,012) |
| Net cash (used in) provided by operating activities | (7,518) | 41,012 |
| **Investing activities** | | |
| Capital expenditures, gross | (11,115) | (20,886) |
| Proceeds from disposals of property and equipment | 4,001 | 1,033 |
| Proceeds from acquisition, net of cash acquired | — | 144 |
| Other | 1,100 | — |
| Net cash used in investing activities | (6,014) | (19,709) |
| **Financing activities** | | |
| Net increase in borrowings (maturities of 90 days or less) | 28,000 | 168 |
| Proceeds from borrowings (maturities longer than 90 days) | — | 349 |
| Principal payments on debt | (29,057) | (13,500) |
| Other | — | (8,744) |
| Net cash used in financing activities | (1,057) | (21,727) |
| Effect of exchange rate changes on cash flows | 252 | 1,594 |
| Net (decrease) increase in cash | (14,337) | 1,170 |
| Cash and cash equivalents at beginning of period | 34,733 | 24,218 |
| Cash and cash equivalents at end of period | $ 20,396 | $ 25,388 |

See accompanying notes.

5

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**1. Company History**

Xerium Technologies, Inc. (the "Company") is a leading global manufacturer and supplier of two types of consumable products used primarily in the production of paper – clothing and roll covers. Operations are strategically located in the major paper-making regions of the world, including North America, Europe, South America and Asia-Pacific.

**2. Basis of Presentation**

The accompanying unaudited condensed consolidated interim financial statements at June 30, 2009 and for the three and six months ended June 30, 2009 and 2008 include the accounts of the Company and its wholly-owned subsidiaries and have been prepared in conformity with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and pursuant to the rules and regulations of the Securities and Exchange Commission. Accordingly, such financial statements do not include all of the information and footnotes required by GAAP for complete financial statements. GAAP requires the Company's management to make estimates and assumptions that affect the amounts reported in the financial statements. Actual results could differ from those estimates. The interim results presented herein are not necessarily indicative of the results to be expected for the entire year. In management's opinion, these unaudited condensed consolidated interim financial statements contain all adjustments of a normal recurring nature necessary for a fair presentation of the financial statements for the interim periods presented. These unaudited condensed consolidated interim financial statements should be read in conjunction with the Company's audited consolidated financial statements for the year ended December 31, 2008 as reported on Form 10-K filed on March 12, 2009.

**3. Accounting Policies**

*Derivatives and Hedging*

On January 1, 2009, the Company adopted Statement of Financial Accounting Standards No. 161, *Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133* ("SFAS No. 161"). SFAS No. 161 amends and expands the disclosure requirements of FASB Statement No. 133 ("SFAS No. 133") with the intent to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for under SFAS No. 133 and its related interpretations, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS No. 161 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments and disclosures about credit-risk-related contingent features in derivative instruments.

As required by SFAS No. 133, the Company records all derivatives on the balance sheet at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether the Company has elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to changes in the fair value of an asset, liability or firm commitment attributable to a particular risk are considered fair value hedges. Derivatives designated and qualifying as a hedge of the exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Derivatives may also be designated as hedges of the foreign currency exposure of a net investment in a foreign operation. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the recognition of the changes in the fair value of the hedged asset or liability that are attributable to the hedged risk in a fair value hedge or the earnings effect of the hedged forecasted transactions in a cash flow hedge.

6

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**3. Accounting Policies—(continued)**

*Derivatives and Hedging—(continued)*

The Company may enter into derivative contracts that are intended to economically hedge certain of its risks, even though hedge accounting does not apply or the Company elects not to apply hedge accounting under SFAS No. 133.

*Goodwill*

The Company accounts for goodwill and other intangible assets in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"). SFAS No. 142 requires that goodwill and intangible assets that have indefinite lives not be amortized but, instead, must be tested at least annually for impairment or whenever events or business conditions warrant. As a result of the tests as of December 31, 2008, the Company determined that no goodwill impairment existed. As of June 30, 2009, the Company evaluated events and circumstances which may have indicated an impairment of goodwill and other intangible assets and determined that no impairment exists.

*Net Income (Loss) Per Common Share*

Net income (loss) per common share has been computed and presented pursuant to the provisions of SFAS No. 128, *Earnings per Share* ("SFAS No. 128"). Net income (loss) per share is based on the weighted-average number of shares outstanding during the period. As of June 30, 2009 and 2008, the Company had outstanding restricted stock units ("RSUs") (see Note 14).

For the three months ended June 30, 2008, the diluted average shares outstanding were computed using the average market price for time-based RSUs granted in 2005 and certain time-based RSUs granted in 2008 and the actual grant date market price for non-employee director RSUs. The calculation of earnings per share for the three and six months ended June 30, 2008 also excludes time-based and performance-based RSUs that were approved on January 3, 2008 as these awards were made contingent upon the approval by the Company's stockholders at or before the Company's 2008 annual meeting of stockholders of an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 5,000,000. On August 6, 2008, at the Company's 2008 annual meeting of stockholders, the stockholders approved an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 7,500,000. The calculation of diluted earnings per share for 2008 also excludes the Company's performance-based RSUs granted in 2005 and 2007 that are based on shareholder return targets because the performance criteria have not been contingently achieved and therefore the RSUs are not contingently issuable.

For the three months ended June 30, 2009, the diluted average shares outstanding were computed using the average market price for time-based RSUs granted in 2008 and 2009 and the actual grant date market price for non-employee director RSUs. The calculation of diluted earnings per share for the three and six months ended June 30, 2009 excludes the Company's performance-based RSUs granted in 2005, 2007, 2008 and 2009 that are based on shareholder return targets because the performance criteria have not been contingently achieved and therefore the RSUs are not contingently issuable. For the six months ended June 30, 2009, the Company excluded the dilutive impact of potential future issuances of common stock underlying the Company's RSUs from the calculation of diluted average shares outstanding because their effect would have been antidilutive as the Company had a net loss for this period.

7

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**3. Accounting Policies—(continued)**

*Net Income (Loss) Per Common Share—(continued)*

The following table sets forth the computation of basic and diluted earnings weighted average shares:

|  | Three Months Ended June 30, 2009 | Three Months Ended June 30, 2008 | Six Months Ended June 30, 2009 | Six Months Ended June 30, 2008 |
|---|---|---|---|---|
| Weighted-average common shares outstanding—basic | 48,882,979 | 46,121,323 | 48,879,669 | 46,084,995 |
| Dilutive effect of stock-based compensation awards outstanding | 88,396 | 89,689 | — | 104,818 |
| Weighted-average common shares outstanding—diluted | 48,971,375 | 46,211,012 | 48,879,669 | 46,189,813 |

*Reclassifications*

Certain prior period amounts have been reclassified to conform to the current period presentation.

*New Accounting Standards*

In June 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, *The FASB Accounting Standards Codification™ and the Hierarchy of Generally Accepted Accounting Principles, a replacement of FASB Statement No. 162* ("SFAS No. 168"). SFAS No. 168 is effective for interim periods ending after September 15, 2009 and identifies the sources of accounting principles and the framework for selecting the principles used in the preparation of financial statements of nongovernmental entities that are presented in conformity with generally accepted accounting principles in the United States. The objective of this statement is to replace SFAS No. 162 and to establish the FASB Accounting Standards Codification™ (Codification) as the source of authoritative accounting principles recognized by the FASB to be applied by nongovernmental entities in the preparation of financial statements in conformity with GAAP. Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants. The Company believes that the adoption of SFAS No. 168 will have no material impact on its results of operations, financial position or cash flows.

In June 2009, the FASB issued SFAS No. 167, *Amendments to FASB Interpretation No. 46(R)* ("SFAS No. 167"), which amends the consolidation guidance applicable to variable interest entities. The amendments will significantly affect the overall consolidation analysis under FASB Interpretation No. 46(R). SFAS No. 167 is effective as of the beginning of the first fiscal year that begins after November 15, 2009 and the Company believes that the adoption of SFAS No. 167 will have no material impact on its results of operations, financial position or cash flows.

In June 2009, the FASB issued FASB Statement No. 166, *Accounting for Transfers of Financial Assets—an amendment of FASB Statement No. 140* ("SFAS No. 166"). SFAS No. 166 is intended to improve the relevance, representational faithfulness and comparability of the information that a reporting entity provides in its financial statements about a transfer of financial assets; the effects of a transfer on its financial position, financial performance, and cash flows; and a transferor's continuing involvement, if any, in transferred financial assets. SFAS No. 166 must be applied as of the beginning of each reporting entity's first annual reporting period that begins after November 15, 2009, for interim periods within that first annual reporting period and for interim and annual reporting periods thereafter. Earlier application is prohibited. The Company believes that the adoption of SFAS No. 166 will have no material impact on its results of operations, financial position or cash flows.

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**3. Accounting Policies—(continued)**

*New Accounting Standards—(continued)*

In May 2009, the FASB issued SFAS No. 165, *Subsequent Events* ("SFAS No. 165"). SFAS 165 is intended to establish general standards of accounting for and disclosure of events that occur after the balance sheet date but before financial statements are issued or are available to be issued. It requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for that date—that is, whether that date represents the date the financial statements were issued or were available to be issued. This disclosure should alert all users of financial statements that an entity has not evaluated subsequent events after that date in the set of financial statements being presented. SFAS No. 165 is effective for interim and annual periods ending after June 15, 2009. The adoption of SFAS No. 165 had no material impact on its results of operations, financial position or cash flows. The Company has evaluated subsequent events through August 6, 2009, which represents the date the Company's Form 10-Q for the quarter ended June 30, 2009 was filed with the Securities and Exchange Commission.

In April 2009, the FASB issued Staff Position SFAS No. 107-1 and APB 28-1, *Interim Disclosures about Fair Value of Financial Instruments* ("FSP FAS 107-1"). FSP 107-1 requires disclosure about fair value of financial instruments for interim reporting periods of publicly traded companies as well as in annual financial statements. FSP 107-1 is effective for interim reporting periods ending after June 15, 2009. The adoption of FSP 107-1 had no material impact on the Company's results of operations, financial position or cash flows. See Note 6 for further discussion.

Effective January 1, 2009, the Company adopted SFAS No. 161, *Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133* ("SFAS No. 161). See "Derivatives and Hedging" above. The Company's adoption of SFAS No. 161 did not have a material effect on its financial position or results of operations.

Effective January 1, 2008, the Company partially adopted SFAS No. 157, *Fair Value Measurements* ("SFAS No. 157"), for measuring its derivative assets and liabilities. See further discussion at Note 4 "Derivatives and Hedging". FASB Staff Position SFAS No. 157-2, *Effective Date of FASB Statement No. 157*, permits the Company to defer the recognition and measurement of its nonfinancial assets and nonfinancial liabilities until January 1, 2009. At January 1, 2009, the Company did not have any nonfinancial assets or nonfinancial liabilities that are recognized or disclosed at fair value.

In December 2007, the FASB issued SFAS No. 141(R), *Business Combinations* ("SFAS No. 141R"). SFAS No. 141R requires that upon initially obtaining control, an acquirer will recognize 100% of the fair values of acquired assets, including goodwill, and assumed liabilities, with only limited exceptions, even if the acquirer has not acquired 100% of its target. SFAS No. 141R amends SFAS No. 109, *Accounting for Income Taxes*, to require the acquirer to recognize changes in the amount of its deferred tax benefits that are recognizable because of a business combination, either in income from continuing operations in the period of the combination or directly in contributed capital, depending on the circumstances. On January 1, 2009, the Company adopted SFAS No. 141R, which is effective for fiscal years beginning after December 15, 2008. The adoption of SFAS No. 141R had no impact on the Company's financial statements.

9

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**3. Accounting Policies—(continued)**

*New Accounting Standards—(continued)*

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements* ("SFAS No. 160"), an amendment of Accounting Research Bulletin ("ARB") No. 51 ("ARB No. 51"). SFAS No. 160 clarifies the classification of noncontrolling interests in consolidated statements of financial position and the accounting for, and reporting of, transactions between the reporting entity and holders of such noncontrolling interests. On January 1, 2009, the Company adopted SFAS No. 160, which is effective for the first annual reporting period beginning on or after December 15, 2008. SFAS No. 160 is required to be adopted prospectively, except for reclassifying noncontrolling interests to equity, separate from the parent's shareholders' equity, in the consolidated statement of financial position and recasting consolidated net income (loss) to include net income (loss) attributable to both the controlling and noncontrolling interests, both of which are required to be adopted retrospectively. Since essentially all of the Company's subsidiaries are 100% owned, the adoption of SFAS No. 160 did not have a significant impact to its financial statements.

**4. Derivatives and Hedging**

*Risk Management Objective of Using Derivatives*

The Company is exposed to certain risks arising from both its business operations and economic conditions. The Company principally manages its exposures to a wide variety of business and operational risks through management of its core business activities. The Company enters into derivative financial instruments to manage exposures that arise from business activities that result in the receipt or payment of future known cash amounts, the value of which are determined by interest rates or foreign exchange rates. Specifically, the Company has entered into interest rate swaps to hedge variable interest related to its senior debt and foreign exchange contracts to protect the value of certain assets and obligations.

*Cash Flow Hedges of Interest Rate Risk*

The Company's objectives in using interest rate derivatives are to add stability to interest expense and to manage its exposure to interest rate movements. To accomplish this objective, the Company primarily uses interest rate swaps as part of its interest rate risk management strategy. Interest rate swaps designated as cash flow hedges involve the receipt of variable-rate amounts from a counterparty in exchange for the Company making fixed-rate payments over the life of the agreements without exchange of the underlying notional amount.

The effective portion of changes in the fair value of derivatives designated and that qualify as cash flow hedges is recorded in accumulated other comprehensive income (loss) and is subsequently reclassified into earnings in the period that the hedged forecasted transaction affects earnings. The ineffective portion of the change in fair value of the derivatives is recognized directly in earnings.

Based on interest rates as of June 30, 2009, amounts reported in accumulated other comprehensive income (loss) related to derivatives will be reclassified to interest expense as interest payments are made on the Company's variable-rate debt. During the twelve months ended June 30, 2010, the Company estimates, based on interest rates as of June 30, 2009, that $13,595 will be reclassified as a charge to interest expense. As of June 30, 2009, the Company effectively fixed the variable interest rate on approximately 84% of the term loan portion of the Company's senior credit facility at 9.74%.

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**4. Derivatives and Hedging—(continued)**

*Cash Flow Hedges of Interest Rate Risk—(continued)*

As of June 30, 2009, the Company had the following outstanding interest rate derivatives that were designated as cash flow hedges of interest rate risk:

| Interest Rate Derivative | Number of Instruments | Notional |
|---|---|---|
| Interest Rate Swaps – Canadian dollar instruments | 2 | $ 53,479 |
| Interest Rate Swaps – Euro instruments | 2 | $173,994 |
| Interest Rate Swaps – U.S. dollar instruments | 2 | $261,152 |

*Non-designated Hedges of Foreign Exchange Risk*

Derivatives not designated as hedges are not speculative and are used to manage the Company's exposure to foreign exchange rates but do not meet the strict hedge accounting requirements of SFAS No. 133. Changes in the fair value of derivatives not designated in hedging relationships are recorded directly in earnings.

The Company, from time to time, enters into foreign exchange forward contracts to fix currencies at specified rates based on expected future cash flows to protect against the fluctuations in cash flows resulting from sales denominated in foreign currency (cash flow hedges). Additionally, to manage its exposure to fluctuations in foreign currency on intercompany balances and certain purchase commitments, the Company uses foreign exchange forward contracts (fair value hedges).

As of June 30, 2009, the Company had the following outstanding derivatives that were not designated as hedges in qualifying hedging relationships. The value of these contracts is recognized at fair value based on market exchange forward rates. The change in fair value of these contracts is included in foreign exchange gain/(loss).

| Foreign Currency Derivative | Notional Sold | Notional Purchased |
|---|---|---|
| Cash flow hedges | $ — | $ 1,540 |
| Fair value hedges | $ (13,831) | $ 13,635 |

*Credit-risk-related Contingent Features*

The Company has agreements with each of its derivative counterparties that contain a provision where if the Company either defaults or is capable of being declared in default on any of its indebtedness, then the Company could also be declared in default on its derivative obligations.

As of June 30, 2009, the fair value of derivatives in a net liability position, which includes accrued interest but excludes any adjustment for nonperformance risk, related to these agreements was $21,388. Included in this amount are certain derivative liabilities of $8,071 that are related to counterparties that are also lenders under the Company's senior credit facility. Liabilities to these counterparties for derivatives and borrowings made under the senior credit facility are secured by substantially all of the Company's assets. The Company has not posted any collateral related to other derivative agreements.

Due to reduced credit limits at some of its banks, the Company has been entering into fewer foreign currency hedging arrangements and may not be able to enter into as many hedging arrangements in the future. As a result, the Company could be more exposed to the effects of currency fluctuations, both favorable and unfavorable, which could have a material impact on its results of operations.

11

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**4. Derivatives and Hedging—(continued)**

The table below presents the fair value of the Company's derivative financial instruments as well as their classification on the consolidated balance sheet as of June 30, 2009.

### Tabular Disclosure of Fair Values of Derivative Instruments

| | Asset Derivatives As of June 30, 2009 | | Liability Derivatives As of June 30, 2009 | |
| --- | --- | --- | --- | --- |
| | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| Derivatives designated as hedging instruments under SFAS 133 | | | | |
| Interest Rate Swaps | Other current assets | $ — | Accrued expenses | $ 16,792 |
| Total derivatives designated as hedging instruments under SFAS 133 | | $ — | | $ 16,792 |
| Derivatives not designated as hedging instruments under SFAS 133 | | | | |
| Foreign Currency Hedges | Other current assets | $ 281 | Accrued expenses | $ 1,141 |
| Total derivatives not designated as hedging instruments under SFAS 133 | | $ 281 | | $ 1,141 |

The tables below present the effect of the Company's derivative financial instruments on the consolidated statements of operations for the three months ended June 30, 2009.

### Tabular Disclosure of the Effect of Derivative Instruments on the Consolidated Statements of Operations for the Three Months Ended June 30, 2009

| Derivatives in SFAS No. 133 Cash Flow Hedging Relationships | Amount of Gain or (Loss) Recognized in OCI on Derivative (Effective Portion), net of tax | Location of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion) | Amount of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion), net of tax | Location of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Amount of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) |
| --- | --- | --- | --- | --- | --- |
| Interest Rate Swaps | $ (3,211) | Interest expense | $ (3,699) | Interest expense | $ (397) |

| Derivatives Not Designated as Hedging Instruments Under SFAS No. 133 | Location of Gain or (Loss) Recognized in Income on Derivative | Amount of Gain or (Loss) Recognized in Income on Derivative |
| --- | --- | --- |
| Foreign Currency Hedges | Foreign exchange gain | $ 1,505 |
| | | $ 1,505 |

12

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**4. Derivatives and Hedging—(continued)**

*Fair Value of Derivatives Under SFAS No. 157*

Effective January 1, 2008, the Company adopted SFAS No. 157 for measuring its derivative assets and liabilities. SFAS No. 157 emphasizes that fair value is a market-based measurement, not an entity-specific measurement. Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. As a basis for considering market participant assumptions in fair value measurements, SFAS No. 157 establishes a fair value hierarchy that distinguishes between market participant assumptions based on market data obtained from sources independent of the reporting entity (observable inputs that are classified within Levels 1 and 2 of the hierarchy) and the reporting entity's own assumptions about market participant assumptions (unobservable inputs classified within Level 3 of the hierarchy).

Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access. Level 2 inputs are inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs may include quoted prices for similar assets and liabilities in active markets, as well as inputs that are observable for the asset or liability (other than quoted prices), such as interest rates, foreign exchange rates, and yield curves that are observable at commonly quoted intervals. Level 3 inputs are unobservable inputs for the asset or liability, which are typically based on an entity's own assumptions, as there is little, if any, related market activity. In instances where the determination of the fair value measurement is based on inputs from different levels of the fair value hierarchy, the level in the fair value hierarchy within which the entire fair value measurement falls is based on the lowest level input that is significant to the fair value measurement in its entirety. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment, and considers factors specific to the asset or liability.

To comply with the provisions of SFAS No. 157, the Company incorporates credit valuation adjustments to appropriately reflect both its own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements. Although the Company has determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with its derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by itself and its counterparties. However, as of June 30, 2009, the Company has assessed the significance of the impact of the credit valuation adjustments on the overall valuation of its derivative positions and has determined that the credit valuation adjustments are not significant to the overall valuation of its derivatives. As a result, the Company has determined that its derivative valuations in their entirety are classified in Level 2 of the fair value hierarchy. The Company does not have any fair value measurements using significant unobservable inputs (Level 3) as of June 30, 2009.

The table below presents the Company's assets and liabilities measured at fair value on a recurring basis as of June 30, 2009, aggregated by the level in the fair value hierarchy within which those measurements fall.

| Assets | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observables Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Derivatives | $    281 | $        — | $    281 | $    — |
| Total | $    281 | $        — | $    281 | $    — |
| | | | | |
| Liabilities | | | | |
| Derivatives | $(17,933) | $        — | $    (17,933) | $    — |
| Total | $(17,933) | $        — | $    (17,933) | $    — |

13

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**5. Inventories**

The components of inventories are as follows at:

|  | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Raw materials | $18,305 | $ 17,357 |
| Work in process | 29,611 | 29,385 |
| Finished units | 38,343 | 38,801 |
|  | $86,259 | $ 85,543 |

**6. Debt**

The Company was in compliance with the covenants under its senior credit facility at June 30, 2009. Based on information available as of the date of this report, the Company anticipates it will not be in compliance with certain financial covenants for the period ending September 30, 2009. Failing to satisfy financial covenants under the senior credit facility would constitute an event of default, upon which the lenders could terminate the revolving credit facility and accelerate the payment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable. The Company intends to seek an amendment to its senior credit facility agreement with the lenders thereunder prior to the date upon which an event of default would occur due to its failure to demonstrate compliance with certain financial covenants for the period ending September 30, 2009. No assurances can be given that the Company will successfully obtain the lenders' consent to amend the credit facility on this timetable, or at all, or amend covenants in a manner sufficient to adequately reduce the risk of default. In connection with any such amendments, the lenders are likely to condition their consent on increases in the fees and interest rate payable under the credit facility, among other things, and no assurance can be given that such fees and increased interest will be sustainable by the Company. Additionally, if the Company does not successfully amend the senior credit facility or if the lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, hedge accounting under SFAS No. 133 would no longer be applicable for these interest rate swaps. Accordingly, the cumulative mark to market changes in their fair value that have been recorded in accumulated other comprehensive income (loss) through September 30, 2009 in addition to the credit valuation adjustments recorded under SFAS No. 157 would be charged to the statement of operations during the third quarter of 2009. As of June 30, 2009 this amount was $18,079. Additionally, mark to market changes subsequent to September 30, 2009 would be recorded as charges or credits to interest expense prospectively.

Previously, the Company was not in compliance with certain financial covenants for the period ended March 31, 2008 under its then existing credit facility and on April 8, 2008 and May 30, 2008, the Company amended its then existing senior credit facility agreement with the lenders thereunder. Under the amended senior credit facility agreement dated May 30, 2008, borrowings under the revolving credit facility and the term loans bear interest at the sum of, as applicable, LIBOR, the Euribor rate or CDOR plus, in each case, the applicable margin. The applicable margin increased from 2.75% to 5.50% through December 31, 2008 with three identified step downs (i.e., to 4.25%, 3.75% and 2.75%) that are contingent upon future improvements in the Company's credit rating levels beginning January 1, 2009. Based on the 90-day LIBOR, as of June 30, 2009, approximately 84% of the Company's long-term debt under its senior credit facility was effectively fixed by interest rate swap contracts at 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed was 6.32%.

FSP 107-1 requires disclosure about fair value of financial instruments for interim reporting periods of publicly traded companies as well as in annual financial statements. Accordingly, the carrying value of the debt under the senior credit facility of $581,402 exceeds its fair value of approximately $385,000 as of June 30, 2009.

14

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**6. Debt—(continued)**

During the first quarters of 2009 and 2008, the Company made mandatory debt repayments of approximately $16,100 and $9,400, respectively, based on the difference between its "pre-dividend free cash flow", as defined in its credit facility agreement, and cash dividends paid in the prior year, multiplied by the applicable percentage. The Company also made mandatory payments of $2,600 during the second quarter of 2009. Beginning in 2009, the sum of voluntary and scheduled debt payments made in the previous year is subtracted from this result to determine the mandatory debt repayment. The Company also made scheduled quarterly debt payments of its senior debt of approximately $4,700 and $1,800 during the first quarters of 2009 and 2008, respectively and $4,700 and $2,000 during the second quarters of 2009 and 2008, respectively. During the first quarter of 2009, the Company made borrowings under its revolver of $28,000.

**7. Income Taxes**

The Company utilizes the asset and liability method for accounting for income taxes in accordance with SFAS No. 109. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities. Deferred tax assets and liabilities are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company reduces the deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Information evaluated includes the Company's financial position and results of operations for the current and preceding years as well as an evaluation of currently available information about future years.

Because of the Company's accumulated loss position and the uncertainty around the future profitability in certain tax jurisdictions, on June 30, 2009, the Company has valuation allowances for deferred tax assets primarily related to net operating loss carry forwards in the United States, the United Kingdom, Canada, Germany, Sweden and Australia.

For the three months ended June 30, 2009 and 2008, the provision for income taxes was $2,697 and $1,911, respectively. The effective tax rate was higher than the statutory rate in all periods presented due to the impact of losses incurred in certain of the Company's U.S. and foreign subsidiaries with previously established valuation allowances in relation to the level of profitability in tax-paying subsidiaries. In addition, the effective tax rate increased for the second quarter of 2009 as compared with the second quarter of 2008 principally due to the minimal tax provision being recognized on the increase in income before income taxes in 2008 resulting from the $13,704 increase in the fair value of the Company's interest rate swaps which occurred principally in subsidiaries with valuation allowances. For the six months ended June 30, 2009 and 2008, the provision for income taxes was $6,589 and $5,550, respectively. The increase in tax for the six months ended June 30, 2009 was primarily due to the establishment of a valuation allowance in Canada of approximately $2,850 in the first quarter of 2009.

The Company adopted FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48") on January 1, 2007. As of December 31, 2008, the Company had a gross unrecognized tax benefit of $4,831. During the six months ended June 30, 2009, the Company's unrecognized tax benefit decreased by approximately $688 based principally on the outcome of a foreign tax audit.

The Company's policy is to recognize interest and penalties related to income tax matters as income tax expense, which were immaterial for the six months ended June 30, 2009 and 2008, respectively. The tax years 2000 through 2008 remain open to examination by the major taxing jurisdictions to which the Company and its subsidiaries are subject.

15

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

## 8. Pensions, Other Postretirement and Postemployment Benefits

The Company has defined benefit pension plans covering substantially all of its U.S. and Canadian employees and employees of certain subsidiaries in other countries. Benefits are generally based on the employee's years of service and compensation. These plans are funded in conformity with the funding requirements of applicable government regulations.

The Company also sponsors various unfunded defined contribution plans that provide for retirement benefits to employees, some in accordance with local government requirements.

Also, through December 31, 2008, the Company sponsored an unfunded plan that offered the opportunity to obtain health care benefits to a majority of all retired U.S. employees and their covered dependents and beneficiaries. A portion of this plan was contributory, with retiree contributions adjusted periodically. Eligibility varied according to date of hire, age and length of service. As of December 31, 2008, the Company no longer sponsors or funds its U.S. retiree health insurance program. Certain retirees also have a life insurance benefit provided at no cost.

Effective December 31, 2008, the Company froze benefit pension accruals under its Pension Plan for U.S. Salaried and Non-Union Hourly Employees (the "Pension Plan") so that service beyond December 31, 2008 is not credited under the Pension Plan. Employees who were vested as of December 31, 2008 will be entitled to their benefit earned as of December 31, 2008. Current employees who were not vested as of December 31, 2008 will be entitled to their benefit earned as of December 31, 2008 upon five years of continuous employment from date of hire.

Additionally, during the first quarter of 2009 the Company suspended its 401(k) plan match in the United States until further notice.

As required by SFAS No. 132 (revised 2003), *Employers' Disclosures about Pensions and Other Postretirement Benefits – an amendment of FASB Statements No. 87, 88, and 106*, the following tables summarize the components of net periodic benefit cost:

### Defined Benefit Plans

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30, 2009 | June 30, 2008 | June 30, 2009 | June 30, 2008 |
| Service cost | $ 689 | $ 1,505 | $ 1,397 | $ 3,026 |
| Interest cost | 1,500 | 1,665 | 2,979 | 3,355 |
| Expected return on plan assets | (788) | (1,200) | (1,547) | (2,402) |
| Amortization of prior service cost | 22 | 30 | 43 | 59 |
| Amortization of net loss | 275 | 125 | 519 | 258 |
| Net periodic benefit cost | $ 1,698 | $ 2,125 | $ 3,391 | $ 4,296 |

### Other Postretirement Benefit Plans

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30, 2009 | June 30, 2008 | June 30, 2009 | June 30, 2008 |
| Service cost | $ — | $ 132 | $ — | $ 264 |
| Interest cost | 9 | 453 | 18 | 906 |
| Amortization of prior service cost | — | (140) | — | (279) |
| Amortization of net gain | (1) | (17) | (2) | (35) |
| Net periodic benefit cost | $ 8 | $ 428 | $ 16 | $ 856 |

16

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**9. Comprehensive Income and Accumulated Other Comprehensive Income (Loss)**

Comprehensive income for the periods ended June 30, 2009 and 2008 is as follows:

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30, 2009 | June 30, 2008 | June 30, 2009 | June 30, 2008 |
| Net income (loss) | $ 1,601 | $14,118 | $(7,847) | $ 9,409 |
| Foreign currency translation adjustments | 12,132 | 6,649 | 9,681 | 12,353 |
| Minimum pension liability/SFAS No. 158 Liability | (973) | (158) | (904) | (65) |
| Change in value of derivative instruments | 60 | — | 11 | — |
| Comprehensive income | $12,820 | $20,609 | $   941 | $21,697 |

The components of accumulated other comprehensive income (loss) are as follows:

|  | Foreign Currency Translation Adjustment | Minimum Pension Liability/SFAS No. 158 Liability | Value of Derivative Instruments | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance at December 31, 2008 | $   5,891 | $   (21,531) | $  (13,859) | $   (29,499) |
| Current period change, net of tax | 9,681 | (904) | 11 | 8,788 |
| Balance at June 30, 2009 | $  15,572 | $   (22,435) | $  (13,848) | $   (20,711) |

**10.    Warranties**

The Company offers warranties on certain products that it sells. The specific terms and conditions of these warranties vary depending on the product sold, the country in which the product is sold and arrangements with the customer. The Company estimates the costs that may be incurred under its warranties and records a liability for such costs. Factors that affect the Company's warranty liability include the number of units sold, historical and anticipated rates of warranty claims, cost per claim and new product introduction. The Company periodically assesses the adequacy of its recorded warranty claims and adjusts the amounts as necessary. Changes in the Company's combined short-term and long-term warranty liabilities during the six months ended June 30, 2009 are as follows:

|  |  |
|---|---|
| Balance at December 31, 2008 | $ 2,424 |
| Warranties provided during period | 1,183 |
| Settlements made during period | (1,061) |
| Changes in liability estimates, including expirations and currency effects | (274) |
| Balance at June 30, 2009 | $ 2,272 |

17

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements – (Continued)
(dollars in thousands, except per share information)

**11.   Restructuring and Impairments Expense**

Restructuring and impairments expense included in the Company's statements of operations are the result of its long-term strategy to reduce production costs and improve long-term competitiveness. Restructuring and impairments expense consists principally of severance costs related to reductions in work force and of facility costs and impairments of assets principally related to closing facilities and/or shifting production from one facility to another. Facility costs are principally comprised of costs to relocate assets to the Company's other facilities, operating lease termination costs and other associated costs.

During the first quarter of 2009, the Company continued its program of streamlining its operating structure and recorded restructuring expenses of approximately $700 in connection therewith. Additionally during the first quarter of 2009, the Company sold its rolls manufacturing facility in Sweden at a gain of approximately $1,200, which was partially offset by approximately $600 of costs incurred to continue with actions related to the closure of manufacturing facilities previously announced prior to the first quarter of 2009.

During the second quarter of 2009, essentially all of the Company's restructuring expenses of approximately $1,000 were related to the streamlining of its operating structure. The Company expects to incur restructuring expenses of approximately $3,000 during the remainder of 2009, primarily related to a continuation of streamlining its operating structure.

The table below sets forth for the six months ended June 30, 2009, the significant components and activity under restructuring programs and asset impairments:

| | Balance at December 31, 2008 | Charges | Currency Effects | Cash Payments | Balance at June 30, 2009 |
|---|---|---|---|---|---|
| Severance | $   5,422 | $2,136 | $   15 | $ (6,326) | $    1,247 |
| Facility costs and other | 2,455 | (996) | 66 | 419 | 1,944 |
| Total | $   7,877 | $1,140 | $   81 | $ (5,907) | $   3,191 |

Restructuring and impairments expense by segment, which is not included in Segment Earnings (Loss) in Note 11, is as follows:

| | For the Three Months Ended | | For the Six Months Ended | |
|---|---|---|---|---|
| | June 30, 2009 | June 30, 2008 | June 30, 2009 | June 30, 2008 |
| Clothing | $    (198) | $    115 | $    (130) | $    115 |
| Roll Covers | 673 | 1,287 | 44 | 1,721 |
| Corporate | 551 | 1,316 | 1,226 | 1,414 |
| Total | $   1,026 | $   2,718 | $   1,140 | $   3,250 |

18

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**12. Business Segment Information**

The Company is a global manufacturer and supplier of consumable products used primarily in the production of paper and is organized into two reportable segments: Clothing and Roll Covers. The Clothing segment represents the manufacture and sale of synthetic textile belts used to transport paper along the length of papermaking machines. The Roll Covers segment primarily represents the manufacture and refurbishment of covers used on the steel rolls of papermaking machines. The Company manages each of these operating segments separately.

Management evaluates segment performance based on earnings before interest, taxes, depreciation and amortization and before allocation of corporate charges. Such measure is then adjusted to exclude items that are of an unusual nature and are not used in measuring segment performance or are not segment specific ("Segment Earnings (Loss)"). The accounting policies of these segments are the same as those for the Company as a whole. Inter-segment net sales and inter-segment eliminations are not material for any of the periods presented.

Summarized financial information for the Company's reportable segments is presented in the tables that follow for the three and six months ended June 30, 2009 and 2008, respectively.

| | Clothing | Roll Covers | Corporate | Total |
|---|---|---|---|---|
| **Three Months Ended June 30, 2009:** | | | | |
| Net sales | $ 80,033 | $40,810 | $ — | $120,843 |
| Segment Earnings (Loss) | 25,955 | 8,421 | (2,467) | |
| **Three Months Ended June 30, 2008:** | | | | |
| Net sales | $109,275 | $61,118 | $ — | $170,393 |
| Segment Earnings (Loss) | 27,901 | 15,522 | (6,953) | |

| | Clothing | Roll Covers | Corporate | Total |
|---|---|---|---|---|
| **Six Months Ended June 30, 2009:** | | | | |
| Net sales | $157,848 | $ 79,498 | $ — | $237,346 |
| Segment Earnings (Loss) | 42,831 | 16,319 | (6,777) | |
| **Six Months Ended June 30, 2008:** | | | | |
| Net sales | $212,854 | $116,526 | $ — | $329,380 |
| Segment Earnings (Loss) | 51,957 | 29,669 | (9,984) | |

Segment Earnings (Loss) above excludes restructuring and impairments expense.

19

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**12. Business Segment Information—(continued)**

Provided below is a reconciliation of Segment Earnings (Loss) to income before provision for income taxes for the three and six months ended June 30, 2009 and 2008, respectively.

|  | Three Months Ended June 30, | |
|---|---|---|
|  | 2009 | 2008 |
| Segment Earnings (Loss): | | |
| Clothing | $ 25,955 | $ 27,901 |
| Roll Covers | 8,421 | 15,522 |
| Corporate | (2,467) | (6,953) |
| Non-cash compensation and related expenses | (885) | 197 |
| Net interest expense | (15,570) | (766) |
| Depreciation and amortization | (10,130) | (11,956) |
| Restructuring and impairments expense | (1,026) | (2,718) |
| Expenses related to debt financing | — | (5,198) |
| Income before provision for income taxes | $ 4,298 | $ 16,029 |

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2009 | 2008 |
| Segment Earnings (Loss): | | |
| Clothing | $ 42,831 | $ 51,957 |
| Roll Covers | 16,319 | 29,669 |
| Corporate | (6,777) | (9,984) |
| Non-cash compensation and related expenses | (1,046) | (274) |
| Net interest expense | (31,527) | (25,987) |
| Depreciation and amortization | (19,918) | (23,959) |
| Restructuring charges | (1,140) | (3,250) |
| Unrealized foreign exchange gain on revaluation of debt | — | 1,985 |
| Expenses related to debt financing | — | (5,198) |
| Income (loss) before provision for income taxes | $ (1,258) | $ 14,959 |

**13. Commitments and Contingencies**

The Company is involved in various legal matters, which have arisen in the ordinary course of business. The Company does not believe that the ultimate resolution of these matters will have a material adverse effect on its financial position, results of operations or cash flow.

*Environmental Matters*

During the third quarter of 2008, the Company, while evaluating its facility in Australia, discovered the possibility of contamination at that facility. Subsequently, the Company had a preliminary evaluation performed, which confirmed the existence of contamination and estimated preliminary costs to remediate this facility. Based upon this evaluation, the Company accrued $4,100 in 2008 as its best estimate of the remediation costs it expected to incur. A Phase II assessment of the groundwater contamination performed for the Company during the second quarter of 2009 indicated the costs to remediate the contamination would be significantly less than originally estimated and accordingly, the Company reduced the accrual by $3,400 during the second quarter of 2009 based on this assessment.

The Company believes that any additional liability in excess of amounts provided which may result from the resolution of such matters will not have a material adverse effect on the financial condition, liquidity or cash flow of the Company.

20

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation**

Effective May 19, 2005, the Company adopted the 2005 Equity Incentive Plan (the "2005 Plan"), under which the Board of Directors authorized 2,500,000 shares for grant (subsequently increased to 7,500,000 at the Company's Annual Meeting of Stockholders on August 6, 2008).

The Company recorded stock-based compensation expense (income) during the three and six months ended June 30, 2009 and 2008, respectively, with respect to the following programs:

| | For the Three Months Ended | | For the Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2009 | June 30, 2008 | June 30, 2009 | June 30, 2008 |
| RSU Awards (1) | $ 733 | $ (193) | $ 776 | $ 274 |
| 2009 Performance Award Program (2) | 152 | — | 270 | — |
| Stock Awards (3) | 94 | — | 94 | — |
| Total | $ 979 | $ (193) | $ 1,140 | $ 274 |

(1) Related to restricted stock units awarded in and prior to 2009. See further discussion below.

(2) Related to the value of expected awards for the year ending December 31, 2009 under the Company's Performance Award Program, which was approved by the Company's Board of Directors on March 10, 2009.

(3) Represents the value of 60,000 shares of the Company's common stock awarded to Mr. Maffucci on June 8, 2009 in connection with his appointment as the Company's Executive Vice President and Chief Financial Officer.

As a result of adopting SFAS No. 123R on January 1, 2006, the Company has used the straight-line attribution method to recognize expense for time-based RSUs granted after December 31, 2005. The Company used the graded attribution method to recognize expense for all RSUs granted prior to the adoption of SFAS No. 123R.

During 2005, 424,683 time-based RSUs and 801,843 performance-based RSUs were granted to officers and employees of the Company. Non-employee directors were also granted 12,500 RSUs during 2005. Each RSU represents one share of common stock.

To earn common stock under time-based RSUs granted in 2005, generally the grantee must be employed by the Company through the applicable vesting date, which occurred annually on May 19, 2006, 2007 and 2008. The final tranche of these RSUs vested on May 19, 2008.

To earn common stock under performance-based RSUs granted in 2005, generally defined shareholder return targets must be met over the four years following the completion of the Company's initial public offering on May 19, 2005 and the grantee must be employed by the Company through May 19, 2009. On May 19, 2009, all of the remaining 269,171 of these RSUs were forfeited because the defined shareholder return targets had not been achieved.

On May 16, 2007, the Company granted 742,885 performance-based RSUs to certain officers and employees of the Company. Generally, to earn common stock under these performance-based RSUs, defined shareholder return targets must be met over the four years following the grant date and the grantee must be employed by the Company through May 16, 2011.

21

Table of Contents

Xerium Technologies, Inc.

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

Awards to non-employee directors vest immediately under the 2005 Plan and the underlying shares will be issued to the director upon termination of service as a member of the Board or a change in control, as defined in the 2005 Plan. Annually during 2005, 2006 and 2007, the non-employee directors were granted 12,500 RSUs in the aggregate. In July 2008, they also were granted 48,820 RSUs in the aggregate. On November 30, 2008, three members of the Board retired, which resulted in an aggregate issuance of 81,351 shares of common stock to them underlying their vested RSUs. On June 9, 2009 the non-employee directors were granted 224,715 RSUs in the aggregate.

On January 3, 2008, the Compensation Committee of the Company's Board of Directors approved 433,000 performance-based RSU awards (based on shareholder return targets) and 433,000 time-based RSU awards for certain of the Company's officers under the 2005 Plan, which were made contingent upon the approval by the Company's stockholders at or before the Company's 2008 annual meeting of stockholders of an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 5,000,000. On August 6, 2008, at the Company's 2008 annual meeting of stockholders, the stockholders approved an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 7,500,000. The shareholder return based awards will generally only vest if the share price of the Company's common stock plus dividends paid on the common stock from January 3, 2008 satisfies annual targets that the Compensation Committee has established in respect of the three years following January 3, 2008 and the named officer continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the awards) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price. The time-based restricted stock unit awards are scheduled to vest completely, in nearly equal installments on the first, second, and third anniversaries of January 3, 2008, provided that the named officer continues to be employed by the Company on such dates. Dividends, if any, on such time based restricted stock units will be paid at the same rate as dividends on the Company's common stock, but only in the form of additional restricted stock units. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the awards) and/or termination of employment under the circumstances set forth in the restricted stock unit awards.

The Company also granted time-based restricted stock unit awards to its new chief executive officer with respect to 75,000 shares on February 26, 2008 and 37,500 shares on June 13, 2008. These awards are scheduled to vest completely, in nearly equal installments on the first, second, and third anniversaries of January 3, 2008 and June 13, 2008, respectively, provided that the Company's chief executive officer continues to be employed by the Company on such dates. Additionally, on June 13, 2008, the Company granted a time-based restricted stock unit award to certain of its executive officers with respect to an aggregate 60,000 shares, which are scheduled to vest on the third anniversary of June 13, 2008, provided that the named officers continue to be employed by the Company on that date. During 2008, the Company granted to certain employees 55,175 time-based restricted stock units that vest equally in annual installments from the grant date over a period of three to four years.

During the first quarter of 2009, 54,299 shares of common stock underlying 87,000 time-based RSUs were issued; the remaining 32,701 shares underlying the RSUs were withheld from issuance in connection with minimum tax withholding requirements related to the issuance of such shares to the recipients. During the second quarter of 2009, 21,828 shares of common stock underlying 32,377 time-based RSUs were issued; the remaining 10,549 shares underlying the RSUs werewithheld from issuance in connection with minimum tax withholding requirements related to the issuance of such shares to the recipients.

22

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

On March 10 2009, the Company granted to certain employees 39,000 time-based restricted stock units and 39,000 performance-based restricted stock units. The time-based restricted stock unit awards are scheduled to vest completely, in nearly equal installments on the first and second anniversaries of January 3, 2009, provided that the employee continues to be employed by the Company on such dates. Dividends, if any, on such time based restricted stock units will be paid at the same rate as dividends on the Company's common stock, but only in the form of additional restricted stock units. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the awards) and/or termination of employment under the circumstances set forth in the restricted stock unit awards. The shareholder return based awards will generally only vest if the share price of the Company's common stock plus dividends paid on the common stock from January 3, 2009 satisfies annual targets that the Compensation Committee has established in respect of the two years following January 3, 2009 and the named employee continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the awards) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price.

On March 10, 2009, in accordance with the employment agreement between the Company and Mr. Stephen Light, the Company's Chairman, President and Chief Executive Officer, the Compensation Committee of the Company's Board of Directors approved RSU grants to Mr. Light as follows: (i) 341,761 time-based RSUs; (ii) 605,209 time-based RSUs that were contingent on shareholder approval of an increase in the maximum number of shares that may be granted as stock awards to any one person in any calendar year under the 2005 Plan; and (iii) 946,969 performance-based RSUs that were contingent on shareholder approval of the same increase. Mr. Light's employment agreement provides that he was to have been granted RSUs having a fair market value of $1,250 on January 1, 2009, or 1,893,939 RSUs, and that half of these are to vest based on his service over time while the other half vest based on the Company's performance. The 2005 Plan imposes a limit on the maximum number of shares that may be granted as stock awards to any one person in any calendar year. Those of the RSUs granted to Mr. Light that were in excess of that limit were granted contingent on shareholder approval of an amendment to the 2005 Plan to increase the limit to enable these grants. The contingent awards were not considered outstanding until approved by the shareholders. The shareholders approved the amendment on June 9, 2009.

On June 8, 2009, in connection with the appointment of Mr. David G. Maffucci as Executive Vice President and Chief Financial Officer, the Company granted to Mr. Maffucci 112,500 time-based RSUs and 37,500 performance-based RSUs. With respect to 75,000 of the time-based RSUs, the awards will vest in nearly equal installments on the first, second, and third anniversaries of the date of grant. With respect to 37,500 of the time-based RSUs, 12,500 will vest on January 3, 2010 and the remaining 25,000 will vest on January 3, 2011. Mr. Maffucci's time-based restricted stock unit awards will vest as long as he continues to be employed by the Company on the applicable vesting dates. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the RSU agreement) and/or termination of employment under the circumstances set forth in the restricted stock unit awards. The shareholder return based awards will generally only vest if the share price of the Company's common stock plus dividends paid on the common stock satisfies annual targets that the Compensation Committee has established in respect of January 3, 2010 and 2011 and Mr. Maffucci continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the RSU agreement) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price.

Certain time-based RSUs and all non-employee director RSUs automatically adjust to reflect awards of additional RSUs upon payment of dividends by the Company. During the year ended December 31 2008 and the first six months of 2009, no RSUs were awarded in connection with the payment of dividends as no dividends were declared by the Company during any of those periods.

23

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

A summary of RSUs outstanding as of June 30, 2009 and their vesting dates is as follows:

| | Vesting Dates | Number of RSUs |
|---|---|---|
| Time-based RSUs granted February 26, 2008 | Annually in equal installments on January 3, 2009, January 3, 2010 and January 3, 2011 | 50,000 |
| Time-based RSUs granted June 13, 2008 | With respect to 37,500 RSUs — annually in equal installments on June 13, 2009, | |
| | June 13, 2010 and June 13, 2011; with respect to 60,000 RSUs— June 13, 2011 | 85,000 |
| Time-based RSUs granted August 6, 2008 (contingently awarded on January 3, 2008) | Annually in equal installments on January 3, 2009, January 3, 2010 and January 3, 2011 | 91,334 |
| Time-based RSUs granted at various dates during 2008 | Annually in equal installments over three years | 32,334 |
| Time-based RSUs granted at various dates during 2009 | With respect to 1,023,470 RSUs—annually in equal installments on January 1, 2010 and January 1, 2011; with respect to 75,000 RSUs—annually in equal installments on June 8, 2010, 2011 and 2012 | 1,098,470 |
| Performance-based RSUs granted May 19, 2005 (based on shareholder return targets) | Forfeited on May 19, 2009 because shareholder return targets were not achieved. | — |
| Performance-based RSUs granted May 16, 2007 (based on shareholder return targets) | May 16, 2011, assuming performance criteria are achieved | 376,200 |
| Performance-based RSUs granted August 6, 2008 (based on shareholder return targets) (contingently awarded on January 3, 2008) | January 3, 2011, assuming performance criteria are achieved | 137,000 |
| Performance-based RSUs granted at various dates during 2009 (based on shareholder return targets) | January 3, 2011, assuming performance criteria are achieved | 1,023,469 |
| Non-employee directors' RSUs | Date of grant | 261,254 |
| Total RSUs outstanding | | 3,155,061 |

24

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

RSU activity during the six months ended June 30, 2009 is presented below.

| | Number of RSUs | Price Range of Grant-Date Fair Value Price Per RSU | Weighted Average Grant-Date Fair Value Price Per RSU |
|---|---|---|---|
| Outstanding, December 31, 2008 | 1,358,585 | $ 3.77 - 12.01 | $ 7.50 |
| Granted | 2,346,654 | 0.54 - 1.57 | 1.30 |
| Forfeited | (430,802) | 5.12 -11.66 | 9.80 |
| Issued or withheld for tax withholding purposes | (119,376) | 3.89 - 5.40 | 5.22 |
| Outstanding, June 30, 2009 | 3,155,061 | $ 0.54 -12.01 | $ 2.66 |
| Vested, June 30, 2009 (1) | 261,254 | $ 1.43 -12.01 | $ 2.13 |

(1)    Vested RSUs at June 30, 2009 consist entirely of non-employee director RSUs. The common stock underlying these RSUs will be issued to the directors upon termination of their service as members of the Board and/or a change in control, as defined in the 2005 Plan. The total grant-date fair value of such non-employee directors RSUs that vested during the six months ended June 30, 2009 was $200.

**Assumptions**

Under SFAS No. 123R, the Company uses the following assumptions in determining compensation expense:

*Grant-Date Fair Value*

The Company calculates the grant-date fair value of time-based RSUs and non-employee directors' RSUs based on the closing price of the Company's common stock on the date of grant.

For the performance-based RSUs granted in 2008, 2007 and 2005 (none granted in 2006), the Company calculated the grant-date fair value of performance-based RSUs by using a Monte Carlo pricing model and the following assumptions:

| | For Performance-Based RSUs Granted at various dates during 2009 | For Performance-Based RSUs Granted August 6, 2008 (contingently awarded January 3, 2008) | For Performance-Based RSUs Granted May 16, 2007 | For Performance-Based RSUs Granted May 19, 2005 |
|---|---|---|---|---|
| Expected term (i) | 1 1/2 to 2 years | 3 years | 4 years | 4 years |
| Expected volatility (ii) | 116% and 119% | 44% | 39% | 37% |
| Expected dividends (iii) | None | None | $0.45 per year ($0.1125 per quarter) | $0.90 per year ($0.225 per quarter) |
| Risk-free interest rate (iv) | 0.99% to 1.17% | 2.64% | 4.32% | 3.73% |

(i)    *Expected term.* Performance-based RSUs expire three years after the grant date for the 2008 awards and four years after the grant date for the 2007 and 2005 awards. For 2009 awards, the RSUs expire after approximately 1 1/2 to 2 years.

**Table of Contents**

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

**Assumptions—(continued)**

(ii)  *Expected volatility*. The Company is responsible for estimating the volatility of the price of its common stock and has considered a number of factors, including third party estimates, to determine its expected volatility. For the 2008, 2007 and 2005 awards, the Company performed a peer group analysis of historical and implied volatility measures rather than using its own historical volatility because it had been a public company for a relatively short period of time (i.e., since its initial public offering on May 19, 2005). Based upon the peer group analysis, the Company determined to use a 44%, 39% and 37% volatility assumption for performance-based RSUs granted in 2008, 2007 and 2005, respectively, which is the midpoint of the range developed by looking at the peer group. For the 2009 awards, after being a public company for four years, the Company determined to use its own historical volatility rather than a peer group analysis. The volatility for the 2009 awards was 116% and 119%.

(iii)  *Expected dividends*. Based on the Company's dividend policy in place at the time of the performance-based RSU grants on May 19, 2005, an assumed continuation of quarterly dividends at the rate of $0.225 per share of common stock was used for the purposes of the application of the Monte Carlo pricing model. On May 2, 2007, the Company modified its credit agreement to limit the amount of any quarterly dividends payable on its common stock to not more than $0.1125 per share. Accordingly, for the performance-based RSUs that were granted on May 16, 2007, the Company assumed continuation of quarterly dividends at the rate of $0.1125 per share of common stock for the purposes of the application of the Monte Carlo pricing model. On May 30, 2008, the Company amended its credit facility. No dividends are permitted to be paid on the Company's common stock through May 2012, the maturity date of the term loans under the amended senior credit facility. Accordingly no dividends were assumed for the 2008 or 2009 awards for purposes of the application of the Monte Carlo pricing model.

(iv)  *Risk-free interest rate*. The yield on zero-coupon U.S. Treasury securities for the period that is commensurate with the expected term assumptions.

26

Table of Contents

**Xerium Technologies, Inc.**

Notes to Unaudited Condensed Consolidated Financial Statements
(dollars in thousands, except per share data)

**14. Stock-Based Compensation—(continued)**

**Assumptions—(continued)**

*Forfeitures*

As the time-based and performance-based RSUs require continued employment up to the time of vesting, the amount of stock-based compensation recognized during a period is required to include an estimate of forfeitures. SFAS No. 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The term "forfeitures" is related to employee attrition and based on a historical analysis of its employee turnover. This analysis is re-evaluated quarterly and the forfeiture rate will be adjusted as necessary. Ultimately, the actual expense recognized over the vesting period will be only for those shares that meet the requirements of continued employment up to the time of vesting. The Company estimated its forfeiture rates as of June 30, 2009 to be as follows:

| Description of Award | Forfeiture Rates |
|---|---|
| Time-based RSUs granted on various dates in 2008 and in 2009 (and contingently granted on January 1, 2009), other than those on August 6, 2008 | 10% |
| Time-based RSUs granted on August 6, 2008 | 55% |
| Performance-based RSUs granted May 19, 2005 (based on shareholder return targets) | 74% |
| Performance-based RSUs granted May 19, 2007 (based on shareholder return targets) | 65% |
| Performance-based RSUs granted August 6, 2008 (based on shareholder return targets) | 70% |
| Performance-based RSUs granted in 2009 (and contingently granted on January 1, 2009 (based on shareholder return targets) | 10% |
| Non-employee directors' RSUs | Vest immediately upon grant so no forfeiture rate required. |

As of June 30, 2009, there was approximately $2,800 of total unrecognized compensation expense related to unvested share-based awards which is expected to be recognized over a weighted average period of 1.7 years.

27

**Table of Contents**

**ITEM 2.        MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Forward Looking Statements**

The following discussion of our financial condition and results of operations should be read together with our unaudited condensed consolidated interim financial statements and the related notes thereto contained elsewhere in this Quarterly Report on Form 10-Q. The discussion included in this section, as well as other sections of this Quarterly Report on Form 10-Q contains forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties, and other factors that may cause our actual results, levels of activity, performance, or achievements to be materially different from any future results, levels of activity, performance, or achievements expressed or implied by these forward-looking statements. In some cases, you can identify forward-looking statements by the use of words such as "may," "could," "expect," "intend," "plan," "seek," "anticipate," "believe," "estimate," "predict," "potential," or "continue" or the negative of these terms or other comparable terminology. Undue reliance should not be placed on forward-looking statements because they involve known and unknown risks, uncertainties, and other factors that are, in some cases, beyond our control and that could materially affect actual results, levels of activity, performance, or achievements. Factors that could materially affect our actual results, levels of activity, performance or achievements include the following items:

- based on information available as of the date of this report, we anticipate we will not be in compliance with certain financial covenants in our senior credit facility for the period ending September 30, 2009. We intend to seek an amendment to our senior credit facility agreement with the lenders thereunder prior to the date upon which an event of default would occur due to our failure to demonstrate compliance with certain financial covenants for the period ending September 30, 2009, although no assurances can be given that we will successfully obtain the lenders' consent to amend the credit facility on this timetable, or at all, or amend covenants in a manner sufficient to adequately reduce the risk of default;

- in the event that we are not in compliance with certain financial covenants in our senior credit facility for the period ending September 30, 2009, our lenders could terminate our revolving credit facility and accelerate the repayment of all of the outstanding debt under our senior credit facility, causing it to immediately become due and payable and counterparties may have the right to terminate our existing interest rate swaps if we are not able to reach agreement on amendment of our financial covenants or otherwise refinance our credit facility;

- in the event that we are not in compliance with certain financial covenants in our senior credit facility for the period ending September 30, 2009 and if we are able to reach agreement on amendment of our financial covenants or otherwise refinance our credit facility, we may be required to pay substantial fees and our borrowing costs are likely to increase, and we may not have sufficient cash to pay such increased fees and costs;

- absent an amendment to our senior credit facility agreement as discussed above, based on our current internal forecasts, we anticipate we will not be in compliance with certain financial covenants for the period ending September 30, 2009. Our ability to generate cash sufficient to service our debt also depends on our ability to achieve our financial forecasts. Our forecasts are based on certain assumptions that may or may not materialize as we expect regarding (i) demand for paper products, (ii) the level of paper production and inventories, (iii) the number of mills producing paper, (iv) the financial health of our customers, (v) the stability of product prices, (vi) the strength of market acceptance of new products, (vii) the absence of dramatic increases in commodity prices, (viii) our ability to maintain hedge accounting for our interest rate swaps, (ix) the beginning of an economic recovery in the global paper market in 2009, with the effect of increasing our revenues and profits, (x) the value of the Euro relative to the U.S. dollar from its current level and (xi) our ability to implement and continue planned cost reductions;

- we may not have sufficient cash to fund our operations should the current conditions in the global paper market continue;

Table of Contents

- we have entered into fewer hedging arrangements due to reduced credit limits at some of our banks and may not be able to enter into as many hedging arrangements in the future. As a result, we could be more exposed to the effects of currency fluctuations, both favorable and unfavorable, which could have a material impact on our results of operations;

- we are subject to the risk of weaker economic conditions in the locations around the world where we conduct business, including without limitation the current turmoil in the global paper markets and the impact of the current global economic crisis on the paper industry and our customers;

- our strategies and plans, including, but not limited to, those relating to the decrease in our financial leverage, developing new products, enhancing our operational efficiencies and reducing costs may not result in the anticipated benefits;

- we may not achieve compliance with the NYSE continued listing standards;

- our profitability could be adversely affected by fluctuations in interest rates;

- we may not be able to develop and market new products successfully;

- we may not be successful in developing new technologies or in competing against new technologies developed by competitors;

- we may have insufficient cash to fund growth and unexpected cash needs after satisfying our debt service obligations due to our high degree of leverage and significant debt service obligations;

- there can be no assurance that in future periods we will be able to assert that our hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting;

- we may be required to incur significant costs to reorganize our operations in response to market changes in the paper industry;

- we are subject to the risk of terrorist attacks or an outbreak or escalation of any insurrection or armed conflict involving the United States or any other country in which we conduct business, or any other national or international calamity;

- we are subject to any future changes in government regulation; and

- we are subject to any changes in U.S. or foreign government policies, laws and practices regarding the repatriation of funds or taxes.

Many of these risks are discussed elsewhere in this Form 10-Q, including in the sections below: "Recent Developments," "Overview," "Industry Trends and Outlook," "Liquidity and Capital Resources" and "Credit Facility." Other factors that could materially affect actual results, levels of activity, performance, or achievements can be found in Part I, Item 1A in our Annual Report on Form 10-K for the year ended December 31, 2008 filed with the Securities and Exchange Commission on March 12, 2009. If any of these risks or uncertainties materialize, or if our underlying assumptions prove to be incorrect, actual results may vary significantly from what we projected. Any forward-looking statement in this Quarterly Report on Form 10-Q reflects our current views with respect to future events and is subject to these and other risks, uncertainties, and assumptions relating to our operations, results of operations, growth strategy, and liquidity. We assume no obligation to publicly update or revise these forward-looking statements for any reason, whether as a result of new information, future events, or otherwise.

## Recent Developments

### Senior Credit Facility

Our senior credit facility requires that we satisfy certain operating requirements and financial covenant ratios in order to avoid a default or event of default under the facility. See "Credit Facility" below. As of June 30, 2009, the Company was in compliance with all of the covenants under its senior credit facility. Absent a significant recovery in revenue resulting from an economic revival in the paper industry, we anticipate that we will not be in compliance with certain financial covenants for the period ending September 30, 2009 and intend to seek an amendment to our senior credit facility agreement with the lenders prior to the date when an event of default would occur due to our failure to demonstrate compliance with certain financial covenants for the period ending September 30, 2009. We have begun work toward this amendment, initiating contact with our lenders, although no assurances can be

Table of Contents

given that we will successfully obtain the lenders' consent to amend the credit facility on this timetable, or at all, or amend covenants in a manner sufficient to adequately reduce the risk of default. We have created a steering committee of our Board of Directors to lead this activity and have retained AlixPartners, LLC as our financial advisor to assist in this process. Failing to satisfy financial covenants under the senior credit facility would constitute an event of default, upon which the lenders could terminate the revolving credit facility and accelerate the repayment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable. Any such acceleration of our obligations would likely cause other lenders and contractual counterparties, including counterparties to our interest rate swap agreements and other hedge agreements to terminate and/or to accelerate our obligations under other financing and credit instruments and agreements. Should the lenders and/or other counterparties demand immediate repayment of all of our obligations, we expect that we would be unable to pay such obligations.

### New York Stock Exchange ("NYSE")

On December 29, 2008, we were notified by the NYSE that we were not in compliance with two NYSE standards for continued listing of our common stock on the exchange because the average closing price of our common stock was less than $1.00 per share over a consecutive 30 trading day period, and our average total market capitalization was less than $75 million over the same period and our most recently reported stockholders' equity was less than $75 million.

On March 27, 2009, we were notified by the NYSE that it has accepted our plan for continued listing on the NYSE. As a result, our common stock will continue to be listed on the NYSE during the compliance period, subject to quarterly reviews by the NYSE to monitor our progress against the approved plan for continued listing.

With respect to the $1.00 minimum price standard, we initially had six months from the date of receipt of the notification from the NYSE to bring our share price and average share price over $1.00. However, the NYSE suspended the $1.00 minimum price requirement through June 30, 2009. On July 8, 2009, we announced that we were notified by the NYSE that because our closing price and average share price for the 30 days ended June 29, 2009 was above $1.00, we are no longer considered to be below the $1.00 continued listing criterion. However, the Company's stock price has since varied above and below $1.00 and, should we fall out of compliance again, we would have six months to regain compliance.

The Company has 18 months from the original non-compliance notification date on December 29, 2008 in which to regain compliance with the NYSE's revised $50 million market capitalization and $50 million stockholders' equity requirement. Failure to make progress consistent with the plan or to regain compliance with the continued listing standards could result in our common stock being delisted from the NYSE.

### Global Economic Environment

Our business is highly dependent upon the paper production industry and the degree to which the paper industry is affected by global economic conditions and the availability of credit. Demand for our products, could continue to decline if paper manufacturers are unable to obtain required financing or if the economic crisis causes additional mill closures or extends current capacity curtailments.

During 2008, especially the latter part of the year, the global paper industry experienced a sharp reduction in production levels, caused by the general slowdown in economic activity and the related paper consumption decline during the same period. The slowdown of production was across all grades of paper production, but most notably in the packaging grades and newsprint. For packaging grades, demand is directly related to broad manufacturing and transportation activity reduction, while newsprint demand has been increasingly declining over a number of years due to the greater prevalence of electronic media, exacerbated in recent months by a reduction in print advertising. One of the results of the recent reduction in demand for paper products is that the inventory of paper at the paper-makers has increased significantly and production slowdowns, curtailments and idling of paper-making machines have been occurring at a sharply increasing rate since October 2008 and have continued into 2009. Regionally, North America and Europe have seen the most significant production declines. Paper production in those regions decreased in 2008 and is expected to decrease further in 2009. While we were successful in reducing the rate of price decrease in 2008 for the products we sell to the paper-makers and prices have remained relatively stable in the first half of 2009, there continues to be price pressure due to our competitors pursuing market growth at this time of lower overall demand in our market.

**Table of Contents**

In the quarters ended September 30, 2008 and December 31, 2008, due to the global economic crisis and the lack of credit availability that may affect our customers' demand for products and their ability to pay their debts, we assessed the impact of this crisis on our customers and our industry, and changed our estimates of net realizable value of receivables and inventories. For example, two of our major customers, who collectively represent approximately 5% of 2008 revenues, have experienced financial difficulties and filed for bankruptcy protection in 2009. As of March 31, 2009, we had fully reserved for all amounts due from these customers. As of June 30, 2009, the Company determined it does not need to reserve for the post-bankruptcy receivables, due to the improved financial situation for these customers. The Company continues to reserve for pre-bankruptcy receivables. Decreases in orders from these customers or future payment problems from these or other customers could have a material adverse effect on our sales and profitability, which in turn could impact our ability to satisfy the covenant requirements in our credit facility.

## Overview

We are a leading global manufacturer and supplier of two categories of consumable products used primarily in the production of paper—clothing and roll covers. Our operations are strategically located in the major paper-producing regions of North America, Europe, South America and Asia-Pacific.

Our products play key roles in the formation and processing of paper along the length of a paper-making machine. Paper producers rely on our products and services to help improve the quality of their paper, differentiate their paper products, operate their paper-making machines more efficiently and reduce production costs. Our products and services typically represent only a small fraction of a paper producer's overall production costs, yet they can reduce costs by permitting the use of lower-cost raw materials and reducing energy consumption. Paper producers must replace clothing and refurbish or replace roll covers regularly as these products wear down during the paper production process. Our products are designed to withstand extreme temperature, chemical and pressure conditions, and are the result of a substantial investment in research and development and highly sophisticated manufacturing processes.

We operate in two principal business segments: clothing and roll covers. In our clothing segment, we manufacture and sell highly engineered synthetic textile belts that transport paper as it is processed on a paper-making machine. Clothing plays a significant role in the forming, pressing and drying stages of paper production. Because paper-making processes and machine specifications vary widely, the clothing size, form, material and function is selected to fit each individual paper-making machine and process. For the three months ended June 30, 2009, our clothing segment represented 66% of our net sales.

Our roll cover products provide a surface with the mechanical properties necessary to process the paper sheet in a cost-effective manner that delivers the sheet qualities desired by the paper producer. Roll covers are tailored to each individual paper-making machine and process, using different materials, treatments and finishings. In addition to manufacturing and selling new roll covers, we also provide refurbishment services for previously installed roll covers and manufacture spreader rolls. For the three months ended June 30, 2009, our roll covers segment represented 34% of our net sales.

## Industry Trends and Outlook

Historically, demand for our products has been driven primarily by the volume of paper produced on a worldwide basis. According to the Food and Agriculture Organization of the United Nations, the volume of paper production between 1980 and 2007 increased at a compound annual growth rate of approximately 3.07%. There can be no assurance that the industry will continue to grow at a similar rate and it is possible that paper production may decline in any specific period compared to prior periods, as production declined globally for the latter half of 2008 and the first half of 2009. Generally, and over time, we expect growth in paper production to be greater in Asia, South America and Eastern Europe than in the more mature North American and Western European regions where demand may potentially decline.

The profitability of paper producers has historically been highly cyclical due to wide swings in the price of paper, driven to a high degree by the oversupply of paper during periods when paper producers have more aggregate capacity than the market requires. A

31

Table of Contents

sustained downturn in the paper industry, either globally or in a particular region, can cause paper manufacturers to reduce production or cease operations, which could adversely affect our revenues and profitability. Since 2000, paper producers have taken actions that seek to structurally improve the balance between the supply of and demand for paper. As part of these efforts, they have permanently shut down many paper-making machines. Between 2001 and 2004 the bulk of these closures occurred in North America. Announcements by paper producers concerning temporary and permanent shutdowns of paper-making machines in both North America and Europe have continued. During 2005 through the first half of 2009, the sales and profitability of our North American and European operations were adversely affected by these shutdowns. Papermakers continue to experience low levels of profitability, and we believe that further consolidation among papermakers, reducing the number of paper producers, and shutdowns of paper-making machines will occur in Europe and North America, until there is a better balance between supply and demand for paper and the profit levels of paper producers improve. This rebalancing will be accelerated during the current global economic recession. Over a number of years, consumption growth of paper is expected to drive an increase in the global production rates required to maintain balance between supply and demand although it is highly likely that a consumption slow-down and related effect on global paper production will continue in the near term, exacerbated by the global economic crisis. Also affecting machine curtailments are structural productivity gains from improved products that we and our competitors supply.

Global paper production growth that does occur would be moderated by the level of industry consolidation and paper-machine shutdown activity that is a continuing underlying trend in North America and Western Europe. We also believe that, in addition to industry consolidation and paper machine shutdown activity in North America and Western Europe, the trend towards new paper machine designs which have fewer rolls and market recognition of extended life of our roll cover products has been and will continue to negatively impact demand for these products and that the volume potential for the roll covers business will slowly diminish. Additionally, we are seeing a trend that paper producers are placing an increasing emphasis on maintenance cost reduction and, as a result, are extending the life of roll covers through additional maintenance cycles before replacing them.

We anticipate that pricing pressure for our products will continue with the consolidation among paper producers and as the shift of paper production growth in Asia develops. In response to this pricing pressure, we expect to increase our expenditure levels on research and development expenses and continue to develop our value added selling approach as part of our strategy to differentiate our products, while at the same time remaining focused on cost reduction and efficiency programs.

The negative paper industry trends described above are likely to continue. We believe that in the current economic environment, the paper industry will experience reduced demand, increased emphasis on cost reduction, and sustained paper-machine shutdown activity than would have been the case in the absence of the economic crisis.

## Sales and Expenses

Sales in both our clothing and roll covers segments are primarily driven by the following factors:

- The volume of worldwide paper production;

- Advances in the technology of our products, which can provide value to our customers by improving the efficiency of paper-making machines;

- Our ability to provide products and services which reduce paper-making machine downtime, while at the same time allowing the manufacture of high quality paper products; and

- Impact of currency fluctuations.

Sales in our roll covers segment include our mechanical services business. We have expanded this business in response to demand from paper producers that we perform work on the internal mechanisms of a roll while we refurbish or replace a roll cover. In our clothing segment, a portion of our business has been conducted pursuant to consignment arrangements under which we do not recognize a sale of a product to a customer until the customer places the product into use, which typically occurs some period after the product is shipped to the customer or to a warehouse location near the customer's facility. We are striving to reduce the number of consignment arrangements and increase the use of standard terms of sale under which we recognize a sale upon product shipment. We made progress with this initiative in 2008 and expect this effort to be successful over several years.

Table of Contents

Our operating costs are driven primarily by our total sales volume, the impact of inflation and currency and the level and impact of cost reduction programs.

The level of our cost of products sold is primarily attributable to labor costs, raw material costs, shipping costs, plant utilization and depreciation, with labor costs constituting the largest component. We invest in facilities and equipment that enable innovative product development and improve production efficiency and costs. Recent examples of capital spending for such purposes include faster weaving looms and seaming machines with accurate electronic controls, automated compound mixing equipment and computer-controlled lathes and mills.

The level of research and development spending is driven by market demand for technology enhancements, including both specific customer needs and general market requirements, as well as by our own analysis of applied technology opportunities. With the exception of purchases of equipment and similar capital items used in our research and development activities, all research and development is expensed as incurred. Research and development expenses were $2.7 million and $3.2 million for the three months ended June 30, 2009 and 2008, respectively.

## Foreign Exchange

We have a geographically diverse customer base. For the three months ended June 30, 2009, approximately 36% of our sales was in Europe, 36% was in North America, 17% was in Asia-Pacific, 9% was in South America and 2% was in the rest of the world.

A substantial portion of our sales is denominated in Euros or other currencies. As a result, changes in the relative values of U.S. Dollars, Euros and other currencies affect our reported levels of revenues and profitability as the results are translated into U.S. Dollars for reporting purposes. In particular, increases in the value of the U.S. Dollar relative to the value of the Euro and these other currencies negatively impact our levels of revenue and profitability because the translation of a certain number of Euros or units of such other currencies into U.S. Dollars for financial reporting purposes will represent fewer U.S. Dollars.

For certain transactions, our sales are denominated in U.S. Dollars or Euros but all or a substantial portion of the associated costs are denominated in a different currency. As a result, changes in the relative values of U.S. Dollars, Euros and other currencies can affect the level of the profitability of these transactions. The largest proportion of such transactions consist of transactions in which the sales are denominated in or indexed to U.S. Dollars and all or a substantial portion of the associated costs are denominated in Euros, Reals or other currencies.

Currency fluctuations have a greater effect on the level of our net sales than on the level of our income from operations. For example, for the three months ended June 30, 2009 as compared with the three months ended June 30, 2008, the change in the value of the U.S. Dollar against the currencies we conduct our business in resulted in currency translation decreases in net sales and income from operations of $17.0 million and $2.0 million, respectively. Although the results for the three months ended June 30, 2009 reflect a period in which the value of the U.S. Dollar increased against the currencies in which we conduct the majority of our non-U.S. Dollar denominated business as compared to the three months ended June 30, 2008, we would expect a similar but opposite effect in a period in which the value of the U.S. Dollar decreases. For any period in which the value of the U.S. Dollar changes relative to other currencies, we would expect our income from operations to be proportionately affected less than our net sales.

During the three and six months ended June 30, 2009, we conducted business in 11 foreign currencies. The following table provides the average exchange rate for the three and six months ended June 30, 2009 and 2008, respectively, of the U.S. Dollar against each of the four foreign currencies in which we conduct the largest portion of our operations, and indicates the percentage of our net sales for the three and six months ended June 30, 2009 denominated in such foreign currency.

**Table of Contents**

| Currency | Average exchange rate of the U.S. Dollar for the three months ended June 30, 2009 | Average exchange rate of the U.S. Dollar for the three months ended June 30, 2008 | Percentage of net sales for the three months ended June 30, 2009 denominated in such currency |
|---|---|---|---|
| Euro | $1.36 = 1 Euro | $1.56 = 1 Euro | 41.9% |
| Canadian Dollar | $0.86 = 1 Canadian Dollar | $0.99 = 1 Canadian Dollar | 6.7% |
| Brazilian Real | $0.48 = 1 Brazilian Real | $0.60 = 1 Brazilian Real | 7.6% |
| Australian Dollar | $0.76 = 1 Australian Dollar | $0.94 = 1 Australian Dollar | 7.2% |

| Currency | Average exchange rate of the U.S. Dollar for the six months ended June 30, 2009 | Average exchange rate of the U.S. Dollar for the six months ended June 30, 2008 | Percentage of net sales for the six months ended June 30, 2009 denominated in such currency |
|---|---|---|---|
| Euro | $1.33 = 1 Euro | $1.53 = 1 Euro | 41.9% |
| Canadian Dollar | $0.83 = 1 Canadian Dollar | $0.99 = 1 Canadian Dollar | 6.4% |
| Brazilian Real | $0.46 = 1 Brazilian Real | $0.59 = 1 Brazilian Real | 8.9% |
| Australian Dollar | $0.71 = 1 Australian Dollar | $0.92 = 1 Australian Dollar | 6.7% |

To mitigate the risk of transactions in which a sale is made in one currency and associated costs are denominated in a different currency, we utilize forward currency contracts in certain circumstances to lock in exchange rates with the objective that the gain or loss on the forward contracts will approximate the loss or gain that results from the transaction or transactions being hedged. We determine whether to enter into hedging arrangements based upon the size of the underlying transaction or transactions, an assessment of the risk of adverse movements in the applicable currencies and the availability of a cost effective hedge strategy. To the extent we do not engage in hedging or such hedging is not effective, changes in the relative value of currencies can affect our profitability.

Due to reduced credit limits at some of our banks, we have been entering into fewer foreign currency hedging arrangements and may not be able to enter into as many hedging arrangements in the future. As a result, we could be more exposed to the effects of currency fluctuations, both favorable and unfavorable, which could have a material impact on our results of operations.

## Cost Reduction Programs

An important part of our long-term operating strategy is to seek to reduce our overall costs and improve our competitiveness. As a part of this effort, we have engaged in a series of cost reduction programs, which were designed to improve the cost structure of our global operations in response to changing market conditions. These cost reduction programs include headcount reductions throughout the world as well as plant closures that have rationalized production among our facilities to better enable us to meet customer demands.

During the first quarter of 2009, we continued our program of streamlining our operating structure and recorded restructuring expenses of approximately $0.7 million in connection therewith. Additionally, during 2009 we sold our rolls manufacturing facility in Sweden at a gain of approximately $1.2 million, which was partially offset by approximately $0.6 million of costs incurred to continue with actions related to the closure of manufacturing facilities announced prior to the first quarter of 2009. During the second quarter of 2009, essentially all of the $1.0 million of restructuring expenses we recorded were related to streamlining our operating structure. We expect to incur restructuring expenses of approximately $3 million during the remainder of 2009, primarily related to continuing our program of streamlining our operating structure.

During the first quarter of 2009, we also froze one of our U.S. employee pension plans, terminated our retiree medical plan, suspended contributions to our U.S. 401(k) program, froze salaries, delayed union contract wage increases, curtailed travel and halted work on our Vietnam project.

34

Table of Contents

## Results of Operations

The tables that follow set forth for the periods presented certain consolidated operating results and the percentage of net sales they represent:

| (in millions) | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2009 | 2008 | 2009 | 2008 |
| Net sales | $ 120.8 | $ 170.4 | $ 237.3 | $ 329.4 |
| Cost of products sold | 75.2 | 101.6 | 147.4 | 197.3 |
| Selling expenses | 16.1 | 21.8 | 32.6 | 42.3 |
| General and administrative expenses | 6.5 | 23.4 | 19.7 | 42.1 |
| Restructuring and impairments expenses | 1.0 | 2.7 | 1.1 | 3.2 |
| Research and development expenses | 2.7 | 3.2 | 5.4 | 6.2 |
| Income from operations | 19.3 | 17.7 | 31.1 | 38.3 |
| Interest expense, net | (15.6) | (0.8) | (31.5) | (25.9) |
| Foreign exchange gain (loss) | 0.6 | (0.9) | (0.8) | 2.6 |
| Income (loss) before provision for income taxes | 4.3 | 16.0 | (1.2) | 15.0 |
| Provision for income taxes | 2.7 | 1.9 | 6.6 | 5.6 |
| Net income (loss) | $ 1.6 | $ 14.1 | $ (7.8) | $ 9.4 |

### Percentage of Sales

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2009 | 2008 | 2009 | 2008 |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of products sold | 62.3 | 59.6 | 62.1 | 59.9 |
| Selling expenses | 13.3 | 12.8 | 13.7 | 12.8 |
| General and administrative expenses | 5.4 | 13.7 | 8.3 | 12.8 |
| Restructuring and impairments expenses | 0.8 | 1.6 | 0.5 | 1.0 |
| Research and development expenses | 2.3 | 1.9 | 2.3 | 1.9 |
| Income from operations | 15.9 | 10.4 | 13.1 | 11.6 |
| Interest expense, net | (12.9) | (0.5) | (13.3) | (7.9) |
| Foreign exchange gain (loss) | 0.5 | (0.5) | (0.3) | 0.8 |
| Income (loss) before provision for income taxes | 3.5 | 9.4 | (0.5) | 4.5 |
| Provision for income taxes | 2.2 | 1.1 | 2.8 | 1.7 |
| Net income (loss) | 1.3% | 8.3% | (3.3)% | 2.8% |

***Three Months Ended June 30, 2009 Compared to the Three Months Ended June 30, 2008.***

*Net Sales.* Net sales for the three months ended June 30, 2009 decreased by $49.6 million, or 29.1%, to $120.8 million from $170.4 million for the three months ended June 30, 2008. For the three months ended June 30, 2009, 66% of our net sales were in our clothing segment and 34% were in our roll covers segment.

In our clothing segment, net sales for the three months ended June 30, 2009 decreased by $29.3 million, or 26.8%, to $80.0 million from $109.3 million for the three months ended June 30, 2008 primarily due to (i) decreased worldwide sales volume and (ii) unfavorable currency effects on net sales of $12.4 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. The decrease was partially offset by favorable currency effects on pricing related to sales prices indexed in U.S. Dollars by certain non-U.S. operations of $1.5 million. Overall pricing levels in our clothing segment increased slightly less than 1% during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

In our roll covers segment, net sales for the three months ended June 30, 2009 decreased by $20.3 million or 33.2%, to $40.8 million from $61.1 million for the three months ended June 30, 2008. The decrease was primarily due to (i) decreased worldwide sales volumes and (ii) unfavorable currency effects on net sales of $4.6 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. Overall pricing levels in our roll covers segment increased by approximately 1% during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

Table of Contents

*Cost of Products Sold.* Cost of products sold for the three months ended June 30, 2009 decreased by $26.4 million, or 26.0%, to $75.2 million from $101.6 million for the three months ended June 30, 2008.

In our clothing segment, cost of products sold decreased by $16.0 million, or 25.0%, to $48.1 million for the three months ended June 30, 2009 from $64.1 million for the three months ended June 30, 2008 primarily due to (i) lower sales volumes during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008, (ii) favorable currency effects of $7.3 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes and (iii) the $1.1 million impact of a lower cost structure, resulting from our cost reduction programs, during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

In our roll covers segment, cost of products sold decreased by $10.4 million, or 27.7%, to $27.1 million for the three months ended June 30, 2009 from $37.5 million for the three months ended June 30, 2008 primarily due to (i) lower sales volumes during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008, (ii) favorable currency effects of $3.0 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes and (iii) the $1.2 million impact of a lower cost structure, resulting from our cost reduction programs, during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

*Selling Expenses.* For the three months ended June 30, 2009, selling expenses decreased by $5.7 million, or 26.1%, to $16.1 million from $21.8 million for the three months ended June 30, 2008. The decrease was primarily due to the impact of (i) a reduction in salaried sales positions, commissions and travel expenses, (ii) favorable currency effects of $2.3 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008 and (iii) the $0.7 million impact of a lower cost structure, resulting from our cost reduction programs, during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

*General and Administrative Expenses.* For the three months ended June 30, 2009, general and administrative expenses decreased by $16.9 million, or 72.2%, to $6.5 million from $23.4 million for the three months ended June 30, 2008. The decrease was primarily due to (i) a decrease in consulting, legal and bank fees of $5.2 million for the three months ended June 30, 2009 as compared with the three months ended June 30, 2008, relating to the amendment of our senior credit facility on May 30, 2008, (ii) a decrease in environmental expense of $3.4 million as a result of a Phase II assessment during the second quarter of 2009 that indicated that remediation costs in Australia would be significantly less than originally estimated, (iii) a decrease in litigation accruals of $2.3 million for Brazilian labor matters and other legal matters, (iv) favorable currency translation effects of $1.9 million, (v) decreased provisions for bad debts of approximately $1.4 million and (vi) decreased salaries, travel and other costs as a result of cost reduction efforts during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

*Restructuring and Impairments Expenses.* For the three months ended June 30, 2009, restructuring and impairments expenses decreased by $1.7 million, or 63.0%, to $1.0 million from $2.7 million for the three months ended June 30, 2008. Restructuring expenses result from our long-term strategy to reduce production costs and improve long-term competitiveness as described above under "Cost Reduction Programs" by closing and/or transferring production from certain of our manufacturing facilities and through headcount reductions. For the three months ended June 30, 2009, restructuring expenses consisted almost entirely of severance costs.

*Research and Development Expenses.* For the three months ended June 30, 2009, research and development expenses decreased by $0.5 million, or 15.6%, to $2.7 million from $3.2 million for the three months ended June 30, 2008 primarily due to lower salary and supply costs and to favorable currency effects during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

36

**Table of Contents**

*Interest Expense, Net.* Net interest expense for the three months ended June 30, 2009 increased by $14.8 million to $15.6 million from $0.8 million for the three months ended June 30, 2008. The increase is primarily attributable to (i) the $13.7 million credit to interest expense in 2008 in connection with the change in the fair value of our interest rate swaps due to the loss of hedge accounting for the first six months of 2008 and (ii) increased interest rates during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008 resulting from the amendment of our senior credit facility on May 30, 2008.

*Foreign Exchange Gain (Loss).* For the three months ended June 30, 2009 and 2008, we had a foreign exchange gain of $0.6 million and a foreign exchange loss of $0.9 million, respectively. Foreign exchange gains and losses were primarily the result of hedging and intercompany activities.

*Provision for Income Taxes.* For the three months ended June 30, 2009 and 2008, the provision for income taxes was $2.7 million and $1.9 million, respectively. The effective tax rate increased for the second quarter of 2009 as compared with the second quarter of 2008 principally due to (i) minimal tax provision being recognized on the increase in income before income taxes in 2008 resulting from the $13.7 million increase in the fair value of the Company's interest rate swaps in 2008 which occurred principally in subsidiaries with valuation allowances and (ii) to the impact of losses incurred in certain of the Company's U.S. and foreign subsidiaries with previously established valuation allowances in relation to the level of profitability in tax-paying subsidiaries.

**Six Months Ended June 30, 2009 Compared to the Six Months Ended June 30, 2008.**

*Net Sales.* Net sales for the six months ended June 30, 2009 decreased by $92.1 million, or 28.0%, to $237.3 million from $329.4 million for the six months ended June 30, 2008. For the six months ended June 30, 2009, 66% of our net sales were in our clothing segment and 34% were in our roll covers segment.

In our clothing segment, net sales for the six months ended June 30, 2009 decreased by $55.1 million, or 25.9%, to $157.8 million from $212.9 million for the six months ended June 30, 2008 primarily due to (i) decreased sales volume, primarily in Europe and North America and (ii) unfavorable currency effects on net sales of $26.0 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. The decrease was partially offset by favorable currency effects on pricing related to sales prices indexed in U.S. Dollars by certain non-U.S. operations of $6.3 million. Overall pricing levels in our clothing segment remained unchanged during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008.

In our roll covers segment, net sales for the six months ended June 30, 2009 decreased by $37.0 million, or 31.8%, to $79.5 million from $116.5 million for the six months ended June 30, 2008. The decrease was primarily due to (i) decreased worldwide sales volumes and (ii) unfavorable currency effects on net sales of $9.3 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. Overall pricing levels in our roll covers segment increased by approximately 1% during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008.

*Cost of Products Sold.* Cost of products sold for the six months ended June 30, 2009 decreased by $49.9 million, or 25.3%, to $147.4 million from $197.3 million for the six months ended June 30, 2008.

In our clothing segment, cost of products sold decreased by $31.6 million, or 25.0%, to $94.9 million for the six months ended June 30, 2009 from $126.5 million for the six months ended June 30, 2008 primarily due to (i) lower sales volumes during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008, (ii) favorable currency effects of $15.5 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008 and (iii) the $1.2 million impact of a lower cost structure, resulting from our cost reduction programs, during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008.

In our roll covers segment, cost of products sold decreased by $18.3 million, or 25.8%, to $52.5 million for the six months ended June 30, 2009 from $70.8 million for the six months ended June 30, 2008. The decrease in cost of products sold was primarily due to (i) lower worldwide sales volumes during the six months ended June 30, 2009, (ii) favorable currency effects of $5.8 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes during

Table of Contents

the six months ended June 30, 2009 as compared with the six months ended June 30, 2008 and (iii) the $1.2 million impact of a lower cost structure, resulting from our cost reduction programs, during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008.

*Selling Expenses.* For the six months ended June 30, 2009, selling expenses decreased by $9.7 million, or 22.9%, to $32.6 million from $42.3 million for the six months ended June 30, 2008. The decrease was primarily due to (i) the impact of a reduction in salaried sales positions, commissions and travel expenses, (ii) favorable currency effects of $4.8 million during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008 and (iii) the $0.7 million impact of a lower cost structure, resulting from our cost reduction programs, during the three months ended June 30, 2009 as compared with the three months ended June 30, 2008.

*General and Administrative Expenses.* For the six months ended June 30, 2009, general and administrative expenses decreased by $22.4 million, or 53.2%, to $19.7 million from $42.1 million for the six months ended June 30, 2008. The decrease was primarily due to (i) a decrease in consulting, legal and bank fees of $5.2 million for the six months ended June 30, 2009 as compared with the six months ended June 30, 2008, which include fees relating to the amendment of our senior credit facility on May 30, 2008, (ii) a decrease in environmental expense of $3.4 million as a result of a Phase II assessment during the second quarter of 2009 that indicated that remediation costs in Australia would be significantly less than originally estimated, (iii) a decrease in litigation accruals of $2.3 million for Brazilian labor matters and other legal matters, (iv) a decrease in management incentive bonus and stock-based compensation expense of $1.1 million, (v) favorable currency translation effects of $3.9 million, (vi) decreased provisions for bad debts of approximately $3.1 million and (vii) decreased salaries, travel and other costs as a result of cost reduction efforts during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008.

*Restructuring Expenses.* For the six months ended June 30, 2009, restructuring expenses decreased by $2.1 million, or 65.6%, to $1.1 million from $3.2 million for the six months ended June 30, 2008. Restructuring expenses result from our long-term strategy to reduce costs and improve long-term competitiveness as described above under "Cost Reduction Programs" by closing and/or transferring production from certain of our manufacturing facilities and through headcount reductions. For the six months ended June 30, 2009, restructuring expenses consisted of severance costs and facility costs of $2.1 million and $0.2 million, respectively. These costs were offset by the $1.2 million gain on the sale of our Swedish roll covers facility on March 31, 2009.

*Research and Development Expenses.* For the six months ended June 30, 2009, research and development expenses decreased by $0.8 million, or 12.9%, to $5.4 million from $6.2 million for the six months ended June 30, 2008 primarily to lower material and supply costs and to favorable currency effects during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008.

*Interest Expense, Net.* Net interest expense for the six months ended June 30, 2009 increased by $5.6 million, or 21.6%, to $31.5 million from $25.9 million for the six months ended June 30, 2008. The increase is primarily attributable to increased interest rates during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008 resulting from the amendment of our senior credit facility on May 30, 2008. The increase was partially offset by (i) the $1.5 million credit to interest expense in 2008 in connection with the change in the fair value of our interest rate swaps due to the loss of hedge accounting for the first six months of 2008 and (ii) favorable currency effects of $1.9 million.

*Foreign Exchange Gain (Loss).* For the six months ended June 30, 2009, we had an unrealized foreign exchange loss of $0.8 million compared to a gain of $2.6 million for the six months ended June 30, 2008. The gain in 2008 was primarily attributable to mark-to-market gains on fair value hedges, including gains on hedges for which the underlying foreign exchange exposure on certain intercompany debt no longer existed in the first quarter of 2008, and gains on hedges on future purchases of equipment. Foreign exchange gains and losses during the first half of 2009 were primarily the result of hedging and intercompany activities.

*Provision for Income Taxes.* For the six months ended June 30, 2009 and 2008, the provision for income taxes was $6.6 million and $5.6 million, respectively. The increase in tax was primarily due to the establishment of a valuation allowance in Canada of $2.9 million in the first quarter of 2009 and to the impact of losses incurred in certain of our U.S. and foreign subsidiaries with previously established valuation allowances in relation to the level of profitability in tax-paying subsidiaries.

38

**Table of Contents**

## LIQUIDITY AND CAPITAL RESOURCES

Our operations are highly dependent upon the paper production industry and the degree to which the paper industry is affected by global economic conditions and the availability of credit. Demand for our products could continue to decline if paper manufacturers are unable to obtain required financing or if the economic slowdown causes additional mill closures or continued inventory build-up. In addition, the global economic crisis and the ensuing lack of credit availability may affect our customers' ability to pay their debts which could have a negative impact on our Company. These factors would impact our liquidity and our ability to satisfy the covenant requirements of our credit facility.

As of June 30, 2009, the Company was in compliance with all of the covenants under its senior credit facility. Our ability to satisfy the covenants required by our credit facility is contingent on our ability to achieve our financial forecasts. These forecasts are based on certain assumptions regarding demand for paper products, the level of paper production and inventories, the number of mills producing paper and the financial health and access to capital of the paper producers. Absent a significant recovery in revenue resulting from an economic revival in the paper industry, we anticipate that we will not be in compliance with certain financial covenants for the period ending September 30, 2009 and intend to seek an amendment to our senior credit facility agreement with the lenders prior to the date when an event of default would occur due to our failure to demonstrate compliance with certain financial covenants for the period ending September 30, 2009. We have begun work toward this amendment, initiating contact with our lenders, although no assurances can be given that we will successfully obtain the lenders' consent to amend the credit facility on this timetable, or at all, or amend covenants in a manner sufficient to adequately reduce the risk of default. We have created a steering committee of the Board of Directors to lead this activity and have retained AlixPartners, LLC as our financial advisor to assist in this process. Failing to satisfy financial covenants under the senior credit facility would constitute an event of default, upon which the lenders could terminate the revolving credit facility and accelerate the repayment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable. Any such acceleration of our obligations would likely cause other lenders and contractual counterparties, including counterparties to our interest rate swap agreements and other hedge agreements to terminate and/or to accelerate our obligations under other financing and credit instruments and agreements. Should the lenders and/or other counterparties demand immediate repayment of all of our obligations, we expect that we would be unable to pay such obligations. As of June 30, 2009, the amount of cash that would be required to settle all outstanding hedging obligations is $21.4 million. In light of this risk, and as part of our ongoing focus on enterprise risk management, we are continuing to evaluate market conditions and plan for contingencies, including, without limitation, exploring strategic initiatives to reduce our debt, which may include, among other things, an issuance of equity or other securities to repay a portion of our outstanding debt. There can be no assurance that we will be able to complete any such strategic initiatives on satisfactory terms, and any such strategic initiatives involving issuances of equity are likely to be highly dilutive to our existing stockholders.

Our principal liquidity requirements are for debt service, working capital and capital expenditures. We plan to use cash generated by operations as our primary source of liquidity as well as borrowings, if necessary, under the revolving portion of the credit facility and the utilization of certain bank overdraft facilities to meet normal operating requirements for at least the next twelve months. We may have difficulty making additional borrowings under our revolver in light of the anticipated non-compliance with certain financial covenants in our senior credit facility for the period ending September 30, 2009. If expected revenue and profits are not realized in 2009, we may not be able to generate enough cash to meet our obligations. In addition, should the current conditions in the global paper market continue, we may not have sufficient cash to fund our operations or meet our other liquidity requirements.

Net cash used in operating activities was $7.5 million for the six months ended June 30, 2009 and net cash provided by operating activities was $41.0 million for the six months ended June 30, 2008. The $48.5 million decrease is principally attributable to a decrease in the volume of business as a result of the global economic crisis and an increase in working capital during the first half of 2009 as compared with the first half of 2008 principally due to the level of payment of payables and accruals since December 31, 2008. We typically defer payments to certain vendors at the end of each quarter, which results in an increased cash position at the

Table of Contents

end of the quarter and increased net cash from operating activities for the period then ended. Such deferrals were significant at December 31, 2008 and the absence of the extent of such deferrals at the end of June 30, 2009 contributed to the increase in working capital for the six months ended June 30, 2009. In an effort to improve working capital, in the second quarter of 2009, the Company initiated a project to accelerate accounts receivable collections and to sell excess inventories. As of June 30, 2009, the Company's efforts under this project contributed approximately $2.5 million in additional cash and increased Adjusted EBITDA by approximately $4 million.

Net cash used in investing activities was $6.0 million for the six months ended June 30, 2009 and $19.7 million for the six months ended June 30, 2008. The decrease of $13.7 million was primarily due to (i) a decrease in capital equipment spending of $9.8 million in the six months ended June 30, 2009 as compared with the six months ended June 30, 2008 and (ii) an increase in proceeds from disposals of property and equipment of $3.9 million in the six months ended June 30, 2009 as compared with the six months ended June 30, 2008, including $1.9 million from the sale of our Swedish roll covers facility on March 31, 2009 and $1.1 million from the sale of the Chief Executive Officer's former home in the second quarter of 2009, as provided in his employment agreement in connection with the Executive's relocation of his principal residence.

Net cash used in financing activities was $1.1 million for the six months ended June 30, 2009 and $21.7 million for the six months ended June 30, 2008. The decrease of $20.6 million was primarily the result of borrowings under our revolver of $28.0 million during the first quarter of 2009 and the decrease in other financing activities of $8.7 million in the six months ended June 30, 2009 as compared with the six months ended June 30, 2008 which consisted principally of expenses associated with the amendment of our credit facility on May 30, 2008, partially offset by higher debt payments of approximately $16.1 million during the six months ended June 30, 2009 as compared with the six months ended June 30, 2008. We made a mandatory principal repayment of $16.1 million in the first quarter of 2009 as compared with $9.4 million in the first quarter of 2008. The increase in the mandatory payment was due to the loan agreement requiring us to make such excess payments based on the prior year's Adjusted EBITDA, which was impacted during 2008 by gains of approximately $52 million related to the freezing of one of our U.S. pension plans, the termination of our U.S. retiree medical plan and the mark to market changes in the fair value of our interest rate swaps, partially offset by approximately $30 million related to increased restructuring expenses and increased noncash reserves. Because none of these events generated any cash but increased Adjusted EBITDA which increased the mandatory principal payment, the effect of these actions reduced our available cash.

As of June 30, 2009, there was a $581.4 million balance of term loans outstanding under our senior credit facility. During the first half of 2009, we made scheduled principal payments of $9.5 million and mandatory principal repayment of $18.7 million. In addition, as of June 30, 2009, we had an aggregate of $28.0 million outstanding under our current revolving lines of credit, including the revolving credit facility under our senior credit facility and lines of credit in various foreign countries that are used to facilitate local short-term operating needs and an aggregate of $21.8 million available for additional borrowings under these revolving lines of credit. We may have difficulty making additional borrowings under our revolver in light of the anticipated financial covenant non-compliance for the period ending September 30, 2009. Our liquidity is substantially affected by the covenant requirements of our credit agreement. See "Credit Facility" below. We had cash and cash equivalents of $20.4 million at June 30, 2009 compared to $34.7 million at December 31, 2008.

## CAPITAL EXPENDITURES

For the six months ended June 30, 2009, we had capital expenditures of $11.1 million consisting of growth capital expenditures of $6.0 million and maintenance capital expenditures of $5.1 million. Growth capital expenditures consist of items that are intended to increase the manufacturing, production and/or distribution capacity or efficiencies of our operations in conjunction with the execution of our business strategies. Maintenance capital expenditures are designed to sustain the current capacity or efficiency of our operations and include items relating to the renovation of existing manufacturing or service facilities, the purchase of machinery and equipment for safety and environmental needs and information technology. For the six months ended June 30, 2008, capital expenditures were $20.9 million, consisting of growth capital expenditures of $13.8 million and maintenance capital expenditures of $7.1 million.

40

Table of Contents

In the first quarter of 2008 we began an effort to reduce our planned capital expenditures. As part of this effort, we determined to delay the planned capital expenditures for the Vietnam facility and cancelled or rescheduled certain other previously planned capital expenditures. These cancellations did not result in any substantial penalties for us. In December 2008, we discontinued the construction of the Vietnam facility. While construction of the Vietnam facility has been discontinued, we continue to have contractual obligations with respect to certain equipment which was previously ordered for the facility. We are redeploying this equipment to other locations. Due to our assessment of the impact of the global economic crisis and the potential effect on our customers and our industry, we are currently evaluating additional capital expenditures reductions and cost reduction actions to improve long-term operating efficiencies and to better match our production with demand. We analyze our planned capital expenditures based on investment opportunities available to us and our financial and operating performance, and accordingly, actual capital expenditures may be more or less than these amounts. We target capital expenditures for 2009 to be approximately $27 million, and that capital expenditure levels in 2010 will be comparable to those in 2009.

See "—Credit Facility" below for a description on limitations on capital expenditures imposed by our credit facility.

## CREDIT FACILITY

Upon the completion of the initial public offering of our common stock on May 19, 2005, we and certain of our subsidiaries entered into a senior secured credit facility. The credit facility was amended four times: on February 8, 2006, December 22, 2006, May 2, 2007 and April 8, 2008. The credit facility was amended and restated on May 30, 2008.

The description of the credit facility below describes the facility as amended and restated.

Our credit facility provides for a $50 million senior secured revolving credit facility and for term loans that had a total principal amount of $650 million as of May 2005. Because the term loans include portions denominated in Euros and Canadian dollars, in addition to a U.S. Dollar denominated portion, the aggregate outstanding principal on our term loans is affected by our currency exchange rates as well as principal repayments. The revolving credit facility matures on November 19, 2011, and the term loans mature on May 19, 2012. The credit facility is secured by substantially all of our assets and the assets of most of our subsidiaries, subject to legal and tax considerations and requirements.

Borrowings under the revolving credit facility and the term loans bear interest at the sum of, as applicable, LIBOR, the Euribor rate or CDOR plus, in each case, the applicable margin. The applicable margin was set at 5.50% through December 31, 2008. Beginning January 1, 2009, the applicable margin depends upon our credit rating level: it will be 2.75% if our credit rating is Ba3 or higher by Moody's and BB- or higher by S&P, 3.75% if our credit rating is B1 by Moody's or B+ by S&P, 4.25% if our credit rating is B3 or higher but lower than B1 by Moody's and 'B-' or higher but lower than 'B+' by S&P, and 5.50% if our credit rating is lower than B3 by Moody's or lower than B- by S&P. In order to qualify at each level the rating must be with a stable outlook. Our current credit rating is Caa1 by Moody's and 'CCC+' by S&P. On September 29, 2008, Standard & Poor's Ratings Services raised its ratings on the Company, including raising the long-term corporate credit rating, from 'CCC+' to 'B-' but on July 29, 2009 lowered the rating to 'CCC+' due to our anticipated financial covenant non-compliance for the period ending September 30, 2009. Our current applicable margin is 5.50%.

On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. The interest rate swap arrangements effectively fixed the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. These interest rate swaps initially qualified for hedge accounting under SFAS No. 133. As a result of the financial covenant non-compliance for the period ended March 31, 2008 as discussed in Note 6 of the Notes to Unaudited Condensed Consolidated Financial Statements included elsewhere in this Quarterly Report, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under SFAS No. 133 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12.2 million was recorded as a non-cash charge to interest expense in the first quarter of 2008 and a non-cash credit to interest expense of $13.7 million in the second quarter of 2008. Effective July 1, 2008, we were again able to

Table of Contents

assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. Such mark to market changes on these interest rate swaps are principally credited or charged to accumulated other comprehensive income (loss). The ineffective portion of these interest rate swaps of $0.8 million was charged to interest expense during the six months ended June 30, 2009. There can be no assurance that in future periods we will be able to assert that the hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting. The new interest rate swaps effectively fix the interest rate on approximately 84% of the term loan portion of our credit facility through December 31, 2010. As of June 30, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 6.32%.

The credit facility provides for scheduled quarterly principal payments of the term loans as set out below:

| Currency: | USD | Euro | CAD |
|---|---|---|---|
| 2009 | 2,458,174 | 1,392,040 | 584,489 |
| 2010 | 3,318,535 | 1,879,254 | 789,059 |
| 2011 | 4,055,987 | 2,296,865 | 964,406 |
| 2012 (first quarter only) | 4,916,348 | 2,784,080 | 1,168,976 |

The credit facility provides that for the purposes of computing debt, which is a part of the calculation of the leverage ratio, indebtedness which is payable in Canadian Dollars or Euros shall be converted into U.S. Dollars using the average exchange rate for the period of four consecutive fiscal quarters ended March 31, 2008. Accordingly, if the value of the U.S. Dollar increases relative to the Euro or the Canadian Dollar and our Adjusted EBITDA declines as a result of this currency effect, there would not be a corresponding decrease in the amount of our debt for purposes of the maximum leverage ratio covenant calculation.

The credit facility also requires us to make additional prepayments of the term loans under the following circumstances:

- with 100% of the net cash proceeds received by us from any sale, transfer or other disposition of any assets (excluding inventory and certain discontinued manufacturing facilities), subject to an exemption for the reinvestment of up to $3 million of such proceeds within a year of our receipt thereof in long-term productive assets of the general type used in our business;

- with 100% of the net cash proceeds received by us from any insurance recovery or condemnation events, subject to certain exceptions and reinvestment rights and exempting the first $2 million;

- with 75% of the net cash proceeds from the issuance of any common stock, subject to customary exceptions and exempting the first $100,000;

- with 100% of the net cash proceeds from the incurrence of any indebtedness by us (excluding indebtedness permitted under the credit facility, but including any subordinated indebtedness), subject to customary exceptions; and

- with 75% of our excess cash on an annual basis; that is, our Adjusted EBITDA minus consolidated interest expense, cash income tax expense, consolidated capital expenditures (subject to certain exceptions), consolidated restructuring costs, cash payments of withholding taxes from proceeds of the repurchase, redemption or retention of common stock and the aggregate amount of scheduled and voluntary payments made during the past fiscal year.

Prior to the effectiveness of the amendment and restatement of our credit facility, the percentage of our annual excess cash required to be prepaid was 40% for 2007, 27.5% for 2008 and 50% for each fiscal year thereafter. We made mandatory principal prepayments from excess cash of $18.7 million and $9.4 million in the first half of 2009 and 2008, respectively.

42

**Table of Contents**

Our credit facility requires that we observe and perform numerous affirmative and negative covenants, including certain financial covenants. The financial covenants per the amended credit facility are now as follows:

| **Minimum Interest Coverage Ratio:** | **Four Fiscal Quarters Ending** | **Ratio** |
|---|---|---|
| The ratio of four quarter Adjusted EBITDA to interest expense. | March 31, 2009 to March 31, 2010 | 2.00:1.00 |
| | June 30, 2010 to March 31, 2011 | 2.25:1.00 |
| | June 30, 2011 to December 31, 2011 | 2.50:1.00 |
| | March 31, 2012 | 2.75:1.00 |

| **Minimum Fixed Charge Coverage Ratio:** | **Four Fiscal Quarters Ending** | **Ratio** |
|---|---|---|
| The ratio of four quarter Adjusted EBITDA to fixed charges (interest expense, scheduled principal payments, and cash taxes). | June 30, 2009 to March 31, 2012 | 1.20:1.00 |

| **Maximum Leverage Ratio:** | **Four Fiscal Quarters Ending** | **Ratio** |
|---|---|---|
| The ratio of outstanding debt to four quarter Adjusted EBITDA. | June 30, 2009 and September 30, 2009 | 5.25:1.00 |
| | December 31, 2009 | 5.00:1.00 |
| | March 31, 2010 and June 30, 2010 | 4.75:1.00 |
| | September 30, 2010 | 4.50:1.00 |
| | December 31, 2010 and March 31, 2011 | 4.25:1.00 |
| | June 30, 2011 to March 31, 2012 | 4.00:1.00 |

For the four fiscal quarters ended June 30, 2009 our interest coverage ratio was 2.24:1, our fixed charge coverage ratio was 1.43:1 and our leverage ratio was 4.82:1.

Our credit facility defines consolidated capital expenditures for a particular fiscal year as all expenditures required under GAAP to be included in "purchase of property and equipment" or similar items. The credit facility limits the amount of our consolidated capital expenditures in any given fiscal year to an amount not exceeding $50 million for fiscal year 2008 and $35 million for each of fiscal years 2009, 2010 and 2011, exclusive of capital expenditures paid with net insurance and condemnation proceeds; provided that the maximum amount of consolidated capital expenditures permitted in each fiscal year shall be increased by 50% of the amount below the maximum not spent in the prior fiscal year (determined without reference to any carryover amount); and provided, further, that solely for fiscal year 2008, the maximum amount that may be carried forward to fiscal year 2009 shall equal 100% of the first $10 million of any permitted consolidated expenditures not expended in fiscal year 2008 plus 50% of any remaining expenditures not expended in fiscal year 2008.

Our credit facility also prohibits the payment of dividends on our common stock.

As of June 30, 2009, we were in compliance with all of the covenants under our senior credit facility. Our ability to satisfy the covenants required by our credit facility is contingent on our ability to achieve our financial forecasts. These forecasts are based on certain assumptions regarding demand for paper products, the level of paper production and inventories, the number of mills

**Table of Contents**

producing paper and the financial health and access to capital of the paper producers. Absent a significant recovery in revenue resulting from an economic revival in the paper industry, we anticipate that we will not be in compliance with certain financial covenants for the period ending September 30, 2009 and intend to seek an amendment to our senior credit facility agreement with the lenders prior to the date when an event of default would occur due to our failure to demonstrate compliance with certain financial covenants for the period ending September 30, 2009. We have begun work toward this amendment, initiating contact with our lenders, although no assurances can be given that we will successfully obtain the lenders' consent to amend the credit facility on this timetable, or at all, or amend covenants in a manner sufficient to adequately reduce the risk of default. We have created a steering committee of our Board of Directors to lead this activity and have retained AlixPartners, LLC as our financial advisor to assist in this process. Failing to satisfy financial covenants under the senior credit facility would constitute an event of default, upon which the lenders could terminate the revolving credit facility and accelerate the repayment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable. Any such acceleration of our obligations would likely cause other lenders and contractual counterparties, including counterparties to our interest rate swap agreements and other hedge agreements to terminate and/or to accelerate our obligations under other financing and credit instruments and agreements. Should the lenders and/or other counterparties demand immediate repayment of all of our obligations, we expect that we would not be able to pay such obligations. As of June 30, 2009, the amount of cash that would be required to settle all outstanding hedging obligations is $21.4 million. In light of this risk, and as part of our ongoing focus on enterprise risk management, we are continuing to evaluate market conditions and plan for contingencies, including, without limitation, exploring strategic initiatives to reduce our debt, which may include, among other things, an issuance of equity or other securities to repay a portion of our outstanding debt. There can be no assurance that we will be able to complete any such strategic initiatives on satisfactory terms, and any such strategic initiatives involving issuances of equity are likely to be highly dilutive to our existing stockholders.

We may have difficulty making additional borrowings under our revolver in light of the anticipated financial covenant non-compliance for the period ending September 30, 2009.

## CRITICAL ACCOUNTING POLICIES

The preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses. Actual results could differ from those estimates. We have formal accounting policies in place including those that address critical and complex accounting areas. Note 3 to the consolidated financial statements included elsewhere in this Quarterly Report identifies the significant accounting policies used in preparation of the consolidated financial statements. The most significant areas involving management judgments and estimates are described below.

*Derivatives and Hedging.* On January 1, 2009, we adopted Statement of Financial Accounting Standards No. 161, *Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133* ("SFAS No. 161"). SFAS No, 161 amends and expands the disclosure requirements of FASB Statement No. 133 ("SFAS No. 133") with the intent to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for under SFAS No. 133 and its related interpretations, and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS No. 161 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative instruments.

As required by SFAS No. 133, we record all derivatives on the balance sheet at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether we have elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to changes in the fair value of an asset, liability, or firm commitment attributable to a particular risk are considered fair value hedges. Derivatives designated and qualifying as a hedge of the

Table of Contents

exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Derivatives may also be designated as hedges of the foreign currency exposure of a net investment in a foreign operation. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the recognition of the changes in the fair value of the hedged asset or liability that are attributable to the hedged risk in a fair value hedge or the earnings effect of the hedged forecasted transactions in a cash flow hedge. We may enter into derivative contracts that are intended to economically hedge certain of its risk, even though hedge accounting does not apply or if we elect not to apply hedge accounting under SFAS No. 133.

There are two types of hedges into which we enter: hedges of fair value exposure and hedges of cash flow exposure. Hedges of fair value exposure are entered into in order to hedge the fair value of a recognized asset or liability, or a firm commitment. Hedges of cash flow exposure are entered into in order to hedge a forecasted transaction or the variability of cash flows to be paid related to a recognized liability. Changes in derivative fair values are recognized in earnings as offsets to the changes in fair value of the related hedged assets and liabilities. Changes in the derivative fair values that are designated as cash flow hedges which meet the criteria for hedge accounting are recorded in other comprehensive income (loss). On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. The interest rate swap arrangements effectively fixed the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. These interest rate swaps initially qualified for hedge accounting under SFAS No. 133. As a result of the financial covenant non-compliance for the period ended March 31, 2008 as discussed in Note 6 of the Notes to Unaudited Condensed Consolidated Financial Statements included elsewhere in this Quarterly Report, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under SFAS No. 133 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12.2 million was recorded as a non-cash charge to interest expense in the first quarter of 2008 and a non-cash credit to interest expense of $13.7 million in the second quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. Such mark to market changes on these interest rate swaps are principally credited or charged to accumulated other comprehensive income (loss). The ineffective portion of these interest rate swaps of $0.8 million was charged to interest expense during the six months ended June 30, 2009.

These interest rate swaps effectively fix the interest rate on approximately 84% of the term loan portion of our credit facility through December 31, 2010. As of June 30, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 6.32%. There can be no assurance that in future periods we will be able to assert that the hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting. Specifically, if left uncured, our anticipated financial covenant non-compliance with certain covenants in our senior credit facility for the period ending September 30, 2009 would constitute an event of default, upon which the lenders could terminate the revolving credit facility and accelerate the repayment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable. If the lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, hedge accounting under SFAS No. 133 would no longer be applicable for these interest rate swaps. Accordingly, the cumulative mark to market changes in their fair value that will have been recorded in accumulated other comprehensive income (loss) through September 30, 2009 in addition to the credit valuation adjustments recorded under SFAS No. 157 , *Fair Value Measurements* ("SFAS No. 157") would be charged to interest expense during the third quarter of 2009. As of June 30, 2009 this amount was $18.1 million. Additionally, mark to market changes subsequent to September 30, 2009 would be recorded as charges or credits to interest expense prospectively.

Effective January 1, 2008, we adopted SFAS No. 157 for measuring our derivative assets and liabilities. We have classified our interest rate swaps in Level 2 of the SFAS No. 157 fair value hierarchy, as the significant inputs to the overall valuations are based on market-observable data or information derived from or corroborated by market-observable data, including market-based inputs to models, model calibration to market-clearing transactions, broker or dealer quotations, or alternative pricing sources with reasonable levels of price transparency. Where models are used, the selection of a particular model to value a derivative depends upon the

45

Table of Contents

contractual terms of, and specific risks inherent in, the instrument as well as the availability of pricing information in the market. We use similar models to value similar instruments. Valuation models require a variety of inputs, including contractual terms, market prices, yield curves, credit curves, measures of volatility, and correlations of such inputs. For our derivatives, all of which trade in liquid markets, model inputs can generally be verified and model selection does not involve significant management judgment.

To comply with the provisions of SFAS No. 157, we incorporated credit valuation adjustments to appropriately reflect both our own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements of our derivatives. The credit valuation adjustments are calculated by determining the total expected exposure of the derivatives (which incorporates both the current and potential future exposure) and then applying each counterparty's credit spread to the applicable exposure. For derivatives with two-way exposure, such as interest rate swaps, the counterparty's credit spread is applied to our exposure to the counterparty, and our own credit spread is applied to the counterparty's exposure to us, and the net credit valuation adjustment is reflected in our derivative valuations. The total expected exposure of a derivative is derived using market-observable inputs, such as yield curves and volatilities. The inputs utilized for our own credit spread are based on implied spreads from its publicly-traded debt. For counterparties with publicly available credit information, the credit spreads over LIBOR used in the calculations represent implied credit default swap spreads obtained from a third party credit data provider. In adjusting the fair value of its derivative contracts for the effect of nonperformance risk, we have considered the impact of netting and any applicable credit enhancements, such as collateral postings, thresholds, mutual puts, and guarantees. Additionally, we actively monitor counterparty credit ratings for any significant changes.

Although we have determined that the majority of the inputs used to value our derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with our derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by us and our counterparties. However, as of June 30, 2009, we have assessed the net significance of the impact of the credit valuation adjustments on the overall valuation of our derivative positions and have determined that the credit valuation adjustments reduced the settlement values of our derivative liabilities by $3.7 million. Various factors impact changes in the credit are not significant to the overall valuation adjustments over time, including changes in the credit spreads of the parties to the contracts, as well as changes in market rates and volatilities, which affect the total expected exposure of the derivative instruments.

When appropriate, valuations are also adjusted for various factors such as liquidity and bid/offer spreads, which factors were deemed immaterial by us as of June 30, 2009. As a result, we have determined that our derivative valuations in their entirety are classified in Level 2 of the fair value hierarchy. We do not have any fair value measurements using significant unobservable inputs (Level 3) as of June 30, 2009.

Effective January 1, 2008, we partially adopted SFAS No. 157. Financial Accounting Standards Board (FASB) Staff Position SFAS No. 157-2, *Effective Date of FASB Statement No. 157*, permits us to defer the recognition and measurement of its nonfinancial assets and nonfinancial liabilities until January 1, 2009. At June 30, 2009, the Company did not have any nonfinancial assets or nonfinancial liabilities that are recognized or disclosed at fair value.

*Goodwill.* We account for acquired goodwill and intangible assets in accordance with SFAS No. 141, *Business Combinations* ("SFAS No. 141"). Purchase accounting required by SFAS No. 141 involves judgment with respect to the valuation of the acquired assets and liabilities in order to determine the amount of goodwill. We believe that the estimates that we have used to record prior acquisitions are reasonable and in accordance with SFAS No. 141.

*Impairment of Goodwill and Indefinite-Lived Intangible Assets.* We account for acquired goodwill and goodwill impairment in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"). This pronouncement requires considerable judgment in the valuation of acquired goodwill and the ongoing evaluation of goodwill impairment. SFAS No. 142 requires that goodwill and intangible assets that have indefinite lives not be amortized but, instead, must be tested at least annually for impairment or whenever events or business conditions warrant.

Table of Contents

We perform an annual test for goodwill impairment as of December 31st at the business segment level. We have two business segments: clothing and roll covers. When our business was acquired in 1999, more than 80% of the goodwill was assigned to the roll covers segment based on relative fair values at the date of acquisition.

Goodwill impairment testing is a two-step process. Step 1 involves comparing the fair value of the Company's reporting unit to its carrying amount. If the fair value of the reporting unit is greater than its carrying amount, there is no impairment. If the reporting unit carrying amount is greater than the fair value then the second step must be completed to measure the amount of impairment, if any. Step 2 calculates the implied fair value of goodwill by deducting the fair value of all tangible and intangible assets, excluding goodwill, of the reporting unit from the fair value of the reporting unit as determined in Step 1. The implied fair value of goodwill determined in this step is compared to the carrying value of goodwill. If the implied fair value of goodwill is less than the carrying value of goodwill, an impairment loss is recognized equal to the difference.

For the purpose of performing the annual impairment test, we allocate all shared assets and liabilities to the business segments based upon the percentage of each segment's revenue to total revenue. Shared expenses are allocated to each segment to the extent necessary to allow them to operate as independent businesses. Fair value was determined by using a weighted combination of both a market multiple approach and an income approach. The market multiple approach utilizes our proprietary information to determine measures that are used to value our business segments. The income approach is a present value technique used to measure the fair value of future cash flows produced by each business segment. Determining the fair value of a business segment or an indefinite-lived purchased intangible asset is judgmental in nature and requires the use of significant estimates and assumptions, including revenue growth rates and operating margins, discount rates and future market conditions, among others. We believe that the assumptions and rates used in our annual impairment test under SFAS No. 142 are reasonable, but inherently uncertain.

Based on these assessments performed as of December 31, 2008, we determined that no impairment of goodwill exists. The excess of the fair value over the carrying value for our clothing and roll covers segment as of December 31, 2008, the annual test date, was approximately $134 million and $30 million, respectively. In order to evaluate the sensitivity of the analysis performed, we applied a hypothetical 5% decrease to the fair value of these business segments, which resulted in a fair value in excess of carrying value of approximately $110 million and $13 million for the clothing segment and roll covers segment, respectively.

As of June 30, 2009, the Company evaluated events and circumstances which may have indicated an impairment of goodwill and other intangible assets and determined that no impairment exists.

*Contingencies.* We are subject to various claims and contingencies associated with lawsuits, insurance, tax, environmental and other issues arising out of the normal course of business. Our consolidated financial statements reflect the treatment of claims and contingencies based on management's view of the expected outcome. We consult with legal counsel on those issues related to litigation with respect to matters in the ordinary course of business. If the likelihood of an adverse outcome is probable and the amount is estimable, we accrue a liability in accordance with SFAS No. 5, *Accounting for Contingencies.* While we believe that the current level of reserves is adequate, the adequacy of these reserves may change in the future due to new developments in particular matters. During the third quarter of 2008, while evaluating one of our foreign facilities, we discovered the possibility of contamination at the facility. Subsequently we had a preliminary evaluation performed, which confirmed the existence of contamination and estimated preliminary costs to clean up the facility. Based upon this evaluation, we recorded $4.1 million in 2008 as our best estimate of the remediation costs we expected to incur. A Phase II assessment of the ground water contamination performed for us during the second quarter of 2009 indicated the costs to remediate the contamination would be significantly less than originally estimated and accordingly, we reduced the accrual by $3.4 million during the second quarter of 2009 based on this assessment.

*Income Taxes.* We utilize the asset and liability method for accounting for income taxes in accordance with SFAS No. 109, *Accounting for Income Taxes.* Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities. Deferred tax assets and liabilities are measured using the enacted tax rates and statutes that will be in effect when the differences are expected to reverse.

**Table of Contents**

We reduce our deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Relevant evidence, both positive and negative, is considered in determining the need for a valuation allowance. Information evaluated includes our financial position and results of operations for the current and preceding years as well as an evaluation of currently available information about future years. In light of our accumulated loss position in certain tax jurisdictions, and the uncertainty of profitability in future periods, we recorded valuation allowances for deferred tax assets primarily related to net operating loss carryforwards in the United States, United Kingdom, Germany, Sweden, Australia and Canada.

In addition, we operate within multiple taxing jurisdictions and could be subject to audit in these jurisdictions. These audits can involve complex issues and rely on estimates and assumptions. These audits may require an extended period of time to resolve and may cover multiple years. Although we believe that the estimates and assumptions are reasonable, the final determination of tax audits and any related litigation could be different than that which is reflected in historical income tax provisions and recorded assets and liabilities. There are currently no U.S. Federal or state audits or examinations underway. In May 2009, we concluded an audit relating to our German subsidiaries for tax years 1999 through 2002. No further adjustments not previously recognized were required in the quarter ended June 30, 2009 as a result of this settlement. The Canadian Federal tax authorities contacted us in October of 2008 and have initiated an audit of our Canadian companies. The audit is still in the initial information gathering stages and no issues or assessments have been raised. We believe that there are no other jurisdictions in which the outcome of unresolved issues or claims is likely to be material to our results of operations, financial position or cash flows. We further believe that we have made adequate provision for all income tax uncertainties.

In June 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FAS No. 109. FIN 48 prescribes a two-step process to determine the amount of tax benefit to be recognized. First, the tax position must be evaluated to determine the likelihood that it will be sustained upon external examination. If the tax position is deemed "more-likely-than-not" to be sustained, the tax position is then assessed to determine the amount of benefit to recognize in the financial statements. The amount of the benefit that may be recognized is the largest amount that has a greater than 50% likelihood of being realized upon ultimate settlement.

## NON-GAAP LIQUIDITY MEASURES

We use EBITDA and Adjusted EBITDA as supplementary non-GAAP liquidity measures to assist us in evaluating our liquidity and financial performance, specifically our ability to service indebtedness and to fund ongoing capital expenditures. Our credit facility includes covenants based on Adjusted EBITDA. If our Adjusted EBITDA declines below certain levels, we will violate the covenants resulting in a default condition under the credit facility or be required to prepay the credit facility. Neither EBITDA nor Adjusted EBITDA should be considered in isolation or as a substitute for net cash provided by operating activities (as determined in accordance with GAAP) or income (loss) from operations (as determined in accordance with GAAP).

EBITDA is defined as net income (loss) before interest expense, income tax provision (benefit) and depreciation and amortization. Adjusted EBITDA is defined in our credit facility and is EBITDA plus (i) restructuring or related impairment costs (not to exceed $5.0 million in the aggregate for 2008 and in each year thereafter, (ii) reserves for inventory in connection with plant closings, (iii) stock-based and other non-cash compensation charges, charges from forgiveness of loans made to employees in connection with the purchase of equity and any tax gross-up payments made in respect of such loan forgiveness in connection with or prior to the completion of our initial public offering, (iv) certain transaction costs, including costs incurred in connection with our initial public offering and the related debt financing, the legal reorganization of Brazilian subsidiaries and the preparation and closing of the existing credit agreement, (v) consolidated amendment/termination costs, which consist of costs incurred in connection with the consummation of the fourth and fifth amendments to the senior credit facility and the termination of the employment contract of the former Chief Executive Officer and transition to the new Chief Executive Officer, not to exceed $8.0 million in the aggregate, (vi) costs associated with payments to management prior to the completion of our initial public offering in connection with the termination of incentive plans, (vii) non-cash charges resulting from the application of purchase accounting, (viii) non-cash expenses

Table of Contents

resulting from the granting of stock options, restricted stock or restricted stock unit awards under equity compensation programs solely with respect to our common stock and (ix) expenses incurred not exceeding $7 million per year as a result of the repurchase, redemption or retention of our own common stock earned under equity compensation programs solely in order to make withholding tax payments. For certain historical periods, the amended credit agreement specified Adjusted EBITDA is $35,610, $36,514 and $38,431 for the quarters ended March 31, 2008, December 31, 2007 and September 30, 2007, respectively. For the quarter ended March 31, 2008, the amount reflects an increase of $800 over the originally disclosed amount in the first quarter of 2008, related to the transition to the new Chief Executive Officer. Adjusted EBITDA, as defined in the credit facility and calculated below, may not be comparable to similarly titled measurements used by other companies.

The following table provides a reconciliation from net income (loss), which is the most directly comparable GAAP financial measure, to EBITDA and Adjusted EBITDA.

| | Three Months Ended June 30, | |
| --- | --- | --- |
| (in thousands) | 2009 | 2008 |
| Net income | $ 1,601 | $ 14,118 |
| Income tax provision | 2,697 | 1,911 |
| Interest expense, net | 15,570 | 766 |
| Depreciation and amortization | 10,130 | 11,956 |
| EBITDA | 29,998 | 28,751 |
| Amendment/termination costs (D) | — | 5,198 |
| Change in fair value of interest rate swaps (C) | (397) | 13,704 |
| Restructuring expenses | 1,026 | 2,651 |
| Inventory write-offs under restructuring programs | 142 | — |
| Non-cash compensation and related expenses | 885 | (130) |
| Adjusted EBITDA | $31,654 | $50,174 |

| | Six Months Ended June 30, | |
| --- | --- | --- |
| (in thousands) | 2009 | 2008 |
| Net income (loss) | $ (7,847) | $ 9,409 |
| Income tax provision | 6,589 | 5,550 |
| Interest expense, net | 31,527 | 25,987 |
| Depreciation and amortization | 19,918 | 23,959 |
| EBITDA | 50,187 | 64,905 |
| Unrealized foreign exchange gain on indebtedness, net (B) | — | (1,985) |
| Amendment/termination costs (D) | — | 5,998 |
| Change in fair value of interest rate swaps (C) | (795) | 13,704 |
| Change in fair value of other derivatives | — | (2,126) |
| Restructuring expenses | 1,140 | 3,183 |
| Inventory write-offs under restructuring programs | 245 | — |
| Growth program costs (A) | — | 1,764 |
| Non-cash compensation and related expenses | 1,046 | 341 |
| Adjusted EBITDA | $51,823 | $85,784 |

(A)  In accordance with the definition of Adjusted EBITDA in our credit facility, as amended on May 30, 2008, growth program costs are not added back to Adjusted EBITDA for periods beginning after the quarter ended March 31, 2008. Growth programs costs for the three months ended March 31, 2008 included expenses incurred for our lean manufacturing initiatives, expansion into Vietnam and other growth programs.

(B)  In accordance with the definition of Adjusted EBITDA in our credit facility, as amended on May 30, 2008, unrealized foreign exchange gains and losses on indebtedness are not added back to Adjusted EBITDA for periods beginning after the quarter ended March 31, 2008.

Table of Contents

(C)   In accordance with the definition of Adjusted EBITDA in our credit facility agreement, as amended on May 30, 2008, interest expense added back to calculate Adjusted EBITDA excludes, for periods beginning after the quarter ended March 31, 2008, the effect of any non-cash gains and losses resulting from the marking to market of hedging obligations that has been charged to interest expense. Had this amended definition been in place for all periods presented, Adjusted EBITDA would have been $12.2 million lower for the three and six months ended June 30, 2008, respectively.

(D)   For the three and six months ended June 30, 2008, amendment/termination costs include $5,198 of costs incurred in connection with the consummation of the fourth and fifth amendments to the credit facility; and for the six months ended June 30, 2008, these costs include an $800 increase to Adjusted EBITDA for the first quarter of 2008 in accordance with the agreement with our lenders.

## ITEM 3.       QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

*Foreign Currency Hedging.* We have foreign currency cash flow and earnings exposure with respect to specific sale and intercompany debt transactions denominated in currencies other than the functional currency of the unit incurring the costs associated with such transactions. To mitigate the risks related to these exposures, we utilize forward currency contracts in certain circumstances, to lock in exchange rates with the objective that the gain or loss on the forward contracts will approximate the loss or gain on the transaction or transactions being hedged. We determine whether to enter into hedging arrangements based upon the size of the underlying transaction or transactions, an assessment of the risk of adverse movements in the applicable currencies and the availability of a cost-effective hedging strategy. In South America, substantially all of our sales are indexed to U.S. Dollars, but the associated costs are recorded in the local currencies of the operating units. Generally, we do not hedge this U.S. Dollar exposure as it would not be cost effective due to the relatively inefficient foreign exchange markets for local currencies in that region. To the extent we do not engage in hedging or such hedging is not effective, changes in the relative value of currencies can affect our profitability. The value of these contracts is recognized at fair value based on market exchange forward rates and amounted to a net liability position of $0.9 million at June 30, 2009. These contracts mature at various dates through June 2010.

Relative to foreign currency exposures existing at June 30, 2009, a 10% unfavorable movement in foreign currency exchange rates would not expose us to significant losses in earnings or cash flows because we have hedged substantially all of our exposures against fluctuations in foreign currency exchange rates. As of June 30, 2009, we had open foreign currency exchange contracts maturing through June 2010 with total net notional amounts of approximately $1.3 million. At June 30, 2009, we prepared an analysis to determine the sensitivity of our forward foreign exchange contracts to changes in exchange rates. A hypothetical adverse exchange rate movement of 10% against our forward foreign exchange contracts would have resulted in potential net loss in fair value of these contracts of approximately $0.1 million. The calculation assumes that each exchange rate would change in the same direction relative to the U.S. Dollar. In addition to the direct effects of changes in exchange rates, such changes typically affect the volume of sales or the foreign currency sales price as competitors' products become more or less attractive. Our sensitivity analysis of the effects of changes in foreign currency exchange rates does not factor in a potential change in sales levels or local currency selling prices.

Due to reduced credit limits at some of our banks, we have been entering into fewer foreign currency hedging arrangements and may not be able to enter into as many hedging arrangements in the future. As a result, we could be more exposed to the effects of currency fluctuations, both favorable and unfavorable, which could have a material impact on our results of operations.

For additional information about the risks associated with fluctuations in currency exchange rates, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Foreign Exchange."

*Interest Rate Hedging.* Our senior credit facility has a variable interest rate. On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. These interest rate swaps initially qualified for hedge accounting under SFAS No. 133. As a result of the financial covenant non-compliance for the period ended March 31, 2008 as discussed in Note 6 of the Notes to Unaudited Condensed

**Table of Contents**

Consolidated Financial Statements included elsewhere in this Quarterly Report, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under SFAS No. 133 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12.2 million was recorded as a non-cash charge to interest expense in the first quarter of 2008 and a non-cash credit to interest expense of $13.7 million in the second quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. Such mark to market changes on these interest rate swaps are principally credited or charged to accumulated other comprehensive income (loss). The ineffective portion of these interest rate swaps of $0.8 million was charged to interest expense during the six months ended June 30, 2009.

The interest rate swaps effectively fix the interest rate on approximately 84% of the term loan portion of our credit facility through December 31, 2010. As of June 30, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 9.74%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 6.32%. There can be no assurance that in future periods we will be able to assert that the hedge transactions are probable of occurring, and thus there can be no assurance that the interest rate swaps will continue to qualify for hedge accounting. Specifically, if left uncured, our anticipated non-compliance with certain financial covenants in our senior credit facility for the period ending September 30, 2009 would constitute an event of default, upon which the lenders could terminate the revolving credit facility and accelerate the repayment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable. If the lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, hedge accounting under SFAS No. 133 would no longer be applicable for these interest rate swaps. Accordingly, the cumulative mark to market changes in their fair value that will have been recorded in accumulated other comprehensive income (loss) through September 30, 2009 in addition to the credit valuation adjustments recorded under SFAS No. 157 would be charged to interest expense during the third quarter of 2009. As of June 30, 2009 this amount was $18.1 million. Additionally, mark to market changes subsequent to September 30, 2009 would be recorded as charges or credits to interest expense prospectively. If payment of our hedge obligations were accelerated and if we were required to pay these outstanding obligations, which as of June 30, 2009 were $21.4 million, the hedged fixed interest rate on approximately 84% of our senior debt (9.74% at June 30, 2009) would become variable (6.32% at June 30, 2009).

As a result of the amendment of our senior credit facility agreement on May 30, 2008, the applicable margin for LIBOR term loans, LIBOR revolving loans, Euribor loans and CDOR loans under our senior credit facility increased from 2.75% to 5.50%. We estimate that a 1% increase in the LIBOR rate would increase our interest expense on the term debt by approximately $0.9 million on an annual basis through December 31, 2010, the period covered by the interest rate swap agreements.

**ITEM 4.        CONTROLS AND PROCEDURES**

(a) *Evaluation of Disclosure Controls and Procedures.* We have carried out an evaluation, as of June 30, 2009, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a–15(e) and 15d–15(e) under the Securities Exchange Act of 1934, as amended (the "Act"). Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Act is (i) recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms; and (ii) accumulated and communicated to our management, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosures. No evaluation of disclosure controls and procedures can provide absolute assurance that these controls and procedures will operate effectively under all circumstances. However, the Company's disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives, and the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective at the reasonable assurance level as set forth above.

Table of Contents

(b) *Changes in Internal Control over Financial Reporting.* No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended June 30, 2009 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

### ITEM 1.      LEGAL PROCEEDINGS

We are involved in various legal matters, which have arisen in the ordinary course of business. We do not believe that the ultimate resolution of these matters will have a material adverse effect on our financial position, results of operations or cash flow.

### ITEM 1A.      RISK FACTORS

Since the date that we filed our Annual Report on Form 10-K for the fiscal year ended December 31, 2008 the majority of our served markets have deteriorated substantially from the decline in paper demand related to slowing global economic activity, which may substantially reduce our revenue, Adjusted EBITDA and cash flows. As a result, the risks disclosed in our Form 10-K are more likely to occur. Based on information available as of the date of this report, we also anticipate that we will not be in compliance with certain financial covenants in our senior credit facility for the period ending September 30, 2009. Accordingly, we are supplementing the risk factors disclosed in our Form 10-K for the year ended December 31, 2008 with the risk factors below.

**If we do not enter into an amendment to our senior credit facility prior to the date we are required to demonstrate compliance with the financial covenants in our senior credit facility for the period ending September 30, 2009, we expect to be in default of certain of these covenants, which could have a material adverse effect on our ability to continue operating.**

Our senior credit facility requires us to satisfy certain operating requirements and financial ratios in order to avoid a default or event of default under the facility. These financial covenants are described above under "Management's Discussion and Analysis of Financial Condition and Results of Operations—Credit Facility." Absent a significant recovery in revenue resulting from an economic revival in the paper industry, we anticipate that we will not be in compliance with certain of these financial covenants for the period ending September 30, 2009. Failing to meet financial covenants under the senior credit facility would constitute an event of default, upon which our lenders could terminate the revolving credit facility and accelerate the repayment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable. Any such acceleration of our obligations would likely cause other lenders and contractual counterparties, including counterparties to our interest rate swap agreements and other hedge agreements, to terminate and/or to accelerate the obligations under their financing and credit instruments and agreements with us. Should the lenders and/or other counterparties demand immediate repayment of all of our obligations, we expect that we would be unable to pay such obligations.

Additionally, if we are not able to successfully amend our senior credit facility or if the lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, hedge accounting under SFAS No. 133 would no longer be applicable for these interest rate swaps. Accordingly, the cumulative mark to market changes in their fair value that will have been recorded in accumulated other comprehensive income (loss) through September 30, 2009 in addition to the credit valuation adjustments recorded under SFAS No. 157 would be charged to interest expense during the third quarter of 2009. At June 30, 2009, this amount is $18.1 million. Additionally, mark to market changes subsequent to September 30, 2009 would be recorded as charges or credits to interest expense prospectively. If payment of our hedge obligations were accelerated and if we were required to pay these outstanding obligations, which as of June 30, 2009 were $21.4 million, the hedged fixed interest rate on approximately 84% of our senior debt (9.74% at June 30, 2009) would become variable (6.32% at June 30, 2009).

We have initiated contact with the lenders regarding the need for an amendment to our senior credit facility agreement prior to the date when an event of default would occur due to our failure to demonstrate compliance with certain financial covenants for the

52

Table of Contents

period ending September 30, 2009. In conjunction with this effort, we are continuing to evaluate alternatives to allow us to reduce or restructure our debt and plan for contingencies, which may include, without limitation, issuing equity. No assurances can be given that we will be able to obtain the lenders' consent to amend the credit facility on this timetable, or at all, that we will be able to amend the covenants in a manner sufficient to adequately reduce the risk of default or that we will be able to succeed in other strategies to reduce our debt. Even if we are able to obtain amendments to our credit facility, the lenders are likely to condition agreement on substantial increases in the fees and interest rate payable under the credit facility, among other things, and no assurance can be given that we would be able to sustain such fees and increased interest.

**We are subject to increased risk relating to the effects of currency fluctuations on our operations, as we are we are unable to enter into additional hedging arrangements.**

Due to reduced credit limits at some of our banks, we have been entering into fewer foreign currency hedging arrangements and we may not be able to enter into as many hedging arrangements in the future. As a result we could be more exposed to the effects of currency fluctuations, both favorable and unfavorable, which could have a material impact on our results of operations.

**In the event that we successfully negotiate an amendment to our credit facility or refinance our credit facility, our borrowing costs are likely to increase.**

As described above, we are attempting to negotiate amendments to our credit facility. In the event that we are able to negotiate satisfactory amendments to our credit facility, and in view of current turmoil in the credit markets and our current credit ratings, the lenders are likely to require that we pay substantially higher interest and fees on our credit facility going forward. This may result in increased costs of our operations thereby adversely affecting our results of operations, and no assurance can be given that any higher interest or fees will be sustainable by us.

**Our current credit facility difficulties could have an adverse impact on our business and increase our operating costs.**

The fact that we may default on our credit facility is likely to cause our customers or vendors to seek financial assurances from us before they are willing to continue doing business with us or may instead choose to do business with our competitors. This may result in increased costs of our operations, thereby adversely affecting our results of operations.

**We may explore strategic alternatives to amending our credit facility, including alternatives that involve the issuance of equity, which would dilute our existing stockholders**.

Concurrent with pursuing an amendment of our credit facility, we are considering strategic alternatives to allow us to reduce our debt, which may include issuing equity. There can be no assurance we would be able to complete any such strategic initiative on satisfactory terms. In addition, issuance of new equity for this purpose would likely result in substantial dilution to our existing stockholders. The new investors may, through contractual provisions and/or the percentage of voting securities purchased in such transaction or transactions, be in a position to exert strong influence over our business, policies and affairs. We cannot be certain that the interests of these investors will align with the interests of other stockholders. In addition, any concentration of ownership or other contractual rights could have the effect of delaying or preventing a change in control, merger or tender offer, which would deprive shareholders of an opportunity to receive a premium for their shares of common stock and may negatively affect the market price of our common stock.

Table of Contents

ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.

**Restrictions on Payment of Dividends**

For a description on restrictions imposed by Delaware law and our credit agreement on our payment of dividends, see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Credit Facility."

ITEM 3.    DEFAULTS UPON SENIOR SECURITIES.

See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Credit Facility."

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

(a) The annual meeting of shareholders of Xerium Technologies, Inc. was held on June 9, 2009.

(b) All director nominees were elected.

(c) Certain matters voted upon at the meeting and the votes cast with respect to such matters are as follows:

**Management Proposals and Vote Tabulations**

| | Votes Cast | | | |
|---|---|---|---|---|
| | For | Against | Abstain | Broker Non-Votes |
| Approval of Amendment No. 3 to the 2005 Equity Incentive Plan | 29,756,150 | 6,159,391 | 25,067 | 4,900,890 |
| Ratification of appointment of independent registered public accounting firm for 2009 | 40,734,846 | 87,530 | 19,122 | — |

Amendment No. 3 to the 2005 Equity Incentive Plan increased the limit on the number of shares of common stock that may be granted as stock awards in 2009 to the Company's Chief Executive Officer to 2,302,178 shares.

**Election of Directors**

| Director | Votes Received | Votes Withheld |
|---|---|---|
| Stephen R. Light | 40,134,786 | 706,712 |
| Jay J. Gurandiano | 40,171,830 | 669,668 |
| Nico Hansen | 35,852,694 | 4,988,804 |
| David G. Maffucci | 40,174,855 | 666,643 |
| Edward Paquette | 40,162,738 | 678,760 |
| Michael Phillips | 34,357,393 | 6,484,105 |
| John G. Raos | 40,173,355 | 668,143 |

**Table of Contents**

**ITEM 5.      OTHER INFORMATION.**

**Director Compensation**

On August 4, 2009, our Board of Directors approved the following RSU awards under our 2005 Equity Incentive Plan to directors who served as non-management directors during the year prior to the 2009 Annual Meeting of Stockholders: Jay Gurandiano, 26,176 RSUs; Nico Hansen, 42,295 RSUs; David Maffucci, 26,176 RSUs; Edward Paquette, 50,561 RSUs; Michael Phillips, 50,561 RSUs; and John Raos 26,176 RSUs. While Mr. Maffucci is currently serving as a management director, he previously served as a non-management director for a portion of the year prior to our 2009 Annual Meeting of Stockholders. The RSUs awarded to Mr. Maffucci on August 4, 2009 relate solely to his prior service as a non-management director.

Also on August 4, 2009 our Board of Directors adopted a revised policy regarding compensation for non-management directors. The changes to the policy provide that: (1) the equity compensation granted to non-management directors after the Annual Meeting of Stockholders will be provided in arrears for the prior year of service, instead of in advance for the ensuing year as provided under the prior policy, (2) non-management directors who serve only a partial year of service will receive a pro-rated amount of equity compensation, and (3) for Board or Committee meetings held after March 31, 2009, non-management directors will receive $1,500 per in person meeting and $500 for telephonic meetings that last longer than one hour.

**Code of Ethics Amendment**

On August 4, 2009, our Board of Directors adopted an amendment to our corporate code of business conduct and ethics, which applies to all of our employees, officers and directors. The amendment provides additional detail regarding the import and export regulations applicable to us. Our corporate code of business conduct and ethics, as amended, is available free of charge on our website at www.xerium.com.

**ITEM 6.      EXHIBITS**

See the exhibit index following the signature page to this quarterly report.

55

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**XERIUM TECHNOLOGIES, INC.**
(Registrant)

Date: August 6, 2009

By: /s/ David G. Maffucci

David G. Maffucci
Executive Vice President and Chief Financial Officer
(Principal Financial and Accounting Officer)

56

**Table of Contents**

EXHIBIT INDEX

| Exhibit Number | Description of Exhibits |
| --- | --- |
| 10.1(1) | Amendment No. 3 to the 2005 Equity Incentive Plan. |
| 10.2 | Xerium Technologies, Inc. Performance Award Program for 2009. |
| 10.3 | Employment Agreement with David Maffucci. |
| 10.4 | Supplemental Agreement No. 1 to Management Service Contract with Peter Williamson. |
| 31.1 | Certification Statement of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Statement of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Statement of the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification Statement of the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

(1)    Filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 11, 2009, and incorporated herein by reference.

Exhibit 10.2

### XERIUM TECHNOLOGIES, INC.
### PERFORMANCE AWARD PROGRAM

This Xerium Technologies, Inc. Performance Award Program (the "Program") contains rules supplemental to those set forth in the Xerium Technologies, Inc. 2005 Equity Incentive Plan (the "EIP"). The Program provides for the grant of the incentive award opportunities (each, an "Award") under and subject to the terms of the EIP, which is incorporated herein by reference. In the event of any inconsistency between the Program and applicable provisions of the EIP, the EIP shall control. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the EIP.

1. Administration; Eligibility; Features of Awards. The Program shall be administered by the Committee as described in the EIP. The Committee may in its discretion consult with outside advisors or internal Company resources for purposes of making any determinations in connection with its administration of the Program. Eligibility to participate in the Program shall be limited to individuals who are selected in accordance with the terms of the EIP to participate in the Program from among those individuals who are eligible to participate in the EIP (each, a "Participant"). Participation in any Award shall not entitle a Participant to share in any future Awards or in any other future awards of the Company or its subsidiaries. Each Award shall entitle the holder, subject to satisfaction of the performance conditions under the Award (and, to the extent the Award is intended to qualify for the performance-based compensation exception under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), to the further limitations of the EIP with respect thereto), to a benefit determined under Section 2 below and Exhibit A (the "Total Benefit Amount") that shall be payable as follows, subject to tax withholding as described in Section 5 below: (1) up to fifty (50%) of the Total Benefit Amount may be paid in cash as the Committee may decide in its sole discretion any time before payouts under the Program are made; and (2) the balance of the Total Benefit Amount shall be payable in the form of Restricted Stock Units ("RSUs"). The number of RSUs deliverable in respect of all or part of an Award shall be determined as described in Section 4 below.

2. Determination of Total Benefit Amount. The Committee may determine that a portion of each Participant's Total Benefit Amount under an Award for any calendar year or portion thereof (a "performance year") shall be earned solely by the Participant's remaining continuously employed by the Company or a subsidiary through the date Awards are paid under the Program for the performance year (the "Time-Based Portion") as indicated on Exhibit B hereto. The determination of the remainder of each Participant's Total Benefit Amount under an Award for the performance year (the "Performance-Based Portion") shall be made in accordance with the provisions of Exhibit A applicable to such Participant for such performance year. (The Performance-Based Portion of the Total Benefit Amount is referred to in Exhibit A as the Performance-Based Benefit Amount"). All payouts under the Program, whether Time-Based or Performance-Based, are conditioned on the Company's being in compliance with the financial covenants contained in Section 6.8(a) (Interest Coverage Ratio Covenant), (b) (Leverage Ratio Covenant) and (c) (Fixed Charge Coverage Ratio Covenant) (collectively the "Financial Covenants") of the Credit and Guaranty Agreement dated as of May 19, 2005,

entered into by and among the Company, certain subsidiaries of the Company, Citigroup Global Markets, Inc., CIB World Markets Corp. and other agents and banks party thereto, as amended and in effect on May 30, 2008 (the "Credit Agreement") at the end of each of the four fiscal quarters in the performance year. A breach of any of these Financial Covenants for any quarter will result in no payouts under the Program for the performance year, except as the Committee may otherwise expressly determine in its discretion.

3. Terms of RSUs. The RSUs payable under any Award shall be granted substantially in the form of the Restricted Stock Units Agreement attached as Exhibit C hereto (the "Restricted Stock Units Agreement"), which provides that the RSUs shall be fully vested at grant and payable 90 days thereafter.

4. Determination of Number of RSUs Payable. The number of RSUs payable under any Award shall be the quotient determined by dividing (x) by (y), where (x) is that portion of the Total Benefit Amount, if any, payable in RSUs and (y) is the greater of (1) three dollars ($3.00) and (2) the average of the per-share closing prices of the Stock (adjusted as appropriate to reflect any stock splits, stock dividends or similar events) for the last twenty (20) trading days of the performance year, rounded down to the nearest whole number.

5. Latest Payment Date; Tax Withholding. All payments, if any, under an Award shall be made not later than by March 31 of the calendar year following the performance year. The minimum tax withholding amount with respect to any payments being made in cash shall be withheld from such payments. The minimum tax withholding amount with respect to any payments being made in RSUs shall be satisfied by means of share withholding at the time the RSUs are settled as provided in the Restricted Stock Units Agreement.

6. Intent to be Exempt from Section 162(m). Awards for the 2009 performance year are not intended to qualify for the performance-based compensation exception under Section 162(m) of the Code. In the case of any Award for a subsequent performance year that is intended to so qualify, (i) the Exhibit A performance goals with respect to such Award shall be established by the Committee not later than ninety (90) days after the commencement of the performance year (or by such earlier date as is required by Section 1.162-27(e)(2)(i) of the Treasury Regulations), (ii) the Exhibit A performance goals, as so established, shall be consistent with the eligible performance measures, if any, approved by the shareholders of the Company for use in respect of performance awards under the EIP and shall be objectively determinable in compliance with Section 1.162-27(e)(2) of the Treasury Regulations, and (iii) no portion of the Award shall be paid unless and until the Committee has certified (as required by Section 1.162-27(e)(5) of the Treasury Regulations) that the performance goals have been achieved (or, if the performance goals are expressed in terms that admit of varying payout levels for different levels of performance, have been achieved at a level sufficient to support the payment).

7. Nature of Awards. Awards hereunder are intended to qualify as Stock Unit Awards under the EIP, with any cash portion payable pursuant to Section 9(d) of the EIP. The Program is unfunded and any cash payments by the Company hereunder shall be made from the general assets of the Company.

2

8. <u>Termination of Employment</u>. The Performance-Based Portion of an Award shall not be payable to or in respect of a Participant, except as the Committee shall otherwise expressly determine, unless the Participant is employed by the Company or a subsidiary on December 31 of the performance year. The Time-Based Portion of an Award shall not be payable to or in respect of a Participant, except as the Committee shall otherwise expressly determine, unless the Participant is employed by the Company or a subsidiary on the date Awards are paid for the performance year.

9. <u>Availability of Stock</u>. If, when Awards become payable in respect of any performance year, the number of shares of Stock needed to grant any RSUs under the Awards exceeds the number of shares then available under the EIP, the RSUs shall be granted conditionally so that the grant takes effect when the shareholders approve an increase in the number of shares available under the EIP. If the shareholders do not approve such an increase so that all or part of the conditional RSUs are not granted, the Company will pay out the value of any conditional RSUs that were not granted in cash and determine their value by reversing the calculation under Section 4 above used to determine the number of such RSUs.

10. <u>Treatment of Awards Upon a Change in Control</u>. If (a) the Company merges into or combines with any other entity and, immediately following such merger or combination, any Person or group of Persons acting in concert holds 50% or more of the voting power of the entity surviving such merger or combination (other than any Person or group of Persons which held 50% or more of the Company's voting power immediately prior to such merger or combination or any Affiliated Person of any such Person or member of such group); (b) any Person or group of Persons acting in concert acquires 50% or more of the Company's voting power; or (c) the Company sells all or substantially all of its assets or business for cash or for securities of another Person or group of Persons (other than to any Person or group of Persons which held 50% or more of the Company's total voting power immediately prior to such sale or to any Affiliated Person of any such Person or any member of such group), then, unless the Committee provides for the continuation or assumption of Awards or for the grant of new awards in substitution therefor (which substitute awards, if any, may be payable in cash or other property or a combination thereof) by the surviving entity or acquiror, in each case on such terms and subject to such conditions as the Committee may determine, with respect to each Award not so assumed or continued:

(a) In the event such transaction occurs on or after the close of the performance year with respect to the Award, the Committee shall determine, acting in its sole and reasonable discretion, prior to the occurrence of the transaction, the extent to which the applicable performance metrics specified in Exhibit A have been satisfied. If financial statements or other relevant data are not available prior to the time of such determination, the Committee shall make such determination based upon the financial information and data then available to the Company.

(b) In the event such transaction occurs prior to the close of the performance year with respect to the Award, the applicable performance metrics specified in Exhibit A shall be determined as follows: (i) the performance year shall be deemed to end on the effective date of such transaction; and (ii) the extent to which the applicable performance metrics specified in Exhibit A for the shortened performance year described in clause (i) above have been achieved shall be determined by the Committee acting in its sole

3

and reasonable discretion based upon the financial information available to the Company (it being understood that the Committee may, to the extent it deems necessary, extrapolate performance through the effective date of the transaction based upon available data); (iii) the performance determined pursuant to clause (ii) shall then be adjusted by multiplying it by fraction, the numerator of which is the number of days in the shortened performance year and the denominator of which is 365, and the performance as so adjusted shall be the basis for determining the Total Benefit Amount with respect to the Award, subject to proration in accordance with Section 10(c) below.

(c) If subsection (b) above applies, the Total Benefit Amount initially determined under subsection (b) with respect to an Award shall be prorated by multiplying such initially determined amount by a fraction, the numerator of which is the number of days in the shortened performance year and the denominator of which is 365.

For purposes of this Section 10, "Person" means any individual, partnership, limited liability company, corporation, association, trust, joint venture, unincorporated organization, or other entity or group, and "Affiliated Person" means, with respect to any Person, any other Person that directly or indirectly controls or is controlled by or is under common control with such Person.

11. Amendment. The Committee may amend the Program at any time and from time to time, and may terminate the Program, in each case subject only to such limitations, if any, as the EIP may impose.

12. 409A. This Program and the Awards granted thereunder shall be construed and administered consistent with the intent that they at all times be in compliance with or exempt from the requirements of Section 409A of the Code and the regulations promulgated thereunder.

4

**XERIUM TECHNOLOGIES, INC.**
**PERFORMANCE AWARD PROGRAM**

**Exhibit A (applicable to 2009 performance year)**

There are five different types of Awards under the Performance-Based Portion of the Program for 2009 performance year:

1.  Corporate Awards
2.  North America Division Awards
3.  South America Division Awards
4.  Europe Division Awards and
5.  Asia Division Awards.

The North America Division Awards, South America Division Awards, Europe Division Awards and Asia Division Awards are referred to herein collectively as "Division Awards" and each as a "Division Award". The North America Division, South America Division, Europe Division and Asia Division are referred to herein collectively as "Divisions" and each as a "Division".

Participants in the Program selected by the Committee shall receive the types of Awards in the amounts determined by the Committee.

Corporate Awards are described in Section 1 below, and Division Awards are described in Section 2 below.

Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with U.S. generally accepted accounting principles.

## Section 1 - Corporate Awards

Two measures of performance are relevant in determining the Performance-Based Benefit Amount, if any, under a Corporate Award: (i) the Corporate Cash Metric and (ii) the Corporate EBITDA Metric.

i.    Corporate Cash Metric

The "Corporate Cash Metric" means, for Xerium Technologies, Inc., on a consolidated basis, net cash provided by operating activities for the year ended December 31, 2009 *minus* capital expenditures (as reflected on the cash flow statement) for the year ended December 31, 2009 *plus* interest expense (excluding the amortization of debt expense and net of interest income) for the year ended December 31, 2009 *plus* the reduction (where a reduction is expressed as a positive number and an increase is expressed as a negative number) in Trapped Cash for Xerium Technologies, Inc., on a consolidated basis, from December 31, 2008 to December 31, 2009. "Trapped Cash" means accounts receivable (if any) outstanding at December 31, 2008 or December 31, 2009, as the case may be, in excess of the accounts receivable that would cause the quotient determined by dividing accounts receivable on such date by the ratio

5

of net sales for the year then ended to 365 to be in excess of 50 *plus* inventory (if any) at December 31, 2008 or December 31, 2009, as the case may be, in excess of one-sixth of cost of goods sold for the year then ended *plus* accounts payable (if any) outstanding at December 31, 2008 or December 31, 2009, as the case may be, less than the amount of the accounts payable that would cause the quotient determined by dividing accounts payable on such date by the ratio of cost of goods sold for the year then ended to 365 to be less than 48. For the avoidance of doubt, for this purpose, the term "accounts payable" shall exclude wages payable. The Committee shall have sole discretion to determine the calculation of the amount of the Corporate Cash Metric.

Weighting: The amount of the target award under the Corporate Award that is based upon the Corporate Cash Metric is 25% of the total Corporate Award for the Participant. "X" below refers to the target award for the Participant under the Corporate Award that is based upon the Corporate Cash Metric.

The Target Corporate Cash Metric (referred to below as "Y") shall be established by the Committee upon the granting of Corporate Awards and communicated to Participants receiving a Corporate Award; provided, however, that the amount so established by the Committee may be adjusted by the Committee after the initial determination of the amount to reflect any significant change of circumstance, including without limitation, the acquisition or disposition of any business by Xerium Technologies, Inc. or any of its subsidiaries.

Subject to Section 1(iii), the Performance-Based Benefit Amount payable with respect to a Corporate Award based upon the portion measured against the Corporate Cash Metric shall be determined as follows:

> Corporate Cash Metric below .95Y: no payment under the Corporate Cash Metric component
>
> Corporate Cash Metric at .95Y: bonus = .5 X
>
> Corporate Cash Metric at Y: bonus = X
>
> Corporate Cash Metric at 1.8Y or above: bonus = 2.5X
>
> The amount payable between the levels of Corporate Cash Metric identified above shall be determined on the basis of straight line interpolation between points.

ii.    Corporate EBITDA Metric

The "Corporate EBITDA Metric" means "Adjusted EBITDA," as such term is defined in the first sentence of the definition of such term in the Credit and Guaranty Agreement (the "Credit Agreement"), dated as of May 19, 2005, entered into by and among the Company, certain subsidiaries of the Company, Citigroup Global Markets, Inc., CIBC World Markets Corp. and other agents and banks party thereto, as amended and in effect on May 30, 2008, for Xerium Technologies, Inc. for the year ended December 31, 2009. The Committee shall have sole discretion to determine the calculation of the amount of the Corporate EBITDA Metric.

6

Weighting: The amount of the target award under the Corporate Award that is based upon the Corporate EBITDA Metric is 75% of the total Corporate Award for the Participant. "X" below refers to the target award for the Participant under the Corporate Award that is based upon the Corporate EBITDA Metric.

The Target Corporate EBITDA Metric (referred to below as "Y") shall be established by the Committee upon the granting of Corporate Awards and communicated to Participants receiving a Corporate Award; provided, however, that the amount so established by the Committee may be adjusted by the Committee after the initial determination of the amount to reflect any significant change of circumstance, including without limitation, the acquisition or disposition of any business by the Company or any of its subsidiaries.

Subject to Section 1(iii), the Performance-Based Benefit Amount payable with respect to a Corporate Award based upon the portion measured against the Corporate EBITDA Metric shall be determined as follows:

Corporate EBITDA Metric below .75Y: no payment under the Corporate EBITDA Metric component

Corporate EBITDA at .75Y: bonus = .05X

Corporate EBITDA at Y: bonus = X

Corporate EBITDA at 1.42Y or above: bonus = 2.5X

The amount payable between the levels of Corporate EBITDA Metric identified above shall be determined on the basis of straight line interpolation between points.

iii. Performance-Based Benefit Amount payable with respect to a Corporate Award shall be the sum of the amounts determined pursuant to Section 1(i) and Section 1(ii) above; provided, however, if the such amount exceeds two (2) times the sum of (a) the target award for the Participant under the Corporate Award that is based upon the Corporate Cash Metric and (b) the target award for the Participant under the Corporate Award that is based upon the Corporate EBITDA Metric (such sum with respect to a Participant, the "Corporate Target") then the Performance-Based Benefit Amount payable with respect to a Corporate Award for such Participant shall be reduced to two (2) times the Corporate Target.

<u>**Section 2 - Division Awards**</u>

The description of Division Awards below applies to the Division Awards of each of the four Divisions.

Two measures of performance are relevant in determining the Performance-Based Benefit Amount, if any, under a Division Award: (i) the Division Cash Metric and (ii) the Division EBITDA Metric.

i.    <u>Division Cash Metric</u>

The "Division Cash Metric" means net cash provided by operating activities for the year ended December 31, 2009 <u>*minus*</u> capital expenditures for the year ended December 31, 2009 <u>*plus*</u> interest expense (excluding the amortization of debt expense and net of interest income) for the year ended December 31, 2009 <u>*plus*</u> the reduction (where a reduction is expressed as a positive number and an increase is expressed as a negative number) in Trapped Cash (as defined in Section 1(i) above) for the particular Division from December 31, 2008 to December 31, 2009, in each case as required to be presented in the internal financial management reports (commonly referred to as "GRs") of the Company for the particular Division. The Committee shall have sole discretion to determine the calculation of the amount of the Division Cash Metric.

Weighting: The amount of the target award under the Division Award that is based upon the Division Cash Metric is 25% of the total Division Award for the Participant. "X" below refers to the target award for the Participant under the Division Award that is based upon the Division Cash Metric.

The Target Division Cash Metric (referred to below as "Y") shall be established by the Committee upon the granting of Division Awards and communicated to Participants receiving a Division Award for the particular Division; <u>provided</u>, <u>however</u>, that the amount so established by the Committee may be adjusted by the Committee after the initial determination of the amount to reflect any significant change of circumstance, including without limitation, the acquisition or disposition of any business by the particular Division.

Subject to Section 2(iii), the Performance-Based Benefit Amount payable with respect to a Division Award (other than an Asia Division Award) based upon the portion measured against the Division Cash Metric shall be determined as follows:

Division Cash Metric below .95Y: no payment under the Division Cash Metric component

Division Cash Metric at .95Y: bonus = .5X

Division Cash Metric at Y: bonus = X

Division Cash Metric at 1.81Y or above: bonus = 2.5X

The amount payable between the levels of Division Cash Metric identified above shall be determined on the basis of straight line interpolation between points.

8

Subject to Section 2(iii), the Performance-Based Benefit Amount payable with respect to an Asia Division Award based upon the portion measured against the Division Cash Metric shall be determined as follows:

Division Cash Metric below .95Y: no payment under the Division Cash Metric component

Division Cash Metric at .95Y: bonus = .5X

Division Cash Metric at Y: bonus = X

Division Cash Metric at 8.25Y or above: bonus = 2.5X

The amount payable between the levels of Division Cash Metric identified above shall be determined on the basis of straight line interpolation between points.

ii.    <u>Division EBITDA Metric</u>:

The "Division EBITDA Metric" means "Adjusted EBITDA" for the particular Division for the year ended December 31, 2009 as required to be presented in the internal financial management reports (commonly referred to as "GRs") of the Company in accordance with the guidelines for such reports in effect on June 30, 2009 and consistent with the definition of Adjusted EBITDA as set forth in the first sentence of the definition of such term in the Credit Agreement. The Committee shall have sole discretion to determine the calculation of the amount of the Division EBITDA Metric.

Weighting: The amount of the target award under the Division Award that is based upon the Division EBITDA Metric is 75% of the total Division Award for the Participant. "X" below refers to the target award for the Participant under the Division Award that is based upon the Division EBITDA Metric.

The Target Division EBITDA Metric (referred to below as "Y") shall be established by the Committee upon the granting of Division Awards and communicated to Participants receiving a Division Award for the particular Division; <u>provided</u>, <u>however</u>, that the amount so established by the Committee may be adjusted by the Committee after the initial determination of the amount to reflect any significant change of circumstance, including without limitation, the acquisition or disposition of any business by the particular Division.

Subject to Section 2(iii), the Performance-Based Benefit Amount payable with respect to a Division Award (other than an Asia Division Award) based upon the portion measured against the Division EBITDA Metric shall be determined as follows:

Division EBITDA Metric below .75Y: no payment under the Division EBITDA Metric component

Division EBITDA at .75Y: bonus = .05X

9

Division EBITDA at Y: bonus = X

Division EBITDA Metric at 1.38Y or above: bonus = 2.5X

The amount payable between the levels of Division EBITDA Metric identified above shall be determined on the basis of straight line interpolation between points.

Subject to Section 2(iii), the Performance-Based Benefit Amount payable with respect to an Asia Division Award based upon the portion measured against the Division EBITDA Metric shall be determined as follows:

Division EBITDA Metric below .75Y: no payment under the Division EBITDA Metric component

Division EBITDA at .75Y: bonus = .05X

Division EBITDA at Y: bonus = X

Division EBITDA Metric at 3.25Y or above: bonus = 2.5X

The amount payable between the levels of Division EBITDA Metric identified above shall be determined on the basis of straight line interpolation between points.

iii. Performance-Based Benefit Amount payable with respect to a Division Award shall be the sum of the amounts determined pursuant to Section 2 (i) and Section 2(ii) above; provided, however, if the such amount exceeds two (2) times the sum of (a) the target award for the Participant under the Division Award that is based upon the Division Cash Metric and (b) the target award for the Participant under the Division Award that is based upon the Division EBITDA Metric (such sum with respect to a Participant, the "Division Target") then the Performance-Based Benefit Amount payable with respect to a Division Award for such Participant shall be reduced to two (2) times the Division Target.

## Section 3 - Performance-Based Benefit Amount

The Performance-Based Benefit Amount for a Participant shall be the sum of the Performance-Based Benefit Amount payable with respect to any Corporate Award for such Participant (as determined in accordance with Section 1(iii)) and the Performance-Based Benefit Amount payable with respect to any Division Award for such Participant (as determined in accordance with Section 2(iii)).

10

**XERIUM TECHNOLOGIES, INC.**
**PERFORMANCE AWARD PROGRAM**

**Exhibit B (applicable to 2009 performance year)**

| Participant(s) | Time-Based Portion of Total Benefit Amount | Performance-Based Portion of Total Benefit Amount |
|---|---|---|
| CEO and His Direct Reports | 50% | 50% |
| Other Executives | 25% | 75% |

11

**XERIUM TECHNOLOGIES, INC.**
**PERFORMANCE AWARD PROGRAM**

**Exhibit C (applicable to 2009 performance year)**

**[Form of Restricted Stock Units Agreement (2009 MIC)]**

12

**Exhibit 10.3**

## EMPLOYMENT AGREEMENT

AGREEMENT made and entered into in North Carolina by and between Xerium Technologies, Inc. (the "Company"), a Delaware corporation with its principal place of business in Raleigh, North Carolinas and David G. Maffucci (the "Executive"), effective as of the 8th day of June, 2009 (the "Effective Date").

WHEREAS, subject to the terms and conditions hereinafter set forth, the Company wishes to employ the Executive, in the position of Executive Vice President and Chief Financial Officer, and Executive wishes to accept such employment;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises, terms, provisions and conditions set forth in this Agreement, the parties hereby agree:

1. Employment. Subject to the terms and conditions set forth in this Agreement, the Company hereby offers and the Executive hereby accepts employment.

2. Term. The employment of the Executive by the Company hereunder shall be for the period commencing on the Effective Date and expiring on the date of the termination of such employment in accordance with Section 5 hereof. For all purposes of this Agreement, references to (a) the "Termination Date" shall mean the date Executive's employment hereunder shall terminate pursuant to said Section 5, and (b) references to the "term" of the Executive's employment hereunder shall mean the period commencing on the Effective Date and ending on the Termination Date. Following the Termination Date, unless specifically otherwise agreed between Executive and any applicable party, the Executive shall cease to hold any position (whether as an officer, director, manager, employee, trustee, fiduciary or otherwise) with the Company or any of its Subsidiaries or Affiliates.

3. Capacity and Performance.

(a) During the term of Executive's employment hereunder, the Executive shall serve the Company as its Executive Vice President and Chief Financial Officer. In addition, and without further compensation, the Executive may serve as a director of the Company and as a director and/or officer of one or more of the Company's subsidiaries, if so elected or appointed from time to time.

(b) During the term of Executive's employment hereunder, the Executive shall be employed by the Company on a full-time basis and shall perform such duties and responsibilities on behalf of the Company and its Subsidiaries as may be designated from time to time by the Chief Executive Officer.

(c) During the term of Executive's employment hereunder, the Executive shall devote his full business time to the advancement of the business and interests of the Company and its Subsidiaries and to the discharge of his duties and responsibilities hereunder, except that Executive may serve as a director of one for-profit external board. The Executive shall not engage in any other business activity or serve in any industry, trade, professional, governmental or academic position during the term of this Agreement, except as may be expressly approved in advance by the Chief Executive Officer in writing.

4. Compensation and Benefits. During the term of Executive's employment hereunder as compensation for all services performed by the Executive:

(a) Base Salary. The Company shall pay the Executive a base salary at the rate of four hundred fifteen thousand dollars ($415,000) per year effective as of June 8, 2009, payable in accordance with the payroll practices of the Company for its executives and subject to increase from time to time by the Board, in its sole discretion. Such base salary, as from time to time increased, is hereafter referred to as the "Base Salary."

(b) Annual Incentive Bonus Plan. The Executive shall be entitled to participate in any and all annual bonus plans (the "Annual Bonus Plans") from time to time in effect for senior executives of the Company generally. The terms of each Annual Bonus Plan and Executive's participation therein shall be determined by the compensation committee of the Board of Directors of the Company (the "Board") (or, if there is no such committee, by the Board); provided, however, that the Executive shall be entitled to participate in such plans at a minimum participation rate of sixty percent (60%) of his Base Salary (pro-rated in 2009 based on employment commencement date and at the rate in effect on December 31, 2009 provided that the Executive is employed by the Company on the payment date) paid for the applicable year, with any awards thereunder payable only to the extent earned pursuant to the terms of the applicable Annual Bonus Plan and subject to adjustment in accordance with the terms of the applicable Annual Bonus Plan. Notwithstanding the foregoing, no award under the Annual Bonus Plans may be granted if the compensation committee determines that in order for such award to qualify as performance-based for purposes of Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), the Plan must be submitted to and approved, or resubmitted to and approved, by the stockholders of the Company in accordance with the requirements of Section 162(m) of the Code, unless such grant is made contingent upon such approval. The compensation committee of the Board (or, if there is no such committee, the Board) may alter, modify, add to or delete any Annual Bonus Plan at any time as it, in its sole judgment determines to be appropriate.

(i) Fiscal 2009 Bonus Guarantee. With respect to the Company's 2009 fiscal year only, the Executive is guaranteed that his total bonus compensation earned for such fiscal year (including any awards granted him under the Annual Bonus

2

Plans for the fiscal year) shall not be less than fifty percent (50%) of the amount calculated in Section 4(b) above. Any payment due pursuant to this guarantee that is made pursuant to an award under one or more of the Annual Bonus Plans shall be payable in accordance with the Incentive Compensation Plan.

(c) Equity Participation

(i) On or about the Effective Date, the Executive will be granted sixty thousand (60,000) shares of the Company's common stock valued at the closing price on the Executive's employment commencement date.

(ii) On or about the Effective Date, the Executive will be granted seventy-five thousand (75,000) Time-Based restricted stock units ("RSUs") under the Company's 2005 Equity Incentive Plan, subject to any delay resulting from the need to obtain shareholder approval to increase the size of said Plan and subject to the Executive signing and returning the Company's Time-Based Restricted Stock Agreement. The RSUs so granted will vest in accordance with the vesting schedule contained in the Company's Time-Based Restricted Stock Agreement. In the event of termination of the Executive's employment hereunder, in accordance with Section 5(a) as a result of death or Section 5(b) as a result of disability, any RSUs granted under this Section (c)(i) that have not yet vested, but remain outstanding, shall vest as of the termination date. In the event of termination of the Executive's employment hereunder by the Company other than for Cause in accordance with Section 5(d) or by the Executive for Good Reason, in accordance with Section 5(f), any RSUs granted under this Section (c)(i) that have not vested, but remain outstanding, will vest upon the effectiveness of the Employee Release (as defined in Section 6(d)(iii) hereof). If the Executive's employment terminates other than as provided in the preceding two sentences, any RSUs granted hereunder which have not yet vested shall be forfeited. The RSUs granted hereunder shall otherwise be subject to the terms and conditions of the 2005 Equity Incentive Plan and the Time-Based Restricted Stock Agreement.

(iii) The Executive will be granted seventy-five thousand (75,000) RSUs under the Company's Long Term Incentive Program of 2008. The Executive shall participate in such Program for the remainder of the Program, provided that the Executive's employment by the Company hereunder is continuing on the applicable date, subject to any delay resulting from the need to obtain stockholder approval to increase the size of said Program and subject to the Executive signing and timely returning the applicable Restricted Stock Agreement, as provided below. Fifty percent (50%) of the RSUs of such grant shall be subject to the Company's time-based restricted stock agreement then in effect and the remaining fifty percent (50%) of such grant shall be subject to the Company's performance-based restricted stock agreement then in effect. The RSUs granted hereunder shall otherwise be subject to the terms of the Long Term Incentive Program of 2008 and the applicable Restricted Stock Agreements.

3

(iv) In addition to the equity participation described in Section (c)(i) and (c)(ii) hereunder, while the Executive's employment with the Company hereunder is continuing, the Executive shall be entitled to participate in such Company equity plans from time to time in effect for senior executives of the Company generally. The terms of each such plan and Executive's participation therein shall be determined by the compensation committee of the Board (or, if there is no such committee, by the Board itself).

(d) Other Incentive Plans. The Executive shall be entitled to participate in any and all cash, equity, bonus and other incentive plans which are not Annual Bonus Plans (the "Long Term Plans") from time to time in effect for senior executives of the Company generally. The terms of each Long Term Plan and Executive's participation therein shall be determined by the compensation committee of the Board (or, if there is no such committee, by the Board). The compensation committee of the Board (or, if there is no such committee, the Board) may alter, modify, add to or delete any Long Term Plan at any time as it, in its sole judgment, determines to be appropriate.

(e) Vacations. The Executive shall be entitled to an annual vacation of four (4) weeks, with reasonable notice to the Chief Executive Officer and subject to the reasonable business needs of the Company. Vacation shall otherwise be governed by the policies of the Company, as in effect from time to time.

(f) Other Benefits. Subject to any contribution therefor generally required of executives of the Company, the Executive shall be entitled to participate in any and all employee benefit plans from time to time in effect for executives of the Company generally, except to the extent such plans are in a category of benefit specifically otherwise provided to the Executive under this Agreement (*e.g.*, severance pay). Such participation shall be subject to the terms of the applicable plan documents and generally applicable Company policies. The Board may alter, modify, add to or delete employee benefit plans at any time as it, in its sole judgment, determines to be appropriate.

(g) Certain Prerequisites. The Company shall provide the Executive while he continues to be employed by the Company with: (i) a housing allowance of thirty thousand dollars ($30,000) per year net of taxes; (ii) participation in the Company's standard executive automobile program; and (iii) eligibility to use a Company-owned country club membership at the TPC in Wakefield, North Carolina.

4

(h) <u>Business Expenses</u>. The Company shall pay or reimburse the Executive for all reasonable and necessary business expenses incurred or paid by the Executive in the performance of his duties and responsibilities hereunder, subject to any maximum annual limit or other restrictions on such expenses set by the Board and to such reasonable substantiation and documentation as may be specified by the Company from time to time. In the case of any reimbursement to which the Executive is entitled pursuant to this Section 4(h) that would constitute deferred compensation subject to Section 409A of the Code, the following additional rules shall apply: (i) the reimbursable expense must have been incurred, except as otherwise expressly provided in this Agreement, during the term of this Agreement; (ii) the amount of expenses eligible for reimbursement during any calendar year will not affect the amount of expenses eligible for reimbursement in any other calendar year; (iii) the reimbursement shall be made not later than December 31 of the calendar year following the calendar year in which the expense was incurred; and (iv) the Executive's entitlement to reimbursement shall not be subject to liquidation or exchange for another benefit.

(i) <u>Payments/Actions by Company</u>. Wherever it is provided in this Agreement that payment of any form of compensation or any other action shall be made by the Company, such payment or action may be made by any Subsidiary or Affiliate of the company.

5. <u>Termination of Employment</u>. The Executive's employment hereunder shall terminate under the following circumstances:

(a) <u>Death</u>. In the event of the Executive's death during the term of Executive's employment hereunder, the Executive's employment shall immediately and automatically terminate.

(b) <u>Disability</u>. The Company may terminate the Executive's employment hereunder, upon notice to the Executive, in the event that the Executive becomes disabled during his employment hereunder. For this purpose, disability means that the Executive (i) is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, or (ii) is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of the Company. If any questions shall arise as to whether during any period the Executive is disabled within the meaning of this Section 5(b), the Executive, at the request of the Company, shall submit to a medical examination by a physician selected by the Company to determine whether the Executive is so disabled and such determination shall for the purposes of this Agreement be conclusive of the issue. If such question shall arise and the Executive shall fail to submit to such medical examination, the Company's determination of the issue shall be binding on the Executive.

5

(c) <u>By the Company for Cause</u>. The Company may terminate the Executive's employment hereunder for Cause at any time upon notice to the Executive setting forth the nature of such Cause. The following shall constitute Cause for termination: (i) the Executive's conviction of or plea of nolo contendere to a felony or other crime involving moral turpitude; (ii) the Executive's fraud, theft or embezzlement committed with respect to the Company or its Subsidiaries; (iii) material breach by the Executive of any of the provisions of Sections 8, 9 or 10 hereof that causes demonstrable harm to the Company or any of its Subsidiaries; or (iv) the Executive's willful and continued failure to perform his material duties to the Company and its Subsidiaries; <u>provided</u>, <u>however</u>, that the Company may terminate Executive's employment hereunder for "Cause" within the meaning of this clause (iv) only after the Company has provided written notice to the Executive of the failure and the Executive shall not have remedied such failure within ten (10) business days following the effectiveness of such notice.

(d) <u>By the Company Other than for Cause</u>. The Company may terminate the Executive's employment hereunder other than for Cause at any time upon notice to the Executive.

(e) <u>By the Executive Other than for Good Reason</u>. The Executive may terminate his employment hereunder other than for Good Reason (as defined in Section 5(f) below) at any time upon the provision of sixty (60) days written notice to the Company. In the event of termination of the Executive pursuant to this Section 5(e), the Board may elect to waive the period of notice or any portion thereof.

(f) <u>By the Executive for Good Reason</u>. The Executive may terminate his employment hereunder for Good Reason upon written notice to the Company setting forth in reasonable detail the nature of such Good Reason; <u>provided</u>, that such written notice must be delivered to the Company within ninety (90) days of the initial existence of the condition or circumstance constituting or giving rise to the purported Good Reason. A termination by the Executive hereunder shall not be treated as a termination for Good Reason if the Company remedies the condition or circumstance constituting or giving rise to the purported Good Reason within thirty (30) days of the receipt of the Executive's notice, or if actual termination occurs more than two years following the initial existence of such condition or circumstance. The following shall constitute Good Reason for purposes of this subsection (f): a requirement that the Executive relocate more than fifty (50) miles from his then-current principal residence, it being understood that the Executive may be required to travel frequently and that prolonged periods spent away from Executive's principal residence shall not constitute Good Reason.

6

6. <u>Compensation upon Termination</u>.

(a) <u>Death</u>. In the event of a termination of the Executive's employment hereunder by reason of death as contemplated by Section 5(a), the Company shall pay in a lump sum within thirty (30) days of such termination to the Executive's designated beneficiary or, if no beneficiary has been designated by the Executive, to his estate, the Base Salary earned but not paid through the Termination Date.

(b) <u>Disability</u>. In the event of any termination of Executive's employment hereunder by reason of disability as contemplated by Section 5(b), the Company shall pay to his Base Salary earned but not paid through the Termination Date and, in addition, shall, subject to any employee contribution applicable to the Executive on the Termination Date, continue to contribute to the premium cost of the Executive's participation in the Company's group medical and dental plans for eighteen (18) months (or such longer period as may be provided under the employee benefit plans of the Company), but only if the Executive does not have access at reasonable cost to substantially equivalent benefits through another employer, and provided that the Executive is entitled to continue such participation under applicable law and plan terms.

(c) <u>By the Company for Cause</u>. In the event of any termination of Executive's employment hereunder by the Company for Cause as contemplated by Section 5(c), the Company shall have no further obligations to the Executive under this Agreement other than payment of Base Salary through the Termination Date and except as specifically provided in Section 6(g).

(d) <u>By the Company Other than for Cause or by the Executive for Good Reason</u>.

(i) <u>Not Close in Time to a Change of Control</u>. In the event of any termination of Executive's employment hereunder by the Company pursuant to Section 5(d) or by the Executive pursuant to Section 5(f), which occurs after Executive has completed at least six (6) months of employment with the Company and which termination does not occur within three (3) months prior to or within two (2) years following a Change of Control, the Company (A) shall continue to pay the Executive the Base Salary at the rate in effect on the Termination Date for one (1) year, and (B) subject to any employee contribution applicable to the Executive on the Termination Date, shall continue to contribute to the premium cost of the Executive's participation in the Company's group medical and dental plans for one (1) year (or such longer period as may be provided under the employee benefit plans of the Company), but only if the Executive does not have access at reasonable cost to substantially equivalent benefits through another employer, and provided that the Executive is entitled to continue such participation under applicable law and plan terms.

7

(ii) <u>Close in Time to a Change of Control</u>. In the event of any termination of Executive's employment hereunder by the Company pursuant to Section 5(d) or by the Executive pursuant to Section 5(f), which occurs after Executive has completed at least six (6) months of employment with the Company and which termination occurs within three (3) months prior to or within two (2) years following a Change of Control, the Company (A) shall continue to pay the Executive the Base Salary at the rate in effect on the Termination Date for eighteen (18) months, and (B) subject to any employee contribution applicable to the Executive on the Termination Date, shall continue to contribute to the premium cost of the Executive's participation in the Company's group medical and dental plans for eighteen (18) months (or such longer period as may be provided under the employee benefit plans of the Company), but only if the Executive does not have access at reasonable cost to substantially equivalent benefits through another employer, and provided that the Executive is entitled to continue such participation under applicable law and plan terms.

(iii) <u>Conditions</u>. Any obligation of the Company to the Executive under Sections 6(b) and 6(d) hereof is conditioned upon (A) the Executive signing a release of claims in the form appended hereto as <u>Attachment A</u> or such other form as the Company may require (the "Employee Release") within twenty-one (21) days (or such greater period as the Company may specify) following the date notice of termination of employment is given hereunder and upon the Executive's not revoking the Employee Release in a timely manner thereafter and (B) the Executive's continued full performance of his continuing obligations hereunder, including those under Sections 8, 9 and 10. Base Salary to which the Executive is entitled under Sections 6(b) and 6(d) hereof shall be payable in accordance with the normal payroll practices of the Company in effect on the Termination Date and will begin at the Company's next regular payroll period which is at least five (5) business days following the effective date of the Employee Release, but shall be retroactive to next business day following the Termination Date.

(iv) <u>No reduction</u>. The continued payments/contributions by the Company that are described in Sections 6(d)(i) and 6(d)(ii) hereof shall not be reduced by any income or other compensation received by Executive subsequent to the termination of his employment.

(e) <u>By the Executive Other than for Good Reason</u>. If the Executive shall terminate his employment pursuant to Section 5(e), the Company shall continue to pay Executive his Base Salary through the Termination Date (it being understood that if, in accordance with Section 5(e), the Board elects to waive the period of notice, or any portion thereof, the payment of Base Salary under this Section 6(e) shall continue through the notice period or any portion thereof so waived).

8

(f) <u>Delay in Payment Commencement on Account of Internal Revenue Code Section 409A</u>. If the Executive is, at the time of separation from service, a "specified employee" (as hereinafter defined), any and all amounts payable in connection with such separation from service that constitute deferred compensation subject to Section 409A of the Code, as determined by the Company in its sole discretion, and that would (but for this sentence) be payable within six (6) months following such separation from service, shall not be paid until the date which is six (6) months and one (1) day after the date of such separation from service or, if earlier, Executive's date of death. In this regard, any payments that otherwise would have been made during such six (6) month period shall be paid to the Executive in a lump sum on the first date on which they may be paid, together with interest credited at the short-term applicable federal rate, compounded daily. For purposes of this subsection (f), "specified employee" means an individual determined by the Company to be a specified employee as defined in subsection (a)(2)(B)(i) of Section 409A of the Code. The Company may, but need not, elect in writing, subject to the applicable limitations under Section 409A of the Code, any of the special elective rules prescribed in Section 1.409A-1(i) of the Treasury Regulations for purposes of determining "specified employee" status. Any such written election shall be deemed part of this Agreement.

(g) <u>Post-Termination Obligations Generally</u>. Except for (i) any right expressly set forth in this Section 6, (ii) any vested benefits under any employee benefit plan referred to in Section 4(f) which specifically is designed to provide benefits following termination of employment (such as any such plan providing benefits upon disability or retirement) (but subject to all of the terms, if any, of each such other benefit plan as to how such vested benefits will be treated following termination of employment) and (iii) any rights expressly set forth in any other written agreement to which Executive and any of the company or any of its Subsidiaries or Affiliates shall become parties from time to time after the date hereof, none of the Company or any of its Subsidiaries or Affiliates shall have any further obligations to the Executive, in connection with his employment or the termination thereof, following expiration of the term of the Executive's employment hereunder. Satisfaction by the Company and other applicable Persons of such rights and benefits shall constitute full settlement of any claim that the Executive may have on account of any termination of employment hereunder against the Company, any of its Subsidiaries or Affiliates and all of their respective past and present officers, directors, stockholders, members, managers, partners, controlling Persons, employees, agents, representatives, successors and assigns and all other others connected with any of them, both individually and in their official capacities.

9

7. <u>Limitation</u>.

(a) In the event that it is determined that any payment or benefit provided by the Company or any of its Subsidiaries to or for the benefit of the Executive, either under this Agreement or otherwise, and regardless of under what plan or arrangement it was made, would, absent the application of this Section 7, be subject to excise tax (the "Excise Tax") imposed by Section 4999 of the Code, or any successor provision ("Section 4999"), the Company will reduce such payments and/or benefits to the extent, but only to the extent, necessary so that no portion of the remaining payments and/or benefits will be subject to the Excise Tax. The Company shall have discretion in determining which, if any, of several payments and/or benefits (if more than one) are to be reduced.

(b) Determinations as to the amount of any cutback required under this Section 7 will be made by the Company's tax accountant unless the Executive has reasonable objections to the use of that firm, in which case the determinations will be made by a comparable firm chosen jointly by the Company and the Executive (the firm making the determinations to be referred to as the "Firm"). The determinations of the Firm will be binding upon the Company and the Executive except as the determinations are established in resolution (including by settlement) of a controversy with the Internal Revenue Service to have been incorrect. All fees and expenses of the Firm will be paid by the Company.

8. <u>Restricted Activities</u>. The Executive agrees that some restrictions on his activities during and after his employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the company and its Subsidiaries:

(a) While the Executive is employed by the Company and for one (1) year after his employment terminates (or eighteen (18) if the Executive is terminated in accordance with Section 6 (d)(ii)) (in the aggregate, the "Non-Competition Period") the Executive shall not, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, compete with the Company: (i) anywhere throughout the world; (ii) in North America; (iii) in South America; (iv) in Europe; (v) in Asia; or (vi) in Australia. Specifically, but without limiting the foregoing, the Executive agrees not to: (A) undertake any planning for any business competitive with the Company or any of its Subsidiaries; or (B) engage in any manner in any activity that is competitive with the business of the Company or any of its Subsidiaries. For the purposes of this Section 8, the Executive's undertaking shall encompass all items, products and services that may be used in substitution for Products.

(b) The Executive agrees that, during his employment with the Company, he will not undertake any outside activity, whether or not competitive with the business of the Company or its Subsidiaries that could reasonably give rise to a conflict of interest or otherwise interfere with his duties and obligations to the Company or any of its Subsidiaries.

<div align="center">10</div>

(c) The Executive further agrees that while he is employed by the Company and during the Non-Competition Period, the Executive will not, directly or indirectly, (i) hire or attempt to hire any employee of the Company or any of its Subsidiaries, (ii) hire or attempt to hire any independent contractor providing services to the Company or any of its Subsidiaries, (iii) assist in hiring or any attempt to hire anyone identified in clauses (i) or (ii) of this sentence by any other Person, (iv) encourage any employee or independent contractor of the Company or any of its Subsidiaries to terminate his or her relationship with the Company or any of its Subsidiaries, or (v) solicit or encourage any customer or vendor of the Company or any of its Subsidiaries to terminate or diminish its relationship with any of them, or, in the case of a customer, to conduct with any Person any competing business or activity.

(d) In the event that the one (1) year or eighteen (18) month post-termination period stated above is held unenforceable by a court of competent jurisdiction due to its length, then the period shall be six (6) months.

9. <u>Confidential Information</u>.

(a) The Executive acknowledges that the Company and its Subsidiaries continually develop Confidential Information, that the Executive has in the past and may in the future develop Confidential Information for the Company or its Subsidiaries and that the Executive has in the past and may in the future learn of Confidential Information during the course of employment. The Executive will comply with the policies and procedures of the Company and its Subsidiaries for protecting Confidential Information and shall never use or disclose to any Person (except as required by applicable law or for the proper performance of his duties and responsibilities to the Company and its Subsidiaries), any Confidential Information obtained by the Executive incident to his employment or other association with the Company or any of its Subsidiaries. The Executive understands that this restriction shall continue to apply after his employment terminates, regardless of the reason for such termination.

(b) All documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or its Subsidiaries and any copies, in whole or in part, thereof (the "Documents"), whether or not prepared by the Executive, shall be the sole and exclusive property of the Company and its Subsidiaries. The Executive shall safeguard all Documents and shall surrender to the Company at the time his employment terminates, or at such earlier time or times as the Board or its designee may specify, all Documents then in the Executive's possession or control.

11

10. <u>Assignment of Rights to Intellectual Property</u>. The Executive shall promptly and fully disclose all Intellectual Property to the Company. The Executive hereby assigns and agrees to assign to the Company (or as otherwise directed by the Company) the Executive's full right, title and interest in and to all Intellectual Property. The Executive agrees to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property. The Executive will not charge the Company for time spent in complying with these obligations. All copyrightable works that the Executive creates shall be considered "work made for hire."

11. <u>Notification Requirement</u>. Until the conclusion of the Non-Competition Period, the Executive shall give notice to the Company of each new business activity that he plans to undertake at least thirty (30) days prior to beginning any such activity. Such notice shall state the name and address of the Person for whom such activity is undertaken and the nature of the Executive's business relationship(s) and position(s) with such Person. The Executive shall provide the Company with such other pertinent information concerning such business activity as the Company may reasonably request in order to determine the Executive's continued compliance with his obligations under Sections 8, 9 and 10 hereof.

12. <u>Enforcement of Covenants</u>. The Executive acknowledges that he has carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed upon his pursuant to Sections 8, 9 and 10 hereof. The Executive agrees that said restraints are necessary for the reasonable and proper protection of the Company and its Subsidiaries and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. The Executive further acknowledges that, were he to breach any of the covenants contained in Sections 8, 9 and 10 hereof, the damage to the Company would be irreparable. The Executive therefore agrees that the Company, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by the Executive of any of said covenants, without having to post bond. The parties further agree that, in the event that any provision of Sections 8, 9 and 10 hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

13. <u>Conflicting Agreements</u>. The Executive hereby represents and warrants that the execution of this Agreement and the performance of his obligations hereunder will not breach or be in conflict with any other agreement to which the Executive is a party or is bound and that the Executive is not now subject to any covenants against competition or similar covenants or any court order or other legal obligation that would affect the performance of his obligations hereunder. The Executive will not disclose to or use on behalf of the Company any proprietary information of a third party without such party's consent.

12

14. <u>Definitions</u>. Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this Section 14 and as provided elsewhere herein. For purposes of this Agreement, the following definitions apply:

(a) "Affiliate" means, with respect to the Company or any other specified Person, any other Person directly or indirectly controlling, controlled by or under common control with the Company or such other specified Person, where control may be by management authority, equity interest or other means.

(b) "Change of Control" shall mean any of the following which takes place after the consummation of the initial public offering of common stock of the Company (including as part of an income deposit security or other investment unit) registered under the Securities Act of 1933, as amended: (i) any Person or "group," within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934 (the "Act"), other than the Company or any of its Subsidiaries or any trustee or other fiduciary holding securities under an employee benefit plan of the Company or one of its Subsidiaries, becomes a beneficial owner, directly or indirectly, in one or a series of transactions, of securities representing fifty percent (50%) or more of the total number of votes that may be cast for the election of directors of the Company; (ii) any merger or consolidation involving the Company or any sale or other disposition of all or substantially all of the assets of the Company, or any combination of the foregoing, occurs and the beneficial owners of the Company's voting securities outstanding immediately prior to such consolidation, merger, sale or other disposition do not, immediately following the consummation of such consolidation, merger, sale or other disposition, hold beneficial ownership, directly or indirectly, of securities representing fifty percent (50%) or more of the total number of votes that may be cast for election of directors of the surviving or resulting corporation in the case of any merger or consolidation or of the acquiring Person or Persons in the case of any sale or other disposition; or (iii) within twelve (12) months after a tender offer or exchange offer for voting securities of the Company (other than by the Company or any of its Subsidiaries), individuals who are Continuing Directors shall cease to constitute a majority of the Board. For the purpose of this definition, the term "beneficial owner" (and correlative terms, including "beneficial ownership") shall have the meaning set forth in Rule 13d-3 under the Act.

(c) "Confidential Information" means any and all information of the Company and its Subsidiaries that is not generally known by others with whom they compete or do business, or with whom they plan to compete or do business and any and all information which, if disclosed by the Company or its Subsidiaries, would assist in competition against them. Confidential Information includes without limitation such information relating to (i) the development, research, testing, manufacturing,

13

marketing and financial activities of the Company and its Subsidiaries, (ii) the Products, (iii) the costs, sources of supply, financial performance and strategic plans of the Company and its Subsidiaries, (iv) the identity and special needs of the customers of the Company and its Subsidiaries and (v) the people and organizations with whom the Company and its Subsidiaries have business relationships and those relationships. Confidential Information also includes any information that the Company or any of its Subsidiaries have received, or may receive hereafter, from others which was received by the Company or any of its Subsidiaries with any understanding, express or implied, that the information would not be disclosed.

(d) "Continuing Director" means, with respect to any event referred to in the definition of "Change of Control," each individual who was a director of the Company immediately prior to the event in question and each individual whose election as a director by the Board or whose nomination for election by the stockholders of the Company was approved by a vote of two-thirds of the directors then still in office who were directors immediately prior to such event or whose election or nomination was previously so approved.

(e) "Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by the Executive (whether alone or with others and whether or not during normal business hours or on or off the premises of the Company or any of its Subsidiaries) during the Executive's employment with the Company or any of its Subsidiaries (including prior to the Effective Date if applicable) that relate to either the Products or any prospective activity of the Company or any of its Subsidiaries or that make use of Confidential Information or any of the equipment or facilities of the Company or any of its Subsidiaries.

(f) "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization.

(g) "Products" mean all products planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by the Company or any of its Subsidiaries, together with all services provided or planned by the Company or any of its Subsidiaries, during the Executive's employment with the Company or any of its Subsidiaries (including prior to the Effective Date if applicable).

(h) "Subsidiary" shall mean any Person of which the Company (or other specified Person) shall, directly or indirectly, own beneficially or control the voting of at least a majority of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally or at least a majority of the partnership, membership, joint venture or similar interests, or in which the Company (or other specified Person) or a Subsidiary thereof shall be a general partner or joint venturer without limited liability.

14

(i) All references in this Agreement to termination of employment, separation from service, retirement and similar or correlative terms, when used in a context that bears upon the vesting, payment or timing of payment of any amounts or benefits that constitute or could constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code, shall be construed to require a "separation from service" (as that term is defined in Section 1.409A-1(h) of the Treasury Regulations) from the Company and from all other corporations and trades or businesses, if any, that would be treated as a single "service recipient" with the Company under Section 1.409A-1 (h)(3) of the Treasury Regulations. The Company may, but need not, elect in writing, subject to the applicable limitations under Section 409A of the Code, any of the special elective rules prescribed in Section 1.409A-1(h) of the Treasury Regulations for purposes of determining whether a "separation from service" has occurred. Any such written election shall be deemed part of this Agreement.

15. <u>Survival</u>. The provisions of this Agreement shall survive following the Termination Date if so provided herein or desirable to accomplish the purposes of other surviving provisions, including without limitation the provisions of Sections 6, 7, 8, 9, 10 and 11.

16. <u>Withholding</u>. All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

17. <u>Assignment</u>. Neither the Company nor the Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; <u>provided</u>, <u>however</u>, that the Company may assign its rights and obligations under this Agreement without the consent of the Executive in the event that the Company shall hereafter effect a reorganization, consolidation or merger or to whom the Company transfers all or substantially all of its properties or assets. This Agreement shall inure to the benefit of and be binding upon the Company and the Executive, their respective successors, executors, administrators, heirs and permitted assigns.

18. <u>Severability</u>. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

<div align="center">15</div>

19. <u>Waiver</u>. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of either party to require the performance of any term or obligation of this Agreement, or the waiver by either party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

20. <u>Notices</u>. Any and all notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered in person, when delivered by courier at the Executive's last known address on the books of the Company, or five (5) business days following deposit in the United States mail, postage prepaid, registered or certified, and addressed to the Executive at his last known address on the books of the Company or, in the case of the Company, at its principal place of business, attention of the Chairman of the Board or to such other address as either party may specify by notice to the other actually received.

21. <u>Entire Agreement</u>. This Agreement and the other plans and documents specifically referred to herein constitute the entire agreement between the parties regarding the subject matter of this Agreement and such other plans and documents and supersede all prior communications, agreements and understandings, written or oral, with respect to such subject matter.

22. <u>Amendment</u>. This Agreement may be amended or modified only by a written instrument signed by the Executive and by an expressly authorized representative of the Company.

23. <u>Headings</u>. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

24. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

25. <u>Governing Law</u>. This is a North Carolina contract and shall be construed and enforced under and be governed in all respects by the laws of the State of North Carolina, without regard to the conflict of laws principles thereof.

26. <u>Seal</u>. The Executive warrants and represents that he hereby adopts the word/symbol (SEAL) as his seal with the intent that this Agreement be signed by the Executive under seal and treated as a sealed instrument.

27. <u>Consideration</u>. The parties expressly waive any defense either may now or hereafter have as to the lack of inadequacy of consideration for this Agreement.

<u>THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK</u>

16

IN WITNESS WHEREOF, this Agreement has been executed as a sealed instrument by the Executive, and by the Company, through its duly authorized representative, as the date first above written.

THE EXECUTIVE:

/s/ David G. Maffucci (SEAL)                                          By:    /s/ Stephen R. Light
Name:  David G. Maffucci                                             Title:   Chairman and CEO

17

**Exhibit 10.4**

**SUPPLEMENTAL AGREEMENT No 1 TO THE MANAGEMENT SERVICE
CONTRACT FOR MANAGEMENT BOARD MEMBERS**

between

**Stowe Woodward AG**

Am Langen Graben 22, 52353 Düren, represented by its Supervisory Board, in turn
represented by its chairman, Stephen R. Light (hereinafter the "Company")

and

**Mr. Peter Williamson**

Bismarckstraße 3, 69198 Schriesheim (hereinafter the "Management Board Member")

dated March 12, 2008.

1.  In addition to the position as member of the management board of the Company, it is intended to appoint the Management Board Member also as Managing Director ("Geschäftsführer") of Xerium Germany Holding GmbH as well as of Xerium Technologies Limited UK. The Management Board Member's annual base salary as specified under section 3.1 of the Management Service Contract for Management Board Members shall cover all additional activities in connection with these positions, and it is agreed that no additional remuneration shall be paid.

2.  All other provisions of the Management Service Contract for Management Board Member remain unchanged and unaffected.

The Company,                                            Management Board Member
represented by:
Stephen R. Light, Chairman
of the Supervisory Board

Place, Date:  Raleigh, North Carolina, U.S.A,         Place, Date:  Düren, June 10, 2009
              June 10, 2009

Signature:  /s/ Stephen R. Light                      Signature:  /s/ Peter Williamson

**Exhibit 31.1**

CHIEF EXECUTIVE OFFICER CERTIFICATION

I, Stephen R. Light, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Xerium Technologies, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 6, 2009

/s/ Stephen R. Light
_____
Stephen R. Light
President, Chief Executive Officer and Chairman
(Principal Executive Officer)

**Exhibit 31.2**

CHIEF FINANCIAL OFFICER CERTIFICATION

I, David G. Maffucci, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Xerium Technologies, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 6, 2009

/s/ David G. Maffucci
_____
David G. Maffucci
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned, as principal executive officer of Xerium Technologies, Inc. (the "Company"), does hereby certify that, to his knowledge:

1) the Company's Form 10-Q for the period ended June 30, 2009, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) the information contained in the Company's Form 10-Q for the period ended June 30, 2009, fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Stephen R. Light
Stephen R. Light
President, Chief Executive Officer and Chairman
(Principal Executive Officer)

August 6, 2009

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned, as principal financial officer of Xerium Technologies, Inc. (the "Company"), does hereby certify that, to his knowledge:

1) the Company's Form 10-Q for the period ended June 30, 2009, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) the information contained in the Company's Form 10-Q for the period ended June 30, 2009, fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ David G. Maffucci
David G. Maffucci
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

August 6, 2009

## EXHIBIT E

**XERIUM'S FORM 10-Q FOR THE QUARTERLY PERIOD
ENDED SEPTEMBER 30, 2009**

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

---

☒ **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period Ended September 30, 2009**

or

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Transition Period from _____ to _____**

**Commission File Number 001-32498**

---

# Xerium Technologies, Inc.
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **DELAWARE** | **42-1558674** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **8537 Six Forks Road Suite 300 Raleigh, North Carolina** | **27615** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(919) 526-1400**
**(Registrant's telephone number, including area code)**

---

**(Former name, former address and former fiscal year, if changed since last report)**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer | ☒ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The number of shares of the registrant's common stock, $0.01 par value, outstanding as of November 2, 2009 was 48,934,820.

Table of Contents

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Part I. Financial Information | | |
| Item 1. | Financial Statements | 3 - 30 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 31 - 55 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 55 - 56 |
| Item 4. | Controls and Procedures | 57 |
| Part II. Other Information | | |
| Item 1. | Legal Proceedings | 57 |
| Item 1A. | Risk Factors | 57 - 60 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 60 |
| Item 3. | Defaults Upon Senior Securities | 60 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 60 |
| Item 5. | Other Information | 60 |
| Item 6. | Exhibits | 61 |

2

Table of Contents

## PART I. FINANCIAL INFORMATION

**ITEM 1.    FINANCIAL STATEMENTS**

### Xerium Technologies, Inc.

**Condensed Consolidated Balance Sheets—(Unaudited)**
**(dollars in thousands, except per share data)**

|  | September 30, 2009 | December 31, 2008 |
|---|---:|---:|
| **ASSETS** |  |  |
| Current assets: |  |  |
|     Cash and cash equivalents | $ 21,816 | $ 34,733 |
|     Accounts receivable (net of allowance for doubtful accounts of $7,780 at September 30, 2009 and $14,937 at December 31, 2008) | 81,745 | 94,049 |
|     Inventories | 82,128 | 85,543 |
|     Prepaid expenses | 5,917 | 4,844 |
|     Other current assets | 27,680 | 14,938 |
| Total current assets | 219,286 | 234,107 |
| Property and equipment, net | 392,299 | 384,590 |
| Goodwill | 155,055 | 155,205 |
| Intangible assets | 12,670 | 32,129 |
| Other assets | 5,106 | 5,541 |
|       Total assets | $ 784,456 | $ 811,572 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** |  |  |
| Current liabilities: |  |  |
|     Notes payable | $ 28,100 | $ — |
|     Accounts payable | 27,703 | 53,076 |
|     Accrued expenses | 63,269 | 83,139 |
|     Current maturities of long-term debt | 10,058 | 39,687 |
|     Long-term debt classified as current | 585,156 | — |
| Total current liabilities | 714,286 | 175,902 |
| Long-term debt, net of current maturities and long-term debt classified as current | 5,240 | 577,270 |
| Deferred and long-term taxes | 15,595 | 13,358 |
| Pension, other postretirement and postemployment obligations | 68,134 | 67,029 |
| Other long-term liabilities | 4,657 | 5,594 |
| Commitments and contingencies |  |  |
| Stockholders' deficit |  |  |
|     Preferred stock, $0.01 par value, 1,000,000 shares authorized; no shares outstanding as of September 30, 2009 and December 31, 2008 | — | — |
|     Common stock, $0.01 par value, 150,000,000 shares authorized; 48,934,820 and 46,257,772 shares outstanding as of September 30, 2009 and December 31, 2008, respectively | 489 | 463 |
|     Paid-in capital | 221,399 | 220,370 |
|     Accumulated deficit | (234,143) | (218,915) |
|     Accumulated other comprehensive loss | (11,201) | (29,499) |
|     Total stockholders' deficit | (23,456) | (27,581) |
|       Total liabilities and stockholders' deficit | $ 784,456 | $ 811,572 |

See accompanying notes.

3

Table of Contents

**Xerium Technologies, Inc.**

**Condensed Consolidated Statements of Operations—(Unaudited)**
**(dollars in thousands, except per share data)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Net sales | $ 130,308 | $ 159,307 | $ 367,654 | $ 488,687 |
| Costs and expenses: | | | | |
|   Cost of products sold | 81,520 | 106,513 | 228,956 | 303,763 |
|   Selling | 16,991 | 20,125 | 49,574 | 62,437 |
|   General and administrative | 15,428 | 28,265 | 35,100 | 70,322 |
|   Restructuring and impairments | 1,754 | 3,612 | 2,894 | 6,862 |
|   Research and development | 2,708 | 2,910 | 8,168 | 9,109 |
|   Curtailment/settlement gains | — | (39,968) | — | (39,968) |
| | 118,401 | 121,457 | 324,692 | 412,525 |
| Income from operations | 11,907 | 37,850 | 42,962 | 76,162 |
| Interest expense | (16,651) | (16,963) | (48,899) | (43,513) |
| Interest income | 226 | 733 | 947 | 1,296 |
| Foreign exchange gain (loss) | 561 | 710 | (225) | 3,344 |
| Income (loss) before provision for income taxes | (3,957) | 22,330 | (5,215) | 37,289 |
| Provision for income taxes | 3,424 | 794 | 10,013 | 6,344 |
| Net income (loss) | $ (7,381) | $ 21,536 | $ (15,228) | $ 30,945 |
| Net income (loss) per share: | | | | |
|   Basic | $ (0.15) | $ 0.47 | $ (0.31) | $ 0.67 |
|   Diluted | $ (0.15) | $ 0.46 | $ (0.31) | $ 0.67 |
| Shares used in computing net income (loss) per share: | | | | |
|   Basic | 48,882,979 | 46,163,605 | 48,898,255 | 46,111,390 |
|   Diluted | 48,882,979 | 46,327,233 | 48,898,255 | 46,208,018 |

See accompanying notes.

4

Table of Contents

**Xerium Technologies, Inc.**

**Condensed Consolidated Statements of Cash Flows—(Unaudited)**
**(dollars in thousands)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| **Operating activities** | | |
| Net income (loss) | $(15,228) | $ 30,945 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Stock-based compensation | 1,824 | 774 |
| Depreciation | 29,021 | 33,311 |
| Amortization of intangibles | 1,748 | 2,386 |
| Deferred financing cost amortization | 3,895 | 3,539 |
| Unrealized foreign exchange (gain) loss on revaluation of debt | (1,719) | (2,510) |
| Deferred taxes | 2,835 | (9,419) |
| Asset impairments | 1,667 | 472 |
| Gain on disposition of property and equipment | (2,024) | (2,637) |
| Change in fair value of interest rate swaps | 1,653 | (1,998) |
| Provision for bad debt expense | (4,823) | 8,163 |
| Curtailment/settlement gains | — | (39,968) |
| Change in assets and liabilities which provided (used) cash: | | |
| Accounts receivable | 21,795 | 3,407 |
| Inventories | 9,319 | 13,150 |
| Prepaid expenses | (771) | (596) |
| Other current assets | 3,057 | 373 |
| Accounts payable and accrued expenses | (48,385) | 15,155 |
| Deferred and other long-term liabilities | (75) | (1,713) |
| Net cash provided by operating activities | 3,789 | 52,834 |
| **Investing activities** | | |
| Capital expenditures, gross | (13,970) | (29,145) |
| Proceeds from disposals of property and equipment | 4,211 | 3,566 |
| Proceeds from acquisition, net of cash acquired | — | 144 |
| Other | 1,100 | (1,700) |
| Net cash used in investing activities | (8,659) | (27,135) |
| **Financing activities** | | |
| Net increase in borrowings (maturities of 90 days or less) | 28,000 | (1,768) |
| Proceeds from borrowings (maturities longer than 90 days) | — | 2,381 |
| Principal payments on debt | (35,872) | (22,205) |
| Other | (1,442) | (8,794) |
| Net cash used in financing activities | (9,314) | (30,386) |
| Effect of exchange rate changes on cash flows | 1,267 | (1,082) |
| Net (decrease) increase in cash | (12,917) | (5,769) |
| Cash and cash equivalents at beginning of period | 34,733 | 24,218 |
| Cash and cash equivalents at end of period | $ 21,816 | $ 18,449 |

See accompanying notes.

5

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements**
**(dollars in thousands, except per share data)**

## 1. Company History

Xerium Technologies, Inc. (the "Company") is a leading global manufacturer and supplier of two types of consumable products used primarily in the production of paper – clothing and roll covers. Operations are strategically located in the major paper-making regions of the world, including North America, Europe, South America and Asia-Pacific.

## 2. Senior Credit Facility Matters and Basis of Presentation

### (a) Senior Credit Facility Matters

The Company's senior credit facility ("Credit Agreement") requires that the Company satisfy certain operating requirements and financial covenant ratios in order to avoid a default or event of default under the Credit Agreement. As previously disclosed in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009, the Company anticipated that it would not be in compliance with certain financial covenants of the Credit Agreement for the period ending September 30, 2009. Therefore to provide the Company with additional time to work with its creditors and stockholders to find long-term solutions to its credit issues, on September 29, 2009, the Company entered into Waiver and Amendment No. 1 (the "Waiver Agreement") to the Credit Agreement. As of September 30, 2009, the Company was not in compliance with those covenants. Absent the Waiver Agreement, failure to meet these financial covenants would constitute an event of default under the Credit Agreement and potentially could lead to acceleration of the Company's loan obligations by the lenders, the termination of its interest rate swap agreements by the counterparties (see Note 4) or the initiation of insolvency proceedings against the Company in some non-U.S. jurisdictions.

Pursuant to the Waiver Agreement, the lenders agreed to waive any violation of the interest coverage, leverage and fixed charge covenants under the Credit Agreement until the earliest of (i) the occurrence of any other default under the Credit Agreement, (ii) the Company's failure to comply with any term of the Waiver Agreement or (iii) December 15, 2009 (the "Waiver Period"). During the Waiver Period no new revolving loans may be made to the Company. The Company may request new letters of credit of up to $3,500 for equipment purchases and may extend the expiration dates for certain outstanding letters of credit.

In connection with the Waiver Agreement, the Company paid aggregate fees to the lenders of approximately $1,500 at the time of the effectiveness of the Waiver Agreement. Additional fees of approximately $1,500 will be paid at the maturity date for the loans under the Credit Agreement and will accrue interest at the rate applicable to the loans at that time. In addition, during the period between September 29, 2009 and December 15, 2009 the outstanding balance under the Credit Agreement will bear interest at a rate that is 1.0% per year in excess of the non-default rate otherwise payable during that period under the Credit Agreement. The non-default rate is LIBOR, the Euribor or CDOR rate plus the applicable margin of 5.50%.

The Company has formed a steering committee of its Board of Directors to explore initiatives to address long-term solutions to its credit issues. The Company is in discussions with its current lenders regarding restructuring or replacing some or all of its debt, which would be likely to include the issuance of equity to such lenders and the payment of additional fees, as well as exploring with third parties various strategic alternatives affecting our debt and equity ownership.

**Table of Contents**

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**2. Senior Credit Facility Matters and Basis of Presentation—(continued)**

    *(a) Senior Credit Facility Matters—(continued)*

Even with the additional time provided by the Waiver Agreement, there can be no assurance that the Company will be able to complete any initiatives to resolve its credit issues on satisfactory terms, or at all. Any such initiatives the Company pursues are likely to severely dilute its existing stockholders and may result in its existing common stock having little or no value. If the Company is unable to execute its initiatives prior to the expiration of the Waiver Period, its failure to comply with the financial covenants of the Credit Agreement as of September 30, 2009 would be a default under that Agreement, absent a further waiver of those terms, which may not be available at that time. The Company is seeking an additional wavier to extend the Waiver Period and provide additional Credit Agreement relief from the payment of principal and interest due. The Company anticipates that it may have insufficient cash at year end to both make its required payments under the Credit Agreement and operate its business. Accordingly, absent a waiver of some or all of the scheduled quarterly payments required under the Credit Agreement, which would require unanimous approval of the lenders of the debt outstanding under the Credit Agreement, the Company may default on its payment obligations under the Credit Agreement or seek relief through the bankruptcy courts. There can be no assurance that the Company will be able to obtain a waiver of all or any portion of the scheduled quarterly payments under the Credit Agreement from its lenders.

Because the Waiver Agreement expires December 15, 2009, the accompanying balance sheet as of September 30, 2009 includes a reclassification of $585,156 to reflect as current the long-term debt under the Credit Agreement that was anticipated to be in default. Additionally, related deferred financing costs of approximately $16,948 were also reclassified to other current assets from other assets as of September 30, 2009.

    *(b) Basis of Presentation*

The accompanying unaudited condensed consolidated interim financial statements at September 30, 2009 and for the three and nine months ended September 30, 2009 and 2008 include the accounts of the Company and its wholly-owned subsidiaries and have been prepared in conformity with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and pursuant to the rules and regulations of the Securities and Exchange Commission. Accordingly, such financial statements do not include all of the information and footnotes required by GAAP for complete financial statements. GAAP requires the Company's management to make estimates and assumptions that affect the amounts reported in the financial statements. Actual results could differ from those estimates. The interim results presented herein are not necessarily indicative of the results to be expected for the entire year. In management's opinion, these unaudited condensed consolidated interim financial statements contain all adjustments of a normal recurring nature necessary for a fair presentation of the financial statements for the interim periods presented. These unaudited condensed consolidated interim financial statements should be read in conjunction with the Company's audited consolidated financial statements for the year ended December 31, 2008 as reported on Form 10-K on March 12, 2009.

**Table of Contents**

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

### 3. Accounting Policies

#### Derivatives and Hedging

Effective January 1, 2009, the Company adopted Accounting Standards Codification ("ASC") Topic 815-10-65-1, *Transition and Effective Date Related to FASB Statement No. 161, Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133* ("Topic 815-10-65-1") for disclosure related to derivatives and hedging. Topic 815-10-65-1 amends and expands the disclosure requirements to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. Topic 815-10-65-1 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments and disclosures about credit-risk-related contingent features in derivative instruments.

As required by ASC Topic 815 *Derivatives and Hedging* ("Topic 815"), the Company records all derivatives on the balance sheet at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether the Company has elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to changes in the fair value of an asset, liability or firm commitment attributable to a particular risk are considered fair value hedges. Derivatives designated and qualifying as a hedge of the exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Derivatives may also be designated as hedges of the foreign currency exposure of a net investment in a foreign operation. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the recognition of the changes in the fair value of the hedged asset or liability that are attributable to the hedged risk in a fair value hedge or the earnings effect of the hedged forecasted transactions in a cash flow hedge.

The Company may enter into derivative contracts that are intended to economically hedge certain of its risks, even though hedge accounting does not apply or the Company elects not to apply hedge accounting under Topic 815.

#### Goodwill

The Company accounts for goodwill and other intangible assets in accordance with ASC Topic 350, *Intangibles—Goodwill and Other Intangible Assets* ("Topic 350"). Topic 350 requires that goodwill and intangible assets that have indefinite lives not be amortized but, instead, must be tested at least annually for impairment or whenever events or business conditions warrant. As a result of the tests as of December 31, 2008, the Company determined that no goodwill impairment existed. During the third quarter of 2009, the Company evaluated events and circumstances that may have indicated an impairment of goodwill and performed an interim test for goodwill impairment. The interim test indicated that no impairment exists.

8

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**3. Accounting Policies—(continued)**

### Net Income (Loss) Per Common Share

Net income (loss) per common share has been computed and presented pursuant to the provisions of ASC Topic 260, *Earnings per Share* ("Topic 260"). Net income per share is based on the weighted-average number of shares outstanding during the period. As of September 30, 2009 and 2008, the Company had outstanding restricted stock units ("RSUs") (see Note 14).

For the three months ended September 30, 2008, the diluted average shares outstanding were computed using the average market price for time-based RSUs granted in 2005 and certain time-based RSUs granted in 2008 and the actual grant date market price for non-employee director RSUs. The calculation of diluted earnings per share for 2008 excluded the Company's performance-based RSUs granted in 2005 and 2007 that are based on shareholder return targets because the performance criteria had not been contingently achieved and therefore the RSUs were not contingently issuable.

For the three months ended September 30, 2009, the diluted average shares outstanding were computed using the average market price for time-based RSUs granted in 2008 and 2009 and the actual grant date market price for non-employee director RSUs. The calculation of diluted earnings per share for the three and nine months ended September 30, 2009 excluded the Company's performance-based RSUs granted in 2005, 2007, 2008 and 2009 that are based on shareholder return targets because the performance criteria have not been contingently achieved and therefore the RSUs are not contingently issuable. For the three and nine months ended September 30, 2009, the Company excluded the dilutive impact of potential future issuances of common stock underlying the Company's RSUs from the calculation of diluted average shares outstanding because their effect would have been antidilutive as the Company had a net loss for these periods.

The following table sets forth the computation of basic and diluted earnings weighted average shares:

| | Three Months Ended September 30, 2009 | Three Months Ended September 30, 2008 | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
|---|---|---|---|---|
| Weighted-average common shares outstanding—basic | 48,882,979 | 46,163,605 | 48,898,255 | 46,111,390 |
| Dilutive effect of stock-based compensation awards outstanding | — | 163,628 | — | 96,628 |
| Weighted-average common shares outstanding—diluted | 48,882,979 | 46,327,233 | 48,898,255 | 46,208,018 |

### Reclassifications

Certain prior period amounts have been reclassified to conform to the current period presentation.

### New Accounting Standards

In August 2009, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") 2009-05 – *Measuring Liabilities at Fair Value* ("ASU 2009-05"), which is an update of ASC Topic 820, *Fair Value Measurements.* ASU 2009-05 was issued to reduce potential ambiguity in financial reporting related to the fair value of liabilities by providing clarification on measuring liabilities at fair value when a quoted price in an active market is not available. ASU 2009-05 is effective for the fourth quarter of 2009 and the Company believes that the adoption of ASU 2009-05 will have no material impact on its consolidated financial statements.

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**3. Accounting Policies—(continued)**

*New Accounting Standards—(continued)*

In June 2009, the FASB issued ASU No. 2009-01, *Topic 105—Generally Accepted Accounting Principles, amendments based on Statement of Financial Accounting Standards* ("SFAS") *No. 168 — The FASB Accounting Standards Codification™ and the Hierarchy of Generally Accepted Accounting Principles* ("ASU No. 2009-01"). ASU No. 2009-01 is effective for interim periods ending after September 15, 2009 and identifies the sources of accounting principles and the framework for selecting the principles used in the preparation of financial statements of nongovernmental entities that are presented in conformity with generally accepted accounting principles in the United States ("GAAP"). The objective of this statement is to establish the FASB Accounting Standards Codification™ (Codification) as the source of authoritative accounting principles recognized by the FASB to be applied by nongovernmental entities in the preparation of financial statements in conformity with GAAP. Rules and interpretive releases of the Securities and Exchange Commission ("SEC") under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants. The adoption of ASU No. 2009-01 had no material impact on the Company's consolidated financial statements.

In June 2009, the FASB issued SFAS No. 167, *Amendments to FASB Interpretation No. 46(R)* ("SFAS No. 167"), which amends the consolidation guidance applicable to variable interest entities. The amendments will significantly affect the overall consolidation analysis under FASB Interpretation No. 46(R). SFAS No. 167 is effective as of the beginning of the first fiscal year that begins after November 15, 2009 and the Company believes that the adoption of SFAS No. 167 will have no material impact on its consolidated financial statements.

In June 2009, the FASB issued FASB Statement No. 166, *Accounting for Transfers of Financial Assets—an amendment of FASB Statement No. 140* ("SFAS No. 166"). SFAS No. 166 is intended to improve the relevance, representational faithfulness and comparability of the information that a reporting entity provides in its financial statements about a transfer of financial assets; the effects of a transfer on its financial position, financial performance, and cash flows; and a transferor's continuing involvement, if any, in transferred financial assets. SFAS No. 166 must be applied as of the beginning of each reporting entity's first annual reporting period that begins after November 15, 2009, for interim periods within that first annual reporting period and for interim and annual reporting periods thereafter. Earlier application is prohibited. The Company believes that the adoption of SFAS No. 166 will have no material impact on its consolidated financial statements.

In May 2009, the FASB issued, in ASC Topic 855-10-50-1, *Subsequent Events* ("Topic 855"), general standards of accounting for and disclosure of events that occur after the balance sheet date but before financial statements are issued or are available to be issued. It requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for that date—that is, whether that date represents the date the financial statements were issued or were available to be issued. This disclosure should alert all users of financial statements that an entity has not evaluated subsequent events after that date in the set of financial statements being presented. Topic 855 is effective for interim and annual periods ending after June 15, 2009. The adoption of Topic 855 had no material impact on its consolidated financial statements. The Company has evaluated subsequent events through November 6, 2009, which represents the date the Company's Form 10-Q for the quarter ended September 30, 2009 was filed with the SEC.

10

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**3. Accounting Policies—(continued)**

*New Accounting Standards—(continued)*

In April 2009, the FASB issued, in ASC Topic 825-10-65, *Transition Related to FSP FAS 107-1 and APB 28-1, Interim Disclosures about Fair Value of Financial Instruments* ("Topic 825-10-65"), requirements for disclosure about fair value of financial instruments for interim reporting periods of publicly traded companies as well as in annual financial statements. Topic 825-10-65 is effective for interim reporting periods ending after June 15, 2009. The adoption of Topic 825-10-65 had no material impact on the Company's consolidated financial statements. See Note 6 for further discussion.

Effective January 1, 2009, the Company adopted ASC Topic 815-10-65-1 for disclosure related to derivatives and hedging. See "Derivatives and Hedging" above. The Company's adoption of Topic 815-10-65-1 did not have a material effect on its consolidated financial statements.

Effective January 1, 2008, the Company partially adopted provisions of ASC Topic 820, *Fair Value Measurements and Disclosures*, for measuring its derivative assets and liabilities. See further discussion at Note 4 "Derivatives and Hedging". ASC Topic 820-10-65-1, *Transition related to FASB Staff Position FAS157-2, Effective Date of FASB Statement No. 157* permits the Company to defer the recognition and measurement of its nonfinancial assets and nonfinancial liabilities until January 1, 2009. At January 1, 2009, the Company did not have any nonfinancial assets or nonfinancial liabilities that are recognized or disclosed at fair value.

In May 2008, the FASB issued ASC Topic 260-10-65-2, *Transition Related to FSP EITF 03-6-1* ("Topic 260"), which addresses whether instruments granted in share-based payment transactions are participating securities prior to vesting and, therefore, need to be included in the allocation in computing earnings per share under the two-class method. The FASB concluded that all outstanding unvested share-based payment awards that contain rights to nonforfeitable dividends participate in undistributed earnings with common shareholders. If awards are considered participating securities, the Company is required to apply the two-class method of computing basic and diluted earnings per share. These provisions of Topic 260 are effective for fiscal years beginning after December 15, 2008 and interim periods within those fiscal years. Early adoption is prohibited. The implementation of the provisions of Topic 260 did not impact the Company's consolidated financial statements.

In December 2007, the FASB issued, in ASC Topic 805-10-65, *Transition Related to FASB Statement No. 141 (Revised 2007), Business Combinations* ("Topic 805-10-65") requirements that upon initially obtaining control, an acquirer is to recognize 100% of the fair values of acquired assets, including goodwill, and assumed liabilities, with only limited exceptions, even if the acquirer has not acquired 100% of its target. Topic 805-10-65 also requires the acquirer to recognize changes in the amount of its deferred tax benefits that are recognizable because of a business combination, either in income from continuing operations in the period of the combination or directly in contributed capital, depending on the circumstances. On January 1, 2009, the Company adopted Topic 805-10-65, which are effective for fiscal years beginning after December 15, 2008. The adoption of these provisions of Topic 805-10-65 had no impact on the Company's consolidated financial statements.

11

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**3. Accounting Policies—(continued)**

*New Accounting Standards—(continued)*

In December 2007, the FASB issued, in ASC Topic 810-10-65, *Transition Related to FASB Statement No. 160, Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51* ("Topic 810-10-65"). Topic 810-10-65 provided clarification of the classification of noncontrolling interests in consolidated statements of financial position and the accounting for, and reporting of, transactions between the reporting entity and holders of such noncontrolling interests. On January 1, 2009, the Company adopted Topic 810-10-65, which was effective for the first annual reporting period beginning on or after December 15, 2008. Topic 810-10-65 was required to be adopted prospectively, except for reclassifying noncontrolling interests to equity, separate from the parent's shareholders' equity, in the consolidated statement of financial position and recasting consolidated net income (loss) to include net income (loss) attributable to both the controlling and noncontrolling interests, both of which are required to be adopted retrospectively. Since essentially all of the Company's subsidiaries are 100% owned, the adoption of these provisions of Topic 810-10-65 did not have a significant impact on its consolidated financial statements.

**4. Derivatives and Hedging**

*Risk Management Objective of Using Derivatives*

The Company is exposed to certain risks arising from both its business operations and economic conditions. The Company principally manages its exposures to a wide variety of business and operational risks through management of its core business activities. The Company enters into derivative financial instruments to manage exposures that arise from business activities that result in the receipt or payment of future known cash amounts, the value of which are determined by interest rates or foreign exchange rates. Specifically, the Company has entered into interest rate swaps to hedge variable interest related to its senior debt and foreign exchange contracts to protect the value of certain assets and obligations.

*Cash Flow Hedges of Interest Rate Risk*

The Company's objectives in using interest rate derivatives are to add stability to interest expense and to manage its exposure to interest rate movements. To accomplish this objective, the Company primarily uses interest rate swaps as part of its interest rate risk management strategy. Interest rate swaps designated as cash flow hedges involve the receipt of variable-rate amounts from a counterparty in exchange for the Company making fixed-rate payments over the life of the agreements without exchange of the underlying notional amount.

12

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**

**(dollars in thousands, except per share data)**

**4. Derivatives and Hedging—(continued)**

*Cash Flow Hedges of Interest Rate Risk—(continued)*

The Company anticipated that it would not be in compliance with certain financial covenants under its senior credit facility for the period ending September 30, 2009 and thus, on September 29, 2009, the Company entered into Waiver and Amendment No. 1 (the "Waiver Agreement") to the Credit Agreement (see Note 2). As of September 30, 2009, the Company was not in compliance with those covenants. As it is uncertain that the Company will be able to complete any alternative, long-term solutions to its credit issues or to obtain a further waiver prior to expiration of the Waiver Agreement, the Company is no longer able to support that the variable-rate interest payments (hedged transactions) under its senior credit facility are probable of occurring. Therefore, effective September 1, 2009, the Company was required to discontinue cash flow hedge accounting prospectively for its interest rate swaps so that the mark to market changes in their fair value are charged or credited to interest expense. Prior to September 1, 2009, the effective portion of changes in the fair value of derivatives designated and that qualified as cash flow hedges were recorded in accumulated other comprehensive income (loss) and subsequently reclassified into earnings in the period that the hedged forecasted transaction affected earnings. The ineffective portion of the change in fair value of the derivatives was recognized directly in earnings. The balance in accumulated other comprehensive loss as of August 31, 2009 related to the interest rate swaps for which hedge accounting was discontinued will be subsequently reclassified into the statement of operations (interest expense) over the remaining original term of the derivative as the hedged forecasted transactions are also recognized to interest expense, in accordance with ASC Topic 815. Accordingly, during the twelve months ended September 30, 2010, the Company estimates, based on interest rates as of September 30, 2009, that $10,115 will be reclassified as a charge to interest expense. However, if the Company is not able to restructure its debt obligations in a manner that is consistent with the hedged forecasted transactions or if the lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, the cumulative mark to market changes in the fair value of the underlying interest rate swaps that have been recorded in accumulated other comprehensive loss, in addition to the credit valuation adjustments recorded under ASC Topic 820, would be charged to the statement of operations at that time. As of September 30, 2009 this amount was $15,800. Any acceleration of the obligations of the Company under its credit facility, or any failure of the Company to make required payments under its credit facility, could allow the counterparties on certain of its existing interest rate swaps to terminate those arrangements. As of September 30, 2009, the Company estimates that the amount payable upon a termination of such interest rate swaps would have been approximately $19,045.

Although these interest rate swaps are subject to mark to market accounting through earnings effective September 1, 2009, they continue to effectively fix, from a cash flow hedge perspective, the interest rate on approximately 81% of the term loan portion of the Company's credit facility through December 31, 2010. As of September 30, 2009, the variable interest rate was effectively fixed at 10.75%. As of September 30, 2009, the Company had the following outstanding interest rate swaps, all of which were not designated as hedges:

| Interest Rate Derivative | Number of Instruments | Notional |
|---|---|---|
| Interest Rate Swaps – Canadian dollar instruments | 2 | $  57,832 |
| Interest Rate Swaps – Euro instruments | 2 | $159,064 |
| Interest Rate Swaps – U.S. dollar instruments | 2 | $260,406 |

*Non-designated Hedges of Foreign Exchange Risk*

Derivatives not designated as hedges are not speculative and are used to manage the Company's exposure to foreign exchange rates but do not meet the strict hedge accounting requirements of Topic 815. Changes in the fair value of derivatives not designated in hedging relationships are recorded directly in earnings.

13

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**4. Derivatives and Hedging—(continued)**

The Company, from time to time, enters into foreign exchange forward contracts to fix currencies at specified rates based on expected future cash flows to protect against the fluctuations in cash flows resulting from sales denominated in foreign currency (cash flow hedges). Additionally, to manage its exposure to fluctuations in foreign currency on intercompany balances and certain purchase commitments, the Company uses foreign exchange forward contracts (fair value hedges).

As of September 30, 2009, the Company had the following outstanding derivatives that were not designated as hedges in qualifying hedging relationships. The value of these contracts is recognized at fair value based on market exchange forward rates. The change in fair value of these contracts is included in foreign exchange gain/(loss) in the statement of operations.

| Foreign Currency Derivative | Notional Sold | | Notional Purchased | |
|---|---|---|---|---|
| Cash flow hedges | $ | — | $ | 682 |
| Fair value hedges | $ | (2,264) | $ | — |

*Credit-risk-related Contingent Features*

The Company has agreements with certain of its derivative counterparties that contain a provision where if the Company either defaults in payment obligations under its credit facility or if such obligations are accelerated by the lenders, then the Company could also be declared in default on its derivative obligations.

As of September 30, 2009, the fair value of derivatives in a net liability position, which includes accrued interest but excludes any adjustment for nonperformance risk, related to these agreements was $18,886. Included in this amount are certain derivative liabilities of $6,283 that are related to counterparties that are also lenders under the Company's senior credit facility. Liabilities to these counterparties for derivatives and borrowings made under the senior credit facility are secured by substantially all of the Company's assets. The Company has not posted any collateral related to other derivative agreements.

Due to reduced credit limits at some of its banks, the Company has been entering into fewer foreign currency hedging arrangements and may not be able to enter into as many hedging arrangements in the future. Additionally, as discussed above, effective September 1, 2009, the Company was required to discontinue cash flow hedge accounting prospectively for its interest rate swaps so that the mark to market changes in their fair value are charged or credited to interest expense in the Company's statement of operations. Consequently, the Company's financial statements are more exposed to the effects of currency and interest rate fluctuations, respectively, both favorable and unfavorable, which could have a material impact on its results of operations.

The table below presents the fair value of the Company's derivative financial instruments as well as their classification on the consolidated balance sheet as of September 30, 2009.

14

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**4. Derivatives and Hedging—(continued)**

**Tabular Disclosure of Fair Values of Derivative Instruments**

| | Asset Derivatives As of September 30, 2009 | | Liability Derivatives As of September 30, 2009 | |
| | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
|---|---|---|---|---|
| Derivatives designated as hedging instruments under Topic 815 | | | | |
| Interest Rate Swaps | Other current assets | $ — | Accrued expenses | $ — |
| Total derivatives designated as hedging instruments under Topic 815 | | $ — | | $ — |
| Derivatives not designated as hedging instruments under Topic 815 | | | | |
| Interest Rate Swaps | Other current assets | $ — | Accrued expenses | $ 15,886 |
| Foreign Currency Hedges | Other current assets | $ 184 | Accrued expenses | $ — |
| Total derivatives not designated as hedging instruments under Topic 815 | | $ 184 | | $ 15,886 |

The tables below present the effect of the Company's derivative financial instruments on the consolidated statements of operations for the three months ended September 30, 2009.

**Tabular Disclosure of the Effect of Derivative Instruments on the Consolidated Statements of Operations**
**for the Three Months Ended September 30, 2009**

| Derivatives in Topic 815 Cash Flow Hedging Relationships | Amount of Gain or (Loss) Recognized in OCI on Derivative (Effective Portion), net of tax | Location of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion) | Amount of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion), net of tax | Location of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Amount of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) |
|---|---|---|---|---|---|
| Interest Rate Swaps (1) | $ (1,634) | Interest expense | $ (2,952) | Interest expense | $ (266) |

| Derivatives Not Designated as Hedging Instruments Under Topic 815 | Location of Gain or (Loss) Recognized in Income on Derivative | Amount of Gain or (Loss) Recognized in Income on Derivative |
|---|---|---|
| Interest Rate Swaps (1) | Interest Expense | $ (592) |
| Foreign Currency Hedges | Foreign exchange gain | $ 120 |
| | | $ (472) |

(1)    The Company's interest rate swaps were considered designated hedging instruments through August 31, 2009. As discussed above, effective September 1, 2009, the interest rate swaps were no longer designated hedging instruments.

15

Table of Contents

Xerium Technologies, Inc.

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**4. Derivatives and Hedging—(continued)**

*Fair Value of Derivatives Under Accounting Standards Topic 820*

Effective January 1, 2008, the Company adopted ASC Topic 820 for measuring its derivative assets and liabilities. Topic 820 emphasizes that fair value is a market-based measurement, not an entity-specific measurement. Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. As a basis for considering market participant assumptions in fair value measurements, Topic 820 establishes a fair value hierarchy that distinguishes between market participant assumptions based on market data obtained from sources independent of the reporting entity (observable inputs that are classified within Levels 1 and 2 of the hierarchy) and the reporting entity's own assumptions about market participant assumptions (unobservable inputs classified within Level 3 of the hierarchy).

Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access. Level 2 inputs are inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs may include quoted prices for similar assets and liabilities in active markets, as well as inputs that are observable for the asset or liability (other than quoted prices), such as interest rates, foreign exchange rates, and yield curves that are observable at commonly quoted intervals. Level 3 inputs are unobservable inputs for the asset or liability which are typically based on an entity's own assumptions, as there is little, if any, related market activity. In instances where the determination of the fair value measurement is based on inputs from different levels of the fair value hierarchy, the level in the fair value hierarchy within which the entire fair value measurement falls is based on the lowest level input that is significant to the fair value measurement in its entirety. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment, and considers factors specific to the asset or liability.

To comply with Topic 820, the Company incorporates credit valuation adjustments to appropriately reflect both its own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements. Although the Company has determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with its derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by itself and its counterparties. However, as of September 30, 2009, the Company has assessed the significance of the impact of the credit valuation adjustments on the overall valuation of its derivative positions and has determined that the credit valuation adjustments are not significant to the overall valuation of its derivatives. As a result, the Company has determined that its derivative valuations in their entirety are classified in Level 2 of the fair value hierarchy. The Company does not have any fair value measurements using significant unobservable inputs (Level 3) as of September 30, 2009.

The table below presents the Company's assets and liabilities measured at fair value on a recurring basis as of September 30, 2009, aggregated by the level in the fair value hierarchy within which those measurements fall.

| Assets | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observables Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Derivatives | $  184 | $  — | $  184 | $  — |
| Total | $  184 | $  — | $  184 | $  — |
| | | | | |
| **Liabilities** | | | | |
| Derivatives | $(15,886) | $  — | $  (15,886) | $  — |
| Total | $(15,886) | $  — | $  (15,886) | $  — |

16

Table of Contents

<div align="center">

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

</div>

### 5. Inventories

The components of inventories are as follows at:

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Raw materials | $ 17,365 | $ 17,357 |
| Work in process | 27,734 | 29,385 |
| Finished units | 37,029 | 38,801 |
|  | $ 82,128 | $ 85,543 |

### 6. Debt

On September 29, 2009, the Company entered into the Waiver Agreement under its senior credit facility. See Note 2.

Borrowings under the revolving credit facility and the term loans carry interest at the sum of, as applicable, LIBOR, the Euribor or CDOR rate plus, in each case, the applicable margin. In connection with the amendment of the senior credit facility agreement on May 30, 2008, the applicable margin increased from 2.75% to 5.50% through December 31, 2008 with three identified step downs (i.e., to 4.25%, 3.75% and 2.75%) that are contingent upon future improvements in the Company's credit rating levels beginning January 1, 2009. Under the terms of the Waiver Agreement entered into on September 29, 2009, there is a 1% increase in interest rates through the end of the Waiver Period. Based on the 90-day LIBOR, as of September 30, 2009, approximately 81% of the Company's long-term debt under its senior credit facility was effectively fixed by interest rate swap contracts at 10.75%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed was 7.08%.

During the first quarters of 2009 and 2008, the Company made mandatory debt repayments of approximately $16,100 and $9,400, respectively, based on the difference between its "pre-dividend free cash flow", as defined in its credit facility agreement, and cash dividends paid in the prior year, multiplied by the applicable percentage as defined in the agreement. The Company also made mandatory payments of $2,600 and $500 during the second and third quarters of 2009. Beginning in 2009, the sum of voluntary and scheduled debt payments made in the previous year is subtracted from this result to determine the mandatory debt repayment. The Company also made scheduled quarterly debt payments of its senior debt of approximately $4,700 and $1,800 during the first quarters of 2009 and 2008, respectively, $4,700 and $2,000 during the second quarters of 2009 and 2008, respectively and $5,000 and $2,300 during the third quarters of 2009 and 2008, respectively. Also in the third quarter of 2008, the Company made a voluntary prepayment of approximately $6,100. During the first quarter of 2009, the Company made borrowings under its revolver of $28,000.

Topic 825-10-65 requires disclosure about fair value of financial instruments for interim reporting periods of publicly traded companies as well as in annual financial statements. The carrying value of the debt under the senior credit facility of $591,446 exceeded its fair value of approximately $421,000 as of September 30, 2009.

<div align="center">17</div>

**Table of Contents**

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**7. Income Taxes**

The Company utilizes the asset and liability method for accounting for income taxes in accordance with ASC Topic 740, *Income Taxes* ("Topic 740"). Under Topic 740, deferred tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities. Deferred tax assets and liabilities are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company reduces the deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Information evaluated includes the Company's financial position and results of operations for the current and preceding years as well as an evaluation of currently available information about future years.

Because of the Company's accumulated loss position and the uncertainty around the future profitability in certain tax jurisdictions, on September 30, 2009, the Company has deferred tax asset valuation allowances for deferred tax assets primarily related to net operating loss carry forwards in the United States, the United Kingdom, Canada, Germany, Sweden and Australia.

For the three months ended September 30, 2009 and 2008, the provision for income taxes was $3,424 and $794, respectively. For the three months ended September 30, 2009 and 2008, the effective tax rate for income taxes was (86.5%) and 3.6%, respectively. The increase in income taxes for the third quarter of 2009 as compared with the third quarter of 2008 is principally due to losses incurred by certain foreign and domestic subsidiaries for which the Company currently has deferred tax asset valuation allowances recorded, including curtailment/settlement gains recorded in the third quarter of 2008 relating to U.S. retiree plans of $40.1 million for which no taxes were reflected due to the U.S. deferred tax asset valuation allowance recorded as of 2008. Recorded deferred tax asset valuation allowances resulted in positive tax expense for the quarter ended September 30, 2009, which resulted in a negative effective rate when compared with the Company's third quarter pre-tax loss of $3,957.

For the nine months ended September 30, 2009 and 2008, the provision for income taxes was $10,013 and $6,344, respectively. The increase in income taxes for the nine months ended September 30, 2009 was primarily due to the reasons noted above for the third quarter of 2009 and the establishment of a deferred tax asset valuation allowance in Canada of approximately $2,850 in the first quarter of 2009.

As of December 31, 2008, the Company had a gross unrecognized tax benefit of $4,831. During the nine months ended September 30, 2009, the Company's unrecognized tax benefit decreased by approximately $432 based principally on the outcome of a foreign tax audit.

The Company's policy is to recognize interest and penalties related to income tax matters as income tax expense, which were immaterial for the nine months ended September 30, 2009 and 2008, respectively. The tax years 2000 through 2008 remain open to examination by the major taxing jurisdictions to which the Company and its subsidiaries are subject.

18

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

### 8. Pensions, Other Postretirement and Postemployment Benefits

The Company has defined benefit pension plans covering substantially all of its U.S. and Canadian employees and employees of certain subsidiaries in other countries. Benefits are generally based on the employee's years of service and compensation. These plans are funded in conformity with the funding requirements of applicable government regulations.

The Company also sponsors various unfunded defined contribution plans that provide for retirement benefits to employees, some in accordance with local government requirements.

Also, through December 31, 2008, the Company sponsored an unfunded plan that offered the opportunity to obtain health care benefits to a majority of all retired U.S. employees and their covered dependents and beneficiaries. A portion of this plan was contributory, with retiree contributions adjusted periodically. Eligibility varied according to date of hire, age and length of service. As of December 31, 2008, the Company no longer sponsors or funds its U.S. retiree health insurance program. Certain retirees also have a life insurance benefit provided at no cost.

Effective December 31, 2008, the Company froze benefit pension accruals under its Pension Plan for U.S. Salaried and Non-Union Hourly Employees (the "Pension Plan") so that service beyond December 31, 2008 is not credited under the Pension Plan. Employees who were vested as of December 31, 2008 will be entitled to their benefits earned as of December 31, 2008. Current employees who were not vested as of December 31, 2008 will be entitled to their benefits earned as of December 31, 2008 upon five years of continuous employment from date of hire.

Additionally, during the first quarter of 2009 the Company suspended its 401(k) plan match in the United States until further notice.

As required by ASC Topic 715-20-50, *Compensation—Retirement Benefits* ("Topic 715"), the following tables summarize the components of net periodic benefit cost:

| Defined Benefit Plans | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2009 | September 30, 2008 | September 30, 2009 | September 30, 2008 |
| Service cost | $ 1,018 | $ 1,598 | $ 2,415 | $ 4,624 |
| Interest cost | 1,731 | 1,663 | 4,710 | 5,018 |
| Expected return on plan assets | (982) | (1,200) | (2,528) | (3,602) |
| Amortization of prior service cost | 28 | 30 | 70 | 89 |
| Amortization of net loss | 284 | 137 | 804 | 395 |
| Curtailment/settlement gains | — | (3,451) | — | (3,451) |
| Net periodic benefit cost | $ 2,079 | $ (1,223) | $ 5,471 | $ 3,073 |

| Other Postretirement Benefit Plans | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2009 | September 30, 2008 | September 30, 2009 | September 30, 2008 |
| Service cost | $ — | $ 132 | $ — | $ 395 |
| Interest cost | 10 | 453 | 29 | 1,358 |
| Amortization of prior service cost | — | (140) | — | (419) |
| Amortization of net gain | (2) | (17) | (4) | (52) |
| Curtailment/settlement gains | — | (36,517) | — | (36,517) |
| Net periodic benefit cost | $ 8 | $ (36,089) | $ 25 | $ (35,235) |

19

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**9. Comprehensive Income and Accumulated Other Comprehensive Income (Loss)**

Comprehensive income for the periods ended September 30, 2009 and 2008 is as follows:

|  | Three Months Ended | | Nine Months Ended | |
|  | September 30, 2009 | September 30, 2008 | September 30, 2009 | September 30, 2008 |
|---|---|---|---|---|
| Net income (loss) | $ (7,381) | $ 21,536 | $ (15,228) | $ 30,945 |
| Foreign currency translation adjustments | 7,697 | (21,698) | 17,378 | (9,345) |
| Pension liability changes | (6) | (7,231) | (910) | (7,296) |
| Change in value of derivative instruments | 1,817 | (3,055) | 1,828 | (3,055) |
| Comprehensive income (loss) | $ 2,127 | $ (10,448) | $ 3,068 | $ 11,249 |

The components of accumulated other comprehensive income (loss) are as follows:

|  | Foreign Currency Translation Adjustment | Pension Liability Changes under Topic 715 | Value of Derivative Instruments | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance at December 31, 2008 | $ 5,891 | $ (21,531) | $ (13,859) | $ (29,499) |
| Current period change, net of tax | 17,380 | (910) | 1,828 | 18,298 |
| Balance at September 30, 2009 | $ 23,271 | $ (22,441) | $ (12,031) | $ (11,201) |

**10. Warranties**

The Company offers warranties on certain products that it sells. The specific terms and conditions of these warranties vary depending on the product sold, the country in which the product is sold and arrangements with the customer. The Company estimates the costs that may be incurred under its warranties and records a liability for such costs. Factors that affect the Company's warranty liability include the number of units sold, historical and anticipated rates of warranty claims, cost per claim and new product introduction. The Company periodically assesses the adequacy of its recorded warranty claims and adjusts the amounts as necessary. Changes in the Company's combined short-term and long-term warranty liabilities during the nine months ended September 30, 2009 are as follows:

| | |
|---|---|
| Balance at December 31, 2008 | $ 2,424 |
| Warranties provided during period | 1,647 |
| Settlements made during period | (1,707) |
| Changes in liability estimates, including expirations and currency effects | (240) |
| Balance at September 30, 2009 | $ 2,124 |

**11. Restructuring and Impairments Expense**

Restructuring and impairments expense included in the Company's income statements are the result of its long-term strategy to reduce production costs and improve long-term competitiveness. Restructuring and impairments expense consists principally of severance costs related to reductions in work force and of facility costs and impairments of assets principally related to closing facilities and/or shifting production from one facility to another. Facility costs are principally comprised of costs to relocate assets to the Company's other facilities, operating lease termination costs and other associated costs.

20

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**11. Restructuring and Impairments Expense—(continued)**

During the first quarter of 2009, the Company continued its program of streamlining its operating structure and recorded restructuring expenses of approximately $700 in connection therewith. Additionally during the first quarter of 2009, the Company sold its rolls manufacturing facility in Sweden at a gain of approximately $1,200, which was partially offset by approximately $600 of costs incurred to continue with actions related to the closure of manufacturing facilities previously announced prior to the first quarter of 2009. During the second quarter of 2009, essentially all of the Company's restructuring expenses of approximately $1,000 were related to the streamlining of its operating structure.

During the third quarter of 2009, $1,667 of the Company's $1,754 restructuring and impairments expenses was related to the impairment of long-term assets at various locations around the world. Additionally, during the third quarter of 2009, the Company continued its program of streamlining its operating structure and recorded restructuring expenses of $87 in connection therewith.

The Company expects to incur restructuring expenses of approximately $800 during the remainder of 2009, primarily related to a continuation of streamlining its operating structure.

The table below sets forth for the nine months ended September 30, 2009, the significant components and activity under restructuring programs and asset impairments:

| | Balance at December 31, 2008 | Charges | Write-offs | Currency Effects | Cash Payments | Balance at September 30, 2009 |
|---|---|---|---|---|---|---|
| Severance | $ 5,422 | $2,217 | $ — | $ 51 | $ (7,091) | $ 599 |
| Asset impairment | — | 1,667 | (1,667) | — | — | — |
| Facility costs and other | 2,455 | (990) | — | 138 | 24 | 1,627 |
| Total | $ 7,877 | $2,894 | $ (1,667) | $ 189 | $ (7,067) | $ 2,226 |

Restructuring and impairments expense by segment, which is not included in Segment Earnings (Loss) in Note 12, is as follows:

| | For the Three Months Ended | | For the Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2009 | September 30, 2008 | September 30, 2009 | September 30, 2008 |
| Clothing | $ 785 | $ 2,098 | $ 656 | $ 2,214 |
| Roll Covers | 957 | 941 | 1,000 | 2,662 |
| Corporate | 12 | 573 | 1,238 | 1,986 |
| Total | $ 1,754 | $ 3,612 | $ 2,894 | $ 6,862 |

**12. Business Segment Information**

The Company is a global manufacturer and supplier of consumable products used primarily in the production of paper, and is organized into two reportable segments: Clothing and Roll Covers. The Clothing segment represents the manufacture and sale of synthetic textile belts used to transport paper along the length of papermaking machines. The Roll Covers segment primarily represents the manufacture and refurbishment of covers used on the steel rolls of papermaking machines. The Company manages each of these operating segments separately.

21

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**12. Business Segment Information—(continued)**

Management evaluates segment performance based on earnings before interest, taxes, depreciation and amortization and before allocation of corporate charges. Such measure is then adjusted to exclude items that are of an unusual nature and are not used in measuring segment performance or are not segment specific ("Segment Earnings (Loss)"). The accounting policies of these segments are the same as those for the Company as a whole. Inter-segment net sales and inter-segment eliminations are not material for any of the periods presented.

Summarized financial information for the Company's reportable segments is presented in the tables that follow for the three and nine months ended September 30, 2009 and 2008, respectively.

|  | Clothing | Roll Covers | Corporate | Total |
|---|---|---|---|---|
| **Three Months Ended September 30, 2009:** |  |  |  |  |
| Net sales | $ 86,033 | $44,275 | $    — | $130,308 |
| Segment Earnings (Loss) | 20,186 | 11,010 | (5,345) |  |
| **Three Months Ended September 30, 2008:** |  |  |  |  |
| Net sales | $104,416 | $54,891 | $    — | $159,307 |
| Segment Earnings (Loss) | 39,463 | 16,484 | (1,054) |  |

|  | Clothing | Roll Covers | Corporate | Total |
|---|---|---|---|---|
| **Nine Months Ended September 30, 2009:** |  |  |  |  |
| Net sales | $243,881 | $123,773 | $    — | $367,654 |
| Segment Earnings (Loss) | 63,017 | 27,329 | (12,122) |  |
| **Nine Months Ended September 30, 2008:** |  |  |  |  |
| Net sales | $317,270 | $171,417 | $    — | $488,687 |
| Segment Earnings (Loss) | 91,420 | 46,152 | (11,038) |  |

Segment Earnings (Loss) above excludes restructuring and impairments expense.

Provided below is a reconciliation of Segment Earnings (Loss) to income (loss) before provision for income taxes for the three and nine months ended September 30, 2009 and 2008, respectively.

|  | Three Months Ended September 30, | |
|---|---|---|
|  | 2009 | 2008 |
| Segment Earnings (Loss): |  |  |
| Clothing | $    20,186 | $    39,463 |
| Roll Covers | 11,010 | 16,484 |
| Corporate | (5,345) | (1,054) |
| Non-cash compensation and related expenses | (778) | (500) |
| Net interest expense | (16,425) | (16,230) |
| Depreciation and amortization | (10,851) | (11,738) |
| Restructuring and impairments expense | (1,754) | (3,612) |
| Expenses related to debt financing | — | (483) |
| Income (loss) before provision for income taxes | $    (3,957) | $    22,330 |

22

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**12. Business Segment Information—(continued)**

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2009 | 2008 |
| Segment Earnings (Loss): | | |
| Clothing | $ 63,017 | $ 91,420 |
| Roll Covers | 27,329 | 46,152 |
| Corporate | (12,122) | (11,038) |
| Non-cash compensation and related expenses | (1,824) | (774) |
| Net interest expense | (47,952) | (42,217) |
| Depreciation and amortization | (30,769) | (35,697) |
| Restructuring and impairments expense | (2,894) | (6,862) |
| Unrealized foreign exchange gain on revaluation of debt | — | 1,985 |
| Expenses related to debt financing | — | (5,680) |
| Income (loss) before provision for income taxes | $ (5,215) | $ 37,289 |

**13. Commitments and Contingencies**

The Company is involved in various legal matters, which have arisen in the ordinary course of business. The Company does not believe that the ultimate resolution of these matters will have a material adverse effect on its financial position, results of operations or cash flow.

*Environmental Matters*

During the third quarter of 2008, the Company, while evaluating its facility in Australia, discovered the possibility of contamination at that facility. Subsequently, the Company had a preliminary evaluation performed, which confirmed the existence of contamination and estimated preliminary costs to remediate this facility. Based upon this evaluation, the Company accrued $4,100 in 2008 as its best estimate of the remediation costs it expected to incur. A Phase II assessment of the groundwater contamination performed for the Company during the second quarter of 2009 indicated the costs to remediate the contamination would be significantly less than originally estimated and accordingly, the Company reduced the accrual by $3,400 during the second quarter of 2009 based on this assessment.

The Company believes that any additional liability in excess of amounts provided which may result from the resolution of such matters will not have a material adverse effect on the financial condition, liquidity or cash flow of the Company.

**14. Stock-Based Compensation**

Effective May 19, 2005, the Company adopted the 2005 Equity Incentive Plan (the "2005 Plan"), under which the Board of Directors authorized 2,500,000 shares for grant (subsequently increased to 7,500,000 at the Company's Annual Meeting of Stockholders on August 6, 2008).

23

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**14. Stock-Based Compensation—(continued)**

The Company records stock-based compensation expense in accordance with ASC Topic 718, *Compensation—Stock Compensation* ("Topic 718") and during the three and nine months ended September 30, 2009 and 2008 recorded stock-based compensation as follows:

|  | For the Three Months Ended | | For the Nine Months Ended | |
|  | September 30, 2009 | September 30, 2008 | September 30, 2009 | September 30, 2008 |
|---|---|---|---|---|
| RSU Awards (1) | $ 678 | $ 500 | $ 1,454 | $ 774 |
| 2009 Performance Award Program (2) | 100 | — | 370 | — |
| Stock Awards (3) | — | — | 94 | — |
| Total | $ 778 | $ 500 | $ 1,918 | $ 774 |

(1) Related to restricted stock units awarded in and prior to 2009. See further discussion below.

(2) Related to the value of expected awards for the year ending December 31, 2009 under the Company's Performance Award Program, which was approved by the Company's Board of Directors on March 10, 2009.

(3) Represents the value of 60,000 shares of the Company's common stock awarded to Mr. Maffucci on June 8, 2009 in connection with his appointment as the Company's Executive Vice President and Chief Financial Officer.

The Company has used the straight-line attribution method to recognize expense for time-based RSUs granted after December 31, 2005.

During 2005, 424,683 time-based RSUs and 801,843 performance-based RSUs were granted to officers and employees of the Company. Non-employee directors were also granted 12,500 RSUs during 2005. Each RSU represents one share of common stock.

To earn common stock under time-based RSUs granted in 2005, generally the grantee must be employed by the Company through the applicable vesting date, which occurred annually on May 19, 2006, 2007 and 2008. The final tranche of these RSUs vested on May 19, 2008.

To earn common stock under performance-based RSUs granted in 2005, generally defined shareholder return targets must be met over the four years following the completion of the Company's initial public offering on May 19, 2005 and the grantee must be employed by the Company through May 19, 2009. On May 19, 2009, all of the remaining 269,171 of these RSUs were forfeited because the defined shareholder return targets had not been achieved.

On May 16, 2007, the Company granted 742,885 performance-based RSUs to certain officers and employees of the Company. Generally, to earn common stock under these performance-based RSUs, defined shareholder return targets must be met over the four years following the grant date and the grantee must be employed by the Company through May 16, 2011.

Awards to non-employee directors vest immediately under the 2005 Plan and the underlying shares will be issued to the director upon termination of service as a member of the Board or a change in control, as defined in the 2005 Plan. Annually during 2005, 2006 and 2007, the non-employee directors were granted 12,500 RSUs in the aggregate. In July 2008, they also were granted 48,820 RSUs in the aggregate. On November 30, 2008, three members of the Board retired, which resulted in an aggregate issuance of 81,351 shares of common stock to them underlying their vested RSUs.

On June 9, 2009 the non-employee directors were granted 224,715 RSUs in the aggregate. These RSUs are fully vested on the grant date; provided, however, that if a director ceases to serve as a member of the Board for any reason other than as a result of a change in control (as defined in the 2005 Plan) prior to the 2010 annual meeting of stockholders, the director will forfeit a pro rata portion of the award. On August 4, 2009, Board members who served as non-employee directors during the year prior to the 2009 Annual Meeting of Stockholders were awarded 221,945 RSUs in the aggregate that vested immediately.

24

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**14. Stock-Based Compensation—(continued)**

On January 3, 2008, the Compensation Committee of the Company's Board of Directors approved 433,000 performance-based RSU awards (based on shareholder return targets) and 433,000 time-based RSU awards for certain of the Company's officers under the 2005 Plan, which were made contingent upon the approval by the Company's stockholders at or before the Company's 2008 annual meeting of stockholders of an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 5,000,000. On August 6, 2008, at the Company's 2008 annual meeting of stockholders, the stockholders approved an amendment to the Company's 2005 Plan to increase the aggregate number of shares of common stock that may be delivered under or in satisfaction of awards under such plan from 2,500,000 to 7,500,000. The shareholder return based awards will generally only vest if the share price of the Company's common stock plus dividends paid on the common stock from January 3, 2008 satisfies annual targets that the Compensation Committee has established in respect of the three years following January 3, 2008 and the named officer continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the awards) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price. The time-based restricted stock unit awards are scheduled to vest completely, in nearly equal installments on the first, second, and third anniversaries of January 3, 2008, provided that the named officer continues to be employed by the Company on such dates. Dividends, if any, on such time based restricted stock units will be paid at the same rate as dividends on the Company's common stock, but only in the form of additional restricted stock units. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the awards) and/or termination of employment under the circumstances set forth in the restricted stock unit awards.

The Company also granted time-based restricted stock unit awards to its new chief executive officer with respect to 75,000 shares on February 26, 2008 and 37,500 shares on June 13, 2008. These awards are scheduled to vest completely, in nearly equal installments on the first, second, and third anniversaries of January 3, 2008 and June 13, 2008, respectively, provided that the Company's chief executive officer continues to be employed by the Company on such dates. Additionally, on June 13, 2008, the Company granted a time-based restricted stock unit award to certain of its executive officers with respect to an aggregate 60,000 shares, which are scheduled to vest on the third anniversary of June 13, 2008, provided that the named officers continue to be employed by the Company on that date. During 2008, the Company granted to certain employees 55,175 time-based restricted stock units that vest equally in annual installments from the grant date over a period of three to four years.

During the first quarter of 2009, 54,299 shares of common stock underlying 87,000 time-based RSUs were issued; the remaining 32,701 shares underlying the RSUs were withheld from issuance in connection with minimum tax withholding requirements related to the issuance of such shares to the recipients. During the second quarter of 2009, 21,828 shares of common stock underlying 32,377 time-based RSUs were issued; the remaining 10,549 shares underlying the RSUs were withheld from issuance in connection with minimum tax withholding requirements related to the issuance of such shares to the recipients.

25

[Table of Contents](#)

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**14. Stock-Based Compensation—(continued)**

On March 10 2009, the Company granted to certain employees 39,000 time-based restricted stock units and 39,000 performance-based restricted stock units. The time-based restricted stock unit awards are scheduled to vest completely, in nearly equal installments on the first and second anniversaries of January 3, 2009, provided that the employee continues to be employed by the Company on such dates. Dividends, if any, on such time based restricted stock units will be paid at the same rate as dividends on the Company's common stock, but only in the form of additional restricted stock units. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the awards) and/or termination of employment under the circumstances set forth in the restricted stock unit awards. The shareholder return based awards will generally only vest if the share price of the Company's common stock plus dividends paid on the common stock from January 3, 2009 satisfies annual targets that the Compensation Committee has established in respect of the two years following January 3, 2009 and the named employee continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the awards) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price.

On March 10, 2009, in accordance with the employment agreement between the Company and Mr. Stephen Light, the Company's Chairman, President and Chief Executive Officer, the Compensation Committee of the Company's Board of Directors approved RSU grants to Mr. Light as follows: (i) 341,761 time-based RSUs; (ii) 605,209 time-based RSUs that were contingent on shareholder approval of an increase in the maximum number of shares that may be granted as stock awards to any one person in any calendar year under the 2005 Plan; and (iii) 946,969 performance-based RSUs that were contingent on shareholder approval of the same increase. Mr. Light's employment agreement provides for grants of RSUs having a fair market value of $1,250 on each of January 1, 2009 and January 1, 2010 and that half of these RSUs are to vest based on his service over time while the other half vest based on the Company's performance. The 2005 Plan imposes a limit on the maximum number of shares that may be granted as stock awards to any one person in any calendar year. Those of the RSUs granted to Mr. Light that were in excess of that limit were granted contingent on shareholder approval of an amendment to the 2005 Plan to increase the limit to enable these grants. The contingent awards were not considered outstanding until approved by the shareholders. The shareholders approved the amendment on June 9, 2009.

On June 8, 2009, in connection with the appointment of Mr. David G. Maffucci as Executive Vice President and Chief Financial Officer, the Company granted to Mr. Maffucci 112,500 time-based RSUs and 37,500 performance-based RSUs. With respect to 75,000 of the time-based RSUs, the awards will vest in nearly equal installments on the first, second, and third anniversaries of the date of grant. With respect to 37,500 of the time-based RSUs, 12,500 will vest on January 3, 2010 and the remaining 25,000 will vest on January 3, 2011. Mr. Maffucci's time-based restricted stock unit awards will vest as long as he continues to be employed by the Company on the applicable vesting dates. The time based restricted stock units may also vest, in whole or in part, in connection with a change of control (as defined in the RSU agreement) and/or termination of employment under the circumstances set forth in the restricted stock unit awards. The shareholder return based awards will generally only vest if the share price of the Company's common stock satisfies annual targets that the Compensation Committee has established in respect of January 3, 2010 and 2011 and Mr. Maffucci continues to be employed with the Company through January 3, 2011. The shareholder return based restricted stock units may also vest, in whole or in part, if a change of control (as defined in the RSU agreement) occurs and shareholder return based requirements have previously been satisfied or are satisfied based on the transaction price.

Certain time-based RSUs and all non-employee director RSUs automatically adjust to reflect awards of additional RSUs upon payment of dividends by the Company. During the year ended December 31, 2008 and the first nine months of 2009, no RSUs were awarded in connection with the payment of dividends as no dividends were declared by the Company during any of those periods.

26

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**14. Stock-Based Compensation—(continued)**

A summary of RSUs outstanding as of September 30, 2009 and their vesting dates is as follows:

|  | Vesting Dates | Number of RSUs |
|---|---|---:|
| Time-based RSUs granted February 26, 2008 | Annually in equal installments on January 3, 2009, January 3, 2010 and January 3, 2011 | 50,000 |
| Time-based RSUs granted June 13, 2008 | With respect to 37,500 RSUs — annually in equal installments on June 13, 2009, June 13, 2010 and June 13, 2011; with respect to 60,000 RSUs— June 13, 2011 | 85,000 |
| Time-based RSUs granted August 6, 2008 (contingently awarded on January 3, 2008) | Annually in equal installments on January 3, 2009, January 3, 2010 and January 3, 2011 | 91,334 |
| Time-based RSUs granted at various dates during 2008 | Annually in equal installments over three years | 32,334 |
| Time-based RSUs granted at various dates during 2009 | With respect to 1,023,470 RSUs—annually in equal installments in January 2010 and January 2011; with respect to 75,000 RSUs—annually in equal installments on June 8, 2010, 2011 and 2012 | 1,098,470 |
| Performance-based RSUs granted May 16, 2007 (based on shareholder return targets) | May 16, 2011, assuming performance criteria are achieved | 334,950 |
| Performance-based RSUs granted August 6, 2008 (based on shareholder return targets) (contingently awarded on January 3, 2008) | January 3, 2011, assuming performance criteria are achieved | 137,000 |
| Performance-based RSUs granted at various dates during 2009 (based on shareholder return targets) | January 3, 2011, assuming performance criteria are achieved | 1,023,469 |
| Non-employee directors' RSUs | Date of grant | 483,199 |
| Total RSUs outstanding | | 3,335,756 |

27

Table of Contents

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**14. Stock-Based Compensation—(continued)**

RSU activity during the nine months ended September 30, 2009 is presented below.

| | Number of RSUs | Price Range of Grant-Date Fair Value Price Per RSU | Weighted Average Grant-Date Fair Value Price Per RSU |
|---|---|---|---|
| Outstanding, December 31, 2008 | 1,358,585 | $ 3.77 -12.01 | $ 7.50 |
| Granted | 2,568,599 | 0.54 - 1.65 | 1.33 |
| Forfeited | (472,052) | 5.12 -11.66 | 9.65 |
| Issued or withheld for tax withholding purposes | (119,376) | 3.89 - 5.40 | 5.22 |
| Outstanding, September 30, 2009 | 3,335,756 | $ 0.54 -12.01 | $ 2.52 |
| Vested, September 30, 2009 (1) | 292,130 | $ 1.43 -12.01 | $ 1.60 |

(1)   Vested RSUs at September 30, 2009 consist entirely of non-employee director RSUs. The common stock underlying these RSUs will be issued to the directors upon termination of their service as members of the Board and/or a change in control, as defined in the 2005 Plan. The total grant-date fair value of such non-employee directors RSUs that vested during the nine months ended September 30, 2009 was $467.

*Assumptions*

In accordance with Topic 718, the Company uses the following assumptions in determining compensation expense:

*Grant-Date Fair Value*

The Company calculates the grant-date fair value of time-based RSUs and non-employee directors' RSUs based on the closing price of the Company's common stock on the date of grant.

For the performance-based RSUs granted in 2009, 2008, 2007 and 2005 (none granted in 2006), the Company calculated the grant-date fair value of performance-based RSUs by using a Monte Carlo pricing model and the following assumptions:

| | For Performance-Based RSUs Granted at various dates during 2009 | For Performance-Based RSUs Granted August 6, 2008 (contingently awarded January 3, 2008) | For Performance-Based RSUs Granted May 16, 2007 | For Performance-Based RSUs Granted May 19, 2005 |
|---|---|---|---|---|
| Expected term (i) | 1 ½ to 2 years | 3 years | 4 years | 4 years |
| Expected volatility (ii) | 116% and 119% | 44% | 39% | 37% |
| Expected dividends (iii) | None | None | $0.45 per year ($0.1125 per quarter) | $0.90 per year ($0.225 per quarter) |
| Risk-free interest rate (iv) | 0.99% to 1.17% | 2.64% | 4.32% | 3.73% |

(i)   *Expected term.* Performance-based RSUs expire three years after the grant date for the 2008 awards and four years after the grant date for the 2007 and 2005 awards. For 2009 awards, the RSUs expire after approximately 1 ½ to 2 years.

28

**Table of Contents**

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**14. Stock-Based Compensation—(continued)**

*Assumptions—(continued)*

(ii)  *Expected volatility*. The Company is responsible for estimating the volatility of the price of its common stock and has considered a number of factors, including third party estimates, to determine its expected volatility. For the 2008, 2007 and 2005 awards, the Company performed a peer group analysis of historical and implied volatility measures rather than using its own historical volatility because it had been a public company for a relatively short period of time (i.e., since its initial public offering on May 19, 2005). Based upon the peer group analysis, the Company determined to use a 44%, 39% and 37% volatility assumption for performance-based RSUs granted in 2008, 2007 and 2005, respectively, which is the midpoint of the range developed by looking at the peer group. For the 2009 awards, after being a public company for four years, the Company determined to use its own historical volatility rather than a peer group analysis. The volatility for the 2009 awards was 116% and 119%.

(iii)  *Expected dividends*. Based on the Company's dividend policy in place at the time of the performance-based RSU grants on May 19, 2005, an assumed continuation of quarterly dividends at the rate of $0.225 per share of common stock was used for the purposes of the application of the Monte Carlo pricing model. On May 2, 2007, the Company modified its credit agreement which limited the amount of any quarterly dividends payable on its common stock to not more than $0.1125 per share. Accordingly, for the performance-based RSUs that were granted on May 16, 2007, the Company assumed continuation of quarterly dividends at the rate of $0.1125 per share of common stock for the purposes of the application of the Monte Carlo pricing model. On May 30, 2008, the Company amended its credit facility. No dividends are permitted to be paid on the Company's common stock through May 2012, the maturity date of the term loans under the amended senior credit facility. Accordingly no dividends were assumed for the 2008 or 2009 awards for purposes of the application of the Monte Carlo pricing model.

(iv)  *Risk-free interest rate*. The yield on zero-coupon U.S. Treasury securities for the period that is commensurate with the expected term assumptions.

29

**Table of Contents**

**Xerium Technologies, Inc.**

**Notes to Unaudited Condensed Consolidated Financial Statements—(Continued)**
**(dollars in thousands, except per share data)**

**14. Stock-Based Compensation—(continued)**

*Forfeitures*

As the time-based and performance-based RSUs require continued employment up to the time of vesting, the amount of stock-based compensation recognized during a period is required to include an estimate of forfeitures. Topic 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The term "forfeitures" is related to employee attrition and based on a historical analysis of its employee turnover. This analysis is re-evaluated quarterly and the forfeiture rate will be adjusted as necessary. Ultimately, the actual expense recognized over the vesting period will be only for those shares that meet the requirements of continued employment up to the time of vesting. The Company estimated its forfeiture rates as of September 30, 2009 to be as follows:

| Description of Award | Forfeiture Rates |
|---|---|
| Time-based RSUs granted on various dates in 2008 and in 2009 (and contingently granted on January 1, 2009), other than those on August 6, 2008 | 10% |
| Time-based RSUs granted on August 6, 2008 | 55% |
| Performance-based RSUs granted May 19, 2007 (based on shareholder return targets) | 65% |
| Performance-based RSUs granted August 6, 2008 (based on shareholder return targets) | 70% |
| Performance-based RSUs granted in 2009 (based on shareholder return targets) | 10% |
| Non-employee directors' RSUs | 0% |

As of September 30, 2009, there was approximately $2,600 of total unrecognized compensation expense related to unvested share-based awards which is expected to be recognized over a weighted average period of 1.4 years.

30

Table of Contents

**ITEM 2.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Forward Looking Statements*

The following discussion of our financial condition and results of operations should be read together with our unaudited condensed consolidated interim financial statements and the related notes thereto contained elsewhere in this Quarterly Report on Form 10-Q. The discussion included in this section, as well as other sections of this Quarterly Report on Form 10-Q contains forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties, and other factors that may cause our actual results, levels of activity, performance, or achievements to be materially different from any future results, levels of activity, performance, or achievements expressed or implied by these forward-looking statements. In some cases, you can identify forward-looking statements by the use of words such as "may," "could," "expect," "intend," "plan," "seek," "anticipate," "believe," "estimate," "predict," "potential," or "continue" or the negative of these terms or other comparable terminology. Undue reliance should not be placed on forward-looking statements because they involve known and unknown risks, uncertainties, and other factors that are, in some cases, beyond our control and that could materially affect actual results, levels of activity, performance, or achievements. Factors that could materially affect our actual results, levels of activity, performance or achievements include the following items:

- our lenders would have the right to demand immediate repayment of our obligations under our credit facility if we are not able to restructure our debt or execute on any initiative that addresses our credit issues prior to December 15, 2009, or such earlier date when the waiver of the violation of the financial covenants in our credit facility expires, and any acceleration of our debt or failure on our part to make required payments under our credit facility could allow the counterparties on certain of our existing interest rate swaps to terminate those arrangements;

- we may not be able to obtain any further extension of the waiver of the violation of the financial covenants in our credit facility, in which case we will be in default following the waiver period unless we reach agreement with our lenders before it expires;

- we anticipate that we may have insufficient cash to operate our business and make the scheduled quarterly payments required under our credit facility and, accordingly, we may default on our payment obligations under the facility absent a waiver of those terms;

- we may choose to file for reorganization under Chapter 11 of the U.S. Bankruptcy Code if we are in default under the credit facility. Additionally, the initiation of insolvency proceedings in certain non-U.S. jurisdictions may be warranted, which would limit our access to cash from our operations in those jurisdictions and impact our ability to control our assets in those jurisdictions;

- even if we obtain approval of sufficient lenders to obtain an additional waiver, we still may choose to file for reorganization under Chapter 11 of the U.S. Bankruptcy Code to address any non-approving lenders to restructuring of the debt facilities;

- if we are in default and we file for reorganization, we may be without sufficient cash to operate our business and will be without access to financing unless we are able to obtain debtor-in-possession financing. We may be unable to find any lender willing to provide us with debtor-in-possession financing, and any such financing that we are able to obtain would require the approval of the bankruptcy court;

- we may pursue initiatives to resolve our credit issues, including initiatives that involve issuances of equity, that are likely to severely dilute our existing stockholders and may result in our existing common stock having little or no value;

- we may not be able to restructure or replace any or all of our outstanding debt or complete any other alternative to address our long term credit issues on satisfactory terms, or at all, and any such arrangements could increase our borrowing costs and result in additional fees and expenses;

31

Table of Contents

- our financial results face increased exposure to currency fluctuations, as our banks have limited our ability to enter into hedging arrangements and our interest rate swaps no longer qualify for hedge accounting;

- the fact that we may default on our credit facility is likely to cause our customers and vendors to seek financial assurances from us before they are willing to continue doing business with us, and they may instead choose to do business with our competitors. This may result in decreased revenues or increased costs of our operations, or negatively impact our ability to operate our business, thereby adversely affecting our results of operations;

- we may not have sufficient cash to fund our operations in light of (i) continuing conditions in the global paper market that are affecting our business, (ii) the significant expenses we have continued to incur in connection with addressing our long-term credit issues and (iii) our potential inability to access any additional sources of financing;

- we may be required to sell certain of our assets or businesses for the purposes of raising cash to fund the balance of our operations;

- in the event that we are able to successfully restructure our debt, we may incur unfavorable tax consequences resulting in increased income tax expense;

- we are subject to the risk of weaker economic conditions in the locations around the world where we conduct business, including without limitation the current turmoil in the global paper markets and the impact of the current global economic crisis on the paper industry and our customers;

- our strategies and plans, including, but not limited to, those relating to the decrease in our financial leverage, developing new products, enhancing our operational efficiencies and reducing costs may not result in the anticipated benefits;

- we may not achieve compliance with the NYSE continued listing standards;

- our profitability could be adversely affected by fluctuations in interest rates;

- we may not be able to develop and market new products successfully;

- we may not be successful in developing new technologies or in competing against new technologies developed by competitors;

- we may have insufficient cash to fund growth and unexpected cash needs after satisfying our debt service obligations due to our high degree of leverage and significant debt service obligations;

- we may be required to incur significant costs to reorganize our operations in response to market changes in the paper industry;

- we are subject to the risk of terrorist attacks or an outbreak or escalation of any insurrection or armed conflict involving the United States or any other country in which we conduct business, or any other national or international calamity;

- we are subject to any future changes in government regulation; and

- we are subject to any changes in U.S. or foreign government policies, laws and practices regarding the repatriation of funds or taxes.

Many of these risks are discussed elsewhere in this Quarterly Report on Form 10-Q, including in the sections below: "Recent Developments," "Overview," "Industry Trends and Outlook," "Liquidity and Capital Resources" and "Credit Facility." Other factors that could materially affect actual results, levels of activity, performance, or achievements can be found in Part I, Item 1A in our Annual Report on Form 10-K for the year ended December 31, 2008 filed with the Securities and Exchange Commission ("SEC") on March 12, 2009. If any of these risks or uncertainties materialize, or if our underlying assumptions prove to be incorrect, actual results may vary significantly from what we projected. Any forward-looking statement in this Quarterly Report on Form 10-Q reflects our current views with respect to future events and is subject to these and other risks, uncertainties, and assumptions relating to our operations, results of operations, growth strategy, and liquidity. We assume no obligation to publicly update or revise these forward-looking statements for any reason, whether as a result of new information, future events, or otherwise.

Table of Contents

### Recent Developments

#### Senior Credit Facility

Our senior credit facility requires that we satisfy certain operating requirements and financial covenant ratios in order to avoid a default or event of default under the facility. See "Credit Facility" below. As previously disclosed in our Quarterly Report of Form 10-Q for the quarter ended June 30, 2009, we anticipated that we would not be in compliance with certain financial covenants of the senior credit facility for the period ending September 30, 2009. Therefore, to provide us additional time to work with our creditors and stockholders to find long-term solutions to our credit issues, on September 29, 2009, we entered into Waiver and Amendment No. 1 (the "Waiver Agreement") to the senior credit facility. As of September 30, 2009, we were not in compliance with certain financial covenants of the Credit Agreement. Absent the Waiver Agreement, failure to meet these financial covenants would constitute an event of default under the senior credit facility and potentially could lead to acceleration of our loan obligations by our lenders, the termination of our interest rate swap agreements by the counterparties or the initiation of insolvency proceedings against us in some non-U.S. jurisdictions.

Pursuant to the Waiver Agreement, the lenders agreed to waive any violation of the interest coverage, leverage and fixed charge covenants under the senior credit facility until the earliest of (i) the occurrence of any other default under the senior credit facility, (ii) our failure to comply with any term of the Waiver Agreement or (iii) December 15, 2009 (the "Waiver Period"). We agreed that during the Waiver Period no new revolving loans may be made to us, and the lenders would not be required to make any loans to us. We may request new letters of credit in an amount up to $3.5 million for equipment purchases and may extend the expiration dates for certain outstanding letters of credit. The Waiver Agreement also requires us to report certain additional financial information to the lenders on a regular basis.

In connection with the Waiver Agreement, we were required to pay aggregate fees to the lenders of approximately (i) $1.5 million in cash at the time of the effectiveness of the Waiver Agreement and (ii) $1.5 million to be deferred to the maturity date for the loans under the senior credit facility and to accrue interest at the rate applicable to the loans until that time. In addition, during the period between September 29, 2009 and December 15, 2009 the outstanding balance under the senior credit facility will bear interest at a rate that is 1.0% per year in excess of the non-default rate otherwise payable during that period under the senior credit facility. The non-default rate is LIBOR, the Euribor or CDOR rate plus the applicable margin of 5.50%.

We have formed a steering committee of our Board of Directors to explore initiatives to address long-term solutions to our credit issues. We are in discussions with our current lenders regarding restructuring or replacing some or all of our debt, which would be likely to include the issuance of equity to such lenders and the payment of additional fees, as well as exploring with third parties various strategic alternatives affecting our debt and equity ownership.

Even with the additional time provided by the Waiver Agreement, there can be no assurance that we will be able to complete any initiatives to resolve our credit issues on satisfactory terms, or at all. Any such initiatives we pursue are likely to severely dilute our existing stockholders and may result in our existing common stock having little or no value. If we are unable to execute on our initiatives prior to the expiration of the Waiver Period, our failure to comply with the financial covenants of the senior credit facility as of September 30, 2009 would be a default under our credit facility, absent a further waiver of those terms, which may not be available at that time. We are seeking an additional waiver to extend the Waiver Period and provide additional credit facility relief from the payment of principal and interest due. We anticipate that we may have insufficient cash at year end to both make our required payments under the credit facility and operate our business. Accordingly, absent a waiver of some or all of the scheduled quarterly payments under our credit facility, which would require unanimous approval of the lenders of the debt outstanding under the facility, we may default on our payment obligations under the facility or seek relief through the bankruptcy courts. There can be no assurance that we will be able to obtain a waiver of all or any portion of the scheduled quarterly payments under our credit facility from our lenders. The occurrence of an event of default under our credit facility potentially could lead to acceleration of our loan obligations by our lenders, reorganization under Chapter 11 of the U.S. Bankruptcy Code and the initiation of insolvency proceedings against us in some non-U.S. jurisdictions.

Table of Contents

### Global Economic Environment

Our business is highly dependent upon the paper production industry and the degree to which the paper industry is affected by global economic conditions and the availability of credit. Demand for our products, could continue to decline if paper manufacturers are unable to obtain required financing or if the economic crisis causes additional mill closures or extends current capacity curtailments.

During 2008, especially the latter part of the year, the global paper industry experienced a sharp reduction in production levels, caused by the general slowdown in economic activity and the related paper consumption decline during the same period. The slowdown of production was across all grades of paper production, but most notably in the packaging grades and newsprint. For packaging grades, demand is directly related to broad manufacturing and transportation activity reduction, while newsprint demand has been increasingly declining over a number of years due to the greater prevalence of electronic media, exacerbated in recent months by a reduction in print advertising. One of the results of the recent reduction in demand for paper products is that the inventory of paper at the paper-makers has increased significantly and production slowdowns, curtailments and idling of paper-making machines have been occurring at a sharply increasing rate, particularly in North America and Europe, since October 2008 and continuing into mid-2009. Recently, however, there has been some abatement in these production declines and very modest improvements in paper and board manufacturers' operating rates that have begun to have a positive impact on the demand for some of our products. While we were successful in reducing the rate of price decreases in 2008 for the products we sell to the paper-makers and prices have remained relatively stable in the nine months ended September 30, 2009, there continues to be price pressure due to our competitors pursuing market growth at this time of lower overall demand in our market.

### Overview

We are a leading global manufacturer and supplier of two categories of consumable products used primarily in the production of paper—clothing and roll covers. Our operations are strategically located in the major paper-producing regions of North America, Europe, South America and Asia-Pacific.

Our products play key roles in the formation and processing of paper along the length of a paper-making machine. Paper producers rely on our products and services to help improve the quality of their paper, differentiate their paper products, operate their paper-making machines more efficiently and reduce production costs. Our products and services typically represent only a small fraction of a paper producer's overall production costs, yet they can reduce costs by permitting the use of lower-cost raw materials and reducing energy consumption. Paper producers must replace clothing and refurbish or replace roll covers regularly as these products wear down during the paper production process. Our products are designed to withstand extreme temperature, chemical and pressure conditions, and are the result of a substantial investment in research and development and highly sophisticated manufacturing processes.

In our clothing segment, we manufacture and sell highly engineered synthetic textile belts that transport paper as it is processed on a paper-making machine. Clothing plays a significant role in the forming, pressing and drying stages of paper production. Because paper-making processes and machine specifications vary widely, the clothing size, form, material and function is selected to fit each individual paper-making machine and process. For the three months ended September 30, 2009, our clothing segment represented 66% of our net sales.

Our roll cover products provide a surface with the mechanical properties necessary to process the paper sheet in a cost-effective manner that delivers the sheet qualities desired by the paper producer. Roll covers are tailored to each individual paper-making machine and process, using different materials, treatments and finishings. In addition to manufacturing and selling new roll covers, we also provide refurbishment services for previously installed roll covers and manufacture spreader rolls. For the three months ended September 30, 2009, our roll covers segment represented 34% of our net sales.

### Industry Trends and Outlook

Historically, demand for our products has been driven primarily by the volume of paper produced on a worldwide basis. Generally, and over time, we expect growth in paper production to be greater in Asia, South America and Eastern Europe than in the more mature North American and Western European regions where demand may potentially decline.

34

Table of Contents

The profitability of paper producers has historically been highly cyclical due to wide swings in the price of paper, driven to a high degree by the oversupply of paper during periods when paper producers have more aggregate capacity than the market requires. A sustained downturn in the paper industry, either globally or in a particular region, can cause paper manufacturers to reduce production or cease operations, which could adversely affect our revenues and profitability. As part of these efforts, they have permanently shut down many paper-making machines or entire manufacturing facilities. Papermakers continue to experience low levels of profitability, and we believe that further consolidation among papermakers, reducing the number of paper producers, and shutdowns of paper-making machines or facilities will occur in Europe and North America, until there is a better balance between supply and demand for paper and the profit levels of paper producers improve. This rebalancing has been accelerated during the current global economic recession. Over a number of years, consumption growth of paper, particularly in South America and Asia, is expected to drive an increase in the global production rates required to maintain balance between supply and demand. It is highly likely, however, that a consumption slow-down and related effect on global paper production will continue in the near term, exacerbated by the global economic crisis. Also affecting machine curtailments are structural productivity gains from improved products that we and our competitors supply.

Global paper production growth that does occur would be moderated by the level of industry consolidation and paper-machine shutdown activity that is a continuing underlying trend in North America and Western Europe. We also believe that, in addition to industry consolidation and paper machine shutdown activity in North America and Western Europe, the trend towards new paper machine designs which have fewer rolls and market recognition of extended life of our roll cover products has been and will continue to negatively impact demand for these products and that the volume potential for the roll covers business will slowly diminish. Additionally, we are seeing a trend that paper producers are placing an increasing emphasis on maintenance cost reduction and, as a result, are extending the life of roll covers through additional maintenance cycles before replacing them.

We anticipate that pricing pressure for our products will continue with the consolidation among paper producers and as the shift of paper production growth in Asia develops. In response to this pricing pressure, we expect to increase our expenditure levels on research and development expenses and continue to develop our value added selling approach as part of our strategy to differentiate our products, while at the same time remaining focused on cost reduction and efficiency programs.

The negative paper industry trends described above are likely to continue. We believe that in the current economic environment, the paper industry will experience reduced demand, increased emphasis on cost reduction, and sustained paper-machine shutdown activity than would have been the case in the absence of the economic crisis. To address these conditions, we have sought to aggressively restructure our business and reduce costs. See "Cost Reduction Programs" below.

### Sales and Expenses

Sales in both our clothing and roll covers segments are primarily driven by the following factors:

- The volume of worldwide paper production;

- Advances in the technology of our products, which can provide value to our customers by improving the efficiency of paper-making machines;

- Our ability to provide products and services which reduce paper-making machine downtime, while at the same time allowing the manufacture of high quality paper products; and

- Impact of currency fluctuations.

Sales in our roll covers segment include our mechanical services business. We have expanded this business in response to demand from paper producers that we perform work on the internal mechanisms of a roll while we refurbish or replace a roll cover. In our clothing segment, a portion of our business has been conducted pursuant to consignment arrangements under which we do not recognize a sale of a product to a customer until the customer places the product into use, which typically occurs some period after the

35

Table of Contents

product is shipped to the customer or to a warehouse location near the customer's facility. We are striving to reduce the number of consignment arrangements and increase the use of standard terms of sale under which we recognize a sale upon product shipment. We made progress with this initiative in 2008 and expect this effort to be successful over several years.

Our operating costs are driven primarily by our total sales volume, the impact of inflation and currency and the level and impact of cost reduction programs.

The level of our cost of products sold is primarily attributable to labor costs, raw material costs, shipping costs, plant utilization and depreciation, with labor costs constituting the largest component. We invest in facilities and equipment that enable innovative product development and improve production efficiency and costs. Recent examples of capital spending for such purposes include faster weaving looms and seaming machines with accurate electronic controls, automated compound mixing equipment and computer-controlled lathes and mills.

The level of research and development spending is driven by market demand for technology enhancements, including both specific customer needs and general market requirements, as well as by our own analysis of applied technology opportunities. With the exception of purchases of equipment and similar capital items used in our research and development activities, all research and development is expensed as incurred. Research and development expenses were $2.7 million and $2.9 million for the three months ended September 30, 2009 and 2008, respectively.

### Foreign Exchange

We have a geographically diverse customer base. For the three months ended September 30, 2009, approximately 36% of our sales was in North America, 35% was in Europe, 18% was in Asia-Pacific, 10% was in South America and 1% was in the rest of the world.

A substantial portion of our financial results are denominated in Euros or other currencies. As a result, changes in the relative values of U.S. Dollars, Euros and other currencies affect our reported levels of revenues and profitability as the results are translated into U.S. Dollars for reporting purposes. In particular, increases in the value of the U.S. Dollar relative to the value of the Euro and these other currencies negatively impact our levels of revenue and profitability because the translation of a certain number of Euros or units of such other currencies into U.S. Dollars for financial reporting purposes will represent fewer U.S. Dollars.

For certain transactions, our sales are denominated in U.S. Dollars or Euros but all or a substantial portion of the associated costs are denominated in a different currency. As a result, changes in the relative values of U.S. Dollars, Euros and other currencies can affect the level of the profitability of these transactions. The largest proportion of such transactions consist of transactions in which the sales are denominated in or indexed to U.S. Dollars and all or a substantial portion of the associated costs are denominated in Euros or Reals.

Currency fluctuations have a greater effect on the level of our net sales than on the level of our income from operations. For example, for the three months ended September 30, 2009 as compared with the three months ended September 30, 2008, the change in the value of the U.S. Dollar against the currencies we conduct our business in resulted in currency translation decreases in net sales and income from operations of $6.0 million and $1.4 million, respectively. Although the results for the three months ended September 30, 2009 reflect a period in which the value of the U.S. Dollar increased against most of the currencies in which we conduct the majority of our non-U.S. Dollar denominated business as compared to the three months ended September 30, 2008, we would expect a similar but opposite effect in a period in which the value of the U.S. Dollar decreases.

During the three and nine months ended September 30, 2009, we conducted business in 11 foreign currencies. The following table provides the average exchange rate for the three and nine months ended September 30, 2009 and 2008, respectively, of the U.S. Dollar against each of the four foreign currencies in which we conduct the largest portion of our operations, and indicates the percentage of our net sales for the three and nine months ended September 30, 2009 denominated in such foreign currency.

36

**Table of Contents**

| Currency | Average exchange rate of the U.S. Dollar for the three months ended September 30, 2009 | Average exchange rate of the U.S. Dollar for the three months ended September 30, 2008 | Percentage of net sales for the three months ended September 30, 2009 denominated in such currency |
|---|---|---|---|
| Euro | $1.43 = 1 Euro | $1.50 = 1 Euro | 41.9% |
| Brazilian Real | $0.54 = 1 Brazilian Real | $0.60 = 1 Brazilian Real | 8.1% |
| Canadian Dollar | $0.91 = 1 Canadian Dollar | $0.96 = 1 Canadian Dollar | 6.7% |
| Australian Dollar | $0.83 = 1 Australian Dollar | $0.89 = 1 Australian Dollar | 6.6% |

| Currency | Average exchange rate of the U.S. Dollar for the nine months ended September 30, 2009 | Average exchange rate of the U.S. Dollar for the nine months ended September 30, 2008 | Percentage of net sales for the nine months ended September 30, 2009 denominated in such currency |
|---|---|---|---|
| Euro | $1.37 = 1 Euro | $1.52 = 1 Euro | 41.9% |
| Brazilian Real | $0.48 = 1 Brazilian Real | $0.59 = 1 Brazilian Real | 8.6% |
| Canadian Dollar | $0.86 = 1 Canadian Dollar | $0.98 = 1 Canadian Dollar | 6.5% |
| Australian Dollar | $0.75 = 1 Australian Dollar | $0.91 = 1 Australian Dollar | 6.7% |

To mitigate the risk of transactions in which a sale is made in one currency and associated costs are denominated in a different currency, we utilize forward currency contracts in certain circumstances to lock in exchange rates with the objective that the gain or loss on the forward contracts will approximate the loss or gain that results from the transaction or transactions being hedged. We determine whether to enter into hedging arrangements based upon the size of the underlying transaction or transactions, an assessment of the risk of adverse movements in the applicable currencies and the availability of a cost effective hedge strategy. To the extent we do not engage in hedging or such hedging is not effective, changes in the relative value of currencies can affect our profitability.

Due to reduced credit limits at some of our banks, we have been entering into fewer foreign currency hedging arrangements and may not be able to enter into as many hedging arrangements in the future. As a result, our financial statements are more exposed to the effects of currency fluctuations, both favorable and unfavorable, which could have a material impact on our results of operations.

### Cost Reduction Programs

An important part of our long-term operating strategy is to seek to reduce our overall costs and improve our competitiveness. As a part of this effort, we have engaged in a series of cost reduction programs, which were designed to improve the cost structure of our global operations in response to changing market conditions. These cost reduction programs include headcount reductions throughout the world as well as plant closures that have rationalized production among our facilities to better enable us to meet customer demands.

During the first quarter of 2009, we continued our program of streamlining our operating structure and recorded restructuring expenses of approximately $0.7 million in connection therewith. Additionally, during 2009 we sold our rolls manufacturing facility in Sweden at a gain of approximately $1.2 million, which was partially offset by approximately $0.6 million of costs incurred to continue with actions related to the closure of manufacturing facilities announced prior to the first quarter of 2009. During the first quarter of 2009, we also froze one of our U.S. employee pension plans, terminated our retiree medical plan, suspended contributions to our U.S. 401(k) program, froze salaries, delayed union contract wage increases, curtailed travel and halted work on our Vietnam project.

During the second quarter of 2009, essentially all of the $1.0 million of restructuring expenses we recorded were related to streamlining our operating structure. During the third quarter of 2009, we continued our program of streamlining our operating structure and recorded restructuring expenses of $0.1 million therewith. Additionally during the third quarter of 2009, approximately $1.7 million of our restructuring expenses were related to the impairment of assets at various locations around the world. We expect to incur restructuring expenses of approximately $0.8 million during the remainder of 2009, primarily related to continuing our program of streamlining our operating structure.

37

Table of Contents

### Results of Operations

The tables that follow set forth for the periods presented certain consolidated operating results and the percentage of net sales they represent:

| (in millions) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Net sales | $ 130.3 | $ 159.3 | $367.7 | $488.7 |
| Cost of products sold | 81.5 | 106.5 | 229.0 | 303.8 |
| Selling expenses | 17.0 | 20.1 | 49.6 | 62.4 |
| General and administrative expenses | 15.4 | 28.3 | 35.1 | 70.3 |
| Restructuring and impairments expenses | 1.8 | 3.6 | 2.9 | 6.9 |
| Research and development expenses | 2.7 | 2.9 | 8.1 | 9.1 |
| Curtailment/settlement gain | — | (40.0) | — | (40.0) |
| Income from operations | 11.9 | 37.9 | 43.0 | 76.2 |
| Interest expense, net | (16.4) | (16.2) | (48.0) | (42.2) |
| Foreign exchange gain (loss) | 0.5 | 0.7 | (0.2) | 3.3 |
| Income (loss) before provision for income taxes | (4.0) | 22.3 | (5.2) | 37.3 |
| Provision for income taxes | 3.4 | 0.8 | 10.0 | 6.4 |
| Net income (loss) | $ (7.4) | $ 21.5 | $(15.2) | $ 30.9 |

### Percentage of Sales

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of products sold | 62.6 | 66.9 | 62.3 | 62.2 |
| Selling expenses | 13.0 | 12.6 | 13.5 | 12.8 |
| General and administrative expenses | 11.8 | 17.7 | 9.5 | 14.4 |
| Restructuring and impairments expenses | 1.3 | 2.3 | 0.8 | 1.4 |
| Research and development expenses | 2.1 | 1.8 | 2.2 | 1.9 |
| Curtailment/settlement gain | — | (25.1) | — | (8.2) |
| Income from operations | 9.2 | 23.8 | 11.7 | 15.5 |
| Interest expense, net | (12.6) | (10.2) | (13.0) | (8.6) |
| Foreign exchange gain (loss) | 0.4 | 0.4 | (0.1) | 0.7 |
| Income (loss) before provision for income taxes | (3.0) | 14.0 | (1.4) | 7.6 |
| Provision for income taxes | 2.6 | 0.5 | 2.7 | 1.3 |
| Net income (loss) | (5.6)% | 13.5% | (4.1)% | 6.3% |

*Three Months Ended September 30, 2009 Compared to the Three Months Ended September 30, 2008.*

*Net Sales.* Net sales for the three months ended September 30, 2009 decreased by $29.0 million, or 18.2%, to $130.3 million from $159.3 million for the three months ended September 30, 2008. For the three months ended September 30, 2009, 66% of our net sales was in our clothing segment and 34% was in our roll covers segment.

In our clothing segment, net sales for the three months ended September 30, 2009 decreased by $18.4 million, or 17.6%, to $86.0 million from $104.4 million for the three months ended September 30, 2008 primarily due to (i) decreased sales volume primarily in North America and Europe and (ii) unfavorable currency effects on net sales of $4.6 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. The decrease was partially offset by $1.8 million of favorable currency effects on pricing related to sales prices indexed in U.S. Dollars by certain non-U.S. operations. Overall pricing levels in our clothing segment decreased slightly more than 1% during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008.

38

Table of Contents

In our roll covers segment, net sales for the three months ended September 30, 2009 decreased by $10.6 million or 19.3%, to $44.3 million from $54.9 million for the three months ended September 30, 2008. The decrease was primarily due to (i) decreased sales volumes primarily in North America and Europe, (ii) unfavorable currency effects on net sales of $1.4 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. Overall pricing levels in our roll covers segment increased slightly less than 1% during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008.

*Cost of Products Sold.* Cost of products sold for the three months ended September 30, 2009 decreased by $25.0 million, or 23.5%, to $81.5 million from $106.5 million for the three months ended September 30, 2008.

In our clothing segment, cost of products sold decreased by $19.0 million, or 26.4%, to $53.0 million for the three months ended September 30, 2009 from $72.0 million for the three months ended September 30, 2008 primarily due to (i) lower sales volumes during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008, (ii) the absence in 2009 of the increased provision for slow-moving and obsolete inventory of $8.1 million that was recorded in the third quarter of 2008, (iii) favorable currency effects of $2.5 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes and (iv) the $2.3 million impact of a lower cost structure, resulting from our cost reduction programs, during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008.

In our roll covers segment, cost of products sold decreased by $6.0 million, or 17.4%, to $28.5 million for the three months ended September 30, 2009 from $34.5 million for the three months ended September 30, 2008 primarily due to (i) lower sales volumes during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008, (ii) favorable currency effects of $1.0 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes, (iii) the absence in 2009 of the increased provision for slow-moving and obsolete inventory of $0.6 million that was recorded in the third quarter of 2008 and (iv) the $0.6 million impact of a lower cost structure, resulting from our cost reduction programs, during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008.

*Selling Expenses.* For the three months ended September 30, 2009, selling expenses decreased by $3.1 million, or 15.4%, to $17.0 million from $20.1 million for the three months ended September 30, 2008. The decrease was primarily due to the impact of (i) a reduction in salaried sales positions, commissions and travel expenses, (ii) favorable currency effects of $0.8 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008 and (iii) the $0.2 million impact of a lower cost structure, resulting from our cost reduction programs, during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008.

*General and Administrative Expenses.* For the three months ended September 30, 2009, general and administrative expenses decreased by $12.9 million, or 45.6%, to $15.4 million from $28.3 million for the three months ended September 30, 2008. The decrease was primarily due to (i) environmental accruals of $4.1 million recorded in the third quarter of 2008 that were absent in the third quarter of 2009, (ii) decreased provisions for bad debts of approximately $9.8 million, principally due to a $7.9 million increase in 2008, (iii) decreased salaries, travel and other costs as a result of cost reduction efforts during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008 and (iv) favorable currency translation effects of $0.2 million. These decreases were partially offset by (i) increased bank and related fees of $2.2 million that were incurred relating to initiatives undertaken to resolve our credit issues and (ii) gains on the sale of property and equipment of $2.4 million recorded in the third quarter of 2008 that were absent in the third quarter of 2009.

*Restructuring and Impairments Expenses.* For the three months ended September 30, 2009, restructuring and impairments expenses decreased by $1.8 million, or 50%, to $1.8 million from $3.6 million for the three months ended September 30, 2008. Restructuring expenses result from our long-term strategy to reduce production costs and improve long-term competitiveness as described above under "Cost Reduction Programs" by closing and/or transferring production from certain of our manufacturing facilities and through headcount reductions. For the three months ended September 30, 2009, restructuring expenses consisted of asset impairments of $1.7 million and severance costs of $0.1 million.

Table of Contents

*Research and Development Expenses.* For the three months ended September 30, 2009, research and development expenses decreased by $0.2 million, or 6.9%, to $2.7 million from $2.9 million for the three months ended September 30, 2008 primarily due to lower salary and supply costs and to favorable currency effects.

*Curtailment/Settlement Gains.* During the third quarter of 2008, we recorded curtailment/settlement gains of $40.0 million as a result of the following decisions made and communicated during the third quarter of 2008: (i) freezing benefit pension accruals under our Pension Plan for U.S. Salaried and Non-Union Hourly Employees (the "Pension Plan") effective December 31, 2008 so that future service beyond December 31, 2008 will not be credited under the Pension Plan and (ii) no longer sponsoring or funding, as of December 31, 2008, our U.S. retiree health insurance program under which we had offered health care benefits to a certain group of retired U.S. employees and their covered dependents and beneficiaries. The gains include a loss of $0.2 million incurred as a result of curtailing a Canadian pension plan.

*Interest Expense, Net.* Net interest expense for the three months ended September 30, 2009 increased by $0.2 million, or 1.2%, to $16.4 million from $16.2 million for the three months ended September 30, 2008 primarily due to (i) a $1.3 million increase to interest expense in the three months ended September 30, 2009 as compared with the three months ended September 30, 2008 in connection with the change in the fair value of our interest rate swaps and (ii) a $0.5 million decrease in interest income related to lower levels of cash available for investment in the three months ended September 30, 2009 as compared with the three months ended September 30, 2008. In 2009, the ineffective portion of the mark to market change on two of our interest rate swap hedges has been charged to interest expense and, effective September 1, 2009, we were required to discontinue hedge accounting for all of our interest rate swaps and recorded the mark to market change in their fair value of $0.5 million as an increase to interest expense. For the three months ended September 30, 2008, our interest rate swaps qualified for hedge accounting and the change in their fair value was recorded in accumulated other comprehensive income (loss). The increases were partially offset by (i) decreased interest expense of $1.6 million related to decreased levels of debt during the three months ended September 30, 2009 as compared with the three months ended September 30, 2008 and (ii) favorable currency effects of $0.3 million.

*Foreign Exchange Gain.* For the three months ended September 30, 2009, we had a foreign exchange gain of $0.5 million compared to a gain of $0.7 million for the three months ended September 30, 2008. The $0.2 million decrease was primarily attributable to the manner in which swings in the value of the U.S. Dollar as compared to other currencies, primarily the Euro and the Brazilian Real, affect the reported amount of intercompany transactions. Foreign exchange gains and losses have resulted primarily from hedging and intercompany activity.

*Provision for Income Taxes.* For the three months ended September 30, 2009 we recorded income tax expense of $3.4 million compared with $0.8 million for the three months ended September 30, 2008. The increase in the provision for income taxes for the third quarter of 2009 compared to the third quarter of 2008 was principally due losses incurred by certain foreign and domestic subsidiaries for which the Company currently has deferred tax asset valuation allowances recorded including curtailment/settlement gains recorded in the third quarter of 2008 relating to U.S. retiree plans of $40.1 million for which no taxes were reflected due to the U.S. deferred tax asset valuation allowance recorded as of 2008.

   *Nine Months Ended September 30, 2009 Compared to the Nine Months Ended September 30, 2008.*

*Net Sales.* Net sales for the nine months ended September 30, 2009 decreased by $121.0 million, or 24.8%, to $367.7 million from $488.7 million for the nine months ended September 30, 2008. For the nine months ended September 30, 2009, 66% of our net sales was in our clothing segment and 34% was in our roll covers segment.

In our clothing segment, net sales for the nine months ended September 30, 2009 decreased by $73.4 million, or 23.1%, to $243.9 million from $317.3 million for the nine months ended September 30, 2008 primarily due to (i) decreased sales volume in all regions and (ii) unfavorable currency effects on net sales of $30.8 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. The decrease was partially offset by $8.2 million of favorable currency

40

**Table of Contents**

effects on pricing related to sales prices indexed in U.S. Dollars by certain non-U.S. operations. Overall pricing levels in our clothing segment remained unchanged during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008.

In our roll covers segment, net sales for the nine months ended September 30, 2009 decreased by $47.6 million, or 27.8%, to $123.8 million from $171.4 million for the nine months ended September 30, 2008. The decrease was primarily due to (i) decreased sales volumes in all regions and (ii) unfavorable currency effects on net sales of $10.7 million related to the translation of sales made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes. Overall pricing levels in our roll covers segment increased by slightly less than 1% during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008.

*Cost of Products Sold.* Cost of products sold for the nine months ended September 30, 2009 decreased by $74.8 million, or 24.6%, to $229.0 million from $303.8 million for the nine months ended September 30, 2008.

In our clothing segment, cost of products sold decreased by $50.5 million, or 25.4%, to $148.0 million for the nine months ended September 30, 2009 from $198.5 million for the nine months ended September 30, 2008 primarily due to (i) lower sales volumes during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008, (ii) favorable currency effects of $18.2 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008, (iii) increased provision for slow-moving and obsolete inventory of $8.4 million in the nine months ended September 30, 2008 and (iv) the $3.4 million impact of a lower cost structure, resulting from our cost reduction programs, during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008.

In our roll covers segment, cost of products sold decreased by $24.3 million, or 23.1%, to $81.0 million for the nine months ended September 30, 2009 from $105.3 million for the nine months ended September 30, 2008. The decrease in cost of products sold was primarily due to (i) lower sales volumes in all regions during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008, (ii) favorable currency effects of $6.7 million related to the translation of expenses made in currencies other than the U.S. Dollar to U.S. Dollars for financial reporting purposes during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008, (iii) the $3.2 million impact of a lower cost structure, resulting from our cost reduction programs, during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 and (iv) increased provision for slow-moving and obsolete inventory of $0.6 million in the nine months ended September 30, 2008.

*Selling Expenses.* For the nine months ended September 30, 2009, selling expenses decreased by $12.8 million, or 20.5%, to $49.6 million from $62.4 million for the nine months ended September 30, 2008. The decrease was primarily due to (i) the impact of a reduction in salaried sales positions, commissions and travel expenses, (ii) favorable currency effects of $5.5 million during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 and (iii) the $1.6 million impact of a lower cost structure, resulting from our cost reduction programs, during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008.

*General and Administrative Expenses.* For the nine months ended September 30, 2009, general and administrative expenses decreased by $35.2 million, or 50.1%, to $35.1 million from $70.3 million for the nine months ended September 30, 2008. The decrease was primarily due to (i) decreased provisions for bad debts of approximately $13.0 million, principally due to a $7.1 million increase in 2008, (ii) a decrease in environmental expense of $7.5 million as a result of (a) accruals of $4.1 million related to the environmental matter in Australia recorded in the third quarter of 2008 that were absent in the third quarter of 2009 and (b) a Phase II assessment during the second quarter of 2009 that indicated that remediation costs in Australia would be significantly less than originally estimated, resulting in the reversal of $3.4 million of accruals in the second quarter of 2009, (iii) a decrease in consulting, legal and bank fees of $2.7 million for the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 that were incurred relating to initiatives undertaken to resolve our credit issues, (iv) favorable currency translation effects of

41

**Table of Contents**

$4.1 million (v) a decrease in litigation accruals of $2.3 million for Brazilian labor matters and other legal matters, (vi) a decrease in management incentive bonus and stock-based compensation expense of $1.4 million, (vii) decreased salaries, travel and other costs as a result of cost reduction efforts during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 and (viii) the $0.2 million impact of a lower cost structure, resulting from our cost reduction programs, during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008.

*Restructuring Expenses.* For the nine months ended September 30, 2009, restructuring expenses decreased by $4.0 million, or 58.0%, to $2.9 million from $6.9 million for the nine months ended September 30, 2008. Restructuring expenses result from our long-term strategy to reduce costs and improve long-term competitiveness as described above under "Cost Reduction Programs" by closing and/or transferring production from certain of our manufacturing facilities and through headcount reductions. For the nine months ended September 30, 2009, restructuring expenses consisted of asset impairments of $1.7 million, severance costs of $2.2 million and facility costs of $0.2 million. The facility costs were partially offset by the $1.2 million gain on the sale of our Swedish roll covers facility on March 31, 2009.

*Research and Development Expenses.* For the nine months ended September 30, 2009, research and development expenses decreased by $1.0 million, or 11.0%, to $8.1 million from $9.1 million for the nine months ended September 30, 2008 primarily due to lower material and supply costs and to $0.4 million of favorable currency effects during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008.

*Curtailment/Settlement Gains.* During the third quarter of 2008, we recorded curtailment/settlement gains of $40.0 million as a result of the following decisions made and communicated during the third quarter of 2008: (i) freezing benefit pension accruals under our Pension Plan for U.S. Salaried and Non-Union Hourly Employees (the "Pension Plan") effective December 31, 2008 so that future service beyond December 31, 2008 will not be credited under the Pension Plan and (ii) no longer sponsoring or funding, as of December 31, 2008, our U.S. retiree health insurance program under which we had offered health care benefits to a certain group of retired U.S. employees and their covered dependents and beneficiaries. The gains include a loss of $0.2 million incurred as a result of curtailing a Canadian pension plan.

*Interest Expense, Net.* Net interest expense for the nine months ended September 30, 2009 increased by $5.8 million, or 13.7%, to $48.0 million from $42.2 million for the nine months ended September 30, 2008. The increase is primarily attributable to (i) increased interest rates during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 as a result of the amendment of our senior credit facility on May 30, 2008 and (b) the $3.8 million increase to interest expense in the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 in connection with the change in the fair value of our interest rate swaps. In 2009, the ineffective portion of the mark to market change on two of our interest rate swap hedges has been charged to interest expense and, effective September 1, 2009, we were required to discontinue hedge accounting for all of our interest rate swaps and recorded the mark to market change in their fair value of $0.5 million as a charge to interest expense. During the nine months ended September 30, 2008, the swaps did not qualify for hedge accounting for the first half of the year, which resulted in a credit to interest expense for the change in their fair value for the first six months of 2008. These increases were partially offset by favorable currency effects of $2.2 million.

*Foreign Exchange Gain (Loss).* For the nine months ended September 30, 2009, we had a foreign exchange loss of $0.2 million compared to a gain of $3.3 million for the nine months ended September 30, 2008. The gain in 2008 was primarily attributable to mark-to-market gains on fair value hedges, including gains on hedges for which the underlying foreign exchange exposure on certain intercompany debt no longer existed in the first quarter of 2008, and gains on hedges on future purchases of equipment. Foreign exchange gains and losses during the nine months ended September 30, 2009 were primarily the result of hedging and intercompany activities.

*Provision for Income Taxes.* For the nine months ended September 30, 2009 and 2008, the provision for income taxes was $10.0 million and $6.4 million, respectively. The increase in income taxes was principally due to the reasons noted above for the third quarter and the establishment of a deferred tax asset valuation allowance in Canada of $2.9 million in the first quarter of 2009.

42

**Table of Contents**

## LIQUIDITY AND CAPITAL RESOURCES

Our operations are highly dependent upon the paper production industry and the degree to which the paper industry is affected by global economic conditions and the availability of credit. Demand for our products could continue to decline if paper manufacturers are unable to obtain required financing or if the economic slowdown causes additional mill closures or continued inventory build-up. In addition, the global economic crisis and the ensuing lack of credit availability may affect our customers' ability to pay their debts which could have a negative impact on our Company. These factors would impact our liquidity and our ability to satisfy the covenant requirements of our credit facility.

As previously disclosed in our Quarterly Report of Form 10-Q for the quarter ended June 30, 2009, we anticipated that we would not be in compliance with certain financial covenants of our senior credit facility for the period ending September 30, 2009. Accordingly, on September 29, 2009, we entered into the Waiver Agreement pursuant to which our lenders agreed to waive any violations of the interest coverage, leverage and fixed charge covenants under our senior credit facility during the Waiver Period. As of September 30, 2009, we were not in compliance with those financial covenants. Absent the Waiver Agreement, failure to meet these financial covenants would constitute an event of default under the senior credit facility and potentially could lead to acceleration of our loan obligations by our lenders, the termination of our interest rate swap agreements by the counterparties and the initiation of insolvency proceedings against us in some non-U.S. jurisdictions.

We have formed a steering committee of our Board of Directors to explore initiatives to address long-term solutions to our credit issues. We are in discussions with our current lenders regarding restructuring or replacing some or all of our debt, which would be likely to include the issuance of equity to such lenders and the payment of additional fees, as well as exploring with third parties various strategic alternatives affecting our debt and equity ownership

Even with the additional time provided by the Waiver Agreement, there can be no assurance that we will be able to complete any initiatives to resolve our credit issues on satisfactory terms, or at all. Any such initiatives we pursue are likely to severely dilute our existing stockholders and may result in our existing common stock having little or no value. If we are unable to execute on our initiatives prior to the expiration of the Waiver Period, our failure to comply with the financial covenants of the credit facility as of September 30, 2009 would be a default under that agreement, absent a further waiver of those terms, which may not be available at that time. We are seeking an additional wavier to extend the Waiver Period and provide additional credit facility relief from the payment of principal and interest due. We anticipate that we may have insufficient cash at year end to both make our required payments under the credit facility and operate our business. Accordingly, absent a waiver of some or all of the scheduled quarterly payments under our credit facility, which would require unanimous approval of the lenders of the debt outstanding under the facility, we may default on our payment obligations under the facility or seek relief from the bankruptcy courts. There can be no assurance that we will be able to obtain a waiver of all or any portion of the scheduled quarterly payments under our credit facility from our lenders.

Under an event of default, the lenders could accelerate the repayment of all of the outstanding debt under the senior credit facility, causing it to immediately become due and payable and, unless our lenders agree to refrain from the exercise of their remedies under our credit facility, such an event of default also could lead to the initiation of insolvency proceedings against us in some non-U.S. jurisdictions. Any such acceleration of our obligations would likely cause other lenders and contractual counterparties to terminate and/or to accelerate our obligations under other financing and credit instruments and agreements. Any acceleration of our obligations or failure on our part to make required payments under our credit facility also could allow the counterparties on certain of our existing interest rate swaps to terminate those arrangements. As of September 30, 2009, the amount of cash that would be required to settle all outstanding hedging obligations is $19.0 million. Should the lenders and/or other counterparties demand immediate repayment of all of our obligations, we expect that we would be unable to pay such obligations and we would need to seek reorganization under Chapter 11 of the U.S. Bankruptcy Code and possibly initiate insolvency proceedings in certain non-U.S. jurisdictions.

Our principal liquidity requirements are for debt service, working capital and capital expenditures. We plan to use cash generated by operations as our primary source of liquidity, but we anticipate that revenues and profits may not generate sufficient cash to fund our operations or meet our other liquidity requirements. We are not permitted to make additional borrowings under our revolver under the

43

Table of Contents

terms of the Waiver Agreement and we have limited access to other sources of loans. Without adequate liquidity, we may seek reorganization under Chapter 11 of the U.S. Bankruptcy Code or liquidate our assets. In the event that we seek reorganization under Chapter 11, we are likely to need immediate access to funding through debtor-in-possession financing. We may be unable to find any lender willing to provide us with debtor-in-possession financing, and any such financing that we are able to obtain would require the approval of the bankruptcy court. If such financing is not available, then we may find it necessary to discontinue our operations. Also, if we or the directors of our foreign subsidiaries are required to commence insolvency proceedings under the local law applicable in certain of the foreign jurisdictions in which we operate, then we may lose access to cash from our operations in those jurisdictions or may lose control of the assets underlying those operations, even prior to any filing under Chapter 11.

Net cash provided by operating activities was $3.8 million and $52.8 million for the nine months ended September 30, 2009 and 2008, respectively. The $49.0 million decrease is principally attributable to a decrease in the volume of business as a result of the global economic crisis and an increase in working capital during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 principally due to the level of payment of payables and accruals since December 31, 2008. We typically defer payments to certain vendors at the end of each quarter, which results in an increased cash position at the end of the quarter and increased net cash from operating activities for the period then ended. Such deferrals were significant at December 31, 2008 and the absence of the extent of such deferrals at the end of September 30, 2009 contributed to the increase in working capital for the nine months ended September 30, 2009. In an effort to improve working capital, in the second quarter of 2009, the Company initiated a project to accelerate accounts receivable collections and to sell excess inventories. As of September 30, 2009, the Company's efforts under this project contributed approximately $5.8 million in additional cash and increased Adjusted EBITDA by approximately $6.8 million.

Net cash used in investing activities was $8.7 million for the nine months ended September 30, 2009 and $27.1 million for the nine months ended September 30, 2008. The decrease of $18.4 million was primarily due to (i) a decrease in capital equipment spending of $15.2 million in the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 and (ii) a $3.2 million increase in the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 related to proceeds from the sale of property and equipment and the Chief Executive Officer's former home.

Net cash used in financing activities was $9.3 million for the nine months ended September 30, 2009 and $30.4 million for the nine months ended September 30, 2008. The decrease of $21.1 million was primarily the result of (i) borrowings under our revolver of $28.0 million during the first quarter of 2009, and (ii) the decrease in other financing activities of $7.4 million in the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008 related to expenses associated with initiatives undertaken to resolve our credit issues. These decreases were partially offset by higher debt payments of approximately $13.7 million during the nine months ended September 30, 2009 as compared with the nine months ended September 30, 2008. We made mandatory principal repayments of $16.6 million during the nine months ended September 30, 2009 as compared with $9.4 million during the nine months ended September 30, 2008. The increase in the mandatory payment was due to the loan agreement requiring us to make such excess payments based on the prior year's Adjusted EBITDA, which was impacted during 2008 by gains of approximately $52 million related to the freezing of one of our U.S. pension plans, the termination of our U.S. retiree medical plan and the mark to market changes in the fair value of our interest rate swaps, partially offset by approximately $30 million related to increased restructuring expenses and increased noncash reserves. Because none of these events generated any cash but increased Adjusted EBITDA which increased the mandatory principal payment, the effect of these actions reduced our available cash. We also made a voluntary debt repayment of $6.1 million during the nine months ended September 30, 2008 and none in nine months ended September 30, 2009.

As of September 30, 2009, there was a $591.4 million balance of term loans outstanding under our senior credit facility. During the nine months ended September 30, 2009, we made scheduled principal payments of $14.4 million and mandatory principal repayments of $19.2 million. In addition, as of September 30, 2009, we had $28.1 million outstanding under our current revolving lines of credit, including the revolving credit facility under our senior credit facility and lines of credit in various foreign countries that are used to facilitate local short-term operating needs and an aggregate of $8.0 million available for additional borrowings under these revolving

44

Table of Contents

lines of credit. We are not permitted to make additional borrowings under our revolver during the Waiver Period and we have limited access to other sources of loans. Our liquidity is substantially affected by the covenant requirements of our credit agreement. See "Credit Facility" below. We had cash and cash equivalents of $21.8 million at September 30, 2009 compared to $34.7 million at December 31, 2008.

## CAPITAL EXPENDITURES

For the nine months ended September 30, 2009, we had capital expenditures of $14.0 million consisting of growth capital expenditures of $7.0 million and maintenance capital expenditures of $7.0 million. Growth capital expenditures consist of items that are intended to increase the manufacturing, production and/or distribution capacity or efficiencies of our operations in conjunction with the execution of our business strategies. Maintenance capital expenditures are designed to sustain the current capacity or efficiency of our operations and include items relating to the renovation of existing manufacturing or service facilities, the purchase of machinery and equipment for safety and environmental needs and information technology. For the nine months ended September 30, 2008, capital expenditures were $29.1 million, consisting of growth capital expenditures of $21.5 million and maintenance capital expenditures of $7.6 million.

In the first quarter of 2008 we began an effort to reduce our planned capital expenditures. As part of this effort, we determined to delay the planned capital expenditures for the Vietnam facility and cancelled or rescheduled certain other previously planned capital expenditures. These cancellations did not result in any substantial penalties for us. In December 2008, we discontinued the construction of the Vietnam facility. While construction of the Vietnam facility has been discontinued, we continue to have contractual obligations with respect to certain equipment which was previously ordered for the facility. We are redeploying this equipment to other locations. Due to our assessment of the impact of the global economic crisis and the potential effect on our customers and our industry, we are currently evaluating additional capital expenditures reductions and cost reduction actions to improve long-term operating efficiencies and to better match our production with demand. We analyze our planned capital expenditures based on investment opportunities available to us and our financial and operating performance, and accordingly, actual capital expenditures may be more or less than these amounts. We target capital expenditures for 2009 to be approximately $23 million, and estimated capital expenditure levels for 2010 are approximately $33 million.

See "—Credit Facility" below for a description on limitations on capital expenditures imposed by our credit facility.

## CREDIT FACILITY

Upon the completion of the initial public offering of our common stock on May 19, 2005, we and certain of our subsidiaries entered into a senior secured credit facility. The credit facility was amended six times, most recently by the Waiver Agreement described below.

The credit facility requires that we satisfy certain operating requirements and financial covenant ratios in order to avoid a default or event of default under the senior credit facility agreement. See further discussion below. As previously disclosed in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2009, we anticipated that we would not be in compliance with certain financial covenants of the credit facility for the period ending September 30, 2009. Therefore, to provide us additional time to work with our creditors and stockholders to find long-term solutions to our credit issues, on September 29, 2009, we entered into the Waiver Agreement to the Credit Agreement. As of September 30, 2009, we were not in compliance with certain financial covenants of the credit facility. Absent the Waiver Agreement, failure to meet these financial covenants would constitute an event of default under the senior credit facility and potentially could lead to acceleration of our loan obligations by our lenders, the termination of our interest rate swap agreements by the counterparties and the initiation of insolvency proceedings against us in some non-U.S. jurisdictions.

Pursuant to the Waiver Agreement, the lenders agreed to waive any violation of the interest coverage, leverage and fixed charge covenants under the senior credit facility until the earliest of (i) the occurrence of any other default under the credit facility, (ii) our failure to comply with any term of the Waiver Agreement or (iii) December 15, 2009 (the "Waiver Period"). We agreed that during the Waiver Period no new revolving loans may be made to us, and the lenders would not be required to make any loans to us. We may request new letters of credit in an amount up to $3.5 million for equipment purchases and may extend the expiration dates for certain outstanding letters of credit. The Waiver Agreement also requires us to report certain additional financial information to the lenders on a regular basis.

**Table of Contents**

In connection with the Waiver Agreement, we were required to pay aggregate fees to the lenders of approximately (i) $1.5 million in cash at the time of the effectiveness of the Waiver Agreement and (ii) $1.5 million to be deferred to the maturity date for the loans under the credit facility and to accrue interest at the rate applicable to the loans at that time. In addition, during the period between September 29, 2009 and December 15, 2009 the outstanding balance under the credit facility will bear interest at a rate that is 1.0% per year in excess of the non-default rate otherwise payable during that period under the credit facility. The non-default rate is LIBOR, the Euribor or CDOR rate plus the applicable margin of 5.50%.

We have formed a steering committee of our Board of Directors to explore initiatives to address long-term solutions to our credit issues. We are in discussions with our current lenders regarding restructuring or replacing some or all of our debt, which would be likely to include the issuance of equity to such lenders and the payment of additional fees, as well as exploring with third parties various strategic alternatives affecting our debt and equity ownership.

Even with the additional time provided by the Waiver Agreement, there can be no assurance that we will be able to complete any initiatives to resolve our credit issues on satisfactory terms, or at all. Any such initiatives involving issuances of equity are likely to severely dilute our existing stockholders and may result in our existing common stock having little or no value. If we are unable to execute on our initiatives prior to the expiration of the Waiver Period, our failure to comply with the financial covenants of the credit facility as of September 30, 2009 would be a default under that agreement, absent a further waiver of those terms, which may not be available at that time. We are seeking an additional wavier to extend the Waiver Period and provide additional credit facility relief from the payment of principal and interest due. We anticipate that we may have insufficient cash at year end to both make our required payments under the credit facility and operate our business. Accordingly, absent a waiver of some or all of the scheduled quarterly payments under our credit facility, which would require unanimous approval of the lenders of the debt outstanding under the facility, we may default on our payment obligations under the facility or seek relief from the bankruptcy courts. There can be no assurance that we will be able to obtain a waiver of all or any portion of the scheduled quarterly payments under our credit facility from our lenders. Should an event of default occur under our credit facility, we would need to seek reorganization under Chapter 11 of the U.S. Bankruptcy Code and possibly initiate insolvency proceedings in certain non-U.S. jurisdictions.

The description of the credit facility below describes the facility as amended and restated on May 30, 2008.

Our credit facility provides for a $50 million senior secured revolving credit facility and for term loans that had a total principal amount of $650 million as of May 2005. Because the term loans include portions denominated in Euros and Canadian dollars, in addition to a U.S. Dollar denominated portion, the aggregate outstanding principal on our term loans is affected by our currency exchange rates as well as principal repayments. The revolving credit facility matures on November 19, 2011, and the term loans mature on May 19, 2012. The credit facility is secured by substantially all of our assets and the assets of most of our subsidiaries, subject to legal and tax considerations and requirements.

Borrowings under the revolving credit facility and the term loans bear interest at the sum of, as applicable, LIBOR, the Euribor or CDOR rate plus, in each case, the applicable margin. The applicable margin was set at 5.50% through December 31, 2008. Beginning January 1, 2009, the applicable margin depends upon our credit rating level: it will be 2.75% if our credit rating is Ba3 or higher by Moody's and BB- or higher by S&P, 3.75% if our credit rating is B1 by Moody's or B+ by S&P, 4.25% if our credit rating is B3 or higher but lower than B1 by Moody's and 'B-' or higher but lower than 'B+' by S&P, and 5.50% if our credit rating is lower than B3 by Moody's or lower than B- by S&P. In order to qualify at each level the rating must be with a stable outlook. Our current credit rating is Caa3 by Moody's and 'CC-' by S&P. Our current applicable margin is 5.50%, except that during the Waiver Period, the outstanding balance under the credit facility will bear interest at a rate that is 1.0% per year in excess of this rate.

On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. The interest rate swap arrangements effectively fixed the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. These interest rate swaps initially qualified for hedge accounting under Topic 815. As a result of the financial covenant non-compliance for the period

46

**Table of Contents**

ended March 31, 2008, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under Topic 815 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12.0 million was recorded as a non-cash charge to interest expense in the first quarter of 2008 and a non-cash credit to interest expense of $13.7 million in the second quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. Such mark to market changes on these interest rate swaps were principally credited or charged to accumulated other comprehensive income (loss) through September 1, 2009. As previously disclosed in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2009, we anticipated that we would not be in compliance with certain financial covenants under our senior credit facility for the period ending September 30, 2009 and thus, on September 29, 2009, we entered into the Waiver Agreement. As of September 30, 2009, we were not in compliance with those covenants under our senior credit facility. As it is uncertain that we will be able to complete any alternative, long-term solutions to our credit issues or to obtain a further waiver prior to expiration of the Waiver Agreement, we are no longer able to support that the variable-rate interest payments (hedged transactions) under our senior credit facility are probable of occurring and therefore, effective September 1, 2009, we were required to discontinue cash flow hedge accounting prospectively for our interest rate swaps so that the mark to market changes in their fair value are charged or credited to interest expense. For the month of September 2009, this amounted to a $0.5 million charge to interest expense. If we are not able to restructure our debt obligations in a manner that is consistent with the hedged forecasted transactions or if our lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, the cumulative mark to market changes in the fair value of the underlying interest rate swaps that have been recorded in accumulated other comprehensive loss, in addition to the credit valuation adjustments recorded under Topic 820, would be charged to the statement of operations at that time. As of September 30, 2009 this amount was $15.8 million. Additionally, any acceleration of our obligations under our credit facility, or any failure to make required payments under our credit facility, could allow the counterparties on certain of our existing interest rate swaps to terminate those arrangements. As of September 30, 2009, the amount payable by us upon a termination of such interest rate swaps would have been approximately $19.0 million.

The $1.7 million impact of the ineffective portion of these interest rate swaps and the discontinuation of hedge accounting were charged to interest expense during the nine months ended September 30, 2009.

Although these interest rate swaps are subject to mark to market accounting through earnings effective September 1, 2009, they continue to effectively fix, from a cash flow hedge perspective, the interest rate on approximately 81% of the term loan portion of the Company's credit facility through December 31, 2010. As of September 30, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 10.75%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 7.08%.

The credit facility provides for scheduled quarterly principal payments of the term loans as set out below:

| Currency: | USD | Euro | CAD |
|---|---|---|---|
| 2009 | 2,458,174 | 1,392,040 | 584,489 |
| 2010 | 3,318,535 | 1,879,254 | 789,059 |
| 2011 | 4,055,987 | 2,296,865 | 964,406 |
| 2012 (first quarter only) | 4,916,348 | 2,784,080 | 1,168,976 |

The credit facility provides that for the purposes of computing debt, which is a part of the calculation of the leverage ratio, indebtedness which is payable in Canadian Dollars or Euros shall be converted into U.S. Dollars using the average exchange rate for the period of four consecutive fiscal quarters ended March 31, 2008. Accordingly, if the value of the U.S. Dollar increases relative to the Euro or the Canadian Dollar and our Adjusted EBITDA declines as a result of this currency effect, there would not be a corresponding decrease in the amount of our debt for purposes of the leverage ratio covenant calculation.

47

**Table of Contents**

The credit facility also requires us to make additional prepayments of the term loans under the following circumstances:

- with 100% of the net cash proceeds received by us from any sale, transfer or other disposition of any assets (excluding inventory and certain discontinued manufacturing facilities), subject to an exemption for the reinvestment of up to $3 million of such proceeds within a year of our receipt thereof in long-term productive assets of the general type used in our business;

- with 100% of the net cash proceeds received by us from any insurance recovery or condemnation events, subject to certain exceptions and reinvestment rights and exempting the first $2 million;

- with 75% of the net cash proceeds from the issuance of any common stock, subject to customary exceptions and exempting the first $100,000;

- with 100% of the net cash proceeds from the incurrence of any indebtedness by us (excluding indebtedness permitted under the credit facility, but including any subordinated indebtedness), subject to customary exceptions; and

- with 75% of our excess cash on an annual basis; that is, our Adjusted EBITDA minus consolidated interest expense, cash income tax expense, consolidated capital expenditures (subject to certain exceptions), consolidated restructuring costs, cash payments of withholding taxes from proceeds of the repurchase, redemption or retention of common stock and the aggregate amount of scheduled and voluntary payments made during the past fiscal year.

Prior to the effectiveness of the amendment and restatement of our credit facility, the percentage of our annual excess cash required to be prepaid was 40% for 2007, 27.5% for 2008 and 50% for each fiscal year thereafter. We made mandatory principal prepayments from excess cash of $19.2 million and $9.4 million in the nine months ended September 30, 2009 and 2008, respectively.

Our credit facility requires that we observe and perform numerous affirmative and negative covenants, including certain financial covenants. The financial covenants per the amended credit facility are now as follows:

| **Minimum Interest Coverage Ratio:** | **Four Fiscal Quarters Ending** | **Ratio** |
|---|---|---|
| The ratio of four quarter Adjusted EBITDA to interest expense. | March 31, 2009 to March 31, 2010 | 2.00:1.00 |
| | June 30, 2010 to March 31, 2011 | 2.25:1.00 |
| | June 30, 2011 to December 31, 2011 | 2.50:1.00 |
| | March 31, 2012 | 2.75:1.00 |

| **Minimum Fixed Charge Coverage Ratio:** | **Four Fiscal Quarters Ending** | **Ratio** |
|---|---|---|
| The ratio of four quarter Adjusted EBITDA to fixed charges (interest expense, scheduled principal payments, and cash taxes). | June 30, 2009 to March 31, 2012 | 1.20:1.00 |

| **Maximum Leverage Ratio:** | **Four Fiscal Quarters Ending** | **Ratio** |
|---|---|---|
| The ratio of outstanding debt to four quarter Adjusted EBITDA. | June 30, 2009 and September 30, 2009 | 5.25:1.00 |
| | December 31, 2009 | 5.00:1.00 |
| | March 31, 2010 and June 30, 2010 | 4.75:1.00 |
| | September 30, 2010 | 4.50:1.00 |
| | December 31, 2010 and March 31, 2011 | 4.25:1.00 |
| | June 30, 2011 to March 31, 2012 | 4.00:1.00 |

48

**Table of Contents**

For the four fiscal quarters ended September 30, 2009 our interest coverage ratio was 1.78:1, our fixed charge coverage ratio was 1.10:1 and our leverage ratio was 6.15:1. Accordingly, as discussed above, we were not in compliance with these financial covenants as of September 30, 2009.

Our credit facility defines consolidated capital expenditures for a particular fiscal year as all expenditures required under GAAP to be included in "purchase of property and equipment" or similar items. The credit facility limits the amount of our consolidated capital expenditures in any given fiscal year to an amount not exceeding $50 million for fiscal year 2008 and $35 million for each of fiscal years 2009, 2010 and 2011, exclusive of capital expenditures paid with net insurance and condemnation proceeds; provided that the maximum amount of consolidated capital expenditures permitted in each fiscal year shall be increased by 50% of the amount below the maximum not spent in the prior fiscal year (determined without reference to any carryover amount); and provided, further, that solely for fiscal year 2008, the maximum amount that may be carried forward to fiscal year 2009 shall equal 100% of the first $10 million of any permitted consolidated expenditures not expended in fiscal year 2008 plus 50% of any remaining expenditures not expended in fiscal year 2008.

Our credit facility also prohibits the payment of dividends on our common stock.

## CRITICAL ACCOUNTING POLICIES

The preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses. Actual results could differ from those estimates. We have formal accounting policies in place including those that address critical and complex accounting areas. Note 3 to the consolidated financial statements included elsewhere in this Quarterly Report identifies the significant accounting policies used in preparation of the consolidated financial statements. The most significant areas involving management judgments and estimates are described below.

*Derivatives and Hedging.* Effective January 1, 2009, we adopted Accounting Standards Codification Topic 815-10-65-1, *Transition and Effective Date Related to FASB Statement No. 161,Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133* ("Topic 815-10-65-1") for disclosure related to derivatives and hedging. Topic 815-10-65-1 amends and expands the disclosure requirements to provide users of financial statements with an enhanced understanding of: (a) how and why an entity uses derivative instruments, (b) how derivative instruments and related hedged items are accounted for and (c) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. Topic 815-10-65-1 requires qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about the fair value of and gains and losses on derivative instruments and disclosures about credit-risk-related contingent features in derivative instruments.

As required by ASC Topic 815 *Derivatives and Hedging* ("Topic 815"), we record all derivatives on the balance sheet at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether we have elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to changes in the fair value of an asset, liability or firm commitment attributable to a particular risk are considered fair value hedges. Derivatives designated and qualifying as a hedge of the exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Derivatives may also be designated as hedges of the foreign currency exposure of a net investment in a foreign operation. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the recognition of the changes in the fair value of the hedged asset or liability that are

49

**Table of Contents**

attributable to the hedged risk in a fair value hedge or the earnings effect of the hedged forecasted transactions in a cash flow hedge. We may enter into derivative contracts that are intended to economically hedge certain of our risks, even though hedge accounting does not apply or if we elect not to apply hedge accounting under Topic 815.

There are two types of hedges into which we enter: hedges of fair value exposure and hedges of cash flow exposure. Hedges of fair value exposure are entered into in order to hedge the fair value of a recognized asset or liability, or a firm commitment. Hedges of cash flow exposure are entered into in order to hedge a forecasted transaction or the variability of cash flows to be paid related to a recognized liability. Changes in derivative fair values are recognized in earnings as offsets to the changes in fair value of the related hedged assets and liabilities. Changes in the derivative fair values that are designated as cash flow hedges which meet the criteria for hedge accounting are recorded in other comprehensive income (loss). On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. The interest rate swap arrangements effectively fixed the interest rate on approximately 85% of the term loan portion of our credit facility through December 31, 2010. These interest rate swaps initially qualified for hedge accounting under Topic 815. As a result of the financial covenant non-compliance for the period ended March 31, 2008, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under Topic 815 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12.0 million was recorded as a non-cash charge to interest expense in the first quarter of 2008 and a non-cash credit to interest expense of $13.7 million in the second quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. Such mark to market changes on these interest rate swaps were principally credited or charged to accumulated other comprehensive income (loss) through September 1, 2009.

Effective September 1, 2009, we were required to discontinue hedge accounting for these interest rate swaps. It is uncertain that we will be able to complete any alternative, long-term solutions to our credit issues or to obtain a further waiver prior to expiration of the Waiver Agreement entered into on September 29, 2009. Accordingly, we are no longer able to support that the variable-rate interest payments (hedged transactions) under our senior credit facility are probable of occurring and therefore, effective September 1, 2009, we were required to discontinue cash flow hedge accounting prospectively for our interest rate swaps so that the mark to market changes in their fair value are charged or credited to interest expense. For the month of September 2009, this amounted to a $0.5 million charge to interest expense. If we are not able to restructure our debt obligations in a manner that is consistent with the hedged forecasted transactions or if our lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, the cumulative mark to market changes in the fair value of the underlying interest rate swaps that have been recorded in accumulated other comprehensive loss, in addition to the credit valuation adjustments recorded under Topic 820, would be charged to the statement of operations at that time. As of September 30, 2009 this amount was $15.8 million.

Any acceleration of our obligations under our credit facility, or any failure to make required payments under our credit facility, could allow the counterparties on certain of our existing interest rate swaps to terminate those arrangements. As of September 30, 2009, we estimate that the amount payable by us upon a termination of such interest rate swaps would have been approximately $19.0 million.

The $1.7 million impact of the ineffective portion of these interest rate swaps and the discontinuation of hedge accounting were charged to interest expense during the nine months ended September 30, 2009.

Although these interest rate swaps are subject to mark to market accounting through earnings effective September 1, 2009, they continue to effectively fix, from a cash flow hedge perspective, the interest rate on approximately 81% of the term loan portion of the Company's credit facility through December 31, 2010. As of September 30, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 10.75%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 7.08%.

Effective January 1, 2008, we adopted Topic 820 for measuring our derivative assets and liabilities. We have classified our interest rate swaps in Level 2 of the Topic 820 fair value hierarchy, as the significant inputs to the overall valuations are based on market-observable data or information derived from or corroborated by market-observable data, including market-based inputs to models,

50

Table of Contents

model calibration to market-clearing transactions, broker or dealer quotations, or alternative pricing sources with reasonable levels of price transparency. Where models are used, the selection of a particular model to value a derivative depends upon the contractual terms of, and specific risks inherent in, the instrument as well as the availability of pricing information in the market. We use similar models to value similar instruments. Valuation models require a variety of inputs, including contractual terms, market prices, yield curves, credit curves, measures of volatility, and correlations of such inputs. For our derivatives, all of which trade in liquid markets, model inputs can generally be verified and model selection does not involve significant management judgment.

To comply with the provisions of Topic 820, we incorporated credit valuation adjustments to appropriately reflect both our own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements of our derivatives. The credit valuation adjustments are calculated by determining the total expected exposure of the derivatives (which incorporates both the current and potential future exposure) and then applying each counterparty's credit spread to the applicable exposure. For derivatives with two-way exposure, such as interest rate swaps, the counterparty's credit spread is applied to our exposure to the counterparty, and our own credit spread is applied to the counterparty's exposure to us, and the net credit valuation adjustment is reflected in our derivative valuations. The total expected exposure of a derivative is derived using market-observable inputs, such as yield curves and volatilities. The inputs utilized for our own credit spread are based on implied spreads from its publicly-traded debt. For counterparties with publicly available credit information, the credit spreads over LIBOR used in the calculations represent implied credit default swap spreads obtained from a third party credit data provider. In adjusting the fair value of our derivative contracts for the effect of nonperformance risk, we have considered the impact of netting and any applicable credit enhancements, such as collateral postings, thresholds, mutual puts, and guarantees. Additionally, we actively monitor counterparty credit ratings for any significant changes.

Although we have determined that the majority of the inputs used to value our derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with our derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by us and our counterparties. However, as of September 30, 2009, we have assessed the net significance of the impact of the credit valuation adjustments on the overall valuation of our derivative positions and have determined that the credit valuation adjustments reduced the settlement values of our derivative liabilities by $3.2 million. Various factors which impact changes in the credit are not significant to the overall valuation adjustments over time, including changes in the credit spreads of the parties to the contracts, as well as changes in market rates and volatilities, which affect the total expected exposure of the derivative instruments.

When appropriate, valuations are also adjusted for various factors such as liquidity and bid/offer spreads, which factors were deemed immaterial by us as of September 30, 2009. As a result, we have determined that our derivative valuations in their entirety are classified in Level 2 of the fair value hierarchy. We do not have any fair value measurements using significant unobservable inputs (Level 3) as of September 30, 2009.

Effective January 1, 2008, we partially adopted provisions of Topic 820. ASC Topic 820-10-65-1, *Transition related to FASB Staff Position FAS157-2, Effective Date of FASB Statement No. 157* permits us to defer the recognition and measurement of nonfinancial assets and nonfinancial liabilities until January 1, 2009. At January 1, 2009, we did not have any nonfinancial assets or nonfinancial liabilities that are recognized or disclosed at fair value.

*Goodwill.* We account for acquired goodwill and intangible assets in accordance with ASC Topic 805, *Business Combinations* ("Topic 805"). Purchase accounting required by Topic 805 involves judgment with respect to the valuation of the acquired assets and liabilities in order to determine the amount of goodwill. We believe that the estimates that we have used to record prior acquisitions are reasonable and in accordance with Topic 805.

*Impairment of Goodwill and Indefinite-Lived Intangible Assets.* We account for acquired goodwill and goodwill impairment in accordance with Topic 350, which requires considerable judgment in the valuation of acquired goodwill and the ongoing evaluation of goodwill impairment. Topic 350 requires that goodwill and intangible assets that have indefinite lives not be amortized but, instead, must be tested at least annually for impairment or whenever events or business conditions warrant.

**Table of Contents**

We perform an annual test for goodwill impairment as of December 31st at the business segment level. We have two business segments: clothing and roll covers. When our business was acquired in 1999, more than 80% of the goodwill was assigned to the roll covers segment based on relative fair values at the date of acquisition.

Goodwill impairment testing is a two-step process. Step 1 involves comparing the fair value of our reporting unit to its carrying amount. If the fair value of the reporting unit is greater than its carrying amount, there is no impairment. If the reporting unit carrying amount is greater than the fair value then the second step must be completed to measure the amount of impairment, if any. Step 2 calculates the implied fair value of goodwill by deducting the fair value of all tangible and intangible assets, excluding goodwill, of the reporting unit from the fair value of the reporting unit as determined in Step 1. The implied fair value of goodwill determined in this step is compared to the carrying value of goodwill. If the implied fair value of goodwill is less than the carrying value of goodwill, an impairment loss is recognized equal to the difference.

For the purpose of performing the annual impairment test, we allocate all shared assets and liabilities to the business segments based upon the percentage of each segment's revenue to total revenue. Shared expenses are allocated to each segment to the extent necessary to allow them to operate as independent businesses. Fair value was determined by using a weighted combination of both a market multiple approach and an income approach. The market multiple approach utilizes our proprietary information to determine measures that are used to value our business segments. The income approach is a present value technique used to measure the fair value of future cash flows produced by each business segment. Determining the fair value of a business segment or an indefinite-lived purchased intangible asset is judgmental in nature and requires the use of significant estimates and assumptions, including revenue growth rates and operating margins, discount rates and future market conditions, among others. We believe that the assumptions and rates used in our annual impairment test under Topic 350 are reasonable, but inherently uncertain.

Based on these assessments performed as of December 31, 2008, we determined that no impairment of goodwill exists.

During the third quarter of 2009, we evaluated events and circumstances that may have indicated an impairment of goodwill and performed an interim test for goodwill impairment. This interim test indicated that no impairment exists. The excess of the fair value over the carrying value for our clothing and roll covers segment as of September 30, 2009, was approximately $189 million and $12 million, respectively. In order to evaluate the sensitivity of the analysis performed, we applied a hypothetical 5% decrease to the fair value of these business segments, which resulted in a fair value in excess of carrying value of approximately $160 million for the clothing segment and resulted in a fair value that approximately equals the carrying value for the roll covers segment.

*Contingencies.* We are subject to various claims and contingencies associated with lawsuits, insurance, tax, environmental and other issues arising out of the normal course of business. Our consolidated financial statements reflect the treatment of claims and contingencies based on management's view of the expected outcome. We consult with legal counsel on those issues related to litigation with respect to matters in the ordinary course of business. If the likelihood of an adverse outcome is probable and the amount is estimable, we accrue a liability in accordance with AST Topic 450, *Contingencies*. While we believe that the current level of reserves is adequate, the adequacy of these reserves may change in the future due to new developments in particular matters. During the third quarter of 2008, while evaluating one of our foreign facilities, we discovered the possibility of contamination at the facility. Subsequently we had a preliminary evaluation performed, which confirmed the existence of contamination and estimated preliminary costs to clean up the facility. Based upon this evaluation, we recorded $4.1 million in 2008 as our best estimate of the remediation costs we expect to incur. A Phase II assessment of the ground water contamination performed for us during the second quarter of 2009 indicated the costs to remediate the contamination would be significantly less than originally estimated and accordingly, we reduced the accrual by $3.4 million during the second quarter of 2009 based on this assessment.

*Income Taxes.* We utilize the asset and liability method for accounting for income taxes in accordance with Topic 740. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting and tax bases of assets and liabilities. Deferred tax assets and liabilities are measured using the enacted tax rates and statutes that will be in effect when the differences are expected to reverse.

Table of Contents

We reduce our deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Relevant evidence, both positive and negative, is considered in determining the need for a valuation allowance. Information evaluated includes our financial position and results of operations for the current and preceding years as well as an evaluation of currently available information about future years. In light of our accumulated loss position in certain tax jurisdictions, and the uncertainty of profitability in future periods, we recorded valuation allowances for deferred tax assets primarily related to net operating loss carryforwards in the United States, United Kingdom, Germany, Sweden, Australia and Canada.

In addition, we operate within multiple taxing jurisdictions and could be subject to audit in these jurisdictions. These audits can involve complex issues and rely on estimates and assumptions. These audits may require an extended period of time to resolve and may cover multiple years. Although we believe that the estimates and assumptions are reasonable, the final determination of tax audits and any related litigation could be different than that which is reflected in historical income tax provisions and recorded assets and liabilities. There are currently no U.S. Federal or state audits or examinations underway. In May 2009, we concluded an audit relating to our German subsidiaries for tax years 1999 through 2002. No further adjustments not previously recognized were required in the quarter ended September 30, 2009 as a result of this settlement. The Canadian Federal tax authorities contacted us in October of 2008 and have initiated an audit of our Canadian companies. The audit is still in the initial information gathering stages and no issues or assessments have been raised. We believe that there are no other jurisdictions in which the outcome of unresolved issues or claims is likely to be material to our results of operations, financial position or cash flows. We further believe that we have made adequate provision for all income tax uncertainties.

Topic 740 prescribes a two-step process to determine the amount of tax benefit to be recognized. First, the tax position must be evaluated to determine the likelihood that it will be sustained upon external examination. If the tax position is deemed "more-likely-than-not" to be sustained, the tax position is then assessed to determine the amount of benefit to recognize in the financial statements. The amount of the benefit that may be recognized is the largest amount that has a greater than 50% likelihood of being realized upon ultimate settlement.

## NON-GAAP LIQUIDITY MEASURES

We use EBITDA and Adjusted EBITDA as supplementary non-GAAP liquidity measures to assist us in evaluating our liquidity and financial performance, specifically our ability to service indebtedness and to fund ongoing capital expenditures. Our credit facility includes covenants based on Adjusted EBITDA. If our Adjusted EBITDA declines below certain levels, we will violate the covenants resulting in a default condition under the credit facility or be required to prepay the credit facility. Neither EBITDA nor Adjusted EBITDA should be considered in isolation or as a substitute for income (loss) from operations (as determined in accordance with GAAP).

EBITDA is defined as net income (loss) before interest expense, income tax provision (benefit) and depreciation (including non-cash impairment charges) and amortization. Adjusted EBITDA is defined in our credit facility and is EBITDA plus (i) restructuring or related impairment costs (not to exceed $5.0 million in the aggregate for 2008 and in each year thereafter, (ii) reserves for inventory in connection with plant closings, (iii) stock-based and other non-cash compensation charges, charges from forgiveness of loans made to employees in connection with the purchase of equity and any tax gross-up payments made in respect of such loan forgiveness in connection with or prior to the completion of our initial public offering, (iv) certain transaction costs, including costs incurred in connection with our initial public offering and the related debt financing, the legal reorganization of Brazilian subsidiaries and the preparation and closing of the existing credit agreement, (v) consolidated amendment/termination costs, which consist of costs incurred in connection with the consummation of the fourth and fifth amendments to the senior credit facility and the termination of the employment contract of the former Chief Executive Officer and transition to the new Chief Executive Officer, not to exceed $8.0 million in the aggregate, (vi) costs associated with payments to management prior to the completion of our initial public offering in connection with the termination of incentive plans, (vii) non-cash charges resulting from the application of purchase accounting, (viii) non-cash expenses resulting from the granting of stock options, restricted stock or restricted stock unit awards under equity compensation programs solely with respect to our common stock and (ix) expenses incurred not exceeding $7 million per year as a

**Table of Contents**

result of the repurchase, redemption or retention of our own common stock earned under equity compensation programs solely in order to make withholding tax payments. Adjusted EBITDA, as defined in the credit facility and calculated below, may not be comparable to similarly titled measurements used by other companies.

The following table provides a reconciliation from net income (loss), which is the most directly comparable GAAP financial measure, to EBITDA and Adjusted EBITDA.

| | Three Months Ended September 30, | |
|---|---|---|
| *(in thousands)* | **2009** | **2008** |
| Net income (loss) | $ (7,381) | $ 21,536 |
| Income tax provision | 3,424 | 794 |
| Interest expense, net | 16,425 | 16,230 |
| Depreciation and amortization | 10,851 | 11,739 |
| **EBITDA** | **23,319** | **50,299** |
| Amendment/termination costs (F) | — | 483 |
| Change in fair value of interest rate swaps (E) | (859) | 450 |
| Restructuring expenses (C) | 87 | 1,817 |
| Inventory write-offs under restructuring programs | 104 | 199 |
| Non-cash compensation and related expenses | 778 | 500 |
| Non-cash impairment charges (A) | 1,667 | 405 |
| **Adjusted EBITDA** | **$25,096** | **$ 54,153** |

| | Nine Months Ended September 30, | |
|---|---|---|
| *(in thousands)* | **2009** | **2008** |
| Net income (loss) | $(15,228) | $ 30,945 |
| Income tax provision | 10,013 | 6,344 |
| Interest expense, net | 47,952 | 42,217 |
| Depreciation and amortization | 30,769 | 35,697 |
| **EBITDA** | **73,506** | **115,203** |
| Unrealized foreign exchange gain on indebtedness, net (D) | — | (1,985) |
| Amendment/termination costs (F) | — | 6,480 |
| Change in fair value of interest rate swaps (E) | (1,654) | 14,154 |
| Change in fair value of other derivatives | — | (2,126) |
| Restructuring expenses (C) | 1,227 | 5,000 |
| Inventory write-offs under restructuring programs | 349 | 199 |
| Growth program costs (B) | — | 1,764 |
| Non-cash compensation and related expenses | 1,824 | 774 |
| Non-cash impairment charges (A) | 1,667 | 472 |
| **Adjusted EBITDA** | **$76,919** | **$139,935** |

(A)    In accordance with the definition of Adjusted EBITDA in our credit facility, non-cash impairment charges resulting from application of Topic 350 and ASC Topic 360, *Property, Plant, and Equipment*, have been added back to Adjusted EBITDA.

(B)    In accordance with the definition of Adjusted EBITDA in our credit facility, as amended on May 30, 2008, growth program costs are not added back to Adjusted EBITDA for periods beginning after the quarter ended March 31, 2008. Prior to that period, growth programs were added back to Adjusted EBITDA based upon the credit facility agreement as in effect at that time. Growth programs were those intended to increase productivity and economic efficiency or the market share capacity of the Company, reduce cost structure, improve equipment utilization or provide additional regional capacity to better serve growth markets. These growth program costs for the nine months ended September 30, 2008 included expenses incurred for our lean manufacturing initiatives, expansion into Vietnam and other growth programs.

Table of Contents

(C)  Restructuring and related impairment costs that can be added back to determine Adjusted EBITDA were capped at $5,000 for 2008.

(D)  In accordance with the definition of Adjusted EBITDA in our credit facility, as amended on May 30, 2008, unrealized foreign exchange gains and losses on indebtedness are not added back to Adjusted EBITDA for periods beginning after the quarter ended March 31, 2008. Prior to that period, such gains and losses are added back to Adjusted EBITDA based upon the credit facility as in effect at that time.

(E)  In accordance with the definition of Adjusted EBITDA in our credit facility agreement, as amended on May 30, 2008, interest expense added back to calculate Adjusted EBITDA excludes, for periods beginning after the quarter ended March 31, 2008, the effect of any non-cash gains and losses resulting from the marking to market of hedging obligations that has been charged to interest expense. Had this amended definition been in place for all periods presented, Adjusted EBITDA would have been approximately $12,000 lower for the nine months ended September 30, 2008.

(F)  For the nine months ended September 30, 2008, amendment/termination costs include $5,680 of costs incurred in connection with the consummation of the fourth and fifth amendments to the credit facility during the second quarter of 2008 and an $800 increase to Adjusted EBITDA for the first quarter of 2008, in accordance with the agreement with our lenders.

## ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

*Foreign Currency Hedging.* We have foreign currency cash flow and earnings exposure with respect to specific sale and intercompany debt transactions denominated in currencies other than the functional currency of the unit incurring the costs associated with such transactions. To mitigate the risks related to these exposures, we utilize forward currency contracts in certain circumstances, to lock in exchange rates with the objective that the gain or loss on the forward contracts will approximate the loss or gain on the transaction or transactions being hedged. We determine whether to enter into hedging arrangements based upon the size of the underlying transaction or transactions, an assessment of the risk of adverse movements in the applicable currencies and the availability of a cost-effective hedging strategy. In South America, substantially all of our sales are indexed to U.S. Dollars, but the associated costs are recorded in the local currencies of the operating units. Generally, we do not hedge this U.S. Dollar exposure as it would not be cost effective due to the relatively inefficient foreign exchange markets for local currencies in that region. To the extent we do not engage in hedging or such hedging is not effective, changes in the relative value of currencies can affect our profitability. The value of these contracts is recognized at fair value based on market exchange forward rates and amounted to a net asset position of less than $0.2 million at September 30, 2009. These contracts mature at various dates through August 2010.

As of September 30, 2009, we had open foreign currency exchange contracts maturing through August 2010 with total net notional amounts of approximately $1.6 million. At September 30, 2009, we prepared an analysis to determine the sensitivity of our forward foreign exchange contracts to changes in exchange rates. A hypothetical adverse exchange rate movement of 10% against our forward foreign exchange contracts would have resulted in potential net loss in fair value of these contracts of approximately $0.2 million. The calculation assumes that each exchange rate would change in the same direction relative to the U.S. Dollar. In addition to the direct effects of changes in exchange rates, such changes typically affect the volume of sales or the foreign currency sales price as competitors' products become more or less attractive. Our sensitivity analysis of the effects of changes in foreign currency exchange rates does not factor in a potential change in sales levels or local currency selling prices.

For additional information about the risks associated with fluctuations in currency exchange rates, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Foreign Exchange."

*Interest Rate Hedging*. Our senior credit facility has a variable interest rate. On November 16, 2007, we entered into interest rate swap arrangements pursuant to which we paid fixed rates on notional amounts while receiving the applicable floating LIBOR, Euribor or CDOR rates. These interest rate swaps initially qualified for hedge accounting under Topic 815. As a result of the financial covenant

55

Table of Contents

non-compliance for the period ended March 31, 2008, this debt was potentially payable prior to the expiration of the underlying interest rate swaps, and accordingly, hedge accounting under Topic 815 was no longer applicable for these interest rate swaps and the mark to market decrease in their fair value of $12.0 million was recorded as a non-cash charge to interest expense in the first quarter of 2008 and a non-cash credit to interest expense of $13.7 million in the second quarter of 2008. Effective July 1, 2008, we were again able to assert that the hedged transactions were probable of occurring and accordingly redesignated the interest rate swaps as cash flow hedges of benchmark interest rate risk on variable interest payments on the hedged debt as of June 30, 2008. Such mark to market changes on these interest rate swaps were principally credited or charged to accumulated other comprehensive income (loss) through September 1, 2009.

Effective September 1, 2009, we were required to discontinue hedge accounting for these interest rate swaps. It is uncertain that we will be able to complete any alternative, long-term solutions to our credit issues or to obtain a further waiver prior to expiration of the Waiver Agreement. Accordingly, we are no longer able to support that the variable-rate interest payments (hedged transactions) under our senior credit facility are probable of occurring and therefore, effective September 1, 2009, we were required to discontinue cash flow hedge accounting prospectively for our interest rate swaps so that the mark to market changes in their fair value are charged or credited to interest expense. For the month of September 2009, this amounted to a $0.5 million charge to interest expense. If we are not able to restructure our debt obligations in a manner that is consistent with the hedged forecasted transactions or if our lenders accelerate the debt under the senior credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, the cumulative mark to market changes in the fair value of the underlying interest rate swaps that have been recorded in accumulated other comprehensive loss, in addition to the credit valuation adjustments recorded under Topic 820, would be charged to the statement of operations at that time. As of September 30, 2009 this amount was $15.8 million.

Any acceleration of our obligations under our credit facility, or any failure to make required payments under our credit facility, could allow the counterparties on certain of our existing interest rate swaps to terminate those arrangements. As of September 30, 2009, we estimate that the amount payable by us upon a termination of such interest rate swaps would have been approximately $19.0 million.

The $1.7 million impact of the ineffective portion of these interest rate swaps and the discontinuation of hedge accounting was charged to interest expense during the nine months ended September 30, 2009.

Although these interest rate swaps are subject to mark to market accounting through earnings effective September 1, 2009, they continue to effectively fix, from a cash flow hedge perspective, the interest rate on approximately 81% of the term loan portion of the Company's credit facility through December 31, 2010. As of September 30, 2009, the weighted average interest rate on the effectively fixed portion of the term loan facility was 10.75%, and the weighted average interest rate on the portion of the term loan facility not effectively fixed by interest rate swap contracts, based on the 90-day LIBOR, was 7.08%.

As a result of the amendment of our senior credit facility agreement on May 30, 2008, the applicable margin for LIBOR term loans, LIBOR revolving loans, Euribor loans and CDOR loans under our senior credit facility increased from 2.75% to 5.50%, except that during the Waiver Period, the outstanding balance under the credit facility will bear interest at a rate that is 1.0% per year in excess of the non-default rate otherwise payable during that period under the credit facility. The non-default rate is LIBOR, the Euribor or CDOR rate plus the applicable margin of 5.50%. We estimate that a 1% increase in the LIBOR rate would increase our interest expense on the term debt by approximately $1.1 million on an annual basis through December 31, 2010, the period covered by the interest rate swap agreements.

Due to reduced credit limits at some of our banks, we have been entering into fewer foreign currency hedging arrangements and may not be able to enter into as many hedging arrangements in the future. As discussed above, we also were required to discontinue cash flow hedge accounting prospectively effective September 1, 2009 for our interest rate swaps so that the mark to market changes in their fair value are charged or credited to interest expense. Consequently, our financial statements are more exposed to the effects of currency and interest rate fluctuations, respectively, both favorable and unfavorable, which could have a material impact on our results of operations.

56

Table of Contents

## ITEM 4.        CONTROLS AND PROCEDURES

(a) *Evaluation of Disclosure Controls and Procedures*. We have carried out an evaluation, as of September 30, 2009, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a–15(e) and 15d–15(e) under the Securities Exchange Act of 1934, as amended (the "Act"). Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Act is (i) recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms; and (ii) accumulated and communicated to our management, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosures. No evaluation of disclosure controls and procedures can provide absolute assurance that these controls and procedures will operate effectively under all circumstances. However, the Company's disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives, and the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective at the reasonable assurance level as set forth above.

(b) *Changes in Internal Control over Financial Reporting*. No change in our internal control over financial reporting (as defined in Rules 13a-15 (f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended September 30, 2009 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

## ITEM 1.        LEGAL PROCEEDINGS

We are involved in various legal matters, which have arisen in the ordinary course of business. We do not believe that the ultimate resolution of these matters will have a material adverse effect on our financial position, results of operations or cash flow.

## ITEM 1A.        RISK FACTORS

Since the date that we filed our Annual Report on Form 10-K for the fiscal year ended December 31, 2008 the majority of our served markets have deteriorated substantially from the decline in paper demand related to slowing global economic activity, which may substantially reduce our revenue, Adjusted EBITDA and cash flows. As a result, the risks disclosed in our Form 10-K are more likely to occur. Additionally, because we were not in compliance with certain financial covenants in our senior credit facility for the period ending September 30, 2009, we entered into the Waiver Agreement on September 29, 2009. Accordingly, we are supplementing the risk factors disclosed in our Form 10-K for the year ended December 31, 2008 and our Form 10-Q for the quarter ended June 30, 2009 with the risk factors below.

**If we are not able to address our credit issues prior to the expiration of the Waiver Period, we expect to be in default of certain covenants in our credit facility, which could have a material adverse effect on our ability to continue operating.**

Our credit facility requires us to satisfy certain operating requirements and financial ratios in order to avoid a default or event of default under the agreement. These financial covenants are described above under "Management's Discussion and Analysis of Financial Condition and Results of Operations—Credit Facility." We did not satisfy our interest coverage, leverage and fixed charge covenants for the period ended September 30, 2009. Failure to satisfy these covenants would constitute a default under our credit facility absent a waiver from our lenders. On September 29, 2009, we obtained a temporary waiver from the lenders for violations of the interest coverage, leverage and fixed charge covenants under the credit facility. The waiver is in effect until the expiration of the Waiver Period, or December 15, 2009 at the latest.

**Table of Contents**

In the event that the Company and the lenders under our credit facility have not reached a resolution of our debt issue and/or if the lenders decline to extend the waiver subsequent to December 15, 2009, the lenders would have the right to demand immediate repayment of such obligations under the credit facility. Any such acceleration of our obligations would likely cause other lenders and contractual counterparties to terminate and/or to accelerate our obligations under other financing and credit instruments and agreements. In addition, any acceleration of our obligations or failure on our part to make required payments under our credit facility also could allow the counterparties on certain of our existing interest rate swaps to terminate those arrangements. Should the lenders and/or other counterparties demand immediate repayment of all of our obligations, we expect that we would not be able to pay such obligations. In such event, we may be obligated to initiate insolvency proceedings in some non-U.S. jurisdictions, and/or we and our subsidiaries may have to file for bankruptcy. Even if the lenders do not demand immediate repayment, if the lenders have the right to make such a demand due to an event of default under our credit agreement, we may be obligated to initiate insolvency proceedings in some non-U.S jurisdictions.

We are in discussions with our current lenders regarding restructuring or replacing some or all of our debt, which would be likely to include the issuance of equity to such lenders and the payment of additional fees, as well as exploring with third parties various strategic alternatives affecting our debt and equity ownership. Even with the additional time provided by the Waiver Agreement, no assurances can be given that we will be able to restructure our debt or otherwise execute on a strategic transaction to address our credit issues prior to the expiration of the Waiver Period.

Additionally, if we do not successfully restructure our debt or otherwise address our credit issues or if our lenders accelerate the debt under the credit facility so that it is payable prior to the expiration of the underlying interest rate swaps, the cumulative mark to market changes in the fair value of the underlying interest rate swaps that have been recorded in accumulated other comprehensive income (loss), in addition to the credit valuation adjustments recorded under Topic 820, would be charged to the statement of operations at that time. As of September 30, 2009 this amount was $15.8 million. If payment of our hedge obligations were accelerated and if we were required to pay these outstanding obligations, which as of September 30, 2009 were $19.0 million, the hedged fixed interest rate on approximately 81% of our senior debt (10.75% at September 30, 2009) would become variable (7.08% at September 30, 2009).

**We anticipate that we may have insufficient cash to operate our business and make the scheduled quarterly payments required under our credit facility.**

Our credit facility requires us to make scheduled quarterly principal and interest payments on our term loans, which are described above under "Management's Discussion and Analysis of Financial Condition and Results of Operations—Credit Facility." We anticipate that we may not have sufficient cash to operate our business and make these scheduled quarterly payments, including a payment due on December 31, 2009. Accordingly, absent a waiver of some or all of these scheduled payments, which would require unanimous approval of the lenders of the debt outstanding under the credit facility, we may default on our payment obligations under the credit facility and may find it necessary to file for protection under Chapter 11 of the U.S. Bankruptcy Code. There can be no assurance that we will be able to obtain a waiver of all or any portion of the scheduled quarterly payments under the credit facility from our lenders.

**We may not be able to obtain sufficient lender approval to achieve a restructuring of our debt or extension of the waiver.**

The restructuring of our debt generally would require unanimous approval of the lenders of the debt outstanding under our credit facility. If we are not able to achieve unanimous approval on the proposed or other restructuring of our debt prior to the expiration of the waiver period, we would need the approval of a supermajority of our lenders in order to further extend the waiver to permit us to pursue other alternatives. There can be no assurance we would be able to obtain sufficient approval for either a restructuring or a further waiver.

**Our lenders may not agree to the necessary forbearance on their claims in order for us to successfully achieve a restructuring or other strategic alternative.**

In order to achieve a restructuring of our debt, we may need our lenders to agree to significant forbearance from the exercise of remedies upon expiration of the waiver of the credit facility. In the event that such forbearance is not agreed, we or the directors of

**Table of Contents**

our foreign subsidiaries may be required under local law in some non-U.S. jurisdictions to commence insolvency proceedings in those jurisdictions, which may inhibit or prevent our overall ability to restructure our debt or pursue other strategic alternatives, including a reorganization in or out of bankruptcy.

**In the event that we are unable to restructure our debt, obtain an extension of the Waiver Period, or obtain a waiver of the scheduled quarterly payments required under our credit facility, we may face bankruptcy or insolvency, and may lack the financing to continue operations.**

In the event that we are unable to restructure our debt, obtain an extension of the Waiver Period, or obtain a waiver of the scheduled quarterly payments required under our credit facility, we may find it necessary to file for protection under Chapter 11 of the U.S. Bankruptcy Code, and upon any such filing we are likely to require immediate access to funding in order to continue operations. Funding for the Company in bankruptcy cannot be assured, and would be most likely in the form of debtor-in-possession financing. We may be unable to find any lender willing to provide us with debtor-in-possession financing and any such financing that we are able to obtain would require approval by the bankruptcy court. If such financing is not available, then we may find it necessary to discontinue our operations. Also, if we or the directors of our foreign subsidiaries are required to commence insolvency proceedings under local law in one or more of the foreign jurisdictions in which we operate, then we may lose access to cash from our operations in those jurisdictions or may lose control of the assets underlying those operations.

**Our current credit facility difficulties could have an adverse impact on our business and increase our operating costs.**

The fact that we may be in default on our credit facility is likely to cause our customers and vendors to seek financial assurances from us before they are willing to continue doing business with us and they may instead choose to do business with our competitors. This may result in increased costs of our operations, thereby adversely affecting our results of operations. In addition, we have continued to incur significant expenses in connection with our process to address our long-term credit issues, which has contributed to increasing our costs of operations and consumption of available cash.

**If we file for bankruptcy protection, our business and operations will be subject to various additional risks.**

A bankruptcy filing by us would subject our business and operations to various additional risks, including the following:

- a bankruptcy filing and operating under bankruptcy protection would involve significant costs, including expenses of legal counsel and other professional advisors;

- transactions outside the ordinary course of business would be subject to the prior approval of the bankruptcy court, which might limit our ability to respond timely to certain events or take advantage of certain opportunities;

- if we file for bankruptcy protection in the U.S., the initiation of insolvency proceedings in certain non-U.S. jurisdictions may be warranted, which could cause us to lose control and funding for our foreign businesses;

- we might be unable to retain key executives and employees through the process of reorganization;

- we may be unable to successfully develop, prosecute, confirm, and consummate a plan of reorganization that would be acceptable to the bankruptcy court and our creditors, equity holders, and other parties in interest;

- our common stock may cease to be listed on a national securities exchange, which would make it difficult for stockholders to sell or accurately value our common stock.

**We are subject to increased risk relating to the effects of currency and interest rate fluctuations on our operations, as we are we are unable to enter into additional hedging arrangements.**

Due to reduced credit limits at some of our banks, we have been entering into fewer foreign currency hedging arrangements and we may not be able to enter into as many hedging arrangements in the future. It is uncertain that we will be able to complete any alternative, long-term solutions to our credit issues or to obtain a further waiver of compliance with certain covenants in our credit facility prior to expiration of the Waiver Agreement entered into on September 29, 2009. Accordingly, we are no longer able to

Table of Contents

support that the variable-rate interest payments (hedged transactions) under our senior credit facility are probable of occurring and therefore, effective September 1, 2009, we were required to discontinue cash flow hedge accounting prospectively for our interest rate swaps so that the mark to market changes in their fair value are charged or credited to interest expense. Consequently, our financial statements are more exposed to the effects of currency and interest rate fluctuations, respectively, both favorable and unfavorable, which could have a material impact on our results of operations.

**In the event that we are able to successfully restructure our debt, our borrowing costs are likely to increase.**

As described above, we are in discussions with our lenders to restructure our debt. In the event that we are able to successfully restructure our debt, and in view of current uncertainty in the credit markets and our current credit ratings, the lenders are likely to require that we pay substantially higher interest and fees on our debt going forward. This may result in increased costs of our operations thereby adversely affecting our results of operations, and no assurance can be given that any higher interest or fees will be sustainable by us.

**Restructuring our outstanding debt or other strategic alternatives we may pursue to address our credit issues, whether through a negotiated restructuring or in a bankruptcy proceeding, would likely severely dilute our existing stockholders and may result in our existing common stock having little or no value.**

We are considering strategic alternatives to allow us to restructure our debt, which may include issuing new equity securities. There can be no assurance we would be able to complete any such strategic initiatives on satisfactory terms, or at all. Any such strategic initiatives that we pursue, whether through a negotiated restructuring or in a bankruptcy proceeding, are likely to severely dilute our existing stockholders and may result in our existing common stock having little or no value. In addition, any new investors may, through contractual provisions and/or the percentage of voting securities purchased in such transaction or transactions, be in a position to exert strong influence over our business, policies and affairs, while our existing stockholders may have little or no influence. There can be no assurance that the interests of any new investors will align with the interests of our existing stockholders.

## ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.

### *Restrictions on Payment of Dividends*

For a description on restrictions imposed by Delaware law and our credit agreement on our payment of dividends, see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Credit Facility."

## ITEM 3.    DEFAULTS UPON SENIOR SECURITIES.

See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Credit Facility."

## ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

Not applicable.

## ITEM 5.    OTHER INFORMATION.

Not applicable.

60

**Table of Contents**

**ITEM 6.        EXHIBITS**

See the exhibit index following the signature page to this quarterly report.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**XERIUM TECHNOLOGIES, INC.**
(Registrant)

Date: November 6, 2009

By: _____ /S/   DAVID G. MAFFUCCI _____

**David G. Maffucci**
**Executive Vice President and Chief Financial Officer**
**(Principal Financial and Accounting Officer)**

62

**Table of Contents**

### EXHIBIT INDEX

| Exhibit Number | Description of Exhibits |
|---|---|
| 10.1 | Amendment to Employment Agreement with David G. Maffucci. |
| 10.2(1) | Waiver and Amendment No. 1 to Credit Agreement, dated as of September 29, 2009, by and among Xerium Technologies, Inc., certain subsidiaries of Xerium Technologies, Inc. and certain financial institutions as the Lenders. |
| 10.3 | 2009 Director Restricted Stock Units Agreement dated as of June 9, 2009. |
| 10.4 | 2009 Director Restricted Stock Units Agreement dated as of August 4, 2009. |
| 10.5 | Description of Compensation for Non-Management Directors. |
| 31.1 | Certification Statement of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Statement of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Statement of the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification Statement of the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

(1)    Filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 30, 2009 and incorporated herein by reference.

EXHIBIT 10.1

**AMENDMENT TO EMPLOYMENT AGREEMENT**

THIS AMENDMENT TO EMPLOYMENT AGREEMENT (this "Amendment"), made and entered into in North Carolina by and between Xerium Technologies, Inc. (the "Company"), a Delaware corporation with its principal place of business in Raleigh, North Carolina, and David G. Maffucci (the "Executive"), effective as of the 26th day of August, 2009.

W I T N E S S E T H:

WHEREAS, the Company and the Executive are parties to that certain Employment Agreement dated as of June 8, 2009 (the "Employment Agreement"); and

WHEREAS, Section 6(d) of the Employment Agreement provides that the Executive must have completed at least six (6) months of employment with the Company prior to being eligible to receive severance and other benefits in connection with a termination of the Executive's employment by the Company pursuant to Section 5(d) of the Employment Agreement or by the Executive pursuant to Section 5(f); and

WHEREAS, the Company and the Executive desire to reduce the period that the Executive must have completed employment with the Company prior to being eligible to receive severance and other benefits in connection with a termination of the Executive's employment by the Company pursuant to Section 5(d) of the Employment Agreement or by the Executive pursuant to Section 5(f) from six (6) months to three (3) months.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. Amendments to the Employment Agreement.

(a) Section 6(d)(i) is amended as follows: The word and numeral "six (6)" appearing in the fourth (4th) line of Section 6(d)(i) are replaced by the word and numeral "three (3)".

(b) Section 6(d)(ii) is amended as follows: The word and numeral "six (6)" appearing in the fourth (4th) line of Section 6(d)(ii) are replaced by the word and numeral "three (3)".

Section 2. Reference to and Effect on the Employment Agreement.

(a) Each reference in the Employment Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Employment Agreement, and each reference to the "Employment Agreement", "thereunder", "thereof" or words of like import referring to the Employment Agreement as amended hereby, shall mean and be a reference to the Employment Agreement as amended hereby.

(b) Except as specifically amended above, the Employment Agreement shall continue to be in full force and effect and is hereby in all respects ratified and confirmed.

Section 3. <u>Controlling Law</u>. This Amendment has been executed, delivered and accepted at, and shall be deemed to have been made in, the State of North Carolina and shall be interpreted in accordance with the internal laws (as opposed to conflicts of laws provisions) of the State of North Carolina, without regard to principles of conflicts of laws.

Section 4. <u>Counterparts</u>. This Amendment may be executed in several counterparts, each of which shall be an original and all of which together shall constitute but one and the same.

*[Signature Page to Amendment to Employment Agreement]*

IN WITNESS WHEREOF, this Amendment has been executed as a sealed instrument by the Executive, and by the Company, through its duly authorized representative, as of the date first above written.

**XERIUM TECHNOLOGIES, INC.**

By:    /s/ Stephen R. Light
Name:  Stephen R. Light
Title:  President, Chief Executive Officer and Chairman

**EXECUTIVE**

By:    /s/ David G. Maffucci
Name:  David G. Maffucci

Exhibit 10.3

**XERIUM TECHNOLOGIES, INC.**
**2009 DIRECTOR RESTRICTED STOCK UNITS**
**AGREEMENT**

Dated as of June 9, 2009

In recognition of the important contributions that              (the "Director") has made and can make to the success of Xerium Technologies, Inc. (the "Company") and its Affiliates, pursuant to the Xerium Technologies, Inc. 2005 Equity Incentive Plan (the "Plan"), the Company hereby grants to the Director the Restricted Stock Units Award described below.

1.    **The Restricted Stock Unit Award.** The Company hereby grants to the Director            Units, subject to the terms and conditions of this Agreement and the Plan. The Director's rights to the Units are subject to the restrictions described in this Agreement and the Plan, including the forfeiture provisions of Section 3, in addition to such other restrictions, if any, as may be imposed by law.

2.    **Definitions.** The following definitions will apply for purposes of this Agreement. Capitalized terms not defined in the Agreement are used as defined in the Plan, including without limitation the following terms: "Affiliate"; "Code"; "Committee"; and "Covered Transaction".

(a)    "Agreement" means this Restricted Stock Units Agreement granted by the Company and agreed to by the Director.

(b)    "Award" means the grant of Units in accordance with this Agreement.

(c)    "Change in Control" means a Covered Transaction that would be treated as a "change in ownership," "change in effective control" or "change in ownership of a substantial portion of the assets" within the meaning of Section 409A(a)(2)(A)(iv) of the Code and the regulations thereunder.

(d)    "Common Stock" means the common stock of the Company, $0.01 par value.

(e)    "Fair Market Value" means, on the applicable date, or if the applicable date is not a date on which the NYSE is open the next preceding date on which the NYSE was open, the last sale price with respect to such Common Stock reported on the NYSE, or, if on any such date such Common Stock is not quoted by NYSE, the average of the closing bid and asked prices with respect to such Common Stock, as furnished by a professional market maker making a market in such Common Stock selected by the Committee in good faith; or, if no such market maker is available, the fair market value of such Common Stock as of such day as determined in good faith by the Committee.

(f)    "Grant Date" means June 9, 2009.

(g) "NYSE" means the New York Stock Exchange.

(h) "Payment Date" means as soon as reasonably practicable coincident with or following the earliest to occur of (1) the date on which the Director ceases to serve as a member of the Board and (2) a Change in Control.

(i) "Unit" means a notional unit which is equivalent to a single share of Common Stock on the Grant Date, subject to Section 4.

(j) "Vested" means that portion of the Award to which the Director has a nonforfeitable right, as described in Section 3.

3. **Vesting.**

The Award shall be fully Vested on the Grant Date; provided, however, that if a Director ceases to serve as a member of the Board for any reason other than as a result of a Change in Control prior to the 2010 annual meeting of stockholders, the Director will forfeit a pro rata portion of the Award. For this purpose, the pro rata portion of the Award to be forfeited shall be the product of (x) the number of Units subject to the Award and (y) a fraction, the numerator of which is the number of days from the date the Director ceased to serve as a member of the Board to the one year anniversary of the Grant Date, and the denominator of which is 365.

4. **Adjustments Based on Certain Changes in the Common Stock.** In the event of any stock split, reverse stock split, stock dividend, recapitalization or similar change affecting the Common Stock, the Award shall be equitably adjusted.

5. **No Voting Rights.** The Award shall not be interpreted to bestow upon the Director any equity interest or ownership in the Company or any Affiliate prior to the Payment Date.

6. **Dividends.** On each date on which dividends are paid by the Company, the Director shall be credited with that number of additional Units (including fractional Units) as is equal to the amount of the dividend that would have been paid on the Units then credited to the Director under this Agreement if they had been held in Common Stock on such date divided by the Fair Market Value of a share of Common Stock on such date.

7. **Payment of Award.** On the Payment Date, the Company shall issue to the Director that number of shares of Common Stock as equals that number of Units which have been credited to him or her.

8. **Right to Continue as Member of Board of Directors.** This Agreement shall not create any right of the Director to the continued right to serve as a member of the Board of Directors of the Company or its Affiliates. Except to the extent required by applicable law that cannot be waived, the loss of the Award shall not constitute an element of damages in the event of termination of the Director's service relationship with the Company or its Affiliates even if the termination is determined to be in violation of an obligation of the Company or its Affiliates to the Director by contract or otherwise.

9.  **Unfunded Status.** The obligations of the Company and its Affiliates hereunder shall be contractual only and all such payments shall be made from the general assets of the Company or its Affiliates. The Director shall rely solely on the unsecured promise of the Company and nothing herein shall be construed to give the Director or any other person or persons any right, title, interest or claim in or to any specific asset, fund, reserve, account or property of any kind whatsoever owned by the Company or any Affiliate.

10. **No Assignment.** No right or benefit or payment under the Plan shall be subject to assignment or other transfer nor shall it be liable or subject in any manner to attachment, garnishment or execution.

11. **Withholding.** The Director shall pay to the Company, or make provision satisfactory to the Company for payment of, any taxes required by law to be withheld in respect of an Award, no later than the Payment Date. Such withheld amounts, if any, shall include shares retained from the Award creating the tax obligation, valued at their Fair Market Value on the business day most immediately preceding the date of retention.

12. **409A.** The Award shall be construed and administered consistent with the intent that it be at all times in compliance with, or exempt from, the requirements of Section 409A of the Code and the regulations thereunder.

13. **Amendment or Termination.** This Agreement may be amended only by mutual written agreement of the parties.

IN WITNESS WHEREOF, Xerium Technologies, Inc. has executed this Restricted Stock Units Agreement as of the date first written above.

Xerium Technologies, Inc.

By: _____

Name:   Stephen R. Light
Title:    Chairman and CEO

Acknowledged and agreed:

DIRECTOR

_____
Name:

Exhibit 10.4

**XERIUM TECHNOLOGIES, INC.**
**2009 DIRECTOR RESTRICTED STOCK UNITS**
**AGREEMENT**

Dated as of August 4, 2009

In recognition of the important contributions that                    (the "Director") has made and can make to the success of Xerium Technologies, Inc. (the "Company") and its Affiliates, pursuant to the Xerium Technologies, Inc. 2005 Equity Incentive Plan (the "Plan"), the Company hereby grants to the Director the Restricted Stock Units Award described below.

1.  **The Restricted Stock Unit Award.** The Company hereby grants to the Director           Units, subject to the terms and conditions of this Agreement and the Plan. The Director's rights to the Units are subject to the restrictions described in this Agreement and the Plan, in addition to such other restrictions, if any, as may be imposed by law.

2.  **Definitions.** The following definitions will apply for purposes of this Agreement. Capitalized terms not defined in the Agreement are used as defined in the Plan, including without limitation the following terms: "Affiliate"; "Code"; "Committee"; and "Covered Transaction".

    (a)  "Agreement" means this Restricted Stock Units Agreement granted by the Company and agreed to by the Director.

    (b)  "Award" means the grant of Units in accordance with this Agreement.

    (c)  "Change in Control" means a Covered Transaction that would be treated as a "change in ownership," "change in effective control" or "change in ownership of a substantial portion of the assets" within the meaning of Section 409A(a)(2)(A)(iv) of the Code and the regulations thereunder.

    (d)  "Common Stock" means the common stock of the Company, $0.01 par value.

    (e)  "Fair Market Value" means, on the applicable date, or if the applicable date is not a date on which the NYSE is open the next preceding date on which the NYSE was open, the last sale price with respect to such Common Stock reported on the NYSE, or, if on any such date such Common Stock is not quoted by NYSE, the average of the closing bid and asked prices with respect to such Common Stock, as furnished by a professional market maker making a market in such Common Stock selected by the Committee in good faith; or, if no such market maker is available, the fair market value of such Common Stock as of such day as determined in good faith by the Committee.

    (f)  "Grant Date" means August 4, 2009.

    (g)  "NYSE" means the New York Stock Exchange.

    (h)  "Payment Date" means as soon as reasonably practicable coincident with or following the earliest to occur of (1) the date on which the Director ceases to serve as a member of the Board and (2) a Change in Control.

(i)     "Unit" means a notional unit which is equivalent to a single share of Common Stock on the Grant Date, subject to Section 4.

(j)     "Vested" means that portion of the Award to which the Director has a nonforfeitable right.

3.    **Vesting.**

The Award shall be fully Vested on the Grant Date.

4.    **Adjustments Based on Certain Changes in the Common Stock.** In the event of any stock split, reverse stock split, stock dividend, recapitalization or similar change affecting the Common Stock, the Award shall be equitably adjusted.

5.    **No Voting Rights.** The Award shall not be interpreted to bestow upon the Director any equity interest or ownership in the Company or any Affiliate prior to the Payment Date.

6.    **Dividends.** On each date on which dividends are paid by the Company, the Director shall be credited with that number of additional Units (including fractional Units) as is equal to the amount of the dividend that would have been paid on the Units then credited to the Director under this Agreement if they had been held in Common Stock on such date divided by the Fair Market Value of a share of Common Stock on such date.

7.    **Payment of Award.** On the Payment Date, the Company shall issue to the Director that number of shares of Common Stock as equals that number of Units which have been credited to him or her.

8.    **Right to Continue as Member of Board of Directors.** This Agreement shall not create any right of the Director to the continued right to serve as a member of the Board of Directors of the Company or its Affiliates. Except to the extent required by applicable law that cannot be waived, the loss of the Award shall not constitute an element of damages in the event of termination of the Director's service relationship with the Company or its Affiliates even if the termination is determined to be in violation of an obligation of the Company or its Affiliates to the Director by contract or otherwise.

9.    **Unfunded Status.** The obligations of the Company and its Affiliates hereunder shall be contractual only and all such payments shall be made from the general assets of the Company or its Affiliates. The Director shall rely solely on the unsecured promise of the Company and nothing herein shall be construed to give the Director or any other person or persons any right, title, interest or claim in or to any specific asset, fund, reserve, account or property of any kind whatsoever owned by the Company or any Affiliate.

10.   **No Assignment.** No right or benefit or payment under the Plan shall be subject to assignment or other transfer nor shall it be liable or subject in any manner to attachment, garnishment or execution.

11.   **Withholding.** The Director shall pay to the Company, or make provision satisfactory to the Company for payment of, any taxes required by law to be withheld in respect of an Award, no later than the Payment Date. Such withheld amounts, if any, shall include shares retained from the Award creating the tax obligation, valued at their Fair Market Value on the business day most immediately preceding the date of retention.

12.   **409A.** The Award shall be construed and administered consistent with the intent that it be at all times in compliance with, or exempt from, the requirements of Section 409A of the Code and the regulations thereunder.

13.   **Amendment or Termination.** This Agreement may be amended only by mutual written agreement of the parties.

IN WITNESS WHEREOF, Xerium Technologies, Inc. has executed this Restricted Stock Units Agreement as of the date first written above.

Xerium Technologies, Inc.

By:  _____

Name:  Stephen R. Light

Title:  Chairman and CEO


Acknowledged and agreed:

DIRECTOR

_____

Name:

Exhibit 10.5

**Xerium Technologies, Inc.**
**Description of Compensation for Non-Management Directors**

Cash Compensation

Non-management directors receive an annual cash retainer of $30,000. For meetings held after March 31, 2009, non-management directors also receive $1,500 per director per meeting for attending meetings of the Board or any committee of the Board in person and $500 for attending meetings that last longer than one hour by telephone. The chairman of the Audit Committee also receives additional cash compensation at an annual rate of $10,000 per year, and the chairman of the Compensation Committee and the chairman of the Nominating and Governance Committee each receive additional cash compensation at an annual rate of $5,000 per year. These amounts are payable quarterly in arrears promptly following the end of the quarter. Directors are also reimbursed for out-of-pocket expenses for attending board and committee meetings.

Equity Compensation

Non-management directors that serve until the next annual meeting of stockholders will receive equity-based compensation in the form of a grant of restricted stock units following the annual meeting of stockholders in recognition of their services for the prior year. The number of restricted stock units granted to each non-management director is calculated by dividing $40,000 by the average closing price per share of the Company's common stock over the 20 trading days prior to the annual meeting of stockholders. Non-management directors whose service on the Company's board is terminated prior to the next annual meeting of stockholders will also receive a grant of restricted stock units, calculated by dividing a pro-rated portion of $40,000 (based on the number of days served by the director since the prior annual meeting of stockholders) by the average closing price per share of the Company's common stock over the 20 trading days prior to the director's date of termination. In either case, the restricted stock units shall be granted promptly after the 20 trading day period runs.

Dividends, if any, in respect of these restricted stock units are paid at the same rate as dividends on the Company's common stock but are paid only in the form of additional restricted stock units. The restricted stock units are fully vested at grant. Upon the termination of the director's service on the Company's board, such director is entitled to receive the number of shares of common stock that equals the number of restricted stock units the director has earned.

To the extent that a non-management director has already received equity compensation for a given period of service pursuant to a Company policy previously in effect, the equity compensation provisions of this policy will not be applicable to such director until after the end of the period of service for which the equity compensation was previously awarded.

**Exhibit 31.1**

CHIEF EXECUTIVE OFFICER CERTIFICATION

I, Stephen R. Light, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Xerium Technologies, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 6, 2009

/s/ Stephen R. Light
_____
Stephen R. Light
President, Chief Executive Officer and Chairman
(Principal Executive Officer)

**Exhibit 31.2**

## CHIEF FINANCIAL OFFICER CERTIFICATION

I, David G. Maffucci, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Xerium Technologies, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 6, 2009

/s/ David G. Maffucci
_____
David G. Maffucci
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned, as principal executive officer of Xerium Technologies, Inc. (the "Company"), does hereby certify that, to his knowledge:

1) the Company's Form 10-Q for the period ended September 30, 2009, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) the information contained in the Company's Form 10-Q for the period ended September 30, 2009, fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Stephen R. Light
Stephen R. Light
President, Chief Executive Officer and Chairman
(Principal Executive Officer)

November 6, 2009

**Exhibit 32.2**

<div align="center">

**CERTIFICATION PURSUANT TO
SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

</div>

Pursuant to Section 1350, Chapter 63 of Title 18, United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned, as principal financial officer of Xerium Technologies, Inc. (the "Company"), does hereby certify that, to his knowledge:

1) the Company's Form 10-Q for the period ended September 30, 2009, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) the information contained in the Company's Form 10-Q for the period ended September 30, 2009, fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ David G. Maffucci
_____
David G. Maffucci
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

November 6, 2009

## **EXHIBIT F**

**XERIUM ORGANIZATIONAL CHART**



Xerium Technologies, Inc.
Xerium Asia LLC [US}
Xerium Asia Holding Ltd [HK]
Huyck Wangner (Shanghai) Trading Co Ltd
Huyck Wangner Vietnam Co Ltd
Weavexx LLC [US]
Wangner Limited [Ireland]
Xerium III (US) Limited
Xerium V (US) Limited
Stowe Woodward LLC [US]
Stowe Woodward Licensco LLC [US]
XTI LLC [US]
Xerium Technologies Ltd [UK]
Xi'an Paper Machinery Works
Beloit Asia Pacific (M) Ltd [Mauritius]
10%
90%
Beloit Xibe Roll Covering Co Ltd [China]
Stowe Woodward (Changzhou) Roll Technologies Co Ltd [China]
Huyck Licensco Inc [US]
Huyck Wangner France [Branch of Weavexx]
Huyck Wangner Japan Limited
Xerium Canada Inc
Xerium France SAS
Huyck Wangner (UK) Ltd
Stowe Woodward (UK) Ltd
Xerium Germany Holding Gmbh
Stowe Woodward France SAS
82.5789%
17.42115%
Xerium IV (US) Limited
Wangner Itelpa I LLC [US]
Wangner Itelpa II LLC [US]
Huyck Argentina SA
Huyck Wangner Spain SA
Huyck Wangner Germany GmbH
Huyck Wangner Scandinavia AB [Sweden]
Huyck Wangner Austria GmbH
Stowe Woodward Sweden AB
Minority Shareholders
Robec Walzen GmbH [Germany]
Stowe Woodward Finland Oy
805,667 Shares
1 Share
153,351 Quotas
1 Quota
8,328 Quotas
2,757 Quotas
.45%
99.45%
Stowe Woodward Mexico SA de CV
Robec Brazil LLC [US]
Xerium do Brasil Ltda
Wangner Itelpa Participações Ltda [Brazil]
TIAG Transworld Interweaving GmbH [Switz]
Dissolution Pending
Xerium Italia SpA
Huyck Wangner Australia Pty Ltd
Stowe Woodward AG [Germany]
116,461 Shares
228,705 Shares
38,550 Shares
205,890,194 Shares
Xerium Technologies Brasil Indústria e Comércio SA
1 Share each; Orban, Carroll, Godoi
Huyck Wangner Italia SpA

## **EXHIBIT G**

**PROJECTED FINANCIAL INFORMATION**

## PROJECTIONS

### A.      Responsibility for and Purpose of the Projections

For the purpose of demonstrating the feasibility of the Plan, the following financial projections for each of the six fiscal years 2010 through 2015 (the "Projections") were prepared by the Debtors, assisted by their professional advisors.  The Projections reflect the Debtors' most recent estimates of consolidated financial position, results of operations and cash flows of Xerium.  Consequently, the Projections reflect the Debtors' assumptions and judgments as to expectations of market and business conditions, expected future operating performance, and the occurrence or nonoccurrence of certain future events, all of which are subject to change, as discussed below.

The Debtors do not, as a matter of course, publish their projections, strategies, or forward-looking projections of the financial position, results of operations, and cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to the holders of Claims or Equity Interests after the date of this Disclosure Statement, or to include such information in documents required to be filed with the SEC or to otherwise make such information public.  The assumptions disclosed herein are those that the Debtors believe to be significant to the Projections and are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.

The Projections present, to the best of the Debtors' knowledge and belief, the projected financial position, results of operations, and cash flows for the six fiscal years  2010 through 2015 for Xerium and reflect the Debtors' assumptions and judgments as of March 1, 2010.  Although the Debtors are of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including, without limitation, material changes to the economic environment, changes and fluctuations in available foreign exchange rates, supply and demand of key inputs, the competitive environment, the financial health of customers and their industries, and other factors affecting the Debtors' businesses.  The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty.  Consequently, actual financial results could differ materially from the Projections.  The Projections assume the Plan will be implemented in accordance with its stated terms and that consummation of the Plan will occur on or about May 31, 2010.  The Projections should be read in conjunction with the assumptions and qualifications contained herein.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP") IN THE U.S.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT PUBLIC ACCOUNTING FIRM.**

**THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND, AS SUCH, ARE SUBJECT**

**TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.**

B.     **General Assumptions**

The Debtors prepared the Projections with the assistance of their professional advisors, including the incorporation of independent economic data and other input from third party sources.  The Projections represent, to the best of the Debtors' knowledge and belief, the Debtors' projected financial position, results of operations, and cash flows for each of the six fiscal years 2010 through 2015 and reflect the Debtors' assumptions and judgments considering information known as of March 1, 2010.

1.     **Consolidation**

The Projections are presented in a consolidated manner and include the financial performance of all entities of Xerium.  As such, the Projections include the financial position, results of operations, and cash flows of both Debtor and non-Debtor entities.

2.     **Methodology**

The Projections reflect management's current estimate of demand for its products and services as well as the achievability of productivity and cost savings initiatives.  The senior management team and business unit managers of Xerium Technologies, Inc. took into account current and projected macroeconomic and microeconomic analyses relevant to the broad paper production industries as well as the Company's own internal estimates of factors that impact supply and demand for Company's products.  The Projections were developed using a regional build up by product segment and consolidated at a corporate level where additions and adjustments were made for non-allocatable items and elimination of intercompany sales.

3.     **Tax Structure**

The Projections for Xerium include the estimated impact of U.S. and non-U.S. taxes.  Therefore, certain assumptions have been made with respect to regional and local profits and losses.  Certain jurisdictions impose restrictions on the current deductibility of interest payments.  These restrictions have been factored into the Projections.  Actual cash taxes in any year may differ materially based upon varying levels of debt, interest rates, actual results, and income distribution assumptions as well as the final determination of remaining U.S. tax attributes in the chapter 11 emergence case.  Income tax estimates were built up by entity for all

2

forecast periods through December 2010 with a blended tax rate of 40.7% to 40.9% of profit before taxes applied thereafter.

4.  **Plan Consummation Date**

The Projections assume the Plan will be consummated on or about May 31, 2010.  Any significant change in the assumed date of the consummation of the Plan will materially impact the Company's ability to achieve the Projections.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

## C.    Xerium Pro Forma Emergence Consolidated Balance Sheet

Below is a reconciliation of the pre-emergence consolidated balance sheet to the post-emergence consolidated balance sheet assuming chapter 11 filing on March 31, 2010 and consummation of the Plan on May 31, 2010.

**Xerium Technologies, Inc.**
**Consolidated Balance Sheet**
*(USD Millions)*

| | 5/31/2010 Pre-Closing (a) | Bank Debt (b) | New First Lien Facilities (c) | Transaction Fees (d) | 5/31/2010 Post-Closing |
|---|---|---|---|---|---|
| | | Restructuring Transactions | | | |
| **Assets** | | | | | |
| Cash and Short-Term Investments | $ 51.7 | $ (17.2) | $ - | $ (11.3) | $ 23.2 |
| Restricted Cash | 15.3 | | - | | 15.3 |
| Accounts Receivable | 83.7 | | | | 83.7 |
| Inventories | 83.5 | | | | 83.5 |
| Prepaid Expenses | 5.8 | | | | 5.8 |
| Other Current Assets | 23.0 | (13.2) | | | 9.8 |
| **Total Current Assets** | 263.0 | (30.4) | - | (11.3) | 221.3 |
| Property, Plant, and Equipment, net | 383.1 | | | | 383.1 |
| Investments | 0.7 | | | | 0.7 |
| Goodwill | 150.5 | | | | 150.5 |
| Intangible Assets and Deferred Financing, net | 13.7 | | | 2.5 | 16.2 |
| Other Assets | 6.2 | | | | 6.2 |
| **Total Assets** | $ 817.2 | $ (30.4) | $ - | $ (8.8) | $ 778.0 |
| **Liabilities and Stockholder's Equity** | | | | | |
| New Revolver | | | $ - | | $ - |
| Notes Payable (e) | 20.0 | (20.0) | | | - |
| Old Secured Debt (f) | 619.5 | (611.7) | | | 7.8 |
| Accounts Payable | 30.7 | | | | 30.7 |
| Accrued Expenses | 53.4 | (7.2) | | (1.5) | 44.7 |
| **Total Current Liabilities** | 723.5 | (638.9) | - | (1.5) | 83.2 |
| New DIP/First Lien Term Loan | 60.0 | | - | | 60.0 |
| New Long Term Debt | - | 410.0 | | | 410.0 |
| Long-Term Deferred Tax Liability | 14.4 | | | | 14.4 |
| Pension and Post Retirement Benefits | 67.5 | | | | 67.5 |
| Other Liabilities | 10.1 | | | | 10.1 |
| **Total Liabilities** | 875.6 | (228.9) | - | (1.5) | 645.2 |
| **Stockholder's Equity** | | | | | |
| Common Stock Ending Balance | 0.5 | | | | 0.5 |
| Paid In Capital | 224.8 | 211.7 | | | 436.4 |
| Retained Earnings | (276.5) | (13.2) | | (7.3) | (297.0) |
| Accumulated Other Comprehensive Income | (7.1) | | | | (7.1) |
| **Total Stockholder's Equity** | (58.3) | 198.5 | - | (7.3) | 132.8 |
| **Total Liabilities and Stockholder's Equity** | $ 817.3 | $ (30.4) | $ - | $ (8.8) | $ 778.0 |

Notes:
(a)  The pre-closing balance sheet reflects actual results through December 31, 2009 and forecasted results for the five months ending May 31, 2010 with exchange rates as of December 31, 2009; liability accounts include approximately $434 million in Liabilities Subject to Compromise at the Debtor entities, the balance sheet has not been so classified as the forecast assumes court approval for payment of all foreign claims and all vendor claims in the normal course of business.
(b)  Reflects issuance of a new $410 million term loan, related fees to the secured lenders pursuant to the Plan, and payment of March 2010 interest payment; reflects cash payments of $17.2 million, consisting of $10.0 million cash payment to settle secured lender claims and $7.2 million of accrued interest payable at closing; reflects $13.2 million write-off of deferred financing associated with pre-petition secured debt.
(c)  Reflects no draw under the new $20.0 million revolver facility required to maintain a minimum cash balance of $15.0 million; also includes roll-over of $60.0 million Debtor-in-Possession term loan facility with $15.3 million of restricted cash to collateralize Letters of Credit at 103%.
(d)  Includes $7.3 million in success fees, $1.5 million in deferred waiver fees, and $2.5 million in incremental financing fees related to the Debtor-in-Possession and Exit facilities.
(e)  Notes Payable carried as a current liability, booked in December 2009, for anticipated cash settlement claim paid to secured lenders at closing: $10.0 million funds cash and the remaining $10.0 million will be booked as an increase in equity.
(f)  Assumes all $611.7 million of secured bank debt is replace by new Term Loan A, Term Loan B, and revolver facilities with $7.8 million in the Japanese and Austrian lines of credit remaining as a current liability.

## D.    Xerium Projected Consolidated Balance Sheets (Unaudited)

Below are management's projections of the consolidated financial positions at December 31 for the fiscal years 2010 through 2015 with unaudited, preliminary results for fiscal year 2009.

**Xerium Technologies, Inc.**
**Consolidated Balance Sheet**
*(USD Millions)*

| As of December 31: | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Cash and Short-Term Investments | $ 23.0 | $ 46.0 | $ 55.2 | $ 80.0 | $ 104.5 | $ 134.8 | $ 172.9 |
| Restricted Cash | - | 15.3 | 15.3 | 15.3 | 15.3 | 15.3 | 15.3 |
| Accounts Receivable | 77.2 | 81.8 | 91.7 | 95.1 | 99.5 | 103.8 | 107.9 |
| Inventories | 78.2 | 77.3 | 80.2 | 82.8 | 86.1 | 89.2 | 92.3 |
| Prepaid Expenses | 5.8 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Other Current Assets | 24.6 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 | 5.2 |
| **Total Current Assets** | 208.8 | 229.8 | 251.8 | 282.6 | 314.7 | 352.5 | 397.8 |
| Property, Plant, and Equipment, net | 385.5 | 374.1 | 360.2 | 345.9 | 330.2 | 314.4 | 298.7 |
| Investments | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Goodwill | 150.5 | 150.5 | 150.5 | 150.5 | 150.5 | 150.5 | 150.5 |
| Intangible Assets and Deferred Financing, net | 14.5 | 13.5 | 9.7 | 6.1 | 4.9 | 4.5 | 4.5 |
| Other Assets | 6.3 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 |
| **Total Assets** | $ 766.3 | $ 774.9 | $ 779.1 | $ 792.0 | $ 807.2 | $ 828.8 | $ 858.4 |
| **Liabilities and Stockholder's Equity** | | | | | | | |
| Consolidated Debt | $ 640.1 | $ 472.4 | $ 459.5 | $ 445.2 | $ 421.3 | $ 392.9 | $ 359.1 |
| Accounts Payable | 32.1 | 35.5 | 36.8 | 38.0 | 39.5 | 40.9 | 42.3 |
| Accrued Expenses | 39.7 | 41.3 | 39.3 | 37.3 | 35.3 | 33.3 | 31.3 |
| **Total Current Liabilities** | 711.9 | 549.2 | 535.6 | 520.4 | 496.0 | 467.1 | 432.7 |
| Long-Term Deferred Tax Liability | 14.9 | 13.8 | 11.5 | 11.9 | 15.5 | 19.9 | 27.6 |
| Pension and Post Retirement Benefits | 68.3 | 66.6 | 66.6 | 66.6 | 66.6 | 66.6 | 66.6 |
| Other Liabilities | 10.0 | 10.4 | 10.4 | 10.4 | 10.4 | 10.4 | 10.4 |
| **Total Liabilities** | 805.2 | 640.0 | 624.2 | 609.4 | 588.6 | 564.0 | 537.4 |
| **Stockholder's Equity** | | | | | | | |
| Common Stock Ending Balance | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Paid In Capital | 221.9 | 437.2 | 439.9 | 442.6 | 445.2 | 447.9 | 450.5 |
| Retained Earnings | (249.9) | (301.7) | (284.2) | (259.2) | (225.9) | (182.4) | (128.8) |
| Accumulated Other Comprehensive Income | (11.3) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) |
| **Total Shareholder's Equity** | (38.9) | 134.8 | 154.9 | 182.6 | 218.6 | 264.8 | 321.0 |
| **Total Liabilities and Shareholder's Equity** | $ 766.4 | $ 774.9 | $ 779.1 | $ 792.0 | $ 807.2 | $ 828.8 | $ 858.4 |

**E.**    **Xerium Projected Consolidated Income Statements (Unaudited)**

Below is management's projection of consolidated income for the fiscal years 2010 through 2015 with unaudited, preliminary results for fiscal year 2009.

Xerium Technologies, Inc.
Consolidated Income Statement
(USD Millions)

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Total Sales | $ 500.1 | $ 559.8 | $ 572.5 | $ 602.1 | $ 634.3 | $ 666.8 | $ 699.1 |
| Cost of Product Sold | (312.6) | (338.3) | (337.7) | (351.7) | (367.8) | (382.9) | (398.2) |
| **Gross Margin** | **187.5** | **221.5** | **234.8** | **250.4** | **266.5** | **283.9** | **300.9** |
| SG&A Expenses | (138.4) | (193.7) | (159.7) | (164.6) | (169.9) | (175.1) | (180.2) |
| **EBIT** | **49.1** | **27.8** | **75.1** | **85.8** | **96.6** | **108.8** | **120.7** |
| Depreciation | 39.5 | 42.7 | 42.9 | 43.7 | 44.5 | 44.5 | 44.5 |
| Amortization of Intangibles | 2.3 | 2.3 | 2.3 | 2.3 | - | - | - |
| **EBITDA** | **91.0** | **72.8** | **120.3** | **131.9** | **141.1** | **153.4** | **165.2** |
| Interest Income | 1.2 | 1.6 | 2.4 | 3.1 | 4.1 | 5.3 | 6.8 |
| Interest Expense | (59.2) | (46.4) | (45.4) | (44.1) | (42.0) | (39.4) | (36.3) |
| Amortization of Finance Costs | (5.4) | (16.5) | (1.5) | (1.3) | (1.2) | (0.4) | - |
| Other Income, net | (4.7) | (10.1) | - | - | - | - | - |
| **Profit Before Taxes** | **(19.1)** | **(43.7)** | **30.6** | **43.6** | **57.5** | **74.3** | **91.2** |
| Income Tax Expense | (11.9) | (8.0) | (13.1) | (18.5) | (24.2) | (30.9) | (37.7) |
| **Net Income/(Loss)** | **$ (31.0)** | **$ (51.6)** | **$ 17.4** | **$ 25.1** | **$ 33.3** | **$ 43.5** | **$ 53.5** |

For purposes of comparison, the Company has prepared a schedule that normalizes Earnings before Interest, Taxes, Depreciation, and Amortization ("EBITDA") to exclude the impact of one-time events.  Below is management's projection of normalized EBITDA for the fiscal years 2010 through 2015 with EBITDA and adjustment amounts for fiscal year 2009 based on unaudited, preliminary results for fiscal year 2009.

Xerium Technologies, Inc.
Normalized EBITDA
(USD Millions)

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| **EBITDA** | **$ 91.0** | **$ 72.8** | **$ 120.3** | **$ 131.9** | **$ 141.1** | **$ 153.4** | **$ 165.2** |
| Stock Based Compensation | 2.3 | 3.7 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| IPO Costs, Related Comp & Refi Cost | - | - | - | - | - | - | - |
| Impairment (FAS 142 & 144) | 1.7 | 1.3 | - | - | - | - | - |
| Australian environmental reserve | (3.4) | - | - | - | - | - | - |
| CEO transtion costs | - | - | - | - | - | - | - |
| Curtailment/settlement pension gains | - | - | - | - | - | - | - |
| Significant bad debt adjustments | (1.8) | - | - | - | - | - | - |
| Inventory reserve adjustments | (0.4) | - | - | - | - | - | - |
| Reversal of litigation accruals | (2.3) | - | - | - | - | - | - |
| Gain on Asset Sales | (0.8) | - | - | - | - | - | - |
| Operational Restructuring Costs, Net | 2.4 | 12.2 | 3.4 | 3.4 | 3.4 | 3.4 | 3.4 |
| Financial Restructuring Costs | 8.7 | 14.1 | - | - | - | - | - |
| Other Restructuring Costs | - | 7.6 | - | - | - | - | - |
| **Normalized EBITDA** | **$ 97.4** | **$ 111.6** | **$ 126.4** | **$ 138.0** | **$ 147.2** | **$ 159.4** | **$ 171.3** |

1.    **Key Assumptions**

(a)    Revenues and Cost of Sales

Management's current long range plan assumes a global rebound in demand for the products and services of Xerium in some, but not all, paper and board segments. Management forecasts that the percentage of total Xerium revenue from Asia and South America will continue to expand through the forecast period while the share of revenue from North America and Europe will continue to decline.  With the exception of its Asia division, management has projected a consolidated revenue growth rate that is below the global growth rate projected by RISI for worldwide paper and board volume through 2011 and has used

internal projections to develop growth rates in the latter years.  Asia, on the other hand, is expected to grow faster than analysts' projections for that region as the company aggressively expands its sales and service force.   The Projections take into account continuing mill curtailments with limited new start-ups, the impact of new technologies and customer behavior that may result in fewer positions and longer lifecycles of rolls and covers, shifting worldwide mix to tissue and specialty grades from newsprint and printing & writing, and greater overall market growth in developing markets in Asia, South America, and Eastern Europe.   The Projections from 2010 through 2015 assume a stable foreign exchange rate at those available to the Company as of September 30, 2009 when the 2010 budget was prepared.

(b)      Selling, General and Administrative

Consolidated selling, general, and administrative ("SG&A") expenses include, among other things, salaries, wages, commissions, benefits, corporate overhead, incentive plans, rent, leases, marketing activities, and research and development expenses as well as expenses associated with operational restructuring and professional fees related to financial restructuring. SG&A expenses are forecast to increase in 2010 compared with 2009 to support significant operational and financial restructuring activities.  SG&A expenses are then forecast to decrease markedly in 2011 as restructuring activities are pared back and the Company begins to realize benefits from productivity and cost reduction initiatives.  From 2012 through 2015, annual SG&A expenses are forecast to increase between 2.9% and 3.3%, due to higher sales volumes, an assumed increase in employee costs, and general inflation.

(c)      Depreciation and Amortization

Consolidated depreciation and amortization of intangibles is forecasted to remain relatively constant throughout the projection period as capital spending remains relatively stable and no major sales or acquisitions of business units or product lines are forecasted.

## F.      Xerium Projected Consolidated Statement of Cash Flows (Unaudited)

Below is management's projection of consolidated cash flow for the fiscal years 2010 through 2015 with unaudited, preliminary results for fiscal year 2009.

**Xerium Technologies, Inc.**
**Consolidated Cash Flow Statement**
(USD Millions)

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Net Income/(Loss) | $ (31.0) | $ (51.6) | $ 17.4 | $ 25.1 | $ 33.3 | $ 43.5 | $ 53.5 |
| Depreciation and Amortization | 41.9 | 45.0 | 45.2 | 46.0 | 44.5 | 44.5 | 44.5 |
| Deferred Financing Cost Amortization | 5.4 | 16.5 | 1.5 | 1.3 | 1.2 | 0.4 | - |
| Deferred Taxes | 7.0 | (1.1) | (2.3) | 0.4 | 3.6 | 4.4 | 7.7 |
| Other Liabilities and Prepaid Expenses | 4.2 | 15.1 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| Change in Current Assets and Liabilities | (11.3) | (7.5) | (13.4) | (6.9) | (8.1) | (8.0) | (7.9) |
| **Cash Provided/(Used) By Operations** | **16.1** | **16.4** | **51.1** | **68.6** | **77.2** | **87.5** | **100.6** |
| Capital Expenditures, gross | (19.5) | (32.4) | (29.0) | (29.4) | (28.8) | (28.8) | (28.8) |
| Proceeds from Divestitures and Asset Sales, net | 4.3 | (0.1) | - | - | - | - | - |
| Other Investing Activities | 1.1 | - | - | - | - | - | - |
| **Cash Provided/(Used) By Investing** | **(14.2)** | **(32.5)** | **(29.0)** | **(29.4)** | **(28.8)** | **(28.8)** | **(28.8)** |
| Net Increase/(Decrease) in Revolver | 28.0 | - | - | - | - | - | - |
| Net Increase/(Decrease) in Other Debt | (41.1) | 43.9 | (12.9) | (14.4) | (23.9) | (28.4) | (33.8) |
| Other Financing Activities | (1.5) | (4.7) | (0.0) | 0.0 | 0.0 | 0.0 | - |
| **Cash Provided/(Used) By Financing** | **(14.6)** | **39.2** | **(12.9)** | **(14.4)** | **(23.9)** | **(28.4)** | **(33.8)** |
| Effect of Exchange Rate Changes on Cash Flows | 1.0 | (0.1) | - | - | - | - | - |
| **Net Increase/(Decrease) in Cash** | **(11.7)** | **23.0** | **9.2** | **24.8** | **24.5** | **30.3** | **38.0** |
| Cash and Cash Equivalents at Beginning of Period | 34.7 | 23.0 | 46.0 | 55.2 | 80.0 | 104.5 | 134.8 |
| **Ending Cash and Cash Equivalents** | **$ 23.0** | **$ 46.0** | **$ 55.2** | **$ 80.0** | **$ 104.5** | **$ 134.8** | **$ 172.9** |

1.    **Key Assumptions**

    (a)    Working Capital

Management estimates that the Company will continue to see improvement in working capital as a result of its targeted efforts to release "trapped cash" in receivables, inventory, and payables through 2010. The consolidated working capital days assumptions for Accounts Receivable, Inventory, and Accounts Payable remain constant with 2010 levels through the remainder of the projection period as measured against total revenue or cost of sales.

    (b)    Capital Expenditures

Between 2010 and 2015, Xerium Technologies, Inc. forecasts consolidated capital expenditures of $177.2 million, primarily for the replacement of aged equipment, to support the normal roll-outs of new products and productivity initiatives, and to enable mix changes in order to be responsive to the marketplace. Capital expenditures in 2010 are also projected to include a limited amount of additional incremental spend resulting from the deferral of select projects from 2009.

    (c)    Debt

Management expects that the Debtors will be required to make adequate protection payments in an amount equal to the interest due on the outstanding balances under the Shared Collateral Claims during the pendency of these cases. The Projections assume a new $410 million term loan will replace all existing Term B secured debt and the Prepetition Revolver along with a $80 million DIP Facility which will roll into the Exit Facility on the Plan confirmation date of May 31, 2010.

The Projections also assume that all restructuring transactions occur on May 31, 2010 with accrued interest paid to lenders as required and future amortization, debt balances, and interest payments paid per the terms of the Amended and Restated Credit Facility and/or Exit Facility using base interest rates available as of February 24, 2010.

See Section IV(C)(1) of the Disclosure Statement, entitled "Exit Facility" for a full description of the Exit Facility.

# EXHIBIT H

## LIQUIDATION ANALYSIS

## Liquidation Analysis

### A.    Introduction

Under the "best interests" of creditors test set forth in section 1129(a)(7) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or equity interest with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date.  To demonstrate that the Debtors'[1] joint prepackaged plan of reorganization (the "Plan") satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis (the "Notes").  Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

The Liquidation Analysis estimates potential Cash distributions to holders of Allowed Claims and Equity Interests in a hypothetical chapter 7 liquidation of the Debtors' assets.  Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement.  The Debtors prepared the Liquidation Analysis with the assistance of their advisors.

### B.    Scope, Intent, and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.  No independent appraisals were conducted in preparing the Liquidation Analysis. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY MATERIALLY.

---

[1] The Debtors include:  Xerium Technologies, Inc.; Huyck Licensco Inc.; Stowe Woodward Licensco LLC; Stowe Woodward LLC; Wangner Itelpa I LLC; Wangner Itelpa II LLC; Weavexx, LLC; Xerium Asia, LLC; Xerium III (US) Limited; Xerium IV (US) Limited; Xerium V; XTI LLC; Xerium Canada Inc.; Huyck.Wangner Austria GmbH; Xerium Germany Holding GmbH; and Xerium Italia S.p.A.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims reflected on the Debtors' books and records to date. In addition, the Liquidation Analysis includes estimates for Claims that could be asserted and Allowed in a chapter 7 liquidation, including Administrative Expense Claims, wind-down costs and trustee fees. For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims contained in the Liquidation Analysis references specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to holders of Allowed Claims and Equity Interests are based on ranges of Allowed Claims and Equity Interests. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Equity Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE REORGANIZATION CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## C.    Global Notes to the Liquidation Analysis

### 1.    Liquidation Date and Appointment of Chapter 7 Trustee

The Liquidation Analysis assumes that the Debtors commence a chapter 7 liquidation on May 30, 2010 (the "Liquidation Date"). On the Liquidation Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates (the "Estates"). Should multiple Trustees be appointed to administer the Estates, lower recoveries and higher administrative costs could result and distributions to creditors could be delayed.

### 2.    Liquidation of the Debtors

The Liquidation Analysis assumes the Debtors' liquidation begins on the Liquidation Date and continues for a period of approximately twelve months. During such liquidation period, the Debtors' assets would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to holders of Allowed Claims or Equity Interests.

### 3.    Value of Debtors' Assets

Unless otherwise stated herein, the book values of the Debtors' assets used in the Liquidation Analysis are the un-audited net book values for each of the Debtors as of December 31, 2009, and are assumed to be a proxy for the Debtors' assets as of the Liquidation Date.

### 4.    Liquidation Analysis Waterfall and Recovery Ranges

The Liquidation Analysis assumes that the proceeds generated from the Debtors' assets will be available to the Trustee (the "Liquidation Proceeds"). The Trustee then would use the Liquidation Proceeds to satisfy the costs and expenses of the liquidation, including wind-down costs including, to the extent required, costs related to local insolvency proceedings for non-U.S. Debtors, and the Trustee fees. For purposes of this analysis, secured lenders are

assumed to provide a carve-out for liquidation expenses.  Any remaining net Liquidation Proceeds would then be allocated to holders of Claims and Equity Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.  The Liquidation Analysis provides for high and low recovery percentages for Claims and Equity Interests upon the Trustee's application of the Liquidation Proceeds.  The high and low recovery ranges reflect a high and low range of estimated Liquidation Proceeds from the Trustee's sale of the Debtors' assets.

### 5. <u>Liquidation of Non-Debtor Affiliates</u>

Affiliates of the Debtors ("<u>Non-Debtor Affiliates</u>") are assumed to be liquidated in applicable insolvency proceedings concurrent with the liquidation of the Debtors.  The methodologies and assumptions utilized in the non-Debtor liquidation analyses are generally consistent with the methodologies and assumptions utilized for the Debtors' Liquidation Analysis.  Net proceeds from the liquidation of the Non-Debtor Affiliates are distributed, first, to satisfy any guarantees of the Debtors' secured debt, then to unsecured Claims, and finally, to the extent of any excess proceeds, to Equity Interest holders, including Debtors.

### 6. <u>Liquidation of U.S. Debtors</u>

For purposes of this analysis, the U.S. Debtors are presented in a consolidated schedule. The asset proceeds and claims recoveries presented in the consolidated schedule, however, are based upon entity-level liquidations.

### 7. <u>Factors Considered in Valuing Hypothetical Liquidation Proceeds</u>

Certain factors may limit the amount of the Liquidation Proceeds available to the Trustee.  Certain of these factors are discussed in further detail below.  In addition, it is possible that distribution of the Liquidation Proceeds would be delayed while the Trustee and his or her professionals become knowledgeable about the Reorganization Cases and the Debtors' business and operations.  This delay could materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

*(Dollars in Thousands)*

| Debtor | Notes | NBV | Recovery High | Recovery Low | Value Available For Distribution High | Value Available For Distribution Low |
|---|---|---|---|---|---|---|
| ***U.S. Debtors - Consolidated\**** | | | | | | |
| Cash | 1 | $ 44,286 | 100.0% | 100.0% | $ 44,286 | $ 44,286 |
| Accounts receivable - gross | 2 | 17,880 | 89.9% | 80.1% | 16,082 | 14,327 |
| Intercompany receivables | 3 | 105,074 | 0.0% | 0.0% | 22 | 14 |
| Inventories - gross | 4 | 18,750 | 47.0% | 37.0% | 8,819 | 6,944 |
| Prepaid expenses | 5 | 2,190 | 10.0% | 0.0% | 219 | - |
| Other current assets | 5 | 10,946 | 10.0% | 0.0% | 1,095 | - |
| Property, plant & equipment - net | 6 | 80,290 | 45.1% | 33.3% | 36,234 | 26,734 |
| Investments - net | 7 | 1,572,804 | 0.1% | 0.0% | 1,151 | 328 |
| Intangible assets - net | 8 | 47,335 | 0.0% | 0.0% | - | - |
| **Gross liquidation proceeds** | | $ 1,899,555 | 5.7% | 4.9% | $ 107,908 | $ 92,632 |
| Less: liquidation expenses | | | | | | |
| Wind-down costs | 9 | | | | (20,450) | (21,473) |
| Professional fees | 10 | | | | (2,414) | (2,598) |
| Trustee fees | 11 | | | | (3,203) | (2,769) |
| Total liquidation expenses | | | | | (26,067) | (26,840) |
| % of gross liquidation proceeds | | | | | 24% | 29% |
| **Net proceeds available for distribution:** | | | | | $ 81,841 | $ 65,792 |

| Estimated superpriority administrative claims: | 12 | Amount | Recovery High | Recovery Low | Paydown From Net Asset Proceeds High | Paydown From Net Asset Proceeds Low |
|---|---|---|---|---|---|---|
| DIP Professional Fees Carve Out | | $ 3,000 | 100.0% | 100.0% | $ (3,000) | $ (3,000) |
| DIP Credit Facility & Accrued Interest | | 60,336 | 100.0% | 100.0% | (60,336) | (60,336) |
| | | $ 63,336 | 100.0% | 100.0% | $ (63,336) | $ (63,336) |
| **Net proceeds available for creditors:** | | | | | $ 18,505 | $ 2,456 |

| Secured equipment financing and leases: | 15 | | Recovery High | Recovery Low | | |
|---|---|---|---|---|---|---|
| Secured equipment financing and leases | | $ 175 | 100.0% | 100.0% | $ (175) | $ (175) |
| **Net proceeds available for secured creditors:** | | | | | $ 18,330 | $ 2,281 |

| Secured credit facility claims: | 15 | | | | | |
|---|---|---|---|---|---|---|
| Revolving Credit Facility | | $ 28,100 | 1.6% | 0.2% | $ (437) | $ (60) |
| Term B - XTI | | 299,494 | 1.6% | 0.2% | (4,656) | (636) |
| Deferred Waiver Claim | | 1,500 | 1.6% | 0.2% | (23) | (3) |
| Term B - XTI LLC | | 64,423 | 0.0% | 0.0% | (4) | (0) |
| Debt Guaranteed by U.S. Entities (gross to all Debtors) | | 592,428 | 2.2% | 0.3% | (13,118) | (1,570) |
| | | $ 985,944 | 1.8% | 0.2% | $ (18,237) | $ (2,269) |
| Proceeds from guarantees & equalization payments | | | | | | |
| Distributions from guarantors | 13 | | | | $ - | $ - |
| Equalization proceeds / (payments) | 14 | | | | 103,628 | 63,451 |
| | | | | | $ 103,628 | $ 63,451 |

| Secured credit facility claims (post guarantees & equalization): | 15 | | | | Cummulative Paydown | |
|---|---|---|---|---|---|---|
| Revolving Credit Facility | | $ 28,100 | 29.9% | 16.5% | $ (8,394) | $ (4,632) |
| Term B - XTI | | 299,494 | 29.9% | 16.5% | (89,469) | (49,369) |
| Deferred Waiver Claim | | 1,500 | 29.9% | 16.5% | (448) | (247) |
| Term B - XTI LLC | | 64,423 | 29.9% | 16.5% | (19,245) | (10,619) |
| Debt Guaranteed by U.S. Entities (net to Non-U.S. Debtors) | | 204,031 | 2.1% | 0.4% | (4,310) | (852) |
| | | $ 597,548 | 20.4% | 11.0% | $ (121,866) | $ (65,720) |

| Secured swap claims: | 15 | | | | | |
|---|---|---|---|---|---|---|
| ML Secured Swap USD - XTI | | $ 5,946 | 1.6% | 0.2% | $ (92) | $ (12) |
| ML Secured Swap EUR - XTI LLC | | 852 | 0.0% | 0.0% | (0) | (0) |
| | | $ 6,798 | 1.4% | 0.2% | $ (92) | $ (12) |
| **Net proceeds available for priority & unsecured claims:** | | | | | $ - | $ - |

*\* Includes U.S. Debtors, comprising Xerium Technologies Inc., XTI LLC, Huyck Licensco Inc., Stowe Woodward Licensco LLC, Stowe Woodward LLC, Wangner Itelpa I LLC, Wangner Itelpa II LLC, Weavexx, LLC, Xerium Asia, LLC, Xerium III (US) Limited, Xerium IV (US) Limited, and Xerium V (US) Limited. Claim recoveries are based upon entity-specific claims and proceeds.*

*(Dollars in Thousands)*

| Debtor | Notes | NBV | Recovery High | Recovery Low | Value Available For Distribution High | Value Available For Distribution Low |
|---|---|---|---|---|---|---|
| **Xerium Germany Holding Gmbh** | | | | | | |
| Cash | 1 | $ - | - | - | $ - | $ - |
| Accounts receivable - gross | 2 | - | - | - | - | - |
| Intercompany receivables | 3 | 25,571 | 26.2% | 10.0% | 6,692 | 2,557 |
| Inventories - gross | 4 | - | - | - | - | - |
| Prepaid expenses | 5 | 169 | 10.0% | 0.0% | 17 | - |
| Other current assets | 5 | 1,999 | 10.0% | 0.0% | 200 | - |
| Property, plant & equipment - net | 6 | - | - | - | - | - |
| Investments - net | 7 | 414,451 | 0.6% | 0.1% | 2,580 | 563 |
| Intangible assets - net | 8 | - | - | - | - | - |
| **Gross liquidation proceeds** | | **$ 442,191** | **2.1%** | **0.7%** | **$ 9,489** | **$ 3,120** |
| Less: liquidation expenses | | | | | | |
| Wind-down costs | 9 | | | | (1,572) | (1,651) |
| Professional fees | 10 | | | | (223) | (109) |
| Trustee fees | 11 | | | | (207) | (77) |
| Total liquidation expenses | | | | | (2,003) | (1,836) |
| % of gross liquidation proceeds | | | | | 21% | 59% |
| **Net proceeds available for creditors** | | | | | **$ 7,486** | **$ 1,284** |

| Secured credit facility claims | 15 | Amount | Recovery High | Recovery Low | Paydown From Net Asset Proceeds | |
|---|---|---|---|---|---|---|
| Term B - Xerium Germany | | $ 85,317 | 3.6% | 0.6% | $ (3,084) | $ (529) |
| Debt Guaranteed by Xerium Germany Holding Gmbh | | 121,798 | 3.6% | 0.6% | (4,402) | (755) |
| | | $ 207,115 | 3.6% | 0.6% | $ (7,486) | $ (1,284) |

| Proceeds from guarantees & equalization payments | | | | | | |
|---|---|---|---|---|---|---|
| Distributions from guarantors | 13 | | | | 151,234 | 92,440 |
| Equalization proceeds / (payments) | 14 | | | | (39,895) | (23,626) |
| | | | | | $ 111,340 | $ 68,814 |

| Secured credit facility claims (post guarantees & equalization) | 15 | | | | Cummulative Paydown | |
|---|---|---|---|---|---|---|
| Term B - Xerium Germany | | $ 85,317 | 29.9% | 16.5% | $ (25,487) | $ (14,064) |
| Debt Guaranteed by Xerium Germany Holding Gmbh | | 121,798 | 76.6% | 46.0% | (93,339) | (56,034) |
| | | $ 207,115 | 57.4% | 33.8% | $ (118,826) | $ (70,098) |

| Proceeds available for priority & general unsecured claims | | | | | $ - | $ - |
|---|---|---|---|---|---|---|

*(Dollars in Thousands)*

| Debtor | Notes | NBV | Recovery High | Recovery Low | Value Available For Distribution High | Value Available For Distribution Low |
|---|---|---|---|---|---|---|
| **Xerium Italia SpA** | | | | | | |
| Cash | 1 | $      - | - | - | $      - | $      - |
| Accounts receivable - gross | 2 | - | - | - | - | - |
| Intercompany receivables | 3 | - | - | - | - | - |
| Inventories - gross | 4 | - | - | - | - | - |
| Prepaid expenses | 5 | - | - | - | - | - |
| Other current assets | 5 | 698 | 10.0% | 0.0% | 70 | - |
| Property, plant & equipment - net | 6 | - | - | - | - | - |
| Investments - net | 7 | 104,834 | 7.6% | 0.8% | 7,974 | 883 |
| Intangible assets - net | 8 | 1,968 | 0.0% | 0.0% | - | - |
| **Gross liquidation proceeds** | | $  107,500 | 7.5% | 0.8% | $   8,043 | $    883 |
| Less: liquidation expenses | | | | | | |
| Wind-down costs | 9 | | | | - | - |
| Professional fees | 10 | | | | (2) | - |
| Trustee fees | 11 | | | | (2) | - |
| Total liquidation expenses | | | | | (4) | - |
| % of gross liquidation proceeds | | | | | 0% | 0% |
| **Net proceeds available for creditors** | | | | | $   8,039 | $    883 |

| Secured credit facility claims | 15 | Amount | Recovery High | Recovery Low | Paydown From Net Asset Proceeds | |
|---|---|---|---|---|---|---|
| Term B - Xerium Italia | | $   27,080 | 3.9% | 0.4% | $  (1,061) | $   (117) |
| Debt Guaranteed by Xerium Italia SpA | | 178,013 | 3.9% | 0.4% | (6,978) | (767) |
| | | $  205,093 | 3.9% | 0.4% | $  (8,039) | $   (883) |

| **Proceeds from guarantees & equalization payments** | | | | | | |
|---|---|---|---|---|---|---|
| Distributions from guarantors | 13 | | | | 149,283 | 92,439 |
| Equalization proceeds / (payments) | 14 | | | | (12,683) | (7,470) |
| | | | | | $ 136,601 | $ 84,969 |

| Secured credit facility claims (post guarantees & equalization) | 15 | Amount | High | Low | Cummulative Paydown | |
|---|---|---|---|---|---|---|
| Term B - Xerium Italia | | $   27,080 | 29.9% | 16.5% | $  (8,090) | $  (4,464) |
| Debt Guaranteed by Xerium Italia SpA | | 178,013 | 76.7% | 45.7% | (136,550) | (81,388) |
| | | $  205,093 | 70.5% | 41.9% | $ (144,640) | $ (85,852) |

| **Proceeds available for priority & general unsecured claims** | | | | | $      - | $      - |
|---|---|---|---|---|---|---|

6

*(Dollars in Thousands)*

| Debtor | Notes | NBV | Recovery High | Recovery Low | Value Available For Distribution High | Value Available For Distribution Low |
|---|---|---|---|---|---|---|
| **Huyck Wangner Austria GmbH** | | | | | | |
| Cash | 1 | $ 292 | 100.0% | 100.0% | $ 292 | $ 292 |
| Accounts receivable - gross | 2 | 13,737 | 88.5% | 78.8% | 12,155 | 10,830 |
| Intercompany receivables | 3 | 1,657 | 0.0% | 0.0% | - | - |
| Inventories - gross | 4 | 18,313 | 46.2% | 36.2% | 8,469 | 6,638 |
| Prepaid expenses | 5 | 755 | 10.0% | 0.0% | 76 | - |
| Other current assets | 5 | 913 | 10.0% | 0.0% | 91 | - |
| Property, plant & equipment - net | 6 | 40,637 | 52.9% | 35.9% | 21,480 | 14,572 |
| Investments - net | 7 | 46,754 | 0.0% | 0.0% | - | - |
| Intangible assets - net | 8 | 36,350 | 0.0% | 0.0% | - | - |
| **Gross liquidation proceeds** | | **$ 159,409** | **26.7%** | **20.3%** | **$ 42,563** | **$ 32,331** |
| Less: liquidation expenses | | | | | | |
| Wind-down costs | 9 | | | | (15,117) | (15,873) |
| Professional fees | 10 | | | | (1,377) | (1,374) |
| Trustee fees | 11 | | | | (1,277) | (970) |
| Total liquidation expenses | | | | | (17,771) | (18,218) |
| % of gross liquidation proceeds | | | | | 42% | 56% |
| **Net proceeds available for creditors** | | | | | **$ 24,792** | **$ 14,114** |

| Secured credit facility claims | 15 | Amount | Recovery High | Recovery Low | Paydown From Net Asset Proceeds High | Paydown From Net Asset Proceeds Low |
|---|---|---|---|---|---|---|
| Term B - HW Austria | | $ 38,762 | 11.9% | 6.8% | $ (4,606) | $ (2,622) |
| Debt Guaranteed by HW Austria | | 169,876 | 11.9% | 6.8% | (20,186) | (11,492) |
| | | $ 208,637 | 11.9% | 6.8% | $ (24,792) | $ (14,114) |
| **Proceeds from guarantees & equalization payments** | | | | | | |
| Distributions from guarantors | 13 | | | | 139,277 | 87,709 |
| Equalization proceeds / (payments) | 14 | | | | (18,902) | (12,037) |
| | | | | | $ 120,375 | $ 75,673 |

| Secured credit facility claims (post guarantees & equalization) | 15 | | Recovery High | Recovery Low | Cummulative Paydown High | Cummulative Paydown Low |
|---|---|---|---|---|---|---|
| Term B - HW Austria | | $ 38,762 | 29.9% | 16.5% | $ (11,579) | $ (6,389) |
| Debt Guaranteed by HW Austria | | 169,876 | 78.6% | 49.1% | (133,588) | (83,397) |
| | | $ 208,637 | 69.6% | 43.0% | $ (145,167) | $ (89,787) |
| **Proceeds available for priority & general unsecured claims** | | | | | **$ -** | **$ -** |

*(Dollars in Thousands)*

| Debtor | Notes | NBV | Recovery High | Recovery Low | Value Available For Distribution High | Value Available For Distribution Low |
|---|---|---|---|---|---|---|
| ***Xerium Canada Inc.*** | | | | | | |
| Cash | 1 | $ 915 | 100.0% | 100.0% | $ 915 | $ 915 |
| Accounts receivable - gross | 2 | 6,286 | 79.3% | 70.0% | 4,988 | 4,403 |
| Intercompany receivables | 3 | 4,142 | 0.0% | 0.0% | - | - |
| Inventories - gross | 4 | 8,362 | 44.0% | 34.0% | 3,682 | 2,846 |
| Prepaid expenses | 5 | 159 | 10.0% | 0.0% | 16 | - |
| Other current assets | 5 | 1,580 | 10.0% | 0.0% | 158 | - |
| Property, plant & equipment - net | 6 | 35,640 | 41.3% | 28.9% | 14,709 | 10,306 |
| Investments - net | 7 | - | | | - | - |
| Intangible assets - net | 8 | 2,416 | 0.0% | 0.0% | - | - |
| **Gross liquidation proceeds** | | $ 59,500 | 41.1% | 31.0% | $ 24,467 | $ 18,469 |
| Less: liquidation expenses | | | | | | |
| Wind-down costs | 9 | | | | (5,708) | (5,993) |
| Professional fees | 10 | | | | (791) | (785) |
| Trustee fees | 11 | | | | (734) | (554) |
| Total liquidation expenses | | | | | (7,233) | (7,332) |
| % of gross liquidation proceeds | | | | | 30% | 40% |
| **Net proceeds available for creditors** | | | | | $ 17,234 | $ 11,137 |

| Secured credit facility claims | 15 | Amount | Recovery High | Recovery Low | Paydown From Net Asset Proceeds | |
|---|---|---|---|---|---|---|
| Term B - Xerium Canada | | $ 67,146 | 8.2% | 5.3% | $ (5,522) | $ (3,569) |
| Debt Guaranteed by Xerium Canada | | 142,407 | 8.2% | 5.3% | (11,712) | (7,569) |
| | | $ 209,554 | 8.2% | 5.3% | $ (17,234) | $ (11,137) |

| Proceeds from guarantees & equalization payments | | | | | | |
|---|---|---|---|---|---|---|
| Distributions from guarantors | 13 | | | | 145,697 | 89,418 |
| Equalization proceeds / (payments) | 14 | | | | (32,148) | (20,318) |
| | | | | | $ 113,549 | $ 69,100 |

| Secured credit facility claims (post guarantees & equalization) | 15 | | | | Cummulative Paydown | |
|---|---|---|---|---|---|---|
| Term B - Xerium Canada | | $ 67,146 | 29.9% | 16.5% | $ (20,059) | $ (11,068) |
| Debt Guaranteed by Xerium Canada | | 142,407 | 77.8% | 48.6% | (110,724) | (69,169) |
| | | $ 209,554 | 62.4% | 38.3% | $ (130,783) | $ (80,237) |
| **Proceeds available for priority & general unsecured claims** | | | | | $ - | $ - |

The numerical designation for a particular line item in the "notes" column of the Liquidation Analysis corresponds to a specific note below.

1.      Cash and Cash Equivalents

Cash and cash equivalents include estimated cash in deposit and disbursement accounts held at May 30, 2010.   The Liquidation Analysis assumes that additional cash available for distribution would only be generated by the disposition of assets.   It is assumed that cash held in the accounts of the Company is fully available.

2.      Accounts Receivable

Trade accounts receivable represent amounts owed to the Debtors by the Debtors' customers.  Based upon a review of the aging of customer accounts, gross accounts receivable is estimated to have a recovery rate between 70.0% and 90.0%.   Other accounts

receivable relating to accrued rebates and miscellaneous receivables is estimated to have a recovery rate between 40.0% and 50.0%.

3.      Intercompany Receivables

Intercompany receivables represent amounts owed to the Debtors by both Debtor and Non-Debtor Affiliates.  Recovery rates were estimated by reviewing the individual affiliates' ability to satisfy unsecured claims in a liquidation scenario.  Based upon this review, the estimated recovery is assumed to be 0.0% with the exception of Xerium Germany, for which the recovery rate is estimated to be between 10.0% and 26.2%.

4.      Inventory

Inventories include raw materials, work-in-process inventory, and finished rolls and roll covers.  The Liquidation Analysis assumes that the Trustee would continue to operate manufacturing operations to convert a portion of work-in-process inventory into finished goods for sale.  Based upon a review of the components of inventory, the estimated recovery is assumed to be between 34.0% and 47.0%.

5.      Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets primarily include prepaid insurance, prepaid rent and deposits, other prepaid assets, deferred tax and other miscellaneous assets. Recovery estimates for these assets are based upon factors such as the nature of the asset, its potential use during the liquidation period and the Debtors' ability to recover value.  The aggregate estimated recovery for prepaid and other current assets is assumed to be between 0.0% and 10.0%.

6.      Property and Equipment

Property and equipment primarily consists of land, buildings, machinery and equipment, furniture and fixtures and leasehold improvements.  Estimated recovery values are based on appraisals of fair market values as of December 31, 2007, adjusted for timing and liquidation assumptions.  The aggregate estimated recovery on property and equipment is assumed to be 28.9% to 41.2% for Xerium Canada, 35.9% to 52.9% for Xerium Austria, and 33.3% and 45.1% for U.S. Debtors.

7.      Investment in Subsidiaries

Investment in subsidiaries consists of equity investments in the Non-Debtor Affiliates.  The respective recovery estimates are based on parallel liquidation analyses of the Non-Debtor Affiliates assuming they would be liquidated through applicable insolvency proceedings.  The estimated recovery values reflect any proceeds in excess of secured and unsecured Claims.

8.     Intangible Assets

Intangible assets consist of goodwill, patents, licenses, trademarks, and trade names.  For the Debtors, only goodwill has book value as of December 31, 2009.  Goodwill and other intangible assets are estimated to have no value in a chapter 7 liquidation.

9.     Wind-Down Costs

The Debtors estimate that liquidating and completely winding down their operations will take approximately twelve months.  The Debtors anticipate that they would incur certain costs in connection with the wind down of their operations.  Such costs include wages, benefits and severance for employed personnel, rent and utilities for critical facilities, and other overhead and administrative expenses necessary to maintain critical operations and liquidate assets during the wind down period.

10.    Professional Fees

Professional fees include the fees and expenses incurred by any attorneys, accountants, investment bankers, and other professionals retained by the Trustee, the Debtors, the Debtors' secured lenders and any official committee of unsecured creditors that may be formed during the liquidation period.

11.    Trustee Fees

It is assumed that the Trustee fees are paid by the Debtors in accordance with section 326 of the Bankruptcy Code.  Trustee fees are estimated based upon historical experience in other similar cases and are calculated to be 3% of the asset recovery value.

12.    Super-priority Administrative Claims

Total obligations under the DIP Facility held by the U.S. Debtors and related accrued interest is estimated to be $60.3 million at May 30, 2010.  The carve-out at May 30, 2010 is estimated to be $3 million, which includes estimated unpaid professional fees.  The DIP Facility Claim and the carve-out for accrued and unpaid professional fees from the chapter 11 estates are assumed to be paid after the liquidation costs of the chapter 7 estates, with the carve-out assumed paid in its entirety first and the DIP Facility Claim paid subsequently.

13.    Distributions from Guarantors

Distributions from guarantors represent proceeds received from both Debtor guarantors[2] and Non-Debtor Guarantors[3] of the Term B senior secured debt.

---

[2] Xerium Technologies, Inc., XTI LLC, Huyck Licensco Inc., Stowe Woodward Licensco LLC, Stowe Woodward LLC, Wangner Itelpa I LLC, Wangner Itelpa II LLC, Weavexx, LLC, Xerium Asia, LLC, Xerium III (US) Limited, Xerium IV (US) Limited, Xerium V (US) Limited, Xerium Germany Holding GmbH, Xerium Italia S.p.A, Huyck.Wangner Austria GmbH, and Xerium Canada Inc.

10

14.    Equalization Proceeds / Payments

In accordance with the ratable sharing provisions of the Credit Facility, the lenders share proceeds of the collateral of all Debtors equally such that the recovery rates in a liquidation would be equal across tranches.  The equalization proceeds / payments represent the reallocation of proceeds in accordance with this provision of the Credit Facility.

15.    Secured Claims

Secured Claims consist of Claims under equipment financing and leases, Claims under the Credit Facility, the Deferred Waiver Claim, the debt guarantee Claims, and the Secured Swap Termination Claims at Xerium and XTI.  No proceeds in excess of the Secured Claims are estimated to be available for further distribution.

---

[3] Huyck Wangner Australia Pty Ltd; Xerium do Brasil Ltda; Xerium Technologies Brasil Indústria e Comércio SA; Wangner Itelpa Participacoes Ltda; Stowe Woodward France SAS; Xerium (France) SAS; Huyck Wangner Japan Ltd; Stowe Woodward Mexico SA de CV; TIAG Transworld Interweaving GmbH; Huyck Wangner UK Limited; Stowe Woodward (UK) Limited; Xerium Technologies Limited; Huyck Wangner Scandinavia AB; Stowe Woodward Sweden AB; Huyck Wangner Vietnam Co Ltd; Huyck Wangner Germany GmbH; Stowe Woodward AG; and Robec Walzen GmbH.