# TABLE OF CONTENTS

Page

| SECTION 1. | DEFINITIONS AND INTERPRETATION | 2 |
|---|---|---|
| 1.1 | Definitions | 2 |
| 1.2 | Accounting Terms | 38 |
| 1.3 | Interpretation, etc | 38 |
| SECTION 2. | LOANS AND LETTERS OF CREDIT | 38 |
| 2.1 | Term Loans | 38 |
| 2.2 | Revolving Loans | 39 |
| 2.3 | [Reserved] | 40 |
| 2.4 | Letters of Credit. | 40 |
| 2.5 | Pro Rata Shares; Availability of Funds | 48 |
| 2.6 | Use of Proceeds | 49 |
| 2.7 | Evidence of Debt; Register; Banks' Books and Records; Promissory Notes. | 49 |
| 2.8 | Interest on Loans | 50 |
| 2.9 | Conversion/Continuation. | 54 |
| 2.10 | Default Interest | 55 |
| 2.11 | Fees | 55 |
| 2.12 | Scheduled Payments | 56 |
| 2.13 | Voluntary Prepayments/Commitment Reductions. | 57 |
| 2.14 | Mandatory Prepayments/Commitment Reductions. | 58 |
| 2.15 | Application of Prepayments/Reductions/Scheduled Payments. | 60 |
| 2.16 | General Provisions Regarding Payments. | 61 |
| 2.17 | Ratable Sharing | 62 |
| 2.18 | Making or Maintaining LIBOR Loans. | 63 |
| 2.19 | Increased Costs; Capital Adequacy. | 65 |
| 2.20 | Taxes; Withholding, etc. | 67 |
| 2.21 | Obligation to Mitigate | 71 |
| 2.22 | Tax Credit | 71 |
| 2.23 | Defaulting Banks | 72 |

i

| | | |
|---|---|---|
| 2.24 | Removal or Replacement of a Bank | 74 |
| 2.25 | Joint and Several Liability. | 75 |
| 2.26 | Loans to Non-US Borrowers | 77 |
| 2.27 | Intercreditor Agreement | 78 |
| 2.28 | Assumption of Obligations | 78 |
| 2.29 | Conversion of DIP Term Loans, DIP Revolving Loans and Existing Letters of Credit | 78 |
| SECTION 3. | CONDITIONS PRECEDENT | 78 |
| 3.1 | Conditions to Closing Date | 78 |
| 3.2 | Conditions to Each Credit Extension. | 85 |
| SECTION 4. | REPRESENTATIONS AND WARRANTIES | 87 |
| 4.1 | Organization; Requisite Power and Authority; Qualification | 87 |
| 4.2 | Capital Stock and Ownership | 87 |
| 4.3 | Due Authorization | 87 |
| 4.4 | No Conflict | 87 |
| 4.5 | Governmental Consents | 88 |
| 4.6 | Binding Obligation | 88 |
| 4.7 | Historical Financial Statements | 88 |
| 4.8 | Business Plan | 89 |
| 4.9 | No Material Adverse Change | 89 |
| 4.10 | [Intentionally Omitted]. | 89 |
| 4.11 | Adverse Proceedings, etc | 89 |
| 4.12 | Payment of Taxes | 89 |
| 4.13 | Properties | 89 |
| 4.14 | Environmental Matters | 90 |
| 4.15 | No Defaults | 91 |
| 4.16 | Material Contracts | 91 |
| 4.17 | Governmental Regulation | 91 |
| 4.18 | Margin Stock | 91 |
| 4.19 | Employee Matters | 91 |
| 4.20 | Employee Benefit Plans | 92 |
| 4.21 | Certain Fees | 93 |

NY2 - 504826.09

| 4.22 | Solvency | 93 |
|---|---|---|
| 4.23 | [Reserved] | 93 |
| 4.24 | Compliance with Statutes, etc | 93 |
| 4.25 | Disclosure | 93 |
| 4.26 | Insurance | 94 |
| 4.27 | Use of Proceeds | 94 |
| 4.28 | Deposit and Securities Accounts | 94 |
| 4.29 | UK Establishment | 94 |
| **SECTION 5.** | **AFFIRMATIVE COVENANTS** | 94 |
| 5.1 | Financial Statements and Other Reports | 94 |
| 5.2 | Existence | 100 |
| 5.3 | Payment of Taxes and Claims | 100 |
| 5.4 | Maintenance of Properties | 100 |
| 5.5 | Insurance | 101 |
| 5.6 | Books and Records; Inspections | 101 |
| 5.7 | [Intentionally Omitted] | 102 |
| 5.8 | Compliance with Laws; SEC Filings | 102 |
| 5.9 | Environmental | 102 |
| 5.10 | Subsidiaries | 103 |
| 5.11 | Additional Material Real Estate Assets | 104 |
| 5.12 | [Intentionally Omitted] | 104 |
| 5.13 | Further Assurances | 104 |
| 5.14 | Intellectual Property | 104 |
| 5.15 | Know-Your-Customer Rules. | 105 |
| 5.16 | Pari Passu Ranking | 106 |
| 5.17 | 2009 Audit Opinion | 106 |
| **SECTION 6.** | **NEGATIVE COVENANTS** | 106 |
| 6.1 | Indebtedness | 106 |
| 6.2 | Liens | 109 |
| 6.3 | Equitable Lien | 111 |
| 6.4 | No Further Negative Pledges | 111 |

NY3 - 504826.09

| 6.5 | Restricted Junior Payments..................................................................................112 |
|---|---|
| 6.6 | Restrictions on Subsidiary Distributions ........................................................112 |
| 6.7 | Investments .........................................................................................................113 |
| 6.8 | Financial Covenants............................................................................................114 |
| 6.9 | Fundamental Changes; Disposition of Assets; Acquisitions ........................117 |
| 6.10 | Disposal of Subsidiary Interests.......................................................................118 |
| 6.11 | Sales and Lease Backs.........................................................................................118 |
| 6.12 | Transactions with Shareholders and Affiliates ...............................................118 |
| 6.13 | Conduct of Business ...........................................................................................119 |
| 6.14 | [Intentionally Omitted]. ....................................................................................119 |
| 6.15 | Amendments or Waivers of Organizational Documents ...............................119 |
| 6.16 | Amendments or Waivers of with respect to Subordinated Debt and the Second Lien Credit Agreement.......................................................................119 |
| 6.17 | Fiscal Year ...........................................................................................................119 |
| 6.18 | Account Control Agreements; Cash Management ..........................................119 |
| SECTION 7. | GUARANTY ........................................................................................................120 |
| 7.1 | Guaranty of the Obligations..............................................................................120 |
| 7.2 | Contribution by Guarantors. .............................................................................120 |
| 7.3 | Payment by Guarantors.......................................................................................122 |
| 7.4 | Liability of Guarantors Absolute ......................................................................123 |
| 7.5 | Waivers by Guarantors .......................................................................................126 |
| 7.6 | Guarantors' Rights of Subrogation, Contribution, etc ..................................127 |
| 7.7 | Subordination of Other Obligations..................................................................128 |
| 7.8 | Continuing Guaranty..........................................................................................128 |
| 7.9 | Authority of Guarantors or Borrowers..............................................................129 |
| 7.10 | Financial Condition of Each Borrower ............................................................129 |
| 7.11 | Bankruptcy, etc. ..................................................................................................129 |
| 7.12 | Discharge of Guaranty Upon Sale of Guarantor.............................................130 |
| 7.13 | Validity of Pledge of Shares held by Xerium Technologies Limited, Xerium (France) SAS and the German Guarantors; Parallel Obligations..........................................................................................................130 |
| 7.14 | Limitation of Non-US Guaranteed Obligations...............................................132 |
| 7.15 | Validity and Effectiveness ................................................................................137 |

iv

| SECTION 8. | EVENTS OF DEFAULT | 137 |
| --- | --- | --- |
| 8.1 | Events of Default | 137 |
| 8.2 | CAM Exchange | 141 |
| SECTION 9. | AGENTS | 141 |
| 9.1 | Appointment of Agents | 141 |
| 9.2 | Powers and Duties | 142 |
| 9.3 | General Immunity. | 142 |
| 9.4 | Agents Entitled to Act as Bank | 143 |
| 9.5 | Banks' Representations, Warranties and Acknowledgment | 143 |
| 9.6 | Right to Indemnity | 144 |
| 9.7 | Successor Administrative Agent and Collateral Agent | 144 |
| 9.8 | Collateral Documents and Guaranty. | 145 |
| 9.9 | Reliance and Engagement Letters | 147 |
| SECTION 10. | MISCELLANEOUS | 147 |
| 10.1 | Notices | 147 |
| 10.2 | Expenses | 147 |
| 10.3 | VAT | 148 |
| 10.4 | Indemnity | 148 |
| 10.5 | Set Off | 150 |
| 10.6 | Amendments and Waivers. | 150 |
| 10.7 | Successors and Assigns; Participations. | 152 |
| 10.8 | Independence of Covenants | 156 |
| 10.9 | Survival of Representations, Warranties and Agreements | 156 |
| 10.10 | No Waiver; Remedies Cumulative | 156 |
| 10.11 | Marshalling; Payments Set Aside | 157 |
| 10.12 | Severability | 157 |
| 10.13 | Obligations Several | 157 |
| 10.14 | Headings | 157 |
| 10.15 | APPLICABLE LAW | 157 |
| 10.16 | CONSENT TO JURISDICTION AND SERVICE OF PROCESS | 158 |
| 10.17 | WAIVER OF JURY TRIAL | 159 |

NY3 - 504826.09

| 10.18 | Confidentiality | 160 |
| 10.19 | Usury Savings Clause | 161 |
| 10.20 | Counterparts | 161 |
| 10.21 | Effective Date | 162 |
| 10.22 | Importation of Credit Documents into Austria | 162 |
| 10.23 | Place of Performance | 162 |
| 10.24 | USA Patriot Act Notice | 162 |
| 10.25 | No Setoffs and Defenses | 163 |

NY3 - 504826.09

**APPENDICES:**

A-1     Xerium Term Loan Amounts
A-2     XTI Term Loan Amounts
A-3     Italia Term Loan Amounts
A-4     Xerium Canada Term Loan Amounts
A-5     Austria Term Loan Amounts
A-6     Germany Term Loan Amounts
B       Revolving Commitments
C       Notice Addresses

**SCHEDULES:**   1.1(a)     Factoring Agreements
                 1.1(b)     Guarantors
                 2.4(c)     Existing Letters of Credit
                 2.29       Intercompany Arrangements
                 3.1(i)     Closing Date Mortgaged Property
                 4.1        Jurisdictions of Organization
                 4.2        Capital Stock and Ownership
                 4.13(b)    Real Estate Assets
                 4.14       Environmental Matters
                 4.16       Material Contracts
                 4.28       Primary Accounts
                 6.1(i)     Certain Indebtedness
                 6.2(l)     Certain Liens
                 6.7(i)     Certain Investments
                 6.12       Certain Affiliate Transactions

**EXHIBITS:**    A 1        Funding Notice

                 A 2        Conversion/Continuation Notice
                 A 3        Issuance Notice
                 B          Compliance Certificate
                 C          Assignment Agreement
                 D          Certificate Re Non-Bank Status
                 E          Closing Date Certificate
                 F          Counterpart Agreement
                 G          Pledge and Security Agreement
                 H          Mortgage
                 I          Landlord Waiver and Consent Agreement
                 J          Affiliate Subordination Agreement
                 K          Intercreditor Agreement
                 L          Formalities Certificate
                 M          Initial Business Plan
                 N          Solvency Certificate

## CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)

This **CREDIT AND GUARANTY AGREEMENT (FIRST LIEN)**, dated as of [_____],
2010, is entered into by and among **XERIUM TECHNOLOGIES, INC. ("Xerium")**, a
Delaware corporation, as reorganized pursuant to and under the Plan of Reorganization (as
defined herein), **XTI LLC ("XTI")**, a Delaware limited liability company, as reorganized
pursuant to and under the Plan of Reorganization, **XERIUM ITALIA S.P.A. ("Italia SpA")**, an
Italian società per azioni, as reorganized pursuant to and under the Plan of Reorganization,
**XERIUM CANADA INC. ("Xerium Canada")**, a New Brunswick (Canada) corporation, as
reorganized pursuant to and under the Plan of Reorganization, **HUYCK.WANGNER
AUSTRIA GMBH ("Huyck Austria")**, an Austrian limited liability company (formerly known
as Huyck Austria GmbH) , as reorganized pursuant to and under the Plan of Reorganization, and
**XERIUM GERMANY HOLDING GMBH ("Germany Holdings")**, a German limited
liability company, as reorganized pursuant to and under the Plan of Reorganization, (each of
Xerium, XTI, Italia SpA, Xerium Canada, Huyck Austria and Germany Holdings, individually, a
**"Borrower"** and, collectively, the **"Borrowers"**), **CERTAIN SUBSIDIARIES OF THE
BORROWERS**, as Guarantors, the Banks party hereto from time to time, **CITIGROUP
GLOBAL MARKETS INC.**, as Sole Lead Arranger and Sole Bookrunner (in such capacity,
**"Lead Arranger"**), **CITICORP NORTH AMERICA, INC.**, as Administrative Agent (together
with its permitted successors, in such capacity, **"Administrative Agent"**) and **CITICORP
NORTH AMERICA, INC.**, as Collateral Agent (together with its permitted successors, in such
capacity, **"Collateral Agent"**).

### RECITALS:

**WHEREAS**, capitalized terms used in these Recitals and not otherwise defined herein shall have
the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, on March [_____], 2010 (the **"Petition Date"**) the Borrowers, together with
certain direct and indirect wholly-owned Subsidiaries of Xerium (collectively, the **"Debtors"**),
filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the
Bankruptcy Court and the cases in the Bankruptcy Court have been consolidated for purposes of
joint administration of the Debtors (the **"Bankruptcy Cases"**);

**WHEREAS**, the Debtors' respective chapter 11 cases (collectively, the **"Bankruptcy Cases"**)
have been consolidated for procedural purposes only pursuant to Rule 1015(b) of the Federal
Rules of Bankruptcy Procedure;

**WHEREAS**, pursuant to the DIP Credit Agreement, the Banks party hereto extended term loans
and revolving loans to Xerium and the Issuing Bank issued or, with respect to certain existing
letters of credit, was deemed to have issued, certain letters of credit;

**WHEREAS**, as agreed by the Banks and pursuant to the DIP Credit Agreement and the Plan of
Reorganization, and as approved by the order entered by the Bankruptcy Court confirming the
Plan of Reorganization (the **"Confirmation Order"**), the loans under the DIP Credit Agreement
will continue to be outstanding loans under this Agreement, the letters of credit outstanding

under the DIP Credit Agreement will continue as Term Loan Letters of Credit under this Agreement, and the DIP Credit Agreement shall be superseded and replaced by this Agreement;

WHEREAS, pursuant to the Plan of Reorganization and the Confirmation Order, the Obligations of the Borrowers under this Agreement shall be secured by the grant to the Collateral Agent, for the benefit of the Secured Parties, of a First Priority Lien on the Collateral owned by them; and

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS AND INTERPRETATION

1.1 **Definitions.** The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**ABR Loan**" means a Loan or any portion thereof bearing interest by reference to the Alternate Base Rate.

"**Adjusted EBITDA**" means, with respect to any Person for any period, the total of (A) the Consolidated Net Income of such Person and its Subsidiaries for such period, plus (B), without duplication, to the extent that any of the following were included in computing such Consolidated Net Income for such period: (i) provision for taxes based on income or profits, (ii) Consolidated Interest Expense, (iii) Consolidated Depreciation and Amortization Expense, (iv) reserves for inventory in connection with plant closures, (v) Consolidated Operational Restructuring Costs, (vi) Consolidated Financial Restructuring Costs, (vii) non-cash charges or gains resulting from the application of purchase accounting, including push-down accounting, (viii) non-cash expenses resulting from the granting of stock options, restricted stock or restricted stock unit awards under equity compensation programs solely with respect to Common Stock, (ix) non-cash items related to a change in or adoption of accounting policies, and (x) expenses incurred as a result of the repurchase, redemption or retention by Xerium of Common Stock earned under equity compensation programs solely in order to make withholding tax payments. Notwithstanding the foregoing, taxes paid and provision for taxes based on the income or profits of, and the Consolidated Depreciation and Amortization Expense of, a Subsidiary of such Person shall be added to Consolidated Net Income of such Person to compute Adjusted EBITDA only to the extent (and in the same proportion) that the Consolidated Net Income of such Subsidiary was included in calculating Consolidated Net Income of such Person. Notwithstanding the foregoing, Adjusted EBITDA for the Fiscal Quarter ended December 31, 2009 shall be $24,600,000.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Xerium or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Xerium or any of its Subsidiaries, threatened against or affecting Xerium or any of its Subsidiaries or any property of Xerium or any of its Subsidiaries.

2

"**Affected Bank**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Affiliate Subordination Agreement**" means the Affiliate Subordination Agreement, dated the date hereof, among the Credit Parties and the Administrative Agent, substantially in the form of Exhibit J, as amended, supplemented or otherwise modified from time to time.

"**Agent**" means each of the Administrative Agent, the Collateral Agent and the Lead Arranger.

"**Agent Parties**" as defined in Section 5.1(o)(iii).

"**Agent's Spot Rate of Exchange**" means the Administrative Agent's spot rate of exchange for the purchase of the relevant currency with Dollars in the foreign exchange market at or about 11:00 a.m. (New York City time) on a particular day.

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Agreement**" means this Credit and Guaranty Agreement (First Lien), as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Alternate Base Rate**" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the greater of (i) LIBOR for a one month Interest Period beginning on such day (or if such day is not a Business Day, the immediately preceding Business Day), plus 1% and (ii) 3.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or LIBOR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or LIBOR, respectively. If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability of the Administrative Agent to obtain sufficient quotations in accordance with the terms thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the first sentence of this definition until the circumstances giving rise to such inability no longer exist.

"**Alternative Currency**" means Euros, Canadian dollars, Australian dollar and Swedish krona.

3

"**Applicable Margin**" means (i) with respect to LIBOR Loans, 4.50% and (ii) with respect to ABR Loans, 3.50%.

"**Applicable Revolving Commitment Fee Percentage**" means 1.00%.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sub-lessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person (other than Xerium or any of its Subsidiaries), in one transaction or a series of transactions, of all or any part of Xerium's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the Capital Stock of any of Xerium's Subsidiaries, other than (i) inventory (or other assets) sold or leased in the Ordinary Course (excluding any such sales by operations or divisions discontinued or to be discontinued), (ii) substantially worn, damaged or obsolete property disposed of in the Ordinary Course, (iii) returns of inventory in the Ordinary Course, (iv) the use of cash and Cash Equivalents in a manner not inconsistent with the provisions of this Agreement and the other Credit Documents, (v) leases of real property in the Ordinary Course, (vi) licenses or sublicenses of patents, trademarks, copyrights and other intellectual property in the Ordinary Course and (vii) sales of other assets for gross consideration of less than $100,000 with respect to any transaction or series of related transactions.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit C, with such amendments or modifications as may be approved by the Administrative Agent.

"**Australia Asset Sales**" means Asset Sales relating to the business, assets or properties of Huyck.Wangner Australia Pty Limited.

"**Australian Obligor**" means Huyck.Wangner Australia Pty Limited.

"**Austria Term Loan**" means an Austria Term Loan deemed made by a Bank to Huyck Austria pursuant to Section 2.1(a)(v).

"**Austria Term Loan Amount**" means the principal amount of the Austria Term Loan a Bank is deemed to have made on the Closing Date. The "Austria Term Loan Amount" of each Bank, if any, is set forth on Appendix A-5 or in the applicable Assignment Agreement. The aggregate amount of the Austria Term Loan Amounts as of the Closing Date is set forth on Appendix A-5.

"**Austria Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the Austria Term Loans of such Bank.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

4

"**Bank**" means each financial institution listed on Appendix A-1, A-2, A-3, A-4, A-5, A-6 or B, and any other Person that becomes a Bank party hereto pursuant to an Assignment Agreement.

"**Bank Counterparty**" means each Bank, or any Affiliate of a Bank, counterparty to the applicable documentation creating Hedging Obligations (including any Person who is a Bank (and any Affiliate thereof) as of the Closing Date and party to such documentation as of the Closing Date but subsequently, after entering into the applicable documentation creating Hedging Obligations, ceases to be a Bank) including, without limitation, each such Affiliate that enters into a joinder agreement with the Collateral Agent.

"**Bank Insolvency Event**" means that (i) a Bank or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (ii) such Bank or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor, or sequestrator or the like has been appointed for such Bank or its Parent Company, or such Bank or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment.

