given by a duly authorized officer or other person authorized on behalf of a Borrower or for otherwise acting in good faith.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

In order to induce the Banks and the Issuing Bank to make each Credit Extension to be made by this Agreement, and to induce each Bank Counterparty to enter into any transaction in respect of Hedging Obligations, each Credit Party represents and warrants to each Bank, Bank Counterparty and the Issuing Bank, on the Closing Date, each Interest Payment Date and each Credit Date, that the following statements are true and correct:

4.1 **Organization; Requisite Power and Authority; Qualification.** Each of Xerium and its Subsidiaries (a) is duly organized, validly existing and in good standing (or, for Non-U.S. Credit Parties of equivalent status when reasonably ascertainable) under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

4.2 **Capital Stock and Ownership.** The Capital Stock of each of Xerium and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Xerium or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of Xerium or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Xerium or any of its Subsidiaries of any additional membership interests or other Capital Stock of Xerium or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of Xerium or any of its Subsidiaries. Schedules 4.1 and 4.2 correctly set forth the ownership interest of Xerium and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

4.3 **Due Authorization.** The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

4.4 **No Conflict.** The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation

87

applicable to Xerium or any of its Subsidiaries, any of the Organizational Documents of Xerium or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on Xerium or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Xerium or any of its Subsidiaries except to the extent such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Xerium or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, on behalf of Secured Parties); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Xerium or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Banks and except for any such approvals or consents the failure of which to obtain will not have a Material Adverse Effect.

4.5 **Governmental Consents.** The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for (i) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Closing Date and (ii) filings and recordings to be made in connection with the perfection of Collateral acquired after the Closing Date.

4.6 **Binding Obligation.** Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

4.7 **Historical Financial Statements.** The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year end adjustments. As of the Closing Date, neither Xerium nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in

88

relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Xerium and any of its Subsidiaries taken as a whole.

4.8 **Business Plan.** The Initial Business Plan and each Business Plan delivered pursuant to Section 5.1(q) is and will be based on good faith estimates and assumptions made by the management of Xerium; provided, that such Business Plan is not to be viewed as fact and that actual results during the period or periods covered by the Business Plan may differ from such Business Plan and that the differences may be material; provided, further, as of the Closing Date, management of Xerium believed that the Business Plan was reasonable and attainable.

4.9 **No Material Adverse Change.** Since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

4.10 **[Intentionally Omitted].**

4.11 **Adverse Proceedings, etc.** There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. Neither Xerium nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, provincial, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.12 **Payment of Taxes.** Except as otherwise permitted under Section 5.3, all tax returns and reports of Xerium and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Xerium and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable. Xerium knows of no proposed tax assessment against Xerium or any of its Subsidiaries which is not being actively contested by Xerium or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.13 **Properties.** (a) Title. Each of Xerium and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective

89

Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the Ordinary Course or as otherwise permitted under Section 6.9. Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b) Real Estate. As of the Closing Date, Schedule 4.13(b) contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment. Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and Xerium does not have knowledge of any default that has occurred and is continuing thereunder except where the consequences, direct or indirect, of such default or defaults, if any, could not be reasonably expected to have a Material Adverse Effect, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

4.14 **Environmental Matters.** Neither Xerium nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. There are and, to each of Xerium's and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Xerium or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Xerium nor any of its Subsidiaries nor, to any Credit Party's knowledge, any predecessor of Xerium or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility that, individually or in the aggregate, could be reasonably expected to have a Material Adverse Effect, and none of Xerium's or any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of Hazardous Materials, except as would not reasonably be expected to form the basis of an Environmental Claim against Xerium or any of its Subsidiaries, or as listed on Schedule 4.14. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to Xerium or any of its Subsidiaries relating to any Environmental Law, any Release of

90

Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

4.15 **No Defaults**. Neither Xerium nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect and except as contemplated by the Plan of Reorganization.

4.16 **Material Contracts**. Schedule 4.16 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date, and except as described thereon, all such Material Contracts are in full force and effect and no defaults currently exist thereunder, except any such default or failure to be in force and effect which could not reasonably be expected to result in an exercise of remedies or acceleration of the indebtedness created thereunder.

4.17 **Governmental Regulation**. Neither Xerium nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal, provincial or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. Neither Xerium nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18 **Margin Stock**. Neither Xerium nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of said Board of Governors.

4.19 **Employee Matters**. Neither Xerium nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against Xerium or any of its Subsidiaries, or to the best knowledge of Xerium and each other Credit Party, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Xerium or any of its Subsidiaries or to the best knowledge of Xerium and each other Credit Party,

91

threatened against any of them, (b) no strike, work stoppage or lock-out in existence or threatened involving Xerium or any of its Subsidiaries, and (c) to the best knowledge of Xerium and each other Credit Party, no union representation question existing with respect to the employees of Xerium or any of its Subsidiaries and, to the best knowledge of Xerium and each other Credit Party, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

## 4.20 Employee Benefit Plans

(a) Xerium, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan, other than any non-compliance or non-performance that would not be reasonably expected to have a Material Adverse Effect. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a recent favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status, except such defect that can be corrected pursuant to Rev. Proc. 2003-44 or any successor ruling or regulation without giving rise to a Material Adverse Effect. No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA (other than Ordinary Course contribution obligations) has been or is expected to be incurred by Xerium, any of its Subsidiaries or any of their ERISA Affiliates that could reasonably be expected to have a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur which could reasonably be expected to result in a Material Adverse Effect.

(b) Each Canadian Registered Pension Plan has been established, registered, qualified, invested and administered in compliance with its terms and all applicable laws, other than any non-compliance that would not reasonably be expected to have a Material Adverse Effect. No liability (other than required contributions and premium payments) under the Canadian Registered Pension Plans has been or is expected to be incurred by Xerium Canada, or any Affiliate of Xerium Canada that could reasonably be expected to have a Material Adverse Effect. No Canadian Pension Plan Event has occurred or is reasonably expected to occur which could reasonably be expected to result in a liability to Xerium Canada or any Affiliate of Xerium Canada in excess of $1,000,000. Each Canadian Registered Pension Plan has been funded on both a going concern and solvency basis in accordance with applicable laws and on the basis of the actuarial report which was most recently filed with the applicable pension regulator for the applicable Canadian Registered Pension Plan. None of Xerium Canada or any

92

Affiliate of Xerium Canada contribute to, are obligated to contribute to (or have contributed within the last five years to) a multi-employer pension plan, as defined under applicable laws. Xerium Canada has provided the Administrative Agent with a copy of the actuarial valuation for each Canadian Registered Pension Plan most recently filed with the applicable pension regulator.

4.21 **Certain Fees**. No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated by the Credit Documents.

4.22 **Solvency**. After giving effect to the transactions contemplated hereby and pursuant to the Plan of Reorganization and the incurrence of the Indebtedness and obligations being incurred in connection herewith and under the Second Lien Credit Agreement, each Credit Party is Solvent.

4.23 [Reserved].

4.24 **Compliance with Statutes, etc**. Each of Xerium and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Xerium or any of its Subsidiaries), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

4.25 **Disclosure**. No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements, including without limitation, information contained in the presentations made to the Banks, furnished to Banks by or on behalf of Xerium or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to Xerium or any other Borrower, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Xerium or any other Borrower to be reasonable at the time made, it being recognized by Banks that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results. There are no facts known (or which should upon the reasonable exercise of diligence be known) to Xerium or any other Borrower (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other

93

documents, certificates and statements furnished to Banks for use in connection with the transactions contemplated hereby.

**4.26 Insurance.** All policies of insurance of Xerium or any of its Subsidiaries, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity and workers' compensation, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of such Person.

**4.27 Use of Proceeds.** The proceeds of the Loans shall be used by the Borrowers solely in accordance with Section 2.6.

**4.28 Deposit and Securities Accounts.** Schedule 4.28 contains a true, correct and complete list of the Credit Parties' primary Dollar denominated master deposit and investment accounts and primary Euro denominated master deposit and investment accounts (collectively, the **"Primary Accounts"**).

**4.29 UK Establishment.** No Credit Party has a "UK establishment" within the meaning of the Overseas Companies Regulations 2009.

## SECTION 5. AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that so long as any Commitment is in effect and until payment in full of all Obligations and cancellation or expiration of all Letters of Credit, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1 Financial Statements and Other Reports.** Xerium will deliver to Administrative Agent:

(a) [Intentionally Omitted]

(b) Quarterly Financial Statements. As soon as available, and in any event within 45 days after the end of the first three Fiscal Quarters of each Fiscal Year, the consolidated balance sheets of Xerium and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of Xerium and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form (x) the corresponding figures for the corresponding periods of the previous Fiscal Year, and (y) the corresponding figures contained in the Business Plan for the corresponding periods for the current Fiscal Year, together with a Financial Officer Certification with respect thereto and including a detailed explanation as to the material variances that may have occurred from the prior Fiscal Quarter and the figures contained in the Business Plan for the corresponding period for the current Fiscal Year;

94

(c) <u>Annual Financial Statements</u>. As soon as available, and in any event within 90 days after the end of each Fiscal Year, beginning with Fiscal Year 2010, (i) the audited consolidated balance sheets of Xerium and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of Xerium and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, together with a Financial Officer Certification and including a detailed explanation as to the material variances that may have occurred from the prior Fiscal Year and the figures contained in the Business Plan for the current Fiscal Year and (ii) with respect to such consolidated financial statements a report thereon of Ernst & Young LLP or other independent certified public accountants of recognized international standing selected by Xerium (which report shall be unqualified as to going concern and scope of audit, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Xerium and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants stating that nothing has come to their attention that causes them to believe that the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof;

(d) <u>Compliance Certificate</u>. Together with each delivery of financial statements of Xerium and its Subsidiaries pursuant to Sections 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate; provided, that in respect of the fourth Fiscal Quarter of each Fiscal Year, it shall also deliver a duly executed and completed Compliance Certificate as soon as available, and in any event within 90 days after the end of the fourth Fiscal Quarter;

(e) <u>Statements of Reconciliation after Change in Accounting Principles</u>. If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the Compliance Certificate (including, without limitation, calculation of Excess Cash therein) of Xerium and its Subsidiaries delivered pursuant to Section 5.1(d) will differ in any material respect in the manner in which computations are derived from Xerium's financial statements for the Compliance Certificate that would have been delivered pursuant to such subsection had no such change in accounting principles and policies been made, then, together with the first delivery of such Compliance Certificate after such change, Xerium will deliver one or more statements of explanation of such difference(s) in form and substance satisfactory to Administrative Agent and, if appropriate, Xerium's proposal for amending any terms or requirements used or addressed in the Compliance Certificate to adjust for such change(s);

95

(f) <u>Sufficiency of Public Quarterly and Annual Reports</u>. Notwithstanding anything to the contrary contained herein, delivery to the Administrative Agent by Xerium of its quarterly report on Form 10-Q and its annual report on form 10-K shall satisfy the requirements of Sections 5.1(b) and (c), respectively, for so long as Xerium remains a reporting company under the Exchange Act.

(g) <u>Notice of Default</u>. Promptly upon any officer of Xerium or each other Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Xerium or each other Borrower with respect thereto; (ii) that any Person has given any notice to Xerium or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action each Borrower has taken, is taking and proposes to take with respect thereto;

(h) <u>Notice of Litigation</u>. Promptly upon any officer of Xerium or each other Borrower obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Adverse Proceeding not previously disclosed in writing by each Borrower to Banks, or (ii) any material development in any Adverse Proceeding that, in the case of either (i) or (ii) could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Xerium or each other Borrower to enable Banks and their counsel to evaluate such matters;

(i) <u>ERISA</u>. (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

96

(j) Canadian Registered Pension Plans. (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any Canadian Pension Plan Event, a written notice specifying the nature thereof, what action Xerium Canada or any Affiliate of Xerium Canada has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Canada Revenue Agency or any applicable pension regulator; and (ii) with reasonable promptness, (1) copies of each annual information return filed with the Canada Revenue Agency or any applicable pension regulator with respect to a Canadian Registered Pension Plan; (2) copies of all notices received by Xerium Canada or any Affiliate of Xerium Canada from the sponsor of a multi-employer pension plan, as defined under applicable laws, concerning a Canadian Pension Plan Event; (3) copies of each actuarial valuation for each Canadian Registered Pension Plan filed with any applicable pension regulator; (4) copies of any actuarial certifications in respect of each Canadian Registered Pension Plan filed with any applicable pension regulator, whether in connection with a request for approval to effect commuted value transfers from such plan or otherwise; and (5) copies of such other documents or governmental reports or filings relating to any Canadian Registered Pension Plan as Administrative Agent shall reasonably request;

(k) Insurance Report. As soon as practicable following any material change in the insurance coverage, notice to the Administrative Agent of such change and an explanation in form and substance reasonably satisfactory to the Administrative Agent of such change;

(l) Environmental Reports and Audits. As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of Xerium or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(m) Information Regarding Collateral. Each Borrower will furnish to the Collateral Agent prompt written notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure or (iii) in any Credit Party's Federal Taxpayer Identification Number. Each Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents. Each Borrower also agrees promptly to notify Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(n) Annual Collateral Verification. Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.1(c), each Borrower shall deliver to the Collateral Agent an

97

Officer's Certificate either confirming that there has been no change in such information since the date of the Collateral Questionnaire delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes;

(o) Other Information. (i) Promptly upon their becoming available, copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by Xerium to its security holders acting in such capacity or by any Subsidiary of Xerium to its security holders other than Xerium or another Subsidiary of Xerium, (B) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Xerium or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission and (C) all press releases and other statements made available generally by Xerium or any of its Subsidiaries to the public concerning material developments in the business of Xerium or any of its Subsidiaries, and (ii) such other information and data with respect to Xerium or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent;

(p) Electronic Delivery.

