## EXHIBIT A

## AMENDED AND RESTATED CREDIT FACILITY

The following describes the principal terms of the Amended and Restated Credit Facility.

## XERIUM TECHNOLOGIES, INC.

### Summary of Terms and Conditions

### US$410,000,000 Second Lien Secured Term Loan Facility

The following is a summary (the "Preliminary Term Sheet") of certain material terms of a proposed restructuring of the loans under the Amended and Restated Credit and Guaranty Agreement of Xerium Technologies, Inc. ("Xerium") and certain of its subsidiaries, dated as of May 30, 2008, as amended (the "Prepetition Credit Agreement"). The restructuring of such loans shall be effectuated through a plan of reorganization (the "Plan of Reorganization") to be filed by Xerium with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

| 1. | *Administrative and Collateral Agent:* | Citicorp North America, Inc. (the "New Term Loan Agent"). |
|---|---|---|
| 2. | *Sole Lead Arranger and Sole Bookrunner:* | Citigroup Global Markets, Inc.. |
| 3. | *Lenders:* | The banks and financial institutions party to the Prepetition Credit Agreement and the Prepetition Swap Parties (the "New Term Loan Lenders"). |
| 4. | *Prepetition Swap Parties:* | Deutsche Bank AG and Merrill Lynch Capital Services, Inc. |
| 5. | *Borrowers:* | Xerium Technologies, Inc. (the "Company"); XTI LLC ("XTI", and together with the Company, the "U.S. Borrowers"), Xerium Canada, Inc. ("Xerium Canada"), Huyck Wangner Austria GmbH ("Huyck Austria"), Xerium Italia S.p.A. ("Xerium Italia") and Xerium Germany Holding GmbH ("Xerium Germany", and together with Xerium Canada, Huyck Austria and Xerium Italia, the "Non U.S. Borrowers"). |
| 6. | *Guarantors:* | The guarantors under the Prepetition Credit Agreement and Robec Brazil LLC (the "Guarantors"). The Guarantors organized under the laws of the United States or any state thereof are referred to as the "U.S. Guarantors", and the Guarantors organized outside the United States are referred to as the "Non U.S. Guarantors." |
| 7. | *Joint and Several Obligations; Limitation on* | The obligations of the Borrowers under the Term Loan Facility and the related loan documents shall be joint and several, provided that none of the Non |

| | |
|---|---|
| ***Obligations:*** | U.S. Borrowers shall be liable for any of the obligations of any U.S. Borrower. |
| | The obligations of the Guarantors under the loan documents shall be joint and several, provided that none of the Non U.S. Guarantors shall be liable for any of the obligations of any U.S. Guarantor. |
| | Notwithstanding the foregoing, any payments received by the New Term Loan Agent with respect to the Term Loans or the Collateral shall be applied to the payment of the obligations under the loan documents for the ratable benefit of the New Term Loan Lenders. |
| 8. ***Term Loan Facility:*** | The Borrowers shall issue to the New Term Loan Lenders term loans (the "Term Loans") in an aggregate amount equal to US$410,000,000.[1] The Term Loans shall be issued by the Borrowers in the following amounts and currencies: |

| Borrower | Amount[2] | Currency |
|---|---|---|
| Xerium | US$225,145,947.36 | US Dollars |
| XTI | US$43,677,549.37 | Euros |
| Xerium Canada | US$46,532,560.48 | Canadian Dollars |
| Huyck Austria | US$24,267,534.91 | Euros |
| Xerium Italia | US$16,957,549.73 | Euros |
| Xerium Germany | US$53,418,858.16 | Euros |

The Term Loans shall be deemed to have been

---

[1] The $410 million will represent a pro rata reduction of the existing loans under the Prepetition Credit Agreement.

[2] Based on the applicable "New York Closing" exchange rate published online at http://online.wsj.com for Tuesday, February 23, 2010, to be adjusted at closing based on exchange rates two business days prior to closing.

2

made to the Borrowers on the Closing Date without any actual funding. Term Loans that are repaid shall not be reborrowed.

| | | |
|---|---|---|
| 9. | *Closing Date:* | The date on which the conditions precedent to the closing of the Term Loan Facility shall have been satisfied or waived. |
| 10. | *Amortization:* | 2% annual amortization, payable on the 15th day of the last month of each calendar quarter, beginning in the first full calendar quarter after the Closing Date. |
| 11. | *Maturity Date:* | Five years following the Closing Date. |
| 12. | *Interest:* | The Term Loans shall bear interest as follows: |

(i) in the case of the Term Loans issued by Xerium Canada, at the BA Rate plus the Applicable Margin;

(ii) in the case of the Term Loans issued by Xerium, at the LIBOR Rate plus the Applicable Margin; and

(iii) in the case of the Term Loans issued by XTI, Xerium Italia, Huyck Austria and Xerium Germany, at the Euribor Rate plus the Applicable Margin.

The terms "BA Rate", "LIBOR Rate" and "Euribor Rate" shall have the same meanings as set forth in the Prepetition Credit Agreement except that the BA Rate, the LIBOR Rate and the Euribor Rate shall not be less than 2.00% per annum.

The term "Applicable Margin" means (i) 625 bps if the Leverage Ratio equals or exceeds 2.75:1.00, and (ii) 575 bps if the Leverage Ratio is less than 2.75:1.00.

Interest periods will be 1, 2, 3 or 6 months.

If any Event of Default occurs and is continuing, then the Borrowers will pay interest on the unpaid balance of the outstanding Term Loans at a per annum rate of two percent (2%) greater than the rate

3

of interest specified above.

| | | |
|---|---|---|
| 13. | **Interest Payments:** | Interest shall be payable in arrears on the last day of each interest period. |
| 14. | **Mandatory Prepayment:** | Mandatory prepayment of the Term Loans shall be made from (i) 100% of the net cash proceeds from asset sales in excess of US$100,000 (with the obligation to mandatorily prepay commencing when such asset sales are greater than US$250,000) made outside the ordinary course of business, less any taxes payable by the Borrowers with respect to such asset sales; provided that with respect to the net cash proceeds from the Australia and Vietnam Assets (as defined in Section 20(h)), only 50% of the net cash proceeds shall be subject to mandatory prepayment, (ii) 100% of insurance and condemnation award payments, less any taxes payable by the Borrowers with respect to such award payments, (iii) cash proceeds from debt issuances, other than permitted debt and permitted refinancing debt and (iv) 50% of excess cash flow, which shall exclude non-cash items and shall include certain working capital adjustments, after the end of each fiscal year, beginning at the end of fiscal year 2011 (payable in 2012), with (in the case of clauses (i), (ii) and (iii)) exceptions, baskets and reinvestment rights to be agreed upon. Mandatory prepayments pursuant to clauses (i), (ii) and (iv) will be shared ratably with the lenders under the First Lien Facility pursuant to the terms of the Intercreditor Agreement. Borrowers will bear all costs related to any mandatory prepayment of Term Loans on a day that is not the last day of an interest period. |
| 15. | **Voluntary Prepayment:** | The Term Loans may be prepaid without penalty, on 3 business days' notice, in minimum amounts and increments to be agreed upon. Borrowers will bear all costs related to the voluntary prepayment of Term Loans prior to the last day of the interest period thereof. |
| 16. | **Security and Second Priority:** | The New Term Loan Agent for and on behalf of the New Term Loan Lenders shall have perfected second priority security interests in and liens upon (i) all existing and after acquired real and personal, |

4

tangible and intangible, property of the U.S. Borrowers and U.S. Guarantors and (ii) the real and personal, tangible and intangible, property of the Non U.S. Borrowers and Non U.S. Guarantors securing the obligations under the Prepetition Credit Agreement (together, the "Collateral").

All amounts owing under the Term Loan Facility and the related loan documents in respect thereof at all times will be subject and subordinate to the liens granted under the Company's US$80,000,000 revolving and term loan credit facility to become effective concurrently with the Term Loan Facility (the "First Lien Facility"), subject to the terms of the Intercreditor Agreement.

17. **Conditions to Closing:**       The closing of the Term Loan Facility shall be subject to the satisfaction of the conditions customary for a transaction of this type, including:

(a) The Bankruptcy Court shall have entered an order confirming the Company's Plan of Reorganization, which order (i) shall be in form and substance satisfactory to the New Term Loan Agent and (ii) shall be in full force and effect and shall not have been reversed, modified, amended or stayed (or application therefor made).

(b) All fees and other payments required to be made under the Term Loan Agreement or any other written agreement shall have been paid.

(c) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist.

(d) Representations and warranties shall be true and correct in all material respects, except where such representation or warranty relates to an earlier date, in which case it shall be true and correct in all material respects as of such earlier date; provided that any representation or warranty that is by its terms qualified by materiality shall be true and correct in all

5

respects.

(e) Execution and delivery of all loan and collateral documents for the Term Loan Facility and the Intercreditor Agreement, including but not limited to mortgages, ALTA mortgage title insurance policies and evidence of flood insurance with respect to any property located in any flood hazard zone.

(f) The New Term Loan Agent shall have a perfected second priority security interest in the Collateral and all filings and recordings and searches necessary or desirable in connection with such liens and security interest shall have been duly made.

(g) Delivery of legal opinion by counsel to the Borrowers and the Guarantors.

(h) Delivery of customary officers' and secretaries' certificates, incumbency/specimen signature certificates, resolutions and good standing certificates.

(i) All required consents shall have been obtained.

(j) The Company's debtor-in-possession credit facility shall have been repaid in full and commitments thereunder terminated, and all liens and security interests related thereto shall have been terminated and released, unless continued or refinanced pursuant to the terms of the First Lien Facility.

(k) The New Term Loan Agent shall have received reasonably satisfactory evidence that the conditions to effectiveness under the First Lien Facility shall have been satisfied or waived in accordance with the terms thereof.

(l) Issuance of common stock of the Company to the lenders under the Prepetition Credit Agreement and to the Prepetition Swap Parties as contemplated by the Company's Plan of Reorganization.

(m) The agent under the Prepetition Credit

6

Agreement (on behalf of the lenders thereunder) and the Prepetition Swap Parties shall have received the cash payment contemplated by the Company's Plan of Reorganization.

(n)  The collateral agent for the First Lien Facility, as bailee for the New Term Loan Agent and other parties, shall have received the certificates representing the shares of capital stock pledged pursuant to the security documents, together with undated stock powers (or the equivalent) for each such certificate executed by the applicable Borrower or Guarantor.

(o)  The New Term Loan Agent shall have received a detailed consolidated budget and business plan of the Company and its subsidiaries through fiscal year 2015 (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of fiscal year 2015), in form and substance acceptable to the New Term Loan Agent.

(p)  The Company's US$80,000,000 First Lien Facility shall have become effective.

18.  **Representations and Warranties:**

The Term Loan Agreement will contain representations and warranties that are customary for a transaction of this type and shall be based on the representations and warranties set forth in the Prepetition Credit Agreement (subject to materiality qualifiers and exceptions in the Prepetition Credit Agreement, as well as matters disclosed in SEC filings and the Disclosure Statement), including:

(a)  Confirmation of corporate status and authority of the Company and its subsidiaries.

(b)  Capital stock of each of the Company and its subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable.

(c)  Due authorization, execution and delivery of

7

the loan documents.

(d) Execution, delivery, and performance by the Borrowers and Guarantors of the loan documents do not conflict with law, existing agreements or organization documents except where such conflict would not reasonably be expected to result in a Material Adverse Effect.

(e) No governmental or regulatory approvals required.

(f) Legality, validity, binding effect and enforceability of the loan documents.

(g) Accuracy of information and financial statements.

(h) Projections based on good faith estimates.

(i) No occurrence of any event, matter or circumstance since the petition date: (a) which is materially adverse to the: (i) business, assets or financial condition of Company and its subsidiaries taken as a whole; or (ii) ability of any Borrower or any Guarantor to perform any of its obligations in accordance with their terms under any of the loan documents; or (b) which in the reasonable opinion of the Requisite Lenders results in any (i) loan document not being legal, valid and binding on and, subject to reservations contained in the legal opinions provided as conditions precedent thereto, enforceable against any party thereto, from and after the Effective Date of the Plan of Reorganization, and/or (ii) collateral document not being a valid and effective security interest, from and after the Effective Date of the Plan of Reorganization, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any New Term Loan Lenders under the loan documents ("Material Adverse Effect").

(j) Payment of taxes by the Company and its subsidiaries, except those taxes being contested

8

in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP.

(k) Good, sufficient and legal title to properties owned by the Company or its subsidiaries.

(l) Environmental compliance by the Company and its subsidiaries, except where non-compliance would not reasonably be expected to result in a Material Adverse Effect.

(m) No defaults by the Company or its subsidiaries in any contractual obligations except where such default would not reasonably be expected to result in a Material Adverse Effect and except as contemplated by the Plan of Reorganization.

(n) List of material contracts in effect on the Closing Date is true, correct and complete.

(o) Neither the Company nor any of its subsidiaries is an investment company.

(p) Neither the Company nor any of its subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock and no part of the proceeds of the Term Loans made will be used to purchase or carry any such margin stock.

(q) No unfair labor practices by the Company or its subsidiaries and other employment law non-compliance matters that could reasonably be expected to result in a Material Adverse Effect.

(r) Compliance by the Company and its subsidiaries with employee benefit plans, except where non-compliance would not reasonably be expected to result in a Material Adverse Effect.

(s) No broker's or finder's fee or commission will be payable in connection with the transactions contemplated by the loan documents.

9

(t) Borrowers and Guarantors are solvent.

(u) Full and accurate disclosure by Borrowers and Guarantors.

(v) Compliance with laws, except where non-compliance would not reasonably be expected to result in a Material Adverse Effect.

19. *Affirmative Covenants:*

The Term Loan Agreement will contain affirmative covenants that are customary for a transaction of this type and shall be based on the affirmative covenants set forth in the Prepetition Credit Agreement, including:

(a) The Company to deliver to the New Term Loan Agent the following: (i) audited annual financial statements within 90 days after the end of each fiscal year; (ii) unaudited quarterly financial statements within 45 days after the end of each fiscal quarter; (iii) detailed consolidated budget and business plan of the Company and its subsidiaries through fiscal year 2015 (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of fiscal year 2015) on or before April 1 of each fiscal year; (iv) compliance certificates; (v) notices of default; (vi) notices of litigation; (vii) notices of ERISA events; (viii) annual collateral verification reports; and (ix) other information.

(b) The Company to file all reports and other documents with the Securities and Exchange Commission required under the Securities Exchange Act.

(c) Each Borrower, each Guarantor and their respective subsidiaries to preserve and maintain in full force and effect its corporate existence and all rights and franchises, licenses and permits material to its business, except where its board of directors determines that such preservation is no longer desirable in the conduct of its business and the loss is not disadvantageous in any material respect to it or

10

the New Term Loan Lenders.

(d) Each Borrower, each Guarantor and their respective subsidiaries to pay all material taxes, except those taxes which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP.

(e) Each Borrower, each Guarantor and their respective subsidiaries to maintain in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of the Company and its subsidiaries and make all appropriate repairs, renewals and replacements thereof, except where failure to do so would not reasonably be expected to have a Material Adverse Effect.

(f) The Company will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Company and its subsidiaries as may customarily be carried or maintained under similar circumstances by persons of established reputation engaged in similar businesses, in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such persons.

(g) Each Borrower, each Guarantor and their respective subsidiaries to maintain accurate books and records and, as reasonably requested and with reasonable notice, permit visitation and inspection by the New Term Loan Agent representatives.

(h) Each Borrower, each Guarantor and their respective subsidiaries to comply in all

11

material respects, with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (including all environmental laws), except where failure to do so would not reasonably be expected to have a Material Adverse Effect.

(i) The Company to deliver to the New Term Loan Agent environmental reports and disclosures.

(j) Each Borrower to cause any person that becomes a material subsidiary to become a Guarantor and a grantor under the applicable collateral documents.

(k) Each Borrower, each Guarantor and their respective subsidiaries, upon acquisition of a material real estate asset, to take all actions to create in favor of New Term Loan Agent a valid and perfected second priority security interest.

(l) Each Borrower and Guarantors to take all actions the New Term Loan Agent may reasonably request in order to effect fully the purposes of the loan and collateral documents.

(m) Each Borrower and each of its subsidiaries will continue to own or possess the right to use, free from any restrictions, all patents, trademarks, copyrights, and domain names that are used in the operation of their respective businesses as presently conducted and as proposed to be conducted, except to the extent the failure to so own or possess would not reasonably be expected to have a Material Adverse Effect.

(n) Each Borrower and each Guarantor to supply to the New Term Loan Agent or any New Term Loan Lender documents and evidence reasonably requested and necessary to comply with "know your customer" or other similar checks.

(o) Each Borrower, each Guarantor and their

12

respective subsidiaries to ensure that its payment obligations under each of the loan and collateral documents rank and will at all times rank junior only to the obligations under the First Lien Facility in accordance with the terms of the Intercreditor Agreement and Permitted Liens (as defined in the Prepetition Credit Agreement) and will at all times rank at least pari passu to the obligations of all other present and future secured and unsubordinated indebtedness, other than obligations under the First Lien Facility.

(p) If the audit opinion delivered with the audited consolidated financial statements of the Company and its subsidiaries for the fiscal year 2009 contains a going concern qualification, the Company will use its commercially reasonable efforts to cause its auditors to deliver a revised opinion withdrawing the going concern qualification.

