## XERIUM TECHNOLOGIES, INC.
## 2010 EQUITY INCENTIVE PLAN

### 1.    Purpose; Term.

This Xerium Technologies, Inc. 2010 Equity Incentive Plan (the "Plan") provides for the grant of incentive awards consisting of or based on the Common Stock of the Company. The purpose of the Plan is to attract and retain key employees, directors and consultants of the Company and its Affiliates, to provide an incentive for them to achieve performance goals, and to enable them to participate in the growth of the Company by granting Awards with respect to the Company's Common Stock. No Awards may be granted under the Plan after the tenth anniversary of the Effective Date, but Awards granted prior to that date may continue in accordance with their terms. Certain capitalized terms used herein are defined in Section 3 below.

### 2.    Administration.

The Plan shall be administered by the Committee. Except to the extent action by the Committee is required under Section 162(m) of the Code in the case of Awards intended to qualify for exemption thereunder, the Board may in any instance perform any of the functions of the Committee hereunder. The Committee shall select the Participants to receive Awards and shall determine the terms and conditions of the Awards. The Committee shall have authority to adopt, alter and repeal such administrative rules, guidelines and practices governing the operation of the Plan as it shall from time to time consider advisable, and to interpret the provisions of the Plan. The Committee's decisions shall be final and binding. The Committee may delegate (i) to one or more of its members such of its duties, powers and responsibilities as it may determine; (ii) to one or more officers of the Company the power to grant rights or options to the extent permitted by Section 157(c) of the Delaware General Corporation Law; (iii) to one or more officers of the Company the authority to allocate other Awards among such persons (other than officers of the Company) eligible to receive Awards under the Plan as such delegated officer or officers determine consistent with such delegation; provided, that with respect to any delegation described in this clause (iii) the Committee (or a properly delegated member or members of such Committee) shall have authorized the issuance of a specified number of shares of Stock under such Awards and shall have specified the consideration, if any, to be paid therefor; and (iv) to such employees or other persons as it determines such ministerial tasks as it deems appropriate. In the event of any delegation described in the preceding sentence, references herein to the Committee shall include the person or persons so delegated to the extent of such delegation.

### 3.    Certain Definitions.

"Affiliate" means any business entity in which the Company owns directly or indirectly 50% or more of the total voting power or has a significant financial interest as determined by the Committee.

"Award" means any Option, SAR, Restricted Stock, Unrestricted Stock or Stock Unit Award granted under the Plan.

"Board" means the Board of Directors of the Company.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor law.

"Committee" means one or more committees each comprised of not less than two members of the Board appointed by the Board to administer the Plan or a specified portion thereof. Unless otherwise determined by the Board, if a Committee is authorized to grant Awards to a Reporting Person or a Covered Employee, each member shall be a "non-employee director" within the meaning of Rule 16b-3 under the Exchange Act or an "outside director" within the meaning of Section 162(m) of the Code, respectively.

"Common Stock" or "Stock" means the Common Stock, $0.001 par value, of the Company.

"Company" means Xerium Technologies, Inc., a Delaware corporation.

"Covered Employee" means a "covered employee" within the meaning of Section 162(m) of the Code.

"Designated Beneficiary" means the beneficiary designated by a Participant, in a manner determined by the Committee, to receive amounts due or exercise rights of the Participant in the event of the Participant's death. In the absence of an effective designation by a Participant, "Designated Beneficiary" means the Participant's estate.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, or any successor law.

"Fair Market Value" means, with respect to Common Stock or any other property, the fair market value of such property as determined by the Committee in good faith or in the manner established by the Committee from time to time.

"Participant" means a person selected by the Committee to receive an Award under the Plan.

"Reporting Person" means a person subject to Section 16 of the Exchange Act.

"Section 409A" means Section 409A of the Code and the Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulation or other guidance that may be issued after the Effective Date.

4. **Eligibility**.

All key employees, all directors and all consultants of the Company or of any Affiliate whom the Committee considers to be capable of contributing to the successful performance of the Company are eligible to be Participants in the Plan. Incentive Stock Options may be granted only to employees of the Company or of any parent or subsidiary corporation of the Company, as those terms are used in Section 424 of the Code.

## 5. Stock Available for Awards.

a. **Amount.** Subject to adjustment under subsection (b), no more than 463,525 shares of Common Stock in the aggregate may be delivered under or in satisfaction of Awards, provided, however, that to the extent that equity incentive awards granted prior to the Effective Date pursuant to the Company's 2005 Equity Incentive Plan, as amended, do not vest on or after the Effective Date in accordance with their terms, the number of shares of Common Stock subject to such unvested awards shall be added to the number of shares that may be delivered hereunder. For the avoidance of doubt, the termination, cancellation or expiration of an Award or any portion thereof without the delivery of shares of Common Stock, or the satisfaction of an Award or any portion thereof by the delivery of cash or other property other than shares of Common Stock, shall not be treated as the delivery of shares of Common Stock for purposes of this subsection (a). Common Stock issued under awards granted by another company ("other company awards") and assumed by the Company in connection with a merger, consolidation, stock purchase or similar transaction, or issued by the Company under awards substituted for other company awards in connection with a merger, consolidation, stock purchase or similar transaction, shall not reduce the shares available for Awards under the Plan; provided, that the maximum number of shares that may be issued pursuant to ISOs (as defined below) shall be determined in a manner consistent with Section 422 of the Code and the rules thereunder. Shares issued under the Plan may consist of authorized but unissued shares or treasury shares.

b. **Adjustment.** In the event that the Committee determines that any stock dividend, extraordinary cash dividend, recapitalization, reorganization, merger, consolidation, split-up, spin-off, combination, exchange of shares or other transaction affects the Common Stock such that an adjustment is required or appropriate to preserve the benefits intended to be provided by the Plan, then the Committee (subject in the case of ISOs, or in the case of Awards intended to qualify for exemption under Section 162(m) of the Code, to any limitation required under the Code) shall make such adjustment as it determines to be equitable to any or all of (i) the number and kind of shares in respect of which Awards may be made under the Plan, (ii) the number and kind of shares subject to outstanding Awards and (iii) the exercise price with respect to any of the foregoing; provided, that the number of shares subject to any Award shall always be a whole number.

c. **Limit on Individual Grants.** The maximum number of shares of Common Stock subject to Options and Stock Appreciation Rights that may be granted to any Participant in the aggregate in any calendar year shall not exceed, in each case, 150,000, and the maximum number of shares of Common Stock that may be granted as Stock Awards pursuant to Section 8 to any Participant in the aggregate in any calendar year shall not exceed 150,000, subject in each case to adjustment under subsection (b).

## 6. Stock Options.

a. **Grant of Options.** Subject to the provisions of the Plan, the Committee may grant both (i) options ("Options") to purchase shares of Common Stock that are

intended to comply with the requirements of Section 422 of the Code and the rules thereunder ("ISOs") and (ii) Options that are not intended to comply with such requirements ("NSOs"). The Committee shall determine the number of shares subject to each Option and the exercise price therefor, which shall not be less than 100% of the Fair Market Value of the Common Stock on the date of grant.

b.      **Terms and Conditions**. Each Option shall be exercisable at such times and subject to such terms and conditions as the Committee may specify in the applicable grant or thereafter. The Committee may impose such conditions with respect to the exercise of Options, including conditions relating to applicable federal or state securities laws, as it considers necessary or advisable.

c.      **Payment**. No shares shall be delivered pursuant to any exercise of an Option until payment in full of the exercise price therefor is received by the Company. Such payment may be made in whole or in part in cash or, to the extent legally permissible and permitted by the Committee at or after the grant of the Option, by delivery of a note or other commitment satisfactory to the Committee; shares of Common Stock that have been owned by the optionee for at least six months (or such other period as the Committee may determine), valued at their Fair Market Value on the date of delivery; such other lawful consideration, including a payment commitment of a financial or brokerage institution, as the Committee may determine; or any combination of the foregoing permitted forms of payment.

7.      **Stock Appreciation Rights**.

a.      **Grant of SARs**. Subject to the provisions of the Plan, the Committee may grant rights to receive any excess in value of shares of Common Stock over the exercise price ("Stock Appreciation Rights" or "SARs"). The Committee shall determine at the time of grant or thereafter whether SARs are settled in cash, Common Stock or other securities of the Company, Awards or other property, and may define the manner of determining the excess in value of the shares of Common Stock.

b.      **Exercise Price**. The Committee shall fix the exercise price of each SAR, which shall not be less than 100% of the Fair Market Value of the Common Stock at the date of grant.

8.      **Stock Awards**.

a.      **Restricted or Unrestricted Stock Awards**. The Committee may grant shares of Common Stock subject to forfeiture ("Restricted Stock") and determine the duration of the period (the "Restricted Period") during which, and the conditions under which, the shares may be forfeited to the Company and the other terms and conditions of such Awards. Shares of Restricted Stock may not be sold, assigned, transferred, pledged or otherwise encumbered, except as permitted by the Committee, during the Restricted Period. Shares of Restricted Stock shall be evidenced in such manner as the Committee may determine. Any certificates issued in respect of shares of Restricted Stock shall be registered in the name of the Participant and unless otherwise determined by the

-4-

Committee, deposited by the Participant, together with a stock power endorsed in blank, with the Company. At the expiration of the Restricted Period, the Company shall deliver such certificates to the Participant or if the Participant has died, to the Participant's Designated Beneficiary. The Committee also may make Awards of shares of Common Stock that are not subject to restrictions or forfeiture, on such terms and conditions as the Committee may determine from time to time ("Unrestricted Stock"). Shares of Restricted Stock or Unrestricted Stock may be issued for such consideration, if any, as the Committee may determine consistent with applicable law.

b.   **Stock Unit Awards.** The Committee may grant Awards ("Stock Unit Awards") consisting of units representing shares of Common Stock. Each Stock Unit Award shall represent the unfunded and unsecured commitment of the Company to deliver to the Participant at a specified future date or dates one or more shares of Common Stock (including, if so provided with respect to the Award, shares of Restricted Stock), subject to the satisfaction of any vesting or other terms and conditions established with respect to the Award as the Committee may determine. No Participant or Designated Beneficiary holding a Stock Unit Award shall be treated as a stockholder with respect to the shares of Common Stock subject to the Award unless and until such shares are actually delivered under the Award. Stock Unit Awards may not be sold, assigned, transferred, pledged or otherwise encumbered except as permitted by the Committee.

c.   **Performance Goals.** The Committee may establish performance goals on which the granting of Restricted Stock, Unrestricted Stock, or Stock Unit Awards, or the vesting of Restricted Stock or Stock Unit Awards, will be subject. Such performance goals may be based on such corporate or other business criteria as the Committee may determine. The Committee shall determine whether any performance goals so established have been achieved, and if so to what extent, and its determination shall be binding on all persons. Notwithstanding anything herein to the contrary, the performance criteria terms set forth on Appendix A hereto shall apply to any Award for which performance goals are established pursuant to this Section 8(c) that is intended to satisfy the exception for qualified performance-based compensation under Section 162(m) of the Code.

## 9.   General Provisions Applicable to Awards.

a.   **Documentation.** Each Award shall be evidenced by a writing delivered to the Participant or agreement executed by the Participant specifying the terms and conditions thereof and containing such other terms and conditions not inconsistent with the provisions of the Plan as the Committee considers necessary or advisable to achieve the purposes of the Plan or to comply with applicable tax and regulatory laws and accounting principles.

b.   **Application of Code Section 409A.** Notwithstanding anything in this Plan to the contrary, it is intended that any grant of an Award shall satisfy the requirements for compliance with or exemption from Section 409A of the Code, to the extent applicable. The Plan and any Award shall be interpreted in a manner that is consistent with compliance with or exemption from Section 409A. In the event that any Award is subject to Section 409A and is otherwise payable upon a Change of Control, no

-5-

such payment shall be made unless such Change of Control constitutes a "Change in Control Event" as defined in Section 1.409A-3(i)(5)(i) of the Treasury Regulations, and as set forth in Section 1.409A-3(i)(5)(v) through (vii). In the event that any Award is subject to Section 409A and is payable upon termination of employment or service, such Award shall not be payable upon a termination of employment or service unless such termination of employment or service constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Treasury Regulations.

c.    **Committee Discretion.** Awards may be made alone or in combination with other Awards, including Awards of other types. The terms of Awards of the same type need not be identical, and the Committee need not treat Participants uniformly (subject to the requirements of applicable law). Except as otherwise provided by the Plan or a particular Award, any determination with respect to an Award may be made by the Committee at the time of grant or at any time thereafter.

d.    **Dividends and Cash Awards.** In the discretion of the Committee, any Award under the Plan may provide the Participant with (i) dividends or dividend equivalents payable (in cash or in the form of Awards under the Plan) currently or deferred with or without interest and (ii) cash payments in lieu of or in addition to an Award.

e.    **Termination of Service.** Unless the Committee expressly provides otherwise, the following rules shall apply in connection with the cessation of a Participant's employment or other service relationship with the Company and its Affiliates. Immediately upon the cessation of the Participant's employment or other service relationship with the Company and its Affiliates an Award requiring exercise will cease to be exercisable and all Awards to the extent not already fully vested will be forfeited, except that:

(i) All Stock Options and SARs held by a Participant immediately prior to his or her death, to the extent then exercisable, will remain exercisable by such Participant's executor or administrator or the person or persons to whom the Stock Option or SAR is transferred by will or the applicable laws of descent and distribution, in each case for the lesser of (i) the one year period ending with the first anniversary of the Participant's death or (ii) the period ending on the latest date on which such Stock Option or SAR could have been exercised without regard to this subsection (e), and shall thereupon terminate; and

(ii) all Stock Options and SARs held by the Participant immediately prior to the cessation of the Participant's employment or other service relationship for reasons other than death and except as provided in (iii) below, to the extent then exercisable, will remain exercisable for the lesser of (1) a period of three months or (2) the period ending on the latest date on which such Stock Option or SAR could have been exercised without regard to this subsection (e), and shall thereupon terminate.