"**Bankruptcy Cases**" as defined in the recitals hereto.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended, and applicable to the Bankruptcy Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Beneficiary**" means each Agent, the Issuing Bank, Bank and each Bank Counterparty.

"**Borrower**" as defined in the preamble hereto.

"**Business Day**" means (i) with respect to all matters except those addressed in clause (ii), any day, excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state or jurisdiction are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with LIBOR Loans, means any such day that is a Business Day described in clause (i) and that is also a day on which banks in the City of London are generally open for interbank or foreign exchange.

"**Business Plan**" as defined in Section 5.1(q).

"**CAM Exchange**" means the exchange of the Banks' interests provided for in Section 8.2.

"**CAM Exchange Date**" means the date on which any Event of Default referred to in Section 8.01(f) or (g) shall occur.

5

"**CAM Percentage**" means, as to each Bank, a fraction, expressed as a decimal, of which (a) the numerator shall be the aggregate outstanding principal amount of the Designated Obligations owed to such Bank (whether or not at the time due and payable) on the date immediately prior to the CAM Exchange Date and (b) the denominator shall be the aggregate amount of the Designated Obligations owed to all the Banks (whether or not at the time due and payable) on the date immediately prior to the CAM Exchange Date.

"**Canadian Guarantor**" as defined in 7.14(e).

"**Canadian Pension Plan Event**" means (i) the failure by Xerium Canada, or any Affiliate of Xerium Canada to make any required contribution or premium payment to a Canadian Registered Pension Plan in a timely manner in accordance with the terms of the applicable Canadian Registered Pension Plan and all applicable laws; (ii) the withdrawal by Xerium Canada or any Affiliate of Xerium Canada as a participating employer under any multi-employer pension plan, as defined under applicable laws; (iii) the termination, in whole or in part, of any Canadian Registered Pension Plan; (iv) the institution of proceedings by a pension regulator which has jurisdiction over a Canadian Registered Pension Plan to terminate the Canadian Registered Pension Plan in whole or in part; or (v) the occurrence of any event or condition which could reasonably be expected to result in the institution of proceedings by the applicable pension regulator to terminate a Canadian Registered Pension Plan, in whole or in part.

"**Canadian Registered Pension Plan**" means a "registered pension plan", as defined in subsection 248(1) of the Income Tax Act (Canada) which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed to by, Xerium Canada or any Affiliate of Xerium Canada.

"**Capital Expenditures**" means, with respect to any Person, all expenditures that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the cash flows of such Person.

"**Capitalized Lease Obligation**" means, as applied to any Person, any obligation incurred or arising out of in connection with a Capital Lease.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests, membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means money, currency or a credit balance in any Deposit Account.

"**Cash Collateral Account**" means a deposit account maintained by the Borrowers with the Administrative Agent, for the Secured Parties, for the purpose of holding deposits of Net

6

Asset Sale Proceeds and Net Insurance/Condemnation Proceeds that are allowed to be reinvested by the Borrowers in accordance with Sections 2.14(a) and 2.14(b), respectively; provided that the Administrative Agent shall require any such deposits remaining in such deposit account for three hundred sixty-one (361) days to be applied by the Borrowers to repay Loans, in each case, to the extent required by and in a manner consistent with Section 2.15(b).

"**Cash Collateralize**" means, in respect of an obligation, to provide and pledge (as a First Priority perfected security interest) cash collateral in Dollars, at a location and pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent (and "**Cash Collateralization**" has a corresponding meaning).

"**Cash Equivalents**" means (i) Dollars or any foreign currency freely exchangeable into Dollars and, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the Ordinary Course, (ii) securities issued or directly and fully guaranteed or insured by the US government or any agency or instrumentality thereof, (iii) certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of $1 billion and whose long-term debt is rated at least "A" or the equivalent thereof by Moody's or S&P, (iv) repurchase obligations for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in the immediately preceding clause, (v) commercial paper issued by a corporation (other than an Affiliate of Xerium) rated at least "A-2" or the equivalent thereof by Moody's or S&P and in each case maturing within one year after the date of acquisition, (vi) investment funds investing substantially all of their assets in securities of the types described in clauses (i) through (v) above, (vii) readily marketable direct obligations issued by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P, (viii) instruments equivalent to those referred to above denominated in Euros or any other foreign currency that are comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States and (ix) money market funds as defined in Rule 2a-7 of the General Rules and Regulations as promulgated under the Investment Company Act of 1940.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit D.

"**Change of Control**" means, at any time, (i) any Person or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act) shall have acquired beneficial ownership (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 35% or more on a fully diluted basis of the voting and/or economic interest in the Capital Stock of Xerium; (ii) Xerium shall cease to directly or indirectly beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of its Subsidiaries (other than Xerium Technologies Brasil Indústria e Comércio S.A., Stowe Woodward AG and PMP Xibe Roll Covering Co Ltd and except as a result of transactions permitted under this Agreement) including, but not limited to, if a Person shall attain the right, even if not exercised, by contract, share ownership or otherwise, to appoint the majority of the board of directors of any such Subsidiary or to direct the manner in which the board of directors of such Subsidiary conducts its

affairs; (iii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Xerium cease to be occupied by Persons who either (a) were members of the board of directors of Xerium on the Closing Date or (b) were nominated for election by the board of directors of Xerium, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors; or (iv) any "change of control" or similar event under the Second Lien Credit Agreement or the documents governing Subordinated Debt, if any, shall occur. Notwithstanding the foregoing, the consummation of the transactions contemplated by the Plan of Reorganization shall not constitute a Change of Control.

"**Closing Date**" means the date on which all conditions precedent set forth in Section 3.1 are satisfied or waived in accordance with the terms of this Agreement.

"**Closing Date Bank Affiliate**" means [American Securities LLC, Carl Marks Strategic Investments, L.P., Cerberus Capital Management, L.P., on behalf of its affiliated funds and accounts].

"**Closing Date Certificate**" means the Closing Date Certificate substantially in the form of Exhibit E.

"**Closing Date Mortgaged Property**" means, each Real Estate Asset listed in Schedule 3.1(i) and which has been encumbered by fully executed and notarized Mortgages, and recorded in all appropriate places in all applicable jurisdictions.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) and interests therein and proceeds and products thereof, whether now or hereafter acquired, in or upon which Liens are purported to be granted and/or confirmed pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreements, the Mortgages, the Landlord Personal Property Collateral Access Agreements, if any, the Term Loan LC Collateral Account Control Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant and/or confirm to the Collateral Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate in form satisfactory to the Collateral Agent that provides information with respect to the personal, real and mixed property of each Credit Party.

"**Common Stock**" means the common stock of Xerium, par value [$0.001] per share.

"**Communications**" as defined in Section 5.1(p)(i).

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit B.

8

"**Confirmation Order**" as defined in the recitals.

"**Consolidated Capital Expenditures**" means, with respect to any Person for any period, the aggregate of all Capital Expenditures of such Person and its Subsidiaries during such period determined on a consolidated basis.

"**Consolidated Current Assets**" means, at any date of the determination, the total assets (other than cash and Cash Equivalents) of Xerium and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP), excluding the current portion of current and deferred income taxes, deferred debt expense and property held for sale so long as any future changes in the balance sheet values of such property held for sale are non-cash events, and the proceeds from the sale of such property is intended to be applied to prepay the Loans in accordance with Section 2.14(a).

"**Consolidated Current Liabilities**" means, at any date of determination, the total liabilities of Xerium and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of any Indebtedness, accruals of interest expense, and the current portion of current and deferred income taxes.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, including without limitation non-cash impairment charges resulting from the application of Statements of Financial Accounting Standards No. 142 and No. 144 and any amortization of intangibles arising pursuant to Statement of Financial Accounting Standards No. 141.

"**Consolidated Financial Restructuring Costs**" means cash, fees and expenses (including professional and accounting fees and expenses) incurred in connection with the Recapitalization; provided, that the amount of such costs for Fiscal Year 2010 shall not exceed $30 million in the aggregate.

"**Consolidated Interest Expense**" means, with respect to any Person for any period, consolidated interest expense of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided, however, that for the purpose of calculating the Interest Coverage Ratio only, amortization of deferred financing fees and any non-cash gains and losses resulting from marking to market Hedging Obligations shall be excluded from the calculation of Consolidated Interest Expense. For purposes of clarifying the intention of the parties, the calculation of Consolidated Interest Expense shall be net of interest income and the effect of all interest rate Hedging Obligations.

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided, however, that the following, without duplication, shall be excluded in determining Consolidated Net Income: (i) any net after-tax extraordinary or non-recurring gains, losses or expenses (less all fees and expenses relating thereto), (ii) the cumulative effect of changes in accounting principles, (iii) any fees and

9

expenses incurred during such period in connection with the issuance or repayment of Indebtedness, any refinancing transaction or amendment or modification of any debt instrument, in each case, as permitted under this Agreement and (iv) any gains resulting from the returned surplus assets of any Pension Plan or Canadian Registered Pension Plan; and provided, further that, without duplication, (x) the net income for such period of any Person that is not a Subsidiary of such Person or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to such Person or a wholly-owned Subsidiary thereof in respect of such period (and if such net income is a loss it will be included only to the extent such loss has been funded with cash by such Person or a wholly-owned Subsidiary thereof in respect of such period), and (y) the net income (loss) for such period of any Subsidiary shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of its net income is not at the date of determination permitted without any prior governmental approval (which has not been obtained and which is not expected by Xerium to be obtained in the Ordinary Course) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders (other than any loan agreement or similar agreement which restricts the payment of dividends or similar distributions upon the occurrence of or during the existence or continuance of a default or event of default), unless such restrictions with respect to the payment of dividends or in similar distributions have been legally waived and except that this clause (y) shall not apply to any Subsidiary that is also a Guarantor in the calculation of Xerium's Leverage Ratio.

"Consolidated Operational Restructuring Costs" means, with respect to any Person for any period, any restructuring or related impairment costs for such Person and its Subsidiaries resulting from the restructuring activities of such Person and its Subsidiaries; provided, that the amount of such costs for the applicable Fiscal Year shall not exceed the Maximum Consolidated Operational Restructuring Costs.

"Consolidated Working Capital" means, at any date, the excess of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date.

"Consolidated Working Capital Adjustment" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period.

"Constitutional Documents" means the constitutional documents of the Credit Parties as amended from time to time in accordance with the terms of this Agreement.

"Contractual Obligation" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

10

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion of a Loan, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit F delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Letters of Credit, the Collateral Documents, the Affiliate Subordination Agreement, the Intercreditor Agreement, the Fee Letters, any documents or certificates executed by any Borrower in favor of the Issuing Bank relating to any Letters of Credit, and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, the Issuing Bank or any Bank in connection herewith.

"**Credit Extension**" means the making, or deemed making, of a Loan or the issuance, or deemed issuance, of a Letter of Credit.

"**Credit Party**" means each US Credit Party and Non-US Credit Party.

"**Debt**" means, with respect to Xerium, on a consolidated basis on any date, the actual outstanding amount of funded indebtedness of Xerium and its Subsidiaries, plus, without duplication, the principal component of all Capitalized Lease Obligations and, without duplication, other Indebtedness of Xerium and its Subsidiaries on such date. For purposes of computing Debt, Indebtedness which is payable in any currency other than Dollars shall be converted into Dollars using the average New York CitiFx Benchmark rate for the most recently ended four Fiscal Quarters for which Xerium's financial statements are available.

"**Debtors**" as defined in the recitals hereto.

"**Default**" means a condition or event that, after notice or expiry of an applicable grace period, or the making of any determination under the Credit Documents, or any combination of any of the foregoing, would constitute an Event of Default.

"**Defaulting Bank**" means, at any time, a Bank as to which the Administrative Agent has notified the Borrower that (i) such Bank has failed for three or more Business Days to comply with its obligations under this Agreement to make a Loan or make a payment to the Issuing Bank in respect of a Letter of Credit (each a "**funding obligation**"), (ii) such Bank has notified the Administrative Agent or has stated publicly, that it will not comply with any such funding obligation hereunder, or has defaulted on its funding obligations under any other loan agreement or credit agreement or similar agreement, (iii) such Bank has, for three or more Business Days, failed to confirm in writing to the Administrative Agent, in response to a written request of the Administrative Agent, that it will comply with its funding obligations hereunder, or (iv) a Bank Insolvency Event has occurred and is continuing with respect to such Bank (provided that neither

11

the reallocation of funding obligations provided in Section 2.24(a) as a result of a Bank being a Defaulting Bank nor the performance by Non-Defaulting Banks of such reallocation of funding obligations will by themselves cause the relevant Defaulting Bank to become a Non-Defaulting Bank). Any determination that a Bank is a Defaulting Bank under clauses (i) through (iv) above will be made by the Administrative Agent in its sole discretion acting in good faith. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"**Deficiency Amount**" as defined in Section 2.4(k).

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Depositary Bank**" means Citibank, N.A.

"**Designated Obligations**" means all obligations of the Borrowers with respect to (a) principal of and interest on the Loans and (b) accrued and unpaid fees under the Credit Documents.

"**Determination Date**" means, with respect to any Term Loan Letter of Credit, (i) the most recent date upon which one of the following shall have occurred: (x) the date of issuance of such Term Loan Letter of Credit, (y) the date on which the Issuing Bank was or is, as applicable, required to deliver a notice of non-renewal with respect to such Letter of Credit, and (z) the first Business Day of each month, commencing on the first Business Day following the issuance of such Letter of Credit; and (ii) such other date determined by the Administrative Agent in its sole discretion.

"**DIP Credit Agreement**" means the Superpriority Priming Senior Secured Credit and Guaranty Agreement, dated as of March [   ], 2010, among Xerium, the guarantors named therein, the several lenders and agent banks from time to time parties thereto, as amended, supplemented, restated or otherwise modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**DIP Revolving Loans**" means the revolving loans made under the DIP Credit Agreement.

"**DIP Term Loan Deposit Account**" means the deposit account maintained by the agent under the DIP Credit Agreement and referred therein as the "Term Loan Deposit Account".

"**DIP Term Loans**" means the term loans made under the DIP Credit Agreement.

"**Disclosure Statement**" means that certain disclosure statement related to the Plan of Reorganization and filed by the Debtors with the Bankruptcy Court on [          ], 2010, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Dollar Equivalent**" means (i) with respect to all matters other than the Letters of Credit, (x) with respect to any amount denominated in Dollars, such amount and (y) with respect to any

12

amount denominated in an Alternative Currency, the amount converted into Dollars using the 12:00 p.m. New York CitiFx Benchmark rate for such Alternative Currency on such day or, if such day is not a Business Day, on the immediately preceding Business Day and (ii) with respect to the Letters of Credit issued (x) in Dollars, such amount on any Determination Date and (y) in an Alternative Currency, the amount converted into Dollars using the 12:00 p.m. New York CitiFx Benchmark rate for such Alternative Currency on such Determination Date or, if such day is not a Business Day, on the immediately preceding Business Day.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Effective Date**" means the date that is determined to be the "Effective Date" of and as defined in the Plan of Reorganization.

"**Eligible Assignee**" means (i) any Bank, any Affiliate of any Bank and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, financial institution, trust fund, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans as one of its businesses or in the ordinary course or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets; neither Xerium nor any Affiliate of Xerium (other than a Closing Date Bank Affiliate) shall be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed by, Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, provincial or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Xerium or any of its Subsidiaries or any Facility.

13

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Xerium or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Xerium or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Xerium or such Subsidiary and with respect to liabilities arising after such period for which Xerium or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation under subsections .21, .22, .23, .27, .28, .29, .31 and .32); (ii) the failure to meet the minimum funding standard of or other requirements of Section 412, 430 or 436 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived), the failure to meet the funding standards or other requirements of Section 431 or 432 of the Internal Revenue Code with respect to any Multiemployer Plan or the failure to make by its due date any required installment, contribution or premium payment to or in respect of any Pension Plan or Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Xerium, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that is in endangered, seriously endangered or critical status pursuant to Section 432 of the Internal Revenue Code or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; or (viii) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to

14

any Pension Plan; provided that, notwithstanding the forgoing, the filing and continuation of the Bankruptcy Cases shall not constitute an ERISA Event.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Excess Cash**" means commencing with Fiscal Year 2011, with respect to any period, the total of (A) the sum, without duplication, of (i) Adjusted EBITDA for such period and (ii) the Consolidated Working Capital Adjustment minus (B) the sum, without duplication, for such period of: (i) Consolidated Interest Expense paid in cash, (ii) cash income tax expense, net of cash income tax refunds and cash income tax rebates received by Xerium and its Subsidiaries, (iii) Consolidated Capital Expenditures (except to the extent (I) financed or refinanced with an incurrence of Indebtedness, until such Indebtedness is repaid (other than through the refinancing thereof), (II) financed with insurance or condemnation proceeds or (III) financed with the cash proceeds from any Asset Sale) permitted under Section 6.8(d), (iv) Consolidated Operational Restructuring Costs paid in cash, (v) cash payments of withholding taxes from proceeds of the repurchase, redemption or retention of Common Stock permitted under Section 6.5(c) and (vi) scheduled amortization payments of Debt permitted under this Agreement.

"**Excess Amount**" as defined in Section 2.4(k).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Existing Letters of Credit**" as defined in Section 2.4(c).

"**Excluded Taxes**" as defined in Section 2.19(a).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Xerium or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Facility Office**" means the office or offices notified by a Bank or the Issuing Bank to the Administrative Agent in writing on or before the date it becomes a Bank or the Issuing Bank (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement.

"**Factoring Agreements**" means those certain agreements set forth on Schedule 1.1(a) and provided to the Administrative Agent and its counsel, providing for Xerium or any of its Subsidiaries to sell or otherwise dispose of any receivable:

    (A)    on arm's length terms for cash payable at the time of disposal in accordance with the terms of the Japanese Promissory Note Discounting Facilities as in effect on the date hereof, provided that the maximum aggregate amount of receivables which have been so sold or disposed of and which remain outstanding (other than as a result of a default by the relevant debtor) does not exceed ¥1,500,000,000 at any time; or

    (B)    on non-recourse (as regards default by the relevant debtor(s)) and arm's length terms for cash payable at the time of disposal by Huyck.Wangner Australia Pty

15

Limited in respect of customer-provided letters of credit, provided that the maximum aggregate amount of receivables which have been so sold or disposed of and which remain outstanding (other than as a result of a default by the relevant debtor) does not exceed AUD 7,500,000 at any time.

"**Federal Funds Effective Rate**" means, for any day, for any day, the rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate quoted to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letters**" means collectively, any fee letter between the Borrower or any Credit Party on the one hand and any of the Agents or the Lead Arranger on the other hand.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Xerium that such financial statements fairly present, in all material respects, the financial condition of Xerium and its Subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year end adjustments.

"**First Currency**" as defined in Section 10.4(b).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than Permitted Liens which are junior in priority to the Collateral Agent's Lien on such Collateral.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Xerium and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Banks, and located in an area designated by the Federal Emergency Management Agency or other Governmental Authority as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Formalities Certificate**" means a Formalities Certificate substantially in the form of Exhibit L.

16

"**Fraudulent Transfer Laws**" as defined in Section 2.25(a).

"**French Guarantor**" as defined in Section 7.14(d).

"**Funding Borrower**" as defined in Section 2.25(b).

"**Funding Default**" means a default by a Bank in its obligation to fund any Revolving Loan or its portion of any unreimbursed payment under Section 2.2(b)(iv) or 2.4(g).

"**Funding Notice**" means a notice substantially in the form of Exhibit A 1.

"**FX Currency Losses**" means any losses incurred by the Issuing Bank as a result of purchasing currencies other than Dollars or exchanging Dollars into another currency in connection with any drawing under any Term Loan Letter of Credit.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, for Xerium and its Subsidiaries, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**German Term Loan**" means a German Term Loan deemed made by a Bank to Germany Holdings pursuant to Section 2.1(a)(vi).

"**German Term Loan Amount**" means the principal amount of the German Term Loan a Bank is deemed to have made on the Closing Date. The "German Term Loan Amount" of each Bank, if any, is set forth on Appendix A-6 or in the applicable Assignment Agreement. The aggregate amount of the German Term Loan Amounts as of the Closing Date is set forth on Appendix A-6.

"**German Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the German Term Loans of such Bank.

"**German Guarantors**" means Robec Walzen GmbH, formerly known as Stowe Woodward Forschungs- und Entwicklungs GmbH (also as universal successor of Robec GmbH), Stowe Woodward AG, Huyck.Wangner Germany GmbH, formerly known as Wangner Beteiligungsgesellschaft mbH (also as universal successor of Wangner Service GmbH, Wangner Verwaltungsgesellschaft mbH and Wangner Finckh GmbH & Co. KG).