(i) Notwithstanding anything in any Credit Document to the contrary, each Credit Party hereby agrees that it will use its reasonable best efforts to provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for a new Credit Extension or other extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under any Credit Document prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under any Credit Document or (D) is required to be delivered to satisfy any condition set forth in Sections 3.1 and/or 3.2 (all such non-excluded communications being referred to herein collectively as the "Communications"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to oploanswebadmin@citi.com, with a copy to [lynne.p.savage@citigroup.com]. In addition, each Credit Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Credit Documents, but only to the extent requested by the Administrative Agent.

(ii) Each Credit Party further agrees that the Administrative Agent may make the Communications available to the Banks by posting the Communications on IntraLinks, Fixed Income Direct or a substantially similar electronic transmission system (each such system, a "Platform"). Each

98

Credit Party acknowledges that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution.

(iii) **EACH PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF ANY PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR ANY PLATFORM. IN NO EVENT SHALL ANY AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, THE "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWERS, ANY OTHER CREDIT PARTY, ANY BANK OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWERS' OR THE AGENTS' TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

(iv) The Administrative Agent agrees that the receipt of the Communications by it at its e-mail address set forth in Annex B shall constitute effective delivery of the Communications to the Administrative Agent for purposes of this Section 5.1(p). Each Bank agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to a Platform shall constitute effective delivery of the Communications to such Bank for purposes of this Section 5.1(p). Each Bank agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Bank's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

99

(v) Nothing in this Section 5.1(p) shall prejudice the right of any Agent or any Bank to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(q) <u>Business Plan</u>. Promptly after approval thereof by the board of directors of Xerium, and in any event no later than April 1 of each Fiscal Year, Xerium shall deliver to the Administrative Agent (commencing with Fiscal Year 2010), a detailed consolidated budget and business plan of Xerium and its Subsidiaries through Fiscal Year 2015 (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of each Fiscal Year through Fiscal Year 2015) in form and substance reasonably satisfactory to the Administrative Agent (the "**Business Plan**"); provided that with respect to the Fiscal Year in which the Business Plan is being delivered such Business Plan shall be prepared by Fiscal Quarter for such Fiscal Year.

5.2 **Existence**. Except as otherwise permitted under Section 6.9, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; <u>provided</u>, no Credit Party or any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Banks.

5.3 **Payment of Taxes and Claims**. Each Credit Party will, and will cause each of its Subsidiaries to, pay all material Taxes imposed upon it or any of its properties or assets or in respect of any of its profits, income, capital, capital gains, payroll businesses or franchises before any penalty or fine accrues thereon, and all Taxes or claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP, shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim. No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Xerium or any of its Subsidiaries).

5.4 **Maintenance of Properties**. Each Credit Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of Xerium and its Subsidiaries and from

100

time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof except where the failure to maintain such properties would not reasonably be expected in any individual case or in the aggregate to have a Material Adverse Effect.

5.5 **Insurance.** Xerium will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Xerium and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Without limiting the generality of the foregoing, Xerium will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses. Each such policy of insurance issued by an insurer organized or incorporated in the United States shall (i) name the Collateral Agent, on behalf of Banks as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Collateral Agent, that names the Collateral Agent, on behalf of the Secured Parties, as the loss payee thereunder for losses of $1,000,000 or greater and provides for at least thirty days' prior written notice to the Administrative Agent and the Second Lien Agent of any modification or cancellation of such policy.

5.6 **Books and Records; Inspections.** Each Credit Party will, and will cause each of its respective Subsidiaries to, keep books and records which accurately reflect its business affairs in all material respects and material transactions and each Credit Party will, and will cause each of its respective Subsidiaries to, permit any authorized representatives designated by the Administrative Agent to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested. Each Credit Party will cause its officers to participate in update calls, no more frequently than once each quarter, with the Agents and the Banks upon reasonable notice and request from the Administrative Agent.

101

### 5.7 [Intentionally Omitted]

**5.8 Compliance with Laws; SEC Filings.** Each Credit Party will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), except where failure to do so would not reasonably be expected to have a Material Adverse Effect and Xerium shall timely file with the Securities and Exchange Commission all reports, notices and documents required to be filed under the Exchange Act.

### 5.9 Environmental.

(a) <u>Environmental Disclosure</u>. Xerium will deliver to Administrative Agent:

(i) as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Xerium or any of its Subsidiaries or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Facility or with respect to any Environmental Claims that could reasonably be expected to have a Material Adverse Effect;

(ii) promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, provincial, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by Xerium or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) Xerium's or each other Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii) as soon as practicable following the sending or receipt thereof by Xerium or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is

102

investigating whether Xerium or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv) prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Xerium or any of its Subsidiaries that could reasonably be expected to (A) expose Xerium or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) adversely affect the ability of Xerium or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (2) any proposed action to be taken by Xerium or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Xerium or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v) with reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b) Hazardous Materials Activities, Etc. Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.10 Subsidiaries. In the event that any Person becomes a Subsidiary of a Borrower, such Borrower shall (a) promptly cause such Subsidiary to become a Guarantor hereunder and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement, taking into account not to create adverse tax consequences to any Credit Party in respect of Section 956 of the Internal Revenue Code, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, opinions and certificates as are reasonably requested by the Collateral Agent. With respect to each such Subsidiary, each Borrower shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of such Borrower, and (ii) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of such Borrower; provided, such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

NY3 - 504826.09

5.11 **Additional Material Real Estate Assets.** In the event that any Credit Party acquires a Material Real Estate Asset or a Real Estate Asset owned or leased on the Closing Date becomes a Material Real Estate Asset and such interest has not otherwise been made subject to the Lien of the Collateral Documents in favor of Collateral Agent, for the benefit of Secured Parties, taking into account not to create adverse tax consequences to Xerium in respect of Section 956 of the Internal Revenue Code, then such Credit Party, as soon as practicable but in no event later than twenty (20) days after acquiring such Material Real Estate Asset, shall take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates with respect to each such Material Real Estate Asset that Collateral Agent shall reasonably request to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets. The applicable Credit Party shall use its commercially reasonable efforts to cause a Landlord Personal Property Collateral Access Agreement and a Landlord Consent and Estoppel to be executed by the applicable landlord and delivered to the Collateral Agent (i) within 90 days after the Closing Date with respect to any Leasehold Property listed on Schedule 4.13(b) as a Leasehold Property and located in the United States and with respect to which aggregate payments under the terms of such lease are $500,000 or more per annum, and (ii) within 90 days after the acquisition of interest therein, any other Leasehold Property located in the United States which the Credit Party leases and with respect to which aggregate payments under the terms of such lease are $500,000 or more per annum. In addition to the foregoing, each Borrower shall, at the request of Requisite Banks, deliver, from time to time, to Administrative Agent such appraisals as are required by law or regulation of Real Estate Assets with respect to which Collateral Agent has been granted a Lien.

5.12 **[Intentionally Omitted].**

5.13 **Further Assurances.** At any time or from time to time upon the request of the Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents. In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by the Collateral.

5.14 **Intellectual Property.** Unless otherwise consented to by Agents or Requisite Banks, the Borrower and each of its Subsidiaries will continue to own or possess the right to use, free from any restrictions, all patents, trademarks, copyrights, and domain names that are used in the operation of their respective businesses as presently conducted and as proposed to be conducted, except to the

104

extent the failure to so own or possess would not reasonably be expected to have a Material Adverse Effect.

### 5.15 Know-Your-Customer Rules.

If:

   (i) (A)  the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the Closing Date;

   (B) any change in the status of a Credit Party after the Closing Date; or

   (C) a proposed assignment or transfer by a Bank of any of its rights and obligations under this Agreement to a party that is not a Bank prior to such assignment or transfer,

obliges the Administrative Agent or any Bank (or, in the case of paragraph (C) above, any prospective new Bank) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Credit Party shall promptly upon the request of the Administrative Agent or any Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Bank) or any Bank (for itself or, in the case of the event described in paragraph (C) above, on behalf of any prospective new Bank) in order for the Administrative Agent, such Bank or, in the case of the event described in paragraph (C) above, any prospective new Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Credit Documents.

   (ii) Each Bank shall promptly upon the request of the Administrative Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself) in order for the Administrative Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Credit Documents.

   (iii) Xerium shall, by not less than 10 Business Days' prior written notice to the Administrative Agent, notify the Administrative Agent (which shall promptly notify the Banks) that one of its Subsidiaries shall become a Guarantor pursuant to Section 5.10.

Following the giving of any notice pursuant to paragraph (iii) above, if the accession of such Subsidiary obliges the Administrative Agent or any Bank to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, Xerium shall promptly upon the request of the

105

Administrative Agent or any Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Bank) or any Bank (for itself or on behalf of any prospective new Bank) in order for the Administrative Agent or such Bank or any prospective new Bank to carry out and be satisfied it has complied with the results of all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement.

> 5.16 **Pari Passu Ranking.** Each Credit Party will, and will cause each of its Subsidiaries to ensure that its payment obligations under each of the Credit Documents rank and will at all times rank at least pari passu in right and priority of payment with all its other present and future secured and unsubordinated indebtedness (actual or contingent) except indebtedness preferred solely by operation of law.

> 5.17 **2009 Audit Opinion.** If the audit opinion delivered with the audited consolidated financial statements of Xerium and its Subsidiaries pursuant to Section 5.1(c) for Fiscal Year 2009 contains a going concern qualification, Xerium will use its commercially reasonable efforts to cause such auditors to deliver a revised opinion withdrawing the going concern qualification.

### SECTION 6. NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations and cancellation or expiration of all Letters of Credit, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

> 6.1 **Indebtedness.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

> (a) the Obligations;

> (b) Indebtedness of any Credit Party to a Borrower or to any other Credit Party, or of a Borrower to any other Borrower or any Credit Party; provided, (i) all such Indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a First Priority Lien pursuant to the applicable Collateral Documents, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to the Administrative Agent, and (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a *pro tanto* reduction of the amount of any Indebtedness owed by such Credit Party to Xerium or to any of its Subsidiaries for whose benefit such payment is made;

106

(c) unsecured Debt (including Subordinated Debt); provided, that (i) no Default or Event of Default is continuing under this Agreement or would result from such issuance, (ii) each Borrower is in compliance (and certifies as to such compliance) with Section 6.8 on a pro forma basis after giving effect to the such issuance, (iii) the proceeds of such issuance are applied in accordance with Section 2.14(d) of the Second Lien Credit Agreement, and if all loans thereunder are paid in full, then the proceeds of such issuance shall be used for Permitted Acquisitions or to fund Capital Expenditures permitted under this Agreement, (iv) such Debt shall have a maturity of not earlier than six (6) months after the Term Loan Maturity Date, (v) the documentation relating to such Debt shall not permit or provide for any scheduled amortization payments prior to the Term Loan Maturity Date and (vi) the documentation relating to such Debt shall not contain any covenant or event of default that is either (x) not substantially provided for in this Agreement or (y) more favorable to the holder of such Debt than the comparable covenant or event of default set forth in this Agreement, and, with respect to Subordinated Debt, shall contain customary subordination provisions pursuant to which such subordinated Debt is subordinate to the prior payment in full of the Obligations;

(d) Indebtedness incurred by Xerium or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of each Borrower or any such Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions or permitted dispositions of any business, assets or Subsidiary of Xerium or any of its Subsidiaries;

(e) Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the Ordinary Course;

(f) Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(g) guaranties in the Ordinary Course of obligations to suppliers, customers, franchisees and licensees of Xerium and its Subsidiaries;

(h) guaranties or the provision of other credit support by a Borrower of Indebtedness of a Credit Party or guaranties or the provision of other credit support by a Credit Party of a Borrower of Indebtedness of a Borrower or a Credit Party with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1;

(i) Indebtedness, including the ability to draw on commitments to incur Indebtedness, described in Schedule 6.1(i), but not any extensions, renewals or replacements of such Indebtedness except (i) renewals and extensions expressly provided for in the agreements evidencing any such Indebtedness as the

107

same are in effect on the date of this Agreement and (ii) refinancings and extensions of any such Indebtedness if the terms and conditions thereof are not materially less favorable to the obligor thereon or to the Banks than the Indebtedness being refinanced or extended, and the average life to maturity thereof is greater than or equal to that of the Indebtedness being refinanced or extended; provided, such Indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the Indebtedness being renewed, extended or refinanced, except as to fees and expenses at refinancing or (C) be incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom;

(j) Indebtedness with respect to Capital Leases or purchase money Indebtedness in an amount not to exceed at any time $25,000,000 in the aggregate (including any Indebtedness acquired in connection with a Permitted Acquisition); provided, any such purchase money Indebtedness shall be secured only to the asset(s) acquired in connection with the incurrence of such Indebtedness;

(k) other Indebtedness of Xerium and its Subsidiaries in an aggregate amount not to exceed at any time $25,000,000;

(l) Indebtedness under the Factoring Agreements otherwise permitted by this Agreement;

(m) unsecured working capital facilities of any Subsidiary in respect of which a Letter of Credit in an amount equal to the maximum principal amount of such facilities has been issued under this Agreement;

(n) Hedging Obligations entered into for the purpose of hedging risks associated with the operations of Xerium and its Subsidiaries;

(o) Indebtedness owed under the Second Lien Credit Agreement and the Second Lien Credit Documents; and

(p) provided that no Event of Default shall have occurred and be continuing or would occur as a consequence thereof, any replacement, renewal or refinancing of any Indebtedness described in Sections 6.1 (c), (j), (k), and (o) (collectively, the "**Permitted Refinancing Indebtedness**") that (i) does not exceed the aggregate principal amount of the Indebtedness being replaced, renewed or refinanced, except as to fees and expenses at refinancing, (ii) does not have a maturity date earlier than the Indebtedness being replaced renewed or refinanced, (iii) does not rank at the time of such replacement, renewal or refinancing senior to the Indebtedness being replaced, renewed or refinanced, (iv) the documentation relating to such Indebtedness shall not contain any covenant or event of default that is either (x) not substantially provided for in this

108

Agreement or (y) more favorable to the holder of such debt than the comparable covenant or event of default set forth in this Agreement, (v) the obligors in respect of such Permitted Refinancing Indebtedness (including in their capacities as primary obligor and guarantor) are the same as for the Indebtedness being refinanced and (vi) any Liens securing such Permitted Refinancing Indebtedness are not extended to any property which does not secure the Indebtedness being refinanced.