20.    *Negative Covenants:*    The Term Loan Agreement will contain negative covenants that are customary for a transaction of this type and shall be based on the negative covenants set forth in the Prepetition Credit Agreement, including:

(a) No incurrence of indebtedness by any Borrower or any Guarantor or any of their subsidiaries, other than:

    1.    the obligations under the Term Loan Agreement and the related loan and collateral documents (the "Obligations");

    2.    indebtedness of any subsidiary to any Borrower or to any other subsidiary, or of any Borrower to any subsidiary; provided, (i) all such indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a lien pursuant to the collateral documents, (ii) all such indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable

13

promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to the New Term Loan Agent, and (iii) any payment by any such subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any indebtedness owed by such subsidiary to the Company or to any of its subsidiaries for whose benefit such payment is made;

3. senior or subordinated unsecured debt; provided, that (i) no default or event of default is continuing under the Term Loan Agreement or would result from such issuance, (ii) each Borrower is in compliance (and certifies as to such compliance) with the financial covenants on a pro forma basis after giving effect to the such issuance, (iii) the proceeds of such issuance are applied in accordance with the mandatory prepayment provisions of the Term Loan Agreement, (iv) such debt shall have a maturity of not earlier than six months after the Maturity Date, and (v) the documentation relating to such subordinated debt shall not contain any covenant or event of default that is either (x) not substantially provided for in the Term Loan Agreement or (y) more favorable to the holder of such subordinated debt than the comparable covenant or event of default set forth in the Term Loan Agreement, and, in the case of any subordinated debt, shall contain customary subordination provisions pursuant to which such debt is subordinated to the prior payment in full of the obligations under the Term Loan Agreement;

4. indebtedness incurred by the Company or any of its subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance

14

bonds securing the performance of each Borrower or any such subsidiary pursuant to such agreements, in connection with certain permitted acquisitions or permitted dispositions of any business, assets or subsidiary of the Company or any of its subsidiaries;

5. indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

6. indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

7. guaranties in the ordinary course of business of obligations to suppliers, customers, franchisees and licensees of the Company and its subsidiaries;

8. guaranties or the provision of other credit support by a Borrower of indebtedness of a subsidiary or guaranties or the provision of other credit support by a subsidiary of a Borrower of indebtedness of a Borrower or a subsidiary with respect, in each case, to indebtedness otherwise permitted to be incurred pursuant to the lien covenant section below;

9. existing disclosed indebtedness, but not any extensions, renewals or replacements of such indebtedness except (i) renewals and extensions expressly provided for in the agreements evidencing any such indebtedness as the same are in effect on the Closing Date and (ii) refinancings and extensions of any such indebtedness if the terms and conditions thereof are not materially less favorable to the obligor thereon or to the New Term Loan Lenders than the indebtedness being refinanced or extended, and the average life to maturity

15

thereof is greater than or equal to that of the indebtedness being refinanced or extended; provided, such indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include indebtedness of an obligor that was not an obligor with respect to the indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the indebtedness being renewed, extended or refinanced or (C) be incurred, created or assumed if any default or event of default under the Term Loan Agreement has occurred and is continuing or would result therefrom;

10. indebtedness with respect to capital leases or purchase money indebtedness in an amount not to exceed at any time US$25 million in the aggregate (including any indebtedness acquired in connection with certain permitted acquisitions); provided, any such purchase money indebtedness shall be secured only to the asset(s) acquired in connection with the incurrence of such indebtedness;

11. other indebtedness of the Company and its subsidiaries in an aggregate amount not to exceed at any time US$25 million;

12. indebtedness under certain factoring agreements;

13. unsecured working capital facilities of any subsidiary in respect of which a letter of credit in an amount equal to the maximum principal amount of such facilities has been issued under the First Lien Facility;

14. hedging obligations entered into for the purpose of hedging risks associated with the operations of the Company and its subsidiaries;

15. the obligations under the First Lien

16

Facility;

16. any replacement, renewal or refinancing of and debt described in 3, 10, 11 and 15 ("Permitted Refinancing Indebtedness") that (i) does not exceed the aggregate principal amount of the debt being replaced, renewed or refinanced, (ii) does not have a maturity date earlier than the debt being replaced renewed or refinanced, (iii) does not rank at the time of such replacement, renewal or refinancing senior to the debt being replaced, renewed or refinanced and (iv) the documentation relating to such debt shall not contain any covenant or event of default that is either (x) not substantially provided for in the Term Loan Agreement or (y) more favorable to the holder of such debt than the comparable covenant or event of default set forth in the Term Loan Agreement; and

17. scheduled indebtedness existing on the Closing Date.

(b) No liens on any property or assets of the Company or its subsidiaries, other than:

1. liens in favor of New Term Loan Agent for the benefit of New Term Loan Lenders granted pursuant to any security document;

2. liens for taxes not then due or if due obligations with respect to such taxes that are not at such time required to be paid pursuant to the payment of taxes covenant or which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

3. statutory liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen,

17

workmen and materialmen, and other liens imposed by law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of 15 days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

4.   liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

5.   easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of the Company or any of its subsidiaries;

6.   any (i) interest or title of a lessor or sublessor under any lease of real estate permitted under the Term Loan Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to

18

in the preceding clause (ii), so long as the holder of such restriction or encumbrance agrees to recognize the rights of such lessee or sublessee under such lease;

7. liens solely on any cash earnest money deposits made by the Company or any of its subsidiaries in connection with any letter of intent or purchase agreement permitted under the Term Loan Agreement;

8. purported liens evidenced by the filing of precautionary UCC financing statements or, for property located in foreign jurisdictions, the preparation and/or filing of functionally similar documents, relating solely to operating leases of personal property entered into in the ordinary course of business;

9. liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

10. any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

11. (i) licenses of patents, trademarks and other intellectual property rights granted by the Company or any of its subsidiaries in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of the Company or such subsidiary and (ii) leases or subleases granted by Company of any of its subsidiaries to third parties in respect of surplus property which is not fundamental to the operation of the business in the ordinary course of business; provided that such leases and subleases are on arms-length commercial terms and are otherwise satisfactory to the

19

New Term Loan Agent;

12. liens described on a title report delivered in connection with any real property securing the obligations under the Term Loan Agreement;

13. liens securing indebtedness permitted pursuant to clauses 10, and 11. of the debt covenant above; provided, any such lien shall encumber only the asset acquired with the proceeds of such indebtedness;

14. liens granted by entities acquired pursuant to the asset sale covenant prior to their acquisition and not in contemplation of such acquisition and which are discharged within three months of the date of acquisition and in relation to which the secured amount is not increased in contemplation of or after the date of the relevant acquisition;

15. liens in favor of the collateral agent under the security documents relating to the First Lien Facility;

16. liens securing Permitted Refinancing Indebtedness, provided that any such lien shall encumber only the assets that secure the debt being replaced, renewed or refinanced by such Permitted Refinancing Indebtedness;

17. scheduled liens outstanding on the Closing Date and replacements thereof so long as the replacement liens encumber only the assets subject to the liens being replaced; and

18. a general lien basket of US$15 million so long as the assets subject to such lien are located outside the United States and are not included in the Collateral, of which US$5 million of such general lien basket may apply to assets subject to such lien that are located in the United States and

20

are not included in the Collateral.

(c) If any Borrower or any of its subsidiaries creates any lien upon any of its properties or assets, other than Permitted Liens, it shall make provisions whereby the obligations under the Term Loan Agreement will be secured by such lien equally and ratably.

(d) No further negative pledges by any Borrower, any Guarantor or their subsidiaries, other than:

1. specific property encumbered to secure payment of particular indebtedness or to be sold pursuant to an executed agreement with respect to a permitted asset sale;

2. restrictions contained in any documents evidencing subordinated debt; provided, that in respect of subordinated debt such restrictions do not restrict the ability to grant security interests under the Term Loan Agreement or any agreement that refinances the obligations under the Term Loan Agreement;

3. restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be);

4. liens permitted to be incurred under lien and debt covenants in the Term Loan Agreement and restrictions in the agreements relating thereto that limit the right of any Borrower or any Guarantor to dispose of or transfer the assets subject to such liens;

5. provisions limiting the disposition or distribution of assets or property under

21

sale-leaseback agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of such agreements;

6. any encumbrance or restriction in connection with an acquisition of property, so long as such encumbrance or restriction relates solely to the property so acquired and was not created in connection with or in anticipation of such acquisition; and

7. restrictions imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements that restrict the transfer of ownership interest in such partnership, limited liability company, joint venture or similar person.

(e) No restricted junior payments (e.g., dividends and payments of subordinated debt) except distributions from a subsidiary to its shareholders, provided that such payments are made to all its shareholders proportionately, and so long as no default exists, the Company can repurchase or redeem common stock up to US$7 million per year for the purpose of repurchases of common stock from departing executives or satisfying the purchase price of equity awards under, or paying withholding taxes with respect to vested equity compensation programs.

(f) Limited restrictions on subsidiary ability to make distributions.

(g) No investments in any person (including joint ventures) by any Borrower, any Guarantor or their subsidiaries, other than:

1. investments in cash and cash equivalents;

22

2.  equity investments and loans as of the Closing Date in or to any subsidiary and equity investments and loans made after the Closing Date in or to any subsidiary of any Borrower;

3.  investments (i) in any securities received in satisfaction or partial satisfaction of obligations of financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the Company's and its subsidiaries' ordinary course of business;

4.  intercompany loans and guaranties to the extent permitted by the provisions of the indebtedness covenant above;

5.  capital expenditures permitted under the financial covenants below;

6.  loans and advances to employees of the Company and its subsidiaries made in the ordinary course of business in an aggregate principal amount not to exceed US$1 million in the aggregate;

7.  investments made in connection with certain permitted acquisitions, provided that equity of the Company may be used as consideration in connection with permitted acquisitions so long as the Company is in compliance, on a pro forma basis, with the financial covenants;

8.  investments received in lieu of cash in connection with certain permitted asset sales;

9.  existing disclosed investments; and

10. other investments in an aggregate amount not to exceed at any time US$20 million.

(h) No mergers, consolidations, acquisitions, sales, leases of all or part of Company's or any of its subsidiaries' assets or property other than:

23

1. purchases or acquisitions of inventory, materials and equipment and cap-ex in the ordinary course of business;

2. any subsidiary of the Company may be merged with or into a Borrower or any other subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, to a Borrower or any other subsidiary, provided that in the case of a merger involving a Borrower or a Guarantor merging with a non-Guarantor, such Borrower or Guarantor shall be the surviving entity;

3. sales or dispositions of inventory in the ordinary course of business and sales of other assets for gross consideration of less than US$250,000 with respect to any transaction or series of related transactions;

4. asset sales, the proceeds of which when aggregated with proceeds of all other asset sales in the same fiscal year are less than US$25 million; provided that (x) such amount shall exclude proceeds of the sale of assets of Huyck Wangner Australia Pty Limited and Huyck Wangner Vietnam Co Ltd (the "Australian and Vietnam Assets") and (y) the net cash proceeds will be subject to the mandatory prepayment provisions set forth in Section 14 above; provided further that up to US$3 million of such proceeds may be reinvested within 360 days of receipt;

5. disposals of obsolete, worn out or surplus property;

6. permitted acquisitions so long as the amount does not exceed US$10 million;

7. investments permitted under the Term

24

Loan Agreement.

(i) No sales by any Borrower, any Guarantor or their subsidiaries of interests in the capital stock of any of the subsidiaries, unless permitted by the Term Loan Agreement.

(j) No sales and lease backs by any Borrower, any Guarantor or their subsidiaries, unless permitted by the Term Loan Agreement.

(k) No transactions by any Borrower, any Guarantor or their subsidiaries with shareholders owning more than 5% of any class of stock of the Company or any of its subsidiaries and affiliates on terms less favorable to such Borrower or Guarantor, other than (a) any transaction between the Company or any of its subsidiaries and the Company and its subsidiaries; (b) compensation arrangements for directors, officers and other employees of Company and its subsidiaries entered into in the ordinary course of business, including indemnification arrangements, equity compensation and stock ownership plans; and (c) certain other permitted transactions agreed upon.

(l) No engaging by any Borrower, any Guarantor or their subsidiaries in business other than businesses engaged in by such Borrower and the Guarantors on the Closing Date or other similar or related businesses.

(m) No amendments or modifications by any Borrower, any Guarantor or their subsidiaries of any organizational documents that would be materially adverse to the New Term Loan Lenders.

(n) No amendments or waivers by any Borrower, any Guarantor or their subsidiaries with respect to certain terms of subordinated debt or amendments that would be adverse to the New Term Loan Lenders.

(o) No change by any Borrower, any Guarantor or

25

their subsidiaries in its fiscal year end from December 31.

21. **Financial Covenants:**

(a) Interest Coverage Ratio measured quarterly for a rolling 12 month period at levels to be agreed upon.

(b) Leverage Ratio measured quarterly for a rolling 12 month period at levels to be agreed upon.

(c) Maximum Capital Expenditures each year in amounts to be agreed upon.

22. **Events of Default:**

The Term Loan Agreement will contain Events of Default that are customary for a transaction of this type and shall be based on the events of default in the Prepetition Credit Agreement, including:

(a) Failure by any Borrower to pay principal when due and failure to pay interest, fees and other amounts within 3 business days of when due.

(b) Cross-default to payment defaults beyond applicable grace periods by any Borrower, any Guarantor or any of their subsidiaries on principal aggregating US$5 million, or to other events if the effect is to accelerate or permit acceleration of such debt.

(c) Failure by any Borrower or any Guarantor to comply with any negative covenant, any financial covenant or the use of proceeds covenant.

(d) Any representations or warranty made by any Borrower or any Guarantor shall be false in any material respect as of the date made or deemed made.

(e) Failure by any Borrower or any Guarantor to comply with other covenants in Term Loan Agreement or other loan or collateral documents and such failure continues unremedied for a period of 20 business days following receipt of notice by an officer of the Company or actual knowledge of such failure

26

by any such Borrower or Guarantor.

(f) Involuntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of the Company or any of its subsidiaries if not dismissed within 60 days.

(g) Voluntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of the Company or any of its subsidiaries, other than any Case(s) not closed as of the Closing Date.

(h) Failure to pay by the Company or any of its subsidiaries of a final judgment or court order if not stayed within 60 days in excess of US$5 million.

(i) Any order, judgment or decree shall be entered against any Borrower or any Guarantor decreeing the dissolution or split up of such Borrower or Guarantor and such order shall remain undischarged or unstayed for a period in excess of 30 days.

(j) Occurrence of an ERISA event which would reasonably be expected to result in liability of the Company or any of its subsidiaries in excess of US$5 million.

(k) Occurrence of a change of control of the Company, other than pursuant to the Plan of Reorganization.

(l) Any collateral document ceases to be in full force and effect other than in accordance with its terms or shall be declared null and void or the New Term Loan Agent shall not have or shall cease to have a valid and perfected lien in any Collateral purported to be covered by such collateral document with the priority required by such collateral document.

(m) Occurrence of any Material Adverse Effect.

27

| 23. | *Remedies Upon Event of Default:* | Upon the occurrence of an Event of Default under paragraphs (f), (g) or (k) above, automatically, and upon the occurrence of any other Event of Default, at the request of the Requisite Lenders, the principal of and all accrued interest and fees and all other amounts owed to the New Term Loan Agent and the New Term Loan Lenders under the Term Loan Agreement shall be immediately due and payable, and the New Term Loan Agent and the New Term Loan Lenders shall have the rights and remedies provided in the Term Loan Agreement and the collateral documents, subject to the terms of the Intercreditor Agreement. |
|---|---|---|
| 24. | *CAM Exchange:* | On the date on which an Event of Default under paragraphs (f) and (g) above (bankruptcy) occurs, the New Term Loan Lenders shall automatically be deemed to have exchanged interest in all obligations of the Borrowers under the Term Loan Agreement such that each New Term Loan Lender shall own a pro rata interest in all of the Term Loans. |
| 25. | *Assignments and Participations:* | Each New Term Loan Lender may sell or assign all or any portion of its Term Loans with notice to the New Term Loan Agent and to the Company. Each New Term Loan Lender may grant participations in all or any of its Term Loans without the prior consent of any Borrower. |
| 26. | *Voting:* | Amendments, modifications, terminations and waivers of any provision of the Term Loan Agreement or any related document will require the approval of Requisite Lenders (as defined below), except that in certain circumstances the consent of a greater percentage of the outstanding Term Loans may be required. |
| 27. | *Requisite Lenders:* | New Term Loan Lenders holding at least a majority of the outstanding Term Loans. |
| 28. | *Intercreditor Agreement:* | The New Term Loan Agent and the collateral agent for the First Lien Facility shall enter into an intercreditor agreement setting forth the lien and payment priorities with respect to the obligations under the Term Loan Agreement and the First Lien Facility. |

28

| 29. | **_Term Loan Agreement and Other Terms:_** | The Term Loan Agreement shall be an amendment and restatement of the Prepetition Credit Agreement effectuated through the Plan of Reorganization and will provide additional terms that are usual and customary for a transaction of this type. |
|---|---|---|
| 30. | **_Expenses:_** | The Borrowers shall reimburse the New Term Loan Agent for all fees, expenses and disbursements, including reasonable fees, expenses and disbursements of counsel to the New Term Loan Agent, incurred in connection with the transaction, including, without limitation, related preparation, negotiation, execution and administration of the definitive documentation and ongoing expenses related to the Term Loan Facility. After the occurrence of a Default or and Event of Default, Borrowers shall reimburse the New Term Loan Agent and the New Term Loan Lenders for all costs and expenses and costs of settlement incurred in enforcing any Obligation or in collecting any payments due or in connection with any refinancing and restructuring of the credit arrangements. |
| 31. | **_Indemnification:_** | The Borrowers and the Guarantors shall indemnify the New Term Loan Agent and New Term Loan Lenders and their respective affiliates, officers, partners, directors trustees, investment advisors, employees and agents for any liability, obligation, loss, damage, claim, costs, expense and disbursement (including reasonable fees and disbursements of counsel to the indemnitees) arising out of (i) the Term Loan Agreement and the related loan documents and the transactions contemplated under the Term Loan Facility, the use or proposed use of proceeds of the term loans or any enforcement of the Term Loan Agreement or any related loan documents or (ii) any environmental claims or hazardous materials activity arising from activity of the Company and its subsidiaries, provided that such indemnification obligation does not extend to any damages or liabilities arising from gross negligence or willful misconduct. |
| 32. | **_Yield Protection and Taxes:_** | The Term Loan Agreement and the related documents will contain yield protection provisions and tax gross-up provisions that are customary and based on the yield protection and tax gross-up |

29

provisions set forth in the Prepetition Credit
Agreement.

33.    *Governing Law:*                The Term Loan Facility and all documentation in
                                  connection with the Term Loan Facility (other than
                                  the applicable security documents) shall be
                                  governed by the laws of the State of New York.

30

# EXHIBIT B

## COMMITMENT LETTER

CITIGROUP GLOBAL MARKETS INC.
390 GREENWICH STREET
NEW YORK, NEW YORK 10013

February 26, 2010

Xerium Technologies, Inc.
8537 Six Forks Road, Suite 300
Raleigh, NC 27615
Attention: Mr. Stephen Light
Chief Executive Officer

US$80,000,000 Senior Secured Superpriority Priming DIP Financing Facility and
US$80,000,000 First Lien Exit Facility
or
US$80,000,000 First Lien Out of Court Restructuring Facility
COMMITMENT LETTER

Ladies and Gentlemen:

You have advised us that Xerium Technologies, Inc. (the "**Company**"), which may become a debtor-in-possession in cases (the "**Cases**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), desires to establish (i) a US$80 million senior secured superpriority priming debtor-in-possession facility (the "**DIP Facility**") comprised of (A) a US$20 million senior secured superpriority priming debtor-in-possession revolving loan facility and (B) a US$60 million senior secured superpriority priming debtor-in-possession term loan facility, which will convert, upon confirmation of the Prepackaged Plan of Reorganization (the "**Plan of Reorganization**") in the Cases into (ii) a US$80 million first lien secured exit facility (the "**Exit Facility**", and together with the DIP Facility, the "**Facilities**") comprised of (A) a US$20 million first lien secured exit revolving loan facility, and (B) a US$60 million first lien secured exit term loan facility. The proceeds of the DIP Facility will be used by the Company solely to (i) pay related transaction costs, fees and expenses associated with the DIP Facility, (ii) fund working capital and general corporate purposes of the DIP Borrower and its subsidiaries during the pendency of the Cases, (iii) make adequate protection payments and (iv) fund costs, fees and expenses incurred in connection with the administration and prosecution of the Cases. The proceeds of the Exit Facility will be used by the Company and certain of its subsidiaries solely to (i) pay fees and expenses associated with the Exit Facility, (ii) fund working capital and general corporate purposes of the Company and certain of its subsidiaries, (iii) refinance the DIP Facility in accordance with the terms set forth in Annex I and (iv) fund costs, fees and expenses incurred in connection with the consummation of the Plan of Reorganization in accordance with the attached Annex I.