(iii) Unless the Committee expressly provides otherwise, a Participant's "employment or other service relationship with the Company and its Affiliates" will be deemed to have ceased, in the case of an employee Participant, upon termination of the Participant's employment with the Company and its Affiliates (whether or not the Participant continues in the service of the Company or its Affiliates in some capacity other than that of an employee of the Company or its Affiliates), and in the case of any other Participant, when the service relationship in respect of which the Award was granted terminates (whether or not the Participant continues in the service of the Company or its Affiliates in some other capacity).

f. **Change in Control.** If (i) any Person or "group," within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act, other than the Company or any of its subsidiaries or any trustee or other fiduciary holding securities under an employee benefit plan of the Company or one of its subsidiaries, becomes a beneficial owner, directly or indirectly, in one or a series of transactions, of securities representing fifty percent (50%) or more of the total number of votes that may be cast for the election of directors of the Company, (ii) the Company merges into or combines with any other entity and, immediately following such merger or combination, any Person or group of Persons acting in concert holds 50% or more of the voting power of the entity surviving such merger or combination (other than any Person or group of Persons which held 50% or more of the Company's voting power immediately prior to such merger or combination or any Affiliated Person of any such Person or member of such group), (iii) the Company sells all or substantially all of its assets or business for cash or for securities of another Person or group of Persons (other than to any Person or group of Persons which held 50% or more of the Company's total voting power immediately prior to such sale or to any Affiliated Person of any such Person or any member of such group), or (iv) a dissolution or liquidation of the Company (any of (i), (ii), (iii) or (iv) being herein referred to as a "Covered Transaction"), then, without further action by the Committee, (A) all outstanding Options and SARs shall immediately become fully vested and exercisable, and (B) all outstanding Restricted Stock Awards and Stock Unit Awards shall immediately become fully earned and vested and, in the case of Restricted Stock, the Restricted Period with respect thereto shall immediately lapse; provided, however, that: (1) any such Restricted Stock Awards and Stock Unit Awards that are conditioned upon the attainment of specified price targets with respect to the Common Stock shall only become earned and vested to the extent that the transaction price per share in the Covered Transaction or, if not discernable due to the nature of the Covered Transaction, the Fair Market Value of a share of Common Stock, in each case as determined by the Committee, exceeds the applicable price targets under such Awards, and (2) any such Restricted Stock Awards and Stock Unit Awards that are conditioned upon the attainment of performance-based conditions (other than performance-based Awards covered by subsection (1) above) shall only become earned and vested in respect of that portion of the Award that would become earned and vested upon target-level achievement of the performance goals applicable thereto, as determined by the Committee. Without limiting the foregoing (but solely after giving full effect to the provisions of the preceding sentence), in the event of a Covered Transaction, the Committee in its discretion may, with respect to any Award, at the time the Award is made or at any time thereafter, take

one or more of the following actions: (A) provide for the acceleration of any time period relating to the exercise or payment of the Award (provided that the payment of any Award that constitutes a deferral of compensation subject to Section 409A may not be accelerated except to the extent permitted by Section 409A of the Code), (B) provide for the cancellation of the Award (without the consent of the Participant) in exchange for the payment to the Participant of cash or other property with a Fair Market Value equal to the amount that would have been received (net of any exercise price) upon the exercise or payment of the Award had the Award been exercised or paid immediately prior to the Covered Transaction, (C) adjust the terms of the Award in a manner determined by the Committee to reflect the covered transaction, (D) cause the Award to be assumed, or new rights substituted therefor, by another entity, or (E) make such other provision as the Committee may consider equitable to Participants and in the best interests of the Company.

g.      **Transferability**. No Award may be transferred other than by will or the laws of descent and distribution and may be exercised, during the life of the Participant, only by the Participant, except that, as to Awards other than ISOs, the Committee may permit certain transfers to the Participant's family members or to certain entities controlled by the Participant or his or her family members.

h.      **Withholding Taxes**. The Participant shall pay to the Company, or make provision satisfactory to the Committee for payment of, any taxes or social insurance contributions required by law to be withheld in respect of Awards under the Plan no later than the date of the event creating the tax liability. The Company and its Affiliates may, to the extent permitted by law, deduct any such tax (or social insurance) obligations from any payment of any kind due to the Participant hereunder or otherwise. In the Committee's discretion, the minimum tax (or social insurance) obligations required by law to be withheld in respect of Awards may be paid in whole or in part in shares of Common Stock, including shares retained from the Award creating the obligation, valued at their Fair Market Value on the date of retention or delivery.

i.      **Amendment of Award**. The Committee may amend, modify, or terminate any outstanding Award, including substituting therefor another Award of the same or a different type, changing the date of exercise or realization and converting an Incentive Stock Option to a Nonstatutory Stock Option. Any such action shall require the Participant's consent unless the Committee determines that the action, taking into account any related action, would not materially and adversely affect the Participant.

j.      **Foreign Nationals**. The Committee may take any action consistent with the terms of the Plan, either before or after an Award has been granted, which the Committee deems necessary or advisable to comply with government laws or regulatory requirements of any foreign jurisdiction, including but not limited to modifying or amending the terms and conditions governing any Awards, establishing sub-plans under the Plan, or adopting such procedures as the Committee may determine to be appropriate in response to differences in laws, rules, regulations or customs of such foreign jurisdictions with respect to tax, securities, currency, employment, accounting or other matters.

## 10. Miscellaneous.

a. **No Right To Employment.** No person shall have any claim or right to be granted an Award. Neither the adoption, maintenance, nor operation of the Plan nor any Award hereunder shall constitute a contract of employment or confer upon any employee, director or consultant of the Company or of any Affiliate any right with respect to the continuance of his/her employment by or other service with the Company or any such Affiliate nor shall it or they be construed as affecting the rights of the Company (or Affiliate) to terminate the service of any person at any time or otherwise change the terms of such service, including, without limitation, the right to promote, demote or otherwise re-assign any employee or other service provider from one position to another within the Company or any Affiliate.

b. **No Rights As Stockholder.** Subject to the provisions of the applicable Award, no Participant or Designated Beneficiary shall have any rights as a stockholder with respect to any shares of Common Stock to be issued under the Plan until he or she becomes the holder thereof. A Participant to whom Restricted Stock or Unrestricted Stock is awarded shall be considered a stockholder of the Company at the time of the Award except as otherwise provided in the applicable Award.

c. **Effective Date.** The date on which the Joint Prepackaged Plan of Reorganization Plan of the Company (and the other Debtors listed therein) becomes effective.

d. **Amendment of Plan.** The Board may amend, suspend, or terminate the Plan or any portion thereof at any time, subject to such stockholder approval as the Board determines to be necessary or advisable. Further, under all circumstances, the Committee may make non-substantive administrative changes to the Plan as to conform with or take advantage of governmental requirements, statutes or regulations.

e. **Repricing.** Without the approval of stockholders, the Committee will not amend or replace previously granted Options or SARs in a transaction that constitutes a "repricing," which for this purpose means any of the following or any other action that has the same effect: (i) lowering the exercise price of an Option or SAR after it is granted; (ii) any other action that is treated as a repricing under generally accepted accounting principles; or (iii) canceling an Option or SAR at a time when its exercise price exceeds the Fair Market Value of the underlying Common Stock, in exchange for another Option or SAR or other equity, cash or other property; provided, however, that the foregoing transactions shall not be deemed a repricing if pursuant to an adjustment authorized under Section 5(b).

f. **Governing Law.** The provisions of the Plan shall be governed by and interpreted in accordance with the laws of the State of Delaware.

## APPENDIX A

## PERFORMANCE CRITERIA TERMS

A Performance Criterion must be an objectively determinable measure of performance relating to any or any combination of the following (measured either absolutely or by reference to an index or indices and determined either on a consolidated basis or, as the context permits, on a divisional, subsidiary, line of business, project or geographical basis or in combinations thereof): sales; revenues; assets; expenses; earnings before or after deduction for all or any portion of interest, taxes, depreciation, or amortization, whether or not on a continuing operations or an aggregate or per share basis, including, without limitation, EBITDA or adjusted EBITDA as determined for purposes of any credit agreement or other agreement to which the Company is a party; return on equity, investment, capital or assets; one or more operating ratios; borrowing levels, leverage ratios or credit rating; market share; capital expenditures; cash flow; net cash from operations plus or minus such expenditures, expenses, cash proceeds from dispositions (whether or not of operating assets) and other objectively determinable adjustments, if any, as the Committee may determine; stock price; stockholder return; sales of particular products or services; customer acquisition or retention; acquisitions and divestitures (in whole or in part); joint ventures and strategic alliances; spin-offs, split-ups and the like; reorganizations; or recapitalizations, restructurings, financings (issuance of debt or equity) or re-financings. A Performance Criterion and any targets with respect thereto determined by the Committee need not be based upon an increase, a positive or improved result or avoidance of loss. The Committee may provide that any or any combination, or all, of the Performance Criteria applicable to an award will be adjusted in an objectively determinable manner to reflect events (for example, but without limitation, acquisitions or dispositions) occurring during the performance period that affect the applicable Performance Criterion or Criteria, to the extent consistent with the requirements for satisfying the performance-based compensation exception under Section 162(m) of the Code.

## EXHIBIT D

### NEW WARRANTS

The summary below describes the principal terms of the New Warrants.

| | |
|---|---|
| Number of Warrants | Holders of Allowed Equity Interests in Class 8 will receive their Pro Rata Shares of the New Warrants to purchase up to 10% of the fully diluted shares of New Common Stock as of the Effective Date, calculated after giving effect to (a) the issuance of the New Common Stock and (b) the full exercise of the New Warrants, in each case, prior to the issuance of any New Common Stock reserved for the New Management Incentive Plan. |
| Exercise Price | An exercise price equal to the value per share of all New Common Stock issued or outstanding at the time of exercise of the New Warrant equal to (a)(i) 1.1 multiplied by an amount equal to the sum of the final amount of the Allowed Credit Facility Claims, the final amount of the Allowed Secured Swap Termination Claims, and the final amount of the Allowed Unsecured Swap Termination Claims minus (ii) the aggregate principal amount of the Term Notes at the time of issuance minus (iii) $10 million in Cash divided by (b) the number of shares of New Common Stock distributed pursuant to Sections 4.2 and 4.5 of the Plan, which number may be adjusted from time to time for stock splits and reverse stock splits. |
| Issue Date | Effective Date. |
| Term | The New Warrants will be exercisable for a term of four years from the Issue Date. |
| Exercise Date | The date that the Exercise Price is received by Reorganized Xerium. |
| Form of Delivery | Upon exercise of any of the New Warrants, each holder shall provide Reorganized Xerium with (a) payment of the aggregate Exercise Price for all New Warrants exercised (unless the consideration being distributed is cash and a cashless exercise is elected by such holder), (b) all certificates evidencing the New Warrants and (c) any other documentation reasonably requested by Reorganized Xerium. In the event that any of the New Warrants are exercised, Reorganized Xerium shall deliver shares of New Common Stock to the holder of such New Warrants or shall deliver proceeds from a sale of Reorganized Xerium on an "as exercised" basis. |

| | |
|---|---|
| Anti-dilution | The New Warrant certificates shall provide for adjustment of the Exercise Price and the number of shares of New Common Stock purchasable upon the exercise of each New Warrant in the case of (a) the distribution of any stock dividends in New Common Stock after the Issue Date or (b) a stock split or a reverse stock split of the New Common Stock after the Issue Date. |
| Transferability | The New Warrants will be transferable, subject to federal and state securities laws. |
| Compliance With Securities Laws | To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of New Warrants and New Common Stock issuable upon exercise of the New Warrants will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. |

## EXHIBIT E

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED

| | | | |
|---|---|---|---|
| One Tech Westborough, LLC, as **Landlord** and successor in interest to Westborough Office Center, Inc., who was a successor in interest to NE Aspen Westborough LLC.