"**Germany Holdings**" as defined in the preamble hereto.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, provincial, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or any foreign entity or government.

17

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" as defined in the Pledge and Security Agreement.

"**Guaranteed Obligations**" as defined in Section 7.1(b).

"**Guarantor**" means each Non-US Guarantor and each US Guarantor.

"**Guarantor Subsidiary**" means each Guarantor other than Xerium.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7 or any other guaranty which purports to guaranty all or a portion of the Obligations.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under (i) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements entered into with a Bank Counterparty in Xerium's or any of its Subsidiaries' Ordinary Course and not for speculative purposes and (ii) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices entered into with a Bank Counterparty in Xerium's or any of its Subsidiaries' Ordinary Course and not for speculative purposes.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Bank which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Xerium and its Subsidiaries, for the immediately preceding three Fiscal Years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial statements of Xerium and its Subsidiaries as at the most recently ended Fiscal Quarter, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three , six or nine month period, as applicable, ending on such date, and, in the

18

case of clauses (i) and (ii), certified by the chief financial officer of Xerium that they fairly present, in all material respects, the financial condition of Xerium and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year end adjustments.

"**Huyck Austria**" as defined in the preamble hereto.

"**Increased Cost Banks**" as defined in Section 2.24.

"**Indebtedness**" means, with respect to any Person, the principal and premium (if any) of any indebtedness of such Person, whether or not contingent: (i) in respect of borrowed money, (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (iii) representing the deferred and unpaid purchase price of any property, other than trade payables incurred in the Ordinary Course, (iv) in respect of Capitalized Lease Obligations, (v) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (vi) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof or (vii) representing any Hedging Obligations, if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP. To the extent not otherwise included, Indebtedness shall include (a) any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the Indebtedness of another Person (other than by endorsement of negotiable instruments for collection in the Ordinary Course), and (b) Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); provided, however, that the amount of such Indebtedness will be the lesser of (A) the fair market value of such asset at such date of determination and (B) the amount of such Indebtedness of such other Person. Notwithstanding the foregoing, any obligation of such Person or any of its Subsidiaries in respect of (x) minimum guaranteed commissions, or other similar payments, to clients, minimum returns to clients or stop loss limits in favor of clients or indemnification obligations to clients, in each case pursuant to contracts to provide services to clients entered into in the Ordinary Course, and (y) account credits to participants under any compensation plan, shall be deemed not to constitute Indebtedness.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this

19

indemnity), whether direct, indirect or consequential and whether based on any federal, provincial, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws and including any fees or expenses resulting from changes in laws in effect on the date of this Agreement), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Banks' agreement to make a Credit Extension or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Xerium or any of its Subsidiaries.

"**Indemnified Taxes**" as defined in Section 2.20(a).

"**Indemnitee**" as defined in Section 10.4.

"**Information**" as defined in Section 10.18.

"**Initial Business Plan**" means the business plan of Xerium and its Subsidiaries delivered in connection with the closing of the DIP Credit Agreement and attached hereto as Exhibit M.

"**Intercreditor Agreement**" means the Intercreditor Agreement to be executed and delivered by the Administrative Agent and the Collateral Agent, the Second Lien Agent and the Credit Parties, substantially in the form of Exhibit K, as amended, restated, modified and supplemented from time to time.

"**Interest Coverage Ratio**" means, with respect to Xerium for any period, the ratio of (A) the Adjusted EBITDA for the four-Fiscal Quarters period then ending to (B) the Consolidated Interest Expense for the four-Fiscal Quarters then ending; provided, that in computing Consolidated Interest Expense for any period commencing on or prior to the Closing Date and ending as of the close of any Fiscal Quarter on or prior to the first anniversary of the Closing Date, Consolidated Interest Expense for such period shall equal the product of (x) Consolidated Interest Expense for the period commencing on the first day of the first full calendar month following the Closing Date and ending on the last day of such Fiscal Quarter multiplied by (y) a fraction, the numerator of which is equal to 365 and the denominator of which is equal to the number of days that have elapsed in such period commencing on the first day of the first full calendar month following the Closing Date and ending on the last day of such Fiscal Quarter.

"**Interest Payment Date**" means (i) with respect to any LIBOR Loan, the last day of each Interest Period applicable to such LIBOR Loan, provided, in the case of each Interest Period of longer than three months "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period and (ii) with respect to any ABR Loan, the 15th day of each March, June, September and

December, commencing on the first such day following the making of such ABR Loan or conversion from a LIBOR Loan to an ABR Loan.

"**Interest Period**" means, in connection with a LIBOR Loan, an interest period of one, two, three or six months, as selected by each Borrower in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; (b) no Interest Period with respect to any portion of Term Loans shall extend beyond the Term Loan Maturity Date; (c) no Interest Period with respect to any portion of Revolving Loans shall extend beyond the Revolving Commitment Termination Date; and (d) all interest periods of the same currency having the same commencing date and expiration date shall be considered one Interest Period.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Xerium's and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period the date that is two Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Xerium or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than Xerium, any other Borrower or a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Xerium from any Person (other than Xerium, any other Borrower or a Guarantor Subsidiary), of any Capital Stock of such Person; and (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course) or capital contribution by Xerium or any of its Subsidiaries to any other Person (other than Xerium, any other Borrower or a Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write ups, write downs or write offs with respect to such Investment.

"**Investment Cash Equivalents**" means (i) Dollars and, only if Section 2.4(n)(iii) is applicable, Alternative Currencies, (ii) securities issued or directly and fully guaranteed or insured by the US government or any agency or instrumentality thereof, (iii) certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus in excess of

21

$1.0 billion and whose long-term debt is rated at least "A" or the equivalent thereof by Moody's or S&P, (iv) repurchase obligations for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in the immediately preceding clause, (v) commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-2" or the equivalent thereof by Moody's or S&P and in each case maturing within one year after the date of acquisition, (vi) investment funds investing substantially all of their assets in securities of the types described in clauses (i) through (v) above, (vii) readily marketable direct obligations issued by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P and (viii) money market funds as defined in Rule 2a-7 of the General Rules and Regulations as promulgated under the Investment Company Act of 1940.

"Issuance Notice" means an Issuance Notice substantially in the form of Exhibit A 3.

"Issuing Bank" means Citicorp North America, Inc., together with its permitted successors and assigns in such capacity.

"Italia SpA" as defined in the preamble hereto.

"Italia Term Loan" means an Italia Term Loan deemed made by a Bank to Italia SpA pursuant to Section 2.1(a)(iii).

"Italia Term Loan Amount" means the principal amount of the Italia Term Loan a Bank is deemed to have made on the Closing Date. The "Italia Term Loan Amount" of each Bank, if any, is set forth on Appendix A-3 or in the applicable Assignment Agreement. The aggregate amount of the Italia Term Loan Amounts as of the Closing Date is set forth on Appendix A-3.

"Italia Term Loan Exposure" means, with respect to any Bank, as of any date of determination, the outstanding principal of the Italia Term Loans of such Bank.

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"Landlord Consent and Estoppel" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, pursuant to which, among other things, the landlord consents to the granting of a Mortgage on such Leasehold Property by the Credit Party tenant, such Landlord Consent and Estoppel to be in form and substance acceptable to Collateral Agent in its reasonable discretion, but in any event sufficient for Collateral Agent to obtain a Title Policy with respect to such Mortgage.

"Landlord Personal Property Collateral Access Agreement" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit K with such amendments or modifications as may be approved by Collateral Agent.

"Lead Arranger" as defined in the preamble hereto.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Letter of Credit**" means each Revolving Letter of Credit and Term Loan Letter of Credit, including the Existing Letters of Credit.

"**Letter of Credit Exposure**" means, as at any date of determination, the sum of (i) the aggregate undrawn amount under all Revolving Letters of Credit then outstanding, and (ii) the aggregate amount of all Unpaid Drawings.

"**Letter of Credit Usage**" means, as at any date of determination, the sum of (i) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Revolving Letters of Credit then outstanding, and (ii) the aggregate amount of all drawings under Revolving Letters of Credit honored by Issuing Bank and not theretofore reimbursed by or on behalf of each Borrower.

"**Leverage Ratio**" means, with respect to Xerium on any date, the ratio of (A) the Debt of Xerium and its Subsidiaries as of such date to (B) the Adjusted EBITDA of Xerium and its Subsidiaries for the period of four consecutive Fiscal Quarters ending on such date (or if such date is not the last day of a Fiscal Quarter of Xerium, for the period of four consecutive Fiscal Quarters most recently ended).

"**LIBOR**" means, in relation to any LIBOR Loan, the greater of:

> (i) (a) the applicable Screen Rate; or (b) (if no Screen Rate is available for the currency or Interest Period of that LIBOR Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Administrative Agent at its request quoted by the Reference Banks to leading banks in the London interbank market, as of approximately 11:00 a.m. (London time) on the Interest Rate Determination Date for the offering of deposits in the currency of that LIBOR Loan and for a period comparable to the Interest Period for that LIBOR Loan; and

> (ii) 2.00%.

"**LIBOR Loan**" means a Loan or any portion thereof bearing interest by reference to the LIBOR Rate.

"**LIBOR Rate**" means the rate of interest for each Interest Period that is equal to the interest rate per annum which is the aggregate of the applicable LIBOR determined interest rate.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

23

"**Loan**" means a Term Loan and a Revolving Loan.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means any effect, event, matter or circumstance: (a) which is materially adverse to the: (i) business, assets or financial condition or prospects of Xerium and its Subsidiaries taken as a whole; or (ii) ability of any Credit Party to perform any of its Obligations in accordance with their terms under any of the Credit Documents; or (b) which in the reasonable opinion of the Requisite Banks results in any (i) Credit Document not being legal, valid and binding on and, subject to reservations contained in the legal opinions provided as conditions precedent thereto, enforceable against any party thereto from and after the Effective Date and/or (ii) Collateral Document not being a valid and effective security interest from and after the Effective Date, provided that the Bankruptcy Cases shall not be deemed to constitute an impediment to enforcement, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any Bank under the Credit Documents.

"**Material Contract**" means any contract or other arrangement to which Xerium or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, non-performance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Material Real Estate Asset**" means (i) (a) any fee-owned Real Estate Asset having a fair market value in excess of $1,000,000 as of the date of the acquisition thereof and (b) all Leasehold Properties other than those with respect to which the aggregate payments under the terms of the lease are less than $500,000 per annum, in each case located in the United States, Canada and the United Kingdom or (ii) any Real Estate Asset that the Requisite Banks have reasonably determined is material to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium or any Subsidiary thereof, including each Borrower.

"**Maximum Consolidated Capital Expenditures**" as defined in Section 6.8(d).

"**Maximum Consolidated Operational Restructuring Costs**" means the following amounts set forth below opposite the applicable Fiscal Year:

| | |
|---|---|
| 2010 | $15,000,000 |
| 2011 | $6,000,000 |
| 2012 and each Fiscal Year thereafter | $5,000,000 |

24

provided, that the Maximum Consolidated Operational Restructuring Costs for any Fiscal Year shall be increased by an amount equal to 50% of the portion of Maximum Consolidated Operational Restructuring Costs not incurred in the immediately preceding Fiscal Year (the "**Carry-Forward Amount**"); provided, further, that any Carry-Forward Amount not incurred in the applicable Fiscal Year shall not be added to the amount of Maximum Consolidated Operational Restructuring Costs for the immediately succeeding Fiscal Year.

"**Mexican Guarantor**" means each Guarantor incorporated in Mexico.

"**Mexico**" means the United Mexican States.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a Mortgage substantially in the form of Exhibit J, as it may be amended, supplemented or otherwise modified from time to time.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Xerium or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs (including, without limitation, reasonable transaction costs) incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Xerium or any of its Subsidiaries in connection with such Asset Sale.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Xerium or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder (excluding proceeds of business interruption insurance) or (b) as a result of the taking of any assets of Xerium or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Xerium or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Xerium or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

25

"Non-Consenting Bank" as defined in Section 2.24.

"Non-Defaulting Bank" means, at any time, a Bank that is not a Defaulting Bank or a Potential Defaulting Bank.

"Non-US Aggregate Payments" as defined in 7.2(a).

"Non-US Bank" as defined in Section 2.20(c).

"Non-US Borrower" means each Borrower other than Xerium and XTI.

"Non-US Credit Party" means each Non-US Borrower and each Non-US Guarantor.

"Non-US Contributing Guarantor" as defined in Section 7.2(a).

"Non-US Fair Share" as defined in Section 7.2(a).

"Non-US Fair Share Contribution Amount" as defined in Section 7.2(a).

"Non-US Funding Guarantor" as defined in Section 7.2(a).

"Non-US Guaranteed Obligations" as defined in Section 7.1(a).

"Non-US Guarantor" means each Guarantor listed as a Non-US guarantor in Schedule 1.1(b) and any other Foreign Subsidiary that becomes a party to the Guaranty.

"Non-US Obligations" mean the Obligations of the Non-US Borrowers and the Non-US Guarantors.

"Notice" means a Funding Notice, an Issuance Notice, or a Conversion/Continuation Notice.

"Obligation Aggregate Payments" as defined in Section 2.25(b).

"Obligation Fair Share" as defined in Section 2.25(b).

"Obligation Fair Share Contribution Amount" as defined in Section 2.25(b).

"Obligation Fair Share Shortfall" as defined in Section 2.25(b).

"Obligations" means all obligations of every nature of a US Credit Party or a Non-US Credit Party, as the case may be, from time to time owed to the Agents (including former Agents), the Banks, or any of them, any Issuing Bank and Bank Counterparties, including Hedging Obligations, under any Credit Document or the applicable documents creating the Hedging Obligations (including, without limitation, with respect to Hedging Obligations, obligations owed to any person who was a Bank or an Affiliate of a Bank at the time such Hedging Obligation was incurred), whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in

26

the related bankruptcy proceeding), reimbursement of amounts drawn under Letters of Credit, payments for early termination of Hedging Obligations, fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" as defined in Section 7.7.

"**Officers' Certificate**" means a certificate signed on behalf of Xerium by two officers of Xerium, one of whom must the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of Xerium.

"**Ordinary Course**" means ordinary course of business or ordinary trade activities that are customary, typical and carried out in a manner consistent with past practice.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its bylaws, as amended, and with respect to a German stock corporation (*Aktiengesellschaft*) an excerpt from the commercial register (*Handels-registerauszug*) (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, and with respect to a German limited partnership (*Kommanditgesellschaft*) an excerpt from the commercial register (Handels-registerauszug), (iii) with respect to any general partnership, its partnership agreement, as amended, and with respect to a German limited partnership (*Kommanditgesellschaft*) an excerpt from the commercial register (*Handels-registerauszug*), (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended, and with respect to a German limited liability company (GmbH) its list of shareholders (*Gesellschafterliste*) an excerpt from the commercial register (*Handels-registerauszug*), and (v) with respect to any other Foreign Subsidiary or entity, its memorandum or articles of association or other constitutional documents. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Parallel Obligations**" as defined in Section 7.13(a)(i).

"**Parent Company**" means, with respect to a Bank, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Bank and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Bank.

"**Patriot Act**" as defined in Section 10.21.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA which is or, within the preceding six years, was sponsored, maintained or contributed to by, or required to be contributed by, Xerium, any of its Subsidiaries or any of its ERISA Affiliates.

NY3 - 504826.09

"**Permitted Acquisition**" means any acquisition by a Borrower or any of its wholly owned Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all or substantially all of the Capital Stock of, or a business line or unit or a division of, any Person; provided,

(i) immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(ii) all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity with all applicable Governmental Authorizations;

(iii) in the case of the acquisition of Capital Stock, all of the Capital Stock (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law) acquired or otherwise issued by such Person or any newly formed Subsidiary of a Borrower in connection with such acquisition shall be owned (directly or indirectly) 100% by a Borrower or a Guarantor Subsidiary thereof; provided such Guarantor Subsidiary shall not have any limitations in respect of its guaranty of the Obligation similar to those set forth in Section 7.14, and each Borrower shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of each Borrower, each of the actions set forth in Sections 5.10 and/or 5.11, as applicable;

(iv) Xerium and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 6.8 on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended (as determined in accordance with Section 6.8(e));

(v) there are no material contingent liabilities (including, without limitation, Environmental Claims, but excluding for this purpose Ordinary Course Tax liabilities) relating to the company or business acquired;

(vi) Xerium shall have delivered to Administrative Agent at least fifteen (15) Business Days prior to such proposed acquisition, a Compliance Certificate evidencing compliance with Section 6.8 as required under clause (iv) above, together with all relevant financial information with respect to such acquired assets, including, without limitation, the aggregate consideration for such acquisition and any other information required to demonstrate compliance with Section 6.8; and

(vii) any Person or assets or division as acquired in accordance herewith (x) shall be in the same business or lines of business in which Xerium and/or any of its Subsidiaries are engaged as of the Closing Date and (y) shall have generated positive cash flow for the four quarter period most recently ended prior to the date of such acquisition adjusted on a pro forma basis as certified by the Chief Financial Officer of Xerium.

28

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Refinancing Indebtedness**" as defined in Section 6.1(p).

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" as defined in the recitals.

"**Plan of Reorganization**" means the prepackaged plan of reorganization filed by the Debtors with the Bankruptcy Court on March [_____], 2010, as amended, restated, supplemented or otherwise modified prior to the Closing Date.

"**Plan Supplement**" means the Plan Supplement filed with the Bankruptcy Court in connection with the Plan of Reorganization.

"**Platform**" as defined in Section 5.1(p)(ii).

"**Pledge and Security Agreements**" mean the Pledge and Security Agreement to be executed by each U.S. Credit Party substantially in the form of Exhibit I and each functionally similar agreement executed by any Non-U.S. Credit Party, as each may be amended, supplemented or otherwise modified from time to time.

"**Potential Defaulting Bank**" means, at any time, a Bank (i) as to which the Administrative Agent has notified the Borrower that an event of the kind referred to in the definition of "Bank Insolvency Event" has occurred and is continuing in respect of any financial institution affiliate of such Bank, (ii) as to which the Administrative Agent or the Issuing Bank has in good faith determined and notified the Borrower and the Administrative Agent that such Bank or its Parent Company or a financial institution affiliate thereof has notified the Administrative Agent, or has stated publicly, that it will not comply with its funding obligations under any other loan agreement or credit agreement or similar agreement or (iii) that has, or whose Parent Company has, a non-investment grade rating from Moody's or S&P or another national recognized rating agency. Any determination that a Bank is a Potential Defaulting Bank under any of clauses (i) through (iii) above will be made by the Administrative Agent, in its sole discretion acting in good faith. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"**Primary Accounts**" as defined in Section 4.28.

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective on the date such change is publicly announced as effective.

"**Principal Office**" means, for each of Administrative Agent and Issuing Bank, such Person's "Principal Office" as set forth on Appendix B, or such other office as such Person may

from time to time designate in writing to each Borrower, the Administrative Agent and each Bank.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Xerium Term Loan of any Bank, the percentage obtained by dividing (a) the Xerium Term Loan Exposure of that Bank by (b) the aggregate Xerium Term Loan Exposure of all Banks; (ii) with respect to all payments, computations and other matters relating to the XTI Term Loan of any Bank, the percentage obtained by dividing (a) the XTI Term Loan Exposure of that Bank by (b) the aggregate XTI Term Loan Exposure of all Banks; (iii) with respect to all payments, computations and other matters relating to the Italia Term Loan of any Bank, the percentage obtained by dividing (a) the Italia Term Loan Exposure of that Bank by (b) the aggregate Italia Term Loan Exposure of all Banks; (iv) with respect to all payments, computations and other matters relating to the Xerium Canada Term Loan of any Bank, the percentage obtained by dividing (a) the Xerium Canada Term Loan Exposure of that Bank by (b) the aggregate Xerium Canada Term Loan Exposure of all Banks; (v) with respect to all payments, computations and other matters relating to the Austria Term Loan of any Bank, the percentage obtained by dividing (a) the Austria Term Loan Exposure of that Bank by (b) the aggregate Austria Term Loan Exposure of all Banks; (vi) with respect to all payments, computations and other matters relating to the German Term Loan of any Bank, the percentage obtained by dividing (a) the German Term Loan Exposure of that Bank by (b) the aggregate German Term Loan Exposure of all Banks; and (vii) with respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Bank or any Letters of Credit issued or participations purchased therein by any Bank, the percentage obtained by dividing (a) the Revolving Exposure of that Bank by (b) the aggregate Revolving Exposure of all Banks. For all other purposes with respect to each Bank, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Xerium Term Loan Exposure, the XTI Term Loan Exposure, the Italia Term Loan Exposure, the Xerium Canada Term Loan Exposure, the Austria Term Loan Exposure, the German Term Loan Exposure and the Revolving Exposure of that Bank, by (B) an amount equal to the sum of the aggregate Xerium Term Loan Exposure, the aggregate XTI Term Loan Exposure, the aggregate Italia Term Loan Exposure, the aggregate Xerium Canada Term Loan Exposure, the aggregate Austria Term Loan Exposure, the aggregate German Term Loan Exposure and the aggregate Revolving Exposure of all Banks.