6.2 **Liens.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Xerium or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, except:

(a) Liens in favor of the Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document;

(b) Liens for Taxes not then due or if due obligations with respect to such Taxes that are not at such time required to be paid pursuant to Section 5.3 or which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(c) statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the Ordinary Course (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of fifteen (15) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(d) Liens incurred in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

109

(e) easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of Xerium or any of its Subsidiaries;

(f) any (i) interest or title of a lessor or sublessor under any lease of real estate permitted hereunder, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii), so long as the holder of such restriction or encumbrance agrees to recognize the rights of such lessee or sublessee under such lease;

(g) Liens solely on any cash earnest money deposits made by Xerium or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(h) purported Liens evidenced by the filing of precautionary UCC financing statements or, for property located in foreign jurisdictions, the preparation and/or filing of functionally similar documents, relating solely to operating leases of personal property entered into in the Ordinary Course;

(i) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j) any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k) (i) licenses of patents, trademarks and other intellectual property rights granted by Xerium or any of its Subsidiaries in the Ordinary Course and not interfering in any material respect with the ordinary conduct of the business of Xerium or such Subsidiary and (ii) leases or subleases granted by Xerium of any of its Subsidiaries to third parties in respect of surplus property which is not fundamental to the operation of the business in the Ordinary Course; provided that such leases and subleases are on arms-length commercial terms and are otherwise satisfactory to the Administrative Agent;

(l) existing Liens described in Schedule 6.2(l) and replacements thereof, so long as the replacement Liens encumber only the assets subject to the Liens being replaced and the replacement Liens secure obligations in an amount no greater than the obligations secured by the Liens being replaced;

(m) Liens securing Indebtedness permitted pursuant to Sections 6.1(j) and (k); provided, any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness;

110

(n) Liens granted by **entities acquired pursuant** to Section 6.9 prior to their acquisition and not in contemplation of such acquisition and which are discharged within three (3) months of the date of acquisition and in relation to which the secured amount is not increased in contemplation of or after the date of the relevant acquisition;

(o) the Parallel Obligations;

(p) Liens on the Collateral securing the Second Lien Obligations;

(q) Liens securing Permitted Refinancing Indebtedness, provided that any such Lien shall encumber only the assets that secure the Indebtedness being replaced, renewed or refinanced by such of such Permitted Refinancing Indebtedness;

(r) existing Liens on a title report delivered pursuant to Section 3.1(i)(iv);

(s) any Liens arising by operation of law and any lien arising under customary retention of title arrangements (*Eigentumsvorbehalt*) in the Ordinary Course;

(t) any Lien arising under the general terms and conditions of banks or Sparkassen (*Allgemeine Geschäftsbedingungen der Banken oder Sparkassen*) with whom Xerium or any of its Subsidiaries maintains a banking relationship with a financial institution in Germany; and

(u) Liens securing Indebtedness or obligations that do not exceed $15,000,000 (the "**Lien Basket Amount**") at any time outstanding that encumber assets located outside of the United States; provided that up to $5,000,000 of the Lien Basket Amount may relate to Liens encumbering assets located in the United States.

**6.3 Equitable Lien.** If any Credit Party or any of its Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provisions whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided, notwithstanding the foregoing, this covenant shall not be construed as a consent by Requisite Banks to the creation or assumption of any such Lien not otherwise permitted hereby.

**6.4 No Further Negative Pledges.** Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale, (b) restrictions contained in any documents evidencing Subordinated Debt; provided, that in respect of Subordinated Debt such restrictions do not restrict the ability to grant security interests under this Agreement or any agreement that

111

refinances this Agreement, (c) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the Ordinary Course (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), (d) Liens permitted to be incurred under Section 6.2 and restrictions in the agreements relating thereto that limit the right of any Credit Party to dispose of or transfer the assets subject to such Liens, (e) provisions limiting the disposition or distribution of assets or property in sale-leaseback agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of such agreements, (f) any encumbrance or restriction in connection with an acquisition of property, so long as such encumbrance or restriction relates solely to the property so acquired and was not created in connection with or in anticipation of such acquisition, (g) restrictions contained in the Second Lien Credit Documents and (h) restrictions imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements that restrict the transfer of ownership interest in such partnership, limited liability company, joint venture or similar Person, no Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

    **6.5 Restricted Junior Payments.** No Credit Party shall, nor shall it permit any of its Subsidiaries or Affiliates through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment, except:

        (a) any Subsidiary may declare and pay or make any distributions to its shareholders, provided that such payments are made to all its shareholders proportionately based on their ownership interest in such Subsidiary;

        (b) [Intentionally omitted]; and

        (c) so long as no Default or Event of Default has occurred and is continuing, Xerium may repurchase, redeem or retain Common Stock in an amount not to exceed $7.0 million per annum solely for the purpose of repurchases of Common Stock from departing Xerium executives or satisfying the purchase price of equity award under, or paying withholding taxes payable with respect to, vested equity compensation programs.

    **6.6 Restrictions on Subsidiary Distributions.** Except as provided herein and as provided in the Second Lien Credit Agreement, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Xerium to (a) pay dividends or make

112

any other distributions on any of such Subsidiary's Capital Stock owned by Xerium or any other Subsidiary of Xerium, (b) repay or prepay any Indebtedness owed by such Subsidiary to Xerium or any other Subsidiary of Xerium, (c) make loans or advances to Xerium or any other Subsidiary of Xerium, or (d) transfer any of its property or assets to Xerium or any other Subsidiary of Xerium, other than restrictions (i) in agreements evidencing Indebtedness permitted by Section 6.1(k) that impose restrictions on the property so acquired; (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the Ordinary Course; (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement; (iv) in any agreement for the sale or other disposition of a Subsidiary that restricts distributions by that Subsidiary pending the sale or other disposition; (v) in provisions in agreements or instruments which prohibit the payment of dividends or the making of other distributions with respect to any class of Capital Stock of a Person other than on a pro rata basis; and (vi) in any instrument governing Indebtedness or Capital Stock of a Person acquired by Xerium or any of its Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the property or assets of the Person, so acquired, provided that, in the case of Indebtedness, such Indebtedness was permitted by Section 6.1.

6.7 **Investments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a) Investments in Cash and Cash Equivalents;

(b) equity Investments and loans as of the Closing Date in or to any Subsidiary and equity Investments and loans made after the Closing Date in or to any Guarantor Subsidiary;

(c) Investments (i) in any Securities received in satisfaction or partial satisfaction of obligations of financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in Xerium's and its Subsidiaries' Ordinary Course;

(d) intercompany loans and guaranties to the extent permitted under Section 6.1(b), (d), (e), (g) and (h);

(e) Consolidated Capital Expenditures permitted by Section 6.8(d);

113

(f) loans and advances to employees of Xerium and its Subsidiaries made in the Ordinary Course in an aggregate principal amount not to exceed $1,000,000 in the aggregate;

(g) Investments made in connection with Permitted Acquisitions permitted pursuant to and in accordance with Section 6.9; provided that shares of Common Stock may be issued as consideration in connection with Permitted Acquisitions so long as Xerium is in compliance, on a pro forma basis, with the financial covenants set forth in Section 6.8;

(h) Investments received in lieu of Cash in connection with Asset Sales permitted by and in accordance with Section 6.9;

(i) Investments described in Schedule 6.7(i);

(j) other Investments (including without limitation Investments in Subsidiaries which are not wholly owned, directly or indirectly, by any Borrower) in an aggregate amount not to exceed at any time $20,000,000.

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.5.

### 6.8 Financial Covenants.

(a) **Interest Coverage Ratio.** Xerium shall not permit the Interest Coverage Ratio for any period of four consecutive Fiscal Quarters ending with any Fiscal Quarter set forth below to be less than the ratio set forth below opposite such Fiscal Quarter:

|  |  |
| --- | --- |
| September 30, 2010 | 1.75 |
| December 31, 2010 | 1.75 |
| March 31, 2011 | 1.75 |
| June 30, 2011 | 2.00 |
| September 30, 2011 | 2.00 |
| December 31, 2011 | 2.00 |
| March 31, 2012 | 2.25 |
| June 30, 2012 | 2.25 |
| September 30, 2012 | 2.25 |
| December 31, 2012 | 2.25 |
| March 31, 2013 | 2.25 |
| June 30, 2013 | 2.25 |
| September 30, 2013 | 2.25 |
| December 31, 2013 | 2.50 |

114

| | |
|---|---|
| March 31, 2014 | 2.50 |
| June 30, 2014 | 2.50 |
| September 30, 2014 | 2.50 |
| December 31, 2014 | 2.50 |
| March 31, 2015 | 2.50 |
| June 30, 2015 | 2.50 |
| September 30, 2015 | 2.50 |
| December 31, 2015 | 2.50 |

(b) <u>Leverage Ratio</u>. Xerium shall not permit the Leverage Ratio for any period of four consecutive Fiscal Quarters ending with any Fiscal Quarter set forth below to be greater than the ratio set forth below opposite such Fiscal Quarter:

| | |
|---|---|
| September 30, 2010 | 5.50 |
| December 31, 2010 | 5.50 |
| March 31, 2011 | 5.25 |
| June 30, 2011 | 5.25 |
| September 30, 2011 | 5.00 |
| December 31, 2011 | 4.75 |
| March 31, 2012 | 4.75 |
| June 30, 2012 | 4.50 |
| September 30, 2012 | 4.50 |
| December 31, 2012 | 4.25 |
| March 31, 2013 | 4.25 |
| June 30, 2013 | 4.25 |
| September 30, 2013 | 4.00 |
| December 31, 2013 | 4.00 |
| March 31, 2014 | 3.75 |
| June 30, 2014 | 3.75 |
| September 30, 2014 | 3.75 |
| December 31, 2014 | 3.50 |
| March 31, 2015 | 3.50 |
| June 30, 2015 | 3.50 |
| September 30, 2015 | 3.50 |
| December 31, 2015 | 3.50 |

(c) [Intentionally omitted]

(d) <u>Maximum Consolidated Capital Expenditures</u>. Xerium shall not, and shall not permit its Subsidiaries to, make or incur Consolidated Capital Expenditures, in any Fiscal Year indicated below, in an aggregate amount for Xerium and its Subsidiaries in excess of the corresponding amount ("**Maximum Consolidated Capital Expenditures**") set forth below opposite such Fiscal Year

115

(exclusive of capital expenditures paid with Net Insurance/Condemnation Proceeds in accordance with Section 2.14(b)):

| | |
|---|---|
| 2010 | $37,300,000 |
| 2011 | $33,400,000 |
| 2012 | $33,800,000 |
| 2013 | $33,100,000 |
| 2014 | $33,100,000 |
| 2015 | $33,100,000 |

provided, that the Maximum Consolidated Capital Expenditures for any Fiscal Year shall be increased by an amount equal to 50% of the portion of Maximum Consolidated Capital Expenditures not expended in the immediately preceding Fiscal Year (the "**Roll-Over Amount**"); provided, further, that any Roll-Over Amount not expended in the applicable Fiscal Year shall not be added to the amount of Maximum Consolidated Capital Expenditures for the immediately succeeding Fiscal Year.

(e) Certain Calculations. (i) With respect to any period during which a Permitted Acquisition or an Asset Sale has occurred (each, a "**Subject Transaction**"), for purposes of determining compliance with the financial covenants set forth in this Section 6.8, Adjusted EBITDA shall be calculated with respect to such period on a pro forma basis (including (x) pro forma adjustments arising out of events which are directly attributable to a specific transaction, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, which would include cost savings resulting from head count reduction, closure of facilities and similar restructuring charges and applicable interest expense shall be calculated with respect to such period on a pro rata basis, which pro forma adjustments shall be certified by the chief financial officer of Xerium and (y) such other adjustments that are acceptable to the Administrative Agent) using the historical audited financial statements of any business so acquired or to be acquired or sold or to be sold and the consolidated financial statements of Xerium and its Subsidiaries which shall be reformulated as if such Subject Transaction, and any Indebtedness incurred or repaid in connection therewith, had been consummated or incurred or repaid at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans incurred during such period).

(ii) Whenever pro forma effect is to be given to any transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of Xerium. Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a

116

responsible financial or accounting officer of Xerium to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

6.9 **Fundamental Changes; Disposition of Assets; Acquisitions.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and Capital Expenditures in the Ordinary Course) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a) any Subsidiary of Xerium may be merged with or into a Borrower or any other Subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to a Borrower or any other Subsidiary; provided, however, in the case of such a merger involving a Borrower or a Guarantor Subsidiary merging with a non-Guarantor Subsidiary, such Borrower or Guarantor Subsidiary shall be the continuing or surviving Person;

(b) sales or other dispositions of assets that do not constitute Asset Sales;

(c) Asset Sales, the proceeds of which (valued at the principal amount thereof in the case of non-Cash proceeds consisting of notes or other debt Securities and valued at fair market value in the case of other non-Cash proceeds) when aggregated with the proceeds of all other Asset Sales made within the same Fiscal Year, are less than $25,000,000 (excluding proceeds from the Australia Asset Sales and the Vietnam Asset Sales); provided (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of such Credit Party (or similar governing body)), (2) no less than 75% thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.14(a);

(d) disposals of obsolete, worn out or surplus property, and any assets acquired in connection with the acquisition of another Person in a division or line of business of such Person reasonably determined by the acquirer to be surplus assets;

(e) Permitted Acquisitions, so long as (i) the equity of Xerium is used as 100% of the consideration in connection therewith or (ii) cash of Xerium or any of its Subsidiaries is used as all or a portion of the consideration; provided

117

that, in the case of clause (ii), Xerium must demonstrate that, on a pro forma basis, the Leverage Ratio of Xerium is at least 0.5x inside the then applicable Leverage Ratio under Section 6.8(b); and

(f) Investments made in accordance with Section 6.7.