Subject to the terms and conditions of this commitment letter and the attached Annex I (collectively, and together with the Fee Letter referred to below, this "**Commitment Letter**", as amended and modified from time to time), Citigroup Global Markets Inc. ("**CGMI**"), on behalf of Citi (as defined below), is pleased to inform the Company of Citi's commitment to provide the Company the entire amount of the Facilities and to act as administrative agent and collateral agent for the Facilities. However, if the Company obtains unanimous approval by April 12, 2010 from (i) the lenders under the Prepetition Credit Agreement (as defined in Annex I), (ii) Deutsche Bank AG and Merrill Lynch Capital Services, Inc. as swap counterparties in the interest rate swap agreements with the Company or certain of

its subsidiaries, which agreements were terminated in December 2009 and January 2010, respectively, and (iii) Apax WW Nominees Ltd. and Apax-Xerium APIA LP for an out of court restructuring of its debt and equity (the "Out of Court Restructuring Approval"), Citi (as defined below) agrees that it will instead provide (A) a US$20 million first lien secured revolving loan facility and (B) a US$60 million first lien secured term loan facility (the "Out of Court Restructuring Facility") on terms set forth in Part II of Annex I, with adjustments to such terms to take into account that the Out of Court Restructuring Facility is not a debtor-in-possession facility and not an exit facility and references to "Facilities" in this Commitment Letter shall mean the Out of Court Restructuring Facility. If the Out of Court Restructuring Facility is provided, the aggregate amount of the upfront fees listed in the attached Annex I that would have been due on the DIP Closing Date and the Exit Closing Date will instead be due and payable on the closing date of the Out of Court Restructuring Facility. The proceeds of the Out of Court Restructuring Facility will be used by the Company and certain of its subsidiaries solely to (i) pay fees and expenses associated with the Out of Court Restructuring Facility, (ii) fund working capital and general corporate purposes of the Company and certain of its subsidiaries and (iii) fund costs, fees and expenses incurred in connection with the consummation of the Company's out of court restructuring. For purposes of this Commitment Letter, "Citi" means CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated hereby.

Section 1. **Conditions Precedent.** Citi's commitment and other obligations hereunder are subject to: (i) the preparation, execution and delivery of mutually acceptable loan documentation, including without limitation, a credit agreement, security agreements, guaranties and other agreements, incorporating substantially the terms and conditions outlined in this Commitment Letter and otherwise satisfactory to Citi (the "Operative Documents"); (ii) in the judgment of CGMI, the absence of any material adverse change in the business, condition (financial or otherwise), operations or prospects of the Company and its subsidiaries, taken as a whole, since September 30, 2009 other than (x) the matters described in the Company's quarterly report on Form 10-Q for the quarterly period ended September 30,2009 filed with the Securities and Exchange Commission and any Form 8-K filed with the Securities and Exchange Commission prior to the date hereof, (y) commencement of the Cases and (z) the occurrence or continuation of circumstances that give rise or would reasonably be expected to give rise to the filing of the Cases, so long as Citi has been made aware as of the date hereof of all such circumstances, (iii) the accuracy and completeness of all representations that the Company makes to Citi and all information that the Company furnishes to Citi; (iv) the Company's compliance with the terms of this Commitment Letter, including without limitation, the payment in full of all fees, expenses and other amounts payable under this Commitment Letter; (v) the satisfaction of the other conditions precedent to the closing of the Facilities contained in Annex I, (vi) Citi not discovering or otherwise becoming aware of any information not previously disclosed to it that it believes to be materially inconsistent with its understanding, based on the information provided to it prior to the date hereof, of the business, condition (financial or otherwise), operations or prospects of the Company and its subsidiaries taken as a whole and (vii) Citi shall have been afforded an opportunity to syndicate the Facilities for a period of a minimum of four weeks, commencing from the date of execution of this Commitment Letter by the Company.

Section 2. **Commitment Termination.** Citi's commitment and other obligations set forth in this Commitment Letter will terminate on the earlier of (I) the date the Operative Documents become effective, and (II) April 12, 2010 for the DIP Facility and the Exit Facility commitment, or if the Company obtains the Out of Court Approval, April 30, 2010 for the Out of Court Restructuring Facility commitment (the "Citi Commitment Termination Date"). Before such date, Citi may terminate its commitment and other obligations hereunder if any event occurs or information becomes available that, in its judgment, results in, or is likely to result in, the failure to satisfy any condition set forth in Section 1. Notwithstanding the

2

foregoing, the termination of Citi's commitment and other obligations hereunder will not affect Sections 4 through 12, which provisions will survive any such termination.

Section 3. **Syndication**. Citi reserves the right, before the execution of the Operative Documents, to syndicate all or a portion of the Facilities (including all or part of Citi's commitment) to one or more other financial institutions that will become parties to the Operative Documents pursuant to a syndication to be managed by CGMI (the financial institutions becoming parties to the Operative Documents being collectively referred to herein as the "**Lenders**"). Citi intends to commence syndication promptly upon execution of this Commitment Letter by the Company. CGMI will manage all aspects of the syndication in consultation with the Company, including the timing of all offers to potential Lenders, the determination of the amounts offered to potential Lenders, the acceptance of commitments of the Lenders and the compensation to be provided to the Lenders.

The Company will use its commercially reasonable efforts to assist CGMI, as CGMI may reasonably request, in forming a syndicate acceptable to CGMI. The Company's assistance in forming such a syndicate will include, without limitation, commercially reasonable efforts to (i) make senior management, advisors and representatives of the Company available to participate in information meetings with potential Lenders and rating agencies at such times and places as CGMI may reasonably request; (ii) ensure that the syndication efforts benefit from the Company's existing lending relationships; (iii) assist and cause its affiliates and advisors to assist in the preparation of a confidential information memorandum for the Facilities and other marketing and rating agency materials to be used in connection with syndication of the Facilities; (iv) promptly provide CGMI with all information reasonably necessary to successfully complete the syndication of the Facilities and (v) obtain corporate/ corporate family ratings for the Borrower and ratings for the Exit Facility or the Out of Court Restructuring Facility, as applicable, from Standard & Poor's Rating Group ("S&P") and Moody's Investors Service, Inc. ("**Moody's**") prior to the DIP Closing Date, or the closing date of the Out of Court Restructuring Facility, as applicable.

The Company acknowledges that (i) Citi may make available any Information and Projections (each as defined in Section 8) (collectively, the "**Company Materials**") to potential Lenders by posting the Company Materials on IntraLinks, the Internet or another similar electronic system (the "**Platform**") and (ii) certain of the potential Lenders may be public side Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Company or its securities) (each, a "**Public Lender**"). The Company agrees that (A) at the request of Citi, it will prepare a version of the information package and presentation to be provided to potential Lenders that does not contain material non-public information concerning the Company or its securities for purposes of United States federal and state securities laws; (B) all Company Materials that are to be made available to Public Lenders will be clearly and conspicuously marked "PUBLIC" which, at a minimum, will mean that the word "PUBLIC" will appear prominently on the first page thereof; (C) by marking Company Materials "PUBLIC," the Company will be deemed to have authorized Citi and the proposed Lenders to treat such Company Materials as not containing any material non-public information (although they may be confidential or proprietary) with respect to the Company or its securities for purposes of United States federal and state securities laws; (D) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Lender," and (E) Citi will be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Lender."

To ensure an effective syndication of the Facilities, the Company agrees that, other than in connection with amendments and waivers to the Company's and certain of its subsidiaries' Amended and Restated Credit and Guaranty Agreement, dated as of May 30, 2008 (as amended, supplemented or otherwise modified), the Plan of Reorganization and the transactions contemplated thereby, until the termination of the syndication (as determined by CGMI), the Company will not, and will not permit any of

3

Its affiliates to, syndicate or issue, attempt to syndicate or issue, announce or authorize the announcement of the syndication or issuance of, or engage in discussions concerning the syndication or issuance of, any debt facility or debt security (including any renewals thereof), without the prior written consent of CGMI.

Citi will act as the sole administrative agent and collateral agent for the Facilities and CGMI will act as sole lead arranger and bookrunner. No additional agents, co-agents or arrangers will be appointed, no other titles awarded and no compensation (except as set forth in this Commitment Letter) will be paid, without the consent of Citi.

**Section 4. Fees.** In addition to the fees described in Annex I, the Company will pay the non-refundable fees set forth in the letter agreement dated the date hereof (the "Fee Letter") between the Company and Citi. The terms of the Fee Letter are an integral part of Citi's commitment and other obligations hereunder and constitute part of this Commitment Letter for all purposes hereof.

**Section 5. Indemnification.** The Company will indemnify and hold harmless Citi, each Lender and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case, arising out of or in connection with or by reason of this Commitment Letter or the Operative Documents or the transactions contemplated hereby or thereby or any actual or proposed use of the proceeds of the Facilities, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity will be effective whether or not such investigation, litigation or proceeding is brought by the Company, any of its directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Party will have any liability (whether in contract, tort or otherwise) to the Company or any of its affiliates or any of their respective security holders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct. In no event, however, will any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages (including without limitation, any loss of profits, business or anticipated savings).

The Company acknowledges that information and other materials relative to the Facilities and the transactions contemplated hereby may be transmitted through the Platform. No Indemnified Person will be liable to the Company or any of its affiliates or any of their respective security holders or creditors for any damages arising from the use by unauthorized persons of information or other materials sent through the Platform that are intercepted by such persons.

**Section 6. Costs and Expenses.** The Company will pay, or reimburse Citi on demand for, all reasonable transaction related costs and expenses incurred by Citi (whether incurred before or after the date hereof) in connection with the Facilities and the preparation, negotiation, execution and delivery of this Commitment Letter, including without limitation, the reasonable fees and expenses of counsel, regardless of whether any of the transactions contemplated hereby are consummated. The Company will also pay all

reasonable transaction related costs and expenses of Citi (including without limitation, the reasonable fees and disbursements of counsel) incurred in connection with the enforcement of any of its rights and remedies under this Commitment Letter.

Section 7. **Confidentiality.** By accepting delivery of this Commitment Letter, the Company agrees that this Commitment Letter, the Fee Letter and any written communications provided by Citi in connection with the transactions contemplated hereby are for the Company's confidential use only and that neither the existence of this Commitment Letter and the Fee Letter nor their terms will be disclosed by the Company to any person other than the Company's affiliates and its and their respective officers, directors, employees, advisors, agents and representatives (the "Company Representatives"), and then only on a confidential and "need to know" basis in connection with the transactions contemplated hereby; provided, however, that the Company may (i) make such public disclosures of the terms and conditions of this Commitment Letter and the Fee Letter as the Company is required by law or compulsory legal process (in which case you agree to inform us promptly thereof), (ii) disclose the contents of this Commitment Letter (but not the Fee Letter) in connection with the filing of the Cases and the solicitation of the Plan of Reorganization, provided, further, however, that notwithstanding the foregoing, unless otherwise directed by the Court, the Company shall (x) file the Fee Letter with the Court under seal, and (y) provide, on a confidential basis, a copy of the Fee Letter to the Office of the United States Trustee for the District of Delaware prior to the commencement of the Cases, (iii) the information contained in Annex I to Moody's, S&P and Fitch, Inc.; provided that such information is supplied only on a customary basis after consultation with Citi; and (iv) in enforcing the Company's rights with respect to this Commitment Letter or the Fee Letter. For the avoidance of doubt, in connection with the Company's preparation of any financial statements, cash flow statements, projections and other financial reports (collectively, "Financial Information"), the Company will not disclose the fees payable pursuant to the Fee Letter as a separate line item in any such Financial Information, but the amount of such fees may be included with other fees or amounts paid by the Company during the applicable period covered by such Financial Information.

Section 8. **Representations and Warranties of the Company.** The Company represents and warrants that (i) all information, other than Projections (as defined below), that has been or will hereafter be made available to Citi, any Lender or any potential Lender by the Company or any Company Representatives in connection with the transactions contemplated hereby (the "Information") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made and (ii) all financial projections, if any, that have been or will be prepared by the Company or any Company Representatives and made available to Citi, any Lender or any potential Lender (the "Projections") have been or will be prepared in good faith based upon assumptions that are or were reasonable as of the date of the preparation of such Projections (it being understood that the Projections are subject to significant uncertainties and contingencies, many of which are beyond the Company's control, and that no assurance can be given that the Projections will be realized). If, at any time from the date hereof until the termination of this Commitment Letter, any of the representations and warranties in the preceding sentence would not be accurate and complete in any material respect if the Information or Projections were being furnished, and such representations and warranties were being made, at such time, then the Company agrees to its commercially reasonable efforts to promptly supplement the Information and/or Projections from time to time so that the representations and warranties contained in the preceding sentence would be remain accurate and complete in all material respects if the Information or Projections were being were being furnished, and such representations and warranties were being made, at such time.

5

In providing this Commitment Letter and in arranging the Facilities, Citi is relying on the accuracy of the Information furnished to it by or on behalf of the Company or any Company Representatives without independent verification thereof.

Section 9. **No Third Party Reliance, Not a Fiduciary, Etc.** The agreements of Citi hereunder and of any Lender that issues a commitment to provide financing under the Facilities are made solely for the benefit of the Company and may not be relied upon or enforced by any other person. Please note that those matters that are not covered or made clear herein are subject to mutual agreement of the parties. The Company may not assign or delegate any of its rights or obligations hereunder without Citi's prior written consent. This Commitment Letter may not be amended or modified, or any provision hereof waived, except by a written agreement signed by all parties hereto.

The Company hereby acknowledges that Citi is acting pursuant to a contractual relationship on an arm's length basis, and the parties hereto do not intend that Citi act or be responsible as a fiduciary to the Company, its management, stockholders, creditors or any other person. Each of the Company and Citi hereby expressly disclaims any fiduciary relationship and agrees they are each responsible for making their own independent judgments with respect to any transactions entered into between them. The Company also hereby acknowledges that Citi has not advised and is not advising the Company as to any legal, accounting, regulatory or tax matters, and that the Company is consulting its own advisors concerning such matters to the extent it deems appropriate.

The Company understands that Citi and its affiliates (collectively, the "**Group**") are engaged in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research). Members of the Group and businesses within the Group generally act independently of each other, both for their own account and for the account of clients. Accordingly, there may be situations where parts of the Group and/or their clients either now have or may in the future have interests, or take actions, that may conflict with the Company's interests. For example, the Group may, in the ordinary course of business, engage in trading in financial products or undertake other investment businesses for their own account or on behalf of other clients, including without limitation, trading in or holding long, short or derivative positions in securities, loans or other financial products of the Company or its affiliates or other entities connected with the Facilities or the transactions contemplated hereby.

In recognition of the foregoing, the Company agrees that the Group is not required to restrict its activities as a result of this Commitment Letter and that the Group may undertake any business activity without further consultation with or notification to the Company. Neither this Commitment Letter nor the receipt by Citi of confidential information nor any other matter will give rise to any fiduciary, equitable or contractual duties (including without limitation, any duty of trust or confidence) that would prevent or restrict the Group from acting on behalf of other customers or for its own account. Furthermore, the Company agrees that neither the Group nor any member or business of the Group is under a duty to disclose to the Company or use on behalf of the Company any information whatsoever about or derived from those activities or to account for any revenue or profits obtained in connection with such activities. However, consistent with the Group's long-standing policy to hold in confidence the affairs of its customers, the Group will not use confidential information obtained from the Company except in connection with its services to, and its relationship with, the Company, provided however, that the Group will be free to disclose information in any manner as required by law, regulation, regulatory authority or other applicable judicial or government order.

Section 10. **Governing Law, Etc.** This Commitment Letter will be governed by, and construed in accordance with, the law of the State of New York. This Commitment Letter sets forth the entire agreement

between the parties with respect to the matters addressed herein and supersedes all prior communications, written or oral, with respect hereto. This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, will be deemed to be an original and all of which, taken together, will constitute one and the same Commitment Letter. Delivery of an executed counterpart of a signature page to this Commitment Letter by telecopier or electronic mail in portable document format (.pdf) will be as effective as delivery of an original executed counterpart of this Commitment Letter.

Section 11. **Waiver of Jury Trial**. Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter or the transactions contemplated hereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof.

Section 12. **Consent to Jurisdiction, Etc**. The Company irrevocably and unconditionally (i) submits to the exclusive jurisdiction of any New York State or Federal court located in the City of New York over any suit, action or proceeding arising out of or relating to this Commitment Letter, (ii) accepts for itself and in respect of its property the jurisdiction of such courts, (iii) waives any objection to the laying of venue of any such suit, action or proceeding brought in any such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum and (iv) consents to the service of any process, summons, notice or document in any such suit, action or proceeding by registered mail addressed to the Company at its address specified on the first page of this Commitment Letter. A final judgment in any such suit, action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein will affect the right of Citi to serve legal process in any other manner permitted by law or affect Citi's right to bring any suit, action or proceeding against the Company or its property in the courts of other jurisdictions. To the extent that the Company has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Company irrevocably waives such immunity in respect of its obligations under this Commitment Letter.

Section 13. **Patriot Act Compliance**. CGMI hereby notifies the Company that pursuant to the requirements of the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Company, which information includes the name and address of the Company and other information that will allow CGMI to identify the Company in accordance with the Patriot Act. In that connection, CGMI may also request corporate formation documents, or other forms of identification, to verify information provided.

Please indicate the Company's acceptance of the provisions hereof by signing the enclosed copy of this Commitment Letter and the Fee Letter and returning them to Caesar W. Wyszomirski, Authorized Signatory, Citigroup Global Markets Inc., 390 Greenwich Street, New York, New York 10013 (fax: (646) 328-3765) at or before 5 p.m. (New York City time) on February 27, 2010, the time at which Citi's commitment and other obligations hereunder (if not so accepted prior thereto) will terminate.

[signature page follows]

If the Company elects to deliver this Commitment Letter by telecopier or electronic mail in portable document format (.pdf), please arrange for the executed original to follow by next-day courier.

Very truly yours,

CITIGROUP GLOBAL MARKETS INC.

By _Caesar W. Wyszomirski_
Name: Caesar W. Wyszomirski
Title: Authorized Signatory

ACCEPTED AND AGREED
on _____, 2010:

XERIUM TECHNOLOGIES, INC.

By_____
   Name:
   Title:

If the Company elects to deliver this Commitment Letter by telecopier or electronic mail in portable document format (.pdf), please arrange for the executed original to follow by next-day courier.

Very truly yours,

CITIGROUP GLOBAL MARKETS INC.

By_____
Name:  Caesar W. Wyszomirski
Title:  Authorized Signatory

ACCEPTED AND AGREED
on *February 26* 2010:

XERIUM TECHNOLOGIES, INC.