Xerium Technologies, Inc., as **Tenant** and successor in interest to Xerium, Inc. | One Tech Westborough, LLC c/o Conroy Development Corporation 800 Technology Center Drive Stoughton, Massachusetts 02072 Attention: Terence W. Conroy, Jr. | Rejection effective as of July 31, 2010. | **Lease, dated December 23, 1999,** as amended by that certain Amendment to Lease dated August 21, 2000, a Second Amendment to Lease dated March 22, 2005, and a Third Amendment to Lease dated August 24, 2006.

Real estate lease for certain premises located at One Technology Drive, Westborough, Massachusetts, with a lease term expiring February 28, 2014. |

[DIP BUDGET]


[See attached]

NY3 - 504899.05

DRAFT - SUBJECT TO CHANGE

Xerium Technologies Inc. (U.S. Entities)
DIP Receipts & Disbursements Covenants

*(dollars in thousands)*

| | Week Ending: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 04/04/10 | 04/11/10 | 04/18/10 | 04/25/10 | 05/02/10 | 05/09/10 | 05/16/10 | 05/23/10 | 05/30/10 |

**Receipts**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| External Customer | 2,440 | 3,061 | 3,005 | 3,005 | 3,005 | 3,060 | 3,060 | 3,060 | 3,060 |
| Intercompany Sales | 0 | 663 | 51 | 133 | 428 | | 59 | | 764 |
| Interco Funding (Euro/py) | 3,500 | | | | | | | | |
| Other Interco Invoice | | 32 | 155 | 292 | 705 | 25 | 150 | 12 | 88 |
| Total DIP Receipts | 5,941 | 3,742 | 3,209 | 3,360 | 3,793 | 3,207 | 3,210 | 3,350 | 3,912 |
| Rolling 4 Week Average Receipts | | | | 4,963 | 3,456 | 3,302 | 3,313 | 3,340 | 3,300 |
| Proposed Cushion | | | | (813) | (795) | (675) | (677) | (970) | (678) |
| Proposed DIP Receipts Covenant | | | | 3,281 | 4,251 | 2,274 | 2,274 | 2,494 | 2,794 |
| Proposed Covenant Cushion % | | | | 29.8% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% |

**Disbursements**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Operating Expenses | (7,264) | (1,943) | (3,374) | (3,135) | (4,416) | (2,374) | (4,210) | (3,665) | (4,701) |
| Interco Expenses | (6,580) | | | | (801) | | | (321) | (148) |
| DIP Financing Fees | (2,227) | | | | (77) | | | | (21) |
| Intercompany Funding | (350) | (0,622) | (425) | (827) | (412) | (425) | (903) | (863) | (605) |
| Total DIP Disbursements | (4,855) | (5,195) | (3,795) | (3,360) | (5,155) | (2,799) | (4,930) | (8,869) | (1,464) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Interest Expense | (6,515) | | | | (303) | (341) | | (533) | (504) |
| Financial Restructuring | (3,395) | (73) | (73) | (77) | (7) | | (347) | (341) | (997) |
| DIP Financing Fees | (2,219) | | | | (31) | | | | (22) |
| Disbursements Excl. Interest, DIP Fees & Rest. | (5,318) | (5,453) | (3,725) | (3,487) | (4,898) | (2,118) | (4,351) | (3,195) | (4,546) |
| Rolling 4 Week Average Disbursements | | | | (4,733) | (4,349) | (3,909) | (3,409) | (3,600) | (3,530) |
| Proposed Cushion | | | | 805 | (973) | (110) | (22) | (110) | (06) |
| Proposed DIP Disbursement Covenant | (5,318) | | | (5,564) | (5,334) | (4,303) | (4,362) | (4,309) | (4,236) |
| Proposed DIP Disbursement Cushion % | | | | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% |

**Liquidity**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Balance Revolver | 29,000 | 29,000 | 29,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Cash | 29,002 | 27,468 | 27,852 | 26,332 | 29,561 | 29,361 | 20,305 | 26,972 | 26,572 |
| Total Liquidity | 49,400 | 47,611 | 47,011 | 46,822 | 49,361 | 49,361 | 46,305 | 46,331 | 46,529 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Balance | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Cushion | 9,360 | 7,611 | 7,022 | 6,822 | 9,361 | 9,361 | 6,305 | 6,331 | 9,529 |
| Cushion % | 25.5% | 20.5% | 17.0% | 17.0% | 24.0% | 24.0% | 15.0% | 17.1% | 15.1% |

DRAFT - SUBJECT TO CHANGE

## [FORM OF ISSUANCE NOTICE]

## ISSUANCE NOTICE

Citicorp North America, Inc.,
as Administrative Agent
390 Greenwich St., 1st Floor
New York, NY 10013
Attn: [Blake Gronich]

Reference is made to the Superpriority Priming Senior Secured Debtor-in-Possession Credit and Guaranty Agreement, dated as of March [___], 2010 (as it may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), among Xerium Technologies, Inc., as debtor and debtor-in-possession, as Borrower, the companies named therein as Guarantors, Citigroup Global Markets Inc. as Sole Lead Arranger and Sole Bookrunner, Citicorp North America, Inc. as Collateral Agent and as Administrative Agent, and the other Banks and Agents party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

Pursuant to Section 2.2 of the Credit Agreement, the Borrower hereby irrevocably notifies the Issuing Bank and the Administrative Agent that it requests a Letter of Credit to be issued on _____, 2010 (the "Credit Date")[1] by the Issuing Bank in accordance with the terms and conditions of the Credit Agreement and, in that connection, specifies the following information:

1.    stated face amount the Letter of Credit    $ _____[2]

---

[1]    The Credit Date shall be at least three (3) Business Days (in the case of standby letters of credit) or five (5) Business Days (in the case of commercial letters of credit) after the delivery of the Issuance Notice, or in each case such shorter period as may be agreed to by the Issuing Bank in any particular instance, in advance of the proposed date of issuance.

[2]    When combined with the Dollar Equivalent of the aggregate face amount of Existing Letters of Credit, the amount must not exceed the $20,000,000; provided, (i) each Letter of Credit (other than the Existing Letters of Credit) must be denominated in Dollars, Euros, Canadian dollars, Australian dollars and Swedish krona, (ii) the stated amount of each Letter of Credit (other than the Existing Letters of Credit) must not be less than $500,000 or such lesser amount as is acceptable to the Issuing Bank and (iii) after giving effect to such issuance, in no event shall the amount of Cash and Cash Equivalents on deposit in the Term LC Collateral Account be less than 103% of the Dollar Equivalent of the amount available to be drawn under all Letters of Credit (including the Existing Letters of Credit).

EXHIBIT I-1

2.    date on which the Letter of Credit will expire is _____, 20__ [3]

3.    Name and address of beneficiary: _____

4.    Select One:            [standby or commercial Letter of Credit]

5.    Attached hereto for such Letter of Credit is either (i) the verbatim text of such proposed
      Letter of Credit, or (ii) a description of the proposed terms and conditions of such Letter
      of Credit, including a precise description of any documents to be presented by the
      beneficiary which, if presented by the beneficiary prior to the expiration date of such
      Letter of Credit, would require the Issuing Bank to make payment under such Letter of
      Credit.

The Borrower hereby certifies that the following statements are true:

                (i)      after making the Credit Extensions requested on the Credit Date,
                         Revolving Loans will not exceed the Revolving Commitments then
                         in effect;

                (ii)     as of the Credit Date, the representations and warranties contained
                         in each of the Credit Documents are true and correct in all material
                         respects on and as of the Credit Date to the same extent as though
                         made on and as of such date, except to the extent such
                         representations and warranties specifically relate to an earlier date,
                         in which case such representations and warranties are true and
                         correct in all material respects on and as of such earlier date;

                (iii)    as of the Credit Date, no event has occurred and is continuing or
                         would result from the consummation of the Credit Extensions
                         contemplated hereby that would constitute a Default or an Event of
                         Default; and

                (iv)     as of the Credit Date, the conditions of Section 3.2 of the Credit
                         Agreement have been satisfied or waived in accordance therewith.

        IN WITNESS WHEREOF, the Borrower has caused this Issuance Notice to be
executed and delivered by its duly Authorized Officer as of the date set forth below.

Date: _____, 20___

---

[3]   In no event shall any Letter of Credit (other than the Existing Letters of Credit) have an expiration date later
      than 180 days from the Closing Date.

EXHIBIT I-2

NY3 - 504893.05

**XERIUM TECHNOLOGIES, INC.,**
as debtor and debtor-in-possession, as Borrower

By: _____
    Name:
    Title:

EXHIBIT I-2

## [FORM OF WITHDRAWAL REQUEST]

## WITHDRAWAL REQUEST

Citicorp North America, Inc.,
as Administrative Agent
390 Greenwich St., 1st Floor
New York, NY 10013
Attn: [Blake Gronich]

Reference is made to the Superpriority Priming Senior Secured Debtor-In-Possession Credit and Guaranty Agreement, dated as of March [   ], 2010 (as it may be amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), among Xerium Technologies, Inc., as debtor and debtor-in-possession, as Borrower, the companies named therein as Guarantors, Citigroup Global Markets Inc. as Sole Lead Arranger and Sole Bookrunner, Citicorp North America, Inc. as Collateral Agent and as Administrative Agent, and the other Banks party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

Pursuant to Section 2.1(c) of the Credit Agreement, the Borrower hereby notifies the Administrative Agent that it requests to withdraw funds on deposit in the Term Loan Deposit Account on _____, 2010 (the "**Disbursement Date**")[1] in accordance with the terms and conditions of the Credit Agreement and, in that connection, specifies the following information:

Amount of funds to be withdrawn from Term Loan Deposit Account    $ _____

The Borrower hereby certifies that the following statements are true:

      (i)    after making the disbursement requested on the Disbursement Date, Revolving Loans will not exceed the Revolving Commitments then in effect;

      (ii)    as of the Disbursement Date, the representations and warranties contained in each of the Credit Documents are true and correct in all material respects on and as of the Disbursement Date to the same extent as though made on and as of such date, except to the extent such representations and warranties specifically relate to an

---

[1]   Disbursement Date shall be at least one Business Day after the date on which the Borrower delivers the Withdrawal Request.

NY3 - 504897.05

earlier date, in which case such representations and warranties are true and correct in all material respects on and as of such earlier date;

(iii)    as of the date of the Withdrawal Request and as of the Disbursement Date, no event has occurred and is continuing or would result from the consummation of such disbursement contemplated hereby that would constitute a Default or an Event of Default;

(iv)    the disbursed funds will be used for _____, in accordance with Section 2.4 of the Credit Agreement[2];

(iv)    as of the Disbursement Date, the aggregate principal amount of Revolving Loans plus amounts withdrawn from the Term Loan Deposit Account pursuant to Section 2.1(c) of the Credit Agreement are consistent with the DIP Budget and in compliance with Section 6.8 of the Credit Agreement; and

(vi)    as of the Disbursement Date, the conditions set forth in Sections 3.2 and 3.3 of the Credit Agreement have been satisfied or waived in accordance therewith.

[SIGNATURE PAGE FOLLOWS]

---

[2] Insert use of proceeds (clauses (ii), (iii), (iv) or (v) of Section 2.4 of the Credit Agreement).

EXHIBIT J-2

IN WITNESS WHEREOF, the Borrower has caused this Withdrawal Request to be executed and delivered by its duly Authorized Officer as of the date set forth below.