"**Qualifying Lender**" means:

    (a)    a Bank which is a bank as defined in Section 991 Income Tax Act 2007 of the United Kingdom, beneficially entitled to all amounts payable to it by a Credit Party under the Credit Documents and within the charge to United Kingdom corporation tax as respects such amounts; or

    (b)    a bank in respect of which an order under Section 991(2)(e) Income Tax Act 2007 designating it as a bank for the purposes of Section 879 Income Tax Act 2007 of the United Kingdom provides that Section 879 Income Tax Act 2007 shall apply to it as if the words from "if" to the end in that section were omitted; or

30

(c)     a Treaty Lender.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Recapitalization**" means the restructuring and recapitalization of the capital stock of Xerium and the Indebtedness of the Debtors and their Subsidiaries pursuant to the Plan of Reorganization.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Administrative Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third party purchasers and encumbrancers of the affected real property.

"**Reference Banks**" means, in relation to LIBOR, the principal London offices of Citibank, N.A. and such two other banks as may be appointed by the Administrative Agent in consultation with Xerium.

"**Register**" as defined in Section 2.7(b).

"**Reimbursement Date**" as defined in Section 2.4(e).

"**Related Fund**" means, with respect to any Bank that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Bank or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Bank**" as defined in Section 2.24.

"**Required Prepayment Date**" as defined in Section 2.15(c).

"**Requisite Banks**" means, collectively (i) one or more Term Loan Banks having or holding Term Loan Exposure and representing more than 50.0% of the sum of the aggregate Term Loan Exposure of all Term Loan Banks and (ii) one or more Revolving Banks having or

31

holding Revolving Exposure and representing more than 50.0% of the sum of the aggregate Revolving Exposure of all Revolving Banks.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Xerium now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Xerium now or hereafter outstanding, except any payment made solely in shares of that class of stock to the holders of that class; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Xerium now or hereafter outstanding; and (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal defeasance), sinking fund or similar payment with respect to, any Subordinated Debt, excluding, in respect of this clause (iv), payments in kind.

"**Revolving Bank**" means, at any time, any Bank that has a Revolving Commitment at such time.

"**Revolving Commitment**" means the commitment of a Bank to make or otherwise fund any Revolving Loan and "**Revolving Commitments**" means such commitments of all Banks in the aggregate. The amount of each Bank's Revolving Commitment is set forth on Appendix B or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Commitments as of the Closing Date is $20,000,000.

"**Revolving Commitment Period**" means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"**Revolving Commitment Termination Date**" means the earlier of (i) the date that is three (3) years after the Closing Date, (ii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.13(b) or 2.14, and (iii) the date of the termination of the Revolving Commitments pursuant to Section 8.1.

"**Revolving Exposure**" means, with respect to any Bank as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Bank's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Loans of that Bank and (b) in the case of the Issuing Bank, the aggregate Letter of Credit Exposure in respect of all Revolving Letters of Credit issued by that Bank (net of any participations by other Revolving Banks in such Revolving Letters of Credit), and (c) the aggregate amount of all participations by that Bank in any outstanding Revolving Letters of Credit or any Unpaid Drawing under any Revolving Letter of Credit.

"**Revolving Letter of Credit**" means each commercial or standby letter of credit issued or to be issued by the Issuing Bank pursuant to Section 2.4(a) of this Agreement and in form and substance acceptable to the Issuing Bank and the Administrative Agent.

32

"**Revolving Letter of Credit Sublimit**" means (i) $3,000,000 for the period from the Closing Date through the one year anniversary of the Closing Date and (b) $7,500,000 thereafter.

"**Revolving Loan**" as defined in Section 2.2(a)(i).

"**Roll-Over Amount**" as defined in Section 6.8(d).

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Companies.

"**Scheduled Term Loan Maturity Date**" means the date that is four and one half (4.5) years after the Closing Date.

"**Screen Rate**" means in relation to LIBOR, the offered rate for deposits in Dollars for the applicable Interest Period appearing on the Reuters Screen LIBOR 01 Page. If such page is replaced or service ceases to be available, the Administrative Agent may specify another page or service displaying the appropriate rate after consultation with the Borrower and the Banks.

"**Second Currency**" as defined in Section 10.4(b).

"**Second Lien Agent**" means Citicorp North America, Inc., as the administrative agent and the collateral agent for the lenders under the Second Lien Credit Agreement, together with any of its successors and assigns.

"**Second Lien Credit Agreement**" means the Second Amended and Restated Credit and Guaranty Agreement (Second Lien), dated as of [_____], 2010, among the Borrowers, the Guarantors, the several lenders and agent banks from time to time parties thereto and the Second Lien Agent, as amended, supplemented, restated or otherwise modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**Second Lien Credit Documents**" means the "Credit Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means the "Obligations" as defined in the Second Lien Credit Agreement.

"**Second Lien Secured Parties**" means the "Secured Parties" as defined in the Second Lien Credit Agreement.

"**Secured Parties**" has the meaning assigned to that term in the Collateral Documents.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim

33

certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Solvency Certificate**" means a Solvency Certificate of the chief financial officer of each Borrower substantially in the form of Exhibit N.

"**Solvent**" means, with respect to any Credit Party, that as of the date of determination, both (i) (a) the sum of such Credit Party's debt (including contingent liabilities) does not exceed the present fair saleable value of such Credit Party's present assets; (b) such Credit Party's capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Initial Business Plan or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances and by the laws of the jurisdiction where such Credit Party is incorporated, formed or organized. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Subject Transaction**" as defined in Section 6.8(e).

"**Subordinated Debt**" means any unsecured subordinated Debt of any Credit Party which meets the requirements of Section 6.1(c).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Sum**" as defined in Section 10.4(b).

"**Swedish Guarantor**" means each Guarantor incorporated in Sweden.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, whether disputed or not,

34

including any interest, penalties or additions thereto and any installments in respect thereof; provided, "Tax on the overall net income" of a Person shall be construed as a reference to a Tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Bank, its lending office) is located or in which that Person (and/or, in the case of a Bank, its lending office) is deemed to be doing business on all or part of the net income, profits, or gains (whether worldwide, or only insofar as such income, profits, or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Bank, its applicable lending office).

"Tax Confirmation" means a confirmation by a Bank that it is a 991 Bank.

"Tax Credit" means a credit against, relief or remission for or repayment of any Tax.

"Term LC Deposit Date" as defined in Section 2.4(k)

"Term LC Reimbursement Date" as defined in Section 2.4(i)

"Term LC Unreimbursed Amount" as defined in Section 2.4(i)

"Term LC Collateral Account" means the deposit account established for the purpose of Cash Collateralizing Xerium's obligations in respect of the letters of credit under the DIP Credit Agreement and, pursuant to the terms hereof, the Term Loan Letters of Credit and shall include any sub-accounts or additional accounts contemplated by Section 2.4(n)(iii).

"Term Loan" means a Xerium Term Loan, an XTI Term Loan, an Italia Term Loan, a Xerium Canada Term Loan, an Austria Term Loan or a German Term Loan.

"Term Loan Amount" means, as applicable, a Xerium Term Loan Amount, an XTI Term Loan Amount, an Italia Term Loan Amount, a Xerium Canada Term Loan Amount, an Austria Term Loan Amount or a German Term Loan Amount, and "Term Loan Amounts" means such amounts held by all Banks.

"Term Loan Bank" means, at any time, any Bank that holds a Term Loan at such time.

"Term Loan LC Collateral Account Control Agreement" means the Account Control Agreement (Term Loan LC Collateral Account), dated as of [_____], 2010, among Xerium, the Collateral Agent, the Administrative Agent and Citibank, N.A., as amended, supplemented or otherwise modified from time to time.

"Term Loan Letter of Credit" means each commercial or standby letter of credit issued, to be issued or deemed to have been issued by the Issuing Bank pursuant to Section 2.4(b) of this Agreement and in form and substance acceptable to the Issuing Bank and the Administrative Agent.

"Term Loan Letter of Credit Sublimit" means $20,000,000.

"**Term Loan Maturity Date**" means the earlier of (i) Scheduled Term Loan Maturity Date, and (ii) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Terminated Bank**" as defined in Section 2.24.

"**Title Policy**" as defined in Section 3.1(i).

"**Total Utilization of Revolving Commitments**" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of reimbursing Issuing Bank for any amount drawn under any Letter of Credit, but not yet so applied) and (ii) the Letter of Credit Usage.

"**Treaty Lender**" means a Bank which at the time the payment is made is beneficially entitled to all amounts payable to it under the Credit Documents and is entitled pursuant to the interpretation of the taxation authorities of the jurisdiction from which the payment is made or deemed to be made under a double taxation agreement in force at that date (subject only to the completion of any necessary formalities or administrative procedures, (including, without limitation, the matters referred to in Section 2.20(e)) to receive any payments of principal, interest, fees or other amounts under the Credit Documents without deduction or withholding for or on account of Tax.

"**Type of Loan**" means a LIBOR Loan or an ABR Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unreallocated Portion**" as defined in Section 2.23(b).

"**Unpaid Drawing**" as defined in Section 2.03(g).

"**Unused Revolving Commitment**" means, at any time, (a) the Revolving Commitments at such time minus (b) the sum of (i) the aggregate principal amount of outstanding Revolving Loans plus (ii) the Letter of Credit Usage.

"**US Aggregate Payments**" as defined in 7.2(b).

"**US Credit Party**" means Xerium, XTI, and each US Guarantor.

"**US Contributing Guarantors**" as defined in 7.2(b).

"**US Funding Guarantor**" as defined in Section 7.2(b).

"**US Fair Share**" as defined in 7.2(b).

"**US Fair Share Contribution Amount**" as defined in 7.2(b).

"**US Guarantor**" means (i) each Guarantor listed in Schedule 1.1(b) as a US Guarantor and (ii) each other Domestic Subsidiary that becomes a party to the Guaranty.

36

"VAT" means value added tax, goods and services tax and any similar sales or turnover tax.

"Vietnam Asset Sales" means, Asset Sales relating to the business, assets or properties of Huyck Wangner Vietnam Co. Ltd.

"Waivable Mandatory Prepayment" as defined in Section 2.15(c).

"Xerium" as defined in the preamble hereto.

"Xerium Canada" as defined in the preamble hereto.

"Xerium Canada Term Loan" means a Xerium Canada Term Loan deemed made by a Bank to Xerium Canada Inc. pursuant to Section 2.1(a)(iv).

"Xerium Canada Term Loan Amount" means the principal amount of the Xerium Canada Term Loan a Bank is deemed to have made on the Closing Date. The "Xerium Canada Term Loan Amount" of each Bank, if any, is set forth on Appendix A-4 or in the applicable Assignment Agreement. The aggregate amount of the Xerium Canada Term Loan Amounts as of the Closing Date is set forth on Appendix A-4.

"Xerium Canada Term Loan Exposure" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the Xerium Canada Term Loans of such Bank.

"Xerium Term Loan" means a Xerium Term Loan deemed made by a Bank to Xerium. pursuant to Section 2.1(a)(i).

"Xerium Term Loan Amount" means the principal amount of the Xerium Term Loan a Bank is deemed to have made on the Closing Date. The "Xerium Term Loan Amount" of each Bank, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement. The aggregate amount of the Xerium Term Loan Amounts as of the Closing Date is set forth on Appendix A-1.

"Xerium Term Loan Exposure" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the Xerium Term Loans of such Bank.

"XTI" as defined in the preamble hereto.

"XTI Term Loan" means an XTI Term Loan deemed made by a Bank to XTI pursuant to Section 2.1(a)(ii).

"XTI Term Loan Amount" means the principal amount of the XTI Term Loan a Bank is deemed to have made on the Closing Date. The "XTI Term Loan Amount" of each Bank, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement. The aggregate amount of the XTI Term Loan Amounts as of the Closing Date is set forth on Appendix A-2.

37

"**XTI Term Loan Exposure**" means, with respect to any Bank, as of any date of determination, the outstanding principal amount of the XTI Term Loans of such Bank.

"**991 Bank**" means a Bank falling within paragraph (a) or (b) of the definition of Qualifying Lender.

1.2 **Accounting Terms.** Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Xerium to the Banks pursuant to Section 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation. Notwithstanding the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements for the Fiscal Year ended December 31, 2009 only.

1.3 **Interpretation, etc.** Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

## SECTION 2. LOANS AND LETTERS OF CREDIT

2.1 **Term Loans.** (a) Subject to the terms and conditions hereof, each applicable Term Loan Bank agrees that on the Closing Date, the outstanding principal amount of the DIP Term Loans owing to such Term Loan Bank shall be converted into a Term Loan deemed to have been made by such Bank, on the Closing Date, as follows:

(i) a Xerium Term Loan to Xerium in Dollars in a principal amount equal to such Term Bank's Xerium Term Loan Amount;

(ii) an XTI Term Loan to XTI in Dollars in a principal amount equal to such Term Bank's XTI Term Loan Amount;

(iii) an Italia Term Loan to Italia SpA in Dollars in a principal amount equal to such Term Bank's Italia Term Loan Amount;

38

(iv) a Xerium Canada Term Loan to Xerium Canada in Dollars in a principal amount equal to such Term Bank's Xerium Canada Term Loan Amount;

(v) an Austria Term Loan to Huyck Austria in Dollars in a principal amount equal to such Term Bank's Austria Term Loan Amount; and

(vi) a German Term Loan to Germany Holdings in Dollars in an amount equal to such Term Bank's German Term Loan Amount.

Any Term Loan repaid or prepaid may not be reborrowed. Subject to Sections 2.13 and 2.14, all amounts owed hereunder with respect to all Term Loans shall be paid in full no later than the Term Loan Maturity Date. The Xerium Term Loans deemed made hereunder on the Closing Date shall be LIBOR Rate Loans. The Interest Period applicable to the DIP Term Loans on the day immediately preceding the Closing Date shall apply to the Term Loans on the Closing Date.

(b) Term Loan Deposit Account. After the payment of all fees and expenses required to be paid on the Closing Date, the Administrative Agent shall transfer all funds on deposit in the DIP Term Loan Deposit Account to Xerium on the Closing Date.

### 2.2 Revolving Loans

(a) Revolving Commitments.

(i) During the Revolving Commitment Period, subject to the terms and conditions hereof, each Revolving Bank severally agrees to make revolving loans in Dollars to Xerium ("**Revolving Loans**") in an aggregate amount up to but not exceeding such Revolving Bank's Revolving Commitment; provided, that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect. Subject to Sections 2.13(a) and 2.14, all amounts owed hereunder with respect to Revolving Loans shall be paid in full no later than the Revolving Loan Termination Date.

(ii) Subject to the terms and conditions hereof, each applicable Revolving Bank agrees that on the Closing Date, the outstanding principal amount of DIP Revolving Loans owing to such Revolving Bank shall be converted into a Revolving Loan deemed to have been made by such Revolving Bank to Xerium, on the Closing Date, as set forth in Appendix B.

(b) Borrowing Mechanics for Revolving Loans Generally.

(i) Except pursuant to Section 2.4(d), Revolving Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

39

(ii) Whenever Xerium desires that Revolving Banks make Revolving Loans, Xerium shall deliver to the Administrative Agent a fully executed and delivered Funding Notice no later than (A) 9:30 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a LIBOR Loan or (B) 9:30 a.m. (New York City time) on the proposed Credit Date in the case of an ABR Loan. Except as otherwise provided herein, a Funding Notice for a Loan that is a LIBOR Loan shall be irrevocable on and after the related Interest Rate Determination Date, and Xerium shall be bound to make a borrowing in accordance therewith.

(iii) Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Revolving Bank's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by the Administrative Agent to each applicable Bank by telefacsimile with reasonable promptness, but (provided the Administrative Agent shall have received such notice by 9:30 a.m. (New York City time)) not later than 3:00 p.m. (New York City time) on the same day as the Administrative Agent's receipt of such Funding Notice from Xerium.

(iv) Each Revolving Bank shall make the amount of its Revolving Loan available to the Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, the Administrative Agent shall make the proceeds of such Revolving Loans available to Xerium on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by the Administrative Agent from the Revolving Banks to be credited to the account of Xerium at the Administrative Agent's Principal Office or such other account as may be reasonably designated in writing no later than three (3) days before to the Administrative Agent by Xerium.

2.3 [Reserved]

2.4 Letters of Credit.

(a) Revolving Letters of Credit. During the Revolving Commitment Period, subject to the terms and conditions hereof, the Issuing Bank agrees to issue Revolving Letters of Credit for the account of each Borrower in the aggregate amount up to but not exceeding the Revolving Letter of Credit Sublimit; provided, (i) after giving effect to such issuance, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect; (ii) after giving effect to such issuance, in no event shall the Letter of Credit Usage exceed the Revolving Letter of Credit Sublimit then in effect; (iii) in no event shall any standby Revolving Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior the Revolving

40

Commitment Termination Date and (2) the date which is one year from the date of issuance of such standby Revolving Letter of Credit; and (iv) in no event shall any commercial Revolving Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior to the Revolving Commitment Termination Date and (2) the date which is 180 days from the date of issuance of such commercial Revolving Letter of Credit; provided, further, in the event (x) a Funding Default exists or (y) a determination pursuant to Section 2.18 or 2.19 occurs, the Issuing Bank shall not be required to issue any Revolving Letter of Credit unless the Issuing Bank has entered into arrangements satisfactory to it and each Borrower to eliminate the Issuing Bank's risk with respect to the participation in the Revolving Letters of Credit of the Defaulting Bank, including by Cash Collateralizing such Defaulting Bank's Pro Rata Share of the Letter of Credit Usage.

(b) Term Loan Letters of Credit. Subject to the terms and conditions hereof, the Issuing Bank agrees to issue Term Loan Letters of Credit for the account of the Borrowers or any of their respective Subsidiaries in the aggregate amount which, when combined with the Dollar Equivalent of the aggregate face amount of Existing Letters of Credit, does not exceed the Term Loan Letter of Credit Sublimit; provided, (i) after giving effect to such issuance, in no event shall the amount of Cash and Investment Cash Equivalents on deposit in the Term LC Collateral Account be less than 103% of the Dollar Equivalent of the amount available to be drawn under all Term Loan Letters of Credit (including the Existing Term Loan Letters of Credit), (ii) in no event shall any standby Term Loan Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior to the Scheduled Term Loan Termination Date and (2) the date which is one year from the date of issuance of such standby Term Loan Letter of Credit and (iii) in no event shall any commercial Term Loan Letter of Credit have an expiration date later than the earlier of (1) five (5) Business Days prior to the Scheduled Term Loan Termination Date and (2) the date which is 180 days from the date of issuance of such commercial Term Loan Letter of Credit.

(c) Existing Letters of Credit. Schedule 2.4(c) contains a schedule of certain letters of credit issued or outstanding prior to the Closing Date under the DIP Credit Agreement (the "Existing Letters of Credit") for the account of Xerium or one of its Subsidiaries by Citicorp North America, Inc. On the Closing Date, (i) the Existing Letters of Credit, to the extent outstanding, shall be automatically, and without further action by the parties hereto, converted to Term Loan Letters of Credit issued and outstanding under this Agreement and subject to the provisions hereof, as if such Existing Letters of Credit had been issued on the Closing Date hereunder, (ii) the issuing bank of the Existing Letters of Credit shall be deemed to be the "Issuing Bank" hereunder solely for the purpose of maintaining such Existing Letters of Credit, and (iii) all liabilities of Xerium, the other Borrowers or any of their respective Subsidiaries with respect to Existing Letters of Credit shall constitute Obligations.

41

(d) <u>Letters of Credit Generally</u>. Each Letter of Credit is subject to the following applicable conditions: (i) each Term Loan Letter of Credit shall be denominated in Dollars or an Alternative Currency; (ii) each Revolving Letter of Credit shall be denominated in Dollars, (iii) the stated amount of each Letter of Credit shall not be less than a Dollar Equivalent of $500,000 (or the Dollar Equivalent thereof if issued in an Alternative Currency) or such lesser amount as is acceptable to the Issuing Bank and (iii) in no event shall a Letter of Credit be issued if such Letter of Credit is not in a form acceptable to the Issuing Bank in its reasonable discretion. Subject to the foregoing, the Issuing Bank may agree that a standby Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each, unless the Issuing Bank elects not to extend for any such additional period; <u>provided</u>, the Issuing Bank shall not extend any such Letter of Credit if it has received written notice from the Administrative Agent, acting on behalf of the Requisite Banks, that an Event of Default has occurred and is continuing.