6.10 **Disposal of Subsidiary Interests.** Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.9 or pursuant to the Collateral Documents, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualify directors if required by applicable law; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law.

6.11 **Sales and Lease Backs.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Xerium or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than Xerium or any of its Subsidiaries) in connection with such lease.

6.12 **Transactions with Shareholders and Affiliates.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of Capital Stock of Xerium or any of its Subsidiaries or with any Affiliate of Xerium or of any such holder, on terms that are less favorable to Xerium or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, the foregoing restriction shall not apply to (a) any transaction between Xerium or any of its Subsidiaries and any other of Xerium and its Subsidiaries; (b) reasonable and customary fees paid to members of the board of directors (or similar governing body) of Xerium and its Subsidiaries; (c) compensation arrangements for officers and other employees of Xerium and its Subsidiaries entered into in the Ordinary Course; (d) the agreements and instruments listed on Schedule 2.29 and the transactions related thereto (which agreements and instruments shall be in form and substance reasonably satisfactory to the Administrative Agent); and (e) transactions described in Schedule 6.12. Notwithstanding anything to the contrary herein, the transactions contemplated by the Plan of Reorganization or

118

the Disclosure Statement shall be deemed permitted transactions under this Agreement.

6.13 **Conduct of Business.** From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by one or more Credit Parties on the Closing Date and similar or related businesses and (ii) such other lines of business as may be consented to by Requisite Banks.

6.14 **[Intentionally Omitted].**

6.15 **Amendments or Waivers of Organizational Documents.** No Credit Party shall terminate or agree to any amendment, restatement, supplement or other modification to, any Organizational Document that would be materially adverse to the Banks.

6.16 **Amendments or Waivers of with respect to Subordinated Debt and the Second Lien Credit Agreement.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, amend or otherwise change the terms of any Subordinated Debt or make any payment consistent with an amendment thereof or change thereto, if the effect of such amendment or change is to increase the interest rate or the amortization rate on such Subordinated Debt, change (to earlier dates) any dates upon which payments of principal or interest are due thereon, change any event of default or condition to an event of default with respect thereto (other than to eliminate any such event of default or increase any grace period related thereto), change the redemption, prepayment or defeasance provisions thereof, change the subordination provisions of such Subordinated Debt (or of any guaranty thereof), or if the effect of such amendment or change, together with all other amendments or changes made, is to increase materially the obligations of the obligor thereunder or to confer any additional rights on the holders of such Subordinated Debt (or a trustee or other representative on their behalf) which would be adverse to any Credit Party or Banks. In addition, the Borrowers shall not amend or otherwise modify the terms of the Second Lien Credit Agreement in contravention of the terms of the Intercreditor Agreement.

6.17 **Fiscal Year.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its Fiscal Year end from December 31st.

6.18 **Account Control Agreements; Cash Management.** Xerium shall not alter or permit its Subsidiaries to alter the cash concentration and cash management practice and services with respect to the accounts covered by the control agreements pursuant to which the Administrative Agent is a party unless it gives the Collateral Agent 30 days' prior written notice of such change and the applicable Credit Party, prior to effecting such change, enters into control agreements in form and substance reasonably satisfactory to the Collateral Agent; provided that if for two consecutive Fiscal Quarters the Leverage Ratio shall be less than 3.00, then the obligation of the Credit Parties to maintain control

119

agreements for the benefit of the Banks, including control agreements relating to the Primary Accounts (but excluding the Term Loan LC Collateral Account Control Agreement), shall terminate and upon the request of Xerium the Collateral Agent and (if a party thereto) the Administrative Agent will enter into applicable termination agreements terminating such control agreements.

## SECTION 7. GUARANTY

### 7.1 **Guaranty of the Obligations.**

(a) Subject to the provisions of Section 7.2 and 7.14, the Non-US Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Non-US Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "**Non-US Guaranteed Obligations**")

(b) Subject to the provisions of Section 7.2, the US Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "**Guaranteed Obligations**").

### 7.2 **Contribution by Guarantors.**

(a) All Non-US Guarantors desire to allocate among themselves (collectively, the "**Non-US Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Non-US Funding Guarantor**") under this Guaranty such that its Non-US Aggregate Payments exceed its Non-US Fair Share as of such date, such Non-US Funding Guarantor shall be entitled to a contribution from each of the other Non-US Contributing Guarantors in an amount sufficient to cause each Non-US Contributing Guarantor's Non-US Aggregate Payments to equal its Non-US Fair Share as of such date. "**Non-US Fair Share**" means, with respect to a Non-US Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Non-US Fair Share Contribution Amount with respect to such Non-US Contributing Guarantor to (ii) the aggregate of the Non-US Fair Share Contribution Amounts with respect to all Non-US Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Non-US Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. "**Non-US Fair Share Contribution Amount**" means,

120

with respect to a Non-US Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Non-US Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Non-US **Fair Share Contribution Amount**" with respect to any Non-US Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Non-US Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Non-US Contributing Guarantor. "**Non-US Aggregate Payments**" means, with respect to a Non-US Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Non-US Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Non-US Contributing Guarantor from the other Non-US Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Non-US Funding Guarantor. The allocation among Non-US Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Non-US Contributing Guarantor hereunder. Each Non-US Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2(a).

(b) All US Guarantors desire to allocate among themselves (collectively, the "**US Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a US Guarantor (a "**US Funding Guarantor**") under this Guaranty such that its US Aggregate Payments exceed its US Fair Share as of such date, such US Funding Guarantor shall be entitled to a contribution from each of the other US Contributing Guarantors in an amount sufficient to cause each US Contributing Guarantor's US Aggregate Payments to equal its US Fair Share as of such date. "**US Fair Share**" means, with respect to a US Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the US Fair Share Contribution Amount with respect to such US Contributing Guarantor to (ii) the aggregate of the US Fair Share Contribution Amounts with respect to all US Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all US Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. "**US Fair Share Contribution Amount**" means, with respect to a US Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such US Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law;

121

provided, solely for purposes of calculating the "US **Fair Share Contribution Amount**" with respect to any US Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such US Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such US Contributing Guarantor. "**US Aggregate Payments**" means, with respect to a US Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such US Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such US Contributing Guarantor from the other US Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable US Funding Guarantor. The allocation among US Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any US Contributing Guarantor hereunder. Each US Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2(b).

### 7.3 Payment by Guarantors

(a) Subject to Section 7.2(a), Non-US Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Non-US Guarantor by virtue hereof, that upon the failure of a Non-US Borrower to pay any of the Non-US Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Non-US Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Non-US Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Non-US Guaranteed Obligations (including interest which, but for any Non-US Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Non-US Guaranteed Obligations, whether or not a claim is allowed against such Non-US Borrower for such interest in the related bankruptcy case) and all other Non-US Guaranteed Obligations then owed to Beneficiaries as aforesaid.

(b) Subject to Section 7.2(b), US Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any US Guarantor by virtue hereof, that upon the failure of a Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated

122

maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), US Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for any Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against such Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

7.4 **Liability of Guarantors Absolute**. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of such Guarantor and not merely a contract of surety;

(b) Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between any Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c) the obligations of such Guarantor hereunder are independent of the obligations of any Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of any Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against any Borrower or any of such other guarantors and whether or not any Borrower is joined in any such action or actions;

(d) payment by any Guarantor of a portion, but not all, of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of

123

the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be;

(e) any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Non-US Guaranteed Obligations or Guaranteed Obligations, or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, and take and hold security for the payment hereof or the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, any other guaranties of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, or any other obligation of any Person (including any other Guarantor) with respect to the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, provided, however, that no Credit Document to which such Guarantor is party may be amended without its written consent; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable documentation creating Hedging Obligations and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Borrower or any security for the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be; and (vi) exercise any other rights available to it under the Credit Documents or the applicable documentation creating Hedging Obligations; and

(f) this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation (subject, however, to the limitations applicable to certain Non-US Guarantors as

124

set out in Section 7.14), impairment, discharge or termination for any reason (other than payment in full of the Non-US Guaranteed Obligations and Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or the applicable documentation creating Hedging Obligations, at law, in equity or otherwise) with respect to the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any of the applicable documentation creating Hedging Obligations or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, in each case whether or not in accordance with the terms hereof or such Credit Document, such applicable documentation creating Hedging Obligations or any agreement relating to such other guaranty or security; (iii) the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or any of the applicable documentation creating Hedging Obligations or from the proceeds of any security for the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, except to the extent such security also serves as collateral for indebtedness other than the Non-US Guaranteed Obligations or Guaranteed Obligations) to the payment of indebtedness other than the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, even though any Beneficiary might have elected to apply such payment to any part or all of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Xerium or any of its Subsidiaries and to any corresponding restructuring of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be; (vii) any defenses, set offs or counterclaims which any Borrower may allege or assert against any Beneficiary in respect of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; (viii) any law or regulation of any jurisdiction or any other event affecting any term of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the

125

case may be; and (ix) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be.

(g) Notwithstanding anything to the contrary herein or in any Credit Document, this guarantee given by any guarantor organized under Austrian law is meant to be and shall be interpreted as abstract guarantee (*"abstrakter Garantievertrag"*) and not as surety (*"Buergschaft"*), neither as a joint obligation as a borrower (*"Mitschuldner"*) and such Austrian Guarantor undertakes to pay unconditionally, irrevocably, upon first demand and without raising any defenses (*"unbedingt, unwiderruflich, ueber erste Aufforderung und unter Verzicht auf alle Einwendungen"*) any amounts demanded by any of the Beneficiaries under reference to this guarantee.

(h) Notwithstanding anything to the contrary herein or in any Credit Document, to the extent that this guarantee is granted by any guarantor organized under German law, such guarantee is granted in the form of an abstract guarantee (*abstraktes Garantieversprechen*) and not as a surety (*Buergschaft*) or as a joint obligation as borrower (*Mitschuldübernahme*), and any German Guarantor undertakes, subject to subsection 7.14(f) hereof, to pay unconditionally, irrevocably, upon first demand and without raising any defenses (*unbedingt, unwiderruflich, auf erstes Anfordern und unter Verzicht auf alle Einwendungen und Einreden*) any amounts demanded by any of the Beneficiaries under reference to this guarantee. Each German Guarantor hereby confirms to the Administrative Agent and each Beneficiary that (i) it has thoroughly read this guarantee and understands that it may be liable hereunder for payments in excess of the amounts of the Loans, (ii) it has discussed this guarantee with its legal counsel prior to entering into this Agreement, and (iii) in the past it has entered into such guarantees as a guarantor before.

7.5 **Waivers by Guarantors.** Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against any Borrower, any other guarantor (including any other Guarantor) of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be or any other Person, (ii) proceed against or exhaust any security held from any Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Borrower or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of any Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, or any agreement or instrument relating thereto or by reason of the cessation of the liability of any Borrower or any other Guarantor from any cause other than payment in full of the Non-US

126

Guaranteed Obligations or Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Non-US Guaranteed Obligations or Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, the applicable documentation creating Hedging Obligations or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Non-US Guaranteed Obligations or Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to any Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof, subject to the limitations applicable to certain Non-US Guarantors as set out in Section 7.14.

The Mexican Guarantor, hereby expressly waives, to the fullest extent allowed by law of Mexico, all legal benefits including, but not limited to, inter alia the benefits of order, excussio and division provided for in Articles 2813, 2814, 2815, 2817, 2818, 2820, 2821, 2822, 2823, 2826 and 2837 of Federal Civil Code of Mexico, the contents and scope of which the Mexican Guarantor hereby acknowledges to be fully aware of. Likewise, the Mexican Guarantor expressly waives the rights granted to it under Articles 2845, 2846, 2847 and 2849 of the Federal Civil Code of Mexico, pursuant to which the Mexican Guarantor would be relieved from its obligations in case any of the Banks would grant any extensions or releases to the Mexican Guarantor.

7.6 **Guarantors' Rights of Subrogation, Contribution, etc.** Until the Non-US Guaranteed Obligations and Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against any Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its respective obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter

127

have against any Borrower with respect to the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against any Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Non-US Guaranteed Obligations and Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, including, without limitation, any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against any Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against any Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Non-US Guaranteed Obligations and Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, whether matured or unmatured, in accordance with the terms hereof.

      **7.7 Subordination of Other Obligations.** Any Indebtedness of any Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Non-US Guaranteed Obligations and Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof, subject, however to the limitations applicable to certain Non-US Guarantors as set out in Sections 7.13 and 7.14.

      **7.8 Continuing Guaranty.** This Guaranty is a continuing guaranty and shall remain in effect until all of the Non-US Guaranteed Obligations and Guaranteed Obligations shall have been paid in full and the Revolving

128

Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be.

7.9 **Authority of Guarantors or Borrowers**. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or any Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

7.10 **Financial Condition of Each Borrower**. Any Credit Extension may be made to any Borrower or continued from time to time, and any applicable documentation creating Hedging Obligations may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of such Borrower at the time of any such grant or continuation or at the time such applicable documentation creating Hedging Obligations is entered into, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of any Borrower. Each Guarantor has adequate means to obtain information from each Borrower on a continuing basis concerning the financial condition of such Borrower and its ability to perform its respective obligations under the Credit Documents and the applicable documentation creating Hedging Obligations, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of each Borrower and of all circumstances bearing upon the risk of non-payment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of any Borrower now known or hereafter known by any Beneficiary.

7.11 **Bankruptcy, etc.**

(a) So long as any Non-US Guaranteed Obligations or Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Banks, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against any Borrower or any other Guarantor, subject to the limitations applicable to certain Non-US Guarantors as set out in Section 7.13 and Section 7.14. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of any Borrower or any other Guarantor or by any defense which any Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

129

(b) Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Non-US Guaranteed Obligations and Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Non-US Guaranteed Obligations and Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Non-US Guaranteed Obligations and Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Non-US Guaranteed Obligations and Guaranteed Obligations which are guaranteed by the applicable Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve any Borrower of any portion of such Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c) In the event that all or any portion of the Non-US Guaranteed Obligations or Guaranteed Obligations are paid by any Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Non-US Guaranteed Obligations and Guaranteed Obligations for all purposes hereunder.