By_____
Name: *STEPHEN R. LIGHT*
Title: *CHAIRMAN, PRESIDENT & CEO*

Term Sheet

### *XERIUM TECHNOLOGIES, INC.*

### *Summary of Terms and Conditions*

### *US$80,000,000 Senior Secured Superpriority Priming DIP Financing Facility and US$80,000,000 First Lien Exit Facility*
### *or*
### *US$80,000,000 First Lien Out of Court Restructuring Facility*

The following is a summary (the "<u>Term Sheet</u>") of certain material terms of (i) a proposed US$80 million senior secured superpriority priming debtor-in-possession facility (the "<u>DIP Facility</u>") comprised of (A) a US$20 million senior secured superpriority priming debtor-in-possession revolving loan facility and (B) a US$60 million senior secured superpriority priming debtor-in-possession term loan facility to be made available to Xerium Technologies, Inc. ("<u>Xerium</u>") and (ii) a proposed US$80 million first lien secured exit facility (the "<u>Exit Facility</u>") comprised of (A) a US$20 million first lien secured exit revolving loan facility, and (B) a US$60 million first lien secured exit term loan facility to be made available to Xerium and certain subsidiaries of Xerium. This Term Sheet is for discussion purposes only and remains subject to further review and comment. This Term Sheet does not contain all the terms, conditions and other provisions of the DIP Facility or the Exit Facility and does not constitute a commitment on behalf of any lender or any of its affiliates to arrange or provide financing for or to Xerium, except upon mutually satisfactory documentation and court orders.

However, if Xerium obtains unanimous approval by April 12, 2010 from (i) the lenders under the Prepetition Credit Agreement (as defined below), (ii) Deutsche Bank AG and Merrill Lynch Capital Services, Inc. as swap counterparties in the interest rate swap agreements with the Company or certain of its subsidiaries, which agreements were terminated in December 2009 and January 2010, respectively, and (iii) Apax WW Nominees Ltd. and Apax-Xerium APIA LP for an out of court restructuring of its debt and equity (the "<u>Out of Court Restructuring Approval</u>"), the proposed facility will instead be (A) a US$20 million first lien secured revolving loan facility and (B) a US$60 million first lien secured term loan facility (the "<u>Out of Court Restructuring Facility</u>") on terms set forth in Part II of this Term Sheet, with adjustments to such terms to take into account that the Out of Court Restructuring Facility is not a debtor-in-possession facility and not an exit facility. If the Out of Court Restructuring Facility is provided, the aggregate amount of the upfront fees payable on the DIP Closing Date and the Exit Closing Date will instead be due and payable on the closing date of the Out of Court Restructuring Facility and the closing date therefore shall occur no later than April 30, 2010.

## I. TERMS OF DIP FACILITY

| | | |
|---|---|---|
| 1. | *Administrative and Collateral Agent:* | An affiliate of Citigroup Global Markets, Inc. (in such capacity, the "<u>DIP Facility Agent</u>"). |
| 2. | *Sole Lead Arranger and Sole Bookrunner:* | Citigroup Global Markets, Inc. ("<u>CGMI</u>"). |
| 3. | *DIP Issuing Bank* | Citicorp North America, Inc. |

| 4. | *Lenders:* | A syndicate of banks, financial institutions and other entities (the "<u>DIP Facility Lenders</u>"). |
|---|---|---|
| 5. | *Borrower:* | Xerium Technologies, Inc., a Delaware corporation (the "<u>Company</u>" or the "<u>DIP Borrower</u>") and debtor-in-possession in the cases (the "<u>Cases</u>") that may be commenced under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"). |
| 6. | *Guarantors:* | All U.S. subsidiaries of the DIP Borrower (the "<u>DIP Guarantors</u>"), each of the DIP Guarantors being a debtor-in-possession in the Cases. The liability of the DIP Borrower and DIP Guarantors (collectively, the "<u>Debtors</u>") with respect to the DIP Facility shall be joint and several. |
| 7. | *DIP Facility:* | *<u>DIP Term Loan Facility</u>* |

The DIP Facility Lenders shall provide the DIP Borrower with a term loan credit facility (the "<u>DIP Term Loan Facility</u>") providing for extensions of term loans (the "<u>DIP Term Loans</u>") not to exceed US$60,000,000 (the "<u>DIP TL Commitment Amount</u>"). The DIP Term Loans shall be funded in full on the funding date under the terms of the DIP Loan Agreement. The DIP Term Loans will be made by the DIP Facility Lenders ratably in proportion to their respective DIP TL Commitment Amount. DIP Term Loans that are repaid shall not be reborrowed.

The DIP Facility shall have a letter of credit sublimit in the amount of US$20,000,000 as described in paragraph 8 below (the "<u>DIP Term Loan L/C Facility</u>").

Upon the entry of an order (the "<u>Interim Order</u>") by the Court substantially in the form agreed to by and among the DIP Borrower, the DIP Guarantors, the DIP Facility Agent and the DIP Facility Lenders, and subject to the terms of a debtor-in-possession credit agreement acceptable to the DIP Facility Lenders, the DIP Borrower and the DIP Guarantors (the "<u>DIP Loan Agreement</u>"), the DIP TL Commitment Amount shall be available to the DIP

2

Borrower.

All DIP Term Loans shall be made in U.S. dollars.

On the DIP Closing Date (as defined below), (i) a portion of the proceeds from the DIP Term Loans shall be deposited into the Term Loan LC Collateral Account in accordance with paragraph 8 below, (ii) a portion of the proceeds from the DIP Term Loans shall be utilized to pay transaction costs payable on the DIP Closing Date and (iii) the balance of the proceeds from the DIP Term Loans shall deposited into the Term Loan Deposit Account in accordance with paragraph 8 below.

## *DIP Revolving Loan Facility*

The DIP Facility Lenders shall provide the DIP Borrower with a revolving loan facility (the "DIP Revolving Loan Facility") providing for extensions of revolving loans (the "DIP Revolving Loans", and together with the DIP Term Loans, the "DIP Loans") with the principal amount of the DIP Revolving Loans not to exceed US$20,000,000 in the aggregate (the "DIP RL Commitment Amount").

From the DIP Closing Date and prior to the DIP Revolving Commitment Termination Date (as defined below), the DIP Borrower may, subject to the terms of the DIP Loan Agreement, borrow, repay and reborrow DIP Revolving Loans, subject to satisfaction of applicable conditions to borrowing. DIP Revolving Loans will be in minimum principal amounts to be agreed to. All DIP Revolving Loans will be made by the DIP Facility Lenders ratably in proportion to their respective DIP RL Commitment Amounts. DIP Revolving Loans will be available on 3 business days' notice in the case of DIP Revolving Loans that are Eurodollar Loans and same business day notice in the case of DIP Revolving Loans that are Base Rate Loans. The DIP Borrower will repay each DIP Revolving Loan no later than on the DIP Revolving Commitment Termination Date.

Upon the entry of the Interim Order by the Court,

3

and subject to the terms of the DIP Loan Agreement, the DIP RL Commitment Amount shall be available to the DIP Borrower.

All DIP Revolving Loans shall be made in U.S. dollars.

8. ***DIP Letters of Credit:***    On the DIP Closing Date (i) the outstanding letters of credit (the "Prepetition Letters of Credit") under the DIP Borrower's Amended and Restated Credit and Guaranty Agreement dated as of May 30, 2008, as amended, (the "Prepetition Credit Agreement") shall be outstanding letters of credit under the DIP Term Loan L/C Facility (the "DIP Term Loan Letters of Credit") and (ii) a portion of the proceeds from the DIP Term Loans equal to the lesser of (x) 103% of the amount available to be drawn under the DIP Term Loan Letters of Credit and (y) US$20,000,000, shall be deposited into an account maintained by the DIP Facility Agent (the "Term Loan LC Collateral Account"). Amounts on deposit in the Term Loan LC Collateral Account shall secure the DIP Borrower's reimbursement obligation to the DIP Issuing Bank with respect to the DIP Term Loan Letters of Credit. If the DIP Borrower fails to reimburse the DIP Issuing Bank for drawings under the DIP Term Loan Letters of Credit then the DIP Facility Agent shall withdraw funds from the Term Loan LC Collateral Account equal to such drawings and remit such funds to the DIP Issuing Bank.

Funds on deposit in the Term Loan LC Collateral Account shall be invested in acceptable cash equivalents. The DIP Facility Agent, for the benefit of the DIP Issuing Bank, shall have a lien on the Term Loan LC Collateral Account and all funds and amounts held therein. If on the last business day of any month the amount on deposit in the Term Loan LC Collateral Account exceeds 103% of the amount available to be drawn under the DIP Term Loan Letters of Credit, then no later than the second succeeding business day the DIP Facility Agent shall remit such excess amount to the Term Loan Deposit Account (as defined below).

If on the last business day of any month (or such

4

other date as determined by the DIP Facility Agent in its sole discretion) at any time the amount on deposit in the Term Loan LC Collateral Account is less than 103% of the amount available to be drawn under the DIP Term Loan Letters of Credit, then the DIP Borrower shall cause additional amounts to be deposited within one business day after notice from the DIP Facility Agent into the Term Loan LC Collateral Account equal to such deficiency. If the DIP Borrower shall fail to make such deposit, the DIP Facility Agent shall withdraw funds from the Term Loan Deposit Account equal to such deficiency and deposit such funds into the Term Loan LC Collateral Account. If sufficient funds are not available in the Term Loan Deposit Account then the DIP Facility Lenders shall make a DIP Revolving Loan under the DIP Revolving Facility in an amount of such deficiency and the proceeds of which shall be deposited into the Term Loan LC Collateral Account. The conditions precedent to making DIP Revolving Loans and the minimum amounts of DIP Revolving Loans shall not apply to DIP Revolving Loans made pursuant to this paragraph. If there is not sufficient availability under the DIP Revolving Facility to make such DIP Revolving Loans provided for in this paragraph, such event shall constitute an Event of Default.

9.  **Term Loan Deposit Account:**

On the DIP Closing Date, proceeds from the DIP Term Loans (less the amounts deposited into the Term Loan LC Collateral Account and amounts applied to pay transaction costs on the DIP Closing Date) shall be deposited into an account maintained by the DIP Facility Agent (the "Term Loan Deposit Account"). Funds on deposit in the Term Loan Deposit Account shall be invested in acceptable cash equivalents. The DIP Facility Agent shall have a lien on the Term Loan Deposit Account and all funds and amounts held therein. The DIP Borrower shall have the right to withdraw funds from the Term Loan Deposit Account in amounts consistent with its cash needs based on the 13-week cash flow statement and pro forma financial statements, in form and substance satisfactory to the DIP Facility Lenders and demonstrating satisfactory liquidity (the "DIP Budget"). It shall be a condition to any such withdrawal that the DIP Borrower shall have

5

delivered to the DIP Facility Agent a withdrawal request and no default or event of default shall have occurred and be continuing.

| | | |
|---|---|---|
| 10. | **DIP Closing Date:** | No later than 3 business days after the entry of the Interim Order, but in any event no later than April 12, 2010. |
| 11. | **DIP Maturity Date and DIP Revolving Commitment Termination Date:** | Unless accelerated as a result of an Event of Default (as defined herein), the DIP Loans outstanding under the DIP Facility will be immediately due and payable upon the earlier of (i) 120 days after the DIP Closing Date, (ii) 35 days after the entry of the Interim Order if the Final Order (as defined below) has not been entered by the Court on or before such date, (iii) the closing date of any sale of the Debtors of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code in the Cases that has been approved by an order of the Court, and (iv) the effective date of a Plan of Reorganization in the Cases that has been confirmed by an order of the Court (such date being the "DIP Maturity Date" and the "DIP Revolving Commitment Termination Date"). |
| 12. | **Purpose and Use of Proceeds:** | The proceeds of the DIP Facility will be used by the DIP Borrower (including by way of withdrawals from the Term Loan Deposit Account as described above) solely to (i) pay related transaction costs, fees and expenses associated with the DIP Facility, (ii) fund working capital and general corporate purposes of the DIP Borrower and its subsidiaries during the pendency of the Cases, (iii) make adequate protection payments, and (iv) fund costs, fees and expenses incurred in connection with the administration and prosecution of the Cases. |
| 13. | **Amortization:** | None. |
| 14. | **Interest:** | At the DIP Borrower's election, DIP Loans shall be Eurodollar Loans or Base Rate Loans. Eurodollar Loans shall bear interest at the annual rate equal to LIBOR plus the Applicable Margin, with a LIBOR floor of 2.00% per annum. Base Rate Loans shall bear interest at the annual rate equal to the Base Rate plus the Applicable Margin. |

6

Base Rate: a fluctuating rate equal to the highest of (a) the Prime Rate of the DIP Facility Agent, (b) the Federal Funds Effective Rate plus 1/2 of 1% and (c) LIBOR plus 1%, with a LIBOR floor of 2.00%.

Applicable Margin: 4.50% per annum with respect to Eurodollar Loans and 3.50% per annum with respect to Base Rate Loans.

If any Event of Default occurs and is continuing under the DIP Facility, then the DIP Borrower will pay interest on the unpaid balance of the DIP Loans at a per annum rate of two percent (2%) greater than the rate of interest specified above.

If any Event of Default occurs and is continuing under the DIP Facility, each Eurodollar Loan will convert to a Base Rate Loan at the end of the Interest Period then in effect for such Eurodollar Loan.

15. *Interest Period:*    Each interest period will be for one (1) month, or shorter periods if available to all DIP Facility Lenders.

16. *Interest Payments:*    Interest shall be payable monthly in arrears and on the last day of each interest period.

17. *Mandatory Prepayment:*    Mandatory prepayment of the DIP Loans shall be made from 100% of the net cash proceeds from asset sales made outside the ordinary course of business and 100% of insurance and condemnation award payments, subject to restrictions, exceptions, baskets and reinvestment rights to be agreed upon.

18. *DIP Upfront Fee:*    To be determined in connection with the syndication.

19. *DIP Commitment Fee:*    1.00% per annum on the daily average amount of the unused DIP RL Commitment Amount of each DIP Facility Lender, payable to each DIP Facility Lender monthly in arrears from the DIP Closing Date until the DIP Revolving Commitment Termination Date.

20. *DIP Letter of Credit Fee:*    A fronting fee equal to 0.25% per annum will accrue on the outstanding undrawn amount of any DIP Letters of Credit, payable to the DIP Issuing

7

Bank monthly in arrears.

21. *Security:*

The agent for the DIP Facility Lenders (the "DIP Facility Agent") for and on behalf of the DIP Facility Lenders shall be entitled to the following security, subject to exceptions to be agreed upon:

(a) Priming Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected, priming security interests in and liens upon (the "Priming Liens"): all existing and after acquired real and personal, tangible and intangible, property of the DIP Borrower and the DIP Guarantors that constitutes collateral of the DIP Borrower and the DIP Guarantors under the Prepetition Credit Agreement (the "Priming Lien Collateral"), which shall be senior in all respects to the interests in and liens upon such property of, without limitation, the lenders under the Prepetition Credit Agreement (the "Prepetition First Lien Lenders") but which shall be subject to (i) non-avoidable, valid, enforceable and perfected Permitted Liens (as defined in the Prepetition Credit Agreement) in existence on the date the Cases are commenced (the "Petition Date"), (ii) non-avoidable, valid, enforceable and perfected liens that are capitalized leases, purchase money security interests or mechanics' or other statutory liens in existence on the Petition Date, and (iii) non-avoidable, valid, enforceable liens that are capitalized leases, purchase money security interests or mechanics' or other statutory liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and (iv) mechanics, warehousemen's or other statutory liens arising after the Petition Date (clauses (ii) - (iv), collectively, "Additional Permitted Liens").

(b) First Liens. Pursuant to section 364(c)(2) of the Bankruptcy Code, fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected, security interests in and

8

liens upon (the "First Liens" and collectively, with the Priming Liens, the "Financing Liens"), all existing and after acquired real and personal, tangible and intangible, property of the DIP Borrower and the DIP Guarantors that is not collateral of the DIP Borrower and the DIP Guarantors under the Prepetition Credit Agreement, existing, or acquired prior or subsequent to the commencement of the Cases, including, but not limited to, upon entry of the Final Order, all causes of action arising under Chapter 5 of the Bankruptcy Code, and any and all proceeds thereof, (the "First Lien Collateral" and together with the Priming Lien Collateral, the "DIP Collateral"), which liens are subject only to Permitted Liens and Additional Permitted Liens.

22. **Priority:** Pursuant to section 364(c)(1) of the Bankruptcy Code, all amounts owing by the Debtors under the DIP Facility in respect thereof at all times will constitute allowed superpriority administrative expense claims in the Debtors' respective Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code ("Superpriority"), subject to indebtedness secured by Permitted Liens and Additional Permitted Liens and the Carve-out (as defined herein).

23. **Adequate Protection:** The Prepetition First Lien Lenders and Merrill Lynch Capital Services, Inc., as secured swap counterparty (the "Secured Swap Counterparty") are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Priming Lien Collateral equal in amount to the aggregate diminution in value (each such diminution, a "Diminution in Value"), calculated in accordance with Section 506(a) of the Bankruptcy Code, of their respective interests in the Priming Lien Collateral, including without limitation, any such diminution resulting from (i) the sale, lease or use by the Debtors of any Priming Lien Collateral, and (ii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code

9

(respectively, the "Adequate Protection Claim").

As adequate protection, the administrative agent under the Prepetition Credit Agreement (the "Prepetition First Lien Agent"), the Prepetition First Lien Lenders and the Secured Swap Counterparty shall be granted the following:

(a) Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value of the pre-petition security interest, the Prepetition First Lien Agent (for the benefit of the Prepetition First Lien Lenders) and the Secured Swap Counterparty shall be granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) replacement security interests in and liens upon all the DIP Collateral, subject and subordinate only to (i) the security interests and liens granted to the DIP Facility Agent for the benefit of the DIP Facility Lenders in the Interim Order and pursuant to the DIP Loan Agreement and (ii) Permitted Liens, (iii) Additional Permitted Liens and (iv) the Carve-out.

(b) Adequate Protection Claim. The Adequate Protection Claim of the Prepetition First Lien Lenders and the Secured Swap Counterparty shall have Superpriority status, subject only to the Superpriority status of the obligations under the DIP Facility, claims secured by Permitted Liens, and the Carve-out.

(c) Payment of Debt Service. Payment of accrued but unpaid interest (whether prepetition or postpetition) to the Prepetition First Lien Lenders and the Secured Swap Counterparty at the rate of 1.00% per annum in excess of the non-default interest rate payable on the LIBOR Loans under the Prepetition Credit Agreement.

(d) Fees and Expenses. The Debtors shall pay all reasonable fees, out-of-pocket costs and expenses of (i) the Prepetition First Lien Agent

10

and the Prepetition First Lien Lenders under the Prepetition Credit Agreement (including fees and expenses of legal advisors, financial advisors and investment banks) promptly upon receipt of invoices therefor and (ii) the Secured Swap Counterparty under the secured swap agreement.

(e) <u>Other Adequate Protection</u>. The Prepetition First Lien Lenders and the Secured Swap Counterparty shall be entitled to such other adequate protection as (i) reasonably agreed upon by the DIP Facility Agent, the DIP Facility Lenders, Prepetition First Lien Lenders and the Secured Swap Counterparty, as applicable, and the Debtors and approved by the Court, or (ii) as otherwise granted by the Court.