Date: _____, 20___

> **XERIUM TECHNOLOGIES, INC.,**
> as debtor and debtor-in-possession, as Borrower
>
> By: _____
>     Name:
>     Title:

EXHIBIT J-3

## [INTERCREDITOR AGREEMENT]

[See attached]

NY3 - 504893.05

"NOTE: THE TAKING OF THIS DOCUMENT OR ANY CERTIFIED COPY OR ANY DOCUMENT WHICH CONSTITUTES SUBSTITUTE DOCUMENTATION THEREOF, INCLUDING WRITTEN CONFIRMATIONS OR REFERENCES THERETO, INTO AUSTRIA AS WELL AS PRINTING OUT ANY E-MAIL COMMUNICATION WHICH REFERS TO THIS DOCUMENT IN AUSTRIA OR SENDING ANY E-MAIL COMMUNICATION TO WHICH A PDF SCAN OF THIS DOCUMENT IS ATTACHED TO AN AUSTRIAN ADDRESSEE OR SENDING ANY E-MAIL COMMUNICATION CARRYING AN ELECTRONIC OR DIGITAL SIGNATURE WHICH REFERS TO THIS DOCUMENT TO AN AUSTRIAN ADDRESSEE MAY CAUSE THE IMPOSITION OF AUSTRIAN STAMP DUTY. ACCORDINGLY, IN PARTICULAR KEEP THE ORIGINAL DOCUMENT AS WELL AS ALL CERTIFIED COPIES THEREOF AND WRITTEN AND SIGNED REFERENCES THERETO OUTSIDE OF AUSTRIA AND AVOID PRINTING OUT ANY EMAIL COMMUNICATION WHICH REFERS TO THIS DOCUMENT IN AUSTRIA OR SENDING ANY E-MAIL COMMUNICATION TO WHICH A PDF SCAN OF THIS DOCUMENT IS ATTACHED TO AN AUSTRIAN ADDRESSEE OR SENDING ANY E-MAIL COMMUNICATION CARRYING AN ELECTRONIC OR DIGITAL SIGNATURE WHICH REFERS TO THIS DOCUMENT TO AN AUSTRIAN ADDRESSEE."

## INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT** (this "**Agreement**"), is dated as of [_____], 2010, and entered into by and among **CITICORP NORTH AMERICA, INC.**, in its capacity as administrative agent and collateral agent for the First Lien Claimholders (as defined below), including its successors and assigns from time to time (the "**First Lien Agent**") and **CITICORP NORTH AMERICA, INC.**, in its capacity as administrative agent and collateral agent for the Second Lien Claimholders (as defined below), including its successors and assigns from time to time (the "**Second Lien Agent**") and acknowledged and agreed to by **XERIUM TECHNOLOGIES, INC.**, a Delaware corporation (the "**Company**") and the other Grantors (as defined below). Capitalized terms used in this Agreement have the meanings assigned to them in Section 1 below.

## RECITALS

The Company, the other Borrowers (as defined below), certain subsidiaries of the Company as Guarantors, the lenders party thereto, and Citicorp North America, Inc., as Administrative Agent and Collateral Agent, have entered into (or deemed to have entered into) that Second Amended and Restated Credit and Guaranty Agreement (Second Lien), dated as of the date hereof, providing for a term loan (as amended, restated, supplemented, modified or replaced from time to time, the "**Second Lien Credit Agreement**");

The Company, the other Borrowers, the lenders party thereto, certain subsidiaries of the Company as Guarantors, and Citicorp North America, Inc., as Administrative Agent and Collateral Agent, entered into that Credit and Guaranty

Agreement (First Lien), dated as of the date hereof, providing for revolving credit and term loan facilities (as amended, restated, supplemented, modified or replaced from time to time, the **"First Lien Credit Agreement"**);

Pursuant to (i) the First Lien Credit Agreement certain present and future Subsidiaries of the Company (such current and future Subsidiaries providing a guaranty thereof, the **"Guarantors"**) have guaranteed the First Lien Obligations to the extent provided therein (the **"First Lien Guaranty"**); and (ii) the Second Lien Credit Agreement, the Guarantors have guaranteed the Second Lien Obligations to the extent provided therein (the **"Second Lien Guaranty"**);

The obligations of the Company, the other Borrowers and the Guarantors under the First Lien Credit Agreement and the obligations of the Company, the other Borrowers and the Guarantors under the First Lien Guaranty will be secured on a first priority basis by liens on certain assets of the Company, the other Borrowers and the Guarantors, respectively, pursuant to the terms of the First Lien Collateral Documents;

The obligations of the Company, the other Borrowers and the Guarantors under the Second Lien Credit Agreement and the obligations of the Company, the other Borrowers and the Guarantors under the Second Lien Guaranty will be secured on a second priority basis by liens on certain assets of the Company, the other Borrowers and the Guarantors, respectively, pursuant to the terms of the Second Lien Collateral Documents;

The First Lien Loan Documents and the Second Lien Loan Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

In order to induce the First Lien Agent and the First Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrowers or any other Grantor, the Second Lien Agent on behalf of the Second Lien Claimholders has agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1. Definitions.Defined Terms.** As used in the Agreement, the following terms shall have the following meanings:

**"Affiliate"** has the meaning assigned to that term in the First Lien Credit Agreement.

2

"**Agreement**" means this Intercreditor Agreement, as amended, restated, renewed, extended, supplemented or otherwise modified from time to time.

"**Asset Sales**" has the meaning assigned to that term in the First Lien Credit Agreement and the Second Lien Credit Agreement, each as in effect on the date hereof.

"**Bank Counterparty**" means any Person who is a "Bank Counterparty" under the First Lien Loan Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Law**" means the Bankruptcy Code and any other applicable bankruptcy, insolvency or similar federal, state or foreign law.

"**Borrowers**" means the Company and the other borrowers under the First Lien Credit Agreement and the Second Lien Credit Agreement.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law or governmental action to close.

"**Cap Amount**" has the meaning assigned to that term in the definition of "First Lien Obligations."

"**Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, constituting both First Lien Collateral and Second Lien Collateral.

"**Company**" has the meaning assigned to that term in the Preamble to this Agreement.

"**Comparable Second Lien Collateral Document**" means, in relation to any Collateral subject to any Lien created under any First Lien Collateral Document, the Second Lien Loan Document that creates a Lien on the same Collateral, granted by the same Grantor.

"**DIP Financing**" has the meaning assigned to that term in Section 6.1.

"**Dollar Equivalent**" means on any day (a) with respect to any amount denominated in Dollars, such amount and (b) with respect to any amount denominated in a currency other than Dollars (the "**Alternative Currency**"), the amount of Dollars into which such amount may be converted at the spot rate at which Dollars are offered to the First Lien Administrative Agent in New York, New York for the Alternative Currency in which such amount is denominated at approximately 11:00 a.m. (New York City time) on such day or if such day is not a Business Day, on the immediately preceding Business Day.

"**Discharge of First Lien Obligations**" means:

3

(a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) on all Indebtedness outstanding under the First Lien Loan Documents and constituting First Lien Obligations;

(b) payment in full in cash of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than any indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time);

(c) termination or expiration of all commitments, if any, to extend credit that would constitute First Lien Obligations; and

(d) termination or cash collateralization (in an amount and manner reasonably satisfactory to the First Lien Agent, but in no event greater than 103% of the aggregate undrawn face amount) of all letters of credit issued under the First Lien Loan Documents and constituting First Lien Obligations.

"**Excess Cash**" has the meaning assigned to that term in the First Lien Credit Agreement and the Second Lien Credit Agreement, each as in effect on the date hereof.

"**First Lien Administrative Agent**" means the Administrative Agent under the First Lien Credit Agreement.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at that time, including the First Lien Lenders and the agents under the First Lien Loan Documents.

"**First Lien Agent**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"**First Lien Collateral Documents**" means the Collateral Documents (as defined in the First Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Lien Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First Lien Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

4

"First Lien Lenders" means the "Banks" under and as defined in the First Lien Loan Documents.

"First Lien Loan Documents" means the First Lien Credit Agreement and the other Credit Documents (as defined in the First Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations, including any intercreditor or joinder agreement among holders of First Lien Obligations, to the extent such are effective at the relevant time, as each may be amended, restated, amended and restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"First Lien Obligations" means, subject to clause (c) hereof, the following:

(a) (i) All principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all loans made pursuant to the First Lien Credit Agreement, (ii) all reimbursement obligations (if any) and interest thereon (including without limitation any Post-Petition Interest) with respect to any letter of credit or similar instruments issued pursuant to the First Lien Credit Agreement, (iii) all guarantee obligations, fees, expenses and all other Obligations under the First Lien Credit Agreement and the other First Lien Loan Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding and (iv) the "Obligations" (as such term is defined in the First Lien Credit Agreement).

(b) To the extent any payment with respect to any First Lien Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Lien Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Lien Claimholders and the Second Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred. To the extent that any interest, fees, expenses or other charges (including, without limitation, Post-Petition Interest) to be paid pursuant to the First Lien Loan Documents are disallowed by order of any court, including, without limitation, by order of a Bankruptcy Court in any Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including, without limitation, Post-Petition Interest) shall, as between the First Lien Claimholders and the Second Lien Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "First Lien Obligations".

(c) Notwithstanding the foregoing, if the sum of: (1) Indebtedness for borrowed money constituting principal outstanding under the First Lien Credit Agreement and the other First Lien Loan Documents (other than Indebtedness in respect of Hedge Agreements); plus (2) the aggregate face amount of any letters of credit issued but not reimbursed under the First Lien Credit Agreement, is in excess of the Dollar Equivalent of $80,000,000 in the aggregate on the date hereof (the "Cap Amount") plus Indebtedness in

5

respect of Hedge Agreements, then only that portion of such Indebtedness and such aggregate face amount of letters of credit which together do not exceed the Cap Amount shall be included in First Lien Obligations, and interest and reimbursement obligations with respect to such Indebtedness, letters of credit and Hedge Agreements shall only constitute First Lien Obligations to the extent related to Indebtedness, face amounts of letters of credit and Hedge Agreements included in the First Lien Obligations.

"**Grantors**" means the Company, the other Borrowers, each of the Guarantors and each other Person that has or may from time to time hereafter execute and deliver a First Lien Collateral Document or a Second Lien Collateral Document as a "grantor" or "pledgor" (or the equivalent thereof).

"**Guarantors**" has the meaning set forth in the Recitals to this Agreement.

"**Hedging Agreement**" means (a) a currency exchange, interest rate or commodity swap agreement, currency exchange, interest rate or commodity cap agreement and currency exchange, interest rate or commodity collar agreement entered into with a Bank Counterparty in the Company's or any of its Subsidiaries' ordinary course of business and not for speculative purposes or (b) any other agreement or arrangement designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices entered into with a Bank Counterparty in the Company's or any of its Subsidiaries' ordinary course of business and not for speculative purposes.

"**Indebtedness**" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

"**Insolvency or Liquidation Proceeding**" means:

(a)     any voluntary or involuntary case or proceeding under any applicable Bankruptcy Law with respect to any Grantor;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)     any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof)

6

and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"**Obligations**" means the "Obligations" (as such term is defined in the First Lien Credit Agreement and the Second Lien Credit Agreement) and all other obligations of every nature of each Grantor from time to time owed to the First Lien Claimholders, the Second Lien Claimholders or any of them or their respective Affiliates, agents or trustees, in each case under the First Lien Loan Documents or the Second Lien Loan Documents, whether for principal, interest, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"**Pledged Collateral**" has the meaning set forth in Section 5.4.

"**Post-Petition Interest**" means interest, fees, expenses and other charges that pursuant to the First Lien Credit Agreement or the Second Lien Credit Agreement, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"**Recovery**" has the meaning set forth in Section 6.5.

"**Second Lien Agent**" has the meaning assigned to that term in the Preamble of this Agreement.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at that time, including the Second Lien Lenders and the agents under the Second Lien Loan Documents.

"**Second Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"**Second Lien Collateral Documents**" means the Collateral Documents (as defined in the Second Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Lien Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Second Lien Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

7

**"Second Lien Lenders"** means the "Banks" under and as defined in the Second Lien Credit Agreement.

**"Second Lien Loan Documents"** means the Second Lien Credit Agreement and the other Credit Documents (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations, including any intercreditor or joinder agreement among holders of Second Lien Obligations to the extent such are effective at the relevant time, as each may be amended, restated, amended and restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

**"Second Lien Obligations"** means

(a) (i) All principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Second Lien Credit Agreement, (ii) all guarantee obligations, fees, expenses and other Obligations under the Second Lien Credit Agreement and the other Second Lien Loan Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding and (iii) the "Obligations" (as such term is defined in the Second Lien Credit Agreement).

(b) To the extent any payment with respect to any Second Lien Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the First Lien Claimholders and the Second Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.

(c) To the extent that any interest, fees, expenses or other charges (including, without limitation, Post-Petition Interest) to be paid pursuant to the Second Lien Loan Documents are disallowed by order of any court, including, without limitation, by order of a Bankruptcy Court in any Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including, without limitation, Post-Petition Interest) shall be deemed to continue to accrue and be added to the amount to be calculated as the "Second Lien Obligations".

**"Standstill Period"** has the meaning set forth in Section 3.1(a)(1).

**"Subsidiary"** has the meaning assigned to that term in the First Lien Credit Agreement.

**"UCC"** means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

8

**1.2** Terms Generally.The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise:

(a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented, modified, renewed or extended;

(b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d) all references herein to Sections shall be construed to refer to Sections of this Agreement; and

(e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## SECTION 2. Lien Priorities.