(e) <u>Notice of Issuance</u>. Whenever a Borrower desires the issuance of a Letter of Credit, it shall deliver an Issuance Notice to the Administrative Agent no later than 9:30 a.m. (New York City time) at least three (3) Business Days (in the case of standby letters of credit) or five (5) Business Days (in the case of commercial letters of credit), or in each case such shorter period as may be agreed to by the Issuing Bank in any particular instance, in advance of the proposed date of issuance, which Issuance Notice shall state whether the requested Letter of Credit is to be a Revolving Letter of Credit or a Term Loan Letter of Credit. Upon satisfaction or waiver of the conditions set forth in Section 3.2, the Issuing Bank shall issue the requested Letter of Credit only in accordance with the Issuing Bank's standard operating procedures. Upon the issuance of any Letter of Credit or any amendment or modification to a Letter of Credit, the Issuing Bank shall promptly notify the Administrative Agent thereof, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and, in the case of Revolving Letters of Credit, the amount of each Revolving Bank's respective participation in such Letter of Credit pursuant to Section 2.4(f).

(f) <u>Responsibility of Issuing Bank With Respect to Requests for Drawings and Payments</u>. In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, the Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit. As between each Borrower and the Issuing Bank, each Borrower assumes all risks of the acts and omissions of, or misuse of, the Letters of Credit issued by the Issuing Bank by the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, the Issuing Bank shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects

42

invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of the Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of the Issuing Bank's rights or powers hereunder. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by the Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of the Issuing Bank to any Borrower. Notwithstanding anything to the contrary contained in this Section 2.4(f), each Borrower shall retain any and all rights it may have against the Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of the Issuing Bank.

(g) Reimbursement by a Borrower of Amounts Drawn or Paid Under Revolving Letters of Credit. In the event the Issuing Bank has determined to honor a drawing under a Revolving Letter of Credit, it shall immediately notify the applicable Borrower and Administrative Agent, and such Borrower shall reimburse Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the "Reimbursement Date") in Dollars in same day funds equal to the amount of such honored drawing (each such amount so paid until reimbursed, an "Unpaid Drawing"); provided, anything contained herein to the contrary notwithstanding, (i) unless such Borrower shall have notified Administrative Agent and Issuing Bank prior to 9:30 a.m. (New York City time) on the date three (3) Business Days prior to the date such drawing is honored that such Borrower intends to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Revolving Loans, such Borrower shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Banks to make Revolving Loans that are ABR Loans on the Reimbursement Date in Dollars in the same amount of such honored drawing, and (ii) subject to satisfaction or waiver of the conditions specified in Section 3.2, Revolving Banks having a Revolving Commitment shall, on the Reimbursement Date, make Revolving Loans that are ABR Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse the Issuing Bank for the amount of such honored drawing; and provided further, if for any reason proceeds of Revolving Loans are not received by the Issuing Bank on the Reimbursement Date in an

43

amount equal to the amount of such honored drawing, such Borrower shall reimburse the Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Revolving Loans, if any, which are so received. Nothing in this Section 2.4(g) shall be deemed to relieve any Revolving Bank from its obligation to make Revolving Loans on the terms and conditions set forth herein, and each Borrower shall retain any and all rights it may have against any Revolving Bank resulting from the failure of such Bank to make such Revolving Loans under this Section 2.4(g).

(h) **Banks' Purchase of Participations in Revolving Letters of Credit**. Immediately upon the issuance of each Revolving Letter of Credit, each Revolving Bank having a Revolving Commitment shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from the Issuing Bank a participation in such Revolving Letter of Credit and any drawings honored thereunder in an amount equal to such Bank's Pro Rata Share (with respect to the Revolving Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder. In the event that a Borrower shall fail for any reason to reimburse the Issuing Bank as provided in Section 2.4(e), the Issuing Bank shall promptly notify each Bank of the unreimbursed amount of such honored drawing and of such Bank's respective participation therein based on such Bank's Pro Rata Share of the Revolving Commitments. Each Bank shall make available to the Issuing Bank an amount equal to its respective participation, in same day funds, at the office of the Issuing Bank specified in such notice, not later than 12:00 p.m. (New York City time) on the first Business Day (under the laws of the jurisdiction in which such office of the Issuing Bank is located) after the date notified by the Issuing Bank. In the event that any Bank fails to make available to the Issuing Bank on such Business Day the amount of such Bank's participation in such Revolving Letter of Credit as provided in this Section 2.4(h), the Issuing Bank shall be entitled to recover such amount on demand from such Bank together with interest thereon for three (3) Business Days at the rate customarily used by the Issuing Bank for the correction of errors among banks and thereafter at the Alternate Base Rate. Nothing in this Section 2.4(h) shall be deemed to prejudice the right of any Bank to recover from Issuing Bank any amounts made available by such Bank to the Issuing Bank pursuant to this Section in the event that it is determined that the payment with respect to a Revolving Letter of Credit in respect of which payment was made by such Bank constituted gross negligence or willful misconduct on the part of the Issuing Bank. In the event the Issuing Bank shall have been reimbursed by other Banks pursuant to this Section 2.4(h) for all or any portion of any drawing honored by the Issuing Bank under a Revolving Letter of Credit, such Issuing Bank shall distribute to each Bank which has paid all amounts payable by it under this Section 2.4(h) with respect to such honored drawing such Bank's Pro Rata Share of all payments subsequently received by the Issuing Bank from such Borrower in reimbursement of such honored drawing when such payments are received. Any such distribution shall be made to a Bank at its primary address set forth below its name on Appendix B or at such other address as such Bank may request.

44

(i) <u>Reimbursement of Amounts Drawn or Paid Under Term Loan Letters of Credit</u>. In the event the Issuing Bank has determined to honor a drawing under a Term Loan Letter of Credit, it shall immediately notify the applicable Borrower and the Administrative Agent, and such Borrower shall reimburse the Issuing Bank in an amount equal to the Dollar Equivalent of such drawing plus any FX Currency Losses no later than 1:00 p.m. (New York City time) on the date such drawing is honored (the "**Term LC Reimbursement Date**"), if such Borrower shall have received such notice prior to 11:00 a.m. (New York City time) on such date, or, if such notice has not been received by such Borrower prior to such time on such date, then not later than 1:00 p.m. (New York City time) on the next Business Day; provided that (subject to the immediately succeeding sentence) unless such Borrower shall reimburse the Issuing Bank by 1:00 p.m. (New York City time) on the same day on which such drawing is made, the unpaid amount thereof shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin, for each day commencing on the date the drawing is made until the date that the Borrower pays the Issuing Bank for the Dollar Equivalent of the amount of such drawing plus any FX Currency Losses. If such Borrower does not so reimburse the Issuing Bank at or prior to the time for payment specified above in respect of such drawing under such Term Loan Letter of Credit, the Administrative Agent shall promptly cause the amounts on deposit in the Term Loan LC Collateral Account to be applied to repay in full such amounts (such amounts, including any FX Currency Losses accrued interest thereon, the "**Term LC Unreimbursed Amount**"). If amounts on deposit in the Term LC Collateral Account is less than such Term LC Unreimbursed Amount, then such Borrower shall be deemed to have given a timely Funding Notice to the Administrative Agent requesting Revolving Banks to make a Revolving Loan on the Term LC Reimbursement Date in the amount equal to the Term LC Unreimbursed Amount, less the amounts withdrawn from the Term LC Collateral Account pursuant to the preceding sentence, and the Revolving Banks shall, on the Term LC Reimbursement Date, make Revolving Loans in such amount, the proceeds of which shall be applied directly by the Administrative Agent to reimburse the Issuing Bank for the Term LC Unreimbursed Amount. The conditions to the making of a Revolving Loan set forth in Section 3.2 and the minimum amount of Revolving Loans set forth in Section 2.2(b)(i) shall not apply to Revolving Loans made pursuant to this Section 2.4(i), and the Revolving Loans made pursuant to this Section 2.4(i) shall initially be ABR Loans.

(j) <u>Investing Funds in Term LC Collateral Account</u>. Funds on deposit in the Term LC Collateral Account shall be held in the form of Cash, except as described below. So long as no Default or Event of Default shall have occurred and be continuing, Xerium is authorized to direct the Administrative Agent to make investments of funds on deposit in the Term LC Collateral Account in Investment Cash Equivalents as directed by Xerium. Upon the occurrence and during the continuation of a Default or an Event of Default, the funds on deposit in the Term LC Collateral Account shall be invested in accordance with the Term Loan LC Collateral Account Control Agreement.

45

(k) <u>Top-Up and Release of Funds in the Term LC Collateral Account</u>. If on the last Business Day of any month the aggregate amount of Cash and Investment Cash Equivalents on deposit in the Term LC Collateral Account exceeds 103% of the Dollar Equivalent of the amount available to be drawn under the Letters of Credit (such excess, the **"Excess Amount"**), then, upon the written request of Xerium, no later than the second Business Day after such request the Administrative Agent shall cause an amount of Cash (including cash proceeds from the liquidation of any Investment Cash Equivalents) equal to the Excess Amount (calculated at the date of withdrawal), to be withdrawn from the Term LC Collateral Account and transferred to Xerium. If, however, on any Determination Date the aggregate amount of Cash and Investment Cash Equivalents on deposit in the Term LC Collateral Account is less than 103% of the Dollar Equivalent of the amount available to be drawn under the Letters of Credit (such shortfall, the **"Deficiency Amount"**), then no later than the next Business Day (the "Term LC Deposit Date") after notice thereof to Xerium from the Administrative Agent, Xerium shall deposit Cash or Investment Cash Equivalents into the Term LC Collateral Account in an amount or with a value equal to the Deficiency Amount. If by 11:00 a.m. (New York City time) on the Term LC Deposit Date Xerium has failed to make such deposit, then the Borrower shall be deemed to have given a timely Funding Notice to the Administrative Agent requesting Revolving Banks to make a Revolving Loan on the Term LC Deposit Date in the amount of the Deficiency Amount, and the Revolving Banks shall, on the Term LC Deposit Date, make Revolving Loans in such amount, the proceeds of which shall be deposited by the Administrative Agent into the Term LC Collateral Account. The conditions to the making of a Revolving Loan set forth in Section 3.2 and the minimum amount of Revolving Loans set forth in Section 2.2(b)(i) shall not apply to Revolving Loans made pursuant to this Section 2.4(k) and the Revolving Loans made pursuant to this Section 2.4(k) shall be ABR Loans.

(l) <u>Obligations Absolute</u>. The obligation of each Borrower to reimburse Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Revolving Loans made by Banks pursuant to Section 2.4(e) and the obligations of Banks under Section 2.4(g) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set off, defense or other right which any Borrower or any Bank may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), the Issuing Bank, Bank or any other Person or, in the case of a Bank, against any Borrower, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between such Borrower or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by the Issuing

46

Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium or any of its Subsidiaries; (vi) any breach hereof or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; provided, in each case, that payment by the Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank under the circumstances in question.

(m) Indemnification. Without duplication of any obligation of each Borrower under Section 10.2, 10.3 or 10.4, in addition to amounts payable as provided herein, each Borrower hereby agrees to protect, indemnify, pay and save harmless the Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance and maintenance of any Letter of Credit by the Issuing Bank, other than as a result of (1) the gross negligence or willful misconduct of the Issuing Bank or (2) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of the Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

(n) Term Loan LC Collateral Account.

(i) Xerium shall maintain and continue the existence of the Term Loan LC Collateral Account established under the DIP Credit Agreement with the Depositary Bank for the purpose of Cash Collateralizing a Borrower's obligations to the Issuing Bank in respect of the Term Loan Letters of Credit.

(ii) Xerium hereby grants to the Collateral Agent, for the benefit of the Issuing Bank, a security interest in the Term Loan LC Collateral Account and all Cash, balances and Investment Cash Equivalents therein and all proceeds of the foregoing, as security for the Borrowers' obligations in respect of the Term Loan Letters of Credit (and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations, provided that amounts on deposit in the Term Loan LC Collateral Account shall be applied, first, to repay the Borrowers' obligations to the Issuing Bank in respect of Term Loan Letters of Credit and, second, to all other Obligations). Except as expressly provided herein or in any other Credit Document, no Person shall have the right to make any withdrawal from the Term Loan LC Collateral Account or to exercise any right or power with respect thereto.

47

(iii) If an Event of Default shall have occurred and is continuing, then the Administrative Agent shall convert, or cause to be converted, amounts on deposit in the Term Loan LC Collateral Account into Alternative Currencies, to the extent necessary, so that after giving effect to such conversion the amounts on deposit in the Term Loan LC Collateral Account are in the currency which corresponds to the currency in which the Term Loan Letters of Credit are issued. The Borrowers agree that the Administrative Agent is authorized to establish additional accounts or sub-accounts as necessary to hold such funds in an Alternative Currency, and the Borrowers shall execute all documents necessary to effectuate any transfers to any other accounts or sub-accounts and to create, continue or maintain the security interest and lien perfection in the applicable accounts or sub-accounts and the Cash and Investment Cash Equivalents held therein, including the entering into any control agreements. All cost and expenses incurred by the Administrative Agent and the Collateral Agent in connection with the matters set forth in this Section 2.4(n)(iii) shall be borne by the Borrowers.

(o) Resignation of Issuing Bank. If a Bank becomes, and during the period it remains, a Defaulting Bank or a Potential Defaulting Bank, the Issuing Bank may, upon prior written notice to Xerium and the Administrative Agent, resign as Issuing Bank, effective at the close of business New York time on a date specified in such notice (which date may not be less than five (5) Business Days after the date of such notice); provided that such resignation by the Issuing Bank will have no effect on the validity or enforceability of any Letter of Credit then outstanding or on the obligations of the Borrowers or any Bank under this Agreement with respect to any such outstanding Letter of Credit or otherwise to the Issuing Bank.

(p) Defaulting Banks. In addition to the other conditions precedent herein set forth, if any Bank becomes, and during the period it remains, a Defaulting Bank or a Potential Defaulting Bank, the Issuing Bank will not be required to issue any Letter of Credit or to amend any outstanding Letter of Credit to increase the face amount thereof, alter the drawing terms thereunder or extend the expiry date thereof, unless the Issuing Bank is satisfied that any exposure that would result therefrom is eliminated or fully covered by the Revolving Commitments of the Non-Defaulting Banks or by Cash Collateralization or a combination thereof satisfactory to the Issuing

## 2.5 Pro Rata Shares; Availability of Funds.

(a) Pro Rata Shares. All Loans shall be made, and all participations purchased, by Banks simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Bank shall be responsible for any default by any other Bank in such other Bank's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Revolving Commitment of any Bank be increased or decreased as a result of a

48

default by any other Bank in such other Bank's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b) Availability of Funds. Unless the Administrative Agent shall have been notified by any Bank prior to the applicable Credit Date that such Bank does not intend to make available to the Administrative Agent the amount of such Bank's Loan requested on such Credit Date, the Administrative Agent may assume that such Bank has made such amount available to the Administrative Agent on such Credit Date and the Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to the Borrower a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to the Administrative Agent by such Bank, the Administrative Agent shall be entitled to recover such amount on demand from such Bank together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the customary rate set by the Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the LIBOR Rate. If such Bank does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such amount to the Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to the Administrative Agent, at the rate payable hereunder for LIBOR Rate Loans. Nothing in this Section 2.5(b) shall be deemed to relieve any Bank from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Bank as a result of any default by such Bank hereunder.

2.6 Use of Proceeds. The proceeds of the Loans shall be applied by each Borrower for working capital and general corporate purposes, to pay fees and expenses in connection with the transactions contemplated hereby, to make payments of fees, expenses and any other amounts owing under the DIP Credit Agreement and to pay costs, fees and expenses incurred in connection with the consummation of the Plan of Reorganization. The proceeds of the Revolving Loans and Letters of Credit made after the Closing Date shall be applied by each Borrower for working capital and general corporate purposes of Xerium and its Subsidiaries and pay fees and expenses hereunder; provided, that in no event will the proceeds of Loans be used for the purposes of repurchasing Loans as permitted under Section 2.13 hereof. No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

2.7 Evidence of Debt; Register; Banks' Books and Records; Promissory Notes.

49

(a) Banks' Evidence of Debt. Each Bank may maintain on its internal records an account or accounts evidencing the Obligations of each Borrower to such Bank, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on such Borrower, absent manifest error; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect any Bank's Revolving Commitments or such Borrower's Obligations in respect of any applicable Loans; and provided further, in the event of any inconsistency between the Register and any Bank's records, the recordations in the Register shall govern.

(b) Register. The Administrative Agent may maintain at its Principal Office a register for the recordation of the names and addresses of Banks and the Revolving Commitments and Loans of each Bank from time to time (the "Register"). The Administrative Agent may record in the Register the Revolving Commitments and the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on such Borrower and each Bank, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Bank's Revolving Commitments or such Borrower's Obligations in respect of any Loan. Each Borrower hereby designates the Administrative Agent to serve as each Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.7, and each Borrower hereby agrees that, to the extent the Administrative Agent serves in such capacity, the Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c) Notes. If so requested by any Bank by written notice to Xerium (with a copy to the Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, each Borrower shall execute and deliver to such Bank (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Bank pursuant to Section 10.7) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Xerium's receipt of such notice) a promissory note or promissory notes, in a form reasonably acceptable to the Administrative Agent and Xerium, to evidence such Bank's Term Loans or Revolving Loans, as the case may be.

### 2.8 Interest on Loans.

(a) Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i) if a LIBOR Loan, at the LIBOR Rate plus the Applicable Margin; or

50

(ii) if an ABR Loan, at the Alternate Base Rate plus the Applicable Margin.

(b) The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any LIBOR Loan, shall be selected by each Borrower and notified to the Administrative Agent and Banks pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to the Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then such Loan will automatically convert into an ABR Loan.

(c) In connection with LIBOR Loans there shall be no more than six (6) Interest Periods in the aggregate outstanding at any time. In the event a Borrower fails to specify between an ABR Loan or a LIBOR Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a LIBOR Loan) will be automatically continued as a LIBOR Loan with an Interest Period of one month beginning on the last day of the then-current Interest Period for such Loan), or (if outstanding as an ABR Loan) will be automatically continued as an ABR Loan, or (if not then outstanding) will be automatically made as a LIBOR Loan with an Interest Period of one month. In the event a Borrower fails to specify an Interest Period for any LIBOR Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Borrower shall be deemed to have selected an Interest Period of one month. As soon as practicable after 11:00 a.m. (London time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to each Borrower and each Bank.

(d) Interest payable pursuant to Section 2.8(a) and any other interest, commission or fee accruing under a Credit Document (other than interest payable pursuant to Section 2.8(a)(ii)) will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days. Interest payable pursuant to Section 2.6(a)(ii) will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 or 366 days, as appropriate, when determined by reference to clause (a) of the definition of "Alternate Base Rate", and a year of 360 days at all other times. For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid under a Credit Document or in connection therewith is to be calculated on the basis of any period of time that is less than a calendar year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided

51

by 360 or 365 days, as applicable to such interest or fee pursuant to such Credit Document. The rates of interest hereunder are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation hereunder.

(e) Except as otherwise set forth herein, interest on each Loan shall be payable in arrears on and to (i) each Interest Payment Date applicable to that Loan; (ii) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity, and on the Revolving Commitment Termination Date and the Term Loan Maturity Date.

(f) Xerium agrees to pay to the Issuing Bank, with respect to drawings honored under any Revolving Letter of Credit, interest on the amount paid by the Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of Xerium at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Revolving Loans that are LIBOR Loans, or ABR Loans, and (ii) thereafter, to the extent permitted by applicable law, a rate which is 2% per annum in excess of the rate of interest otherwise payable hereunder with respect to Revolving Loans that are LIBOR Loans or ABR Loans.

(g) Interest payable pursuant to Section 2.8(f) shall be computed on the basis of a 365/366 day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Revolving Letter of Credit is reimbursed in full. Promptly upon receipt by the Issuing Bank of any payment of interest pursuant to Section 2.8(f), the Issuing Bank shall distribute to each Revolving Bank, out of the interest received by the Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which the Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Revolving Loans), the amount that such Revolving Bank would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Revolving Letter of Credit for such period if no drawing had been honored under such Revolving Letter of Credit. In the event the Issuing Bank shall have been reimbursed (other than with the proceeds of a Revolving Loan) by Revolving Banks for all or any portion of such honored drawing, Issuing Bank shall distribute to each Revolving Bank which has paid all amounts payable by it under Section 2.4(f) with respect to such honored drawing such Revolving Bank's Pro Rata Share of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by Revolving Banks for the period from the date on which the Issuing Bank was so reimbursed by Revolving Banks to but excluding the date on which such portion of such honored drawing is reimbursed by the applicable Borrower.