7.12 **Discharge of Guaranty Upon Sale of Guarantor.** If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

7.13 **Validity of Pledge of Shares held by Xerium Technologies Limited, Xerium (France) SAS and the German Guarantors; Parallel Obligations.**

(a) For the purposes of taking a valid security interest in the shares held by Xerium (France) SAS, Xerium Technologies Limited and the German Guarantors securing only the Non-US Obligations and ensuring the continued validity of such security interest, and despite anything to the contrary contained in any Credit Document:

130

(i) Xerium (France) SAS shall pay to the Collateral Agent sums equal to, and in the currency of, its obligations owing by it to a Secured Party (other than the Collateral Agent) as and when the same fall due for payment under the Credit Documents and each of the German Guarantors shall pay to the Collateral Agent sums equal to, and in the currency of, the Non-US Obligations as and when the same fall due for payment under the Credit Documents (the "**Parallel Obligations**");

(ii) the rights of the Secured Parties to receive payment under the Credit Documents are several and independent from the rights of the Collateral Agent to receive the Parallel Obligations;

(iii) the Collateral Agent shall have its own independent right to demand payment of the Parallel Obligations by Xerium Technologies Limited, Xerium (France) SAS and the German Guarantors;

(iv) the payment by Xerium Technologies Limited, Xerium (France) SAS or any of the German Guarantors of its Parallel Obligations to the Collateral Agent in accordance with this Section 7.13 shall be a good discharge of the corresponding obligations owed by it to the relevant Secured Party under the relevant Credit Document, or the corresponding Non-US Obligations, as the case may be, and payment by Xerium (France) SAS or any of the German Guarantors of its obligations owed by it to the relevant Secured Party under the relevant Credit Document, or the corresponding Non-US Obligations, as the case may be, shall be a good discharge of the corresponding Parallel Obligations to the Collateral Agent; and

(v) with regard to Xerium Technologies Limited, Xerium (France) SAS and the German Guarantors, nothing in any Credit Document shall in any way limit the Collateral Agent's right to act in the protection or preservation of the rights under, or to enforce any, Collateral Document as contemplated by this Section 7.13 or the relevant Collateral Document.

(b) Despite the foregoing, any such payment shall be made to the Administrative Agent unless the Administrative Agent directs such payment to be made to the Collateral Agent.

(c) Without limiting or affecting the Collateral Agent's rights against Xerium Technologies Limited, Xerium (France) SAS or any of the German Guarantors (whether under this Section 7.13 or under any other provision of the Credit Documents and subject to paragraph (a)(v) of this Section 7.13), the Collateral Agent agrees with each other Secured Party or creditor of a Non-US Obligation, as the case may be, that it will not exercise its rights in respect of the Parallel Obligations except with the consent of the relevant Secured Party or the creditor of a Non-US Obligation or the Requisite Banks, as the case may be.

(d) A Secured Party and the Collateral Agent may not, by virtue of this Section 7.13, pursue Xerium (France) SAS or any of the German Guarantors concurrently for the same obligation.

### 7.14 Limitation of Non-US Guaranteed Obligations.[3]

(a) <u>Austrian guarantee</u>. The obligations of each Non-US Guarantor organized under Austrian law (each, an "**Austrian Guarantor**") shall be limited so as not to result in the violation of Austrian capital maintenance rules pursuant to Austrian company law, in particular Section 82 of the Act on Limited Liability Companies (*Gesetz über Gesellschaften mit beschränkter Haftung*) and Section 52 of the Austrian Act on Stock Corporations (*Aktiengesetz*)(Austrian Capital Maintenance Rules), and all obligations hereunder of such Austrian Guarantor shall be limited in accordance with these rules. Further, the subordination of obligations pursuant to Section 7.7 hereof shall not be binding on any Obligee Guarantor organized under Austrian law to the extent such subordination would constitute a violation of mandatory Austrian capital maintenance provisions. No reduction of the amount enforceable against an Austrian Guarantor pursuant to this paragraph in accordance with the above limitations will prejudice the rights of the Administrative Agent to continue to enforce the guarantee pursuant to Section 7.1 (subject always to the operation of the limitation set forth above at the time of such enforcement) until the Non-US Obligations have been satisfied in full.

(b) <u>Italian guarantee</u>. This liability of each Non-US Guarantor organized under the laws of the Republic of Italy (each, an "**Italian Guarantor**") shall:

(i) at no time require an Italian Guarantor to pay an amount which exceeds an amount corresponding from time to time to the aggregate of the outstanding indebtedness of the Italian Guarantor under the Italia Term Loan; and

(ii) the guarantee obligations of an Italian Guarantor under this Section 7.14(b) shall be limited to the extent required to comply with Italian mandatory provisions on financial assistance and corporate benefit (including, without limitation, Article 2358 of the Italian Civil Code) and, accordingly, such guarantee obligations shall not include and shall not extend to any indebtedness incurred by any Borrower and/or Guarantor in relation to the financing of the acquisition or subscription for of shares issued or to be issued

---

[3] Under review and discussion by local counsel.

132

by such Italian Guarantor or by any direct or indirect controlling entity of such Italian Guarantor, unless the conditions and procedure provided for under Article 2358 of the Italian Civil Code are complied with; without prejudice to the foregoing and for the specific purposes of article 1938 of the Italian Civil Code (if applicable), the maximum amount that each Italian Guarantor may be required to pay under this Section 7.14 shall in no event exceed Euro [_____].

(c) Intentionally omitted.

(d) French guarantee. The liability of each Non-US Guarantor organized under the laws of France (a "French Guarantor") shall (A) not include any obligations which if incurred would constitute the provision of financial assistance as defined by article L225-216 of the French Commercial Code, (B) only guarantee obligations to the extent that the proceeds are used to finance or refinance the working capital needs or the debt of any Borrower and (C) be limited at any time to the greater of:

(i) the equivalent to Euros of the Loans (plus any accrued interest thereon, commissions and fees) made available to any obligor (other than, if applicable, the French Guarantor) to the extent directly or indirectly on-lent by the obligor to the French Guarantor calculated by the Facility Agent on the date on which such moneys are paid; and

(ii) 80% of the greater of:

(A) the Net Asset Value of the French Guarantor calculated and certified by the statutory auditors of the French Guarantor on the basis of the last audited financial statements available at the date hereof; and

(B) the Net Asset Value of the French Guarantor calculated and certified by the statutory auditors of the French Guarantor on the basis of the last audited financial statements available at the date on which demand is made on it pursuant to this Section 7.

For the purposes of this Section 7.14(d) "Net Asset Value" of the French Guarantor means the *capitaux propres* (as defined under the provisions of French accounting laws, decrees and regulations consistently applied) of the French Guarantor. A certificate of the statutory auditors of the French Guarantor as to the Net Asset Value shall be prima facie evidence as to the amount to which it relates.

The liability of any French Guarantor under Section 7 (Guaranty) of this Agreement for the obligations under the Credit Documents of any Non-US Credit Party which is its Subsidiary shall not, in relation to amounts due by such Non-US Credit Party, be limited.

(e) Canadian guarantee. No Guarantor existing under the laws of Canada or any province thereof (a "Canadian Guarantor") shall guarantee, undertake, or provide any indemnity in respect of, the obligations of any person

133

under this Section 7 unless at the time such guarantee or undertaking is given or indemnity is provided (i) such person is a Subsidiary of the Canadian Guarantor or (ii) the Canadian Guarantor is a wholly owned Subsidiary of such person or (iii) such Canadian Guarantor is not prohibited by applicable laws from giving such guarantee or undertaking or providing such indemnity.

(f) German guarantees.

(i) To the extent that any of the guarantees granted hereunder by any Guarantor organized under the laws of the Federal Republic of Germany as a German limited liability company (*GmbH*) or a German limited partnership with a German limited liability company (*GmbH*) as general partner (*GmbH & Co. KG*) is enforced with respect to Non-US Guaranteed Obligations owed and payable by an affiliated company (*verbundenes Unternehmen*) within the meaning of Section 15 *et seq.* of the German Stock Corporation Act (*Aktiengesetz*) of the relevant Guarantor other than affiliated companies as to which such Guarantor (or, in the case of a GmbH & Co. KG, it or its general partner) is a direct or indirect shareholder, the right to enforce the Guarantee against the relevant Guarantor shall, but only with respect to such Guarantor, be limited

(1) to such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) net assets, being its total assets less its liabilities each as calculated in accordance with the accounting standards applicable to such Guarantor (or, in the case of a GmbH & Co. KG, its general partner) by law from time to time, (*Nettovermögen*) (the "Net Assets"), however only if and to the extent that such Guarantor provides sufficient evidence to the Administrative Agent that

> (A) such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) Net Assets are reduced below the amount of its (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital (*Stammkapital*) as a result of the enforcement, the application of the proceeds towards the Non-US Guaranteed Obligations would thus constitute a violation of Section 30 German Limited Liability Company Act (*GmbH-Gesetz*), and such payment of proceeds to such Guarantor is therefore required to allow such Guarantor (or, in the case of a GmbH & Co. KG, its general partner) to maintain its stated share capital in accordance with Section 30 German Limited Liability Company Act, or

> (B) such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) Net Assets had already been reduced prior to the enforcement to an amount below its (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital, the application of the proceeds towards the Non-US Guaranteed Obligations would thus constitute a violation of Section 30 German Limited Liability Company Act, and such payment of proceeds to such Guarantor is

134

therefore required to restore such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital in accordance with Section 30 German Limited Liability Company Act;

(2) to such an amount as such limitation is required to prevent a destruction of such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) existence, however only if and to the extent that such Guarantor provides sufficient evidence to the Administrative Agent that such destruction of existence would otherwise occur and be deemed to have been brought about by a lack of minimum considerateness of such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) interests (*Rücksichtnahme auf die Eigenbelange der GmbH*) on the part of such Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) sole shareholder (*existenzvernichtender Eingriff*);

however in each case only if and to the extent that such Guarantor further provides sufficient evidence to the Administrative Agent that the Non-US Guaranteed Obligations, including without limitation any interest or ancillary obligations relating thereto, with respect to which the guarantee is enforced do not correspond to funds that have been directly or indirectly passed on by any of the Borrowers of such Non-US Guaranteed Obligations (1) in the form of a loan to such Guarantor (or, in the case of a GmbH & Co. KG, to it or its general partner) or (2) in the form of a loan or of equity to an affiliated company of such Guarantor (or, in the case of a GmbH & Co. KG, of it or its general partner) as to which it (or, in the case of a GmbH & Co. KG, it or its general partner) is a direct or indirect shareholder and that is not itself a Credit Party.

(ii) The foregoing subsection 7.14(f)(i)(1) shall apply only subject to the provisos that

(1) for the purposes of the determination of the relevant Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) stated share capital the amount of any increase of such stated share capital after the date hereof shall be disregarded to the extent such increase (A) has been effected without the prior written consent of the Administrative Agent, (B) is effected out of company funds (*Kapitalerhöhung aus Gesellschaftsmitteln*) or (C) is not fully paid up; and

(2) for the purposes of the calculation of the relevant Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) Net Assets the following items shall be adjusted as follows:

1. (A) obligations under loans provided to the relevant Guarantor (or, in the case of a GmbH & Co. KG, to it or its general partner) by its (or, in the case of a GmbH & Co. KG, its or its general partner's) direct or indirect shareholders or their affiliates to the extent that such obligations (x) are subordinated pursuant to contractual arrangements or if the conditions of Section 39(1) no. 5 or (2) of the *German Insolvency Act* (*Insolvenzordnung*) are met or (y) qualify as obligations which may not be repaid under Section 30 of the German Limited Liability Company Act;

135

2. (B) rights for payment under loans granted by the relevant Guarantor (or, in the case of a GmbH & Co. KG, by it or its general partner) to any of its (or, in the case of a GmbH & Co. KG, its or its general partner's) direct or indirect shareholders or their affiliates to the extent the granting of such loans constituted a violation of Section 30 German Limited Liability Company Act shall be accounted for with their full nominal value; without prejudice to the foregoing, rights for payment under loans (other than or in excess of those accounted for with their full value pursuant to the foregoing) shall be disregarded to the extent such rights do not qualify as assets of the relevant Guarantor (or, in the case of a GmbH & Co. KG, of its general partner) for purposes of Section 30 German Limited Liability Company Act provided that such loans were made by such Guarantor (or, in the case of a GmbH & Co. KG, by its general partner) to one of its (or, in the case of a GmbH & Co. KG, its general partner's) direct or indirect shareholders or their affiliates and such shareholder or affiliate is fully liable for the payment of the Non-US Guaranteed Obligations;

3. (C) obligations under loans or other contractual liabilities incurred by the relevant Guarantor (or, in the case of a GmbH & Co. KG, by it or its general partner) in violation of any Credit Document to which it (or, in the case of a GmbH & Co. KG, it or its general partner, respectively) is a party shall be disregarded; and

4. (D) any asset that is not necessary for the relevant Guarantor's (or, in the case of a GmbH & Co. KG, its or its general partner's) business (nicht betriebsnotwendig), that is shown in such Guarantor's (or, in the case of a GmbH & Co. KG, its or its general partner's, respectively) balance sheet with a book value (Buchwert) which is lower than the market value of such asset, and that can be realized, shall be taken into account with its market value, except where such Guarantor provides sufficient evidence to the Administrative Agent that (x) such realization would not be legally permitted or (y) the proceeds achievable through such realization would not exceed the total of the book value plus the expenses in connection with such realization.

   (iii) The limitations set out above in (i) and (ii) shall not apply if the relevant German Guarantor has entered into a domination and or profit and loss transfer agreement (Beherrschungs- und/oder Gewinnabführungsvertrags) as the dominated party.