24. *Carve-out:*    As used in this Term Sheet, the term "Carve-out" shall mean the following amounts: (i) all fees required to be paid to the Clerk of the Court, all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), and all fees, expenses, and disbursements payable to any professionals retained by the Debtors pursuant to 28 U.S.C. § 156(c); and (ii) in the event of an occurrence and during the continuance of an Event of Default, the "<u>Case Professionals Carve-out</u>", comprising the sum of (a) all allowed unpaid fees, expenses and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) for any professionals retained by the Debtors or any statutory committee appointed in the Cases pursuant to sections 327, 328, 363, or 1103, as applicable, of the Bankruptcy Code (the "<u>Case Professionals</u>") incurred subsequent to receipt of notice delivered by the DIP Facility Agent to counsel for the Debtors following the occurrence of an Event of Default expressly stating that the Carve-out has been invoked (a "<u>Carve-out Trigger Notice</u>") in an aggregate amount not in excess of US$3,000,000 (the "<u>Carve-out Cap</u>"), plus (b) all unpaid professional fees, expenses, and disbursements of such Case Professionals incurred prior to receipt of the Carve-out Trigger Notice to the extent previously or subsequently allowed pursuant to an order of the

11

Court (collectively, "<u>Allowed Professional Fees</u>")
under sections 328, 330 and/or 331 of the
Bankruptcy Code. So long as a Carve-out Trigger
Notice has not been delivered, the Carve-out Cap
shall not be reduced by the payment of fees or
expenses allowed by the Court (whether allowed
before or after delivery of the Carve-out Trigger
Notice) and payable under sections 328, 330, or 331
of the Bankruptcy Code, or 28 U.S.C. §156(c).

25.  *Conditions to Closing*    The closing of the DIP Facility shall be subject to
the satisfaction of the conditions customary for a
transaction of this type, including:

(a) The Interim Order shall have been entered by
the Court;

(b) Any "first day" order authorizing the use of cash
collateral, and any other orders affecting or
concerning the DIP Collateral shall be in form
and substance reasonably satisfactory to the DIP
Facility Agent and the DIP Facility Lenders, the
DIP Borrower and the DIP Guarantors;

(c) All fees and other payments required to be made
to the DIP Facility Lenders, the DIP Facility
Agent and the Sole Lead Arranger and their
respective advisors and counsel under the DIP
Loan Agreement or any other written agreement
shall have been paid;

(d) Delivery of the DIP Budget;

(e) Delivery of the business plan in form and
substance reasonably satisfactory to the DIP
Facility Lenders.

(f) The Interim Order shall be in full force and
effect and shall not have been reversed,
modified, amended or stayed (or application
therefor made);

(g) No Event of Default and no condition which
would constitute an Event of Default with the
giving of notice or lapse of time or both shall
exist;

(h) Representations and warranties in the DIP Loan

12

Agreement shall be true and correct in all
material respects;

(i) No administrative claim that is senior to or pari
passu with the Superpriority claims of the DIP
Facility Agent and the DIP Facility Lenders
shall exist, except the Permitted Liens,
Additional Permitted Liens and the Carve-out;

(j) All documentation relating to the DIP Facility
shall be in form and substance consistent with
this Term Sheet and otherwise reasonably
satisfactory to the Debtors and their counsel and
the DIP Facility Agent and its counsel;

(k) The DIP Facility Agent shall have received
satisfactory opinions of independent counsel to
the DIP Borrower and the DIP Guarantors,
addressing such customary matters as the DIP
Facility Agent shall reasonably request;

(l) The absence of a DIP Material Adverse Effect,
or any event or occurrence which could
reasonably be expected to result in a material
adverse change, in (i) the business, assets,
financial condition or prospects of the DIP
Borrower, the DIP Guarantors and their
respective subsidiaries, taken as a whole, since
September 30, 2009 (other than events leading
up to and resulting from the anticipated filing of
the Cases), (ii) ability of the DIP Borrower or
any DIP Guarantor to perform any of its
obligations in accordance with the terms under
the DIP Loan Agreement or any loan document,
or (iii) the ability of the DIP Facility Agent and
the DIP Facility Lenders to enforce the DIP
Loan Agreement or any DIP Facility loan
document, provided that the filing of the Cases
will not be deemed to constitute an impediment
to enforcement hereunder;

(m) There shall exist no action, suit, investigation,
litigation or proceeding pending or threatened in
writing, in each case, based on actual
knowledge, in any court or before any arbitrator
or governmental instrumentality (other than the
Cases) that could reasonably be expected to

13

result in a DIP Material Adverse Effect.

(n) All material necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Facility Lenders) and shall remain in effect, and all applicable governmental filings have been made and all applicable waiting periods shall have expired without in either case any action being taken by any competent authority; and no law or regulation shall be applicable in the judgment of the DIP Facility Lenders that restrains, prevents or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby;

(o) The DIP Facility Lenders shall have a valid and perfected lien on and security interest in the DIP Collateral having the priority described herein; searches necessary or desirable in connection with such liens and security interests that have been requested by the DIP Facility Agent shall have been duly made;

(p) The DIP Facility Agent shall have received endorsements naming the DIP Facility Agent, on behalf of the DIP Facility Lenders, as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the DIP Borrower, the DIP Guarantors and their respective subsidiaries forming part of the DIP Collateral;

(q) The filing of the Cases shall have occurred; and

(r) The DIP Borrower shall have received the requisite votes needed to confirm the DIP Borrower's Prepackaged Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code.

26.  *Conditions to All*        Each extension of credit under the DIP Facility shall be subject to the satisfaction of the conditions

14

*Extensions of Credit*   customary for a transaction of this type, including:

(a) If the proceeds from the requested extension of credit are to be used in a manner or for a purpose which requires the prior approval of the Court, such approval shall have been obtained;

(b) The Interim Order or the Final Order, as the case may be, shall be in full force and effect and shall not have been reversed, modified, amended or stayed (or application therefor made), except for modifications and amendments that are reasonably acceptable to the DIP Facility Agent and the Debtors;

(c) Absence of any administrative claim that is senior to, or pari passu with, the Superpriority Claim of the DIP Facility Agent and the DIP Facility Lenders, other than claims secured by Permitted Liens, Additional Permitted Liens and the Carve-out;

(d) With respect to any DIP Revolving Loan, the receipt of a notice of borrowing or with respect to the issuance of a DIP Letter of Credit, a letter of credit application from the DIP Borrower. The request for and the acceptance of each extension of credit by the DIP Borrower shall constitute a representation and warranty that the conditions to each extension of credit shall have been satisfied;

(e) The extension of credit shall be consistent with the DIP Budget;

(f) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist; and

(g) Representations and warranties shall be true and correct in all material respects, except where such representation or warranty relates to an earlier date, in which case it shall be true and correct in all material respects as of such earlier date; provided that any representation or warranty that is by its terms qualified by

15

materiality shall be true and correct in all respects.

27. **Representations and Warranties**: The DIP Loan Agreement will contain representations and warranties that are customary for a transaction of this type, subject to materiality qualifiers and exceptions to be agreed upon, as well as matters disclosed in SEC filings and Disclosure Statement, including:

(a) Confirmation of corporate status and authority of the DIP Borrower and its subsidiaries.

(b) Due authorization, execution and delivery of the DIP Loan Agreement and the related documents;

(c) Execution, delivery, and performance by the DIP Borrower and the DIP Guarantors of the DIP Loan Agreement and the related documents do not conflict with law, existing agreements or organization documents except where such conflict would not reasonably be expected to result in a DIP Material Adverse Effect;

(d) No governmental or regulatory approvals required other than the Interim Order or the Final Order, as the case may be;

(e) Subject to the Interim Order or the Final Order, as the case may be, legality, validity, binding effect and enforceability of the DIP Loan Agreement and the related documents;

(f) Accuracy of information and financial statements in all material respects;

(g) Projections based on good faith estimates;

(h) No occurrence of any event, matter or circumstance since the Petition Date: (a) which is materially adverse to: (i) the business, assets or financial condition or prospects of the DIP Borrower and its subsidiaries taken as a whole; or (ii) the ability of any DIP Borrower or any DIP Guarantor to perform any of its obligations in accordance with their terms

16

under the DIP Loan Agreement and the related documents; or (b) which results in (i) the DIP Loan Agreement or any related loan document not being legal, valid and binding on, and enforceable against, any party thereto, from and after the date the Interim Order becomes effective, and/or (ii) any collateral document not being a valid and effective security interest, from and after the date the Interim Order becomes effective, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any DIP Facility Lender under the DIP Loan Agreement or any related document ("<u>DIP Material Adverse Effect</u>");

(i) Payment of taxes by the Company and its subsidiaries, except those taxes being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(j) Good, sufficient and legal title to properties owned by the Company or its subsidiaries;

(k) Environmental compliance by the Company and its subsidiaries, except where non-compliance would not reasonably be expected to result in a DIP Material Adverse Effect;

(l) No defaults by the Company or its subsidiaries in any contractual obligations except where such conflict would not reasonably be expected to result in a DIP Material Adverse Effect;

(m) List of material contracts in effect on the DIP Closing Date is true, correct and complete;

(n) Neither the Company nor any of its subsidiaries is an investment company;

(o) Neither the Company nor any of its subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock and no part of the proceeds of the DIP Loans made will be used

17

to purchase or carry any such margin stock;

(p)  No unfair labor practices by the Company or its subsidiaries and other employee matters, employment law non-compliance matters that could reasonably be expected to result in a DIP Material Adverse Effect;

(q)  Compliance by the Company and its subsidiaries with employee benefit plans, except where non-compliance would not reasonably be expected to result in a DIP Material Adverse Effect;

(r)  No broker's or finder's fee or commission will be payable in connection with the transactions contemplated by the DIP Loan Agreement and the related documents;

(s)  Full and accurate disclosure by Borrowers and Guarantors;

(t)  Compliance with applicable laws, except where non-compliance would not reasonably be expected to result in a DIP Material Adverse Effect;

(u)  Continued effectiveness of the Interim Order or the Final Order, as applicable;

(v)  Use of proceeds in accordance with the DIP Loan Agreement, the Interim Order and the Final Order (as applicable);

(w)  No action, suit, investigation, litigation or proceeding pending or threatened that could have a DIP Material Adverse Effect, other than proceedings attendant to confirmation of the Plan of Reorganization;

(x)  Insurance matters;

(y)  Validity, priority and perfection of security interests in the DIP Collateral; and

(z)  Status of the DIP Facility as senior debt entitled to superpriority administrative claim

18

status in the Cases.

28. **Reporting Covenants:**      The DIP Loan Agreement will contain reporting covenants that are customary for a transaction of this type, including:

   (a)   Delivery of independently audited annual consolidated financial statements and unaudited quarterly and monthly consolidated financial statements, together with a comparison to the DIP Borrower's prior corresponding financial statements and annual financial plan and, with respect to quarterly and annual financial statements, a detailed explanation of material variances, provided that the annual consolidated financial statements for fiscal year 2009 may include a going concern qualification;

   (b)   Delivery each week of a rolling 13-week forecast of receipts and disbursements, and a report setting forth in reasonable detail any material variances from the weekly cash flows and disbursements on the basis of the actual prior week as well as on a cumulative basis (the "Cash Flow Forecast"); and

   (c)   Other reporting requirements and notices, including notices of default and litigation and ERISA notices.

29. **Affirmative Covenants:**      The DIP Loan Agreement will contain affirmative covenants that are customary for a transaction of this type, including;

   (a)   The DIP Borrower, each DIP Guarantor and their respective subsidiaries to preserve and maintain in full force and effect its corporate existence and all rights and franchises, licenses and permits material to its business, except where its board of directors determines that such preservation is no longer desirable in the conduct of its business and the loss is not disadvantageous in any material respect to it or the DIP Facility Lenders;

   (b)   The DIP Borrower, each DIP Guarantor and

19

their respective subsidiaries to pay all material taxes, except those taxes being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(c) The DIP Borrower, each DIP Guarantor and their respective subsidiaries to maintain in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of the DIP Borrower and its subsidiaries and make all appropriate repairs, renewals and replacements thereof, except where failure to do so would not reasonably be expected to have a DIP Material Adverse Effect;

(d) The DIP Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the DIP Borrower and its subsidiaries as may customarily be carried or maintained under similar circumstances by persons of established reputation engaged in similar businesses, in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such persons;

(e) The DIP Borrower, each DIP Guarantor and their respective subsidiaries to maintain accurate books and records and, as reasonably requested and with reasonable advance notice, permit visitation and inspection by the DIP Facility Agent representatives;

(f) The DIP Borrower, each DIP Guarantor and their respective subsidiaries to comply in all material respects, with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (including all

20

environmental laws);

(g) The DIP Borrower and each DIP Guarantors to take all actions the DIP Facility Agent may reasonably request in order to effect fully the purposes of the DIP Loan Agreement and the related documents;

(h) The DIP Borrower and each of its subsidiaries will continue to own or possess the right to use, free from any restrictions, all patents, trademarks, copyrights, and domain names that are used in the operation of their respective businesses as presently conducted and as proposed to be conducted, except where such failure to do so will not result in a DIP Material Adverse Effect;

(i) The DIP Borrower and each DIP Guarantor to supply to the DIP Facility Agent or any DIP Facility Lender documents and evidence necessary to comply with "know your customer" or other similar checks; and

(j) Not later than thirty-five (35) days after the entry of the Interim Order, the Court shall have entered an order (in form and substance acceptable to the DIP Facility Lenders and the DIP Facility Agent) (the "Final Order") on an application or motion by the DIP Borrower and the DIP Guarantors, that motion to be in form and substance satisfactory to the DIP Facility Lenders and the DIP Facility Agent, approving, on a final basis (but which Final Order need not have become final and non-appealable), the financing transactions contemplated herein and granting the superpriority claim status and liens referred to above, and which Final Order, among other things, shall (i) approve the DIP Facility and authorize extensions of credit under the DIP Facility, (ii) approve the payment by the DIP Borrower and DIP Guarantors of all the fees provided for herein, (iii) provide for the automatic termination of the automatic stay (but solely with respect to the DIP Facility) to permit the DIP Facility Agent and the DIP

21

Facility Lenders to exercise their remedies, with respect to the DIP Facility, after five (5) business days' written notice (the "Notice Period") of an Event of Default, which notice shall be provided by the DIP Facility Agent to the Debtors, counsel to the Debtors, counsel to any statutory committee(s) appointed in the Cases, and the Office of the United States Trustee for the District of Delaware, and which notice shall be filed with the Court, with a full waiver by the DIP Borrower and the DIP Guarantors of all rights to contest such termination except with respect to the existence of an Event of Default, (iv) not have been reversed, modified, amended or stayed, and (v) have such other findings, orders and relief typical for financings of the type contemplated herein. The Final Order shall have been entered on such notice to such parties as may be reasonably satisfactory to the DIP Facility Lenders and as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, orders of the Court, and any applicable local bankruptcy rules.

30. *Negative Covenants:*     The DIP Loan Agreement will contain negative covenants that are customary for a transaction of this type, including:

(a)  Limitation on debt;

(b)  Limitation on liens;

(c)  Limitation on negative pledges;

(d)  Limitation on dividends, redemptions and repurchases with respect to capital stock;

(e)  Limitations on investments and loans, provided that the DIP Borrower shall be permitted to make investments in foreign subsidiaries of no more than US$7,500,000 from the DIP Closing Date through May 31, 2010 and US$5,000,000 thereafter, and provided further that proceeds under the DIP Facility, subject to the limitations set forth herein, can be used to finance foreign operations and ensure foreign

22

companies maintain adequate liquidity to avoid
the commencement of insolvency proceedings
outside the U.S.;

(f) Limitations on mergers, consolidations;
acquisitions, sales, leases and sale/leaseback
transactions;

(g) Limitations on transactions with affiliates;

(h) Limitations on changes in business and
organizational documents;

(i) No change in fiscal year; and

(j) Limitations on voluntary and optional
prepayments and redemptions of debt (other
than DIP Loans).

31. *Financial Covenants:* The DIP Loan Agreement will contain the
following financial covenants:

(a) Minimum of US$40,000,000 from the DIP
Closing Date through May 31, 2010 and
US$35,000,000 thereafter of (x) unrestricted
cash and cash equivalents of the DIP Borrower
and the DIP Guarantors on hand and (y)
undrawn and available commitments under the
DIP Revolving Loan Facility at all times; and

(b) Actual average cash receipts for any period of
four weeks shall not be less than 80% of
average cash receipts for such period projected
in the initial Cash Flow Forecast, and actual
average cash disbursements (calculated
without giving effect to debt service,
professional fees and other restructuring
expenses) for any period of four weeks shall
not be more than 120% of average cash
disbursements for such period projected in the
initial Cash Flow Forecast, in each case tested
on a rolling weekly basis.

32. *Events of Default:* The DIP Loan Agreement will contain Events of
Default that are customary for a transaction of this
type, including:

(a) Failure by the DIP Borrower to pay principal

23

when due and failure to pay interest, fees and other amounts within 3 business days of when due;

(b) Cross-default to payment defaults by the DIP Borrower, any DIP Guarantor or any of their subsidiaries on principal aggregating US$5 million, or to other events (other than the commencement of the Cases by the DIP Borrowers and the DIP Guarantors) if the effect is to accelerate or permit acceleration of such debt;

(c) Failure by the DIP Borrower or any DIP Guarantor to comply with any negative covenant, any financial covenant or the use of proceeds covenant;

(d) Any representations or warranty made by the DIP Borrower or any DIP Guarantor shall be false in any material respect as of the date made or deemed made;

(e) Failure by any DIP Borrower or any DIP Guarantor to comply with other covenants in the DIP Facility Loan Agreement or other related loan or collateral documents and such failure continues unremedied for a period of 20 business days following receipt of notice by an officer of the Company or actual knowledge by such officer;

(f) Involuntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of any subsidiary of the DIP Borrower (other than those subject to the Cases) if not dismissed within 60 days;

(g) Voluntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of any subsidiary of the DIP Borrower (other than those subject to the Cases);

(h) Failure to pay by the DIP Borrower or any of its subsidiaries of a final judgment or court

24

order if not stayed within 60 days in excess of US$5 million;

(i) Occurrence of an ERISA event (which shall exclude the filing of the Cases) which would reasonably be expected to result in a DIP Material Adverse Effect;

(j) Occurrence of a change of control of the DIP Borrower, other than as a result of the transactions contemplated by the Plan of Reorganization;

(k) Any collateral document ceases to be in full force and effect other than in accordance with its terms or shall be declared null and void or the DIP Facility Agent shall not have or shall cease to have a valid and perfected lien in any Collateral purported to be covered by such collateral document with the priority required by such collateral document;

(l) Actual invalidity, or any assertion by any the DIP Borrower, any DIP Guarantor or any of their affiliates of invalidity, of the DIP Loan Agreement or any related document;

(m) Entry of an order granting relief from the automatic stay with respect to any claim in excess of specified amounts to be mutually agreed upon;

(n) Entry of or application for order appointing a trustee under Section 1104 of the Bankruptcy Code or examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code;

(o) Entry of an order converting any of the Cases into a chapter 7 case;

(p) Submission by the Debtors of, or entry of an order confirming, a plan of reorganization that does not (i) provide for termination of the DIP Facility and payment in full in cash of all obligations payable under the DIP Loan Agreement and the related documents on or before the effective date of such plan or (ii) provide for (A) a conversion of the DIP

25

Facility to the Exit Facility as described in this Term Sheet, pursuant to such Plan of Reorganization and (B) the continuation of the liens and security interests of the DIP Facility Agent and continued priority thereof until such plan effective date;

(q) Entry of an order dismissing any of the Cases that does not provide for termination of the DIP Facility and payment in full in cash of all obligations under the DIP Loan Agreement and the related documents;

(r) Entry of an order to (i) revoke, reverse, stay, modify, supplement or amend the Interim Order or the Final Order, (ii) permit any administrative expense or claim to have administrative priority as to the DIP Borrower or any DIP Guarantor equal or superior to the priority of the DIP Facility Agent and the DIP Facility Lenders in respect of the DIP Facility, other than claims secured by Permitted Liens, Additional Permitted Liens and the Carve-out, or (iii) grant or permit the grant of the liens on the DIP Collateral other than as permitted by the DIP Loan Agreement and the related documents, including, but not limited to, the Interim Order and the Final Order (as applicable);

(s) Failure by the Court to enter a Final Order within 35 days of the Petition Date;

(t) There shall be filed by the DIP Borrower or any DIP Guarantor any motion to sell all or a substantial part of the Collateral on terms that are not acceptable to the Requisite Lenders;

(u) The DIP Borrower or any DIP Guarantor shall file any action, suit or other proceeding or contested matter challenging the validity, perfection or priority of any liens securing the Prepetition Credit Agreement, or the validity or enforceability of any of the Credit Documents (as defined therein), or asserting any avoidance claim against, or seeking to recover any monetary damages from, any

26

agent or lender under any of the Prepetition Credit Agreement or the DIP Facility; and

(v) Without Requisite Lenders consent, the DIP Borrower or any DIP Guarantor shall discontinue or suspend all or any material part of its business operations or commence an orderly wind-down or liquidation of any material part of the DIP Collateral.