**2.1** Relative Priorities.Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any other applicable law or the Second Lien Loan Documents or any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens securing the First Lien Obligations or any other circumstance whatsoever, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that:

(a) any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Second Lien Obligations; and

(b) any Lien on the Collateral securing any Second Lien Obligations now or hereafter held by or on behalf of the Second Lien Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant,

9

possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations. All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, whether or not such Liens securing any First Lien Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

2.2 Prohibition on Contesting Liens.Each of the Second Lien Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Agent, for itself and on behalf of each First Lien Claimholder, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity, perfection or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Agent or any First Lien Claimholder or the Second Lien Agent or any Second Lien Claimholder, as the case may be, to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the First Lien Obligations and the Second Lien Obligations as provided in Sections 2.1 and 3.1.

2.3 No New Liens. So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, the parties hereto agree that the Company shall not, and shall not permit any other Grantor to:

(a) grant or permit any additional Liens on any asset or property to secure any Second Lien Obligation unless it has granted or concurrently grants a Lien on such asset or property to secure the First Lien Obligations, the parties hereto agreeing that any such Lien shall be subject to Section 2.1 hereof; or

(b) grant or permit any additional Liens on any asset or property to secure any First Lien Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Second Lien Obligations. To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Lien Agent and/or the First Lien Claimholders, the Second Lien Agent, on behalf of Second Lien Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

2.4 Similar Liens and Agreements.The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical. In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement:

10

(a)    upon request by the First Lien Agent or the Second Lien Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Loan Documents and the Second Lien Loan Documents; and

(b)    that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral and guarantees for the First Lien Obligations and the Second Lien Obligations, subject to Section 5.3(d), shall be in all material respects the same forms of documents other than with respect to the first lien and the second lien nature of the Obligations thereunder.

### SECTION 3. Enforcement.

3.1    Exercise of Remedies.(a)    Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, the Second Lien Agent and the Second Lien Claimholders:

(1)    will not exercise or seek to exercise any rights or remedies with respect to any Collateral (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Agent or any Second Lien Claimholder is a party) or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure); provided, however, that the Second Lien Agent may exercise any or all such rights or remedies after the passage of a period of at least 180 days has elapsed since the later of: (i) the date on which the Second Lien Agent declared the existence of any Event of Default under any Second Lien Loan Documents and demanded the repayment of all the principal amount of any Second Lien Obligations; and (ii) the date on which the First Lien Agent received notice from the Second Lien Agent of such declarations of an Event of Default (the "Standstill Period"); provided, further, however, that notwithstanding anything herein to the contrary, in no event shall the Second Lien Agent or any Second Lien Claimholder exercise any rights or remedies with respect to the Collateral if, notwithstanding the expiration of the Standstill Period, the First Lien Agent or First Lien Claimholders shall have commenced and be diligently pursuing the exercise of their rights or remedies with respect to all or any material portion of the Collateral (prompt notice of such exercise to be given to the Second Lien Agent);

(2)    will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Agent or any First Lien Claimholder or any other exercise by the First Lien Agent or any First Lien Claimholder of any rights and remedies relating to the Collateral under the First Lien Loan Documents or otherwise; and

11

(3)  subject to their rights under clause (a)(1) above, will not object to the forbearance by the First Lien Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral, in each case so long as the Liens granted to secure the Second Lien Obligations of the Second Lien Claimholders attach to the proceeds thereof subject to the relative priorities described in Section 2.

(b)  Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, subject to Section 3.1(a)(1), the First Lien Agent and the First Lien Claimholders shall have the exclusive right to enforce rights, exercise remedies (including set-off, recoupment and the right to credit bid their debt) and, subject to Section 5.1, to make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Agent or any Second Lien Claimholder; provided, that the Lien securing the Second Lien Obligations shall remain on the proceeds of such Collateral released or disposed of subject to the relative priorities described in Section 2. In exercising rights and remedies with respect to the Collateral, the First Lien Agent and the First Lien Claimholders may enforce the provisions of the First Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC or any other applicable law and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction. Any payment or proceeds of Collateral received by the First Lien Agent or any First Lien Claimholder in connection with the First Lien Agent's exercise of rights or remedies in respect of Collateral shall be applied to the Obligations as provided in Section 4.1. To the extent the Second Lien Agent is expressly permitted hereunder to exercise rights or remedies in respect of the Collateral, then (x) in exercising rights and remedies with respect to the Collateral, the Second Lien Agent may enforce the provisions of the Second Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion and (y) such exercise and enforcement by the Second Lien Agent shall include the rights of an agent appointed by the Second Lien Agent to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC or any other applicable law and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(c)  Notwithstanding the foregoing, the Second Lien Agent and any Second Lien Claimholder may:

(1)  file a claim or statement of interest with respect to the Second Lien Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor;

12

(2)     take any action (not adverse to the priority status of the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Collateral;

(3)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)     vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Lien Obligations and the Collateral;

(5)     bid for or purchase for cash any Collateral at any private or public sale of such Collateral initiated by the First Lien Agent or any First Lien Claimholder;

(6)     join (but not control in any way) any foreclosure or other judicial lien enforcement proceeding with respect to any Collateral initiated by the First Lien Agent or any First Lien Claimholder so long as they do not delay, interfere or hinder in any way with the exercise by the First Lien Agent or the First Lien Claimholders of their rights as provided in the First Lien Loan Documents and this Agreement; or

(7)     exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period to the extent permitted by Section 3.1(a)(1).

The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off and recoupment) with respect to any Collateral in its capacity as a creditor, unless and until the Discharge of First Lien Obligations has occurred, except in connection with any foreclosure expressly permitted by Section 3.1(a)(1) to the extent the Second Lien Agent and Second Lien Claimholders are permitted to retain the proceeds thereof in accordance with Sections 4.1 and 4.2 of this Agreement. Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Sections 3.1(a), 4.1, 6.3(b) and this Section 3.1(c), the sole right of the Second Lien Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred.

(d)     Subject to Sections 3.1(a) and (c) and Section 6.3(b):

13

(1)     the Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, agrees that the Second Lien Agent and the Second Lien Claimholders will not take any action that would hinder any exercise of remedies under the First Lien Loan Documents or as otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise;

(2)     the Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner in which the First Lien Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens securing the First Lien Obligations granted in any of the First Lien Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the First Lien Agent or First Lien Claimholders is adverse to the interest of the Second Lien Claimholders; and

(3)     the Second Lien Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Lien Agent or the First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Credit Documents.

(e)     Except as specifically set forth in Sections 3.1(a), (d), and (g), the Second Lien Agent and the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against the Company or any other Grantor that has guaranteed or granted Liens to secure the Second Lien Obligations in accordance with the terms of the Second Lien Loan Documents and applicable law; provided that in the event that any Second Lien Claimholder becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Lien Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Lien Obligations) as the other Liens securing the Second Lien Obligations are subject to this Agreement.

(f)     Except as specifically set forth in Sections 3.1(a), (d), and (g), nothing in this Agreement shall prohibit the receipt by the Second Lien Agent or any Second Lien Claimholders of the required payments of interest, principal and other amounts owed in respect of the Second Lien Obligations so long as such receipt is not the direct or indirect result of the exercise by the Second Lien Agent or any Second Lien Claimholders of rights or remedies as a secured creditor (including set-off and recoupment) or enforcement in contravention of this Agreement of any Lien held by any of them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Agent or the First Lien Claimholders may have with respect to the First Lien Collateral.

14

(g)     The Second Lien Agent and the Second Lien Claimholders agree with the Grantors that none of the Grantors may make any payment to the Second Lien Agent or any Second Lien Claimholders in respect of the Second Lien Obligations (other than non-cash pay interest in kind, payments under Section 4.1 and payments in the form of reorganization securities contemplated by Section 6.6) until the Discharge of First Lien Obligations if:

(i)     a payment default on the First Lien Obligations occurs and is continuing beyond any applicable grace period in the applicable First Lien Loan Document and the Second Lien Agent and the Company receives written notice thereof from the First Lien Agent;

(ii)     any other default occurs (other than an Event of Default under Section 8.1(f) or 8.1(g)[1] of the First Lien Credit Agreement) and is continuing beyond any applicable grace period in the applicable First Lien Loan Document on the First Lien Obligations that permits the First Lien Claimholders to accelerate its maturity and the Second Lien Agent and the Company receive a notice thereof from the First Lien Agent (any such notice given pursuant to this clause (ii) (a "**Payment Blockage Notice**"); or

(iii)     an Event of Default occurs and is continuing under Section 8.1(f) or 8.1(g) of the First Lien Credit Agreement,

provided that, unless otherwise prohibited by this Section 3, the Grantors may resume payments in respect of the Second Lien Obligations upon the earlier of:

(i)     in the case of a payment default under clause (i) above, upon the earlier of (a) the Discharge of First Lien Obligations has occurred and (b) the date upon which such default is cured or waived;

(ii)     in the case of a nonpayment default under clause (ii) above, upon the earlier of (a) the Discharge of First Lien Obligations has occurred, (b) the date on which such nonpayment default is cured or waived, and (c) 180 days after the date on which the applicable Payment Blockage Notice is issued, unless the First Lien Obligations have been accelerated; or

(iii)     in the case of an Event of Default under clause (iii) above, upon the occurrence of the Discharge of First Lien Obligations.

**3.2     Actions Upon Breach.**     If any Second Lien Claimholder, in contravention of the terms of this Agreement, in any way takes, attempts to or threatens to take any action with respect to the Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fails to take any action required by this Agreement, this Agreement shall create an irrebuttable presumption

---

[1] Sections 8.1(f) and (g) are the bankruptcy default provisions.

NY3 - 503980.08

and admission by such Second Lien Claimholder that relief against such Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief is necessary to prevent irreparable harm to the First Lien Claimholders, it being understood and agreed by the Second Lien Agent on behalf of each Second Lien Claimholder that (i) the First Lien Claimholders' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Second Lien Claimholder waives any defense that the Grantors and/or the First Lien Claimholders cannot demonstrate damage and/or be made whole by the awarding of damages.

## SECTION 4. Payments.

**4.1**     Application of Proceeds.(a) So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies by the First Lien Agent or First Lien Claimholders shall be applied by the First Lien Agent to the First Lien Obligations in such order as specified in the relevant First Lien Loan Documents. Upon the Discharge of First Lien Obligations, the First Lien Agent shall deliver to the Second Lien Agent any Collateral and proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second Lien Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents.

(b) The First Lien Agent, on behalf of the First Lien Claimholders, and the Second Lien Agent, on behalf of the Second Lien Claimholders, acknowledge that mandatory prepayments under the First Lien Credit Agreement and the Second Lien Credit Agreement from proceeds from certain Asset Sales, insurance and condemnation payments and Excess Cash, as described in Section 2.14 of the First Lien Credit Agreement and Section 2.14 of the Second Lien Credit Agreement, shall be shared ratably between the First Lien Claimholders and the Second Lien Claimholders based on the then outstanding principal amount of the loans outstanding under the First Lien Credit Agreement and the Second Lien Credit Agreement, and that mandatory prepayments from proceeds from the incurrence by the Company or any of its Subsidiaries of certain Indebtedness as described in Section 2.14 of the First Lien Credit Agreement, shall be applied first to the payment of the First Lien Obligations until the Discharge of First Lien Obligations and then to the payment of the Second Lien Obligations.

**4.2**     Payments Over.(a)     So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Lien Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off or recoupment) relating to the Collateral in contravention of this Agreement in all cases shall be segregated and held in trust and forthwith paid over to the First Lien Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary

16

endorsements or as a court of competent jurisdiction may otherwise direct. The First Lien Agent is hereby authorized to make any such endorsements as agent for the Second Lien Agent or any such Second Lien Claimholders. This authorization is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations.

(b) So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Lien Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off or recoupment) relating to the Collateral not in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the First Lien Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct; provided, however, that this Section 4.2(b) shall only be applicable if the exercise of such right or remedy by the Second Lien Agent or any Second Lien Claimholder has the effect of discharging the Lien of the First Lien Agent on such Collateral. The First Lien Agent is hereby authorized to make any such endorsements as agent for the Second Lien Agent or any such Second Lien Claimholders. This authorization is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations.

(c) So long as the Discharge of First Lien Obligations has not occurred, if in any Insolvency or Liquidation Proceeding the Second Lien Agent or any Second Lien Claimholders shall receive any distribution of money or other property in respect of the Collateral, such money or other property shall be segregated and held in trust and forthwith paid over to the First Lien Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements. Any Lien received by the Second Lien Agent or any Second Lien Claimholders in any Insolvency or Liquidation Proceeding shall be subject to the terms of this Agreement.