52

(h) For purposes of disclosure pursuant to the Interest Act (Canada), the annual rates of interest or fees to which the rates of interest or fees provided in this Agreement and the other Credit Documents (and stated herein or therein, as applicable, to be computed on the basis of a three hundred sixty (360) day year or any other period of time less than a calendar year) are equivalent to the rates so determined multiplied by the actual number of days in the applicable calendar year and divided by three hundred sixty (360) or such other period of time, respectively.

(i) If any provision of this Agreement or any other Credit Document would obligate Xerium Canada to make any payment of interest or other amount payable to (including for the account of) any Bank in an amount, or calculated at a rate, that would be prohibited by law or would result in a receipt by such Bank of interest at a criminal rate (as such terms are construed under the Criminal Code (Canada)) then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by such Bank of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (A) first, by reducing the amount or rate of interest required to be paid to such Bank; and (B) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to such Bank that would constitute interest for purposes of Section 347 of the Criminal Code (Canada). Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if a Bank shall have received an amount in excess of the maximum amount permitted by that section of the Criminal Code (Canada), then Xerium Canada shall be entitled, by notice in writing to such Bank, to obtain reimbursement from such Bank in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by such Bank to Xerium Canada. Any amount or rate of interest referred to in this section with respect to the Non-US Obligations shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the Non-US Obligations remain outstanding on the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the Criminal Code (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the Revolving Commitment Period and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by Agent shall be conclusive for the purposes of such determination.

(j) Notwithstanding any provision to the contrary contained in this Agreement, in no event shall the aggregate "interest" (as defined in Section 347 of the Criminal Code, Revised Statutes of Canada, 1985, c. 46 as the same may be amended, replaced or re-enacted from time to time) payable under this Agreement exceed the effective annual rate of interest on the "credit advanced" (as defined in that section) under this Agreement lawfully permitted under that section and, if any payment, collection or demand pursuant to this Agreement in respect of

53

"interest" (as defined in that section) is determined to be contrary to the provisions of that section, such payment, collection or demand shall be deemed to have been made by mutual mistake of Xerium Canada and the Banks and the amount of such payment or collection shall be refunded to Xerium Canada. For the purposes of this Agreement, the effective annual rate of interest shall be determined in accordance with generally accepted actuarial practices and principles over the term of a Loan made to Xerium Canada on the basis of annual compounding of the lawfully permitted rate of interest and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent will be conclusive for the purposes of such determination.

(k) Notwithstanding any other provisions contained herein, if the remuneration stated to be applicable under this Agreement would cause a breach of Law n. 108/1996 and Law n. 24/2001 ("**Italian Usury Law**"), then the remuneration payable by any Borrower organized under the laws of the Republic of Italy under this Agreement (including fees and expenses which would be considered as interest for the purpose of Italian Usury Law) shall be capped to the maximum rate permitted to be payable under Italian Usury Law.

### 2.9 Conversion/Continuation.

(a) Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, each Borrower shall have the option:

(i) to convert at any time all or any part of any Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a LIBOR Loan may only be converted on the expiration of the Interest Period applicable to such LIBOR Loan unless the Borrower shall pay all amounts due under Section 2.15 in connection with any such conversion; or

(ii) upon the expiration of any Interest Period applicable to any LIBOR Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $250,000 in excess of that amount as a LIBOR Loan.

(b) Such Borrower shall deliver a Conversion/Continuation Notice to the Administrative Agent no later than noon (New York City time) on the date of the proposed conversion date (in the case of a conversion to an ABR Loan) and at least three (3) Business Days in advance of the proposed Conversion/Continuation Date (in the case of a conversion to, or a continuation of, a LIBOR Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any LIBOR Loans (or telephonic notice in lieu thereof) shall be irrevocable and such Borrower shall be bound to effect a conversion or continuation in accordance therewith.

54

(c) Notwithstanding anything to the contrary in the foregoing, no conversion in whole or in part to a LIBOR Loan shall be permitted at any time at which (i) a Default or Event of Default shall have occurred and be continuing or (ii) the continuation of, or conversion into, a LIBOR Loan would violate any provision of Sections 2.15 or 2.16.

(d) If a Default or Event of Default shall have occurred and be continuing, LIBOR Loans shall automatically convert to ABR Loans upon the expiration of the Interest Period applicable thereto.

2.10 **Default Interest.** Notwithstanding anything to the contrary in Section 2.9, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand, at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable under this Agreement for ABR Loans). Payment or acceptance of the increased rates of interest provided for in this Section 2.10 is not a permitted alternative to timely payment and shall not constitute a waiver of any Default or Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Bank.

2.11 **Fees**

(a) The Borrowers agree to pay to Banks having:

(i) Revolving Exposure (A) commitment fees equal to (1) the average daily Unused Revolving Commitment times (2) the Applicable Revolving Commitment Fee Percentage; (B) letter of credit fees equal to (1) the Applicable Margin for Revolving Loans that are LIBOR Loans, times (2) the average aggregate daily maximum amount available to be drawn under all such Letters of Credit (regardless of whether any conditions for drawing could then be met and determined as of the close of business on any date of determination) and (C) an upfront fee equal to 2.00% times the aggregate amount of the Revolving Commitments;

(ii) Term Loan Exposure an upfront fee equal to 1.50% times the aggregate amount of the Term Loan Commitments; and

(iii) All fees referred to in this Section 2.11(a) shall be paid in Cash in Dollars to the Administrative Agent at its Principal Office and upon receipt, the Administrative Agent shall promptly distribute to each Revolving Bank (in the case of the fees set forth in Section 2.11(a)(i)) and to each Term Loan

55

Bank (in the case of the fees set forth in Section 2.11(a)(ii) its Pro Rata Share thereof.

(b) The Borrower agrees to pay directly to the Issuing Bank, for its own account, the following fees:

(i) a fronting fee equal to 0.25%, per annum, times the average aggregate daily amount available to be drawn under all Letters of Credit (determined as of the close of business on any date of determination); and

(ii) such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(c) The fees referred to in Section 2.11(a)(i)(A), 2.11(a)(i)(B) and in 2.11(b)(i) shall be calculated on the basis of a 360 day year and the actual number of days elapsed and shall be payable in arrears on the 15th day of each March, June, September and December during the Revolving Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Termination Date. The fees referred to in Sections 2.11(a)(i)(C) and 2.11(a)(ii) shall be payable on the Closing Date.

(d) In addition to any of the foregoing fees, the Borrower agrees to pay to the Agents and the Lead Arranger such other fees in the amounts and at the times separately agreed upon.

2.12 Scheduled Payments. Each Borrower shall make principal payments on its respective Term Loans in installments in amounts as set forth below and on the dates set forth below:

| Borrower:<br>Payment Date:[1] | Xerium | XTI | Germany Holdings | Huyck Austria | Italia SpA | Xerium Canada |
|---|---|---|---|---|---|---|
| 09/15/2010 | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| 12/15/2010 | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |

[1] 1.00% annual amortization on the Term Loans, with the balance paid on the Term Loan Maturity Date. Amounts and final payment date to be inserted prior to Closing Date, once the Closing Date is determined.

56

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/15/2011 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 06/15/2011 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 09/15/2011 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 12/15/2011 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 03/15/2012 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 06/15/2012 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 09/15/2012 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 12/15/2012 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 03/15/2013 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 06/15/2013 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 09/15/2013 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 12/15/2013 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 03/15/2014 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 06/15/2014 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 09/15/2014 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |
| 12/15/2014 | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] | [ | ] |

All scheduled payments required to be made pursuant to this Section 2.12 shall be applied in accordance with Section 2.15(d).

2.13 **Voluntary Prepayments/Commitment Reductions.**

(a) Voluntary Prepayments.

(i) Any time and from time to time, each Borrower may prepay any Loans on any Business Day in whole or in part in an aggregate minimum principal amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii) All such prepayments shall be made upon not less than three (3) Business Days' prior written or telephonic notice (in the case of LIBOR Loans) or upon not less than one Business Days' prior written or telephonic notice (in the case of ABR Loans), in each case given to the Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to the Administrative Agent (and the Administrative Agent will promptly transmit such telephonic or original notice by telefacsimile or telephone to each Bank). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.15(a).

(b) Voluntary Commitment Reductions.

(i) Xerium may, upon not less than three (3) Business Days' prior written or telephonic notice confirmed in writing to the Administrative Agent (which original written or telephonic notice the Administrative Agent will promptly transmit by telefacsimile or telephone to each applicable Bank), at

57

any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the outstanding principal amount of the Revolving Loans at the time of such proposed termination or reduction; provided, any such partial reduction of the Revolving Commitments shall be in an aggregate minimum principal amount of $1,000,000 and integral multiples of $250,000 in excess of that amount.

(ii) Xerium's notice to the Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in Xerium's notice and shall reduce the applicable Revolving Commitment of each Bank proportionately to its Pro Rata Share thereof.

## 2.14 **Mandatory Prepayments/Commitment Reductions.**

(a) <u>Asset Sales</u>. Subject to the sharing provisions set forth in Section 4.1(b) of the Intercreditor Agreement, no later than the fifth Business Day following the date of receipt by Xerium or any of its Subsidiaries of aggregate Net Asset Sale Proceeds in excess of $250,000, each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an amount of such Net Asset Sale Proceeds; <u>provided</u> that, subject to the sharing provisions set forth in Section 4.1(b) of the Intercreditor Agreement, with respect to the Australia Asset Sales and the Vietnam Asset Sales, each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced in an aggregate amount equal to only 50% of such Net Asset Sale Proceeds; <u>provided further</u>, so long as no Default or Event of Default shall have occurred and be continuing, the Borrowers shall have the option, directly or through one or more of its Subsidiaries, to invest up to $3,000,000 in the aggregate of Net Asset Sale Proceeds of Asset Sales (excluding Australia Asset Sales and Vietnam Asset Sales) consummated after the Closing Date, in one transaction or a series of transactions, within three hundred and sixty (360) days of receipt thereof in long term productive assets of the general type used in the business of Xerium and its Subsidiaries, which assets need not be of the same type as the assets sold or otherwise disposed of to generate such Net Asset Sale Proceeds; <u>provided, further</u>, pending any such investment all such Net Asset Sale Proceeds shall be deposited in the Cash Collateral Account.

(b) <u>Insurance/Condemnation Proceeds</u>. Subject to the sharing provisions set forth in Section 4.1(b) of the Intercreditor Agreement, no later than the second Business Day following the date of receipt by Xerium or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds (but not including the first $2,000,000 of Net Insurance/Condemnation Proceeds in the aggregate received after the Closing Date), each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate

58

amount equal to such Net Insurance/Condemnation Proceeds; provided, so long as no Default or Event of Default shall have occurred and be continuing, each Borrower shall have the option, directly or through one or more of its Subsidiaries to commit to invest within one hundred eighty (180) days and invest such Net Insurance/Condemnation Proceeds within three hundred sixty (360) days of receipt thereof in the acquisition of long term productive assets of the general type used in the business of Xerium and its Subsidiaries, which assets need not be the same as the assets lost or damaged and which Net Insurance/Condemnation Proceeds may, but need not, be invested in the repair, restoration or replacement of the applicable assets thereof; provided further, pending any such investment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be deposited in the Cash Collateral Account.

(c) Revolving Loans. Xerium shall from time to time prepay the Revolving Loans to the extent necessary so that the Total Utilization of Revolving Commitments shall not at any time exceed the Revolving Commitments then in effect.

(d) Issuance of Debt. No later than the second Business Day following the date of receipt by Xerium or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Xerium or any of its Subsidiaries not permitted pursuant to Section 6.1, each Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e) Excess Cash. Subject to the sharing provisions of Section 4.1(b) of the Intercreditor Agreement in the event that there shall be Excess Cash for any Fiscal Year (commencing with Fiscal Year 2011), each Borrower shall, no later than 90 days after the end of such Fiscal Year, prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.15(b) in an aggregate amount equal to the remainder of (i) 50% of such Excess Cash for such Fiscal Year minus (ii) the amount of voluntary prepayments of the Term Loan during such Fiscal Year and the amount of voluntary prepayments of Revolving Loans which are accompanied by a reduction of the Revolving Commitments during such Fiscal Year.

(f) Prepayment Certificate. Concurrently with any prepayment of the Loans and/or the Revolving Commitments shall be permanently reduced pursuant to Sections 2.14(a) through 2.14(e), each Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds or Excess Cash, as the case may be; provided, if such officer's certificate is subsequently determined to be inaccurate, such Authorized Officer (or such Authorized Officer's successor) must deliver a new certificate setting forth in detail the adjustments necessary to make the prior certificate accurate in all respects. In the event that a Borrower

59

shall subsequently determine that the actual amount exceeded the amount set forth in such certificate, each Borrower shall promptly make an additional prepayment of the Loans and/or the Revolving Commitments shall be permanently reduced in an amount equal to such excess, and such Borrower shall concurrently therewith deliver to Administrative Agent the certificate as set forth above in this Section 2.14(f).

(g) Notification of Mandatory Prepayment. Xerium shall notify the Administrative Agent of the amount and date of any mandatory prepayment not less than five (5) Business Days prior to the date of such mandatory prepayment, in accordance with Section 2.15(c).

## 2.15 Application of Prepayments/Reductions/Scheduled Payments.

(a) Application of Voluntary Prepayments. Any prepayment of any Loan pursuant to Section 2.13(a) shall be applied, at a Borrower's sole discretion, to prepay Revolving Loans or the Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(b) Application of Mandatory Prepayments. Any amount required to be paid pursuant to Sections 2.14(a), (b), (d) and (e) shall be applied as follows:

*first*, to prepay the Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) to the full extent thereof;

*second*, to prepay the Revolving Loans on a pro rata basis to the full extent thereof and to further permanently reduce the Revolving Commitments by the amount of such prepayment; and

*third*, to further permanently reduce the Revolving Commitments to the full extent thereof.

(c) Waivable Mandatory Prepayment. Anything contained herein to the contrary notwithstanding, so long as any Term Loans are outstanding, in the event a Borrower is required to make any mandatory prepayment (a **"Waivable Mandatory Prepayment"**) of the Term Loans, not less than five (5) Business Days prior to the date (the **"Required Prepayment Date"**) on which such Borrower is required to make such Waivable Mandatory Prepayment, such Borrower shall notify Administrative Agent of the amount and date of such prepayment, and Administrative Agent will promptly thereafter notify each Bank holding an outstanding Term Loan of the amount of such Bank's Pro Rata Share of such Waivable Mandatory Prepayment and such Bank's option to refuse such amount. Each such Bank may exercise such option by giving written notice to such Borrower and Administrative Agent of its election to do so on or before the first Business Day prior to the Required Prepayment Date (it being understood that any Bank which does not notify such Borrower and Administrative Agent of its election to exercise such option on or before the first Business Day prior to the

60

Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Required Prepayment Date, such Borrower shall pay to Administrative Agent the amount of the Waivable Mandatory Prepayment, which amount shall be applied in accordance with Section 2.15(b) (except prepayments of the Term Loans shall only be applied to the Term Loans of such Banks that have elected not to exercise such option).

(d) Application of Scheduled Payments. Any amount required to be paid pursuant to Section 2.12 shall be applied to pay the applicable Term Loans, on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

## 2.16 General Provisions Regarding Payments.

(a) Except as otherwise provided in Section 2.20, all payments by each Borrower of principal, interest, fees and other Obligations shall be made in Dollars and in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at the Administrative Agent's Principal Office for the account of the Banks; funds received by the Administrative Agent after that time on such due date shall be deemed to have been paid by such Borrower on the next succeeding Business Day.

(b) All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

(c) The Administrative Agent shall promptly distribute to each Bank at such address as such Bank shall indicate in writing, such Bank's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by the Administrative Agent.

(d) Subject to the provisos set forth in the definition of "Interest Period", whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

(e) Each Borrower hereby authorizes the Administrative Agent to charge such Borrower's accounts with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

61

(f) The Administrative Agent shall deem any payment by or on behalf of each Borrower hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by the Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. The Administrative Agent shall give prompt telephonic notice to such Borrower and each applicable Bank (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.10 from the date such amount was due and payable until the date such amount is paid in full.

(g) If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1, all payments or proceeds received by any Agents hereunder in respect of any of the Obligations (except as expressly provided elsewhere in a Credit Document), shall be forwarded to the Administrative Agent and applied in full or in part by the Administrative Agent against, the Obligations in the following order of priority: *first*, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to the Administrative Agent and Collateral Agent and their agents and counsel, and all other expenses, liabilities and advances made or incurred by the Administrative Agent or Collateral Agent in connection therewith, and all amounts for which the Administrative Agent or Collateral Agent is entitled to indemnification hereunder (each in its capacity as the Administrative Agent or Collateral Agent, and not as a Bank) and all advances made by the Administrative Agent or Collateral Agent hereunder for the account of the applicable Credit Party, and to the payment of all costs and expenses paid or incurred by the Administrative Agent or Collateral Agent in connection with the exercise of any right or remedy hereunder or under any Credit Document, all in accordance with the terms hereof or thereof; *second*, to the extent of any excess of such proceeds, to the payment of all other Obligations for the ratable benefit of the Banks and the Bank Counterparties; and *third*, to the extent of any excess of such proceeds, to the payment to or upon the order of such Credit Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

2.17 **Ratable Sharing**. The Banks hereby agree among themselves that, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under

62

the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to such Bank hereunder or under the other Credit Documents (collectively, the **"Aggregate Amounts Due"** to such Bank) which is greater than the proportion received by any other Bank in respect of the Aggregate Amounts Due to such other Bank, then the Bank receiving such proportionately greater payment shall (a) notify the Administrative Agent and each other Bank of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Banks so that all such recoveries of Aggregate Amounts Due shall be shared by all Banks in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Bank is thereafter recovered from such Bank upon the bankruptcy or reorganization of such Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Bank ratably to the extent of such recovery, but without interest. Each Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by each Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

## 2.18 **Making or Maintaining LIBOR Loans.**

(a) Inability to Determine Applicable Interest Rate. In the event that the Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Loans, that by reasons of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Loans on the basis provided for in the definition of LIBOR Rate, the Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to such Borrower and each Bank of such determination, whereupon (i) no Loans may be made as, or converted to, LIBOR Loans until such time as the Administrative Agent notifies such Borrower and Banks that the circumstances giving rise to such notice no longer exist, (ii) any Funding Notice or Conversion/Continuation Notice given by such Borrower with respect to the LIBOR Loans in respect of which such determination was made shall be deemed to be rescinded by such Borrower and (iii) the interest rate applicable to such LIBOR Loans shall be the Alternate Base Rate until such time as the Administrative Agent notifies such Borrower and Banks that the circumstances giving rise to such notice no longer exist.

(b) Illegality or Impracticability of LIBOR Loans. In the event that on any date any Bank shall have determined (which determination shall be

63

final and conclusive and binding upon all parties hereto but shall be made only after consultation with such Borrower and the Administrative Agent) that the making, maintaining or continuation of all or any of its Loans, (i) has become unlawful as a result of compliance by such Bank in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Bank in that market, then, and in any such event, such Bank shall be an "Affected Bank" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to each Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Bank). Thereafter (1) the Revolving Commitments and obligation of the Affected Bank to make or maintain Loans as, or to convert Loans to, LIBOR Loans shall be suspended until such notice shall be withdrawn by the Affected Bank, (2) to the extent such determination by the Affected Bank relates to a LIBOR Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Bank shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) an ABR Loan, (3) the Affected Bank's obligation to maintain its outstanding LIBOR Loans (the "Affected Loans") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the interest rate applicable to such Affected Loans shall be the Alternate Base Rate, provided the Affected Bank shall make commercially reasonable efforts to assign the Affected Loans according to Section 10.7. Notwithstanding the foregoing, to the extent a determination by an Affected Bank as described above relates to a LIBOR Loan then being requested by a Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, such Borrower shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Banks by giving notice (by telefacsimile or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Bank gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Bank). Except as provided in the immediately preceding sentence, nothing in this Section 2.18(b) shall affect the obligation of any Bank other than an Affected Bank to make or maintain Loans as, or to convert Loans to, LIBOR Loans in accordance with the terms hereof.

(c) Compensation for Breakage or Non-Commencement of Interest Periods. Each Borrower shall compensate each Bank, upon written request by such Bank to the Administrative Agent within five (5) Business Days after the applicable event (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Bank to banks of funds borrowed by it to make or carry its LIBOR Loans and any loss, expense or liability sustained by such Bank in connection

64

with the liquidation or re employment of such funds but excluding loss of anticipated profits) which such Bank may sustain: (i) if for any reason (other than a default by such Bank) a borrowing of any LIBOR Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing or a conversion or continuation of any LIBOR Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any conversion or any prepayment or other principal payment occurs on a date prior to the last day of an Interest Period applicable to that LIBOR Loan (including, without limitation, pursuant to Section 2.18(b) hereof); or (iii) if any prepayment of any of its LIBOR Loans is not made on any date specified in a notice of prepayment given by such Borrower.