   (g) Swedish guarantees. The obligations of any Swedish Guarantor as a Non-US Guarantor under the Credit Documents shall be limited, if required by the provisions of the Swedish Companies Act (Sw. Aktiebolagslagen 2005:551) regulating distribution of assets (Chapter 17, Section 3 or the equivalent clause/s from time to time) and it is understood that the liability of such Swedish Guarantor only applies to the extent and in such amount permitted by the above mentioned provisions of the Swedish Companies Act.

   (h) Mexican guarantees. To the extent that the Guarantor is a Mexican Guarantor, the enforcement of the obligations under this Section 7 against the Mexican Guarantor shall be subject and may be limited:

136

(i) by the fact that the obligations of the Mexican Guarantor under the Credit Documents are invalid, illegal or unenforceable obligations of the Mexican Guarantor;

(ii) by Mexican bankruptcy, insolvency, fraudulent conveyance, suspension of payments, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally; and

(iii) by the fact that the obligations guaranteed by the Mexican Guarantor are inherent to its corporate purpose.

7.15 **Validity and Effectiveness.** This Guaranty shall remain wholly valid and effective until the full, unconditional and irrevocable performance and discharge of the Non-US Guaranteed Obligations or Guaranteed Obligations, as the case may be, and for all the period during which payments effected in such respect are subject to the claw back and/or avoidance under any applicable law.

## SECTION 8. EVENTS OF DEFAULT

8.1 **Events of Default.** If any one or more of the following conditions or events shall occur:

(a) Failure to Make Payments When Due. Failure by a Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) when due any amount payable to Issuing Bank in reimbursement of any drawing under a Letter of Credit; or (iii) any interest on any Loan or any fee or any other amount due hereunder, which failure continues for three (3) Business Days only if as a result of a transmission failure due to a failure of the banking markets; or

(b) Default in Other Agreements. (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) with an aggregate principal amount of $5,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, originally provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

137

(c) Breach of Certain Covenants. Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.6, Section 2.23(a)(ii)(A), Section 5.1(g)(i), Section 5.1(q), Section 5.2 or Section 6; or

(d) Breach of Representations, etc. Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e) Other Defaults Under Credit Documents. Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other subsection of this Section 8.1, and such default shall not have been remedied or waived within twenty (20) Business Days after the earlier of (i) an officer of such Credit Party becoming aware of such default or (ii) receipt by Xerium of notice from the Administrative Agent or any Bank of such default; or

(f) Involuntary Bankruptcy; Appointment of Receiver, etc. (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Xerium or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, provincial or state law; or (ii) an involuntary case (including, without limitation, a winding-up, dissolution, reorganization, compromise or arrangement) shall be commenced against Xerium or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or any application shall have been made, or is required by applicable law to be made, with a court for the opening of insolvency proceedings with regard to Xerium or any of its Subsidiaries; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Xerium or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Xerium or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Xerium or any of its Subsidiaries, and (A) in relation only to any Non-US Borrower and any Foreign Subsidiary, any such event described in this clause (ii) shall continue for seven days without having been dismissed, bonded or discharged, and (B) in relation only to Xerium or any Domestic Subsidiary, any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged; or

138

(g) <u>Voluntary Bankruptcy; Appointment of Receiver, etc.</u> (i) Xerium or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case (including, without limitation, a winding-up, dissolution, reorganization, compromise or arrangement) under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Xerium or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Xerium or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Xerium or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f), other than any Bankruptcy Cases not closed as of the Closing Date; or

(h) <u>Judgments and Attachments</u>. Any money judgment, writ or warrant of attachment or similar process involving in the aggregate at any time an amount in excess of $5,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Xerium or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days (or in any event later than five days prior to the date of any proposed sale thereunder); or

(i) <u>Dissolution</u>. Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30)days; or

(j) <u>Employee Benefit Plans</u>. (i) There shall occur one or more ERISA Events and/or Canadian Pension Plan Events which individually or in the aggregate results in or could reasonably be expected to result in liability of Xerium, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $5,000,000 during the term hereof; or (ii) there exists any fact or circumstance that would reasonably be expected to result in the imposition of a Lien or security interest under Section 412(n) of the Internal Revenue Code or under ERISA; or

(k) <u>Change of Control</u>. A Change of Control shall occur, other than as contemplated under the Plan of Reorganization; or

(l) <u>Guaranties, Collateral Documents and Other Credit Documents</u>. At any time after the execution and delivery thereof, (i) any Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in

139

full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof or any other termination of such Collateral Document in accordance with the terms thereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of the Collateral Agent or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Banks, under any Credit Document to which it is a party or any Credit Document shall cease to be in full force and effect or shall be declared null and void;

(m) <u>Material Adverse Effect</u>. Any event, condition or situation shall occur that has a Material Adverse Effect, provided that the consummation of the transactions contemplated by the Plan of Reorganization shall not constitute a Material Adverse Effect;

(n) <u>Failure to Reimburse Issuing Bank from Revolving Loans</u>. The failure of the Issuing Bank to be reimbursed in full for any drawings under any Letter of Credit from proceeds of Revolving Loans required to be made pursuant to Section 2.4(i); or

(o) <u>Failure to Top-Up the Term LC Collateral Account from Revolving Loans</u>. The failure of the Term LC Collateral Account to be funded from proceeds of Revolving Loans required to be made pursuant to Section 2.4(k);

THEN, (1) upon the occurrence of any Event of Default described in Sections 8.1(f), (g) or (k), automatically, and (2) upon the occurrence and continuation of any other Event of Default, at the request of (or with the consent of) Requisite Banks, upon notice to Xerium by the Administrative Agent, (A) the Revolving Commitments, if any, of each Bank having such Revolving Commitments and the obligation of Issuing Bank to issue any Letter of Credit shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest on the Loans, (II) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (regardless of whether any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letters of Credit), and (III) all other Obligations; <u>provided</u>, the foregoing shall not affect in any way the obligations of Banks under Section 2.4(g); (C) the Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Collateral Documents; and

140

(D) Administrative Agent shall direct each Borrower to pay (and each Borrower hereby agrees upon receipt of such notice, or upon the occurrence of any Event of Default specified in Section 8.1(f) and (g) to pay) to Administrative Agent such additional amounts of cash, to be held as security for each Borrower's reimbursement Obligations in respect of Letters of Credit then outstanding, equal to the Letter of Credit Usage at such time.

> 8.2 **CAM Exchange.** On the CAM Exchange Date, the Banks shall automatically and without further act be deemed to have exchanged interests in the Designated Obligations such that, in lieu of the interests of each Bank in the Designated Obligations under each Loan in which it shall participate as of such date, such Bank shall own an interest equal to such Bank's CAM Percentage in the Designated Obligations under each of the Loans. Each Bank, each Person acquiring a participation from any Bank as contemplated by Section 10.6 and each Borrower hereby consents and agrees to the CAM Exchange. Each of the Borrowers and the Banks agrees from time to time to execute and deliver to the Administrative Agent all such promissory notes and other instruments and documents as the Administrative Agent shall reasonably request to evidence and confirm the respective interests and obligations of the Banks after giving effect to the CAM Exchange, and each Bank agrees to surrender any promissory notes originally received by it in connection with its Loans hereunder to the Administrative Agent against delivery of any promissory notes so executed and delivered; provided that the failure of any Borrower to execute or deliver or of any Bank to accept any such promissory note, instrument or document shall not affect the validity or effectiveness of the CAM Exchange.

As a result of the CAM Exchange, on and after the CAM Exchange Date, each payment received by the Administrative Agent pursuant to any Credit Document in respect of the Designated Obligations shall be distributed to the Bank pro rata in accordance with their respective CAM Percentages (to be redetermined as of each such date of payment). Any direct payment received by a Bank upon or after the CAM Exchange Date, including by way of setoff, in respect of a Designated Obligation shall be paid over to the Administrative Agent for distribution to the Banks in accordance herewith.

## SECTION 9. AGENTS

> 9.1 **Appointment of Agents.** Citigroup Global Markets, Inc. is hereby appointed Lead Arranger hereunder, and each Bank hereby authorizes the Lead Arranger (under release from the restrictions of Section 181 of the *German Civil Code*) to act as its agent in accordance with the terms hereof and the other Credit Documents. Citicorp North America, Inc. is hereby appointed the Administrative Agent hereunder and under the other Credit Documents and each Bank hereby authorizes the Administrative Agent to act as its agent in accordance with the terms hereof and the other Credit Documents. Citicorp North America, Inc. is hereby appointed the Collateral Agent hereunder and under the other Credit Documents and each Bank hereby authorizes the Collateral Agent to act as its agent in accordance with the terms hereof and the other Credit Documents. Each Agent hereby agrees to act upon the express conditions contained herein and the

other Credit Documents, as applicable. The provisions of this Section 9 are solely for the benefit of the Agents and the Banks and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Banks and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Xerium or any of its Subsidiaries. The Lead Arranger, without consent of or notice to any party hereto, may assign any and all of its respective rights or obligations hereunder to any of its Affiliates. As of the Closing Date, Citigroup Global Markets Inc, in its capacity as the Lead Arranger, shall not have any obligations hereunder but shall be entitled to all benefits of this Section 9.

9.2 **Powers and Duties.** Each Bank irrevocably authorizes each Agent (under release from the restrictions of Section 181 of the *German Civil Code*) to take such action on such Bank's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Bank; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein..

### 9.3 General Immunity.

(a) No Responsibility for Certain Matters. No Agent shall be responsible to any Bank for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Banks or by or on behalf of any Credit Party to any Agent or any Bank in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not

142

have any liability arising from confirmations of the amount of outstanding Loans or the Letter of Credit Usage or the component amounts thereof.

(b) Exculpatory Provisions. No Agent or any of its officers, partners, directors, employees or agents shall be liable to the Banks for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct. No Agent shall have an obligation to act without receiving a satisfactory indemnity from the parties to this Agreement. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from the Requisite Banks (or such other Banks as may be required to give such instructions under Section 10.6) and, upon receipt of such instructions from the Requisite Banks (or such other Banks, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Xerium and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Bank shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Banks (or such other Banks as may be required to give such instructions under Section 10.6).

9.4 **Agents Entitled to Act as Bank.** The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Bank hereunder. With respect to its participation in the Loans and the Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Bank and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Bank" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Xerium or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from each Borrower for services in connection herewith and otherwise without having to account for the same to Banks.

9.5 **Banks' Representations, Warranties and Acknowledgment.** Each Bank represents and warrants that it has made its own independent

143

investigation of the financial condition and affairs of Xerium and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Xerium and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Banks or to provide any Bank with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Banks.

9.6 **Right to Indemnity.** Each Bank, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party (and without limiting the Borrowers' obligation to do so), for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; provided, no Bank shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Bank to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Bank's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Bank to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

9.7 **Successor Administrative Agent and Collateral Agent.** The Administrative Agent and the Collateral Agent may resign at any time by giving thirty days' prior written notice thereof to the Banks and Xerium, and the Administrative Agent and the Collateral Agent may be removed at any time (with or without cause) by the Requisite Banks giving ten days' prior written notice thereof delivered to Xerium and the Administrative Agent and the Collateral Agent and the Administrative Agent shall then promptly give notice of such removal to the Banks. During the first two Business Days after notice from the Administrative Agent and the Collateral Agent of its resignation or removal, one or more Revolving Banks (other than the then Administrative Agent and Collateral Agent if it is a Revolving Bank) shall have the right to propose a

144

successor Administrative Agent and Collateral Agent (the "**Proposed Successor Agent**"). The Proposed Successor Agent shall become the Administrative Agent and Collateral Agent if approved by the Requisite Banks. If such Proposed Successor Agent is not approved by the Requisite Banks within five Business Days after proposed by such Revolving Banks, then the Requisite Banks shall have the right upon five Business Days' notice to Xerium, to appoint a successor Administrative Agent and Collateral Agent. Upon the acceptance of any appointment as Administrative Agent or Collateral Agent hereunder by a successor Administrative Agent or Collateral Agent, that successor Administrative Agent or Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent or Collateral Agent and the retiring or removed Administrative Agent or Collateral Agent shall promptly (i) transfer to such successor Administrative Agent or Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent or Collateral Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent or Collateral Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent or Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Administrative Agent or Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents. Regardless of whether a replacement Administrative Agent or Collateral Agent, as applicable, has been appointed, the removal or resignation will, to the fullest extent permitted by applicable law, be effective upon the earlier (i) the date the successor Administrative Agent or Collateral Agent is appointed and (ii) the date that is thirty days after the giving of the written notice of resignation or removal. After any retiring or removed Administrative Agent's or Collateral Agent's resignation or removal hereunder as Administrative Agent or Collateral Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent or Collateral Agent hereunder.

### 9.8 Collateral Documents and Guaranty.

(a) Agents under Collateral Documents and Guaranty. Each Bank hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable (each under release from the restrictions of Section 181 of the German Civil Code) on behalf of and for the benefit of the Banks, to be the agent for and representative of the Banks with respect to the Guaranty, the Collateral and the Collateral Documents. Pursuant to the Plan of Reorganization, the Agents, on behalf of the Banks, are empowered and authorized to execute and deliver to the Credit Parties the other Credit Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Credit Documents. Subject to Section 10.6, without further

145

written consent or authorization from the Banks, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Requisite Banks (or such other Banks as may be required to give such consent under Section 10.6) have otherwise consented or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which the Requisite Banks (or such other Banks as may be required to give such consent under Section 10.6) have otherwise consented.

(b) Right to Realize on Collateral and Enforce Guaranty. Anything contained in any of the Credit Documents to the contrary notwithstanding, each Borrower, the Administrative Agent, the Collateral Agent and each Bank hereby agrees that (i) no Bank shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Banks in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Collateral Agent or any Bank may be the purchaser of any or all of such Collateral at any such sale and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Bank or Banks in its or their respective individual capacities unless the Requisite Banks shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale.