33. **Remedies Upon Event of Default:**

If an Event of Default shall have occurred and is continuing, upon receipt by the Debtors of the written notice referred to in section 29(j)(iii) above (which written notice shall be served by the DIP Facility Agent upon the parties identified therein and filed with the Court), and upon expiration of the Notice Period, the principal of and all accrued interest and fees and all other amounts owed to the DIP Facility Agent and the DIP Facility Lenders under the Interim Order, the Final Order or the DIP Loan Agreement shall be immediately due and payable, and the DIP Facility Agent and the DIP Facility Lenders shall have the rights and remedies provided in the Interim Order, the Final Order or the DIP Loan Agreement, as applicable.

34. **Voting:**

Amendments, modifications, terminations and waivers of any provision of the DIP Loan Agreement or any related document will require the approval of Requisite Lenders, except that in certain circumstances the consent of a greater percentage of the aggregate amount of the loans and commitments of the DIP Facility Lenders may be required.

35. **Requisite Lenders:**

"Requisite Lenders" shall mean (i) the DIP Facility Lenders holding DIP Revolving Loans and commitments in the aggregate representing more than 50% of (a) the unfunded commitments and the outstanding DIP Revolving Loans or (b) if the commitments have been terminated, the outstanding DIP Revolving Loans (the "DIP RL Facility Exposure") and (ii) the DIP Facility Lenders holding DIP Term Loans in the aggregate representing more than 50% of the outstanding DIP Term Loans (the "DIP TL Facility Exposure"); provided that with respect to any amendment or waiver that would adversely affect the holders of the

27

DIP RL Facility Exposure or the DIP TL Facility Exposure, as the case may be, differently from the rights of any other DIP Facility Lender, then the consent of only the holders of more than 50% of the DIP RL Facility Exposure or the DIP TL Facility Exposure, as the case may be, shall be required. The unfunded commitments of, and the outstanding DIP Loans held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Requisite Lenders.

36. *Assignments and Participations*

Each DIP Facility Lender may sell or assign all or any portion of its DIP Loans with the prior consent of the DIP Facility Agent. Each DIP Facility Lender may sell, assign or grant participations in all or any of its DIP Loans without the prior consent of the DIP Borrower. Minimum aggregate assignment level (which shall not be applicable to assignments to affiliates of the assigning DIP Facility Lenders and other DIP Lenders and their affiliates) of US$2,500,000 and increments of US$1,000,000 in excess thereof. The parties to the assignment shall pay to the DIP Facility Agent an administrative fee of US$3,500.

37. *Defaulting Lenders:*

The DIP Loan Agreement shall contain defaulting lender provisions, including that (i) no defaulting lender (to be defined in the DIP Loan Agreement) will earn a DIP Commitment Fee so long that it remains a defaulting lender, (ii) no defaulting lender will be entitled to be counted in any matter requiring the consent of only the Requisite Lenders, and (iii) subject to receipt by a defaulting lender of all amounts due and owing to it, the DIP Borrower will have the right to replace such defaulting lender.

38. *Other Terms:*

The DIP Loan Agreement will provide additional terms that are usual and customary for a transaction of this type and will be based on the Prepetition Credit Agreement.

39. *Expenses:*

The DIP Borrower shall reimburse the DIP Facility Agent for all reasonable fees, expenses and disbursements, including reasonable fees, expenses and disbursements of counsel to the DIP Facility Agent, incurred in connection with the transaction, including, without limitation, related preparation,

28

negotiation, execution and administration of the definitive documentation and ongoing expenses related to the DIP Facility. After the occurrence of a default or an Event of Default, the DIP Borrower shall reimburse the DIP Facility Agent and the DIP Facility Lenders for all costs and expenses and costs of settlement incurred in enforcing any obligation under the DIP Loan Agreement and the related loan documents or in collecting any payments due or in connection with any refinancing and restructuring of the credit arrangements.

40. *Indemnification:*    The DIP Borrower and the DIP Guarantors shall indemnify the DIP Facility Agent, the DIP Issuing Bank and DIP Facility Lenders and their respective affiliates, officers, partners, directors trustees, investment advisors, employees and agents for any liability, obligation, loss, damage, claim, costs, expense and disbursement (including reasonable fees and disbursements of counsel to the indemnitees) arising out of (i) the DIP Loan Agreement and the related loan documents and the transactions contemplated under the DIP Facility, the use or proposed use of proceeds of the loans or any enforcement of the DIP Loan Agreement or any related loan documents or (ii) any environmental claims or hazardous materials activity arising from activity of the DIP Borrower and its subsidiaries, provided that such indemnification obligation does not extend to any damages, liabilities, or other costs arising from gross negligence or willful misconduct.

41. *Yield Protection and Taxes:*    The DIP Loan Agreement and the related documents will contain yield protection provisions and tax gross-up provisions that are customary and based on the yield protection and tax gross-up provisions set forth in the Prepetition Credit Agreement.

42. *Governing Law:*    The DIP Facility and all documentation in connection with the DIP Facility shall be governed by the laws of the State of New York applicable to agreements made and performed in such state, except as governed by the Bankruptcy Code.

43. *Counsel to the DIP Facility*    Chadbourne & Parke LLP.

29

| 44. | ***Counsel to the DIP Borrower and DIP Guarantors:*** | Cadwalader, Wickersham & Taft LLP. |
| 45. | ***Conflicts:*** | In the event of any conflict between any of the terms of the DIP Loan Agreement and the Interim Order, the terms of the Interim Order shall govern. In the event of any conflict between or among any of the terms of the DIP Loan Agreement, the Interim Order and the Final Order, the Final Order shall govern. |

## II. TERMS OF EXIT FACILITY

On the Exit Closing Date pursuant to the Plan of Reorganization and the order of the Court confirming same (the "Confirmation Order"), the obligations of the DIP Borrower and the DIP Guarantors under the DIP Facility shall be assumed by the reorganized Company and certain of its affiliates, provided that, pursuant to the Plan of Reorganization and the Confirmation Order, and effective as of the Exit Closing Date, the terms of the DIP Facility shall be modified consistent with the terms set forth below (and such modified facility, which remains subject to definitive documentation in all respects, shall be referred to as the "Exit Facility"):

On the Exit Closing Date (a) the DIP Term Loans outstanding under the DIP Facility will continue as term loans under the Exit Facility, (b) the DIP Revolving Loans outstanding under the DIP Facility will continue as revolving loans under the Exit Facility, (c) the DIP Term Loan Letters of Credit outstanding under the DIP Term Loan L/C Facility shall be deemed to be outstanding letters of credit under the Exit Term Loan L/C Facility and (d) the commitment of the DIP Facility Lenders to make the DIP Revolving Loans shall be converted into their commitment to make Exit Revolving Loans under the Exit Facility.

| 1. | ***Administrative and Collateral Agent:*** | An affiliate of Citigroup Global Markets, Inc. (in such capacity, the "Exit Facility Agent"). |
| 2. | ***Sole Lead Arranger and Sole Bookrunner:*** | Citigroup Global Markets, Inc. ("CGMI") |
| 3. | ***Exit Issuing Bank:*** | Citicorp North America, Inc. |
| 4. | ***Lenders:*** | The lenders under the DIP Facility (the "Exit Facility Lenders"). |
| 5. | ***Borrowers:*** | Xerium Technologies, Inc. (the "Company"), XTI LLC ("XTI", and together with the Company, the "U.S. Borrowers"), Xerium Canada, Inc. ("Xerium |

Canada"), Huyck Wangner Austria GmbH ("Huyck Austria"), Xerium Italia S.p.A. ("Xerium Italia") and Xerium Germany Holding GmbH ("Xerium Germany", and together with Xerium Canada, Huyck Austria and Xerium Italia, the "Non U.S. Borrowers").

6. **Guarantors:**

The guarantors under Prepetition Credit Agreement and Robec Brazil LLC (the "Guarantors"). The Guarantors organized under the laws of the United States or any state thereof are referred to as the "U.S. Guarantors", and the Guarantors organized outside the United States are referred to as the "Non U.S. Guarantors."

7. **Joint and Several Obligations; Limitation on Obligations:**

The obligations of the Borrowers under the Exit Facility and the related loan documents shall be joint and several, provided that none of the Non U.S. Borrowers shall be liable for any of the obligations of any U.S. Borrower.

The obligations of the Guarantors under the loan documents shall be joint and several, provided that none of the Non U.S. Guarantors shall be liable for any of the obligations of any U.S. Guarantor.

Notwithstanding the foregoing, any payments received by the Exit Facility Agent with respect to the Exit Loans or the Exit Collateral shall be applied to the payment of the obligations under the loan documents for the ratable benefit of the Exit Facility Lenders.

8. **Exit Facility:**

_Exit Term Loan Facility_

The Exit Facility Lenders shall provide the Borrowers with a term loan credit facility (the "Exit Term Loan Facility") providing for extensions of term loans (the "Exit Term Loans") not to exceed US$60,000,000 (the "Exit TL Commitment Amount"). Exit Term Loans that are repaid shall not be reborrowed.

All Exit Term Loans shall be made in U.S. dollars.

The Exit Term Loan Facility shall have a letter of credit sublimit in the amount of US$20,000,000 as

31

described in paragraph 9 below (the "Exit Term Loan L/C Facility") and the DIP Term Loan Letters of Credit shall be deemed to be outstanding letters of credit under the Exit Term Loan L/C Facility (the "Exit Term Loan Letters of Credit").

Outstanding DIP Term Loans under the DIP Facility shall be deemed to be outstanding Exit Term Loans under the Exit Facility as of the Exit Closing Date.

### *Exit Revolving Facility*

The Exit Facility Lenders shall provide the Borrowers with a revolving credit facility (the "Exit Revolving Facility") providing for extensions of revolving loans (the "Exit Revolving Loans", and together with the Exit Term Loans, the "Exit Loans") and letters of credit (the "Exit Revolving Letters of Credit"), with the principal amount of Exit Revolving Loans and the face amount of Exit Letters of Credit not to exceed US$20,000,000 in the aggregate (the "Exit RL Commitment Amount").

From the Exit Closing Date and prior to the Exit Revolving Commitment Termination Date, the Borrowers may, subject to the terms of the Exit Loan Agreement, borrow, repay and reborrow Exit Revolving Loans, subject to satisfaction of applicable conditions to borrowing. Exit Revolving Loans will be in minimum principal amounts to be agreed to. All Exit Revolving Loans will be made by the Exit Facility Lenders ratably in proportion to their respective Exit RL Commitment Amounts. Exit Revolving Loans will be available on 3 business days' notice in the case of Exit Revolving Loans that are Eurodollar Loans and same business day notice in the case of Exit Revolving Loans that are Base Rate Loans. The Borrowers will repay each Exit Revolving Loan no later than on the Exit Revolving Commitment Termination Date.

Outstanding DIP Revolving Loans under the DIP Facility shall be deemed to be outstanding Exit Revolving Loans under the Exit Facility as of the

32

Exit Closing Date.

Exit Revolving Loans shall be made in U.S. dollars.

9.    **Exit Letters of Credit:**    <u>Exit Revolving Facility Sublimit</u>

A portion of the Exit Revolving Facility not in
excess of (a) US$3,000,000 for the period from the
Exit Closing Date through the one year anniversary
of the Exit Closing Date and (b) US$7,500,000 after
the one year anniversary of the Exit Closing Date
shall be available for the issuance of Exit Revolving
Letters of Credit by the Exit Issuing Bank.

Drawings under any Exit Revolving Letter of Credit
shall be reimbursed by the Borrowers on the next
business day. To the extent the Borrowers do not so
reimburse the Exit Issuing Bank, the Exit Facility
Lenders under the Exit Facility shall be irrevocably
and unconditionally obligated to reimburse the Exit
Issuing Bank on a pro rata basis.

No Exit Revolving Letter of Credit shall have an
expiration date after the earlier of (a) one year after
the date of issuance and (b) five business days prior
to the Exit Maturity Date.

<u>Exit Term Loan Deposit Letter of Credit Subfacility</u>

On the Exit Closing Date the amounts on deposit in
the Term Loan LC Collateral Account will serve as
collateral support for the Borrowers' reimbursement
obligation with respect to the Exit Term Loan
Letters of Credit. Amounts on deposit in the Term
Loan LC Collateral Account shall secure the
Borrowers' reimbursement obligation to the Exit
Issuing Bank with respect to the Exit Term Loan
Letters of Credit. If the Borrowers fail to reimburse
the Exit Issuing Bank for drawings under the Exit
Term Loan Letters of Credit then the Exit Facility
Agent shall withdraw funds from the Term Loan LC
Collateral Account equal to such drawings and
remit such funds to the Exit Issuing Bank.

Funds on deposit in the Term Loan LC Collateral
Account shall be invested in acceptable cash
equivalents. The Exit Facility Agent, for the benefit
of the Exit Issuing Bank, shall have a lien on the

33

Term Loan LC Collateral Account and all funds and amounts held therein. If on the last business day of any month the amount on deposit in the Term Loan LC Collateral Account exceeds 103% of the amount available to be drawn under the Exit Term Loan Letters of Credit, then no later than the second succeeding business day the Exit Facility Agent shall remit such excess amount to the Borrowers so long as no default or event of default shall have occurred and be continuing.

If on the last business day of any month (or such other date as determined by the Exit Facility Agent in its sole discretion) the amount on deposit in the Term Loan LC Collateral Account is less than 103% of the amount available to be drawn under the Exit Term Loan Letters of Credit, then the Borrowers shall cause additional amounts to be deposited within one business day after notice from the Exit Facility Agent into the Term Loan LC Collateral Account equal to such deficiency. If the Borrowers shall fail to make such deposit, the Exit Facility Lenders shall make an Exit Revolving Loan under the Exit Revolving Facility in an amount of such deficiency and the proceeds of which shall be deposited into the Term Loan LC Collateral Account. The conditions precedent to making Exit Revolving Loans and the minimum amounts of Exit Revolving Loans shall not apply to Exit Revolving Loans made pursuant to this paragraph. If there is not sufficient availability under the Exit Revolving Facility to make such Exit Revolving Loans provided for in this paragraph, such event shall constitute an Event of Default.

No Exit Term Loan Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance or the date of its continuance or extension and (b) five business days prior to the Exit Maturity Date.

| 10. | *Withdrawal from Term Loan Deposit Account:* | On the Exit Closing Date, all funds on deposit in the Term Loan Deposit Account established under the DIP Facility shall be withdrawn and remitted to the Company to be used in accordance with the terms of this Term Sheet. |

34

| | | |
|---|---|---|
| 11. | *Exit Closing Date:* | The date on which the conditions precedent to the closing of the Exit Facility shall have been satisfied or waived. |
| 12. | *Exit Revolving Commitment Termination Date* | Three (3) years following the Exit Closing Date. |
| 13. | *Exit Maturity Date:* | Four and a half (4.5) years following the Exit Closing Date. |
| 14. | *Purpose and Use of Proceeds:* | The proceeds of the Exit Facility will be used by the Borrowers to solely (i) pay fees and expenses associated with the Exit Facility, (ii) fund working capital and general corporate purposes of the Borrowers and (iii) refinance the DIP Facility. |
| 15. | *Amortization* | 1.00% annual amortization on the Exit Term Loans, payable on the 15th day of the last month of each calendar quarter, beginning in the first full calendar quarter after the Exit Closing Date, with the balance paid on the Exit Maturity Date. |
| 16. | *Interest:* | At the Borrower's election, Exit Loans shall be Eurodollar Loans or Base Rate Loans. Eurodollar Loans shall bear interest at the annual rate equal to LIBOR plus the Applicable Margin, with a LIBOR floor of 2.00% per annum. Base Rate Loans shall bear interest at the annual rate equal to the Base Rate plus the Applicable Margin. |
| | | Base Rate: a fluctuating rate equal to the highest of (a) the Prime Rate of the Exit Facility Agent, (b) the Federal Funds Effective Rate plus 1/2 of 1% and (c) LIBOR plus 1%, with a LIBOR floor of 2.00%. |
| | | Applicable Margin: 4.50% per annum with respect to Eurodollar Loans and 3.50% per annum with respect to Base Rate Loans. |
| | | Interest periods will be 1, 2, 3 or 6 months. |
| | | If any Event of Default occurs and is continuing, then the Borrowers will pay interest on the unpaid balance of the outstanding Exit Loans at a per annum rate of two percent (2%) greater than the rate of interest specified above. |

35

If any Event of Default occurs and is continuing under the Exit Facility, each Eurodollar Loan will convert to a Base Rate Loan at the end of the Interest Period then in effect for such Eurodollar Loan.

| | | |
|---|---|---|
| 17. | *Interest Payments:* | Interest shall be payable in arrears on the last day of each interest period. |
| 18. | *Exit Upfront Fee:* | To be determined in connection with the syndication. |
| 19. | *Exit Commitment Fee:* | 1.00% per annum on the daily average amount of the unused Exit RL Commitment Amount of each Exit Facility Lender, payable quarterly in arrears to each Exit Facility Lender from the Exit Closing Date until the Exit Revolving Commitment Termination Date. |
| 20. | *Exit Letter of Credit Fee:* | A fronting fee equal to 0.25% per annum of the amounts available to be drawn under all Exit Letters of Credit, payable to the Exit Issuing Bank quarterly in arrears. |

A letter of credit fee equal to the Applicable Margin with respect to LIBOR Rate Loans on the amounts available to be drawn under all Exit Letters of Credit, payable to the Exit Facility Lenders quarterly in arrears.