## SECTION 5. Other Agreements.

5.1    Releases.(a)   If in connection with the exercise of the First Lien Agent's remedies in respect of the Collateral, the First Lien Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral or releases any Guarantor from its obligations under its guaranty of the First Lien Obligations or forecloses on or otherwise disposes of any Collateral, then the Liens, if any, of the Second Lien Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Guarantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released; provided, that such release of the Second Lien Agent will not occur without the consent of the Second Lien Agent if in connection with the exercise of the First Lien Agent's remedies in respect of the Collateral the net proceeds thereof will not be applied to the First Lien Obligations. The Second Lien Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Agent or such Guarantor

17

such termination statements, releases and other documents as the First Lien Agent or such Guarantor may request to effectively confirm such release.

(b)     If in connection with any sale, lease, exchange, transfer or other disposition of any Collateral by any Grantor permitted under the terms of the First Lien Loan Documents and not expressly prohibited under the terms of the Second Lien Loan Documents (other than in connection with the exercise of the First Lien Agent's remedies in respect of the Collateral which shall be governed by Section 5.1(a) above), the First Lien Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Guarantor from its obligations under its guaranty of the First Lien Obligations, then the Liens, if any, of the Second Lien Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Guarantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released. The Second Lien Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Agent or such Guarantor such termination statements, releases and other documents as the First Lien Agent or such Grantor may request to effectively confirm such release.

(c)     Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Agent or the First Lien Claimholders (i) have released any Lien on Collateral or any Guarantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any new liens or additional guarantees from any Guarantor, then the Second Lien Agent, for itself and for the Second Lien Claimholders, shall be granted a Lien on any such Collateral, subject to the lien subordination provisions of this Agreement, and an additional guaranty, as the case may be.

(d)     Until the Discharge of First Lien Obligations occurs, the Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Agent, with the full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Agent or the Second Lien Claimholders or in the Second Lien Agent's own name, from time to time in the First Lien Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.

5.2     Insurance.Unless and until the Discharge of First Lien Obligations has occurred, the First Lien Agent and the First Lien Claimholders shall have the sole and exclusive right, subject to any rights of the Grantors under the First Lien Loan Documents, to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral. Subject to the ratable sharing provision in Section 4.1(b), and subject to the rights of the Grantors under the First Lien Loan Documents and the Second Lien Loan Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of

18

condemnation) if in respect to the Collateral shall be paid to the First Lien Agent for the benefit of the First Lien Claimholders pursuant to the terms of the First Lien Loan Documents (including for purposes of cash collateralization of letters of credit) and thereafter, to the extent no First Lien Obligations are outstanding, and subject to the rights of the Grantors under the Second Lien Loan Documents, to the Second Lien Agent for the benefit of the Second Lien Claimholders to the extent required under the Second Lien Collateral Documents and then, to the extent no Second Lien Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. Until the Discharge of First Lien Obligations has occurred, if the Second Lien Agent or any Second Lien Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the First Lien Agent in accordance with the terms of Section 4.2 for application as described in Section 4.1(b) and this Section 5.2.

5.3    Amendments to First Lien Loan Documents and Second Lien Loan Documents.(a) The First Lien Loan Documents may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with their terms, in each case, without notice to, or the consent of the Second Lien Agent or the Second Lien Claimholders, all without affecting the lien subordination or other provisions of this Agreement or refinanced to the extent permitted by the Second Lien Credit Agreement; provided, however, that any such amendment, restatement, amendment and restatement, supplement, modification or refinancing shall not, without the consent of the Second Lien Agent:

(1)    increase the sum of (without duplication) (A) the then outstanding aggregate principal amount of the First Lien Credit Agreement (including, if any, any undrawn portion of any commitment under the First Lien Credit Agreement) and (B) the aggregate face amount of any letters of credit issued under the First Lien Credit Agreement and not reimbursed in excess of the Cap Amount;

(2)    extend the scheduled maturity of the First Lien Credit Agreement beyond the scheduled maturity of the Second Lien Credit Agreement, unless such extension shall not preclude the Second Lien Claimholders from receiving payment in respect of the Second Lien Obligations in accordance with the terms of this Agreement;

(3)    contravene the provisions of this Agreement;

(4)    change the prepayment provisions thereof;

(5)    increases the amount of proceeds from the disposition of any Collateral that are not required to be used to prepay First Lien Obligations and that may be retained by the Grantors to an amount greater than permitted under the Second Lien Credit Agreement; or

19

(6)    modifies a covenant or event of default that directly restricts one or more Grantors from making payments under the Second Lien Loan Documents that would otherwise be permitted under the First Lien Loan Documents as in effect on the date hereof.

(b)    Without the prior written consent of the First Lien Agent, no Second Lien Loan Document may be refinanced, amended, restated, amended and restated, supplemented or otherwise modified or entered into to the extent such refinancing, amendment, restatement, amendment and restatement, supplement or modification, or the terms of any new Second Lien Loan Document, would:

(1)    increase the then outstanding principal amount of the Second Lien Credit Agreement;

(2)    change any default or Event of Default thereunder in a manner adverse to the loan parties thereunder;

(3)    change (to earlier dates) any dates upon which payments of principal or interest are due thereon, except for any acceleration of the maturity date of the Second Lien Obligations during the continuance of an Event of Default (as defined in the Second Lien Credit Agreement);

(4)    change the prepayment provisions thereof;

(5)    contravene the provisions of this Agreement; or

(6)    increase materially the obligations of the obligor thereunder or to confer any additional material rights on the Second Lien Lenders (or a representative on their behalf) which would be adverse to any loan parties, any First Lien Lenders, the First Lien Agent or the holders of any other First Lien Obligations.

(c)    Each Grantor agrees that each Second Lien Collateral Document to which it is a party shall include the following language (or language to similar effect approved by the First Lien Agent, which approval shall not be unreasonably withheld, delayed or conditioned):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second Lien Agent pursuant to this Agreement and the exercise of any right or remedy by the Second Lien Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of [_____,] 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Citicorp North America, Inc. as First Lien Agent and Citicorp North America, Inc. as Second Lien Agent and certain other persons party or that may become party thereto from time to time. In the event of any conflict

20

between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(d)     In the event any First Lien Agent or the First Lien Claimholders and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Lien Collateral Document or changing in any manner the rights of the First Lien Agent, such First Lien Claimholders, the Company or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Lien Collateral Document without the consent of the Second Lien Agent or the Second Lien Claimholders and without any action by the Second Lien Agent, the Company or any other Grantor, provided, that:

of:

(1)     no such amendment, waiver or consent shall have the effect

(A)     removing assets subject to the Lien of the Second Lien Collateral Documents, except to the extent that a release of such Lien is permitted or required by Section 5.1 and provided that there is a corresponding release of the Liens securing the First Lien Obligations;

(B)     imposing duties on the Second Lien Agent without its consent;

(C)     permitting other Liens on the Collateral not permitted under the terms of the Second Lien Loan Documents or Section 6; or

(D)     being prejudicial to the interests of the Second Lien Claimholders to a greater extent than the First Lien Claimholders; and

(2)     notice of such amendment, waiver or consent shall have been given to the Second Lien Agent no later than the effective date of such amendment, waiver or consent.

5.4     Gratuitous Bailee for Perfection.(a)     The First Lien Agent agrees to hold that part of the Collateral that is in its physical possession or "control" (within the meaning of Section 9-314 of the UCC) (or in the physical possession or control of its agents or bailees) to the extent that physical possession or control thereof is taken to perfect a Lien thereon under the UCC (such Collateral being the "**Pledged Collateral**") or other applicable law as collateral agent for the First Lien Claimholders and as gratuitous bailee for the Second Lien Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC and any other relevant comparable law) and any assignee solely for the purpose of perfecting the security interest granted under the First Lien Loan Documents and the Second Lien Loan Documents, respectively, subject to the terms and conditions of this Section 5.4. Solely with respect to any deposit accounts under the control (within the meaning of Section 9-

21

104 of the UCC and under any other relevant comparable law) of the First Lien Agent, the First Lien Agent agrees to also hold control over such deposit accounts as gratuitous agent for the Second Lien Agent, subject to the terms and conditions of this Section 5.4.

(b)     The First Lien Agent shall have no obligation whatsoever to the First Lien Claimholders, the Second Lien Agent or any Second Lien Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The duties or responsibilities of the First Lien Agent under this Section 5.4 shall be limited solely to holding the Pledged Collateral as bailee (and with respect to deposit accounts, agent) in accordance with this Section 5.4 and delivering the Pledged Collateral upon a Discharge of First Lien Obligations as provided in paragraph (d) below.

(c)     The First Lien Agent shall not have by reason of the First Lien Collateral Documents, the Second Lien Collateral Documents, this Agreement or any other document a fiduciary relationship in respect of the First Lien Claimholders, the Second Lien Agent or any Second Lien Claimholder and the Second Lien Agent and the Second Lien Claimholders hereby waive and release the First Lien Agent from all claims and liabilities arising pursuant to the First Lien Agent's role under this Section 5.4 as gratuitous bailee and gratuitous agent with respect to any common Collateral. It is understood and agreed that the interests of the First Lien Agent and the Second Lien Agent may differ and the First Lien Agent shall be fully entitled to act in its own interest without taking into account the interests of the Second Lien Agent or Second Lien Claimholders.

(d)     Upon the Discharge of First Lien Obligations under the First Lien Loan Documents to which the First Lien Agent is a party, the First Lien Agent shall deliver the remaining Pledged Collateral in its possession (if any) together with any necessary endorsements (such endorsement shall be without recourse and without any representation or warranty), first, to the Second Lien Agent to the extent Second Lien Obligations remain outstanding, and second, to the Company to the extent no First Lien Obligations or Second Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral). The First Lien Agent further agrees to take all other action reasonably requested by the Second Lien Agent at the expense of the Second Lien Agent or the Company in connection with the Second Lien Agent obtaining a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

5.5     Purchase Right. Without prejudice to the enforcement of the First Lien Claimholders remedies, the First Lien Claimholders agree at any time following (a) an acceleration of the First Lien Obligations in accordance with the terms of the First Lien Credit Agreement, (b) a payment default under the First Lien Credit Agreement that has not been cured or waived by the First Lien Claimholders within 180 days of the occurrence thereof, (c) the commencement of any Insolvency or Liquidation Proceeding, or (d) the commencement of any enforcement action in respect of the First Lien Obligations, the First Lien Agent, on behalf of the First Lien Claimholders, will offer the Second Lien Claimholders the option (but the Second Lien Claimholders will not have the obligation) to purchase the entire aggregate amount of outstanding First Lien Obligations (including

22

unfunded commitments under the First Lien Credit Agreement) at par plus accrued interest (without regard to any prepayment penalty or premium), without warranty or representation or recourse, on a pro rata basis across First Lien Claimholders. The Second Lien Claimholders shall irrevocably accept or reject such offer within ten (10) Business Days of the receipt thereof and the parties shall endeavor to close promptly thereafter. If the Second Lien Claimholders accept such offer, they shall give the Company contemporaneous written notice thereof and same shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Agent and the Second Lien Agent. If the Second Lien Claimholders reject such offer (or do not so irrevocably accept such offer within the required timeframe), the First Lien Claimholders shall have no further obligations pursuant to this Section 5.6 and may take any further actions in their sole discretion in accordance with the First Lien Loan Documents and this Agreement.

## SECTION 6. Insolvency or Liquidation Proceedings.

6.1 Finance and Sale Issues.Until the Discharge of First Lien Obligations has occurred, if the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code), on which the First Lien Agent or any other creditor has a Lien or to permit the Company or any other Grantor to obtain financing, whether from the First Lien Claimholders or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law ("DIP Financing"), then the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to such Cash Collateral use or DIP Financing and to the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing, the Second Lien Agent will subordinate its Liens in the Collateral to the Liens securing such DIP Financing (and all Obligations relating thereto) and will not request adequate protection or any other relief in connection therewith (except, as expressly agreed by the First Lien Agent or to the extent permitted by Section 6.3); provided that, the aggregate principal amount of the DIP Financing plus the aggregate outstanding principal amount of First Lien Obligations (other than First Lien Obligations in respect of Hedge Agreements) plus the aggregate face amount of any letters of credit issued and not reimbursed under the First Lien Credit Agreement does not exceed the Cap Amount and the Second Lien Agent and the Second Lien Claimholders retain the right to object to any ancillary agreements or arrangements regarding Cash Collateral use or the DIP Financing that are materially prejudicial to their interests. The Second Lien Agent on behalf of the Second Lien Claimholders, agrees that it will raise no objection or oppose a motion to sell or otherwise dispose of any Collateral free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code (or any other similar law) if the requisite First Lien Claimholders have consented to such sale or disposition of such assets, and such motion does not impair the rights of the Second Lien Claimholders under Section 363(k) of the Bankruptcy Code (or any other similar law); provided, that the Cap Amount shall be reduced by an amount equal to the net cash

23

proceeds of such sale or other disposition which are used to pay the principal or face amount of the First Lien Obligations.