(d) Booking of LIBOR Loans. Any Bank may make, carry or transfer LIBOR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Bank.

(e) Assumptions Concerning Funding of LIBOR Loans. Calculation of all amounts payable to a Bank under this Section 2.18 and under Section 2.19 shall be made as though such Bank had actually funded each of its relevant LIBOR Loans through the purchase of a LIBOR deposit bearing interest at the rate in an amount equal to the amount of such LIBOR Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such LIBOR deposit from an offshore office of such Bank to a domestic office of such Bank in the United States of America; provided, however, each Bank may fund each of its LIBOR Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.18 and under Section 2.19.

## 2.19 Increased Costs; Capital Adequacy.

(a) Compensation For Increased Costs and Taxes. Subject to the provisions of Section 2.20 (which shall be controlling with respect to the matters covered thereby), in the event that any Bank (which term shall include the Issuing Bank for purposes of this Section 2.19(a)) shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Bank with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi governmental authority (whether or not having the force of law): (i) subjects such Bank (or its applicable lending office) to any additional Tax (other than (A) any Tax on the overall net income of such Bank or its applicable lending office or (B) any Tax imposed as a result of the Administrative Agent's or any Bank's (including the Issuing Bank's)

65

failure to satisfy the applicable requirements as set forth in any statute enacted (or regulation or administrative guidance promulgated thereunder) after the date hereof that is based on, or similar to, Subtitle A - Foreign Account Tax Compliance of H.R. 2847, as passed by the United States House of Representatives on March 4, 2010 ((A) and (B), collectively, "**Excluded Taxes**")) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Bank (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Bank (other than any such reserve or other requirements with respect to LIBOR Loans); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Bank (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Bank of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Bank (or its applicable lending office) with respect thereto; then, in any such case, such Borrower shall promptly pay to such Bank, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Bank in its sole discretion shall determine) as may be necessary to compensate such Bank for any such increased cost or reduction in amounts received or receivable hereunder. Such Bank shall deliver to such Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Bank under this Section 2.19(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b) Capital Adequacy Adjustment. In the event that any Bank (which term shall include the Issuing Bank for purposes of this Section 2.19(b)) shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Bank (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Bank or any corporation controlling such Bank as a consequence of, or with reference to, such Bank's Loans or Revolving Commitments or Letters of Credit, or participations therein or other obligations hereunder with respect to the Loans or the Letters of Credit to a level below that which such Bank or such controlling corporation could have achieved but for such adoption, effectiveness, phase in,

66

applicability, change or compliance (taking into consideration the policies of such Bank or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by such Borrower from such Bank of the statement referred to in the next sentence, such Borrower shall pay to such Bank such additional amount or amounts as will compensate such Bank or such controlling corporation on an after tax basis for such reduction. Such Bank shall deliver to such Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Bank under this Section 2.19(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

### 2.20 Taxes; Withholding, etc.

(a) Payments to Be Free and Clear. All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than any Excluded Taxes) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment (such Taxes, "Indemnified Taxes").

(b) Withholding of Taxes. If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any Tax from any sum paid or payable by any Credit Party to the Administrative Agent or any Bank (which term shall include the Issuing Bank for purposes of this Section 2.20(b)) under any of the Credit Documents: (i) each Borrower shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as each Borrower becomes aware of it; (ii) each Borrower shall pay to the appropriate taxing or other authority any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on the Administrative Agent or such Bank, as the case may be) on behalf of and in the name of the Administrative Agent or such Bank; (iii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, (including deductions, withholdings or payments applicable to additional sums payable under this Section 2.20(b)) the Administrative Agent or such Bank, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made in respect of Indemnified Taxes; and (iv) within thirty days after paying any sum from which it is required by law to make any deduction or withholding, and within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay, each Credit Party shall deliver to

67

the Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority. Each Credit Party shall indemnify the Administrative Agent, each Bank and the Issuing Bank, within 10 days after written demand therefor, which demand shall identify in reasonable detail the nature and amount of such Indemnified Taxes (and provide such other evidence thereof as has been received by the Administrative Agent, such Bank or the Issuing Bank, as the case may be), for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Bank or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of such Credit Party hereunder and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to a Credit Party by a Bank or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Bank or the Issuing Bank, shall be conclusive absent manifest error.

(c) Evidence of Exemption From U.S. Withholding Tax. Each Bank that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "Non-US Bank") shall deliver to the Administrative Agent for transmission to Xerium, on or prior to the Closing Date (in the case of each Bank listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Bank (in the case of each other Bank), and at such other times as may be necessary in the determination of Xerium or the Administrative Agent (each in the reasonable exercise of its discretion), (i) two original copies of Internal Revenue Service Form W-8BEN or W-8ECI (or any successor forms), properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by Xerium to establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Bank is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver Internal Revenue Service Form W-8ECI pursuant to clause (i) above, a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by each Borrower to establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents. Each Bank that is a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "US Bank") shall deliver to the Administrative Agent for transmission to Xerium, on or prior to the Closing Date (in the case of each Bank

68

listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Bank (in the case of each other Bank), and at such times as may be necessary in the determination of Xerium or the Administrative Agent (each in the reasonable exercise of its discretion), such other form or forms, certificates or documentation, including two original copies of Internal Revenue Service Form W-9, as reasonably requested by any Borrower to confirm or establish that such Bank is not subject to deduction, withholding, or backup withholding of United States federal income tax with respect to any payments to such Bank of principal, interest, fees or other amounts payable under any of the Credit Documents. Each Bank required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.20(c) hereby agrees, from time to time after the initial delivery by such Bank of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Bank shall promptly deliver to the Administrative Agent for transmission to each Borrower two new original copies of Internal Revenue Service Form W-8BEN or W-8ECI, or a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN (or any successor form), or two new original copies of Internal Revenue Service Form W-9, as the case may be, properly completed and duly executed by such Bank, and such other documentation required under the Internal Revenue Code and reasonably requested by any Borrower to confirm or establish that such Bank is not subject to deduction or withholding of United States federal income tax with respect to payments to such Bank under the Credit Documents, or notify the Administrative Agent and each Borrower of its inability to deliver any such forms, certificates or other evidence. Each Borrower shall not be required to pay any additional amount to any Non-US Bank under Section 2.20(b) if such Bank shall have failed (1) to deliver the forms, certificates or other evidence referred to in the first three sentences of this Section 2.20(c), or (2) to notify the Administrative Agent and each Borrower of its inability to deliver any such forms, certificates or other evidence, as the case may be; provided, if such Bank shall have satisfied the requirements of the first sentence of this Section 2.20(c) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Bank, as applicable, nothing in this last sentence of Section 2.20(c) shall relieve each Borrower of its obligation to pay any additional amounts pursuant to this Section 2.20 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Bank is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Bank is not subject to withholding as described herein.

(d) Withholding or Deduction for or on Account of Non-US Tax. A Credit Party shall not be required to pay any additional amount under Section 2.20(b) if, on the date on which the payment falls due (i) the payment could have been made to the relevant Bank without deduction or withholding for

69

or on account of any Tax imposed by any jurisdiction other than the United States ("**Non-US Tax**") if that Bank was a Qualifying Lender but on that date that Bank is not or has ceased to be a Qualifying Lender (other than where such Bank was a Qualifying Lender on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Bank, as applicable, and has ceased to be a Qualifying Lender as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof); (ii) the relevant Bank is a Treaty Lender and the payment could have been made to the Bank without deduction or withholding for or on account of Non-US Tax had that Bank complied with its obligations under Section 2.20(e) below; or (iii) the relevant Bank is a 991 Bank and has not given a Tax Confirmation to the Administrative Agent (other than by reason of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof after the Closing Date or the date of the Assignment Agreement pursuant to which the relevant Bank became a Bank, as applicable). The provisions of this Section 2.20(d) are subject always to the proviso contained in Section 2.20(c) above.

(e) <u>Completion of Procedural Formalities</u>. A Treaty Lender and each Credit Party which makes a payment to which that Treaty Lender is entitled shall co-operate in completing as soon as reasonably practicable after the Closing Date (or the date of the Assignment Agreement pursuant to which the relevant Bank becomes a Bank, as applicable) any procedural formalities necessary for that Credit Party to obtain authorization to make that payment without deduction or withholding for or on account of Non-US Tax (including for the avoidance of doubt the completion and submission to the Tax authority in the relevant Treaty Lender's country of incorporation (or, if different, its country of residence for the purposes of the relevant double taxation agreement) of appropriate forms and documents that are provided to it by the relevant Credit Party).

(f) <u>Change in Circumstance</u>. A Bank that is a 991 Bank shall promptly notify the Administrative Agent if there is any change in the position from that set out in the Tax Confirmation.

(g) <u>Certain Documents</u>. If any Tax was not correctly or legally asserted, the relevant Bank(s) shall, upon Xerium's reasonable request and at the expense of Xerium, provide such documents to Xerium to enable Xerium to contest such Tax pursuant to appropriate proceedings then available to the relevant Bank(s) (so long as providing such documents shall not, in the good faith determination of the relevant Bank(s) result in any liability to the relevant Bank(s) and doing so is otherwise permitted under applicable law as determined by the relevant Bank(s)).

(h) <u>Withholdings for Certain German Taxes</u>. The provisions of Section 2.20(a) through (g) shall, in addition to all other deductions and withholdings on account of any German Taxes, also apply to deductions and

70

withholdings that are to be made by a Credit Party with respect to any sums payable under the Credit Documents that constitute deemed distributions by a Credit Party. As among the Credit Parties on the one hand and the Administrative Agent and the Banks on the other hand, the Credit Parties shall be responsible for, and effect, the payment of these deductions and withholdings and indemnify the Administrative Agent and the Banks against any sums paid or damages incurred as a result of being required to make the respective payments; Section 2.20(b) shall in such event apply, *mutatis mutandis*.

2.21 **Obligation to Mitigate.** Each Bank (which term shall include Issuing Bank for purposes of this Section 2.21) agrees that, as promptly as practicable after the officer of such Bank responsible for administering its Loans or Letters of Credit, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would cause such Bank to become an Affected Bank or that would entitle such Bank to receive payments under Sections 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Bank and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Bank, or (b) take such other measures as such Bank may deem reasonable, if as a result thereof the circumstances which would cause such Bank to be an Affected Bank would cease to exist or the additional amounts which would otherwise be required to be paid to such Bank pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Bank in its sole discretion, the making, issuing, funding or maintaining of such Revolving Commitments, Loans or Letters of Credit through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Revolving Commitments, Loans or Letters of Credit or the interests of such Bank; provided, such Bank will not be obligated to utilize such other office pursuant to this Section 2.21 unless each Borrower agrees to pay all incremental expenses incurred by such Bank as a result of utilizing such other office as described in clause (a) above. A certificate as to the amount of any such expenses payable by each Borrower pursuant to this Section 2.21 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Bank to such Borrower (with a copy to the Administrative Agent) shall be conclusive absent manifest error.

2.22 **Tax Credit.** If a Credit Party pays any additional amount under Section 2.20(b) and the relevant Bank (or the Administrative Agent, as the case may be) determines in its sole discretion that (a) a Tax Credit is attributable either to an increased payment of which that additional amount forms part, or to that additional amount and (b) that Bank (or the Administrative Agent, as the case may be) has obtained, utilized and retained that Tax Credit, the Bank (or the Administrative Agent, as the case may be) shall, to the extent that it can do so without prejudice to the retention of the Tax Credit, pay an amount to the Credit Party which that Credit Party determines in its absolute discretion but in good faith will leave it (after that payment) in the same after-Tax position as it would have been in had the additional amount not been required to be paid by the Credit

71

Party. Nothing herein contained shall interfere with the right of any Bank (or the Administrative Agent, as the case may be) to arrange its affairs in whatever manner it thinks fit and, in particular, no Bank (or the Administrative Agent, as the case may be) shall be under any obligation to claim a Tax Credit on its corporate profits or otherwise, or to claim such relief in priority to any other claims, reliefs, credits or deductions available to it or to disclose details of its affairs. Any amount to be paid by a bank pursuant to this Section 2.22 shall be made promptly on the date of receipt of the relevant Tax Credit by such Bank(or the Administrative Agent, as the case may be) or, if later, on the last date on which the applicable taxation authority would be able in accordance with applicable law to reclaim or reduce such Tax Credit.

## 2.23 Defaulting Banks

(a) Effect on Letter of Credit Exposure. If a Bank becomes, and during the period it remains, a Defaulting Bank, the following provisions shall apply with respect to such Defaulting Bank's Letter of Credit Exposure:

(i) subject to the limitation in the first proviso below, the Letter of Credit Exposure of such Defaulting Bank shall automatically be reallocated (effective on the day such Bank becomes a Defaulting Bank) among the Non-Defaulting Bank's pro rata in accordance with their respective Revolving Commitments; provided that (A) the sum of (x) the amount of each Defaulting Bank's pro rata share of such Defaulting Bank's Letter of Credit Exposure, plus (y) the principal amount of such Non-Defaulting Bank's outstanding Revolving Loans at the time of such reallocation, plus (z) such Non-Defaulting Bank's Pro Rata Share of the Letter of Credit Exposure as in effect immediately prior to such reallocation may not exceed the Revolving Commitment of such Non-Defaulting Bank as in effect at the time of such reallocation, and (B) neither such reallocation nor any payment by a Non-Defaulting Bank pursuant thereto will constitute a waiver or release of any claim the Borrowers, the Administrative Agent, the Issuing Bank or any other Bank may have against such Defaulting Bank or cause such Defaulting Bank to be a Non-Defaulting Bank;

(ii) to the extent that any portion of such Defaulting Bank's Letter of Credit Exposure cannot be so reallocated (the **"Unreallocated Portion"**), whether by reason of the first proviso in clause (i) above or otherwise, the Borrowers will, not later than two (2) Business Days after demand by the Administrative Agent (at the direction of the Issuing Bank) (A) Cash Collateralize the obligations of the Borrowers to the Issuing Bank in respect of such Letter of Credit Exposure in an amount at least equal to the aggregate amount of the Unreallocated Portion of such Letter of Credit Exposure, or (B) make other arrangements satisfactory to the Administrative Agent and to the Issuing Bank in their sole discretion to protect them against the risk of non-payment by such Defaulting Bank; and

72

(iii) any amount paid by the Borrowers for the account of a Defaulting Bank under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Bank, but will instead be retained by the Administrative Agent in a segregated, non-interest bearing account until (subject to Section 2.23(e)) the termination of the Revolving Commitments and payment in full of all Secured Obligations, and will be applied by the Administrative Agent, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority: first, to the payment of any amounts owing by such Defaulting Bank to the Administrative Agent under this Agreement; second, to the payment of any amounts owing by such Defaulting Bank to the Issuing Bank under this Agreement (ratably in accordance with the amounts owing to the Issuing Bank); third, to the payment of post-default interest and then current interest due and payable to the Non-Defaulting Banks, ratably among them in accordance with the amounts of such interest then due and payable to them; fourth, to the payment of fees then due and payable to the Non-Defaulting Banks hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them; fifth, to pay principal and Unpaid Drawings under Revolving Letters of Credit honored by the Issuing Bank then due and payable to the Non-Defaulting Banks hereunder ratably in accordance with the amounts thereof then due and payable to them; sixth, to the ratable payment of other amounts then due and payable to the Non-Defaulting Banks; and seventh, after the termination of the Revolving Commitments and payment in full of all Revolving Loans or any other Obligations of any Loan Party under the Credit Documents, to pay amounts owing under this Agreement to such Defaulting Bank or as a court of competent jurisdiction may otherwise direct.

(b) Authorization to Give Funding Notices. In furtherance of the foregoing, if any Bank becomes, and during the period it remains, a Defaulting Bank or a Potential Defaulting Bank, the Issuing Bank is hereby authorized by the Borrowers (which authorization is irrevocable and coupled with an interest) to give, in its discretion, through the Administrative Agent, Funding Notices pursuant to Section 2.2(b) in such amounts and in such times as may be required to (i) reimburse amounts representing Unpaid Drawings under Revolving Letters of Credit honored by the Issuing Bank and/or (ii) Cash Collateralize the obligations of the Borrowers in respect of outstanding Revolving Letters of Credit in an amount at least equal to the aggregate amount of the obligations (contingent or otherwise) of such Defaulting Bank or Potential Defaulting Bank in respect of such Revolving Letters of Credit.

(c) No Fees. Anything herein to the contrary notwithstanding, during such period as a Bank is a Defaulting Bank, such Defaulting Bank will not be entitled to any fees accruing during such period pursuant to Section 2.11(a)(i)(A) and 2.11(a)(i)(B) (without prejudice to the rights of the Banks other than Defaulting Banks in respect of such fees); provided that (a) to the extent that a portion of the Letter of Credit Exposure of such Defaulting Bank

73

is reallocated to the Non-Defaulting Banks pursuant to Section 2.23(a)(i), such fees that would have accrued for the benefit of such Defaulting Bank will instead accrue for the benefit of and be payable to such Non-Defaulting Banks, pro rata in accordance with their respective Revolving Commitments, and (b) to the extent any portion of such Letter of Credit Exposure cannot be so reallocated, such fees will instead accrue for the benefit of and be payable to the Issuing Bank as its interests appear (and the pro rata payment provisions of Section 2.17 will automatically be deemed adjusted to reflect the provisions of this Section).

(d) <u>Termination of Commitment</u>. The Borrowers may terminate the unused amount of the Revolving Commitment of a Defaulting Bank upon not less than three (3) Business Days' prior notice to the Administrative Agent (which will promptly notify the Banks thereof), and in such event the provisions of Section 2.16(g) will apply to all amounts thereafter paid by the Borrowers for the account of such Defaulting Bank under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts); <u>provided</u> that such termination will not be deemed to be a waiver or release of any claim the Borrowers, the Administrative Agent, the Issuing Bank or any Bank may have against such Defaulting Bank.

(e) <u>Reinstatement</u>. If the Borrowers, the Administrative Agent and the Issuing Bank agree in writing in their discretion that a Bank that is a Defaulting Bank or a Potential Defaulting Bank should no longer be deemed to be a Defaulting Bank or Potential Defaulting Bank, as the case may be, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Bank will, to the extent applicable, purchase such portion of outstanding Loans of the other Banks and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Exposure of the Banks to be based upon their respective Pro Rata Shares, whereupon such Bank will cease to be a Defaulting Bank or Potential Defaulting Bank and will be a Non-Defaulting Bank (and the Revolving Exposure will automatically be adjusted on a prospective basis to reflect the foregoing); <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Bank was a Defaulting Bank; and <u>provided further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Bank or Potential Defaulting Bank to Non-Defaulting Bank will constitute a waiver or release of any claim of any party hereunder arising from such Bank's having been a Defaulting Bank or Potential Defaulting Bank.

2.24 **Removal or Replacement of a Bank**. Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Bank (an **"Increased Cost Bank"**) shall give notice to each Borrower that such Bank is an Affected Bank or that such Bank is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Bank to be an Affected Bank or which entitle such Bank to receive such payments shall remain

74

in effect, and (iii) such Bank shall fail to withdraw such notice within five Business Days after a Borrower's request for such withdrawal; (b) any Bank is a Defaulting Bank; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.6(b), the consent of Requisite Banks shall have been obtained but the consent of one or more of such other Banks (each a "Non-Consenting Bank") whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Bank, Defaulting Bank or Non-Consenting Bank (the "Terminated Bank"), a Borrower may, by giving written notice to Administrative Agent and any Terminated Bank of its election to do so, elect to cause such Terminated Bank (and such Terminated Bank hereby irrevocably agrees) to assign its outstanding Loans and its Commitments, if any, in full to one or more Eligible Assignees (each a "Replacement Bank") in accordance with the provisions of Section 10.6 and Xerium shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Bank shall pay to the Terminated Bank an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Bank, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Bank, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Bank pursuant to Section 2.11; (2) on the date of such assignment, each Borrower shall pay any amounts payable to such Terminated Bank pursuant to Section 2.18(c), 2.19 or 2.20 or otherwise as if it were a prepayment; and (3) in the event such Terminated Bank is a Non-Consenting Bank, each Replacement Bank shall consent, at the time of such assignment, to each matter in respect of which such Terminated Bank was a Non-Consenting Bank; provided, a Borrower may not make such election with respect to any Terminated Bank that is also the Issuing Bank unless, prior to the effectiveness of such election, the Borrower shall have caused each outstanding Letter of Credit issued thereby to be cancelled. Upon the prepayment of all amounts owing to any Terminated Bank and the termination of such Terminated Bank's Revolving Commitments, if any, such Terminated Bank shall no longer constitute a "Bank" for purposes hereof; provided, any rights of such Terminated Bank to indemnification hereunder shall survive as to such Terminated Bank.