(c) Collateral Agent's Power of Attorney. Each Secured Party, including in its capacity as Bank Counterparty, irrevocably constitutes, to the extent necessary, the Collateral Agent as the holder of an irrevocable power of attorney (i.e. "*fondé de pouvoirs*" within the meaning of Article 2692 of the *Civil Code of Québec*) in order to hold security granted by any Credit Party in the Province of Quebec to secure the Indebtedness of such Credit Party under any bond issued by such Credit Party. Notwithstanding the provisions of section 32 of an *Act respecting the special powers of a legal person* (Québec), each Secured Party, including in its capacity as Bank Counterparty, acknowledges that the Collateral Agent may acquire and be the holder of any bond issued by any Credit Party. Each assignee Bank that enters into an Assignment Agreement shall be deemed to have confirmed and ratified the constitution of the Collateral Agent as the holder of such irrevocable power of attorney ("*fondé de pouvoirs*") and the acquisition and holding by the Collateral Agent of any bonds issued by any Credit Party. Each of the Credit Parties hereby acknowledge that, for the purposes of holding any security granted by any Credit Party on property pursuant to the laws of the Province of Québec to secure obligations of any Credit Party under any bonds issued by any Credit Party, the Collateral Agent shall be the holder of an

146

irrevocable power of attorney (i.e. *"fondé de pouvoirs"* within the meaning of Article 2692 of the *Civil Code of Québec*) for each Secured Party, including in its capacity as Bank Counterparty). Each of the Credit Parties hereby acknowledges that such bond constitutes a title on indebtedness, as such term is used in Article 2692 of the *Civil Code of Québec*. The execution by the Collateral Agent, acting as fondé de pouvoir as aforesaid, prior to the date of this Agreement of any deeds of hypothec or other security documents is hereby ratified and confirmed.

9.9 **Reliance and Engagement Letters.** Each Bank confirms that each of the Lead Arranger and the Administrative Agent has authority (and is released from the restrictions of Section 181 of the *German Civil Code*) to accept on its behalf the terms of any reliance or engagement letters relating to any reports or letters provided by accountants in connection with the Credit Documents or the transactions contemplated in the Credit Documents (including any net asset letter in connection with the financial assistance procedures) and to bind it in respect of those reports or letters and to sign such on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

## SECTION 10. MISCELLANEOUS

10.1 **Notices.** Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party, the Collateral Agent, the Administrative Agent or the Lead Arranger, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Bank, the address as indicated on Appendix B or otherwise indicated to the Administrative Agent in writing. Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the mail with postage prepaid and properly addressed; provided, no notice to any Agent shall be effective until received by such Agent and all notices from or to a Credit Party shall be sent through the applicable Agent.

10.2 **Expenses.** Whether or not the transactions contemplated hereby shall be consummated, each Borrower agrees to pay promptly (a) all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for each Borrower and the other Credit Parties; (c) the reasonable fees, expenses and disbursements of counsel to the Agents (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents, advising the Administrative Agent and the Collateral Agent of their respective rights and obligations under the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by any Borrower; (d) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of the Collateral Agent, for the

147

benefit of the Secured Parties pursuant hereto, including filing and recording fees, expenses stamp, registration, transfer, documentary and other similar taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or the Requisite Banks may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents or any Agent's rights and obligations under any Credit Document; (e) all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants, advisors or appraisers retained by the Administrative or the Collateral Agent with the prior consent of Xerium (not to be unreasonably withheld); (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and the Banks in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

10.3 **VAT.** All amounts set out or expressed to be payable under a Credit Document by a Credit Party to a Bank shall be exclusive of any applicable VAT and (subject to the provisions regarding reimbursement of VAT below) the Credit Party shall in addition pay to the Bank an amount equal to the amount of the VAT, following receipt by the Credit Party of a valid VAT invoice. Where a Credit Party is required by a Credit Document to reimburse a Bank for any costs or expenses, that Credit Party shall also reimburse the Bank for any VAT incurred by the Bank in respect of the relevant costs or expenses to the extent that neither the Bank nor any member of any group of which it is a member for VAT purposes is entitled to credit or repayment from the relevant Tax authority in respect of the VAT.

10.4 **Indemnity.** In addition to the payment of expenses pursuant to Sections 10.2 and 10.3, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' reasonable approval of counsel), indemnify, pay and hold harmless, each Agent and Bank and the officers, partners, directors, trustees, investment advisors, employees, agents and Affiliates of each Agent and each Bank (each, an

148

"**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.4 may be unenforceable in whole or in part because they are in violation of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(a) To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against the Banks, the Agents and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) in connection with, arising out of, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and Xerium and each other Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(b) Currency indemnity.

(i) If any sum due from a Credit Party under the Credit Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(A) making or filing a claim or proof against that Credit Party; or

(B) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Credit Party shall as an independent obligation, within three Business Days of demand, indemnify the Agent and each Bank to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (x) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (y) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

149

(ii) Each Credit Party waives any right it may have in any jurisdiction to pay any amount under the Credit Documents in a currency or currency unit other than that in which it is expressed to be payable.

10.5 **Set Off.** Subject to the terms of the Intercreditor Agreement, in addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and continuation of any Event of Default each Bank and each of its respective Affiliates is hereby authorized by each Credit Party at any time or from time to time subject to the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than the Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Bank or its Affiliate to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Bank hereunder, the Letters of Credit and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, the Letters of Credit and participations therein or with any other Credit Document, irrespective of whether or not (a) such Bank shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured.

10.6 **Amendments and Waivers.**

(a) Requisite Banks' and Borrower Consent. Subject to Section 10.6(b) and 10.6(c), no amendment, modification, termination or waiver of any provision of the Credit Documents (other than the Fee Letters), or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Credit Parties and the Requisite Banks.

(b) Affected Banks' Consent. Without the written consent of the Credit Parties and each Bank (other than a Defaulting Bank) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i) extend the scheduled final maturity of any Loan;

(ii) waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii) extend the stated expiration date of any Letter of Credit beyond the Revolving Commitment Termination Date;

150

(iv) reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee payable hereunder;

(v) extend the time for payment of any such interest or fees;

(vi) reduce or forgive the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(vii) amend, modify, terminate or waive any provision of this Section 10.6(b) or Section 10.6(c);

(viii) amend the definition of **"Requisite Banks"** or **"Pro Rata Share"**; provided, with the consent of Requisite Banks, additional extensions of credit pursuant hereto may be included in the determination of **"Requisite Banks"** or **"Pro Rata Share"** on substantially the same basis as the Term Loans, the Revolving Commitments and the Revolving Loans are included on the Closing Date;

(ix) extend the Revolving Commitment Termination Date;

(x) release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents;

(xi) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document (other than the Fee Letters);

(xii) amend, modify or waive any provision of Section 2.15 or 2.16(g); or

(xiii) consent to currency changes.

(c) Other Consents. No amendment, modification, termination or waiver of any provision of the Credit Documents (other than the Fee Letters), or consent to any departure by any Credit Party therefrom, shall:

(i) increase any Revolving Commitment of any Bank over the amount thereof then in effect without the consent of each Credit Party and such Bank; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Revolving Commitment of any Bank;

(ii) amend, modify, terminate or waive any obligation of Banks relating to the purchase of participations in Letters of Credit as provided in Section 2.4(g) without the written consent of each Credit Party, Administrative Agent and of Issuing Bank; or

151

(iii) amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of each Credit Party and such Agent.

(d) Execution of Amendments, etc. The Administrative Agent may, but shall have no obligation to, with the concurrence of any Bank, execute amendments, modifications, waivers or consents on behalf of such Bank. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.6 shall be binding upon each Bank at the time outstanding, each future Bank and, if signed by a Credit Party, on such Credit Party.

(e) Defaulting Banks. Anything herein to the contrary notwithstanding, during such period as a Bank is a Defaulting Bank, to the fullest extent permitted by applicable law, such Bank will not be entitled to vote in respect of amendments and waivers hereunder and the Revolving Commitment and the outstanding Loans of such Bank hereunder will not be taken into account in determining with the Requisite Banks or all of the Banks, as required, have approved any such amendment or waiver (and the definition of "Requisite Banks" will automatically be deemed modified accordingly for the duration of such period); provided that any such amendment or waiver that would increase or extend the term of the Revolving Commitment of such Defaulting Bank, extend the date fixed for the payment of principal or interest owing to such Defaulting Bank, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Bank or of any fee payable to such Defaulting Bank hereunder, or alter the terms of this proviso, will require the consent of such Defaulting Bank.

10.7 **Successors and Assigns; Participations.**

(a) Generally. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Banks. No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Banks. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Banks) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Register. Each Borrower, the Administrative Agent and each Bank shall deem and treat the Persons listed as Banks in the Register as the

152

holders and owners of the corresponding Revolving Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Revolving Commitment or Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by the Administrative Agent and recorded in the Register as provided in Section 10.7(e). Prior to such recordation, all amounts owed with respect to the applicable Revolving Commitment or Loan shall be owed to the Bank listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Bank shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Revolving Commitments or Loans.

(c) Right to Assign. Each Bank shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including, without limitation, all or a portion of its Revolving Commitment or Loans owing to it or other Obligation (provided, however, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Revolving Commitments):

(i) to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to Xerium and the Administrative Agent; and

(ii) to any Person meeting the criteria of clause (ii) of the definition of the term "Eligible Assignee" upon the giving of notice to Xerium and the Administrative Agent; subject, however, in the case of assignments of Revolving Loans or Revolving Commitments to any such Person, to prior written consent by Xerium, the Administrative Agent and the Issuing Bank (such consent not to be (x) unreasonably withheld or delayed or, (y) in the case of Xerium, required at any time an Event of Default shall have occurred and then be continuing); provided that Xerium shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; provided, further, each such assignment pursuant to this Section 10.7(c)(ii) shall be in an aggregate amount of not less than (A) $2,500,000 (or such lesser amount as may be agreed to by the Administrative Agent (and so long as no Event of Default shall have occurred and be continuing) Xerium or as shall constitute the aggregate amount of the Revolving Commitments and Revolving Loans of the assigning Bank) with respect to the assignment of the Revolving Commitments and Revolving Loans and (B) $1,000,000 (or such lesser amount as may be agreed to by the Administrative Agent (and so long as no Event of Default shall have occurred and be continuing) Xerium or as shall constitute the aggregate amount or the Term Loans of the assigning Bank) with respect to the assignment of Term Loans.

153

(d) Mechanics. The assigning Bank and the assignee thereof shall execute and deliver to the Administrative Agent an Assignment Agreement, together with (i) a processing and recordation fee of $3,500 (except (A) in the case of assignments pursuant to Section 10.7(c)(i), no processing or recordation fee shall be required and (B) that only one fee shall be payable in the case of contemporaneous assignments to or by Related Funds), and (ii) such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to the Administrative Agent pursuant to Section 2.20(c).

(e) Notice of Assignment. Upon its receipt of a duly executed and completed Assignment Agreement, together with the processing and recordation fee referred to in Section 10.7(d) (and any forms, certificates or other evidence required by this Agreement in connection therewith), the Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to each Borrower and shall maintain a copy of such Assignment Agreement.

(f) Representations and Warranties of Assignee. Each Bank, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Revolving Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Revolving Commitments or Loans for its own account in the Ordinary Course and without a view to distribution of such Revolving Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.7, the disposition of such Revolving Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(g) Effect of Assignment. Subject to the terms and conditions of this Section 10.7, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Bank" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Bank" for all purposes hereof, and in the case of an assignment from the Issuing Bank, shall have the rights and obligations of an "Issuing Bank" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be an "Issuing Bank" for all purposes hereof; (ii) the assigning Bank thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder (and, in the case of

154

an Assignment Agreement covering all or the remaining portion of an assigning Bank's rights and obligations hereunder, such Bank shall cease to be a party hereto and, if such Bank were an Issuing Bank, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder as an "Issuing Bank"; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Bank shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Bank as a Bank hereunder); (iii) the Revolving Commitments shall be modified to reflect the Revolving Commitment of such assignee and any Revolving Commitment of such assigning Bank, if any; and (iv) for the purposes of article 1263 of the Italian Civil Code, it is expressly agreed that the security created or evidenced by the Collateral Documents shall be preserved for the benefit of the assignee and each other Bank. Any assignment or transfer by a Bank of rights or obligations under this Agreement that does not comply with subsections (c) through (g) of this Section 10.7 shall be treated for purposes of this Agreement as a sale by such Bank of a participation in such rights and obligations in accordance with clause (h).

(h) Participations. Each Bank shall have the right at any time to sell one or more participations to any Person (other than Xerium, any of its Subsidiaries or any of its Affiliates (excluding Closing Date Bank Affiliates)) in all or any part of its Revolving Commitments or Loans or in any other Obligation. The holder of any such participation, other than an Affiliate of the Bank granting such participation, shall not be entitled to require such Bank to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan, or any Letter of Credit (unless, in the case of Revolving Letters of Credit, such Revolving Letter of Credit is not extended beyond the Revolving Commitment Termination Date, and in the case of Term Loan Letters of Credit, such Term Loan Letter of Credit is not extended beyond the Term Loan Maturity Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under the Collateral Documents (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating. The Borrowers agree that each participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 to the same extent as if it were a Bank and had acquired its interest by assignment pursuant to paragraph (c) of this Section;

155

provided, (i) a participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Bank would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with each Borrower's prior written consent, and (ii) a participant that would be a Non-US Bank if it were a Bank shall not be entitled to the benefits of Section 2.20 unless each Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of each Borrower, to comply with Section 2.20 as though it were a Bank. To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.6 as though it were a Bank, provided such participant agrees to be subject to Section 2.17 as though it were a Bank.

(i) Certain Other Assignments. In addition to any other assignment permitted pursuant to this Section 10.7, any Bank may assign and/or pledge all or any portion of its Loans, the other Obligations owed by or to such Bank, to secure obligations of such Bank including, without limitation, any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; provided, no Bank, as between each Borrower and such Bank, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided, further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Bank" or be entitled to require the assigning Bank to take or omit to take any action hereunder.