21. *Mandatory Prepayment:*    Mandatory prepayment of the Exit Loans shall be made from (i) 100% of the net cash proceeds from asset sales in excess of US$100,000 (with the obligation to mandatorily prepay commencing when such asset sales are greater than US$250,000) made outside the ordinary course of business, less any taxes payable by the Borrowers with respect to such asset sales, provided that with respect to the net cash proceeds from the Australia and Vietnam Assets (as defined in Section 29(h)), only 50% of the net cash proceeds shall be subject to mandatory prepayment, (ii) 100% of insurance and condemnation award payments, less any taxes payable by the Borrowers with respect to such award payments, (iii) cash proceeds from debt issuances, other than permitted debt and permitted refinancing debt and (iv) 50% of excess cash flow, which shall exclude non-cash

36

items and shall include certain working capital adjustments, after the end of each fiscal year, beginning at the end of fiscal year 2011 (payable in 2012), with (in the case of clauses (i), (ii) and (iii)) exceptions, baskets and reinvestment rights to be agreed upon. Mandatory prepayments pursuant to clauses (i), (ii) and (iv) will be shared ratably with the lenders under the Second Lien Term Loan Facility pursuant to the terms of the Intercreditor Agreement. Mandatory prepayments pursuant to clause (iii) will be applied first to obligations under the Exit Term Loan Facility and thereafter to obligations under the Exit Revolving Facility. Borrowers will bear all costs related to any mandatory prepayment of Exit Loans on a day that is not the last day of an interest period, provided that such mandatory prepayments shall be applied to base rate Loans and then to Eurodollar Loans.

22.   *Voluntary Prepayment:*   The Exit Loans may be prepaid without penalty, on 3 business days' notice, in minimum amounts of and increments to be agreed upon. Borrowers will bear all costs related to the voluntary prepayment of Exit Loans prior to the last day of the interest period thereof.

23.   *Reduction of Commitments*   Borrowers may permanently terminate or reduce the unused commitments, on 3 business days' notice, in minimum amounts and increments of to be agreed upon.

24.   *Security and First Priority:*   The Exit Facility Agent, for and on behalf of the Exit Facility Lenders and each Secured Hedge Counterparty (as defined below) shall have perfected first priority security interests in and liens upon (i) all existing and after acquired real and personal, tangible and intangible, property of the U.S. Borrowers and U.S. Guarantors and (ii) the real and personal, tangible and intangible, property of the Non U.S. Borrowers and Non U.S. Guarantors securing the obligations under the Prepetition Credit Agreement (together, the "Exit Collateral"). The term "Secured Hedge Counterparty" means each Exit Facility Lender, or any affiliate of a Exit Facility Lender, counterparty to the applicable documentation creating any currency exchange, interest rate or commodity swap

37

agreement, or other similar agreements with the Company or any of its subsidiaries, entered into in the ordinary course of business and not for speculative purposes.

All amounts owing under the Exit Facility and the related loan documents in respect thereof at all times will be senior to the liens granted under the Company's US$410,000,000 term loan facility to become effective concurrently with the Exit Facility (the "Second Lien Term Loan Facility"), and any indebtedness which replaces or refinances the Second Lien Term Loan Facility, subject to the terms of the Intercreditor Agreement.

25. **Conditions to Closing:**    The closing of the Exit Facility shall be subject to the satisfaction of the conditions customary for a transaction of this type, including:

    (a)  All documentation relating to the Exit Facility (including the Intercreditor Agreement) shall be in form and substance consistent with this Term Sheet and otherwise satisfactory to the Borrowers and their counsel and the Exit Facility Agent and its counsel, it being understood that the Intercreditor Agreement to be included in the Plan Supplement (as defined in the Plan of Reorganization) shall be deemed to be in form and substance consistent with this Term Sheet and otherwise satisfactory to the Borrowers and their counsel and the Exit Facility Agent and its counsel, thus satisfying this condition to closing as it relates to the Intercreditor Agreement;

    (b)  The terms of the Plan of Reorganization shall have been confirmed by an order entered by the Court in form and substance acceptable to the Requisite Lenders; the Requisite Lenders shall be satisfied with, to the extent not specifically described in the Plan of Reorganization, the Disclosure Statement of the Plan Supplement, the terms of the restructuring of the Borrowers and its subsidiaries (including, without limitation, changes to the current composition of the Boards of Directors and of senior management

38

and the capital and tax structure of the Borrowers and their subsidiaries), it being understood that the documents to be included in the Plan Supplement identifying the current composition of the Boards of Directors and of senior management and the capital and tax structure of the Borrowers and their subsidiaries shall be deemed to be in form and substance consistent with this Term Sheet and otherwise satisfactory to the Borrowers and their counsel and the Exit Facility Agent and its counsel, thus satisfying this condition to closing as it relates to the such aforementioned documents;

(c) The Exit Facility Lenders shall have received, and the Requisite Lenders shall be satisfied with, (i) a pro forma estimated balance sheet of the Company and its subsidiaries at the Exit Closing Date after giving effect to the Plan of Reorganization and the transactions contemplated thereby, (ii) audited financial statements of the Borrower and its subsidiaries for the fiscal period ending December 31, 2009, (iii) interim unaudited monthly and quarterly financial statements of the Borrower and its subsidiaries through the fiscal month ending at least 30 days prior to the Exit Closing Date and the fiscal quarter ending at least 45 days prior to the Exit Closing Date, and (iv) the detailed business plan of the Company and its subsidiaries which shall include a projected consolidated balance sheet and related statements of projected operations and cash flow on a monthly basis for the fiscal year ending December 31, 2010, and on an annual basis through the fifth fiscal year after the Exit Closing Date, prepared by the Company's management;

(d) The Exit Facility Agent shall be satisfied that (i) the Borrowers', the Guarantors', and their respective subsidiaries' existing debts and liens do not exceed an amount agreed upon prior to the Exit Closing Date, and (ii) there shall not occur as a result of, and after giving effect to, the consummation of the Plan of

39

Reorganization or the funding of the Exit Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrowers', the Guarantors' or their respective subsidiaries' debt instruments and other agreements that could reasonably be expected to result in an Exit Material Adverse Effect;

(e) The Company shall have delivered certificates, in form and substance satisfactory to the Exit Facility Agent, attesting to the solvency of each of the Borrowers and each of the Guarantors after giving effect to the transactions contemplated hereby, from its chief financial officer;

(f) The absence of an Exit Material Adverse Effect or event or occurrence which could reasonably be expected to result in a material adverse change, in (i) the business, assets, financial condition or prospects of the Borrowers, the Guarantors and their respective subsidiaries, taken as a whole, since the confirmation off the Plan of Reorganization, (ii) the ability of any Borrower or any Guarantor to perform any of its obligations in accordance with the terms under the Exit Loan Agreement or any loan document, or (iii) the ability of the Exit Facility Agent and the Exit Facility Lenders to enforce the Exit Loan Agreement or any loan document provided that the filing of the Cases will not be deemed to constitute an impediment to enforcement hereunder;

(g) There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in an Exit Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Exit Facility or the transactions contemplated thereby, other than

**40**

the Cases;

(h)    The Exit Facility Agent shall have received endorsements naming the Exit Facility Agent as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the Borrowers, the Guarantors and their respective subsidiaries forming part of the Exit Collateral;

(i)    The Borrowers and the Guarantors shall have at least US$35 million of unrestricted cash and cash equivalents on hand and undrawn and available commitments under the Exit Revolving Facility;

(j)    All fees and other payments required to be made to the Exit Facility Lenders, the Exit Facility Agent and the Sole Lead Arranger and their respective advisors and counsel under the Exit Loan Agreement or any other written agreement shall have been paid;

(k)    No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist;

(l)    Representations and warranties shall be true and correct in all material respects, except where such representation or warranty relates to an earlier date, in which case it shall be true and correct in all material respects as of such earlier date; provided that any representation or warranty that is by its terms qualified by materiality shall be true and correct in all respects;

(m)   Execution and delivery of all collateral documents for the Exit Facility, including but not limited to mortgages, ALTA mortgage title insurance policies and evidence of flood insurance with respect to any property located in any flood hazard zone;

(n)    The Exit Facility Agent shall have a perfected first priority security interest in the Exit

41

Collateral, and all filings and recordings and searches necessary or desirable in connection with such liens and security interest shall have been duly made;

(o) Delivery of legal opinion by counsel to the Borrowers and the Guarantors;

(p) Delivery of customary officers' and secretaries' certificates, incumbency/specimen signature certificates, resolutions and good standing certificates;

(q) All required consents shall have been obtained;

(r) The Exit Facility Agent shall have received the certificates representing the shares of capital stock pledged pursuant to the security documents, together with undated stock powers (or the equivalent) for each such certificate executed by the applicable Borrower or Guarantor; and

(s) The Company shall have received a rating on the Exit Facility from Moody's Investors Service, Inc. and shall have used commercially reasonable efforts to obtain a rating on the Exit Facility from Standard & Poor's Rating Group.

26. *Conditions to All Extensions of Credit*

Each extension of credit shall be subject to the satisfaction of the conditions customary for a transaction of this type, including:

(a) No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist; and

(b) Representations and warranties shall be true and correct in all material respects, except where such representation or warranty relates to an earlier date, in which case it shall be true and correct in all material respects as of such earlier date; provided that any representation or warranty that is by its terms qualified by materiality shall be true and correct in all respects.

42

27. **_Representations and_**
**_Warranties:_**

The Exit Loan Agreement will contain representations and warranties that are customary for a transaction of this type and shall be based on the representations and warranties set forth in the Prepetition Credit Agreement (subject to materiality qualifiers and exceptions to be agreed upon, as well as matters disclosed in SEC filings and the Disclosure Statement), including:

(a) Confirmation of corporate status and authority of the Company and its subsidiaries;

(b) Capital stock of each of the Company and its subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable;

(c) Due authorization, execution and delivery of the loan documents;

(d) Execution, delivery, and performance by the Borrowers and Guarantors of the loan documents do not conflict with law, existing agreements or organization documents except where such conflict would not reasonably be expected to result in an Exit Material Adverse Effect;

(e) No governmental or regulatory approvals required;

(f) Legality, validity, binding effect and enforceability of the loan documents;

(g) Accuracy of information and financial statements;

(h) Projections based on good faith estimates;

(i) No occurrence of any event, matter or circumstance since the Petition Date, other than the transactions consummated under the Plan of Reorganization: (a) which is materially adverse to the: (i) business, assets financial condition or prospects of Company and its subsidiaries taken as a whole; or (ii) ability of any Borrower or any Guarantor to perform any of its obligations in accordance with their terms

43

under any of the loan documents; or (b) which in the reasonable opinion of the Requisite Lenders results in any (i) loan document not being legal, valid and binding on and, subject to reservations contained in the legal opinions provided as conditions precedent thereto, enforceable against any party thereto, from and after the Effective Date of the Plan of Reorganization, and/or (ii) collateral document not being a valid and effective security interest, from and after the Effective Date of the Plan of Reorganization, and in the case of (b), in each case in a manner or to an extent materially prejudicial to the interest of any Exit Facility Lender under the loan documents ("Exit Material Adverse Effect");

(j) Payment of taxes by the Company and its subsidiaries, except those taxes being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

(k) Good, sufficient and legal title to properties owned by the Company or its subsidiaries;

(l) Environmental compliance by the Company and its subsidiaries, except where non-compliance would not reasonably be expected to result in an Exit Material Adverse Effect;

(m) No defaults by the Company or its subsidiaries in any contractual obligations, except where such default would not reasonably be expected to result in an Exit Material Adverse Effect and except as contemplated by the Plan of Reorganization;

(n) List of material contracts in effect on the Exit Closing Date is true, correct and complete;

(o) Neither the Company nor any of its subsidiaries is an investment company;

(p) Neither the Company nor any of its subsidiaries is engaged in the business of extending credit

44

for the purpose of purchasing or carrying any margin stock and no part of the proceeds of the Exit Loans made will be used to purchase or carry any such margin stock;

(q) No unfair labor practices by the Company or its subsidiaries and other employment law non-compliance matters that could reasonably be expected to result in an Exit Material Adverse Effect;

(r) Compliance by the Company and its subsidiaries with employee benefit plans, except where non-compliance would not reasonably be expected to result in an Exit Material Adverse Effect;

(s) No broker's or finder's fee or commission will be payable in connection with the transactions contemplated by the loan documents;

(t) Borrowers and Guarantors are solvent;

(u) Full and accurate disclosure by Borrowers and Guarantors;

(v) Compliance with laws, except where non-compliance would not reasonably be expected to result in an Exit Material Adverse Effect;

(w) Use of proceeds in accordance with the terms hereof and the Exit Loan Agreement;

(x) No action, suit, investigation, litigation or proceeding pending or threatened that could have an Exit Material Adverse Effect;

(y) Insurance matters;

(z) Validity, priority and perfection of security interests in the Exit Collateral; and

(aa) Status of the Exit Facility as senior debt.

| 28. | *Affirmative Covenants:* | The Exit Loan Agreement will contain affirmative covenants that are customary for a transaction of this type and shall be based on the affirmative covenants set forth in the Prepetition Credit |

45

Agreement, including:

(a) The Company to deliver to the Exit Facility Agent the following: (i) audited annual financial statements within 90 days after the end of each fiscal year; (ii) unaudited quarterly financial statements within 45 days after the end of each fiscal quarter; (iii) detailed consolidated budget and business plan of the Company and its subsidiaries through the fifth fiscal year after the Exit Closing Date (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of such fiscal year) on or before April 1 of each fiscal year; (iv) compliance certificates; (v) notices of default; (vi) notices of litigation; (vii) notices of ERISA events; (viii) annual collateral verification reports; and (ix) other information.

(b) The Company to file all reports and other documents with the Securities and Exchange Commission required under the Securities Exchange Act.

(c) Each Borrower, each Guarantor and their respective subsidiaries to preserve and maintain in full force and effect its corporate existence and all rights and franchises, licenses and permits material to its business, except where its board of directors determines that such preservation is no longer desirable in the conduct of its business and the loss is not disadvantageous in any material respect to it or the Exit Facility Lenders.

(d) Each Borrower, each Guarantor and their respective subsidiaries to pay all material taxes, except those taxes which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP.

(e) Each Borrower, each Guarantor and their respective subsidiaries to maintain in good repair, working order and condition, ordinary

46

wear and tear excepted, all material properties used or useful in the business of the Company and its subsidiaries and make all appropriate repairs, renewals and replacements thereof, except where failure to do so would not reasonably be expected to have an Exit Material Adverse Effect.

(f) The Company will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Company and its subsidiaries as may customarily be carried or maintained under similar circumstances by persons of established reputation engaged in similar businesses, in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such persons.

(g) Each Borrower, each Guarantor and their respective subsidiaries to maintain accurate books and records and, as reasonably requested and with reasonable notice, permit visitation and inspection by the Exit Facility Agent representatives.

(h) Each Borrower, each Guarantor and their respective subsidiaries to comply in all material respects, with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (including all environmental laws), except where failure to do so would not reasonably be expected to have an Exit Material Adverse Effect.

(i) The Company to deliver to the Exit Facility Agent environmental reports and disclosures.

(j) Each Borrower to cause any person that becomes a material subsidiary to become a Guarantor and a grantor under the applicable

47

collateral documents.

(k) Each Borrower, each Guarantor and their respective subsidiaries, upon acquisition of a material real estate asset, to take all actions to create in favor of Exit Facility Agent a valid and perfected first priority security interest.

(l) Each Borrower and Guarantors to take all actions the Exit Facility Agent may reasonably request in order to effect fully the purposes of the loan and collateral documents.

(m) Each Borrower and each of its subsidiaries will continue to own or possess the right to use, free from any restrictions, all patents, trademarks, copyrights, and domain names that are used in the operation of their respective businesses as presently conducted and as proposed to be conducted, except to the extent the failure to so own or possess would not reasonably be expected to have an Exit Material Adverse Effect.

(n) Each Borrower and each Guarantor to supply to the Exit Facility Agent or any Exit Facility Lender documents and evidence reasonably requested and necessary to comply with "know your customer" or other similar checks.

(o) Each Borrower, each Guarantor and their respective subsidiaries to ensure that its payment obligations under each of the loan and collateral documents rank and will at all times rank senior to the obligations under the Second Lien Term Loan Facility in accordance with the terms of the Intercreditor Agreement and Permitted Liens and will at all times rank at least pari passu to the obligations of all other present and future secured and unsubordinated indebtedness.

29.  *Negative Covenants:*  The Exit Loan Agreement will contain negative covenants that are customary for a transaction of this type and shall be based on the negative covenants set forth in the Prepetition Credit

48

Agreement, including:

(a) No incurrence of indebtedness by any Borrower or any Guarantor or any of their subsidiaries, other than:

    1. the obligations under the Exit Loan Agreement and the related loan and collateral documents (the "Obligations");

    2. indebtedness of any subsidiary to any Borrower or to any other subsidiary, or of any Borrower to any subsidiary; provided, (I) all such indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a lien pursuant to the collateral documents, (ii) all such indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to the Exit Facility Agent, and (iii) any payment by any such subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any indebtedness owed by such subsidiary to the Company or to any of its subsidiaries for whose benefit such payment is made;

    3. senior or subordinated unsecured debt; provided, that (i) no default or event of default is continuing under the Exit Loan Agreement or would result from such issuance, (ii) each Borrower is in compliance (and certifies as to such compliance) with the financial covenants on a pro forma basis after giving effect to the such issuance, (iii) the proceeds of such issuance are applied in accordance with the mandatory prepayment provisions of the Second Lien Term Loan Facility, and if the loans thereunder are paid in full, then the proceeds of such issuance shall be used for permitted

49

acquisitions or to fund permitted capital expenditures, (iv) such debt shall have a maturity of not earlier than six months after the Exit Maturity Date and (v) the documentation relating to such debt shall not contain any covenant or event of default that is either (x) not substantially provided for in the Exit Loan Agreement or (y) more favorable to the holder of such debt than the comparable covenant or event of default set forth in the Exit Loan Agreement, and, in the case of any subordinated debt, shall contain customary subordination provisions pursuant to which such debt is subordinated to the prior payment in full of the obligations under the Exit Loan Agreement;

4.  indebtedness incurred by the Company or any of its subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of each Borrower or any such subsidiary pursuant to such agreements, in connection with certain permitted acquisitions or permitted dispositions of any business, assets or subsidiary of the Company or any of its subsidiaries;

5.  indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

6.  indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

7.  guaranties in the ordinary course of business of obligations to suppliers, customers, franchisees and licensees of

50

the Company and its subsidiaries;

8.     guaranties or the provision of other credit support by a Borrower of indebtedness of a subsidiary or guaranties or the provision of other credit support by a subsidiary of a Borrower of indebtedness of a Borrower or a subsidiary with respect, in each case, to indebtedness otherwise permitted to be incurred pursuant to the lien covenant section below;

9.     existing disclosed indebtedness, but not any extensions, renewals or replacements of such indebtedness except (i) renewals and extensions expressly provided for in the agreements evidencing any such indebtedness as the same are in effect on the Exit Closing Date and (ii) refinancings and extensions of any such indebtedness if the terms and conditions thereof are not materially less favorable to the obligor thereon or to the Exit Facility Lenders than the indebtedness being refinanced or extended, and the average life to maturity thereof is greater than or equal to that of the indebtedness being refinanced or extended; provided, such indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include indebtedness of an obligor that was not an obligor with respect to the indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the indebtedness being renewed, extended or refinanced or (C) be incurred, created or assumed if any default or event of default under the Exit Loan Agreement has occurred and is continuing or would result therefrom;

10.    indebtedness with respect to capital leases or purchase money indebtedness in an amount not to exceed at any time US$25 million in the aggregate (including any indebtedness acquired in connection with certain permitted acquisitions); provided,

51

any such purchase money indebtedness shall be secured only to the asset(s) acquired in connection with the incurrence of such indebtedness;

11. other indebtedness of the Company and its subsidiaries in an aggregate amount not to exceed at any time US$25 million;

12. indebtedness under certain factoring agreements;

13. unsecured working capital facilities of any subsidiary in respect of which an Exit Letter of Credit in an amount equal to the maximum principal amount of such facilities has been issued under the Exit Facility;

14. hedging obligations entered into for the purpose of hedging risks associated with the operations of the Company and its subsidiaries;

15. the obligations under the Second Lien Term Loan Facility;

16. any replacement, renewal or refinancing of and debt described in 3, 10, 11 and 15 ("Permitted Refinancing Indebtedness") that (i) does not exceed the aggregate principal amount of the debt being replaced, renewed or refinanced, (ii) does not have a maturity date earlier than the debt being replaced renewed or refinanced, (iii) does not rank at the time of such replacement, renewal or refinancing senior to the debt being replaced, renewed or refinanced and (iv) the documentation relating to such debt shall not contain any covenant or event of default that is either (x) not substantially provided for in the Exit Loan Agreement or (y) more favorable to the holder of such debt than the comparable covenant or event of default set forth in the Exit

52

Loan Agreement; and

17. scheduled indebtedness existing on the Exit Closing Date.