**6.2** Relief from the Automatic Stay.Until the Discharge of First Lien Obligations has occurred, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Lien Agent, unless a motion for adequate protection permitted under Section 6.3 has been denied by the Bankruptcy Court and except in connection with any remedies permitted to be taken by the Second Lien Agent pursuant to Section 3.1(a)(1).

**6.3** Adequate Protection.The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(1) any request by the First Lien Agent or the First Lien Claimholders for adequate protection; or

(2) any objection by the First Lien Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Agent or the First Lien Claimholders claiming a lack of adequate protection.

(b) Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency or Liquidation Proceeding:

(1) if the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any Cash Collateral use or DIP Financing, then the Second Lien Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the Liens securing the First Lien Obligations and such Cash Collateral use or DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the First Lien Obligations under this Agreement and the First Lien Agent, on behalf of itself and the First Lien Claimholders, shall not object to any such request for adequate protection that meets the requirements of Section 6.3(b)(2); and

(2) The Second Lien Agent and Second Lien Claimholders shall only be permitted to seek adequate protection with respect to their rights in the Collateral in any Insolvency or Liquidation Proceeding in the form of (A) additional collateral; provided that, as adequate protection for the First Lien Obligations, the First Lien Agent, on behalf of the First Lien Claimholders, is also granted a senior Lien on such additional collateral; (B) replacement Liens on the Collateral; provided that, as adequate protection for the First Lien Obligations, the First Lien Agent, on behalf of the First Lien Claimholders, is also granted senior replacement Liens on the Collateral; (C) an administrative expense claim; provided that, as

24

adequate protection for the First Lien Obligations, the First Lien Agent, on behalf of the First Lien Claimholders, is also granted an administrative expense claim which is senior and prior to the administrative expense claim of the Second Lien Agent and the Second Lien Claimholders; (D) a claim for professional fees and expenses in any Insolvency or Liquidation Proceeding; provided that, as adequate protection for the First Lien Obligations, the First Lien Agent, on behalf of the First Lien Claimholders, is also granted a claim for professional fees and expenses which is senior and prior to the claim for professional fees and expenses of the Second Lien Agent and the Second Lien Claimholders; (E) cash payments with respect to interest on the Second Lien Obligations; provided either (1) as adequate protection for the First Lien Obligations, the First Lien Agent, on behalf of the First Lien Claimholders, is also granted cash payments with respect to interest on the First Lien Obligations, or (2) such cash payments do not exceed an amount equal to the interest accruing on the principal amount of Second Lien Obligations outstanding on the date such relief is granted at the interest rate under the Second Lien Credit Documents and accruing from the date the Second Lien Agent is granted such relief; and (F) any other form of adequate protection; provided that, as adequate protection for the First Lien Obligations, the First Lien Agent, on behalf of the First Lien Claimholders, is also granted a claim for such form of adequate protection which is senior and prior to the claim for such form of adequate protection of the Second Lien Agent and the Second Lien Claimholders. If any Second Lien Secured Party receives post-petition interest and/or adequate protection payments in an Insolvency or Liquidation Proceeding ("Second Lien Adequate Protection Payments"), and the First Lien Claimholders do not receive payment in full in cash of all First Lien Obligations (subject, in the case of principal outstanding under the First Lien Credit Agreement and the other First Lien Documents and face amounts of letters of credit, to the Cap Amount) upon the effectiveness of the plan of reorganization for, or conclusion of, that Insolvency or Liquidation Proceeding, then, each Second Lien Claimholders shall pay over to the First Lien Claimholders an amount (the "Pay-Over Amount") equal to the lesser of (i) the Second Lien Adequate Protection Payments received by such Second Lien Claimholders and (ii) the amount of the short-fall (the "Short Fall") in payment in full of the First Lien Loan Obligations (subject, in the case of principal outstanding under the First Lien Credit Agreement and the other First Lien Documents and face amounts of letters of credit, to the Cap Amount); provided that to the extent any portion of the Short Fall represents payments received by the First Lien Claimholders in the form of promissory notes, equity or other property, equal in value to the cash paid in respect of the Pay-Over Amount, the First Lien Claimholders shall, upon receipt of the Pay-Over Amount, transfer those promissory notes, equity or other property, pro rata, equal in value to the cash paid in respect of the Pay-Over Amount to the applicable Second Lien Claimholders in exchange for the Pay-Over Amount. Notwithstanding anything herein to the contrary, the First Lien Claimholders shall not be deemed to have consented to, and expressly retain their rights to object to the grant of adequate protection in the form of cash payments to the Second Lien Claimholders made pursuant to the foregoing Section 6.3(b).

25

(c)     The Second Lien Agent, for itself and on behalf of the other Second Lien Claimholders, agrees that notice of a hearing to approve DIP Financing or use of Cash Collateral on an interim basis shall be adequate if delivered to the Second Lien Agent at least five (5) Business Days in advance of such hearing and that notice of a hearing to approve DIP Financing or use of Cash Collateral on a final basis shall be adequate if delivered to the Second Lien Agent at least fifteen (15) days in advance of such hearing.

6.4     No Waiver.Subject to Sections 3.1(a) and (d), 6.3(b) and 6.7(d), nothing contained herein shall prohibit or in any way limit the First Lien Agent or any First Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Lien Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Loan Documents or otherwise.

6.5     Avoidance Issues.If any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor any amount paid in respect of First Lien Obligations (a "Recovery"), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts, and from and after the date of such reinstatement the Discharge of First Lien Obligations shall be deemed not to have occurred for all purposes hereunder. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

6.6     Reorganization Securities.If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

6.7     Post-Petition Interest.Neither the Second Lien Agent nor any Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Agent or any First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of Post-Petition Interest to the extent of the value of any First Lien Claimholder's Lien, without regard to the existence of the Lien of the Second Lien Agent on behalf of the Second Lien Claimholders on the Collateral.

(b)     Neither the First Lien Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Agent or any Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien

26

Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of the Second Lien Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account the value of the First Lien Obligations).

6.8   Waiver.The Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it may hereafter have against any First Lien Claimholder arising out of the election of any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

6.9   Separate Grants of Security and Separate Classification.The Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, and the First Lien Agent for itself and on behalf of the First Lien Claimholders, acknowledges and agrees that

(a)   the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens; and

(b)   because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and the Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1 and 4.1, all distributions shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Collateral (with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Lien Claimholders), the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing (or that would be owing if there were such separate classes of senior and junior secured claims) in respect of Post-Petition Interest, including any additional interest payable pursuant to the First Lien Credit Agreement, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding) before any distribution is made in respect of the claims held by the Second Lien Claimholders with respect to the Collateral, with the Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, hereby acknowledging and agreeing to turn over to the First Lien Agent, for itself and on behalf of the First Lien Claimholders, Collateral or proceeds of Collateral otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders).

27

**6.10** Credit Bid Rights. Notwithstanding anything herein to the contrary, this Agreement shall not be construed to prohibit the Second Lien Claimholders from exercising a credit bid under Section 363(k) of the Bankruptcy Code in a sale or other disposition of Collateral under Section 363 of the Bankruptcy Code; provided that in connection with and immediately after giving effect to such sale and credit bid there occurs a Discharge of First Priority Obligations.

### SECTION 7. Reliance; Waivers; Etc.

**7.1** Reliance.Other than any reliance on the terms of this Agreement, the First Lien Agent, on behalf of itself and the First Lien Claimholders under its First Lien Loan Documents, acknowledges that it and such First Lien Claimholders have, independently and without reliance on the Second Lien Agent or any Second Lien Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First Lien Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement or this Agreement. The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Second Lien Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Loan Documents or this Agreement.

**7.2** No Warranties or Liability. The First Lien Agent, on behalf of itself and the First Lien Claimholders under the First Lien Loan Documents, acknowledges and agrees that each of the Second Lien Agent and the Second Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Except as otherwise provided herein, the Second Lien Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the First Lien Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Agent and the Second Lien Claimholders shall have no duty to the First Lien Agent or any of the First Lien Claimholders, and the First Lien Agent and the First Lien Claimholders shall have no duty to the Second Lien

28

Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any other Grantor (including the First Lien Loan Documents and the Second Lien Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

7.3  No Waiver of Lien Priorities.(a)  No right of the First Lien Claimholders, the First Lien Agent or any of them to enforce any provision of this Agreement or any First Lien Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or any other Grantor or by any act or failure to act by any First Lien Claimholder or the First Lien Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Loan Documents or any of the Second Lien Loan Documents, regardless of any knowledge thereof which the First Lien Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

(b)  Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Company and the other Grantors under the First Lien Loan Documents and subject to the provisions of Section 5.3(a)), the First Lien Claimholders, the First Lien Agent and any of them may, at any time and from time to time in accordance with the First Lien Loan Documents and/or applicable law, without the consent of, or notice to, the Second Lien Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(1)  change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of the Company or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Agent or any of the First Lien Claimholders, the First Lien Obligations or any of the First Lien Loan Documents; provided that any such increase in the First Lien Obligations shall not increase the sum of the Indebtedness constituting principal under the First Lien Credit Agreement and the face amount of any letters of credit issued under the First Lien Credit Agreement and not reimbursed to an amount in excess of the Cap Amount;

(2)  sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the First Lien Collateral or any liability of the Company or any other Grantor to the First Lien

29

Claimholders or the First Lien Agent, or any liability incurred directly or indirectly in respect thereof;

(3) settle or compromise any First Lien Obligation or any other liability of the Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order; and

(4) exercise or delay in or refrain from exercising any right or remedy against the Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with the Company, any other Grantor or any First Lien Collateral and any security and any guarantor or any liability of the Company or any other Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof.

(c) Except as otherwise expressly provided herein, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the First Lien Claimholders and the First Lien Agent shall have no liability to the Second Lien Agent or any Second Lien Claimholders, and the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against any First Lien Claimholder or the First Lien Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Agent may take or permit or omit to take with respect to:

(1) the First Lien Loan Documents (other than this Agreement);

(2) the collection of the First Lien Obligations; or

(3) the foreclosure upon, or sale, liquidation or other disposition of, any First Lien Collateral. The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Agent have no duty to them in respect of the maintenance or preservation of the First Lien Collateral, the First Lien Obligations or otherwise.

(d) Until the Discharge of First Lien Obligations, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

7.4 Obligations Unconditional.All rights, interests, agreements and obligations of the First Lien Agent and the First Lien Claimholders and the Second Lien Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

30

(a)     any lack of validity or enforceability of any First Lien Loan Documents or any Second Lien Loan Documents;

(b)     except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Loan Document or any Second Lien Loan Document;

(c)     except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guaranty thereof;

(d)     the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the First Lien Agent, the First Lien Obligations, any First Lien Claimholder, the Second Lien Agent, the Second Lien Obligations or any Second Lien Claimholder in respect of this Agreement.

### SECTION 8. Miscellaneous.

8.1     Conflicts.In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Loan Documents or the Second Lien Loan Documents, the provisions of this Agreement shall govern and control.

8.2     Effectiveness; Continuing Nature of this Agreement; Severability.This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any time and without notice to the Second Lien Agent or any Second Lien Claimholder subject to the Second Lien Loan Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereof. The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor

31

(as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect:

(a) with respect to the First Lien Agent, the First Lien Claimholders and the First Lien Obligations, the date of Discharge of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 6.5; and

(b) with respect to the Second Lien Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Credit Agreement terminate if there are no other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate.

**8.3** Amendments; Waivers.No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Agent or the First Lien Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, the Company shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent the rights or obligations of the Company or any other Grantor are affected. The Company shall be given notice and copies of all amendments, modifications and waivers hereof or hereunder.

**8.4** Information Concerning Financial Condition of the Company and its Subsidiaries.. (a) The First Lien Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of the Company and its Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations.

(b) The First Lien Agent and the First Lien Claimholders shall have no duty to advise the Second Lien Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the First Lien Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Agent or any Second Lien Claimholder, it or they shall be under no obligation:

(i) to make, and the First Lien Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

32

(ii) to provide any additional information or to provide any such information on any subsequent occasion;

(iii) to undertake any investigation; or

(iv) to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

(c) The Second Lien Agent and the Second Lien Claimholders shall have no duty to advise the First Lien Agent or any First Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the Second Lien Agent or any of the Second Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the First Lien Agent or any First Lien Claimholder, it or they shall be under no obligation:

(i) to make, and the Second Lien Agent and the Second Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(ii) to provide any additional information or to provide any such information on any subsequent occasion;

(iii) to undertake any investigation; or

(iv) to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

**8.5** Subrogation. With respect to the value of any payments or distributions in cash, property or other assets that any of the Second Lien Claimholders or the Second Lien Agent pays over to the First Lien Agent or the First Lien Claimholders under the terms of this Agreement, the Second Lien Claimholders and the Second Lien Agent shall be subrogated to the rights of the First Lien Agent and the First Lien Claimholders; provided that, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred. Each Grantor acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by the Second Lien Agent or the Second Lien Claimholders that are paid over to the First Lien Agent or the First Lien Claimholders pursuant to this Agreement shall not reduce any of the Second Lien Obligations.