### 2.25 Joint and Several Liability.

(a) Joint and Several Liability. All Obligations of the Borrowers under this Agreement and the other Credit Documents shall be joint and several Obligations of each Borrower to the extent (i) legally permissible and (ii) local restrictions apply and provided that, without prejudice to the limitations set forth in Section 7.14, none of Italia SpA, Huyck Austria, Xerium Canada, Germany Holdings or any Non-US Guarantor shall be liable for any Obligations of any Borrower organized in the United States. Anything contained in this Agreement and the other Credit Documents to the contrary notwithstanding, the Obligations of each Borrower hereunder shall be limited to a maximum aggregate amount

75

equal to the largest amount that would not render its Obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under § 548 of the Bankruptcy Code, 11 U.S.C. § 548, or any applicable provisions of comparable law of a Governmental Authority (collectively, the "**Fraudulent Transfer Laws**"), in each case after giving effect to all other liabilities of such Borrower, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such Borrower in respect of intercompany Indebtedness to any other Credit Party or Affiliates of any other Credit Party to the extent that such Indebtedness would be discharged in an amount equal to the amount paid by such Credit Party hereunder) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation or contribution of such Borrower pursuant to (i) applicable law or (ii) any agreement providing for an equitable allocation among such Borrower and other Affiliates of any Credit Party of Obligations arising under Guaranties by such parties.

(b) Subrogation. Until the Obligations shall have been paid in full in Cash, each Borrower shall withhold exercise of any right of subrogation, contribution or any other right to enforce any remedy which it now has or may hereafter have against any other Borrower or any other guarantor of the Obligations. Each Borrower further agrees that, to the extent the waiver of its rights of subrogation, contribution and remedies as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any such rights such Borrower may have against any other Borrower, any collateral or security or any such other guarantor, shall be junior and subordinate to any rights Collateral Agent may have against any such other Borrower, any such collateral or security, and any such other guarantor. The Borrowers under this Agreement and the other Credit Documents together desire to allocate among themselves, in a fair and equitable manner, their Obligations arising under this Agreement and the other Credit Documents. Accordingly, in the event any payment or distribution is made on any date by any Borrower under this Agreement and the other Credit Documents (a "**Funding Borrower**") that exceeds its Obligation Fair Share (as defined below) as of such date, that Funding Borrower shall be entitled to a contribution from each of the other Borrowers in the amount of such other Borrowers' Obligation Fair Share Shortfall (as defined below) as of such date, with the result that all such contributions will cause each Borrowers' Obligation Aggregate Payments (as defined below) to equal its Obligation Fair Share as of such date. "**Obligation Fair Share**" means, with respect to a Borrower as of any date of determination, an amount equal to (i) the ratio of (X) the Obligation Fair Share Contribution Amount (as defined below) with respect to such Borrower to (Y) the aggregate of the Obligation Fair Share Contribution Amounts with respect to all the Borrowers, multiplied by (ii) the aggregate amount paid or distributed on or before such date by all Funding Borrowers under this Agreement and the other Credit Documents in respect of the Obligations guarantied. "**Obligation Fair Share Shortfall**" means, with respect to a Borrower as of any date of determination, the excess, if any, of the Obligation Fair Share of such Borrower over the Obligation Aggregate Payments of such Borrower. "**Obligation Fair**

76

Share Contribution Amount" means, with respect to a Borrower as of any date of determination, the maximum aggregate amount of the Obligations of such Borrower under this Agreement and the other Credit Documents that would not render its Obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided that, solely for purposes of calculating the "Obligation Fair Share Contribution Amount" with respect to any Borrower for purposes of this Section 2.25, any assets or liabilities of such Credit Party arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or Obligations of contribution hereunder shall not be considered as assets or liabilities of such Borrower. "Obligation Aggregate Payments" means, with respect to a Borrower as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such Borrower in respect of this Agreement and the other Credit Documents (including in respect of this Section 2.25) minus (ii) the aggregate amount of all payments received on or before such date by such Borrower from the other Borrowers as contributions under this Section 2.25. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Borrower. The allocation among the Borrowers of their Obligations as set forth in this Section 2.25 shall not be construed in any way to limit the liability of any Borrower hereunder or under any other Credit Document. Nothing contained in this Section 2.25(b) shall be of prejudice to any more favorable provisions applicable to Italia SpA, Huyck Austria, Xerium Canada, Germany Holdings or any non-US Guarantor pursuant to Section 7.6.

(c) Parallel Debt and Collateral Agent. Notwithstanding anything to the contrary in any Credit Document, each of the Borrowers and Guarantors and each of the Secured Parties agree that the Collateral Agent shall be the joint and several creditor (together with the relevant Secured Party) of each and every obligation of any Borrower or Guarantor towards each of the Secured Parties (other than the Collateral Agent) under the Credit Documents, and that accordingly the Collateral Agent will have its own independent right to demand performance by the relevant Borrower or Guarantor of such obligations. However, any discharge of any such obligation to one of the Collateral Agent or any Secured Party (other than the Collateral Agent) shall, to that extent, discharge the corresponding obligation owing to the other. Nothing in this Agreement or in any other Credit Document shall in any way limit the Collateral Agent's right to enforce, protect and preserve all of its rights under each Collateral Document as contemplated by this Agreement or the relevant Collateral Document (or to perform any act reasonably incidental to any of the foregoing).

2.26 **Loans to Non-US Borrowers.** Each Bank may, at its option, make any Loan available to any Non-US Borrower by causing any foreign or domestic branch or Affiliate of such Bank to make such Loan; provided that any

exercise of such option shall not affect the obligation of such Non-US Borrower to repay such Loan in accordance with the terms of this Agreement.

2.27 **Intercreditor Agreement.** Each Bank hereby authorizes and directs the Administrative Agent and the Collateral Agent to enter into the Intercreditor Agreement on its behalf and hereby approves and agrees to be bound by the terms of the Intercreditor Agreement. Notwithstanding anything to the contrary herein, in the case of any inconsistency between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern. The Banks acknowledge that the Second Lien Obligations are secured by the Collateral, subject to the Intercreditor Agreement.

2.28 **Assumption of Obligations.** The Borrowers (other than Xerium) and the Guarantors acknowledge that they have received significant direct and indirect benefit from the loans and credit extension made to Xerium under the DIP Credit Agreement. Each Borrower acknowledges and agrees that as of the Closing Date it they will become a borrower under this Agreement and shall be directly liable for its Obligations owed under the Credit Documents as set forth herein and in the other Credit Documents, and each Guarantor acknowledges and agrees that as of the Closing Date it will become a guarantor under this Agreement and shall be directly liable for the Obligations owed under the Credit Documents as set forth herein and in the other Credit Documents.

2.29 **Conversion of DIP Term Loans, DIP Revolving Loans and Existing Letters of Credit.** As provided in Sections 2.1(a) and 2.2(a)(ii), the DIP Revolving Loans and DIP Term Loans outstanding on the Closing Date shall be converted into Revolving Loans and Term Loans, respectively, under this Agreement and, as provided in Section 2.4(c), the Existing Letters of Credit outstanding on the Closing Date shall be converted into Term Loan Letters of Credit under this Agreement and the agreements and instruments listed on Schedule 2.29 (which shall be in form and substance reasonably satisfactory to the Administrative Agent). Each Bank (as defined in the DIP Credit Agreement) shall be a Bank hereunder and the Issuing Bank (as defined in the DIP Credit Agreement) that issued an Existing Letter of Credit shall be the Issuing Bank hereunder. The Credit Documents (as defined in the DIP Credit Agreement) shall be superseded and replaced by the applicable Credit Documents. Each of the Administrative Agent, the Issuing Bank and the Banks shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.29; provided, however, that any such action by the Administrative Agent, the Issuing Bank or any of the Banks shall not be a condition precedent to the effectiveness of the provisions of this Section 2.29.

## SECTION 3. CONDITIONS PRECEDENT

3.1 **Conditions to Closing Date.** The occurrence of the Closing Date and the obligation of each Bank to make Credit Extensions hereunder, in each

78

case as of the Closing Date, are, in addition to the conditions specified in Sections 3.2, subject at the time of the occurrence of the Closing Date to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions on or before [July/ August __ ], 2010[2]:

(a) <u>Credit Documents</u>. The Administrative Agent shall have received sufficient copies of each Credit Document to be executed by the appropriate Credit Party on the Closing Date and delivered by each applicable Credit Party for each Bank (which may be delivered by facsimile or other electronic means for the purposes of satisfying this Section 3.1(a) on the Closing Date, with signed originals to be delivered promptly thereafter) and such Credit Documents shall be in form and substance satisfactory to the Borrowers and their counsel and the Administrative Agent and its counsel.

(b) <u>Organizational Documents; Incumbency</u>. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent: (i) a copy of each Organizational Document of each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Credit Party executing the Credit Documents to which it is a party; (iii) resolutions of the board of directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) resolution of the shareholder(s) of the Australian Obligor and Guarantors incorporated in the United Kingdom approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment and (v) to the extent applicable, a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date. For Credit Parties organized, incorporated or formed outside of the United States, delivery of a Formalities Certificate shall suffice to satisfy this Section 3.1(b).

---

[2] Date that is four months after the closing date of the DIP Credit Agreement to be inserted.

(c) <u>Closing Date Certificate</u>. The Administrative Agent shall have received a Closing Date Certificate, dated the Closing Date and signed by an Authorized Officer of Xerium.

(d) <u>No Liabilities</u>. Neither Xerium nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the audited financial statements delivered pursuant to Section 3.1(k) for Fiscal Year 2009 or the notes thereto (other than as contemplated by the Plan of Reorganization) and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium and any of its Subsidiaries taken as a whole.

(e) <u>Organizational and Capital Structure</u>. The organizational structure and capital structure of Xerium and its Subsidiaries, after giving effect to the Recapitalization, shall be as set forth in the Plan of Reorganization and Disclosure Statement, provided that any changes to such Plan of Reorganization and Disclosure Statement which are adverse to the Banks shall be acceptable to the Banks.

(f) <u>Confirmation Order, Plan of Reorganization</u>. The Confirmation Order shall be in full force and effect and shall not have been reversed or modified, stayed, subject to a motion to stay or subject to appeal or petition for review, rehearing or certiorari, (ii) the Administrative Agent shall have received a copy of the Confirmation Order, certified as true, correct and complete by the clerk of the Bankruptcy Court, (iii) the Confirmation Order and the Plan of Reorganization shall each be in full force and effect and shall be in form and substance reasonably satisfactory to the Administrative Agent, (iv) all documents executed in connection with the implementation of the Plan of Reorganization shall be in accordance with the Plan of Reorganization and, if so required thereunder, shall be in form and substance reasonably satisfactory to the Administrative Agent, (v) all motions and proposed orders to be filed with the Bankruptcy Court in connection with this Agreement and the Plan of Reorganization shall be in form and substance reasonably satisfactory to the Administrative Agent and (vi) all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied or waived by the Administrative Agent, and the Effective Date and substantial consummation of the Plan of Reorganization shall have occurred.

(g) <u>Second Lien Credit Agreement</u>. (i) The terms of the Second Lien Credit Agreement shall be reasonably satisfactory to the Administrative Agent, and (ii) the Administrative Agent shall have received reasonably satisfactory evidence that the conditions to the effectiveness of the Second Lien Credit Agreement shall have been satisfied or waived in accordance with its terms.

80

(h) <u>Governmental Authorizations and Consents</u>. Each Credit Party shall have obtained all material necessary Governmental Authorizations and all consents of other Persons (including any necessary approvals of the Bankruptcy Court or otherwise in connection with the Recapitalization), in each case that are necessary in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(i) <u>Real Estate Assets</u>. In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected security interest in certain Real Estate Assets, the Collateral Agent shall have received from each applicable Borrower and each applicable Guarantor:

(i) fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.1(i) (each, a "**Closing Date Mortgaged Property**");

(ii) an opinion of counsel (which counsel shall be reasonably satisfactory to the Collateral Agent) in each state in which a Closing Date Mortgaged Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as the Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Collateral Agent;

(iii) (a) ALTA mortgagee title insurance policies or unconditional commitments therefor issued by one or more title companies reasonably satisfactory to the Collateral Agent with respect to each Closing Date Mortgaged Property located in the United States (each, a "**Title Policy**"), in amounts not less than the fair market value of each Closing Date Mortgaged Property, together with a title report issued by a title company with respect thereto, and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to the Collateral Agent and (B) evidence satisfactory to the Collateral Agent that such Credit Party has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording

81

and intangible taxes) payable in connection with recording the Mortgages for each Closing Date Mortgaged Property in the appropriate real estate records;

(iv) evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, in form and substance reasonably satisfactory to the Collateral Agent; and

(v) ALTA surveys of all Closing Date Mortgaged Properties located in the United States, certified to Collateral Agent and dated or updated not more than ninety (90) days prior to the Closing Date and a survey sufficient to remove the standard survey exception to coverage from the Title Policies which will insure the Mortgages.

(j) Personal Property Collateral. In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected security interest in the personal property Collateral, the Collateral Agent shall have received:

(i) evidence reasonably satisfactory to the Collateral Agent of the compliance by each Credit Party of their obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to execute and deliver UCC financing statements, other securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

(ii) the Collateral Agent shall have received (x) the originals of certificates representing the shares of capital stock pledged pursuant to the Pledge and Security Agreement and the other Collateral Documents, together with an original of an undated stock power for each such certificate executed in blank by a duly Authorized Officer of the pledgor thereof (if applicable and subject to the provisions of the relevant Collateral Document), and (y) originals of each promissory note (if any) pledged to the Collateral Agent pursuant to the Pledge and Security Agreement and the other Collateral Documents endorsed in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof;

(iii) a completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of Xerium, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal, real or mixed property of any Credit Party in the jurisdictions specified in the Collateral Questionnaire, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly executed by all applicable Persons for filing in all applicable jurisdictions as

82

may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

(iv) opinions of counsel (which counsel shall be reasonably satisfactory to the Collateral Agent) with respect to the creation and perfection of the security interests in favor of Collateral Agent in such Collateral and such other matters governed by the laws of each jurisdiction in which any Credit Party or any personal property Collateral is located as the Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Collateral Agent; and

(v) evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document, notice and instrument (including without limitation, any intercompany notes evidencing Indebtedness permitted to be incurred pursuant to Section 6.1(b)) and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by the Collateral Agent.

(k) Financial Statements; Business Plan. The Banks shall have received from Xerium (i) the audited consolidated balance sheets of Xerium and its Subsidiaries as of December 31, 2009 for the Fiscal Year then ended and the related consolidated statements of income, stockholders' equity and cash flows of Xerium and its Subsidiaries for such Fiscal Year, together with a report thereon of Ernst & Young LLP, which financial statements and report shall be in form and substance reasonably satisfactory to the Administrative Agent, and (ii) an Officer's Certificate executed by an Authorized Office of Xerium certifying that there have been no changes to the Initial Business Plan.

(l) Insurance. The Collateral Agent shall have received a certificate from Xerium's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming the Collateral Agent, for the benefit of Secured Parties, as additional insured and naming the Collateral Agent, on behalf of the Secured Parties and the Second Lien Secured Parties as loss payee thereunder to the extent required under Section 5.5.

(m) Opinions of Counsel to Credit Parties. The Administrative Agent and its counsel shall have received executed copies of the favorable written opinions of counsel to the Credit Parties as to such matters as the Administrative Agent may reasonably request, dated as of the Closing Date and otherwise in form and substance reasonably satisfactory to the Administrative Agent.

(n) Cash Payment and Common Stock Issuance. The Banks (or the Administrative Agent on behalf of the Banks) shall have received the cash payment and Common Stock contemplated by the Plan of Reorganization.

83

(o) <u>Fees and Expenses</u>. The Administrative Agent shall have received payment in full of all fees and expenses invoiced and due to the Agents (including the reasonable fees and expenses due of their advisors and legal counsel) in connection with this Agreement.

(p) <u>No Litigation</u>. There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority (other than the Bankruptcy Cases) that, in the reasonable opinion of the Administrative Agent, singly or in the aggregate, materially impairs the transactions contemplated by the Credit Documents or that could have a Material Adverse Effect.

(q) <u>Completion of Proceedings</u>. All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated by the Credit Documents and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request.

(r) <u>Representations and Warranties</u>. The representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Closing Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that any representation or warranty that is by its terms qualified by materiality shall be true and correct in all respects.

(s) <u>No Default</u>. No event shall have occurred and be continuing or would result from the consummation of the transaction contemplated hereunder or under the Credit Documents that would constitute an Event of Default or a Default.

(t) <u>No Material Adverse Effect</u>. Since the Petition Date, nothing shall have occurred (and neither the Administrative Agent nor the Requisite Banks shall have become aware of any facts or conditions not previously known) which the Administrative Agent or the Requisite Banks shall reasonably determine has had, or could reasonably be expected to have, a Material Adverse Effect.

(u) <u>Compliance with Law and Regulations</u>. All Term Loans and all other financings to the Borrowers (and all guaranties thereof and security therefor), as well as the transactions contemplated by the Credit Documents and the consummation thereof, shall be in full compliance in all material respects with

84

all applicable requirements of law, including Regulations T, U and X of the Federal Reserve Board.

(v) <u>No Conflict with Material Contracts</u>. After giving effect to the transactions contemplated by the Credit Documents, there shall be no conflict with, or default under, any Material Contract.

(w) <u>Patriot Act Information</u>. Each of the Credit Parties shall have provided the documentation and other information to the Banks that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(x) <u>Liquidity</u>. The Borrowers and the Guarantors shall have unrestricted Cash and Cash Equivalents on hand plus, after giving effect to the making of any Revolving Loans on the Closing Date, Unused Revolving Commitments in an aggregate amount of at least the Dollar Equivalent of $35,000,000.

(y) <u>Rating of Term Loans</u>. Xerium (i) shall have obtained a corporate family rating and a rating on the Term Loans from Moody's and (ii) shall have obtained, or the Administrative Agent shall be reasonably satisfied that Xerium used commercially reasonable efforts to obtain a corporate rating and a rating on the Term Loans from S&P.

(z) <u>Solvency Certificate</u>. On the Closing Date, the Administrative Agent shall have received a Solvency Certificate from each Borrower dated the Closing Date and addressed to the Administrative Agent and the Banks.

(aa) <u>Account Control Agreements</u>. The applicable Credit Party shall have entered into account control agreements with respect to each Primary Account in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent.

For the purpose of determining compliance with the conditions specified in this Section 3.1, each Bank that has accepted the distributions under the Plan of Reorganization shall be deemed to have accepted, and to be satisfied with, each document required to be delivered in a form satisfactory to the Banks or Requisite Banks under this Section 3.1 and which was included in the Plan Supplement.

### 3.2 Conditions to Each Credit Extension.

(a) <u>Conditions Precedent</u>. The obligation of each Bank to make, convert or continue any Loan, or the Issuing Bank to issue any Letter of Credit, on any Credit Date or Conversion/Continuation Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.6, of the following conditions precedent:

85

(i) the Administrative Agent shall have received a fully executed and delivered Funding Notice, Conversion/Continuation Notice or Issuance Notice, as the case may be;

(ii) after making the Credit Extensions requested on such Credit Date or Conversion/Continuation Date, the Total Utilization of Revolving Commitments shall not exceed the Revolving Commitments then in effect;

(iii) as of such Credit Date or Conversion/Continuation Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of that Credit Date or Conversion/Continuation Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iv) as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default;

(v) on or before the date of issuance of any Letter of Credit, the Administrative Agent shall have received all other information required by the applicable Issuance Notice, and such other documents or information as the Issuing Bank may reasonably require in connection with the issuance of such Letter of Credit; and

(vi) the conditions set forth in Section 3.1 shall have been satisfied or waived in accordance with Section 10.6.

Any Agent or Requisite Banks shall be entitled, but not obligated to, request and receive, prior to the making of any Credit Extension, additional information reasonably satisfactory to the requesting party confirming the satisfaction of any of the foregoing if, in the good faith judgment of such Agent or Requisite Bank, such request is warranted under the circumstances.

(b) Notices. Any Notice shall be executed by an Authorized Officer in a writing delivered to Administrative Agent. In lieu of delivering a Notice, each Borrower may give Administrative Agent telephonic notice by the required time of any proposed borrowing or conversion or continuation of any Loan or issuance of a Letter of Credit, as the case may be; provided each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the applicable date of any such borrowing, conversion, continuation or issuance. Neither Administrative Agent nor any Bank shall incur any liability to any Borrower in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been

86