10.8 Independence of Covenants. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.9 Survival of Representations, Warranties and Agreements. All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.18(c), 2.19, 2.20, 10.2, 10.3, 10.4 and 10.5 and the agreements of the Banks set forth in Sections 2.17, 9.3(b) and 9.6 shall survive the payment of the Loans, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

10.10 No Waiver; Remedies Cumulative. No failure or delay on the part of any Agent or any Bank in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.

156

The rights, powers and remedies given to each Agent and each Bank hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the applicable documentation creating Hedging Obligations. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.11 **Marshalling; Payments Set Aside.** Neither any Agent nor any Bank shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to the Administrative Agent or the Banks (or to the Administrative Agent, on behalf of the Banks), or the Administrative Agent or the Banks enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other provincial, state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

10.12 **Severability.** In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.13 **Obligations Several.** The obligations of the Banks hereunder are several and no Bank shall be responsible for the obligations or Revolving Commitment of any other Bank hereunder. Nothing contained herein or in any other Credit Document, and no action taken by Banks pursuant hereto or thereto, shall be deemed to constitute Banks as a partnership, an association, a joint venture or any other kind of entity.

10.14 **Headings.** Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.15 **APPLICABLE LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK INCLUDING GENERAL OBLIGATIONS LAW 5-1401.**

10.16 **CONSENT TO JURISDICTION AND SERVICE OF PROCESS**. (a) ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN THE CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON-CONVENIENS; (iii) AGREES THAT, NOTWITHSTANDING SECTION 10.16(c), SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (iv) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (iii) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (v) AGREES AGENTS AND BANKS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION;

(b) IN ADDITION TO SECTION 10.16(a), HUYCK.WANGNER AUSTRIA GMBH IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS IN ENGLAND FOR THE PURPOSE OF HEARING AND DETERMINING ANY DISPUTE ARISING OUT OF THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT OR ANY OF THE OBLIGATIONS OR RELATING HERETO AND FOR THE PURPOSES OF ENFORCEMENT OF ANY JUDGMENT AGAINST ITS ASSETS (IN NO EVENT SHALL THE COURTS OF AUSTRIA HAVE JURISDICTION FOR THE PURPOSE OF HEARING AND DETERMINING ANY DISPUTE ARISING OUT OF THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT OR ANY OF THE OBLIGATIONS OR RELATING HERETO AND FOR THE PURPOSES OF ENFORCEMENT OF ANY JUDGMENT AGAINST ITS ASSETS); AND

(c) EACH CREDIT PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY APPOINTS CT CORPORATION SYSTEM WITH AN OFFICE ON THE DATE HEREOF AT 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10001, UNITED STATES AND ITS SUCCESSORS HEREUNDER (THE "PROCESS AGENT"), AS ITS AGENT TO RECEIVE ON BEHALF OF SUCH CREDIT PARTY AND ITS PROPERTY SERVICE OF COPIES OF THE SUMMONS AND COMPLAINTS AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR

NY3 - 504826.09

PROCEEDING BROUGHT IN ANY COURT SPECIFIED IN SECTION 10.16(a). SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO A CREDIT PARTY IN CARE OF THE PROCESS AGENT AT THE ADDRESS SPECIFIED ABOVE FOR THE PROCESS AGENT, AND EACH CREDIT PARTY HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS THE PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF. EACH CREDIT PARTY FURTHER CONSENTS TO MAILING COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH CREDIT PARTY AT ITS ADDRESSES FOR NOTICE HEREUNDER, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER MAILING. FAILURE OF THE PROCESS AGENT TO GIVE NOTICE TO ANY CREDIT PARTY OR FAILURE OF A CREDIT PARTY TO RECEIVE NOTICE OF SUCH SERVICES OF PROCESS SHALL NOT AFFECT IN ANY WAY THE VALIDITY OF SUCH SERVICE ON THE PROCESS AGENT OR SUCH CREDIT PARTY. EACH CREDIT PARTY COVENANTS AND AGREES THAT IT SHALL TAKE ANY AND ALL REASONABLE ACTION, INCLUDING THE EXECUTION AND FILING OF ANY AND ALL DOCUMENTS, THAT MAY BE NECESSARY FOR THE PROCESS AGENT TO ACT AS SUCH. IN THE EVENT THAT AT ANY TIME SUCH PROCESS AGENT SHALL FOR ANY REASON CEASE TO MAINTAIN AN OFFICE IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, OR CEASE TO ACT AS PROCESS AGENT, THEN, SUCH CREDIT PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ACCORDANCE WITH THE TERMS OF CLAUSE (iii) OF SECTION 10.16(a). EACH CREDIT PARTY ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS SECTION 10.16(b) SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

10.17 **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE BANK/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING**

INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO
RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.
EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS
THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL
COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES
ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH
LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING
THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING
(OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY
REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF
THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY
SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR
MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT
DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS
RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF
LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN
CONSENT TO A TRIAL BY THE COURT.

10.18 **Confidentiality.** Each Agent, the Issuing Bank and each Bank
agrees to maintain the confidentiality of the Information (as defined below),
except that Information may be disclosed (a) to its and its Affiliates' directors,
officers, trustees, employees and agents, including accountants, legal counsel and
other advisors (it being understood that the Persons to whom such disclosure is
made will be informed of the confidential nature of such Information and
instructed to keep such Information confidential), (b) to the extent requested by
any regulatory authority, including the NAIC, (c) to the extent required by
applicable laws or regulations or by any subpoena or similar legal process, (d) to
any other party to this Agreement, (e) in connection with the exercise of any
remedies hereunder or any suit, action or proceeding relating to this Agreement or
any other Credit Document or the enforcement of rights hereunder or thereunder,
(f) subject to an agreement containing provisions substantially the same as those
of this Section 10.18, to (i) any assignee of or participant in, or any prospective
assignee of or participant in, any of its rights or obligations under this Agreement,
(ii) any rating agency, or (iii) the CUSIP Service Bureau or any similar
organization, (g) with the consent of the Borrowers, (h) to any pledgee referred to
in Section 10.7(i) or any actual or prospective party (or its managers,
administrators, trustees, partners, directors, officers, employees, agents, advisors
or other representatives) to any swap or derivatives or similar transaction under
which payments are to be made by reference to the Borrowers and the
Obligations, this Agreement or payments hereunder, so long as such pledgee or
any actual or prospective counterparty (or its managers, administrators, trustees,
partners, directors, officers, employees, agents, advisors and other
representatives) agrees to be bound by the provisions of this Section 10.18, or
(i) to the extent such Information (i) becomes publicly available other than as a
result of a breach of this Section 10.18 or (ii) becomes available to any Agent, the
Issuing Bank or any Bank on a non-confidential basis from a source other than the
Borrowers. For the purposes of this Section 10.18, "Information" means all

160

information received from the Borrowers relating to the Borrowers or their business, other than any such information that is available to any Agent, the Issuing Bank or any Bank on a non-confidential basis prior to disclosure by the Borrowers. Any Person required to maintain the confidentiality of Information as provided in this Section 10.18 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding anything in this Agreement or in any other Credit Document to the contrary, the Borrowers and each Bank (and each employee, representative or other agent of the Borrowers) may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Borrower relating to such U.S. tax treatment and U.S. tax structure.

10.19 **Usury Savings Clause.** Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, each Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of each Bank and each Borrower to conform strictly to any applicable usury laws. Accordingly, if any Bank contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Bank's option be applied to the outstanding amount of the Loans made hereunder or be refunded to each Borrower, as applicable.

10.20 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission or "PDF" shall be effective as delivery of a manually executed counterpart hereof.

161

10.21 **Effective Date.** This Agreement shall become effective on the Closing Date.

10.22 **Importation of Credit Documents into Austria.** Each of the parties hereto covenants and agrees that it will not send, or cause to be sent, bring or cause to be brought, or otherwise import, or cause otherwise to be imported, into the Republic of Austria any original counterpart or certified or conformed copy of any executed Credit Document or any document constituting or evidencing any transfer by any party of any right or interest under any Credit Document, or make use of any Credit Document or document before any fiscal or governmental authority or agency or any court of Austria; provided that, any party may, at the joint and several cost and expense of the Credit Parties, send, or cause to be sent, bring, or cause to be brought, or otherwise import, or cause otherwise to be imported, any such Credit Document or document into the Republic of Austria if required to do so by applicable law or if such Credit Document or document is required to be presented in Austria in order to assist, enforce, protect or preserve any right of or remedy available to such party arising under or in respect of any of the Credit Documents or applicable law. Each of the parties hereto further agrees not to: (i) object to the introduction into evidence of (a) any uncertified copy of a signed original of a Credit Document or notarized or certified copy thereof or (b) any written minutes recording the transactions contemplated by a Credit Document and signed by a party or its representative (for the purpose of this Section 10.22, each an **"Original"**); (ii) raise as a defense to any action or exercise of a remedy a failure to introduce an Original into evidence; (iii) object to the submission of any uncertified copy of a Credit Document in any proceedings relating to a dispute before any court, arbitral body or governmental authority in Austria (for the purpose of this Section 10.22, the **"Proceedings"**); (iv) contest the authenticity, and conformity to the Original (*Ubereinstimmung mit dem echten Original*), of an uncertified copy of an Original, in each case, unless any such uncertified copy actually introduced into evidence in Proceedings does not accurately reflect the content of such Original.

10.23 **Place of Performance.** The place of performance for all parties under this Agreement and the other Credit Documents shall be any jurisdiction other than the Republic of Austria. Nothing in this Agreement shall be construed in a way as to entitle or oblige any party hereto to render or request any performance contemplated by this Agreement, including, but not limited to, payment obligations, within the Republic of Austria. In particular, all payments to be made by, or to, a party to a Credit Document under or in connection with the Credit Documents shall be effected to and from bank accounts outside of Austria.

10.24 **USA Patriot Act Notice.** Each Bank and the Agents (for the Agents and not on behalf of any Bank) hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-5 (signed into law on October 26, 2001)), as amended (the **"Patriot Act"**), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other

162

information that will allow such Bank or the applicable Agent, as applicable, to identify the Borrowers in accordance with the Patriot Act.

10.25 **No Setoffs and Defenses.** Each Credit Party acknowledges it has no setoffs or defenses to their respective obligations under the Credit Documents and no claims or counterclaims against any of the Agents or the Banks.

**[Remainder of page intentionally left blank]**

163

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

XERIUM TECHNOLOGIES, INC.

By: _____
    Name:
    Title:

XTI LLC

By: _____
    Name:
    Title:

XERIUM ITALIA S.P.A.

By: _____
    Name:
    Title:

XERIUM CANADA INC.

By: _____
    Name:
    Title:

HUYCK.WANGNER AUSTRIA GMBH

By: _____
    Name:
    Title:

XERIUM GERMANY HOLDING GMBH

By: _____
    Name:
    Title:

HUYCK.WANGNER GERMANY GMBH

By: _____
    Name:
    Title:


Signed by

HUYCK.WANGNER AUSTRALIA PTY LIMITED (ACN 004 624 015)
in accordance with section 127 of the *Corporations Act 2001 (Australia)* by
two directors:


_____      _____
Signature of director          Signature of director


_____      _____
Name of director (please print) Name of director (please print)


ROBEC WALZEN GMBH

By: _____
    Name:
    Title:


WANGNER ITELPA PARTICIPAÇÕES LTDA.

By: _____
    Name:
    Title:


XERIUM TECHNOLOGIES DO BRASIL
INDÚSTRIA E COMÉRCIO S.A.

By: _____
    Name:
    Title:


XERIUM DO BRASIL LTDA.

By: _____
    Name:
    Title:

XERIUM (FRANCE) SAS

By: _____
    Name:
    Title:

STOWE WOODWARD FRANCE SAS

By: _____
    Name:
    Title:

STOWE WOODWARD AG

By: _____
    Name:
    Title:

HUYCK. WANGNER JAPAN LIMITED

By: _____
    Name:
    Title:

STOWE WOODWARD MÉXICO, S.A. DE C.V.

By: _____
    Name:
    Title:

HUYCK. WANGNER (UK) LIMITED

By: _____
    Name:
    Title:

**STOWE-WOODWARD (UK) LIMITED**

By: _____
    Name:
    Title:


**XERIUM TECHNOLOGIES LIMITED**

By: _____
    Name:
    Title:


**HUYCK LICENSCO INC.**

By: _____
    Name:
    Title:


**STOWE WOODWARD LLC**

By: _____
    Name:
    Title:


**STOWE WOODWARD LICENSCO LLC**

By: _____
    Name:
    Title:


**WEAVEXX, LLC**

By: _____
    Name:
    Title:


**XERIUM III (US) LIMITED**

By: _____
    Name:
    Title:

XERIUM IV (US) LIMITED

By: _____
    Name:
    Title:


XERIUM V (US) LIMITED

By: _____
    Name:
    Title:


WANGNER ITELPA I LLC

By: _____
    Name:
    Title:


WANGNER ITELPA II LLC

By: _____
    Name:
    Title:


XERIUM ASIA LLC

By: _____
    Name:
    Title:


ROBEC BRAZIL LLC

By:

    Name:
    Title:


HUYCK WANGNER VIETNAM CO LTD

By: _____

Name:
Title:

HUYCK WANGNER SCANDINAVIA AB

By: _____
    Name:
    Title:

STOWE WOODWARD SWEDEN AB

By: _____
    Name:
    Title:

**CITIGROUP GLOBAL MARKETS INC.,**
as Lead Arranger and Bookrunner

By: _____

Name:

Title:

**CITICORP NORTH AMERICA, INC.,**
as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

_____, as a
Bank (please print name of institution)

By⁴:_____
    Name:
    Title:

---

⁴   Bank: If more than one signature is required, please add accordingly. Please delete this
footnote before executing.