(b) No liens on any property or assets of the Company or its subsidiaries, other than:

1. liens in favor of Exit Facility Agent for the benefit of Exit Facility Lenders granted pursuant to any security document;

2. liens for taxes not then due or if due obligations with respect to such taxes that are not at such time required to be paid pursuant to the payment of taxes covenant or which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which an adequate reserve has been made in accordance with GAAP;

3. statutory liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other liens imposed by law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of 15 days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

4. liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts,

53

trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Exit Collateral on account thereof;

5. easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of the Company or any of its subsidiaries;

6. any (i) interest or title of a lessor or sublessor under any lease of real estate permitted under the Exit Loan Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii), so long as the holder of such restriction or encumbrance agrees to recognize the rights of such lessee or sublessee under such lease;

7. liens solely on any cash earnest money deposits made by the Company or any of its subsidiaries in connection with any letter of intent or purchase agreement permitted under the Exit Loan Agreement;

8. purported liens evidenced by the filing of precautionary UCC financing statements or, for property located in foreign jurisdictions, the preparation and/or filing of functionally similar documents, relating solely to operating leases of personal property entered into in the ordinary course of business;

54

9. liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

10. any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

11. (i) licenses of patents, trademarks and other intellectual property rights granted by the Company or any of its subsidiaries in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of the Company or such subsidiary and (ii) leases or subleases granted by Company of any of its subsidiaries to third parties in respect of surplus property which is not fundamental to the operation of the business in the ordinary course of business; provided that such leases and subleases are on arms-length commercial terms and are otherwise satisfactory to the Exit Facility Agent;

12. liens described on a title report delivered in connection with any real property securing the obligations under the Exit Loan Agreement;

13. liens securing indebtedness permitted pursuant to clauses 10. and 11. of the debt covenant above; provided, any such lien shall encumber only the asset acquired with the proceeds of such indebtedness;

14. liens granted by entities acquired pursuant to the asset sale covenant prior to their acquisition and not in contemplation of such acquisition and which are discharged within three months of the date of acquisition and in relation to which the secured amount is not increased in contemplation of or after the date of the

55

relevant acquisition;

15. liens in favor of the collateral agent under the security documents relating to the Second Lien Term Loan Facility;

16. liens securing Permitted Refinancing Indebtedness, provided that any such lien shall encumber only the assets that secure the debt being replaced, renewed or refinanced by such Permitted Refinancing Indebtedness;

17. scheduled liens outstanding on the Exit Closing Date and replacements thereof so long as the replacement liens encumber only the assets subject to the liens being replaced; and

18. a general lien basket of US$15 million so long as the assets subject to such lien is located outside the United States and are not included in the Exit Collateral, of which US$5 million of such general lien basket may apply to assets subject to such lien that are located in the United States and are not included in the Exit Collateral.

(c) If any Borrower or any of its subsidiaries creates any lien upon any of its properties or assets, other than Permitted Liens, it shall make provisions whereby the obligations under the Exit Loan Agreement will be secured by such lien equally and ratably.

(d) No further negative pledges by any Borrower, any Guarantor or their subsidiaries, other than:

1. specific property encumbered to secure payment of particular indebtedness or to be sold pursuant to an executed agreement with respect to a permitted asset sale;

2. restrictions contained in any documents evidencing subordinated debt; provided, that in respect of subordinated debt such restrictions do not restrict the ability to grant security interests under the Exit

56

Loan Agreement or any agreement that refinances the obligations under the Exit Loan Agreement;

3.  restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be);

4.  liens permitted to be incurred under lien and debt covenants in the Exit Loan Agreement and restrictions in the agreements relating thereto that limit the right of any Borrower or any Guarantor to dispose of or transfer the assets subject to such liens;

5.  provisions limiting the disposition or distribution of assets or property under sale-leaseback agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of such agreements;

6.  any encumbrance or restriction in connection with an acquisition of property, so long as such encumbrance or restriction relates solely to the property so acquired and was not created in connection with or in anticipation of such acquisition; and

7.  restrictions imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements that restrict the transfer of ownership interest in such partnership, limited liability company, joint venture or similar

57

person.

(e) No restricted junior payments (e.g., dividends and payments of subordinated debt) except distributions from a subsidiary to its shareholders, provided that such payments are made to all its shareholders proportionately, and so long as no default exists, the Company can repurchase or redeem common stock up to US$7 million per year for the purpose of repurchases of common stock from departing executives or satisfying the purchase price of equity awards under, or paying withholding taxes with respect to vested equity compensation programs.

(f) Limited restrictions on subsidiary ability to make distributions.

(g) No investments in any person (including joint ventures) by any Borrower, any Guarantor or their subsidiaries, other than:

1. investments in cash and cash equivalents;

2. equity investments and loans as of the Exit Closing Date in or to any subsidiary and equity investments and loans made after the Exit Closing Date in or to any subsidiary of any Borrower;

3. investments (i) in any securities received in satisfaction or partial satisfaction of obligations of financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the Company's and its subsidiaries' ordinary course of business;

4. intercompany loans and guaranties to the extent permitted by the provisions of the indebtedness covenant above;

5. capital expenditures permitted under the financial covenants below;

6. loans and advances to employees of the Company and its subsidiaries made in the

58

ordinary course of business in an aggregate principal amount not to exceed US$1 million in the aggregate;

7. investments made in connection with certain permitted acquisitions, provided that equity of the Company may be used as consideration in connection with permitted acquisitions so long as the Company is in compliance, on a pro forma basis, with the financial covenants;

8. investments received in lieu of cash in connection with certain permitted asset sales;

9. existing disclosed investments; and

10. other investments in an aggregate amount not to exceed at any time US$20 million.

(h) No mergers, consolidations, acquisitions, sales, leases of all or part of Company's or any of its subsidiaries' assets or property other than:

1. purchases or acquisitions of inventory, materials and equipment and cap-ex in the ordinary course of business;

2. any subsidiary of the Company may be merged with or into a Borrower or any other subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, to a Borrower or any other subsidiary, provided that in the case of a merger involving a Borrower or a Guarantor merging with a non-Guarantor, such Borrower or Guarantor shall be the surviving entity;

3. sales or dispositions of inventory in the ordinary course of business and sales of other assets for gross consideration of less than US$250,000 with respect to any transaction or series of related transactions;

59

4. asset sales, the proceeds of which when aggregated with proceeds of all other asset sales in the same fiscal year are less than US$25 million; provided that (x) such amount shall exclude proceeds of the sale of assets of Huyck Wangner Australia Pty Limited and Huyck Wangner Vietnam Co Ltd (the "Australian and Vietnam Assets") and (y) the net cash proceeds will be subject to the mandatory prepayment provisions set forth in Section 21 above; provided further that up to US$3 million of such proceeds may be reinvested within 360 days of receipt;

5. disposals of obsolete, worn out or surplus property;

6. permitted acquisitions with no dollar or asset limitation so long as (i) equity of the Company is used as 100% of the consideration in connection therewith or (ii) cash of the Company or any of its subsidiaries is used as all or a portion of the consideration; provided that, in the case of clause (ii), the Company must demonstrate that, on a pro forma basis, the leverage covenant level of the Company is at least 0.5x inside the then applicable Leverage Ratio covenant level; and

7. investments permitted under the Exit Loan Agreement.

(i) No sales by any Borrower, any Guarantor or their subsidiaries of interests in the capital stock of any of the subsidiaries, unless permitted by the Exit Loan Agreement.

(j) No sales and lease backs by any Borrower, any Guarantor or their subsidiaries, unless permitted by the Exit Loan Agreement.

(k) No transactions by any Borrower, any Guarantor or their subsidiaries with shareholders owning more than 5% of any class of stock of the Company or any of its

60

subsidiaries and affiliates on terms less favorable to such Borrower or Guarantor, other than (a) any transaction between the Company or any of its subsidiaries and the Company and its subsidiaries; (b) compensation arrangements for directors, officers and other employees of Company and its subsidiaries entered into in the ordinary course of business, including indemnification arrangements, equity compensation and stock ownership plans; and (c) certain other permitted transactions agreed upon.

(l) No engaging by any Borrower, any Guarantor or their subsidiaries in business other than businesses engaged in by such Borrower and the Guarantors on the Exit Closing Date or other similar or related businesses.

(m) No amendments or modifications by any Borrower, any Guarantor or their subsidiaries of any organizational documents that would be materially adverse to the Exit Facility Lenders.

(n) No amendments or waivers by any Borrower, any Guarantor or their subsidiaries with respect to certain terms of subordinated debt or amendments that would be adverse to the Exit Facility Lenders.

(o) No change by any Borrower, any Guarantor or their subsidiaries in its fiscal year end from December 31.

30. ***Financial Covenants:***

(a) Interest Coverage Ratio measured quarterly for a rolling 12 month period at levels to be agreed upon.

(b) Leverage Ratio measured quarterly for a rolling 12 month period at levels to be agreed upon.

(c) Maximum Capital Expenditures each year in amounts to be agreed upon.

31. ***Events of Default:***

The Exit Loan Agreement will contain Events of Default that are customary for a transaction of this type and shall be based on the events of default in

61

the Prepetition Credit Agreement, including:

(a) Failure by any Borrower to pay principal when due and failure to pay interest, fees and other amounts within 3 business days of when due.

(b) Cross-default to payment defaults beyond applicable grace periods by any Borrower, any Guarantor or any of their subsidiaries on principal aggregating US$5 million, or to other events if the effect is to accelerate or permit acceleration of such debt.

(c) Failure by any Borrower or any Guarantor to comply with any negative covenant, any financial covenant or the use of proceeds covenant.

(d) Any representations or warranty made by any Borrower or any Guarantor shall be false in any material respect as of the date made or deemed made.

(e) Failure by any Borrower or any Guarantor to comply with other covenants in Exit Loan Agreement or other loan or collateral documents and such failure continues unremedied for a period of 20 business days following receipt of notice by an officer of the Company or actual knowledge of such failure by any such Borrower or Guarantor.

(f) Involuntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of the Company or any of its subsidiaries if not dismissed within 60 days.

(g) Voluntary bankruptcy, liquidation, or the appointment of a receiver or similar official or institution of any such proceeding in respect of the Company or any of its subsidiaries, other than any Case(s) not closed as of the Exit Closing Date.

(h) Failure to pay by the Company or any of its subsidiaries of a final judgment or court order if not stayed within 60 days in excess of US$5

62

million.

(i) Any order, judgment or decree shall be entered against any Borrower or any Guarantor decreeing the dissolution or split up of such Borrower or Guarantor and such order shall remain undischarged or unstayed for a period in excess of 30 days.

(j) Occurrence of an ERISA event which would reasonably be expected to result in liability of the Company or any of its subsidiaries in excess of US$5 million.

(k) Occurrence of a change of control of the Company, other than as a result of the transactions contemplated by the Plan of Reorganization.

(l) Any collateral document ceases to be in full force and effect other than in accordance with its terms or shall be declared null and void or the Exit Facility Agent shall not have or shall cease to have a valid and perfected lien in any Collateral purported to be covered by such collateral document with the priority required by such collateral document.

(m) Occurrence of any Exit Material Adverse Effect.

32. ***Remedies Upon Event of Default:***

Upon the occurrence of an Event of Default under paragraphs (f), (g) or (k) above, automatically, and upon the occurrence of any other Event of Default, at the request of the Requisite Lenders, the principal of and all accrued interest and fees and all other amounts owed to the Exit Facility Agent and the Exit Facility Lenders under the Exit Loan Agreement shall be immediately due and payable, and the Exit Facility Agent and the Exit Facility Lenders shall have the rights and remedies provided in the Exit Loan Agreement and the collateral documents, subject to the terms of the Intercreditor Agreement.

33. ***Voting:***

Amendments, modifications, terminations and waivers of any provision of the Exit Loan

63

Agreement or any related document will require the approval of Requisite Lenders (as defined below), except that in certain circumstances the consent of a greater percentage of the aggregate amount of the loans and commitments of the Exit Facility Lenders may be required.

34.   **Requisite Lenders:**   "<u>Requisite Lenders</u>" shall mean (i) the Exit Facility Lenders holding Exit Revolving Loans and commitments in the aggregate representing more than 50% of (a) the unfunded commitments and the outstanding Exit Loans, letter of credit obligations and participations thereof or (b) if the commitments have been terminated, the outstanding Exit Revolving Loans, letter of credit obligations and participations thereof (the "Exit RL Facility Exposure") <u>and</u> (ii) the Exit Facility Lenders holding Exit Term Loans in the aggregate representing more than 50% of the outstanding Exit Term Loans (the "<u>Exit TL Facility Exposure</u>"); <u>provided</u> that with respect to any amendment or waiver that would adversely affect the holders of the Exit RL Facility Exposure or the Exit TL Facility Exposure, as the case may be, differently from the rights of any other Exit Facility Lender, then the consent of only the holders of more than 50% of the Exit RL Facility Exposure or the Exit TL Facility Exposure, as the case may be, shall be required. The unfunded commitments of, and the outstanding Exit Loans, letter of credit obligations and participations therein held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Requisite Lenders.

35.   **CAM Exchange:**   On the date on which an Event of Default under paragraphs (f) and (g) above (bankruptcy) occurs, the Exit Facility Lenders shall automatically be deemed to have exchanged interest in all obligations of the Borrowers under the Exit Loan Agreement such that each Exit Facility Lender shall own a pro rata interest in all of the Exit Loans.

36.   **Assignments and Participations:**   Each Exit Facility Lender may sell or assign all or any portion of its Exit Loans with the prior consent of the Exit Facility Agent, the Exit Issuing Bank, and except in the case of assignments to another Exit Facility Lender or an affiliate of a Exit Facility

64

Lender or while an Event of Default is continuing, the prior consent of the Company (not to be unreasonably withheld). Minimum aggregate assignment level (which shall not be applicable to assignments to affiliates of the assigning Exit Facility Lenders and other Exit Facility Lenders and their affiliates) of US$2,500,000 and increments of US$1,000,000 in excess thereof. The parties to the assignment shall pay to the Exit Facility Agent an administrative fee of US$3,500.

Each Exit Facility Lender may grant participations in all or any of its Exit Loans without the prior consent of the Company.

37. **Intercreditor Agreement:** The Exit Facility Agent and the collateral agent for the Second Lien Term Loan Facility shall enter into an intercreditor agreement setting forth the lien and payment priorities with respect to the obligations under the Exit Loan Agreement and the Second Lien Term Loan Facility.

38. **Defaulting Lenders** The Exit Loan Agreement shall contain defaulting lender provisions, including that (i) no defaulting lender (to be defined in the Exit Loan Agreement) will earn an Exit Commitment Fee or an Exit Letter of Credit Fee for so long that it remains a defaulting lender, (ii) no defaulting lender will be entitled to be counted in any matter requiring the consent of only the Requisite Lenders, (iii) the Borrower will be required to cash collateralize the defaulting lender's Exit Letter of Credit obligations and (iv) subject to receipt by a defaulting lender of all amounts due and owing to it, the Borrower will have the right to replace such defaulting lender.

39. **Exit Loan Agreement and Other Terms:** The Exit Loan Agreement shall be based on the Prepetition Credit Agreement and will provide additional terms that are usual and customary for a transaction of this type.

40. **Expenses:** The Borrowers shall reimburse the Exit Facility Agent for all fees, expenses and disbursements, including reasonable fees, expenses and disbursements of counsel to the Exit Facility Agent, incurred in connection with the transaction, including, without limitation, related preparation,

65

negotiation, execution and administration of the definitive documentation and ongoing expenses related to the Exit Facility. After the occurrence of a Default or an Event of Default, Borrowers shall reimburse the Exit Facility Agent, the Exit Issuing Bank and the Exit Facility Lenders for all costs and expenses and costs of settlement incurred in enforcing any Obligation or in collecting any payments due or in connection with any refinancing and restructuring of the credit arrangements.

41.  **Indemnification:**  The Borrowers and the Guarantors shall indemnify the Exit Facility Agent, the Exit Issuing Bank and the Exit Facility Lenders and their respective affiliates, officers, partners, directors trustees, investment advisors, employees and agents for any liability, obligation, loss, damage, claim, costs, expense and disbursement (including reasonable fees and disbursements of counsel to the indemnitees) arising out of (i) the Exit Loan Agreement and the related loan documents and the transactions contemplated under the Exit Facility, the use or proposed use of proceeds of the loans or any enforcement of the Exit Loan Agreement or any related loan documents or (ii) any environmental claims or hazardous materials activity arising from activity of the Company and its subsidiaries, provided that such indemnification obligation does not extend to any damages or liabilities arising from gross negligence or willful misconduct.

42.  **Yield Protection and Taxes:**  The Exit Loan Agreement and the related documents will contain yield protection provisions and tax gross-up provisions that are customary and based on the yield protection and tax gross-up provisions set forth in the Prepetition Credit Agreement.

43.  **Governing Law:**  The Exit Facility and all documentation in connection with the Exit Facility (other than the applicable security documents) shall be governed by the laws of the State of New York.

44.  **Counsel to the Exit Facility Agent:**  Chadbourne & Parke LLP.

66

45. **_Counsel to the Borrowers_**    Cadwalader, Wickersham & Taft LLP.
    **_and the Guarantors:_**

NY3 - 504309.02

## EXHIBIT C

## NEW MANAGEMENT INCENTIVE PLAN