**8.6** Application of Payments. All payments received by the First Lien Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or

33

in part, to such part of the First Lien Obligations provided for in the First Lien Loan Documents. The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor, except as expressly set forth in Section 5.3 of this Agreement.

**8.7** SUBMISSION TO JURISDICTION; WAIVERS.**(a)** **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY:**

**(1)** **ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;**

**(2)** **WAIVES ANY DEFENSE OF FORUM NON CONVENIENS;**

**(3)** **AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 8.8; AND**

**(4)** **AGREES THAT SERVICE AS PROVIDED IN CLAUSE (3) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.**

**(b)** **EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND**

34

REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE; MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.7(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c) **EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FIRST LIEN LOAN DOCUMENT OR SECOND LIEN LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.**

**8.8** Notices.All notices to the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Second Lien Agent and the First Lien Agent, respectively. Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as set forth in the First Lien Credit Agreement and the Second Lien Credit Agreement, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

**8.9** Further Assurances.The First Lien Agent, on behalf of itself and the First Lien Claimholders under the First Lien Loan Documents, and the Second Lien Agent, on behalf of itself and the Second Lien Claimholders under the Second Lien Loan Documents, and the Company and the other Grantors, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Agent or the Second Lien Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

**8.10** APPLICABLE LAW.THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY RELATING TO THE SUBJECT MATTER HEREOF WHETHER SOUNDING IN CONTRACT LAW OR TORT LAW, SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

35

**8.11**   Binding on Successors and Assigns.This Agreement shall be binding upon the First Lien Agent, the First Lien Claimholders, the Second Lien Agent, the Second Lien Claimholders and their respective successors and assigns. If either of the First Lien Agent or the Second Lien Agent resigns or is replaced pursuant to the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable, its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.

**8.12**   Specific Performance.Each of the First Lien Agent and the Second Lien Agent may demand specific performance of this Agreement. The First Lien Agent, on behalf of itself and the First Lien Claimholders under the First Lien Loan Documents, and the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First Lien Agent or the First Lien Claimholders or the Second Lien Agent or the Second Lien Claimholders, as the case may be.

**8.13**   Headings.Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.14**   Counterparts.This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by electronic transmission or "PDF" shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.15**   Authorization.Each party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.16**   No Third Party Beneficiaries.This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Claimholders and the Second Lien Claimholders. Nothing in this Agreement shall impair, as between the Company and the other Grantors and the First Lien Agent and the First Lien Claimholders, or as between the Company and the other Grantors and the Second Lien Agent and the Second Lien Claimholders, the obligations of the Company and the other Grantors to pay principal, interest, fees and other amounts as provided in the First Lien Loan Documents and the Second Lien Loan Documents, respectively.

**8.17**   Provisions Solely to Define Relative Rights.The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Agent and the First Lien Claimholders on the one hand and the Second Lien Agent and the Second Lien Claimholders on the other hand. Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor, which are

36

absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

8.18    Multiple Capacities. The First Lien Claimholders, the Second Lien Claimholders, the Grantors and all other parties hereto, hereby (i) acknowledge that Citicorp North America, Inc. is acting hereunder and under the First Lien Loan Documents, the Second Lien Loan Documents and the facilities described therein in multiple capacities for multiple parties and (ii) waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against Citicorp North America, Inc. any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto. Each Party agrees that Citicorp North America, Inc., in its various capacities hereunder, may take such actions on its behalf as is contemplated by the terms of thereof. Citicorp North America, Inc. may, in such multiple capacities, discharge its separate functions fully, without hindrance, liability or regard to claims based on conflict of interest principles, duty of loyalty principles or other breach of duties principles arising from or based on its acting in such multiple capacities. In furtherance thereof, each party hereto expressly waives all defenses, claims or assertions it may have against Citicorp North America, Inc. that are based on any such claims.

8.19    Austrian Stamp Duty

Notwithstanding the foregoing, each of the parties hereto covenants and agrees that it will not send, or cause to be sent, bring or cause to be brought, or otherwise import, or cause otherwise to be imported, into the Republic of Austria any original counterpart or certified or conformed copy of any executed First Lien Loan Documents or Second Lien Loan Documents (for the purposes of this Section 8.19, together, the "Loan Documents") or any document constituting or evidencing any transfer by any party of any right or interest under any Loan Document, or make use of any Loan Document or document before any fiscal or governmental authority or agency or any court of Austria; provided that, any party may, at the joint and several cost and expense of the Credit Parties as defined in the First Lien Credit Agreement if with respect to any executed First Lien Loan Documents or the Credit Parties as defined in the Second Lien Credit Agreement if with respect to any executed Second Lien Loan Document, send, or cause to be sent, bring, or cause to be brought, or otherwise import, or cause otherwise to be imported, any such Loan Document or document into the Republic of Austria if required to do so by applicable law or if such Loan Document or document is required to be presented in Austria in order to assist, enforce, protect or preserve any right of or remedy available to such party arising under or in respect of any of the Loan Documents or applicable law.

Each of the parties further agrees not to: (i) object to the introduction into evidence of (a) any uncertified copy of a signed original of a Loan Document or notarized or certified copy thereof or (b) any written minutes recording the transactions contemplated by a Loan Document and signed by a party or its representative (for the purpose of this Section 8.19, each an "Original"); (ii) raise as a defense to any action or exercise of a remedy a failure to introduce an Original into evidence; (iii) object to the submission of any uncertified copy of a Loan Document in any proceedings relating to a dispute before any

court, arbitral body or governmental authority in Austria (for the purpose of this Section 8.19, the "Proceedings"); (iv) contest the authenticity, and conformity to the Original *(Ubereinstimmung mit dem echten Original),* of an uncertified copy of an Original, in each case, unless any such uncertified copy actually introduced into evidence in Proceedings does not accurately reflect the content of such Original.

[Remainder of Page Intentionally Left Blank]

38

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

**First Lien Agent**

**CITICORP NORTH AMERICA, INC.,**
as First Lien Agent

By:_____
    Name:
    Title:

S-1

**Second Lien Agent**

**CITICORP NORTH AMERICA, INC.,**
as Second Lien Agent

By:_____
     Name:
     Title:

NY2 - 503980.08

**Acknowledged and Agreed to by:**

**XERIUM TECHNOLOGIES, INC.,**

By:_____
    Name:
    Title:

**XTI LLC**

By:_____
    Name:
    Title:

**XERIUM ITALIA S.P.A.**

By:_____
    Name:
    Title:

**XERIUM CANADA INC.**

By:_____
    Name:
    Title:

**HUYCK.WANGNER AUSTRIA GMBH**

By:_____
    Name:
    Title:

**XERIUM GERMANY HOLDING GMBH**

By:_____
    Name:
    Title:

**HUYCK.WANGNER GERMANY GMBH**

S-3

By:_____
   Name:
   Title:

**HUYCK.WANGNER AUSTRALIA PTY LIMITED**

By:_____
   Name:
   Title:
By:_____
   Name:
   Title:

**ROBEC WALZEN GMBH**

By:_____
   Name:
   Title:

**WANGNER ITELPA PARTICIPAÇÕES LTDA.**

By:_____
   Name:
   Title:

**XERIUM TECHNOLOGIES DO BRASIL INDÚSTRIA E COMÉRCIO S.A.**

By:_____
   Name:
   Title:

**XERIUM DO BRASIL LTDA.**

By:_____
   Name:
   Title:

**XERIUM (FRANCE) SAS**

By:_____

NY3 - 503990.08

Name:
Title:

**STOWE WOODWARD FRANCE SAS**

By:_____
   Name:
   Title:

**STOWE WOODWARD AG**

By:_____
   Name:
   Title:

**HUYCK. WANGNER JAPAN LIMITED**

By:_____
   Name:
   Title:

**STOWE WOODWARD MÉXICO, S.A. DE C.V.**

By:_____
   Name:
   Title:

**HUYCK. WANGNER UK LIMITED**

By:_____
   Name:
   Title:

**STOWE-WOODWARD (UK) LIMITED**

By:_____
   Name:
   Title:

5

**XERIUM TECHNOLOGIES LIMITED**

By:_____
    Name:
    Title:


**HUYCK LICENSCO INC.**

By:_____
    Name:
    Title:


**STOWE WOODWARD LLC**

By:_____
    Name:
    Title:


**STOWE WOODWARD LICENSCO LLC**

By:_____
    Name:
    Title:


**WEAVEXX, LLC**

By:_____
    Name:
    Title:


**XERIUM III (US) LIMITED**

By:_____
    Name:
    Title:

**XERIUM IV (US) LIMITED**

6

By:_____
    Name:
    Title:

## XERIUM V (US) LIMITED

By:_____
    Name:
    Title:

## WANGNER ITELPA I LLC

By:_____
    Name:
    Title:

## WANGNER ITELPA II LLC

By:_____
    Name:
    Title:

## XERIUM ASIA LLC

By:_____
    Name:
    Title:

## ROBEC BRAZIL LLC

By:_____
    Name:
    Title:

## HUYCK WANGNER VIETNAM CO LTD

By:_____
    Name:

7

Title:

**HUYCK WANGNER SCANDINAVIA AB**

By:_____

    Name:

    Title:

**STOWE WOODWARD SWEDEN AB**

By:_____

    Name:

    Title:

8

## [FORM OF CLOSING DATE CERTIFICATE]

## CLOSING DATE CERTIFICATE

### EACH OF THE UNDERSIGNED HEREBY CERTIFY AS FOLLOWS:

1. I am the Vice President and Treasurer of XERIUM TECHNOLOGIES, INC. (the "Borrower").

2. Reference is made to the Superpriority Priming Senior Secured Debtor-in-Possession Credit and Guaranty Agreement, dated as of March [__], 2010 (as it may be amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement"), among Xerium Technologies, Inc., as debtor and debtor-in-possession, as Borrower, the companies named therein as Guarantors, Citigroup Global Markets Inc. as Sole Lead Arranger and Sole Bookrunner, Citicorp North America, Inc. as Collateral Agent and as Administrative Agent, and the other Banks party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Credit Agreement. I have reviewed the terms of Section 3 of the Credit Agreement and the definitions and provisions contained in the Credit Agreement relating thereto, and in my opinion I have made, or have caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein.

3. Based upon my review and examination described in paragraph 2 above, I certify, on behalf of Borrower, that as of the date hereof:

(i)     as of the Closing Date, the representations and warranties contained in each of the Credit Documents are true, correct and complete in all material respects on and as of the Closing Date to the same extent as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true, correct and complete in all material respects on and as of such earlier date;

(ii)    as of the Closing Date, there exists no action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that singly or in the aggregate, materially impairs the transactions contemplated by the Credit Documents or that could have a Material Adverse Effect.

(iii)   as of the Closing Date, no event has occurred and is continuing or would result from the consummation of the borrowing contemplated hereby that would constitute a Default or Event of Default.

EXHIBIT L-1

4. Attached hereto as Annex A are true, complete and correct copies of the Historical Financial Statements.

5. Attached hereto as Annex B is a true, complete and correct copy of the DIP Budget.

6. The Debtors have filed voluntary petitions in the Bankruptcy Court for relief and commenced the Cases under chapter 11 of the Bankruptcy Code.

7. The Debtors has received the requisite votes needed to confirm the Prepackaged Plan of Reorganization of the Debtors pursuant to chapter 11 of the Bankruptcy Code.

8. Attached hereto as Annex C is a true, correct and complete copy of the Interim Order.

[Remainder of page intentionally left blank.]

EXHIBIT L-2

The foregoing certifications are made and delivered as of _____, 2010.

**XERIUM TECHNOLOGIES, INC.,**
as debtor and debtor-in-possession, as Borrower

By: _____
Name:
Title: Vice President and Treasurer

EXHIBIT L-3

EXHIBIT M TO
SUPERPRIORITY PRIMING SENIOR
SECURED DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT

**[FORM OF WEEKLY CASHFLOW FORECAST]**

[SEE ATTACHED; TO BE UPDATED]

EXHIBIT M-1

USD

| 22-Mar | 29-Mar | 5-Apr | 12-Apr | 19-Apr | 26-Apr | 3-May | 10-May | 17-May | 24-May | 31-May | 7-Jun | 14-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |